# EXHIBIT B

**EDGAR** Online

# OCEAN RIG UDW INC.

## FORM F-4/A
(Amended Securities Registration (foreign private issuer))

## Filed 10/11/11

| | |
|---|---|
| Telephone | 011 357 22767517 |
| CIK | 0001447382 |
| Symbol | ORIG |
| SIC Code | 1381 - Drilling Oil and Gas Wells |

Powered By **EDGAR** Online

http://www.edgar-online.com

© Copyright 2011, EDGAR Online, Inc. All Rights Reserved.

Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

As filed with the Securities and Exchange Commission on October 11, 2011

Registration No. 333-176641

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Amendment No. 1
### TO
# Form F-4
### REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

# Ocean Rig UDW Inc.
*(Exact name of registrant as specified in its charter)*

| Republic of the Marshall Islands | 1381 | N/A |
|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification Number)* |

**Ocean Rig UDW Inc.**
**10 Skopa Street, Tribune House**
**2 nd Floor, Office 202, CY 1075**
**Nicosia, Cyprus**
**011 357 22767517**
*(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)*

**Seward & Kissel LLP**
**Attention: Gary J. Wolfe**
**One Battery Park Plaza**
**New York, New York 10004**
**(212) 574-1200**
*(Name, address and telephone number of agent for service)*

*Copies to:*

| Philip Richter | Gary J. Wolfe |
|---|---|
| Robert Mollen | Seward & Kissel LLP |
| Fried, Frank, Harris, Shriver & Jacobson LLP | One Battery Park Plaza |
| One New York Plaza | New York, NY 10004 |
| New York, NY 10004 | (212) 574-1200 (telephone number) |
| (212) 859-8000 | (212) 480-8421 (facsimile number) |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after this registration statement is declared effective and all conditions to the merger contemplated by the Agreement and Plan of Merger, dated as of July 26, 2011, described in the enclosed proxy statement / prospectus, have been satisfied or waived and the merger has been completed as described in the enclosed proxy statement / prospectus.

If the securities being registered on this Form are being offered in connection with the formation of a holding company and there is compliance with General Instruction G, check the following box: ☐

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

☐ Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer)

☐ Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer)

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| Common stock, par value $0.01 | 1,541,171(1) | N/A | $13,224,513.74(2) | $1,535.37(3) |
| Preferred stock purchase rights(4) | | | | |
| Total | 1,541,171 | N/A | $13,224,513.74 | $1,535.37(5) |

(1) The number of common shares, par value $0.01 per share, of the registrant, being registered represents the estimated maximum number of the registrant's common shares to be issued in connection with the merger described herein. The number of common shares is based upon the product obtained by multiplying 2,945,326 shares of Class A common stock, par value $0.01 per share, of OceanFreight Inc., or OceanFreight common stock, estimated to be outstanding immediately prior to the merger described herein and entitled to receive the merger consideration at the closing of the merger described herein by the exchange ratio in the merger of 0.52326.

(2) Pursuant to Rules 457(f)(1), 457(f)(3) and 457(c) under the Securities Act and solely for the purpose of calculating the registration fee, the proposed maximum aggregate offering price is (i) the product obtained by multiplying (x) $15.74 (the average of the high and low prices of OceanFreight common stock on August 30, 2011), by (y) 2,945,326 shares of OceanFreight common stock (the number of shares of OceanFreight common stock estimated to be outstanding immediately prior to the merger described herein and entitled to receive the merger consideration at the closing of the merger described herein), minus (ii) $33,134,917.50 (the estimated amount of cash to be paid by DryShips Inc. to OceanFreight Inc.'s shareholders in the merger described herein). The cash consideration was calculated as (i) 2,945,326 shares of OceanFreight common stock (the number of shares of OceanFreight common stock estimated to be

outstanding immediately prior to the merger described herein and entitled to receive the merger consideration at the closing of the merger described herein) and (ii) multiplied by the cash consideration of $11.25.

(3) Determined in accordance with Section 6(b) of the Securities Act to be $1,535.37, which is equal to 0.00011610 multiplied by the proposed maximum aggregate offering price of $13,224,513.74.

(4) Preferred stock purchase rights are not currently separable from the common stock and are not currently exercisable. The value attributable to the preferred stock purchase rights, if any, will be reflected in the market price of the common stock.

(5) Previously paid.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the Registration Statement shall become effective on such date as the U.S. Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Information contained herein is subject to completion or amendment. A registration statement relating to these securities has been filed with the U.S. Securities and Exchange Commission. These securities may not be sold nor may offers to buy be accepted prior to the time the registration statement becomes effective. This document shall not constitute an offer to sell or the solicitation of an offer to buy nor shall there by any sale of these securities in any jurisdiction in which such offer, solicitation or sale is not permitted.

**PRELIMINARY — SUBJECT TO COMPLETION — DATED OCTOBER 11, 2011**



### PROPOSED MERGER TRANSACTION

Dear Shareholders of OceanFreight Inc.:

I am pleased to inform you that OceanFreight Inc., or OceanFreight, and DryShips Inc., or DryShips, have entered into an agreement and plan of merger, or the merger agreement, pursuant to which DryShips will acquire all of the outstanding shares of OceanFreight Class A common stock, or OceanFreight common stock. If the merger is completed, OceanFreight will become a wholly-owned subsidiary of DryShips and you will be entitled to receive $11.25 in cash and 0.52326 shares of Ocean Rig common stock for each of your shares of OceanFreight common stock.

You are cordially invited to attend a special meeting of our shareholders, or the special meeting, which will be held at OceanFreight's offices located at 80 Kifissias Avenue, GR 151 25, Amaroussion, Athens, Greece, on November 3, 2011, at 10:00 a.m. local time, to vote on the approval of the merger agreement. As described in the accompanying proxy statement / prospectus, a special committee of independent directors established by the OceanFreight board of directors, or the OceanFreight Special Committee, and the OceanFreight board of directors have each unanimously approved the merger agreement and declared that the merger, the merger agreement and the transactions contemplated thereby are in the best interests of OceanFreight's shareholders. The OceanFreight Special Committee and the OceanFreight board of directors each unanimously recommends that you vote " **FOR** " the adoption and approval of the merger agreement.

OceanFreight cannot complete the merger unless OceanFreight's shareholders holding a majority of the outstanding shares of OceanFreight common stock approve the merger agreement.

The notice of special meeting and the proxy statement / prospectus that accompany this letter provide you with extensive information about the merger agreement, the merger and the special meeting. We encourage you to read these materials carefully, including the section in the proxy statement / prospectus entitled "Risk Factors" beginning on page 29 of the proxy statement / prospectus.

Approximately 50.5% of the outstanding shares of OceanFreight common stock, which were held by certain entities controlled by our Chief Executive Officer, Antonis Kandylidis, were purchased by DryShips on August 24, 2011 for $11.25 in cash and 0.52326 shares of Ocean Rig common stock for each share of OceanFreight common stock pursuant to a separate purchase agreement approved by the OceanFreight Special Committee and the OceanFreight board of directors. DryShips has committed to vote those shares in favor of the approval of the merger agreement. Accordingly, approval of the merger agreement is assured.

Your vote is important. Whether or not you plan to attend the special meeting, please read the enclosed proxy statement / prospectus and promptly complete, sign, date and return the enclosed proxy card in the postage-paid envelope provided in accordance with the directions set forth on the proxy card. Thank you for your support.

Sincerely,

Professor John Liveris
Chairman of the Special Committee and
the Board of Directors

**For a discussion of risk factors which you should consider in evaluating the transaction, see "Risk Factors" beginning on page 29.**

THIS TRANSACTION HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, OR THE SEC, NOR HAS THE SEC PASSED UPON THE FAIRNESS OR MERITS OF THIS TRANSACTION OR THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS

PROXY STATEMENT / PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

This proxy statement / prospectus is dated          , 2011, and is first being mailed, along with the attached proxy card, to OceanFreight shareholders on or about          , 2011.



# NOTICE OF SPECIAL MEETING OF SHAREHOLDERS
## TO BE HELD ON NOVEMBER 3, 2011

To Shareholders of OceanFreight Inc.:

The special meeting of shareholders of OceanFreight Inc., or OceanFreight, will be held at OceanFreight's principal executive offices at 80 Kifissias Avenue, GR 151 25, Amaroussion, Athens, Greece, on November 3, 2011, at 10:00 a.m. local time, for the following purposes:

1. To consider and vote upon a proposal to approve the Agreement and Plan of Merger, dated as of July 26, 2011, or the merger agreement, by and among DryShips Inc., or DryShips, Pelican Stockholdings Inc. and OceanFreight, pursuant to which OceanFreight will become a wholly-owned subsidiary of DryShips.

2. To transact such other business as may properly come before the meeting or any adjournment thereof.

Only holders of record of OceanFreight Class A common stock, or OceanFreight common stock, at the close of business on October 7, 2011, the record date for the special meeting, are entitled to notice of, and to vote at, the special meeting and any adjournments or postponements thereof. Each share of OceanFreight common stock entitles its holder to one vote on all matters that come before the special meeting.

A special committee of independent directors of OceanFreight established to consider the proposed transaction and the OceanFreight board of directors each unanimously recommends that OceanFreight's shareholders vote " **FOR** " the approval of the merger agreement. Approval of the merger agreement requires the affirmative vote by the holders of a majority of the outstanding shares of OceanFreight common stock on the record date.

The merger is described in the accompanying proxy statement / prospectus, which you are urged to read carefully. A copy of the merger agreement is included in the proxy statement / prospectus as Annex A.

Whether or not you plan to attend the special meeting, please complete, date, sign and return the enclosed proxy in the enclosed envelope, which does not require postage if mailed in the United States. If you do attend the special meeting and wish to vote in person, you may do so notwithstanding the fact that you previously submitted or appointed a proxy. Please note, however, that if your shares are held of record by a broker, bank, trustee or other nominee and you wish to vote at the meeting, you must obtain from your nominee a proxy issued in your name.

Please do not send your stock certificates at this time. If the merger is completed, you will be sent instructions regarding the surrender of your stock certificates.

Very truly yours,

Stefanos Delatolas
Corporate Secretary of OceanFreight Inc.

# TABLE OF CONTENTS

QUESTIONS AND ANSWERS ABOUT THE VOTING PROCEDURES FOR THE SPECIAL MEETING ........ vi
TRANSACTION SUMMARY ........ 1
  Parties to the Merger Agreement ........ 1
  The Merger ........ 1
  Merger Consideration ........ 2
  Purchase and Sale Agreement ........ 2
  Comparative Market Prices and Share Information ........ 2
  The OceanFreight Special Committee's and the OceanFreight Board of Directors' Reasons for the Transaction; the OceanFreight Special Committee and the OceanFreight Board of Directors Unanimously Recommend that the OceanFreight Shareholders Vote "FOR" the Merger ........ 3
  The OceanFreight Special Committee has Received an Opinion from OceanFreight's Financial Advisor ........ 3
  Tax Considerations ........ 4
  The Interests of Some OceanFreight Executive Officers and Directors in the Merger may Differ from those of the Holders of Shares of OceanFreight Common Stock ........ 4
  Key Terms of the Merger Agreement ........ 4
  Risk Factors ........ 7
OCEAN RIG SUMMARY ........ 8
  Ocean Rig ........ 8
  Ocean Rig's Fleet ........ 9
  Employment of Ocean Rig's Fleet ........ 9
  Option to Purchase Additional New Drillships ........ 10
  Management of Ocean Rig's Drilling Units ........ 11
  Ocean Rig's Competitive Strengths ........ 11
  Business Strategy ........ 13
  Risk Factors ........ 14
  Industry Overview ........ 15
  Dividend Policy ........ 15
  Corporate Structure ........ 15
  Private Offering of Common Shares ........ 16
  Recent Developments ........ 16
SELECTED HISTORICAL CONSOLIDATED FINANCIAL AND OTHER DATA OF OCEANFREIGHT ........ 19
SELECTED HISTORICAL CONSOLIDATED FINANCIAL AND OTHER DATA OF OCEAN RIG ........ 22
COMPARATIVE PER SHARE DATA ........ 25
  OceanFreight and Ocean Rig Historical Common Share Data ........ 25
COMPARATIVE PER SHARE MARKET PRICE INFORMATION ........ 26
CURRENCY EXCHANGE RATE DATA ........ 28
RISK FACTORS ........ 29
  Risk Factors Relating to the Merger ........ 29
  Risk Factors Relating to the Drilling Industry ........ 30
  Risk Factors Relating to Ocean Rig ........ 39
  Risk Factors Relating to Ocean Rig's Common Stock ........ 51

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**                                     **56**
**THE SPECIAL MEETING**                                                                       **58**
  Date, Time and Place                                                              58
  Purpose of the Special Meeting                                                     58
  Record Date; Outstanding Shares; Shares Entitled to Vote                           58
  Recommendation of the OceanFreight Special Committee                               58
  Approval and Recommendation of the OceanFreight Board of Directors                 58
  Quorum and Vote Required                                                           59
  Voting; Proxies; Revocation                                                        59
  Delivery of Proxy Materials                                                        60
  Solicitation of Proxies                                                            61
  Dissenters' Rights of Appraisal                                                    61
**THE TRANSACTION**                                                                           **62**
  General Description of the Transaction                                             62
  Background of the Transaction                                                      62
  OceanFreight's Reasons for the Merger; Recommendation of the OceanFreight Special Committee and Board
    of Directors                                                           66
  Opinion of OceanFreight's Financial Advisor                                        69
  Interests of OceanFreight's Directors and Officers in the Merger                   73
  Procedures for Exchanging Shares of OceanFreight Common Stock and Distribution of the Merger
    Consideration                                                          75
  Accounting Treatment of the Merger                                                 76
  Delisting and Deregistration of OceanFreight Common Stock                          76
**THE MERGER AGREEMENT**                                                                      **76**
  The Merger                                                                         76
  Closing; Effective Time                                                            76
  Exchange and Payment Procedures                                                    77
  Representations and Warranties                                                     78
  Conduct of OceanFreight's Business Pending the Merger                              80
  Conduct of Ocean Rig's Business Pending the Merger; Conduct of DryShips            80
  No Solicitation                                                                    81
  Litigation                                                                         83
  Employee and Director Matters                                                      83
  Ocean Rig Common Stock                                                             83
  Covenants of DryShips                                                              83
  Covenants of DryShips and OceanFreight                                             84
  Conditions to the Merger                                                           85
  Termination                                                                        87
  Effect of Termination                                                              88
  Termination Fee and Expenses                                                       88
  Specific Performance                                                               89
  Amendment and Waiver                                                               89
  Governing Law and Jurisdiction                                                     89
**THE PURCHASE AND SALE AGREEMENT**                                                           **90**
  The Purchase                                                                       90
  Closing                                                                            90
  Purchase Consideration                                                             90

Voting Agreement; Irrevocable Proxy                                                           90
Representations and Warranties                                                                 91
Covenants                                                                                      91
Non-Solicitation                                                                               92
Waivers                                                                                        92
Conditions to the Closing of the Purchase and Sale                                            92
Termination; Effect of Termination                                                            93
Expenses; Fees                                                                                 93
Assigns                                                                                        93
Governing Law and Jurisdiction                                                                93
**OCEAN RIG CAPITALIZATION**                                                                  **94**
**OCEAN RIG MANAGEMENT'S DISCUSSION AND ANALYSIS OF OCEAN RIG'S FINANCIAL**
**CONDITION AND RESULTS OF OPERATIONS**                                                       **95**
Overview                                                                                       95
History of Ocean Rig                                                                           95
Drilling Rigs                                                                                  96
Drillships                                                                                     96
Recent Employment Contracts                                                                    97
Management of Drilling Units                                                                   98
Corporate Structure                                                                            99
Market Overview                                                                                99
Factors Affecting Results of Operations                                                        99
Revenue from Drilling Contracts                                                               100
Rig Operating Expenses                                                                        100
Depreciation                                                                                  101
Management Fees to Related Party                                                              101
General and Administrative Expenses                                                           101
Interest and Finance Costs                                                                    101
Results of Operations                                                                         101
Restatement of Previously Issued Financial Statements for 2009                               102
Six-Month Period Ended June 30, 2011 Compared to Six-Month Period Ended June 30, 2010        103
Year Ended December 31, 2010 Compared to Year Ended December 31, 2009, as Restated           106
Year Ended December 31, 2009, as Restated, Compared to Year Ended December 31, 2008          109
Year Ended December 31, 2009, as Restated, Compared to Pro Forma Year Ended December 31, 2008 113
Liquidity and Capital Resources                                                              116
Compliance with Financial Covenants under Secured Credit Facilities                          119
Credit Facilities                                                                            120
Cash Flows                                                                                    120
Swap Agreements                                                                              122
Currency Forward Sale Exchange Contracts                                                     123
Off-Balance Sheet Arrangements                                                               123
Critical Accounting Policies                                                                 123
Recent Accounting Pronouncements                                                             126
Contractual Obligations                                                                      128
Derivative Instruments                                                                       129

iii

**THE OFFSHORE DRILLING INDUSTRY**                                                      **130**
   Summary                                                              130
   Oil & Gas Fundamentals                                               130
   Rig Market Fundamentals                                             132
   The Floater Market                                                  137
**BUSINESS**                                                                            **149**
   Ocean Rig                                                           149
   History of Ocean Rig                                                150
   Recent Developments                                                 151
   Ocean Rig's Fleet                                                   154
   Employment of Ocean Rig's Fleet                                     154
   Option to Purchase Additional New Drillships                        155
   Management of Ocean Rig's Drilling Units                            156
   Potential Conflicts of Interest                                     157
   Ocean Rig's Competitive Strengths                                   157
   Business Strategy                                                   158
   Risk Factors                                                        160
   Industry Overview                                                   160
   Corporate Structure                                                 160
   Customers                                                           161
   Contract Drilling Services                                          161
   Competition                                                         163
   Employees                                                           163
   Recruitment for Drillship Operations                                163
   Properties                                                          163
   Environmental and Other Regulations                                 164
   Insurance for Ocean Rig's Offshore Drilling Units                   165
   Legal Proceedings                                                   165
   Exchange Controls                                                   166
   Description of Indebtedness                                         166
**OCEAN RIG MANAGEMENT**                                                                **172**
   Ocean Rig Directors and Senior Management                           172
   Compensation of Directors and Senior Management                     174
   Board of Directors and Committees                                   175
   Ocean Rig Employment Agreements                                     175
**OCEAN RIG RELATED PARTY TRANSACTIONS**                                                **176**
   Ocean Rig Related Party Agreements                                  176
**OCEAN RIG PRINCIPAL SHAREHOLDERS**                                                    **180**
**OCEAN RIG DIVIDEND POLICY**                                                           **180**
**DESCRIPTION OF OCEAN RIG'S CAPITAL STOCK**                                            **181**
   Purpose                                                             181
   Authorized Capitalization                                           181
   Share History                                                       181
   Description of Ocean Rig Common Stock                               182
   Description of Ocean Rig Preferred Stock                            182
   Directors of Ocean Rig                                              182

Ocean Rig Shareholder Meetings 182
Dissenters' Rights of Appraisal and Payment under the MIBCA 182
Shareholders' Derivative Actions under the MIBCA 183
Limitations on Liability and Indemnification of Ocean Rig Directors and Officers 183
Anti-takeover Effect of Certain Provisions of Ocean Rig's Articles of Incorporation and Bylaws 183
Ocean Rig Blank Check Preferred Stock 184
Ocean Rig Classified Board of Directors 184
Election and Removal of Ocean Rig Directors 184
Limited Actions by Ocean Rig Shareholders 184
Advance Notice Requirements for Ocean Rig Shareholder Proposals and Director Nominations 184
Ocean Rig's Amended and Restated Stockholders Rights Agreement 184
Ocean Rig's Transfer Agent 185
**COMPARISON OF SHAREHOLDER RIGHTS** **186**
**REPUBLIC OF THE MARSHALL ISLANDS COMPANY CONSIDERATIONS** **193**
**TAXATION** **197**
Certain Material Tax Consequences 197
**ENFORCEABILITY OF OCEAN RIG CIVIL LIABILITIES** **201**
**LEGAL MATTERS** **202**
**EXPERTS** **202**
**INFORMATION PROVIDED BY OCEAN RIG** **202**
**OCEAN RIG ASA INDEX TO CONSOLIDATED FINANCIAL STATEMENTS** **F-1**
**OCEAN RIG UDW INC. INDEX TO CONSOLIDATED FINANCIAL STATEMENTS** **F-32**
**OCEAN RIG UDW INC. UNAUDITED PRO FORMA CONDENSED STATEMENT OF OPERATIONS** **F-99**

**ANNEXES**

Annex A: Agreement and Plan of Merger

Annex B: Purchase Agreement

Annex C: Opinion of Fearnley Fonds ASA

Annex D: OceanFreight's Annual Report on Form 20-F for the Year Ended December 31, 2010

Annex E: Updated information relating to OceanFreight Inc., its fleet and recent developments and other updates related to the passage of time, together with Management's Discussion and Analysis of Financial Condition and Results of Operation and interim consolidated unaudited financial statements and related information and data of OceanFreight Inc. as of and for the six-month period ended June 30, 2011

**PART II INFORMATION NOT REQUIRED IN THE PROSPECTUS** II-1
EX-5.1
EX-8.1
EX-23.3
EX-23.4
EX-23.5
EX-23.6
EX-99.1

## QUESTIONS AND ANSWERS ABOUT THE VOTING PROCEDURES FOR
## THE SPECIAL MEETING

*The following are answers to some questions that you, as a shareholder of OceanFreight, may have regarding the merger and the other matters being considered at the shareholder meeting of OceanFreight, or the special meeting or the OceanFreight special meeting. OceanFreight urges you to read carefully the remainder of this proxy statement / prospectus because the information in this section does not provide all the information that might be important to you with respect to the merger and the other matters being considered at the special meeting. Additional important information is also contained in the Annexes to this proxy statement / prospectus.*

**Q:    What am I being asked to vote on?**

A:    OceanFreight Inc., or OceanFreight, and DryShips Inc., or DryShips, have entered into the Agreement and Plan of Merger, dated July 26, 2011, or the merger agreement, pursuant to which DryShips has agreed to acquire OceanFreight. You are being asked to vote to approve the merger agreement. Under the terms of the merger agreement, a newly-formed wholly-owned subsidiary of DryShips will merge with and into OceanFreight, with OceanFreight continuing as the surviving corporation and a wholly-owned subsidiary of DryShips.

**Q:    What will I receive for my OceanFreight shares in the merger?**

A:    If the merger is completed, you will receive, with respect to each share of OceanFreight Class A common stock, or OceanFreight common stock, you own, $11.25 in cash and 0.52326 shares of Ocean Rig common stock.

**Q:    When and where is the OceanFreight special meeting?**

A:    The special meeting of shareholders of OceanFreight will be held on November 3, 2011, at 10:00 a.m. local time, at OceanFreight's principal executive offices at 80 Kifissias Avenue, GR 151 25, Amaroussion, Athens, Greece, unless adjourned or postponed to a later time.

**Q:    Who can vote at the special meeting?**

A:    Shareholders of record as of the close of business on October 7, 2011, the record date for the special meeting, are entitled to receive notice of and to vote at the special meeting. On the record date, there were 5,946,180 shares of OceanFreight common stock issued and outstanding and entitled to vote at the special meeting. You may vote all shares of OceanFreight common stock you owned as of the close of business on the record date. All shares of OceanFreight common stock that were outstanding as of the close of business on the record date are entitled to one vote per share.

Some of OceanFreight's shareholders hold their shares through a broker, bank, trustee or other nominee rather than directly in their own names. As summarized below, there are some distinctions between shares held of record and those owned beneficially:

• *SHAREHOLDER OF RECORD* — If your OceanFreight shares are registered directly in your name with OceanFreight's transfer agent, American Stock Transfer & Trust Company, LLC, then you are considered the shareholder of record of those shares and these proxy materials are being sent directly to you by OceanFreight. As the shareholder of record, you have the right to grant a proxy or vote in person at the meeting.

• *BENEFICIAL OWNER* — If your OceanFreight shares are held in a stock brokerage account or otherwise, by a broker, bank, trustee or other nominee, then you are considered to be the beneficial owner of shares held in "street name" and these proxy materials are being forwarded to you by your broker, bank, trustee or other nominee who is considered the shareholder of record of those shares. As the beneficial owner, you have the right to direct your broker, bank, trustee or other nominee on how to vote your shares. You are also invited to attend the special meeting. However, because you are not the shareholder of record, you may not vote these shares in person at the meeting unless you first obtain a legal proxy from your broker, bank, trustee or other nominee holding your shares.

vi

**Q: What vote is required to approve the merger agreement?**

A: The merger agreement must be approved by a majority of the outstanding shares of OceanFreight common stock on the record date for the special meeting. Approximately 50.5% of the outstanding shares of OceanFreight common stock, which were held by certain entities controlled by OceanFreight's Chief Executive Officer, Antonis Kandylidis, were purchased by DryShips on August 24, 2011 for $11.25 in cash and 0.52326 shares of Ocean Rig common stock for each share of OceanFreight common stock under a separate purchase agreement approved by a special committee of independent directors established by the OceanFreight board of directors, or the OceanFreight Special Committee, and the OceanFreight board of directors. DryShips has committed to vote those shares in favor of the approval of the merger agreement. Accordingly, approval of the merger agreement is assured.

**Q: What if I do not vote or do not fully complete my proxy card?**

A: If you do not vote your shares of OceanFreight common stock with respect to the proposal to approve the merger agreement, it will have the same effect as a vote against the proposal. However, if the proposal to approve the merger agreement is approved and the merger is completed, your OceanFreight common stock will be converted into the right to receive the merger consideration even though you did not vote.

If you submit a proxy without specifying the manner in which you would like your shares to be voted, your shares will be voted **"FOR"** approval of the merger agreement.

**Q: What do I need to do now?**

A: After carefully reading and considering the information contained in this document, please fill out, sign and date the proxy card and then mail your signed proxy card in the enclosed envelope, as soon as possible so that your shares may be voted at the OceanFreight special meeting. See "The Special Meeting — Voting; Proxies; Revocation."

**Q: If my shares are held in "street name" by my bank, broker, trustee or other nominee, will my bank, broker, trustee or other nominee vote my shares for me?**

A: You should instruct your bank, broker, trustee or other nominee to vote your shares. If you do not instruct your bank, broker, trustee or other nominee, your bank, broker, trustee or other nominee will not be able to vote your shares. Please check with your bank, broker, trustee or other nominee and follow the voting procedures your bank, broker, trustee or other nominee provides. Your bank, broker, trustee or other nominee will advise you whether you may submit voting instructions by telephone or via the Internet. See "The Special Meeting — Voting; Proxies; Revocation."

**Q: When do you expect the merger to be completed?**

We currently expect to complete the merger in the fourth quarter of 2011. However, we cannot assure you when or if the merger will be completed.

**Q: What are the material United States federal income tax consequences of the merger to OceanFreight shareholders?**

A: For a U.S. Holder (as defined in "Taxation — Certain Material Tax Consequences"), the merger will be treated for United States, or U.S., federal income tax purposes as a taxable sale by such holder of the OceanFreight shares that such holder surrenders in the merger for the shares of Ocean Rig common stock and cash received in the merger.

For a Non-U.S. Holder (as defined in "Taxation — Certain Material Tax Consequences"), any gain realized on the receipt of shares of Ocean Rig common stock and cash in the merger generally will not be subject to U.S. federal income or withholding tax unless such Non-U.S. Holder has certain connections to the United States.

See "Taxation — Certain Material Tax Consequences" for a discussion of certain material U.S. federal income tax consequences of (i) the merger and (ii) owning and disposing of shares of Ocean common stock.

**Q:  May I change my vote after I have submitted a proxy?**

A:  Yes. If your shares of OceanFreight common stock are registered directly in your name, there are three ways you can change your vote after you have submitted your proxy:

• First, you may complete and submit a signed written notice of revocation to the Secretary of OceanFreight at the address below:

OceanFreight Inc.
80 Kifissias Avenue
Amaroussion 151 25
Athens, Greece

• Second, you may complete and submit a new proxy card. Your latest vote actually received by OceanFreight before the special meeting will be counted, and any earlier votes will be revoked.

• Third, you may attend the special meeting and vote in person. Any earlier proxy will thereby be revoked. However, simply attending the meeting without voting will not revoke any earlier proxy you may have given.

If your OceanFreight shares are held in "street name" by a bank, broker, trustee or other nominee, you must follow the directions you receive from your bank, broker, trustee or other nominee in order to change or revoke your vote and any deadlines for the receipt of those instructions.

**Q:  If I want to attend the special meeting, what do I do?**

A:  You should come to OceanFreight's principal executive offices at 80 Kifissias Avenue, GR 151 25, Amaroussion, Athens, Greece at 10:00 a.m. local time, on November 3, 2011. If you hold your shares in "street name," you will need to bring proof of ownership (by means of a recent brokerage statement, letter from your bank or broker or similar means) to be admitted to the meeting. Shareholders of record as of the record date for the special meeting can vote in person at the special meeting. If your shares of OceanFreight common stock are held in "street name," then you are not the shareholder of record and you must ask your bank, broker, trustee or other nominee how you can vote at the special meeting.

**Q:  Should I send my stock certificates now?**

A:  No. Shortly after the merger is completed, you will receive a letter of transmittal with instructions informing you how to send your OceanFreight stock certificates to the exchange agent in order to receive the per share merger consideration. You should use the letter of transmittal to exchange your OceanFreight stock certificates for the per share merger consideration to which you are entitled as a result of the merger. **Please do not send in your OceanFreight stock certificates with your proxy card.**

**Q:  What if I cannot find my stock certificates?**

A:  There will be a procedure for you to receive the merger consideration in the merger, even if you have lost one or more of your OceanFreight stock certificates. This procedure, however, may take time to complete. In order to ensure that you will be able to receive the merger consideration promptly after the merger is completed, if you cannot locate your OceanFreight stock certificates after looking for them carefully, we urge you to contact OceanFreight's transfer agent, American Stock Transfer & Trust Company, LLC, as soon as possible and follow the procedures they explain to you for replacing your OceanFreight stock certificates. American Stock Transfer & Trust Company, LLC can be reached at 1-800-937-5449 or on their website at www.amstock.com and at the email address info@amstock.com, or you can write them at the following address:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, NY 11219

**Q:  Are there risks I should consider in deciding whether to vote for the merger agreement?**

A:  Yes. We have set forth a non-exhaustive list of risk factors that you should consider carefully in connection with the merger. See "Risk Factors" beginning on page 29.

**Q:  How will OceanFreight shareholders receive the merger consideration?**

A:  Following the merger, you will receive a letter of transmittal and instructions on how to obtain the merger consideration in exchange for your shares of OceanFreight common stock. You must return the completed letter of transmittal and surrender your OceanFreight stock certificates as described in the instructions, and you will receive the merger consideration after the exchange agent receives your completed letter of transmittal, OceanFreight stock certificates and/or such other documents that may be required by the exchange agent. See "The Transaction — Procedures for Exchanging Shares of OceanFreight Stock and Distribution of the Merger Consideration."

**Q:  Who can help answer my additional questions about the merger or voting procedures?**

A:  If you have more questions about the merger, including the procedures to voting your shares you should contact OceanFreight:

OceanFreight Inc.
80 Kifissias Avenue
Amaroussion 15125
Athens, Greece

If your broker holds your shares, then you should also contact your broker for additional information.

ix

# TRANSACTION SUMMARY

*This summary is not intended to be complete and is qualified in all respects by the more detailed information appearing elsewhere in this proxy statement / prospectus. You should review carefully the entire proxy statement / prospectus, including the Annexes. As used throughout this proxy statement / prospectus, (i) unless otherwise indicated, all references to "dollars" and "$" are to, and amounts are presented in, U.S. Dollars, (ii) all references to "OceanFreight shares," "OceanFreight common shares," "OceanFreight common stock" and "shares of OceanFreight common stock" refer to shares of Class A common stock, par value $0.01 per share, of OceanFreight, (iii) all references to "Ocean Rig shares," "Ocean Rig common shares," "Ocean Rig common stock" and "shares of Ocean Rig common stock" refer to shares of common stock, par value $0.01 per share, of Ocean Rig and (iv) all references to the "SEC" refer to the U.S. Securities and Exchange Commission.*

## Parties to the Merger Agreement

### DryShips

DryShips Inc., or DryShips, is an owner of drybulk carriers and tankers that operate worldwide. Through its majority owned subsidiary, Ocean Rig UDW Inc., or Ocean Rig, DryShips owns and operates nine offshore ultra deepwater drilling units, comprising of two ultra deepwater semisubmersible drilling rigs and seven ultra deepwater drillships, three of which remain to be delivered to Ocean Rig during 2013. DryShips owns a fleet of 35 drybulk carriers (including newbuildings), comprising seven Capesize, 26 Panamax and two Supramax, with a combined deadweight tonnage of over 3.3 million tons, and 12 tankers (including newbuildings), comprising six Suezmax and six Aframax, with a combined deadweight tonnage of over 1.6 million tons.

DryShips' common stock is listed on the NASDAQ Global Select Market where it trades under the symbol "DRYS."

### Pelican Stockholdings Inc.

Pelican Stockholdings Inc. is a wholly-owned subsidiary of DryShips. Pelican Stockholdings Inc. was organized on July 22, 2011 solely for the purpose of effecting the merger with OceanFreight. It has not carried on any activities other than in connection with the transaction.

### OceanFreight

OceanFreight Inc., or OceanFreight, is an owner and operator of drybulk vessels that operate worldwide. OceanFreight owns a fleet of six vessels, comprised of six drybulk vessels (four Capesize and two Panamax) and has contracted to purchase five newbuilding Very Large Ore Carriers, or VLOCs, currently under construction, with a combined deadweight tonnage of about 1.9 million tons. Detailed information about OceanFreight is included in Annexes D and E to this document.

OceanFreight's common stock is listed on the NASDAQ Global Market where it trades under the symbol "OCNF."

## The Merger

On July 26, 2011, DryShips, Pelican Stockholdings Inc. and OceanFreight entered into an Agreement and Plan of Merger, or the merger agreement, pursuant to which, subject to the terms and conditions of the merger agreement and in accordance with the Marshall Islands Business Corporations Act, or the MIBCA, Pelican Stockholdings Inc. will merge with and into OceanFreight. Following the merger, OceanFreight will continue its corporate existence under the MIBCA as the surviving corporation in the merger and will be a wholly-owned subsidiary of DryShips. The merger agreement is included as Annex A to this proxy statement / prospectus and you are encouraged to read the merger agreement carefully and in its entirety because it is the legal agreement that governs the merger. OceanFreight and Ocean Rig currently expect that the merger will be completed during the fourth quarter of 2011. However, OceanFreight and Ocean Rig cannot assure you when or if the merger will occur.

**Merger Consideration**

At the effective time of the merger, each share of OceanFreight common stock outstanding (other than shares of OceanFreight common stock held by DryShips or OceanFreight or any of their respective direct or indirect subsidiaries) will be converted into the right to receive:

- $11.25 in cash; and

- 0.52326 shares of Ocean Rig common stock.

OceanFreight shareholders will not receive fractional shares of Ocean Rig common stock in the merger. Instead, each holder of shares of OceanFreight common stock otherwise entitled to a fraction of a share of Ocean Rig common stock will upon surrender of the certificate representing such holder's shares of OceanFreight common stock, or the certificate, be entitled to receive an amount of cash (without interest) determined by multiplying $21.50 by the fractional share interest to which the holder would otherwise be entitled.

Among certain other conditions (described below), the obligations of OceanFreight and DryShips to complete the merger are conditioned upon (i) the registration statement, of which this proxy statement / prospectus forms a part, having been declared effective and no stop order having been issued by the U.S. Securities and Exchange Commission, or the SEC, and (ii) the shares of Ocean Rig common stock included in the merger consideration payable to the holders of shares of OceanFreight common stock pursuant to the merger agreement having been approved for listing on NASDAQ, subject to the completion of the merger.

See "The Merger Agreement — Closing; Effective Time — Merger Consideration."

**Purchase and Sale Agreement**

Concurrently with the execution of the merger agreement, DryShips entered into a purchase and sale agreement, or the purchase agreement, with Basset Holdings Inc., Steel Wheel Investments Limited and Haywood Finance Limited, or, collectively, the Sellers (each of which is controlled by Mr. Antonis Kandylidis, the Chief Executive Officer of OceanFreight), and OceanFreight, pursuant to which DryShips purchased from the Sellers, on August 24, 2011, approximately 50.5% of the outstanding shares of OceanFreight common stock, or the Seller Shares. The consideration paid by DryShips for each share of OceanFreight common stock owned by the Sellers consisted of (x) $11.25 in cash and (y) 0.52326 shares of Ocean Rig common stock (with cash paid in lieu of fractional shares). See "The Purchase and Sale Agreement."

**Comparative Market Prices and Share Information**

OceanFreight common stock is listed and traded on the NASDAQ Global Market under the symbol "OCNF." Ocean Rig common stock currently trades on the OTC market maintained by the Norwegian Association of Stockbroking Companies, or the Norwegian OTC, under the symbol "OCRG." Also, on October 6, 2011, Ocean Rig common stock commenced trading on the NASDAQ Global Select Market under the symbol "ORIG." On July 25, 2011, the last trading day in the United States, or the U.S., before the announcement of the transaction between OceanFreight and DryShips, the closing price of OceanFreight common stock on the NASDAQ Global Market was $9.47 per share and the last traded value of the Ocean Rig common stock on the Norwegian OTC was NOK89.00 (or approximately $16.44 based on the NOK / USD exchange rate of NOK5.41 / $1 on July 25, 2011). Based on the foregoing, the merger consideration of $11.25 and 0.52326 shares of Ocean Rig common stock per share of OceanFreight common stock reflected a value as of July 25, 2011 of $19.85 and a premium of approximately 109.6% over the closing price of OceanFreight common stock on July 25, 2011.

On          , 2011, the most recent practicable trading day prior to the printing of this proxy statement / prospectus, the closing price of OceanFreight common stock was $      per share and the closing price of Ocean Rig common stock on the NASDAQ Global Select Market was $      per share.

See "Comparative Per Share Market Price Information."

**The OceanFreight Special Committee's and the OceanFreight Board of Directors' Reasons for the Transaction; the OceanFreight Special Committee and the OceanFreight Board of Directors Unanimously Recommend that the OceanFreight Shareholders Vote " FOR " the Merger**

As discussed in detail elsewhere in this proxy statement / prospectus, a special committee of independent directors established by the OceanFreight board of directors, or the OceanFreight Special Committee, and the OceanFreight board of directors have determined that the merger agreement and the transactions contemplated by the merger agreement are in the best interests of OceanFreight's shareholders (other than DryShips, Pelican Stockholdings Inc., Basset Holdings Inc., Steel Wheel Investments Limited and Haywood Finance Limited) and have unanimously approved the merger agreement and the transactions contemplated thereby. The OceanFreight Special Committee and the OceanFreight board of directors unanimously recommend that OceanFreight's shareholders vote " **FOR** " the approval of the merger agreement.

In the course of reaching their decision to approve the merger agreement and the transactions contemplated thereby, the OceanFreight Special Committee and the OceanFreight board of directors considered a number of factors in their deliberations. Those factors are described in the section entitled "The Transaction — OceanFreight's Reasons for the Merger; Recommendation of the OceanFreight Special Committee and Board of Directors." Among others, the following factors supported the decision of the OceanFreight Special Committee and the OceanFreight board of directors:

- The current and historical prices of OceanFreight's common stock and the fact that the per share merger consideration of $11.25 in cash and 0.52326 shares of Ocean Rig common stock represents a premium of approximately 109.6% over the closing price of $9.47 per share of OceanFreight's common stock on July 25, 2011, the last trading day before the public announcement of the merger;

- The OceanFreight Special Committee's and the OceanFreight board of directors' view that the merger is more favorable to OceanFreight's shareholders than the possible alternatives to the merger, including continuing to operate OceanFreight as an independent publicly traded company or pursuing other strategic alternatives, because of the uncertain returns to such shareholders in light of OceanFreight's business, operations, financial condition and obligations (including OceanFreight's debt and newbuilding obligations), strategy and prospects, as well as the risks involved in achieving those returns, the uncertainties surrounding the availability of future equity or debt financing, the nature of the dry bulk shipping industry, and general industry, economic and market conditions, both on a historical and on a prospective basis; and

- The fact that the merger consideration contains a significant cash component, so that the transaction allows OceanFreight's shareholders to realize immediately a considerable portion of their investment in cash and provides such shareholders with a level of certainty as to the value of their shares, while also providing such shareholders with the opportunity to participate in the potential growth of Ocean Rig following the merger.

See "The Transaction — OceanFreight's Reasons for the Merger; Recommendation of the OceanFreight Special Committee and Board of Directors."

**The OceanFreight Special Committee has Received an Opinion from OceanFreight's Financial Advisor**

On July 25, 2011, Fearnley Fonds ASA, or Fearnley, rendered its oral opinion to the OceanFreight Special Committee, which was subsequently confirmed in writing, that as of the date of the opinion, and based upon and subject to the considerations and limitations set forth in its written opinion, its work described in its written opinion and other factors it deemed relevant, the merger consideration to be received by the holders of OceanFreight common stock, was fair from a financial point of view to such holders. The full text of the written opinion of Fearnley, which sets forth the various assumptions made, procedures followed, matters considered and limitations on the review undertaken in connection with the opinion, is included as Annex C to this proxy statement / prospectus. Fearnley's opinion was provided for the benefit of the OceanFreight Special Committee in connection with, and for the purpose of, its evaluation of the merger. The opinion does not constitute a recommendation as to how any holder of OceanFreight common stock should vote with respect to the merger or any matter related thereto. Holders of shares of OceanFreight common stock are urged to read the opinion of Fearnley carefully and in its entirety.

See "The Transaction — Opinion of OceanFreight's Financial Advisor."

**Tax Considerations**

For a U.S. Holder (as defined in "Taxation — Certain Material Tax Consequences"), the merger will be treated for U.S. federal income tax purposes as a taxable sale by such holder of the OceanFreight shares that such holder surrenders in the merger for the Ocean Rig shares and cash received in the merger.

For a Non-U.S. Holder (as defined in "Taxation — Certain Material Tax Consequences"), any gain realized on the receipt of Ocean Rig shares and cash in the merger generally will not be subject to U.S. federal income or withholding tax unless such Non-U.S. Holder has certain connections to the United States.

See "Taxation — Certain Material Tax Consequences" for a discussion of certain material U.S. federal income tax consequences of (i) the merger and (ii) owning and disposing of Ocean Rig shares.

**The Interests of Some OceanFreight Executive Officers and Directors in the Merger may Differ from those of the Holders of Shares of OceanFreight Common Stock**

Some of the members of OceanFreight's board of directors and certain of OceanFreight's executive officers have financial interests in the merger that are in addition to, and/or different from, the interests of holders of OceanFreight common stock. The independent members of OceanFreight's board of directors were aware of these additional and/or differing interests and potential conflicts and considered them, among other matters, in evaluating, negotiating and approving the merger agreement. These interests include the following:

- As indicated above, entities controlled by Mr. Kandylidis, the Chief Executive Officer of OceanFreight, are parties to the purchase agreement under which DryShips purchased the Seller Shares owned by these entities at a per share purchase price equal to the per share merger consideration on August 24, 2011. See "The Purchase and Sale Agreement."

- OceanFreight's consultancy agreement with Steel Wheel Investments Limited, a company wholly-owned by Mr. Kandylidis, the Chief Executive Officer of OceanFreight, as modified by an addendum dated July 25, 2011, entitles Steel Wheel Investments Limited to a change of control payment of €2.7 million upon closing of the merger and, pursuant to the addendum noted above, entitles Steel Wheel Investments Limited to the continued payment of its monthly consultancy fee of €75,000 until the later of December 31, 2011 or the closing of the merger.

- DryShips has agreed to use reasonable efforts to enter into employment agreements with OceanFreight's President and Chief Operating Officer, Demetris Nenes and OceanFreight's Chief Financial Officer, Solon Dracoulis.

- The merger agreement provides for director and officer indemnification arrangements for each of OceanFreight's directors and officers and provides existing directors' and officers' liability insurance to the OceanFreight directors and officers that will continue for six years following completion of the merger.

- All legal and advisory fees up to $1,500,000 incurred by entities controlled by Mr. Kandylidis in connection with the sale of their shares of OceanFreight common stock to DryShips will be paid for by OceanFreight.

- The closing of the purchase agreement caused shares of OceanFreight restricted stock (approximately 35,222 shares) held by OceanFreight's officers and directors and their affiliates to vest.

See "The Transaction — Interests of OceanFreight's Directors and Officers in the Merger."

**Key Terms of the Merger Agreement**

*Conditions to the Merger Agreement*

As more fully described in this proxy statement / prospectus and in the merger agreement, the obligations of OceanFreight and DryShips to complete the merger are conditioned upon:

- the approval of the merger and the merger agreement by OceanFreight's shareholders in accordance with the MIBCA;

- no law, rule or regulation or any order, injunction, judgment, decree or similar requirement of any governmental authority to which any of the parties or by which any of the parties is subject or bound preventing or prohibiting the consummation of the merger shall be in effect;

- the registration statement, of which this proxy statement / prospectus forms a part, having been declared effective and no stop order having been issued by the SEC; and

- the shares of Ocean Rig common stock included in the merger consideration payable to the holders of shares of OceanFreight common stock pursuant to the merger having been approved for listing on NASDAQ, subject to the completion of the merger.

Also, the obligations of OceanFreight and DryShips to complete the merger are conditioned upon:

- the other party's representations and warranties being true and correct, except for failures that individually or in the aggregate would not reasonably be expected to have a material adverse effect on that party;

- the other party having complied in all material respects with its obligations under the merger agreement; and

- the absence of any material adverse effect on the other party's financial condition, business or results of operations taken as a whole.

However, since the consummation of the purchase agreement (described above), DryShips' obligation to complete the merger is no longer conditioned upon (i) OceanFreight's representations and warranties being true or (ii) the absence of any material adverse effect on OceanFreight's financial condition, business or results of operations.

### *No Solicitation; Withdrawal of Board Recommendation*

OceanFreight and its subsidiaries and representatives may not, among other things:

- solicit, initiate or knowingly take any action designed to facilitate or encourage any acquisition proposal;

- enter into or participate in any discussions or negotiations with, furnish any information relating to OceanFreight or any of its subsidiaries or provide access to the business, properties, assets, books or records of OceanFreight or any of its subsidiaries to any third party with respect to inquiries regarding, or the making of, an acquisition proposal;

- fail to make, withdraw, or modify or amend in a manner adverse to DryShips the recommendation of either the OceanFreight Special Committee or the OceanFreight board of directors, or recommend any other acquisition proposal;

- grant any waiver or release under any standstill or similar agreement with respect to any class of equity securities of OceanFreight or any of its subsidiaries;

- approve, endorse, recommend, enter into, or make a public proposal regarding, any agreement in principle, letter of intent, term sheet, merger agreement, acquisition agreement, option agreement or other similar agreement relating to an acquisition proposal, with the exception of a confidentiality agreement with a permitted third party;

- approve any transaction under Article K of OceanFreight's third amended and restated articles of incorporation (which relates to business combinations); or

- redeem the rights issued to holders of OceanFreight's common stock pursuant to the Second Amended and Restated Stockholder Rights Agreement, dated as of April 8, 2011, or OceanFreight's rights plan, amend or modify or terminate OceanFreight's rights plan or exempt any person from, or approve any transaction under, OceanFreight's rights plan.

Notwithstanding these prohibitions:

- Prior to August 23, 2011, OceanFreight was permitted to:

  - engage in negotiations or discussions with any third party, that made an unsolicited written acquisition proposal after the date of the merger agreement if the OceanFreight Special Committee reasonably

believed in good faith, after consulting with external legal and financial advisors, that the proposal would reasonably have been expected to lead to a superior proposal;

- thereafter furnish to such third party non-public information relating to OceanFreight or any of its subsidiaries pursuant to a confidentiality agreement; and

- if, in the case of the actions described in the two subbullets above, the OceanFreight Special Committee determined in good faith, after consultation with outside legal counsel, that the failure to take such action would have been reasonably likely to result in a breach of its fiduciary duties under applicable law and OceanFreight had provided DryShips two business days notice of its intention to take any action discussed in the two subbullets above; and

- Prior to OceanFreight's shareholders approving the merger, the OceanFreight Special Committee or the OceanFreight board of directors may withdraw its recommendation in favor of the proposed merger in response to a material fact, event, change, development or set of circumstances (other than an acquisition proposal) arising during the period after the date of the merger agreement and before the approval of OceanFreight shareholders, which was not known or reasonably foreseeable by the OceanFreight Special Committee or the OceanFreight board of directors on the date of the merger agreement, if the failure to withdraw, modify or amend the recommendation would be reasonably likely to result in a breach of its fiduciary duties under applicable law; however, DryShips must be given at least five business days prior written notice by OceanFreight and, if requested by DryShips, OceanFreight must engage in good faith negotiations with DryShips to amend the merger agreement in such a manner that obviates the need for a withdrawal of the recommendation in favor of the proposed merger.

In addition, prior to August 23, 2011, OceanFreight had the right to terminate the merger agreement to enter into a definitive agreement with respect to a superior proposal or make a recommendation in connection with a superior proposal if the superior proposal did not result from a breach of the non-solicitation provisions of the merger agreement, and the OceanFreight Special Committee reasonably determined in good faith after consultation with its outside counsel and financial advisors that the failure to take any such action would have breached its fiduciary duties to OceanFreight shareholders, subject to certain conditions.

For additional information on limitations on solicitation and withdrawal of board recommendations, see "The Merger Agreement — No Solicitation."

### Termination of the Merger Agreement

The merger agreement provides for certain termination rights for OceanFreight and DryShips (even after the vote of the OceanFreight shareholders), including the right of:

- both parties to terminate the merger agreement by mutual agreement;

- either party to terminate the merger agreement if the merger has not become effective by March 26, 2012 or applicable law prohibits the consummation of the merger;

- OceanFreight to terminate the merger agreement if either DryShips or Pelican Stockholdings Inc. has materially breached the merger agreement, including by failing to perform covenants or obligations under the merger agreement or because certain of its representations and warranties have become untrue, or upon certain other events, and that breach has not been cured; and

- DryShips to terminate the merger agreement if OceanFreight has materially breached the merger agreement by failing to perform covenants or obligations under the merger agreement, and that breach has not been cured.

Additionally, DryShips or OceanFreight had the right to terminate the merger agreement in two additional circumstances that are no longer applicable. First, DryShips had the right to terminate the merger agreement prior to the purchase agreement closing date, which occurred on August 24, 2011, if: the OceanFreight Special Committee made an adverse recommendation in respect of the merger; OceanFreight entered into a binding agreement (other than a confidentiality agreement contemplated by the merger agreement) with a third party relating to any

acquisition proposal; the OceanFreight Special Committee or the OceanFreight board of directors failed publicly to reaffirm its recommendation of the merger agreement or the merger within five business days of receipt of a written request by DryShips or Pelican Stockholdings Inc. to provide such reaffirmation following an acquisition proposal from a third party; or OceanFreight or any of its representatives materially breached any of its obligations under the non-solicitation provisions under the merger agreement.

Second, OceanFreight had the right to terminate the merger agreement, prior to August 23, 2011, in relation to a superior proposal (in accordance with the requirements set out above), provided that OceanFreight paid to DryShips the termination fee described below, and immediately following termination of the merger agreement, OceanFreight entered into a definitive agreement with respect to a superior proposal.

For additional information on OceanFreight's and DryShips' rights to terminate the merger agreement, see "The Merger Agreement — Termination."

### Termination Fee

If (i) the merger agreement is terminated by DryShips (i) as a result of a material breach by OceanFreight of its covenants or obligations, (ii) an acquisition proposal is made prior to termination of the merger agreement, and (iii) prior to the first anniversary of the date of termination, OceanFreight enters into a definitive agreement with respect to or recommends to its shareholders any acquisition proposal or any such acquisition proposal shall have been consummated, then OceanFreight will be required to pay a termination fee of $4.5 million in cash to DryShips.

Additionally, a termination fee would have been payable in two additional circumstances that are no longer applicable. First, if the merger agreement was terminated by DryShips prior to the closing of the purchase agreement, which occurred on August 24, 2011, and pursuant to the merger agreement, in the event that (i) prior to the purchase agreement closing date, the OceanFreight Special Committee or the OceanFreight board of directors made an adverse recommendation, (ii) OceanFreight entered into a binding agreement (other than a confidentiality agreement contemplated by the merger agreement) relating to any third-party acquisition proposal, (iii) the OceanFreight Special Committee or the OceanFreight board of directors failed publicly to reaffirm its recommendation of the merger agreement or the transaction contemplated thereby within five business days of receipt of a written request by DryShips or Pelican Stockholdings Inc. to provide such a reaffirmation following any third-party acquisition proposal, or (iv) OceanFreight or any of its representatives materially breached any of its obligations relating to the prohibition on solicitation under the merger agreement, then OceanFreight would have been required to pay to DryShips in immediately available funds a termination fee of $4.5 million in cash.

Second, if the merger agreement was terminated by OceanFreight prior to August 23, 2011 after receipt of a superior proposal (and in accordance with the provisions set out above), then OceanFreight would have been required to pay to DryShips in immediately available funds a termination fee of $4.5 million in cash.

For additional information on the termination fee and reimbursement of expenses, see "The Merger Agreement — Termination Fee and Expenses."

## Risk Factors

In evaluating the transaction, the merger agreement or the transactions contemplated by the merger agreement, you should carefully read this proxy statement / prospectus and especially consider the factors discussed in the section entitled "Risk Factors" beginning on page 29.

# OCEAN RIG SUMMARY

**Ocean Rig**

Ocean Rig is an international offshore drilling contractor providing oilfield services for offshore oil and gas exploration, development and production drilling and specializing in the ultra-deepwater and harsh-environment segment of the offshore drilling industry. Ocean Rig seeks to utilize its high-specification drilling units to the maximum extent of their technical capability and Ocean Rig believes that it has earned a reputation for operating performance excellence. Ocean Rig currently owns and operates two modern, fifth generation ultra-deepwater semi-submersible offshore drilling rigs, the *Leiv Eiriksson* and the *Eirik Raude* , and four sixth generation, advanced capability ultra-deepwater drillships, the *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* , delivered in January 2011, March 2011, July 2011 and September 2011, respectively, by Samsung Heavy Industries Co. Ltd., or Samsung.

Ocean Rig has additional newbuilding contracts with Samsung for the construction of three seventh generation newbuilding drillships, or Ocean Rig's seventh generation hulls. These three newbuilding drillships are currently scheduled for delivery in July 2013, September 2013 and November 2013, respectively. The *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* are "sister-ships" constructed by the same shipyard to the same high-quality vessel design and specifications and are capable of drilling in water depths of 10,000 feet. The design of Ocean Rig's seventh generation hulls reflects additional enhancements that, with the purchase of additional equipment, will enable the drillship to drill in water depths of 12,000 feet.

Ocean Rig also has options with Samsung for the construction of up to three additional seventh generation ultra-deepwater drillships at an estimated total project cost, excluding financing costs, of $638.0 million per drillship, based on a shipyard contract price of $570.0 million, costs of approximately $38.0 million for upgrades to the existing drillship specifications and construction-related expenses of $30.0 million. These options are exercisable by Ocean Rig at any time on or prior to January 31, 2012.

Ocean Rig believes that the *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* , as well as its three newbuilding drillships, will be among the most technologically advanced drillships in the world. The S10000E design, used for the *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* , was originally introduced in 1998 and according to Fearnley Offshore AS, including these four drillships, a total of 45 drillships have been ordered using this base design, which has been widely accepted by customers, of which 24 had been delivered as of July 2011, including the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* . Among other technological enhancements, Ocean Rig drillships are equipped with dual activity drilling technology, which involves two drilling systems using a single derrick that permits two drilling-related operations to take place simultaneously. Ocean Rig estimates this technology saves between 15% and 40% in drilling time, depending on the well parameters. The *Ocean Rig Corcovado,* the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* are capable of drilling 40,000 feet at water depths of 10,000 feet and Ocean Rig's seventh generation hulls will have the capacity to drill 40,000 feet at water depths of 12,000 feet. Ocean Rig currently has a team of its employees at Samsung overseeing the construction of the three newbuilding drillships to help ensure that those drillships are built on time, to Ocean Rig's exact vessel specifications and on budget, as was the case for the *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos.*

The total cost of construction and construction-related expenses for the *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* amounted to approximately $755.7 million, $756.9 million, $791.8 million and $784.4 million, respectively. Construction-related expenses include equipment purchases, commissioning, supervision and commissions to related parties, excluding financing costs and fair value adjustments. As of September 30, 2011, Ocean Rig had made an aggregate of $726.7 million of construction and construction-related payments for its three seventh generation hulls and have remaining total construction and construction-related payments relating to these drillships of approximately $1.2 billion in the aggregate.

Ocean Rig's revenue, earnings before interest, taxes, depreciation and amortization, or EBITDA, and net income for the twelve-months ended June 30, 2011 were $452.4 million, $242.2 million and $114.0 million, respectively. Ocean Rig believes EBITDA provides useful information to investors because it is a basis upon which

it measures its operations and efficiency. Please see "Selected Historical Consolidated Financial and Other Data of Ocean Rig" for a reconciliation of EBITDA to net income, the most directly comparable U.S. generally accepted accounting principles, or U.S. GAAP, financial measure.

### Ocean Rig's Fleet

Set forth below is summary information concerning Ocean Rig's offshore drilling units as of September 30, 2011.

| Unit | Year Built or Scheduled Delivery/ Generation | Water Depth to the Wellhead (ft) | Drilling Depth to the Oil Field (ft) | Customer | Contract Term | Dayrate | Drilling Location |
|---|---|---|---|---|---|---|---|
| **Existing Drilling Rigs** | | | | | | | |
| *Leiv Eiriksson* | 2001 / 5th | 7,500 | 30,000 | Cairn Energy plc | Q2 2011 – Q4 2011 | $ 560,000 | Greenland |
| | | | | Borders & Southern plc | Q4 2011 – Q2 2012 | $ 530,000 | Falkland Islands |
| *Eirik Raude* | 2002 / 5th | 10,000 | 30,000 | Tullow Oil plc | Q4 2008 – Q4 2011 | $ 665,000 | Ghana |
| **Existing Drillships** | | | | | | | |
| *Ocean Rig Corcovado* (A) | 2011 / 6th | 10,000 | 40,000 | Cairn Energy plc | Q1 2011 – Q4 2011 | $ 560,000 | Greenland |
| | | | | Petróleo Brasileiro S.A. | Q4 2011 – Q4 2014 | $ 460,000 | Brazil |
| *Ocean Rig Olympia* (A) | 2011 / 6th | 10,000 | 40,000 | Vanco Cote d'Ivoire Ltd. and Vanco Ghana Ltd. | Q2 2011 – Q2 2012 | $ 415,000 | West Africa |
| *Ocean Rig Poseidon* (A) | 2011 / 6th | 10,000 | 40,000 | Petrobras Tanzania Limited | Q3 2011 – Q3 2013 | $632,000* | Tanzania and West Africa |
| *Ocean Rig Mykonos* (A) | 2011 / 6th | 10,000 | 40,000 | Petróleo Brasileiro S.A. | Q4 2011 – Q4 2014 | $ 455,000 | Brazil |
| **Newbuilding Drillships** | | | | | | | |
| *NB #1 (TBN)* (A) | Q3 2013 / 7th | 12,000 | 40,000 | | | | |
| *NB #2 (TBN)* (A) | Q3 2013 / 7th | 12,000 | 40,000 | | | | |
| *NB #3 (TBN)* (A) | Q4 2013 / 7th | 12,000 | 40,000 | | | | |
| **Optional Newbuilding Drillships** | | | | | | | |
| *NB Option #1*(A) | | 12,000 | 40,000 | | | | |
| *NB Option #2*(A) | | 12,000 | 40,000 | | | | |
| *NB Option #3*(A) | | 12,000 | 40,000 | | | | |

(A)  Represents "sister ship" vessels built to the same or similar design and specifications.

\*    Maximum Dayrate

### Employment of Ocean Rig's Fleet

In April 2011, the *Leiv Eiriksson* commenced a contract with a term of approximately six months with Cairn Energy plc, or Cairn, for drilling operations in Greenland at a maximum operating dayrate of $560,000 and a mobilization fee of $7.0 million plus fuel costs. The contract period is scheduled to expire on October 31, 2011, subject to Ocean Rig's customer's option to extend the contract period through November 30, 2011. Following the expiration of its contract with Cairn, the *Leiv Eiriksson* is scheduled to commence a contract with Borders & Southern for drilling operations offshore the Falkland Islands at a maximum operating dayrate of $530,000 and a $3.0 million fee payable upon commencement of mobilization as well as mobilization and demobilization fees, including fuel costs, of $15.4 million and $12.6 million, respectively. The contract was originally a two-well program at a maximum dayrate of $540,000; however, on May 19, 2011, Borders & Southern exercised its option to extend the contract to drill an additional two wells, which it assigned to Falkland Oil and Gas Limited, or Falkland Oil and Gas, and the maximum dayrate decreased to $530,000. Borders & Southern has the option to further extend this contract to drill an additional fifth well, in which case the dayrate would increase to $540,000. The estimated duration for the four-well contract, including mobilization/demobilization periods, is approximately 230 days, and Ocean Rig estimates that the optional period to drill the additional fifth well would extend the contract term by approximately 45 days.

The *Eirik Raude* is employed under a contract, or the Tullow Oil contract, with Tullow Oil plc, or Tullow Oil, for development drilling offshore of Ghana at a weighted average dayrate of $637,000, based upon 100%

utilization. On February 15, 2011, the dayrate increased to a maximum of $665,000, which rate will be effective until expiration of the contract in October 2011.

The *Ocean Rig Corcovado* is employed under a contract with Cairn for a period of approximately ten months, under which the drillship commenced drilling and related operations in Greenland in May 2011 at a maximum operating dayrate of $560,000. In addition, Ocean Rig is entitled to a mobilization fee of $17.0 million, plus fuel costs, and winterization upgrading costs of $12.0 million, plus coverage of yard stay costs at $200,000 per day during the winterization upgrade. The contract period is scheduled to expire on October 31, 2011, subject to Ocean Rig's customer's option to extend the contract period through November 30, 2011. On July 20, 2011, Ocean Rig entered into a three-year contract with Petróleo Brasileiro S.A., or Petrobras Brazil, for the *Ocean Rig Corcovado* for drilling operations offshore Brazil at a maximum dayrate of $460,000, plus a mobilization fee of $30.0 million. The contract is scheduled to commence upon the expiration of the drillship's contract with Cairn.

The *Ocean Rig Olympia* is employed under contracts to drill a total of five wells with Vanco Cote d'Ivoire Ltd. and Vanco Ghana Ltd., or, collectively, Vanco, for exploration drilling offshore of Ghana and Cote d'Ivoire at a maximum operating dayrate of $415,000 and a daily mobilization rate of $180,000, plus fuel costs. The aggregate contract term is for approximately one year, subject to Ocean Rig's customer's option to extend the term at the same dayrate for (i) one additional well, (ii) one additional year or (iii) one additional well plus one additional year. Vanco is required to exercise the option no later than the date on which the second well in the five-well program reaches its target depth.

The *Ocean Rig Poseidon* commenced a contract with Petrobras Tanzania Limited, or Petrobras Tanzania, a company related to Petrobras Oil & Gas B.V., or Petrobras Oil & Gas, on July 29, 2011 for drilling operations in Tanzania and West Africa for a period of 544 days, plus a mobilization period, at a maximum dayrate of $632,000, plus a bonus of up to $46,000. In addition, Ocean Rig is entitled to receive a separate dayrate of $422,500 for up to 60 days during relocation and a mobilization dayrate of $317,000, plus the cost of fuel. The *Ocean Rig Poseidon* is currently earning mobilization fees under the contract. Drilling operations commenced on August 28, 2011.

On July 20, 2011, Ocean Rig entered into a three-year contract with Petrobras Brazil for the *Ocean Rig Mykonos* for drilling operations offshore Brazil at a maximum dayrate of $455,000, plus a mobilization fee of $30.0 million. The contract is scheduled to commence in the fourth quarter of 2011.

Ocean Rig has not arranged employment for its three seventh generation hulls, which are scheduled to be delivered in July 2013, September 2013 and November 2013, respectively.

### Option to Purchase Additional New Drillships

On November 22, 2010, DryShips, Ocean Rig's parent company, entered into a contract with Samsung that granted DryShips options for the construction of up to four additional ultra-deepwater drillships, which would be "sister-ships" to the *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* with certain upgrades to vessel design and specifications. The option agreement required DryShips to pay a non-refundable slot reservation fee of $24.8 million per drillship. The option agreement was novated by DryShips to Ocean Rig on December 30, 2010, at a cost of $99.0 million, which Ocean Rig paid from the net proceeds of a private offering of its common shares that Ocean Rig completed in December 2010. In addition, Ocean Rig paid additional deposits totaling $20.0 million to Samsung in the first quarter of 2011 to maintain favorable costs and yard slot timing under the option contract.

On May 16, 2011, Ocean Rig entered into an addendum to the option contract with Samsung, pursuant to which Samsung granted Ocean Rig the option for the construction of up to two additional ultra-deepwater drillships, which would be "sister-ships" to its drillships and its seventh generation hulls, with certain upgrades to vessel design and specifications. Ocean Rig did not pay slot reservation fees in connection with its entry into this addendum.

As of the date of this proxy statement / prospectus, Ocean Rig has exercised three of the six options and, as a result, has entered into shipbuilding contracts for its seventh generation hulls with deliveries scheduled in July 2013, September 2013 and November 2013, respectively. Ocean Rig made payments of $632.4 million to the shipyard in the second quarter of 2011 in connection with its exercise of the three newbuilding drillship options. The estimated total project cost per drillship is $638.0 million, which consists of $570.0 million of construction costs, costs of approximately $38.0 million for upgrades to the existing drillship specifications and construction-related expenses

of $30.0 million. These upgrades include a 7 ram blowout preventer, or BOP, a dual mud system and, with the purchase of additional equipment, the capability to drill up to 12,000 feet water depth.

Ocean Rig may exercise the three remaining newbuilding drillship options at any time on or prior to January 31, 2012, with vessel deliveries ranging from the first to the third quarter of 2014, depending on when the options are exercised. Ocean Rig estimates the total project cost, excluding financing costs, for the remaining three optional drillships to be $638.0 million per drillship, based on the construction and construction-related expenses for its seventh generation hulls described above.

As part of the novation of the contract described above, the benefit of the slot reservation fees passed to Ocean Rig. The amount of the slot reservation fees for the seventh generation hulls has been applied towards the drillship contract prices and the amount of the slot reservation fees applicable to one of the remaining three newbuilding drillship options will be applied towards the drillship contract price if the option is exercised.

## Management of Ocean Rig's Drilling Units

Ocean Rig's existing drilling rigs, the *Leiv Eiriksson* and the *Eirik Raude* , are managed by Ocean Rig AS, Ocean Rig's wholly-owned subsidiary. Ocean Rig AS also provides supervisory management services, including onshore management, to the *Ocean Rig Corcovado, the Ocean Rig Olympia* , the *Ocean Rig Poseidon* , the *Ocean Rig Mykonos* and Ocean Rig's newbuilding drillships pursuant to separate management agreements entered into with each of the drillship-owning subsidiaries. Under the terms of these management agreements, Ocean Rig AS, through its offices in Stavanger, Norway, Aberdeen, United Kingdom and Houston, Texas, is responsible for, among other things, (i) assisting in construction contract technical negotiations, (ii) securing contracts for the future employment of the drillships, and (iii) providing commercial, technical and operational management for the drillships.

Pursuant to the Global Services Agreement between DryShips and Cardiff Marine Inc., or Cardiff, a related party, effective December 21, 2010, DryShips has engaged Cardiff to act as consultant on matters of chartering and sale and purchase transactions for the offshore drilling units operated by Ocean Rig. Under the Global Services Agreement, Cardiff, or its subcontractor, will (i) provide consulting services related to identifying, sourcing, negotiating and arranging new employment for offshore assets of DryShips and its subsidiaries, including Ocean Rig's drilling units and (ii) identify, source, negotiate and arrange the sale or purchase of the offshore assets of DryShips and its subsidiaries, including Ocean Rig's drilling units. The services provided by Ocean Rig AS and Cardiff overlap mainly with respect to negotiating shipyard orders and providing marketing for potential contractors. Cardiff has an established reputation within the shipping industry, and has developed expertise and a network of strong relationships with shipbuilders and oil companies, which supplement the management capabilities of Ocean Rig AS. Ocean Rig may benefit from services provided in accordance the Global Services Agreement. See "Business — Management of Ocean Rig's Drilling Units — Global Services Agreement."

## Ocean Rig's Competitive Strengths

Ocean Rig believes that its prospects for success are enhanced by the following aspects of its business:

*Proven track record in ultra-deepwater drilling operations.*   Ocean Rig has a well-established record of operating drilling equipment with a primary focus on ultra-deepwater offshore locations and harsh environments. Established in 1996, Ocean Rig employed 1,093 people as of September 30, 2011, and has gained significant experience operating in challenging environments with a proven track record for operations excellence through Ocean Rig's completion of 105 wells. Ocean Rig capitalizes on its high-specification drilling units to the maximum extent of their technical capability, and Ocean Rig believes that it has earned a reputation for operating performance excellence. Ocean Rig has operated the *Leiv Eiriksson* since 2001 and the *Eirik Raude* since 2002. From February 24, 2010 through February 3, 2011, the *Leiv Eiriksson* performed drilling operations in the Black Sea under its contract with Petrobras Oil & Gas, or the Petrobras contract, and achieved a 91% earnings efficiency. The *Eirik Raude* has been operating in deep water offshore of Ghana under the Tullow Oil contract and achieved a 98% earnings efficiency for the period beginning October 2008, when the rig commenced the contract, through June 30, 2011.

*Technologically advanced deepwater drilling units.*   According to Fearnley Offshore AS, the *Leiv Eiriksson* and the *Eirik Raude* are two of only 15 drilling units worldwide as of July 2011 that are technologically equipped to operate in both ultra-deepwater and harsh environments. Additionally, each of Ocean Rig's drillships will be either a

sixth or seventh generation, advanced capability, ultra-deepwater drillship built based on a proven design that features full dual derrick enhancements. The *Ocean Rig Corcovado,* the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* have the capacity to drill 40,000 feet at water depths of 10,000 feet and Ocean Rig's seventh generation hulls will have the capacity to drill 40,000 feet at water depths of 12,000 feet. One of the key benefits of each of Ocean Rig's drillships is its dual activity drilling capabilities, which involves two drilling systems that use a single derrick and which permits two drilling-related operations to take place simultaneously. Ocean Rig estimates that this capability reduces typical drilling time by approximately 15% to 40%, depending on the well parameters, resulting in greater utilization and cost savings to Ocean Rig's customers. According to Fearnley Offshore AS, of the 34 ultra-deepwater drilling units to be delivered worldwide in 2011, only 11 are expected to have dual activity drilling capabilities, including Ocean Rig's four drillships. As a result of the *Deepwater Horizon* offshore drilling accident in the Gulf of Mexico in April 2010, in which Ocean Rig was not involved, Ocean Rig believes that independently and nationally owned oil companies and international governments will increase their focus on safety and the prevention of environmental disasters and, as a result, Ocean Rig expects that high quality and technologically advanced drillships such as Ocean Rig's will be in high demand and at the forefront of ultra-deepwater drilling activity.

    *Long-term blue-chip customer relationships.*    Since the commencement of its operations, Ocean Rig has developed relationships with large independent oil producers such as Chevron Corporation, or Chevron, Exxon Mobil Corporation, or ExxonMobil, Petrobras Oil & Gas, Royal Dutch Shell plc, or Shell, BP plc, or BP, Total S.A., or Total, Statoil ASA, or Statoil, and Tullow Oil. Together with its predecessor, Ocean Rig ASA, Ocean Rig has drilled 105 wells in 15 countries for 22 clients, including those listed above. Currently, Ocean Rig has employment contracts with Petrobras Oil & Gas, Petrobras Tanzania, Petrobras Brazil, Tullow Oil, Borders & Southern, Cairn and Vanco. Ocean Rig believes these strong customer relationships stem from its proven track record for dependability and for delivering high-quality drilling services in the most extreme operating environments. Although Ocean Rig's former clients are not obligated to use its services, it expects to use its relationships with its current and former customers to secure attractive employment contracts for its drilling units.

    *High barriers to entry.*    There are significant barriers to entry in the ultra-deepwater offshore drilling industry. Given the technical expertise needed to operate ultra-deepwater drilling rigs and drillships, operational know-how and a track record of safety play an important part in contract awards. The offshore drilling industry in some jurisdictions is highly regulated, and compliance with regulations requires significant operational expertise and financial and management resources. With the negative press around the *Deepwater Horizon* drilling rig accident, Ocean Rig expects regulators worldwide to implement more stringent regulations and oil companies to place a premium on drilling firms with a proven track record for safety. There are also significant capital requirements for building ultra-deepwater drillships. Further, there is limited shipyard availability for new drillships and required lead times are typically in excess of two years. Additionally, due to the recent financial crisis, access to bank lending, the traditional source for ship and offshore financing, has become constrained. According to Fearnley Offshore AS, as of July 2011, there were 85 ultra-deepwater drilling units in operation with another 62 under construction, including the *Ocean Rig Poseidon,* the *Ocean Rig Mykonos* and Ocean Rig's three newbuilding drillships.

    *Anticipated strong free cash flow generation.*    Based on current and expected supply and demand dynamics in ultra-deepwater drilling, Ocean Rig expects dayrates to be above its estimated daily cash breakeven rate, based on estimated daily operating costs, general and administrative costs and debt service requirements, thereby generating substantial free cash flow going forward. According to Fearnley Offshore AS, the most recent charterhire in the industry for a modern ultra-deepwater drillship or rig (June 2011) was at a gross dayrate of $450,000 for a two-year contract commencing in the third quarter of 2012. As of September 30, 2011, Ocean Rig's five-unit fleet generated a maximum average dayrate of $560,000.

    *Leading shipbuilder constructing Ocean Rig's newbuildings.*    Only a limited number of shipbuilders possess the necessary construction and underwater drilling technologies and experience to construct drillships. The *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* were, and Ocean Rig's three newbuilding drillships are being, built by Samsung, which is one of the world's largest shipbuilders in the high-tech and high-value shipbuilding sectors, which include drillships, ultra-large container ships, liquefied natural gas carriers and floating production storage and offshore units, or FPSOs. According to Fearnley Offshore AS, of the 74 drillships ordered

on a global basis since 2005, Samsung has delivered or will deliver 40, representing a 54% market share. To date, construction of Ocean Rig's newbuilding drillships has progressed on time and on budget.

*Experienced management and operations team.*   Ocean Rig has an experienced management and operations team with a proven track record and an average of 24 years of experience in the offshore drilling industry. Many of the core members of Ocean Rig's management team have worked together since 2006, and certain members of Ocean Rig's management team have worked at leading oil-related and shipping companies such as ExxonMobil, Statoil, Transocean Ltd., ProSafe and Smedvig (acquired by Seadrill Limited). In addition to the members of the management team, Ocean Rig had at September 30, 2011, 39 employees of Ocean Rig overseeing construction of its newbuilding drillships and will have highly trained personnel operating the drillships once they are delivered from the yard. Ocean Rig also had at September 30, 2011, an onshore team of 116 people in management functions as well as administrative and technical staff and support functions, ranging from marketing, human resources, accounting, finance, technical support and health, environment, safety and quality, or HES&Q. Ocean Rig believes the focus and dedication of its personnel in each step of the process, from design to construction to operation, has contributed to its track record of safety and consistently strong operational performance.

## Business Strategy

Ocean Rig's business strategy is predicated on becoming a leading company in the offshore ultra-deepwater drilling industry and providing customers with safe, high quality service and state-of-the-art drilling equipment. The following outlines the primary elements of this strategy:

*Create a "pure play" model in the ultra-deepwater and harsh environment markets.*   Ocean Rig's mission is to become the preferred offshore drilling contractor in the ultra-deepwater and harsh environment regions of the world and to deliver excellent performance to its clients by exceeding their expectations for operational efficiency and safety standards. Ocean Rig believes the *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* are, and its three newbuilding drillships will be, among the most technologically advanced in the world. Ocean Rig currently has an option to purchase up to three additional newbuilding drillships and it intends to grow its fleet over time in order to continue to meet its customers' demands while optimizing its fleet size from an operational and logistical perspective.

*Capitalize on the operating capabilities of Ocean Rig's drilling units.*   Ocean Rig plans to capitalize on the operating capabilities of its drilling units by entering into attractive employment contracts. The focus of its marketing effort is to maximize the benefits of the drilling units' ability to operate in ultra-deepwater drilling locations. As described above, the *Leiv Eiriksson* and *Eirik Raude* are two of only 15 drilling units worldwide as of July 2011 that are technologically equipped to operate in both ultra-deepwater and harsh environments, and its drillships will have the capacity to drill 40,000 feet at water depths of 10,000 feet or, in the case of Ocean Rig's seventh generation hulls, 12,000 feet with dual activity drilling capabilities. Ocean Rig aims to secure firm employment contracts for the drilling units at or near the highest dayrates available in the industry at that time while balancing appropriate contract lengths. As Ocean Rig works towards its goal of securing firm contracts for its drilling units at attractive dayrates, Ocean Rig believes it will be able to differentiate itself based on its prior experience operating drilling rigs and its safety record.

*Maintain high drilling units utilization and profitability.*   Ocean Rig has a proven track record of optimizing equipment utilization. Until February 2011, the *Leiv Eiriksson* was operating in the Black Sea under the Petrobras contract and maintained a 91% earnings efficiency from February 24, 2010 through February 3, 2011, for the period it performed drilling operations under the contract. The *Eirik Raude* has been operating offshore of Ghana under the Tullow Oil contract and maintained a 98% earnings efficiency from October 2008, when it commenced operations under the contract, through March 31, 2011. Ocean Rig aims to maximize the revenue generation of its drilling units by maintaining its track record of high drilling unit utilization as a result of the design capabilities of its drilling units that can operate in harsh environmental conditions.

*Capitalize on favorable industry dynamics.*   Ocean Rig believes the demand for offshore deepwater drilling units will be positively affected by increasing global demand for oil and gas and increased exploration and development activity in deepwater markets. The International Energy Agency, or the IEA, projected that oil demand for 2010 increased by 3.4% compared to 2009 levels, and that oil demand will further increase to 89.2 million barrels per day in 2011, an increase of 1.5% compared to 2010 levels. As the Organization for Economic Co-

operation and Development, or OECD, countries resume their growth and the major non-OECD countries continue to develop, led by China and India, oil demand is expected to grow. Ocean Rig believes it will become increasingly difficult to find the incremental barrels of oil needed, due to depleting existing oil reserves. This is expected to force oil companies to continue to explore for oil farther offshore for growing their proven reserves. According to Fearnley Offshore AS, from 2005 to 2010, the actual spending directly related to ultra-deepwater drilling units increased from $4.7 billion to $19.0 billion, a compound average growth rate, or CAGR, of 32.2%.

*Continue to prioritize safety as a key focus of Ocean Rig's operations.*   Ocean Rig believes safety is of paramount importance to its customers and a key differentiator for Ocean Rig when securing drilling contracts from its customers. Ocean Rig has a zero incident philosophy embedded in its corporate culture, which is reflected in its policies and procedures. Despite operating under severely harsh weather conditions, Ocean Rig has a proven track record of high efficiency deepwater and ultra-deepwater drilling operations. Ocean Rig employed 1,093 people as of September 30, 2011 and has been operating ultra-deepwater drilling rigs since 2001. Ocean Rig has extensive experience working in varying environments and regulatory regimes across the globe, including Eastern Canada, Angola, Congo, Ireland, the Gulf of Mexico, the U.K., West of Shetlands, Norway, including the Barents Sea, Ghana and Turkey.

Both of Ocean Rig's drilling rigs and one of its drillships, the *Ocean Rig Corcovado* , have a valid and updated safety case under U.K. Health and Safety Executive, or HSE, regulations, and both of Ocean Rig's drilling rigs hold a Norwegian sector certificate of compliance (called an Acknowledgement of Compliance), which evidences that the rigs and Ocean Rig's management system meet the requirements set by the U.K. and Norwegian authorities.

Ocean Rig believes that this safety record has enabled it to hire and retain highly-skilled employees, thereby improving its overall operating and financial performance. Ocean Rig expects to continue its strong commitment to safety across all of its operations by investing in the latest technologies, performing regular planned maintenance on its drilling units and investing in the training and development of new safety programs for its employees.

*Implement and sustain a competitive cost structure.*   Ocean Rig believes that it has a competitive cost structure due to its operating experience and successful employee retention policies and that its retention of highly-skilled personnel leads to significant transferable experience and knowledge of drilling rig operation through deployment of seasoned crews across its fleet. By focusing on the ultra-deepwater segment, Ocean Rig believes that it is able to design and implement best-in-class processes to streamline its operations and improve efficiency. As Ocean Rig grows, it hopes to benefit from significant economies of scale due to an increased fleet size and a fleet of "sister-ships" to its drillships, where Ocean Rig expects to benefit from the standardization of these drilling units, resulting in lower training and operating costs. In addition, Ocean Rig's drillships have high-end specifications, including advanced technology and safety features, and, therefore, Ocean Rig expects that the need for upgrades will be limited in the near term. Ocean Rig expects the increase from six to nine drilling units to enable it to bring more than one unit into a drilling region in which it operates. To the extent Ocean Rig operates more than one drilling unit in a drilling region, Ocean Rig expects to benefit from economies of scale and improved logistic coordination managing more units from the same onshore bases.

## Risk Factors

Ocean Rig faces a number of risks associated with its business and industry and must overcome a variety of challenges to utilize its strengths and implement its business strategy. These risks include, among others, changes in the offshore drilling market, including supply and demand, utilization rates, dayrates, customer drilling programs, and commodity prices; a downturn in the global economy; hazards inherent in the drilling industry and marine operations resulting in liability for personal injury or loss of life, damage to or destruction of property and equipment, pollution or environmental damage; inability to comply with loan covenants; inability to finance shipyard and other capital projects; and inability to successfully employ its drilling units.

This is not a comprehensive list of risks to which Ocean Rig is subject, and you should carefully consider all the information in this proxy statement / prospectus in connection with its common shares. In particular, Ocean Rig urges you to carefully consider the risk factors set forth in the section of this proxy statement / prospectus entitled "Risk Factors" beginning on page 29.

**Industry Overview**

In recent years, the international drilling market has seen an increasing trend towards deep and ultra-deepwater oil and gas exploration. As shallow water resources mature, deep and ultra-deepwater regions are expected to play an increasing role in offshore oil and gas production. According to Fearnley Offshore AS, the ultra-deepwater market has seen rapid development over the last six years, with dayrates increasing from approximately $180,000 in 2004 to above $600,000 in 2008, before declining to a level of approximately $453,000 in July 2011. The ultra-deepwater market rig utilization rate has been stable above 80% since 2000 and above 97% since 2006. The operating units capable of drilling in ultra-deepwater depths of greater than 7,500 feet consist mainly of fifth- and sixth-generation units, but also include certain older upgraded units. The in-service fleet as of July 2011 totaled 85 units, and is expected to grow to 147 units upon the scheduled delivery of the current newbuild orderbook by the middle of 2014. Historically, an increase in supply has caused a decline in utilization and dayrates until drilling units are absorbed into the market. Accordingly, dayrates have been very cyclical. Ocean Rig believes that the largest undiscovered offshore reserves are mostly located in ultra-deepwater fields and primarily located in the "golden triangle" between West Africa, Brazil and the Gulf of Mexico. The location of these large offshore reserves has resulted in more than 90% of the floater orderbook being represented by ultra-deepwater units. Furthermore, due to increased focus on technically challenging operations and the inherent risk of developing offshore fields in ultra-deepwater, particularly in light of the *Deepwater Horizon* oil spill in the Gulf of Mexico, oil companies have already begun to show a preference for modern units more capable of drilling in these harsh environments. See "The Offshore Drilling Industry."

**Dividend Policy**

Ocean Rig's long-term objective is to pay a regular dividend in support of its main objective to maximize shareholder returns. However, Ocean Rig has not paid any dividends in the past and it is currently focused on the development of capital intensive projects in line with its growth strategy and this focus will limit any dividend payment in the medium-term. Furthermore, since Ocean Rig is a holding company with no material assets other than the shares of its subsidiaries through which it conducts its operations, Ocean Rig's ability to pay dividends will depend on its subsidiaries distributing their earnings and cash flow to it. Some of Ocean Rig's other loan agreements limit or prohibit its subsidiaries' ability to make distributions without the consent of its lenders.

Any future dividends declared will be at the discretion of Ocean Rig's board of directors and will depend upon its financial condition, earnings and other factors, including the financial covenants contained in Ocean Rig's loan agreements and its 9.5% senior unsecured notes due 2016. Ocean Rig's ability to pay dividends is also subject to Marshall Islands law, which generally prohibits the payment of dividends other than from operating surplus or while a company is insolvent or would be rendered insolvent upon the payment of such dividend. In addition, under Ocean Rig's $800.0 million senior secured term loan agreement, which matures in 2016, Ocean Rig is prohibited from paying dividends without the consent of its lenders.

**Corporate Structure**

Ocean Rig is a corporation incorporated under the laws of the Republic of the Marshall Islands on December 10, 2007 under the name Primelead Shareholders Inc. Primelead Shareholders Inc. was formed in December 2007 for the purpose of acquiring the shares of Ocean Rig's predecessor, Ocean Rig ASA, which was incorporated in September 1996 under the laws of Norway. Ocean Rig acquired control of Ocean Rig ASA on May 14, 2008. Prior to the private placement of Ocean Rig's common shares in December 2010, it was a wholly-owned subsidiary of DryShips. As of the date of this proxy statement / prospectus, DryShips owns approximately 75% of Ocean Rig's outstanding common shares. Each of Ocean Rig's drilling units is owned by a separate wholly-owned subsidiary. For further information concerning Ocean Rig's organizational structure, please see "Business — Corporate Structure."

Ocean Rig maintains its principal executive offices at 10 Skopa Street, Tribune House, 2nd Floor, Office 202, CY 1075, Nicosia, Cyprus and Ocean Rig's telephone number at that address is 011 357 22767517. Ocean Rig's website is located at www.ocean-rig.com. The information on Ocean Rig's website is not a part of this proxy statement / prospectus.

**Private Offering of Common Shares**

On December 21, 2010, Ocean Rig completed the sale of an aggregate of 28,571,428 of its common shares (representing approximately 22% of its outstanding common stock) in an offering made to both non-U.S. persons in Norway in reliance on Regulation S under the Securities Act of 1933, as amended, or the Securities Act, and to qualified institutional buyers in the U.S. in reliance on Rule 144A under the Securities Act, or the private offering. A company controlled by Ocean Rig's Chairman, President and Chief Executive Officer, Mr. George Economou, purchased 2,869,428 common shares, or 2.38% of its outstanding common shares, in the private offering at the offering price of $17.50 per share. Ocean Rig received approximately $488.3 million of net proceeds from the private offering, of which it used $99.0 million to purchase an option contract from DryShips, Ocean Rig's parent company, for the construction of up to four additional ultra-deepwater drillships as described above. Ocean Rig applied the remaining proceeds to partially fund remaining installment payments for its newbuilding drillships and for general corporate purposes.

On August 26, 2011, Ocean Rig commenced an offer to exchange an aggregate of 28,571,428 registered shares of common stock for an equivalent number of unregistered common shares issued in the private offering, or the Exchange Offer. On September 29, 2011, an aggregate of 28,505,786 common shares were exchanged in the Exchange Offer.

**Recent Developments**

During April 2011, Ocean Rig borrowed an aggregate of $48.1 million from DryShips through shareholder loans for capital expenditures and general corporate purposes. On April 20, 2011, these intercompany loans, along with shareholder loans of $127.5 million that Ocean Rig borrowed from DryShips in March 2011, were fully repaid.

On April 15, 2011, Ocean Rig held a special shareholders meeting at which its shareholders approved proposals (i) to adopt Ocean Rig's second amended and restated articles of incorporation and (ii) to designate the class of each member of Ocean Rig's board of directors and related expiration of term of office.

On April 18, 2011, Ocean Rig entered into an $800 million senior secured term loan agreement to partially finance the construction costs of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* . On April 20, 2011, Ocean Rig drew down the full amount of this facility and prepaid its $325.0 million short-term loan agreement.

On April 18, 2011, Ocean Rig exercised the first of its six newbuilding drillship options under its option contract with Samsung and, as a result, entered into a shipbuilding contract for one of Ocean Rig's seventh generation hulls and paid $207.6 million to the shipyard on April 20, 2011.

On April 27, 2011, Ocean Rig entered into an agreement with the lenders under its two $562.5 million loan agreements, or the Deutsche Bank credit facilities, to restructure these facilities. As a result of this restructuring (i) the maximum amount permitted to be drawn is reduced from $562.5 million to $495.0 million under each facility, (ii) in addition to the guarantee already provided by DryShips, Ocean Rig provided an unlimited recourse guarantee that includes certain financial covenants, and (iii) Ocean Rig is permitted to draw under the facility with respect to the *Ocean Rig Poseidon* based upon the employment of the drillship under its drilling contract with Petrobras Tanzania, and on April 27, 2010, the cash collateral deposited for this vessel was released. On August 10, 2011, Ocean Rig amended the terms of the credit facility for the construction of the *Ocean Rig Mykonos* to allow for full drawdowns to finance the remaining installment payments for this drillship based on the Petrobras Brazil contract and on August 10, 2011, the cash collateral deposited for the drillship was released. The amendment also requires that the *Ocean Rig Mykonos* be re-employed under a contract acceptable to the lenders meeting certain minimum terms and dayrates at least six months, in lieu of 12 months, prior to the expiration of the Petrobras Brazil contract. All other material terms of the credit facility were unchanged.

On April 27, 2011, Ocean Rig issued $500.0 million aggregate principal amount of its 9.5% senior unsecured notes due 2016 offered in a private placement. The net proceeds of the offering of approximately $487.5 million are expected to be used to finance Ocean Rig's newbuilding drillships program and for general corporate purposes.

On April 27, 2011, Ocean Rig exercised the second of six newbuilding drillship options under its option contract with Samsung and, as a result, entered into a shipbuilding contract for the second of Ocean Rig's seventh generation hulls and paid $207.4 million to the shipyard on May 5, 2011.

On May 3, 2011, following the approval by Ocean Rig's board of directors and shareholders, Ocean Rig amended and restated its amended and restated articles of incorporation to, among other things, increase its authorized share capital to 1,000,000,000 common shares and 500,000,000 shares of preferred stock, each with a par value of $0.01 per share.

On May 5, 2011, Ocean Rig terminated its contract with Borders & Southern for the *Eirik Raude* for drilling operations offshore the Falkland Islands and entered into a new contract with Borders & Southern for the *Leiv Eiriksson* on the same terms as the original contract for the *Eirik Raude* with exceptions for the fees payable upon mobilization and demobilization and certain other terms specific to the *Leiv Eiriksson* , including off-hire dates, period surveys and technical specifications.

On May 16, 2011, Ocean Rig entered into an addendum to its option contract with Samsung, pursuant to which Samsung granted Ocean Rig the option for the construction of up to two additional ultra-deepwater drillships, for a total of up to six additional ultra-deepwater drillships, which would be "sister-ships" to its drillships and its seventh generation hulls, with certain upgrades to vessel design and specifications. Pursuant to the addendum, the two additional newbuilding drillship options and the remaining drillship option under the original contract may be exercised at any time on or prior to January 31, 2012.

On May 19, 2011, Borders & Southern exercised its option to drill an additional two wells under its contract with Ocean Rig for the *Leiv Eiriksson* . Borders & Southern assigned the two optional wells to Falkland Oil and Gas. The maximum operating dayrate under the contract, which was originally $540,000, decreased to $530,000 as a result of the exercise of the optional wells. Borders & Southern has a further option under the contract to drill a fifth well, for which, if exercised, the dayrate would be $540,000.

On May 20, 2011, Ocean Rig paid $10.0 million to Samsung in exchange for Samsung's agreement to deliver the third optional newbuilding drillship by November 2013 if Ocean Rig exercises its option to construct the drillship by November 22, 2011 under its contract with Samsung.

On June 23, 2011, Ocean Rig exercised the third of Ocean Rig's six newbuilding drillship options under its option contract with Samsung and, as a result, entered into a shipbuilding contract for the third of its seventh generation hulls and paid $207.4 million to the shipyard.

On July 20, 2011, Ocean Rig entered into contracts with Petrobras Brazil for the *Ocean Rig Corcovado* and the *Ocean Rig Mykonos* for drilling operations offshore Brazil. The term of each contract is 1,095 days, with a total combined value of $1.1 billion. The contract for the *Ocean Rig Mykonos* is scheduled to commence in the fourth quarter of 2011, and the contract for the *Ocean Rig Corcovado* is scheduled to commence upon the expiration of the drillship's current contract with Cairn.

On July 26, 2011, DryShips and OceanFreight entered into the merger agreement described in this proxy statement /prospectus, pursuant to which DryShips agreed to acquire the outstanding shares of OceanFreight common stock for consideration per share consisting of $11.25 in cash and 0.52326 of a share of Ocean Rig common stock. The Ocean Rig common shares that will be received by the OceanFreight shareholders will be from currently outstanding shares held by DryShips. Based on the July 25, 2011 closing price of NOK89.00 (or approximately $16.44 based on the NOK/USD exchange rate of NOK5.41/$1 on July 25, 2011) for the shares of Ocean Rig common stock on the Norwegian OTC market, the transaction consideration reflects a total equity value for OceanFreight of approximately $118 million and a total enterprise value of approximately $239 million, including the assumption of debt. The transaction has been approved by the boards of directors of DryShips and OceanFreight, by the audit committee of the board of directors of DryShips, which negotiated the proposed transaction on behalf of DryShips, and by the OceanFreight Special Committee. The shareholders of OceanFreight, other than the entities controlled by Mr. Kandylidis, the Chief Executive Officer of OceanFreight, will receive the consideration for their shares pursuant to a merger of OceanFreight with a subsidiary of DryShips.

Simultaneously with the execution of the merger agreement, DryShips, entities controlled by Mr. Kandylidis and OceanFreight, entered into a separate purchase agreement. Under the purchase agreement, DryShips acquired

from the entities controlled by Mr. Kandylidis all their OceanFreight shares, representing a majority of the outstanding shares of OceanFreight, for the same consideration per share that the OceanFreight shareholders will receive in the merger. This acquisition closed on August 24, 2011. DryShips has committed to vote the OceanFreight shares it acquired in favor of the merger, which requires approval by a majority vote. Mr. Kandylidis is the son of one of the directors of DryShips and the nephew of Mr. Economou. The Ocean Rig shares paid by DryShips to the entities controlled by Mr. Kandylidis are subject to a six-month lock-up period.

On July 28, 2011, Ocean Rig took delivery of its newbuilding drillship, the *Ocean Rig Poseidon* , the third of Ocean Rig's four sixth-generation, advanced capability ultra-deepwater sister drillships that are being constructed by Samsung. In connection with the delivery of the *Ocean Rig Poseidon* , the final yard installment of $309.3 million was paid, which was financed with additional drawdowns in July 2011 under the Deutsche Bank credit facility.

On August 26, 2011, Ocean Rig commenced an offer to exchange up to 28,571,428 shares of its new common stock that have been registered under the Securities Act pursuant to a registration statement on Form F-4 (Registration no. 333-175940), or the Exchange Shares, for an equivalent number of its common shares previously sold in a private offering in December 2010, or the Original Shares. On September 29, 2011, an aggregate of 28,505,786 common shares were exchanged in the Exchange Offer.

On September 12, 2011, Ocean Rig appointed a new independent director, Mr. Prokopios (Akis) Tsirigakis, to its board of directors to fill the vacancy resulting from the resignation of Mr. Pankaj Khanna as a director. On the same date, the Ocean Rig board of directors approved other changes to Ocean Rig's corporate governance in connection with the application to list Ocean Rig's common shares on the NASDAQ Global Select Market. Specifically, the Ocean Rig board of directors approved (1) an increase in the size of the audit committee to three members; (2) the establishment of a compensation committee comprised of independent directors; (3) the establishment of a nominating and corporate governance committee comprised of independent directors; (4) the adoption of written compensation charters for each of the audit, compensation and nominating and corporate governance committees; and (5) the adoption of a Code of Ethics that applies to all officers, directors and employees of Ocean Rig. The Ocean Rig board of directors has determined that each of Mr. Akis Tsirigakis, Mr. Trygve Arnesen and Mr. Michael Gregos are independent under the rules of the Nasdaq Stock Market.

On September 30, 2011, Ocean Rig took delivery of its newbuilding drillship, the *Ocean Rig Mykonos* , the fourth of its four sixth-generation, advanced capability ultra-deepwater sister drillships that were constructed by Samsung. In connection with the delivery of the *Ocean Rig Mykonos* , the final yard installment of $305.7 million was paid, which was financed with additional drawdowns in September 2011 under the Deutsche Bank credit facility for the construction of the *Ocean Rig Mykonos* totaling $277.6 million.

On October 5, 2011, DryShips completed the partial spin off of Ocean Rig by distributing an aggregate of 2,967,291 common shares of Ocean Rig, after giving effect to the treatment of fractional shares, on a pro rata basis to DryShips' shareholders as of the record date of September 21, 2011, or the Spin Off. In lieu of fractional shares, DryShips' transfer agent aggregated all fractional shares that would otherwise be distributable to DryShips' shareholders and sold a total of 105 common shares on behalf of those shareholders who would otherwise be entitled to receive a fractional share of Ocean Rig. Following the distribution, each such shareholder received a cash payment in an amount equal to its pro rata share of the total net proceeds of the sale of fractional shares.

Ocean Rig has been advised that DryShips completed the Spin Off in order to satisfy the initial listing criteria of the NASDAQ Global Select Market, which require that Ocean Rig have a minimum number of round lot shareholders (shareholders who own 100 or more shares), and thereby increase the liquidity of its shares of common stock. Ocean Rig believes that listing its shares of common stock on the NASDAQ Global Select Market and thereby increasing the liquidity of its shares of common stock will benefit its shareholders by improving the ability of its shareholders to monetize their investment by selling its common shares, reducing volatility in the market price of its common shares, enhancing its ability to access the capital markets and increasing the likelihood of attracting coverage by research analysts which, in turn, would provide additional information to shareholders upon which to base an investment decision. In connection with the Spin Off, Ocean Rig applied to have its common shares listed for trading on the NASDAQ Global Select Market and on September 19, 2011, Ocean Rig's common shares commenced "when issued" trading on the Nasdaq Global Select Market under the ticker symbol "ORIGV." Ocean Rig's common shares commenced "regular way" trading on the NASDAQ Global Select Market under the ticker symbol "ORIG" on October 6, 2011.

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL AND OTHER DATA OF OCEANFREIGHT

The following table sets forth selected consolidated financial and other data of OceanFreight for the period from September 11, 2006 (date of inception) through December 31, 2006 and for the years ended December 31, 2007, 2008, 2009 and 2010 as well as for the six-month periods ended June 30, 2011 and 2010. You should read the notes to OceanFreight's consolidated financial statements for a discussion of the basis on which OceanFreight's consolidated financial statements are presented. The information provided below should be read in conjunction with Item 5 "Operating and Financial Review and Prospects" and the consolidated financial statements, related notes and other financial information included in OceanFreight's Form 20-F included as Annex D to this proxy statement / prospectus and the other financial information included in Annex E to this proxy statement / prospectus.

Following the 3:1 and the 20:1 reverse stock splits effected on June 17, 2010 and July 6, 2011, respectively, pursuant to which every three and twenty shares, respectively, of OceanFreight's common stock issued and outstanding were converted into one share of common stock, all share and per share amounts in the selected consolidated financial and other data of OceanFreight in the following table have been retroactively restated to reflect these changes in capital structure.

(Expressed in thousands of U.S. Dollars — except for share and per share data and average daily results)

| | September 11, 2006 (inception) to December 31, 2006 | Year Ended December 31, | | | | Six Month Period Ended June 30, | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2007 | 2008 | 2009 | 2010 | 2010 | 2011 |
| | | | | | | (Unaudited) | |
| **Income Statement Data:** | | | | | | | |
| Voyage revenue and imputed deferred revenue | $   — | 41,133 | 157,434 | 132,935 | 102,190 | 54,377 | 30,963 |
| Gain/(loss) on forward freight agreements | — | — | — | 570 | (4,342) | (4,218) | — |
| Voyage expenses | — | (1,958) | (14,275) | (5,549) | (5,196) | (2,616) | (2,206) |
| Vessels' operating expenses | — | (9,208) | (28,980) | (43,915) | (41,078) | (21,551) | (12,091) |
| General and administrative expenses | (111) | (3,460) | (9,127) | (8,540) | (8,264) | (2,687) | (3,903) |
| Survey and drydocking costs | — | (1,685) | (736) | (5,570) | (1,784) | (1,336) | — |
| Impairment | — | — | — | (52,700) | — | — | — |
| Depreciation | — | (13,210) | (43,658) | (48,272) | (24,853) | (13,581) | (8,253) |
| Gain/(loss) on sale of vessels and vessels held for sale | — | — | — | (133,176) | (62,929) | 2,476 | (1,993) |
| **Operating income/(loss)** | (111) | 11,612 | 60,658 | (164,217) | (46,256) | 10,864 | 2,517 |
| Interest income | 6 | 2,214 | 776 | 271 | 119 | 110 | 230 |
| Interest and finance costs | — | (5,671) | (16,528) | (12,169) | (6,775) | (3,086) | (1,888) |
| Gain/(loss) on derivative instruments | — | — | (17,184) | (2,567) | (8,713) | (6,671) | (1,740) |
| **Net Income/(loss)** | $   (105) | 8,155 | 27,722 | (178,682) | (61,625) | 1,217 | (881) |
| Earnings/(losses) per common share, basic and diluted | $   — | 50.4 | 116.4 | (136.4) | (17.4) | 0.4 | (0.2) |
| Earnings/(losses) per subordinated share, basic and diluted | $   (1.00) | 11.4 | — | — | — | — | — |
| Weighted average number of common shares, basic and diluted | | 139,221 | 238,691 | 1,309,272 | 3,524,427 | 3,155,041 | 4,951,336 |
| Weighted average number of subordinated shares, basic and diluted | 100,000 | 102,128 | — | — | — | — | — |
| Cash dividends declared per share | | 42.2 | 184.8 | — | — | — | — |
| **Balance Sheet Data:** | | | | | | | |
| Cash and cash equivalents | 499 | 19,044 | 23,069 | 37,272 | 9,549 | 11,895 | 19,275 |
| Total current assets | 503 | 20,711 | 28,677 | 100,299 | 109,754 | 46,001 | 24,237 |
| Vessels, net of accumulated depreciation | — | 485,280 | 587,189 | 423,242 | 311,144 | 459,855 | 303,010 |
| Total assets | 776 | 507,925 | 625,570 | 549,272 | 478,863 | 568,542 | 423,617 |
| Total current liabilities | 285 | 33,884 | 116,381 | 73,528 | 111,311 | 67,791 | 43,539 |
| Long-term imputed deferred revenue including current portion | — | 26,349 | 16,031 | 1,558 | — | — | — |
| Sellers' credit | — | — | 25,000 | — | — | — | — |
| Long — term debt including current portion | — | 260,600 | 308,000 | 265,674 | 209,772 | 235,761 | 142,843 |
| Total stockholders' equity | 491 | 213,410 | 246,961 | 256,611 | 235,236 | 297,371 | 260,398 |

| | September 11, 2006 (inception) to December 31, 2006 | Year Ended December 31, | | | | Six Month Period Ended June 30, | |
|---|---|---|---|---|---|---|---|
| | | 2007 | 2008 | 2009 | 2010 | 2010 | 2011 |
| | | | | | | (Unaudited) | |
| **Other Financial Data:** | | | | | | | |
| Net cash flow provided by operating activities | 1 | 24,434 | 81,369 | 26,552 | 28,449 | 16,433 | 5,802 |
| Net cash flow provided by/(used in) investing activities | (2) | (467,216) | (120,665) | (130,786) | (42,678) | (53,299) | 68,793 |
| Net cash flow provided by/(used in) financing activities | 500 | 461,327 | 42,381 | 118,437 | (13,494) | 11,489 | (64,869) |
| Cash dividends per common and subordinated share | — | 42.2 | 154.8 | — | — | — | — |
| Cash paid for common and subordinated stock dividend | — | 13,048 | 47,772 | — | — | — | — |
| Adjusted EBITDA(1) | — | 20,841 | 96,699 | 55,502 | 41,032 | 21,013 | 14,204 |
| **Fleet Data:** | | | | | | | |
| Average number of vessels(2) | — | 3.7 | 11.4 | 12.7 | 12 | 12.3 | 7.7 |
| Number of vessels | — | 10.0 | 13 | 13 | 11 | 12 | 6 |
| Average age of fleet | — | 12.2 | 13.9 | 12.3 | 9.7 | 9.8 | 6.7 |
| Total calendar days for fleet(3) | — | 1,364 | 4,164 | 4,650 | 4,371 | 2,220 | 1,386 |
| Total voyage days for fleet(4) | — | 1,282 | 4,125 | 4,466 | 4,213 | 2,115 | 1,353 |
| Fleet utilization(5) | — | 94.0% | 99.1% | 96.1% | 96.4% | 95.3% | 97.6% |
| **Average Daily Results:** | | | | | | | |
| Time charter equivalent (TCE) rate(6) | — | 30,558 | 34,705 | 28,523 | 23,022 | 22,479 | 21,254 |
| Daily vessel operating expenses(7) | — | 6,751 | 6,960 | 9,444 | 9,397 | 9,708 | 8,724 |

(1) Adjusted EBITDA represents net income before interest, taxes, depreciation, loss on sale of vessels and impairment charges on vessels. Adjusted EBITDA does not represent and should not be considered as an alternative to net income or cash flow from operations, as determined by U.S. GAAP. OceanFreight's calculation of Adjusted EBITDA may not be comparable to that reported by other companies. Adjusted EBITDA is included herein because it is a basis upon which OceanFreight assesses its liquidity position, because it is used by OceanFreight's lenders as a measure of OceanFreight's compliance with certain loan covenants and because OceanFreight believes that it presents useful information to investors regarding its ability to service and/or incur indebtedness. The table reconciles net cash from operating activities, as reflected in the consolidated statements of cash flows for the years ended December 31, 2007, 2008, 2009 and 2010 and for the six month periods ended June 30, 2010 and 2011, to Adjusted EBITDA.

| | 2007 | 2008 | 2009 | 2010 | 2010 | 2011 |
|---|---|---|---|---|---|---|
| | | | | | (Unaudited) | |
| Net cash from operating activities | 24,434 | 81,369 | 26,552 | 28,449 | 16,433 | 5,802 |
| Net increase/(decrease) in operating assets | 1,665 | 4,881 | 9,988 | (481) | 6,155 | (6,966) |
| Net (increase)/decrease in operating liabilities | (7,556) | (5,865) | 143 | (1,214) | (8,543) | 10,293 |
| Net interest expense(*) | 3,457 | 16,789 | 19,563 | 14,816 | 7,260 | 5,314 |
| Amortization of deferred financing costs included in interest expense | (1,159) | (475) | (744) | (538) | (292) | (239) |
| **Adjusted EBITDA** | 20,841 | 96,699 | 55,502 | 41,032 | 21,013 | 14,204 |

(*) Net interest expense includes the realized loss of interest rate swaps included in "Loss on derivative instrument" in the consolidated statements of operations.

(2) Average number of vessels is the number of vessels that constituted the fleet for the relevant period, as measured by the sum of the number of days each vessel was a part of the fleet during the period divided by the number of calendar days in the related period.

(3) Calendar days are the total days the vessels were in OceanFreight's possession for the relevant period including off-hire and drydock days.

20

(4) Total voyage days for the fleet are the total days during which the vessels were in OceanFreight's possession for the relevant period, net of off-hire days.

(5) Fleet utilization is the percentage of time that the vessels were available for revenue generating voyage days, and is determined by dividing voyage days by fleet calendar days for the relevant period.

(6) Time charter equivalent, or TCE, is a measure of the average daily revenue performance of a vessel on a per voyage basis. OceanFreight's method of calculating TCE is consistent with industry standards and is determined by dividing "voyage revenues" (net of voyage expenses) by voyage days for the relevant time period. Voyage expenses primarily consist of port, canal and fuel costs that are unique to a particular voyage, which would otherwise be paid by the charterer under a time charter contract, as well as commissions. TCE is a standard shipping industry performance measure used primarily to compare period-to-period changes in a shipping company's performance despite changes in the mix of charter types (i.e., spot charters, time charters and bareboat charters) under which the vessels may be employed between the periods.

(7) Daily vessel operating expenses, which include vessel management fees, crew costs, provisions, deck and engine stores, lubricating oil, insurance, maintenance and repairs, are calculated by dividing vessel operating expenses by fleet calendar days for the relevant time period.

**SELECTED HISTORICAL CONSOLIDATED FINANCIAL AND OTHER DATA OF OCEAN RIG**

The following table sets forth selected historical consolidated financial and other data of Ocean Rig, at the dates and for the periods indicated. Ocean Rig was incorporated on December 10, 2007 under the name Primelead Shareholders Inc. The selected historical consolidated financial data as of June 30, 2011 and for the six-month periods ended June 30, 2011 and 2010 and as of and for Ocean Rig's fiscal years ended December 31, 2010, 2009 and 2008 is derived from the unaudited and audited financial statements and related notes of Ocean Rig and its subsidiaries ("successor") appearing elsewhere in this proxy statement / prospectus. The selected historical consolidated financial and other data of Ocean Rig ASA and its subsidiaries ("predecessor") as of and for the period from January 1 to May 14, 2008 is derived from the audited financial statements of Ocean Rig ASA appearing elsewhere in this proxy statement / prospectus. Included elsewhere in this proxy statement / prospectus is Ocean Rig's unaudited pro forma condensed statement of operations for the year ended December 31, 2008. The selected historical consolidated financial data as of and for the year ended December 31, 2007 is derived from the audited financial statements of Ocean Rig ASA not included in this proxy statement / prospectus. In accordance with Item 3.A.1 of Form 20-F, Ocean Rig is omitting fiscal year 2006 from the selected historical consolidated financial data as Ocean Rig did not report consolidated financial statements in compliance with U.S. GAAP for 2006 and such information cannot be provided without unreasonable effort or expense.

You should read the notes to the consolidated financial statements for a discussion of the basis on which the consolidated financial statements are presented. The selected historical consolidated financial and other data should be read in conjunction with the sections of this proxy statement / prospectus entitled "Business — History of Ocean Rig" and "Ocean Rig Management's Discussion and Analysis of Financial Condition and Results of Operations" and Ocean Rig's unaudited and audited consolidated financial statements, the related notes thereto and other Ocean Rig financial information appearing elsewhere in this proxy statement / prospectus. The consolidated financial statements of Ocean Rig as of and for the year ended December 31, 2009 were restated, which impacted interest and finance cost, income before taxes, net income, earnings per common share, basic and diluted, rigs under construction, total assets, stockholders' equity and net cash provided by operating and financing activities. See Note 3 to the consolidated financial statements.

*(U.S. Dollars in thousands)*

| | Ocean Rig ASA (Predecessor) | | Ocean Rig UDW Inc. (Successor) | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, 2007 | January 1, 2008 to May 14, 2008 | Year Ended December 31, 2008 | Year Ended December 31, 2009, as Restated | Year Ended December 31, 2010 | Six-Month Period Ended June 30, 2010 | Six-Month Period Ended June 30, 2011 |
| | | | (U.S. dollars in thousands) | | | | |
| **Income statement data:** | | | | | | | |
| Leasing and service revenue | $ 209,095 | $ 99,172 | $ 202,110 | $ 373,525 | $ 403,162 | $ 189,838 | $ 236,657 |
| Other revenues | — | — | 16,553 | 14,597 | 2,550 | (610) | (702) |
| **Total revenues** | **209,095** | **99,172** | **218,663** | **388,122** | **405,712** | **189,228** | **235,955** |
| Drilling rigs operating expenses | 123,543 | 48,144 | 86,229 | 133,256 | 119.369 | 59,508 | 104,137 |
| Goodwill impairment | — | — | 761,729 | | — | — | — |
| Gain/(Loss) on disposal of assets | — | — | — | — | 1,458 | 430 | 87 |
| Depreciation and amortization | 53,239 | 19,367 | 45,432 | 75,348 | 75,092 | 37,966 | 64,908 |
| General and administrative | 14,062 | 12,140 | 14,462 | 17,955 | 19,443 | 10,075 | 15,730 |
| **Total operating expenses** | **190,844** | **79,651** | **907,852** | **226,559** | **215,362** | **107,979** | **184,862** |

|  | Ocean Rig ASA (Predecessor) | | Ocean Rig UDW Inc. (Successor) | | | | |
|---|---|---|---|---|---|---|---|
|  | Year Ended December 31, 2007 | January 1, 2008 to May 14, 2008 | Year Ended December 31, 2008 | Year Ended December 31, 2009, as Restated | Year Ended December 31, 2010 | Six-Month Period Ended June 30, 2010 | Six-Month Period Ended June 30, 2011 |
|  | | | (U.S. dollars in thousands) | | | | |
| **Operating income/(loss)** | **18,251** | **19,521** | **(689,189)** | **161,563** | **190,350** | **81,249** | **51,093** |
| Interest and finance costs | (60,630) | (41,661) | (71,692) | (46,120) | (8,418) | (5,738) | (22,214) |
| Interest income | 3,234 | 381 | 3,033 | 6,259 | 12,464 | 5,825 | 10,394 |
| Gain/(loss) on interest rate swaps | — | — | — | 4,826 | (40,303) | (34,501) | (18,616) |
| Other income/(expense) | (1,559) | — | (2,300) | 2,023 | 1,104 | (3,752) | (446) |
| **Total finance expenses, net** | **(58,955)** | **(41,280)** | **(70,959)** | **(33,012)** | **(35,153)** | **(38,166)** | **(30,882)** |
| Income/(loss) before taxes | (40,704) | (21,759) | (760,148) | 128,551 | 155,197 | 43,083 | 20,211 |
| Income/(loss) taxes | (6,683) | (1,637) | (2,844) | (12,797) | (20,436) | (11,938) | (9,778) |
| Equity in income/(loss) of investee | — | — | (1,055) | — | — | — | — |
| **Net income/(loss)** | **(47,387)** | **(23,396)** | **(764,047)** | **115,754** | **134,761** | **31,145** | **10,433** |
| Less: Net income attributable to non controlling interest | — | — | (1,800) | — | — | — | — |
| **Net income/(loss)** | **$ (47,387)** | **$(23,396)** | **$ (765,847)** | **$ 115,754** | **$ 134,761** | **$ 31,145** | **$ 10,433** |

|  | Ocean Rig ASA (Predecessor) | | Ocean Rig UDW Inc. (Successor) | | | |
|---|---|---|---|---|---|---|
|  | December 31, 2007 | May 14, 2008 | December 31, 2008 | December 31, 2009, as Restated | December 31, 2010 | June 30, 2011 |
|  | | | (U.S. dollars in thousands) | | | |
| **Balance sheet data:** | | | | | | |
| Cash and cash equivalents | $ 31,002 | — | $ 272,940 | $ 234,195 | $ 95,707 | $ 191,744 |
| Other current assets | 62,646 | 96,471 | 93,379 | 324,363 | 576,299 | 252,251 |
| **Total current assets** | **93,648** | **96,471** | **366,319** | **558,558** | **672,006** | **443,995** |
| Drilling rigs, machinery and equipment, net | 1,141,771 | 1,132,867 | 1,377,359 | 1,317,607 | 1,249,333 | 2,940,888 |
| Intangibles, asset, net | — | — | 13,391 | 11,948 | 10,506 | 9,784 |
| Other non current assets | 7 | — | 3,612 | 43,480 | 523,363 | 221,011 |
| Rigs under construction | — | — | — | 1,178,392 | 1,888,490 | 1,704,350 |
| **Total assets** | **1,235,426** | **1,229,338** | **1,760,681** | **3,109,985** | **4,343,698** | **5,320,028** |
| Current liabilities, including current portion of long term debt | 147,810 | 538,679 | 885,039 | 682,287 | 667,918 | 434,591 |
| Total long term debt, excluding current portion | 656,548 | 281,307 | 788,314 | 662,362 | 697,797 | 1,891,319 |
| Other non current liabilities | 1,180 | 2,470 | 63,697 | 64,219 | 96,901 | 89,128 |
| **Total liabilities** | **805,538** | **822,456** | **1,737,050** | **1,408,868** | **1,462,616** | **2,415,038** |
| **Stockholders' equity** | **429,888** | **406,882** | **23,631** | **1,701,117** | **2,881,082** | **2,904,990** |
| **Total liabilities and stockholders' equity** | **$1,235,426** | **$1,229,338** | **$1,760,681** | **$3,109,985** | **$4,343,698** | **$5,320,028** |

| | Ocean Rig ASA (Predecessor) | | Ocean Rig UDW Inc. (Successor) | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, 2007 | January 1, 2008 to May 14, 2008 | Year Ended December 31, 2008 | Year Ended December 31, 2009, as Restated | Year Ended December 31, 2010 | Six-Month Period Ended June 30, 2010 | Six-Month Period Ended June 30, 2011 |
| | | | (U.S. dollars in thousands, except for operating data) | | | | |
| **Cash flow data:** | | | | | | | |
| Net cash provided by/ (used in): | | | | | | | |
| Operating activities | $ 35,455 | $(29,089) | $ 21,119 | $ 211,075 | $ 221,798 | $ 99,055 | $ 93,915 |
| Investing activities | (48,507) | (10,463) | (1,020,673) | (146,779) | (1,441,347) | (521,161) | (850,837) |
| Financing activities | (47,611) | 8,550 | 1,257,390 | (103,041) | 1,081,061 | 341,710 | 852,959 |
| **Other financial data** | | | | | | | |
| EBITDA(1) (unaudited) | 69,931 | 38,888 | (648,912) | 243,760 | 226,243 | 80,962 | 96,939 |
| Cash paid for interest (unaudited) | 55,524 | 22,628 | 23,103 | 51,093 | 43,203 | 16,511 | 14,499 |
| Capital expenditures (unaudited) | (48,507) | (10,463) | (16,584) | (14,152) | (6,834) | (3,671) | (10,009) |
| Payments for drillships under construction (unaudited) | — | — | — | (125,896) | (705,022) | (483,312) | (1,187,747) |
| **Operating data, when on hire (unaudited)** | | | | | | | |
| Operating units | 2 | 2 | 2 | 2 | 2 | 2 | 4 |
| Average earning efficiency % | 88.0% | 83.3% | 88.7% | 95.2% | 92.7% | 95.2% | 92.5% |

(1) EBITDA represents net income before interest, taxes, depreciation and amortization. EBITDA is a non-U.S. GAAP measure and does not represent and should not be considered as an alternative to net income or cash flow from operations, as determined by GAAP, and Ocean Rig's calculation of EBITDA may not be comparable to that reported by other companies. EBITDA is included herein because it is a basis upon which Ocean Rig measures its operations and efficiency. EBITDA is also used by Ocean Rig's lenders as a measure of its compliance with certain loan covenants and because Ocean Rig believes that it presents useful information to investors regarding a company's ability to service and/or incur indebtedness.

| | Ocean Rig ASA (Predecessor) | | Ocean Rig UDW Inc. (Successor) | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Year Ended December 31, 2007 | January 1, 2008 to May 14, 2008 | Year Ended December 31, 2008 | Year Ended December 31, 2009, as Restated | Year Ended December 31, 2010 | Six-Month Period Ended June 30, 2010 | Six-Month Period Ended June 30, 2011 |
| | | | (U.S. dollars in thousands) | | | | |
| **As adjusted financial data (unaudited)** | | | | | | | |
| EBITDA reconciliation | | | | | | | |
| Net income/(loss) | $ (47,387) | $(23,396) | $ (765,047) | $ 115,754 | $ 134,761 | $ 31,145 | $ 10,433 |
| Add: Depreciation and amortization | 53,239 | 19,367 | 45,432 | 75,348 | 75,092 | 37,966 | 64,908 |
| Add: Net interest expense | 57,396 | 41,280 | 68,659 | 39,861 | (4,046) | (87) | 11,820 |
| Add: Income taxes | 6,683 | 1,637 | 2,844 | 12,797 | 20,436 | 11,938 | 9,778 |
| **EBITDA** | **$ 69,931** | **$ 38,888** | **$ (648,912)** | **$ 243,760** | **$ 226,243** | **$ 80,962** | **$ 96,939** |

## COMPARATIVE PER SHARE DATA

The following tables present, as at the dates and for the periods indicated, selected historical per share financial information of OceanFreight and Ocean Rig.

You should read this information in conjunction with, and the information is qualified in its entirety by, the respective audited and unaudited consolidated financial statements and accompanying notes of OceanFreight and Ocean Rig included elsewhere in this proxy statement / prospectus and the unaudited pro forma condensed combined financial statements and accompanying notes related to such combined financial statements included elsewhere in this proxy statement / prospectus.

**OceanFreight and Ocean Rig Historical Common Share Data**

The following table presents the earnings per share, dividends per share and book value per share with respect to OceanFreight and Ocean Rig respectively on a historical basis.

| | As at and for the Six Months Ended June 30, 2011 | As at and for the Year Ended December 31, 2010 |
|---|---|---|
| *Basic Earnings (Losses) Per Share* : | | |
| OceanFreight historical | $ (0.18) | $(17.40) |
| Ocean Rig historical | $ 0.08 | $ 1.30 |
| *Diluted Earnings (Losses) Per Share* : | | |
| OceanFreight historical | $ (0.18) | $(17.40) |
| Ocean Rig historical | $ 0.08 | $ 1.30 |
| *Dividends Per Share* : | | |
| OceanFreight historical | $ — | $ — |
| Ocean Rig historical | $ — | $ — |
| *Book Value Per Share at Period End* : | | |
| OceanFreight historical | $43.79 | $ 56.50 |
| Ocean Rig historical | $22.06 | $ 21.88 |

**COMPARATIVE PER SHARE MARKET PRICE INFORMATION**

OceanFreight common shares are listed on the NASDAQ Global Market under the trading symbol "OCNF." Ocean Rig common stock is traded over the Norwegian OTC market under the trading symbol "OCRG." Also, on October 6, 2011, Ocean Rig common stock commenced trading on the NASDAQ Global Select Market under the symbol "ORIG." The following table sets forth, for the respective calendar year and quarters indicated, the high and low sale prices of Ocean Rig common shares and the high and low sale prices per share of OceanFreight common shares.

| | Ocean Rig Common Stock* | | OceanFreight Common Stock** | |
| --- | --- | --- | --- | --- |
| | High | Low | High | Low |
| **Year Ended December 31, 2010** | $ N/A | $ N/A | $ 1.48 | $0.44 |
| **Quarterly for 2010** | | | | |
| **First Quarter** | $ N/A | $ N/A | $ 1.10 | $0.70 |
| **Second Quarter** | $ N/A | $ N/A | $ 1.42 | $0.44 |
| **Third Quarter** | $ N/A | $ N/A | $ 1.48 | $0.73 |
| **Fourth Quarter** | $ N/A | $ N/A | $ 1.15 | $0.91 |
| **Quarterly for 2011** | | | | |
| **First Quarter** | $22.67 | $17.63 | $ 0.99 | $0.64 |
| **Second Quarter** | $21.86 | $17.61 | $ 0.72 | $0.30 |
| **Third Quarter** | $18.13 | $13.67 | $18.55 | $0.32 |

The table below sets forth the high and low sale prices for each of the respective calendar months indicated for Ocean Rig common stock and OceanFreight common stock.

| | Ocean Rig Common Stock* | | OceanFreight Common Stock** | |
| --- | --- | --- | --- | --- |
| | High | Low | High | Low |
| **November 2010** | $ N/A | $ N/A | $ 1.13 | $ 0.95 |
| **December 2010** | $ N/A | $ N/A | $ 1.09 | $ 0.91 |
| **January 2011** | $20.28 | $17.63 | $ 0.99 | $ 0.80 |
| **February 2011** | $21.30 | $19.86 | $ 0.84 | $ 0.76 |
| **March 2011** | $22.67 | $20.31 | $ 0.77 | $ 0.64 |
| **April 2011** | $21.86 | $20.43 | $ 0.72 | $ 0.52 |
| **May 2011** | $21.62 | $19.10 | $ 0.58 | $ 0.30 |
| **June 2011** | $19.64 | $17.61 | $ 0.45 | $ 0.30 |
| **July 2011** | $18.13 | $16.44 | $17.53 | $ 0.32 |
| **August 2011** | $16.69 | $13.67 | $17.01 | $11.46 |
| **September 2011** | $16.78 | $14.66 | $18.55 | $15.17 |

\*    As reported in U.S. Dollars by Bloomberg, which reports are based upon the historical NOK/USD rate (see "Currency Exchange Rate Data").

\*\*   OceanFreight conducted 1 for 3 and 1 for 20 reverse stock splits on June 17, 2010 and July 6, 2011, respectively. The figures set forth in this table have not retroactively been adjusted to reflect these stock splits.

Following the completion of the merger, there will be no further market for shares of OceanFreight common stock.

The table below sets forth the closing prices of OceanFreight common stock and Ocean Rig common stock and the implied per share value in the merger to holders of OceanFreight common stock, on July 25, 2011, the last trading day before the public announcement of the merger, and on , 2011, the last practicable trading day before the distribution of this proxy statement / prospectus.

| | OceanFreight Common Stock | Ocean Rig Common Stock | Implied Value of One Share of OceanFreight Common Stock(1) |
| --- | --- | --- | --- |
| **July 25, 2011** | $9.47 | $16.44 | $19.85 |
| **, 2011** | $ | $ | $ |

_____

(1) The implied value per share reflects the value of shares of Ocean Rig common stock that holders of OceanFreight common stock would receive in exchange for each share of OceanFreight common stock if the merger were completed on the date indicated. Such price reflects the 0.52326 shares of Ocean Rig common stock that OceanFreight stockholders will be entitled to receive for each share of OceanFreight common stock in the merger and a cash payment in the amount of $11.25 per share. Holders of OceanFreight common stock will also receive cash in lieu of any fractional share interests.

## CURRENCY EXCHANGE RATE DATA

The following tables show, for the date or periods indicated, certain information regarding the U.S. Dollar / Norwegian Kroner exchange rate and the Norwegian Kroner / U.S. Dollar exchange rate as reported by Bloomberg.

|  | NOK per USD1 | USD$ per NOK1 |
|---|---|---|
| July 25, 2011 | NOK5.4154 | USD$0.1847 |
| (closing price as of the last trading date before public announcement of the transaction between OceanFreight and DryShips) |  |  |

|  | Average* | |
|---|---|---|
|  | NOK per USD1 | USD$ per NOK1 |
| **Year Ended December 31,** |  |  |
| 2006 | NOK6.4107 | USD$0.1562 |
| 2007 | 5.8587 | 0.1712 |
| 2008 | 5.6488 | 0.1796 |
| 2009 | 6.2861 | 0.1600 |
| 2010 | 6.0448 | 0.1656 |
| **Three Months Ended March 31, 2011** | 5.7196 | 0.1749 |
| **Six Months Ended June 30, 2011** | 5.5782 | 0.1794 |
| **Nine Months Ended September 30, 2011** | 5.5531 | 0.1802 |

* The average rate means the average of the daily closing prices during the relevant period as reported by Bloomberg.

The following tables, for the months indicated, shows the high and low U.S. Dollar/ Norwegian Kroner exchange rate and Norwegian Kroner / U.S. Dollar exchange rate as reported by Bloomberg.

|  | NOK per USD1 | |
|---|---|---|
|  | High | Low |
| January 2011 | NOK6.0056 | NOK5.7319 |
| February 2011 | 5.8848 | 5.5604 |
| March 2011 | 5.7234 | 5.5081 |
| April 2011 | 5.5639 | 5.2304 |
| May 2011 | 5.6302 | 5.2174 |
| June 2011 | 5.5964 | 5.3235 |
| July 2011 | 5.6318 | 5.3358 |
| August 2011 | 5.5807 | 5.3309 |
| September 2011 | 5.9130 | 5.3144 |

|  | USD$ per NOK1 | |
|---|---|---|
|  | High | Low |
| January 2011 | USD$0.1745 | USD$0.1665 |
| February 2011 | 0.1798 | 0.1699 |
| March 2011 | 0.1816 | 0.1747 |
| April 2011 | 0.1912 | 0.1797 |
| May 2011 | 0.1917 | 0.1776 |
| June 2011 | 0.1878 | 0.1787 |
| July 2011 | 0.1874 | 0.1776 |
| August 2011 | 0.1876 | 0.1792 |
| September 2011 | 0.1882 | 0.1691 |

# RISK FACTORS

*The merger, the drilling industry, the Ocean Rig business and holding shares of Ocean Rig common stock involve a high degree of risk. By voting in favor of the proposals submitted to current OceanFreight shareholders, you will be choosing to invest in shares of Ocean Rig common stock. An investment in shares of Ocean Rig common stock involves a high degree of risk. In addition to the other information contained in this proxy statement / prospectus, including the matters under the section entitled "Cautionary Note Regarding Forward-Looking Statements," you should carefully consider all of the following risk factors relating to the proposed merger, the drilling industry, the Ocean Rig business and shares of Ocean Rig common stock.*

## Risk Factors Relating to the Merger

***Because the market price of shares of Ocean Rig common stock may fluctuate, you cannot be certain of the precise value of the merger consideration that you will receive in the merger.***

The value of the portion of the merger consideration comprised of shares of Ocean Rig common stock to be received at closing will vary depending on the market price of shares of Ocean Rig common stock on the date of the closing of the merger.

In addition, the prices of shares of Ocean Rig common stock and shares of OceanFreight common stock at the closing of the merger may vary from their respective prices on the date the merger agreement was executed, on the date of this proxy statement / prospectus and on the date of the special meeting.

See "Comparative Per Share Market Price Information" for certain historical market price information of the shares of Ocean Rig common stock and OceanFreight common stock.

These variations in stock prices may be the result of various factors, including:

- changes in the dry bulk charter market and in values of dry bulk vessels;

- changes in the international offshore drilling or offshore oil and gas exploration, development and production drilling industry (for additional risk factors relating to Ocean Rig's industry see "Risk Factors — Risk Factors Relating to the Drilling Industry").

- changes in the business prospects of OceanFreight or Ocean Rig;

- governmental, regulatory and/or litigation developments;

- market assessments as to whether and when the merger will be consummated;

- the timing of the consummation of the merger;

- increased competition in the respective markets; and

- general market, economic and political conditions.

At the time of the special meeting, holders of OceanFreight common stock will not know the precise value of the merger consideration they will be entitled to receive for their shares of Ocean Rig common stock on the day the merger closes. Holders of OceanFreight common stock are urged to obtain a current market quotation for OceanFreight common stock and Ocean Rig common stock.

***The market price for OceanFreight common stock may be affected by factors different from those affecting the shares of Ocean Rig common stock.***

Upon completion of the merger, holders of shares of OceanFreight common stock will be entitled to become holders of shares of Ocean Rig common stock. OceanFreight's businesses differ from those of Ocean Rig, and accordingly the results of operations of Ocean Rig will be affected by factors different from those currently affecting the results of operations of OceanFreight. For a discussion of the businesses of OceanFreight and Ocean Rig and of other factors to consider in connection with those businesses, you should carefully review this document and the documents included as Annexes to this proxy statement / prospectus.

*Certain of OceanFreight executive officers have interests in the merger that differ from, or are in addition to, the interests of holders of shares of OceanFreight common stock.*

Certain of OceanFreight's executive officers and directors have financial interests in the merger that are different from, or in addition to, the interests of OceanFreight shareholders. In particular, companies owned by OceanFreight's Chief Executive Officer, Mr. Kandylidis, which held approximately 50.5% of the common stock of OceanFreight, agreed to sell their shares to DryShips in advance of the merger, and Mr. Kandylidis and other officers are entitled to compensation on a change of control of OceanFreight on completion of the merger. For a detailed discussion of the interests that OceanFreight's directors and executive officers may have in the merger, please see "The Transaction — Interests of OceanFreight's Directors and Officers in the Merger."

*The merger agreement contains provisions that could discourage a potential competing acquirer of OceanFreight or could result in any competing proposal being at a lower price than it might otherwise be.*

The merger agreement contains "no shop" provisions that, subject to certain exceptions, restrict OceanFreight's ability to solicit, encourage, facilitate or discuss competing third-party proposals to acquire all or a significant part of OceanFreight. Further, even if the OceanFreight board of directors withdraws or qualifies its recommendation in favor of adopting the merger agreement, OceanFreight will still be required to submit the matter to a vote of the OceanFreight shareholders at the OceanFreight special meeting, unless the merger agreement is terminated. In addition, DryShips generally has an opportunity to offer to modify the terms of the proposed merger in response to any competing acquisition proposal that may be made before the OceanFreight board of directors may withdraw or qualify its recommendation. In some circumstances upon termination of the merger agreement, OceanFreight may be required to pay to DryShips a termination fee of $4.5 million. Since August 23, 2011, OceanFreight is prohibited from responding to any competing third-party proposals and is not permitted to terminate the merger agreement to enter into a definitive agreement with respect to any superior proposal.

These provisions could discourage a potential competing acquirer that might have an interest in acquiring all or a significant part of OceanFreight from considering or proposing that acquisition, even if it were prepared to pay consideration with a higher per share cash or market value than that market value proposed to be received or realized in the merger, or might result in a potential competing acquirer proposing to pay a lower price than it might otherwise have proposed to pay because of the added expense of the termination fee that may become payable in certain circumstances.

*OceanFreight shareholders will have a reduced ownership and voting interest in Ocean Rig after the merger and will exercise less influence over management.*

OceanFreight shareholders currently have the right to vote in the election of directors of OceanFreight and on certain other matters affecting OceanFreight. Following the merger, each holder of shares of OceanFreight common stock will be entitled to become a shareholder of Ocean Rig with a percentage ownership of Ocean Rig that is much smaller than the shareholder's percentage ownership of OceanFreight. It is expected that the former shareholders of OceanFreight as a group will own approximately 2.3% of the outstanding shares of Ocean Rig common stock immediately after the completion of the merger. Because of this, OceanFreight's shareholders will have substantially less influence on the management and policies of Ocean Rig than they now have with respect to the management and policies of OceanFreight.

### Risk Factors Relating to the Drilling Industry

*The Ocean Rig business in the offshore drilling sector depends on the level of activity in the offshore oil and gas industry, which is significantly affected by, among other things, volatile oil and gas prices and may be materially and adversely affected by a decline in the offshore oil and gas industry.*

The offshore contract drilling industry is cyclical and volatile. Ocean Rig's business in the offshore drilling sector depends on the level of activity in oil and gas exploration, development and production in offshore areas worldwide. The availability of quality drilling prospects, exploration success, relative production costs, the stage of reservoir development and political and regulatory environments affect customers' drilling programs. Oil and gas

prices and market expectations of potential changes in these prices also significantly affect this level of activity and demand for drilling units.

Oil and gas prices are extremely volatile and are affected by numerous factors beyond Ocean Rig's control, including the following:

• worldwide production and demand for oil and gas;

• the cost of exploring for, developing, producing and delivering oil and gas;

• expectations regarding future energy prices;

• advances in exploration, development and production technology;

• the ability of OPEC to set and maintain levels and pricing;

• the level of production in non-OPEC countries;

• government regulations;

• local and international political, economic and weather conditions;

• domestic and foreign tax policies;

• development and exploitation of alternative fuels;

• the policies of various governments regarding exploration and development of their oil and gas reserves; and

• the worldwide military and political environment, including uncertainty or instability resulting from an escalation or additional outbreak of armed hostilities, insurrection or other crises in the Middle East or other geographic areas or further acts of terrorism in the United States, or elsewhere.

Declines in oil and gas prices for an extended period of time, or market expectations of potential decreases in these prices, could negatively affect Ocean Rig's business in the offshore drilling sector. Crude oil inventories remain at high levels compared to historical levels, which may place downward pressure on the price of crude oil and demand for offshore drilling units. Sustained periods of low oil prices typically result in reduced exploration and drilling because oil and gas companies' capital expenditure budgets are subject to their cash flow and are therefore sensitive to changes in energy prices. These changes in commodity prices can have a dramatic effect on rig demand, and periods of low demand can cause excess rig supply and intensify the competition in the industry which often results in drilling units, particularly lower specification drilling units, being idle for long periods of time. Ocean Rig cannot predict the future level of demand for its services or future conditions of the oil and gas industry. Any decrease in exploration, development or production expenditures by oil and gas companies could reduce Ocean Rig's revenues and materially harm its business and results of operations.

In addition to oil and gas prices, the offshore drilling industry is influenced by additional factors, including:

• the availability of competing offshore drilling vessels;

• the level of costs for associated offshore oilfield and construction services;

• oil and gas transportation costs;

• the discovery of new oil and gas reserves;

• the cost of non-conventional hydrocarbons, such as the exploitation of oil sands; and

• regulatory restrictions on offshore drilling.

Any of these factors could reduce demand for Ocean Rig's services and adversely affect Ocean Rig's business and results of operations.

31

***Any renewal of the recent worldwide economic downturn could have a material adverse effect on Ocean Rig's revenue, profitability and financial position.***

There is considerable instability in the world economy and in the economies of countries such as Greece, Spain, Portugal, Ireland and Italy which could initiate a new economic downturn, or introduce volatility in the global markets. A decrease in global economic activity would likely reduce worldwide demand for energy and result in an extended period of lower crude oil and natural gas prices. In addition, continued hostilities and insurrections in the Middle East and the occurrence or threat of terrorist attacks against the United States or other countries could adversely affect the economies of the United States and of other countries. Any prolonged reduction in crude oil and natural gas prices would depress the levels of exploration, development and production activity. Moreover, even during periods of high commodity prices, customers may cancel or curtail their drilling programs, or reduce their levels of capital expenditures for exploration and production for a variety of reasons, including their lack of success in exploration efforts. These factors could cause Ocean Rig's revenues and margins to decline, decrease daily rates and utilization of Ocean Rig's drilling units and limit its future growth prospects. Any significant decrease in daily rates or utilization of Ocean Rig drilling units could materially reduce its revenues and profitability. In addition, any instability in the financial and insurance markets, as experienced in the recent financial and credit crisis, could make it more difficult for Ocean Rig to access capital and to obtain insurance coverage that Ocean Rig considers adequate or are otherwise required by its contracts.

***The offshore drilling industry is highly competitive with intense price competition, and as a result, Ocean Rig may be unable to compete successfully with other providers of contract drilling services that have greater resources than Ocean Rig has.***

The offshore contract drilling industry is highly competitive with several industry participants, none of which has a dominant market share, and is characterized by high capital and maintenance requirements. Drilling contracts are traditionally awarded on a competitive bid basis. Price competition is often the primary factor in determining which qualified contractor is awarded the drilling contract, although drilling unit availability, location and suitability, the quality and technical capability of service and equipment, reputation and industry standing are key factors which are considered. Mergers among oil and natural gas exploration and production companies have reduced, and may from time to time further reduce, the number of available customers, which would increase the ability of potential customers to achieve pricing terms favorable to them.

Many of Ocean Rig's competitors in the offshore drilling industry are significantly larger than Ocean Rig are and have more diverse drilling assets and significantly greater financial and other resources than Ocean Rig has. In addition, because of the relatively small size of its drilling segment, Ocean Rig may be unable to take advantage of economies of scale to the same extent as some of its larger competitors. Given the high capital requirements that are inherent in the offshore drilling industry, Ocean Rig may also be unable to invest in new technologies or expand its drilling segment in the future as may be necessary for it to succeed in this industry, while Ocean Rig's larger competitors with superior financial resources, and in many cases less leverage than Ocean Rig, may be able to respond more rapidly to changing market demands and compete more efficiently on price for drillship and drilling rig employment. Ocean Rig may not be able to maintain its competitive position, and Ocean Rig believes that competition for contracts will continue to be intense in the future. Ocean Rig's inability to compete successfully may reduce its revenues and profitability.

***An over-supply of drilling units may lead to a reduction in dayrates and therefore may materially impact Ocean Rig's profitability in its offshore drilling segment.***

During the recent period of high utilization and high dayrates, industry participants have increased the supply of drilling units by ordering the construction of new drilling units. Historically, this has resulted in an over-supply of drilling units and has caused a subsequent decline in utilization and dayrates when the drilling units enter the market, sometimes for extended periods of time until the units have been absorbed into the active fleet. According to Fearnley Offshore AS, the worldwide fleet of ultra-deepwater drilling units as of July 2011 consisted of 85 units, comprised of 44 semi-submersible rigs and 41 drillships. An additional 17 semi-submersible rigs and 45 drillships are under construction or on order as of July 2011, which would bring the total fleet to 147 drilling units by the middle of 2014. A relatively large number of the drilling units currently under construction have been contracted for

future work, which may intensify price competition as scheduled delivery dates occur. The entry into service of these new, upgraded or reactivated drilling units will increase supply and has already led to a reduction in dayrates as drilling units are absorbed into the active fleet. In addition, the new construction of high-specification rigs, as well as changes in its competitors' drilling rig fleets, could require Ocean Rig to make material additional capital investments to keep its fleet competitive. Lower utilization and dayrates could adversely affect Ocean Rig's revenues and profitability. Prolonged periods of low utilization and dayrates could also result in the recognition of impairment charges on its drilling units if future cash flow estimates, based upon information available to Ocean Rig's management at the time, indicate that the carrying value of these drilling units may not be recoverable.

### Consolidation of suppliers may increase the cost of obtaining supplies, which may have a material adverse effect on Ocean Rig's results of operations and financial condition.

Ocean Rig relies on certain third parties to provide supplies and services necessary for its offshore drilling operations, including but not limited to drilling equipment suppliers, catering and machinery suppliers. Recent mergers have reduced the number of available suppliers, resulting in fewer alternatives for sourcing key supplies. Such consolidation, combined with a high volume of drilling units under construction, may result in a shortage of supplies and services thereby increasing the cost of supplies and/or potentially inhibiting the ability of suppliers to deliver on time. These cost increases or delays could have a material adverse effect on Ocean Rig's results of operations and result in rig downtime, and delays in the repair and maintenance of its drilling rigs.

### Ocean Rig's international operations in the offshore drilling sector involve additional risks, including piracy, which could adversely affect Ocean Rig's business.

Ocean Rig operates in various regions throughout the world. Ocean Rig's two existing drilling rigs, the *Leiv Eiriksson* and the *Eirik Raude*, are currently operating offshore of Greenland and Ghana, respectively, and Ocean Rig's drillship, the *Ocean Rig Corvovado*, commenced drilling and related operations in Greenland in May 2011 and is scheduled to commence a contract for drilling operations offshore Brazil upon the expiration of the drillship's current contract. On March 31, 2011, directly upon its delivery, the *Ocean Rig Olympia* commenced contracts for exploration drilling offshore of Ghana and Cote D'Ivoire. In addition, the *Ocean Rig Poseidon* commenced a contract on July 29, 2011, directly upon its delivery, for drilling offshore of Tanzania and West Africa and the *Ocean Rig Mykonos* is scheduled to commence a contract in the fourth quarter of 2011 for drilling operations offshore Brazil. In the past Ocean Rig has operated the *Eirik Raude* in the Gulf of Mexico, offshore of Canada, Norway, the U.K., and Ghana, while the *Leiv Eiriksson* has operated offshore of West Africa, Turkey, Ireland, west of the Shetland Islands and in the North Sea. As a result of Ocean Rig's international operations, Ocean Rig may be exposed to political and other uncertainties, including risks of:

- terrorist acts, armed hostilities, war and civil disturbances;

- acts of piracy, which have historically affected ocean-going vessels trading in regions of the world such as the South China Sea and in the Gulf of Aden off the coast of Somalia and which have increased significantly in frequency since 2008, particularly in the Gulf of Aden and off the west coast of Africa;

- significant governmental influence over many aspects of local economies;

- seizure, nationalization or expropriation of property or equipment;

- repudiation, nullification, modification or renegotiation of contracts;

- limitations on insurance coverage, such as war risk coverage, in certain areas;

- political unrest;

- foreign and U.S. monetary policy and foreign currency fluctuations and devaluations;

- the inability to repatriate income or capital;

- complications associated with repairing and replacing equipment in remote locations;

- import-export quotas, wage and price controls, imposition of trade barriers;

33

- regulatory or financial requirements to comply with foreign bureaucratic actions;

- changing taxation policies, including confiscatory taxation;

- other forms of government regulation and economic conditions that are beyond its control; and

- governmental corruption.

In addition, international contract drilling operations are subject to various laws and regulations in countries in which Ocean Rig operates, including laws and regulations relating to:

- the equipping and operation of drilling units;

- repatriation of foreign earnings;

- oil and gas exploration and development;

- taxation of offshore earnings and earnings of expatriate personnel; and

- use and compensation of local employees and suppliers by foreign contractors.

Some foreign governments favor or effectively require (i) the awarding of drilling contracts to local contractors or to drilling rigs owned by their own citizens, (ii) the use of a local agent or (iii) foreign contractors to employ citizens of, or purchase supplies from, a particular jurisdiction. These practices may adversely affect Ocean Rig's ability to compete in those regions. It is difficult to predict what governmental regulations may be enacted in the future that could adversely affect the international drilling industry. The actions of foreign governments, including initiatives by OPEC, may adversely affect Ocean Rig's ability to compete. Failure to comply with applicable laws and regulations, including those relating to sanctions and export restrictions, may subject Ocean Rig to criminal sanctions or civil remedies, including fines, denial of export privileges, injunctions or seizures of assets.

### Ocean Rig's business and operations involve numerous operating hazards.

Ocean Rig's operations are subject to hazards inherent in the drilling industry, such as blowouts, reservoir damage, loss of production, loss of well control, lost or stuck drill strings, equipment defects, punch throughs, craterings, fires, explosions and pollution, including spills similar to the events on April 20, 2010 related to the *Deepwater Horizon* , in which Ocean Rig was not involved. Contract drilling and well servicing require the use of heavy equipment and exposure to hazardous conditions, which may subject Ocean Rig to liability claims by employees, customers and third parties. These hazards can cause personal injury or loss of life, severe damage to or destruction of property and equipment, pollution or environmental damage, claims by third parties or customers and suspension of operations. Ocean Rig's offshore drilling segment is also subject to hazards inherent in marine operations, either while on-site or during mobilization, such as capsizing, sinking, grounding, collision, damage from severe weather and marine life infestations. Operations may also be suspended because of machinery breakdowns, abnormal drilling conditions, and failure of subcontractors to perform or supply goods or services, or personnel shortages. Ocean Rig customarily provides contract indemnity to its customers for claims that could be asserted by Ocean Rig relating to damage to or loss of its equipment, including rigs and claims that could be asserted by Ocean Rig or its employees relating to personal injury or loss of life.

Damage to the environment could also result from Ocean Rig's operations, particularly through spillage of fuel, lubricants or other chemicals and substances used in drilling operations, leaks and blowouts or extensive uncontrolled fires. Ocean Rig may also be subject to property, environmental and other damage claims by oil and gas companies. Ocean Rig's insurance policies and contractual indemnity rights with its customers may not adequately cover losses, and Ocean Rig does not have insurance coverage or rights to indemnity for all risks. Consistent with standard industry practice, Ocean Rig's clients generally assume, and indemnify Ocean Rig against, well control and subsurface risks under dayrate contracts. These are risks associated with the loss of control of a well, such as blowout or cratering, the cost to regain control of or re-drill a well and associated pollution. However, there can be no assurance that these clients will be willing or financially able to indemnify Ocean Rig against all these risks. Ocean Rig has no insurance coverage for named storms in the Gulf of Mexico and war risk worldwide. Furthermore, pollution and environmental risks generally are not totally insurable.

***Ocean Rig's insurance coverage may not adequately protect it from certain operational risks inherent in the drilling industry.***

Ocean Rig's insurance is intended to cover normal risks in its current operations, including insurance against property damage, occupational injury and illness, loss of hire, certain war risk and third-party liability, including pollution liability.

Insurance coverage may not, under certain circumstances, be available, and if available, may not provide sufficient funds to protect Ocean Rig from all losses and liabilities that could result from its operations. Ocean Rig has also obtained loss of hire insurance which becomes effective after 45 days of downtime with coverage that extends for approximately one year, except for its operations offshore Greenland under its contracts with Cairn, where the loss of hire insurance becomes effective after 60 days. Ocean Rig received insurance payments under this policy when, in the first quarter of 2007, the *Eirik Raude* experienced 62 days of downtime operating offshore Newfoundland due to drilling equipment failure and hull structure repair that were the result of design issues. The principal risks which may not be insurable are various environmental liabilities and liabilities resulting from reservoir damage caused by Ocean Rig's gross negligence. Moreover, Ocean Rig's insurance provides for premium adjustments based on claims and is subject to deductibles and aggregate recovery limits. In the case of pollution liabilities, Ocean Rig's deductible is $10,000 per event and $250,000 for protection and indemnity claims brought before any U.S. jurisdiction. Ocean Rig's aggregate recovery limits are $625.0 million for oil pollution, or $750.0 million for the *Ocean Rig Corcovado* and the *Leiv Eiriksson* under the contracts with Cairn, and $500.0 million for all other claims under its protection and indemnity insurance which is provided by mutual protection and indemnity associations. Ocean Rig's deductible is $1.5 million per hull and machinery insurance claim, except for its operations offshore Greenland under its contracts with Cairn, where the deductible is $3.0 million for the *Ocean Rig Corcovado* and $4.5 million for the *Leiv Eiriksson* . In addition, insurance policies covering physical damage claims due to a named windstorm in the Gulf of Mexico generally impose strict recovery limits, which may result in losses on any damage to Ocean Rig's drilling units that may be operated in that region in the future. Ocean Rig's insurance coverage may not protect fully against losses resulting from a required cessation of rig operations for environmental or other reasons. Insurance may not be available to Ocean Rig at all or on terms acceptable to Ocean Rig, Ocean Rig may not maintain insurance or, if Ocean Rig is so insured, its policy may not be adequate to cover its loss or liability in all cases. The occurrence of a casualty, loss or liability against which Ocean Rig may not be fully insured could significantly reduce its revenues, make it financially impossible for it to obtain a replacement rig or to repair a damaged rig, cause it to pay fines or damages which are generally not insurable and that may have priority over the payment obligations under its indebtedness or otherwise impair Ocean Rig's ability to meet its obligations under its indebtedness and to operate profitably.

***Governmental laws and regulations, including environmental laws and regulations, may add to Ocean Rig's costs or limit its drilling activity.***

Ocean Rig's business in the offshore drilling industry is affected by laws and regulations relating to the energy industry and the environment in the geographic areas where it operates. The offshore drilling industry is dependent on demand for services from the oil and gas exploration and production industry, and, accordingly, Ocean Rig is directly affected by the adoption of laws and regulations that, for economic, environmental or other policy reasons, curtail exploration and development drilling for oil and gas. Ocean Rig may be required to make significant capital expenditures to comply with governmental laws and regulations. It is also possible that these laws and regulations may, in the future, add significantly to Ocean Rig's operating costs or significantly limit drilling activity. Ocean Rig's ability to compete in international contract drilling markets may be limited by foreign governmental regulations that favor or require the awarding of contracts to local contractors or by regulations requiring foreign contractors to employ citizens of, or purchase supplies from, a particular jurisdiction. Governments in some countries are increasingly active in regulating and controlling the ownership of concessions, the exploration for oil and gas, and other aspects of the oil and gas industries. Offshore drilling in certain areas has been curtailed and, in certain cases, prohibited because of concerns over protection of the environment. Operations in less developed countries can be subject to legal systems that are not as mature or predictable as those in more developed countries, which can lead to greater uncertainty in legal matters and proceedings.

To the extent new laws are enacted or other governmental actions are taken that prohibit or restrict offshore drilling or impose additional environmental protection requirements that result in increased costs to the oil and gas industry, in general, or the offshore drilling industry, in particular, Ocean Rig's business or prospects could be materially adversely affected. The operation of Ocean Rig's drilling units will require certain governmental approvals, the number and prerequisites of which cannot be determined until Ocean Rig identifies the jurisdictions in which it will operate on securing contracts for the drilling units. Depending on the jurisdiction, these governmental approvals may involve public hearings and costly undertakings on Ocean Rig's part. Ocean Rig may not obtain such approvals or such approvals may not be obtained in a timely manner. If Ocean Rig fails to timely secure the necessary approvals or permits, its customers may have the right to terminate or seek to renegotiate their drilling contracts to Ocean Rig's detriment. The amendment or modification of existing laws and regulations or the adoption of new laws and regulations curtailing or further regulating exploratory or development drilling and production of oil and gas could have a material adverse effect on Ocean Rig's business, operating results or financial condition. Future earnings may be negatively affected by compliance with any such new legislation or regulations.

### *Ocean Rig is subject to complex laws and regulations, including environmental laws and regulations, that can adversely affect the cost, manner or feasibility of doing business.*

Ocean Rig's operations are subject to numerous laws and regulations in the form of international conventions and treaties, national, state and local laws and national and international regulations in force in the jurisdictions in which its vessels operate or are registered, which can significantly affect the ownership and operation of its vessels. These requirements include, but are not limited to, the International Convention on Civil Liability for Oil Pollution Damage of 1969, the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matter of 1975, the International Convention for the Prevention of Marine Pollution of 1973, the International Convention for the Safety of Life at Sea of 1974, the International Convention on Load Lines of 1966, the U.S. Oil Pollution Act of 1990, or OPA, the U.S. Clean Air Act, U.S. Clean Water Act and the U.S. Maritime Transportation Security Act of 2002. Compliance with such laws, regulations and standards, where applicable, may require installation of costly equipment or operational changes and may affect the resale value or useful lives of Ocean Rig's vessels. Ocean Rig may also incur additional costs in order to comply with other existing and future regulatory obligations, including, but not limited to, costs relating to air emissions, including greenhouse gases, the management of ballast waters, maintenance and inspection, development and implementation of emergency procedures and insurance coverage or other financial assurance of Ocean Rig's ability to address pollution incidents. These costs could have a material adverse effect on Ocean Rig's business, results of operations, cash flows and financial condition. A failure to comply with applicable laws and regulations may result in administrative and civil penalties, criminal sanctions or the suspension or termination of Ocean Rig's operations. Environmental laws often impose strict liability for remediation of spills and releases of oil and hazardous substances, which could subject Ocean Rig to liability without regard to whether it was negligent or at fault. Under OPA, for example, owners, operators and bareboat charterers are jointly and severally strictly liable for the discharge of oil in U.S. waters, including the 200-nautical mile exclusive economic zone around the United States. An oil spill could result in significant liability, including fines, penalties and criminal liability and remediation costs for natural resource damages under other international and U.S. federal, state and local laws, as well as third-party damages. Ocean Rig is required to satisfy insurance and financial responsibility requirements for potential oil (including marine fuel) spills and other pollution incidents and its insurance may not be sufficient to cover all such risks. As a result, claims against Ocean Rig could result in a material adverse effect on its business, results of operations, cash flows and financial condition.

Ocean Rig's drilling units are separately owned by its subsidiaries and, under certain circumstances, a parent company and all of the ship-owning affiliates in a group under common control engaged in a joint venture could be held liable for damages or debts owed by one of the affiliates, including liabilities for oil spills under OPA or other environmental laws. Therefore, it is possible that Ocean Rig could be subject to liability upon a judgment against it or any one of its subsidiaries.

Ocean Rig drilling units could cause the release of oil or hazardous substances, especially as Ocean Rig's drilling units age. Any releases may be large in quantity, above its permitted limits or occur in protected or sensitive areas where public interest groups or governmental authorities have special interests. Any releases of oil or

36

hazardous substances could result in fines and other costs to Ocean Rig, such as costs to upgrade its drilling rigs, clean up the releases, and comply with more stringent requirements in its discharge permits. Moreover, these releases may result in Ocean Rig's customers or governmental authorities suspending or terminating its operations in the affected area, which could have a material adverse effect on Ocean Rig's business, results of operation and financial condition.

If Ocean Rig is able to obtain from its customers some degree of contractual indemnification against pollution and environmental damages in its contracts, such indemnification may not be enforceable in all instances or the customer may not be financially able to comply with its indemnity obligations in all cases. And, Ocean Rig may not be able to obtain such indemnification agreements in the future.

Ocean Rig's insurance coverage may not be available in the future or Ocean Rig may not obtain certain insurance coverage. If it is available and Ocean Rig has the coverage, it may not be adequate to cover its liabilities. Any of these scenarios could have a material adverse effect on Ocean Rig's business, operating results and financial condition.

### *Regulation of greenhouse gases and climate change could have a negative impact on Ocean Rig's business.*

In 2005, the Kyoto Protocol to the 1992 United Nations Framework Convention on Climate Change, which establishes a binding set of targets for reduction of greenhouse gas emissions, became binding on all those countries that had ratified it. International discussions are currently underway to develop a treaty to replace the Kyoto Protocol after its expiration in 2012. Although the United States is not a party to the Kyoto Protocol, it has taken a number of steps to limit emissions of greenhouse gas emissions, including imposing reporting and permitting requirements on certain categories of sources.

Because Ocean Rig's business depends on the level of activity in the offshore oil and gas industry, existing or future laws, regulations, treaties or international agreements related to greenhouse gases and climate change, including incentives to conserve energy or use alternative energy sources, could have a negative impact on Ocean Rig's business if such laws, regulations, treaties or international agreements reduce the worldwide demand for oil and gas. In addition, such laws, regulations, treaties or international agreements could result in increased compliance costs or additional operating restrictions, which may have a negative impact on Ocean Rig's business.

### *The Deepwater Horizon oil spill in the Gulf of Mexico may result in more stringent laws and regulations governing deepwater drilling, which could have a material adverse effect on Ocean Rig's business, operating results or financial condition.*

On April 20, 2010, there was an explosion and a related fire on the *Deepwater Horizon* , an ultra-deepwater semi-submersible drilling unit that is not connected to Ocean Rig, while it was servicing a well in the Gulf of Mexico. This catastrophic event resulted in the death of 11 workers and the total loss of that drilling unit, as well as the release of large amounts of oil into the Gulf of Mexico, severely impacting the environment and the region's key industries. This event is being investigated by several federal agencies, including the U.S. Department of Justice, and by the U.S. Congress and is also the subject of numerous lawsuits. On May 30, 2010, the U.S. Department of the Interior issued a six-month moratorium on all deepwater drilling in the outer continental shelf regions of the Gulf of Mexico and the Pacific Ocean.

On October 12, 2010, the U.S. government lifted the drilling moratorium, subject to compliance with enhanced safety requirements, including those set forth in Notices to Lessees 2010-N05 and 2010-N06, both of which were implemented during the drilling ban. Additionally, all drilling in the Gulf of Mexico will be required to comply with the Interim Final Rule to Enhance Safety Measures for Energy Development on the Outer Continental Shelf (Drilling Safety Rule) and the Workplace Safety Rule on Safety and Environmental Management Systems, both of which were issued on September 30, 2010. On January 11, 2011, the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling released its final report, with recommendations for new regulations.

Ocean Rig does not currently operate its drilling rigs in these regions but may do so in the future. In any event, those developments could have a substantial impact on the offshore oil and gas industry worldwide. The ongoing

37

investigations and proceedings may result in significant changes to existing laws and regulations and substantially stricter governmental regulation of Ocean Rig's drilling units. For example, Norway's Petroleum Safety Authority is assessing the results of the investigations into the Deepwater Horizon oil spill and has issued a preliminary report of its recommendations on June 9, 2011, and Oil & Gas UK has established the Oil Spill Prevention and Response Advisory Group to review industry practices in the UK. In addition, BP plc, the rig operator of the Deepwater Horizon, has reached an agreement with the U.S. government to establish a claims fund of $20 billion, which far exceeds the $75 million strict liability limit set forth under OPA. Amendments to existing laws and regulations or the adoption of new laws and regulations curtailing or further regulating exploratory or development drilling and production of oil and gas, may be highly restrictive and require costly compliance measures that could have a material adverse effect on Ocean Rig's business, operating results or financial condition. Ocean Rig's future earnings may be negatively affected by compliance with any such amended or new legislation or regulations.

### Failure to comply with the U.S. Foreign Corrupt Practices Act could result in fines, criminal penalties, drilling contract terminations and an adverse effect on Ocean Rig's business.

Ocean Rig currently operates, and historically has operated, its drilling units outside of the United States in a number of countries throughout the world, including some with developing economies. Also, the existence of state or government-owned shipbuilding enterprises puts Ocean Rig in contact with persons who may be considered "foreign officials" under the U.S. Foreign Corrupt Practices Act of 1977. Ocean Rig is committed to doing business in accordance with applicable anti-corruption laws and has adopted a code of business conduct and ethics which is consistent and in full compliance with the U.S. Foreign Corrupt Practices Act. Ocean Rig is subject, however, to the risk that it, its affiliated entities or its or their respective officers, directors, employees and agents may take actions determined to be in violation of such anti-corruption laws, including the U.S. Foreign Corrupt Practices Act. Any such violation could result in substantial fines, sanctions, civil and/or criminal penalties, curtailment of operations in certain jurisdictions, and might adversely affect Ocean Rig's business, results of operations or financial condition. In addition, actual or alleged violations could damage Ocean Rig's reputation and ability to do business. Furthermore, detecting, investigating, and resolving actual or alleged violations is expensive and can consume significant time and attention of its senior management.

### Acts of terrorism and political and social unrest could affect the markets for drilling services, which may have a material adverse effect on Ocean Rig's results of operations.

Acts of terrorism and political and social unrest, brought about by world political events or otherwise, have caused instability in the world's financial and insurance markets in the past and may occur in the future. Such acts could be directed against companies such as Ocean Rig's. Ocean Rig's drilling operations could also be targeted by acts of piracy. In addition, acts of terrorism and social unrest could lead to increased volatility in prices for crude oil and natural gas and could affect the markets for drilling services and result in lower dayrates. Insurance premiums could increase and coverage may be unavailable in the future. U.S. government regulations may effectively preclude Ocean Rig from actively engaging in business activities in certain countries. These regulations could be amended to cover countries where Ocean Rig currently operates or where it may wish to operate in the future. Increased insurance costs or increased cost of compliance with applicable regulations may have a material adverse effect on Ocean Rig's results of operations.

### Hurricanes may impact Ocean Rig's ability to operate its drilling units in the Gulf of Mexico or other U.S. coastal waters, which could reduce Ocean Rig's revenues and profitability.

Hurricanes Ivan, Katrina, Rita, Gustav and Ike caused damage to a number of drilling units in the Gulf of Mexico. Drilling units that were moved off their locations during the hurricanes damaged platforms, pipelines, wellheads and other drilling units. The Minerals Management Service of the U.S. Department of the Interior, now known as the Bureau of Ocean Energy Management, Regulation and Enforcement, or BOEMRE, issued guidelines for tie-downs on drilling units and permanent equipment and facilities attached to outer continental shelf production platforms, and moored drilling rig fitness that apply through the 2013 hurricane season. These guidelines effectively impose new requirements on the offshore oil and natural gas industry in an attempt to improve the stations that house the moored units and increase the likelihood of survival of offshore drilling units during a hurricane. The

guidelines also provide for enhanced information and data requirements from oil and natural gas companies operating properties in the Gulf of Mexico. BOEMRE may issue similar guidelines for future hurricane seasons and may take other steps that could increase the cost of operations or reduce the area of operations for Ocean Rig's ultra-deepwater drilling units, thus reducing their marketability. Implementation of new BOEMRE guidelines or regulations that may apply to ultra-deepwater drilling units may subject Ocean Rig to increased costs and limit the operational capabilities of its drilling units. Ocean Rig's drilling units do not currently operate in the Gulf of Mexico or other U.S. Coastal waters but may do so in the future.

*Any failure to comply with the complex laws and regulations governing international trade could adversely affect Ocean Rig's operations.*

The shipment of goods, services and technology across international borders subjects Ocean Rig's offshore drilling segment to extensive trade laws and regulations. Import activities are governed by unique customs laws and regulations in each of the countries of operation. Moreover, many countries, including the United States, control the export and re-export of certain goods, services and technology and impose related export recordkeeping and reporting obligations. Governments also may impose economic sanctions against certain countries, persons and other entities that may restrict or prohibit transactions involving such countries, persons and entities.

The laws and regulations concerning import activity, export recordkeeping and reporting, export control and economic sanctions are complex and constantly changing. These laws and regulations may be enacted, amended, enforced or interpreted in a manner materially impacting Ocean Rig's operations. Shipments can be delayed and denied export or entry for a variety of reasons, some of which are outside Ocean Rig's control and some of which may result from failure to comply with existing legal and regulatory regimes. Shipping delays or denials could cause unscheduled operational downtime. Any failure to comply with applicable legal and regulatory trading obligations also could result in criminal and civil penalties and sanctions, such as fines, imprisonment, debarment from government contracts, seizure of shipments and loss of import and export privileges.

*New technologies may cause Ocean Rig's current drilling methods to become obsolete, resulting in an adverse effect on its business.*

The offshore contract drilling industry is subject to the introduction of new drilling techniques and services using new technologies, some of which may be subject to patent protection. As competitors and others use or develop new technologies, Ocean Rig may be placed at a competitive disadvantage and competitive pressures may force it to implement new technologies at substantial cost. In addition, competitors may have greater financial, technical and personnel resources that allow them to benefit from technological advantages and implement new technologies before Ocean Rig can. Ocean Rig may not be able to implement technologies on a timely basis or at a cost that is acceptable to Ocean Rig.

## Risk Factors Relating to Ocean Rig

*Ocean Rig may be unable to comply with covenants in its credit facilities or any future financial obligations that impose operating and financial restrictions on it.*

Ocean Rig's credit facilities impose, and future financial obligations may impose, operating and financial restrictions on it. These restrictions may prohibit or otherwise limit Ocean Rig's ability to, among other things:

- enter into other financing arrangements;

- incur additional indebtedness;

- create or permit liens on its assets;

- sell its drilling units or the shares of its subsidiaries;

- make investments;

- change the general nature of its business;

- pay dividends to its shareholders;

- change the management and/or ownership of the drilling units;

- make capital expenditures; and

- compete effectively to the extent its competitors are subject to less onerous restrictions.

In addition, certain of Ocean Rig's current loan agreements and related guarantees contain restrictions requiring it to maintain a minimum amount of total available cash ranging from $5.0 million to $100.0 million and also impose maximum capital expenditure restrictions, such that expenditures over $30.0 million require consent of the lender. These restrictions could limit Ocean Rig's ability to fund its operations or capital needs, make acquisitions or pursue available business opportunities. Furthermore, under the terms of its $800.0 million senior secured term loan agreement, which matures in 2016, Ocean Rig is not permitted to pay dividends without the consent of a majority of the lenders. Ocean Rig's credit facilities require (i) Ocean Rig to maintain specified financial ratios and satisfy financial covenants, including covenants related to the market value of its drilling units and (ii) DryShips, because it is a guarantor of certain of Ocean Rig's facilities, to comply with financial covenants relating to liquidity, equity ratios, interest coverage ratios and net worth. As of June 30, 2011, Ocean Rig was in compliance with all of these ratios and covenants. Events beyond its control, including changes in the economic and business conditions in the deepwater offshore drilling market in which Ocean Rig operates, may affect its ability to comply with these ratios and covenants. Ocean Rig cannot assure you that it will continue to meet these ratios or satisfy these covenants. A breach of any of the covenants in, or its inability to maintain the required financial ratios under, the credit facilities would prevent Ocean Rig from borrowing additional amounts under the credit facilities and could result in a default under the credit facilities. In addition, each of Ocean Rig's loan agreements also contains a cross-default provision which can be triggered by a default under one of its other loan agreements. A violation of these covenants constitutes an event of default under its credit facilities, which, unless waived by Ocean Rig's lenders, would provide its lenders with the right to accelerate the outstanding debt, together with accrued interest and other fees, to be immediately due and payable and proceed against the collateral securing that debt, which could constitute all or substantially all of Ocean Rig's assets. A default by DryShips under one of its loan agreements would trigger a cross-default under Ocean Rig's Deutsche Bank credit facilities and would provide its lenders with the right to accelerate the outstanding debt under these facilities. Further, if DryShips defaults under one of its loan agreements, and the related debt is accelerated, this would trigger a cross-default under its $1.04 billion credit facility and its $800.0 million secured term loan agreement and would provide its lenders with the right to accelerate the outstanding debt under these facilities. Ocean Rig's lenders' interests are different from Ocean Rig's, and Ocean Rig cannot guarantee that it will be able to obtain its lenders' waiver or consent with respect to any noncompliance with the specified financial ratios and financial covenants under its credit facilities or future financial obligations. Any such non-compliance may prevent Ocean Rig from taking business actions that are otherwise in its best interest.

***Ocean Rig's parent company, DryShips, has obtained waiver agreements for violations of various covenants under certain of its loan agreements. Due to the cross-default provisions in Ocean Rig loan agreements that are triggered in the event of a default by Ocean Rig under one of its other loan agreements or, in certain cases, a default by DryShips under one of its loan agreements, when those waivers expire, Ocean Rig's lenders could accelerate its indebtedness if DryShips fails to (i) successfully extend the existing waiver agreements or (ii) comply with the applicable covenants in the original loan agreements.***

Ocean Rig's loan agreements, which are secured by mortgages on its drilling units, require Ocean Rig to (i) comply with specified financial ratios and (ii) satisfy certain financial and other covenants. As of June 30, 2011, Ocean Rig had (i) $597.1 million outstanding under its $1.04 billion credit facility (Ocean Rig has repaid approximately $57.1 million in the third quarter of 2011); (ii) a total of $272.6 million outstanding under its Deutsche Bank credit facilities; (iii) $800.0 million outstanding under its $800 million Nordea senior secured term loan agreement; and (iv) $500.0 million outstanding under its $500 million of aggregate principal amount of 9.5% senior unsecured notes due in 2016.

DryShips currently provides guarantees under Ocean Rig's Deutsche Bank credit facilities and Ocean Rig's $800.0 million senior secured term loan agreement, which require DryShips to comply with certain financial covenants, including covenants to maintain minimum liquidity, equity ratio, interest coverage, net worth and debt

service coverage ratio. All of Ocean Rig's loan agreements contain a cross-default provision that may be triggered by a default under one of its other loan agreements. A cross-default provision means that a default on one loan would result in a default on all of Ocean Rig's other loans. A default by DryShips under one of its loan agreements would trigger a cross-default under Ocean Rig's Deutsche Bank credit facilities and would provide its lenders with the right to accelerate the outstanding debt under these facilities. Further, if DryShips defaults under one of its loan agreements, and the related debt is accelerated, this would trigger a cross-default under Ocean Rig's $1.04 billion credit facility and its $800.0 million secured term loan agreement and would provide Ocean Rig's lenders with the right to accelerate the outstanding debt under these facilities.

DryShips and its shipping subsidiaries have several secured term loan agreements totaling $959.1 million of gross indebtedness outstanding at June 30, 2011. Due to the decline in vessel values in the drybulk shipping sector, DryShips was in breach of certain of its financial covenants as of December 31, 2008 and, as a result, obtained waiver agreements from its lenders waiving the violations of such covenants. Certain of these waiver agreements expire during 2011 and 2012, at which time the original covenants under the loan agreements come back into effect. As of June 30, 2011, DryShips had either regained compliance with the covenants under its loan agreements or had the ability to remedy shortfalls in collateral maintenance requirements within specified grace periods.

If DryShips is not in compliance with all of the covenants under its loan agreements, there can be no assurance that it will be successful in obtaining additional waivers or amendments to the credit facilities or that the lenders will extend their waivers (which under each loan agreement requires the unanimous consent of the applicable lenders) prior to their expiration. Absent a waiver or amendment, a default by DryShips under one of its loan agreements would trigger a cross-default under Ocean Rig's Deutsche Bank credit facilities and would provide its lenders with the right to accelerate the outstanding debt under these facilities and if DryShips defaults under one of its loan agreements, and the related debt is accelerated, this would trigger a cross-default under Ocean Rig's $1.04 billion credit facility and Ocean Rig's $800.0 million secured term loan agreement and would provide its lenders with the right to accelerate the outstanding debt under these facilities, even if Ocean Rig were otherwise in compliance with its loan agreements. Ocean Rig's management does not expect that cash on hand and cash generated from operations will be sufficient to repay those loans with cross-default provisions if such debt is accelerated by the lenders. In such a scenario, Ocean Rig would have to seek to access the capital markets to fund the mandatory payments, although such financing may not be available on attractive terms or at all. In addition, if Ocean Rig otherwise fails to comply with the covenants applicable to its operations in its secured loan agreements, its lenders could accelerate its indebtedness and foreclose their liens on its drilling units, which would impair its ability to continue its operations.

***Ocean Rig will need to procure significant additional financing, which may be difficult to obtain on acceptable terms, in order to complete the construction of its seventh generation hulls and any of the three additional newbuilding drillships for which Ocean Rig may exercise its option.***

In April 2011, Ocean Rig exercised two of its options for the construction of two newbuild drillships by Samsung, which are scheduled to be delivered in July 2013 and September 2013, respectively, and in June 2011, Ocean Rig exercised a third option with Samsung for the construction of a newbuild drillship to be delivered in November 2013. The estimated total project cost of its seventh generation hulls is $638.0 million per drillship, which consists of $570.0 million of construction costs, costs of approximately $38.0 million for upgrades to the existing drillship specifications and construction-related expenses of $30.0 million. Ocean Rig also completed the issuance of $500.0 million in aggregate principal amount of 9.5% senior unsecured notes due 2016 in April 2011. Ocean Rig intends to apply the net proceeds of the notes issuance to partially finance the construction of its seventh generation hulls. In order to complete the construction of its seventh generation hulls, Ocean Rig will need to procure additional financing and, if Ocean Rig fails to take delivery of one or more of the seventh generation hulls for any reason, it will be prevented from realizing potential revenues from the applicable drillship and it could lose its deposit money, which amounted to $726.7 million in the aggregate, as of September 30, 2011. Ocean Rig may also incur additional costs and liability to the shipyards, which may pursue claims against Ocean Rig under its newbuilding construction contract and retain and sell its seventh generation hulls to third parties.

The remaining three optional newbuilding drillships have an estimated total project cost of $638.0 million each, excluding financing costs. The options may be exercised by Ocean Rig at any time on or prior to January 31,

2012, with vessel deliveries ranging from the first to the third quarter of 2014, depending on when the options are exercised. To the extent Ocean Rig exercises any of the three newbuilding options, which have an estimated aggregate cost of $1.9 billion, Ocean Rig will incur additional payment obligations for which Ocean Rig has not arranged financing. If, on the other hand, Ocean Rig does not exercise any of the remaining options, Ocean Rig will sacrifice the corresponding deposits, for which it paid approximately $24.8 million in the aggregate as of September 30, 2011.

### *Ocean Rig may be unable to meet its capital expenditure requirements.*

As of September 30, 2011, Ocean Rig had substantial purchase commitments mainly representing remaining yard installments for the three newbuilding drillships. The total estimated yard cost is $608.0 million for each of the three newbuilding drillships, of which Ocean Rig paid an aggregate amount of $632.4 million in the second quarter of 2011, not including the $94.3 million it paid in slot reservation fees relating to these drillships prior to the second quarter of 2011. The remaining amount is payable on delivery of each drillship, which is scheduled to be in July 2013, September 2013 and November 2013, respectively, for which Ocean Rig has not arranged financing.

Ocean Rig expects to finance the delivery payments due in 2013 for its seventh generation hulls with cash on hand, operating cash flow and bank debt that Ocean Rig intends to arrange. Should Ocean Rig exercise the remaining three newbuilding drillship options under its contract with Samsung, Ocean Rig would expect to incur additional capital commitments of at least $701.8 million payable at the time of exercise, for which Ocean Rig would be dependent upon obtaining additional financing, which it has not yet arranged. Should such financing not be available, this could severely impact Ocean Rig's ability to satisfy its liquidity requirements, meet its obligations and finance future obligations.

### *Ocean Rig may be unable to secure ongoing drilling contracts, including for its three uncontracted seventh generation hulls under construction, due to strong competition, and the contracts that Ocean Rig enters into may not provide sufficient cash flow to meet its debt service obligations with respect to its indebtedness.*

Ocean Rig has not yet secured drilling contracts for its three seventh generation hulls under construction, scheduled to be delivered to Ocean Rig in July 2013, September 2013 and November 2013, respectively. The existing drilling contracts for Ocean Rig's drilling units currently employed are scheduled to expire from the fourth quarter of 2011 through the fourth quarter of 2014. Ocean Rig cannot guarantee that Ocean Rig will be able to obtain contracts for its three uncontracted newbuilding drillships or, upon the expiration or termination of the current contracts, for its drilling units currently employed or that there will not be a gap in employment between current contracts and subsequent contracts. In particular, if the price of crude oil is low, or it is expected that the price of crude oil will decrease in the future, at a time when Ocean Rig is seeking to arrange employment contracts for its drilling units, Ocean Rig may not be able to obtain employment contracts at attractive rates or at all.

If the rates which Ocean Rig receives for the reemployment of its current drilling units are reduced, Ocean Rig will recognize less revenue from their operations. In addition, delays under existing contracts could cause Ocean Rig to lose future contracts if a drilling unit is not available to start work at the agreed date. Ocean Rig's ability to meet its cash flow obligations will depend on its ability to consistently secure drilling contracts for its drilling units at sufficiently high dayrates. Ocean Rig cannot predict the future level of demand for its services or future conditions in the oil and gas industry. If the oil and gas companies do not continue to increase exploration, development and production expenditures, Ocean Rig may have difficulty securing drilling contracts, including for the three newbuilding drillships Ocean Rig has agreed to acquire, or it may be forced to enter into contracts at unattractive dayrates. Either of these events could impair Ocean Rig's ability to generate sufficient cash flow to make principal and interest payments under its indebtedness and meet its capital expenditure and other obligations.

### *Ocean Rig has a substantial amount of debt, and Ocean Rig may lose the ability to obtain future financing and suffer competitive disadvantages.*

Ocean Rig had outstanding indebtedness of $2.2 billion as of June 30, 2011. Ocean Rig expects to incur substantial additional indebtedness in order to fund the remaining $16.8 million of construction-related expenses

for the *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* the total estimated project costs of $1.9 billion for its seventh generation hulls, of which $726.7 million amounted to previously-funded construction installment payments as of September 30, 2011, and any further growth of Ocean Rig's fleet. This substantial level of debt and other obligations could have significant adverse consequences on Ocean Rig's business and future prospects, including the following:

- Ocean Rig may not be able to obtain financing in the future for working capital, capital expenditures, acquisitions, debt service requirements or other purposes;

- Ocean Rig may not be able to use operating cash flow in other areas of its business because Ocean Rig must dedicate a substantial portion of these funds to service the debt;

- Ocean Rig could become more vulnerable to general adverse economic and industry conditions, including increases in interest rates, particularly given its substantial indebtedness, some of which bears interest at variable rates;

- Ocean Rig may not be able to meet financial ratios included in its loan agreements due to market conditions or other events beyond its control, which could result in a default under these agreements and trigger cross-default provisions in Ocean Rig's other loan agreements and debt instruments;

- less leveraged competitors could have a competitive advantage because they have lower debt service requirements; and

- Ocean Rig may be less able to take advantage of significant business opportunities and to react to changes in market or industry conditions than its competitors.

Ocean Rig's ability to service its debt will depend upon, among other things, its future financial and operating performance, which will be affected by prevailing economic conditions and financial, business, regulatory and other factors, some of which are beyond Ocean Rig's control. If Ocean Rig's operating income is not sufficient to service its current or future indebtedness, Ocean Rig will be forced to take actions such as reducing or delaying its business activities, acquisitions, investments or capital expenditures, selling assets, restructuring or refinancing its debt or seeking additional equity capital. Ocean Rig may not be able to affect any of these remedies on satisfactory terms, or at all. In addition, a lack of liquidity in the debt and equity markets could hinder Ocean Rig's ability to refinance its debt or obtain additional financing on favorable terms in the future.

### *Ocean Rig may be unable to pay dividends.*

As a result of various covenant restrictions imposed by its lenders, Ocean Rig may be unable to pay dividends to its shareholders. Under the terms of Ocean Rig's $800.0 million senior secured term loan agreement, which matures in 2016, Ocean Rig is not permitted to pay dividends without the consent of a majority of the lenders. In addition, the payment of any future dividends will be subject at all times to the discretion of Ocean Rig's board of directors. The timing and amount of dividends will depend on Ocean Rig's earnings, financial condition, cash requirements and availability, fleet renewal and expansion, restrictions in its loan agreements, the provisions of Marshall Islands law affecting the payment of dividends and other factors. Marshall Islands law generally prohibits the payment of dividends other than from surplus or while a company is insolvent or would be rendered insolvent upon the payment of such dividends, or if there is no surplus, dividends may be declared or paid out of net profits for the fiscal year.

### *Construction of drillships is subject to risks, including delays and cost overruns, which could have an adverse impact on Ocean Rig's available cash resources and results of operations.*

Ocean Rig has entered into contracts with Samsung for the construction of three ultra-deepwater newbuilding drillships, which Ocean Rig expects to take delivery of in July 2013, September 2013 and November 2013, respectively.

From time to time in the future, Ocean Rig may undertake new construction projects and conversion projects. In addition, Ocean Rig makes significant upgrade, refurbishment, conversion and repair expenditures for its fleet from time to time, particularly as its drilling units become older. Some of these expenditures are unplanned. These

projects together with Ocean Rig's existing construction projects and other efforts of this type are subject to risks of cost overruns or delays inherent in any large construction project as a result of numerous factors, including the following:

- shipyard unavailability;

- shortages of equipment, materials or skilled labor;

- unscheduled delays in the delivery of ordered materials and equipment;

- local customs strikes or related work slowdowns that could delay importation of equipment or materials;

- engineering problems, including those relating to the commissioning of newly designed equipment;

- latent damages or deterioration to the hull, equipment and machinery in excess of engineering estimates and assumptions;

- work stoppages;

- client acceptance delays;

- weather interference or storm damage;

- disputes with shipyards and suppliers;

- shipyard failures and difficulties;

- failure or delay of third-party equipment vendors or service providers;

- unanticipated cost increases; and

- difficulty in obtaining necessary permits or approvals or in meeting permit or approval conditions.

These factors may contribute to cost variations and delays in the delivery of Ocean Rig's ultra-deepwater newbuilding drillships. Delays in the delivery of these newbuilding drillships or the inability to complete construction in accordance with their design specifications may, in some circumstances, result in a delay in contract commencement, resulting in a loss of revenue to Ocean Rig, and may also cause customers to renegotiate, terminate or shorten the term of a drilling contract for the drillship pursuant to applicable late delivery clauses. In the event of termination of one of these contracts, Ocean Rig may not be able to secure a replacement contract on as favorable terms. Additionally, capital expenditures for drillship upgrades, refurbishment and construction projects could materially exceed Ocean Rig's planned capital expenditures. Moreover, Ocean Rig's drillships that may undergo upgrade, refurbishment and repair may not earn a dayrate during the periods they are out of service. In addition, in the event of a shipyard failure or other difficulty, Ocean Rig may be unable to enforce certain provisions under its newbuilding contracts such as its refund guarantee, to recover amounts paid as installments under such contracts. The occurrence of any of these events may have a material adverse effect on Ocean Rig's results of operations, financial condition or cash flows.

***As its current operating fleet is comprised of two ultra-deepwater drilling rigs and four drillships, Ocean Rig relies heavily on a small number of customers and the loss of a significant customer could have a material adverse impact on Ocean Rig's financial results.***

Ocean Rig has three customers for its current operating fleet of two ultra-deepwater drilling rigs and four drillships and it is subject to the usual risks associated with having a limited number of customers for its services. If these customers terminate, suspend or seek to renegotiate the contracts for these drilling units, as they are entitled to do under various circumstances, or cease doing business Ocean Rig's results of operations and cash flows could be adversely affected. Although Ocean Rig expects that a limited number of customers will continue to generate a substantial portion of its revenues, Ocean Rig will have to expand its pool of customers as it takes delivery of its three newbuilding drillships and further grow its business.

44

***Currently, Ocean Rig's revenues depend on two ultra-deepwater drilling rigs and four drillships, which are designed to operate in harsh environments. The damage or loss of either of these drilling rigs could have a material adverse effect on Ocean Rig's results of operations and financial condition.***

Ocean Rig's revenues are dependent on the drilling rig *Eirik Raude* , which is currently operating offshore of Ghana, the drilling rig *Leiv Eiriksson* and the drillship *Ocean Rig Corcovado* , which are currently operating offshore of Greenland since May 2011, the *Ocean Rig Olympia* , which commenced contracts to drill five exploration wells with Vanco off the coast of Ghana and Cote d'Ivoire directly upon its delivery on March 31, 2011, the *Ocean Rig Poseidon* , which commenced a contract for drilling operations in Tanzania and West Africa in July 2011, and the *Ocean Rig Mykonos* , which is currently mobilizing for the Petrobras Brazil contract scheduled to commence in the fourth quarter of 2011. Ocean Rig's drilling units may be exposed to risks inherent in deepwater drilling and operating in harsh environments that may cause damage or loss. The drilling of oil and gas wells, particularly exploratory wells where little is known of the subsurface formations involves risks, such as extreme pressure and temperature, blowouts, reservoir damage, loss of production, loss of well control, lost or stuck drill strings, equipment defects, punch throughs, craterings, fires, explosions, pollution and natural disasters such as hurricanes and tropical storms. In addition, offshore drilling operations are subject to perils peculiar to marine operations, either while on-site or during mobilization, including capsizing, sinking, grounding, collision, marine life infestations, and loss or damage from severe weather. The replacement or repair of a rig or drillship could take a significant amount of time, and Ocean Rig may not have any right to compensation for lost revenues during that time. As long as Ocean Rig has only six drilling units in operation, loss of or serious damage to one of the drilling units could materially reduce its revenues in its offshore drilling segment for the time that a rig or drillship is out of operation. In view of the sophisticated design of the drilling units, Ocean Rig may be unable to obtain a replacement unit that could perform under the conditions that its drilling units are expected to operate, which could have a material adverse effect on Ocean Rig's results of operations and financial condition.

***Ocean Rig is subject to certain risks with respect to its counterparties on drilling contracts, and failure of these counterparties to meet their obligations could cause Ocean Rig to suffer losses or otherwise adversely affect its business.***

Ocean Rig enters into drilling services contracts with its customers, newbuilding contracts with shipyards, interest rate swap agreements and forward exchange contracts, and has employed and may employ its drilling rigs and newbuild drillships on fixed-term and well contracts. Ocean Rig's drilling contracts, newbuilding contracts, and hedging agreements subject Ocean Rig to counterparty risks. The ability of each of Ocean Rig's counterparties to perform its obligations under a contract with it will depend on a number of factors that are beyond Ocean Rig's control and may include, among other things, general economic conditions, the condition of the offshore contract drilling industry, the overall financial condition of the counterparty, the dayrates received for specific types of drilling rigs and drillships and various expenses. In addition, in depressed market conditions, Ocean Rig's customers may no longer need a drilling unit that is currently under contract or may be able to obtain a comparable drilling unit at a lower dayrate. As a result, customers may seek to renegotiate the terms of their existing drilling contracts or avoid their obligations under those contracts. Should a counterparty fail to honor its obligations under an agreement with Ocean Rig, Ocean Rig could sustain significant losses which could have a material adverse effect on its business, financial condition, results of operations and cash flows.

***If Ocean Rig's drilling units fail to maintain their class certification or fail any annual survey or special survey, that drilling unit would be unable to operate, thereby reducing Ocean Rig's revenues and profitability and violating certain covenants under its credit facilities.***

Every drilling unit must be "classed" by a classification society. The classification society certifies that the drilling unit is "in-class," signifying that such drilling unit has been built and maintained in accordance with the rules of the classification society and complies with applicable rules and regulations of the drilling unit's country of registry and the international conventions of which that country is a member. In addition, where surveys are required by international conventions and corresponding laws and ordinances of a flag state, the classification society will undertake them on application or by official order, acting on behalf of the authorities concerned. All four of Ocean Rig's drilling rigs are certified as being "in class" by Det Norske Veritas. Both of Ocean Rig's operating drillships

are certified as being "in class" by American Bureau of Shipping. The *Leiv Eiriksson* was credited with completing its last Special Periodical Survey in April 2011 and the *Eirik Raude* completed the same in 2007. The *Eirik Raude* is due for its next Special Periodical Survey in the third quarter 2012, while Ocean Rig's four drillships are due for their first Special Periodical Survey in 2016. Ocean Rig's seventh generation hulls are due for their first Special Periodical Survey in 2018. If any drilling unit does not maintain its class and/or fails any annual survey or special survey, the drilling unit will be unable to carry on operations and will be unemployable and uninsurable which could cause Ocean Rig to be in violation of certain covenants in its credit facilities. Any such inability to carry on operations or be employed, or any such violation of covenants, could have a material adverse impact on Ocean Rig's financial condition and results of operations. That status could cause Ocean Rig to be in violation of certain covenants in its credit facilities.

> ***Ocean Rig's drilling rigs and its drillships following their delivery to Ocean Rig may suffer damage and it may face unexpected yard costs, which could adversely affect Ocean Rig's cash flow and financial condition.***

If Ocean Rig's drilling rigs and Ocean Rig's drillships following their delivery to Ocean Rig suffer damage, they may need to be repaired at a yard. The costs of yard repairs are unpredictable and can be substantial. The loss of earnings while Ocean Rig's drilling rigs and drillships are being repaired and repositioned, as well as the actual cost of these repairs, would decrease its earnings. Ocean Rig may not have insurance that is sufficient to cover all or any of these costs or losses and may have to pay dry docking costs not covered by its insurance.

> ***Ocean Rig may not be able to maintain or replace its drilling units as they age.***

The capital associated with the repair and maintenance of Ocean Rig's fleet increases with age. Ocean Rig may not be able to maintain its existing drilling units to compete effectively in the market, and Ocean Rig's financial resources may not be sufficient to enable it to make expenditures necessary for these purposes or to acquire or build replacement drilling units.

> ***Ocean Rig may have difficulty managing its planned growth properly.***

Ocean Rig intends to continue to grow its fleet and Ocean Rig may exercise one or more of its purchase options to purchase up to an additional three newbuilding drillships. Ocean Rig's future growth will primarily depend on its ability to:

- locate and acquire suitable drillships;

- identify and consummate acquisitions or joint ventures;

- enhance its customer base;

- manage its expansion; and

- obtain required financing on acceptable terms.

Growing any business by acquisition presents numerous risks, such as undisclosed liabilities and obligations, the possibility that indemnification agreements will be unenforceable or insufficient to cover potential losses and difficulties associated with imposing common standards, controls, procedures and policies, obtaining additional qualified personnel, managing relationships with customers and integrating newly acquired assets and operations into existing infrastructure. Ocean Rig may experience operational challenges as it begins operating its new drillships which may result in low earnings efficiency and/or reduced dayrates compared to maximum dayrates. Ocean Rig may be unable to successfully execute its growth plans or Ocean Rig may incur significant expenses and losses in connection with its future growth which would have an adverse impact on its financial condition and results of operations.

***The market value of Ocean Rig's current drilling units and drilling units Ocean Rig may acquire in the future may decrease, which could cause Ocean Rig to incur losses if it decides to sell them following a decline in their values or accounting charges that may affect Ocean Rig's ability to comply with its loan agreement covenants.***

If the offshore contract drilling industry suffers adverse developments in the future, the fair market value of Ocean Rig's drilling units may decline. The fair market value of the drilling units Ocean Rig currently owns or may acquire in the future may increase or decrease depending on a number of factors, including:

- prevailing level of drilling services contract dayrates;

- general economic and market conditions affecting the offshore contract drilling industry, including competition from other offshore contract drilling companies;

- types, sizes and ages of drilling units;

- supply and demand for drilling units;

- costs of newbuildings;

- governmental or other regulations; and

- technological advances.

In the future, if the market values of the Ocean Rig drilling units deteriorate significantly, Ocean Rig may be required to record an impairment charge in its financial statements, which could adversely affect Ocean Rig's results of operations. If Ocean Rig sells any drilling unit when drilling unit prices have fallen and before Ocean Rig has recorded an impairment adjustment to its financial statements, the sale may be at less than the drilling unit's carrying amount on Ocean Rig's financial statements, resulting in a loss. Additionally, any such deterioration in the market values of Ocean Rig's drilling units could trigger a breach of certain financial covenants under its credit facilities and its lenders may accelerate loan repayments. Such charge, loss or repayment could materially and adversely affect Ocean Rig's business prospects, financial condition, liquidity, and results of operations.

***Because Ocean Rig generates all of its revenues in U.S. Dollars, but incurs a significant portion of its employee salary and administrative and other expenses in other currencies, exchange rate fluctuations could have an adverse impact on its results of operations.***

Ocean Rig's principal currency for its operations and financing is the U.S. Dollar. The dayrates for the drilling rigs, its principal source of revenues, are quoted and received in U.S. Dollars. The principal currency for operating expenses is also the U.S. Dollar; however, a significant portion of employee salaries and administration expenses, as well as parts of the consumables and repair and maintenance expenses for the drilling rigs, may be paid in Norwegian Kroner (NOK), Great British Pound (GBP), Canadian dollar (CAD), Euro (EUR) or other currencies depending in part on the location of its drilling operations. This could lead to fluctuations in net income due to changes in the value of the U.S. Dollar relative to the other currencies. Expenses incurred in foreign currencies against which the U.S. Dollar falls in value can increase, resulting in higher U.S. Dollar denominated expenses. Ocean Rig employs derivative instruments in order to economically hedge its currency exposure; however, Ocean Rig may not be successful in hedging its currency exposure and its U.S. Dollar denominated results of operations could be materially and adversely affected upon exchange rate fluctuations determined by events outside of Ocean Rig's control.

***Ocean Rig is dependent upon key management personnel.***

Ocean Rig's operations depend to a significant extent upon the abilities and efforts of its key management personnel. The loss of Ocean Rig's key management personnel's service to Ocean Rig could adversely affect its efforts to obtain employment for Ocean Rig's drillships and discussions with its lenders and, therefore, could adversely affect its business prospects, financial condition and results of operations. Ocean Rig does not currently, nor does it intend to, maintain "key man" life insurance on any of its personnel.

***Failure to attract or retain key personnel, labor disruptions or an increase in labor costs could adversely affect Ocean Rig's operations.***

Ocean Rig requires highly skilled personnel to operate and provide technical services and support for its business in the offshore drilling sector worldwide. As of September 30, 2011, Ocean Rig employed 1,093 employees, the majority of whom are full-time crew employed on its drilling units. Ocean Rig will need to recruit additional qualified personnel as Ocean Rig takes delivery of its newbuilding drillships. Competition for the labor required for drilling operations has intensified as the number of rigs activated, added to worldwide fleets or under construction has increased, leading to shortages of qualified personnel in the industry and creating upward pressure on wages and higher turnover. If turnover increases, Ocean Rig could see a reduction in the experience level of its personnel, which could lead to higher downtime, more operating incidents and personal injury and other claims, which in turn could decrease revenues and increase costs. In response to these labor market conditions, Ocean Rig is increasing efforts in its recruitment, training, development and retention programs as required to meet its anticipated personnel needs. If these labor trends continue, Ocean Rig may experience further increases in costs or limits on its offshore drilling operations.

Currently, none of Ocean Rig's employees are covered by collective bargaining agreements. In the future, some of Ocean Rig's employees or contracted labor may be covered by collective bargaining agreements in certain jurisdictions such as Brazil, Nigeria, Norway and the U.K. As part of the legal obligations in some of these agreements, Ocean Rig may be required to contribute certain amounts to retirement funds and pension plans and have restricted ability to dismiss employees. In addition, many of these represented individuals could be working under agreements that are subject to salary negotiation. These negotiations could result in higher personnel costs, other increased costs or increased operating restrictions that could adversely affect Ocean Rig's financial performance. Labor disruptions could hinder Ocean Rig's operations from being carried out normally and if not resolved in a timely cost-effective manner, could have a material impact its business. If Ocean Rig chooses to cease operations in one of those countries or if market conditions reduce the demand for Ocean Rig's drilling services in such a country, Ocean Rig would incur costs, which may be material, associated with workforce reductions.

***Ocean Rig's operating and maintenance costs with respect to its offshore drilling rigs will not necessarily fluctuate in proportion to changes in operating revenues, which may have a material adverse effect on Ocean Rig's results of operations, financial condition and cash flows.***

Operating revenues may fluctuate as a function of changes in dayrates. However, costs for operating a rig are generally fixed regardless of the dayrate being earned. Therefore, Ocean Rig's operating and maintenance costs with respect to its offshore drilling rigs will not necessarily fluctuate in proportion to changes in operating revenues. In addition, should Ocean Rig's drilling units incur idle time between contracts, Ocean Rig typically will not de-man those drilling units but rather use the crew to prepare the rig for its next contract. During times of reduced activity, reductions in costs may not be immediate, as portions of the crew may be required to prepare rigs for stacking, after which time the crew members are assigned to active rigs or dismissed. In addition, as Ocean Rig's drilling units are mobilized from one geographic location to another, labor and other operating and maintenance costs can vary significantly. In general, labor costs increase primarily due to higher salary levels and inflation. Equipment maintenance expenses fluctuate depending upon the type of activity the unit is performing and the age and condition of the equipment. Contract preparation expenses vary based on the scope and length of contract preparation required and the duration of the firm contractual period over which such expenditures are incurred. If Ocean Rig experiences increased operating costs without a corresponding increase in earnings, this may have a material adverse effect on Ocean Rig's results of operations, financial condition and cash flows.

***In the event Samsung does not perform under its agreements with Ocean Rig and Ocean Rig is unable to enforce certain refund guarantees, Ocean Rig may lose all or part of its investment, which would have a material adverse effect on Ocean Rig's results of operations, financial condition and cash flows.***

Ocean Rig took delivery of its newbuilding drillships, the *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* , on January 3, 2011, March 30, 2011, July 28, 2011 and September 30, 2011, respectively, from Samsung, which is located in South Korea.

Ocean Rig paid $632.4 million in the second quarter of 2011 in connection with its exercise of three of the drillship newbuilding options under Ocean Rig's contract with Samsung and, as a result, has entered into shipbuilding contracts for three seventh generation, advanced capability ultra-deepwater drillships, scheduled to be delivered in July 2013, September 2013 and November 2013, respectively, for a total estimated project cost, excluding financing costs, of $638.0 million per drillship. In addition, Ocean Rig has additional options under its contract with Samsung to construct up to three additional seventh generation, ultra-deepwater drillships, with an estimated total project cost, excluding financing costs, of $638.0 million per drillship. These options may be exercised at any time by Ocean Rig on or prior to January 31, 2012, with vessel deliveries ranging between the first and third quarter of 2014, depending on when the options are exercised. DryShips, Ocean Rig's parent company, paid a non-refundable deposit of $99.2 million in the aggregate to secure this contract. Ocean Rig paid $99.0 million to DryShips when the contract was novated to Ocean Rig. In addition, Ocean Rig paid deposits totaling $20.0 million to Samsung in the first quarter of 2011 to maintain favorable costs and yard slot timing under the option contract.

In the event Samsung does not perform under its agreements with Ocean Rig and Ocean Rig is unable to enforce certain refund guarantees with third-party bankers due to an outbreak of war, bankruptcy or otherwise, Ocean Rig may lose all or part of its investment, which would have a material adverse effect on Ocean Rig's results of operations, financial condition and cash flows.

***Military action, other armed conflicts, or terrorist attacks have caused significant increases in political and economic instability in geographic regions where Ocean Rig operates and where the newbuilding drillships are being constructed.***

Military tension involving North and South Korea, the Middle East, Africa and other attacks, threats of attacks, terrorism and unrest, have caused instability or uncertainty in the world's financial and commercial markets and have significantly increased political and economic instability in some of the geographic areas where Ocean Rig (i) operates and (ii) has contracted with Samsung to build its four newbuilding drillships. Acts of terrorism and armed conflicts or threats of armed conflicts in these locations could limit or disrupt Ocean Rig's operations, including disruptions resulting from the cancellation of contracts or the loss of personnel or assets. In addition, any possible reprisals as a consequence of ongoing military action in the Middle East, such as acts of terrorism in the United States or elsewhere, could materially and adversely affect Ocean Rig in ways it cannot predict at this time.

***The derivative contracts Ocean Rig has entered into to hedge its exposure to fluctuations in interest rates could result in higher than market interest rates and charges against Ocean Rig's income.***

As of June 30, 2011, Ocean Rig has entered into interest rate swaps for the purpose of managing its exposure to fluctuations in interest rates applicable to indebtedness under its credit facilities, which was drawn at a floating rate based on LIBOR. Ocean Rig's hedging strategies, however, may not be effective and it may incur substantial losses if interest rates move materially differently from Ocean Rig's expectations. Ocean Rig's existing interest rate swaps do not, and future derivative contracts may not, qualify for treatment as hedges for accounting purposes. Ocean Rig recognizes fluctuations in the fair value of these contracts in its income statement. In addition, Ocean Rig's financial condition could be materially adversely affected to the extent it does not hedge its exposure to interest rate fluctuations under its financing arrangements, under which loans have been advanced at a floating rate based on LIBOR and for which it has not entered into an interest rate swap or other hedging arrangement. Any hedging activities Ocean Rig engages in may not effectively manage its interest rate exposure or have the desired impact on its financial conditions or results of operations. At June 30, 2011, the fair value of Ocean Rig's interest rate swaps was a liability of $93.4 million.

***A change in tax laws, treaties or regulations, or their interpretation, of any country in which Ocean Rig operates could result in a higher tax rate on its worldwide earnings, which could result in a significant negative impact on Ocean Rig's earnings and cash flows from operations.***

Ocean Rig conducts its worldwide drilling operations through various subsidiaries. Tax laws and regulations are highly complex and subject to interpretation. Consequently, Ocean Rig is subject to changing tax laws, treaties and regulations in and between countries in which it operates. Ocean Rig's income tax expense is based upon its

49

interpretation of tax laws in effect in various countries at the time that the expense was incurred. A change in these tax laws, treaties or regulations, or in the interpretation thereof, or in the valuation of Ocean Rig's deferred tax assets, could result in a materially higher tax expense or a higher effective tax rate on its worldwide earnings, and such change could be significant to its financial results. If any tax authority successfully challenges Ocean Rig's operational structure, inter-company pricing policies or the taxable presence of its operating subsidiaries in certain countries; or if the terms of certain income tax treaties are interpreted in a manner that is adverse to Ocean Rig's structure; or if it loses a material tax dispute in any country, particularly in the U.S., Canada, the U.K., Turkey, Angola, Cyprus, Korea, Ghana or Norway, Ocean Rig's effective tax rate on its worldwide earnings could increase substantially and Ocean Rig's earnings and cash flows from these operations could be materially adversely affected.

Ocean Rig's subsidiaries may be subject to taxation in the jurisdictions in which its offshore drilling activities are conducted. Such taxation would result in decreased earnings available to its shareholders. In the fourth quarter of 2008, Ocean Rig ASA initiated the process of transferring the domicile of its Norwegian entities that owned, directly or indirectly, the *Leiv Eiriksson* and the *Eirik Raude* to the Republic of the Marshall Islands and to liquidate the four companies in the Norwegian rig owning structure. The *Leiv Eiriksson* and the *Eirik Raude* were transferred to Marshall Islands corporations in December 2008. The present status of the four companies of the former Norwegian rig owning structure is that two of the companies were formally liquidated during December 2010 and the two remaining companies were formally liquidated during the second quarter of 2011.

OceanFreight shareholders are encouraged to consult their own tax advisors concerning the overall tax consequences of the ownership of the Ocean Rig shares arising in its particular situation under U.S. federal, state, local or foreign law.

***United States tax authorities may treat Ocean Rig as a "passive foreign investment company" for United States federal income tax purposes, which may reduce Ocean Rig's ability to raise additional capital through the equity markets.***

A foreign corporation will be treated as a "passive foreign investment company," or PFIC, for U.S. federal income tax purposes if either (1) at least 75% of its gross income for any taxable year consists of certain types of "passive income" or (2) at least 50% of the average value of the corporation's assets produce or are held for the production of those types of "passive income." For purposes of these tests, "passive income" includes dividends, interest, and gains from the sale or exchange of investment property and rents and royalties other than rents and royalties which are received from unrelated parties in connection with the active conduct of a trade or business. For purposes of these tests, income derived from the performance of services does not constitute "passive income." U.S. shareholders of a PFIC are subject to a disadvantageous U.S. federal income tax regime with respect to the income derived by the PFIC, the distributions they receive from the PFIC and the gain, if any, they derive from the sale or other disposition of their shares in the PFIC.

Ocean Rig does not believe that it is currently a PFIC, although certain of its wholly-owned subsidiaries may be or have been classified as PFICs at any time through the conclusion of the 2008 taxable year. Based on Ocean Rig's current operations and future projections, it does not believe that it or any of Ocean Rig's subsidiaries have been, are or will be a PFIC with respect to any taxable year beginning with the 2009 taxable year.

However, no assurance can be given that the U.S. Internal Revenue Service, or IRS, or a court of law will accept Ocean Rig's position, and there is a risk that the IRS or a court of law could determine that Ocean Rig or one of its subsidiaries is a PFIC. Moreover, no assurance can be given that Ocean Rig or one of its subsidiaries would not constitute a PFIC for any future taxable year if there were to be changes in the nature and extent of its operations.

If the IRS were to find that Ocean Rig is or has been a PFIC for any taxable year, Ocean Rig's U.S. shareholders will face adverse U.S. tax consequences. Under the PFIC rules, unless those shareholders make an election available under the Code (which election could itself have adverse consequences for such shareholders, as discussed below under "Taxation — Certain Material Tax Consequences — Material Tax Considerations with Respect to the Ownership and Disposition of Ocean Rig Common Stock"), such shareholders would be liable to pay U.S. federal income tax at the then prevailing income tax rates on ordinary income plus interest upon excess distributions and upon any gain from the disposition of the Ocean Rig shares, as if the excess distribution or gain had been recognized ratably over the shareholder's holding period of the Ocean Rig shares. In the event Ocean Rig's U.S. shareholders

50

face adverse U.S. tax consequences as a result of investing in shares of Ocean Rig common stock, this could adversely affect Ocean Rig's ability to raise additional capital through the equity markets. See "Taxation — Certain Material Tax Consequences — Material Tax Considerations with Respect to the Ownership and Disposition of Ocean Rig Common Stock" for a more comprehensive discussion of the U.S. federal income tax consequences to U.S. shareholders if Ocean Rig was treated as a PFIC.

> ***Ocean Rig may be subject to litigation that, if not resolved in its favor and not sufficiently insured against, could have a material adverse effect on Ocean Rig.***

Ocean Rig may be, from time to time, involved in various litigation matters. These matters may include, among other things, contract disputes, personal injury claims, environmental claims or proceedings, asbestos and other toxic tort claims, employment matters, governmental claims for taxes or duties, and other litigation that arises in the ordinary course of Ocean Rig's business. Ocean Rig cannot predict with certainty the outcome or effect of any claim or other litigation matter, and the ultimate outcome of any litigation or the potential costs to resolve them may have a material adverse effect on it. Insurance may not be applicable or sufficient in all cases, insurers may not remain solvent and policies may not be located.

> ***Ocean Rig has restated its previously reported financial statements for 2009. Investor confidence may be adversely impacted if Ocean Rig is unable to remediate the material weakness for the assessment under Section 404 of the Sarbanes-Oxley Act of 2002.***

As an operating subsidiary of DryShips, Ocean Rig has implemented procedures in order to meet the evaluation requirements of Rules 13a-15(c) and 15d-15 (c) under the Securities Exchange Act of 1934, or the Exchange Act, for the assessment under Section 404 of the Sarbanes-Oxley Act of 2002. Following the effectiveness on August 26, 2011 of the registration statement on Form F-4 that Ocean Rig filed in connection with the Exchange Offer, Ocean Rig became a public company and Ocean Rig will be required to include in its annual report on Form 20-F its management's report on, and assessment of, the effectiveness of Ocean Rig's internal controls over financial reporting. In addition, Ocean Rig's independent registered public accounting firm will be required to attest to and report on management's assessment of the effectiveness of its internal controls over financial reporting. These management assessment and auditor attestation requirements will first apply to Ocean Rig's annual report on Form 20-F for the year ending December 31, 2012. Ocean Rig restated its previously-reported consolidated financial statements for the year ended December 31, 2009 to reflect the correction of errors due to a material weakness in its internal control over financial reporting. For additional information see "Management's Discussion and Analysis of Financial Condition and Results of Operations — Restatement of previously-issued financial statements for 2009" and Note 3 to Ocean Rig's consolidated financial statements included elsewhere in this proxy statement / prospectus. If Ocean Rig fails to remediate the material weakness and therefore its internal controls over financial reporting remain ineffective, this could result in an adverse perception of Ocean Rig in the financial marketplace and cause Ocean Rig investors to lose confidence in its reported results.

## Risk Factors Relating to Ocean Rig's Common Stock

> ***The market value for shares of Ocean Rig common stock may be highly volatile and subject to wide fluctuations.***

Ocean Rig's common stock currently trades on the Norwegian OTC market. Ocean Rig's common stock commenced trading on the NASDAQ Global Select Market under the ticker symbol "ORIG" on October 6, 2011. Holders of Ocean Rig common stock therefore have limited access to information about prior market history on which to base their investment decision.

The market value for shares of Ocean Rig common stock may be highly volatile and could be subject to wide fluctuations. Some of the factors that could negatively affect the share price of Ocean Rig common stock include:

- actual or anticipated variations in Ocean Rig's operating results;

- changes in Ocean Rig's cash flow, EBITDA or earnings estimates;

- publication of research reports about Ocean Rig or the industry in which Ocean Rig operates;

- increases in market interest rates that may lead purchasers of common stock to demand a higher expected yield which, if Ocean Rig distributions are not expected to rise, will mean Ocean Rig share price will fall;

- changes in applicable laws or regulations, court rulings and enforcement and legal actions;

- changes in market valuations of similar companies;

- adverse market reaction to any increased indebtedness Ocean Rig incurs in the future;

- additions or departures of Ocean Rig key personnel;

- actions by institutional shareholders;

- speculation in the press or investment community; and

- general market and economic conditions.

### *Future sales of Ocean Rig's common stock could have an adverse effect on Ocean Rig's share price.*

In order to finance the currently contracted and future growth of its fleet, Ocean Rig will have to incur substantial additional indebtedness and possibly issue additional equity securities. Additional common share issuances, directly or indirectly through convertible or exchangeable securities, options or warrants, will generally dilute the ownership interests of Ocean Rig's existing common shareholders, including their relative voting rights, and could require substantially more cash to maintain the then existing level, if any, of Ocean Rig's dividend payments to its common shareholders, as to which no assurance can be given. Preferred shares, if issued, will generally have a preference on dividend payments, which could prohibit or otherwise reduce Ocean Rig's ability to pay dividends to its common shareholders. Ocean Rig's debt will be senior in all respects to its shares of common stock, will generally include financial and operating covenants with which Ocean Rig must comply and will include acceleration provisions upon defaults thereunder, including Ocean Rig's failure to make any debt service payments, and possibly under other debt. Because Ocean Rig's decision to issue equity securities or incur debt in the future will depend on a variety of factors, including market conditions and other matters that are beyond Ocean Rig's control, Ocean Rig cannot predict or estimate the timing, amount or form of its capital raising activities in the future. Such activities could, however, cause the price of Ocean Rig's shares of common stock to decline significantly.

As of September 30, 2011, DryShips owned 98,587,878 shares of Ocean Rig common stock. Following the merger of DryShips and OceanFreight, DryShips is expected to continue to own a majority of Ocean Rig's outstanding shares of common stock. The shares of Ocean Rig common stock held by DryShips are "restricted securities" within the meaning of Rule 144 under the Securities Act and may not be transferred unless they have been registered under the Securities Act or an exemption from registration is available. Upon satisfaction of certain conditions, Rule 144 permits the sale of certain amounts of restricted securities six months following the date of acquisition of the restricted securities from us. As shares of Ocean Rig common stock become eligible for sale under Rule 144, the volume of sales of Ocean Rig common stock on applicable securities markets may increase, which could reduce the market value of shares of Ocean Rig common stock.

At the closing of the purchase agreement, which occurred on August 24, 2011, the transferee of the Sellers acquired 1,570,226 shares of Ocean Rig common stock. Pursuant to the terms of the purchase agreement the shares acquired by such transferee are subject to a six-month restriction on post-acquisition transfer, or lock up. As shares of Ocean Rig common stock become eligible for sale, the volume of sales of Ocean Rig common stock on applicable securities markets may increase, which could reduce the market value of Ocean Rig common stock.

### *Ocean Rig is incorporated in the Republic of the Marshall Islands, which does not have a well-developed body of corporate law, and as a result, shareholders may have fewer rights and protections under Marshall Islands law than under a typical jurisdiction in the U.S.*

Ocean Rig's corporate affairs are governed by its second amended and restated articles of incorporation and second amended and restated bylaws and by the MIBCA. The provisions of the MIBCA resemble provisions of the corporation laws of a number of states in the U.S. However, there have been few judicial cases in the Republic of the Marshall Islands interpreting the MIBCA. The rights and fiduciary responsibilities of directors under the law of the

Republic of the Marshall Islands are not as clearly established as the rights and fiduciary responsibilities of directors under statutes or judicial precedent in existence in certain U.S. jurisdictions. Shareholder rights may differ as well. While the MIBCA does specifically incorporate the non-statutory law, or judicial case law, of the State of Delaware and other states with substantially similar legislative provisions, Ocean Rig public shareholders may have more difficulty in protecting their interests in the face of actions by management, directors or controlling shareholders than would shareholders of a corporation incorporated in a U.S. jurisdiction.

### It may not be possible for investors to enforce U.S. judgments against Ocean Rig.

Ocean Rig and all of its subsidiaries are incorporated in jurisdictions outside the U.S. and a substantial portion of Ocean Rig's assets and those of its subsidiaries are located outside the U.S. In addition, a majority of Ocean Rig's directors and officers and the experts named in this proxy statement / prospectus reside outside the U.S. and a substantial portion of the assets of its directors and officers and such experts are located outside the U.S. As a result, it may be difficult or impossible for U.S. investors to serve process within the U.S. upon Ocean Rig, its subsidiaries or its directors and officers and such experts or to enforce a judgment against Ocean Rig for civil liabilities in U.S. courts. In addition, you should not assume that courts in the countries in which Ocean Rig or its subsidiaries are incorporated or where Ocean Rig's assets or the assets of its subsidiaries, directors or officers and such experts are located (i) would enforce judgments of U.S. courts obtained in actions against Ocean Rig or its subsidiaries, directors or officers and such experts based upon the civil liability provisions of applicable U.S. federal and state securities laws or (ii) would enforce, in original actions, liabilities against Ocean Rig or its subsidiaries, directors or officers and such experts based on those laws.

### DryShips, Ocean Rig's parent company, controls the outcome of matters on which Ocean Rig's shareholders are entitled to vote.

DryShips owns approximately 75% of Ocean Rig's outstanding common shares as of the date of this proxy statement / prospectus. Following the merger of DryShips and OceanFreight, DryShips is expected to continue to own a majority of Ocean Rig's outstanding shares of common stock. DryShips will control the outcome of matters on which Ocean Rig's shareholders are entitled to vote, including the election of directors and other significant corporate actions. DryShips' interests may be different from the interests of holders of Ocean Rig common stock and the commercial goals of DryShips as a shareholder, and Ocean Rig's goals, may not always be aligned. The substantial equity interests held by DryShips may make it more difficult for Ocean Rig to maintain its business independence from other companies owned by DryShips and DryShips' affiliates.

### Ocean Rig depends on a director who is associated with affiliated companies which may create conflicts of interest.

Ocean Rig's Chairman, President and Chief Executive Officer, Mr. Economou, is also the Chairman, President and Chief Executive Officer of DryShips, its parent company, and has significant shareholdings in DryShips. Mr. Economou owes fiduciary duties to DryShips and its shareholders and may have conflicts of interest in matters involving or affecting Ocean Rig and Ocean Rig's customers. In addition Mr. Economou may have conflicts of interest when faced with decisions that could have different implications for DryShips than they do for Ocean Rig.

In addition, Cardiff provides services relating to Ocean Rig's drilling units, under the Global Services Agreement. 70% of the issued and outstanding capital stock of Cardiff is owned by a foundation which is controlled by Mr. Economou. The remaining 30% of the issued and outstanding capital stock of Cardiff is owned by a company controlled by the sister of Mr. Economou, who is also a director of DryShips. Vivid Finance Ltd., a company controlled by Mr. Economou, has been engaged by DryShips to act as a consultant on financing matters for DryShips and its subsidiaries, including Ocean Rig. See "Ocean Rig Related Party Transactions." If any of these conflicts of interest are not resolved in Ocean Rig's favor, the result could have a material adverse effect on Ocean Rig's business.

*Ocean Rig expects to incur increased costs as a result of becoming a public company.*

On August 26, 2011, the SEC declared effective Ocean Rig's registration statement on Form F-4 relating to the Exchange Offer. From the date that the registration statement has been declared effective, Ocean Rig has been a public reporting company. As a public company, Ocean Rig will incur significant legal, accounting, investor relations and other expenses that Ocean Rig did not incur prior to such date. In addition, Ocean Rig has become subject to the provisions of the Sarbanes-Oxley Act of 2002, SEC rules and stock exchange requirements. Ocean Rig expects these rules and regulations to increase its legal and financial compliance costs and to make some activities more time-consuming and costly. Ocean Rig estimates that it will have increased costs of approximately $0.7 million per year as a public company.

*Anti-takeover provisions contained in Ocean Rig's organizational documents could make it difficult for Ocean Rig shareholders to replace or remove Ocean Rig's current board of directors or have the effect of discouraging, delaying or preventing a merger or acquisition, which could adversely affect the market price of Ocean Rig's securities.*

Several provisions of Ocean Rig's second amended and restated articles of incorporation and second amended and restated bylaws could make it difficult for Ocean Rig's shareholders to change the composition of Ocean Rig's board of directors in any one year, preventing them from changing the composition of management. In addition, the same provisions may discourage, delay or prevent a merger or acquisition that shareholders may consider favorable.

These provisions include:

- authorizing Ocean Rig's board of directors to issue "blank check" preferred stock without shareholder approval;

- providing for a classified board of directors with staggered, three-year terms;

- prohibiting cumulative voting in the election of directors;

- authorizing the removal of directors only for cause and only upon the affirmative vote of the holders of a majority of the outstanding shares of Ocean Rig's common stock entitled to vote generally in the election of directors;

- limiting the persons who may call special meetings of shareholders; and

- establishing advance notice requirements for nominations for election to Ocean Rig's board of directors or for proposing matters that can be acted on by shareholders at shareholder meetings.

In addition, Ocean Rig entered into an Amended and Restated Stockholders Rights Agreement that makes it more difficult for a third party to acquire Ocean Rig without the support of Ocean Rig's board of directors. Under the Amended and Restated Stockholders Rights Agreement, Ocean Rig's board of directors has declared a dividend of one preferred share purchase right, or a right, to purchase one one-thousandth of a share of Ocean Rig's Series A Participating Preferred Stock for each outstanding share of Ocean Rig's common stock. Each right entitles the registered holder, upon the occurrence of certain events, to purchase from Ocean Rig one one-thousandth of a share of Series A Participating Preferred Stock. The rights may have anti-takeover effects. The rights will cause substantial dilution to any person or group that attempts to acquire Ocean Rig without the approval of Ocean Rig's board of directors. As a result, the overall effect of the rights may be to render more difficult or discourage any attempt to acquire Ocean Rig. Because Ocean Rig's board of directors will be able to approve a redemption of the rights or a permitted offer, the rights should not interfere with a merger or other business combination approved by Ocean Rig's board of directors.

Although the MIBCA does not contain specific provisions regarding "business combinations" between corporations organized under the laws of the Republic of Marshall Islands and "interested shareholders," Ocean Rig's second amended and restated articles of incorporation include provisions that prohibit Ocean Rig from

54

engaging in a business combination with an interested shareholder for a period of three years after the date of the transaction in which the person became an interested shareholder, unless:

- upon consummation of the transaction that resulted in the shareholder becoming an interested shareholder, the interested shareholder owned at least 85% of Ocean Rig's voting stock outstanding at the time the transaction commenced;

- at or subsequent to the date of the transaction that resulted in the shareholder becoming an interested shareholder, the business combination is approved by Ocean Rig's board of directors and authorized at an annual or special meeting of Ocean Rig's shareholders by the affirmative vote of at least $66\ 2/3$ % of the outstanding Ocean Rig voting stock that is not owned by the interested shareholder; or

- the shareholder became an interested shareholder prior to the consummation of Ocean Rig's initial public offering under the Securities Act.

For purposes of these provisions, a "business combination" includes mergers, consolidations, exchanges, asset sales, leases and other transactions resulting in a financial benefit to the interested shareholder and an "interested shareholder" is any person or entity that beneficially owns 15% or more of Ocean Rig's outstanding voting stock and any person or entity affiliated with or controlling or controlled by that person or entity, other than DryShips, provided, however, that the term "interested shareholder" does not include any person whose ownership of shares in excess of the 15% limitation is the result of action taken solely by Ocean Rig; provided that such person shall be an interested shareholder if thereafter such person acquires additional shares of Ocean Rig's voting shares, except as a result of further action by Ocean Rig not caused, directly or indirectly, by such person. Further, the term "business combination," when used in reference to Ocean Rig and any "interested shareholder" does not include any transactions for which definitive agreements were entered into prior to May 3, 2011, the date the second amended and restated articles of incorporation were filed with the Republic of the Marshall Islands.

55

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Forward-looking statements include statements concerning plans, objectives, goals, strategies, future events or performance, and underlying assumptions and other statements, which are other than statements of historical or present facts or conditions.

This proxy statement / prospectus and any other written or oral statements made by OceanFreight, Ocean Rig or on behalf of OceanFreight or Ocean Rig may include forward-looking statements which reflect OceanFreight's or Ocean Rig's current views and assumptions with respect to future events and financial performance and are subject to risks and uncertainties. The words "believe," "anticipate," "intend," "estimate," "forecast," "project," "plan," "potential," "may," "should," "expect" and similar expressions identify forward-looking statements.

The forward-looking statements in this document are based upon various assumptions, many of which are based, in turn, upon further assumptions, including without limitation, Ocean Rig's management's or OceanFreight's management's examination of historical operating trends, data contained in OceanFreight or Ocean Rig records and other data available from third parties. Although OceanFreight or Ocean Rig, as applicable, believe that these assumptions were reasonable when made, because these assumptions are inherently subject to significant uncertainties and contingencies which are difficult or impossible to predict and are beyond OceanFreight's or Ocean Rig's control, OceanFreight and Ocean Rig cannot assure you that OceanFreight or Ocean Rig, as applicable, will achieve or accomplish these expectations, beliefs or projections. Without limiting the foregoing, statements contained in the sections "The Transaction — OceanFreight's Reasons for the Merger; Recommendation of the OceanFreight Special Committee and Board of Directors" and "The Transaction — Opinion of OceanFreight's Financial Advisor" include forward-looking statements, which are not historical facts but instead represent only OceanFreight's expectations, estimates and projections regarding future events.

In addition to these important factors and matters discussed elsewhere in this proxy statement / prospectus, important factors that, in OceanFreight's, and Ocean Rig's view, could cause actual results to differ materially from those discussed in the forward-looking statements include factors related to:

- the offshore drilling market, including supply and demand, utilization rates, dayrates, customer drilling programs, commodity prices, effects of new rigs on the market and effects of declines in commodity prices and downturn in global economy on market outlook for Ocean Rig's various geographical operating sectors and classes of rigs;

- hazards inherent in the drilling industry and marine operations causing personal injury or loss of life, severe damage to or destruction of property and equipment, pollution or environmental damage, claims by third parties or customers and suspension of operations;

- customer contracts, including contract backlog, contract commencements, contract terminations, contract option exercises, contract revenues, contract awards and rig mobilizations, newbuildings, upgrades, shipyard and other capital projects, including completion, delivery and commencement of operations dates, expected downtime and lost revenue;

- political and other uncertainties, including political unrest, risks of terrorist acts, war and civil disturbances, piracy, significant governmental influence over many aspects of local economies, seizure, nationalization or expropriation of property or equipment;

- repudiation, nullification, modification or renegotiation of contracts;

- limitations on insurance coverage, such as war risk coverage, in certain areas;

- foreign and U.S. monetary policy and foreign currency fluctuations and devaluations;

- the inability to repatriate income or capital;

- complications associated with repairing and replacing equipment in remote locations;

- import-export quotas, wage and price controls imposition of trade barriers;

- regulatory or financial requirements to comply with foreign bureaucratic actions;

- changing taxation policies and other forms of government regulation and economic conditions that are beyond Ocean Rig's control;

- the level of expected capital expenditures and the timing and cost of completion of capital projects;

- Ocean Rig's ability to successfully employ its drilling units, procure or have access to financing, comply with loan covenants, liquidity and adequacy of cash flow for Ocean Rig's obligations;

- factors affecting Ocean Rig's results of operations and cash flow from operations, including revenues and expenses, uses of excess cash, including debt retirement, timing and proceeds of asset sales, tax matters, changes in tax laws, treaties and regulations, tax assessments and liabilities for tax issues, legal and regulatory matters, including results and effects of legal proceedings, customs and environmental matters, insurance matters, debt levels, including impacts of the financial and credit crisis;

- the effects of accounting changes and adoption of accounting policies;

- recruitment and retention of personnel; and

- other important factors described in this proxy statement / prospectus under "Risk Factors."

OceanFreight and Ocean Rig caution readers of this proxy statement / prospectus not to place undue reliance on these forward-looking statements, which speak only as of their dates. Ocean Rig and OceanFreight undertake no obligation to update publicly or revise any forward-looking statement, whether as a result of new information, future developments or otherwise.

## THE SPECIAL MEETING

This proxy statement / prospectus is being provided to OceanFreight shareholders as part of a solicitation of proxies by the OceanFreight board of directors for use at the OceanFreight special meeting.

### Date, Time and Place

The special meeting will be held at OceanFreight's offices located at 80 Kifissias Avenue, GR 151 25, Amaroussion, Athens, Greece on November 3, 2011, at 10:00 a.m. local time.

### Purpose of the Special Meeting

The purpose of the special meeting is to:

- consider and vote upon the approval of the Agreement and Plan of Merger, dated as of July 26, 2011, among DryShips, Pelican Stockholdings Inc., and OceanFreight, as it may be amended or supplemented from time to time, pursuant to which Pelican Stockholdings Inc., a wholly-owned subsidiary of DryShips, will merge with and into OceanFreight, the separate corporate existence of Pelican Stockholdings Inc. will cease and OceanFreight will continue its corporate existence as the surviving corporation in the merger; and

- transact such other business as may properly come before the special meeting or any adjournment thereof.

### Record Date; Outstanding Shares; Shares Entitled to Vote

Only holders of record of shares of OceanFreight common stock at the close of business on the record date, October 7, 2011, are entitled to notice of and to vote at the OceanFreight special meeting. As of the record date, there were 5,946,180 shares of OceanFreight common stock issued and outstanding and entitled to vote at the OceanFreight special meeting. Each holder of OceanFreight common stock is entitled to one vote for each share of OceanFreight common stock owned as of the record date.

Upon the request of any shareholder at the special meeting or prior thereto, OceanFreight will provide at the special meeting a list of registered shareholders as of the record date, and of holders of bearer shares who as of the record date have qualified for voting.

### Recommendation of the OceanFreight Special Committee

The OceanFreight Special Committee has:

- unanimously determined that the merger agreement and transactions contemplated thereby, including the merger, are fair to and in the best interests of OceanFreight and OceanFreight's shareholders (other than DryShips, Pelican Stockholdings Inc., Basset Holdings Inc., Steel Wheel Investments Limited and Haywood Finance Limited);

- unanimously approved, adopted and declared advisable the merger agreement and purchase agreement and the transactions contemplated thereby, including the merger;

- unanimously recommended that the adoption of the merger agreement be submitted to OceanFreight's special meeting to consummate the merger; and

- unanimously adopted the recommendation for approval and adoption of the merger agreement by the shareholders of OceanFreight.

### Approval and Recommendation of the OceanFreight Board of Directors

The OceanFreight board of directors has:

- unanimously determined that the merger agreement and transactions contemplated thereby, including the merger, are fair to and in the best interests of OceanFreight and OceanFreight's shareholders (other than DryShips, Pelican Stockholdings Inc., Basset Holdings Inc., Steel Wheel Investments Limited and Haywood Finance Limited);

- unanimously approved, adopted and declared advisable the merger agreement and purchase agreement and the transactions contemplated thereby, including the merger;

- unanimously directed that the adoption of the merger agreement be submitted to OceanFreight's special meeting to consummate the merger; and

- unanimously adopted the recommendation by the OceanFreight board of directors for approval and adoption of the merger agreement by the shareholders of OceanFreight.

**Quorum and Vote Required**

One-third of the shares of OceanFreight common stock entitled to vote at any meeting of shareholders must be present in person or represented by proxy at the OceanFreight special meeting to constitute a quorum. A quorum must be present before a vote can be taken on the proposal to approve the merger agreement or any other matter except adjournment of the meeting due to the absence of a quorum.

The approval of the proposal to approve the merger agreement requires the affirmative vote of the holders of a majority of the outstanding shares of OceanFreight common stock entitled to vote thereon.

Simultaneously with the execution of the merger agreement, DryShips; Basset Holdings Inc., Steel Wheel Investments Limited and Haywood Finance Limited, entities controlled by Mr. Kandylidis, the Chief Executive Officer of OceanFreight; and OceanFreight entered into a purchase agreement. Under the purchase agreement, DryShips acquired from the entities controlled by Mr. Kandylidis, on August 24, 2011, all their OceanFreight shares, representing a majority of the outstanding shares of OceanFreight, for the same consideration per share that the OceanFreight shareholders will receive in the merger. DryShips has agreed to vote the OceanFreight shares it acquired "FOR" the approval of the merger agreement. Accordingly, approval of the merger agreement is assured.

**If you do not vote, or you abstain from voting your shares with respect to the proposal to approve the merger agreement, it will have the same effect as a vote against the approval of the merger agreement.**

The affirmative vote of a majority of the votes cast by the holders of OceanFreight common stock at the special meeting is required to approve the proposal to adjourn or postpone the special meeting, if necessary or appropriate, including to solicit additional proxies. If you do not vote, or you abstain from voting, your shares with respect to the proposal to approve such adjournment or postponement, it will have no effect on such proposal.

Broker non-votes are shares held by a broker or other nominee that are represented at the meeting, but with respect to which the broker or nominee is not instructed by the beneficial owner of such shares to vote on the particular proposal and the broker does not have discretionary voting power on the proposal. If an OceanFreight shareholder's broker holds such shareholder's OceanFreight common stock in "street name," the broker will vote such shareholder's shares only if the shareholder provides instructions on how to vote by filling out the voter instruction form sent to the shareholder by his or her broker with this proxy statement / prospectus. Brokers and other nominees will not have discretionary authority to vote on the proposal to adopt the merger agreement. A broker non-vote will have the same effect as a vote "against" the adoption of the merger agreement. Abstentions also will have the same effect as a vote "against" the proposal to approve the plan of merger contained in the merger agreement.

**Voting; Proxies; Revocation**

Holders of OceanFreight's common stock as of the record date may submit a proxy or vote in person at the special meeting.

*Voting in Person*

OceanFreight shareholders who plan to attend the special meeting and wish to vote in person will be given a ballot at the special meeting. Please note, however, that OceanFreight shareholders who hold their shares in "street name," and who wish to vote in person at the special meeting, must bring to the special meeting a proxy from the record holder of the shares authorizing such OceanFreight shareholder to vote at the special meeting.

### *Voting by Proxy*

The vote of each OceanFreight shareholder is very important. Accordingly, OceanFreight shareholders who hold their shares as a record holder should complete, sign and return the enclosed proxy card whether or not they plan to attend the special meeting in person. OceanFreight shareholders should submit their proxy even if they plan to attend the special meeting. OceanFreight shareholders can always change their vote prior to the vote being taken at the special meeting. Voting instructions are included on the enclosed proxy card. If an OceanFreight shareholder properly gives his or her proxy, and submits it to OceanFreight in time to vote, one of the individuals named as such OceanFreight shareholder's proxy will vote the shares as such OceanFreight shareholder has directed. A proxy card is enclosed for use by OceanFreight shareholders of record.

The method of voting by proxy differs for shares held as a record holder and shares held in "street name." If an OceanFreight shareholder holds shares of OceanFreight common stock as a record holder, he or she may submit a proxy by completing, dating and signing the enclosed proxy card and promptly returning it in the enclosed, pre-addressed, postage-paid envelope or otherwise mailing it to OceanFreight. If an OceanFreight shareholder holds shares of OceanFreight common stock in "street name," the OceanFreight shareholder will receive instructions from his or her broker, bank or other nominee that the OceanFreight shareholder must follow in order to vote his or her shares. OceanFreight shareholders who hold their shares in "street name" should refer to the voting instructions from their broker, bank or nominee that accompany this proxy statement / prospectus.

All properly signed proxies that are received prior to the special meeting and that are not revoked will be voted at the special meeting according to the instructions indicated on the proxies or, if no direction is indicated, they will be voted "FOR" the proposal to approve and adopt the plan of merger contained in the merger agreement and "FOR" the proposal to adjourn or postpone the special meeting, if necessary or appropriate.

### *Revocation of Proxies*

An OceanFreight shareholder may revoke his or her proxy, and change his or her vote at any time before the proxy is voted at the special meeting. If you are a holder of record, you can change your vote at any time before your proxy is voted at the special meeting by:

- delivering a signed written notice of revocation to the Secretary of OceanFreight at:

  OceanFreight Inc.
  80 Kifissias Avenue
  Amaroussion, 15125
  Athens, Greece
  Attn.: Secretary

- submitting another proxy bearing a later date (in any of the permitted forms); or

- attending and casting a ballot in person at the special meeting, although your attendance alone will not revoke your proxy.

If you hold your shares in "street name," contact your broker, bank or other nominee regarding how to instruct your broker, bank or other nominee to revoke your proxy and change your vote and any deadlines for the receipt of these instructions.

## Delivery of Proxy Materials

To reduce the expenses of delivering duplicate proxy materials to OceanFreight shareholders, OceanFreight is relying upon SEC rules that permit OceanFreight to deliver only one proxy statement / prospectus to multiple shareholders who share an address unless OceanFreight receives contrary instructions from any shareholder at that address. If you share an address with another shareholder and have received only one proxy statement / prospectus,

you may call or write OceanFreight as specified below to request a separate copy of this document and OceanFreight will promptly send it to you at no cost to you:

OceanFreight Inc.
80 Kifissias Avenue
Amaroussion, 15125
Athens, Greece
+30-210-6140283

**Solicitation of Proxies**

The enclosed proxy is being solicited by or on behalf of the OceanFreight board of directors. In addition to solicitation of proxies by mail, OceanFreight will request that banks, brokers and other record holders send proxies and proxy materials to the beneficial owners of OceanFreight common stock and secure their voting instructions, if necessary. OceanFreight will reimburse the record holders for their reasonable expenses in taking those actions.

Proxies may be solicited by directors, officers and employees of OceanFreight in person or by telephone or other means, for which such persons will receive no special compensation.

**Dissenters' Rights of Appraisal**

Under the MIBCA, a shareholder of a corporation has the right to vote against any plan of merger to which the corporation is a party. If such shareholders vote against the plan of merger, they may have the right to seek payment from their corporation of the appraised fair value of their shares (instead of the contractual merger consideration). However, the right of a dissenting shareholder under the MIBCA to receive payment of the appraised fair value of his shares is not available "for the shares of any class or series of stock, which shares or depository receipts in respect thereof, at the record date fixed to determine the shareholders entitled to receive notice of and to vote at the meeting of the shareholders to act upon the agreement of merger or consolidation, were either (i) listed on a securities exchange or admitted for trading on an interdealer quotation system or (ii) held of record by more than 2,000 holders." It is the view of OceanFreight that since shares of OceanFreight common stock are listed on the NASDAQ Global Market, a dissenting holder of shares of OceanFreight common stock has no right under the MIBCA to receive payment for the appraised fair value of the shares.

## THE TRANSACTION

*The following discussion contains material information about the merger. The discussion is subject, and qualified in its entirety by reference, to the merger agreement and the purchase agreement included as Annex A and Annex B to this proxy statement / prospectus, respectively. Ocean Rig and OceanFreight urge you to read carefully this entire proxy statement / prospectus, including the merger agreement and the purchase agreement included as Annex A and Annex B to this proxy statement / prospectus, for a more complete understanding of the transaction.*

### General Description of the Transaction

The boards of directors of DryShips and OceanFreight, the Audit Committee of the board of directors of DryShips, and the OceanFreight Special Committee have approved the merger agreement and the purchase agreement.

The merger agreement provides that Pelican Stockholdings Inc., a wholly-owned subsidiary of DryShips formed for the purpose of effecting the merger, will merge with and into OceanFreight. Following the merger, OceanFreight will become a wholly-owned subsidiary of DryShips and will continue its corporate existence under the laws of the Marshall Islands. Concurrently, the separate corporate existence of Pelican Stockholdings Inc. will terminate.

In the merger, each outstanding share of OceanFreight common stock (other than shares owned by OceanFreight, DryShips, Pelican Stockholdings Inc., or any of their respective direct or indirect subsidiaries, which will be cancelled) will be converted at the effective time of the merger into the right to receive (i) $11.25 in cash and (ii) 0.52326 shares of Ocean Rig common stock. Based on the last traded price as of July 25, 2011 of NOK89.00 (approximately $16.44 based on an exchange ratio of NOK5.41 / USD$1 as of July 25, 2011) for the shares of Ocean Rig on the Norwegian OTC, the transaction consideration reflects a total equity value for OceanFreight of approximately $118 million and a total enterprise value of approximately $239 million, including the assumption of debt.

Under a purchase and sale agreement with entities controlled by Mr. Kandylidis, DryShips acquired from the entities controlled by Mr. Kandylidis all their OceanFreight shares, representing a majority of the outstanding shares of OceanFreight, for the same consideration per share that the OceanFreight shareholders will receive in the merger. This acquisition closed on August 24, 2011.

DryShips has committed to vote the OceanFreight shares it acquired in favor of the merger, which requires approval by a majority vote.

For additional and more detailed information regarding the legal documents that govern the transaction, including information about the conditions to the completion of the transaction and the provisions for terminating or amending the merger agreement and the purchase agreement, see "The Merger Agreement" and "The Purchase and Sale Agreement."

### Background of the Transaction

On May 23, 2011, Pankaj Khanna, the Chief Operating Officer of DryShips, informed Mr. Kandylidis, the Chief Executive Officer of OceanFreight, that DryShips was interested in investigating possible strategic transactions between DryShips and OceanFreight.

On May 27, 2011, OceanFreight held a board meeting during which Mr. Kandylidis informed the OceanFreight board of directors that he received an expression of interest from DryShips and the OceanFreight board of directors constituted a special committee comprised of its independent members, Messrs. John Liveris, George Biniaris and Panagiotis Korakas to evaluate, discuss and negotiate any proposal by DryShips for a strategic transaction and to make a recommendation to the OceanFreight board of directors at the appropriate time. Mr. John Liveris was appointed chairman of the OceanFreight Special Committee.

On June 1, 2011, Mr. Liveris sent a letter to Mr. Khanna requesting that all future communications be directed to him and that further clarification be provided on the type and nature of the "strategic alternatives" transaction that DryShips wished to pursue with OceanFreight. Mr. Liveris further asked what type of information DryShips wished

62

to receive in connection with any further discussions and expressed the OceanFreight Special Committee's preparedness to engage appropriate advisors and sign a non-disclosure agreement to facilitate an exchange of information and further discussions.

On June 8, 2011, Mr. Khanna sent a letter to the OceanFreight Special Committee outlining a proposed transaction. Pursuant to the proposal, DryShips would acquire a majority interest in OceanFreight held directly or indirectly by Mr. Kandylidis, and DryShips, as the new controlling shareholder of OceanFreight, would support its prospects by, among other things, offering to replace the existing credit facilities with new facilities or amend and guarantee the existing credit facilities. According to Mr. Khanna, DryShips' guarantee would enable OceanFreight to borrow on modified terms that would enhance OceanFreight's financial flexibility. Mr. Khanna stated that he believed that the DryShips' investment and sponsorship, along with the flexibility created by the restructured credit facilities, would be perceived positively by OceanFreight investors, and that OceanFreight would have the opportunity to reintroduce itself to the public markets with the benefit of a high-profile strategic investor, solidified capital structure, and increased financial flexibility. Mr. Khanna noted that, although OceanFreight had improved its prospects over the last year by significantly lowering its average fleet age, lowering its leverage profile and expanding its charter coverage, it faced significant challenges. At the same time, Mr. Khanna provided a high priority due diligence list to the OceanFreight Special Committee and asked that OceanFreight enter into a non-disclosure agreement with DryShips.

On June 15, 2011, the OceanFreight Special Committee responded to Mr. Khanna's letter acknowledging the benefits of a potential transaction with DryShips but stated its strong preference that all shareholders of OceanFreight participate in the transaction and receive the same consideration. The OceanFreight Special Committee requested that DryShips consider acquiring all the shares of OceanFreight, thereby potentially gaining full ownership of OceanFreight. Mr. Liveris noted that the OceanFreight Special Committee could not proceed with the execution of a non-disclosure agreement until a revised offer was received.

On June 17, 2011, Mr. Khanna sent a response to the OceanFreight Special Committee reiterating the rationale and benefits of the proposed transaction and, in addition, offering for DryShips to acquire, at a mutually acceptable price, OceanFreight's newbuild contracts for its five VLOCs, of which two are unfinanced.

On June 21, 2011, the OceanFreight Special Committee responded to Mr. Khanna reiterating its preference for a transaction on equal terms for all OceanFreight shareholders either in the form of an offer being made for all shares on equal terms or in the form of an undertaking by Mr. Kandylidis whereby he would commit to extend DryShips' offer for the shares held directly or indirectly by Mr. Kandylidis on a pro-rata basis to the remaining shareholders. The OceanFreight Special Committee informed Mr. Khanna that it may consider other alternatives to realize the value of OceanFreight's stock for all shareholders. The OceanFreight Special Committee however indicated its willingness to sign a non-disclosure agreement and exchange due diligence material with DryShips.

On June 28, 2011, Mr. Khanna informed the OceanFreight Special Committee that DryShips was willing to proceed with a transaction which would involve an acquisition of all of the outstanding shares of OceanFreight common stock in which all shareholders would receive the same consideration per share, and that DryShips was willing to acquire all of the outstanding common stock of OceanFreight for $0.60 per share (or $12 per share on a 1-for-20 reverse stock split adjustment) in an all cash transaction, subject to satisfactory due diligence. A non-disclosure agreement was executed on the same day and on June 29, 2011, a full due diligence request list was provided to the OceanFreight Special Committee by DryShips.

On June 30, 2011, the OceanFreight Special Committee began to provide due diligence material to DryShips.

On July 1, 2011, the OceanFreight Special Committee held a meeting by telephone, attended by its financial advisor, Fearnley, and its legal advisor, Seward & Kissel LLP, to discuss various matters, including (i) informal discussions between Mr. Liveris and Mr. Khanna of DryShips concerning the terms of the indicative expression of interest contained in DryShips' June 28, 2011 letter to the OceanFreight Special Committee, and (ii) the general process, securities law and other considerations to be taken into account in connection with the proposed transaction, including Fearnley's views on possible alternatives to the proposed transaction.

On July 4, 2011, Mr. Khanna requested that the OceanFreight Special Committee make management available for a due diligence call to review outstanding diligence items, which occurred on July 13, 2011.

On July 5, 2011, OceanFreight announced a 1-for-20 reverse stock split.

On July 8, 2011, DryShips held a Board Meeting where the OceanFreight transaction was discussed and the DryShips board of directors authorized the Audit Committee to negotiate the purchase of OceanFreight. The Audit Committee of independent directors of DryShips chaired by Harry Kerames was authorized by the board of directors of DryShips to formally review the terms and conditions of any proposed transaction and make its recommendation to the board of directors of DryShips at the appropriate time.

On July 11, 2011, Mr. Khanna informed the OceanFreight Special Committee that DryShips had reviewed the diligence materials that had been made available to it and had revised its proposal to acquire all of the outstanding shares of OceanFreight. Mr. Khanna noted that DryShips proposed to acquire (i) the approximately 50.5% ownership interest in OceanFreight held directly or indirectly by Mr. Kandylidis for $14 per share in cash and (ii) the remaining OceanFreight shares for shares of Ocean Rig presently owned by DryShips with an implied value of $16 per OceanFreight share. Mr. Khanna noted that the transaction would provide OceanFreight public shareholders with consideration reflecting a 148% premium to the then current trading price of OceanFreight shares as well as the opportunity to benefit from the potential upside in the Ocean Rig shares, and that DryShips believed that the shares of Ocean Rig were undervalued due to their lack of a public listing. Mr. Khanna offered to provide the OceanFreight Special Committee with any required diligence materials on Ocean Rig so that it could develop its own view on the value of the Ocean Rig shares. Mr. Khanna further noted that Ocean Rig was in the final stage of registering its shares with the SEC, and that DryShips' management expected the Ocean Rig shares to begin trading on NASDAQ within the following months. Mr. Khanna suggested that the transaction be structured as a two-step transaction as follows: (i) acquisition of the shares held directly or indirectly by Mr. Kandylidis concurrently with the execution of a merger agreement between DryShips and OceanFreight and (ii) acquisition of the remaining OceanFreight shares after SEC registration of the Ocean Rig shares. The acquisition of these remaining OceanFreight shares would be completed either via an exchange offer or a one-step merger.

On July 12, 2011, the OceanFreight Special Committee informed DryShips that it could not recommend DryShips' offer and that, in light of the underlying values of OceanFreight, the OceanFreight Special Committee deemed the offer price as insufficient. The OceanFreight Special Committee indicated that it believed an offer of at least $22.50 per share was warranted. The OceanFreight Special Committee also noted that it was not willing to present or recommend to the OceanFreight shareholders an offer which would preclude possible third-party offers. Therefore, Mr. Liveris suggested that the shares held directly or indirectly by Mr. Kandylidis be released to DryShips 60 days after the execution of the merger agreement, during which period the OceanFreight Special Committee should have the right to solicit and accept potential higher offers by third parties.

On July 13, 2011, the OceanFreight Special Committee made OceanFreight management available for a due diligence call to review outstanding diligence items.

On July 14, 2011, Mr. Khanna informed the OceanFreight Special Committee that DryShips had further revised its proposal and was willing to proceed with a transaction in which DryShips would acquire the shares held directly or indirectly by Mr. Kandylidis for $16 per share in cash and all other OceanFreight shares for shares of Ocean Rig in an offer which DryShips believed reflected an implied value of $18 per OceanFreight share.

On July 14, 2011, the OceanFreight Special Committee reiterated the position set out in its July 12th correspondence that the proposed offer did not reflect the underlying value of OceanFreight and that the offer did not address the OceanFreight Special Committee's desire for equal treatment of all of OceanFreight's shareholders. The OceanFreight Special Committee proposed that 50% of the consideration to all shareholders be paid in cash and the remaining 50% in the form of Ocean Rig shares valued at $17.50 per Ocean Rig share (the then trading level). The OceanFreight Special Committee communicated its view that an offer on this basis should be priced at $26 per OceanFreight share and all shareholders should be paid at the same time. The OceanFreight Special Committee indicated that it would want to seek third-party offers for a period of three weeks.

On July 15, 2011, Mr. Khanna informed the OceanFreight Special Committee that DryShips was willing to modify the proposed terms of the acquisition so that all shareholders of OceanFreight would receive the same cash and stock consideration. DryShips also proposed that while OceanFreight would not be permitted to solicit third-party acquisition proposals, in the event that the OceanFreight Special Committee were to receive an unsolicited

superior proposal before the closing of the Exchange Offer, the OceanFreight Special Committee would be permitted to terminate the merger agreement with DryShips to accept the superior proposal after giving DryShips a customary opportunity to match the superior proposal. DryShips stated that it would expect to sign an agreement with Mr. Kandylidis in which he would agree to support the transaction, and that the agreement would terminate in the event the OceanFreight Special Committee terminated the merger agreement to accept an unsolicited superior proposal. In connection with the termination of the merger agreement, OceanFreight would be required to pay DryShips an agreed customary termination fee based on an enterprise value of OceanFreight reflecting the value of DryShips' offer. Mr. Khanna noted that DryShips continued to review the diligence materials and would revert to the OceanFreight Special Committee in the following days to propose an aggregate "cash and share" purchase price.

On July 15, 2011, the OceanFreight Special Committee agreed, in light of the revised proposal from DryShips, to meet in person with DryShips and its advisors in Athens the following week to further discuss the transaction.

On July 19, 2011, the Audit Committee chairman of DryShips, Mr. Kerames, along with Mr. Khanna and the DryShips advisors, met with members of the OceanFreight Special Committee and its advisors to discuss the potential transaction. At the conclusion of the negotiations, the parties agreed in principle, subject to negotiation of definitive agreements reflecting other terms of the proposed transaction, DryShips' completion of its due diligence review and board approval, on a transaction that would occur in two stages: (i) no less than four weeks after signing, DryShips would acquire the approximately 50.5% equity interest in OceanFreight held directly or indirectly by Mr. Kandylidis at a price per OceanFreight share equal to $11.25 in cash and 0.52326 shares of Ocean Rig and (ii) DryShips would acquire all other shares of OceanFreight for the same consideration by means of a one-step merger of a newly-formed subsidiary of DryShips with OceanFreight.

On July 20, 2011, OceanFreight requested certain due diligence material regarding Ocean Rig, which was thereafter provided.

On July 20, 2011, a meeting of the Audit Committee of DryShips was held at which the Audit Committee of DryShips indicated its preliminary approval to certain key proposed business terms of the transaction, subject to further advice from its advisors and final agreement on the terms and documentation.

On July 22, 2011, OceanFreight reached an agreement, subject to the negotiation of satisfactory documentation, with its lenders under its senior credit facility to waive the "change of control" event of default that the transaction would have triggered.

On July 25, 2011, the DryShips board of directors met to consider the transaction. After discussions by the DryShips board of directors with its advisors, the Audit Committee of DryShips recommended the transaction to the board of directors of DryShips. The board of directors of DryShips approved the transaction on the same date.

On July 25, 2011, the OceanFreight Special Committee met to approve the transaction. Fearnley, which acted as the financial advisor to the OceanFreight Special Committee, delivered its fairness opinion at the meeting by presenting its conclusion that the merger consideration to be received by the holders of OceanFreight common stock was fair from a financial point of view to such holders. Fearnley also delivered its written fairness opinion to the OceanFreight Special Committee on the same date. Subsequently, Seward & Kissel LLP, the legal advisor to OceanFreight, presented the structure of the transaction and discussed the duties and obligations applicable to the OceanFreight Special Committee. After the presentations, the OceanFreight Special Committee, among other things, unanimously approved and recommended the transaction to the board of directors of OceanFreight and unanimously approved and recommended that the merger agreement be submitted to the OceanFreight shareholders for their approval and that OceanFreight's rights plan, the interested shareholder provisions of OceanFreight's third amended and restated articles of incorporation, and the standstill provisions contained in its non-disclosure agreement with DryShips, be modified and/or waived in order to permit the consummation of the transaction. After reviewing the OceanFreight Special Committee's recommendations, the OceanFreight board of directors, among other things, unanimously approved the transaction, unanimously directed that the merger agreement be submitted to the OceanFreight shareholders for their approval, and unanimously approved the foregoing modifications and/or waivers to OceanFreight's rights plan, the interested shareholder provisions of OceanFreight's third amended and restated articles of incorporation, and the standstill provisions contained in its non-disclosure agreement with DryShips, on the same date.

On July 26, 2011, the parties signed the merger agreement and the purchase agreement and announced the transaction.

On August 24, 2011, pursuant to the terms of the purchase agreement, DryShips acquired the OceanFreight shares held by the entities controlled by Mr. Kandylidis, representing a majority of the outstanding shares of OceanFreight. The consideration paid by DryShips for each OceanFreight share consisted of (x) $11.25 in cash and (y) 0.52326 shares of Ocean Rig common stock, with cash paid in lieu of fractional shares.

### OceanFreight's Reasons for the Merger; Recommendation of the OceanFreight Special Committee and Board of Directors

#### *OceanFreight Special Committee*

On May 27, 2011, following the receipt by Mr. Kandylidis of an expression of interest from DryShips, the OceanFreight board of directors constituted a special committee comprised of its independent members, Messrs. John Liveris, George Biniaris and Panagiotis Korakas, and authorized the OceanFreight Special Committee to review the transactions proposed by DryShips and alternatives thereto, and to evaluate, negotiate and make recommendations to the OceanFreight board of directors in connection with any proposed transaction. The OceanFreight Special Committee, with the advice and assistance of its legal and financial advisors, evaluated and negotiated the transaction, including the terms and conditions of the merger agreement and the related agreements, with DryShips. Following the negotiations, the OceanFreight Special Committee, among other things, (i) unanimously determined that the transactions contemplated by the merger agreement are fair and reasonable to, and in the best interests of, the OceanFreight shareholders (other than DryShips, Pelican Stockholdings Inc., Basset Holdings Inc., Steel Wheel Investments Limited and Haywood Finance Limited) and (ii) unanimously approved and recommended to the OceanFreight board of directors that the merger agreement and the transactions contemplated thereby, including the merger, be submitted to the OceanFreight shareholders for their approval.

In the course of reaching its determination and making the recommendation described above, the OceanFreight Special Committee considered a number of factors and a significant amount of information, including substantial discussions with its legal and financial advisors. The principal factors and benefits that the OceanFreight Special Committee believes support its conclusion are set forth below:

- The current and historical prices of OceanFreight's common stock and the fact that the per share merger consideration of $11.25 in cash and 0.52326 shares of Ocean Rig common stock represents a premium of approximately 109.6% over the closing price of $9.47 per share of OceanFreight's common stock on July 25, 2011, the last trading day before the public announcement of the merger.

- The OceanFreight Special Committee's familiarity with the business, financial condition, results of operations, prospects and competitive position of OceanFreight, including the challenges faced by OceanFreight in the international dry bulk shipping industry and the prospects and challenges for continued growth and profitability of OceanFreight.

- The OceanFreight Special Committee's view that the merger is more favorable to OceanFreight's shareholders than the possible alternatives to the merger, including continuing to operate OceanFreight as an independent publicly traded company or pursuing other strategic alternatives, because of the uncertain returns to such shareholders in light of OceanFreight's business, operations, financial condition and obligations (including OceanFreight's debt and newbuilding obligations), strategy and prospects, as well as the risks involved in achieving those returns, the uncertainties surrounding the availability of future equity or debt financing, the nature of the dry bulk shipping industry, and general industry, economic and market conditions, both on a historical and on a prospective basis.

- The fact that the merger consideration contains a significant cash component, so that the transaction allows OceanFreight's shareholders to realize immediately a considerable portion of their investment in cash and provides such shareholders with a level of certainty as to the value of their shares.

- OceanFreight's shareholders' ability to participate in the potential growth of Ocean Rig following the merger, with the added condition that if the merger is not completed by January 26, 2012, due to delays with

66

respect to the registration of the Ocean Rig shares with the SEC or the NASDAQ listing of such shares, the merger consideration payable for each OceanFreight share will be converted into $22.50 in cash.

- The terms and conditions of the merger agreement, including (i) the limited conditions to DryShips' obligations to close the merger, (ii) the ability of OceanFreight under certain conditions to consider unsolicited alternative acquisition proposals prior to August 23, 2011, and (iii) the restrictions on the conduct of Ocean Rig's business prior to the completion of the merger.

- Prior to the effective time of the merger, DryShips will not vote any shares of OceanFreight common stock owned beneficially or of record by it, Pelican Stockholdings Inc. or any of DryShips' other subsidiaries in favor of the removal of any OceanFreight director or in favor of the election of any director not approved by the OceanFreight Special Committee.

- The opinion of Fearnley, dated July 25, 2011, to the OceanFreight Special Committee as to the fairness as of such date, from a financial point of view, of the merger consideration to the holders of OceanFreight's common stock, based upon and subject to the factors and assumptions, limitations, qualifications and other matters set forth in the written opinion. See "— Opinion of OceanFreight's Financial Advisor" and Annex C to this proxy statement prospectus.

The OceanFreight Special Committee also considered a variety of risks and other potential negative factors concerning the merger agreement, the merger and the transactions contemplated thereby, including the following:

- The risks and costs associated with the merger not being completed in a timely manner or at all, including the diversion of management and employee attention, potential employee attrition, the potential effect on business and customer relationships and potential litigation arising from the merger agreement or the transactions contemplated thereby.

- The recent decline in dry bulk charter rates and the uncertainty as to whether and to what extent the dry bulk charter market would recover, including the impact that this decline may have had on the price that DryShips was willing to pay to acquire OceanFreight.

- DryShips would acquire the OceanFreight shares held by entities controlled by Mr. Kandylidis, representing a majority of the outstanding shares of OceanFreight, prior to the merger. DryShips would commit to vote the OceanFreight shares so acquired "FOR" the approval of the merger agreement.

- Under the terms of the merger agreement, (i) OceanFreight may not solicit other acquisition proposals and (ii) OceanFreight, in certain circumstances, may be required to pay DryShips a $4.5 million termination fee if the merger agreement is terminated.

- The risk that, while the merger is expected to be completed, there can be no assurance that all conditions to the parties' obligations to consummate the merger will be satisfied, and, as a result, it is possible that the merger may not be completed even if approved by OceanFreight's shareholders.

- The restrictions on the conduct of OceanFreight's business prior to the completion of the merger.

- The fact that the OceanFreight Special Committee did not solicit alternative proposals prior to executing the merger agreement.

- That the merger consideration was fixed and therefore the value of the consideration payable to OceanFreight shareholders would decrease in the event that the value of Ocean Rig shares decreased prior to closing.

- That OceanFreight shareholders will not be entitled to appraisal rights under Marshall Islands law.

- The substantial transactional costs and expenses expected to be incurred by OceanFreight in connection with the proposed transaction.

- The interests of OceanFreight's directors and management in the merger, including those described under the section entitled "— Interests of OceanFreight's Directors and Officers in the Merger."

- Various other applicable risks associated with OceanFreight and the merger, including those described under the section entitled "Risk Factors" beginning on page 29.

The above discussion is not exhaustive, but it addresses the material factors considered by the OceanFreight Special Committee in connection with the proposed transaction. In view of the variety of factors and the amount of information considered, as well as the complexity of that information, the OceanFreight Special Committee does not find it practicable to, and did not, quantify, rank or otherwise assign relative weights to the specific factors it considered in reaching its decision. In addition, individual members of the OceanFreight Special Committee may have given different weight to different factors. This explanation of the OceanFreight Special Committee's reasoning, and all other information presented in this section, is forward-looking in nature and, therefore, should be read in light of the factors discussed under the section entitled "Cautionary Note Regarding Forward-Looking Statements."

The OceanFreight Special Committee unanimously recommends that OceanFreight's shareholders vote "FOR" the approval of the proposal to adopt the merger agreement and to approve the merger.

### OceanFreight Board of Directors

The OceanFreight board of directors met on July 25, 2011, to consider the merger agreement and the transactions contemplated thereby. On the basis of the OceanFreight Special Committee's recommendations and the other factors described below, the OceanFreight board of directors, among other things, (i) determined that the merger agreement and the transactions contemplated thereby, including the merger, are fair and reasonable to, and in the best interests of, OceanFreight and its shareholders (other than DryShips, Pelican Stockholdings Inc., Basset Holdings Inc., Steel Wheel Investments Limited and Haywood Finance Limited), (ii) adopted and approved the merger agreement and the transactions contemplated thereby, including the merger, and (iii) resolved to recommend to the OceanFreight shareholders that they approve the merger agreement and the transactions contemplated thereby, including the merger. See "— Background of the Transaction."

In determining that the merger agreement and the transactions contemplated thereby, including the merger, are fair and reasonable to, and in the best interests of OceanFreight and its shareholders (other than DryShips, Pelican Stockholdings Inc., Basset Holdings Inc., Steel Wheel Investments Limited and Haywood Finance Limited), the OceanFreight board of directors considered:

- the unanimous determination and recommendation of the OceanFreight Special Committee; and

- the factors considered by the OceanFreight Special Committee as described in "— OceanFreight's Reasons for the Merger; Recommendation of the OceanFreight Special Committee and Board of Directors — OceanFreight Special Committee," including the positive factors and potential benefits of the merger agreement and the merger and the risks and potentially negative factors relating to the merger agreement and the merger.

The above discussion is not exhaustive, but it addresses the material factors considered by the OceanFreight board of directors in connection with the proposed transaction. In view of the variety of factors and the amount of information considered, as well as the complexity of that information, the OceanFreight board of directors does not find it practicable to, and did not, quantify, rank or otherwise assign relative weights to the specific factors it considered in reaching its decision. The OceanFreight board of directors discussed the factors described above and asked questions of OceanFreight's management and its advisors. This determination was made after the OceanFreight board of directors considered all of the factors as a whole. In addition, individual members of the OceanFreight board of directors may have given different weight to different factors. This explanation of the OceanFreight board of directors' reasoning, and all other information presented in this section, is forward-looking in nature and, therefore, should be read in light of the factors discussed under the section entitled "Cautionary Note Regarding Forward-Looking Statements."

Based in part on the recommendation of the OceanFreight Special Committee, the OceanFreight board of directors, by the unanimous vote of the directors, recommends that OceanFreight's shareholders vote "FOR" the approval of the proposal to adopt the merger agreement and to approve the merger.

**Opinion of OceanFreight's Financial Advisor**

On July 25, 2011, at a meeting of the OceanFreight Special Committee held to evaluate the proposed transaction, Fearnley delivered to the OceanFreight Special Committee an oral opinion, which opinion was confirmed by delivery of a written opinion dated July 25, 2011, to the effect that, as of that date and based upon and subject to various assumptions, matters considered and limitations described in its opinion, the merger consideration to be received by the holders of OceanFreight common stock was fair from a financial point of view to such holders.

The full text of Fearnley's opinion describes the assumptions made, procedures followed, matters considered and limitations on the review undertaken by Fearnley. This opinion is included as Annex C to this proxy statement / prospectus. Fearnley's opinion was provided for the benefit of the OceanFreight Special Committee in connection with, and for the purpose of, its evaluation of the merger, and addresses only the fairness of the merger consideration to be received by the holders of OceanFreight common stock from a financial point of view. The opinion does not address any other aspect of the proposed transaction, and does not constitute a recommendation as to how any holder of OceanFreight common stock should vote with respect to the merger or any matter related thereto. The summary of Fearnley's opinion set forth below is qualified in its entirety by reference to the full text of the opinion. Holders of shares of OceanFreight common stock are urged to read Fearnley's opinion carefully and in its entirety.

In arriving at its opinion, Fearnley, among other things:

- reviewed the merger agreement;

- reviewed certain publicly available financial and other information about OceanFreight, and held discussions with members of senior management of OceanFreight concerning such matters;

- reviewed certain information furnished to Fearnley by the management of OceanFreight, including financial forecasts and analyses, relating to the business, operations and prospects of OceanFreight, and held discussions with members of senior management of OceanFreight concerning such matters;

- reviewed the share trading price history and valuation multiples for OceanFreight common stock and Ocean Rig common stock and compared them with those of certain publicly traded companies that Fearnley deemed relevant;

- compared the proposed financial terms of the merger with the financial terms of certain other transactions that Fearnley deemed relevant; and

- conducted such other financial studies, analyses and investigations as Fearnley deemed appropriate.

In connection with its review and analysis and in rendering its opinion, Fearnley assumed and relied upon, but did not assume any responsibility to independently investigate or verify, the accuracy and completeness of all financial and other information that was supplied or otherwise made available by OceanFreight and DryShips or that was publicly available (including, without limitation, the information described above), or that was otherwise reviewed by Fearnley. Fearnley relied upon the assurances of the respective managements of OceanFreight and DryShips that they were not aware of any facts or circumstances that would make such information inaccurate or misleading. In connection with its review, Fearnley did not obtain any independent evaluation or appraisal of any of the assets or liabilities of, nor did it conduct a physical inspection of any of the properties or facilities of, OceanFreight or DryShips, nor did Fearnley assume any responsibility to obtain any such evaluations or appraisals.

Projecting future results of any company is inherently subject to uncertainty. With respect to the financial forecasts provided to and examined by Fearnley, OceanFreight informed Fearnley, and Fearnley assumed, that such financial forecasts were reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the management of OceanFreight as to the future financial performance of OceanFreight. Fearnley expressed no opinion as to the financial forecasts provided to it by OceanFreight or the assumptions on which they were made.

Fearnley's opinion was based on economic, monetary, regulatory, market and other conditions existing and which could be evaluated as of the date of the opinion. Fearnley expressly disclaimed any undertaking or obligation

to advise any person of any change in any fact or matter affecting its opinion of which it became aware after the date of the opinion.

Fearnley made no independent investigation of any legal or accounting matters affecting OceanFreight or DryShips, and Fearnley assumed the correctness in all respects material to its analysis of all legal and accounting advice given to OceanFreight, the OceanFreight Special Committee and the OceanFreight board of directors, including, without limitation, advice as to the legal, accounting and tax consequences of the terms of, and transactions contemplated by, the merger agreement to OceanFreight and its shareholders. In addition, in preparing its opinion, Fearnley did not take into account any tax consequences of the transaction to any holder of OceanFreight common stock. Fearnley also assumed that in the course of obtaining the necessary regulatory or third-party approvals, consents and releases for the merger, no delay, limitation, restriction or condition would be imposed that would have an adverse effect on OceanFreight, DryShips, Ocean Rig or the contemplated benefits of the merger.

Fearnley's opinion does not address the relative merits of the transactions contemplated by the merger agreement as compared to any alternative transaction or opportunity that might be available to OceanFreight, nor does it address the underlying business decision by OceanFreight to engage in the merger or the terms of the merger agreement or the documents referred to therein. In addition, Fearnley was not asked to address, and its opinion does not address, the fairness to, or any other consideration of, the holders of any class of securities, creditors or other constituencies of OceanFreight, other than the holders of shares of OceanFreight common stock. Fearnley expressed no opinion as to the price at which shares of OceanFreight common stock or Ocean Rig common stock would trade at any time. Furthermore, Fearnley did not express any view or opinion as to the fairness, financial or otherwise, of the amount or nature of any compensation payable or to be received by any of OceanFreight's officers, directors or employees, or any class of such persons, in connection with the merger.

The following is a brief summary of the material financial analyses presented to the OceanFreight Special Committee in connection with Fearnley's opinion on July 25, 2011. The financial analyses summarized below include information presented in tabular format. In order to fully understand Fearnley's financial analyses, the tables must be read together with the text of each summary. The tables alone do not constitute a complete description of the financial analyses. Considering the data below without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of Fearnley's financial analyses. Quantitative information set forth below, to the extent it is based on market data, is, except as otherwise indicated, based on market data as it existed at or prior to July 25, 2011, and is not necessarily indicative of current or future market conditions. Financial data of OceanFreight set forth below was based on OceanFreight public filings and certain financial forecasts and estimates prepared by OceanFreight's management that the OceanFreight Special Committee directed Fearnley to utilize for purposes of its analyses.

### *Analysis*

#### *Calculation of offer value*

Fearnley assumed that the offer value to the holders of OceanFreight common stock corresponded to approximately $20.14 per share of OceanFreight as of July 22, 2011, the last trading day prior to the release of Fearnley's opinion. This offer value would consist of the cash consideration of $11.25 and the assumed market value of the Ocean Rig settlement shares which would amount to approximately $8.89 per share of OceanFreight.

Fearnley noted that there was considerable uncertainty in the valuation of the Ocean Rig settlement shares, as these were at the relevant time only traded in the over-the-counter market in Oslo, Norway. The assumed value of the Ocean Rig settlement shares was based on the trading price on the over-the-counter market as of July 22, 2011, which was approximately $17 per share. Fearnley noted that Ocean Rig had undertaken a $500 million share placement in December 2010 at $17.50 per share, and also noted that the trading price had fluctuated since that placement. Fearnley further noted that a contemplated listing of Ocean Rig's shares on NASDAQ could have a positive impact on the trading volume and investor attractiveness and potentially on the pricing of Ocean Rig's shares.

70

*Comparison of offer value to share price*

Fearnley noted that the closing price of OceanFreight common stock on July 22, 2011, the last trading day prior to the release of Fearnley's opinion was $7.06. Based on this closing price and the offer value as set out above, the offer value represented a premium of approximately 185%.

Fearnley also noted that the trading price of the OceanFreight common stock had been subject to a significant decline over a period of at least 36 months. Similar declines have been experienced for many other companies in the maritime sector, and may be a reflection of declines in underlying ship values.

*Net asset value analysis*

Fearnley performed a net asset value analysis for OceanFreight's fleet using two alternative valuation estimates that OceanFreight management had received from outside ship valuation companies. The estimates included fair market value estimates for each vessel in OceanFreight's fleet as well as fair market value estimates of each of OceanFreight's contracted vessels under construction (referred to as "new-build vessels"), as if each such new-build vessel was a readily delivered vessel.

Fearnley subtracted OceanFreight's net debt and remaining new-build commitments, as estimated by OceanFreight's management as of June 2011, from the total fair market value of OceanFreight's fleet, to arrive at a "Steel Net Asset Value."

As the fair market value estimates assume that each vessel can be chartered at prevailing market rates, to the extent applicable, Fearnley adjusted values to reflect the anticipated cash flows over the life of the vessel's existing charter. Fearnley added these values to the Steel Net Asset Value to arrive at an implied net asset value for OceanFreight's owned fleet. In the calculation of such charter values, Fearnley discounted the difference between actual rates under the respective charters and the assumed market rates for similar charters, with a discount rate of 8% p.a. The assumed market rates were based on available market sources, in-house assessments and discussions with OceanFreight management.

The fair market value estimates provided were, as is customary in ship valuation, based on an assessment of the values that could be achieved in transactions involving a willing buyer and a willing seller. There can be no assurance that these values can be realized in actual transactions. Fearnley noted, in particular, that current sale and purchase activity in the maritime market is limited and that the valuations must therefore be regarded as uncertain. In order to reflect this uncertainty, Fearnley provided calculations of alternative net asset values if the aggregate value of vessels and charters were to be reduced by 10% and 20%.

71

The results of these analyses were as follows:

Value in $ millions
except per share data

| | Estimate 1 | Estimate 2 |
|---|---|---|
| Fair market of sailing vessels | 196 | 204 |
| Fair market value of new-build vessel | 265 | 250 |
| Other fixed assets | 5 | 5 |
| Less: Net debt | (133) | (133) |
| Less: New-build commitments | (254) | (254) |
| Steel net asset value | 79 | 72 |
| Plus: Charter rate impact | 57 | 57 |
| Net asset value | 137 | 130 |
| Number of shares outstanding | 5.9 | 5.9 |
| Net asset value per share | **$23.03** | **$21.85** |
| Impact of 10% reduction in value of vessels, new-build vessels and charters | | |
| Net asset value | 85 | 79 |
| Net asset value per share | $14.31 | $13.25 |
| Impact of 20% reduction in value of vessels, new-build vessels and charters | | |
| Net asset value | 33 | 28 |
| Net asset value per share | $ 5.60 | $ 4.66 |

Based on these analyses, Fearnley derived an implied net asset value per share range for OceanFreight's common stock of $21.85 to $23.03, before application of any adjustments to reflect the uncertainty of such valuations. Fearnley's calculations of alternative net asset values based on such adjustments resulted in a significantly lower implied net asset value per share range for OceanFreight's common stock.

Fearnley further noted that OceanFreight has large new-build obligations that are partially unfunded. While part of the funding requirements can be assumed to be available in the debt market, there is also a strong likelihood that such funding will also require additional equity. Fearnley noted that in its view, equity raising is challenging at present and may therefore be dilutive to shareholders. Such dilution is not taken into account in the calculation of net asset value above.

**Fearnley's opinion was provided for the information of the OceanFreight Special Committee in its evaluation of the merger and did not constitute a recommendation of the merger to OceanFreight or a recommendation to any holder of OceanFreight common stock as to how that holder should vote on any matters relating to the merger.**

The preceding discussion is a summary of the material financial analyses furnished by Fearnley to the OceanFreight Special Committee, but does not purport to be a complete description of the analyses performed by Fearnley or of its presentation to the OceanFreight Special Committee. The preparation of financial analyses and fairness opinions is a complex process involving subjective judgments and is not necessarily susceptible to partial analysis or summary description. Fearnley made no attempt to assign specific weights to particular analyses or factors considered, but rather made qualitative judgments as to the significance and relevance of all the analyses and factors considered and determined to give its fairness opinion as described above. Accordingly, Fearnley believes that its analyses, and the summary set forth above, must be considered as a whole, and that selecting portions of the analyses and of the factors considered by Fearnley, without considering all of the analyses and factors, could create a misleading or incomplete view of the processes underlying the analyses conducted by Fearnley and its opinion.

In its analyses, Fearnley made numerous assumptions with respect to OceanFreight, DryShips, Ocean Rig, industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond the control of OceanFreight, DryShips and Ocean Rig. Any estimates contained in Fearnley's

72

analyses are not necessarily indicative of actual values or predictive of future results or values, which may be significantly more or less favorable than those suggested by these analyses. Estimates of values of companies do not purport to be appraisals or to necessarily reflect the prices at which companies may actually be sold. Because these estimates are inherently subject to uncertainty, none of OceanFreight, DryShips, Ocean Rig, the OceanFreight Special Committee or board of directors, the DryShips board of directors, Ocean Rig or any other person assumes responsibility if future results or actual values differ materially from the estimates.

Fearnley's analyses were prepared solely as part of Fearnley's analysis of the fairness of the merger consideration and were provided to the OceanFreight Special Committee in that connection. The opinion of Fearnley was only one of the factors taken into consideration by the OceanFreight Special Committee in making its determination to approve the merger agreement and the merger. See the section of this proxy statement / prospectus entitled "— OceanFreight's Reasons for the Merger; Recommendation of the OceanFreight Special Committee and Board of Directors."

### Miscellaneous

Under the terms of Fearnley's engagement, OceanFreight has agreed to pay Fearnley for its financial advisory services in connection with the proposed transaction an aggregate fee of approximately $501,709, of which approximately $351,709 is contingent upon the consummation of the merger. In addition, OceanFreight has agreed to reimburse Fearnley for its reasonable and documented out-of-pocket expenses, and to indemnify Fearnley and related parties against liabilities relating to or arising out of its engagement.

**In the ordinary course of its business, Fearnley and its affiliates may trade or hold securities of OceanFreight, DryShips, Ocean Rig and/or their respective affiliates for its own account and for the accounts of its customers and, accordingly, may at any time hold long or short positions in those securities. In addition, Fearnley may seek to, in the future, provide financial advisory and financing services to OceanFreight, DryShips, Ocean Rig or entities that are affiliated with OceanFreight, DryShips or Ocean Rig, for which Fearnley would expect to receive compensation. Fearnley has in the past provided services to Ocean Rig, including as a lead manager in its $500 million private placement of equity in December 2010 and as a lead manager in its $500 million private placement of unsecured bonds in April 2011.**

### Interests of OceanFreight's Directors and Officers in the Merger

In considering the recommendation of the OceanFreight board of directors to vote for the approval of the merger agreement, OceanFreight's shareholders should be aware that certain members of the OceanFreight board of directors and executive officers have interests that are different from, and/or in addition to, the interests of OceanFreight's shareholders generally. These interests, to the extent material, are described below. The independent members of the OceanFreight board of directors were aware of these differing interests and potential conflicts and considered them, among other matters, in evaluating and negotiating the merger agreement, the merger, and other transactions contemplated by the merger agreement and in recommending to OceanFreight's shareholders that the merger agreement be approved.

### Purchase and Sale Agreement

Entities controlled by Mr. Kandylidis, the Chief Executive Officer of OceanFreight, are parties to the purchase agreement under which DryShips purchased on August 24, 2011 the Seller Shares owned by these entities for consideration per share equal to (x) $11.25 in cash and (y) 0.52326 shares of Ocean Rig common stock (with cash paid in lieu of fractional shares). See "The Purchase and Sale Agreement."

### Consultancy Agreement

OceanFreight and Steel Wheel Investments Limited, a company wholly-owned by Mr. Kandylidis, the Chief Executive Officer of OceanFreight, entered into a consultancy agreement, effective January 1, 2008, which granted Steel Wheel Investments Limited the right, upon a change of control of OceanFreight, to cease providing services to OceanFreight and collect from OceanFreight a change of control payment equal to three times the annual base fee under the consultancy agreement. The consultancy agreement, as subsequently amended, provided for an annual

base fee payable to Steel Wheel Investments Limited of €900,000. Pursuant to an addendum to the consultancy agreement dated July 25, 2011, OceanFreight and Steel Wheel Investments Limited modified the consultancy agreement to provide that the consultancy agreement would terminate upon the closing of the merger (rather than upon the earlier change of control resulting from DryShips' acquisition of OceanFreight shares pursuant to the purchase agreement) at which time Steel Wheel Investments Limited would receive its €2.7 million change of control payment (3x the €900,000 annual base fee). Under the addendum, OceanFreight and Steel Wheel Investments Limited agreed that Mr. Kandylidis will continue to provide his services as Chief Executive Officer and member of the OceanFreight board of directors, and Steel Wheel Investments Limited is entitled to the continued payment of its base fee, until the later of December 31, 2011 or the closing of the merger.

### Employment Agreements

Under the terms of the merger agreement, DryShips has agreed to use its reasonable best efforts to enter into employment agreements with OceanFreight's President and Chief Operating Officer, Demetris Nenes, and Chief Financial Officer, Solon Dracoulis.

### Director and Officer Indemnification and Insurance

Under the terms of the merger agreement, from the effective time of the merger through the sixth anniversary of the effective time of the merger, DryShips will cause OceanFreight, as the surviving corporation, to indemnify and hold harmless to the fullest extent permitted by law each current and former director and officer of OceanFreight and its subsidiaries against all claims, losses, liabilities, damages, judgments, inquiries, fines and reasonable fees, costs and expenses, including attorneys' fees and disbursements, incurred in connection with any litigation, claim, actions, proceedings, arbitrations, mediations or investigations, whether civil, criminal, administrative or investigative, arising out of or pertaining to the fact that such person was a director, officer or fiduciary agent of OceanFreight or its subsidiaries, whether such fact existed or occurred at or prior to the effective time of the merger.

Under the terms of the merger agreement, for six years after the effective date of the merger, DryShips must cause OceanFreight, as the surviving corporation, to maintain provisions in the articles of incorporation and bylaws of OceanFreight or any successor regarding elimination of liability of directors and officers of OceanFreight, indemnification of directors and officers of OceanFreight and advancement of expenses that are no less advantageous to the intended beneficiaries than the provisions existing on the date of the merger agreement.

Under the terms of the merger agreement, either OceanFreight must obtain and fully pay the premium for the non-cancellable extension of directors' and officers' insurance policies and OceanFreight's existing fiduciary liability insurance policies for a discovery period of at least six years for claims relating to any time before the effective time of the merger or DryShips must cause OceanFreight, as the surviving corporation, to maintain OceanFreight's existing cover or equivalent cover for at least six years, subject to a cap on the cost of such cover.

### Legal and Advisory Fees

Under the purchase agreement, all legal fees and other advisory fees up to an aggregate of $1,500,000 incurred by entities controlled by Mr. Kandylidis in connection with the sale of their shares of OceanFreight common stock to DryShips will be paid by OceanFreight upon the consummation of the merger.

### Restricted Stock

In connection with the closing of the purchase agreement, which occurred on August 24, 2011, restricted OceanFreight stock held by certain of OceanFreight's officers and directors and their affiliates vested.

74

The table below sets forth the restricted OceanFreight common stock held by certain of OceanFreight's directors and officers and their affiliates and the amount of stock that vested in connection with the closing of the purchase agreement:

| Name | Outstanding Shares of OceanFreight Restricted Stock that Vested in Connection with the Closing of the Purchase Agreement |
|---|---|
| Steel Wheel Investments Limited (a company controlled by Mr. Kandylidis) | 33,333 |
| Tsunami Shipping Inc. (a company controlled by Demetris Nenes) | 556 |
| Waylon International Limited (a company controlled by Solon Dracoulis) | 222 |
| Sturgeon International Corp. (a company controlled by Konstandia Papaefthymiou) | 111 |
| John Liveris | 778 |
| Panagiotis Korakas | 111 |
| Konstantinos Kandylidis | 111 |
| TOTAL: | 35,222 |

## Procedures for Exchanging Shares of OceanFreight Stock and Distribution of the Merger Consideration

Prior to the completion of the merger, DryShips will deposit or cause to be deposited with an exchange agent, which will be appointed by DryShips, the cash portion of the merger consideration and shares of Ocean Rig common stock to be issued in the merger. DryShips will make available to the exchange agent, from time to time, additional cash sufficient to pay cash in lieu of fractional shares of OceanFreight common stock that would be issued in the merger and any dividends or other distributions with respect to the shares of Ocean Rig common stock to which holders of shares of unsurrendered shares of OceanFreight common stock after the completion of the merger may be entitled.

Shortly after the completion of the merger, the exchange agent will send a letter of transmittal and instructions to each OceanFreight shareholder for use in effecting the surrender of the OceanFreight stock certificates in exchange for the merger consideration. Upon proper surrender of an OceanFreight stock certificate for exchange and cancellation to the exchange agent, together with a letter of transmittal and such other documents as may be specified in the instructions, an OceanFreight shareholder will be entitled to receive the merger consideration.

Six months after the completion of the merger, DryShips may require the exchange agent to deliver to it the remaining cash and shares of Ocean Rig common stock held by the exchange agent. Any OceanFreight shareholder who has not by that time exchanged the shares of OceanFreight common stock may be entitled to look to DryShips for the merger consideration. DryShips, Pelican Stockholdings Inc. or the exchange agent will not be liable to any person in the event that any merger consideration is delivered to a public official pursuant to abandoned property, escheat and other similar laws.

Until an OceanFreight shareholder exchanges its OceanFreight stock certificates for merger consideration, such shareholder will not receive any dividends or other distributions in respect of any shares of Ocean Rig common stock to which the OceanFreight shareholder is entitled in connection with that exchange. Once an OceanFreight shareholder exchanges its OceanFreight stock certificates, such shareholder will receive, without interest, any dividends or distributions with a record date after the completion of the merger and payable with respect to the shares of Ocean Rig common stock such shareholder received.

If an OceanFreight shareholder's OceanFreight stock certificate has been lost, stolen or destroyed, such shareholder may receive the merger consideration upon the making of an affidavit of that fact. Such shareholder may be required to post a bond in a reasonable amount as an indemnity against any claim that may be made with respect to the lost, stolen or destroyed OceanFreight stock certificate.

After the completion of the merger, there will be no further transfer on the stock transfer books of OceanFreight and any certificated shares of OceanFreight common stock presented to the exchange agent or OceanFreight for any reason will be cancelled and exchanged for the merger consideration.

**Accounting Treatment of the Merger**

DryShips intends to account for the merger under the "acquisition method" as defined under ASC 805 *Business Combinations* . Under the acquisition method, the aggregate consideration paid by DryShips in connection with the transaction will be allocated to OceanFreight's net assets based on their estimated fair values as of the completion of the merger. The excess of the total purchase consideration over the fair value of the identifiable net assets acquired will be allocated to goodwill. This method may result in the carrying value of assets, including goodwill, acquired from OceanFreight being substantially different from the former carrying values of those assets. The purchase price allocation is subject to refinement as DryShips completes the valuation of the assets acquired and liabilities assumed. The results of operations of OceanFreight will be included in DryShips' consolidated results of operations only for periods subsequent to the completion of the acquisition.

**Delisting and Deregistration of OceanFreight Common Stock**

Shares of OceanFreight common stock currently trade on the NASDAQ Global Market under the stock symbol "OCNF." When the merger is completed, the OceanFreight common stock currently listed on the NASDAQ Global Market will cease to be quoted on the NASDAQ Global Market and will be deregistered under the Exchange Act.

**THE MERGER AGREEMENT**

*The following is a summary of the material provisions of the merger agreement. The description may not contain all of the information that is important to you. This summary is qualified in its entirety by reference to the merger agreement, which is included as Annex A to this document. Ocean Rig urges you to read the entire merger agreement carefully.*

*The merger agreement contains representations and warranties that each of DryShips, Pelican Stockholdings Inc. and OceanFreight have made as of specific dates. The assertions made in those representations and warranties were made solely for purposes of the contract among DryShips, Pelican Stockholdings Inc. and OceanFreight and may be subject to important qualifications and limitations agreed to by the parties in connection with negotiating the terms of the merger agreement. In addition, some of those representations and warranties may not be accurate or complete as of any specified date, may be subject to a contractual standard of materiality different from what might be viewed as material to shareholders, or may have been used for purposes of allocating risk between the respective parties rather than establishing matters as facts. Shareholders and other investors are not third-party beneficiaries under the merger agreement and should not rely on the representations, warranties and covenants or any descriptions thereof as characterizations of the actual state of facts or conditions of DryShips, Pelican Stockholdings Inc. and OceanFreight or any of their respective subsidiaries or affiliates.*

**The Merger**

Subject to the terms and conditions of the merger agreement and in accordance with the MIBCA, Pelican Stockholdings Inc. will merge with and into OceanFreight. Following the merger, the separate existence of Pelican Stockholdings Inc. will cease and OceanFreight will continue its corporate existence under the MIBCA as the surviving corporation in the merger.

**Closing; Effective Time**

*Closing*

Unless the parties agree otherwise, the closing of the merger will occur no later than the third business day after the satisfaction or waiver of all of the closing conditions (other than conditions that, by their nature, cannot be satisfied until the closing). See "— Conditions to the Merger" for a description of the conditions that must be satisfied or waived prior to the closing of the merger.

### Effective Time

The merger will become effective when the articles of merger have been duly filed with the Registrar or Deputy Registrar of Corporations of the Marshall Islands or such time as DryShips, OceanFreight and Pelican Stockholdings Inc. may agree and specify in the articles of merger in accordance with the MIBCA. OceanFreight and Pelican Stockholdings Inc. will cause the articles of merger to be filed at the closing of the merger.

### Merger Consideration

Except as described in the following paragraph, each share of OceanFreight common stock issued and outstanding immediately prior to the effective time of the merger will be converted into the right to receive $11.25 in cash and 0.52326 shares of Ocean Rig common stock, less any applicable withholding taxes; provided, however, if the closing of the merger occurs at any time after 5:30 p.m. New York time on January 26, 2012, at the effective time of the merger, each share of OceanFreight common stock issued and outstanding immediately prior to the effective time of the merger will be converted into the right to receive $22.50 in cash.

Each share of OceanFreight common stock held by OceanFreight as treasury stock immediately prior to the effective time will be canceled, and no payment will be made with respect thereto. Each share of OceanFreight common stock held by DryShips or any subsidiary of either OceanFreight or DryShips (including but not limited to Pelican Stockholdings Inc.) immediately prior to the effective time will be canceled, and no payment will be made with respect thereto.

Each share of Pelican Stockholdings Inc. common stock outstanding immediately prior to the effective time will be converted into and become one share of OceanFreight common stock with the same rights, powers and privileges as the shares so converted and will constitute the only outstanding shares of OceanFreight capital stock.

## Exchange and Payment Procedures

Prior to the effective time of the merger, DryShips will deliver to an exchange agent reasonably acceptable to OceanFreight, for purposes of exchanging for the OceanFreight common stock, the appropriate amount of cash and certificates representing the appropriate number of shares of Ocean Rig common stock comprising the merger consideration. As soon as practicable after the effective time of the merger, the exchange agent will mail a letter of transmittal and instructions to the shareholders, which will explain how to surrender OceanFreight common stock certificates in exchange for the merger consideration.

Shareholders will not be entitled to receive the merger consideration until the OceanFreight stock certificate or certificates are surrendered to the exchange agent, together with a duly completed and executed letter of transmittal.

The merger consideration may be paid to a person other than the person in whose name the corresponding OceanFreight certificate is registered if the certificate is properly endorsed or is otherwise in the proper form for transfer. In addition, the person who surrenders such certificate or book-entry share must either pay any transfer or other applicable taxes or establish to the satisfaction of the exchange agent that such taxes have been paid or are not applicable.

No interest will be paid or will accrue on the cash payable upon surrender of the OceanFreight certificates. The exchange agent will be entitled to deduct and withhold, and pay to the appropriate taxing authorities, any applicable taxes from the merger consideration. Any sum which is withheld and paid to a taxing authority by the exchange agent will be deemed to have been paid to the person with regard to whom it is withheld.

No fractions of a share of Ocean Rig common stock will be paid in the merger, but each holder of shares of OceanFreight common stock otherwise entitled to a fraction of a share of Ocean Rig common stock will upon surrender of the certificate be entitled to receive an amount of cash (without interest) determined by multiplying $21.50 by the fractional share interest to which the holder would otherwise be entitled.

There will be no further registration of transfers of shares of OceanFreight common stock after the effective time of the merger. If, after the effective time of the merger, certificates are presented to OceanFreight, they will be canceled and exchanged for the merger consideration, except as otherwise required by applicable law.

DryShips and OceanFreight will not be liable to any OceanFreight shareholder for cash or shares of Ocean Rig common stock (including dividends or distributions) delivered to a public official as required by any applicable abandoned property, escheat or similar law.

Any portion of the cash or shares of Ocean Rig common stock made available to the exchange agent (and any interest or other income earned thereon) that remains unclaimed by shareholders of OceanFreight common stock six months after the effective time will be returned to DryShips, on demand, and any holder who has not exchanged shares of OceanFreight common stock for the merger consideration will thereafter look only to DryShips for payment of the merger consideration without any interest thereon.

The exchange agent will invest any cash in the exchange fund as directed by DryShips. Any interest and other income resulting from such investments will be paid to DryShips.

## Representations and Warranties

OceanFreight made customary representations and warranties, generally qualified by, among other things, filings since January 1, 2010, by OceanFreight with the SEC. Some of these representations and warranties were made to DryShips as of specified dates. OceanFreight's representations and warranties in the merger agreement include the following:

- corporate organization and authority to enter into, and carry out the obligations under, the merger agreement and enforceability of the merger agreement and related filing obligations;

- noncontravention and absence of a breach of organizational documents, law or material agreements;

- capitalization and indebtedness;

- status and ownership of subsidiaries;

- filing, and accuracy of documents filed and to be filed with, the SEC, securities law compliance and disclosure controls and procedures and NASDAQ stock market compliance;

- financial statements;

- taxes and tax returns;

- compliance with laws, orders and permits;

- absence of certain changes and undisclosed liabilities;

- tangible personal assets;

- real property;

- vessels and maritime matters;

- material contracts;

- absence of litigation which would challenge or delay the merger, or had had or would reasonably be expected to have a material adverse effect;

- employee benefits;

- labor and employment matters;

- environmental matters;

- insurance;

- the opinion of the OceanFreight Special Committee's financial advisor;

- fees and commissions in connection with the merger agreement and the transactions contemplated thereby;

- non-application of OceanFreight's rights plan and anti-takeover laws and corporate provisions;

- absence of undisclosed interested party transactions;

- absence of certain business practices; and

- absence of existing discussions with respect to acquisition.

DryShips also made customary representations and warranties, generally qualified by, among other things, filings since January 1, 2010, by DryShips with the SEC. Some of the representations and warranties were made to OceanFreight as of specified dates. DryShips' representations and warranties in the merger agreement, which, as applicable, relate to DryShips, Ocean Rig and Pelican Stockholdings Inc., include the following:

- corporate organization and authority to enter into, and carry out the obligations under, the merger agreement and enforceability of the merger agreement and related filing obligations;

- noncontravention and absence of a breach of organizational documents, law or material agreements;

- filing, and accuracy of documents filed and to be filed with, the SEC, securities law compliance and disclosure controls and procedures;

- fees and commissions in connection with the merger agreement and the transactions contemplated thereby;

- capitalization and indebtedness of Ocean Rig;

- status and ownership of subsidiaries of Ocean Rig;

- financial statements of Ocean Rig;

- compliance of Ocean Rig with laws, orders and permits;

- absence of certain changes and undisclosed liabilities of Ocean Rig;

- material contracts of Ocean Rig;

- tangible personal assets of Ocean Rig;

- labor and employment matters of Ocean Rig;

- environmental matters of Ocean Rig; and

- absence of litigation which would challenge or delay the merger, or had had or would reasonably be expected to have a material adverse effect on Ocean Rig.

For purposes of the merger agreement, a "material adverse effect" with respect to OceanFreight means (i) a material adverse effect on the financial condition, business, assets (including vessels), liabilities, or results of operations of OceanFreight and OceanFreight's subsidiaries, taken as a whole, other than an effect that arises or results from any of the following:

- changes in applicable law or changes in GAAP;

- changes in global political financial or securities markets or general global economic or political conditions;

- changes or conditions generally affecting the industry in which OceanFreight and its subsidiaries operate;

- acts of war, sabotage, terrorism or natural disasters;

- other than for purposes of noncontravention and employee benefits compliance, the announcement or consummation of the transactions contemplated by the merger agreement and the purchase agreement;

except, in the case of the first four points above, to the extent such matter has a disproportionate effect on OceanFreight and its subsidiaries, taken as a whole, compared with other companies operating in the same industry; or (ii) any event, circumstance or effect that materially impairs the ability of OceanFreight to perform its obligations under the merger agreement or materially delays the consummation of the merger.

For purposes of the merger agreement, a "material adverse effect" with respect to Ocean Rig means a material adverse effect on the financial condition, business, assets, liabilities, or results of operations of Ocean Rig and Ocean Rig's subsidiaries, taken as a whole, other than an effect that arises or results from any of the following:

- changes in applicable law or changes in GAAP;

- changes in global political financial or securities markets or general global economic or political conditions;

- changes or conditions generally affecting the industry in which Ocean Rig and its subsidiaries operate;

- acts of war, sabotage, terrorism or natural disasters;

- the announcement or consummation of the transactions contemplated by the merger agreement and the purchase agreement;

except, in the case of the first four points above, to the extent such matter has a disproportionate effect on Ocean Rig and its subsidiaries, taken as whole, compared with other companies operating in the same industry.

For purposes of the merger agreement, a "material adverse effect" with respect to DryShips means any event, circumstance or effect that (i) materially impairs the ability of DryShips or Pelican Stockholdings Inc. to perform its obligations under the merger agreement or (ii) materially delays the consummation of the transactions contemplated by the merger agreement.

The representations and warranties in the merger agreement do not survive the effective time of the merger. If the merger agreement is validly terminated, there will be no liability under the representations and warranties of the parties, or otherwise under the merger agreement, except as described below under "— Effect of Termination" and "— Termination Fee and Expenses."

## Conduct of OceanFreight's Business Pending the Merger

Under the merger agreement, OceanFreight has agreed to, during the period from the date of the merger agreement until the effective time of the merger, except as expressly contemplated or permitted by the merger agreement, carry on its business in the ordinary course and in a manner consistent with past practice and to use its reasonable best efforts to:

- preserve intact its present business organization, goodwill and material assets;

- maintain in effect all governmental authorizations required to carry on its business as now conducted;

- keep available the services of its present officers and other employees (provided that OceanFreight will not be required to increase the compensation of present officers and employees); and

- preserve its present relationships with customers, suppliers and others with which it has a business relationship.

OceanFreight has also agreed to comply with a series of negative covenants.

## Conduct of Ocean Rig's Business Pending the Merger; Conduct of DryShips

Under the merger agreement, DryShips has agreed that, except as expressly required by the merger agreement or with OceanFreight's prior written consent, during the period from the date of the merger agreement until the effective time of the merger, DryShips will cause Ocean Rig and each of Ocean Rig's subsidiaries to carry on its business in the ordinary course and to use reasonable best efforts to:

- preserve intact its business organization, goodwill and material assets;

- maintain all required governmental authorizations;

- keep available the services of its present officers and other employees, with certain exceptions; and

- preserve present customer, supplier and other business relationships.

80

**No Solicitation**

OceanFreight and its subsidiaries have agreed to (and OceanFreight has agreed to use its reasonable best efforts to cause its or any of its subsidiaries' representatives to) cease immediately any existing activities, solicitations, encouragements, discussions or negotiations with any party regarding an acquisition proposal.

During the period between the date of the merger agreement and the earlier of the termination of the merger agreement or the effective time of the merger, OceanFreight and its subsidiaries have agreed not to, directly or indirectly:

- solicit or encourage any acquisition proposal;

- enter into or participate in any discussions or negotiations with, furnish any information relating to OceanFreight or any of its subsidiaries or provide access to the business, properties, assets, books or records of OceanFreight or any of its subsidiaries to any third party with respect to inquiries regarding, or the making of, an acquisition proposal;

- fail to make, withdraw, or modify or amend in a manner adverse to DryShips the recommendation of either the OceanFreight Special Committee or the OceanFreight board of directors, or recommend any other acquisition proposal;

- grant any waiver or release under any standstill or similar agreement with respect to any class of equity securities of OceanFreight or any of its subsidiaries;

- approve, endorse, recommend, enter into, or make a public proposal regarding, any agreement in principle, letter of intent, term sheet, merger agreement, acquisition agreement, option agreement or other similar agreement relating to an acquisition proposal, with the exception of a confidentiality agreement with a permitted third party;

- approve any transaction under Article K of OceanFreight's third amended and restated articles of incorporation (which relates to business combinations); or

- redeem the rights issued to holders of OceanFreight's common stock pursuant to the Second Amended and Restated Stockholder Rights Agreement, dated as of April 8, 2011, amend or modify or terminate OceanFreight's rights plan or exempt any person from, or approve any transaction under, OceanFreight's rights plan. On August 22, 2011 OceanFreight entered into the Third Amended and Restated Stockholders Rights Agreement pursuant to which the definition of "Acquiring Person" was amended in connection with the transactions contemplated by the merger agreement and the purchase agreement.

Any failure by a representative of OceanFreight and its subsidiaries to comply with the above restrictions is a breach by OceanFreight regardless of whether OceanFreight used its reasonable best efforts to cause compliance.

Notwithstanding these restrictions:

- Prior to August 23, 2011, OceanFreight was permitted to: (i) engage in negotiations or discussions with any third party, that made an unsolicited written acquisition proposal after the date of the merger agreement that did not otherwise result from a breach of the merger agreement if the OceanFreight Special Committee reasonably believed in good faith, after consulting with external legal and financial advisors, that the proposal would reasonably have been expected to lead to a superior proposal (as defined below) and (ii) thereafter furnished to such third party non-public information relating to OceanFreight or any of its subsidiaries pursuant to a confidentiality agreement, if, in the case of the actions described in clauses (i) or (ii) above, the OceanFreight Special Committee determined in good faith, after consultation with outside legal counsel, that the failure to take such action would have been reasonably likely to result in a breach of its fiduciary duties under applicable law and OceanFreight had provided DryShips two business days notice of its intention to take any action discussed in (i) or (ii) above; provided that all such information provided or made available to such third party (to the extent that such information had not been previously provided or made available to DryShips) was provided or made available to DryShips, as the case may have been, prior to or substantially concurrently with the time it was provided or made available to such third party; and

81

- Prior to OceanFreight's shareholders approving the merger, the OceanFreight Special Committee or the OceanFreight board of directors may withdraw its recommendation in favor of the proposed merger in response to a material fact, event, change, development or set of circumstances (other than an acquisition proposal) arising during the period after the date of the merger agreement and before the approval of OceanFreight shareholders, which was not known or reasonably foreseeable by the OceanFreight Special Committee or the OceanFreight board of directors on the date of the merger agreement, if the failure to withdraw, modify or amend the recommendation would be reasonably likely to result in a breach of their fiduciary duties under applicable law; however, DryShips must be given at least five business days prior written notice by OceanFreight and, if requested by DryShips, OceanFreight will engage in good faith negotiations with DryShips during such five business day period to amend the agreement in such a manner that obviates the need for a withdrawal of the recommendation in favor of the proposed merger.

In addition, prior to August 23, 2011, OceanFreight had the right to terminate the merger agreement to enter into a definitive agreement with respect to a superior proposal or make an adverse recommendation in connection with a superior proposal if the superior proposal did not result from a breach of the non-solicitation provisions of the merger agreement, and the OceanFreight Special Committee reasonably determined in good faith after consultation with its outside counsel and financial advisors that the failure to take any such action would have breached its fiduciary duty to OceanFreight shareholders, provided that:

- OceanFreight provided at least five business days written notice to DryShips prior to any such action, which notice would have had to satisfy certain requirements;

- OceanFreight attached a copy of the current version of the proposed agreement relating to the superior proposal and disclosed the identity of the party making the superior proposal;

- if requested by DryShips, OceanFreight would have been obligated to enter into good faith negotiations with DryShips during such five business day period to amend the merger agreement so that the superior proposal ceased to constitute a superior proposal; and

- following the five business days notice to DryShips, the OceanFreight Special Committee determined in good faith, taking into account any changes to the DryShips/OceanFreight merger agreement proposed by DryShips, that the superior proposal continued to be a superior proposal. OceanFreight would have been required to provide a new written notice period of five business days to DryShips in the event of any financial or other material amendment to the superior proposal.

A "superior proposal" means a bona fide, unsolicited written acquisition proposal to acquire all of OceanFreight's assets or common stock that:

- is not subject to any financing condition and for which financing has been fully committed or is on hand or the OceanFreight Special Committee determines in good faith after considering the advice of its financial advisor of nationally recognized reputation is reasonably capable of being fully financed;

- the OceanFreight Special Committee determines in good faith by a majority vote, after consultation with its outside counsel and its financial advisor, is reasonably likely to be consummated in accordance with its terms, taking into account all aspects of the proposal and the identity of the person making the acquisition proposal; and

- the OceanFreight Special Committee determines in good faith by a majority vote, after considering the advice of its financial advisor, would result in a transaction more financially favorable to OceanFreight's shareholders than the merger contemplated by the merger agreement (after taking into account any amendment of the merger agreement or proposed increase to the merger consideration proposed by DryShips).

The OceanFreight Special Committee and the OceanFreight board of directors are not prohibited from complying with Rule 14e-2(a) under the Exchange Act, consistent with the requirements set forth above, or issuing a "stop, look and listen" disclosure of the type contemplated by Rule 14d-9(f) under the Exchange Act.

OceanFreight and the OceanFreight board of directors shall not take any of the actions described in the exceptions to the non-solicitation provisions described above unless OceanFreight:

- first notifies DryShips promptly (but in no event later than 24 hours) after receipt by OceanFreight (or any of its representatives) of any third-party acquisition proposal, including the material terms and conditions thereof and the identity of the person making such acquisition proposal and its proposed financing sources, and shall keep DryShips reasonably informed on a prompt basis (but in any event no later than 24 hours) as to the status (including changes or proposed changes to the material terms) of such acquisition proposal; and

- notifies DryShips promptly (but in no event later than 24 hours) after receipt by OceanFreight of any request for non-public information relating to OceanFreight or any of its subsidiaries or for access to the business, properties, assets, books or records of OceanFreight or any of its subsidiaries by any third party that has informed OceanFreight that it is considering making, or has made, an acquisition proposal.

### Litigation

OceanFreight will promptly advise DryShips of any litigation, claim, action, suit, hearing, proceeding, arbitration, audit, inspection or other investigation involving OceanFreight or any of its officers or directors, or the OceanFreight Special Committee, relating to the merger agreement or the purchase agreement or the transactions contemplated thereunder and will keep DryShips informed and consult with DryShips regarding the status of any litigation, claim, action, suit, hearing, proceeding, arbitration, audit, inspection or other investigation on an ongoing basis. OceanFreight will cooperate with and give DryShips the opportunity to consult with respect to any defense or settlement relating thereto, and such settlement will not be agreed to without the prior written consent of DryShips.

DryShips will promptly advise OceanFreight of any litigation, claim, action, suit, hearing, proceeding, arbitration, audit, inspection or other investigation involving DryShips or Ocean Rig or any of its officers or directors, relating to the merger agreement or the purchase agreement or the transactions thereunder and will keep OceanFreight informed and consult with OceanFreight regarding the status of any litigation, claim, action, suit, hearing, proceeding, arbitration, audit, inspection or other investigation on an ongoing basis. DryShips will cooperate with and give OceanFreight the opportunity to consult with respect to the defense or settlement relating thereto.

### Employee and Director Matters

Prior to the closing of the merger, DryShips will use reasonable efforts to enter into employment agreements, effective as of the closing of the merger, with Demetris Nenes and Solon Dracoulis in form and substance acceptable to DryShips and those employees.

Immediately prior to the closing of the merger, OceanFreight will pay all employment-related payments due in connection with, or as a result of, the closing of the merger. If the closing of the merger occurs prior to December 31, 2011, OceanFreight shall pay directors' fees for the directors of OceanFreight through December 31, 2011.

### Ocean Rig Common Stock

DryShips shall cause the shares of Ocean Rig common stock that are to be delivered to the holders of OceanFreight common stock pursuant to the surrender and payment provisions under the merger agreement to be free of any mortgage, lien, pledge, hypothecation, charge, security interest, infringement, interference, right of first refusal, right of first offer, preemptive right, option, community property right or other adverse claim or encumbrance and restrictions on transfer, except those imposed by applicable law, and preemptive rights at the time of such delivery.

### Covenants of DryShips

#### *Obligations of Pelican Stockholdings Inc.*

DryShips has agreed that it will take all necessary action to cause its wholly-owned subsidiary, Pelican Stockholdings Inc., to perform its obligations under the merger agreement.

### Voting of DryShips Shares

DryShips has agreed that it will cause all shares of OceanFreight common stock owned beneficially or of record by it, Pelican Stockholdings Inc. or any of DryShips' other subsidiaries to be voted in favor of adopting the merger agreement. Prior to the effective time of the merger, DryShips will not vote any such shares in favor of the removal of any OceanFreight director or in favor of the election of any director not approved by the OceanFreight Special Committee.

### Indemnification and Director and Officer Liability

DryShips has agreed that it will cause OceanFreight, and OceanFreight has agreed that:

- for six years after the effective time of the merger, OceanFreight will indemnify and hold harmless the present and former officers and directors of OceanFreight and its subsidiaries in respect of acts or omissions in their capacities as officers or directors prior to the effective time of the merger to the fullest extent permitted by the MIBCA or any other applicable law or provided under OceanFreight's articles of incorporation and bylaws in effect on the date of the merger agreement;

- for six years after the effective date of the merger, DryShips will maintain provisions in the articles of incorporation and bylaws of OceanFreight or any successor regarding elimination of liability of directors, indemnification and advancement of expenses that are no less advantageous to the intended beneficiaries than the provisions existing on the date of the merger agreement;

- prior to the effective time of the merger, OceanFreight will obtain and fully pay the premium for the non-cancellable extension of directors' and officers' insurance policies and OceanFreight's existing fiduciary liability insurance policies for a discovery period of at least six years for claims relating to any time before the effective time of the merger, or, OceanFreight shall, and DryShips shall cause OceanFreight to, maintain OceanFreight's existing cover or equivalent cover for at least six years, subject to a cap on the cost of such cover;

- if DryShips, OceanFreight or any of its successors or assigns consolidates or merges into any other entity or transfers or conveys substantially all its properties and assets, the surviving entity will assume the directors and officers' liability provisions laid out in the merger agreement; and

- the rights of any indemnified person will survive consummation of the merger and will be enforceable by each indemnified person.

### Stock Exchange Listing

DryShips will use its reasonable best efforts to cause Ocean Rig to take all necessary actions under applicable laws and the rules of NASDAQ to ensure that the shares of Ocean Rig common stock comprising the merger consideration are listed on NASDAQ prior to or as of the effective time of the merger.

## Covenants of DryShips and OceanFreight

DryShips and OceanFreight have agreed that:

- as soon as reasonably practicable after the date of the merger agreement, DryShips and OceanFreight shall prepare, and DryShips shall cause Ocean Rig to file with the SEC, a registration statement on Form F-4 to register under the Securities Act the shares of Ocean Rig common stock to be distributed in the merger, which will include a prospectus with respect to the shares of Ocean Rig common stock and a proxy statement to be sent to OceanFreight's shareholders relating to the OceanFreight shareholders' meeting;

- they will cooperate in the processing of the Form F-4 in order to cause the Form F-4 to be declared and remain effective under the Securities Act and comply with other applicable laws;

- if prior to the effective time of the merger, any event or change occurs that requires an amendment or supplement to the Form F-4, they will inform the other thereof and cooperate in the filing of any amendment

84

to the F-4 or the proxy statement required by law, and, if required disseminate such information to OceanFreight's shareholders;

- as soon as reasonably practicable after the date of the merger agreement, OceanFreight will give notice of, convene and hold a shareholders' meeting to seek approval of the merger agreement, which approval shall be recommended by the OceanFreight Special Committee and the OceanFreight board of directors, except as set forth above, and which meeting shall be held, even if an adverse recommendation has been made;

- OceanFreight and DryShips will use reasonable best efforts to take all actions necessary, proper or advisable under applicable law to consummate the merger including promptly preparing and filing any required documentation and obtaining and maintaining all approvals, consents, registrations, permits authorization and other required confirmations. However, DryShips, Pelican Stockholdings Inc. and OceanFreight will not be required, without DryShips' prior written consent, to consent to any sale or disposal of, or material restriction on, any material portion of the assets or business of the business of DryShips, OceanFreight, Pelican Stockholdings Inc. or any of their subsidiaries;

- DryShips and OceanFreight will consult with each other before making any press release or communication with the press or public;

- at and after the effective time of the merger, OceanFreight's officers and directors will be authorized to execute and deliver on behalf of OceanFreight and Pelican Stockholdings Inc. any required deeds, bills of sale, assignments or assurances, and to take any actions to vest, perfect or confirm of record any and all right, title and interest in, to and under any of the rights, properties or assets of OceanFreight acquired as a result of or in connection with the merger;

- prior to the effective time of the merger, OceanFreight will cooperate with DryShips and use reasonable best efforts to enable the de-listing of OceanFreight common stock from the NASDAQ Global Market and deregistration of OceanFreight common stock under the Exchange Act as promptly as practicable, and not more than ten days after the effective time of merger;

- DryShips, OceanFreight and Pelican Stockholdings Inc. will each use reasonable best efforts to grant any approvals and take any actions reasonably necessary with relation to any antitakeover or similar statute or antitakeover provisions of their articles of incorporation or bylaws so that the transactions contemplated by the merger agreement may be consummated as promptly as practicable; and

- DryShips and OceanFreight will promptly notify each other of any notice relating to (i) alleged consent required, (ii) any governmental notice or communication, (iii) any actions, suits, claims, investigations or proceedings affecting or relating to OceanFreight, DryShips, or any of either of their respective subsidiaries, if notification would have been required pursuant to the merger agreement, (iv) any inaccuracy of any representation or warranty contained in the merger agreement that could reasonably be expected to cause closing of the merger not to occur, and (v) any failure of DryShips or OceanFreight to comply with any covenant, condition or agreement under the merger agreement.

## Conditions to the Merger

Each party's obligation to complete the merger is subject to the satisfaction of the following conditions:

- the merger agreement shall have been approved by a majority of the outstanding OceanFreight common stock in accordance with the MIBCA;

- no law, rule or regulation or any order, injunction, judgment, decree or similar requirement of any governmental authority to which any of the parties or by which any of the parties is subject or bound preventing or prohibiting the consummation of the merger shall be in effect;

- the Form F-4 registration statement as to which this proxy statement / prospectus forms a part shall have become effective under the Securities Act and shall not be the subject of any stop order suspending or seeking to suspend the effectiveness of the statement; provided this condition need not be satisfied after 5:30 p.m. New York time on January 26, 2012; and

- the shares of Ocean Rig common stock included in the merger consideration shall have been approved for listing on NASDAQ, subject to the completion of the merger; provided this condition need not be satisfied after 5:30 p.m. New York time on January 26, 2012.

The obligations of OceanFreight to effect the merger are also subject to the satisfaction by DryShips of the following conditions (as of the purchase agreement closing date, the merger closing date, and/or a specified date as set forth in the representation and warranty):

- the representations and warranties of DryShips set forth in the merger agreement regarding organization and existence and authority to enter into the agreement being true and correct in all material respects (disregarding materiality and material adverse effect qualifications relating to DryShips and Ocean Rig); the representations and warranties of DryShips regarding capitalization of Ocean Rig set forth in the merger agreement shall be true and correct; and the other representations and warranties of DryShips set forth in the merger agreement or any other writing delivered by DryShips pursuant to the merger agreement shall be true and correct (disregarding materiality and material adverse effect qualifications relating to DryShips and Ocean Rig), except as, individually or in the aggregate, has not had or would not reasonably be expected to result in a material adverse effect of DryShips or Ocean Rig;

- the performance by DryShips and Pelican Stockholdings Inc. in all material respects of the obligations required to be performed by them under the merger agreement;

- since the date of the merger agreement, there shall not have been any event, change, circumstance, occurrence, effect or state of facts that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on DryShips or Ocean Rig; and

- DryShips shall have delivered to OceanFreight a certificate, executed by an executive officer of DryShips to the effect that the conditions set out above have been satisfied.

The obligations of DryShips and Pelican Stockholdings Inc. to effect the merger are also subject to the satisfaction by OceanFreight of the following conditions:

- as of the earlier of the purchase agreement closing date, which occurred on August 24, 2011, or the merger closing date, or as of a specified date set forth in the representation and warranty, the representations and warranties of OceanFreight set forth in the merger agreement regarding organization, existence and authority to enter into the agreement, and non-compete arrangements being true and correct in all material respects (disregarding materiality and material adverse effect qualifications relating to OceanFreight); the representations and warranties of OceanFreight set forth in the merger agreement regarding capitalization being true and correct, and the other representations and warranties of OceanFreight set forth in the merger agreement or other writing delivered by OceanFreight pursuant to the merger agreement (disregarding materiality and OceanFreight material adverse effect qualifications) shall be true and correct, except where, individually or in the aggregate, it would not reasonably be expected to have an OceanFreight material adverse effect, and the receipt of an officer's certificate to that effect;

- the performance by OceanFreight in all material respects of the obligations required to be performed by it under the merger agreement, and the receipt of an officer's certificate to that effect;

- as of the earlier of the purchase agreement closing date, which occurred on August 24, 2011, or the merger closing date, or as of a specified date set forth in the representation and warranty, there shall not have been any event, change, circumstance, occurrence, effect or state of facts that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on OceanFreight; and

- OceanFreight shall have delivered to DryShips a certificate, executed by an executive officer of OceanFreight to the effect that the conditions set out above have been satisfied.

Notwithstanding the foregoing, if the closing of the purchase agreement occurs prior to the merger, as it did, the only condition OceanFreight will be required to satisfy is OceanFreight's performance in all material respects of the obligations required to be performed by it under the merger agreement, and the delivery of an officer's certificate to that effect.

**Termination**

The merger agreement may be terminated at any time prior to the effective time of the merger, notwithstanding the approval of the merger agreement by the OceanFreight shareholders (provided that a majority vote of the OceanFreight Special Committee shall be necessary for termination by OceanFreight and the OceanFreight Special Committee may prosecute any action related to the merger agreement and the purchase agreement on behalf of OceanFreight):

- by mutual written agreement of OceanFreight and DryShips;

- by either OceanFreight or DryShips, if:

  - the effective time of merger shall not have occurred on or before March 26, 2012; or

  - there shall be any applicable law that prohibits OceanFreight, DryShips, or Pelican Stockholdings Inc. from consummating the merger and such prohibition shall have become final and nonappealable;

- by OceanFreight, if DryShips and Pelican Stockholdings Inc. shall have breached or failed to perform any of their respective covenants or obligations required to be performed by each of them under the merger agreement, if any representation or warranty of DryShips and Pelican Stockholdings Inc. shall have become untrue or if any other event, change, circumstance, occurrence, effect or state of facts shall have occurred, in each case which breach or failure to perform or to be true or event, change, circumstance, occurrence, effect or state of facts, individually or in the aggregate, has resulted or would reasonably be expected to result in material breach by DryShips, and such material breach by DryShips cannot be or, to the extent curable by DryShips or Pelican Stockholdings Inc., has not been cured by the earlier of March 26, 2012, and twenty days after giving written notice to DryShips of such breach or failure;

- by OceanFreight, prior to August 23, 2011, in relation to a superior proposal (in accordance with the requirements set out above), provided that OceanFreight paid to DryShips the termination fee described below, and immediately following termination of the merger agreement OceanFreight entered into a definitive agreement with respect to a superior proposal;

- by DryShips:

  - if OceanFreight shall have breached or failed to perform any of its covenants or obligations required under the merger agreement (other than the covenants or obligations relating to the prohibition on solicitation which are addressed above) which breach or failure to perform, individually or in the aggregate has resulted or would reasonably be expected to result in a material breach of covenant by OceanFreight, which cannot be or, to the extent curable by OceanFreight, has not been cured by the earlier of March 26, 2012 and twenty days after giving written notice to OceanFreight of such breach or failure; or

  - On or prior to the purchase agreement closing date, which occurred on August 24, 2011, if any representation or warranty of OceanFreight became untrue or if any other event, change, circumstance, occurrence, effect or state of facts occurred, in each case which failure to be true or any event, change, circumstance, occurrence, effect or state of facts, individually or in the aggregate, had resulted in or had reasonably been expected to result in the failure of a condition to DryShips' obligation to close; and

- by DryShips prior to the purchase agreement closing date, which occurred on August 24, 2011, if:

  - the OceanFreight Special Committee made an adverse recommendation in respect of the merger;

  - OceanFreight entered into a binding agreement (other than a confidentiality agreement contemplated by the merger agreement) with a third party relating to any acquisition proposal;

  - the OceanFreight Special Committee or the OceanFreight board of directors failed publicly to reaffirm its recommendation of the merger agreement or the merger within five business days of receipt of a written request by DryShips or Pelican Stockholdings Inc. to provide such reaffirmation following an acquisition proposal from a third party; or

  - OceanFreight or any of its representatives materially breached any of its obligations under the non-solicitation provisions under the merger agreement.

The party desiring to terminate the merger agreement as described above shall give written notice of such termination to the other party.

**Effect of Termination**

If the merger agreement is terminated as described above, the merger agreement shall become void and of no effect without liability of any party (or any shareholder, director, officer, employee, agent, consultant or representative of such party), except that certain provisions of the merger agreement (including the provision for a termination fee) will remain in full force and effect and if the termination shall result from the intentional breach (meaning a material breach that is a consequence of an act undertaken by the breaching party with the intention of breaching the applicable obligation), such party shall be fully liable for any and all liabilities and damages incurred or suffered by the other party as a result of such failure.

**Termination Fee and Expenses**

If (i) the merger agreement is terminated by DryShips as a result of a material breach by OceanFreight of its covenants or obligations, (ii) an acquisition proposal to acquire at least 45% of the assets or common stock of OceanFreight is made prior to termination of the merger agreement, and (iii) prior to the first anniversary of the date of termination, OceanFreight enters into a definitive agreement with respect to or recommends to its shareholders any acquisition proposal involving 45% or more of the assets or common stock of OceanFreight or any such acquisition proposal shall have been consummated, then OceanFreight will be required to pay a termination fee of $4.5 million to DryShips in immediately available funds within two business days after the occurrence of the last of the events described in this paragraph.

Additionally, a termination fee would have been payable in two additional circumstances that are no longer applicable. First, if the merger agreement was terminated by DryShips prior to the closing of the purchase agreement, which occurred on August 24, 2011, and pursuant to the merger agreement in the event that (i) prior to the purchase agreement closing date, the OceanFreight Special Committee or the OceanFreight board of directors made an adverse recommendation, (ii) OceanFreight entered into a binding agreement (other than a confidentiality agreement contemplated by the merger agreement) relating to any third-party acquisition proposal, (iii) the OceanFreight Special Committee or the OceanFreight board of directors failed publicly to reaffirm its recommendation of the merger agreement or the transaction contemplated thereby within five business days of receipt of a written request by DryShips or Pelican Stockholdings Inc. to provide such a reaffirmation following any third-party acquisition proposal, or (iv) OceanFreight or any of its representatives materially breached any of its obligations relating to the prohibition on solicitation under the merger agreement, then OceanFreight would have been required to pay to DryShips in immediately available funds a termination fee of $4.5 million in cash within two business days after such termination.

Second, if the merger agreement was terminated by OceanFreight prior to August 23, 2011 after receipt of a superior proposal (and in accordance with the provisions set out above), then OceanFreight would have been required to pay to DryShips in immediately available funds a termination fee of $4.5 million in cash at the time of such termination.

OceanFreight acknowledges that the provisions relating to a termination fee are an integral part of the transactions contemplated by the merger agreement and that, without these termination fee provisions, DryShips would not have entered into the merger agreement. Accordingly, if OceanFreight fails promptly to pay any amount due to DryShips pursuant to the merger agreement, it shall also pay any costs and expenses incurred by DryShips or Pelican Stockholdings Inc. in connection with a legal action to enforce the merger agreement that results in a judgment against OceanFreight for such amount, together with interest on the amount of any unpaid fee, cost or expense at the publicly announced prime rate of Citibank, N.A. from the date such fee, cost or expense was required to be paid to (but excluding) the payment date.

DryShips and Pelican Stockholdings Inc. agree that, upon any termination of the merger agreement under circumstances where the termination fee is payable by OceanFreight pursuant to the merger agreement and such termination fee is paid in full, DryShips and Pelican Stockholdings Inc. shall be precluded from any other remedy against OceanFreight, at law or in equity or otherwise, and neither DryShips nor Pelican Stockholdings Inc. shall seek to obtain any recovery, judgment, or damages of any kind, including consequential, indirect, or punitive

damages, against OceanFreight or any of OceanFreight's subsidiaries or any of their respective directors, officers, employees, partners, managers, members, shareholders or affiliates or their respective representatives in connection with the merger agreement or the transactions contemplated thereby.

### Specific Performance

The parties to the merger agreement agree that irreparable damage would occur if any provision of the merger agreement were not performed in accordance with the terms provided and that the parties shall be entitled to an injunction or injunctions to prevent breaches of the merger agreement or to enforce specifically the performance of the terms and provisions in any federal court located in the State of New York or any New York state court, in addition to any other remedy to which they are entitled at law or in equity.

### Amendment and Waiver

Any provision of the merger agreement may be amended or waived prior to the effective time of the merger only if such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to the merger agreement or, in the case of a waiver, by each party against whom the waiver is to be effective; provided that (i) any such amendment shall require the approval of a majority of the OceanFreight Special Committee and (ii) after approval of the merger by OceanFreight shareholders, no amendment or waiver that would require the further approval of the OceanFreight shareholders under the MIBCA may be made without such further shareholder approval.

No failure or delay by any party in exercising any right, power or privilege under the merger agreement will operate as a waiver thereof nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided under the merger agreement will be cumulative and not exclusive of any rights or remedies provided by applicable law.

### Governing Law and Jurisdiction

The merger agreement is governed by New York law except to the extent that the law of the Marshall Islands is mandatorily applicable to the merger. The parties have consented to the jurisdiction of certain federal and state courts sitting in New York.

## THE PURCHASE AND SALE AGREEMENT

*The following is a summary of the material terms of the purchase agreement. The description may not contain all of the information that may be important to you and is qualified in its entirety by reference to the purchase agreement, which is included as Annex B to this document. Ocean Rig and OceanFreight urge you to read the entire purchase agreement carefully.*

*The purchase agreement contains representations and warranties that each of DryShips, the Sellers (defined below) and OceanFreight made as of specific dates. The assertions made in those representations and warranties were made solely for purposes of the contract among DryShips, the Sellers and OceanFreight and may be subject to important qualifications and limitations agreed to by the parties in connection with negotiating the terms of the purchase agreement. In addition, some of those representations and warranties may not be accurate or complete as of any specified date, may be subject to a contractual standard of materiality different from what might be viewed as material to shareholders, or may have been used for purposes of allocating risk between the respective parties rather than establishing matters as facts. Shareholders and other investors are not third-party beneficiaries under the purchase agreement and should not rely on the representations, warranties and covenants or any descriptions thereof as characterizations of the actual state of facts or conditions of DryShips, the Sellers or OceanFreight or any of their respective subsidiaries or affiliates.*

### The Purchase

On July 26, 2011, DryShips entered into a purchase agreement with Basset Holdings Inc., Steel Wheel Investments Limited and Haywood Finance Limited, or collectively, the Sellers (each of which is controlled by Mr. Kandylidis) and OceanFreight, pursuant to which DryShips acquired approximately 50.5% of the shares of OceanFreight, or the Seller Shares.

### Closing

The closing of the purchase and sale of the Seller Shares took place on August 24, 2011.

### Purchase Consideration

The consideration paid by DryShips for each share of OceanFreight owned by the Sellers consisted of (x) $11.25 in cash and (y) 0.52326 shares of Ocean Rig common stock (with cash paid in lieu of fractional shares). If the merger converts into an all-cash transaction pursuant to the terms of the merger agreement, the Sellers or their designees will be entitled to require DryShips to purchase the shares of Ocean Rig common stock that the Sellers or their designees received pursuant to the purchase agreement for a price of $21.50 per share of Ocean Rig common stock in cash, and DryShips will have a reciprocal right to acquire those shares at the same price.

### Voting Agreement; Irrevocable Proxy

For the term of the purchase agreement, each of the Sellers had agreed that at any shareholder meeting it would vote (or cause to be voted) all of its Seller Shares in favor of the approval and adoption of the merger agreement and the merger, and only as directed by DryShips with respect to any action that would reasonably be expected to (i) frustrate the purposes of the purchase or sale or the merger or any other transactions contemplated by the purchase agreement and the merger agreement, (ii) breach any representation, warranty, covenant or agreement in the purchase agreement or the merger agreement or result in any of their conditions not being satisfied, (iii) result in any extraordinary transaction involving OceanFreight (other than the merger) or (iv) result in certain changes of the business, management or the board of directors of OceanFreight. Each of the Sellers had further appointed DryShips as attorney-in-fact and proxy for and on behalf of such Seller, to attend any and all shareholder meetings and vote in accordance with the voting agreement.

**Representations and Warranties**

DryShips made customary representations and warranties to the Sellers. DryShips' representations and warranties in the purchase agreement relate to:

- corporate organization, due authorization to enter into, deliver, and carry out the obligations under, the purchase agreement and the enforceability of the purchase agreement;

- valid issuance and freedom from liens, encumbrances and certain restrictions on transfer of the Ocean Rig common stock that was delivered to the Sellers;

- absence of any claims for fees, commissions or compensation against the Sellers as a result of the purchase and sale;

- non-contravention, as a result of the execution of the purchase agreement or implementation of the transactions contemplated thereby, of laws, regulations or orders to which DryShips is subject, or of contracts or other arrangements by which DryShips is bound; and

- sophistication of DryShips as an investor and certain representations relating to compliance with the federal securities laws.

The Sellers also made customary representations and warranties to DryShips. The Sellers' representations and warranties in the purchase agreement relate to:

- corporate organization and due authorization to enter into, deliver, and carry out the obligations under, the purchase agreement, and the enforceability of the purchase agreement;

- Mr. Kandylidis' status as the controlling shareholder of each Seller, and each Seller's ownership of the Seller Shares free from liens and encumbrances and with the ability to deliver the Seller Shares with good title and free from liens and encumbrances;

- non-ownership of OceanFreight common stock (other than the Seller Shares), options, warrants or other rights to acquire OceanFreight common stock;

- non-contravention, as a result of the execution of the purchase agreement or implementation of the transactions contemplated thereby, of laws, regulations or orders to which the Sellers or Mr. Kandylidis are subject, or of contracts or other arrangements by which the Sellers or Mr. Kandylidis are bound;

- absence of certain restrictions on, or prerequisites to, transfer of the Seller Shares;

- absence of claims for fees, commissions or compensation against DryShips as a result of the purchase and sale, except as described below under fees and expenses; and

- sophistication of the Sellers as investors and certain representations relating to compliance with the federal securities laws.

OceanFreight also made certain representations and warranties to DryShips in the purchase agreement. Specifically, OceanFreight represented and warranted that it had irrevocably taken all actions required to:

- exempt the transactions contemplated by the purchase agreement from all anti-takeover laws and provisions in the certificate of incorporation and bylaws;

- avoid distribution and exercise of rights under OceanFreight's rights plan; and

- vest all of the Seller Shares and eliminate restrictions on their transfer.

**Covenants**

The purchase agreement contains certain covenants, including covenants relating to:

- refraining from certain actions that are inconsistent with the purchase agreement or the merger agreement, and taking of certain actions to implement the same;

- public announcements;

- notification to DryShips in the case of acquisition by the Sellers of new shares of OceanFreight;

- absence of any obligation to disclose material non-public information;

- six-month restriction on post-acquisition transfer, or lock up, for the Ocean Rig shares acquired in the transaction by the Sellers or any of their assignees; and

- undertaking of DryShips to cause Ocean Rig to provide customary registration rights at the end of the lock-up period in the event that the shares are not readily transferable on a basis exempt from registration under the U.S. securities laws.

### Non-Solicitation

Pursuant to the purchase agreement, the Sellers agreed to cease all existing discussions and negotiations with any person with respect to any acquisition proposal with respect to OceanFreight as described in "The Merger Agreement — No Solicitation," or any offer, proposal or indication of interest by a third party to purchase the Seller Shares. The Sellers agreed that they would not, and would use their reasonable best efforts to cause their officers, directors, agents or representatives not to, solicit, initiate or knowingly take any action to facilitate or encourage the submission of any acquisition proposal with respect to OceanFreight or an offer, proposal or indication of interest by a third party to purchase the Seller Shares. The Sellers further agreed to notify the OceanFreight Special Committee upon receipt of any such proposal or upon receipt of a request for non-public information relating to the Seller Shares or OceanFreight and its subsidiaries.

### Waivers

Each of the Sellers has irrevocably waived rights, if any, of dissenting shareholders in respect of the Seller Shares that may arise with respect to the merger or the transactions contemplated by the merger agreement.

### Conditions to the Closing of the Purchase and Sale

Each party's obligation to complete the sale of shares was subject to the satisfaction of the condition that no law, rule or regulation or any order, injunction, judgment decree or similar requirement of any governmental authority to which any of the parties or by which any of the parties was subject or bound, preventing or prohibiting the consummation of the purchase and sale, was in effect.

The obligation of DryShips to consummate the purchase was also subject to the satisfaction of the following conditions:

- the satisfaction of the conditions to the obligations of DryShips and Pelican Stockholdings Inc. to consummate the merger as set forth in the merger agreement (except that those conditions that by their terms apply at the time the merger becomes effective shall be measured as if they applied as of the closing date of the purchase and sale, which occurred on August 24, 2011). See "The Merger Agreement — Conditions to the Merger" for a description of the conditions that have to be satisfied;

- the performance by the Sellers in all material respects of their obligations required to be performed by them under the purchase agreement at or prior to the closing date of the purchase and sale, which occurred on August 24, 2011;

- the representations and warranties of the Sellers and OceanFreight set forth in the purchase agreement being true and correct in all material respects as of the date of the purchase agreement and as of the closing date of the purchase and sale, which occurred on August 24, 2011, except for representations and warranties made as of a specified date which are being measured only as of such specified date.

92

The obligation of the Sellers to consummate the sale was also subject to the satisfaction of the following conditions:

- the satisfaction of the conditions to the obligations of OceanFreight to consummate the merger set forth in the merger agreement (except that those conditions that by their terms apply at the effective time of the merger shall be measured as if they applied as of the closing date of the purchase and sale, which occurred on August 24, 2011). See "The Merger Agreement — Conditions to the Merger" for a description of the conditions that have to be satisfied;

- the performance by DryShips in all material respects of its obligations required to be performed by it under the purchase agreement at or prior to the closing date of the purchase and sale, which occurred on August 24, 2011;

- the representations and warranties of DryShips set forth in the purchase agreement being true and correct in all material respects as of the date of the purchase agreement and as of the closing date of the purchase and sale, which occurred on August 24, 2011, except for representations and warranties made as of a specified date which are being measured only as of such specified date.

**Termination; Effect of Termination**

Prior to the closing date of the purchase and sale, which occurred on August 24, 2011, DryShips and the Sellers had the right to terminate the purchase agreement by mutual written consent. The purchase agreement also would have terminated automatically as of the earlier of the termination of the merger agreement or the time the merger becomes effective.

If the purchase agreement had terminated, it would have become void and neither party would have had any liability to the other party, except that certain provisions of the purchase agreement would have remained in full force and effect and no party would have been released from any liabilities arising from its willful breach of any provision of the purchase agreement.

**Expenses; Fees**

The purchase agreement provides that all costs, fees and expenses incurred in connection with the purchase agreement will be paid by or on behalf of the party incurring such cost or expense, except for legal fees and advisory fees up to an aggregate maximum amount of $1,500,000 incurred in connection with the purchase agreement by the Sellers, which will be paid by OceanFreight upon consummation of the merger.

**Assigns**

Prior to the closing of the purchase and sale, which occurred on August 24, 2011, each Seller had the right to designate up to three persons to receive the purchase consideration in lieu of such Seller. In order to transfer the share portion of the purchase consideration to any such designee, the Seller was required to comply with various restrictions under the U.S. securities laws, including requirements relating to the exemption from registration under Regulation S for offshore transactions. Each of the Sellers designated an affiliate, Skidrow Investments Limited, to receive that part of the purchase consideration comprised of Ocean Rig common stock.

**Governing Law and Jurisdiction**

The purchase agreement is governed by New York law except to the extent that the law of the Republic of the Marshall Islands mandatorily applies to the documents relating to the transfer of the shares. The parties consented to the jurisdiction of certain federal and state courts sitting in New York.

## OCEAN RIG CAPITALIZATION

The following table sets forth Ocean Rig's cash position and consolidated capitalization as of June 30, 2011:

- on an actual basis;

- on an as adjusted basis to give effect to:

  (i)   a net increase in bank debt, net of financing fees, of $641.3 million as a result of:

       1.   proceeds, less financing fees, of $308.2 million under the Deutsche Bank credit facilities to fund construction costs of the *Ocean Rig Poseidon* ;

       2.   the repayment of $57.0 million under Ocean Rig's $1.04 billion credit facility and the repayment of $16.7 million under the $800.0 million credit facility; and

       3.   The drawdown of $406.8 million under the Deutsche Bank credit facilities to fund construction costs of the *Ocean Rig Mykonos* ;

  (ii)   the payment of $309.3 million to fund the final construction costs of the *Ocean Rig Poseidon* ;

  (iii)   the payment of $305.7 million to fund the final construction costs of the *Ocean Rig Mykonos* ;

  (iv)  the payment of $4.7 million to fund the upgraded costs to the *Ocean Rig Mykonos* ; and

  (v)   a net decrease in restricted cash of $53.7 million as a result of:

       1.   the restriction of $8.9 million due to the restructuring of the Deutsche Bank credit facilities; and

       2.   the release of $62.6 million in cash collateral due to the restructuring of the Deutsche Bank credit facilities.

| | As of June 30, 2011 | |
| --- | --- | --- |
| | Actual | As Adjusted |
| | (In thousands of U.S. dollars) | |
| **Cash and cash equivalents** | $ 191,744 | $ 267,167 |
| **Restricted cash(1)** | $ 220,192 | $ 166,448 |
| Total secured bank debt, including current portion | 1,622,537 | 2,263,833 |
| 9.5% senior unsecured notes | 500,000 | 500,000 |
| **Total debt(2)** | $2,122,537 | $2,763,833 |
| **Shareholders' equity** | | |
| Common stock, $0.01 par value; 1,000,000,000 shares authorized (actual and as adjusted); 131,696,928 shares issued and outstanding (actual and as adjusted) | 1,317 | 1,317 |
| Preferred stock, $0.01 par value; 500,000,000 shares authorized (actual and as adjusted); 0 shares issued and outstanding (actual and as adjusted) | | |
| Additional paid-in capital | 3,467,301 | 3,467,301 |
| Accumulated other comprehensive loss | (57,103) | (57,103) |
| Retained earnings | (506,525) | (506,525) |
| **Total shareholders' equity** | 2,904,990 | 2,904,990 |
| **Total capitalization** | $5,027,527 | $5,668,823 |

(1) Restricted cash represents bank deposits to be used to fund loan installments coming due and minimum cash deposits required to be maintained with certain banks under Ocean Rig's borrowing arrangements.

(2) Includes $1.6 billion of secured and guaranteed debt and $0.5 billion of unsecured debt as of June 30, 2011 and $1.6 billion of secured and guaranteed debt and $0.5 billion of unsecured debt, which is not guaranteed, as of June 30, 2011, as so adjusted. As of June 30, 2011, DryShips provided guarantees under the two Deutsche Bank credit facilities. Ocean Rig's $1.04 billion credit facility is guaranteed by certain of its subsidiaries.

## OCEAN RIG MANAGEMENT'S DISCUSSION AND ANALYSIS OF OCEAN RIG'S FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following is a discussion of the financial condition and results of operations of Ocean Rig and its wholly-owned subsidiaries for the years and periods referenced below. You should read this section together with the historical consolidated financial statements, including the notes to those historical consolidated financial statements, for those same years and periods included in this document. All of the consolidated financial statements included herein have been prepared in accordance with U.S. GAAP. See " — Results of Operations."

This proxy statement / prospectus contains forward-looking statements. These forward-looking statements are based on Ocean Rig's current expectations and observations. Included among the factors that, in Ocean Rig's view, could cause actual results to differ materially from the forward-looking statements contained in this proxy statement / prospectus are those discussed in sections entitled "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements."

### Overview

Ocean Rig is an international offshore drilling contractor providing oilfield services and drilling vessels for offshore oil and gas exploration, development and production drilling, and specializing in the ultra-deepwater and harsh-environment segment of the offshore drilling industry. Ocean Rig currently owns and operates two modern, fifth generation ultra-deepwater semi-submersible offshore drilling rigs, the *Leiv Eiriksson* and the *Eirik Raude* , and four sixth generation, advanced capability ultra-deepwater drillships, the *Ocean Rig Corcovado,* which was delivered to Ocean Rig on January 3, 2011, the *Ocean Rig Olympia* , which was delivered to Ocean Rig on March 30, 2011, the *Ocean Rig Poseidon* , which was delivered to Ocean Rig on July 28, 2011, and the *Ocean Rig Mykonos* , which was delivered to Ocean Rig on September 30, 2011. Ocean Rig has newbuilding contracts with Samsung for the construction of three seventh generation, advanced capability ultra-deepwater drillships. These newbuilding drillships are currently scheduled for delivery in July 2013, September 2013 and November 2013, respectively.

### History of Ocean Rig

Ocean Rig was formed under the laws of the Republic of the Marshall Islands on December 10, 2007, under the name Primelead Shareholders Inc. and as a wholly-owned subsidiary of DryShips.

Ocean Rig's predecessor, Ocean Rig ASA, was incorporated on September 26, 1996 under the laws of Norway and contracted for the construction of its two operating drilling rigs, the *Leiv Eiriksson* and the *Eirik Raude* . The shares of Ocean Rig ASA traded on the Oslo Stock Exchange from January 1997 to July 2008.

In December 2007, Primelead Limited, Ocean Rig's wholly-owned subsidiary, acquired approximately 30.4% of the outstanding capital stock of Ocean Rig ASA from Cardiff, a company controlled by the Chairman, President and Chief Executive Officer of DryShips and Ocean Rig. After acquiring more than 33% of Ocean Rig ASA's outstanding shares through a series of transactions through April 2008, Ocean Rig launched a mandatory offer for the remaining shares of Ocean Rig ASA at a price of NOK45 per share, or $8.89 per share, as required by Norwegian law. In May 2008, Ocean Rig concluded a guarantee facility of NOK5.0 billion, or $974.5 million, and a term loan facility of $800 million, which Ocean Rig refers to collectively as the Acquisition Facility, in order to guarantee the purchase price of the shares of Ocean Rig ASA acquired through the mandatory offer. Ocean Rig gained control over Ocean Rig ASA on May 14, 2008. The results of operations related to the acquisition are included in Ocean Rig's consolidated financial statements as of May 15, 2008. As of July 10, 2008, Ocean Rig held 100% of the shares of Ocean Rig ASA, or 163.6 million shares, which it acquired at a total cost of $1.4 billion.

With respect to the acquisition of Ocean Rig ASA, discussed above, DryShips purchased 4.4% of the share capital of Ocean Rig ASA from companies affiliated with its Chairman, President and Chief Executive Officer. In March 2009, DryShips contributed to Ocean Rig all of its equity interests in the newbuilding vessel-owning companies of the *Ocean Rig Poseidon* and *Ocean Rig Mykonos* . In May 2009, Ocean Rig acquired the equity interests of Drillships Holdings Inc., the owner of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* , from third parties and entities affiliated with Ocean Rig's Chairman, President and Chief Executive Officer and, in exchange, Ocean Rig issued to the sellers common shares equal to 25% of its total issued and outstanding common shares as of

May 15, 2009. In connection with the acquisition the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* , Ocean Rig incurred debt obligations of $230.0 million, which have been repaid in full. In July 2009, DryShips acquired the remaining 25% of its total issued and outstanding capital stock from the minority interests held by third parties and entities controlled by Ocean Rig's Chairman, President and Chief Executive Officer for a $50.0 million cash payment and the issuance of DryShips Series A Convertible Preferred Stock with an aggregate face value of $280.0 million, following which Ocean Rig became a wholly-owned subsidiary of DryShips.

On December 21, 2010, Ocean Rig completed the sale of an aggregate of 28,571,428 of its common shares (representing approximately 22% of Ocean Rig's outstanding common stock) in the private offering. A company controlled by Ocean Rig's Chairman, President and Chief Executive Officer, Mr. George Economou, purchased 2,869,428 shares, or 2.38% of Ocean Rig's outstanding common stock, in the private offering at the offering price of $17.50 per share. Ocean Rig received approximately $488.3 million of net proceeds from the private offering, of which Ocean Rig used $99.0 million to purchase an option contract from DryShips, its parent company, for the construction of up to four ultra-deepwater drillships, as discussed below. Ocean Rig applied the remaining proceeds to partially fund remaining installment payments for its newbuilding drillships and for general corporate purposes.

Following the completion of Ocean Rig's private offering on December 21, 2010, DryShips owned approximately 78% of Ocean Rig's outstanding common stock. As of the date of this proxy statement / prospectus, DryShips owns approximately 75% of Ocean Rig's outstanding common stock.

On April 27, 2011, Ocean Rig completed the issuance of $500.0 million aggregate principal amount of 9.5% senior unsecured notes due 2016 offered in a private placement. The net proceeds from the notes offering of approximately $487.5 million are expected to be used to finance Ocean Rig's newbuilding drillships program and for general corporate purposes. See "Business — Description of Indebtedness."

**Drilling Rigs**

Ocean Rig drilling rigs are marketed for offshore exploration and development drilling programs worldwide, with particular focus on drilling operations in ultra-deepwater and harsh environments. The *Leiv Eiriksson* , delivered in 2001, has a water depth drilling capacity of 7,500 feet. Since 2001, it has drilled 35 deepwater and ultra-deepwater wells in a variety of locations, including Angola, Congo, Norway, the U.K. and Ireland in addition to five shallow-water wells. In October 2009, the *Leiv Eiriksson* completed the Shell contract. In April 2009, the *Leiv Eiriksson* entered into a three-year contract with Petrobras Oil & Gas for drilling operations in the Black Sea, offshore of Turkey, which was originally scheduled to expire in October 2012, but pursuant to an agreement with Petrobras Oil & Gas, the contract terminated on April 10, 2011.

The *Eirik Raude* , delivered in 2002, has a water depth drilling capacity of 10,000 feet. Since 2002, it has drilled 47 deepwater and ultra-deepwater wells in countries such as Canada, Ghana, Norway and the U.K., and the Gulf of Mexico, in addition to six shallow-water wells. In October 2008, the *Eirik Raude* commenced a three-year contract with Tullow Oil. The contract is scheduled to expire in October 2011.

**Drillships**

Ocean Rig took delivery of the *Ocean Rig Corcovado* , the *Ocean Rig Olympia*, the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* , its four sixth generation, advanced capability ultra-deepwater drillships on January 3, 2011, March 30, 2011, July 28, 2011 and September 30, 2011, respectively. In addition, Ocean Rig has entered into contracts with Samsung for the construction of three seventh generation advanced capability ultra-deepwater drillships, Ocean Rig's seventh generation hulls, which are scheduled for delivery in July 2013, September 2013 and November 2013, respectively.

Ocean Rig drillships are "sister-ships" constructed by the same shipyard to the same or similar design and specifications. Ocean Rig has secured employment for the *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* but not for its seventh generation hulls.

The total cost of construction and construction-related expenses for the *Ocean Rig Corcovado, the Ocean Rig Olympia, the Ocean Rig Poseidon* and the *Ocean Rig Mykonos* amounted to approximately $755.7 million, $756.9 million, $791.8 million and $784.4 million, respectively. Construction-related expenses include

equipment purchases, commissioning, supervision and commissions to related parties, excluding financing costs and fair value adjustments. As of September 30, 2011, Ocean Rig had made an aggregate of $726.7 million of construction and construction-related payments for its three seventh generation hulls and has remaining total construction and construction-related payments relating to these drillships of approximately $1.2 billion in the aggregate.

On November 22, 2010, DryShips, Ocean Rig's parent company, entered into a contract with Samsung that granted DryShips options for the construction of up to four additional ultra-deepwater drillships, which would be "sister-ships" to the *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* with certain upgrades to vessel design and specifications. The option agreement was novated by DryShips to Ocean Rig on December 30, 2010, at a cost of $99.0 million, which Ocean Rig paid from the net proceeds of a private offering of its common shares that Ocean Rig completed in December 2010. In addition, Ocean Rig paid additional deposits totaling $20.0 million to Samsung in the first quarter of 2011 to maintain favorable costs and yard slot timing under the option contract.

On May 16, 2011, Ocean Rig entered into an addendum to the option contract with Samsung, pursuant to which Samsung granted Ocean Rig the option for the construction of up to two additional ultra-deepwater drillships, which would be "sister-ships" to its drillships and its seventh generation hulls, with certain upgrades to vessel design and specifications. Ocean Rig did not pay slot reservation fees in connection with its entry into this addendum.

As of the date of this proxy statement / prospectus, Ocean Rig has exercised three of the six options and, as a result, has entered into shipbuilding contracts for its three seventh generation hulls with deliveries scheduled in July 2013, September 2013 and November 2013, respectively. Ocean Rig has made payments of $632.4 million to the shipyard in the second quarter of 2011 in connection with its exercise of the three newbuilding drillship options. The estimated total project cost per drillship is $638.0 million, which consists of $570.0 million of construction costs, costs of approximately $38.0 million for upgrades to the existing drillship specifications and construction-related expenses of $30.0 million. These upgrades include a 7 ram BOP, a dual mud system and, with the purchase of additional equipment, the capability to drill up to 12,000 feet water depth.

Ocean Rig may exercise its three newbuilding drillship options at any time on or prior to January 31, 2012, with vessel deliveries ranging from the first to the third quarter of 2014, depending on when the options are exercised. Ocean Rig estimates the total project cost, excluding financing costs, for the remaining three optional drillships to be $638.0 million per drillship, based on the construction and construction-related expenses for its seventh generation hulls described above.

As part of the novation of the contract described above, the benefit of the slot reservation fees passed to Ocean Rig. The amount of the slot reservation fees for its seventh generation hulls has been applied towards the drillship contract prices and the amount of the slot reservation fees applicable to one of the remaining three newbuilding drillship options will be applied towards the drillship contract price if the option is exercised.

**Recent Employment Contracts**

On October 11, 2010, Ocean Rig entered into contracts with Vanco for the *Ocean Rig Olympia* to drill a total of five wells for exploration drilling offshore of Ghana and Cote d'Ivoire at a maximum operating dayrate of $415,000 and a daily mobilization rate of $180,000, plus fuel costs. The drillship commenced the contracts upon its delivery on March 31, 2011. The aggregate contract term is for approximately one year, subject to Ocean Rig's customer's option to extend the term at the same dayrate for (i) one additional well, (ii) one additional year, or (iii) one additional well plus one additional year. Vanco is required to exercise the option no later than the date on which the second well in the five well program reaches its target depth.

On December 21, 2010, Ocean Rig entered into an agreement with Petrobras Oil & Gas pursuant to which the *Leiv Eiriksson* was released from the Petrobras contract on April 10, 2011 and, after its release, the rig commenced a contract with Cairn, which is described below.

In connection with the agreement described above, Ocean Rig entered into a 544-day contract, plus a mobilization period, with Petrobras Tanzania for the *Ocean Rig Poseidon* , which the drillship commenced in July

97

2011, for drilling operations offshore of Tanzania and West Africa at a maximum dayrate of $632,000, including a bonus of up to $46,000. In addition, Ocean Rig is entitled to receive a separate dayrate of $422,500 for up to 60 days during relocation and a mobilization dayrate of $317,000, plus fuel costs.

On January 3, 2011, Ocean Rig entered into a contract with Cairn for the *Leiv Eiriksson* for drilling operations in Greenland at a maximum operating dayrate of $560,000 and a mobilization fee of $7.0 million, plus fuel costs. The contract period will expire on October 31, 2011, subject to Ocean Rig's customer's option to extend the contract period through November 30, 2011.

On January 3, 2011, Ocean Rig entered into and commenced a contract of approximately ten months with Cairn for the *Ocean Rig Corcovado* for drilling operations in Greenland at a maximum operating dayrate of $560,000. In addition, Ocean Rig is entitled to a mobilization fee of $17.0 million, plus fuel costs and winterization upgrading costs of $12.0 million, plus coverage of yard stay costs at $200,000 per day for the winterization upgrade. The *Ocean Rig Corcovado* commenced drilling and related operations under this contract in May 2011. The contract period is scheduled to expire on October 31, 2011, subject to Ocean Rig's customer's option to extend the contract period through November 30, 2011.

On May 5, 2011, Ocean Rig entered into a contract with Borders & Southern for the *Leiv Eiriksson* for drilling operations offshore the Falkland Islands at a maximum operating dayrate of $530,000, plus a $3.0 million fee payable upon commencement of mobilization and mobilization and demobilization fees, including fuel costs, of $15.4 million and $12.6 million, respectively. The contract was originally a two-well program at a maximum dayrate of $540,000, but on May 19, 2011, Borders & Southern exercised its option to extend the contract to drill an additional two wells, which it assigned to Falkland Oil and Gas, and the maximum dayrate decreased to $530,000. Borders & Southern has the option to further extend this contract to drill an additional fifth well, in which case the dayrate would increase to $540,000. The estimated duration for the four-well contract, including mobilization/demobilization periods, is approximately 230 days, and Ocean Rig estimates that the optional period to drill the additional fifth well would extend the contract term by approximately 45 days. The *Leiv Eiriksson* is scheduled to commence this contract in the fourth quarter of 2011, following the expiration of its contract with Cairn described above. This contract replaced the contract Ocean Rig entered into with Borders & Southern for the *Eirik Raude* on November 26, 2010, which was terminated on May 5, 2011.

On July 20, 2011, Ocean Rig entered into contracts with Petrobras Brazil for the *Ocean Rig Corcovado* and the *Ocean Rig Mykonos* for drilling operations offshore Brazil. The term of each contract is 1,095 days, with a total combined value of $1.1 billion. The contract for the *Ocean Rig Mykonos* is scheduled to commence in the fourth quarter of 2011, and the contract for the *Ocean Rig Corcovado* is scheduled to commence upon the expiration of the drillship's current contract with Cairn.

## Management of Drilling Units

Ocean Rig's existing drilling rigs, the *Leiv Eiriksson* and the *Eirik Raude* , are managed by Ocean Rig AS, Ocean Rig's wholly-owned subsidiary. Ocean Rig AS also provides supervisory management services including onshore management, to the *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon,* the *Ocean Rig Mykonos* and its newbuilding drillships pursuant to separate management agreements entered into with each of the drillship-owning subsidiaries. Under the terms of these management agreements, Ocean Rig AS, through its offices in Stavanger, Norway, Aberdeen, United Kingdom and Houston, Texas, is responsible for, among other things, (i) assisting in construction contract technical negotiations, (ii) securing contracts for the future employment of the drillships, and (iii) providing commercial, technical and operational management for the drillships.

Pursuant to the Global Services Agreement between DryShips and Cardiff, a related party, effective December 21, 2010, DryShips has engaged Cardiff to act as consultant on matters of chartering and sale and purchase transactions for the offshore drilling units operated by Ocean Rig. Under the Global Services Agreement, Cardiff, or its subcontractor, will (i) provide consulting services related to identifying, sourcing, negotiating and arranging new employment for offshore assets of DryShips and its subsidiaries, including Ocean Rig's drilling units; and (ii) identify, source, negotiate and arrange the sale or purchase of the offshore assets of DryShips and its subsidiaries, including Ocean Rig's drilling units. In consideration for such services, DryShips will pay to Cardiff a fee of 1% in connection with employment arrangements and 0.75% in connection with sale and purchase activities.

The services provided by Ocean Rig AS and Cardiff overlap mainly with respect to negotiating shipyard orders and providing marketing for potential contractors. Cardiff has an established reputation within the shipping industry, and has developed expertise and a network of strong relationships with shipbuilders and oil companies, which supplement the management capabilities of Ocean Rig AS. Ocean Rig does not pay or reimburse DryShips or its affiliates for services provided under the Global Services Agreement. Ocean Rig will, however, record expenses incurred under the Global Services Agreement in its income statement and as a shareholder's contribution (additional paid-in capital) to capital when they are incurred. See "Business — Management of Ocean Rig's Drilling Units — Global Services Agreement."

Previously, Ocean Rig had management agreements with Cardiff pursuant to which Cardiff provided supervisory services in connection with the construction of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* . These agreements were terminated effective December 21, 2010. See "— Management Fees to Related Party" below.

### Corporate Structure

Please see the section of this proxy statement / prospectus entitled "Business — Corporate Structure."

### Market Overview

Ocean Rig's customers include oil super-majors and major integrated oil and gas companies, state-owned national oil companies and independent oil and gas companies. These customers have experienced higher oil prices and significantly increased revenues over the last decade. The increase has been related to higher demand for oil and limited increases in available oil production to offset the growth in demand. Over the same period, the depletion rate for existing oil production has risen and replacement rates for oil reserves have fallen for most oil producers, highlighting the shortfall in exploration and production spending to meet future demand and replace existing reserves. In response to this development, oil producers, particularly super-majors, majors and national oil companies, have devoted more of their activities to identifying replacements for existing production in new geographical areas at increasing water depths. According to Fearnley Offshore AS, this has translated into an increased focus on frontier deepwater and ultra-deepwater areas, not only in existing offshore regions such as Brazil, the Gulf of Mexico, Europe and West Africa but also in India, Southeast Asia, China, East Africa, Australasia and the Mediterranean. These developments have resulted in a strong increase in demand for offshore drilling services, resulting in materially increased dayrates for drilling units. Dayrates increased from approximately $180,000 in 2004 to above $600,000 in 2008, before declining to a level of just above $410,000 in mid-2010 as a result of the effects of the worldwide financial turmoil on the ultra-deep water drilling market. Since then, the dayrates have increased to approximately $453,000 in the current market.

### Factors Affecting Results of Operations

Ocean Rig charters its drilling units to customers primarily pursuant to long-term drilling contracts. Under the drilling contracts, the customer typically pays Ocean Rig a fixed daily rate, depending on the activity and up-time of the drilling unit. The customer bears all fuel costs and logistics costs related to transport to and from the unit. Ocean Rig remains responsible for paying the unit's operating expenses, including the cost of crewing, catering, insuring, repairing and maintaining the unit, the costs of spares and consumable stores and other miscellaneous expenses.

Ocean Rig believes that the most important measures for analyzing trends in the results of its operations consist of the following:

• *Employment Days :*  Ocean Rig defines employment days as the total number of days the drilling units are employed on a drilling contract.

• *Dayrates or maximum dayrates :*  Ocean Rig defines drilling dayrates as the maximum rate in U.S. Dollars possible to earn for drilling services for one 24 hour day at 100% efficiency under the drilling contract. Such dayrate may be measured by quarter-hour, half-hour or hourly basis and may be reduced depending on the activity performed according to the drilling contract.

- *Earnings efficiency / Earnings efficiency on hire* :  Earnings efficiency measures the effective earnings ratio, expressed as a percentage of the full earnings rate, after reducing for certain operations paid at a reduced rate, non-productive time at zero rate, or off hire without dayrates. Earnings efficiency on hire measures the earning efficiency only for the period during which the drilling unit is on contract and does not include off-hire periods.

- *Mobilization / demobilization fees* :  In connection with drilling contracts, Ocean Rig may receive revenues for preparation and mobilization of equipment and personnel or for capital improvements to the drilling vessels, dayrate or fixed price mobilization and demobilization fees.

- *Revenue* :  For each contract, Ocean Rig determines whether the contract, for accounting purposes, is a multiple element arrangement, meaning it contains both a lease element and a drilling services element, and, if so, identify all deliverables (elements). For each element Ocean Rig determines how and when to recognize revenue.

- *Term contracts* :  These are contracts pursuant to which Ocean Rig agrees to operate the unit for a specified period of time. For these types of contracts, Ocean Rig determines whether the arrangement is a multiple element arrangement. For revenues derived from contracts that contain a lease, the lease elements are recognized as "Leasing revenues" in the statement of operations on a basis approximating straight line over the lease period. The drilling services element is recognized as "Service revenues" in the period in which the services are rendered at fair value rates. Revenues related to the drilling element of mobilization and direct incremental expenses of drilling services are deferred and recognized over the estimated duration of the drilling period.

- *Well contracts* :  These are contracts pursuant to which Ocean Rig agrees to drill a certain number of wells. Revenue from dayrate based compensation for drilling operations is recognized in the period during which the services are rendered at the rates established in the contracts. All mobilization revenues, direct incremental expenses of mobilization and contributions from customers for capital improvements are initially deferred and recognized as revenues over the estimated duration of the drilling period.

## Revenue from Drilling Contracts

Ocean Rig's drilling revenues are driven primarily by the number of drilling units in its fleet, the contractual dayrates and the utilization of the drilling units. This, in turn, is affected by a number of factors, including the amount of time that Ocean Rig's drilling units spend on planned off-hire class work, unplanned off-hire maintenance and repair, off-hire upgrade and modification work, reduced dayrates due to reduced efficiency or non-productive time, the age, condition and specifications of Ocean Rig's drilling units, levels of supply and demand in the rig market, the price of oil and other factors affecting the market dayrates for drilling units. Historically, industry participants have increased supply of drilling units in periods of high utilization and dayrates. This has resulted in an oversupply and caused a decline in utilization dayrates. Therefore, dayrates have historically been very cyclical.

## Rig Operating Expenses

Rig operating expenses include crew wages and related costs, catering, the cost of insurance, expenses relating to repairs and maintenance, the costs of spares and consumable stores, shore based costs and other miscellaneous expenses. Ocean Rig's rig operating expenses, which generally represent fixed costs, have historically increased as a result of the business climate in the offshore drilling sector. Specifically, wages and vendor supplied spares, parts and services have experienced a significant price increase over the previous two to three years. Other factors beyond Ocean Rig's control, some of which may affect the offshore drilling industry in general, including developments relating to market prices for insurance, may also cause these expenses to increase. In addition, these rig operating expenses are higher when operating in harsh environments, though an increase in expenses is typically offset by the higher dayrates Ocean Rig receives when operating in these conditions.

**Depreciation**

Ocean Rig depreciates its drilling units on a straight-line basis over their estimated useful lives. Specifically, Ocean Rig depreciates bare-decks over 30 years and other asset parts over five to 15 years. Ocean Rig expenses the costs associated with a five-year periodic class work.

**Management Fees to Related Party**

From October 19, 2007 to December 21, 2010, Ocean Rig was party to, with respect to the *Ocean Rig Corcovado* and the *Ocean Rig Olympia*, separate management agreements with Cardiff pursuant to which Cardiff provided additional supervisory services in connection with these drillships including, among other things: (i) assisting in securing the required equity for the construction; (ii) negotiating, reviewing and proposing finance terms; (iii) assisting in marketing towards potential contractors; (iv) assisting in arranging, reviewing and supervising all aspects of building, equipment, financing, accounting, record keeping, compliance with laws and regulations; (v) assisting in procuring consultancy services from specialists; and (vi) assisting in finding prospective joint-venture partners and negotiating any such agreements. Pursuant to the management agreements, Ocean Rig paid Cardiff a management fee of $40,000 per month per drillship plus (i) a chartering commission of 1.25% on revenue earned; (ii) a commission of 1.0% on the shipyard payments or purchase price paid for drillships; (iii) a commission of 1.0% on loan financing; and (iv) a commission of 2.0% on insurance premiums. In accordance with the Addenda No. 1 to the above management agreements, dated as of December 1, 2010, these management agreements were terminated effective December 21, 2010; however, all obligations to pay for services rendered by Cardiff prior to termination remain in effect. As of December 31, 2010, these obligations totaled $5.8 million. For the year ended December 31, 2010, total charges from Cardiff under the management agreement amounted to $4.0 million. This was capitalized as drillship under construction cost, being a cost directly attributable to the construction of the two drillships, the *Ocean Rig Corcovado* and the *Ocean Rig Olympia*.

See "— Management of Drilling Units."

**General and Administrative Expenses**

Ocean Rig's general and administrative expenses mainly include the costs of its offices, including salary and related costs for members of senior management and its shore-side employees.

**Interest and Finance Costs**

In 2008, Ocean Rig completed a refinancing of Ocean Rig ASA, which was later reorganized into Drill Rigs Holdings Inc., to replace its secured bank debt and two bond issuances with secured bank debt only. Please see "Business — Description of Indebtedness — Existing Credit Facilities — $1.04 billion senior secured credit facility." As of December, 31, 2009 and after the completion of the acquisitions of the four newbuilding drillships in March and May 2009, Ocean Rig had total indebtedness of $1.2 billion. As of December 31, 2010, Ocean Rig had indebtedness of $1.26 billion. Ocean Rig capitalizes its interest on the debt Ocean Rig has incurred in connection with its drillships under construction.

**Results of Operations**

Included in this document are Ocean Rig's unaudited interim consolidated financial statements for the six-month periods ended June 30, 2011 and 2010 and Ocean Rig's audited consolidated historical financial statements for the years ended December 31, 2010, 2009 and 2008. Also included in this document are Ocean Rig's unaudited pro forma condensed statement of operations for the year ended December 31, 2008 and the audited consolidated historical financial statements of Ocean Rig ASA (our predecessor) as of May 14, 2008 and for the period from January 1 to May 14, 2008.

Ocean Rig acquired 30.4% of the shares in Ocean Rig ASA on December 20, 2007. Ocean Rig acquired additional shares of Ocean Rig ASA during 2008. After acquiring more than 33% of Ocean Rig ASA's outstanding shares, Ocean Rig, as required by Norwegian Law, launched a mandatory bid for the remaining shares of Ocean Rig ASA at a price of NOK45 per share ($8.89 per share). Ocean Rig gained control over Ocean Rig ASA on May 14,

2008. Up to May 14, 2008, Ocean Rig recorded its minority share of Ocean Rig ASA's results of operations under the equity method of accounting. The results of operations related to Ocean Rig ASA are consolidated in Ocean Rig's financial statements starting May 15, 2008. The mandatory bid expired on June 11, 2008. As of July 10, 2008, Ocean Rig had acquired 100% of the shares in Ocean Rig ASA. During the period between May 15, 2008 and July 10, 2008, Ocean Rig reflected the minority shareholders interests in net income of Ocean Rig ASA on the line Net income attributable to non controlling interest in its consolidated statement of operations. The step acquisition was accounted for using the purchase method of accounting.

Ocean Rig's results of operations for the full year ended December 31, 2008 are presented because Ocean Rig was formed in December 2007. However, Ocean Rig did not have any meaningful operations prior to the acquisition of control of Ocean Rig ASA on May 14, 2008. The pro forma 2008 financial results included herein gives effect to the acquisition of Ocean Rig ASA as if the transactions had occurred on January 1, 2008. Please see the unaudited pro forma statement of operations included elsewhere in this proxy statement / prospectus that was derived from, and should be read in conjunction with, Ocean Rig's historical consolidated financial statements for the period January 1, 2008 to December 31, 2008 and the historical consolidated financial statements of Ocean Rig ASA for the period January 1, 2008 to May 14, 2008, which are included elsewhere in this proxy statement / prospectus. The unaudited pro forma condensed pro forma statement of operations has been prepared in conformity with U.S. GAAP consistent with those used in Ocean Rig's historical consolidated financial statements.

### Restatement of Previously Issued Financial Statements for 2009

Ocean Rig restated its previously-reported consolidated financial statements for the year ended December 31, 2009, to reflect the correction of an error in computing capitalized interest expense for rigs under construction and to correct an error to reverse the reclassification into earnings of that portion of interest that should have remained in accumulated other comprehensive loss. For additional information see Note 3 to the consolidated financial statements.

The misstatements for 2009 were not detected by Ocean Rig's internal control over financial reporting because of the absence of an effectively-designed control to verify that the entire population of borrowings and borrowing costs was captured in Ocean Rig's calculation. There was also the absence of an effectively-designed control to identify those cash flow hedges for which the interest on the associated borrowings was capitalized. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of Ocean Rig's annual or interim financial statements will not be prevented or detected on a timely basis. As a result of the errors, Ocean Rig has concluded that Ocean Rig had a material weakness in its internal controls over financial reporting.

To remediate the material weakness in Ocean Rig's internal control over financial reporting as described above, Ocean Rig's management is designing and implementing additional controls to remediate this material weakness, specifically by adding additional procedures over the relevant computations including:

- Implementing a new process and control over the determination of the completeness of the population of borrowings used in the determination of Ocean Rig's capitalization rate; and

- Implementing a new process and control over the identification of derivative hedging instruments associated with borrowings used in determining Ocean Rig's capitalization rate.

Ocean Rig anticipates that the actions described above will remediate the material weakness. The material weakness will only be considered remediated when the revised internal controls are operational for a period of time and are tested and Ocean Rig's management has concluded that the controls are operating effectively.

**Six-Month Period Ended June 30, 2011 Compared to Six-Month Period Ended June 30, 2010**

| | Ocean Rig UDW Inc. From January 1, 2010 to June 30, 2010 | Ocean Rig UDW Inc. From January 1, 2011 to June 30, 2011 | Change | Percentage Change |
|---|---|---|---|---|
| | | (U.S. Dollars in thousands) | | |
| **REVENUES:** | | | | |
| Leasing and service revenues | $189,838 | $236,657 | $ 46,819 | 24.7% |
| Other revenues | (610) | (702) | (92) | 15.1% |
| **Total revenues** | **189,228** | **235,955** | **46,727** | **24.7%** |
| **EXPENSES:** | | | | |
| Drilling rigs operating expenses | 59,938 | 104,224 | 44,286 | 73.9% |
| Depreciation and amortization | 37,966 | 64,908 | 26,942 | 71.0% |
| General and administrative expenses | 10,075 | 15,730 | 5,655 | 56.1% |
| **Total operating expenses** | **107,979** | **184,862** | **76,883** | **71.2%** |
| **Operating income / (loss)** | **81,249** | **51,093** | **(30,156)** | **(37.1)%** |
| Interest and finance costs | (5,738) | (22,214) | (16,476) | 287.1% |
| Interest income | 5,825 | 10,394 | 4,569 | 78.4% |
| Gain/(loss) on interest rate swaps | (34,501) | (18,616) | 15,885 | (46.0)% |
| Other, net | (3,752) | (446) | 3,306 | (88.1)% |
| **Total finance expenses, net** | **(38,166)** | **(30,882)** | **7,284** | **(19.1)%** |
| Income/(loss) before taxes | 43,083 | 20,211 | (22,872) | (53.1)% |
| Income taxes | (11,938) | (9,778) | 2,160 | (18.1)% |
| **Net income (loss)** | **$ 31,145** | **$ 10,433** | **$(20,712)** | **(66.5)%** |

### Revenues

Revenues from leasing and service activities under Ocean Rig's drilling contracts increased by $46.8 million, or 24.7%, to $236.7 million for the six-month period ended June 30, 2011, compared to $189.8 million for the six-month period ended June 30, 2010.

During the six-month period ended June 30, 2011, the *Leiv Eiriksson* was employed under the Petrobras contract at a maximum dayrate of $583,000, including a maximum 8% bonus until April 10, 2011. The earnings efficiency during drilling operations in the period from January 1, 2011 to February 3, 2011, when demobilization commenced was 99.9%. The earnings efficiency during demobilization from February 3 to April 10, 2011 was 97.0%. On April 19, 2011 the rig commenced mobilization under the Cairn contract for drilling offshore Greenland at a maximum dayrate of $550,000 plus a mobilization fee. The mobilization was completed on May 25, 2011. During the mobilization period the rig earned a mobilization fee of $7.0 million, which was deferred to be recognized over the drilling period. The earnings efficiency during the period from May 25, 2011 to June 30, 2011 was 95.5%. The earnings efficiency during the six-month period ended June 30, 2011 was 92.7%. From January 1 to February 24, 2010, the rig was mobilized for drilling operations in the Black Sea, and $26.5 million of revenue related to this period was deferred. The earnings efficiency for this period was 90.4% and the earnings efficiency during the six-month period ended June 30, 2010 was 93.2%. The deferred revenue was amortized over the drilling period under the contract, starting on February 24, 2010 with $8.4 million amortized to revenue in the six-month period ended June 30, 2010, compared to $3.6 million amortized to revenue in the six-month period ended June 30, 2011, representing $2.1 million under the Petrobras contract and $1.5 million under the Cairn contract.

103

During the six-month period ended June 30, 2011, while employed under the Tullow Oil contract, the *Eirik Raude* earned a maximum dayrate of $647,000 for the period from January 1 to February 15, 2011, after which the maximum dayrate increased to $665,000. During the six-month period ended June 30, 2010, while employed under the Tullow Oil contract, the *Eirik Raude* earned a maximum dayrate of $629,000 for the period from January 1 to February 15, 2010, after which the maximum dayrate on the same contract increased to $647,000. The earnings efficiency for the *Erik Raude* was 95.5% for the six-month period ended June 30, 2011, compared to an earnings efficiency of 97.2% for the six-month period ended June 30, 2010. Deferred revenue was amortized over the drilling period under the contract, with $1.5 million amortized to revenue in the six-month period ended June 30, 2010, compared to $1.5 million amortized to revenue in the six-month period ended June 30, 2011.

During the six-month period ended June 30, 2011, the *Ocean Rig Corcovado* was employed under the Cairn contract at a maximum dayrate of $560,000. The rig completed a winterization upgrade from January 3, 2011 to February 3, 2011, as requested by the client, while earning a reduced day rate of $200,000 in addition to being reimbursed $12 million cost for the upgrade. The rig commenced mobilization February 3, 2011 at a fixed mobilization fee of $17 million in addition to fuel. All revenue, as well as reimbursement of winterization costs, has been deferred and will be amortized over the drilling period under the contract. The rig commenced drilling operations offshore Greenland on May 20, 2011. During the period May 20 to June 30, 2011 $12.4 million of deferred revenue was amortized to revenue. The earnings efficiency in the six month period ending June 30, 2011 was 93.2%. The vessel did not generate any revenue in 2010 as it was still under construction.

During the six-month period ended June 30, 2011, the *Ocean Rig Olympia* was employed from April 1, 2011 under the Vanco contract at a maximum dayrate of $415,000. The rig commenced mobilization April 1, 2011 at a mobilization day rate of $180,000 in addition to fuel. Such mobilization fee has been deferred and will be amortized over the drilling period under the contract. The rig commenced drilling operations offshore Ghana on May 14, 2011. During the period May 14 to June 30, 2011 $1.1 million of deferred revenue was amortized to revenue. The earnings efficiency in the period ending June 30, 2011 was 88.65%. The vessel did not generate any revenue in 2010 as it was still under construction.

The increase in revenue in 2011 of $46.8 million was mainly due to the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* start-ups that contributed $28.5 million and $16.8 million of revenue respectively. Deferral of $26.5 million of revenue under the Petrobras contract for the *Leiv Eiriksson* for the period from January 1, 2010 to February 24, 2010 was basically offset by absence of revenue recognition during the period between the Petrobras contract demobilization ended April 10, 2010 and the Greenland mobilization completion on May 25, 2011.

Other revenues include amortization of the fair value of contracts from the purchase price allocation of Ocean Rig ASA. Other revenues for the six-month period ended June 30, 2011 were a reduction to revenue of $0.7 million which was largely unchanged from the six-month period ended June 30, 2010 when the reduction to revenue $0.6 million. The amount in both periods relates to the amortization of the fair value above the market value for the acquired Tullow drilling contract.

### *Drilling Rigs Operating Expenses*

Drilling rigs operating expenses increased by $44.3 million, or 73.9%, to $104.2 million for the six-month period ended June 30, 2011, compared to $59.9 million for the six-month period ended June 30, 2010. The increase in operating expenses was mainly due to $17.8 million related to the 10 year class survey of *Leiv Eiriksson,* start-up of operations of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* with $13.9 million and $8.4 million respectively. In addition, for the period from January 1 to February 24, 2010, the *Leiv Eiriksson* was mobilized for drilling operations in the Black Sea and $9.2 million of operating expenses related to this period was deferred. These effects were partly offset by deferral of $7.0 million of *Leiv Eiriksson* operating expenses during the period between the Petrobras contract demobilization ended April 10, 2010 and the Greenland mobilization completion on May 25, 2011. The deferred operating expenses in 2010 are amortized over the Petrobras contract drilling period under the contract, which began on February 24, 2010 with $4.5 million in the six-month period ended June 30, 2010, compared to $2.7 million amortized in the six-month period ended June 30, 2011, representing $1.1 million of costs amortized in the period January 1 to February 3, 2011 under the Petrobras contract and representing $1.6 million of costs amortized in the period May 25 to June 30, 2011 under the Cairn contract. The operating expenses related to the *Ocean Rig*

104

*Corcovado* and the *Ocean Rig Olympia* operations, excluding insurance and onshore base operations, during their respective mobilizations amounted in total to $26.1 million, have been deferred and will be amortized over the drilling period under the contract. Amortizations to operating expenses amounted in the six-month period ended June 30, 2011 to $4.9 million and $0.9 million for the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* respectively.

### Depreciation and Amortization Expense

Depreciation and amortization increased by $26.9 million, or 71.0%, to $64.9 million for the six-month period ended June 30, 2011, compared to $38.0 million for the six-month period ended June 30, 2010. The increase was mainly due to $18.1 million of depreciation related to the *Ocean Rig Corcovado* that Ocean Rig took delivery of on January 3, 2011 and $9.0 million of depreciation related to the *Ocean Rig Olympia* that Ocean Rig took delivery of on March 30, 2011.

### General and Administrative Expenses

General and administrative expenses increased by $5.7 million, or 56.1%, to $15.7 million for the six-month period ended June 30, 2011, compared to $10.1 million for the six-month period ended June 30, 2010, primarily due build-up of the organization to manage a higher number of drilling units, as well as advisory costs related to Ocean Rig's initial public offering.

### Interest and Finance Costs

Interest and finance costs increased by $16.5 million, or 278,1%, to $22.2 million for the six-month period ended June 30, 2011, compared to $5.7 million for the six-month period ended June 30, 2010. The increase was mainly due to higher average debt level, new debt financing costs, and higher interest rates.

### Interest Income

Interest income increased by $4.6 million, or 78.4%, to $10.4 million for the six-month period ended June 30, 2011, compared to $5.8 million for the six-month period ended June 30, 2010. The increase was mainly due to higher average bank deposits.

### Gain/(Loss) on Interest Rate Swaps

We recorded a loss related to interest swaps of $18.6 million for the six-month period ended June 30, 2011, compared to a loss of $34.5 million in the comparable period in 2010, on interest rate swaps that did not qualify for hedge accounting. As of June 30, 2010, 3 of total 11 swaps qualified for hedge swap accounting. As of January 1, 2011, Ocean Rig removed the designation of the cash flow hedges and discontinued hedge accounting.

The loss for the six-month period ended June 30, 2011, was due to mark to market losses from a decreasing interest rate level for the applicable interest swap durations.

### Other, Net

Other, net increased by $3.3 million, or 88.1%, to a loss of $0.4 million for the six-month period ended June 30, 2011, compared to a loss of $3.8 million for the six-month period ended June 30, 2010. The decrease is due to lower net losses on currency forward contracts.

### Income Taxes

Income taxes decreased by $2.2 million, or 18.1%, to $9.8 million for the six-month period ended June 30, 2011, compared to $11.9 million for the six-month period ended June 30, 2010, primarily reflecting a shorter period of Leiv Eiriksson operations in Turkey under the 5% withholding tax regime. Since the drilling rigs operate in international waters around the world, they may become subject to taxation in many different jurisdictions. The basis for such taxation depends on the relevant regulation in the countries in which Ocean Rig operates. Consequently, there is no expected relationship between the income tax expense or benefit for the period and the income or loss before taxes.

*Net Income*

Net income decreased by $20.7 million to $10.4 million, or 66.5%, for the six-month period ended June 30, 2011, compared to $31.1 million for the six-month period ended June 30, 2010, primarily reflecting $76.9 million higher operating expenses, $11.9 million higher total net financing cost, partly offset by $46.7 million higher revenues, $15.9 million lower loss interest rate swaps, $3.3 million lower loss from unrealized forex contracts and $2.2 million lower taxes.

**Year Ended December 31, 2010 Compared to Year Ended December 31, 2009, as Restated**

| | Ocean Rig UDW Inc. From January 1, 2009 to December 31, 2009 (As Restated) | Ocean Rig UDW Inc. From January 1, 2010 to December 31, 2010 | Change | Percentage Change |
|---|---|---|---|---|
| | | (U.S. Dollars in thousands) | | |
| **REVENUES:** | | | | |
| Leasing and service revenues | $   373,525 | $   403,162 | $ 29,637 | 7.9% |
| Other revenues | 14,597 | 2,550 | (12,047) | (82.5)% |
| **Total revenues** | **388,122** | **405,712** | **17,590** | **4.5%** |
| **EXPENSES:** | | | | |
| Drilling rigs operating expenses | 133,256 | 119,369 | (13,887) | (10.4)% |
| Goodwill impairment | — | — | — | — |
| Depreciation and amortization | 75,348 | 75,092 | (256) | (0.3)% |
| Loss on sale of equipment | — | 1,458 | 1,458 | — |
| General and administrative expenses | 17,955 | 19,443 | 1,488 | 8.3% |
| **Total operating expenses** | **226,559** | **215,362** | **11,197** | **4.94%** |
| **Operating income/(loss)** | **161,563** | **190,350** | **28,787** | **17.8%** |
| Interest and finance costs | (46,120) | (8,418) | 37,702 | (81.7)% |
| Interest income | 6,259 | 12,464 | 6,205 | 99.1% |
| Gain/(loss) on interest rate swaps | 4,826 | (40,303) | (45,129) | (935.1)% |
| Other, net | 2,023 | 1,104 | (919) | (45.4)% |
| **Total finance expenses, net** | **(33,012)** | **(35,153)** | **(2,141)** | **6.5%** |
| Income/(loss) before taxes and equity in loss of investee | 128,551 | 155,197 | 26,646 | 20.7% |
| Income taxes | (12,797) | (20,436) | (7,639) | 59.7% |
| Equity in loss of investee | — | — | — | — |
| **Net income (loss),** | **115,754** | **134,761** | **19,007** | **16.4%** |
| Less: Net income attributable to non controlling interests | — | — | — | — |
| **Net income attributable to Ocean Rig UDW Inc.** | **$   115,754** | **$   134,761** | **$ 19,007** | **16.4%** |

*Revenues*

Ocean Rig's revenues from leasing and service activities under its drilling contracts increased by $29.6 million net of agent fees of 1% applicable during the period under the Petrobras contract, or 7.9%, to $403.2 million for the year ended December 31, 2010, compared to $373.5 million for the year ended December 31, 2009.

During the year ended December 31, 2010, the *Leiv Eiriksson* was employed under the Petrobras contract at a maximum dayrate of $583,000, including a maximum 8% bonus. The earnings efficiency during the period from February 24, 2010, when drilling operations commenced, to December 31, 2010 was 89.8%. The earnings efficiency during mobilization from January 1 to February 24, 2010 was 90.4%, and thus the earnings efficiency during the year ended December 31, 2010 was 90.0%. From January 1 to February 24, 2010, the rig was mobilized for drilling operations in the Black Sea, and $26.5 million of revenue related to this period was deferred. The deferred revenue is amortized over the drilling period under the contract, starting on February 24, 2010, of which $19.6 million was recognized in the year ended 2010. During 2009, the *Leiv Eiriksson* was employed under the Shell contract in Norway and in the UK until October 26, 2009, at a maximum dayrate of $511,000 and had an earning efficiency of 90.4%. On October 27, 2009 it commenced the Petrobras contract and started mobilization for the Black Sea operations. Revenue of $33.2 million for October 27, 2009 to December 31, 2009 was deferred to be amortized over the drilling period under the contract, which began on February 24, 2010. The earnings efficiency from October 27, 2009 to December 31, 2009 was 93.9%, and therefore, the earnings efficiency during the year ended December 31, 2009 was 90.8%.

During the year ended December 31, 2010, while employed under the Tullow Oil contract, the *Eirik Raude* earned a maximum dayrate of $629,000 for the period from January 1 to February 15, 2010, after which the maximum dayrate increased to $647,000. During the year ended December 31, 2009, while employed under the Tullow Oil contract, the *Eirik Raude* earned a maximum dayrate of $611,000 for the period from January 1 to February 15, 2009, after which the maximum dayrate on the same contract increased to $629,000. The earnings efficiency for the *Eirik Raude* was 95.5% for the year ended December 31, 2010, compared to an earnings efficiency of 99.8% for the year ended December 31, 2009.

The increase in Ocean Rig's revenue was mainly due to the deferral of $59.7 million of revenue under the Petrobras contract for the *Leiv Eiriksson* for the period from October 27, 2009 to February 24, 2010 which resulted in $19.6 million of the deferred revenue being recognized in 2010, compared to $3.5 million of deferred revenue under the Shell contract being recognized in 2009. In addition, higher day rates for the rigs in 2010 resulted in increased revenue of $13.6 million in 2010 compared to 2009.

Other Ocean Rig revenues include amortization of the fair value of contracts from the purchase price allocation of Ocean Rig ASA and a settlement of litigation. Other revenues decreased by $12.0 million, or 82.5%, to $2.6 million for the year ended December 31, 2010, compared to $14.6 million for the year ended December 31, 2009. Amortization of the fair value of the drilling contracts from the acquisition of Ocean Rig ASA decreased by $15.8 million, which was partly offset by the settlement in the third quarter of 2010 of a legal dispute in Ocean Rig's favor of $3.8 million.

### Drilling Rigs Operating Expenses

Ocean Rig's drilling rigs operating expenses decreased by $13.9 million, or 10.4%, to $119.4 million for the year ended December 31, 2010, compared to $133.3 million for the year ended December 31, 2009. The decrease in operating expenses was mainly due to lower crew costs of $6.0 million and catering costs of $3.4 million from 2010, the result of operations in Turkey in 2010, where costs are lower than they were in Norway, where Ocean Rig operated in 2009, and higher maintenance activity in 2009 compared to 2010 of $2.8 million.

From January 1 to February 24, 2010, the *Leiv Eiriksson* was mobilized for drilling operations in the Black Sea and $9.2 million of deferred operating expenses related to this period was deferred. The deferred operating expenses are amortized over the drilling period under the contract, which began on February 24, 2010, of which $10.7 million has been recognized as cost in 2010 compared to $2.8 million recognized as deferred cost in 2009.

### Depreciation and Amortization Expense

Ocean Rig's depreciation and amortization expense of $75.1 million for the year ended December 31, 2010 was materially unchanged from 2009.

### *Loss on Disposal of Assets*

Ocean Rig recorded a loss on sale of assets of $1.5 million as a result of the disposal of various drilling rig equipment for the year ended December 31, 2010. There was no such gain or loss for the year ended December 31, 2009.

### *General and Administrative Expenses*

Ocean Rig's general and administrative expenses increased by $1.5 million, or 8.3%, to $19.4 million for the year ended December 31, 2010, compared to $18.0 million for the year ended December 31, 2009, primarily due to higher consulting fees.

### *Interest and Finance Costs*

Ocean Rig's interest and finance costs decreased by $37.7 million, or 81.7%, to $8.4 million for the year ended December 31, 2010, compared to $46.1 million for the year ended December 31, 2009. The decrease was due to a higher level of capitalization of interest expense and lower average debt levels.

### *Interest Income*

Ocean Rig's interest income increased by $6.2 million, or 99.1%, to $12.5 million for the year ended December 31, 2010, compared to $6.3 million for the year ended December 31, 2009. The increase was mainly due to higher interest rates on bank deposits and higher average bank deposits included in restricted cash.

### *Gain/(loss) on Interest Rate Swaps*

Ocean Rig recorded an unrealized loss of $40.3 million for the year ended December 31, 2010, compared to an unrealized gain of $4.8 million in 2009, on interest rate swaps that did not qualify for hedge accounting. The loss for the year ended December 31, 2010 was due to mark-to-market losses from a decreasing interest rate level for the applicable interest rate swap durations.

### *Other, Net*

Ocean Rig's other, net decreased by $0.9 million, or 45.4%, to $1.1 million for the year ended December 31, 2010, compared to $2.0 million for the year ended December 31, 2009. The decrease is due to lower gains on currency forward contracts.

### *Income Taxes*

Income taxes increased by $7.6 million, or 59.7%, to $20.4 million for the year ended December 31, 2010, compared to $12.8 million for the year ended December 31, 2009, mainly due to withholding tax of $7.9 million for operations in Turkey in 2010 for the *Leiv Eiriksson* , which was not applicable for 2009. Since the drilling rigs operate in international waters around the world, they may become subject to taxation in many different jurisdictions. The basis for such taxation depends on the relevant regulation in the countries in which Ocean Rig operates. Consequently, there is no expected relationship between the income tax expense or benefit for the period and the income or loss before taxes. In 2009, the internal reorganization continued and certain entities ceased to be taxable in Norway, resulting in the reversal of remaining net deferred tax assets and the associated valuation allowance. As a result, there was no impact on deferred tax expense due to the change in the tax status of the entities. For the year ended December 31, 2010, the income taxes primarily represent withholding taxes for the operations of the *Eirik Raude* in Ghana and the *Leiv Eiriksson* in Turkey of $11.4 million and $7.9 million, respectively, while for the year ended December 31, 2009, the taxes primarily represented withholding tax for the operations of the *Eirik Raude* in Ghana of $11.4 million. During the year ended December 31, 2009, the *Leiv Eiriksson* was operating in the U.K. and Norway and incurred an immaterial amount of tax charges in the U.K. and no tax charges in Norway due to tax loss carry forward.

*Net Income*

Ocean Rig's net income increased by $19.0 million to $134.8 million, or 16.4%, for the year ended December 31, 2010, compared to $115.8 million for the year ended December 31, 2009, primarily reflecting $43.9 million lower net financing cost, $17.6 million higher revenues and $11.2 million lower total operating expenses, partly offset by a $45.1 million negative variance due to the loss on interest rate swaps in the year ended December 31, 2010 and $7.6 million higher taxes.

**Year Ended December 31, 2009, as Restated, Compared to Year Ended December 31, 2008**

| | Ocean Rig UDW Inc. From January 1, 2008 to December 31, 2008 | Ocean Rig UDW Inc. From January 1, 2009 to December 31, 2009 (As Restated) | Change | Percentage Change |
|---|---|---|---|---|
| | | (U.S. Dollars in thousands) | | |
| **REVENUES:** | | | | |
| Leasing and service revenues | $ 202,110 | $ 373,525 | $ 171,415 | 84.8% |
| Other revenues | 16,553 | 14,597 | (1,956) | (11.8)% |
| **Total revenues** | **218,663** | **388,122** | **169,459** | **77.5%** |
| **EXPENSES:** | | | | |
| Drilling rigs operating expenses | 86,229 | 133,256 | 47,027 | 54.5% |
| Goodwill impairment | 761,729 | — | (761,729) | (100.0)% |
| Depreciation and amortization | 45,432 | 75,348 | 29,916 | 65.8% |
| General and administrative expenses | 14,462 | 17,955 | 3,493 | 24.0% |
| **Total operating expenses** | **907,852** | **226,559** | **(681,293)** | **(75.0)%** |
| **Operating income/(loss)** | **(689,189)** | **161,563** | **850,752** | **(123.4)%** |
| Interest and finance costs | (71,692) | (46,120) | 25,572 | (35.7)% |
| Interest income | 3,033 | 6,259 | 3,226 | 106.4% |
| Gain/(loss) on interest rate swaps | — | 4,826 | 4,826 | 100.0% |
| Other, net | (2,300) | 2,023 | 4,323 | (188.0)% |
| **Total finance expenses, net** | **(70,959)** | **(33,012)** | **26,758** | **(37.7)%** |
| Income/(loss) before income taxes and equity in loss of investee | (760,148) | 128,551 | 877,517 | (115.4)% |
| Income taxes | (2,844) | (12,797) | 9,953 | 350.0% |
| Equity in loss of investee | (1,055) | — | 1,055 | (100.0)% |
| **Net income/(loss)** | **(764,047)** | **115,754** | **879,801** | **(115.2)%** |
| Less: Net income attributable to non controlling interest | (1,800) | — | 1,800 | (113.7)% |
| **Net income attributable to Ocean Rig UDW Inc.** | **$ (765,847)** | **$ 115,754** | **$ 881,601** | **(115.1)%** |

Ocean Rig's results of operations for the year ended December 31, 2008 are presented because Ocean Rig was formed in December 2007; however, Ocean Rig did not have any meaningful operations prior to the acquisition of control of Ocean Rig ASA on May 14, 2008. The successor financial statements for 2008 include the parent company activities for January 1 to December 31, 2008, loss under the equity method for the investment in Ocean Rig ASA up to May 14, 2008 and the consolidated results of Ocean Rig ASA since the acquisition date.

### Revenues

Ocean Rig's total revenues increased by $169.5 million, or 77.5%, to $388.1 million for the year ended December 31, 2009, as compared to $218.7 million for the year ended December 31, 2008. Of the increase, $99.2 million was due to the 12 months earnings contribution in 2009 compared to a 7.5 month contribution in 2008. Deferred revenue was recognized with $6.5 million for the year ended December 31, 2009 compared to $5.1 million for the year ended December 31, 2008.

During the year ended December 31, 2009, the *Leiv Eiriksson* worked under the Shell contract at a maximum dayrate of $512,000 and under the Petrobras contract at a maximum dayrate of $583,000. The *Leiv Eiriksson* commenced the Petrobras contract on October 27, 2009 and during the mobilization period from October 27, 2009 to December 31, 2009, revenues of $33.2 million were deferred and will be amortized to revenue as wells are drilled. The mobilization period under the Petrobras contract continued until drilling commenced on February 24, 2010. During the year ended December 31, 2008, the *Leiv Eiriksson* earned maximum dayrates of $511,000 and $476,000 under the Shell contract in Norway and the Shell contract in the U.K., respectively. The earnings efficiency for the *Leiv Eiriksson* was 90.8% for 2009 compared to 83.2% for 2008.

During the year ended December 31, 2009, under the Tullow Oil contract, the *Eirik Raude* earned a maximum dayrate of $611,000 that increased to $629,000 on February 15, 2009. Under the ExxonMobil contract for the year ended 2008, the *Eirik Raude* earned a maximum dayrate of $395,000. The earnings efficiency for the *Eirik Raude* was 99.7% for 2009 compared to an earnings efficiency of 94.1% for 2008.

### Drilling Rigs Operating Expenses

Ocean Rig's drilling rigs operating expenses increased by $47.0 million, or 54.5%, to $133.3 million for the year ended December 31, 2009, as compared to $86.2 million for the year ended December 31, 2008. The increase was mainly due to the 12 months of expenses in 2009 compared to the 7.5 months in 2008, partly offset by the deferral of $21.8 million of the *Leiv Eiriksson* 's operating expenses from October 27, 2009 to December 31, 2009, under the Petrobras contract during the mobilization period. Deferred cost recognized in the year ended December 31, 2009 was $4.4 million compared to $1.7 million in the year ended December 31, 2008.

### Goodwill Impairment

An impairment charge of $761.7 million was recognized in 2008, as a result of the impairment testing performed on goodwill at December 31, 2008 following the acquisition of Ocean Rig ASA. Following the impairment charge, all goodwill was impaired. From the date of the acquisition of Ocean Rig ASA in May 2008 through the annual goodwill impairment test performed on December 31, 2008, the market declined significantly and various factors negatively affected industry trends and conditions, which resulted in the revision of certain key assumptions used in determining the fair value of Ocean Rig's investment and, therefore, the implied fair value of goodwill. During the second half of 2008, the credit markets tightened, driving up the cost of capital and long-term weighted average cost of capital increased. In addition, the economic downturn and volatile oil prices resulted in a downward revision of projected cash flows in Ocean Rig's discounted cash flows analysis for Ocean Rig's 2008 impairment testing. Furthermore, the decline in the global economy negatively impacted publicly traded company multiples used when estimating fair value under the market approach. Based on results of its annual goodwill impairment analysis, Ocean Rig determined that the carrying value of its goodwill was impaired.

### Depreciation and Amortization Expense

Ocean Rig's depreciation and amortization expense increased by $29.9 million, or 65.8%, to $75.3 million for the year ended December 31, 2009, as compared to $45.4 million for the year ended December 31, 2008. The increase was mainly due to the increased period of consolidation of Ocean Rig's drilling rigs in 2009.

### General and Administrative Expenses

Ocean Rig's general and administrative expenses increased by $3.5 million, or 24.0%, to $18.0 million for the year ended December 31, 2009, as compared to $14.5 million for the year ended December 31, 2008. The increase

was mainly due to the fact that Ocean Rig ASA's results were only consolidated for 7.5 months in 2008, partly offset by the change in control related costs from Ocean Rig's acquisition of Ocean Rig ASA, described in the paragraph below.

### Interest and Finance Costs

Ocean Rig's interest and finance costs decreased by $25.6 million, or 35.7%, to $46.1 million for the year ended December 31, 2009, compared to $71.7 million for the year ended December 31, 2008. The decrease is mainly due to the repayment of the Acquisition Facility in first half 2009, as well as the absence of the $26.9 million refinancing costs in 2008. These effects were partly offset by the Ocean Rig ASA and related interest and finance costs being consolidated for 12 months in 2009 as compared to 7.5 months in 2008.

### Interest Income

Ocean Rig's interest income amounted to $6.3 million for the year ended December 31, 2009 compared to $3.0 million for the year ended December 31, 2008, due to interest income for 12 months in 2009 compared to 7.5 months in 2008.

### Gain/(loss) on Interest Rate Swaps

Ocean Rig recognized a gain on interest rate swaps, which did not qualify for hedge accounting, of $4.8 million during 2009. Ocean Rig did not hold these swaps in 2008.

### Other, Net

A gain of $2.0 million was recognized during 2009 compared to a loss of $2.3 million during 2008. This was mainly due to the weakening of the U.S. Dollar and a corresponding gain on currency forward contracts to sell U.S. Dollars. Ocean Rig enters into currency forward contracts to hedge against currency exposure related to operating expense in currencies other than U.S. Dollars. The company typically hedges a percentage of next 12 months currency exposure.

### Income Taxes

Ocean Rig's income taxes increased by $10.0 million to $12.8 million for the year ended December 31, 2009, compared to $2.8 million for the 7.5 month period ended December 31, 2008. The taxes for 2009 primarily represent withholding taxes for the operations of the *Eirik Raude* in Ghana. In December 2008, the ownership of the drilling rigs were redomiciled to the Marshall Islands, which has no corporate income taxes. In 2008, the drilling rigs were domiciled in Norway, which has a 28% tax rate. However, Ocean ASA and its subsidiaries had built up a large deferred tax asset in Norway related to net loss carry forwards, which were fully offset by a valuation allowance since it was not deemed more likely that not that such assets would be realized. Subsequent to the acquisition of Ocean Rig ASA in May 2008, Ocean Rig began an internal reorganization to redomicile its activities outside of Norway. This created a taxable gain in 2008 that utilized a portion of the existing net loss carry forwards in Norway with a corresponding reduction in the valuation allowance. As a result, the reorganization had no impact on total income tax expense for the period. In addition, nontaxable goodwill was impaired in 2008 for which there was no tax deduction. In 2009, the internal reorganization continued and certain entities ceased to be taxable in Norway resulting in the reversal of remaining net deferred tax assets and the associated valuation allowance. As a result, there was no impact on deferred tax expense due to the change in the tax status of the entities. Since the drilling rigs operate in international waters around the world, they may become subject to taxation in many different jurisdictions. The basis for such taxation depends upon the relevant regulation in that country. Consequently, there is not an expected relationship between the income tax expense or benefit for the period and the income or loss before taxes. In 2008, the largest part of the income tax expense related to operations in the U.S. while for 2009, the income tax related to activities in Ghana.

111

*Equity in Loss of Investee*

Equity in loss of investee amounted to $1.1 million in the year ended December 31, 2008. This represents the amount of loss that was attributable to the holding of Ocean Rig's shares prior to obtaining control of Ocean Rig ASA for the period from January 1, 2008 to May 14, 2008. There was no such income/loss for the year ended December 31, 2009 since Ocean Rig ASA's results were consolidated for the entire period.

*Net Income/(Loss)*

Ocean Rig's net income increased by $879.8 million to $115.8 million for the year ended December 31, 2009, compared to a loss of $765.8 million for the for the 7.5 month period ended December 31, 2008, reflecting $169.5 million higher revenue, $681.2 million lower operating expenses mainly due to the impairment of goodwill in 2008, $26.8 million lower financing costs, partly offset by $10.0 million higher taxes, as discussed above.

*Non-Controlling Interest*

Ocean Rig's net income allocated to non-controlling interest amounted to a loss of $1.8 million in the year ended December 31, 2008 and $0 for the year ended December 31, 2009. This represents the amount of consolidated income that is not attributable to Ocean Rig from May 14, 2008 until July 10, 2008, when Ocean Rig acquired 100% of Ocean Rig ASA.

112

**Year Ended December 31, 2009, as Restated, Compared to Pro Forma Year Ended December 31, 2008**

| | Ocean Rig UDW Inc. (Pro forma) From January 1, 2008 to December 31, 2008 | Ocean Rig UDW Inc. From January 1, 2009 to December 31, 2009 (As Restated) | Change | Percentage Change |
|---|---|---|---|---|
| | | (U.S. Dollars in thousands) | | |
| **REVENUES:** | | | | |
| Leasing and service revenues | $  301,282 | $  373,525 | $  72,243 | 24.0% |
| Other revenues | 25,363 | 14,597 | (10,766) | (42.4)% |
| **Total revenues** | **326,645** | **388,122** | **61,477** | **18.8%** |
| **EXPENSES:** | | | | |
| Drilling rigs operating expenses | 134,373 | 133,256 | (1,117) | (0.8)% |
| Goodwill impairment | 761,729 | — | (761,729) | — |
| Depreciation and amortization | 71,708 | 75,348 | 3,640 | (5.1)% |
| General and administrative expenses | 26,602 | 17,955 | (8,647) | (32.5)% |
| **Total operating expenses** | **994,412** | **226,559** | **(767,853)** | **77.2%** |
| **Operating income/(loss)** | **(667,767)** | **161,563** | **829,330** | **(124.2)%** |
| Interest and finance costs | (124,669) | (46,120) | 78,549 | (63.0)% |
| Interest income | 3,414 | 6,259 | 2,845 | 83.3% |
| Gain/(loss) on interest rate swaps | — | 4,826 | 4,826 | — |
| Other, net | (2,300) | 2,023 | 4,323 | (188.0)% |
| **Total other income (expenses), net** | **(123,555)** | **(33,012)** | **90,543** | **(73.3)%** |
| **Income/(loss) before taxes and equity in loss of investee** | (791,322) | 128,551 | 919,873 | (116.2)% |
| Income taxes | (4,481) | (12,797) | (8,316) | 185.6% |
| **Net income/(loss) attributable to Ocean Rig UDW Inc.** | **$  (795,803)** | **$  115,754** | **$ 911,557** | **(114.5)%** |

The following discussion gives effect to the acquisition of Ocean Rig ASA as if the transactions had occurred on January 1, 2008. Please see the unaudited pro forma statement of operations included elsewhere in this proxy statement / prospectus that was derived from, and should be read in conjunction with, the historical consolidated financial statements of Ocean Rig for the period January 1, 2008 to December 31, 2008 and Ocean Rig ASA for the period January 1, 2008 to May 14, 2008, which are included elsewhere in this proxy statement / prospectus. See "— Results of Operations."

*Revenues*

Ocean Rig's revenues from leasing and service activities under Ocean Rig's drilling contracts were $373.5 million for the year ended December 31, 2009, compared to $301.3 million for the year ended December 31, 2008. This was an increase of $72.2 million, or 24%. The increase was mainly due to a higher dayrate of $611,000 for the *Eirik Raude* in 2008 and 2009 under the Tullow Oil contract, which the rig commenced in 2008 after the termination of its contract with ExxonMobil, compared to a dayrate of $395,000 in 2008 under the ExxonMobil contract, but was also due in part to higher earnings efficiencies for both rigs. This was partly offset by the deferral of revenue of $33.2 million during the period from October 27, 2009 to December 31, 2009 during the mobilization of the *Leiv Eiriksson* to the Black Sea. Deferred revenue was recognized with $6.5 million for the year ended December 31, 2009 compared to $5.1 million for the year ended December 31, 2008.

During the year ended December 31, 2009, the *Leiv Eiriksson* worked under the Shell contract at a maximum dayrate of $512,000 and under the Petrobras contract at a maximum dayrate of $583,000. The *Leiv Eiriksson* commenced the Petrobras contract on October 27, 2009. During the mobilization period from October 27, 2009 to December 31, 2009, revenues of $33.2 million were deferred and will be amortized to revenue as wells are drilled. During the year ended December 31, 2008, the *Leiv Eiriksson* earned maximum dayrates of $511,000 and $476,000 under the Shell contract in Norway and the Shell contract in the U.K., respectively. The earnings efficiency for the *Leiv Eiriksson* was 90.8% for 2009 compared to 83.2% for 2008.

During the year ended December 31, 2009, under the Tullow Oil contract, the *Eirik Raude* earned a maximum dayrate of $611,000 for the period from January 1 to February 14, when the rate increased to $629,000. Under the ExxonMobil contract for the year ended 2008, the *Eirik Raude* earned a maximum dayrate of $395,000. The *Eirik Raude* commenced the Tullow Oil contract October 9, 2008, at a maximum dayrate of $611,000. The earnings efficiency for the *Eirik Raude* was 99.8% for 2009 compared to an earnings efficiency of 94.1% for 2008.

Other revenues decreased by $10.8 million to $14.6 million for the year ended December 31, 2009, compared to $25.4 million for the year ended December 31, 2008, reflecting amortization of the fair value of the drilling contracts from the purchase price allocation. The decrease is primarily attributable to the fact that amortization of one contract was completed after eight months in 2009, but was amortized throughout the entire year ended 2008.

### Drilling Rigs Operating Expenses

Ocean Rig's drilling rigs operating expenses of $133.3 million for the year ended December 31, 2009, were relatively unchanged from the year ended December 31, 2008.

The *Leiv Eiriksson* commenced the Petrobras contract on October 27, 2009. During the mobilization period from October 27, 2009 to December 31, 2009, costs of $21.8 million were deferred and will be amortized to rig operating expense as wells are drilled.

Deferred cost recognized in the year ended December 31, 2009 was $4.4 million compared to $0.5 million in the year ended December 31, 2008.

### Goodwill Impairment

An impairment charge of $761.7 million was recognized in 2008 as a result of the impairment testing performed on goodwill at December 31, 2008, following the acquisition of Ocean Rig ASA. Following the impairment charge, all goodwill was impaired. From May 14, 2008, the date the Ocean Rig acquired Ocean Rig ASA, through the annual goodwill impairment test performed on December 31, 2008, the offshore drilling market declined significantly and various factors negatively affected industry trends and conditions, which resulted in the revision of certain key assumptions used in determining the fair value of Ocean Rig's investment and therefore the implied fair value of goodwill. During the second half of 2008, the credit markets tightened, driving up the cost of capital. Therefore, Ocean Rig increased the rate of long-term weighted average cost of capital. In addition, the economic downturn and volatile oil prices resulted in a downward revision of projected cash flows in Ocean Rig's forecasted discounted cash flows analysis for its 2008 impairment testing. Furthermore, the decline in the global economy negatively impacted publicly traded company multiples used when estimating fair value under the market approach. Based on results of Ocean Rig's annual goodwill impairment analysis, Ocean Rig determined that the carrying value of its goodwill was impaired.

### Depreciation and Amortization Expense

Ocean Rig's depreciation and amortization expense increased by $3.6 million, or 5.1%, to $75.3 million for the year ended December 31, 2009, compared to $71.7 million for the year ended December 31, 2008. The increase was mainly due to the higher depreciation and amortization basis arising from capital expenditures during 2009.

### General and Administrative Expenses

Ocean Rig's general and administrative expenses decreased by $8.6 million, or 32.5%, to $18.0 million for the year ended December 31, 2009, compared to $26.6 million for the year ended December 31, 2008. The decrease was mainly

114

due to the fact that general and administrative expenses for the year ended December 31, 2008 included a provision of $3.1 million related to an investment bank claim for financial advisory fees and the change-of-control-related costs triggered by Ocean Rig's acquisition of control of Ocean Rig ASA in May 2008. The change-of-control costs mainly related to increased employee compensation expenses of $2.7 million due to stock-based compensation becoming immediately vested as a result of change-of-control provisions in the employee option agreements and $1.3 million due to costs incurred under the management retention bonus program.

### Interest and Finance Costs

Ocean Rig's interest and finance costs decreased by $78.5 million, or 63.0%, to $46.1 million for the year ended December 31, 2009, compared to $124.7 million for the year ended December 31, 2008. The decrease was mainly due to the incurrence of $26.9 million of expenses in 2008 related to the refinancing of the notes issued in 2005 and 2006 with the $1.04 billion credit facility. In addition, the interest and finance costs in 2009 from the $1.04 billion credit facility declined compared to the financing in 2008 under the notes issued in 2005 and 2006. The refinancing resulted in expenses of $26.9 million in 2008 related to redemption costs and accelerated amortization of debt issuance costs. The level of outstanding debt in 2009 was impacted by debt related to the four drillships under construction, which were acquired in March and May 2009. At year end 2009, the balance of the debt incurred in connection with the acquisition of the drillships was $416.3 million. However, $24.4 million of the related interest expense was capitalized as part of the construction costs for the drillships. During 2008 the drillships under construction were not yet acquired and consequently there was no related interest expense or capitalized interest.

On May 9, 2008, Ocean Rig concluded a guarantee facility of NOK5.0 billion (approximately $974,500) and a term loan of $800,000 in order to guarantee the purchase price of the Ocean Rig ASA shares to be acquired through the mandatory offering and to finance the acquisition cost of the Ocean Rig ASA shares. The loan bore interest at LIBOR plus a margin. For purposes of the pro forma information, it is assumed that the loan was drawn down from January 1, 2008 and therefore had interest expense for the whole year. The interest rate assumed was based upon the LIBOR in effect at the actual acquisition date of May 14, 2008. The total pro forma adjustment for interest expense for the period from January 1, 2008 to May 15, 2008 amounted to $11,316.

### Interest Income

Interest income amounted to $6.3 million for the year ended December 31, 2009, compared to $3.4 million for the year ended December 31, 2008, primarily due to the impact of higher cash balances and restricted cash in 2009 partly offset by higher interest rate levels in 2008 compared to 2009.

### Gain/(Loss) on Interest Rate Swaps

Ocean Rig recognized a gain on interest rate swaps, which did not qualify for hedge accounting, of $4.8 million during the year ended December 31, 2009. There was no such gain or loss for the year ended December 31, 2008.

### Other, Net

A gain of $2.0 million was recognized during the year ended December 31, 2009, compared to a loss of $2.3 million during the year ended December 31, 2008, principally for currency forward contracts. The main reason for the 2008 loss was a substantial appreciation of the U.S. Dollar, and a corresponding loss on currency forward contracts for U.S. Dollars sales. The main reason for the 2009 gain was a substantial depreciation of the U.S. Dollar, and a corresponding gain on currency forward contracts for U.S. Dollars sales.

### Income Taxes

Ocean Rig's income taxes increased by $8.3 million, to $12.8 million for the year ended December 31, 2009, compared to $4.5 million for the year ended December 31, 2008. The taxes for 2009 and 2008 primarily represent withholding taxes for drilling. In December 2008, the ownership of the drilling rigs had been redomiciled to the Republic of the Marshall Islands, which has no corporate income taxes. In 2008, the drilling rigs were domiciled in Norway with a 28% tax rate. However, Ocean Rig ASA and its subsidiaries had historically built up a large deferred tax asset in Norway related to net loss carry forwards which were fully offset by a valuation allowance since it was

115

not deemed more likely than not that such assets would be realized. Subsequent to the acquisition of Ocean Rig ASA in May 2008, Ocean Rig began an internal reorganization to redomicile that company's activities outside of Norway. This created a taxable gain in 2008 that utilized a portion of the existing net loss carry forwards in Norway with a corresponding reduction in the valuation allowance. As a result, this had no impact on total income tax expense for the period. In addition, nontaxable goodwill was impaired in 2008 for which there was no tax deduction. In 2009, the internal reorganization continued and certain entities ceased to be taxable in Norway resulting in the reversal of remaining net deferred tax assets and the associated valuation allowance. As a result, there was no impact on deferred tax expense due to the change in the tax status of the entities. Since the drilling rigs operate in international waters around the world, they may become subject to taxation in many different jurisdictions. The basis for such taxation depends on the relevant regulation in the country. Consequently, there is no expected relationship between the income tax expense or benefit for the period and the income or loss before taxes. The 2009 taxes primarily represent withholding taxes for the operations of the *Eirik Raude* in Ghana that commenced in November 2008 of $11.4 million. In 2008, income taxes primarily related to drilling operations in Ghana, the U.K., the United States and Ireland.

*Net Income/(Loss)*

   Ocean Rig's net income increased by $911.6 million, to $115.8 million for the year ended December 31, 2009, compared to a loss of $795.8 million for the year ended December 31, 2008, reflecting $61.5 million higher revenue, $767.9 million lower operating expenses mainly due to the impairment of goodwill in 2008 and $81.4 million lower financing costs, which were partly offset by $8.3 million higher taxes, as discussed above.

## Liquidity and Capital Resources

   As of June 30, 2011, Ocean Rig had cash and cash equivalents of approximately $191.7 million and $220.2 million of restricted cash related mainly to collateral or minimum liquidity covenants contained in its loan agreements. As of December 31, 2010, Ocean Rig had cash and cash equivalents of approximately $95.7 million and $562.8 million of restricted cash related mainly to collateral or minimum liquidity covenants contained in Ocean Rig's loan agreements. Furthermore, as of June 30, 2011, Ocean Rig had total bank debt of $2.12 billion. As of December 31, 2010, Ocean Rig had total bank debt of $1.26 billion.

   On January 3, 2011, in connection with the delivery of the *Ocean Rig Corcovado,* Ocean Rig paid the final shipyard installment of $289.0 million. On January 4, 2011, Ocean Rig repaid its $300 million short term overdraft facility from the restricted cash from the escrow account securing the loan. On January 5, 2011, Ocean Rig drew down the full amount of the $325 million short term loan facility. On March 18, 2011, Ocean Rig repaid the outstanding amount of $115.0 million under its $230.0 million loan agreement. On March 30, 2011, Ocean Rig took delivery of the *Ocean Rig Olympia* and paid $288.4 million as the final construction installment payment to the shipyard. During March and April 2011, Ocean Rig borrowed an aggregate of $175.5 million from DryShips through shareholder loans for capital expenditures and general corporate purposes. On April 20, 2011, these intercompany loans were repaid. On April 18, 2011, in connection with the exercise of the first of the six newbuilding drillship options, Ocean Rig entered into a shipbuilding contract for the first of its seventh generation hulls and paid $207.6 million to the shipyard. On April 19, 2011, Ocean Rig repaid an amount of $24.9 million under its Deutsche Bank credit facilities and during 2011 to the date of this proxy statement / prospectus, Ocean Rig paid an aggregate amount of $135.8 million under its $1.04 billion credit facility. On April 20, 2011, Ocean Rig drew down the full amount of its $800.0 million senior secured term loan agreement and repaid its $325.0 million short-term credit facility. On April 27, 2011, Ocean Rig issued $500.0 million in aggregate principal amount of its 9.5% senior unsecured notes due 2016, from which Ocean Rig received net proceeds of $487.5 million. On April 27, 2011, Ocean Rig entered into an agreement with the lenders to restructure the Deutsche Bank credit facilities. The principal terms of the restructuring are as follows: (i) the maximum amount permitted to be drawn under each facility was reduced from $562.5 million to $495.0 million; (ii) in addition to the guarantee already provided by DryShips, Ocean Rig provided an unlimited recourse guarantee that includes certain financial covenants, which are discussed below; and (iii) Ocean Rig is permitted to draw under the facility with respect to the *Ocean Rig Poseidon* based upon the fixture of the drillship under its drilling contract with Petrobras Tanzania, and on April 27, 2010, the cash collateral deposited for this vessel was released. On August 10, 2011, Ocean Rig amended the terms of the

116

credit facility for the construction of the *Ocean Rig Mykonos* to allow for full drawdowns to finance the remaining installment payments for this drillship based on the Petrobras Brazil contract and on August 10, 2011, the cash collateral deposited for the drillship was released.

Ocean Rig's cash and cash equivalents increased by $96.0 million to $191.7 million as of June 30, 2011, compared to $95.7 million as of December 31, 2010. As of December 31, 2010, Ocean Rig's cash and cash equivalents decreased by $138.5 million to $95.7 million, compared to $234.2 million as of December 31, 2009. Working capital is defined as current assets minus current liabilities (including the current portion of long-term debt).

As of June 30, 2011, Ocean Rig had a working capital surplus of $9.4 million, compared to a working capital surplus of $4.1 million as of December 31, 2010.

As of December 31, 2010, Ocean Rig's working capital surplus was $4.1 million, compared to a working capital deficit of $123.7 million, as of December 31, 2009. The increase in Ocean Rig's working capital position was primarily due to the number of loans classified as long term debt for 2010 compared to 2009 when a greater number of loans were classified as current due to the breach of covenants by DryShips and cross-default provisions in its loan agreements, which resulted in a technical cross-default under Ocean Rig's loan agreements.

If Ocean Rig does not strengthen its working capital surplus, or if Ocean Rig returns to a working capital deficit and such a working capital deficit continues to grow, lenders may be unwilling to provide future financing or will provide future financing at significantly increased interest rates, which will negatively affect Ocean Rig's earnings, liquidity and capital position, and its ability to make timely payments on its newbuilding purchase contracts and to meet its debt repayment obligations. Ocean Rig expects that the lenders will not demand payment of loans before their maturity, provided that Ocean Rig pays loan installments and accumulated accrued interest as they come due under the existing facilities. Ocean Rig plans to settle the loan interest and scheduled loan repayments with cash generated from operations.

Ocean Rig's principal use of funds has been capital expenditures to establish and grow its fleet, maintain the quality of its drilling units, comply with international standards, environmental laws and regulations, fund working capital requirements and make principal repayments on outstanding loan facilities. Since its formation, Ocean Rig's principal source of funds has been equity provided by its shareholders through their equity offerings or at the market sales, operating cash flows and long-term borrowings. From January 1, 2009 to December 3, 2010, Ocean Rig received $1.3 billion in cash from its parent company, DryShips, in the form of capital contributions to meet obligations for capital expenditures on Ocean Rig's drillships under construction and debt repayments during the period. In 2011 year to date, Ocean Rig has not received cash capital contributions from DryShips. As Ocean Rig is no longer a wholly-owned subsidiary of DryShips, even if it is able to do so, DryShips may be unwilling to provide continued funding for Ocean Rig's capital expenditure requirements or only provide such funding in return for market rate repayment and interest rates or issuances of equity securities, which could be significantly dilutive to other shareholders. In March and April 2011, Ocean Rig borrowed an aggregate amount of $175.5 million from DryShips through shareholder loans, which Ocean Rig repaid in full in April 2011.

Based on its current liquidity position, Ocean Rig does not expect to require funding from DryShips over the next 12 months. Excluding its three recently-exercised newbuilding drillship options, its newbuilding program is fully financed with bank debt and anticipated internal cash flow. Further, all pre-delivery payments have been made under Ocean Rig's three recently-exercised drillship options. The delivery payments for each of these drillships is due in 2013 and Ocean Rig expects to finance these payments with cash on hand, operating cash flow and bank debt that Ocean Rig intends to arrange.

As of June 30, 2011, Ocean Rig had aggregate debt outstanding of $2.12 billion, inclusive of deferred financing costs amounting to $47.1 million, of which $231.2 million was classified as current on Ocean Rig's balance sheet. As of December 31, 2010, Ocean Rig had aggregate debt outstanding of $1.26 billion, inclusive of deferred financing costs amounting to $27.8 million, of which $560.6 million, was classified as current on its balance sheet. As of June 30, 2011 and December 31, 2010, Ocean Rig had $717.4 million and $928.3 million, respectively, of unutilized credit facilities for the construction of the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* . The credit facility for the *Ocean Rig Mykonos* requires that any drawdowns under the facility be

collateralized with an equivalent deposit to restricted cash until Ocean Rig finds suitable employment for that drillship. While the contract with Petrobras Brazil for the *Ocean Rig Mykonos* does not satisfy the minimum dayrates and terms required under this credit facility, on August 10, 2011, Ocean Rig and its lenders amended the credit facility based on the Petrobras Brazil contract to allow for drawdowns and the release of collateral deposited for the *Ocean Rig Mykonos* .

As of December 31, 2010, Ocean Rig had purchase commitments of approximately $1.37 billion, which represented the remaining construction and construction-related payments for the *Ocean Rig Olympia* , which was delivered on March 30, 2011, the *Ocean Rig Poseidon* , which was delivered on July 28, 2011, and the *Ocean Rig Mykonos* , which was delivered on September 30, 2011. As of June 30, 2011, Ocean Rig had substantial purchase commitments mainly representing the remaining yard installments of $614.7 million for the *Ocean Rig Poseidon* , which was delivered on July 28, 2011, and the *Ocean Rig Mykonos* , which was delivered on September 30, 2011. In addition, in the second quarter of 2011, Ocean Rig exercised three of its options with Samsung for the construction of three additional ultra-deepwater drillships and, accordingly, entered into shipbuilding contracts for its seventh generation hulls, which are scheduled to be delivered in July 2013, September 2013 and November 2013, respectively, for a total estimated project cost per drillship of $638.0 million, consisting of $570.0 million of construction costs, costs of approximately $38.0 million for upgrades to the existing drillship specifications and construction-related expenses of $30.0 million. In connection with the exercise of these options, Ocean Rig paid $207.6 million, $207.4 million and $217.4 million, respectively, to the shipyard in the second quarter of 2011. Ocean Rig intends to apply a portion of the proceeds from its 9.5% senior unsecured notes due 2016 to fund the construction of its seventh generation hulls. However, Ocean Rig will have remaining construction and construction-related payments of approximately $1.2 billion coming due in 2013 for which it has not yet arranged financing. The remaining three optional drillships have an estimated total project cost, excluding financing costs, of $638.0 million each. To the extent Ocean Rig exercises any of the three options it has with Samsung for the construction of three additional newbuilding drillships, with an estimated cost of $1.9 billion in the aggregate, Ocean Rig will incur additional payment obligations for which it has not arranged financing. These options are exercisable by Ocean Rig any time on or prior to January 31, 2012; their exercise would result in payment at the time of the exercise of an aggregate of $701.8 million if the options are exercised at the same specifications as the first three options.

Ocean Rig drew down the Deutsche Bank credit facility for the construction of the *Ocean Rig Poseidon* based upon the employment of the drillship under its drilling contract with Petrobras Tanzania, and on April 27, 2011, the cash collateral deposited for this vessel was released. On August 10, 2011, Ocean Rig amended the terms of the Deutsche Bank credit facility for the construction of the *Ocean Rig Mykonos* to allow for full drawdowns to finance the remaining installment payments for this drillship based on the Petrobras Brazil contract and on August 10, 2011, the cash collateral deposited for the drillship was released. The amendment also requires that the *Ocean Rig Mykonos* be re-employed under a contract acceptable to the lenders meeting certain minimum terms and dayrates at least six months, in lieu of 12 months, prior to the expiration of the Petrobras Brazil contract. All other material terms of the credit facility were unchanged.

Ocean Rig expects that its existing cash balances, internally generated cash flows, drawdowns under the credit facilities for the construction of the *Ocean Rig Mykonos* and proceeds from the issuance of new debt or equity will fulfill anticipated obligations such as scheduled debt maturities, committed capital expenditures and working capital needs. Additionally, DryShips has committed to provide cash to meet Ocean Rig's liquidity needs throughout 2011. See note 1.b. to the consolidated financial statements. However, as discussed above, due to Ocean Rig's current liquidity position, which is mainly driven by transactions concluded in April 2011, including its entry into the $800.0 million senior secured term loan agreement and its issuance of $500.0 million aggregate principal amount of 9.5% senior unsecured notes due 2016, Ocean Rig does not expect to require funding from DryShips over the next 12 months. If Ocean Rig requires financing from DryShips over the next 12 months and such financing is not available, Ocean Rig does not expect the lack of financing from DryShips to have a material impact on its ability to satisfy its liquidity requirements and to finance future operations over the next 12 months and intend to cover any shortfalls with new bank debt that Ocean Rig would seek to obtain.

Ocean Rig's internally generated cash flow is directly related to its business and the market sectors in which Ocean Rig operates. Should the drilling market deteriorate, or should Ocean Rig experience poor results in its

operations, cash flow from operations may be reduced. As of the date of this proxy statement / prospectus, Ocean Rig believes that amounts available under its existing credit facilities, current cash balances, as well as operating cash flow, together with any debt or equity issuances in the future, will be sufficient to meet its liquidity needs for the next 12 months, including minimum cash requirements under its loan agreements, and payment obligations for its newbuilding drillships, assuming the drilling or financing markets do not deteriorate. Ocean Rig's access to debt and equity markets may be reduced or closed due to a variety of events, including a credit crisis, credit rating agency downgrades of its debt, industry conditions, general economic conditions, market conditions and market perceptions of Ocean Rig and its industry.

Ocean Rig partially funded the construction costs of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* with borrowings under the $800.0 million senior secured term loan agreement. In July 2011, Ocean Rig funded $308.2 million and $309.3 million remaining construction costs for the *Ocean Rig Poseidon* with borrowings under the Deutsche Bank credit facility for the construction of the drillship. In September 2011, Ocean Rig funded the remaining construction and construction-related costs of the *Ocean Rig Mykonos* , which amounted to $305.7 million, with borrowings under its credit facilities.

## Compliance with Financial Covenants under Secured Credit Facilities

Ocean Rig's secured credit facilities impose operating and financial restrictions on it. These restrictions generally limit Ocean Rig's subsidiaries' ability to, among other things (i) pay dividends, (ii) incur additional indebtedness, (iii) create liens on their assets, (iv) change the management and/or ownership of the drilling units, and (v) change the general nature of their business. For example, Ocean Rig is prohibited from paying dividends under its $800 million secured term loan agreement without the lender's consent.

In addition, Ocean Rig's existing secured credit facilities require Ocean Rig and certain of its subsidiaries to maintain specified financial ratios and satisfy financial covenants, mainly to ensure that the market value of the mortgaged drilling unit under the applicable credit facility, determined in accordance with the terms of that facility, does not fall below a certain percentage of the outstanding amount of the loan, or a value maintenance clause (which becomes applicable upon the completion of construction and following the delivery of the applicable drillship to Ocean Rig). In general, these financial covenants relate to the maintenance of (i) minimum amount of free cash; (ii) leverage ratio not to exceed specified levels; (iii) minimum interest coverage ratio; (iv) minimum current ratio (the ratio of current assets to current liabilities); and (v) minimum equity ratio (the ratio of value adjusted equity to value adjusted total assets). In addition, DryShips, because it guarantees Ocean Rig's Deutsche Bank credit facilities and Ocean Rig's $800.0 million senior secured term loan agreement, is required to maintain certain financial covenants, as guarantor under the facilities. In general, these financial covenants require DryShips to maintain (i) minimum liquidity; (ii) a minimum market adjusted equity ratio; (iii) a minimum interest coverage ratio; (iv) a minimum market adjusted net worth; and (v) a minimum debt service coverage ratio.

Furthermore, all of Ocean Rig's loan agreements also contain a cross-default provision that may be triggered by either a default under one of its other loan agreements or a default by DryShips under one of its loan agreements. A cross-default provision means that a default on one loan would result in a default on all of Ocean Rig's other loans. A default by DryShips under one of its loan agreements would trigger a cross-default under Ocean Rig's Deutsche Bank credit facilities and would provide Ocean Rig's lenders with the right to accelerate the outstanding debt under these facilities. Further, if DryShips defaults under one of its loan agreements, and the related debt is accelerated, this would trigger a cross-default under Ocean Rig's $1.04 billion credit facility and its $800.0 million secured term loan agreement and would provide Ocean Rig's lenders with the right to accelerate the outstanding debt under these facilities.

In general, a violation of financial covenants constitutes a breach under Ocean Rig's credit facilities and its lenders may declare an event of default, which would, unless waived by Ocean Rig's lenders, provide its lenders with the right to require Ocean Rig to post additional collateral, enhance its equity and liquidity, increase its interest payments, pay down its indebtedness to a level where Ocean Rig is in compliance with its loan covenants, sell assets, reclassify Ocean Rig's indebtedness as current liabilities and accelerate its indebtedness, which would impair its ability to continue to conduct its business.

Due to the decline in vessel values in the drybulk shipping sector, DryShips was in breach of certain of its financial covenants as of December 31, 2008 and, as a result, obtained waiver agreements from its lenders waiving the violations of such covenants. As of June 30, 2010, DryShips had either regained compliance with the covenants under its loan agreements or had the ability to remedy shortfalls in value maintenance requirements within specified grace periods. Some of these waiver agreements expire during 2011 and 2012, at which time the original covenants come back into effect.

If Ocean Rig's indebtedness is accelerated pursuant to the cross-default provisions, it will be very difficult in the current financing environment for Ocean Rig to refinance its debt or obtain additional financing and Ocean Rig could lose its drilling rigs if Ocean Rig's lenders foreclose their liens. Ocean Rig does not expect that cash on hand and cash generated from operations would be sufficient to repay its loans that have cross-default provisions, which aggregated approximately $1.62 billion June 30, 2011, if that debt were to be accelerated by the lenders. In such a scenario, Ocean Rig would be required to raise additional funds of approximately $2.23 billion through debt or equity issuances in order to repay such debt and meet its capital expenditure requirements as of June 30, 2011, although such financing may not be available on attractive terms or at all.

### Credit Facilities

For a description of Ocean Rig's credit facilities, see "Business — Description of Indebtedness"

### Cash Flows

#### *Six-month period ended June 30, 2011 compared to period ended June 30, 2010*

Ocean Rig's cash and cash equivalents increased to $191.7 million as of June 30, 2011, compared to $95.7 million as of December 31, 2010, primarily due to cash provided by new financing and operating activities partly offset by cash used in investing activities.

Working capital is equal to current assets minus current liabilities, including the current portion of long-term debt. Ocean Rig's working capital surplus was $9.4 million as of June 30, 2011, compared to a $211.0 million working capital deficit as of June 30, 2010.

The change in working capital is primarily due to a $320.7 million lower current interest bearing debt balance partly offset by $124.0 million lower cash balance including restricted cash.

#### *Net cash used in operating activities*

Net cash provided by operating activities was $93.9 million for the six-month period ended June 30, 2011, compared to $99.0 million for the six-month period ended June 30, 2010, primarily reflecting lower profitability of the operations and higher trade related working capital partly offset by return of margin calls.

#### *Net cash used in investing activities*

Net cash used in investing activities was $850.8 million for the six-month period ended June 30, 2011. Net cash used in investing activities was $521.2 million for the six-month period ended June 30, 2010. Ocean Rig made shipyard payments and project capital expenditures of approximately $1,187.7 million for six-month period ended June 30, 2011. This compares to $483.3 million for advances for drillships for the six-month period ended June 30, 2010. The decrease in restricted cash was $346.9 million during six-month period ended June 30, 2011, reflecting primarily repayment of the $300.0 million Credit Facility with related restricted cash, compared to an increase of $34.2 million in the corresponding period of 2010.

#### *Net cash provided by financing activities*

Net cash provided by financing activities was $853.0 million for the six-month period ended June 30, 2011, consisting of $1,682.1 million in net proceeds from new long term debt largely offset by repayments of short term debt and the current portion of long term debt of $829.2 million. This compares to net cash provided by financing activities of $341.7 million for the six month period ended June 30, 2010, mainly consisting of $402.6 million of

120

shareholders contribution for investments partly offset by repayment of current portion of long term debt of $61.1 million.

### *Year ended December 31, 2010 compared to year ended December 31, 2009*

Ocean Rig's cash and cash equivalents decreased to $95.7 million as of December 31, 2010, compared to $234.2 million as of December 31, 2009, primarily due to cash used in investing activities which was partly offset by cash provided by operating activities and financing activities. Working capital is equal to current assets minus current liabilities, including the current portion of long-term debt. Ocean Rig's working capital surplus was $4.1 million as of December 31, 2010, compared to a $123.7 million working capital deficit as of December 31, 2009. The movement from a deficit to a surplus is due to the reclassification of long-term debt from current liabilities to non-current liabilities due to DryShips' compliance with its covenants, which removed the technical cross-default under Ocean Rig's loan agreements.

#### *Net cash used in operating activities*

Net cash provided by operating activities was $221.8 million for the year ended December 31, 2010, compared to $211.1 million for the year ended December 31, 2009. The increase is mainly due to increased operational profitability during 2010.

#### *Net cash used in investing activities*

Net cash used in investing activities was $1.4 billion for the year ended December 31, 2010. Net cash used in investing activities was $146.8 million for the year ended December 31, 2009. Ocean Rig made shipyard payments of approximately $999.6 million for advances for drillships for the year ended December 31, 2010. This compares to $130.8 million for advances for drillships for the year ended December 31, 2009. The increase in restricted cash was $335.9 million during 2010 and was mainly driven by a $300.0 million short-term credit facility, which was fully cash collateralized and was repaid in January 2011, compared to $185.6 million in the corresponding period of 2009. The increase in the cash used in investing activities for year ended December 31, 2010 was mainly due to yard installments.

#### *Net cash provided by financing activities*

Net cash provided by financing activities was $1.08 billion for the year ended December 31, 2010, consisting mainly of shareholders contribution to fund investments of $540.3 million, net proceeds from the private offering of $488.3 million, proceeds from bank debt of $308.2 million and the repayment of bank debt of $247.7 million. Net cash used in by financing activities was $103.0 million for the year ended December 31, 2009, consisting of shareholders' contribution of $753.4 million, proceeds from credit facilities of $150.0 million and debt repayments of $1.0 billion.

### *Year ended December 31, 2009 compared to year ended December 31, 2008*

Ocean Rig's cash and cash equivalents decreased to $234.2 million as of December 31, 2009, compared to $272.9 million as of December 31, 2008, primarily due to increased use of cash in investing and financing activities, which was partly offset by increased cash provided by operating activities, which was more than offset by cash used in investing and financing activities. Working capital is equal to current assets minus current liabilities, including the current portion of long-term debt. Ocean Rig's working capital deficit was $123.7 million as of December 31, 2009 compared to a working capital deficit of $518.7 million as of December 31, 2008. The deficit decrease mainly due to the increase in Ocean Rig's current assets as a result of equity issuances in 2009, a portion of which Ocean Rig used to repay short-term credit facilities. Ocean Rig's working capital deficit of $123.7 million at December 31, 2009 included indebtedness of $285.6 million, which had been classified as current as a result of breach of its loan covenants.

*Net cash provided by operating activities*

Net cash provided by operating activities increased by $190.0 million to $211.1 million for the year ended December 31, 2009, compared to $21.1 million for the year ended December 31, 2008. This increase was primarily attributable to the contribution of drill rigs income for the entire year of 2009 due to increased day rates.

*Net cash used in investing activities*

Net cash used in investing activities was $146.8 million for the year ended December 31, 2009. Ocean Rig made payments of $145.0 million for asset acquisitions and improvements, and it received $183.8 million in cash from the acquisition of drillships and the increase for restricted cash was $185.6 million.

Net cash used in investing activities was approximately $1.02 billion during 2008 consisting of $972.8 million paid to acquire Ocean Rig ASA, $16.6 million in payments for rig improvements and $31.3 million in the increase of restricted cash.

*Net cash provided by financing activities*

Net cash used in financing activities was $103.0 million for the year ended December 31, 2009, consisting mainly of net proceeds of $753.3 million from equity contributions and the drawdown of an additional $150.0 million under the credit facilities. This was more than offset by the repayment of $1.0 billion of debt under its long and short-term credit facilities.

Net cash provided by financing activities was $1.3 billion for the year ended December 31, 2008, consisting mainly of a $2.1 billion drawdown under short-term and long-term facilities and $650.2 million of equity contributions, partly offset by payments under short-term and long-term credit facilities in the aggregate amount of $1.4 billion.

## Swap Agreements

As of June 30, 2011, Ocean Rig had 7 interest rate swap and cap and floor agreements outstanding, with a notional amount of $1,024.2 million, maturing from September 2011 through November 2017. These agreements were entered into in order to economically hedge Ocean Rig's exposure to interest rate fluctuations with respect to its borrowings. As of January 1, 2011, Ocean Rig discontinued hedge accounting and, as such, changes in their fair values are included in the accompanying consolidated statement of operations for the six month period ended June 30, 2011. As of June 30, 2011, the fair value of all of the above agreements was a liability of $93.4 million. This fair value equates to the amount that would be paid by Ocean Rig if the agreements were cancelled at the reporting date, taking into account current interest rates and Ocean Rig's creditworthiness.

As of June 30, 2011, security deposits (margin calls) of $59.3 million were paid and were recorded as "Other non current assets" in Ocean Rig's consolidated balance sheet. These deposits are required by the counterparty due to the market loss in the swap agreements.

As of December 31, 2008, 2009 and 2010 Ocean Rig had outstanding 11 interest rate swap and cap and floor agreements, with a notional amount of $733 million, $768.1 million and $908.5 respectively, maturing from September 2011 through November 2017. These agreements are entered into in order to economically hedge Ocean Rig's exposure to interest rate fluctuations with respect to its borrowings. As of December 31, 2008 and 2009, eight of these agreements did not qualify for hedge accounting and, as such, changes in their fair values are included in the accompanying consolidated statement of operations. As of December 31, 2008, 2009 and 2010 three agreements qualified for and were designated for hedge accounting and, as such, changes in their fair values are included in other comprehensive loss. The fair value of these agreements equates to the amount that would be paid by Ocean Rig if the agreements were cancelled at the reporting date, taking into account current interest rates and Ocean Rig's creditworthiness.

As of December 31, 2009 and December 31, 2010, security deposits (margin calls) of $40.7 million and $78.6 million, respectively, were paid and were recorded as "Other non current assets" in Ocean Rig's consolidated balance sheet. These deposits are required by the counterparty due to the market loss in the swap agreements.

122

**Currency Forward Sale Exchange Contracts**

As of June 30, 2011, Ocean Rig had currently forward sale exchange contracts for the future sales of U.S. Dollars at fixed rates of $7.0 million outstanding with a fair market value of $1.1 million recorded in "Financial instruments" in its consolidated balance sheet. For the relevant period, Ocean Rig did not designate currency forward sale exchange contracts as hedges under U.S. GAAP, and realized and unrealized gains are included as Other, net in its consolidated statement of operations. See note 11 to the audited consolidated financial statements of Ocean Rig.

As of December 31, 2010, Ocean Rig had currently forward sale exchange contracts for the future sales of U.S. Dollars at fixed rates of $28.0 million outstanding with a fair market value of $1.5 million recorded in "Financial instruments" in its consolidated balance sheet. For the relevant period, Ocean Rig did not designate currency forward sale exchange contracts as hedges under U.S. GAAP, and realized and unrealized gains are included as Other, net in Ocean Rig's consolidated statement of operations. See note 11 to the audited consolidated financial statements of Ocean Rig.

As of December 31, 2009, Ocean Rig had currency forward sale exchange contracts for the future sales of U.S. Dollars at fixed rates of $20.0 million outstanding with a fair market value of $0.4 million recorded in "Financial instruments" in Ocean Rig's consolidated balance sheet. For the relevant period, Ocean Rig did not designate currency forward sale exchange contracts as hedges under US GAAP, and realized and unrealized gains and losses are included as Other, net in its consolidated statement of operations. See note 11 to the audited consolidated financial statements of Ocean Rig.

**Off-Balance Sheet Arrangements**

Ocean Rig does not have any off-balance sheet arrangements.

**Critical Accounting Policies**

*Drilling units under construction:*  This represents amounts Ocean Rig expends in accordance with the terms of the construction contracts for its drillships as well as expenses incurred directly or under a management agreement with a related party in connection with on site supervision. In addition, interest costs incurred during the construction (until the asset is substantially complete and ready for its intended use) are capitalized and depreciated over the useful life of the asset upon delivery. The carrying value of drillships under construction, referred to as newbuildings, represents the accumulated costs at the balance sheet date. Cost components include payments for yard installments and variation orders, commissions to related party, construction supervision, equipment, spare parts, capitalized interest, costs related to first time mobilization and not covered by the client or the contract and commissioning costs. No charge for depreciation is made until commissioning of the newbuilding has been completed and it is ready for its intended use.

*Capitalized interest:*  Interest expenses are capitalized during the construction period of drilling units under construction based on accumulated expenditures for the applicable project at Ocean Rig's current rate of borrowing. The amount of interest expense capitalized in an accounting period is determined by applying an interest rate (the "capitalization rate") to the average amount of accumulated expenditures for the asset during the period. The capitalization rates used in an accounting period are based on the actual interest rates applicable to borrowings outstanding during the period. Ocean Rig does not capitalize amounts beyond the actual interest expense incurred in the period.

If Ocean Rig's financing plans associate a specific new borrowing with a qualifying asset, Ocean Rig uses the rate on that borrowing as the capitalization rate to be applied to that portion of the average accumulated expenditures for the asset that does not exceed the amount of that borrowing. If average accumulated expenditures for the asset exceed the amounts of specific new borrowings associated with the asset, the capitalization rate applied to such excess is a weighted average of the rates applicable to other of Ocean Rig's borrowings.

*Drilling Unit Machinery and Equipment, Net:*  Drilling units are stated at historical cost less accumulated depreciation. Such costs include the cost of adding or replacing parts of drilling unit machinery and equipment when that cost is incurred, if the recognition criteria are met. The recognition criteria require that the cost incurred

extends the useful life of a drilling unit. The carrying amounts of those parts that are replaced are written off and the cost of the new parts is capitalized. Depreciation is calculated on a straight-line basis over the useful life of the assets as follows: bare-deck, 30 years and other asset parts, 5 to 15 years.

Drilling unit machinery and equipment, information technology and office equipment are recorded at cost and are depreciated on a straight-line basis over the estimated useful lives, for drilling unit machinery and equipment over 5 to 15 years and for information technology and office equipment over 5 years.

*Goodwill and intangible assets:* Goodwill represents the excess of the purchase price over the estimated fair value of net assets acquired in a business combination. Goodwill is reviewed for impairment whenever events or circumstances indicate possible impairment. Ocean Rig tests goodwill for impairment annually. Goodwill is not amortized. Ocean Rig has no other intangible assets with an indefinite life. Ocean Rig tests for impairment each year on December 31.

Ocean Rig tests goodwill for impairment by first comparing the carrying value of the reporting unit, which is defined as an operating segment or a component of an operating segment that constitutes a business for which financial information is available and is regularly reviewed by management, to its fair value. Ocean Rig estimates the fair value of the reporting unit by weighting the combination of generally accepted valuation methodologies, including both income and market approaches.

For the income approach, Ocean Rig applies un-discounted projected cash flows. To develop the projected net cash flows from its reporting unit, which are based on estimated future utilization, dayrates, projected demand for its services, and rig availability, Ocean Rig considers key factors that include assumptions regarding future commodity prices, credit market uncertainties and the effect these factors may have on its contract drilling operations and the capital expenditure budgets of its customers.

For the market approach, Ocean Rig derives publicly traded company multiples from companies with operations similar to its reporting unit by using information publicly disclosed by other publicly traded companies and, when available, analyses of recent acquisitions in the marketplace.

If the fair value of a reporting unit exceeds its carrying value, no further testing is required. This is referred to as Step 1. If the fair value is determined to be less than the carrying value, a second step, Step 2, is performed to compute the amount of the impairment, if any. In this process, an implied fair value for goodwill is estimated, based in part on the fair value of the operations, and is compared to its carrying value. The shortfall of the implied fair value of goodwill below its carrying value represents the amount of goodwill impairment.

All of Ocean Rig's goodwill was impaired as at December 31, 2008.

Ocean Rig's finite-lived acquired intangible assets are recorded at historical cost less accumulated amortization. Amortization is recorded on a straight-line basis over the estimated useful lives of the intangibles as follows:

| Intangible Assets/Liabilities | Years |
|---|---:|
| Tradenames | 10 |
| Software | 10 |

Fair value of above market acquired time charters over remaining contract term

Trade names and software constitute the item "Intangible assets" in the Consolidated Balance Sheets. The amortization of these items are included in the line "Depreciation and amortization" in the Consolidated Statement of Operations.

*Impairment of long-lived assets:* Ocean Rig reviews for impairment long-lived assets and intangible long-lived assets held and used whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. In this respect, Ocean Rig reviews its assets for impairment on a rig by rig and asset by asset basis. When the estimate of undiscounted cash flows, excluding interest charges, expected to be generated by the use of the asset is less than its carrying amount, Ocean Rig evaluates the asset for impairment loss. The impairment loss is determined by the difference between the carrying amount of the asset and the fair value of the asset.

124

As at December 31, 2009 and 2010, Ocean Rig performed an impairment review of its long-lived assets due to the global economic downturn, the significant decline in drilling rates in the rig industry and the outlook of the oil services industry. Ocean Rig compared undiscounted cash flows with the carrying values of its long-lived assets to determine if the assets were impaired. In developing estimates of future cash flows, Ocean Rig relied upon assumptions made by management with regard to its rigs, including future drilling rates, utilization rates, operating expenses, future dry docking costs and the estimated remaining useful lives of the rigs. These assumptions are based on historical trends as well as future expectations in line with Ocean Rig's historical performance and its expectations for future fleet utilization under its current fleet deployment strategy, and are consistent with the plans and forecasts used by management to conduct its business. The variability of these factors depends on a number of conditions, including uncertainty about future events and general economic conditions; therefore, Ocean Rig's accounting estimates might change from period to period. As a result of the impairment review, Ocean Rig determined that the carrying amounts of its assets held for use were recoverable, and therefore, concluded that no impairment loss was necessary for 2009 and 2010.

Fair value of above/below market acquired drilling contract: In a business combination, Ocean Rig identifies assets acquired or liabilities assumed and records all such identified assets or liabilities at fair value. Favorable or unfavorable drilling contracts exist when there is a difference between the contracted dayrate and the dayrates prevailing at the acquisition date. The amount to be recorded as an asset or liability at the acquisition date is based on the difference between the then-current fair values of a charter with similar characteristics as the time charter assumed and the net present value of future contractual cash flows from the time charter contract assumed. When the present value of the time charter assumed is greater than the then-current fair value of such charter, the difference is recorded as "Fair value of above market acquired time charter." When the opposite situation occurs, the difference is recorded as "Fair value of below-market acquired time charter." Such assets and liabilities are amortized as a reduction of or an increase in "Other revenue," over the period of the time charter assumed.

*Deferred financing costs:*   Deferred financing costs include fees, commissions and legal expenses associated with Ocean Rig's long-term debt and are capitalized and recorded net with the underlying debt. These costs are amortized over the life of the related debt using the effective interest method and are included in interest expense. Unamortized fees relating to loans repaid or refinanced as debt extinguishments are expensed as interest and finance costs in the period the repayment or extinguishment is made.

### Revenue and Related Expenses

*Revenues:*   Ocean Rig's services and deliverables are generally sold based upon contracts with its customers that include fixed or determinable prices. Ocean Rig recognizes revenue when delivery occurs, as directed by Ocean Rig's customer, or the customer assumes control of physical use of the asset and collectability is reasonably assured. Ocean Rig evaluates if there are multiple deliverables within its contracts and whether the agreement conveys the right to use the drill rigs for a stated period of time and meet the criteria for lease accounting, in addition to providing a drilling services element, which are generally compensated for by dayrates. In connection with drilling contracts, Ocean Rig may also receive revenues for preparation and mobilization of equipment and personnel or for capital improvements to the drilling rigs and dayrate or fixed price mobilization and demobilization fees. Revenues are recorded net of agents' commissions. There are two types of drilling contracts: well contracts and term contracts.

*Well contracts:*   Well contracts are contracts under which the assignment is to drill a certain number of wells. Revenue from dayrate-based compensation for drilling operations is recognized in the period during which the services are rendered at the rates established in the contracts. All mobilization revenues, direct incremental expenses of mobilization and contributions from customers for capital improvements are initially deferred and recognized as revenues over the estimated duration of the drilling period. To the extent that expenses exceed revenue to be recognized, they are expensed as incurred. Contingent demobilization revenues are recognized as the amounts become known over the demobilization period. Non-contingent demobilization revenues are recognized over the estimated duration of the drilling period. All costs of demobilization are expensed as incurred. All revenues for well contracts are recognized as "Service revenues" in the statement of operations.

*Term contracts:*   Term Contracts are contracts under which the assignment is to operate the drilling unit for a specified period of time. For these types of contracts Ocean Rig determines whether the arrangement is a multiple

125

element arrangement containing both a lease element and drilling services element. For revenues derived from contracts that contain a lease, the lease elements are recognized as "Leasing revenues" in the statement of operations on a basis approximating straight line over the lease period. The drilling services element is recognized as "Service revenues" in the period in which the services are rendered at fair value. Revenues related to the drilling element of mobilization and direct incremental expenses of drilling services are deferred and recognized over the estimated duration of the drilling periods. To the extent that expenses exceed revenue to be recognized, they are expensed as incurred. Contingent demobilization revenues are recognized as the amounts become known over the demobilization period. Non-contingent demobilization revenues are recognized over the estimated duration of the drilling period. All costs of demobilization are expensed as incurred. Contributions from customers for capital improvements are initially deferred and recognized as revenues over the estimated duration of the drilling contract.

*Income taxes:*   Income taxes have been provided for based upon the tax laws and rates in effect in the countries in which Ocean Rig's operations are conducted and income is earned. There is no expected relationship between the provision for/or benefit from income taxes and income or loss before income taxes because the countries in which Ocean Rig operates have taxation regimes that vary not only with respect to the nominal rate, but also in terms of the availability of deductions, credits and other benefits. Variations also arise because income earned and taxed in any particular country or countries may fluctuate from year to year. Deferred tax assets and liabilities are recognized for the anticipated future tax effects of temporary differences between the financial statement basis and the tax basis of Ocean Rig's assets and liabilities using the applicable jurisdictional tax rates in effect at the year end. A valuation allowance for deferred tax assets is recorded when it is more likely than not that some or all of the benefit from the deferred tax asset will not be realized. Ocean Rig accrues interest and penalties related to its liabilities for unrecognized tax benefits as a component of income tax expense.

**Recent Accounting Pronouncements**

In September 2009, clarifying guidance was issued on multiple-element revenue arrangements. The revised guidance primarily provides two significant changes: (i) it eliminates the need for objective and reliable evidence of the fair value of the undelivered element in order for a delivered item to be treated as a separate unit of accounting; and (ii) it eliminates the residual method to allocate the arrangement consideration. In addition, the guidance also expands the disclosure requirements for revenue recognition. The new guidance will be effective for the first annual reporting period beginning on or after June 15, 2010, with early adoption permitted provided that the revised guidance is retroactively applied to the beginning of the year of adoption. Ocean Rig implemented the new guidance on January 1, 2011 on a prospective basis. The revisions to the criteria for separating consideration did not and will not impact its accounting for revenue recognition because the guidance for allocating arrangement consideration between leasing and non-leasing elements is unchanged.

In January 2010, the FASB issued ASU 2010-01, Accounting for Distributions to Shareholders with Components of Stock and Cash which amends FASB ASC 505, Equity in order to clarify that the stock portion of a distribution to shareholders that allows the shareholder to elect to receive cash or stock with a potential limitation on the total amount of cash that all shareholders can elect to receive in the aggregate is considered a share issuance that is reflected in earnings per share prospectively and is not a stock dividend for purposes of applying FASB ASC 505, Equity and FASB ASC 260, Earnings Per Share. Ocean Rig has not been involved in any such distributions and thus, the impact to Ocean Rig cannot be determined until any such distribution occurs.

In January 2010, the FASB issued ASU 2010-06, Fair Value Measurements and Disclosures (Topic 820)-Improving Disclosures about Fair Value Measurements. ASU 2010-06 amends ASC 820 to add new requirements for disclosures about transfers into and out of Levels 1 and 2 and separate disclosures about purchases, sales, issuances, and settlements relating to Level 3 measurements. It also clarifies existing fair value disclosures about the level of disaggregation and about inputs and valuation techniques used to measure fair value. The ASU also amends guidance on employers' disclosures about postretirement benefit plan assets under ASC 715 to require that disclosures be provided by classes of assets instead of by major categories of assets. The guidance in the ASU was effective for the first reporting period (including interim periods) beginning after December 15, 2009, except for the requirement to provide the Level 3 activity of purchases, sales, issuances, and settlements on a gross basis, which will be effective for fiscal years beginning after December 15, 2010, and for interim periods within those fiscal

126

years. The adoption of this guidance is not expected to have any impact on Ocean Rig's financial position and results of operation.

In February 2010, the FASB issued ASU 2010-09, Subsequent Events (Topic 855). ASU 2010-09 amends ASC 855 to clarify which entities are required to evaluate subsequent events through the date the financial statements are issued and the scope of the disclosure requirements related to subsequent events. The amendments remove the requirement for an SEC filer to disclose the date through which management evaluated subsequent events in both issued and revised financial statements. Revised financial statements include financial statements revised as a result of either correction of an error or retrospective application of U.S. GAAP. Additionally, the FASB has clarified that if the financial statements have been revised, then an entity that is not an SEC filer should disclose both the date that the financial statements were issued or available to be issued and the date the revised financial statements were issued or available to be issued. Those amendments remove potential conflicts with the SEC's literature. All of the amendments in this update are effective upon its issuance, except for the use of the issued date for conduit debt obligors. That amendment is effective for interim or annual periods ending after June 15, 2010. The adoption of the above amendments of ASU 2010-09 require Ocean Rig to disclose the date through which management evaluated subsequent events in its consolidated financial statements until it becomes a public company.

In March 2010, the FASB issued ASU 2010-11, Derivatives and Hedging- Scope Exception Related to Embedded Credit Derivatives (Topic 815) which addresses application of the embedded derivative scope exception in ASC 815-15-15-8 and 15-9. The ASU primarily affects entities that hold or issue investments in financial instruments that contain embedded credit derivative features, however, other entities may also benefit from the ASU's transition provisions, which permit entities to make a special one-time election to apply the fair value option to any investment in a beneficial interest in securitized financial assets, regardless of whether such investments contain embedded derivative features. The ASU is effective for each reporting entity at the beginning of its first fiscal quarter beginning after June 15, 2010. Early adoption is permitted at the beginning of any fiscal quarter beginning after March 5, 2010. Ocean Rig has not engaged in any such contracts and thus, the impact to Ocean Rig cannot be determined until any such contact is entered.

In April 2010, the FASB issued ASU 2010-13, Compensation-Stock Compensation, Effect of Denominating the Exercise Price of a Share-Based Payment Award in the Currency of the Market in Which the Underlying Equity Security Trades a consensus of the FASB Emerging Issues Task Force (Topic 718) which Update addresses the classification of a share-based payment award with an exercise price denominated in the currency of a market in which the underlying equity security trades. Topic 718 is amended to clarify that a share-based payment award with an exercise price denominated in the currency of a market in which a substantial portion of the entity's equity securities trades shall not be considered to contain a market, performance, or service condition. Therefore, such an award is not to be classified as a liability if it otherwise qualifies as equity classification. The amendments in this Update are effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2010. The amendments in this update should be applied by recording a cumulative-effect adjustment to the opening balance of retained earnings. The cumulative-effect adjustment should be calculated for all awards outstanding as of the beginning of the fiscal year in which the amendments are initially applied, as if the amendments had been applied consistently since the inception of the award. The cumulative-effect adjustment should be presented separately. Earlier application is permitted. Ocean Rig does not have such share-based payments and thus Ocean Rig does not expect the guidance to have any impact on its financial position and results of operation.

In May 2011, the FASB issued ASU No. 2011-04, "Fair Value Measurement (Topic 820): Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRSs" (ASU 2011-04). This newly issued accounting standard clarifies the application of certain existing fair value measurement guidance and expands the disclosures for fair value measurements that are estimated using significant unobservable (Level 3) inputs. This ASU is effective on a prospective basis for annual and interim reporting periods beginning on or after December 15, 2011, which for Ocean Rig means January 1, 2012. Ocean Rig does not expect that adoption of this standard will have a material impact on its financial position or results of operations.

127

In June 2011, the FASB issued Accounting Standards Updated (ASU) No. 2011-05, "Comprehensive Income (Topic 220)" (ASU 2011-05). This newly issued accounting standard (1) eliminates the option to present the components of other comprehensive income as part of the statement of changes in stockholders' equity; (2) requires the consecutive presentation of the statement of net income and other comprehensive income; and (3) requires an entity to present reclassification adjustments on the face of the financial statements from other comprehensive income to net income. The amendments in this ASU do not change the items that must be reported in other comprehensive income or when an item of other comprehensive income must be reclassified to net income nor do the amendments affect how earnings per share is calculated or presented. This ASU is required to be applied retrospectively and is effective for fiscal years and interim periods within those three years beginning after December 15, 2011, which for Ocean Rig means January 1, 2012. As this accounting standard only requires enhanced disclosure, the adoption of this standard will not impact Ocean Rig's financial position or results of operation.

**Contractual Obligations**

The following table sets forth Ocean Rig's contractual obligations and their maturity dates as of December 31, 2010:

| Obligations(1) | Total | 1st Year | 2nd Year | 3rd Year | 4th Year | 5th Year | Thereafter |
|---|---|---|---|---|---|---|---|
| | | | (In thousands of U.S. Dollars) | | | | |
| Long-term debt(1) | 1,285,357 | 568,333 | 195,000 | 522,024 | | — | — |
| Operating leases(2) | 1,393 | 936 | 368 | 33 | 33 | 24 | |
| Pension plan(3) | 1,725 | 83 | 84 | 66 | 106 | 107 | 1279 |
| Drillships under construction/ *Ocean Rig Corcovado* and *Ocean Rig Olympia* (4) | 576,513 | 576,513 | — | — | — | — | — |
| Drillships under construction/ *Ocean Rig Poseidon* and *Ocean Rig Mykonos* (5) | 765,955 | 765,955 | — | — | — | — | — |
| Interest and borrowing fees(5) | 84,335 | 43,093 | 27,035 | 14,207 | — | — | — |
| Obligations to Cardiff(6) | 5,774 | 5,774 | | | | | |
| Total | 2,721,052 | 1,960,684 | 222,487 | 536,329 | 139 | 131 | 1,279 |

(1) The outstanding balance of Ocean Rig's long-term debt at December 31, 2010 was $1,285 million (gross of unamortized deferred financing fees and bond redemption costs of $27 million). Ocean Rig's loans bear interest at LIBOR plus a margin. The amounts in the table above do not include interest payments.

(2) Ocean Rig has entered into a new five year office lease agreement with Vestre Svanholmen 6 AS which commenced on July 1, 2007. This lease includes an option for an additional five year term, which must be exercised at least six months prior to the end of the term of the contract which expires in June 2012. The lease agreements relating to office space are considered to be operational lease contracts. The figures also include minor operating lease agreements.

(3) Ocean Rig has three defined benefit plans for employees managed and funded through Norwegian life insurance companies at December 31, 2010. The pension plans covered 55 employees by year end 2010. Pension liabilities and pension costs are calculated based on the actuarial cost method as determined by an independent third-party actuary.

(4) As of December 31, 2010, an amount of $1,512.7 million was paid to the shipyard representing the first, second, third and fourth installments for *Ocean Rig Corcovado* , the first, second, third and fourth installments for the *Ocean Rig Olympia* , the first, second, third and fourth installments for the *Ocean Rig Poseidon* and the first, second and third installments for the *Ocean Rig Mykonos* .

(5) Ocean Rig's long-term debt outstanding as of December 31, 2010 bears variable interest at a margin over LIBOR, but to some extent such variable interest is fixed by Ocean Rig's existing interest rate swaps. The calculation of interest payments is based on the weighted average interest rate including hedge accounting

interest rate swaps of 4.39% as of December 31, 2010. Ocean Rig's $325.0 million loan, drawn down on January 5, 2011 and repaid in April 2011, has been included in the Interest and borrowing fee calculation.

(6) Represents amounts earned by Cardiff under management agreements terminated on December 21, 2010 which become due in 2011.

## Derivative Instruments

Ocean Rig is exposed to a number of different financial market risks arising from Ocean Rig's normal business activities. Financial market risk is the possibility that fluctuations in currency exchange rates and interest rates will affect the value of Ocean Rig's assets, liabilities or future cash flows.

To reduce and manage these risks, management periodically reviews and assesses its primary financial market risks. Once risks are identified, appropriate action is taken to mitigate the specific risks. The primary strategy used to reduce Ocean Rig's financial market risks is the use of derivative financial instruments where appropriate. Derivatives are used periodically in order to hedge Ocean Rigs' ongoing operational exposures as well as transaction-specific exposures. When the use of derivatives is deemed appropriate, only conventional derivative instruments are used. These may include interest rate swaps, forward contracts and options.

It is Ocean Rig's policy to enter into derivative financial instruments only with highly rated financial institutions. Ocean Rig uses derivatives only for the purposes of managing risks associated with interest rate and currency exposure.

The following table demonstrates the sensitivity to a reasonably possible change in the U.S. Dollar exchange rate, with all other variables held constant, of Ocean Rig's profit before tax and its equity (due to changes in the fair value of financial instruments).

| | Increase/ Decrease in U.S. Dollars | Effect on Profit Before Tax (in millions of U.S. Dollars) | Effect Equity (in millions of U.S. Dollars) |
| --- | --- | --- | --- |
| 2010 | +10% | 4.4 | 0 |
| 2010 | −10% | (4.4) | 0 |
| 2009 | +10% | (1.3) | 0 |
| 2009 | −10% | 1.4 | 0 |
| 2008 | +20% | 2.4 | 0 |
| 2008 | −20% | (3.6) | 0 |

At December 31, 2010, after taking into account the effect the interest swaps that qualify for hedge accounting, approximately 75% of Ocean Rig's loans have fixed interest rate (2009: 54%, 2008: 45%). The following table demonstrates the sensitivity to a reasonably possible change in interest rates, with all other variables held constant, of Ocean Rig's profit before tax (through the impact on the floating rate borrowings and interest swaps that do not qualify for hedge accounting as per year end) and of Ocean Rig's equity (through the impact on interest swaps that qualify for hedge accounting as per year end).

| | Increase/ Decrease in U.S. Dollars | Effect on Profit Before Tax (in millions of U.S. Dollars) | Effect Equity (in millions of U.S. Dollars) |
| --- | --- | --- | --- |
| 2010 | +100 | 24.0 | 13.6 |
| 2010 | −100 | (22.3) | (13.4) |
| 2009 | +100 | 24.4 | 19.0 |
| 2009 | −100 | (2.4) | (2.0) |
| 2008 | +100 | (9.0) | 25.7 |
| 2008 | −100 | 9.0 | (27.1) |

# THE OFFSHORE DRILLING INDUSTRY

*All of the information and data presented in this section has been provided by Fearnley Offshore AS. Fearnley Offshore AS has advised that the statistical and graphical information contained herein is drawn from its database and other sources. In connection therewith, Fearnley Offshore AS has advised that: (a) certain information in Fearnley Offshore AS's database is derived from estimates or subjective judgments; (b) the information in the databases of other offshore drilling data collection agencies may differ from the information in Fearnley Offshore's database; (c) while Fearnley Offshore AS has taken reasonable care in the compilation of the statistical and graphical information and believes it to be accurate and correct, data compilation is subject to limited audit and validation procedures.*

## Summary

The international offshore drilling market has seen an increased trend towards deepwater and ultra deepwater exploration and subsequent development drilling. Due to the BP Macondo/Deepwater Horizon incident, there will be an increased focus on technical and operational issues and the inherent risk of developing offshore fields in ultra deepwater. This may result in the expectation that oil companies will show a higher preference for modern, more technologically advanced units capable of drilling in these environments. Given the increasingly ageing floater fleet, Fearnley Offshore AS believes a sustained demand in the market in the longer term will result in the need for replacements.

Fearnley Offshore AS foresees an increase of drilling activity in the medium to long term, from mid/end 2011 and onwards, possibly eliminating the gap between supply and demand in the ultra deepwater market. Such increased activity and balance in the supply and demand picture will result in higher dayrates. This is based on the assumption that the oil price is maintained above $70 per barrel.

Since the drilling moratorium in the US Gulf of Mexico ended in October 2010, the Bureau of Ocean Energy Management Regulation and Enforcement (BOEMRE) has been granting permits with all of the 18 post-moratorium permits issued in 2011. The halt in all drilling operations due to the moratorium has postponed more than 30 rig-years of planned activity. During the moratorium, nine rigs left the US Gulf of Mexico with only three currently slated to return. Approximately 50% of the 26 deepwater rigs on contract in the US Gulf of Mexico are currently operating while the rest are waiting for permits. A further two deepwater rigs are stacked in the Gulf. Fearnley Offshore AS expects that further permits will be granted, however it could be 2012 before all the units on contract are back in operating mode.

Fearnley Offshore AS foresees that tightening of regulatory regimes will occur especially in the US Gulf of Mexico, but these changes may also be implemented across the industry globally. More controls and systems will be implemented to ensure safer operations, and better plans and responses to accidents must be developed. In the longer term, this could prove to be an advantage for owners of the newest and best equipped units in the ultra deepwater market segment. Fearnley Offshore AS expects the implementation of stricter rules, regulations and requirements for safer well design and engineering and, therefore, higher technical requirements and procedures for the drilling units and contractors. As a result, wells will be more work intensive, thus necessitating more rig time.

## Oil & Gas Fundamentals

### Oil Price and Consumption

Exploration and production ("E&P") spending by oil and gas companies generally creates the demand for oil service companies, of which offshore drilling contracting is a significant part.

Global E&P spending is now forecasted to increase substantially in 2011, as compared to the increase in 2010 and the increase is expected to be driven by the six super majors; BP, Chevron, ConocoPhillips, ExxonMobil, Shell and Total. All the big groups are expected to produce strong results due to the current high oil price. The increase is mainly due to spending gains in Latin America, the Middle East, West Africa and Southeast Asia to boost production growth and further capitalize on high crude prices.

In Latin/South America, PEMEX and Petrobras are also expected to drive the E&P spending, and Petrobras will significantly expand their deepwater activity with the development of its several new large offshore fields off Brazil.

There is a strong relationship between E&P spending and oil companies' earnings, where the oil price is the most important parameter. Fearnley Offshore AS therefore believes that the determining factor influencing the demand for drilling units going forward is the price of oil. Since 2007, the price of oil has been highly volatile, reaching a peak of $147 per barrel in July 2008 and a low of $40 per barrel in January 2009.

Over the past 12 months the price of oil stayed at levels above $70 per barrel, with the current Brent blend oil price trading around $110 per barrel.

## BRENT BLEND OIL PRICE



Though a lower oil price can temporarily discourage exploration and development drilling, it is generally acknowledged that oil consumption will continue to grow for many decades to come based on increasing demand from developing countries. The changing dynamics of demand, such as stagnating growth in developed countries, rate of field decline, and the changing nature of the world's oil reserves, quality, area of origin, refinery capability and ownership, will all affect the price of oil and gas.

The US Energy Information Administration (EIA) expects a tightening of the world oil markets over the next two years and consumption is expected to grow by an annual average of 1.5 million barrels per day (bbl/d) through 2012. The EIA expects the growth in supply from non OPEC countries to average less than 0.1 million bbl/d each year in 2011 and 2012 and the market will rely on both inventories and significant increases in production of crude oil within OPEC member countries to meet world demand growth. Maturing fields in countries such as UK, Norway

131

and Mexico are causing production declines at a rate around 4-6% per year for these countries and oil companies need to develop fields discovered over the last few years and explore in new areas to replace depleting reserves.



source: OECD/IEA - 2008/2010

The graph above shows the International Energy Agency's (IEA) forecast from 2008 (the latest comprehensive forecast available) for world oil & gas supply and consumption. In the total consumption forecast, the IEA anticipates an increase in oil consumption going forward. This should encourage oil companies to engage in further exploration and development to meet the increasing global demand for oil. It should be noted, however, that there is a significant time gap between the oil companies' commitment to secure rig time and the actual production of oil and gas. It should also be noted that most of recent major new discoveries of offshore oil and gas are in deep waters and in deep structure, which are rig-intensive, and will likely need more rig time per produced barrel than more traditional developments onshore or in shallow and non-harsh waters

**Rig Market Fundamentals**

The worldwide fleet of mobile offshore drilling rigs today totals 663 units. Of these, 408 are Jack-up rigs, 192 are Semi-submersible rigs and 63 are Drillships. With 522 of these employed as of July 2011, the fleet utilization is 79%. However, the effective utilization for the mobile drilling rigs being marketed is 90%, as 86 units remain cold-stacked while the remaining number of unemployed units are either at shipyard for repairment/upgrade/classing, warm stacked/idle or are en-route between contracts.

### *Jack-up rigs*

Jack-up rigs are mobile, bottom-supported self-elevating drilling platforms that stand on three or four legs on the seabed. When the rig is to move from one location to another, it will jack its platform down on the water until it floats, and will then be towed by a supply vessel or similar to its next location, where it will lower the legs to the sea bottom and elevate the platform above sea level. A modern Jack-up rig will normally have the ability to move its drill floor aft of its own hull (cantilever), so that multiple wells can be drilled at open water locations or over wellhead platforms without re-positioning the rig. The general water depth capability of a Jack-up rig is 300-375 feet, while premium Jack-up rigs have operational capabilities enabling them to work in water depths in excess of 400 ft.

### Semi-submersible rigs

Semi-submersible rigs are floating platforms, with columns and pontoons and feature a ballasting system that can vary the draft of the partially submerged hull from a shallow transit draft, to a predetermined operational and/or survival draft (50-80 feet) when drilling operations are underway at a well location. This reduces the rig's exposure to weather and ocean conditions (waves, winds, and currents) and increases its stability. Semi-submersible rigs maintain their position above the wellhead either by means of a conventional mooring system, consisting of anchors and chains and/or cables, or by a computerized dynamic positioning (DP) system. Propulsion capabilities of Semi-submersible rigs range from having no propulsion capability or propulsion assistance (and thereby requiring the use of supply vessel or similar for transits between locations) through to self-propelled whereby the rig has the ability to relocate independently of a towing vessel.

### Drillships

Drillships are ships with on-board propulsion machinery, often constructed for drilling in deep water. They are based on conventional ship hulls, but have certain modifications. Drilling operations are conducted through openings in the hull ("moon pools"). Drillships normally have a higher load capacity than semi-submersible rigs and are well suited to offshore drilling in remote areas due to their mobility and high load capacity. Like semi-submersible rigs, drillships can be equipped with conventional mooring systems or DP systems.

The Semi-submersible rigs and Drillships are often categorized collectively as "Floaters."

### The Jack-Up Market

The total jackup fleet currently has 408 units in operation/available in the market with 59 more units under construction. Since the beginning of 2006, 95 newbuild jackups have been delivered. These new units, along with those still under construction, are mainly what Fearnley Offshore AS describes as Special Capability Jackups (SCJU) i.e. larger jackups with $\Rightarrow$ =300ft water depth capability, 30,000ft drilling depth capability, 3 mud pumps and $\Rightarrow$ =1,500 kips hook load.

As jackups contract lead time (time from contracting to anticipated commencement) is generally short and units often are on short contracts, they are easier for operators to let go of and are more sensitive towards market fluctuations than, for example, deepwater floaters.

### Worldwide Jack-up Market

In 2004, contractors realized that demand for jackups was increasing and that the age structure of the existing fleet was old and getting technically obsolete for many of the new market plays. However, generally risk adverse established contractors were not willing to order newbuilds, nor were operators willing to assist contractors ordering newbuilds on contract. This situation resented opportunities for new investors who saw to profit from taking on yard risk and, based on the belief that the existing old units would be obsolete in the near future. As the early newbuilds under construction obtained contracts with favorable day rates, other orders followed and a newbuilding boom began.

Until recently, and as with all other segments in the mobile offshore drilling market, jackups have enjoyed a relatively high utilization during the last several years hovering between 90 and 100%. During the same period, there has also been a geographical shift in the market for jackups. A combination of low gas prices and increased operating costs linked to higher insurance fees in US Gulf of Mexico led to units leaving the US Gulf of Mexico market for other areas, a move which allowed for higher rates and longer contract terms in general. The booming economy in Eastern Hemisphere countries, combined with their desire to create a viable energy market of their own,

resulted in increasing demand for jackups in this area. Due to gas being the main source of energy, the earlier described Special Capability Jackups (SCJU) were the preferred type of units.



As illustrated by the following graph, worldwide active utilization is currently 81% . Units located in Gulf of Mexico account for the majority of this decline as only 50 of 105 units currently are on contract in this area.



At present, the SCJU fleet consists of 122 units with 52 more to be delivered from yard within mid 2014.

Based on the expectations for increased activity, 46 new units have been ordered for delivery in 2012, 2013 and 2014 (see table below for current order book).

| Contractor | Unit | Yard | Reported Delivery |
|---|---|---|---|
| 1 Rowan | Rowan Norway | KFELS | Jul-11 |
| 2 Seadrill | West Elara | Jurong | Jul-11 |
| 3 Swecomex | Independencia 1 | Operadora Cicsa | Jul-11 |
| 4 Rowan | Joe Douglas | LeTourneau | Sep-11 |
| 5 Great Offshore | JU V351 | Bharati | Sep-11 |
| 6 Transocean | Transocean Honor | PPL | Nov-11 |
| 7 Rowan | Rowan EXL 4 | AMFELS | Nov-11 |
| 8 PV Drilling | PV Drill 4 | PV Shipyard | Dec-11 |
| 9 NDC Abu Dhabi | NDC Abu Dhabi TBA 1 | Lamprell, UAE | Feb-12 |
| 10 Essar | Essar 1 | AGB Shipyard | Apr-12 |
| 11 Standard Drilling | Standard Drilling TBA 1 | KFELS | Jul-12 |
| 12 NDC Abu Dhabi | NDC Abu Dhabi TBA 2 | Lamprell, UAE | Aug-12 |
| 13 Essar | Essar 2 | AGB Shipyard | Aug-12 |
| 14 Atwood | Atwood Mako | PPL | Sep-12 |
| 15 Saudi Aramco | Saudi Aramco TBA | KFELS | Oct-12 |
| 16 Transocean | Transocean TBA 2 | KFELS | Nov-12 |
| 17 Transocean | Transocean TBA 3 | KFELS | Nov-12 |

| Contractor | Unit | Yard | Reported Delivery |
|---|---|---|---|
| 18 Prospector | POD TBA I | Dalian | Nov-12 |
| 19 Jasper | Jasper TBA I | KFELS | Nov-12 |
| 20 Noble | Noble TBA 1 | Jurong | Dec-12 |
| 21 Atwood | Atwood Manta | PPL | Dec-12 |
| 22 Seadrill | West Castor | Jurong | Dec-12 |
| 23 Seadrill | West Telesto | Dalian | Dec-12 |
| 24 Mermaid Drilling | Mermaid TBA 1 | KFELS | Dec-12 |
| 25 Greatship | Greatship TBA | Lamprell, UAE | Dec-12 |
| 26 Dynamic Drilling | Dynamic Drilling TBA | KFELS | Feb-13 |
| 27 Standard Drilling | Standard Drilling TBA 2 | KFELS | Mar-13 |
| 28 Noble | Noble TBA 2 | Jurong | Mar-13 |
| 29 Seadrill | West Tucana | Jurong | Mar-13 |
| 30 Prospector | POD TBA II | Dalian | Mar-13 |
| 31 Seadrill | West Oberon | Dalian | Mar-13 |
| 32 Mermaid Drilling | Mermaid TBA 2 | KFELS | Mar-13 |
| 33 Perforadora Central | Perforadora Central TBA | AMFELS | Mar-13 |
| 34 Japan Drilling Company | JDC TBA | KFELS | Mar-13 |
| 35 Discovery Offshore | Discovery Offshore TBA 1 | KFELS | Apr-13 |
| 36 Atwood | Atwood Orca | PPL | Jun-13 |
| 37 Clearwater | Standard Drilling TBA 3 | KFELS | Jun-13 |
| 38 Ensco | Ensco TBA1 | KFELS | Jun-13 |
| 39 Jasper | Jasper TBA II | KFELS | Jun-13 |
| 40 Standard Drilling | Standard Drilling TBA 4 | KFELS | Jul-13 |
| 41 Noble | Noble TBA 3 | Jurong | Sep-13 |
| 42 Seadrill | West CJ70 TBN | Jurong | Sep-13 |
| 43 Prospector | POD TBA III | Dalian | Sep-13 |
| 44 Prospector | POD TBA IV | Dalian | Sep-13 |
| 45 Gulf Drilling International | GDI TBA 1 | KFELS | Sep-13 |
| 46 Discovery Offshore | Discovery Offshore TBA 2 | KFELS | Oct-13 |
| 47 Standard Drilling | Standard Drilling TBA 5 | KFELS | Nov-13 |
| 48 Ensco | Ensco TBA2 | KFELS | Dec-13 |
| 49 Standard Drilling | Standard Drilling TBA 6 | KFELS | Dec-13 |
| 50 Maersk Contractors | Maersk TBA 1 | KFELS | Dec-13 |
| 51 Noble | Noble TBA 4 | Jurong | Mar-14 |
| 52 Standard Drilling | Standard Drilling TBA 7 | KFELS | May-14 |
| 53 Maersk Contractors | Maersk TBA 2 | KFELS | Jul-14 |
| 54 Gulf Drilling International | GDI TBA 2 | KFELS | Sep-14 |

136

**The Floater Market**

The total existing fleet of floaters includes 192 Semi-submersible rigs and 63 Drillships.



As can be seen from the above graph, there is almost full utilization for the floater market. Fearnley Offshore AS notes that reduced demand can be attributed to the lower activity in the shallow market segment.

*Generations*

The Floater fleet is often divided into generations; basically referring to the period in which the rigs were built. There are so called 2 nd , 3 rd , 4 th , 5 th and 6 th generation floaters.

The 2 nd generation consists primarily of semi-submersible rigs built in the seventies, an enhancement of the 1st generation Gulf of Mexico semi. The 3 rd generation was created based on the experience drawn from the 2nd generation with better capacities, all built in the early eighties. A small number of 4th generation floaters were built in mid eighties, which focused more on operation in even harsher environment and arctic conditions.

The next generation (5 th ) was launched in 1996. These units focused on working in deep water. Including conversions, 46 units were delivered between 1998 and 2005, representing roughly 20% of the total floater fleet today. Out of these, 24 are defined as 5th generation units capable of working in water depths of 7,500 feet or deeper. The remaining units are mainly older units having been fully refurbished and some newbuilds with less advanced capabilities.

Since October 2010, a total of 28 floaters have been ordered, scheduled for delivery in 2012, 2013 and 2014. Taking these orders together with the previously existing orders, there are now 67 new units on order. Current newbuild orderbook thus represents approximately 25% of the total floater fleet 63 of the ordered units are ultra deepwater rigs capable of drilling at 7,500 feet or deeper. There are currently several other newbuilding projects under consideration and it is likely that the newbuilding activity will continue, although available yard capacity is

scarce and new orders, beyond current newbuild options, will probably be scheduled for 2014 delivery (see table below for current order book).

| # | Owner | Unit | Yard | Reported Delivery |
|---|-------|------|------|-------------------|
| 1 | Seadrill | West Pegasus | Vyborg/Jurong | Q2 2011 |
| 2 | Schahin | Schahin TBA 1 | Samsung | Q2 2011 |
| 3 | Gazflot | Severnoye Siyanie | Vyborg/Samsung | Q2 2011 |
| 4 | Noble | Noble Bully 1 | COSCO/Keppel | Q2 2011 |
| 5 | CNOOC | Hai Yang Shi You 981 | Shanghai Waigaoqiao | Q2 2011 |
| 6 | Delba Perforadora | Delba III | GPC, Abu Dhabi | Q3 2011 |
| 7 | Songa | Songa Eclipse | Jurong | Q3 2011 |
| 8 | Ensco | Ensco 8504 | KFELS | Q3 2011 |
| 9 | Odebrecht | Norbe VIII | DSME | Q3 2011 |
| 10 | OCR | Ocean Rig Poseidon | Samsung | Q3 2011 |
| 11 | Pacific Drilling | Pacific Santa Ana | Samsung | Q3 2011 |
| 12 | Vantage | Dragon Quest | DSME | Q3 2011 |
| 13 | Saipem | Scarabeo 9 | Yantai Raffles/KFELS | Q3 2011 |
| 14 | OCR | Ocean Rig Mykonos | Samsung | Q3 2011 |
| 15 | IPC | La Muralla IV | DSME | Q3 2011 |
| 16 | Saipem | Scarabeo 8 | Severodvinsk/Fincantie | Q4 2011 |
| 17 | Odfjell | Deepsea Metro 2 | Hyundai | Q4 2011 |
| 18 | Seadrill | West Leo | Sevmarsh/Jurong | Q4 2011 |
| 19 | Stena | Stena IceMax | Samsung | Q4 2011 |
| 20 | Seadrill | West Capricorn | Jurong | Q4 2011 |
| 21 | Noble | Noble Globetrotter 1 | STX Dalian/Huisman | Q4 2011 |
| 22 | Pride | Deep Ocean Molokai | Samsung | Q4 2011 |
| 23 | Schahin | Schahin TBA 2 | Samsung | Q4 2011 |
| 24 | COSL Europe | COSLInnovator | Yantai Raffles | Q4 2011 |
| 25 | Noble | Noble Bully 2 | COSCO/Keppel | Q4 2011 |
| 26 | Petroserv | Carolina | DSME | Q4 2011 |
| 27 | Ensco | Ensco 8505 | KFELS | Q1 2012 |
| 28 | Odebrecht | ODN-1 | DSME | Q1 2012 |
| 29 | Odebrecht | ODN-2 | DSME | Q1 2012 |
| 30 | Sevan Drilling | Sevan Brasil | Cosco Qidong Shipyar | Q1 2012 |
| 31 | Etesco | Etesco TBA | Samsung | Q2 2012 |
| 32 | COSL Europe | COSLPromoter | Yantai Raffles | Q2 2012 |
| 33 | MarAcc | Island Innovator | Cosco Zhoushan/Nym | Q2 2012 |
| 34 | Ensco | Ensco 8506 | KFELS | Q2 2012 |
| 35 | Atw ood | Atw ood Condor | Jurong | Q2 2012 |
| 36 | Petroserv | Catarina | DSME | Q2 2012 |
| 37 | Queiroz Galvao | QG TBA I | Samsung | Q3 2012 |
| 38 | Queiroz Galvao | QG TBA II | Samsung | Q3 2012 |
| 39 | DVB Bank | Dalian Developer | COSCO Dalian | Q4 2012 |
| 40 | Seadrill | West Auriga | Samsung | Q1 2013 |
| 41 | Pacific Drilling | Pacific Khamsin | Samsung | Q2 2013 |
| 42 | Vantage | Tungsten Explorer | DSME | Q2 2013 |

| # | Owner | Unit | Yard | Reported Delivery |
|---|-------|------|------|------------------|
| 43 | Seadrill | West Vela | Samsung | Q2  2013 |
| 44 | Pride | Deep Ocean Marquesas | Samsung | Q2  2013 |
| 45 | Diamond | Ocean BlackHaw k | Hyundai | Q2  2013 |
| 46 | Noble | Noble DS TBA I | Hyundai | Q2  2013 |
| 47 | OCR | Ocean Rig DS TBA I | Samsung | Q2  2013 |
| 48 | Noble | Noble Globetrotter 2 | STX Dalian/Huisman | Q3  2013 |
| 49 | Odebrecht | Odebrech DS 5 | DSME | Q3  2013 |
| 50 | Odebrecht | Odebrecht SS 1 | DSME | Q3  2013 |
| 51 | Atwood | Atw ood Advantage | DSME | Q3  2013 |
| 52 | Pacific Drilling | Pacific Sharav | Samsung | Q3  2013 |
| 53 | Maersk Drilling | Maersk DS TBA 1 | Samsung | Q3  2013 |
| 54 | OCR | Ocean Rig DS TBA II | Samsung | Q3  2013 |
| 55 | Seadrill | West Tellus | Samsung | Q3  2013 |
| 56 | FOE | FOE DS TBA I | Hyundai | Q3  2013 |
| 57 | Row an | Row an DS TBA 1 | Hyundai | Q4  2013 |
| 58 | Noble | Noble DS TBA II | Hyundai | Q4  2013 |

### *Shallow and deep water*

As discussed above, the floater market is also broken down by water depth capability in the following manner:

| | |
|---|---|
| Shallow Water Drilling Rigs | <3000 ft (915m) water depth |
| Deepwater Drilling Rigs | >3000ft (915m) water depth |
| Ultra Deepwater Drilling Rigs | >7500ft (2286 m) water depth |

The breakdown of the floater market is further divided between drillships and semi-submersibles, where Fearnley Offshore AS notes that the focus from both contractors and operators in the last market upturn was towards ultra deepwater drilling.

### *Worldwide Shallow Water Market*

After a strong recovery of the global drilling market in 2004, the shallow water floater fleet experienced close to full effective utilization from 2005 until the last quarter of 2008. This fleet consists of just over 90 units, although some units have been upgraded to deepwater capacity and will leave the segment. The shallow water fleet will see the addition of newbuilds scheduled for delivery during 2011 and 2012, but these newbuilds are units designed for harsh environment; for operation in the North Sea including the Norwegian Continental Shelf.

The shallow water fleet is relatively old, with a large number of units constructed in the mid 1970s and 1980s. Many of these units will need considerable investments to maintain and renew their class and enhance their life expectancy over the next several years. Substantial investments may be postponed until new contracts have been secured, and units will be stacked or even retired from the active fleet. With a theoretical average technical life expectancy of 35 years, 63 units could potentially be retired from the active fleet by the end of 2013 should the

139

drilling contractors not see possibilities of charter contracts justifying life enhancing upgrades. Please see the graph below.



**SUPPLY & DEMAND ALL FLOATERS**
TECHNICAL LIFE EXPECTANCY SCENARIO

The above graph shows historical supply and demand and future supply for all floaters (both shallow and deepwater floaters). The grey line shows theoretical future supply assuming all drilling units older than 35 years leave the active market (by being scrapped, cold stacked or converted into a non-drilling unit). Most of these units are in the shallow water category.

The average age of the existing floater fleet today is 21 years. However, none of the competitive floaters have been retired during the last 5 years due to the strong market conditions, which have provided sufficient earnings to maintain and upgrade the older units. In the preceding period (1995-2005), the average age of units being retired from the fleet was 21.5 years.

It is also noteworthy that the shallow water floater market has a scattered ownership structure, which makes market discipline more difficult, and some of the smaller contractors will strive to maintain high utilization levels. This is resulting in a downward pressure on dayrates in such an unbalanced market, where the supply is greater than demand in the short term.

### The Deepwater Floater Market

This market has proven less susceptible to volatility in the market than the jack-up and shallow water floater segments.

63 deepwater floaters are currently under construction for delivery between now and mid 2014. Notably, only one of these units under construction is a moored unit and most have ultra deepwater capability. Deepwater, more specifically ultra deepwater, has been the major focus for operators in the last upswing from 2005. Upon completion of the current order book, the ultra deepwater fleet alone will consist of 147 rigs. Dynamically- positioned drillships, as opposed to semi submersibles, have seen a rise in popularity and represent over half of the new construction.

In the deepwater market segment there are 75 existing units with an average age of 24 years. For ultra deepwater units there are 85 existing units at an average age of 7 years. For drillships, the age profile is skewed

140

towards younger units, with 41 units in the ultra deepwater category with an average age of 5 years. In light of the Macondo/Deepwater Horizon accident, operators are showing a preference for newer equipment. Given the ageing deepwater fleet, Fearnley Offshore AS sees some oil companies contracting ultra deepwater units even for their deepwater and shallow water wells.

It is widely believed that the more easily extractable oil fields in shallow water have been found, and that the activity has moved towards deeper waters and, to a certain extent, harsher environments. The shallow water still represents the majority of the offshore drilling activity. However, the wells in shallow water are maturing and reserves are being depleted rapidly. New oil and gas production is more likely to be developed in deeper waters.



Although fewer charter contracts have been entered into in the deepwater market after the downturn at the end of 2008 compared to before the downturn, the deepwater market has proven less susceptible to fluctuations than the jack-up and shallow water floater segments. The deepwater market is characterized by longer visibility with several long term charters entered into.

Up until the recent financial turmoil, the deepwater floater market experienced high levels of utilization and record-high dayrates, in excess of $600,000 for some longer term contracts in 2008, sparking an increase in newbuildings. At present, the utilization for the deepwater market is approximately 94%. The number of backlog months for deepwater contracts was at record highs in 2009 at 702 rig years, however, this number decreased over the past year to 618 rig years as of July 1, 2011.

### Demand

During 2009, only 12 long term (longer than six months) contracts were entered into in the deepwater market, compared to 57 such contracts during 2008. During 2010 and 2011, demand recovered with 53 long term deepwater contracts having been entered into.

With the current high oil price, there are numerous potential fields worldwide that are considered economically viable. However, due to the uncertain economic climate during the last couple of years, oil companies have been

holding back on new investments and decision making has been slow. However, with sustained high oil price, this trend is now changing.



The above graph represents Fearnley Offshore's forecasted supply and demand for the deepwater fleet world-wide through 2012. The possible demand is based on a higher than 50% probability, while the requirements has a 70% or higher probability of being accomplished.

In the forecast model Fearnley Offshore AS has accounted for the effect of the drilling ban in the US Gulf of Mexico by deferring certain programs with expected startup from the middle to end of 2011.

Brazil is one of the most promising offshore deepwater drilling regions, and Petrobras has high ambitions going forward. In order to achieve its goal, Petrobras has been active in securing ultra deepwater drilling capacity. However, with political pressure for building up a national Brazilian oil service industry, Petrobras is pushing forward with offshore drilling units built in Brazil. The price and cost for such newbuilding plans are significantly above current international market levels, which is approximately $600-$650 million cost for an ultra deepwater drillship. It is clear that Petrobras, with their significant new fields to be developed, are potentially short of high capability ultra deepwater floaters. Some may be new constructions with back-to-back contracts, but as the most urgent need for additional units seem to be in 2012-2013, existing rigs will have to be the main consideration.

*Supply*

    As of July 2011 there were 63 deepwater units under construction, of which 62 are ultra deepwater units. Of these 62 newbuilds, 35 do not have a charter contract in place. When all newbuilds are delivered the worldwide deepwater fleet will consist of 223 competitive units, of which 147 will be rated for ultra deepwater drilling.



143

The following graph shows the geographical areas were the deepwater floaters are available and in operation, where Brazil is now the dominant area in which almost one-third of the fleet is operating.



144

*The Ultra Deepwater Floater Market*

This market has enjoyed full utilization from 2005, however one unit was available in West Africa in the first quarter of 2011.



*Demand*

The ultra deepwater market evolved with 5 years of intensive exploration activity starting in 1999. Exploration proved to be successful and resulted in significant projects being materialized in this market. The majority of the ultra deepwater units are now involved in development work. Many of the recent long term contracts have been geared towards new areas of exploration, and Fearnley Offshore AS foresees that this will continue in years to come.

The ultra deepwater market still has a high backlog of contracts, enjoying almost full utilization of the fleet. Within the last 12 months, 27 long term charter contracts have been entered into in the ultra deepwater market, compared to 6 and 13 charter contracts for the same period in the two previous years, respectively.



The graph above shows that there is a limited availability of units over the next year. Even though there are few new programs added by independent and smaller operators, there are substantial programs being planned by national oil companies (particularly from Petrobras) and most of the major oil companies (Chevron, Total and ExxonMobil). This could have a positive effect on the market in 2011. Traditionally deepwater activity has been seen in the following geographical regions: West Africa, Brazil and Gulf of Mexico. A new positive shift in this market is that there has been increased demand in all areas worldwide, such as East Africa, Greenland, China, New Zealand, Falkland and the Mediterranean. In addition some of the national oil companies, primarily Petrobras, are struggling with severe delays of scheduled newbuildings already committed for work, which may impact their short to medium term requirements leading to further demand.

### *Supply Ultra Deepwater*

Currently there are 44 semisubmersibles and 41 drillships working in the ultra deepwater segment, with an additional 17 semis and 45 drillships under construction. Of the future fleet of 147 units, almost 35% are contracted into 2015 and beyond.

146

**Table of Contents**

The ultra deepwater contract status through 2012 is presented in the graph below.



| RIG | OPERATOR | CONTRACTOR | WD 1 |
|---|---|---|---|
| SONGA ECLIPSE | YARD/AVAILABLE | Songa | 7 500 |
| LA MURALLA IV | YARD/AVAILABLE | IPC | 10 000 |
| WEST CAPRICORN | YARD/AVAILABLE | Seadrill | 10 000 |
| WEST LEO | YARD/AVAILABLE | Seadrill | 10 000 |
| EIRIK RAUDE | TULLOW | OCR | 10 000 |
| DEEP OCEAN MOLOKAI | YARD/AVAILABLE | Ensco | 10 000 |
| STENA DRILLMAX | REPSOL | Stena | 10 000 |
| NOBLE JIM DAY | SHELL | Noble | 12 000 |
| STENA ICEMAX | YARD/AVAILABLE | Stena | 7 500 |
| OCEAN MONARCH | MARATHON/BP | Diamond | 10 000 |
| ENSCO 8504 | YARD/TOTAL | Ensco | 8 500 |
| ENSCO 8505 | YARD/AVAILABLE | Ensco | 8 500 |
| OCEAN ENDEAVOR | BURULLUS | Diamond | 8 000 |
| NOBLE CLYDE BOUDREAUX | SHELL | Noble | 10 000 |
| OCEAN RIG OLYMPIA | VANCO | OCR | 10 000 |
| DEEPSEA METRO 1 | BG (WOODSIDE) | Odfjell | 10 000 |
| LEIV EIRIKSSON | CAIRN/BORDERS & SOUT | OCR | 7 500 |
| ATWOOD CONDOR | YARD/AVAILABLE | Atwood | 7 500 |
| PACIFIC SCIROCCO | TOTAL | Pacific Drilling | 12 000 |
| DEEPWATER NAUTILUS | SHELL | Transocean | 8 000 |
| ENSCO 8506 | YARD/AVAILABLE | Ensco | 8 500 |
| DISCOVERER ENTERPRISE | BP | Transocean | 10 000 |
| ENSCO 8502 | NEXEN | Ensco | 8 500 |
| CATARINA | YARD/AVAILABLE | Petroserv | 10 000 |
| WEST GEMINI | TOTAL | Seadrill | 10 000 |
| WEST POLARIS | EXXONMOBIL | Seadrill | 10 000 |
| OCEAN CONFIDENCE | MURPHY/COBALT/TOTA | Diamond | 10 000 |
| GSF DEV. DRILLER 1 | BHP | Transocean | 7 500 |
| DALIAN DEVELOPER | YARD/AVAILABLE | Vantage | 10 000 |
| WEST NAVIGATOR | SHELL | Seadrill | 8 200 |
| MAERSK DISCOVERER | WOODSIDE | Maersk | 10 000 |

FIRM CONTRACT
OPTION
CONSTRUCTION DELIVERY
NEWBUILDINGS

**≋ Fearnley Offshore** ©2011

Fearnley Offshore' AS predicts a balanced market in 2011 and emphasizes that there is only 1 available rig year in 2011. With approximately 52 operators active in the market segment, the excess rig capacity could quickly disappear. However, oil companies have implemented their drilling plans slowly, which may defer the timing of their projects, which again will be offset by the commissioning and delivery of the newbuildings.

### *Current Dayrate Level*

In 2008 the international offshore drilling industry experienced record dayrates for the ultra deepwater floater fleet. There have been 36 long term ultra deepwater fixtures since the last record high fixture in October 2008. As seen from the graph below, the ultra deepwater dayrate has come down from its peak at $624,000/day to a level of $453,000/day. Though the rates in the various deepwater segments have been almost parallel in the past, operators see added value in newer and more capable units with higher capacities for their deepwater requirements, both for exploration (which is spreading to more remote areas and deeper waters) and for technically challenging developments. This trend is expected to become even more pronounced going forward due to the Macondo

147

incident in the US Gulf of Mexico. Fearnley Offshore AS expects the gap between the various segments to sustain or even increase.



Even after the recent US Gulf of Mexico incident, there has not been any major deterioration in the dayrates obtained for new contracts, although new contract lengths have been shorter. With the price of oil remaining above $70 per barrel for a sustained period, it is worthwhile to note that the rates for all deepwater segments has flattened out and rates for the ultra deepwater segments are trending upwards for the first time since 2008.

148

# BUSINESS

## Ocean Rig

Ocean Rig is an international offshore drilling contractor providing oilfield services for offshore oil and gas exploration, development and production drilling and specializing in the ultra-deepwater and harsh-environment segment of the offshore drilling industry. Ocean Rig seeks to utilize its high-specification drilling units to the maximum extent of their technical capability and Ocean Rig believes that it has earned a reputation for operating performance excellence. Ocean Rig currently owns and operates two modern, fifth generation ultra-deepwater semi-submersible offshore drilling rigs, the *Leiv Eiriksson* and the *Eirik Raude* , and four sixth generation, advanced capability ultra-deepwater drillships, the *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* , delivered in January 2011, March 2011, July 2011 and September 2011, respectively, by Samsung Heavy Industries Co. Ltd., or Samsung.

Ocean Rig has additional newbuilding contracts with Samsung for the construction of three seventh generation newbuilding drillships, or its seventh generation hulls. These three newbuilding drillships are currently scheduled for delivery in July 2013, September 2013 and November 2013, respectively. The *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* are "sister-ships" constructed by the same shipyard to the same high-quality vessel design and specifications and are capable of drilling in water depths of 10,000 feet. The design of Ocean Rig's seventh generation hulls reflects additional enhancements that, with the purchase of additional equipment, will enable the drillship to drill in water depths of 12,000 feet.

Ocean Rig also has options with Samsung for the construction of up to three additional seventh generation ultra-deepwater drillships at an estimated total project cost, excluding financing costs, of $638.0 million per drillship, based on a shipyard contract price of $570.0 million, costs of approximately $38.0 million for upgrades to the existing drillship specifications and construction-related expenses of $30.0 million. These options are exercisable by Ocean Rig at any time on or prior to January 31, 2012.

Ocean Rig believes that the *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* , as well as its three newbuilding drillships, will be among the most technologically advanced drillships in the world. The S10000E design, used for the *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* was originally introduced in 1998 and according to Fearnley Offshore AS, including these four drillships, a total of 45 drillships have been ordered using this base design, which has been widely accepted by customers, of which 24 had been delivered as of July 2011, including the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* . Among other technological enhancements, Ocean Rig's drillships are equipped with dual activity drilling technology, which involves two drilling systems using a single derrick that permits two drilling-related operations to take place simultaneously. Ocean Rig estimates this technology saves between 15% and 40% in drilling time, depending on the well parameters. Each of its newbuilding drillships will be capable of drilling 40,000 feet at water depths of 12,000 feet. Ocean Rig currently has a team of its employees at Samsung overseeing the construction of the three newbuilding drillships to help ensure that those drillships are built on time, to its exact vessel specifications and on budget, as was the case for the *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos.*

The total cost of construction and construction-related expenses for the *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* amounted to approximately $755.7 million, $756.9 million, $791.8 million and $784.4 million, respectively. Construction-related expenses include equipment purchases, commissioning, supervision and commissions to related parties, excluding financing costs and fair value adjustments. As of September 30, 2011, Ocean Rig had made an aggregate of $726.7 million of construction and construction-related payments for its three seventh generation hulls. Construction-related expenses include equipment purchases, commissioning, supervision and commissions to related parties, excluding financing costs and fair value adjustments. As of

149

September 30, 2011, the remaining total construction and construction-related payments for Ocean Rig's three seventh generation hulls was approximately $1.2 billion in the aggregate, consisting of the following:

| | (In millions) |
|---|---:|
| **NB #1 (TBN)** | |
| Construction payments | $365.6 |
| Other construction-related expenses (excluding financing costs) | $ 30.0 |
| **NB #2 (TBN)** | |
| Construction payments | $365.6 |
| Other construction-related expenses (excluding financing costs) | $ 30.0 |
| **NB #3 (TBN)** | |
| Construction payments | $365.6 |
| Other construction-related expenses (excluding financing costs) | $ 30.0 |

Ocean Rig's revenue, EBITDA and net income for the twelve-months ended June 30, 2011 was $452.4 million, $242.2 million and $114.0 million, respectively. Ocean Rig believes EBITDA provides useful information to investors because it is a basis upon which Ocean Rig measures its operations and efficiency. Please see "Selected Historical Consolidated Financial and Other Data of Ocean Rig" for a reconciliation of EBITDA to net income, the most directly comparable U.S. GAAP financial measure.

## History of Ocean Rig

Ocean Rig is a corporation formed under the laws of the Marshall Islands on December 10, 2007 under the name Primelead Shareholders Inc. and as a wholly-owned subsidiary of DryShips. DryShips is a global provider of marine transportation services for drybulk cargoes and offshore contract drilling oil services. DryShips owns approximately 75% of Ocean Rig's outstanding common stock as of the date of this proxy statement / prospectus. Ocean Rig acquired all of the outstanding shares of Primelead Limited in December 2007.

Ocean Rig's predecessor, Ocean Rig ASA, was incorporated on September 26, 1996 under the laws of Norway and contracted for the construction of Ocean Rig's two existing drilling rigs, the *Leiv Eiriksson* and the *Eirik Raude* , as well as two other newbuilding drilling rigs that were subsequently sold. The *Leiv Eiriksson* and the *Eirik Raude* commenced operations in 2001 and 2002, respectively, under contracts with leading oil and gas companies. The shares of Ocean Rig ASA traded on the Oslo Børs from January 1997 to July 2008.

Ocean Rig's wholly-owned subsidiary, Primelead Limited, a corporation organized under the laws of the Republic of Cyprus, was formed on November 16, 2007 for the purpose of acquiring shares of Ocean Rig ASA. On December 20, 2007, Primelead Limited, acquired 51,778,647 shares, or approximately 30.4% of the outstanding capital stock of Ocean Rig ASA, following its nomination as a buyer from Cardiff Marine Inc., or Cardiff, a company controlled by Mr. Economou, Ocean Rig's Chairman, President and Chief Executive Officer and the Chairman, President and Chief Executive Officer of DryShips, Ocean Rig's parent company. After acquiring more than 33% of Ocean Rig ASA's outstanding shares on April 22, 2008, Ocean Rig launched a mandatory offer for the remaining shares of Ocean Rig ASA at a price of NOK45 per share, or $8.89 per share, as required by Norwegian law. On May 9, 2008, Ocean Rig concluded a guarantee facility of NOK5.0 billion, or approximately $974.5 million, and a senior secured term loan of $800.0 million in order to guarantee the purchase price of the Ocean Rig ASA shares to be acquired through the mandatory offer, to finance the acquisition cost of the Ocean Rig ASA shares and to refinance existing debt. Ocean Rig gained control over Ocean Rig ASA on May 14, 2008. The results of operations related to the acquisition are included in Ocean Rig's consolidated financial statements as of May 15, 2008. Ocean Rig held 100% of the shares of Ocean Rig ASA, or 163.6 million shares, as of July 10, 2008, which Ocean Rig acquired at a total cost of $1.4 billion. With respect to the transaction described above, DryShips purchased 4.4% of the share capital of Ocean Rig ASA from companies affiliated with Mr. Economou, the Chairman, President and Chief Executive Officer of DryShips and of Ocean Rig. On March 5, 2009, DryShips contributed all of its equity interests in the newbuilding vessel-owning companies of the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* to Ocean Rig. On May 15, 2009, Ocean Rig closed a transaction to acquire the equity interests of the newbuilding vessel-owning companies of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* ,

which were owned by clients of Cardiff, including certain entities affiliated with Mr. Economou. As part of this transaction, Ocean Rig assumed the liabilities from two $115.0 million secured loan facilities, which were repaid in connection with the delivery of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* . As consideration for the acquisition of the newbuilding vessel-owning companies of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* , Ocean Rig issued to the sellers, including entities related to Mr. Economou, a number of common shares equal to 25% of its total issued and outstanding common shares as of May 15, 2009.

On July 15, 2009, DryShips acquired the remaining 25% of Ocean Rig's total issued and outstanding capital stock from the minority interests held by certain unrelated entities and certain parties related to Mr. Economou. The consideration paid for the 25% interest consisted of a one-time $50.0 million cash payment and the issuance of DryShips Series A Convertible Preferred Stock with an aggregate face value of $280.0 million. Following such acquisition, Ocean Rig became a wholly-owned subsidiary of DryShips.

On December 21, 2010, Ocean Rig completed the sale of an aggregate of 28,571,428 of Ocean Rig's common shares (representing 22% of Ocean Rig's outstanding common stock) in an offering made to both non-United States persons in Norway in reliance on Regulation S under the Securities Act and to qualified institutional buyers in the United States in reliance on Rule 144A under the Securities Act. Ocean Rig refers to this offering, which includes the sale of 1,871,428 common shares pursuant to the managers' exercise of their option to purchase additional shares, as the private offering. A company controlled by Ocean Rig's Chairman, President and Chief Executive Officer, Mr. Economou, purchased 2,869,428 common shares, or 2.38% of Ocean Rig's outstanding common shares, in the private offering at the offering price of $17.50 per share. Ocean Rig received approximately $488.3 million of net proceeds from the private offering, of which it used $99.0 million to purchase an option contract from DryShips, Ocean Rig's parent company, for the construction of up to four additional ultra-deepwater drillships as described below. Ocean Rig applied the remaining proceeds to partially fund remaining installment payments for its newbuilding drillships and for general corporate purposes.

### Recent Developments

During April 2011, Ocean Rig borrowed an aggregate of $48.1 million from DryShips through shareholder loans for capital expenditures and general corporate purposes. On April 20, 2011, these intercompany loans, along with shareholder loans of $127.5 million that Ocean Rig borrowed from DryShips in March 2011, were fully repaid.

On April 15, 2011, Ocean Rig held a special shareholders meeting at which its shareholders approved proposals (i) to adopt its second amended and restated articles of incorporation; and (ii) to designate the class of each member of the board of directors and related expiration of term of office.

On April 18, 2011, Ocean Rig entered into an $800 million senior secured term loan agreement to partially finance the construction costs of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* . On April 20, 2011, Ocean Rig drew down the full amount of this facility and prepaid its $325.0 million short-term loan agreement.

On April 18, 2011, Ocean Rig exercised the first of its six newbuilding drillship options under its option contract with Samsung and, as a result, entered into a shipbuilding contract for one of its seventh generation hulls and paid $207.6 million to the shipyard on April 20, 2011.

On April 27, 2011, Ocean Rig entered into an agreement with the lenders under its two $562.5 million loan agreements, or its two Deutsche Bank credit facilities, to restructure these facilities. As a result of this restructuring: (i) the maximum amount permitted to be drawn is reduced from $562.5 million to $495.0 million under each facility; (ii) in addition to the guarantee already provided by DryShips, Ocean Rig provided an unlimited recourse guarantee that includes certain financial covenants; and (iii) Ocean Rig is permitted to draw under the facility with respect to the *Ocean Rig Poseidon* based upon the employment of the drillship under its drilling contract with Petrobras Tanzania, and on April 27, 2010, the cash collateral deposited for this vessel was released. On August 10, 2011, Ocean Rig amended the terms of the credit facility for the construction of the *Ocean Rig Mykonos* to allow for full drawdowns to finance the remaining installment payments for this drillship based on the Petrobras Brazil contract and on August 10, 2010, the cash collateral deposited for the drillship was released. The amendment also requires that the *Ocean Rig Mykonos* be re-employed under a contract acceptable to the lenders meeting certain

minimum terms and dayrates at least six months, in lieu of 12 months, prior to the expiration of the Petrobras Brazil contract. All other material terms of the credit facility were unchanged.

On April 27, 2011, Ocean Rig issued $500.0 million aggregate principal amount of its 9.5% senior unsecured notes due 2016 offered in a private placement. The net proceeds of the offering of approximately $487.5 million are expected to be used to finance Ocean Rig's newbuilding drillships program and for general corporate purposes.

On April 27, 2011, Ocean Rig exercised the second of its six newbuilding drillship options under its option contract with Samsung, and, as a result, entered into a shipbuilding contract for the second of its seventh generation hulls and paid $207.4 million to the shipyard on May 5, 2011.

On May 3, 2011, following the approval by Ocean Rig's board of directors and shareholders, Ocean Rig amended and restated its amended and restated articles of incorporation, among other things, to increase Ocean Rig's authorized share capital to 1,000,000,000 common shares and 500,000,000 shares of preferred stock, each with a par value of $0.01 per share.

On May 5, 2011, Ocean Rig terminated its contract with Borders & Southern for the *Eirik Raude* for drilling operations offshore the Falkland Islands and entered into a new contract with Borders & Southern for the *Leiv Eiriksson* on the same terms as the original contract for the *Eirik Raude* with exceptions for the fees payable upon mobilization and demobilization and certain other terms specific to the *Leiv Eiriksson* , including off-hire dates, period surveys and technical specifications.

On May 16, 2011, Ocean Rig entered into an addendum to its option contract with Samsung, pursuant to which Samsung granted Ocean Rig the option for the construction of up to two additional ultra-deepwater drillships, for a total of up to six additional ultra-deepwater drillships, which would be "sister-ships" to its drillships and Ocean Rig's seventh generation hulls, with certain upgrades to vessel design and specifications. Pursuant to the addendum, the two additional newbuilding drillship options and the remaining drillship option under the original contract may be exercised at any time on or prior to January 31, 2012.

On May 19, 2011, Borders & Southern exercised its option to drill an additional two wells under its contract with Ocean Rig for the *Leiv Eiriksson* . Borders & Southern assigned the two optional wells to Falkland Oil and Gas. The maximum operating dayrate under the contract, which was originally $540,000, decreased to $530,000 as a result of the exercise of the optional wells. Borders & Southern has a further option under the contract to drill a fifth well, for which, if exercised, the dayrate would be $540,000.

On May 20, 2011, Ocean Rig paid $10.0 million to Samsung in exchange for Samsung's agreement to deliver the third optional newbuilding drillship by November 2013 if Ocean Rig exercises its option to construct the drillship by November 22, 2011, under Ocean Rig's contract with Samsung.

On June 23, 2011, Ocean Rig exercised the third of six newbuilding drillship options under its option contract with Samsung and, as a result, entered into a shipbuilding contract for the third of Ocean Rig's seventh generation hulls and paid $207.4 million to the shipyard.

On July 20, 2011, Ocean Rig entered into contracts with Petrobras Brazil for the *Ocean Rig Corcovado* and the *Ocean Rig Mykonos* for drilling operations offshore Brazil. The term of each contract is 1,095 days, with a total combined value of $1.1 billion. The contract for the *Ocean Rig Mykonos* is scheduled to commence in the fourth quarter of 2011, and the contract for the *Ocean Rig Corcovado* is scheduled to commence upon the expiration of the drillship's current contract with Cairn.

On July 26, 2011, DryShips and OceanFreight, entered into a definitive agreement for DryShips to acquire the outstanding shares of OceanFreight for consideration per share of $19.85, consisting of $11.25 in cash and 0.52326 of a share of common stock of Ocean Rig. The Ocean Rig common shares that will be received by the OceanFreight shareholders will be from currently outstanding shares held by DryShips. Based on the July 25, 2011 closing price of NOK89.00 ($16.44) for the common shares of Ocean Rig on the Norwegian OTC market, the transaction consideration reflects a total equity value for OceanFreight of approximately $118 million and a total enterprise value of approximately $239 million, including the assumption of debt. The transaction has been approved by the boards of directors of DryShips and OceanFreight, by the audit committee of the board of directors of DryShips, which negotiated the proposed transaction on behalf of DryShips, and by a special committee of independent

directors of OceanFreight established to negotiate the proposed transaction on behalf of OceanFreight. The shareholders of OceanFreight, other than entities controlled by Mr. Kandylidis, the Chief Executive Officer of OceanFreight, will receive the consideration for their shares pursuant to a merger of OceanFreight with a subsidiary of DryShips. The merger is expected to close in the fourth quarter of 2011. Simultaneously with the execution of the definitive merger agreement described above, DryShips, entities controlled by Mr. Kandylidis and OceanFreight, entered into a separate purchase agreement. Under this agreement, DryShips acquired from the entities controlled by Mr. Kandylidis all their OceanFreight shares, representing a majority of the outstanding shares of OceanFreight, for the same consideration per share that the OceanFreight shareholders will receive in the merger. This acquisition closed on August 24, 2011. DryShips has committed to vote the OceanFreight shares it acquired in favor of the merger, which requires approval by a majority vote. Mr. Kandylidis is the son of one of the directors of DryShips and the nephew of Mr. George Economou. The Ocean Rig shares paid by DryShips to the entities controlled by Mr. Kandylidis are subject to a six-month lock-up period.

On July 28, 2011, Ocean Rig took delivery of its newbuilding drillship, the *Ocean Rig Poseidon* , the third of its four sixth-generation, advanced capability ultra-deepwater sister drillships that were constructed by Samsung. In connection with the delivery of the *Ocean Rig Poseidon* , the final yard installment of $309.3 million was paid, which was financed with additional drawdowns in July 2011 under the Deutsche Bank credit facility for the construction of the *Ocean Rig Poseidon* totaling $308.2 million.

On August 26, 2011, Ocean Rig commenced an offer to exchange up to 28,571,428 shares of its new common stock that have been registered under the Securities Act, pursuant to a registration statement on Form F-4 (Registration No. 333-175940), or the Exchange Shares, for an equivalent number of its common shares previously sold in a private offering in December 2010, or the Original Shares. On September 29, 2011, an aggregate of 28,505,786 common shares were exchanged in the Exchange Offer.

On September 12, 2011, Ocean Rig appointed a new independent director, Mr. Prokopios (Akis) Tsirigakis, to its board of directors to fill the vacancy resulting from the resignation of Mr. Pankaj Khanna as a director. On the same date, the Ocean Rig board of directors approved other changes to Ocean Rig's corporate governance in connection with the application to list Ocean Rig's common shares on the NASDAQ Global Select Market. Specifically, the Ocean Rig board of directors approved (1) an increase in the size of the audit committee to three members; (2) the establishment of a compensation committee comprised of independent directors; (3) the establishment of a nominating and corporate governance committee comprised of independent directors; (4) the adoption of written committee charters for each of the audit, compensation and nominating and corporate governance committees; and (5) the adoption of a Code of Ethics that applies to all officers, directors and employees of Ocean Rig. The Ocean Rig board of directors has determined that each of Mr. Akis Tsirgakis, Mr. Trygve Arnesen and Mr. Michael Gregos are independent under the rules of the Nasdaq Stock Market.

On September 30, 2011, Ocean Rig took delivery of its newbuilding drillship, the *Ocean Rig Mykonos* , the fourth of its four sixth-generation, advanced capability ultra-deepwater sister drillships that were constructed by Samsung. In connection with the delivery of the *Ocean Rig Mykonos* , the final yard installment of $305.7 million was paid, which was financed with additional drawdowns in September 2011 under the Deutsche Bank credit facility for the construction of the *Ocean Rig Mykonos* totaling $277.6 million.

On October 5, 2011, DryShips completed the partial spin off of Ocean Rig by distributing an aggregate of 2,967,291 common shares of Ocean Rig, after giving effect to the treatment of fractional shares, on a pro rata basis to DryShips' shareholders as of the record date of September 21, 2011, or the Spin Off. In lieu of fractional shares, DryShips' transfer agent aggregated all fractional shares that would otherwise be distributable to DryShips' shareholders and sold a total of 105 common shares on behalf of those shareholders who would otherwise be entitled to receive a fractional share of Ocean Rig. Following the distribution, each such shareholder received a cash payment in an amount equal to its pro rata share of the total net proceeds of the sale of fractional shares.

Ocean Rig has been advised that DryShips completed the Spin Off in order to satisfy the initial listing criteria of the NASDAQ Global Select Market, which require that Ocean Rig have a minimum number of round lot shareholders (shareholders who own 100 or more shares), and thereby increase the liquidity of its shares of common stock. Ocean Rig believes that listing its shares of common stock on the NASDAQ Global Select Market and thereby increasing the liquidity of its shares of common stock will benefit its shareholders by improving the ability

of its shareholders to monetize their investment by selling its common shares, reduce volatility in the market price of its common shares, enhance its ability to access the capital markets and increase the likelihood of attracting coverage by research analysts which, in turn, would provide additional information to shareholders upon which to base an investment decision. In connection with the Spin Off, Ocean Rig applied to have its common shares listed for trading on the NASDAQ Global Select Market and on September 19, 2011, Ocean Rig's common shares commenced "when issued" trading on the Nasdaq Global Select Market under the ticker symbol "ORIGV." Ocean Rig's common shares commenced "regular way" trading on the NASDAQ Global Select Market under the ticker symbol "ORIG" on October 6, 2011, the next trading day after the distribution date for the Spin Off of October 5, 2011.

## Ocean Rig's Fleet

Set forth below is summary information concerning Ocean Rig's offshore drilling units as of September 30, 2011.

| Unit | Year Built or Scheduled Delivery/ Generation | Water Depth to the Wellhead(ft) | Drilling Depth to the Oil Field(ft) | Customer | Contract Term | Dayrate | Drilling Location |
|---|---|---|---|---|---|---|---|
| **Existing Drilling Rigs** | | | | | | | |
| *Leiv* | 2001/5th | 7,500 | 30,000 | Cairn Energy plc | Q2 2011 – Q4 2011 | $ 560,000 | Greenland |
| *Eiriksson* | | | | Borders & Southern plc | Q4 2011 – Q2 2012 | $ 530,000 | Falkland Islands |
| **Existing Drillships** | | | | | | | |
| *Eirik Raude* | 2002/5th | 10,000 | 30,000 | Tullow Oil plc | Q4 2008 – Q4 2011 | $ 665,000 | Ghana |
| *Ocean Rig Corcovado* (A) | 2011/6th | | | Cairn Energy plc | Q1 2011 – Q4 2011 | $ 560,000 | Greenland |
| | | 10,000 | 40,000 | Petróleo Brasileiro S.A. | Q4 2011 – Q4 2014 | $ 460,000 | Brazil |
| *Ocean Rig Olympia* (A) | 2011/6th | | | Vanco Cote d'Ivoire Ltd. and Vanco Ghana Ltd. | Q2 2011 – Q2 2012 | | West Africa |
| | | 10,000 | 40,000 | Petrobras Tanzania Limited | Q3 2011 – Q1 2013 | $ 415,000 | Tanzania and West Africa |
| *Ocean Rig Poseidon* (A) | 2011/6th | | | | | | |
| | | 10,000 | 40,000 | Petróleo Brasileiro S.A. | Q4 2011 – Q4 2014 | $ 632,000 * | Brazil |
| *Ocean Rig Mykonos* (A) | 2011/6th | | | | | | |
| | | 10,000 | 40,000 | | | $ 455,000 | |
| **Newbuilding Drillships** | | | | | | | |
| *NB #1 (TBN)* (A) | Q3 2013/ 7th | 12,000 | 40,000 | | | | |
| *NB #2 (TBN)* (A) | Q3 2013/7th | 12,000 | 40,000 | | | | |
| *NB #3 (TBN)* (A) | Q4 2013/7th | 12,000 | 40,000 | | | | |
| **Optional Newbuilding Drillships** | | | | | | | |
| *NB Option #1* (A) | | 12,000 | 40,000 | | | | |
| *NB Option #2* (A) | | 12,000 | 40,000 | | | | |
| *NB Option #3* (A) | | 12,000 | 40,000 | | | | |

(A)  Represents "sister ship" vessels built to the same or similar design and specifications.

*  Maximum Dayrate

## Employment of Ocean Rig's Fleet

In April 2011, the *Leiv Eiriksson* commenced a contract with a term of approximately six months with Cairn Energy plc, or Cairn, for drilling operations in Greenland at a maximum operating dayrate of $560,000 and a mobilization fee of $7.0 million plus fuel costs. The contract is scheduled to expire on October 31, 2011, subject to Ocean Rig's customer's option to extend the contract period through November 30, 2011. Following the expiration of its contract with Cairn, the *Leiv Eiriksson* is scheduled to commence a contract with Borders & Southern for drilling operations offshore the Falkland Islands at a maximum operating dayrate of $530,000 and a $3.0 million fee payable upon commencement of mobilization as well as mobilization and demobilization fees, including fuel costs, of $15.4 million and $12.6 million, respectively. The contract was originally a two-well program at a maximum dayrate of $540,000; however, on May 19, 2011, Borders & Southern exercised its option to extend the contract to drill an additional two wells, which it assigned to Falkland Oil and Gas Limited, or Falkland Oil and Gas, and the maximum dayrate decreased to $530,000. Borders & Southern has the option to further extend this contract to drill an additional fifth well, in which case the dayrate would increase to $540,000. The estimated duration for the four-well contract, including mobilization/demobilization periods, is approximately 230 days, and Ocean Rig estimates that the optional period to drill the additional fifth well would extend the contract term by approximately 45 days.

The *Eirik Raude* is employed under the Tullow Oil contract for development drilling offshore of Ghana at a weighted average dayrate of $637,000, based upon 100% utilization. On February 15, 2011, the dayrate increased to a maximum of $665,000, which rate will be effective until expiration of the contract in October 2011.

The *Ocean Rig Corcovado* is employed under a contract with Cairn for a period of approximately ten months, under which the drillship commenced drilling and related operations in Greenland in May 2011 at a maximum operating dayrate of $560,000. In addition, Ocean Rig is entitled to a mobilization fee of $17.0 million, plus fuel costs, and winterization upgrading costs of $12.0 million, plus coverage of yard stay costs at $200,000 per day during the winterization upgrade. The contract period is scheduled to expire on October 31, 2011, subject to Ocean Rig's customer's option to extend the contract period through November 30, 2011. On July 20, 2011, Ocean Rig entered into a three-year contract with Petrobras Brazil for the *Ocean Rig Corcovado* for drilling operations offshore Brazil at a maximum dayrate of $460,000, plus a mobilization fee of $30.0 million. The contract is scheduled to commence upon the expiration of the drillship's contract with Cairn.

The *Ocean Rig Olympia* is employed under contracts to drill a total of five wells with Vanco for exploration drilling offshore of Ghana and Cote d'Ivoire at a maximum operating dayrate of $415,000 and a daily mobilization rate of $180,000, plus fuel costs. The aggregate contract term is for approximately one year, subject to Ocean Rig's customer's option to extend the term at the same dayrate for (i) one additional well, (ii) one additional year or (iii) one additional well plus one additional year. Vanco is required to exercise the option no later than the date on which the second well in the five-well program reaches its target depth.

The *Ocean Rig Poseidon* commenced a contract with Petrobras Tanzania, a company related to Petrobras Oil & Gas, on July 29, 2011 for drilling operations in Tanzania and West Africa for a period of 544 days, plus a mobilization period, at a maximum dayrate of $632,000, including a bonus of up to $46,000. In addition, Ocean Rig is entitled to receive a separate dayrate of $422,500 for up to 60 days during relocation and a mobilization dayrate of $317,000, plus the cost of fuel. The *Ocean Rig Poseidon* is currently earning mobilization fees under the contract. Drilling operations commenced on August 28, 2011.

On July 20, 2011, Ocean Rig entered into a three-year contract with Petrobras Brazil for the *Ocean Rig Mykonos* for drilling operations offshore Brazil at a maximum dayrate of $455,000, plus a mobilization fee of $30.0 million. The contract is scheduled to commence in the fourth quarter of 2011.

Ocean Rig has not arranged employment for Ocean Rig's three seventh generation hulls, which are scheduled to be delivered in July 2013, September 2013 and November 2013, respectively.

**Option to Purchase Additional New Drillships**

On November 22, 2010, DryShips, Ocean Rig's parent company, entered into a contract with Samsung that granted DryShips options for the construction of up to four additional ultra-deepwater drillships, which would be "sister-ships" to the *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* with certain upgrades to vessel design and specifications. The option agreement required DryShips to pay a non-refundable slot reservation fee of $24.8 million per drillship. The option agreement was novated by DryShips to Ocean Rig on December 30, 2010, at a cost of $99.0 million, which Ocean Rig paid from the net proceeds of a private offering of its common shares that Ocean Rig completed in December 2010. In addition, Ocean Rig paid additional deposits totaling $20.0 million to Samsung in the first quarter of 2011 to maintain favorable costs and yard slot timing under the option contract.

On May 16, 2011, Ocean Rig entered into an addendum to the option contract with Samsung, pursuant to which Samsung granted Ocean Rig the option for the construction of up to two additional ultra-deepwater drillships, which would be "sister-ships" to Ocean Rig's drillships and its seventh generation hulls, with certain upgrades to vessel design and specifications. Ocean Rig did not pay slot reservation fees in connection with its entry into this addendum.

As of the date of this proxy statement / prospectus, Ocean Rig has exercised three of the six options and, as a result, has entered into shipbuilding contracts for its seventh generation hulls with deliveries scheduled in July 2013, September 2013 and November 2013, respectively. Ocean Rig made payments of $632.4 million to the shipyard in the second quarter of 2011 in connection with Ocean Rig's exercise of the three newbuilding drillship options. The estimated total project cost per drillship is $638.0 million, which consists of $570.0 million of construction costs,

costs of approximately $38.0 million for upgrades to the existing drillship specifications and construction-related expenses of $30.0 million. These upgrades include a 7 ram BOP, a dual mud system and, with the purchase of additional equipment, the capability to drill up to 12,000 feet water depth.

Ocean Rig may exercise three remaining newbuilding drillship options at any time on or prior January 31, 2012, with vessel deliveries ranging from the first to the third quarter of 2014, depending on when the options are exercised. Ocean Rig estimates the total project cost, excluding financing costs, for the remaining three optional drillships to be $638.0 million per drillship, based on the construction and construction-related expenses for Ocean Rig's seventh generation hulls described above.

As part of the novation of the contract described above, the benefit of the slot reservation fees passed to Ocean Rig. The amount of the slot reservation fees for the seventh generation hulls has been applied towards the drillship contract prices and the amount of the slot reservation fees applicable to one of the remaining three newbuilding drillship options will be applied towards the respective drillship contract price if the options are exercised.

## Management of Ocean Rig's Drilling Units

Ocean Rig's existing drilling rigs, the *Leiv Eiriksson* and the *Eirik Raude* , are managed by Ocean Rig AS, Ocean Rig's wholly-owned subsidiary. Ocean Rig AS also provides supervisory management services including onshore management, to the *Ocean Rig Corcovado,* the *Ocean Rig Olympia,* the *Ocean Rig Poseidon,* the *Ocean Rig Mykonos* and Ocean Rig's newbuilding drillships pursuant to separate management agreements entered into with each of the drillship-owning subsidiaries. Under the terms of these management agreements, Ocean Rig AS, through its offices in Stavanger, Norway, Aberdeen, United Kingdom and Houston, Texas, is responsible for, among other things, (i) assisting in construction contract technical negotiations, (ii) securing contracts for the future employment of the drillships, and (iii) providing commercial, technical and operational management for the drillships.

### Global Services Agreement

On December 1, 2010, DryShips entered into a Global Services Agreement with Cardiff, a related party, effective December 21, 2010, pursuant to which DryShips has engaged Cardiff to act as consultant on matters of chartering and sale and purchase transactions for the offshore drilling units operated by us. Under the Global Services Agreement, Cardiff, or its subcontractor, will (i) provide consulting services related to identifying, sourcing, negotiating and arranging new employment for offshore assets of DryShips and its subsidiaries, including Ocean Rig's drilling units and (ii) identify, source, negotiate and arrange the sale or purchase of the offshore assets of DryShips and its subsidiaries, including Ocean Rig's drilling units. Ocean Rig may benefit from services provided in accordance with Global Services Agreement.

The Global Services Agreement does not apply to the agreement with Petrobras Oil & Gas regarding the early termination of the Petrobras contract for the *Leiv Eiriksson* and the employment of the *Ocean Rig Poseidon* and the contracts with Cairn and Borders & Southern for the *Leiv Eiriksson* . Except as otherwise described, the Global Services Agreement applies to all contracts entered into after December 21, 2010 as well as the contract with Cairn for the *Ocean Rig Corcovado* and the contract with Vanco for *the Ocean Rig Olympia* . Ocean Rig does not pay or reimburse DryShips or its affiliates for services provided under the Global Services Agreement. Ocean Rig will, however, record expenses incurred under the Global Services Agreement in its income statement and as a shareholder's contribution (additional paid-in capital) to capital when they are incurred.

The services described above provided by Ocean Rig AS and Cardiff overlap mainly with respect to negotiating shipyard orders and providing marketing for potential contractors. Cardiff has an established reputation within the shipping industry, and has developed expertise and a network of strong relationships with shipbuilders and oil companies, which supplement the management capabilities of Ocean Rig AS.

For a discussion of Ocean Rig's management agreements with Cardiff that terminated on December 21, 2010, please see "Ocean Rig Related Party Transactions — Ocean Rig Related Party Agreements — Management agreements with Cardiff — Management fees to related party."

**Potential Conflicts of Interest**

Ocean Rig's Chairman, President and Chief Executive Officer, Mr. Economou, is also the Chairman, President and Chief Executive Officer of DryShips, Ocean Rig's parent company. Ocean Rig's officers and directors have fiduciary duties to manage Ocean Rig's business in a manner beneficial to Ocean Rig and its shareholders. Mr. Economou has fiduciary duties to manage the business of DryShips and its affiliates in a manner beneficial to such entities and their shareholders. Consequently, Mr. Economou may encounter situations in which his fiduciary obligations to DryShips and Ocean Rig are in conflict. Any proposed transaction with a related party is subject to the review and approval of the independent members of Ocean Rig's board of directors.

**Ocean Rig's Competitive Strengths**

Ocean Rig believes that its prospects for success are enhanced by the following aspects of its business:

*Proven track record in ultra-deepwater drilling operations.*   Ocean Rig has a well-established record of operating drilling equipment with a primary focus on ultra-deepwater offshore locations and harsh environments. Established in 1996, Ocean Rig employed 1,093 people as of September 30, 2011, and have gained significant experience operating in challenging environments with a proven track record for operations excellence through its completion of 105 wells. Ocean Rig capitalizes on its high-specification drilling units to the maximum extent of their technical capability, and Ocean Rig believes that it has earned a reputation for operating performance excellence. Ocean Rig has operated the *Leiv Eiriksson* since 2001 and the *Eirik Raude* since 2002. From February 24, 2010 through February 3, 2011, the *Leiv Eiriksson* performed drilling operations in the Black Sea under the Petrobras contract and achieved a 91% earnings efficiency. The *Eirik Raude* has been operating in deep water offshore of Ghana under the Tullow Oil contract and achieved a 98% earnings efficiency for the period beginning October 2008, when the rig commenced the contract, through June 30, 2011.

*Technologically advanced deepwater drilling units.*   According to Fearnley Offshore AS, the *Leiv Eiriksson* and the *Eirik Raude* are two of only 15 drilling units worldwide as of July 2011 that are technologically equipped to operate in both ultra-deepwater and harsh environments. Additionally, each of Ocean Rig's drillships will be either a sixth or seventh generation, advanced capability, ultra-deepwater drillship built based on a proven design that features full dual derrick enhancements. The *Ocean Rig Corcovado,* the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* have the capacity to drill 40,000 feet at water depths of 10,000 feet and Ocean Rig's three seventh generation hulls will have the capacity to drill 40,000 feet at water depths of 12,000 feet. One of the key benefits of each of Ocean Rig's drillships is its dual activity drilling capabilities, which involves two drilling systems that use a single derrick and which permits two drilling-related operations to take place simultaneously. Ocean Rig estimates that this capability reduces typical drilling time by approximately 15% to 40%, depending on the well parameters, resulting in greater utilization and cost savings to Ocean Rig's customers. According to Fearnley Offshore AS, of the 34 ultra-deepwater drilling units to be delivered worldwide in 2011, only 11 are expected to have dual activity drilling capabilities, including Ocean Rig's four drillships. As a result of the *Deepwater Horizon* offshore drilling accident in the Gulf of Mexico in April 2010, in which Ocean Rig was not involved, Ocean Rig believes that independently and nationally owned oil companies and international governments will increase their focus on safety and the prevention of environmental disasters and, as a result, Ocean Rig expects that high quality and technologically advanced drillships such as Ocean Rig's will be in high demand and at the forefront of ultra-deepwater drilling activity.

*Long-term blue-chip customer relationships.*   Since the commencement of Ocean Rig's operations, Ocean Rig has developed relationships with large independent oil producers such as Chevron, ExxonMobil, Petrobras Oil & Gas, Shell, BP, Total, Statoil, and Tullow Oil. Together with Ocean Rig's predecessor, Ocean Rig ASA, it has drilled 105 wells in 15 countries for 22 clients, including those listed above. Currently, Ocean Rig has employment contracts with Petrobras Oil & Gas, Petrobras Tanzania, Petrobras Brazil, Tullow Oil, Borders & Southern, Cairn and Vanco. Ocean Rig believes these strong customer relationships stem from its proven track record for dependability and for delivering high-quality drilling services in the most extreme operating environments. Although Ocean Rig's former clients are not obligated to use its services, Ocean Rig expects to use its relationships with its current and former customers to secure attractive employment contracts for its drilling units.

*High barriers to entry.*   There are significant barriers to entry in the ultra-deepwater offshore drilling industry. Given the technical expertise needed to operate ultra-deepwater drilling rigs and drillships, operational know-how and a track record of safety play an important part in contract awards. The offshore drilling industry in some jurisdictions is highly regulated, and compliance with regulations requires significant operational expertise and financial and management resources. With the negative press around the *Deepwater Horizon* drilling rig accident, Ocean Rig expects regulators worldwide to implement more stringent regulations and oil companies to place a premium on drilling firms with a proven track record for safety. There are also significant capital requirements for building ultra-deepwater drillships. Further, there is limited shipyard availability for new drillships and required lead times are typically in excess of two years. Additionally, due to the recent financial crisis, access to bank lending, the traditional source for ship and offshore financing, has become constrained. According to Fearnley Offshore AS, as of July 2011 there were 85 ultra-deepwater drilling units in operation with another 62 under construction, including Ocean Rig's the *Ocean Rig Poseidon,* the *Ocean Rig Mykonos* and its three newbuilding drillships.

*Anticipated strong free cash flow generation.*   Based on current and expected supply and demand dynamics in ultra-deepwater drilling, Ocean Rig expects dayrates to be above Ocean Rig's estimated daily cash breakeven rate, based on estimated daily operating costs, general and administrative costs and debt service requirements, thereby generating substantial free cash flow going forward. According to Fearnley Offshore AS, the most recent charterhire in the industry for a modern ultra-deepwater drillship or rig (June 2011) was at a gross dayrate of $450,000 for a two-year contract commencing in the third quarter of 2012. As of September 30, 2011, Ocean Rig's five-unit fleet generated a maximum average dayrate of $560,000.

*Leading shipbuilder constructing its newbuildings.*   Only a limited number of shipbuilders possess the necessary construction and underwater drilling technologies and experience to construct drillships. The *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* were, and Ocean Rig's three newbuilding drillships are being, built by Samsung, which is one of the world's largest shipbuilders in the high-tech and high-value shipbuilding sectors, which include drillships, ultra-large container ships, liquefied natural gas carriers and floating production storage and offshore units, or FPSOs. According to Fearnley Offshore AS, of the 74 drillships ordered on a global basis since 2005, Samsung has delivered or will deliver 40, representing a 54% market share. To date, construction of Ocean Rig's newbuilding drillships has progressed on time and on budget.

*Experienced management and operations team.*   Ocean Rig has an experienced management and operations team with a proven track record and an average of 24 years of experience in the offshore drilling industry. Many of the core members of Ocean Rig's management team have worked together since 2006, and certain members of its management team have worked at leading oil-related and shipping companies such as ExxonMobil, Statoil, Transocean, ProSafe and Smedvig (acquired by Seadrill Limited). In addition to the members of the management team, Ocean Rig had at September 30, 2011, 39 employees of the Company overseeing construction of Ocean Rig's newbuilding drillships and will have highly trained personnel operating the drillships once they are delivered from the yard. Ocean Rig also had at September 30, 2011, an onshore team of 116 people in management functions as well as administrative and technical staff and support functions, ranging from marketing, human resources, accounting, finance, technical support and health, environment, safety and quality, or HES&Q. Ocean Rig believes the focus and dedication of its personnel in each step of the process, from design to construction to operation, has contributed to its track record of safety and consistently strong operational performance.

**Business Strategy**

Ocean Rig's business strategy is predicated on becoming a leading company in the offshore ultra-deepwater drilling industry and providing customers with safe, high quality service and state-of-the-art drilling equipment. The following outlines the primary elements of this strategy:

*Create a "pure play" model in the ultra-deepwater and harsh environment markets.*   Ocean Rig's mission is to become the preferred offshore drilling contractor in the ultra-deepwater and harsh environment regions of the world and to deliver excellent performance to Ocean Rig's clients by exceeding their expectations for operational efficiency and safety standards. Ocean Rig believes the *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* are, and Ocean Rig's three newbuilding drillships will be, among the most technologically advanced in the world. Ocean Rig currently has an option to purchase up to three additional

158

newbuilding drillships and Ocean Rig intends to grow its fleet over time in order to continue to meet its customers' demands while optimizing its fleet size from an operational and logistical perspective.

*Capitalize on the operating capabilities of its drilling units.* Ocean Rig plans to capitalize on the operating capabilities of its drilling units by entering into attractive employment contracts. The focus of its marketing effort is to maximize the benefits of the drilling units' ability to operate in ultra-deepwater drilling locations. As described above, the *Leiv Eiriksson and Eirik Raude* are two of only 15 drilling units worldwide as of July 2011 that are technologically equipped to operate in both ultra-deepwater and harsh environments, and Ocean Rig's drillships will have the capacity to drill 40,000 feet at water depths of 10,000 feet or, in the case of Ocean Rig's seventh generation hulls, 12,000 feet with dual activity drilling capabilities. Ocean Rig aims to secure firm employment contracts for the drilling units at or near the highest dayrates available in the industry at that time while balancing appropriate contract lengths. As Ocean Rig works towards its goal of securing firm contracts for its drilling units at attractive dayrates, Ocean Rig believes it will be able to differentiate itself based on its prior experience operating drilling rigs and its safety record.

*Maintain high drilling units utilization and profitability.* Ocean Rig has a proven track record of optimizing equipment utilization. Until February 2011, the *Leiv Eiriksson* was operating in the Black Sea under the Petrobras contract and maintained a 91% earnings efficiency from February 24, 2010 through February 3, 2011, for the period it performed drilling operations under the contract. The *Eirik Raude* has been operating offshore of Ghana under the Tullow Oil contract and maintained a 98% earnings efficiency from October 2008, when it commenced operations under the contract, through March 31, 2011. Ocean Rig aims to maximize the revenue generation of its drilling units by maintaining its track record of high drilling unit utilization as a result of the design capabilities of its drilling units that can operate in harsh environmental conditions.

*Capitalize on favorable industry dynamics.* Ocean Rig believes the demand for offshore deepwater drilling units will be positively affected by increasing global demand for oil and gas and increased exploration and development activity in deepwater markets. The IEA projected that oil demand for 2010 increased by 3.4% compared to 2009 levels, and that oil demand will further increase to 89.2 million barrels per day in 2011, an increase of 1.5% compared to 2010 levels. As the OECD countries resume their growth and the major non-OECD countries continue to develop, led by China and India, oil demand is expected to grow. Ocean Rig believes it will become increasingly difficult to find the incremental barrels of oil needed, due to depleting existing oil reserves. This is expected to force oil companies to continue to explore for oil farther offshore for growing their proven reserves. According to Fearnley Offshore AS, from 2005 to 2010, the actual spending directly related to ultra-deepwater drilling units increased from $4.7 billion to $19.0 billion, a CAGR of 32.2%.

*Continue to prioritize safety as a key focus of Ocean Rig's operations.* Ocean Rig believe safety is of paramount importance to its customers and a key differentiator for Ocean Rig when securing drilling contracts from its customers. Ocean Rig has a zero incident philosophy embedded in its corporate culture, which is reflected in its policies and procedures. Despite operating under severely harsh weather conditions, Ocean Rig has a proven track record of high efficiency deepwater and ultra-deepwater drilling operations. Ocean Rig employed 1,093 people as of September 30, 2011, and has been operating ultra-deepwater drilling rigs since 2001. Ocean Rig has extensive experience working in varying environments and regulatory regimes across the globe, including Eastern Canada, Angola, Congo, Ireland, the Gulf of Mexico, the U.K., West of Shetlands, Norway, including the Barents Sea, Ghana and Turkey.

Both of Ocean Rig's drilling rigs and one of its drillships, the *Ocean Rig Corcovado* , have a valid and updated safety case under U.K. Health and Safety Executive, or HSE, regulations, and both of Ocean Rig's drilling rigs hold a Norwegian sector certificate of compliance (called an Acknowledgement of Compliance), which evidences that the rigs and Ocean Rig's management system meet the requirements set by the U.K. and Norwegian authorities.

Ocean Rig believes that this safety record has enabled it to hire and retain highly-skilled employees, thereby improving its overall operating and financial performance. Ocean Rig expects to continue its strong commitment to safety across all of its operations by investing in the latest technologies, performing regular planned maintenance on its drilling units and investing in the training and development of new safety programs for its employees.

159

*Implement and sustain a competitive cost structure.*    Ocean Rig believes that it has a competitive cost structure due to its operating experience and successful employee retention policies and that its retention of highly-skilled personnel leads to significant transferable experience and knowledge of drilling rig operation through deployment of seasoned crews across its fleet. By focusing on the ultra-deepwater segment, Ocean Rig believes that it is able to design and implement best-in-class processes to streamline its operations and improve efficiency. As Ocean Rig grows, it hopes to benefit from significant economies of scale due to an increased fleet size and a fleet of "sister-ships" to Ocean Rig's drillships, where Ocean Rig expects to benefit from the standardization of these drilling units, resulting in lower training and operating costs. In addition, Ocean Rig's drillships have high-end specifications, including advanced technology and safety features, and, therefore, Ocean Rig expects that the need for upgrades will be limited in the near term. Ocean Rig expects the increase from six to nine drilling units to enable it to bring more than one unit into a drilling region in which Ocean Rig operates. To the extent Ocean Rig operates more than one drilling unit in a drilling region, Ocean Rig expects to benefit from economies of scale and improved logistic coordination managing more units from the same onshore bases.

## Risk Factors

Ocean Rig faces a number of risks associated with its business and industry and must overcome a variety of challenges to utilize Ocean Rig's strengths and implement its business strategy. These risks include, among others, changes in the offshore drilling market, including supply and demand, utilization rates, dayrates, customer drilling programs, and commodity prices; a downturn in the global economy; hazards inherent in the drilling industry and marine operations resulting in liability for personal injury or loss of life, damage to or destruction of property and equipment, pollution or environmental damage; inability to comply with loan covenants; inability to finance shipyard and other capital projects; and inability to successfully employ Ocean Rig's drilling units.

This is not a comprehensive list of risks to which Ocean Rig is subject, and you should carefully consider all the information in this proxy statement / prospectus. In particular, Ocean Rig urges you to carefully consider the risk factors set forth in the section of this proxy statement / prospectus entitled "Risk Factors" beginning on page 29.

## Industry Overview

In recent years, the international drilling market has seen an increasing trend towards deep and ultra-deepwater oil and gas exploration. As shallow water resources mature, deep and ultra-deepwater regions are expected to play an increasing role in offshore oil and gas production. According to Fearnley Offshore AS, the ultra-deepwater market has seen rapid development over the last six years, with dayrates increasing from approximately $180,000 in 2004 to above $600,000 in 2008, before declining to a level of approximately $453,000 in July 2011. The ultra-deepwater market rig utilization rate has been stable above 80% since 2000 and above 97% since 2006. The operating units capable of drilling in ultra-deepwater depths of greater than 7,500 feet consist mainly of fifth- and sixth-generation units, but also include certain older upgraded units. The in-service fleet as of July 2011 totaled 85 units, and is expected to grow to 147 units upon the scheduled delivery of the current newbuild orderbook by the middle of 2014. Historically, an increase in supply has caused a decline in utilization and dayrates until drilling units are absorbed into the market. Accordingly, dayrates have been very cyclical. Ocean Rig believes that the largest undiscovered offshore reserves are mostly located in ultra-deepwater fields and primarily located in the "golden triangle" between West Africa, Brazil and the Gulf of Mexico. The location of these large offshore reserves has resulted in more than 90% of the floater orderbook being represented by ultra-deepwater units. Furthermore, due to increased focus on technically challenging operations and the inherent risk of developing offshore fields in ultra-deepwater, particularly in light of the *Deepwater Horizon* oil spill in the Gulf of Mexico, oil companies have already begun to show a preference for modern units more capable of drilling in these harsh environments. See "The Offshore Drilling Industry."

## Corporate Structure

Ocean Rig is a corporation incorporated under the laws of the Marshall Islands on December 10, 2007 under the name Primelead Shareholders Inc. Primelead Shareholders Inc. was formed in December 2007 for the purpose of acquiring the shares of Ocean Rig's predecessor, Ocean Rig ASA, which was incorporated in September 1996 under the laws of Norway. Ocean Rig acquired control of Ocean Rig ASA on May 14, 2008. Prior to the private

placement of its common shares in December 2010, Ocean Rig was a wholly-owned subsidiary of DryShips. As of the date of this proxy statement / prospectus, DryShips owns approximately 75% of Ocean Rig's outstanding common shares. Each of its drilling units is owned by a separate wholly-owned subsidiary. Ocean Rig is the owner, directly or indirectly, of all the issued and outstanding shares of the subsidiaries listed in Exhibit 21.1 to the registration statement on Form F-4, of which this proxy statement / prospectus is a part.

Ocean Rig maintains its principal executive offices at 10 Skopa Street, Tribune House, 2nd Floor, Office 202, CY 1075, Nicosia, Cyprus and its telephone number at that address is 011 357 22767517. Ocean Rig's website is located at www.ocean-rig.com. The information on Ocean Rig's website is not a part of this proxy statement / prospectus.

## Customers

Ocean Rig's prospective customers generally fall within three categories: national oil companies, large integrated major oil companies and medium to smaller independent exploration and production companies. Ocean Rig, together with its predecessor, Ocean Rig ASA, have an established history with 105 wells drilled in 15 countries for 22 different customers. During 2010, Ocean Rig's drilling contracts with Petrobras and Tullow Oil accounted for 43% and 57% of the total consolidated annual revenues, respectively. During 2009, Ocean Rig's drilling contracts with Shell and Tullow Oil accounted for 38% and 62% of the total consolidated annual revenues, respectively. During the period from May 14, 2008 through December 31, 2008, Ocean Rig's drilling contracts with Shell accounted for 54%, Exxon for 26% and Tullow Oil for 20% of the total consolidated annual revenues.

## Contract Drilling Services

Ocean Rig's contracts to provide offshore drilling services and drilling units are individually negotiated and vary in their terms and provisions. Ocean Rig generally obtains its contracts through competitive bidding against other contractors. The contracts for Ocean Rig's drilling units typically provide for compensation on a "dayrate" basis under which Ocean Rig is paid a fixed amount for each day that the vessel is operating under a contract at full efficiency, with higher rates while the drilling unit is operating and lower rates for periods of mobilization or when drilling operations are interrupted or restricted by equipment breakdowns, adverse environmental conditions or other conditions beyond Ocean Rig's control. Under most dayrate contracts, Ocean Rig pays the operating expenses of the rig or drillship, including planned rig maintenance, crew wages, insurance and the cost of supplies.

A dayrate drilling contract generally extends over a period of time covering either the drilling of a single well or group of wells or covering a stated term, as do the current contracts for Ocean Rig's drilling rigs. Currently, there is no spot market for offshore drilling units. The length of shorter-term contracts is typically from 60 to 365 days and the longer-term contracts are typically from two to five years. From time to time contracts with customers in the offshore drilling industry may contain terms whereby the customer has an option to cancel upon payment of an early termination payment, but where such payments may not fully compensate for the loss of the contract. Contracts also customarily provide for either automatic termination or termination at the option of the customer typically without the payment of any termination fee, under various circumstances such as major nonperformance, in the event of substantial downtime or impaired performance caused by equipment or operational issues, or sustained periods of downtime due to force majeure events. Many of these events are beyond Ocean Rig's control. The contract term in some instances may be extended by the client exercising options for the drilling of additional wells or for an additional term. Ocean Rig's contracts also typically include a provision that allows the client to extend the contract to finish drilling a well-in-progress.

Ocean Rig expects that provisions of future contracts will be similar to those in Ocean Rig's current contracts for its drilling units.

In October 2009, the *Leiv Eiriksson* commenced the Petrobras contract for exploration drilling in the Black Sea at a maximum dayrate rate of $583,000, expiring in October 2012. Pursuant to an agreement, dated as of December 21, 2010, by and between Petrobras Oil & Gas and Ocean Rig 1 Inc., the owner of the *Leiv Eiriksson* , the *Leiv Eiriksson* was released from the Petrobras contract on April 10, 2011 and was replaced by the *Ocean Rig Poseidon* . On April 21, 2011, the *Leiv Eiriksson* commenced a contract with a term of approximately six months Cairn, which was entered into in January 2011, for drilling operations in Greenland at a maximum operating dayrate

161

of $560,000 and a mobilization fee of $7.0 million plus fuel costs. The contract period is scheduled to expire on October 31, 2011, subject to Ocean Rig's customer's option to extend the contract period through November 30, 2011. Following the expiration of its contract with Cairn, the *Leiv Eiriksson* is scheduled to commence a contract with Borders & Southern for drilling operations offshore the Falkland Islands at a maximum operating dayrate of $530,000 and a $3.0 million fee payable upon commencement of mobilization as well as mobilization and demobilization fees, including fuel costs, of $15.4 million and $12.6 million, respectively. The contract was originally a two-well program at a maximum dayrate of $540,000; however, on May 19, 2011, Borders & Southern exercised its option to extend the contract to drill an additional two wells, which it assigned to Falkland Oil and Gas Limited, or Falkland Oil and Gas, and the maximum dayrate decreased to $530,000. Borders & Southern has the option to further extend this contract to drill an additional fifth well, in which case the dayrate would increase to $540,000. The estimated duration for the four-well contract, including mobilization/demobilization periods, is approximately 230 days, and Ocean Rig estimates that the optional period to drill the additional fifth well would extend the contract term by approximately 45 days. The *Eirik Raude* was originally scheduled to commence this contract with Borders & Southern; however on May 5, 2011, Ocean Rig terminated the contract for the *Eirik Raude* and entered into a new contract for the *Leiv Eiriksson* on the same terms as the original contract for the *Eirik Raude*, with the exception of the fees payable upon mobilization and demobilization and certain other terms specific to the *Leiv Eiriksson*, including off-hire dates, period surveys and technical specifications.

In October 2008, the *Eirik Raude* commenced the Tullow Oil contract for development drilling offshore of Ghana at an average dayrate of $637,000, based upon 100% utilization, expiring in October 2011. Under the Tullow Oil contract, the dayrate is escalated each year by $18,000. Beginning on February 15, 2011, the dayrate increased to a maximum of $665,000 and will be effective until expiration of the contract. From October 9, 2008 through December 31, 2010, the rig had an earnings efficiency of 98%.

In January 2011, Ocean Rig commenced a contract with a term of approximately ten months with Cairn for the *Ocean Rig Corcovado*, under which the *Ocean Rig Corcovado* commenced drilling and related operations in Greenland in May 2011 at a maximum operating dayrate of $560,000. In addition, Ocean Rig is entitled to a mobilization fee of $17.0 million plus fuel costs and winterization upgrading costs of $12.0 million plus coverage of yard stay costs at $200,000 per day during the winterization upgrade. The contract period is scheduled to expire on October 31, 2011, subject to Ocean Rig's customer's option to extend the contract period through November 30, 2011. On July 20, 2011, Ocean Rig entered into a three-year contract with Petrobras Brazil for the *Ocean Rig Corcovado* for drilling operations offshore Brazil at a maximum dayrate of $460,000, plus a mobilization fee of $30.0 million. The contract is scheduled to commence upon the expiration of the drillship's contract with Cairn.

In October 2010, Ocean Rig entered into contracts with Vanco for the *Ocean Rig Olympia* to drill a total of five wells for exploration drilling offshore of Ghana and Cote d'Ivoire at a maximum operating dayrate of $415,000 and a daily mobilization rate of $180,000 plus fuel costs. The *Ocean Rig Olympia* commenced the contracts directly upon delivery on March 30, 2010. The aggregate contract term is for approximately one year, subject to Ocean Rig's customer's option to extend the term for (i) one additional well, (ii) one additional year, or (iii) one additional well plus one additional year. Vanco is required to exercise the option no later than the date on which the second well in the five well program reaches its target depth.

Pursuant to the agreement described above and a contract entered into with Petrobras Tanzania in December 2010, the *Ocean Rig Poseidon* commenced a 544-day contract, plus a mobilization period, with Petrobras Tanzania on July 29, 2011 for exploration drilling in West Africa and Tanzania at a maximum dayrate of $632,000, including a bonus of up to $46,000. In addition, Ocean Rig is entitled to receive a separate dayrate of $422,500 for up to 60 days during relocation and a mobilization dayrate of $317,000 plus the cost of fuel. The *Ocean Rig Poseidon* is currently earning mobilization fees under the contract. Drilling operations commenced on August 28, 2011.

On July 20, 2011, Ocean Rig entered into a three-year contract with Petrobras Brazil for the *Ocean Rig Mykonos* for drilling operations offshore Brazil at a maximum dayrate of $455,000, plus a mobilization fee of $30.0 million. The contract is scheduled to commence in the fourth quarter of 2011.

**Competition**

The offshore contract drilling industry is competitive with numerous industry participants, few of which at the present time have a dominant market share. The drilling industry has experienced consolidation in recent years and may experience additional consolidation, which could create additional large competitors. Many of Ocean Rig's competitors have significantly greater financial and other resources, including more drilling units, than Ocean Rig. Ocean Rig competes with offshore drilling contractors that together have approximately 156 deepwater and ultra-deepwater drilling units worldwide, defined as units with water depth capacity of 3,000 feet or more.

The offshore contract drilling industry is influenced by a number of factors, including global demand for oil and natural gas, current and anticipated prices of oil and natural gas, expenditures by oil and gas companies for exploration and development of oil and natural gas and the availability of drilling rigs. In addition, mergers among oil and natural gas exploration and production companies have reduced, and may from time to time reduce, the number of available customers.

Drilling contracts are traditionally awarded on a competitive bid basis. Intense price competition is often the primary factor in determining which qualified contractor is awarded a job. Customers may also consider unit availability, location and suitability, a drilling contractor's operational and safety performance record, and condition and suitability of equipment. Ocean Rig believes that it competes favorably with respect to these factors.

Ocean Rig competes on a worldwide basis, but competition may vary significantly by region at any particular time. Competition for offshore units generally takes place on a global basis, as these units are highly mobile and may be moved, at a cost that may be substantial, from one region to another. Competing contractors are able to adjust localized supply and demand imbalances by moving units from areas of low utilization and dayrates to areas of greater activity and relatively higher dayrates. Significant new unit construction and upgrades of existing drilling units could also intensify price competition.

**Employees**

As of December 31, 2010, Ocean Rig's management subsidiaries had approximately 564 employees, of which approximately 445 were employed by Ocean Rig's management subsidiaries and 119 were full-time crew engaged through third-party crewing agencies. Of the total number of employees, approximately 160 were assigned to the *Eirik Raude* , approximately 143 were assigned to the *Leiv Eiriksson* , approximately 139 were assigned to the *Ocean Rig Corcovado* and 50 were assigned to the *Ocean Rig Olympia.* These numbers include shore-based support teams in Turkey and Ghana. The newbuild drillship project team, located in Korea and Norway, employed 50 employees, while the management and staff positions at the Stavanger office consisted of 59 employees. In addition, there were four employees based at the London office and two employees based in other locations. As of September 30, 2011, the total number of employees increased to 1,093, of which 778 are Ocean Rig's employees and 315 are provided by third-party companies. The increase is primarily due to the increase in manning levels on four of Ocean Rig's drillships as follows: 175 to *Ocean Rig Corcovado* , 199 to *Ocean Rig Olympia* , 131 to *Ocean Rig Poseidon* and 89 to *Ocean Rig Mykonos* .

**Recruitment for Drillship Operations**

Ocean Rig will have 90 employees per drillship as base crew and the remainder will be recruited according to contract, location and the availability of quality personnel in that area. The *Ocean Rig Corcovado* , the *Ocean Rig Olympia,* the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* are fully crewed and Ocean Rig is engaged in hiring crew for its three drillships under construction, which Ocean Rig expects to complete prior to the delivery of the applicable drillship.

**Properties**

Ocean Rig maintains its principal executive offices in Nicosia, Cyprus and principally markets its services to clients and potential clients worldwide out of its subsidiaries located in Stavanger, Norway, Houston, Texas and Aberdeen, United Kingdom. Ocean Rig provides technical and administrative support functions from these offices with support from its other offices in Accra, Ghana, Edinburgh, United Kingdom and Geoje, Korea.

**Environmental and Other Regulations**

Ocean Rig's offshore drilling operations include activities that are subject to numerous international, federal, state and local laws and regulations, including the International Convention for the Prevention of Pollution from Ships, or MARPOL, the International Convention on Civil Liability for Oil Pollution Damage of 1969, generally referred to as CLC, the International Convention on Civil Liability for Bunker Oil Pollution Damage, or Bunker Convention, the U.S. Oil Pollution Act of 1990, or OPA, the Comprehensive Environmental Response, Compensation and Liability Act, or CERCLA, the U.S. Outer Continental Shelf Lands Act, and Brazil's National Environmental Policy Law (6938/81), Environmental Crimes Law (9605/98) and Law 9966/2000 relating to pollution in Brazilian waters. These laws govern the discharge of materials into the environment or otherwise relate to environmental protection. In certain circumstances, these laws may impose strict liability, rendering Ocean Rig liable for environmental and natural resource damages without regard to negligence or fault on its part.

For example, the United Nations' International Maritime Organization, or IMO, adopted MARPOL and Annex VI to MARPOL to regulate the discharge of harmful air emissions from ships, which include rigs and drillships. Rigs and drillships must comply with MARPOL limits on sulfur oxide and nitrogen oxide emissions, chlorofluorocarbons, and the discharge of other air pollutants, except that the MARPOL limits do not apply to emissions that are directly related to drilling, production, or processing activities.

Ocean Rig's drilling units are subject not only to MARPOL regulation of air emissions, but also to the Bunker Convention's strict liability for pollution damage caused by discharges of bunker fuel in ratifying states. Ocean Rig believes that all of its drilling units are currently compliant in all material respects with these regulations. In October 2008, IMO's Maritime Environment Protection Committee, or MEPC, adopted amendments to the Annex VI regulations which entered into force on July 1, 2010, that will require a progressive reduction of sulfur oxide levels in heavy bunker fuels and create more stringent nitrogen oxide emissions standards for marine engines in the future. Ocean Rig may incur costs to comply with these revised standards.

Furthermore, any drillships that Ocean Rig may operate in United States waters, including the U.S. territorial sea and the 200 nautical mile exclusive economic zone around the United States, would have to comply with OPA and CERCLA requirements that impose liability (unless the spill results solely from the act or omission of a third party, an act of God or an act of war) for all containment and clean-up costs and other damages arising from discharges of oil or other hazardous substances, other than discharges related to drilling.

The U.S. BOEMRE periodically issues guidelines for rig fitness requirements in the Gulf of Mexico and may take other steps that could increase the cost of operations or reduce the area of operations for Ocean Rig's units, thus reducing their marketability. Implementation of BOEMRE guidelines or regulations may subject the Company to increased costs or limit the operational capabilities of its units and could materially and adversely affect the Company's operations and financial condition.

Numerous governmental agencies issue regulations to implement and enforce the laws of the applicable jurisdiction, which often involve lengthy permitting procedures, impose difficult and costly compliance measures, particularly in ecologically sensitive areas, and subject operators to substantial administrative, civil and criminal penalties or may result in injunctive relief for failure to comply. Some of these laws contain criminal sanctions in addition to civil penalties. Changes in environmental laws and regulations occur frequently, and any changes that result in more stringent and costly compliance or limit contract drilling opportunities, including changes in response to a serious marine incident that results in significant oil pollution or otherwise causes significant adverse environmental impact, such as the April 2010 *Deepwater Horizon* oil spill in the Gulf of Mexico, could adversely affect Ocean Rig's financial results. While Ocean Rig believes that it is in substantial compliance with the current laws and regulations, there is no assurance that compliance can be maintained in the future.

In addition to the MARPOL, OPA, and CERCLA requirements described above, Ocean Rig's international operations in the offshore drilling segment are subject to various laws and regulations in countries in which it operates, including laws and regulations relating to the importation of and operation of drilling units and equipment, currency conversions and repatriation, oil and gas exploration and development, environmental protection, taxation of offshore earnings and earnings of expatriate personnel, the use of local employees and suppliers by foreign contractors and duties on the importation and exportation of drilling units and other equipment. New environmental

164

or safety laws and regulations could be enacted, which could adversely affect Ocean Rig's ability to operate in certain jurisdictions. Governments in some countries have become increasingly active in regulating and controlling the ownership of concessions and companies holding concessions, the exploration for oil and gas and other aspects of the oil and gas industries in their countries. In some areas of the world, this governmental activity has adversely affected the amount of exploration and development work done by major oil and gas companies and may continue to do so. Operations in less developed countries can be subject to legal systems that are not as mature or predictable as those in more developed countries, which can lead to greater uncertainty in legal matters and proceedings.

Implementation of new environmental laws or regulations that may apply to ultra-deepwater drilling units may subject Ocean Rig to increased costs or limit the operational capabilities of Ocean Rig's drilling units and could materially and adversely affect Ocean Rig's operations and financial condition.

## Insurance for Ocean Rig's Offshore Drilling Units

Ocean Rig maintains insurance for its drilling units in accordance with industry standards. Ocean Rig's insurance is intended to cover normal risks in its current operations, including insurance against property damage, loss of hire, war risk and third-party liability, including pollution liability. The insurance coverage is established according to the Norwegian Marine Insurance Plan of 1996, version 2010, which together with the London Drilling Standard Form Plan is the industry standard. Ocean Rig has obtained insurance for the full assessed market value of Ocean Rig's drilling units, as assessed by rig brokers. Ocean Rig's insurance provides for premium adjustments based on claims and is subject to deductibles and aggregate recovery limits. In the case of pollution liabilities, Ocean Rig's deductible is $10,000 per event and in the case of other hull and machinery claims, Ocean Rig's deductible is $1.5 million per event, except in the case of its operations offshore Greenland under its contracts with Cairn, where the deductible is $3.0 million for the *Ocean Rig Corcovado* and $4.5 million for the *Leiv Eiriksson* . However, for the *Ocean Rig Corcovado* and the *Leiv Eiriksson* , the aggregate recovery limits under the Cairn contracts offshore Greenland are $750 million for oil pollution. Ocean Rig's insurance coverage may not protect fully against losses resulting from a required cessation of drilling unit operations for environmental or other reasons. Ocean Rig also has loss of hire insurance which becomes effective after 45 days of off-hire and coverage extends for approximately one year, except for Ocean Rig's operations offshore Greenland under its contracts with Cairn, where the loss of hire insurance becomes effective after 60 days. The principal risks which may not be insurable are various environmental liabilities and liabilities resulting from reservoir damage caused by Ocean Rig's negligence. In addition, insurance may not be available to Ocean Rig at all or on terms acceptable to Ocean Rig, and there is no guarantee that even if Ocean Rig is insured, its policy will be adequate to cover its loss or liability in all cases. Ocean Rig maintains insurance for its drillships in accordance with the Norwegian Marine Insurance Plan of 1996, version 2010. This insurance would also be intended to cover normal risks in its current operations, including insurance against property damage, loss of hire, war risk, third-party liability, including pollution liability and loss of hire.

## Legal Proceedings

### *Import/export duties in Angola*

The *Leiv Eiriksson* operated in Angola during the period from 2002 to 2007. Ocean Rig understands that the Angolan government has retroactively levied import/export duties for two importation events in the period 2002 to 2007. As Ocean Rig has formally disputed all claims in relation to the potential duties, no provision has been made. The maximum amount is estimated to be between $5 million and $10 million.

### *Other legal proceedings*

With the exception of the matters discussed above, Ocean Rig is not involved in any legal proceedings or disputes that it believes will have a significant effect on its business, financial position, and results of operations or liquidity. From time to time, Ocean Rig may be subject to legal proceedings and claims in the ordinary course of business. It is expected that these claims would be covered by insurance if they involved liabilities such as those that arise from a collision, other marine casualty, damage to cargoes, oil pollution, death or personal injuries to crew, subject to customary deductibles. Those claims, even if lacking merit, could result in the expenditure of significant financial and managerial resources.

**Exchange Controls**

Under Republic of the Marshall Islands law, there are currently no restrictions on the export or import of capital, including foreign exchange controls or restrictions that affect the remittance of dividends, interest or other payments to non-resident holders of Ocean Rig's common stock.

**Description of Indebtedness**

As of June 30, 2011, Ocean Rig's outstanding debt totaled $2.2 billion, consisting of bank debt under its various secured credit facilities described below. As of June 30, 2011, Ocean Rig also had $0.7 billion available for drawdown under Ocean Rig's credit facilities, subject to restrictions, as described below. The table below reflects its outstanding indebtedness as of June 30, 2011, as adjusted for scheduled payments under Ocean Rig's credit facilities up to July 31, 2011. The table below has not been prepared in accordance with U.S. GAAP as a result of the adjustments described above and does not reconcile to its consolidated audited financial statements included in this document.

*Outstanding Indebtedness on Existing Credit Facilities and Senior Unsecured Notes as of June 30, 2011, as Adjusted*

| | Original Amount | Amount(1) Drawn | Maturity | Repayment | | | |
|---|---|---|---|---|---|---|---|
| **Facility** | | | | **2011** | **2012** | **2013** | **2014** |
| | | | | Amounts in $'000 | | | |
| $1.04 billion credit facility | $1,040,000 | $ 597,051 | Q3 2013 | $74,551 | $70,000 | $452,500 | — |
| $495.0 million loan agreement with Drillship Kithira Owners Inc. | $ 495,000 | $ 185,821 | Q3 2020 | — | $55,000 | $ 55,000 | $55,000 |
| $495.0 million loan agreement with Drillship Skopelos Owners Inc. | $ 495,000 | $ 86,770 | Q4 2020 | — | $55,000 | $ 31,770 | — |
| $800.0 million senior secured term loan agreement | $ 800,000 | $ 800,000 | Q2 2016 | $33,333 | $66,666 | $ 66,666 | $66,666 |
| $500.0 million of aggregate principal amount of 9.5% senior unsecured notes | $ 500,000 | $ 500,000 | Q2 2016 | — | — | — | — |

(1) Amounts in table exclude deferred financing costs as of June 30, 2011 as follows: (a) $3.7 million for the $1.04 billion credit facility; (b) $9.9 million for the Deutsche bank loan agreement with Drillship Kithira Owners Inc.; (c) $7.1 million for the Deutsche Bank loan agreement with Drillship Skopelos Owners Inc.; (d) $15.2 million for the $800 million Nordea credit facility and (e) $11.2 million for the $500 million of aggregate principal amount of 9.5% senior unsecured notes.

All of Ocean Rig's various loan agreements contain covenants, including restrictions without the lender's prior consent, as to changes in management and ownership of the drilling units, additional indebtedness and mortgaging of drilling units and change in the general nature of Ocean Rig's business.

*Existing Credit Facilities*

*$1.04 billion senior secured credit facility*

On September 17, 2008, Ocean Rig's wholly-owned subsidiaries Ocean Rig ASA and Ocean Rig Norway AS entered into a revolving credit and term loan facility with a syndicate of lenders that was amended and restated on November 19, 2009, to, among other things, add Drill Rigs Holdings Inc. as a borrower. The $1.04 billion credit facility consists of a guarantee facility, which provides Ocean Rig with a letter of credit of up to $20.0 million, which has been drawn, three revolving credit facilities in the amounts of $350.0 million, $250.0 million and $20.0 million, respectively, and a term loan in the amount of up to $400.0 million. This credit facility is in the aggregate amount of approximately $1.04 billion. On September 30 and October 10, 2008, Ocean Rig ASA drew down $750.0 million and $250.0 million, respectively, under this facility for the repayment of approximately $776.0 million under a previous credit facility and for general corporate purposes. Amounts outstanding under the $1.04 billion credit facility bear interest at LIBOR plus a margin and the loan is repayable in 20 quarterly

166

installments plus a balloon payment of $400.0 million payable together with the last installment, on September 17, 2013. As of June 30, 2011 the outstanding balance under this loan agreement was $597.1 million. Ocean Rig has repaid approximately $57.1 million under this credit facility in the third quarter of 2011.

The $1.04 billion credit facility is secured by, among other things, (i) first and second priority mortgages over the *Leiv Eiriksson* and the *Eirik Raude* ; (ii) first and second priority assignment of all insurances and earnings of the *Leiv Eiriksson* and the *Eirik Raude* ; (iii) pledges of shares in each of Primelead Ltd., Ocean Rig 2 AS, Ocean Rig North Sea AS, Ocean Rig Ghana Limited, Ocean Rig Limited, Ocean Rig 1 Inc., Ocean Rig 2 Inc., Ocean Rig 1 Shareholders Inc. and Ocean Rig 2 Shareholders Inc.; and (iv) first and second mortgages over the machinery and plant of Ocean Rig 1 Inc. and Ocean Rig 2 Inc.

Under the $1.04 billion credit facility, Drill Rigs Holdings Inc. and its subsidiaries are subject to certain covenants requiring, among other things, the maintenance of (i) a minimum amount of free cash; (ii) a leverage ratio not to exceed specified levels; (iii) a minimum interest coverage ratio; (iv) a minimum current ratio (the ratio of current assets to current liabilities); and (v) a minimum equity ratio (the ratio of value adjusted equity to value adjusted total assets).

In addition, capital expenditures must not exceed $50.0 million in any fiscal year and capital expenditures in excess of $30.0 million require the prior consent of the lender. Further, the aggregate market value of the *Eirik Raude* and the *Leiv Eiriksson* be at least equal to 135% of the principal amount of the borrowings outstanding under the term loan facility and of the $350.0 million and $20.0 million revolving credit facilities.

Furthermore, pursuant to the terms of the $1.04 billion credit facility, if any person or persons acting in concert (other than DryShips or other companies controlled by Mr. Economou, Ocean Rig's Chairman, President and Chief Executive Officer and the Chairman, President and Chief Executive Officer of DryShips) obtains either direct or indirect control of one-third or more of the shares in Drill Rigs Holdings Inc., notice must be provided to the Agent, who may, upon the instruction of any lender, cancel all commitments and declare outstanding loans and accrued interest due and payable. The $1.04 billion credit facility also contains restrictions on the ability of Drill Rigs Holdings Inc. to pay dividends, make distributions to its shareholders, and reduce share capital without the prior written consent of the lenders if fewer than six months (excluding options) remains on the term of the Tullow Oil contract for the *Eirik Raude* unless such contract has been replaced with a comparable drilling services contract for the *Eirik Raude* with a counterparty that has a financial standing equal to that of Tullow Oil at the time the Tullow Oil contract was entered into. As a result, Drill Rigs Holdings Inc. would not be able to pay dividends beginning April 2011 unless a suitable replacement contract is in place at that time.

This loan agreement contains other customary restrictive covenants and events of default, including non-payment of principal or interest, breach of covenants or material representations, bankruptcy and imposes insurance requirements and restrictions on the employment of the vessels.

This credit facility contains a cross-default provision that applies to Ocean Rig and DryShips. This means that if Ocean Rig or DryShips default, by way of non-payment of principal and interest or by way of acceleration or cancellation of debt, Ocean Rig will be in default of this loan. Ocean Rig's wholly-owned subsidiary Drill Rigs Holdings Inc. has entered into three interest rate swap agreements to fix the interest rate on the principal amounts outstanding under this loan agreement. See the section of this proxy statement / prospectus entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations — Swap agreements" for a description of these interest rate swap agreements.

*Two $562.5 million senior secured credit facilities, amended to $495.0 million each (the Deutsche Bank credit facilities)*

On July 18, 2008, Drillship Kithira Owners Inc. and Drillship Skopelos Owners Inc., Ocean Rig's wholly-owned subsidiaries and the owners of Ocean Rig's newbuilding drillships, the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* , respectively, each entered into separate loan agreements with a syndicate of lenders, including Deutsche Bank AG, London Branch, in the amount of $562.5 million to partially finance (70%) the construction cost of the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* , including payment of the loan financing fees, incidental drillship costs, commitment fees, loan interest, and a portion of the second yard installments. Ocean Rig

refers to these credit facilities as the Deutsche Bank credit facilities. Both of the loans bear interest at a rate that is in part fixed and in part based on LIBOR plus an applicable margin and are repayable in 18 semi-annual installments of $31.25 million through September 2020 and November 2020, respectively. These agreements and the waivers and consents contained therein were terminated pursuant to the terms of the Supplemental Agreement No. 3, dated January 29, 2010, to each of these credit facilities because Ocean Rig, including DryShips, were in compliance with all of the covenants contained in this loan agreement.

On June 5, 2009, Ocean Rig entered into agreements with the facility agent and certain other lenders with respect to each of these credit facilities providing for a waiver of certain financial covenants through January 31, 2010. These agreements and the waivers and consents contained therein were terminated pursuant to the terms of the Supplemental Agreement No. 3, dated January 29, 2010, to each of these credit facilities because Ocean Rig and DryShips were in compliance with all of the covenants contained in this loan agreement. This credit facility contains a cross-default provision that applies to Ocean Rig and DryShips. This means that if Ocean Rig or DryShips default under any of Ocean Rig's other loan obligations, Ocean Rig will be in default of this loan.

On April 27, 2011, Ocean Rig entered into an agreement with the lenders under its two Deutsche Bank credit facilities to restructure these facilities. As a result of this restructuring, (i) the maximum amount permitted to be drawn was reduced from $562.5 million to $495.0 million under each facility; (ii) in addition to the guarantee already provided by DryShips, Ocean Rig provided an unlimited recourse guarantee that includes certain financial covenants; and (iii) Ocean Rig is permitted to draw under the facility with respect to the *Ocean Rig Poseidon* based upon the employment of the drillship under its drilling contract with Petrobras Tanzania, and on April 27, 2010, the cash collateral deposited for this vessel was released. On August 10, 2011, Ocean Rig amended the terms of the credit facility for the construction of the *Ocean Rig Mykonos* to allow for full drawdowns to finance the remaining installment payments for the drillship based on the Petrobras Brazil contract and on August 10, 2011, the cash collateral deposited for the drillship was released. The amendment also requires that the *Ocean Rig Mykonos* be re-employed under a contract acceptable to the lenders meeting certain minimum terms and dayrates at least six months, in lieu of 12 months, prior to the expiration of the Petrobras Brazil contract. All other material terms of the credit facility were unchanged.

Each Deutsche Bank loan agreement is secured by, among other things, a first priority mortgage on the relevant vessel and a reserve account pledge. Each loan agreement contains a loan to value covenant relating to the post-delivery market value of the relevant vessel.

As of June 30, 2011, the outstanding balance under the Deutsche Bank credit facilities was $272.6 million.

These loan agreements are guaranteed by DryShips. The guarantee covers the initial equity contribution and each other equity contribution, the equity collateral, amounts to be paid into the debt service reserve account and each payment of the loan balance. The guarantee by DryShips contains certain financial covenants measured on the DryShips financial accounts requiring the maintenance of (i) a minimum market adjusted equity ratio; (ii) a minimum interest coverage ratio; (iii) a minimum market value adjusted net worth of DryShips and its subsidiaries; and (iv) a minimum amount of free cash and cash equivalents.

In addition, as noted above, Ocean Rig provided an unlimited recourse guarantee under the terms of the restructuring of these loan agreements whereby Ocean Rig is required to comply with certain financial covenants requiring that Ocean Rig maintains (i) a minimum equity ratio; (ii) a minimum amount of working capital; (iii) a maximum leverage ratio; (iv) a minimum interest coverage ratio; and (v) a minimum amount of free cash.

The loan agreements contain customary restrictive covenants and events of default, including non-payment of principal or interest, minimum insurance requirements, breach of covenants or material misrepresentations, bankruptcy, and change of control and impose restrictions on the payments of dividends and employment of the vessels.

In addition, due to the cross-default provisions in these credit facilities, a default by DryShips under one of its loan agreements would trigger a cross-default under Ocean Rig's Deutsche Bank credit facilities and would provide its lenders with the right to accelerate the outstanding debt under these facilities. Further, if DryShips defaults under one of its loan agreements, and the related debt is accelerated, this would trigger a cross-default under Ocean Rig's

$1.04 billion credit facility and Ocean Rig's $800.0 million secured term loan agreement and would provide Ocean Rig's lenders with the right to accelerate the outstanding debt under these facilities.

Ocean Rig has entered into eight interest rate swap agreements to fix the interest rate payable on the principal amounts outstanding under the Deutsche Bank credit facilities. See the section of this proxy statement / prospectus entitled "Ocean Rig Management's Discussion and Analysis of Financial Condition and Results of Operations — Swap Agreements" for a description of these interest rate swap agreements.

### $800.0 million senior secured term loan agreement

On April 15, 2011, Ocean Rig's wholly-owned subsidiary Drillships Holdings Inc., or Drillships Holdings, entered into a $800 million senior secured term loan agreement with a syndicate of lenders to fund a portion of the construction of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* . The $800 million senior secured term loan agreement consists of four loans, which were all fully drawn in April 2011. A portion of the loans was used to refinance the $325 million short term loan facility, as discussed below. Amounts outstanding under the $800 million senior secured term loan agreement bear interest at LIBOR plus a margin and the loan is repayable in 20 quarterly installments plus a balloon payment of $488.3 million payable together with the last installment payment.

The $800 million senior secured term loan agreement is secured by, among other things, the first priority rights to (i) the mortgages over the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* , (ii) the assignment of earnings, (iii) the assignment of earnings accounts, (iv) the minimum cash accounts, (v) the insurances, and (vi) the share charges.

Under the $800 million senior secured term loan agreement, Ocean Rig and certain of its subsidiaries, as guarantors, are subject to certain covenants requiring among other things, the maintenance of (i) a minimum amount of free cash; (ii) a leverage ratio not to exceed specified levels; (iii) a minimum interest coverage ratio; (iv) a minimum current ratio; and (v) a minimum equity ratio. In addition, DryShips, as guarantor, must maintain (i) minimum liquidity; (ii) a minimum interest coverage ratio; (iii) a minimum market adjusted equity ratio; and (iv) a minimum market value adjusted net worth. Further, the aggregate market value of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* must be greater than 140% of the borrowings outstanding under the senior secured term loan.

Also, the $800 million senior secured term loan agreement restricts Ocean Rig's and Drillships Holdings' ability to pay dividends, make any distribution to its shareholders or buy-back common stock, except for dividends paid by Drillships Holdings to Ocean Rig from the first distribution and relating to the refinancing of capital expenditures for the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* . Furthermore, pursuant to the terms of the $800 million senior secured term loan agreement, if, after an initial public offering, any person or group (other than Mr. Economou and DryShips) acquire beneficial ownership of more than 50% of Ocean Rig's equity, or, if Mr. Economou and DryShips fails (i) prior to an initial public offering, to hold 65% of the aggregate ordinary voting power and economic interest in us; or (ii) after an initial public offering, to hold 15% aggregate ordinary voting power and economic interest in Ocean Rig, then all outstanding amounts under the $800 million senior secured term loan agreement are required to be prepaid within 60 days.

The $800 million senior secured term loan agreement contains other customary restrictive covenants and events of default, including non-payment of principal or interest, breach of covenants or material representations, bankruptcy and imposes insurance requirements and restrictions on the employment of the vessels.

The $800 million senior secured term loan agreement contains a cross-default provision that applies to Ocean Rig and DryShips, as guarantor. This means that if Ocean Rig or DryShips default, by way of non-payment of principal or interest or by way of acceleration or cancellation of debt, Ocean Rig will be in default of this loan.

### 9.5% senior unsecured notes due 2016

On April 27, 2011, Ocean Rig completed the issuance of $500.0 million aggregate principal amount of its 9.5% senior unsecured notes due 2016 in an offering made to both non-United States persons in Norway in reliance on Regulation S under the Securities Act and to qualified institutional buyers in the U.S. in reliance on Rule 144A under the Securities Act, or the notes offering. Ocean Rig received net proceeds from the notes offering of

approximately $487.5 million, which Ocean Rig expects to use to finance a portion of the remaining payments under its newbuilding program and for general corporate purposes. DryShips, Ocean Rig's parent company, purchased $75.0 million of Ocean Rig's 9.5% senior unsecured notes due 2016 from a third party on May 18, 2011.

Under the terms of the bond agreement, dated April 14, 2011, Ocean Rig will pay interest on the notes at a rate of 9.5% per annum. Ocean Rig will make interest payments on the notes semi-annually in arrears on October 27 and April 27 of each year, beginning October 27, 2011 until the notes' final maturity on April 27, 2016. Interest will accrue from the issue date of the notes. The notes will not be guaranteed by any of Ocean Rig's subsidiaries. The notes will be Ocean Rig's unsecured obligations and rank senior in right of payment to any of Ocean Rig's future subordinated indebtedness and equally in right of payment to all of its existing and future unsecured senior indebtedness. Ocean Rig may redeem some or all of the notes as follows: (i) at any time and from time to time from April 27, 2014 to April 26, 2015, at a redemption price equal to 104.5% of the aggregate principal amount, plus accrued and unpaid interest to the date of redemption; or (ii) at any time and from time to time from April 27, 2015 at a redemption price equal to 102.5% of the aggregate principal amount, plus accrued and unpaid interest to the date of redemption. Upon a change of control, which occurs if 50% or more of Ocean Rig's shares are acquired by any person or group other than DryShips or its affiliates, the noteholders will have an option to require Ocean Rig to purchase all outstanding notes at a redemption price of 100% of the principal amount thereof plus accrued and unpaid interest to the date of purchase.

Subject to a number of limitations and exceptions, the bond agreement governing the notes contains covenants limiting, among other things, Ocean Rig's ability to: (i) create liens; or (ii) merge, or consolidate or transfer, sell or lease all or substantially all of its assets. Furthermore, the bond agreement contains financial covenants requiring Ocean Rig, among other things, to ensure that it maintains: (i) a consolidated equity ratio of minimum 35%; (ii) free cash of minimum $50 million; (iii) current ratio of minimum 1-to-1; and (iv) an interest coverage ratio of 2.5x calculated on a 12 month rolling basis.

The notes are a new issue of securities. In connection with the issue, Ocean Rig has agreed to apply to list the notes on a securities exchange or other regulated market by December 1, 2011 and to list its common shares on a recognized exchange by the end of the third quarter of 2011. Ocean Rig has obtained a credit rating on the company and the notes in compliance with the loan agreement. If Ocean Rig had failed to obtain the required credit ratings, the interest rate on the notes would have increased by 0.25% annually.

### Repaid Credit Facilities

#### $325.0 million short-term loan facility

On December 21, 2010, Drillship Hydra Owners Inc. entered into a $325.0 million short-term loan facility with a syndicate of lenders for the purpose of (i) meeting the ongoing working capital needs of Drillships Hydra Owners Inc.; (ii) financing the partial repayment of existing debt in relation to the purchase of the *Ocean Rig Corcovado* ; and (iii) financing the payment of the final installment associated with the purchase of said drillship. This loan facility was repayable in full in June 2011 and bore interest at a rate of LIBOR plus a margin. Ocean Rig drew down the full amount of this loan on January 5, 2011 and Ocean Rig repaid the full amount of this loan on April 20, 2011 with borrowings under the $800.0 million senior secured term loan agreement.

This loan agreement was secured by, among other things, a first priority mortgage on the *Ocean Rig Corcovado* . This loan agreement was guaranteed by DryShips and by Ocean Rig and contained certain financial covenants measured on the DryShips financial accounts. The loan agreement contained customary restrictive covenants and events of default, including non-payment of principal or interest, breach of covenants or material misrepresentations, bankruptcy, change of control and imposes restrictions on the payments of dividends and employment of the vessels.

#### $230.0 million loan facilities, dated September 10, 2007, as amended

In connection with the acquisition of Drillships Holdings on May 15, 2009, Ocean Rig assumed two $115 million loan facilities that were entered into in September 2007, in order to finance the construction of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* . The loans bore interest at LIBOR plus margin. Ocean Rig

repaid one $115.0 million term loan facility in December 2010 in connection with the delivery of the *Ocean Rig Corcovado* and repaid the other $115.0 million facility in March 2011 upon the delivery of the *Ocean Rig Olympia* . In addition to the customary security and guarantees issued to the borrower, these facilities were collateralized by certain vessels owned by certain related parties, corporate guarantees of certain related parties, and a personal guarantee from Mr. Economou.

As of December 31, 2010 Ocean Rig had outstanding borrowings in the amount of $115.0 million under these loan facilities, which were repaid on March 18, 2011, as described above.

*$300.0 million short-term facility*

On December 28, 2010, Ocean Rig entered into a $300 million short-term overdraft facility with a lender, which Ocean Rig drew down in full on December 28, 2010. The proceeds of this loan were blocked as security for the loan. The loan was repaid on January 3, 2011 with the cash collateral. The short-term overdraft facility cannot be re-drawn.

*Shareholder loans from DryShips*

During April 2011, Ocean Rig borrowed an aggregate of $48.1 million from DryShips through shareholder loans for capital expenditures and general corporate purposes. On April 20, 2011, these intercompany loans, along with shareholder loans of $127.5 million that Ocean Rig borrowed from DryShips in March 2011, were fully repaid. As of the date of this proxy statement / prospectus, no loan balance exists between Ocean Rig and DryShips.

# OCEAN RIG MANAGEMENT

## Ocean Rig Directors and Senior Management

Set forth below are the names, ages and positions of Ocean Rig's directors and executive officers and the principal officers of certain of Ocean Rig's operating subsidiaries. Members of Ocean Rig's board of directors are elected annually on a staggered basis. Each director elected holds office for a three-year term and until his successor shall have been duly elected and qualified, except in the event of his death, resignation, removal, or the earlier termination of his term of office. The initial term of office of each director is as follows: Ocean Rig's Class A director serves for a term expiring at the 2011 annual general meeting of shareholders, Ocean Rig's two Class B directors serve for a term expiring at the 2012 annual general meeting of shareholders and Ocean Rig's two Class C directors serve for a term expiring at the 2013 annual general meeting of shareholders. Officers are appointed from time to time by Ocean Rig's board of directors, or Ocean Rig's relevant subsidiary, as applicable, and hold office until a successor is appointed.

### Directors and Executive Officers of Ocean Rig

| Name | Age | Position |
| --- | --- | --- |
| George Economou | 58 | Chairman of the Board, President, Chief Executive Officer and Class A Director |
| Michael Gregos | 39 | Class B Director |
| Trygve Arnesen | 53 | Class C Director |
| Savvas D. Georghiades | 61 | Class C Director |
| Prokopios (Akis) Tsirigakis | 56 | Class B Director |

### Principal Officers of Operating Subsidiaries

| Name | Age | Position |
| --- | --- | --- |
| Paul Carsten Pedersen | 56 | Acting Chief Executive Officer |
| Jan Rune Steinsland | 51 | Chief Financial Officer |
| Frank Tollefsen | 48 | Chief Operating Officer and Deputy Chief Executive Officer |
| John Rune Hellevik | 51 | Senior Vice President, Marketing & Contracts |
| Ronald Coull | 49 | Senior Vice President, Human Resources |
| Rolf Håkon Holmboe | 44 | Vice President, Quality, Health, Safety, Environment & Training |

The business address of each of Ocean Rig's directors and principal officers is 10 Skopa Street, Tribune House, 2nd Floor, Office 202, CY 1075, Nicosia, Cyprus.

Biographical information with respect to the above individuals is set forth below.

*George Economou* was appointed as Ocean Rig's President and Chief Executive Officer on September 2, 2010, and Chairman and director in December 2010. Mr. Economou has over 25 years of experience in the maritime industry. He has served as Chairman, President and Chief Executive Officer of DryShips since January 2005. He successfully took DryShips public in February 2005, on NASDAQ under the trading symbol "DRYS." Mr. Economou has overseen the growth of DryShips into one of the largest U.S.-listed dry bulk companies in fleet size and revenue and one of the largest Panamax owners in the world. Mr. Economou began his career in 1976 when he commenced working as a Superintendent Engineer in Thenamaris Ship Management in Greece. From 1981-1986 he held the position of General Manager of Oceania Maritime Agency in New York. Between 1986 and 1991 he invested and participated in the formation of numerous individual shipping companies and in 1991 he founded Cardiff Marine Inc., Group of Companies. Mr. Economou is a member of ABS Council, Intertanko Hellenic Shipping Forum, and Lloyds Register Hellenic Advisory Committee. Mr. Economou is a graduate of the Massachusetts Institute of Technology and holds both a Bachelor of Science and a Master of Science degree in Naval Architecture and Marine Engineering and a Master of Science in Shipping and Shipbuilding Management.

*Michael Gregos* was appointed to Ocean Rig's board of directors in December 2010. Mr. Gregos is Project Manager for Dynacom Tankers Management Ltd. which he joined in 2001. From 2007 to 2008, Mr. Gregos was employed as Chief Operating Officer by OceanFreight Inc. Prior to that period, he worked for a shipping concern based in Athens and New York for five years and the Corporate Finance arm of a Greek bank for one year. He is a graduate of Queen Mary University in London and holds an M.Sc. in Shipping, Trade and Finance from City University.

*Trygve Arnesen* was appointed to Ocean Rig's board of directors in December 2010. Mr. Arnesen is a director for Aftermarket Eastern Region with FMC Technologies, a position he has held since August 2010. Mr. Arnesen holds an M.Sc. in petroleum engineering and applied geophysics from the Norwegian University of Science and Technology from 1980. He has worked in the drilling and oil service industry since 1982, and has held a broad range of positions with various companies including Wilhelmsen (1982-1984), Morco&Ross (1984-1985), Norcem / Aker Drilling (1985-1989), Saga (1989), Transocean / Procon / Prosafe (1990-1992 and 1994-2005), Shell (1992-1994), and Odfjell (2005-2006). From 2006 to 2008, Mr. Arnesen was the Chief Executive Officer of Ocean Rig ASA, Ocean Rig's predecessor, and he worked as Chief Executive Officer for Norwind from 2008 until 2010.

*Savvas Georghiades* was appointed to Ocean Rig's board of directors in December 2010. Mr. Georghiades has been a practicing lawyer in Cyprus since 1976. He is a graduate of the Aristotle University in Thessaloniki.

*Prokopios (Akis) Tsirigakis* has been appointed to serve on Ocean Rig's board of directors effective September 12, 2011. Mr. Tsirigakis serves as Chairman of the Board of Directors, President and Co-Chief Executive Officer of Nautilus Marine Acquisition Corp., a newly-organized blank check company formed for the purpose of acquiring one or more operating businesses or assets. In November 2007 he founded, and until February 2011 was the President and Chief Executive Officer of Star Bulk Carriers Corp. a dry-bulk shipping company listed on the NASDAQ Stock Market (NASDAQ: SBLK) that owns and manages vessels aggregating in excess of 1.2 million deadweight tons of cargo capacity. He has served as a director of Star Bulk Carriers Corp. since November 2007. From May 2005 till November 2007 he founded and served as Chairman of the Board, Chief Executive Officer and President of Star Maritime Acquisition Corp. (AMEX: SEA). Mr. Tsirigakis is experienced in ship ownership, ship management and new shipbuilding projects. Mr. Tsirigakis formerly served on the board of directors of DryShips. Since November 2003, he served as Managing Director of Oceanbulk Maritime S.A., a dry cargo shipping company that has operated and managed vessels. From November 1998 till November 2007, Mr. Tsirigakis served as the Managing Director of Combine Marine Inc., a company which he founded and that is providing ship management services to third parties. From 1991 to 1998, Mr. Tsirigakis was the Vice-President and Technical Director of Konkar Shipping Agencies S.A. of Athens, after having served as Konkar's Technical Director from 1984 to 1991; the company at the time managed 16 dry bulk carriers, multi-purpose vessels and tanker/combination carriers. From 1982 to 1984, Mr. Tsirigakis was the Technical Manager of Konkar's affiliate, Arkon Shipping Agencies Inc. of New York. He is a life-member of The Propeller Club of the United States, a member of the Technical Committee (CASTEC) of Intercargo, the International Association of Dry Cargo Shipowners, President of the Hellenic Technical Committee of RINA, the Italian Classification Society and member of the Technical Committees of various Classification Societies. Mr. Tsirigakis received his Masters and B.Sc. in Naval Architecture from The University of Michigan, Ann Arbor and has seagoing experience.

*Paul Carsten Pedersen* has been the Acting Chief Executive Officer of Ocean Rig AS since February 2011. Prior to joining Ocean Rig AS, Mr. Pedersen spent 29 years at A.P. Moeller-Maersk, where he held a series of positions with increasing responsibilities in the offshore drilling and corporate mergers and acquisitions areas. From 1994 to 1996, Mr. Pedersen served as director of Maersk Tankers, where he focused on the development of floating production storage and offloading, or FPSO, activities. From 1996 to 1998, Mr. Pedersen served as director of Maersk Contractors, where he was involved in the commercial operations of FPSO activities. From 1998 to 2000, Mr. Pedersen served as Vice President and Chief Commercial Officer of Maersk Contractors and from 2000 to 2003, Mr. Pedersen served as Vice President of Maersk Corporate. From 2003 to 2009, Mr. Pedersen served as the Senior Vice President, Chief Commercial Officer and Deputy Chief Executive Officer, where he managed drilling and FPSO activities, and from 2009 to 2010, he served as the Senior Vice President and Chief Executive Officer for Maersk FPSOs and Maersk LNG. Mr. Pedersen holds a masters degree in mechanical engineering from The Technical University of Denmark and has supplemented his education with executive management courses in

173

Denmark and in the United States at Columbia Business School and The Wharton School of the University of Pennsylvania.

*Jan Rune Steinsland* is the Chief Financial Officer of Ocean Rig AS and joined the Ocean Rig group of companies in 2006. Mr. Steinsland has 17 years of experience from various positions in the energy and drilling industry and eight years of experience in the finance and technology industries. From 2000 to 2006, Mr. Steinsland was Chief Financial Officer of the Oslo Børs-listed Acta Holding ASA. From 1988 to 2000, Mr. Steinsland held several management positions in Esso Norge AS/Exxon Company International, including Financial Analyst, Financial Reporting Manager, Vice President Accounting, Project Controller and Audit Advisor. Mr. Steinsland has a Master of Business Administration from the University of St. Gallen Switzerland and is a Certified European Financial Analyst (AFA) from The Norwegian Society of Financial Analysts/Norwegian School of Economics and Business Administration.

*Frank Tollefsen* has been with Ocean Rig since January 2004 and served as the Senior Vice President Operations of Ocean Rig AS from March 2007 to January 2011. Mr. Tollefsen was promoted Chief Operating Officer (COO) and Deputy Chief Executive Officer of Ocean Rig AS as of February 1, 2011. Mr. Tollefsen has 26 years of experience from various positions in the drilling contracting business. From 1990 Mr. Tollefsen has had leading positions in the North Sea, Nigeria, Houston, Texas, Brazil, Canada, and the Middle East region as well as India and the Mediterranean. Prior to joining Ocean Rig AS, he spent 13 years with Transocean Ltd. Prior to that, Mr. Tollefsen served six years with Dolphin Drilling. Mr. Tollefsen is a mechanical engineer.

*John Rune Hellevik* has served as the Senior Vice President Marketing and Contracts of Ocean Rig AS since 2007. Mr. Hellevik has 30 years experience in the offshore business, both from oil companies and contractors. From 1986 to 1995, Mr. Hellevik held various management positions within procurement and marketing in Smedvig Offshore ASA and Scana Offshore Technology. During the period from 1995 to 2006, Mr. Hellevik held management positions within procurement, marketing and contracts of Transocean ASA and Prosafe ASA. Mr. Hellevik received a degree in Business Administration from Bedriftsøkonomisk Institutt (BI), Norway.

*Ronald Coull* has served as the Senior Vice President Human Resources of the Ocean Rig group of companies since June 2009. He has worked in the oil and gas sector for over 20 years with extensive experience in both generalist human resources management and recruitment. Prior to joining Ocean Rig, Mr. Coull worked for Petrofac facilities management for ten years where his roles included Operations Director of Atlantic Resourcing Ltd, which is a part of the Petrofac group of companies, where Mr. Coull was responsible for the operational and financial performance of this business. This included working with a number of external companies delivering innovative recruitment solutions to the drilling, marine and operations business. Prior to this, he was Human Resources Director & Head of Human Resources for Petrofac Facilities Management in Aberdeen, which had a global workforce of 4,500 employees, with responsibility for providing full human resource support to the business in the North Sea, and for international contracts in Europe, Middle East and Africa and Asia Pacific. Prior to that, Mr. Coull spent three years with Kvaerner Oil & Gas as Human Resources Manager providing HR support to a workforce of approximately 1,800 employees. In addition, he held Senior HR roles in the offshore oil and gas industry at Trafalger House Offshore Holdings (two years) and Vauldale Engineering (ten years).

*Rolf Håkon Holmboe* has served as the Vice President Quality, Health, Safety, Environment & Training of Ocean Rig AS since January 2010 and has worked in the area of health, safety, environment and quality in the oil and gas sector for 19 years. From 1991 to 1997, Mr. Holmboe worked for Det Norske Veritas before joining Statoil, where he was employed for 12 years from 1997 to 2009. Mr. Holmboe's areas of experience include emergency preparedness, risk analyses, health, safety and environment management, operational safety and incident investigations. Mr. Holmboe is a Chemical Engineer, graduated from Heriot-Watt University, Edinburgh, in 1990.

**Compensation of Directors and Senior Management**

The aggregate annual compensation paid by Ocean Rig to the members of the senior management of its subsidiaries (six individuals) was $2.9 million for the year ended December 31, 2010, consisting of $2.7 million in salary and bonus, pension contribution of $0.2 million and other benefits. Ocean Rig's non-employee directors are each entitled to receive annual directors fees of $20,000, such amount to be pro-rated for any portion of a full calendar year that a non-employee director is a member of Ocean Rig's board of directors, plus reimbursement for

174

actual expenses incurred while acting in their capacity as director. In addition, the chairmen of the committees of Ocean Rig's board of directors receive annual fees of $10,000, such amount to be pro-rated for any portion of the full calendar year that the director is chairman of the committee, plus reimbursement for actual expenses incurred while acting in their capacity as chairman. Ocean Rig does not maintain a medical, dental, or retirement plan for its directors. Members of Ocean Rig's senior management who also serve as directors will not receive additional compensation for their services as directors.

**Board of Directors and Committees**

The board of directors of Ocean Rig consists of five directors, three of whom Ocean Rig's board of directors has determined to be independent under Rule 10A-3 of the Exchange Act and the rules of the NASDAQ Stock Market: Messrs. Gregos, Arnesen, and Tsirigakis. Under the NASDAQ corporate governance rules, a director is not considered independent unless the board of directors of Ocean Rig affirmatively determines that the director has no direct or indirect material relationship with Ocean Rig or its affiliates that could reasonably be expected to interfere with the exercise of such director's independent judgment. In making this determination, the Ocean Rig board of directors broadly considers all facts and circumstances it deems relevant from the standpoint of the director and from that of persons or organizations with which the director has an affiliation.

Ocean Rig's board of directors has established an audit committee, a compensation committee and a nominating and corporate governance committee, in each case comprised of independent directors.

Ocean Rig's audit committee, among other things, reviews Ocean Rig's external financial reporting, engages its external auditors and oversees its internal audit activities, procedures and the adequacy of its internal accounting controls. Messrs. Gregos, Arnesen and Tsirigakis serve as members of the audit committee. Mr. Tsirigakis serves as Chairman of the audit committee.

Ocean Rig's compensation committee is responsible for establishing directors and executive officers' compensation and benefits and reviewing and making recommendations to the board of directors regarding Ocean Rig's compensation policies. Messrs. Gregos, Arnesen and Tsirigakis serve as members of the compensation committee. Mr. Gregos serves as Chairman of the compensation committee.

Ocean Rig's nominating and corporate governance committee is responsible for recommending to the board of directors nominees for director and directors for appointment to committees of the board of directors and advising the board of directors with regard to corporate governance practices. Shareholders may also nominate directors in accordance with procedures set forth in Ocean Rig's second amended and restated bylaws. Messrs. Gregos, Arnesen and Tsirigakis serve as members of the nominating and corporate governance committee. Mr. Arnesen serves as Chairman of the nominating and corporate governance committee.

**Ocean Rig Employment Agreements**

Ocean Rig's predecessor, Ocean Rig ASA, entered into an employment agreement, dated as of May 15, 2006, with Mr. Jan Rune Steinsland for his services as Chief Financial Officer, pursuant to which Mr. Steinsland receives a fixed annual salary and may receive a bonus through the management bonus plan. The agreement continues until terminated by either party on six-months' notice. In addition, Mr. Steinsland is entitled to participation in Ocean Rig's pension scheme. In the case of his termination, except for reasons of gross breach of contract, Mr. Steinsland is entitled to twelve months' salary, payable in monthly installments following termination. As of December 1, 2008, Mr. Steinsland's employment contract was amended to transfer Mr. Steinsland's employment from Ocean Rig ASA to Ocean Rig AS pursuant to the same terms and conditions described above.

Ocean Rig's predecessor, Ocean Rig ASA, entered into an employment agreement, dated January 8, 2004, with Mr. Frank Tollefsen for his services as Senior Vice President Operations from January 19, 2004. The agreement continues until terminated by either party on three months' notice. Pursuant to the agreement, Mr. Tollefsen receives a fixed annual salary and may receive a bonus through the Ocean Rig management bonus plan as well as a "stay on" bonus of six-months salary paid every three years. In addition Mr. Tollefsen is entitled to participation in Ocean Rig's pension scheme.

Ocean Rig AS entered into an employment agreement, dated September 15, 2007, with Mr. John Rune Hellevik for his services as Senior Vice President Contracts and Procurement from January 1, 2007. The agreement continues until terminated by either party on three-months' notice. Pursuant to the agreement, Mr. Hellevik receives a fixed annual salary and may receive a bonus through the Ocean Rig management bonus plan. In addition Mr. Hellevik is entitled to participation in Ocean Rig's pension scheme.

Ocean Rig Ltd entered into an employment agreement, dated February 8, 2010, with Mr. Ronald Coull for his services as Senior Vice President Human Resources from June 15, 2009. The agreement continues until terminated by either party on six-months' notice. Pursuant to the agreement, Mr. Coull receives a fixed annual salary and may receive a bonus through the Ocean Rig management bonus plan. In addition Mr. Coull is entitled to participation in Ocean Rig's pension scheme. In the case of his termination, Mr. Coull is entitled to six months' notice and six months' salary, which will increase by one month per year of service up to a maximum of 12 months' salary.

Ocean Rig AS entered into an employment agreement, dated September 28, 2009, with Mr. Rolf Håkon Holmboe for his services as Vice President Health, Safety, Environment & Quality from January 1, 2010. The agreement continues until terminated by either party on three-months' notice. Pursuant to the agreement, Mr. Holmboe receives a fixed annual salary and may receive a bonus through the Ocean Rig management bonus program. In addition Mr. Holmboe is entitled to participation in Ocean Rig's pension scheme.

## OCEAN RIG RELATED PARTY TRANSACTIONS

All Ocean Rig related party transactions will be subject to the review and approval of the independent members of Ocean Rig's board of directors.

### Ocean Rig Related Party Agreements

#### *Ocean Rig Management Agreements with Cardiff — Management Fees to Related Party*

From October 19, 2007 to December 21, 2010, Ocean Rig was party to, with respect to the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* , separate management agreements with Cardiff, a party affiliated with Ocean Rig's Chairman, President and Chief Executive Office, Mr. Economou, pursuant to which Cardiff provided additional supervisory services in connection with said drillships including, among other things: (i) assisting in securing the required equity for the construction; (ii) negotiating, reviewing and proposing finance terms; (iii) assisting in marketing towards potential contractors; (iv) assisting in arranging, reviewing and supervising all aspects of building, equipment, financing, accounting, record keeping, compliance with laws and regulations; (v) assisting in procuring consultancy services from specialists; and (vi) assisting in finding prospective joint-venture partners and negotiating any such agreements. Pursuant to the management agreements, Ocean Rig paid Cardiff a management fee of $40,000 per month per drillship plus (i) a chartering commission of 1.25% on revenue earned; (ii) a commission of 1.0% on the shipyard payments or purchase price paid for drillships; (iii) a commission of 1.0% on loan financing; and (iv) a commission of 2.0% on insurance premiums. During the six-months ended June 30, 2010 and 2011, total charges from Cardiff under the management agreements amounted to $2.6 million and $5.8 million, respectively. For the years ended December 31, 2008, 2009 and 2010, total charges incurred by Ocean Rig from Cardiff under the management agreements amounted to $0.0 million, $1.9 million and $4.0 million, respectively. This was capitalized as drillship under construction cost, being a cost directly attributable to the construction of the two drillships, the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* .

In accordance with the Addenda No. 1 to the above management agreements, dated as of December 1, 2010, by and between Cardiff and Ocean Rig's respective drillship-owning subsidiaries, the management agreements were terminated effective December 21, 2010; however, all obligations to pay for services rendered by Cardiff prior to termination remain in effect. As of December 31, 2010, these obligations totaled $5.8 million.

#### *Acquisition of Ocean Rig ASA*

Ocean Rig's wholly-owned subsidiary, Primelead Limited, a corporation organized under the laws of the Republic of Cyprus, was formed on November 16, 2007 for the purpose of acquiring shares of Ocean Rig ASA. On December 20, 2007, Primelead Limited acquired 51,778,647 shares, or approximately 30.4% of the outstanding

176

capital stock of Ocean Rig ASA following its nomination as a buyer from Cardiff, for which Cardiff received a commission of $4.1 million on February 1, 2008. Ocean Rig was formed under the laws of the Republic of the Marshall Islands on December 10, 2007 under the name Primelead Shareholders Inc. Ocean Rig acquired all of the outstanding shares of Primelead Limited in December 2007 in a transaction under common control, which was accounted for as a pooling of interests. In April 2008, 7,546,668 shares, representing 4.4% of the share capital of Ocean Rig ASA, were purchased from companies controlled by Ocean Rig's Chairman, President and Chief Executive Officer, Mr. Economou, for consideration of $66.8 million, which is the U.S. Dollar equivalent of NOK45 per share and was the price offered to all shareholders in the mandatory offering. After acquiring more than 33% of Ocean Rig ASA's outstanding shares on April 22, 2008, Ocean Rig launched a mandatory bid for the remaining shares of Ocean Rig ASA at a price of NOK45 per share, or $8.89 per share, as required by Norwegian law. Ocean Rig gained control over Ocean Rig ASA on May 14, 2008. The results of operations related to the acquisition are included in the consolidated financial statements as of May 15, 2008. Ocean Rig held 100% of the shares of Ocean Rig ASA, or 163.6 million shares, as of July 10, 2008. A commission of $9.9 million was paid to Cardiff on December 5, 2008 for services rendered in relation to Ocean Rig's acquisition of the remaining shares in Ocean Rig ASA.

### *Acquisition of the owning companies for the Ocean Rig Corcovado and the Ocean Rig Olympia*

On October 3, 2008, Ocean Rig entered into a share purchase agreement to acquire the equity interests of the companies owning the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* , which were controlled by clients of Cardiff, including certain entities affiliated with Mr. Economou. As part of this transaction, Ocean Rig assumed the liabilities for two $115.0 million loan facilities which, in addition to the customary security and guarantees issued to the borrower, were collateralized by certain vessels owned by certain parties affiliated with Mr. Economou, corporate guarantees of certain entities affiliated with Mr. Economou and a personal guarantee from Mr. Economou. Ocean Rig repaid one of the $115.0 million loan facilities in December 2010 in connection with the delivery of the *Ocean Rig Corcovado* .

On May 15, 2009, the acquisition described above closed. As consideration for this acquisition, Ocean Rig issued to the sellers the number of common shares equal to 25% of its total issued and outstanding common shares as of May 15, 2009.

On July 15, 2009, DryShips acquired the remaining 25% of Ocean Rig's total issued and outstanding capital stock from the minority interests held by certain unrelated entities and certain parties related to Mr. Economou. The consideration paid for the 25% interest consisted of a one-time $50.0 million cash payment and the issuance of DryShips Series A Convertible Preferred Stock with an aggregate face value of $280.0 million. Following such acquisition, Ocean Rig became a wholly-owned subsidiary of DryShips until December 2010 when Ocean Rig offered and sold an aggregate of 28,571,428 of its common shares in the private offering.

### *Purchase of Drillship Options from DryShips*

On November 22, 2010, DryShips, Ocean Rig's parent company, entered into a contract with Samsung that granted DryShips options for the construction of up to four additional ultra-deepwater drillships, which would be "sister-ships" to the *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* with certain upgrades to vessel design and specifications. The option agreement required DryShips to pay a non-refundable slot reservation fee of $24.8 million per drillship. The option agreement was novated by DryShips to Ocean Rig on December 30, 2010, at a cost of $99.0 million, which Ocean Rig paid from the net proceeds of a private offering of its common shares that Ocean Rig completed in December 2010. In addition, Ocean Rig paid additional deposits totaling $20.0 million to Samsung in the first quarter of 2011 to maintain favorable costs and yard slot timing under the option contract.

On May 16, 2011, Ocean Rig entered into an addendum to the option contract with Samsung, pursuant to which Samsung granted Ocean Rig the option for the construction of up to two additional ultra-deepwater drillships, which would be "sister-ships" to Ocean Rig's drillships and Ocean Rig's seventh generation hulls, with certain upgrades to vessel design and specifications. Ocean Rig did not make slot reservation payments in connection with its entry into this addendum.

As of the date of this proxy statement / prospectus, Ocean Rig has exercised three of the six options and, as a result, has entered into shipbuilding contracts for its seventh generation hulls with deliveries scheduled in July 2013, September 2013 and November 2013, respectively. Ocean Rig made payments of $632.4 million to the shipyard in the second quarter of 2011 in connection with its exercise of the two newbuilding drillship options. The estimated total project cost per drillship is $638.0 million, which consists of $570.0 million of construction costs, costs of approximately $38.0 million for upgrades to the existing drillship specifications and construction-related expenses of $30.0 million. These upgrades include a 7 ram BOP, a dual mud system and, with the purchase of additional equipment, the capability to drill up to 12,000 feet water depth.

Ocean Rig may exercise the three remaining newbuilding drillship options at any time on or prior to January 31, 2012, with vessel deliveries ranging from the first to the third quarter of 2014, depending on when the options are exercised. Ocean Rig estimates the total project cost, excluding financing costs, for the remaining three optional drillships to be $638.0 million per drillship, based on the construction and construction-related expenses for Ocean Rig's seventh generation hulls described above.

As part of the novation of the contract described above, the benefit of the slot reservation fees passed to Ocean Rig. The amount of the slot reservation fees for the seventh generation hulls has been applied towards the drillship contract prices and the amount of the slot reservation fees applicable to one of the remaining three newbuilding drillship options will be applied towards the drillship contract price if the option is exercised.

### Ocean Rig Legal Services

Mr. Savvas D. Georghiades, a member of Ocean Rig's board of directors, provides legal services to Ocean Rig and to its predecessor, Primelead Limited, through his law firm, Savvas D. Georghiades, Law Office. In the six-months ended June 30, 2011 and 2010, Ocean Rig paid a fee of €33,145 and €47,390, respectively, for the legal services provided by Mr. Georghiades. For the years ended December 31, 2010, 2009 and 2008, Ocean Rig paid a fee of €94,235, €0 and €0, respectively, for the legal services provided by Mr. Georghiades.

### Ocean Rig Loans and Guarantees

During March and April 2011, Ocean Rig borrowed an aggregate of $175.5 million from DryShips through shareholder loans for capital expenditures and general corporate purposes. On April 20, 2011, these intercompany loans were repaid. As of the date of this proxy statement / prospectus, no balance exists between Ocean Rig and DryShips.

#### $230.0 million credit facility

On January 23, 2010, DryShips, Ocean Rig's parent company, entered into a guarantee and indemnity in connection with Ocean Rig's $230.0 million credit facility. Under the DryShips guarantee, DryShips is required to meet financial covenants requiring DryShips to maintain a minimum (i) market adjusted equity ratio; (ii) interest coverage ratio; and (iii) market value adjusted net worth. Ocean Rig repaid this facility in March 2011.

#### $562.5 million loan agreements, amended to $495.0 million (the Deutsche Bank credit facilities)

On July 18, 2010, DryShips, Ocean Rig's parent company, entered into guarantees in connection with Ocean Rig's Deutsche Bank credit facilities. The guarantees by DryShips cover the initial equity contribution and each other equity contribution, the equity collateral, amounts to be paid into the debt service reserve account and each payment of the loan balance. In addition, the guarantees by DryShips contain certain financial covenants measured on the DryShips financial accounts requiring the maintenance of (i) minimum market adjusted equity ratio; (ii) minimum interest coverage ratio; (iii) minimum market value adjusted net worth of DryShips and its subsidiaries; and (iv) minimum amount of free cash and cash equivalents.

On April 27, 2011, Ocean Rig entered into an amendment agreement with all lenders to restructure the Deutsche Bank credit facilities. Under the terms of the amendment agreement, in addition to the guarantee provided by DryShips discussed above, Ocean Rig provided an unlimited recourse guarantee that includes certain financial

covenants requiring Ocean Rig to maintain (i) a minimum equity ratio; (ii) a minimum amount of working capital; (iii) a maximum leverage ratio; (iv) a minimum interest coverage ratio; and (v) a minimum amount of free cash.

### $800.0 million senior secured term loan agreement

Ocean Rig's $800.0 million senior secured term loan agreement is guaranteed by Ocean Rig and by DryShips. Under the loan agreement, Ocean Rig is subject to certain covenants requiring, among other things, the maintenance of (i) a minimum amount of free cash; (ii) a leverage ratio not to exceed specified levels; (iii) a minimum interest coverage ratio; (iv) a minimum current ratio; and (v) a minimum equity ratio. In addition, under the loan agreement, DryShips must maintain (i) minimum liquidity; (ii) a minimum interest coverage ratio; (iii) a minimum market adjusted equity ratio; and (iv) a minimum market value adjusted net worth.

### $325.0 million short-term loan facility

Ocean Rig's $325.0 million short-term loan facility was guaranteed by DryShips. Under the loan agreement, DryShips was required to meet certain financial covenants measured on the DryShips financial accounts requiring the maintenance of (i) minimum market adjusted equity ratio; (ii) minimum market value adjusted net worth of DryShips and its subsidiaries; and (iii) minimum amount of free cash and cash equivalents. Ocean Rig repaid this facility in April 2011.

### Ocean Rig Global Services Agreement

On December 1, 2010, DryShips, Ocean Rig's parent company, entered into a Global Services Agreement with Cardiff, a company controlled by Ocean Rig's Chairman, President and Chief Executive Officer, Mr. Economou, effective December 21, 2010, pursuant to which DryShips has engaged Cardiff to act as consultant on matters of chartering and sale and purchase transactions for the offshore drilling units operated by us. Under the Global Services Agreement, Cardiff, or its subcontractor, will (i) provide consulting services related to identifying, sourcing, negotiating and arranging new employment for offshore assets of DryShips and its subsidiaries, including Ocean Rig's drilling units; and (ii) identify, source, negotiate and arrange the sale or purchase of the offshore assets of DryShips and its subsidiaries, including Ocean Rig's drilling units. In consideration of such services, DryShips will pay Cardiff a fee of 1.0% in connection with employment arrangements and 0.75% in connection with sale and purchase activities. Ocean Rig does not pay or reimburse DryShips or its affiliates for services provided in accordance with the Global Services Agreement. Ocean Rig will, however, record expenses incurred under the Global Services Agreement in Ocean Rig's income statement and as a shareholder's contribution (additional paid-in capital) to capital when they are incurred.

The Global Services Agreement does not apply to the agreement with Petrobras Oil & Gas regarding the early termination of the Petrobras contract for the *Leiv Eiriksson* and the employment of the *Ocean Rig Poseidon* and the contracts with Cairn and Borders & Southern for the *Leiv Eiriksson* . Except as otherwise described, the Global Services Agreement applies to all contracts entered into after December 21, 2010 as well as the contract with Cairn for the *Ocean Rig Corcovado* and the contract with Vanco for the *Ocean Rig Olympia* .

### Ocean Rig Consultancy Agreement

As of September 1, 2010, DryShips, Ocean Rig's parent company, entered into an agreement with Vivid Finance, a company controlled by Ocean Rig's Chairman, President and Chief Executive Officer, Mr. Economou, whereby Vivid Finance has been engaged by DryShips to act as a consultant on financing matters for DryShips and its affiliates, subsidiaries or holding companies, including Ocean Rig, as directed by DryShips. Under this agreement, Vivid Finance provides consulting services relating to (i) the identification, sourcing, negotiation and arrangement of new loan and credit facilities, interest swap agreements, foreign currency contracts and forward exchange contracts; (ii) the raising of equity or debt in the public capital markets; and (iii) the renegotiation of existing loan facilities and other debt instruments. In consideration for these services, Vivid Finance is entitled to a fee of twenty basis points, or 0.20%, on the total transaction amount. Ocean Rig does not pay or reimburse DryShips or its affiliates for services provided in accordance with this agreement. Ocean Rig will, however, record expenses incurred under this agreement in its income statement and as a shareholder's contribution (additional paid-in

capital) to capital when they are incurred. During 2011 to the date of this proxy statement / prospectus, Ocean Rig expects to record expenses of a total of approximately $5.2 million in fees from Vivid Finance with respect to Ocean Rig's financing arrangements, including its issuance of $500.0 million of its 9.5% senior unsecured notes, the entry into its $800.0 senior secured term loan agreement, the restructuring of its Deutsche Bank credit facilities and the $325.0 million short-term loan facility.

### Ocean Rig Employment Agreements

See "Ocean Rig Management — Ocean Rig Employment Agreements."

## OCEAN RIG PRINCIPAL SHAREHOLDERS

The following table sets forth information regarding the beneficial owners of more than five percent of shares of Ocean Rig common stock and of Ocean Rig's officers and directors as a group as of the date of this proxy statement / prospectus. All of Ocean Rig's shareholders, including the shareholders listed in this table, are entitled to one vote for each common share held.

Beneficial ownership is determined in accordance with the SEC's rules. In computing percentage ownership of each person, common shares subject to options held by that person that are currently exercisable or convertible, or exercisable or convertible within 60 days of the date of this proxy statement / prospectus, are deemed to be beneficially owned by that person. These shares, however, are not deemed outstanding for the purpose of computing the percentage ownership of any other person.

| Identity of Person or Group | Shares Beneficially Owned | Percentage of Class Beneficially Owned |
|---|---|---|
| DryShips Inc. | 98,587,878 | 75% |
| George Economou(1) | 2,869,428 | 2.38% |
| Other directors and principal officers as a group | 34,400 | * |

\* Less than 1% of Ocean Rig's issued and outstanding common shares.

(1) George Economou, Ocean Rig's Chairman, President and Chief Executive Officer may be deemed to beneficially own these shares through Sphinx Investment Corp., a Marshall Islands corporation controlled by Mr. Economou.

## OCEAN RIG DIVIDEND POLICY

Ocean Rig's long-term objective is to pay a regular dividend in support of its main objective to maximize shareholder returns. However, Ocean Rig has not paid any dividends in the past and Ocean Rig is currently focused on the development of capital intensive projects in line with its growth strategy and this focus will limit any dividend payment in the medium term. Furthermore, since Ocean Rig is a holding company with no material assets other than the shares of its subsidiaries through which Ocean Rig conducts its operations, Ocean Rig's ability to pay dividends will depend on its subsidiaries distributing their earnings and cash flow to Ocean Rig. Some of Ocean Rig's other loan agreements limit or prohibit its subsidiaries' ability to make distributions without the consent of its lenders.

Any future dividends declared will be at the discretion of Ocean Rig's board of directors and will depend upon Ocean Rig's financial condition, earnings and other factors, including the financial covenants contained in its loan agreements and its 9.5% senior unsecured notes due 2016. Ocean Rig's ability to pay dividends is also subject to Marshall Islands law, which generally prohibits the payment of dividends other than from operating surplus or while a company is insolvent or would be rendered insolvent upon the payment of such dividend. In addition, under its $800.0 million senior secured term loan agreement, which matures in 2016, Ocean Rig is prohibited from paying dividends without the consent of its lenders.

## DESCRIPTION OF OCEAN RIG'S CAPITAL STOCK

The following is a description of the material terms of Ocean Rig's second amended and restated articles of incorporation and Ocean Rig's second amended and restated bylaws, which are filed as exhibits to the registration statement on Form F-4, of which this proxy statement / prospectus forms a part.

### Purpose

Ocean Rig's purpose, as stated in its second amended and restated articles of incorporation, is to engage in any lawful act or activity for which corporations may now or hereafter be organized under the Business Corporations Act of the Marshall Islands, or the MIBCA. Ocean Rig's second amended and restated articles of incorporation and its second amended and restated bylaws do not impose any limitations on the ownership rights of Ocean Rig's shareholders.

### Authorized Capitalization

Under Ocean Rig's second amended and restated articles of incorporation, its authorized capital stock consists of 1,000,000,000 shares of common stock, par value $0.01 per share, and 500,000,000 shares of preferred stock, par value $0.01 per share.

As of the date of this proxy statement / prospectus, 131,696,928 common shares were issued and outstanding. All of Ocean Rig's shares of common stock are in registered form.

### Share History

On December 24, 2007, Ocean Rig issued 500 shares of its capital stock, par value $20.00 per share, to DryShips, constituting all of the shares of its authorized capital stock.

On May 15, 2009, Ocean Rig closed a transaction to acquire the equity interests of the newbuilding vessel-owning companies of the *Ocean Rig Corcovado* and *Ocean Rig Olympia* , which were owned by clients of Cardiff, including certain entities affiliated with Mr. Economou. As consideration for the acquisition of the newbuilding vessel-owning companies of the *Ocean Rig Corcovado* and *Ocean Rig Olympia* , Ocean Rig issued to the sellers, including entities related to Mr. Economou, a number of shares equal to 25% of its issued and outstanding capital stock as of May 15, 2009.

On July 15, 2009, DryShips acquired the remaining 25% of Ocean Rig's issued and outstanding capital stock from the minority interests held by certain unrelated entities and certain parties related to Mr. Economou. Following such acquisition, Ocean Rig became a wholly-owned subsidiary of DryShips.

On December 7, 2010, following the approval by its board of directors and sole shareholder, Ocean Rig amended and restated its articles of incorporation, among other things, to increase its authorized share capital to 250,000,000 common shares and to change the par value to $0.01 per share.

On December 21, 2010, Ocean Rig completed the sale of an aggregate of 28,571,428 shares of its common stock in a offering made to non-U.S. persons in Norway in reliance on Regulation S under the Securities Act and to qualified institutional buyers in the U.S. in reliance on Rule 144A under the Securities Act, which included the sale of 1,871,428 common shares pursuant to Ocean Rig's managers' exercise of their option to purchase additional shares. Concurrently with such offering, Ocean Rig paid a stock dividend to DryShips of 103,125,500 common shares. Following this transaction, DryShips owned approximately 78% of Ocean Rig's outstanding common shares. As of the date of this proxy statement / prospectus, DryShips owns approximately 75% of Ocean Rig's outstanding common stock.

On May 3, 2011, following the approval by Ocean Rig's board of directors and shareholders, Ocean Rig amended and restated its amended and restated articles of incorporation, among other things, to increase its authorized share capital to 1,000,000,000 shares of common stock and 500,000,000 shares of preferred stock, each with a par value of $0.01 per share.

181

**Description of Ocean Rig Common Stock**

Under Ocean Rig's second amended and restated articles of incorporation and its second amended and restated bylaws, each outstanding share of Ocean Rig common stock entitles the holder to one vote on all matters submitted to a vote of shareholders. Subject to preferences that may be applicable to any outstanding shares of preferred stock, holders of shares of Ocean Rig's common stock will be entitled to receive ratably all dividends, if any, declared by the Ocean Rig board of directors out of funds legally available for dividends. Holders of Ocean Rig's common shares do not have conversion, redemption or pre-emptive rights to subscribe to any of its securities. The rights, preferences and privileges of holders of Ocean Rig's common shares will be subject to the rights of the holders of any shares of preferred stock, which Ocean Rig may issue in the future.

**Description of Ocean Rig Preferred Stock**

Under its second amended and restated articles of incorporation, Ocean Rig is authorized to issue up to 500,000,000 shares of preferred stock, par value $0.01 per share. Ocean Rig's second amended and restated articles of incorporation authorizes its board of directors to establish one or more series of preferred stock and to determine, with respect to any series of preferred stock, the terms and rights of that series, including:

- the designation of the series;

- the number of shares of the series;

- the preferences and relative, participating, option or other special rights, if any, and any qualifications, limitations or restrictions of such series; and

- the voting rights, if any, of the holders of the series.

Ocean Rig has designated 8,000,000 shares of its preferred stock as Series A Participating Preferred Stock in connection with the adoption of its Amended and Restated Stockholders Rights Agreement described under "— Ocean Rig's Amended and Restated Stockholders Rights Agreement."

**Directors of Ocean Rig**

Ocean Rig's directors are elected by a plurality of the votes cast by Ocean Rig shareholders entitled to vote in an election. There is no provision for cumulative voting. Ocean Rig's second amended and restated articles of incorporation provide that Ocean Rig's board of directors must consist of at least one member, with the exact number to be fixed by a vote of at least two-thirds of the entire board of directors. Ocean Rig directors are elected annually on a staggered basis, whereby each director will be divided into one of three classes, Class A, Class B and Class C, which shall be as nearly equal in number as possible. Each director shall serve for a three-year term and until his successor shall have been duly elected and qualified. See "— Ocean Rig Classified Board of Directors." Ocean Rig's board of directors has the authority to fix the amounts which shall be payable to the members of its board of directors for attendance at any meeting or for services rendered to Ocean Rig.

**Ocean Rig Shareholder Meetings**

Under Ocean Rig's second amended and restated bylaws, annual shareholder meetings are held at a time and place selected by its board of directors. The meetings may be held in or outside of the Marshall Islands. Ocean Rig's board of directors may set a record date between 15 and 60 days before the date of any meeting to determine the Ocean Rig shareholders that will be eligible to receive notice and vote at the meeting. One or more Ocean Rig shareholders representing at least one-third of the total voting rights of the total issued and outstanding shares present in person or by proxy at a shareholder meeting shall constitute a quorum for the purposes of the meeting.

**Dissenters' Rights of Appraisal and Payment under the MIBCA**

Under the MIBCA, Ocean Rig's shareholders have the right to dissent from various corporate actions, including any merger or consolidation and the sale of all or substantially all of Ocean Rig's assets not made in the usual course of its business, and receive payment of the fair value of their shares. However, the right of a dissenting shareholder under the MIBCA to receive payment of the appraised fair value of his shares is not available "for the

shares of any class or series of stock, which shares or depository receipts in respect thereof, at the record date fixed to determine the shareholders entitled to receive notice of and to vote at the meeting of shareholders to act upon the agreement of merger or consolidation, were either (i) listed on a securities exchange or admitted for trading on an interdealer quotation system or (ii) held of record by more than 2,000 holders." In the event of any amendment of Ocean Rig's second amended and restated articles of incorporation, an Ocean Rig shareholder also has the right to dissent and receive payment for his shares if the amendment alters certain rights in respect of those shares. The dissenting Ocean Rig shareholder must follow the procedures set forth in the MIBCA to receive payment. In the event that Ocean Rig and any dissenting Ocean Rig shareholder fail to agree on a price for the shares, the MIBCA procedures involve, among other things, the institution of proceedings in the high court of the Marshall Islands or in any appropriate court in any jurisdiction in which Ocean Rig shares are primarily traded on a local or national securities exchange.

**Shareholders' Derivative Actions under the MIBCA**

Under the MIBCA, any of Ocean Rig's shareholders may bring an action in Ocean Rig's name to procure a judgment in Ocean Rig's favor, also known as a derivative action, provided that the shareholder bringing the action is a holder of Ocean Rig common shares both at the time the derivative action is commenced and at the time of the transaction to which the action relates.

**Limitations on Liability and Indemnification of Ocean Rig Directors and Officers**

The MIBCA authorizes corporations to limit or eliminate the personal liability of directors and officers to corporations and their shareholders for monetary damages for breaches of directors' and officers' fiduciary duties. Ocean Rig's second amended and restated articles of incorporation provide that no director or officer shall be personally liable to Ocean Rig or any of Ocean Rig's shareholders for breach of fiduciary duty as a director or officer except to the extent such exemption from liability or limitation thereof is not permitted under the MIBCA as the same may exist or be amended.

Ocean Rig's second amended and restated bylaws include a provision that entitles any of its directors or officers to be indemnified by Ocean Rig upon the same terms, under the same conditions and to the same extent as authorized by the MIBCA if he acted in good faith and in a manner reasonably believed to be in and not opposed to Ocean Rig's best interests, and with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.

Ocean Rig's second amended and restated bylaws also authorize Ocean Rig to carry directors' and officers' insurance as a protection against any liability asserted against its directors and officers acting in their capacity as directors and officers regardless of whether Ocean Rig would have the power to indemnify such director or officer against such liability by law or under the provisions of its second amended and restated bylaws. Ocean Rig believes that these indemnification provisions and insurance will be useful to attract and retain qualified directors and executive officers.

The indemnification provisions included in Ocean Rig's second amended and restated bylaws may discourage shareholders from bringing a lawsuit against its directors for breach of fiduciary duty. These provisions may also have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit Ocean Rig and its shareholders.

As of September 30, 2011, there was no pending material litigation or proceeding involving any of Ocean Rig's directors, officers or employees for which indemnification is sought.

**Anti-takeover Effect of Certain Provisions of Ocean Rig's Articles of Incorporation and Bylaws**

Several provisions of Ocean Rig's second amended and restated articles of incorporation and second amended and restated bylaws may have anti-takeover effects. These provisions will be intended to avoid costly takeover battles, lessen Ocean Rig's vulnerability to a hostile change of control and enhance the ability of Ocean Rig's board of directors to maximize shareholder value in connection with any unsolicited offer to acquire Ocean Rig. However, these anti-takeover provisions, which are summarized below, could also discourage, delay or prevent (1) the merger

or acquisition of Ocean Rig by means of a tender offer, a proxy contest or otherwise that a shareholder may consider in its best interest and (2) the removal of incumbent officers and directors.

### Ocean Rig Blank Check Preferred Stock

Under the terms of Ocean Rig's second amended and restated articles of incorporation, its board of directors will have the authority, without any further vote or action by its shareholders, to issue up to 500,000,000 shares of blank check preferred stock. Ocean Rig's board of directors will be entitled to issue shares of preferred stock on terms calculated to discourage, delay or prevent a change of control of Ocean Rig or the removal of its management.

### Ocean Rig Classified Board of Directors

Ocean Rig's second amended and restated articles of incorporation provide that its board of directors serve staggered, three-year terms. Approximately one-third of Ocean Rig's board of directors will be elected each year. The classified board provision could discourage a third party from making a tender offer for Ocean Rig's shares or attempting to obtain control of Ocean Rig. It could also delay shareholders who do not agree with the policies of Ocean Rig's board of directors from removing a majority of its board of directors for two years.

### Election and Removal of Ocean Rig Directors

Ocean Rig's second amended and restated articles of incorporation prohibit cumulative voting in the election of directors and Ocean Rig's second amended and restated bylaws require Ocean Rig shareholders to give advance written notice of nominations for the election and removal of directors. Ocean Rig's second amended and restated articles of incorporation also provide that Ocean Rig's directors may be removed only for cause upon the affirmative vote of not less than two-thirds of the outstanding shares of the capital stock entitled to vote generally in the election of directors. These provisions may discourage, delay or prevent the removal of incumbent Ocean Rig officers and directors.

### Limited Actions by Ocean Rig Shareholders

Under the MIBCA, Ocean Rig's second amended and restated articles of incorporation and second amended and restated bylaws, any action required or permitted to be taken by Ocean Rig's shareholders must be effected at an annual or special meeting of shareholders or by the unanimous written consent of Ocean Rig's shareholders. Ocean Rig's second amended and restated bylaws provide that, unless otherwise prescribed by law, only a majority of Ocean Rig's board of directors, the Chairman of Ocean Rig's board of directors or Ocean Rig's executive officers who are also directors may call special meetings of Ocean Rig's shareholders, and the business transacted at the special meeting is limited to the purposes stated in the notice. Accordingly, an Ocean Rig shareholder may be prevented from calling a special meeting for shareholder consideration of a proposal over the opposition of Ocean Rig's board of directors, and shareholder consideration of a proposal may be delayed until the next annual meeting.

### Advance Notice Requirements for Ocean Rig Shareholder Proposals and Director Nominations

Ocean Rig's second amended and restated bylaws provide that shareholders seeking to nominate candidates for election as directors or to bring business before an annual meeting of shareholders must provide timely notice of their proposal in writing to Ocean Rig's corporate secretary. Generally, to be timely, a shareholder's notice must be received at Ocean Rig's principal executive offices not less than 150 days nor more than 180 days prior to the one year anniversary of the preceding year's annual meeting of shareholders. Ocean Rig's second amended and restated bylaws also specify requirements as to the form and content of a shareholder's notice. These provisions may impede the ability of Ocean Rig shareholders to bring matters before an annual meeting of shareholders or make nominations for directors at an annual meeting of shareholders.

### Ocean Rig's Amended and Restated Stockholders Rights Agreement

Ocean Rig has entered into an Amended and Restated Stockholders Rights Agreement with American Stock Transfer & Trust Company, LLC, as Rights Agent. Under this agreement, Ocean Rig declared a dividend payable to shareholders of record on May 23, 2011 of one preferred share purchase right, or right, to purchase one one-

thousandth of a share of Series A Participating Preferred Stock for each outstanding share of its common stock, par value $0.01 per share. The right will separate from the common stock and become exercisable after (1) a person or group, other than DryShips, acquires ownership of 15% or more of Ocean Rig's common stock or (2) the 10th business day (or such later date as determined by Ocean Rig's board of directors) after a person or group, other than DryShips, announces a tender or exchange offer which would result in that person or group holding 15% or more of the Ocean Rig's common stock. On the distribution date, each holder of a right will be entitled to purchase for $100.00 a fraction (1/1000th) of one share of Series A Participating Preferred Stock which has similar economic terms as one share of common stock.

If an acquiring person, or an Acquiring Person, acquires more than 15% of Ocean Rig's common stock then each holder of a right (except that Acquiring Person) will be entitled to buy at the exercise price, a number of shares of Ocean Rig's common stock which has a market value of twice the exercise price. Any time after the date an Acquiring Person obtains more than 15% of Ocean Rig's common stock and before that Acquiring Person acquires more than 50% of Ocean Rig's outstanding common stock, Ocean Rig will be able to exchange each right owned by all other rights holders, in whole or in part, for one share of Ocean Rig's common stock. The rights will expire on the earliest of (1) May 20, 2021 or (2) the exchange or redemption of the rights as described above. Ocean Rig is able to redeem the rights at any time prior to a public announcement that a person has acquired ownership of 15% or more of Ocean Rig's common stock. Ocean Rig will be able to amend the terms of the rights and the Shareholders Rights Agreement without the consent of the rights holders at any time on or prior to the distribution date. After the distribution date, the terms of the rights and the Amended and Restated Stockholders Rights Agreement may be amended to make changes, which do not adversely affect the rights of the rights holders (other than the Acquiring Person). The rights do not have any voting rights. The rights have the benefit of certain customary anti-dilution protections.

**Ocean Rig's Transfer Agent**

The U.S. transfer agent for Ocean Rig's common stock is American Stock Transfer & Trust Company, LLC. The registrar and transfer agent for Ocean Rig's common stock held through the Norwegian VPS is Nordea Bank Norge ASA.

185

## COMPARISON OF SHAREHOLDER RIGHTS

As a result of the merger, OceanFreight shareholders will receive shares of Ocean Rig common stock in exchange for their shares of OceanFreight common stock. OceanFreight is incorporated under the laws of the Marshall Islands and subject to the laws of the Marshall Islands, including the MIBCA, and Ocean Rig is also incorporated under the laws of the Marshall Islands and subject to the laws of the Marshall Islands, including the MIBCA. The rights of OceanFreight shareholders are governed by the Marshall Islands law and the articles of incorporation and bylaws of OceanFreight, while the rights of Ocean Rig shareholders are governed by the Marshall Islands law and the articles of incorporation and bylaws of Ocean Rig. Following the merger, the rights of OceanFreight shareholders who become Ocean Rig shareholders in the merger will be governed by the laws of the Marshall Islands law, Ocean Rig's articles of incorporation and Ocean Rig's bylaws, both as currently in effect and as will be in effect at the completion of the merger.

The following is a summary comparison of material differences between the rights of an OceanFreight shareholder and the rights of an Ocean Rig shareholder. This summary is qualified in its entirety by reference to the full text of Ocean Rig's articles of incorporation and bylaws, OceanFreight's articles of incorporation and bylaws, both as currently in effect and as will be in effect at the completion of the merger, and the full text of the MIBCA.

| **OceanFreight** | **Ocean Rig** |
|---|---|
| Authorized Capital Stock | |
| OceanFreight's third amended and restated articles of incorporation authorize the issuance of up to (i) 333,333,333 shares of OceanFreight Class A common stock, par value $0.01 per share, (ii) 10,000,000 shares of OceanFreight Class B common stock, par value $0.01 per share, or subordinated shares, and (iii) 5,000,000 shares of OceanFreight preferred stock, par value $0.01 per share. | Ocean Rig's second amended and restated articles of incorporation authorize the issuance of up to 1,000,000,000 shares of Ocean Rig common stock, par value $0.01 per share, and up to 500,000,000 shares of Ocean Rig preferred stock, par value $0.01 per share. |
| Following the conversion of all of OceanFreight's subordinated shares on August 15, 2008, OceanFreight now has only Class A Common Stock, or the OceanFreight common stock, issued and outstanding. | Ocean Rig has designated 8,000,000 shares of Ocean Rig preferred stock as Series A Participating Preferred Stock in connection with the adoption of its Amended and Restated Stockholders Rights Agreement. See "Description of Ocean Rig's Capital Stock — Ocean Rig's Amended and Restated Stockholders Rights Agreement." |
| As of October 7, 2011, OceanFreight had 5,946,180 common shares issued and outstanding. | As of September 30, 2011, 131,696,928 shares of Ocean Rig common stock were issued and outstanding. |
| The OceanFreight common shares are listed on the NASDAQ Global Market under the symbol "OCNF." | |
| OceanFreight's third amended and restated articles of incorporation authorizes the board of directors to establish one or more series of preferred stock and to determine, with respect to any series of preferred stock, the terms and rights of that series, including (i) the designation of the series; (ii) the number of shares of the series; (iii) the preferences and relative, participating, option or other special rights, if any, and any qualifications, limitations or restrictions of such series; and (iv) the voting rights, if any, of the holders of the series. | Ocean Rig's second amended and restated articles of incorporation authorizes the board of directors to establish one or more series of preferred stock and to determine, with respect to any series of preferred stock, the terms and rights of that series, including (i) the designation of the series; (ii) the number of shares of the series; (iii) the preferences and relative, participating, option or other special rights, if any, and any qualifications, limitations or restrictions of such series; and (iv) the voting rights, if any, of the holders of the series. |
| | The rights, preferences and privileges of holders of Ocean Rig common shares will be subject to the rights of the holders of any shares of preferred stock, which Ocean Rig may issue in the future. |

| OceanFreight | Ocean Rig |
|---|---|

### Voting Rights

OceanFreight's bylaws provide that if a quorum is present, and except as otherwise expressly provided by law, the affirmative vote of a majority of the shares of stock represented at the meeting shall be the act of the shareholders. Under OceanFreight's third amended and restated articles of incorporation and its amended and restated bylaws, each outstanding share of OceanFreight common stock entitles its holder to one vote on all matters submitted to a vote of OceanFreight shareholders.

Ocean Rig's second amended and restated bylaws provide that if a quorum is present, and except as otherwise expressly provided by law, Ocean Rig's second amended and restated articles of incorporation or Ocean Rig's second amended and restated bylaws, the affirmative vote of a majority of votes of the shares of Ocean Rig stock at the meeting shall be the act of the Ocean Rig shareholders. Under Ocean Rig's second amended and restated bylaws, each outstanding share of Ocean Rig common stock entitles the holder to one vote on all matters submitted to a vote of Ocean Rig shareholders.

### Directors

OceanFreight's directors are elected by a plurality of the votes cast at a meeting of the OceanFreight shareholders by the holders of shares entitled to vote in the election. There is no provision for cumulative voting.

Ocean Rig's directors are elected by a plurality of the votes cast by the Ocean Rig shareholders entitled to vote in an election. There is no provision for cumulative voting.

The OceanFreight board of directors may change the number of directors only by a vote of at least 66 $2/3$ % of the entire board. Each director shall be elected to serve until his successor shall have been duly elected and qualified. OceanFreight's board of directors has the authority to fix the amounts which shall be payable to the members of the OceanFreight board of directors for attendance at any meeting or for services rendered to OceanFreight.

Ocean Rig's second amended and restated articles of incorporation provide that its board of directors must consist of at least one member, with the exact number to be fixed by a vote of at least two-thirds of the entire board of directors. Each director shall serve for a three-year term and until his successor shall have been duly elected and qualified. Ocean Rig's board of directors has the authority to fix the amounts which shall be payable to the members of Ocean Rig's board of directors for attendance at any meeting or for services rendered to Ocean Rig.

OceanFreight's third amended and restated articles of incorporation and amended and restated bylaws also provide that OceanFreight's directors may be removed only for cause and only upon the affirmative vote of the holders of at least 66 2/3% of the outstanding shares of common stock entitled to vote generally in the election of directors.

Ocean Rig's second amended and restated articles of incorporation provide that directors may be removed only for cause upon the affirmative vote of not less than two-thirds of the outstanding shares of the capital stock entitled to vote generally in the election of directors. These provisions may discourage, delay or prevent the removal of incumbent officers and directors.

OceanFreight's third amended and restated articles of incorporation provide for a board of directors serving staggered, three-year terms. Approximately one-third of the OceanFreight board of directors are elected each year.

Ocean Rig's second amended and restated articles of incorporation provide that Ocean Rig's board of directors serve staggered, three-year terms. Approximately one-third of Ocean Rig's board of directors are elected each year.

### Quorum and action by the Board of Directors

A majority of the OceanFreight directors at the time in office, present in person or by proxy or by

A majority of the Ocean Rig directors at the time in office, present in person or by proxy or by conference

187

| **OceanFreight** | **Ocean Rig** |
|---|---|
| communication equipment, shall constitute a quorum for the transaction of business. The vote of the majority of the directors, present in person, by proxy or by conference telephone, at a meeting at which a quorum is present shall be the act of the directors. | telephone, shall constitute a quorum for the transaction of business. The vote of the majority of the directors, present in person, by proxy or by conference telephone, at a meeting at which quorum is present shall be the act of the directors. |

Director and Officer Limitation on Liability and Indemnification

| | |
|---|---|
| OceanFreight's third amended and restated articles of incorporation provide that no OceanFreight director or officer shall be personally liable to Ocean Rig or any of its shareholders for breach of fiduciary duty as a director or officer except to the extent such exemption from liability or limitation thereof is not permitted under the MIBCA as the same may exist or be amended. | Ocean Rig's second amended and restated articles of incorporation provide that no Ocean Rig director or officer shall be personally liable to Ocean Rig or any of its shareholders for breach of fiduciary duty as a director or officer except to the extent such exemption from liability or limitation thereof is not permitted under the MIBCA as the same may exist or be amended. |
| OceanFreight's third amended and restated articles of incorporation include a provision that entitles any of OceanFreight's directors or officers to be indemnified by OceanFreight to the full extent permitted by the MIBCA if he acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of OceanFreight, and with respect to any criminal action or proceeding, had no reason to believe his conduct was unlawful; provided that, with respect to actions or suits by or in the right of OceanFreight to procure a judgment in its favor no indemnification shall be made in respect of any claim as to which such director or officer shall have been adjudged to be liable to OceanFreight unless and only to the extent that the court in which such action or suit was properly brought shall determine that such person is fairly and reasonably entitled to indemnity for any such expenses. | Ocean Rig's second amended and restated bylaws include a provision that entitles any of Ocean Rig's directors or officers to be indemnified by Ocean Rig upon the same terms, under the same conditions and to the same extent as authorized by the MIBCA if he acted in good faith and in a manner reasonably believed to be in and not opposed to Ocean Rig's best interests, and with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. |
| OceanFreight's third amended and restated articles of incorporation authorize OceanFreight to purchase and maintain directors' and officers' insurance as a protection against any liability asserted against OceanFreight's directors and officers acting in their capacity as directors and officers regardless of whether OceanFreight would have the power to indemnify such director or officer against such liability under the provisions of OceanFreight's third amended and restated articles of incorporation. | Ocean Rig's second amended and restated bylaws also authorize Ocean Rig to carry directors' and officers' insurance as a protection against any liability asserted against Ocean Rig directors and officers acting in their capacity as directors and officers regardless of whether Ocean Rig would have the power to indemnify such director or officer against such liability by law or under the provisions of its second amended and restated bylaws. |

Shareholder Meetings

| | |
|---|---|
| *Annual Meetings* .   OceanFreight's amended and restated bylaws provide that annual shareholder | *Annual Meetings* .   Ocean Rig's second amended and restated bylaws provide that annual shareholder |

188

| OceanFreight | Ocean Rig |
|---|---|
| meetings will be held at a time and place selected by OceanFreight's board of directors. The meetings may be held in or outside of the Marshall Islands. OceanFreight's board of directors may set a record date between 15 and 60 days before the date of any meeting to determine the shareholders that will be eligible to receive notice and vote at the meeting. | meetings will be held at a time and place selected by Ocean Rig's board of directors. The meetings may be held in or outside of the Marshall Islands. Ocean Rig's board of directors may set a record date between 15 and 60 days before the date of any meeting to determine the shareholders that will be eligible to receive notice and vote at the meeting. |
| *Special Meetings* .   OceanFreight's amended and restated bylaws provide that special meetings of its shareholders may be called for any purpose by the order of the OceanFreight board of directors, OceanFreight's chairman of the board or OceanFreight's president. No other person or persons are permitted to call a special meeting and no business may be conducted at the OceanFreight special meeting other than business brought before the meeting by the OceanFreight board of directors. Such meetings shall be held at such place and on a date and at such time as may be designated in the notice thereof by the officer of OceanFreight designated by the OceanFreight board of directors to deliver the notice of such meeting. The business transacted at any special meeting shall be limited to the purposes stated in the notice. | *Special Meetings* .   Ocean Rig's second amended and restated bylaws provide that special meetings of its shareholders may be called for any purpose at any time by Ocean Rig's chairman of the board, a majority of the board of directors, or any Ocean Rig officer who is also a director. No other person or persons are permitted to call a special meeting and no business may be conducted at the special meeting other than business brought before the meeting by the Ocean Rig board of directors. Such meetings shall be held at such place and on a date and at such time as may be designated in the notice thereof by the Ocean Rig officer designated by the board of directors to deliver the notice of such meeting. The business transacted at any special meeting shall be limited to the purposes stated in the notice. |

Quorum of Shareholders

| | |
|---|---|
| Except as otherwise expressly provided by law, shareholders representing at least one-third of the total voting rights of the total issued and outstanding shares of OceanFreight common stock present in person or by proxy at a shareholder meeting shall constitute a quorum for the purposes of the meeting. | Except as otherwise expressly provided by law, shareholders representing at least one-third of the total voting rights of the total issued and outstanding shares of Ocean Rig common stock present in person or by proxy at a shareholder meeting shall constitute a quorum for the purposes of the meeting. |

Shareholder Proposals and Nominations

| | |
|---|---|
| OceanFreight's amended and restated bylaws provide that shareholders seeking to nominate candidates for election as directors, to bring business before an annual meeting of shareholders or proposing to remove a director must provide timely notice of their proposal in writing to the corporate secretary. Generally, to be timely a shareholder's notice must be received at OceanFreight's principal executive offices not less than 120 days nor more than 180 days prior to the one year anniversary of the preceding year's annual meeting of shareholders. | Ocean Rig's second amended and restated bylaws provide that shareholders seeking to nominate candidates for election as directors, to bring business before an annual meeting of shareholders or proposing to remove a director must provide timely notice of their proposal in writing to the corporate secretary. Generally, to be timely, a shareholder's notice must be received at Ocean Rig's principal executive offices not less than 150 days nor more than 180 days prior to the one year anniversary of the preceding year's annual meeting of shareholders. |

Shareholder Action Without a Meeting

| | |
|---|---|
| Any action required to be or permitted to be taken at a meeting may be taken without a meeting if a consent in | Any action required to be or permitted to be taken at a meeting, may be taken without a meeting if a consent in |

189

| OceanFreight | Ocean Rig |
|---|---|
| writing, setting forth the action so taken, is signed by all of the shareholders entitled to vote with respect to the subject matter thereof. | writing, setting forth the action so taken, is signed by all of the shareholders entitled to vote with respect to the subject matter thereof. |

## Amendments of Governing Instruments

| OceanFreight | Ocean Rig |
|---|---|
| *Amendments of Articles of Incorporation* .   Any amendment to OceanFreight's third amended and restated articles of incorporation that would increase or decrease the aggregate number of authorized Class A common stock or Class B common stock, increase or decrease the par value of the Class A common stock or Class B common stock, or alter or change the powers, preferences or rights of the Class A common stock or Class B common stock so as to affect them adversely, must be approved by the holders of not less than a majority of the Class A common stock or Class B common stock, as applicable.<br><br>Notwithstanding any other provision in OceanFreight's third amended and restated articles of incorporation or its amended and restated bylaws (and notwithstanding the fact that some lesser percentage may be specified by law), the affirmative vote of the holders of at least 66 $2/3$ % of the outstanding shares of OceanFreight common stock entitled to vote generally in the election of directors shall be required to amend, alter, change or repeal provisions dealing with directors, anti-takeover and director and officer indemnification. | *Amendments of Articles of Incorporation* .   Notwithstanding any other provision in Ocean Rig's second amended and restated articles of incorporation or its second amended and restated bylaws (and notwithstanding the fact that some lesser percentage may be specified by law), the affirmative vote of the holders of two- thirds or more of the outstanding shares of Ocean Rig common stock entitled to vote generally in the election of directors shall be required to amend, alter, change or repeal provisions dealing with directors, amendments to Ocean Rig's bylaws and anti-takeover. |
| *Amendments of Bylaws* .   The board of directors is expressly authorized to make, alter or repeal the bylaws by a vote of not less than a majority of the entire board of directors, unless otherwise provided in the amended and restated bylaws; provided however, that the board of directors is expressly authorized to make, alter or repeal certain provisions in the amended and restated bylaws only by a vote of not less than 66 $2/3$ % of the board of directors. Shareholders may not make, alter or repeal any bylaw. Notwithstanding any other provisions of OceanFreight's third amended and restated articles of incorporation or its amended and restated bylaws (and notwithstanding the fact that some lesser percentage may be specified by law), the affirmative vote of the holders of 66 $2/3$ % or more of OceanFreight's outstanding shares of common stock entitled to vote generally in the election of directors shall be required to amend, alter, change or repeal the provision dealing with amendments to the bylaws. | *Amendments of Bylaws* .   The board of directors is expressly authorized to make, alter or repeal the bylaws by a vote of not less than a majority of the entire board of directors, unless otherwise provided in the second amended and restated bylaws. |

190

| OceanFreight | Ocean Rig |
|---|---|

### Preemptive Rights

| | |
|---|---|
| Holders of OceanFreight shares will not have preferential or preemptive rights to subscribe to any of OceanFreight's shares or securities convertible or exchangeable into such shares. | Holders of Ocean Rig common shares do not have conversion, redemption or pre-emptive rights to subscribe to any of Ocean Rig's securities. |

### Derivative Actions

| | |
|---|---|
| Under the MIBCA, any OceanFreight shareholder may bring an action in OceanFreight's name to procure a judgment in OceanFreight's favor, also known as a derivative action, provided that the shareholder bringing the action is a holder of OceanFreight common shares both at the time the derivative action is commenced and at the time of the transaction to which the action relates. | Under the MIBCA, any Ocean Rig shareholder may bring an action in Ocean Rig's name to procure a judgment in Ocean Rig's favor, also known as a derivative action, provided that the shareholder bringing the action is a holder of Ocean Rig common shares both at the time the derivative action is commenced and at the time of the transaction to which the action relates. |

### Anti-Takeover Provisions

| | |
|---|---|
| Although the MIBCA does not contain specific provisions regarding "business combinations" between corporations organized under the laws of the Republic of Marshall Islands and "interested shareholders," OceanFreight has included these provisions in its third amended and restated articles of incorporation. OceanFreight's third amended and restated articles of incorporation contain provisions which prohibit it from engaging in a business combination with an interested shareholder for a period of three years after the date of the transaction in which the person became an interested shareholder, unless (i) prior to the date of the transaction that resulted in the shareholder becoming an interested shareholder, OceanFreight's board of directors approved either the business combination or the transaction that resulted in the shareholder becoming an interested shareholder; (ii) upon consummation of the transaction that resulted in the shareholder becoming an interested shareholder, the interested shareholder owned at least 85% of the voting stock of OceanFreight outstanding at the time the transaction commenced; (iii) at or subsequent to the date of the transaction that resulted in the shareholder becoming an interested shareholder, the business combination is approved by the board of directors and authorized at an annual or special meeting of shareholders by the affirmative vote of at least 66 $^2/_3$% of the outstanding voting stock that is not owned by the interested shareholder; and (iv) the shareholder became an interested shareholder prior to the consummation of the initial public offering. | Although the MIBCA does not contain specific provisions regarding "business combinations" between corporations organized under the laws of the Republic of Marshall Islands and "interested shareholders," Ocean Rig has included these provisions in its second amended and restated articles of incorporation. Ocean Rig's second amended and restated articles of incorporation contain provisions which prohibit it from engaging in a business combination with an interested shareholder for a period of three years after the date of the transaction in which the person became an interested shareholder, unless (i) prior to the date of the transaction that resulted in the shareholder becoming an interested shareholder, Ocean Rig's board of directors approved either the business combination or the transaction that resulted in the shareholder becoming an interested shareholder; (ii) upon consummation of the transaction that resulted in the shareholder becoming an interested shareholder, the interested shareholder owned at least 85% of the voting stock of Ocean Rig outstanding at the time the transaction commenced; (iii) at or subsequent to the date of the transaction that resulted in the shareholder becoming an interested shareholder, the business combination is approved by the board of directors and authorized at an annual or special meeting of shareholders by the affirmative vote of at least two-thirds of the outstanding voting stock that is not owned by the interested shareholder; and (iv) the shareholder became an interested shareholder prior to the consummation of the initial public offering. |
| For purposes of these provisions, a "business combination" includes mergers, consolidations, exchanges, asset sales, leases and other transactions resulting in a financial benefit to the interested shareholder and an "interested | For purposes of these provisions, a "business combination" includes mergers, consolidations, exchanges, asset sales, leases and other transactions resulting in a financial benefit to the interested shareholder and an "interested |

| **OceanFreight** | **Ocean Rig** |
|---|---|
| shareholder" is any person or entity that beneficially owns 20% or more of OceanFreight's outstanding voting stock and any person or entity affiliated with or controlling or controlled by that person or entity, provided, however, that the term "interested shareholder" does not include any person whose ownership of shares in excess of the 20% limitation is the result of action taken solely by OceanFreight; provided that such person shall be an interested shareholder if thereafter such person acquires additional shares of OceanFreight's voting shares, except as a result of further action by OceanFreight not caused, directly or indirectly, by such person. | shareholder" is any person or entity that beneficially owns 15% or more of Ocean Rig's outstanding voting stock and any person or entity affiliated with or controlling or controlled by that person or entity, other than DryShips, provided, however, that the term "interested shareholder" does not include any person whose ownership of shares in excess of the 15% limitation is the result of action taken solely by Ocean Rig; provided that such person shall be an interested shareholder if thereafter such person acquires additional shares of Ocean Rig's voting shares, except as a result of further action by Ocean Rig not caused, directly or indirectly, by such person. |

### Shareholder Rights Plans

| | |
|---|---|
| OceanFreight has entered into a Third Amended and Restated Stockholders Rights Agreement with American Stock Transfer & Trust Company, LLC, as Rights Agent. The terms of the Third Amended and Restated Stockholders Rights Agreement are substantially similar to the terms of OceanFreight's Second Amended and Restated Stockholders Rights Agreement which is described in OceanFreight's Form 20-F included as Annex D to this document. The Third Amended and Restated Stockholders Rights Agreement modified the definition of the term "'Acquiring Person" in connection with the transactions contemplated by the merger agreement and the purchase agreement. | Ocean Rig has entered into an Amended and Restated Stockholders Rights Agreement with American Stock Transfer & Trust Company, LLC, as Rights Agent. See "Description of Ocean Rig's Capital Stock — Ocean Rig's Amended and Restated Stockholders Rights Agreement." |

192

## REPUBLIC OF THE MARSHALL ISLANDS COMPANY CONSIDERATIONS

Ocean Rig's corporate affairs are governed by its articles of incorporation and bylaws, and by the MIBCA. The provisions of the MIBCA resemble provisions of the corporation laws of a number of states in the United States. While the MIBCA also provides that it is to be interpreted according to the laws of the State of Delaware and other states with substantially similar legislative provisions, there have been few, if any, court cases interpreting the MIBCA in the Marshall Islands and Ocean Rig shareholders cannot predict whether Marshall Islands courts would reach the same conclusions as courts in the U.S. Thus, Ocean Rig shareholders may have more difficulty in protecting their interests in the face of actions by the management, directors or controlling shareholders than would shareholders of a corporation incorporated in a U.S. jurisdiction which has developed a substantial body of case law. The following table provides a comparison between the statutory provisions of the MIBCA and the Delaware General Corporation Law relating to shareholders' rights.

| Marshall Islands | Delaware |
|---|---|
| **Shareholder Meetings** | |
| Held at a time and place as designated in the bylaws. | May be held at such time or place as designated in the certificate of incorporation or the bylaws, or if not so designated, as determined by the board of directors. |
| Special meetings of the shareholders may be called by the board of directors or by such person or persons as may be authorized by the articles of incorporation or by the bylaws. | Special meetings of the shareholders may be called by the board of directors or by such person or persons as may be authorized by the certificate of incorporation or by the bylaws. |
| May be held within or without the Marshall Islands. | May be held within or without Delaware. |
| Notice: | Notice: |
| Whenever shareholders are required to take any action at a meeting, written notice of the meeting shall be given which shall state the place, date and hour of the meeting and, unless it is an annual meeting, indicate that it is being issued by or at the direction of the person calling the meeting.<br>A copy of the notice of any meeting shall be given personally or sent by mail not less than 15 nor more than 60 days before the meeting. | Whenever shareholders are required to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, if any, date and hour of the meeting, and the means of remote communication, if any.<br><br>Written notice shall be given not less than 10 nor more than 60 days before the meeting. |
| **Shareholders' Voting Rights** | |
| Any action required to be taken by a meeting of shareholders may be taken without meeting if consent is in writing and is signed by all the shareholders entitled to vote. | Any action required to be taken at a meeting of shareholders may be taken without a meeting if a consent for such action is in writing and is signed by shareholders having not fewer than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. |
| Any person authorized to vote may authorize another person or persons to act for him by proxy.<br>Unless otherwise provided in the articles of incorporation, a majority of shares entitled to vote constitutes a quorum. In no event shall a quorum consist of fewer than one- third of the shares entitled to vote at a meeting. | Any person authorized to vote may authorize another person or persons to act for him by proxy.<br>For stock corporations, the certificate of incorporation or bylaws may specify the number of shares required to constitute a quorum but in no event shall a quorum consist of less than one- third of shares entitled to vote at a meeting. In the absence of such specifications, a |

193

| Marshall Islands | Delaware |
|---|---|
| | majority of shares entitled to vote shall constitute a quorum. |
| When a quorum is once present to organize a meeting, it is not broken by the subsequent withdrawal of any shareholders. | When a quorum is once present to organize a meeting, it is not broken by the subsequent withdrawal of any shareholders. |
| The articles of incorporation may provide for cumulative voting in the election of directors. | The certificate of incorporation may provide for cumulative voting in the election of directors. |
| Any two or more domestic corporations may merge into a single corporation if approved by the board and if authorized by a majority vote of the holders of outstanding shares at a shareholder meeting. | Any two or more corporations existing under the laws of the state may merge into a single corporation pursuant to a board resolution and upon the majority vote by shareholders of each constituent corporation at an annual or special meeting. |
| Any sale, lease, exchange or other disposition of all or substantially all the assets of a corporation, if not made in the corporation's usual or regular course of business, once approved by the board, shall be authorized by the affirmative vote of two-thirds of the shares of those entitled to vote at a shareholder meeting. | Every corporation may at any meeting of the board sell, lease or exchange all or substantially all of its property and assets as its board deems expedient and for the best interests of the corporation when so authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote. |
| Any domestic corporation owning at least 90% of the outstanding shares of each class of another domestic corporation may merge such other corporation into itself without the authorization of the shareholders of any corporation. | Any corporation owning at least 90% of the outstanding shares of each class of another corporation may merge the other corporation into itself and assume all of its obligations without the vote or consent of shareholders; however, in case the parent corporation is not the surviving corporation, the proposed merger shall be approved by a majority of the outstanding stock of the parent corporation entitled to vote at a duly called shareholder meeting. |
| Any mortgage, pledge of or creation of a security interest in all or any part of the corporate property may be authorized without the vote or consent of the shareholders, unless otherwise provided for in the articles of incorporation. | Any mortgage or pledge of a corporation's property and assets may be authorized without the vote or consent of shareholders, except to the extent that the certificate of incorporation otherwise provides. |

<u>Directors</u>

| Marshall Islands | Delaware |
|---|---|
| The board of directors must consist of at least one member. | The board of directors must consist of at least one member. |
| The number of board members may be changed by an amendment to the bylaws, by the shareholders, or by action of the board under the specific provisions of a bylaw. | The number of board members shall be fixed by, or in a manner provided by, the bylaws, unless the certificate of incorporation fixes the number of directors, in which case a change in the number shall be made only by an amendment to the certificate of incorporation. |
| If the board is authorized to change the number of directors, it can only do so by a majority of the entire board and so long as no decrease in the number shall shorten the term of any incumbent director. | If the number of directors is fixed by the certificate of incorporation, a change in the number shall be made only by an amendment of the certificate. |

194

| Marshall Islands | Delaware |
|---|---|
| Removal: | Removal: |
| Any or all of the directors may be removed for cause by vote of the shareholders. | Any or all of the directors may be removed, with or without cause, by the holders of a majority of the shares entitled to vote unless the certificate of incorporation otherwise provides. |
| If the articles of incorporation or the bylaws so provide, any or all of the directors may be removed without cause by vote of the shareholders. | In the case of a classified board, shareholders may effect removal of any or all directors only for cause. |

### Dissenters' Rights of Appraisal

Shareholders have a right to dissent from any plan of merger, consolidation or sale of all or substantially all assets not made in the usual course of business, and receive payment of the fair value of their shares. However, the right of a dissenting shareholder under the MIBCA to receive payment of the appraised fair value of his shares is not available "for the shares of any class or series of stock, which shares or depository receipts in respect thereof, at the record date fixed to determine the shareholders entitled to receive notice of and to vote at the meeting of the shareholders to act upon the agreement of merger or consolidation, were either (i) listed on a securities exchange or admitted for trading on an interdealer quotation system or (ii) held of record by more than 2,000 holders."

A holder of any adversely affected shares who does not vote on or consent in writing to an amendment to the articles of incorporation has the right to dissent and to receive payment for such shares if the amendment:

Alters or abolishes any preferential right of any outstanding shares having preference; or

Creates, alters, or abolishes any provision or right in respect to the redemption of any outstanding shares; or

Alters or abolishes any preemptive right of such holder to acquire shares or other securities; or

Excludes or limits the right of such holder to vote on any matter, except as such right may be limited by the voting rights given to new shares then being authorized of any existing or new class.

Appraisal rights shall be available for the shares of any class or series of stock of a corporation in a merger or consolidation, subject to limited exceptions, such as a merger or consolidation of corporations listed on a national securities exchange in which listed stock is the offered consideration.

### Shareholder's Derivative Actions

An action may be brought in the right of a corporation to procure a judgment in its favor, by a holder of shares or of voting trust certificates or of a beneficial interest in such shares or certificates. It shall be made to appear that the plaintiff is such a holder at the time of bringing the action and that he was such a holder at the time of the transaction of which he complains, or that his shares or

In any derivative suit instituted by a shareholder of a corporation, it shall be averred in the complaint that the plaintiff was a shareholder of the corporation at the time of the transaction of which he complains or that such shareholder's stock thereafter devolved upon such shareholder by operation of law.

195

| Marshall Islands | Delaware |
|---|---|
| his interest therein devolved upon him by operation of law. | |
| A complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort. | Other requirements regarding derivative suits have been created by judicial decision, including that a shareholder may not bring a derivative suit unless he or she first demands that the corporation sue on its own behalf and that demand is refused (unless it is shown that such demand would have been futile). |
| Such action shall not be discontinued, compromised or settled, without the approval of the High Court of the Republic of The Marshall Islands. | |
| Reasonable expenses including attorney's fees may be awarded if the action is successful. | |
| A corporation may require a plaintiff bringing a derivative suit to give security for reasonable expenses if the plaintiff owns less than 5% of any class of stock and the shares have a value of less than $50,000. | |

196

## TAXATION

**Certain Material Tax Consequences**

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of OceanFreight shares or Ocean Rig shares, other than an entity or arrangement treated as a partnership or other type of pass-through entity for U.S. federal income tax purposes, that is (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States or any state thereof, (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the source of that income or (iv) a trust if it (A) is subject to the primary supervision of a court within the United States and one or more U.S. persons have the authority to control all substantial decisions of the trust or (B) was in existence on August 20, 1996 and has properly elected under applicable U.S. Treasury regulations to be treated as a U.S. person. A "Non-U.S. Holder" is a beneficial owner of OceanFreight shares or Ocean Rig shares that is neither a U.S. Holder nor a partnership or other type of pass-through entity for U.S. federal income tax purposes. If an entity or arrangement treated as a partnership or other type of pass-through entity for U.S. federal income tax purposes holds OceanFreight shares or Ocean Rig shares, the tax treatment of a partner or beneficial owner of such entity or arrangement may depend on the status of the partner or beneficial owner and the activities of the partnership or entity. Partners and beneficial owners in such entities or arrangements holding OceanFreight shares or Ocean Rig shares are urged to consult their own advisors as to the particular U.S. federal income tax consequences applicable to them.

Unless otherwise noted, this discussion is based upon the Internal Revenue Code of 1986, as amended, or the Code, applicable United States Treasury Regulations, Internal Revenue Service rulings and judicial decisions, all as in effect as of the date hereof. Subsequent developments in the tax laws of the United States, including changes in or differing interpretations of the foregoing authorities, which may be applied retroactively, could have a material effect on the tax consequences described below. This discussion only applies to shareholders who hold their OceanFreight and Ocean Rig shares as a "capital asset." This is not a complete description of all the tax consequences of the merger and may not address U.S. federal income tax considerations applicable to OceanFreight shareholders subject to special treatment under U.S. federal income tax law. Shareholders subject to special treatment include, for example, financial institutions, dealers in securities, traders in securities who elect to apply a mark-to-market method of accounting, insurance companies, tax-exempt entities, entities or arrangements treated as partnerships and other pass-through entities for U.S. federal income tax purposes and holders who hold OceanFreight shares as part of a "hedge," "straddle," "conversion" or "constructive sale" transaction.

### *Material United States Federal Income Tax Consequences of the Merger*

The following discussion summarizes certain material U.S. federal income tax consequences of the merger to a U.S. Holder (defined above) and a Non-U.S. Holder (defined above) of OceanFreight shares. This discussion applies only to OceanFreight shares owned as capital assets within the meaning of the Code.

OceanFreight did not obtain a ruling from the Internal Revenue Service or an opinion of counsel with respect to the tax consequences of the merger. This summary is not binding upon the Internal Revenue Service, and no assurance can be given that the Internal Revenue Service would not assert, or that a court would not sustain, a position contrary to any of the tax aspects set forth herein. In addition, this discussion does not address the tax consequences of these transactions under applicable U.S. federal estate, gift or alternative minimum tax laws, or any U.S. state, local or non-U.S. tax laws.

**Each OceanFreight shareholder is urged to consult with its own tax advisors to determine the U.S. federal income tax consequences to it of the merger, as well as the effects of U.S. state, local and non-U.S. tax laws.**

### *U.S. Holder*

The merger will be treated for U.S. federal income tax purposes as a taxable sale by a U.S. Holder of the OceanFreight shares that such holder surrenders in the merger. As a result of the merger,

- A U.S. Holder will recognize gain or loss equal to the difference between (1) the sum of the cash consideration (including any cash received in lieu of fractional shares) and the fair market value of the Ocean Rig shares (at the time the merger is completed) received in the merger and (2) such holder's adjusted tax basis in the OceanFreight shares surrendered in the merger;

- A U.S. Holder's adjusted tax basis in the Ocean Rig shares that such holder receives in the merger will equal the fair market value of the Ocean Rig shares at the time the merger is completed; and

- A U.S. Holder's holding period for the Ocean Rig shares that such holder receives in the merger should generally begin on the day after the completion of the merger.

Because the merger consideration consists of Ocean Rig shares in addition to cash, a U.S. Holder of OceanFreight shares may need to sell a portion of the Ocean Rig shares received in the merger, or raise cash from other sources, to pay any tax obligations resulting from the merger.

If a U.S. Holder acquired different blocks of OceanFreight stock at different times and at different prices, any gain or loss will be determined separately with respect to each such block of OceanFreight stock surrendered, and the cash and Ocean Rig shares that such holder receives will be allocated pro rata to each such block of OceanFreight stock.

Unless OceanFreight is a passive foreign investment company, or PFIC, any gain or loss that a U.S. Holder recognizes in connection with the merger will generally be capital gain or loss. Please read "Taxation — United States Federal Income Taxation of U.S. Holders — United States Federal Income Tax Treatment of Common Shares — Passive Foreign Investment Company Status and Significant United States Federal Income Tax Consequences" in OceanFreight's Annual Report on Form 20-F for the year ended December 31, 2010, included as Annex D to this proxy statement / prospectus, for a discussion of OceanFreight's view that it was not a PFIC during the 2010 taxable year and it does not expect to be a PFIC for any future taxable year. Gain or loss will be long-term capital gain or loss provided that such shareholder's holding period for such shares is more than 12 months at the effective time of the merger. If an individual shareholder's holding period for the OceanFreight shares is one year or less at the effective time of the merger, any gain will be subject to U.S. federal income tax at the same rate as ordinary income. The deductibility of capital losses is subject to limitations under the Code.

For corporations, capital gain is taxed at the same rate as ordinary income, and capital losses in excess of capital gains are not deductible. Corporations, however, generally may carry back and carry forward capital losses for certain periods.

**A holder of OceanFreight shares may be subject to "backup withholding" at a rate of 28% with respect to the amount of cash received in the merger, unless such holder provides proof of an applicable exemption or a correct taxpayer identification number, and otherwise complies with the requirements of the backup withholding rules.** Corporations and Non-U.S. Holders will generally be exempt from backup withholding, but may be required to provide a certification to establish their entitlement to the exemption. Backup withholding does not constitute an additional tax, but is merely an advance payment that may be refunded or credited against a holder's U.S. federal income tax liability if the required information is supplied to the Internal Revenue Service in a timely manner.

*Non-U.S. Holder*

Any gain realized on the receipt of Ocean Rig shares and cash in the merger by a Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax unless: (i) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States, or (ii) in the case of any gain realized by an individual Non-U.S. Holder, such holder is present in the United States for 183 days or more in the taxable year in which the merger is completed and certain other conditions are met.

This summary is of a general nature only and is not intended to be, nor should it be construed to be, tax-advice to any particular holder of OceanFreight shares. This summary does not purport to be a complete analysis or discussion of all potential tax consequences relevant to OceanFreight shareholders. **Each OceanFreight**

**shareholder is urged to consult with its own tax advisors to determine the U.S. federal income tax consequences to it of the merger, as well as the effects of U.S. state, local and non-U.S. tax laws.**

### *Material Tax Considerations with Respect to the Ownership and Disposition of Ocean Rig Common Stock*

The following is a discussion of the material Marshall Islands and U.S. federal income tax considerations relevant to an investment decision by a U.S. Holder and a Non U.S. Holder, each as defined above, with respect to the ownership and disposition of Ocean Rig common stock to be delivered as part of the merger consideration.

#### *Marshall Islands Tax Considerations*

In the opinion of Seward & Kissel LLP, Ocean Rig's Marshall Islands counsel, the following are the material Marshall Islands tax consequences of Ocean Rig's activities to Ocean Rig and Ocean Rig's shareholders. Ocean Rig is incorporated in the Marshall Islands. Under current Marshall Islands law, Ocean Rig is not subject to tax on income or capital gains, and no Marshall Islands withholding tax will be imposed upon payments of dividends by Ocean Rig to its shareholders.

#### *U.S. Federal Income Tax Considerations*

In the opinion of Seward & Kissel LLP, Ocean Rig's U.S. counsel, the following are the material U.S. federal income tax consequences relevant to the ownership of and disposition by a U.S. Holder of Ocean Rig common stock received as part of the merger consideration. The following discussion of U.S. federal income tax matters is based on the Code, judicial decisions, administrative pronouncements, and existing and proposed regulations issued by the U.S. Department of the Treasury, all of which are subject to change, possibly with retroactive effect.

#### *Distributions*

Subject to the discussion of PFICs below, any distributions made by Ocean Rig with respect to its common shares to a U.S. Holder, will generally constitute dividends, to the extent of Ocean Rig's current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of Ocean Rig's earnings and profits will be treated first as a nontaxable return of capital to the extent of the U.S. Holder's tax basis in his Ocean Rig common shares on a dollar-for-dollar basis and thereafter as capital gain. Because Ocean Rig is not a U.S. corporation, U.S. Holders that are corporations will not be entitled to claim a dividends received deduction with respect to any distributions they receive from Ocean Rig. Dividends paid with respect to the Ocean Rig common shares will generally be treated as "passive category income" or, in the case of certain types of U.S. Holders, "general category income" for purposes of computing allowable foreign tax credits for U.S. foreign tax credit purposes.

Until the Ocean Rig common shares are traded on a established securities market in the United States, Ocean Rig does not anticipate that any dividends paid on the Ocean Rig common shares will be treated as "qualified dividend income" which is taxable (through December 31, 2012 under current law) at preferential rates to U.S. Holders who are individuals, trusts or estates.

#### *Sale, Exchange or other Disposition of Ocean Rig Common Shares*

Assuming Ocean Rig does not constitute a PFIC for any taxable year, a U.S. Holder generally will recognize taxable gain or loss upon a sale, exchange or other disposition of the Ocean Rig common shares in an amount equal to the difference between the amount realized by the U.S. Holder from such sale, exchange or other disposition and the U.S. Holder's tax basis in such stock. Such gain or loss will be treated as long-term capital gain or loss if the U.S. Holder's holding period is greater than one year at the time of the sale, exchange or other disposition. Such capital gain or loss will generally be treated as U.S. source income or loss, as applicable, for U.S. foreign tax credit purposes. A U.S. Holder's ability to deduct capital losses is subject to certain limitations.

199

### *Passive Foreign Investment Company Status and Significant Tax Consequences*

Special U.S. federal income tax rules apply to a U.S. Holder that holds stock in a foreign corporation classified as a PFIC, for U.S. federal income tax purposes. In general, a foreign corporation will be treated as a PFIC with respect to a U.S. shareholder in such foreign corporation, if, for any taxable year in which such shareholder holds stock in such foreign corporation, either:

- at least 75% of the corporation's gross income for such taxable year consists of passive income (e.g., dividends, interest, capital gains and rents derived other than in the active conduct of a rental business); or

- at least 50% of the average value of the assets held by the corporation during such taxable year produce, or are held for the production of, passive income.

For purposes of determining whether a foreign corporation is a PFIC, it will be treated as earning and owning its proportionate share of the income and assets, respectively, of any of its subsidiary corporations in which it owns at least 25% of the value of the subsidiary's stock. If Ocean Rig is treated as a PFIC, then a U.S. person would be treated as indirectly owning shares of its foreign corporate subsidiaries for purposes of the PFIC rules.

Income earned by a foreign corporation in connection with the performance of services would not constitute passive income. By contrast, rental income would generally constitute "passive income" unless the foreign corporation is treated under specific rules as deriving its rental income in the active conduct of a trade or business.

Ocean Rig does not believe that it is currently a PFIC, although it may have been a PFIC for certain prior taxable years. Based on Ocean Rig's current operations and future projections, Ocean Rig does not believe that it has been, is, or will be a PFIC with respect to any taxable year beginning with the 2009 taxable year. Although Ocean Rig intends to conduct its affairs in the future in a manner to avoid being classified as a PFIC, Ocean Rig cannot assure you that the nature of its operations will not change in the future.

Special U.S. federal income tax elections have been made or will be made in respect of certain of Ocean Rig's subsidiaries. The effect of these special U.S. tax elections is to ignore or disregard the subsidiaries for which elections have been made as separate taxable entities and to treat them as part of their sole shareholder. Therefore, for purposes of the following discussion, for each subsidiary for which such an election has been made, the shareholder of such subsidiary, and not the subsidiary itself, will be treated as the owner of the subsidiary's assets and as receiving the subsidiary's income.

As discussed more fully below, if Ocean Rig were to be treated as a PFIC for any taxable year, a U.S. Holder would be subject to different taxation rules depending on whether the U.S. Holder makes an election to treat Ocean Rig as a "Qualified Electing Fund," which election Ocean Rig refers to as a "QEF election." In addition, if Ocean Rig were to be treated as a PFIC for any taxable year after 2010, a U.S. Holder would be required to file an annual report with the Internal Revenue Service for that year with respect to such holder's Ocean Rig common shares.

A U.S. Holder who owns shares in a PFIC is permitted to make a "mark-to-market" election with respect to such stock if the stock is treated as "marketable stock." Ocean Rig does not anticipate that its stock will be treated as "marketable stock" for purposes of the PFIC rules and the remainder of this discussion assumes that a U.S. Holder of Ocean Rig common shares will not be able to make a "mark-to-market" election.

#### *Taxation of U.S. Holders Making a Timely QEF Election*

If a U.S. Holder makes a timely QEF election, which U.S. Holder is referred to as an "Electing Holder," the Electing Holder must report each year for U.S. federal income tax purposes his pro rata share of Ocean Rig's ordinary earnings and net capital gain, if any, for Ocean Rig's taxable year that ends with or within the taxable year of the Electing Holder, regardless of whether or not distributions were received from Ocean Rig by the Electing Holder. The Electing Holder's adjusted tax basis in his Ocean Rig common shares will be increased to reflect taxed but undistributed earnings and profits. Distributions of earnings and profits that had been previously taxed will result in a corresponding reduction in the adjusted tax basis in his Ocean Rig common shares and will not be taxed again once distributed. An Electing Holder would generally recognize capital gain or loss on the sale, exchange or other disposition of Ocean Rig common shares. A U.S. Holder would make a QEF election with respect to any year that Ocean Rig is a PFIC by filing Internal Revenue Service Form 8621 with his U.S. federal income tax return. If

Ocean Rig was aware that it was to be treated as a PFIC for any taxable year, Ocean Rig would, if possible, provide each U.S. Holder with all necessary information in order to make the QEF election described above. It should be noted that Ocean Rig may not be able to provide such information if it did not become aware of its status as a PFIC in a timely manner.

### Taxation of U.S. Holders Not Making a Timely QEF Election

Finally, if Ocean Rig was to be treated as a PFIC for any taxable year, a U.S. Holder who does not make a QEF election for that year, whom Ocean Rig refers to as a "Non-Electing Holder," would be subject to special rules with respect to (1) any excess distribution (i.e., the portion of any distributions received by the Non-Electing Holder on the Ocean Rig common shares in a taxable year in excess of 125% of the average annual distributions received by the Non-Electing Holder in the three preceding taxable years, or, if shorter, the Non-Electing Holder's holding period for the Ocean Rig common shares) and (2) any gain realized on the sale, exchange or other disposition of the Ocean Rig common shares. Under these special rules:

- the excess distribution or gain would be allocated ratably over the Non-Electing Holder's aggregate holding period for his Ocean Rig common shares;

- the amount allocated to the current taxable year and any taxable year before Ocean Rig became a PFIC would be taxed as ordinary income; and

- the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for the applicable class of taxpayer for that year, and an interest charge for the deemed deferral benefit would be imposed with respect to the resulting tax attributable to each such other taxable year.

These penalties would not apply to a pension or profit sharing trust or other tax-exempt organization that did not borrow funds or otherwise utilize leverage in connection with its acquisition of Ocean Rig common shares. If a Non-Electing Holder who is an individual dies while owning Ocean Rig common shares, such holder's successor generally would not receive a step-up in tax basis with respect to such stock.

### ***Backup Withholding and Information Reporting***

In general, dividend payments, or other taxable distributions, made within the United States to a U.S. Holder will be subject to information reporting requirements. Such payments will also be subject to backup withholding tax if paid to a non-corporate U.S. Holder who:

- fails to provide an accurate taxpayer identification number;

- is notified by the Internal Revenue Service that he has failed to report all interest or dividends required to be shown on his federal income tax returns; or

- in certain circumstances, fails to comply with applicable certification requirements.

Backup withholding tax is not an additional tax. Rather, a taxpayer generally may obtain a refund of any amounts withheld under backup withholding rules that exceed the taxpayer's income tax liability by filing a refund claim with the Internal Revenue Service.

### Other Tax Considerations

In addition to the tax consequences discussed above, Ocean Rig may be subject to tax in one or more other jurisdictions where Ocean Rig conducts activities. The amount of any such tax imposed upon Ocean Rig's operations may be material.

## ENFORCEABILITY OF OCEAN RIG CIVIL LIABILITIES

Ocean Rig is a Marshall Islands company and Ocean Rig's principal administrative offices are located outside the United States in Nicosia, Cyprus. A majority of Ocean Rig's directors, officers and the experts named in this proxy statement / prospectus reside outside the United States. In addition, a substantial portion of Ocean Rig's assets

and the assets of Ocean Rig's subsidiaries, directors, officers and experts are located outside of the United States. As a result, it may be difficult or impossible for U.S. investors to serve process within the United States upon Ocean Rig or any of these persons. U.S. investors may also have difficulty enforcing, both in and outside the United States, judgments they may obtain in United States courts against Ocean Rig or these persons in any action, including actions based upon the civil liability provisions of U.S. federal or state securities laws.

Furthermore, there is substantial doubt that courts in the countries in which Ocean Rig or its subsidiaries are incorporated or where Ocean Rig's assets or the assets of its subsidiaries, directors or officers and such experts are located (i) would enforce judgments of U.S. courts obtained in actions against Ocean Rig or its subsidiaries, directors or officers and such experts based upon the civil liability provisions of applicable U.S. federal and state securities laws or (ii) would enforce, in original actions, liabilities against Ocean Rig or its subsidiaries, directors or officers and such experts based on those laws.

## LEGAL MATTERS

The validity of the shares of Ocean Rig common stock offered hereby and other matters relating to Marshall Islands and U.S. law will be passed upon for Ocean Rig by Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004.

## EXPERTS

The consolidated financial statements of OceanFreight as of December 31, 2010 and 2009 for each of the three years in the period ended December 31, 2010, appearing in OceanFreight's Form 20-F included as Annex D to this proxy statement / prospectus have been audited by Ernst & Young (Hellas) Certified Auditors Accountants S.A., independent registered public accounting firm, as set forth in their report thereon, appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of Ocean Rig UDW at December 31, 2010 and 2009 and each of the three years in the period ended December 31, 2010, appearing in this proxy statement / prospectus have been audited by Ernst & Young AS, independent registered public accounting firm, as set forth in their report thereon, appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

The consolidated financial statements of Ocean Rig ASA at May 14, 2008, and for the period from January 1, 2008 to May 14, 2008, appearing in this proxy statement / prospectus have been audited by Ernst & Young AS, independent registered public accounting firm, as set forth in their report thereon appearing elsewhere herein, and are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

The sections in this proxy statement / prospectus entitled "Ocean Rig Summary," "Risk Factors," "Ocean Rig Management's Discussion and Analysis of Ocean Rig's Financial Condition and Results of Operation" and "Business" have been reviewed by Fearnley Offshore AS and the section entitled "The Offshore Drilling Industry" has been supplied by Fearnley Offshore AS, which has confirmed to Ocean Rig that such sections accurately describe, to the best of its knowledge, the offshore drilling industry.

## INFORMATION PROVIDED BY OCEAN RIG

Ocean Rig will furnish holders of Ocean Rig's common shares with annual reports containing audited financial statements and a report by Ocean Rig's independent registered public accounting firm. The audited financial statements will be prepared in accordance with U.S. GAAP. As a "foreign private issuer," Ocean Rig is exempt from the rules under the Exchange Act prescribing the furnishing and content of proxy statements to shareholders. While Ocean Rig furnishes proxy statements to shareholders in accordance with the rules of any stock exchange on which Ocean Rig's common shares may be listed in the future, those proxy statements will not conform to Schedule 14A of the proxy rules promulgated under the Exchange Act. In addition, as a "foreign private issuer," Ocean Rig's officers and directors are exempt from the rules under the Exchange Act relating to short swing profit reporting and liability.

**OCEAN RIG ASA**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of May 14, 2008 | F-3 |
| Consolidated Statements of Operations for the period ended May 14, 2008 | F-4 |
| Consolidated Statements of Stockholder' s Equity for the period ended May 14, 2008 | F-5 |
| Consolidated Statements of Cash Flows for the period ended May 14, 2008 | F-6 |
| Notes to Consolidated Financial Statements | F-7 |

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of
Ocean Rig UDW Inc.

We have audited the accompanying consolidated balance sheet of Ocean Rig ASA ("the Company") as of May 14, 2008, and the related consolidated statements of operations, stockholder's equity and cash flows for the period January 1, 2008 through May 14, 2008. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Ocean Rig ASA at May 14, 2008, and the consolidated results of its operations and its cash flows for the period January 1, 2008 through May 14, 2008, in conformity with U.S. generally accepted accounting principles.

/s/  ERNST & YOUNG AS
ERNST & YOUNG AS

Stavanger, Norway
February 3, 2011

F-2

# OCEAN RIG ASA

### Consolidated Balance Sheets
### As of May 14, 2008
### (Expressed in thousands of U.S. Dollars — except for share and per share data)

| | May 14, 2008 |
|---|---|
| **ASSETS** | |
| **CURRENT ASSETS:** | |
| Cash and cash equivalents | $         — |
| Restricted cash (Note 4) | 31,110 |
| Trade accounts receivable | 40,188 |
| Due from related parties (Note 3) | 15 |
| Financial instruments (Note 7) | 923 |
| Deferred operating expenses | 5,359 |
| Prepayments and advances | 18,670 |
| Other current assets | 206 |
| **Total current assets** | 96,471 |
| **FIXED ASSETS, NET:** | |
| Drilling rigs, machinery and equipment, net (Note 5) | 1,132,867 |
| **Total fixed assets, net** | 1,132,867 |
| **OTHER NON-CURRENT ASSETS:** | |
| Other non-current assets | — |
| **Total other non-current assets** | — |
| **Total assets** | 1,229,338 |
| | |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | |
| **CURRENT LIABILITIES:** | |
| Current portion of long-term debt (Note 6) | 490,198 |
| Accounts payable | 9,399 |
| Accrued liabilities | 27,528 |
| Deferred revenue | 6,668 |
| Financial instruments (Note 7) | 621 |
| Other current liabilities | 4,265 |
| **Total current liabilities** | 538,679 |
| **NON-CURRENT LIABILITIES** | |
| Long-term debt, net of current portion (Note 6) | 281,307 |
| Financial instruments (Note 7) | — |
| Pension liability (Note 8) | 2,470 |
| **Total non-current liabilities** | 283,777 |
| **COMMITMENTS AND CONTINGENCIES** (Note 15) | |
| **STOCKHOLDER'S EQUITY:** | |
| Common stock, $0.01 par value; 170,374,980 shares authorized at December 31, 2007 and May 14, 2008;170,374,980 shares issued and 162,171,380 outstanding at December 31, 2007 and May 14, 2008, respectively | 132,109 |
| Additional paid-in capital | 618,131 |
| Treasury stock, 8,203,600 common shares, at par value, at December 31, 2007 and May 14, 2008, respectively | (6,361) |
| Accumulated other comprehensive income | 105,447 |
| (Accumulated deficit)/Retained earnings | (442,444) |
| **Total stockholder's equity** | 406,882 |
| **Total liabilities and stockholder's equity** | 1,229,338 |

The accompanying notes are an integral part of these consolidated financial statements.

F-3

**OCEAN RIG ASA**

**Consolidated Statements of Operations**
**For the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

|  | Period from January 1, to May 14, 2008 |
|---|---:|
| **REVENUES:** | |
| Leasing revenues | $  60,078 |
| Service revenues | 39,094 |
|  | 99,172 |
| **EXPENSES:** | |
| Drilling rigs operating expenses exclusive of items shown separately below (Note 9) | 48,144 |
| Depreciation and amortization (Note 5) | 19,367 |
| General and administrative expenses | 12,140 |
| **Operating income** | 19,521 |
| **OTHER INCOME / (EXPENSES):** | |
| Interest and finance costs (Note 10) | (41,661) |
| Interest income | 381 |
| Other, net (Note 7) | — |
| **Total expenses, net** | (41,280) |
| **LOSS BEFORE INCOME TAXES** | (21,759) |
| Income taxes (Note 13) | (1,637) |
| **NET LOSS** | (23,396) |
| **EARNINGS/(LOSS) PER SHARE, BASIC AND DILUTED** (Note 12) | $      (0.14) |
| **WEIGHTED AVERAGE NUMBER OF SHARES, BASIC AND DILUTED** | 162,171,380 |

The accompanying notes are an integral part of these consolidated financial statements

F-4

**OCEAN RIG ASA**

**Consolidated of Stockholder's Equity**
**For the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

| | Comprehensive Loss | Common Stock | | Additional Paid-in Capital | Treasury Stock | Accumulated Other Comprehensive Income | Retained Earnings | Total Stockholder's Equity |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | # of Shares | Par Value | | | | | |
| **BALANCE, December 31, 2007** | | 170,374,980 | 132,109 | 615,453 | (6,361) | 107,735 | (419,048) | 429,888 |
| — Net loss | (23,396) | — | — | — | — | — | (23,396) | (23,396) |
| — Translation differences | (732) | — | — | — | — | (732) | — | (732) |
| — Option program | — | — | — | 2,678 | — | — | — | 2,678 |
| — Increase/(decrease) in defined benefit plan adjustment, net of tax of $0 (Note 13) | (1,257) | — | — | — | — | (1,257) | — | (1,257) |
| — Interest swap loss , net of tax of $0 (Note 13) | (299) | — | — | — | — | (299) | — | (299) |
| Comprehensive income | 25,684 | | | | | | | |
| **BALANCE, May 14, 2008** | | 170,374,980 | 132,109 | 618,131 | (6,361) | 105,447 | (442,444) | $ 406,882 |

The accompanying notes are an integral part of these consolidated financial statements.

F-5

**OCEAN RIG ASA**

**Consolidated Statements of Cash Flows**
**For the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

| | Period from January 1 - May 14, 2008 |
|---|---:|
| **Cash Flows from Operating Activities:** | |
| Net loss | (23,396) |
| Adjustments to reconcile net income to net cash provided by operating activities: | |
| Depreciation and amortization | 19,367 |
| Amortization, write off of financing costs and premium paid over withdrawn loans | 22,680 |
| Loss on disposal of assets | |
| Compensation costs related to share option program | 2,678 |
| Difference between pension cost and pension paid | — |
| Change in fair value of derivatives | (46) |
| Net unrealized foreign currency exchange gain / loss | — |
| **Changes in operating assets and liabilities:** | |
| Trade receivable | (27,413) |
| Other current assets | 3,429 |
| Due from related parties | (15) |
| Accounts payable | (4,271) |
| Income taxes paid | 546 |
| Other current liabilities | (918) |
| Other prepaid/ Pension liability | 611 |
| Accrued liabilities | (19,228) |
| Deferred revenue | 6,668 |
| Change in restricted cash | (9,781) |
| **Net Cash Provided by/(Used in) Operating Activities** | (29,089) |
| **Cash Flows from Investing Activities:** | |
| Drilling rigs, equipment and other improvements | (10,463) |
| **Net Cash Used in Investing Activities** | (10,463) |
| **Cash Flows from Financing Activities:** | |
| Proceeds from long-term credit facility | — |
| Proceeds from short-term credit facility | 193,500 |
| Payments of short-term credit facility | (10,000) |
| Principal payments and repayments of long-term debt | (167,920) |
| Repurchase of shares | — |
| Payment of financing costs | (7,030) |
| **Net Cash (Used in) /Provided by Financing Activities** | 8,550 |
| **Net increase in cash and cash equivalents** | (31,002) |
| Net foreign exchange difference | — |
| **Cash and cash equivalents at beginning of period** | 31,002 |
| **Cash and cash equivalents at end of period** | — |
| **SUPPLEMENTAL CASH FLOW INFORMATION:** | |
| Cash paid during the year/period for: | |
| Interest, net of amount capitalized | (22,628) |
| Income taxes | (546) |

The accompanying notes are an integral part of these consolidated financial statements.

F-6

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

**1. Basis of Presentation and General Information:**

Ocean Rig ASA, a Norwegian registered entity incorporated on September 26, 1996, was a public limited company whose shares were traded on the Oslo Stock Exchange from 1997 until July 21, 2008. On December 20, 2007, Primelead Limited, a wholly-owned subsidiary of DryShips, a company listed on NASDAQ, acquired 30.4% of the issued shares of Ocean Rig ASA. On May 14, 2008, Primelead Ltd. obtained control of Ocean Rig and Ocean Rig ASA became a consolidated subsidiary of DryShips Inc. Effective July 10, 2008, Primelead Ltd. owned 100% of the shares in Ocean Rig ASA. Subsequently, the operations of Ocean Rig ASA have been internally reorganized and in some cases re-domiciled as part of the DryShips Inc. group. As a result, Ocean Rig ASA filed for liquidation in January 2009 and distributed of all significant assets to Primelead Ltd., as a liquidation dividend, including the shares in all its subsidiaries on December 15, 2009. In 2009, it was also resolved to liquidate several other subsidiaries as a part of a restructuring of the DryShips Inc. group.

Ocean Rig ASA has its origins from 1996, when Ocean Rig ASA ordered four hulls. The 5th generation drilling rigs *Leiv Eiriksson* and *Eirik Raude* were delivered in 2001 and 2002, while two remaining hulls were sold. Ocean Rig UDW owns and operates two semi-submersible offshore drilling rigs that are among the worlds largest drilling rigs, built for ultra deep-waters and extreme weather conditions.

*Basis of consolidation*

The consolidated financial statements of Ocean Rig ASA comprise the financial statements of Ocean Rig ASA and its subsidiaries (the "Company" or the "Group") as of the balance sheet date. Subsidiaries are fully consolidated from the date of acquisition, being the date on which the Group obtains control, and continue to be consolidated until the date that such control ceases. The financial statements of the subsidiaries are prepared for the same reporting year as the parent company, using consistent accounting policies.

**2. Significant Accounting policies:**

*(a) Principles of Consolidation:*

The accompanying consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("US GAAP") and include the accounts and operating results of Ocean Rig ASA and its wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated on consolidation.

*(b) Use of Estimates:*

The preparation of consolidated financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*(c) Current and non-current classification* **:**

Receivables and liabilities are classified as current assets and current liabilities, respectively, if their maturity is within one year of the balance sheet date. Otherwise, they are classified as non-current assets and non-current liabilities.

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

### (d) Cash and Cash Equivalents:

The Company considers highly liquid investments such as time deposits and certificates of deposit with an original maturity of three months or less to be cash equivalents.

### (e) Restricted Cash:

Restricted cash may include (i) retention accounts which can only be used to fund the loan installments coming due; (ii) minimum liquidity requirements under the loan facilities; (iii) taxes withheld from employees and deposited in designated bank accounts; and (iv) amounts pledged as collateral for bank guarantees to suppliers.

In terms of the loan agreements, restricted cash includes additional minimum cash deposits required to be maintained with certain banks under the Company's borrowing arrangements.

### (f) Trade Accounts Receivable:

The amount shown as accounts receivable, trade, at each balance sheet date, includes receivables from charterers for hire of drilling rigs and related billings, net of a provision for doubtful accounts. At each balance sheet date, all potentially uncollectible accounts are assessed individually for purposes of determining the appropriate provision for doubtful accounts. There were no provisions for doubtful debt at May 14, 2008.

### (g) Related parties:

Parties are related if one party has the ability, directly or indirectly, to control the other party or exercise significant influence over the other party in making financial and operating decisions. Parties are also related if they are subject to common control or common significant influence. Related parties also include members of the Company's or its parent company's management or owners and their immediate families (Note 4).

### (h) Derivatives:

The Company's derivatives include interest rate swaps and foreign currency forward contracts. The guidance on accounting for certain derivative instruments and certain hedging activities requires all derivative instruments to be recorded on the balance sheet as either an asset or liability measured at its fair value, with changes in fair value recognized in earnings unless specific hedge accounting criteria are met.

### (i) Hedge Accounting:

At the inception of a hedge relationship, the Company formally designates and documents the hedge relationship to which the Company wishes to apply hedge accounting and the risk management objective and strategy undertaken for the hedge. The documentation includes identification of the hedging instrument, hedged item or transaction, the nature of the risk being hedged and how the entity will assess the hedging instrument's effectiveness in offsetting exposure to changes in the hedged item's cash flows attributable to the hedged risk. Such hedges are expected to be highly effective in achieving offsetting changes in cash flows and are assessed on an ongoing basis to determine whether they actually have been highly effective throughout the financial reporting periods for which they were designated. The Company is party to interest swap agreements where it receives a floating interest rate and pays a fixed interest rate for a certain period in exchange. Certain contracts which meet the criteria for hedge accounting are accounted for as cash flow hedges.

A cash flow hedge is a hedge of the exposure to variability in cash flows that is attributable to a particular risk associated with a recognized asset or liability, or a highly probable forecasted transaction that could affect profit or loss.

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

The effective portion of the gain or loss on the hedging instrument is recognized directly as a component of other comprehensive income in equity, while any ineffective portion, if any, is recognized immediately in current period earnings.

The Company discontinues cash flow hedge accounting if the hedging instrument expires and it no longer meets the criteria for hedge accounting or designation is revoked by the Company. At that time, any cumulative gain or loss on the hedging instrument recognized in equity is kept in equity until the forecasted transaction occurs. When the forecasted transaction occurs, any cumulative gain or loss on the hedging instrument is recognized in profit or loss. If a hedged transaction is no longer expected to occur, the net cumulative gain or loss recognized in equity is transferred to net profit or loss for the year as financial income or expense.

*(ii) Other Derivatives:*

Changes in the fair value of derivative instruments that have not been designated as hedging instruments are reported in current period earnings under "Gain/(loss) on interest rate swaps" and "Other income/ (expenses)".

*(i) Guidance Fair Value Measurements:*

Effective January 1, 2008, the Company adopted the guidance "Fair Value Measurements and Disclosures". In addition, on January 1, 2008, the Company made no election to account for its monetary assets and liabilities at fair values as allowed by ASU guidance for financial instruments (Note 8).

*(j) Concentration of Credit Risk:*

Financial instruments, which potentially subject the Company to significant concentrations of credit risk, consist principally of cash and cash equivalents; trade accounts receivable and derivative contracts (interest rate swaps and foreign currency contracts). The Company places its cash and cash equivalents, consisting mostly of deposits, with qualified financial institutions. The Company performs periodic evaluations of the relative credit standing of those financial institutions. The Company is exposed to credit risk in the event of non-performance by counter parties to derivative instruments; however, the Company limits its exposure by diversifying among counter parties. The Company's customers are mainly major oil companies. The credit risk has therefore determined by the Company to be low. When considered necessary, additional arrangements are put in place to minimize credit risk, such as letters of credit or other forms of payment guarantees. The Company limits its credit risk with trade accounts receivable by performing ongoing credit evaluations of its customer's financial condition and generally does not require collateral for its trade accounts receivable.

*(k) Capitalized interest:*

Interest expenses are capitalized during construction of newbuildings based on accumulated expenditures for the applicable project at the Company's current rate of borrowing. The amount of interest expense capitalized in an accounting period is determined by applying an interest rate ("the capitalization rate") to the average amount of accumulated expenditures for the asset during the period. The capitalization rates used in an accounting period are based on the rates applicable to borrowings outstanding during the period. The Company does not capitalize amounts beyond the actual interest expense incurred in the period.

If the Company's financing plans associate a specific new borrowing with a qualifying asset, the Company uses the rate on that borrowing as the capitalization rate to be applied to that portion of the average accumulated expenditures for the asset that does not exceed the amount of that borrowing. If average accumulated expenditures for the asset exceed the amounts of specific new borrowings associated with the a asset, the capitalization rate to be applied to such excess shall be a weighted average of the rates applicable to other borrowings of the Company.

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

*(l) Drilling Rigs, Machinery and Equipment, Net:*

Drilling rigs are stated at historical cost less accumulated depreciation. Such costs include the cost of adding or replacing parts of drilling rig machinery and equipment when that cost is incurred, if the recognition criteria are met. The recognition criteria require that the cost incurred extends the useful life of a drilling rig. The carrying amounts of those parts that are replaced are written off and the cost of the new parts is capitalized. Depreciation is calculated on a straight-line basis over the useful life of the assets as follows: bare deck 30 years and other asset parts 5 to 15 years.

Drilling rig machinery and equipment, IT and office equipment, are recorded at cost and are depreciated on a straight-line basis over the estimated useful lives, for Drilling rig machinery and equipment over 5-15 years and for IT and office equipment over 5 years.

*(m) Leases:*

The determination of whether an arrangement is, or contains a lease is based on the substance of the arrangement at inception date and considers whether the fulfillment of the arrangement is dependent on the use of a specific asset or assets or the arrangement conveys a right to use the asset. A reassessment is made after inception of the lease only if one of the following applies:

a) There is a change in contractual terms, other than a renewal or extension of the arrangement;

b) A renewal option is exercised or extension granted, unless the term of the renewal or extension was initially included in the lease term;

c) There is a change in the determination of whether fulfillment is dependent on a specified asset; or

d) There is a substantial change of asset.

Where a reassessment is made, lease accounting commences or ceases from the date when the change in circumstances gives rise to the reassessment for scenarios a), c) or d) and the date of renewal or extension period for scenario b).

*(n) Impairment of Long-Lived Assets:*

The Company reviews for impairment long-lived assets held and used whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. In this respect, when required, the Company reviews its assets for impairment on drilling rig by drilling rig basis. When the estimate of undiscounted cash flows, excluding interest charges, expected to be generated by the use of the asset is less than its carrying amount, the Company evaluates the asset for impairment loss. The impairment loss is determined by the difference between the carrying amount of the asset and the fair value of the asset.

As at May 14, 2008 **,** the Company performed an impairment review of the Company's long-lived assets due to the global economic downturn, the significant decline in charter rates in the drillship industry and the outlook of the oil services industry. The Company compared undiscounted cash flows with the carrying values of the Company's long-lived assets to determine if the assets were impaired. In developing estimates of future cash flows, the Company relied upon assumptions made by management with regard to the Company's drilling rigs, including future charter rates, utilization rates, operating expenses, future dry docking costs and the estimated remaining useful lives of the drilling rigs.

These assumptions are based on historical trends as well as future expectations in line with the Company's historical performance and the Company's expectations for future fleet utilization under its current fleet deployment strategy, and are consistent with the plans and forecasts used by management to conduct its business. The

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

variability of these factors depends on a number of conditions, including uncertainty about future events and general economic conditions; therefore, the Company's accounting estimates might change from period to period. As a result of the impairment review, the Company determined that the carrying amounts of its assets held for use were recoverable, and therefore, concluded that no impairment loss was necessary for 2008.

*(o) Deferred Financing Costs:*

Deferred financing costs include fees, commissions and legal expenses associated with the Company's long-term debt and are recorded net with the underlying debt. These costs are amortized over the life of the related debt using the effective interest method and are included in interest expense. Unamortized fees relating to loans repaid or refinanced as debt extinguishments are expensed as interest and finance costs in the period the repayment or extinguishment is made.

*(p) Pension and retirement benefit obligation:*

The Company has five retirement benefit plans for employees, which are managed and funded through Norwegian life insurance companies. The projected benefit obligations are calculated based on projected unit credit method, and compared with the fair value of pension assets.

Because a significant portion of the pension liability will not be paid until well into the future, numerous assumptions have to be made when estimating the pension liability at the balance sheet date. The assumption may be split into two categories; actuarial assumptions and financial assumptions. The actuarial assumptions are unbiased, mutually compatible and represent the Company's best estimates of the variables. The financial assumptions are based on market expectations at the balance sheet date, for the period over which the obligations are to be settled. Due to the long-term nature of the pension obligations, they are discounted to present value.

The funded status or net amount of the projected benefit obligations and pension asset (net pension liability or net pension asset) of each defined of its defined benefit plans, is recorded in the balance sheet under the captions long-term liabilities and non-current assets with an offsetting amount in accumulated other comprehensive income for any amounts of actuary gains of losses or prior service cost that has not been amortized to income.

Net pension costs (benefit earned during the period including interest on the projected benefit obligation, less estimated return on pension assets and amortization of accumulated changes in estimates) are included in "General and administrative expenses" (administrative employees) and Rig operating expenses" (rig employees).

Actuarial gains and losses are recognized as income or expense when the net cumulative unrecognized actuarial gains and losses for each individual plan at the end of the previous reporting year exceed 10% of the higher of the present value of the defined benefit obligation and the fair value of plan assets at that date. These gains and losses are recognized over the expected average remaining working lives of the employees participating in the plans.

*(q) Provisions:*

A provision is recognized in the balance sheet when the Company has a present legal or constructive obligation as a result of a past event, and it is probable that an outflow of economic benefits will be required to settle the obligation and a reliable estimate of the amount can be made. If the effect is material, provisions are determined by discounting the expected future cash flows at a pre-tax rate that reflects current market assessments of the time value of money and, where appropriate, the risks specific to the liability.

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

*(r)  Revenue and Related Expenses:*

*Revenues:*  The Company's services and deliverables are generally sold based upon contracts with its customers that include fixed or determinable prices. The Company recognizes revenue when delivery occurs as directed by our customer or the customer assumes control of physical use of the asset and collectability is reasonably assured. The Company evaluates if there are multiple-deliverables within its contracts and whether the agreement conveys the right to use the drill rigs for a stated period of time and meet the criteria for lease accounting, in addition to providing a drilling services element, which are generally compensated for by day rates. In connection with drilling contracts, the company may also receive revenues for preparation and mobilization of equipment and personnel or for capital improvements to the drilling rigs and day rate or fixed price mobilization and demobilization fees. There are two types of drilling contracts: well contracts and term contracts.

*Well contracts:*  These are contracts where the assignment is to drill a certain number of wells. Revenue from day rate based compensation for drilling operations is recognized in the period during which the services are rendered at the rates established in the contracts. All mobilization revenues, direct incremental expenses of mobilization and contributions from customers for capital improvements initially deferred and recognized as revenues over the estimated duration of the drilling period. To the extent that expenses exceed revenue to be recognized, it is expensed as incurred. Demobilization revenues and expenses are recognized over the demobilization period. All revenues for well contracts are recognized as "Service revenues" in the statement of operations.

*Term contracts:*  These are contracts where the assignment is to operate the unit for a specified period of time. For these types of contracts the Company determines whether the arrangement is a multiple element arrangement containing both a lease element and drilling services element. For revenues derived from contracts that contain a lease, the lease elements are recognized as "Leasing revenues" in the statement of operations on a basis approximating straight line over the lease period. The drilling services element is recognized as "Service revenues" in the period in which the services are rendered at rates at fair value. Revenues related to the drilling element of mobilization and direct incremental expenses of drilling services are deferred and recognized over the estimated duration of the drilling period. To the extent that expenses exceed revenue to be recognized, it is expensed as incurred. Demobilization fees and expenses are recognized over the demobilization period. Contributions from customers for capital improvements are initially deferred and recognized as revenues over the estimated duration of the drilling contract.

*(s)  Class costs:*

The Company follows the direct expense method of accounting for periodic class costs incurred during special surveys of drilling rigs, normally every five years. Class costs and other maintenance costs are expensed in the period incurred and included in drilling rigs operating expenses.

*(t)  Foreign Currency Translation:*

The functional currency of the Company is the U.S. Dollar since the Company operates in international shipping and drilling markets, and therefore primarily transacts business in U.S. Dollars. The Company's accounting records are maintained in U.S. Dollars. Transactions involving other currencies during the year are converted into U.S. Dollars using the exchange rates in effect at the time of the transactions. At the balance sheet dates, monetary assets and liabilities, which are denominated in other currencies, are translated into U.S. Dollars at the year-end exchange rates. Resulting gains or losses are included in "General and administrative expenses" in the accompanying consolidated statements of operations.

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

*(u) Income Taxes:*

Income taxes have been provided for based upon the tax laws and rates in effect in the countries in which the Company's operations are conducted and income is earned. There is no expected relationship between the provision for/or benefit from income taxes and income or loss before income taxes because the countries in which the Company operates have taxation regimes that vary not only with respect to the nominal rate, but also in terms of the availability of deductions, credits and other benefits. Variations also arise because income earned and taxed in any particular country or countries may fluctuate from year to year. Deferred tax assets and liabilities are recognized for the anticipated future tax effects of temporary differences between the financial statement basis and the tax basis of the Company assets and liabilities using the applicable jurisdictional tax rates in effect at the year end. A valuation allowance for deferred tax assets is recorded when it is more likely than not that some or all of the benefit from the deferred tax asset will not be realized. The Company accrues interest and penalties related to its liabilities for unrecognized tax benefits as a component of income tax expense.

*(v) Stock-based compensation:*

Stock-based compensation represents non-vested common stock granted to employees and directors, for their services. The Company calculates total compensation expense for the award based on its fair value on the grant date and amortizes the total compensation on a straight-line basis over the vesting period of the award or service period.

*(w) Earnings/(loss) per Common Share:*

Basic earnings per share ("EPS") is calculated by dividing net income available to common stockholder' s by the weighted average number of common shares outstanding during the year. Diluted earnings per common share reflect the potential dilution that could occur if securities or other contracts to issue common stock were exercised. Dilution has been computed using the treasury stock method.

*(x) Business segment:*

Offshore drilling operations represent the Company's only segment.

*(y) Treasury Stock:*

The Company accounts for treasury stock using the par-value method, whereby only the par value of acquired treasury shares is reflected as a separate component of stockholder's equity.

*(z) Recent accounting pronouncements:*

In December 2007, new guidance, an amendment of ARB No. 51, established accounting and reporting standards for ownership interests in subsidiaries held by parties other than the parent, the amount of consolidated net income attributable to the parent and to the noncontrolling interest, changes in a parent's ownership interest, and the valuation of retained noncontrolling equity investments when a subsidiary is deconsolidated. The new guidance also establishes disclosure requirements that clearly identify and distinguish between the interests of the parent and the interests of the noncontrolling owners. The above-mentioned guidance was effective for fiscal years beginning after December 15, 2008, and will be adopted by the Company in the first quarter of 2009. The adoption of the new guidance did not have a material impact on the Company's consolidated financial statements. The new guidance related to presentation and disclosure was retroactively applied to the consolidated statements as required.

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

**3.  Transactions with Related Parties:**

As of May 14, 2008, the Company had an account receivable of $15 due from DryShips. The amount was related to certain reimbursable expenses. There were no transactions between the Company and DryShips that had an impact on the statement of operations.

**4.  Restricted cash:**

Restricted cash includes cash pledged as collateral for bank guarantees to suppliers and to employee tax withholding amounts, as well as minimum cash requirement under the facility at May 14, 2008.

The amounts included in the accompanying consolidated balance sheets are as follows:

|  | May 14, 2008 |
|---|---|
| **Balance Sheet** | |
| Amount pledged as collateral for bank guarantees to suppliers | $        53 |
| Taxes withheld from employees | 1,267 |
| Minimum cash requirement | 29,790 |
| Total | $    31,110 |

**5.  Fixed assets:**

The amounts in the accompanying consolidated balance sheets are analyzed as follows:

*Drilling rigs, machinery and equipment, net:*

|  | Cost | Accumulated Depreciation | Net Book Value |
|---|---|---|---|
| Balance December 31, 2007 | 1,388,484 | (246,714) | 1,141,771 |
| Additions | 10,463 | — | 10,463 |
| Disposals | — | — | — |
| Depreciation | — | (19,367) | (19,367) |
| Balance May 14, 2008 | $1,398,947 | (266,081) | $1,132,867 |

As of May 14, 2008, all of the Company's drilling rigs have been pledged as collateral to secure the bank loans (Note 6).

**6.  Long-term Debt:**

The amount of long-term debt shown in the accompanying consolidated balance sheets is analyzed as follows:

|  | May 14, 2008 |
|---|---|
| Loan Facilities | $  776,000 |
| Less: Deferred financing costs | (4,495) |
| Total debt | 771,505 |
| Less: Current portion | (490,198) |
| Long-term portion | $  281,307 |

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

*Loan Facilities*

*a) 450,000 Credit Facility*

On June 13, 2005, the Company entered into a "450,000 Credit Facility" agreement with a bank to refinance outstanding debt and for general corporate purposes.

The facility includes a reducing revolving credit facility of $430,000 and a non-reducing $20,000 guarantee and hedging facility. The reducing revolving credit facility consists of three tranches of $280,000 (tranche A), $100,000 (tranche B) and $50,000 (tranche C). A tranche D of $60,000 was established in February 2007.

The table below shows the current commitment and utilization of the facility as per May 14, 2008.

|  | Commitment | Utilization |
|---|---|---|
| Tranche A | $ 227,500 | $227,500 |
| Tranche B | 55,000 | 55,000 |
| Tranche C | 12,500 | 12,500 |
| Tranche D | 60,000 | 60,000 |
| Tranche E | 171,000 | 171,000 |
| **Total Facility** | $ 526,000 | $526,000 |
| Uncommitted guarantee and hedging facility | 20,000 | |

On April 17, 2008, $171,000 was drawn as short- term debt on the facility (Tranche E) to refinance the 2005 Notes described below.

The facility includes covenants typical for bank loans, including inter-alia restrictions on additional indebtedness, creation of liens, sale of assets, payments of dividends, minimum unrestricted cash and certain financial covenants such as interest cover ratio, gearing ratio, maintaining a positive working capital and minimum value adjusted equity. The Company was in compliance with all financial covenants at May 14, 2008.

The borrower under the loan agreement is Ocean Rig Norway AS. In addition Ocean Rig ASA and the two rig companies owning *Leiv Eiriksson* and *Eirik Raude* have fully and unconditionally guaranteed the Facility on a joint and several basis. The facility is secured by a first priority mortgage in respect of *Leiv Eiriksson* and *Eirik Raude* and related assets.

Interest is payable at the end of each interest period, at least semi-annually in arrears.

Interest on the facility accrues at a rate equal to LIBOR plus a variable margin, which will be calculated quarterly based on the aggregate value of the Company's contract backlog as of the end of the previous quarter. Interest is payable at the end of each interest period, at least semi-annually in arrears.

*b) 1,040,000 Credit Facility*

On December 7, 2007, the Company received a $1,020,000 Credit Facility commitment from a Bank. The new facility was planned to refinance outstanding debt and is also for general corporate purposes. The refinancing was executed with a five-year secured credit facility for a final amount of up to $1,040,000 ("1,040,000 Credit Facility") on September 17, 2008. In September and October 2008, Ocean Rig drew down $1,020, 000 of the new credit facility. The drawdown proceeds were used to repay all other Ocean Rig outstanding debt at the date of the drawdown, amounting $776,000.

The new 1,040,000 Credit Facility includes covenants typical for bank loans, including inter alia restrictions on additional indebtedness, creation of liens, sale of assets, payments of dividends, minimum unrestricted cash and

F-15

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

certain financial covenants such as interest cover ratio, gearing ratio, maintaining a positive working capital and minimum value adjusted equity.

### c) 2005 Notes

At December 31, 2007, the Company had long-term 8.375% fixed rate notes outstanding with a face value of $150 million. The 2005 Notes were issued in June 2005. The 2005 Notes mature in June 2013.

The 2005 Notes, contain covenants typical in bond financing (including inter alia restrictions on additional indebtedness, creation of liens, sale of assets and payments of dividends) and are fully redeemable from July 2, 2009 at redemption price of 104.2%, reducing to 102.1% from July, 2010 and at par from July 1, 2011.

The borrower, under the loan agreement, is Ocean Rig Norway AS. In addition, Ocean Rig ASA and the two subsidiary companies owning *Leiv Eiriksson* and *Eirik Raude* have fully and unconditionally guaranteed the 2005 Notes on a joint and several basis. The "2005 Notes" are secured by a second priority charge in respect of *Leiv Eiriksson* and *Eirik Raude* and related assets (subordinated to the loan facility, described above).

On March 18, 2008, the Company launched a tender offer for the notes. On April 17, 2008, the Company repaid the notes, including accrued interests and redemption costs, with $171 million of financing raised under the existing facility.

### d) 2006 Notes

The long-term floating rate notes had a face value of $250 million. The 2006 Notes were issued in March 2006. The 2006 Notes matured in April 2011.

Interest on the 2006 Notes accrues at a rate equal to Libor plus a margin. The 2006 Notes contain covenants typical in bond financing (including inter alia restrictions on additional indebtedness, creation of liens, sale of assets and payments of dividends) and are fully redeemable at a redemption price of 101.25% of par value (plus accrued interest) until April 3, 2008, and will thereafter in six months intervals gradually be reduced to 100.25% (plus accrued interest) from October 4, 2009. The bonds mature in April 2011.

The Notes are senior unsecured and callable.

The 2006 Notes contained a provision allowing noteholders to require the repayment of bonds at par value when there is change of control in the Company. Further, there is a mandatory redemption clause requiring the repayment of bonds at 101% of the face value if the shares of Company were delisted from the Oslo Stock Exchange. As a result of the acquisition of Ocean Rig shares by Primelead Ltd., $16,000 of the bonds were repaid at par, during the third quarter of 2008. On July 29, 2008 $234,000 of bonds were redeemed at 101% of face value as a result of the de-listing from the Oslo Stock Exchange. The bonds were repaid by drawing a total of $250,000 from the existing 450,000 credit Facility.

Total interest incurred on long-term debt, including accrued interest, for the period ended May 14, 2008 amounted to $18,360. This amount is included in "Interest and finance costs" in the accompanying consolidated statements of operations. The Company's weighted average interest rate (including the margin) as of May 14, 2008 was 5.12%.

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

The principal payments to be made after May 14, 2008, for the loans discussed above, are as follows:

| | |
|---|---|
| 2008 | $488,500 |
| 2009 | 40,000 |
| 2010 | 40,000 |
| 2011 | 207,500 |
|   Total principal payments | 776,000 |
| Less: Financing fees | (4,495) |
|   Total debt | $771,505 |

No interest was capitalized in either period as there were no qualifying assets under construction.

**7. Financial Instruments and Fair Value Measurements:**

All derivatives are carried at fair value on the consolidated balance sheet at each period end. Balances as of May 14, 2008 are as follows:

| | Interest Rate Swaps | Foreign Currency Forward Contracts | Total |
|---|---|---|---|
| | | *May 14, 2008* | |
| Current assets | — | 923 | $ 923 |
| Current liabilities | (621) | — | (621) |
| Non current liabilities | — | — | — |
| | (621) | 923 | 302 |

*7.1 Interest rate swaps:*

As of May 14, 2008, the Company had outstanding two interest rate swap agreements with nominal amount of $140,000, maturing in August 2008. This agreement was entered into in order to hedge the Company's exposure to interest rate fluctuations with respect to the Company's borrowings. This contract is designated for hedge accounting and as such changes in its fair values are included in other comprehensive loss. The fair value of this agreement equates to the amount that would be paid by the Company if the agreements was cancelled at the reporting date, taking into account current interest rates and creditworthiness of the Company.

*7.2 Foreign currency forward contracts:*

As of May 14, 2008, the Company had outstanding 24 forward contracts, to sell $31,000 for NOK174,910. These agreements are entered into in order to hedge its exposure to foreign currency fluctuations. Such fair value at May 14, 2008 was an asset of $923.

The change in the fair value of such agreements for the period ended May 14, 2008 amounted to a loss of $0 and is reflected under "Other, net" in the accompanying consolidated statement of operations.

F-17

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

Tabular disclosure of financial instruments is as follows:

*Fair Values of Derivative Instruments in the Statement of Financial Position:*

| Derivatives Designated as Hedging Instruments | Balance Sheet Location | May 14, 2008 Fair Value | Balance Sheet Location | May 14, 2008 Fair Value |
|---|---|---|---|---|
| Interest rate swaps | Financial instruments | — | Financial instruments non current liabilities | $ — |
| | | | Financial instruments current liabilities | $ 621 |
| Total derivatives designated as hedging instruments | | — | | 621 |

| Derivatives not Designated as Hedging Instruments | | | | |
|---|---|---|---|---|
| Foreign currency forward contracts | Financial instruments-current assets | 923 | Financial instruments-current liabilities | — |
| Total derivatives not designated as hedging instruments | | 923 | | — |
| Total derivatives | | 923 | Total derivatives | $ 621 |

The effect of Derivative Instruments on the Statement to Stockholder's Equity:

| Derivatives Designated for Cash Flow Hedging Relationships | Amount of Gain/ (Loss) Recognized in OCI on Derivative (Effective Portion) Year Ended May 14, 2008 |
|---|---|
| Interest rate swaps | $ (299) |
| Total | $ (299) |

No portion of the cash flow hedges shown above was ineffective during the year. In addition, the Company did not transfer any gains/losses on the hedges from accumulated OCI into statement of operations.

| Derivatives not Designated as Hedging Instruments | Location of Gain or (Loss) Recognized | Amount of Gain (Loss) for the Year Ended May 14, 2008 |
|---|---|---|
| Foreign currency forward contracts | Other, net | $ — |
| Total | | $ — |

The Company recognizes all derivative instruments as either assets or liabilities at fair value on its consolidated balance sheet. The Company has designated all qualifying interest rate swap contracts as cash flow hedges, with the last qualifying contract expiring in September 2013.

For derivative instruments that are designated and qualify as a cash flow hedge, the effective portion of the gain or loss on the derivative is reported as a component of other comprehensive income and reclassified into earnings in the same period or periods during which the hedged transaction affects earnings. Gains and losses on the derivative

F-18

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

representing either hedge ineffectiveness or hedge components excluded from the assessment of effectiveness are recognized in the accompanying consolidated statement of operations. Changes in the fair value of derivative instruments that have not been designated as hedging instruments are reported in the accompanying consolidated statement of operations.

The Company enters into interest rate swap transactions to manage interest costs and risk associated with changing interest rates with respect to its variable interest rate loans and credit facilities. The Company enters into foreign currency forward contracts in order to manage risks associated with future hire rates and fluctuations in foreign currencies, respectively. All of the Company's derivative transactions are entered into for risk management purposes.

The carrying amounts of cash and cash equivalents, restricted cash and trade accounts receivable reported in the consolidated balance sheets approximate their respective fair values because of the short term nature of these accounts. The fair value of the interest rate swaps was determined using a discounted cash flow method based on market-based LIBOR swap yield curves, taking into account current interest rates and the creditworthiness of both the financial instrument counterparty and the Company. The fair value of foreign currency forward contracts was based on the forward exchange rates.

Fair value measurements are classified based upon inputs used to develop the measurement under the following hierarchy:

*Level 1:*   Quoted market prices in active markets for identical assets or liabilities.

*Level 2:*   Observable market-based inputs or unobservable inputs that are corroborated by market data.

*Level 3:*   Unobservable inputs that are not corroborated by market data.

The following table summarizes the valuation of assets and liabilities measured at fair value on a recurring basis as of the valuation date.

| | May 14, 2008 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Recurring measurements:** | | | | |
| Interest rate swaps-liability position | $ (621) | — | (621) | $ — |
| Foreign currency forward contracts — asset position | 923 | — | 923 | — |
| Total | $ 302 | $ — | $ 302 | $ — |

**8. Pension Liability:**

The Company has five retirement benefit plans for employees managed and funded through Norwegian life insurance companies. As of May 14, 2008, the pension plans cover 115 employees. The pension scheme is in compliance with the Norwegian law on required occupational pension.

The Company uses a January 1 measurement date for net periodic benefit cost and a December 31 or period end measurement date for benefit obligations and plan assets.

For defined benefit pension plans, the benefit obligation is the projected benefit obligation, the actuarial present value, as of the Company's December 31 measurement data, of all benefits attributed by the pension benefit

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

formula to employee service rendered to that date. The amount for benefit to be paid depends on a number of future events incorporated into the pension benefit formula, including estimates of the average life of employees/survivors and average years of service rendered. It is measured based on assumptions concerning future interest rates and future employee compensation levels.

The following table presents this reconsolidation and shows the change in the projected benefit obligation for the periods ended May 14, 2008:

| | January 1 — May 14, 2008 |
|---|---|
| **Change in pension benefit obligation** | |
| Projected benefits earned at beginning of the period | $   7,234 |
| Service cost for benefits earned | 884 |
| Interest cost | 120 |
| Settlement | — |
| Actuarial losses | 547 |
| Plan amendments | 190 |
| Benefits paid | (44) |
| Payroll tax of employer contribution | (77) |
| Foreign currency exchange rate changes | 520 |
| Projected benefit obligation at end of period | $   9,374 |

The following table presents the change in the value of plan assets and the plans' funded status at May 14, 2008:

| | January 1 — May 14, 2008 |
|---|---|
| **Change in plan assets** | |
| Fair value of plan assets at beginning of the period | $   6,376 |
| Expected return on plan assets | 140 |
| Actual return on plan assets | (528) |
| Employer contributions | 543 |
| Settlement | (44) |
| Foreign currency exchange rate changes | 417 |
| Fair value of plan assets at end of period | $   6,904 |

| | January 1 — May 14, 2008 |
|---|---|
| Unfunded status at end of period | $   2,470 |

The unfunded projected benefit obligation is reflected in "Pension liability" in the accompanying consolidated balance sheets as of May 14, 2008.

F-20

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

Amounts including in accumulated other comprehensive income that have not yet been recognized in net periodic pension cost at May 14, 2008, are listed below:

|  | January 1 — May 14, 2008 |
|---|---|
| Net actuarial loss | $    6,130 |
| Prior service cost | (2,746) |
| Defined benefit plan adjustment, before tax effect | $    3,384 |

The accumulated benefit obligation for the pension plans represents the actuarial present value of benefit based on employee service and compensation as of a certain date and does not include an assumption about future compensation levels. The accumulated benefit obligation for the pension plans was $4,526 at May 14, 2008.

The net pension cost recognized in consolidated statements of income was $1,130 for May 14, 2008.

The following table presents the components of net periodic pension cost:

|  | January 1 — May 14, 2008 |
|---|---|
| **Components of net periodic benefit cost** |  |
| Expected return on plan assets | $     (140) |
| Service cost | 883 |
| Interest cost | 120 |
| Amortization of prior service cost | 190 |
| Amortization of actuarial loss | 77 |
| Settlement | — |
| Net periodic benefit cost | $    1,130 |

The table below presents the components of changes in Plan Assets and Benefit Obligations recognized in Other Comprehensive Income:

|  | January 1 — May 14, 2008 |
|---|---|
| Net actuarial loss (gain) | $    2,679 |
| Prior service cost (credit) | (1,155) |
| Amortization of actuarial loss (gain) | (77) |
| Amortization of prior service cost | (190) |
| Total recognized in net pension cost and other comprehensive income | $    1,257 |

The estimated net loss for pension benefits that will be amortized from accumulated other comprehensive income into the periodic benefit cost for the next fiscal year is $0.

Pension obligations are actuarially determined and are affected by assumptions including expected return on plan assets. As of May 14, 2008, contributions amounting to $543 in total have been made to the pension plan.

The Company evaluates assumptions regarding the estimated long-term rate of return on plan assets based on historical experience and future expectations on investment returns, which are calculated by an unaffiliated investment advisor utilizing the asset allocation classes held by the plan's portfolios. Changes in these and other

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

assumptions used in the actuarial computations could impact the Company's projected benefit obligations, pension liabilities, pension expense and other comprehensive income.

The Company bases its determination of pension expense on a market-related valuation of assets that reduces year-to-year volatility. This market-related valuation recognizes investment gains or losses over a five-year period from the year in which they occur. Investment gains or losses for this purpose are the difference between the expected return calculated using the market-related value of assets and the actual return based on the market-related value of assets.

The following are the weighted — average assumptions used to determine net periodic benefit cost:

|  | January 1 — May 14, 2008 |
|---|---|
| **Weighted average assumptions** |  |
| Expected return on plan assets | 5.50% |
| Discount rate | 4.50% |
| Compensation increases | 4.75% |

The Company reviews its investments and policies annually. In determining its asset allocation strategy, the Company reviews models presenting many different asset allocation scenarios to assess the most appropriate target allocation to produce long-term gains without taking on undue risk. GAAP standards require disclosures for financial assets and liabilities that are remeasured at fair value at least annually.

The following table set forth the pension assets at fair value as of May 14, 2008:

|  | May 14, 2008 |
|---|---|
| Share and other equity investments | $    808 |
| Bonds | 3,970 |
| Properties and real estate | 1,118 |
| Other | 1,008 |
| Total plan net assets at fair value | $   6,904 |

The Company's pension funds are managed by an independent life-insurance company that invests the Company's funds according to Norwegian law. The law requires a low-risk profile; hence the majority of the funds are invested in government bonds and high-rated corporate bonds. The major categories of plan assets as a percentage of the fair value of plan assets are as follows:

|  | As of May 14, 2008 |
|---|---|
| Shares and other equity instruments | 12% |
| Bonds | 58% |
| Properties and real estate | 16% |
| Other | 14% |
| Total | 100% |

F-22

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

The US GAAP standards require disclosures for financial assets and liabilities that are remeasured at fair value at least annually. The US GAAP standards establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. Tiers include three levels which is explained below:

*Level 1:*

Financial instruments valued on the basis of quoted priced for identical assets in active markets. This category encompasses listed equities that over the previous six months have experienced a daily average turnover equivalent to approximately $3,462 or more. Based on this, the equities are regarded as sufficiently liquid to be encompassed by this level. Bonds, certificates or equivalent instruments issued by national governments are generally classified as level 1. In the case of derivatives, standardized equity-linked and interest rate futures will be encompassed by this level.

*Level 2:*

Financial instruments valued on the basis of observable market information not covered by level 1. This category encompasses financial instruments that are valued on the basis of market information that can be directly observable or indirectly observable. Market information that is indirectly observable means that prices can be derived from observable, related markets. Level 2 encompasses equities or equivalent equity instruments for which market prices are available, but where the turnover volume is too limited to meet the criteria in level 1. Equities on this level will normally have been traded during the last month. Bonds and equivalent instruments are generally classified as level 2. Interest rate and currency swaps, non-standardized interest rate and currency derivatives, and credit default swaps are also classified as level 2. Funds are generally classified as level 2, and encompass equity, interest rate, and hedge funds.

*Level 3:*

Financial instruments valued on the basis of information that is not observable pursuant to by level 2. Equities classified as level 3 encompass investments in primarily unlisted/private companies. These include investments in forestry, real estate and infrastructure. Private equity is generally classified as level 3 through direct investments or investments in funds. Asset backed securities (ABS), residential mortgage backed securities (RMBS) and commercial mortgage backed securities (CMBS) are classified as level 3 due to their generally limited liquidity and transparency in the market. Storebrand is of the opinion that the valuation method used represents a best estimate of the mutual fund's market value.

F-23

OCEAN RIG ASA

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

The following table sets forth by level, within the fair value hierarchy, the pension asset at fair value as of May 14, 2008:

|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Equity securities: |  |  |  |  |
| US Equities | 384 | — | 42 | 426 |
| Non-US Equities | 381 | — | — | 381 |
| Fixed Income: |  |  |  |  |
| Government Bonds | 2,487 | 897 | — | 3,384 |
| Corporate Bonds | 587 | — | — | 587 |
| Alternative Investments: |  |  |  |  |
| Hedge funds and limited partnerships | — | 159 | — | 159 |
| Other | 123 | — | — | 123 |
| Cash and cash equivalents | 725 | — | — | 725 |
| Real Estate | — | — | 1,119 | 1,119 |
| **Net Plan Net Assets** | $4,687 | $1,056 | $1,161 | $6,904 |

The tables below set forth a summary of changes in the fair value of the pension assets level 3 investment assets for the period ended May 14, 2008:

|  | Level 3 | Total |
|---|---|---|
| Balance, beginning of year | 863 | 863 |
| Actual return on plan assets: |  |  |
| Assets sold during the period | — | — |
| Assets still held at reporting date | 231 | 231 |
| Purchases, sales, issuances and settlements (net) | 67 | 67 |
| **Net Plan Net Assets** | $1,161 | $1,161 |

The following pension benefits are expected to be paid by the Company during the years ending:

|  |  |
|---|---|
| The period from May 14, to December 31, 2008 | $    0 |
| December 31, 2009 | 42 |
| December 31, 2010 | 82 |
| December 31, 2011 | 76 |
| December 31, 2012 | 77 |
| December 31, 2013 | 58 |
| Thereafter | 1,065 |
| **Total pension payments** | $1,400 |

The Company's estimated contribution to the pension plans for the period from May, 15 to December, 31 2008 and for the fiscal year 2009 is $3,880.

F-24

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

**9.  Drilling Rig Operating Expenses:**

The amounts in the accompanying consolidated statements of operations are analyzed as follows:

| | For the Period from January 1, 2008 to May, 2008 |
|---|---:|
| Crew wages and related costs | $    30,723 |
| Insurance | 3,989 |
| Deferred rig operating cost | 1,215 |
| Repairs and maintenance | 12,217 |
| Total | $    48,144 |

**10.  Interest and Finance Cost:**

The amounts in the accompanying consolidated statements of operations are analyzed as follows:

| | Year Ended May 14, 2008 |
|---|---:|
| Interest on long-term debt | $    18,360 |
| Bank charges | 753 |
| Amortization of financing fees | 22,548 |
| Other | — |
| Total | $    41,661 |

**11.  Stock-based compensation:**

The Company's Extraordinary General Meeting on March 22, 2006, approved establishment of a new 5-year equity settled stock option program for employees and members of the Board of the Company and its subsidiaries comprising up to 5,000,000 Shares ("The 2006-2011 Stock Option Program"). Of the total number of options granted, one third vested at each anniversary of the initial grant date, assuming the employee had not resigned or otherwise breached the vesting conditions of the option agreement. It was therefore a program with graded vesting where each of the three vesting steps was treated as separate programs. Awarded options must be exercised no later than the fifth anniversary of the grant date.

When DryShips Inc. acquired over 50% of the shares in Ocean Rig ASA on May 14, 2008 a change of control occurred and this had the implication that all options immediately became vested and exercisable.

On June 5, 2008, members of the Board and employees exercised a total of 1,440,000 options in Ocean Rig ASA at a volume weighted average strike price of NOK 40.62.

As a result of this exercise, Ocean Rig sold 1,440,000 Ocean Rig shares at a volume weighted average price of NOK 40.62 per share to members of the Board and employees. Following the exercise of options there were no options outstanding.

F-25

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

The following table summarizes activity for the Company's outstanding stock options from December 31, 2006 through May 14, 2008.

|  | Exercise Price Equal to or Greater than Grant Date Share Fair Value | |
| --- | --- | --- |
|  | Number of Shares | Weighted Average Exercise Price |
| Balance at December 31, 2007 | 4,742,500 | 45.52 |
| Exercised during 2008 | — | |
| Granted | 365,000 | 39.06 |
| Forfeited | (3,667,500) | 46.80 |
| Balance at May 14, 2008 | 1,440,000 | 40.62 |

At January 1, 2008, the following options had been granted and were vested:

|  | Granted | Vested | Weighted Average Exercise Price (NOK) |
| --- | --- | --- | --- |
| Chairman | 700,000 | 233,333 | 46.25 |
| Members of the Board | 700,000 | 233,333 | 44.34 |
| Management | 2,737,500 | 1,167,500 | 46.00 |
| Others | 605,000 | 130,000 | 43.85 |
| Total | 4,742,500 | 1,764,166 | 45.52 |

The estimated fair value is calculated using a Black-Scholes option pricing model and is expensed evenly over the vesting period for the share options and is included in salaries and other personnel expenses. However, when all options became vested on May 14, 2008 the remaining fair value was expensed immediately. Share option expense in 2008 was $2,675 and this was expensed in the period ended May 14, 2008.

**12.   Earnings/(loss) per share**

Basic earnings per share is calculated by dividing net profit/ (loss) for the year by the weighted average number of ordinary shares outstanding during the year.

Diluted earnings per share is calculated by dividing the net profit/(loss) by the weighted average number of ordinary shares outstanding during the year plus the weighted average number of ordinary shares that would have been issued on the conversion of options into ordinary shares.

The following reflects the income and the share data used in the basic and diluted earnings per share computations:

|  | Earnings/(Loss) Applicable to Common Shares (Numerator) | Weighted Average Shares Outstanding (Denominator) | Basic Earnings/ (Loss) per Share Amount | Earnings/ (Loss) Applicable to Diluted Shares (Numerator) | Weighted Average Shares Outstanding Diluted (Denominator) | Diluted Earnings/ (Loss) per Share Amount |
| --- | --- | --- | --- | --- | --- | --- |
| For the year ended May 14, 2008: | (23,396) | 162,171,380 | (0.14) | (23,396) | 162,171,380 | (0.14) |

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

**13.    Income Taxes:**

Ocean Rig, the holding company of the drilling segment and some of its subsidiaries are incorporated and domiciled in Norway, and as such, are in general subject to Norwegian income tax of 28%. Participation exemption normally applies to equity investments in the EEA (European Economic Area) except investments in low-tax countries. The model may also apply to investments outside of the EEA (except low-tax countries) to the extent the investment for the last two years have constituted at least 10% of the capital and votes in the entity in question. The Norwegian entities are subject to the Norwegian participation exemption model which implies that only 3% of dividend income and capital gains that are received by Norwegian companies are subject to tax. In effect this gives an effective tax of total income under the participation exemption for Norwegian companies of 0.84% (3% * 28%).

Ocean Rig ASA operates through its various subsidiaries in a number of countries throughout the world. Income taxes have been provided based upon the tax laws and rates in the countries in which operations are conducted and income is earned. The countries in which Ocean Rig ASA operates have taxation regimes with varying nominal rates, deductions, credits and other tax attributes. Consequently, there is not expected relationship between the provision for/or benefit from income taxes and income or loss before income taxes.

A summary of income/(loss) before tax, annual tax expense, the tax effects of temporary and permanent differences and the calculation of deferred tax are presented below.

Allocation of income/(loss) before tax are as follows:

| | Period from January 1 to May 14, 2008 |
|---|---|
| Norway | $    (17,146) |
| UK | (63) |
| Canada | (112) |
| USA | (4,438) |
| Total | $    (21,759) |

The tables below shows for each entity's total income tax expense and provision/(benefit) for income taxes for the period:

| | Period from January 1 to May 14, 2008 |
|---|---|
| Norway (28%) | $         5 |
| UK (28%) | 772 |
| Canada (10% — 19%) | — |
| USA (15% — 35%) | 860 |
| Current tax expense | $    1,637 |
| Deferred tax expense | — |
| Taxes | $    1,637 |
| Effective tax rate | (7.5)% |

Taxes have not been calculated on OCI items as valuation allowances would result in no recognition of deferred tax.

F-27

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

Reconciliation of total tax cost:

| | Period from January 1 to May 14, 2008 |
|---|---:|
| Tax rate of 28% (Norwegian tax rate) multiplied by profit/(loss) before tax | $   (6,093) |
| Change in valuation allowance | 25,082 |
| Differences in tax rates | 5,766 |
| Effect of permanent differences | 18,162 |
| Changes in assessment of tax loss carry forward and other differences | (41,286) |
| Withholding tax | 6 |
| Total | $    1,637 |

Following the completion of the *Eirik Raude* operations in Canada 2002 — 2004, the Canada Revenue Agency (CRA) has suggested changing the Canadian 2002 — 2005 tax returns for Ocean Rig 2 AS. This may reduce the tax loss carry forward in Canada. However, it will not impact the tax loss carry forward in Norway. There is no indication that there will be any tax payable to Canada resulting from such changes.

Ocean Rig is subject to changes in tax laws, treaties, regulations and interpretations in and between the countries in which its subsidiaries operate. A material change in these tax laws, treaties, regulations and interpretations could result in a higher or lower effective tax rate on worldwide earnings.

Deferred tax assets and liabilities are recognized for the anticipated future tax effects of temporary differences between the financial statement basis and the tax basis of the Company's assets and liabilities at the applicable tax rates in effect. The significant components of deferred tax assets and liabilities are as follow:

| Temporary Differences — Tax Effects | Period from January 1 to May 14, 2008 |
|---|---:|
| **Deferred tax assets** | |
| Accrued expenses | $       374 |
| Tax loss carry forwards | 296,930 |
| Total deferred tax assets | 297,304 |
| **Deferred tax liabilities** | |
| Accelerated depreciation of assets for tax purposes | (198,134) |
| Pension assets | 764 |
| Total deferred tax liabilities | (197,370) |
| **Net deferred tax asset** | 99,934 |
| Valuation allowance | (99,934) |
| Net deferred tax assets | — |
| Short-term deferred tax assets | 374 |
| Short-term portion of valuation allowance | (374) |
| Long-term net deferred tax assets | 99,560 |
| Long-term portion of valuation allowance | (99,560) |

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

Based on the Company's historical taxable losses and the lack of certainty regarding the size of future taxable profits, the realization of the deferred tax assets is uncertain. Accordingly, no deferred tax asset has been included in the balance sheet as a valuation allowance has been recorded as of May 14, 2008.

Deferred taxes have not been provided for in circumstances where the Company does not expect the operations in a jurisdiction to give rise to future tax consequences, due to the structure of operations and applicable law. Should its expectations change regarding the expected future tax consequences, the Company may be required to record additional deferred taxes that could have a material adverse effect on its consolidated statement of financial position, results of operations or cash flows.

A valuation allowance for deferred tax assets is recorded when it is more likely than not that some or all of the benefit from the deferred tax asset will not be realized. The Company provides a valuation allowance to offset deferred tax assets for net operating losses ("NOL") incurred during the year in certain jurisdictions and for other deferred tax assets where, in the Company's opinion, it is more likely than not that the financial statement benefit of these losses will not be realized. The Company provides a valuation allowance for foreign tax loss carry forward to reflect the possible expiration of these benefits prior to their utilization.

The Company has tax losses, which arose in Norway of $1,023,253 at May 14, 2008, that are available indefinitely for offset against future taxable profits of the companies in which the losses arose. All of these amounts are related to Ocean Rig ASA, Ocean Rig Norway AS, Ocean Rig 1 AS and Ocean Rig 2 AS.

The Company had tax losses, which arose in Canada of $28,846 at May 14, 2008, that are available indefinitely for offset against future taxable profits of the company in which the losses arose. The tax loss in Canada may be deducted in the future only against income and proceeds of disposition derived from resource properties owned at the time of the acquisition of control, or the Weymouth well. Thus the possibility for utilization of this tax position is in practice expired for the period after the change of control in Ocean Rig on May 14, 2008.

The Company's income tax returns are subject to review and examination in the various jurisdictions in which the Company operates. Currently one tax audit is open. The Company may contest any tax assessment that deviates from its tax filing. However, this review is not expected to incur any tax payables.

The Company accrues for income tax contingencies that it believes are more likely than not exposures in accordance with the provisions of guidance related to accounting for uncertainty in income taxes.

The Company accrues interest and penalties related to its liabilities for unrecognized tax benefits as a component of income tax expense. During the period ended May 14, 2008, the Company did not incur any interest or penalties.

Ocean Rig ASA, and/or one of its subsidiaries, filed federal and local tax returns in several jurisdictions throughout the world.

## 14. Segment information:

The Company has one operating segment which is offshore drilling operations and this is consistent with management reporting and decision making.

For the period ended May 14, 2008, all of the consolidated revenues related to the operations of the Company's two drilling rigs.

### 14.1 Products and services

The *Leiv Eiriksson* commenced drilling in January 2008 in the North Sea under the Shell contract. The Shell contract was accounted for as Term Contract as described in Note 2 (r). Revenues derived from the contract are

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

partly accounted for as a lease, where the lease of the "applicable" rig is recognized to the statement of operation as Leasing revenue on a straight line basis over the lease period, while the drilling services element is recognized in the period when drilling services are rendered as Service revenue.

*Eirik Raude* operated in the US Gulf of Mexico under a contract with Exxon Mobil from 2007 until October 9, 2008, when it commenced a three-year contract with Tullow Oil to drill offshore Ghana. Both, the ExxonMobil and the Tullow contracts qualify as Term Contracts, as described in Note 2 (r). Accounting for the contract follows the same principles as described for the Shell contract as outlined above.

As of May 15, 2008, the estimated future minimum lease payment is $926,000 based upon an estimated 95% earnings efficiency and the contract expires in 2011. The estimated minimum lease payment is distributed over 2008, 2009, 2010 and 2011 with $232,000, $341,000, $224,000 and $129,000 respectively.

*14.2   Geographic segment information for offshore drilling operations*

The revenue shown in the table below is revenue per country based upon the location that the drilling takes place related to the Offshore Drilling Operation segment:

|  | Period from January 1 to May 14, 2008 |
|---|---|
| USA | 50,922 |
| Norway | 5,636 |
| UK | 39,897 |
| Ireland | 2,616 |
| Canada | 0 |
| Angola | 101 |
| Other | — |
| Total | 99,172 |

The drilling rigs *Leiv Eiriksson* and *Eirik Raude* constitute the Company's long lived assets. As of May 14, 2008, the rigs were owned by Norwegian entities.

*14.3   Information about Major customers:*

The Company's customers are oil and gas exploration and production companies, including major integrated oil companies, independent oil and gas producers and government-owned oil and gas companies.

Drilling contracts individually accounted for more than 10% of the Company's drilling rig revenues during the period ended May 14, 2008 were as follows:

|  | Period Ended May 14, 2008 |
|---|---|
| Customer A | 49% |
| Customer B | — |
| Customer C | 51% |

The loss of any of these significant customers could have a material adverse effect on the Company's results of operations if they were not replaced by other customers.

**OCEAN RIG ASA**

**Notes to Consolidated Financial Statements — (Continued)**
**As of and for the period ended May 14, 2008**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

**15.    Commitments and contingencies**

*15.1    Legal proceedings*

Various claims, suits, and complaints, including those involving government regulations and product liability, arise in the ordinary course of the shipping business.

The Company has obtained insurance for the assessed market value of the rigs. However, such insurance coverage may not provide sufficient funds to protect the Company from all liabilities that could result from its operations in all situations. Risks against which the Company may not be fully insured or insurable for include environmental liabilities, which may result from a blow-out or similar accident, or liabilities resulting from reservoir damage alleged to have been caused by the negligence of the Company.

The Company's loss-of-hire insurance coverage does not protect against loss of income from day one, but will be effective after 45 days' off-hire. The occurrence of casualty or loss, against which the Company is not fully insured, could have a material adverse effect on the Company's results of operations and financial condition. The insurance covers approximately one year with loss of hire.

As part of the Company's normal course of operations, its customers may disagree on amounts due to us under the provision of the contracts which are normally settled though negotiations with the customer. Disputed amounts are normally reflected in revenues at such time as we reach agreement with the customer on the amounts due. Except for the matters discussed below, the Company is not a party to any material litigation where claims or counterclaims have been filed against the Company other than routine legal proceedings incidental to its business.

In the period ended May 14, 2008, the Company recognized a provision of $3,100 for a claim that was subsequently settled in July, from an investment bank in relation to DryShips' acquisition of Ocean Rig. Maximum exposure related to the claim was $24,000. On July 21, 2009 Ocean Rig ASA made a settlement with the investment bank equivalent to the provision.

*15.2    Rental payments*

Ocean Rig entered into a five year office lease agreement with Vestre Svanholmen 6 AS which commenced on July 1, 2007. This lease includes an option for an additional five years term which must be exercised at least six months prior to the end of the term of the contract which expires in June 2012. As of May 14, 2008, the future obligations amount to $900 for 2008, $1,500 for 2009, $1,400 for 2010, $1,200 for 2011 and $700 for 2012.

**OCEAN RIG UDW INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| | Page |
|---|---|
| ***Unaudited Interim Condensed Consolidated Financial Statements*** | |
| Consolidated Balance Sheets as of December 31, 2010 and June 30, 2011 (Unaudited) | F-33 |
| Unaudited Interim Condensed Consolidated Statements of Operations for the six-month periods ended June 30, 2010 and 2011 | F-34 |
| Unaudited Interim Condensed Consolidated Statements of Cash Flows for the six-month periods ended June 30, 2010 and 2011 | F-35 |
| Notes to Interim Condensed Consolidated Financial Statements | F-36 |
| Report of Independent Registered Public Accounting Firm | F-48 |
| ***Audited Consolidated Financial Statements*** | |
| Consolidated Balance Sheets as of December 31, 2009 and 2010 | F-49 |
| Consolidated Statements of Operations for the periods ended December 31, 2008, 2009 and 2010 | F-50 |
| Consolidated Statements of Stockholders' Equity for the periods ended December 31, 2008, 2009 and 2010 | F-51 |
| Consolidated Statements of Cash Flows for the periods ended December 31, 2008, 2009 and 2010 | F-52 |
| Notes to Consolidated Financial Statements | F-53 |
| ***Unaudited Pro Forma Condensed Statement of Operations for the year ended December 31, 2008*** | F-99 |

## OCEAN RIG UDW INC.

### Consolidated Balance Sheets
### As of December 31, 2010 and June 30, 2011 (Unaudited)
### (Expressed in thousands of U.S. Dollars — except for share and per share data)

| | December 31, 2010 | June 30, 2011 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 95,707 | $ 191,744 |
| Restricted cash | 512,793 | 95,183 |
| Trade accounts receivable, net | 24,286 | 73,202 |
| Financial instruments (Note 8) | 1,538 | 1,092 |
| Other current assets | 37,682 | 82,774 |
| **Total current assets** | 672,006 | 443,995 |
| **FIXED ASSETS, NET:** | | |
| Rigs under construction (Note 5) | 1,888,490 | 1,704,350 |
| Drilling rigs, machinery and equipment, net (Note 6) | 1,249,333 | 2,940,888 |
| **Total fixed assets, net** | 3,137,823 | 4,645,238 |
| **OTHER NON CURRENT ASSETS:** | | |
| Restricted cash | 50,000 | 125,009 |
| Intangible assets, net | 10,506 | 9,784 |
| Above market acquired time charter | 1,170 | 468 |
| Other non-current assets | 472,193 | 95,534 |
| **Total non current assets, net** | 533,869 | 230,795 |
| **Total assets** | $4,343,698 | $5,320,028 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Current portion of long-term debt (Note 7) | $ 560,561 | $ 231,218 |
| Accounts payable and other current liabilities | 9,018 | 36,676 |
| Accrued liabilities | 45,631 | 76,059 |
| Deferred revenue | 40,205 | 85,194 |
| Financial instruments (Note 8) | 12,503 | 5,443 |
| **Total current liabilities** | 667,918 | 434,591 |
| **NON CURRENT LIABILITIES** | | |
| Long term debt, net of current portion (Note 7) | 696,986 | 1,891,319 |
| Financial instruments (Note 8) | 96,901 | 87,953 |
| Other non-current liabilities | 811 | 1,175 |
| **Total non current liabilities** | 794,698 | 1,980,447 |
| **COMMITMENTS AND CONTINGENCIES** (Note 12) | — | — |
| **STOCKHOLDERS' EQUITY:** | | |
| Preferred stock, $0.01 par value; 500,000,000 shares authorized, 0 issued and outstanding at December 31, 2010 and June 30, 2011 | — | — |
| Common stock, $0.01 par value; 1,000,000,000 shares authorized, 131,696,928 issued and outstanding at December 31, 2010 and June 30, 2011 | 1,317 | 1,317 |
| Accumulated other comprehensive loss | (60,722) | (57,103) |
| Additional paid in capital | 3,457,444 | 3,467,301 |
| Retained earnings | (516,957) | (506,525) |
| **Total stockholders' equity** | 2,881,082 | 2,904,990 |
| **Total liabilities and stockholders' equity** | $4,343,698 | $5,320,028 |

The accompanying notes are an integral part of these unaudited interim condensed consolidated financial statements.

F-33

**OCEAN RIG UDW INC.**

**Unaudited Interim Condensed Consolidated Statements of Operations**
**For the six-month periods ended June 30, 2010 and 2011**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

| | Six Months Ended June 30, | |
| --- | ---: | ---: |
| | 2010 | 2011 |
| **REVENUES:** | | |
| Leasing revenues | $ 70,731 | $ 71,357 |
| Service revenues and amortization | 118,497 | 164,598 |
| Total revenues | 189,228 | 235,955 |
| **EXPENSES:** | | |
| Drilling rigs operating expenses | 59,508 | 104,137 |
| Depreciation and amortization | 37,966 | 64,908 |
| Loss on disposals | 430 | 87 |
| General and administrative expenses | 10,075 | 15,730 |
| **Operating profit** | 81,249 | 51,093 |
| **OTHER INCOME/(EXPENSES):** | | |
| Interest and finance costs (Note 9) | (5,738) | (22,214) |
| Interest income | 5,825 | 10,394 |
| Loss on interest rate swaps (Note 8) | (34,501) | (18,616) |
| Other, net (Note 8) | (3,752) | (446) |
| **Total expenses net** | (38,166) | (30,882) |
| **INCOME BEFORE INCOME TAXES** | 43,083 | 20,211 |
| Income taxes (Note 10) | (11,938) | (9,778) |
| **NET INCOME** | $ 31,145 | $ 10,433 |
| **EARNINGS PER SHARE, BASIC AND DILUTED** | $ 0.30 | $ 0.08 |
| **WEIGHTED AVERAGE NUMBER OF SHARES, BASIC AND DILUTED (Note 3)** | 103,125,500 | 131,696,928 |
| Total Comprehensive Income (Note 12) | 9,601 | 14,052 |

The accompanying notes are an integral part of these unaudited interim condensed consolidated financial statements

F-34

**OCEAN RIG UDW INC.**

**Unaudited Interim Condensed Consolidated Statements of Cash Flows**
**For the six-month periods ended June 30, 2010 and 2011**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

|  | Six Months Ended 30 June | |
|---|---|---|
|  | 2010 | 2011 |
| **Net Cash Provided by Operating Activities** | 99,055 | 93,915 |
| **Cash Flows from Investing Activities:** | | |
| Advances for rigs under construction | (483,312) | (1,187,747) |
| Drilling rigs, equipment and other improvements | (3,671) | (10,009) |
| Decrease/(Increase) in restricted cash | (34,178) | 346,919 |
| **Net Cash used in Investing Activities** | (521,161) | (850,837) |
| **Cash Flows from Financing Activities:** | | |
| Capital contribution by stockholders | 402,361 | — |
| Proceeds from credit facilities | 1,251 | 1,713,456 |
| Payments of credit facilities | (61,119) | (829,170) |
| Payment of financing costs | (783) | (31,327) |
| **Net Cash provided by Financing Activities** | 341,710 | 852,959 |
| **Net (decrease)/increase in cash and cash equivalents** | (80,396) | 96,037 |
| **Cash and cash equivalents at beginning of period** | 234,195 | 95,707 |
| **Cash and cash equivalents at end of period** | 153,799 | 191,744 |

The accompanying notes are an integral part of these unaudited interim condensed consolidated financial statements.

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

**1. Basis of Presentation and General Information:**

The accompanying unaudited interim condensed consolidated financial statements include the accounts of Ocean Rig UDW Inc. and its subsidiaries (collectively, the "Company," "Ocean Rig UDW" or "Group"). Ocean Rig UDW was formed under the laws of the Republic of the Marshall Islands on December 10, 2007 under the name Primelead Shareholders Inc.

The accompanying unaudited interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") for interim financial information. Accordingly, they do not include all the information and notes required by U.S. GAAP for complete financial statements. These statements and the accompanying notes should be read in conjunction with the Company's Annual Consolidated Financial Statements.

These unaudited interim condensed consolidated financial statements have been prepared on the same basis as the annual consolidated financial statements and, in the opinion of management, reflect all adjustments, which include only normal recurring adjustments considered necessary for a fair presentation of the Company's financial position, results of operations and cash flows for the periods presented. Operating results for the six-month period ended June 30, 2011 are not necessarily indicative of the results that might be expected for the fiscal year ending December 31, 2011.

**2. Significant Accounting policies and Recent Accounting Pronouncements:**

A discussion of the Company's significant accounting policies can be found in the Company's Consolidated Financial Statements for the year ended December 31, 2010. There have been no material changes to these policies in the six-month period ended June 30, 2011.

In May 2011, the FASB issued Accounting Standards Update (ASU) No. 2011-04, "Fair Value Measurement (Topic 820): Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRSs" (ASU 2011-04). This newly issued accounting standard clarifies the application of certain existing fair value measurement guidance and expands the disclosures for fair value measurements that are estimated using significant unobservable (Level 3) inputs. This ASU is effective on a prospective basis for annual and interim reporting periods beginning on or after December 15, 2011, which for the Company means January 1, 2012. The Company does not expect that adoption of this standard will have a material impact on its financial position or results of operations.

In June 2011, the FASB issued ASU No. 2011-05, "Comprehensive Income (Topic 220)" (ASU 2011-05). This newly issued accounting standard (1) eliminates the option to present the components of other comprehensive income as part of the statement of changes in stockholders' equity; (2) requires the consecutive presentation of the statement of net income and other comprehensive income; and (3) requires an entity to present reclassification adjustments on the face of the financial statements from other comprehensive income to net income. The amendments in this ASU do not change the items that must be reported in other comprehensive income or when an item of other comprehensive income must be reclassified to net income nor do the amendments affect how earnings per share is calculated or presented. This ASU is required to be applied retrospectively and is effective for fiscal years and interim periods within those years beginning after December 15, 2011, which for the Company means January 1, 2012. As this accounting standard only requires enhanced disclosure, the adoption of this standard will not impact the Company's financial position or results of operations.

**3. Shareholders' equity**

There is one class of common shares, and each common share is entitled to one vote at the General Meeting.

F-36

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements — (Continued)**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

Prior to December 8, 2010, the Company's authorized capital stock consisted of 500 common shares, par value $20.00 per shares. During December 2010, the Company adopted, amended and restated articles of incorporation pursuant to which its authorized capital stock now consists of 250,000,000 common shares, par value $0.01 per share; and (ii) declared and paid a stock dividend of 103,125,000 shares of its common stock to its sole shareholder, DryShips. On December 21, 2010 the Company completed through a private placement the sale of an aggregated of 28,571,428 common shares at $17.50 per share. The proceeds from the private placement net of directly attributable costs of $11,699 were $488,301. The stock dividend has been accounted for as a stock split. As a result, the Company reclassified approximately $1,021 from APIC to common stock, which represents the par value per share of the shares issued. All previously reported share and per share amounts have been restated to reflect the stock dividend.

On April 15, 2011 the Company's Special Meeting of Shareholders approved an increase in the Company's authorized share capital to 1,000,000,000 common shares, and 500,000,000 preferred shares.

**4. Transactions with Related Parties:**

*Drillship Management Agreements with Cardiff:*  Effective December 21, 2010, the Company terminated its management agreements with Cardiff pursuant to which Cardiff provided supervisory services in connection with the construction of the drillships *Ocean Rig Corcovado* and *Ocean Rig Olympia* . The Company paid Cardiff a management fee of $40 per month per drillship for *Ocean Rig Corcovado* and *Ocean Rig Olympia* . The management agreements also provided for: (i) a chartering commission of 1.25% on revenue earned; (ii) a commission of 1% on the shipyard payments or purchase price paid for drillships; (iii) a commission of 1% on loan financing or refinancing; and (iv) a commission of 2% on insurance premiums. These agreements were replaced with the Global Services Agreement discussed below. For the six-month periods ended June 30, 2011 and 2010 the Company paid $5,774 and $2,586 respectively, as fees related to the Management Agreement. All incurred costs from management service agreements are directly attributable cost to the construction and are capitalized as a component of "Rigs under construction".

*Global Services Agreement:*  On December 1, 2010, the Company entered into a Global Services Agreement with Cardiff, effective December 21, 2010, pursuant to which the Company has engaged Cardiff to act as consultant on matters of chartering and sale and purchase transactions for the offshore drilling units operated by the Company. Under the Global Services Agreement, Cardiff, or its subcontractor, (i) provides consulting services related to identifying, sourcing, negotiating and arranging new employment for offshore assets of the Company and its subsidiaries, including the Company's drilling units; and (ii) identifies, sources, negotiates and arranges the sale or purchase of the offshore assets of the Company and its subsidiaries, including the Company's drilling units. In consideration of such services, the Company pays Cardiff a fee of 1.0% in connection with employment arrangements and 0.75% in connection with sale and purchase activities. For the six-month period ended June 30, 2011 the Company incurred cost of $5,694 as fees related to the Global Services Agreement of which $800 regarding employment arrangements and $4,894 regarding sale and purchase activities. The Company does not pay for services provided in accordance with this agreement since equal equity contribution are made by its parent company. Costs from the Global Services Agreement are charged to consolidated statement of operations or capitalized as a component of "Rigs under construction," being directly attributable cost to the construction, as applicable, and as a shareholders contribution to capital.

*Vivid Finance Limited:*  Under the consultancy agreement effective from September 1, 2010 between the Company and Vivid Finance Limited ("Vivid"), a related party entity incorporated in Cyprus, Vivid provides the Company with financing-related services such as (i) negotiating and arranging new loan and credit facilities, interest rate swap agreements, foreign currency contracts and forward exchange contracts, (ii) renegotiating

F-37

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements — (Continued)**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

existing loan facilities and other debt instruments and (iii) the raising of equity or debt in the capital markets. In exchange for its services, Vivid is entitled a fee equal to 0.20% on the total transaction amount. The consultancy agreement has a term of five years and may be terminated (i) at the end of its term unless extended by mutual agreement of the parties; (ii) at any time by the mutual agreement of the parties; and (iii) by the Company after providing written notice to Vivid at least 30 days prior to the actual termination date.

In the period from January 1, 2011 to June 30, 2011, total charges from Vivid Finance were $4,240 and charged to statement of operations and as a shareholders contribution to capital.

### Legal services

Mr. Savvas D. Georghiades, a member of the Company's board of directors, provides legal services to the Company through his law firm, Savvas D. Georghiades, Law Office. In the period January 1 to June 30, 2010 and January 1 to June 30, 2011, the Company and the subsidiary Primelead Limited paid a fee of Euro 33,149 and Euro 47,390 respectively for the legal services provided by Mr. Georghiades.

### Related party transactions on the balance sheet

Dryships, makes a number of payments towards yard installments, loan installments, loan interest and interest rate swap payments on behalf of Ocean Rig UDW. The amount payable/receivable to/from Dryships Inc. included in the accompanying consolidated balance sheets as of June 30, 2011 and December 31, 2010 amounted to $0. As of December 31, 2010 and June 30, 2011, $0 and $0 were outstanding to Cardiff respectively.

## 5. Advances for Rigs under Construction:

The amounts shown in the accompanying consolidated balance sheets include milestone payments relating to the shipbuilding contracts with the shipyards, supervision costs and any material related expenses incurred during the construction periods, all of which are capitalized in accordance with the accounting policy discussed in Note 2 of the Consolidated Financial Statements for the year ended December 31, 2010.

The amounts in the accompanying consolidated balance sheets are analyzed as follows:

|  | December 31, 2010 | June 30, 2011 |
| --- | --- | --- |
| Balance at beginning of year/period | $ 1,178,392 | $ 1,888,490 |
| Advances for drillships under construction and related costs | 710,098 | 1,561,475 |
| Drillships delivered | — | (1,745,615) |
| Balance at end of year/period | $ 1,888,490 | $ 1,704,350 |

On January 3, 2011 the Company took delivery of its newbuilding drillship, the *Ocean Rig Corcovado* , and the final yard installment of $289,000 was paid.

On March 30, 2011 the Company took delivery of its newbuilding drillship, the *Ocean Rig Olympia,* and the final yard installment of $288,400 was paid.

On April 18, 2011, April, 27 and June 23, 2011, pursuant to the drillship master agreement (Note 7), the Company exercised three of its four newbuilding drillship options under its contract with Samsung Heavy Industries Co., Ltd. ("Samsung"), dated November 22, 2010 and entered into shipbuilding contracts for three seventh generation ultra-deepwater drillships namely NB#1, NB#2 and NB#3, for a total yard cost of $608,000, per

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements — (Continued)**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

drillship. The Company paid $622,413 to the shipyard in connection with the exercise of these options. Delivery of these hulls is scheduled for July 2013, September 2013 and November 2013, respectively.

On May 16, 2011, the Company entered into an addendum to its option contract with Samsung, pursuant to which the Company was granted the option for the construction of up to two additional ultra-deepwater drillships, which would be "sister-ships" to the *Ocean Rig Corcovado* , the *Ocean Rig Olympia* , the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* and the seventh generation ultra-deepwater drillships described above, with certain upgrades to vessel design and specifications. Pursuant to the addendum, the two additional newbuilding drillship options and the remaining option under the original contract may be exercised at any time on or prior to January 31, 2012.

During the six-month period ended June 30, 2011, the Company also paid an amount of $156,061 to the yard for the construction of the *Ocean Rig Poseidon* and the *Ocean Rig Mykonos* .

**6.  Drilling Rigs, machinery and equipment:**

The amounts in the accompanying consolidated balance sheets are analyzed as follows:

| | Cost | Accumulated Depreciation | Net Book Value |
|---|---|---|---|
| **Balance, December 31, 2010** | $1,440,118 | (190,785) | $1,249,333 |
| Additions/Transfer in from rigs under construction | 1,755,634 | — | 1,755,634 |
| Depreciation | — | (63,910) | (63,910) |
| Disposals | (169) | — | (169) |
| **Balance, June 30, 2011** | $3,195,583 | (254,695) | $2,940,888 |

As of June 30, 2011, all of the Company's drilling rigs and drillships under construction have been pledged as collateral to secure the bank loans (Note 7).

**7.  Long-term Debt:**

The amount of long-term debt shown in the accompanying consolidated balance sheets is analyzed as follows:

| | December 31, 2010 | June 30, 2011 |
|---|---|---|
| Loan Facilities | $ 1,285,357 | $1,669,643 |
| Senior Notes | — | 500,000 |
| Less: Deferred financing costs | (27,810) | (47,106) |
| Total debt | 1,257,547 | 2,122,537 |
| Less: Current portion | $   560,561 | $   231,218 |
| Long-term portion | $   696,986 | $1,891,319 |

F-39

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements — (Continued)**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The principal payments, excluding deferred financing costs, to be made during each of the twelve-month periods subsequent to June 30, 2011 for the loan payments as classified in the balance sheet, are as follows:

| | |
|---|---:|
| June 30, 2012 | $  231,219 |
| June 30, 2013 | 246,667 |
| June 30, 2014 | 543,437 |
| June 30, 2015 | 114,988 |
| June 30, 2013 | 1,033,332 |
| **Total principal payments** | 2,169,643 |
| Less: Financing fees | (47,106) |
| **Total debt** | $2,122,537 |

### *Senior Notes*

On April 27, 2011, the Company issued $500.0 million aggregate principal amount of its 9.5% senior unsecured notes due 2016 (the "Senior Notes") offered in a private placement resulting in net proceeds of approximately $487.5 million.

The total interest expense related to the Senior Notes in the Company's unaudited interim condensed consolidated statement of operations for the six-month periods ended June 30, 2011 was $8,313. The contractual semi-annual coupon interest rate is 9.5% per year.

### *Credit facilities*

Please refer to Note 10 to the Company's Consolidated Financial Statements for the year ended December 31, 2010 for a discussion of the Company's various credit facilities and material loan covenants contained therein.

As of June 30, 2011, the Company had two open credit facilities, which are reduced in quarterly and semi-annual installments or bullets. The aggregate available unused amounts under these facilities, provided completion of definitive documentation of the amended loan agreement for the *Ocean Rig Mykonos,* as of June 30, 2011 were $717.4 million. The Company is required to pay a quarterly commitment fee of 0.60% per annum of the unutilized portion of the line of credit. Interest is payable at a rate based on LIBOR plus a margin. The Company signed definitive documentation to amend this facility on August 10, 2011.

On December 21, 2010, Drillship Hydra Owners Inc. entered into a $325.0 million short-term loan facility with a syndicate of lenders for the purpose of (i) meeting the ongoing working capital needs of Drillships Hydra Owners Inc.; (ii) financing the partial repayment of existing debt in relation to the purchase of the *Ocean Rig Corcovado* ; and (iii) financing the payment of the final installment associated with the purchase of said drillship. This loan facility was repayable in full in June 2011 and bore interest at a rate of LIBOR plus a margin. The Company drew down the full amount of this loan on January 5, 2011 and repaid the full amount of this loan on April 20, 2011 with borrowings under the $800.0 million senior secured term loan agreement discussed below.

On April 18, 2011, the Company entered into an $800 million syndicated secured term loan facility to partially finance the construction costs of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* . This facility has a five year term and is repayable in 20 quarterly installments plus a balloon payment payable with the last installment. The facility bears interest at LIBOR plus a margin. The facility is guaranteed by DryShips and Ocean Rig UDW and imposes certain financial covenants on both entities. On April 20, 2011, the Company drew down the full amount of this facility and prepaid the outstanding of balance its existing $325 million Bridge Loan Facility.

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements — (Continued)**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

On April 27, 2011, the Company entered into an amended agreement with all lenders under the Two $562,000 Loan Agreements to restructure the original agreements. The principal terms of the restructuring are as follows: (i) the maximum amount permitted to be drawn is reduced from $562.5 million to $495.0 million under each facility; (ii) in addition to the guarantee already provided by DryShips, the Company provided an unlimited recourse guarantee that will include certain financial covenants that will apply quarterly to Ocean Rig UDW; (iii) the Company is permitted to draw under the facility with respect to the Ocean Rig Poseidon based upon the employment of the drillship under its drilling contract with Petrobras Tanzania, and on April 27, 2011, the cash collateral deposited for this vessel was released; and (iv) the Company will be permitted to draw under the facility with respect to the *Ocean Rig Mykonos* provided it has obtained suitable employment for such drillship no later than August 2011 at specified minimum dayrates and for specified minimum terms,with charterers that are satisfactory to such lenders. These minimum dayrates are above current dayrates available in the market and the rates the Company received in certain of the Company's latest contract awards. In the event the Company is unable to secure suitable employment for the *Ocean Rig Mykonos* by that date, the Company would be required to repay all outstanding amounts under the agreement with cash collateral held with the lenders. The Company's lenders have agreed to amend the terms of the credit facility based on the Petrobras Brazil contract to allow for full draw downs to finance the remaining installment payments for the *Ocean Rig Mykonos* and the release of the cash collateral deposited for the drillship. The Company signed definitive documentation to amend this facility on August 10, 2011.

Total interest and debt issuance amortization cost incurred on long-term debt for the six-month periods ended June 30, 2010 and 2011, amounted to $18,653 and $44,997, respectively, of which $17,234 and $30,939 respectively, were capitalized as part of the cost of the "Drill Rigs under construction". Total interest incurred on long-term debt, net of capitalized interest, is included in "Interest and finance costs" in the accompanying unaudited interim condensed consolidated statement of operations (Note 9).

The weighted-average interest rates on the above outstanding loans and credit facilities for the applicable periods were 4.73% for the six-month period ended June 30, 2011 and 4.50% for the year ended December 31, 2010.

The outstanding loans above, except for the senior notes discussed in section below, are secured by a first priority mortgage over the drillships/drill rigs or assignment of shipbuilding contracts, corporate guarantee, and a first assignment of all freights, earnings, insurances and requisition compensation. The loans contain covenants including restrictions, without the bank's prior consent, as to changes in management and ownership of the vessels, additional indebtedness and mortgaging of vessels, change in the general nature of the Company's business, and maintaining an established place of business in the United States or the United Kingdom. The loans also contain certain financial covenants relating to the Company's financial position and the consolidated financial position of DryShips Inc., operating performance and liquidity. A default situation in DryShips could have a substantial effect on the Company. Should DryShips fail to pay loan installments as they fall due, this would result in a cross-default on the Company's facilities. As per December 31, 2010 and June 30, 2011 there was no default situation in DryShips and therefore no cross-default for the Company's loans.

The $500.0 million 9.5% senior unsecured notes due 2016 are unsecured obligations and rank senior in right of payment to any of the Company's future subordinated indebtedness and equally in right of payment to all of the Company's existing and future unsecured senior indebtedness. The notes will not be guaranteed by any of the Company's subsidiaries. The Company may redeem some or all of the notes as follows: (i) at any time and from time to time from April 27, 2014 to April 26, 2015, at a redemption price equal to 104.5% of the aggregate principal amount, plus accrued and unpaid interest to the date of redemption; or (ii) at any time and from time to time from April 27, 2015 at a redemption price equal to 102.5% of the aggregate principal amount, plus accrued and unpaid interest to the date of redemption. Upon a change of control, which occurs if 50% or more of the Company's shares

F-41

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements — (Continued)**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

are acquired by any person or group other than DryShips or its affiliates, the noteholders will have an option to require the Company to purchase all outstanding notes at a redemption price of 100% of the principal amount thereof plus accrued and unpaid interest to the date of purchase. Subject to a number of limitations and exceptions, the bond agreement governing the notes contains covenants limiting, among other things, the Company's ability to: (i) create liens; or (ii) merge, or consolidate or transfer, sell or lease all or substantially all of the Company's assets. Furthermore, the bond agreement contains financial covenants requiring the Company, among other things, to ensure that the Company maintains: (i) a consolidated equity ratio of minimum 35%; (ii) free cash of minimum $50 million; (iii) current ratio of minimum 1-to-1; and (iv) an interest coverage ratio of 2.5x calculated on a 12 month rolling basis. As per June 30, 2011, the Company was in compliance with the bond agreement financial covenants.

**8. Financial Instruments and Fair Value Measurements:**

As of June 30, 2011, the Company had outstanding seven interest rate swap (IRS), cap and floor agreements, with a notional amount of $1.0 billion. All derivatives are carried at fair value on the consolidated balance sheets at each period end. Balances as of December 31, 2010 and June 30, 2011, are as follows:

| | December 31, 2010 | | | June 30, 2011 | | |
|---|---|---|---|---|---|---|
| | Interest Rate Swaps | Foreign Currency Forward Contracts | Total | Interest Rate Swaps | Foreign Currency Forward Contracts | Total |
| Current Assets | $ — | 1,538 | $ 1,538 | $ — | 1,092 | $ 1,092 |
| Current liabilities | (12,503) | — | (12,503) | (5,443) | — | (5,443) |
| Non-current liabilities | (96,901) | — | (96,901) | (87,953) | — | (87,953) |
| Total | $(109,404) | 1,538 | $(107,866) | $ (93,396) | 1,092 | $(92,304) |

| | | Asset Derivatives | | Liability Derivatives | | |
|---|---|---|---|---|---|---|
| | | December 31, 2010 | June 30, 2011 | | December 31, 2010 | June 30, 2011 |
| Derivatives Designated as Hedging Instruments | Balance Sheet Location | Fair value | Fair value | Balance Sheet Location | Fair Value | Fair Value |
| Interest rate swaps | Financial instruments | $ — | $ — | Financial instruments non-current liabilities | $ (36,523) | $ — |
| Total derivatives designated as hedging instruments | | — | — | | (36,523) | — |

F-42

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements — (Continued)**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

| Derivatives Designated as Hedging Instruments | Balance Sheet Location | Asset Derivatives | | | Balance Sheet Location | Liability Derivatives | |
|---|---|---|---|---|---|---|---|
| | | December 31, 2010 | June 30, 2011 | | | December 31, 2010 | June 30, 2011 |
| | | Fair value | Fair value | | | Fair Value | Fair Value |
| **Derivatives not Designated as Hedging Instruments** | | | | | | | |
| Interest rate swaps | Financial Instruments current assets | — | — | | Financial Instruments current liabilities | (12,503) | (5,443) |
| Interest rate swaps | Financial Instruments non-current assets | — | — | | Financial Instruments non-current liabilities | (60,378) | (87,953) |
| Foreign currency forward contracts | Financial instruments current assets | 1,538 | 1,092 | | Financial instruments current liabilities | — | — |
| Total derivatives not designated as hedging instruments | | 1,538 | 1,092 | | | (72,881) | (93,396) |
| Total derivatives | | $ 1,538 | $ 1,092 | Total derivatives | | $ (109,404) | $ (93,396) |

The Effect of Derivative Instruments on the unaudited interim condensed consolidated statements of operations:

| Derivatives Designated for Cash Flow Hedging Relationships | Amount of Gain/(Loss) Recognized in OCI on Derivatives (Effective Portion) | |
|---|---|---|
| | Six-Month Period Ended June 30, 2010 | Six-Month Period Ended June 30, 2011 |
| Interest rate swaps — unrealized gains/(losses) | $ (9,707) | $ — |
| **Total** | $ (9,707) | $ — |

No portion of the cash flow hedges shown above was ineffective during 2010. Effective January 1, 2011 the Company removed the designation of the cash flow hedges and discontinued hedge accounting for the associated interest rate swaps.

During the six-month periods ended June 30, 2010 and 2011, $0 and $3,479, respectively, of existing losses were transferred from Other Comprehensive Income (OCI) to the statement of operations. The estimated net amount of existing losses at June 30, 2011 that will be reclassified to earnings within the next twelve months is $14,061.

The effects of derivative instruments not designated or qualifying as hedging instruments on the unaudited interim condensed consolidated statement of operations:

| Derivatives not Designated as Hedging Instruments | Location of Gain or (Loss) Recognized | Amount of Gain/(Loss) | |
|---|---|---|---|
| | | Six-Month Period Ended June 30, 2010 | Six-Month Period Ended June 30, 2011 |
| Foreign currency forward contracts | Other, net | $ (3,318) | $ (446) |
| Interest rate swaps | Gain/(Loss) on interest rate swaps | (34,501) | (18,616) |
| Total | | $ (37,819) | (19,062) |

F-43

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements — (Continued)**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

ASC 815, 'Derivatives and Hedging' requires companies to recognize all derivatives instruments as either assets or liabilities at fair value in the statement of financial position. Effective January 1, 2011 the Company removed the designation of the cash flow hedges and discontinued hedge accounting for the associated interest rate swaps.

For derivative instruments that are designated and qualify as a cash flow hedge, the effective portion of the gain or loss on the derivative is reported as a component of other comprehensive income and reclassified into earnings in the same period or periods during which the hedged transaction affects earnings. Gains and losses on the derivative representing either hedge ineffectiveness or hedge components excluded from the assessment of effectiveness are recognized in the accompanying consolidated statement of operations. Changes in the fair value of derivative instruments that have not been designated as hedging instruments are reported in the accompanying consolidated statement of operations.

The Company enters into interest rate swap transactions to manage interest costs and risk associated with changing interest rates with respect to its variable interest rate loans and credit facilities. The Company enters into foreign currency forward contracts in order to manage risks associated with future hire rates and fluctuations in foreign currencies, respectively.

The carrying amounts of cash and cash equivalents, restricted cash and trade accounts receivable reported in the consolidated balance sheets approximate their respective fair values because of the short term nature of these accounts. The fair value of the interest rate swaps was determined using a discounted cash flow method based on market-based LIBOR swap yield curves, taking into account current interest rates and the creditworthiness of both the financial instrument counterparty and the Company. The fair value of foreign currency forward contracts was based on the forward exchange rates.

The guidance for fair value measurements applies to all assets and liabilities that are being measured and reported on a fair value basis. This guidance enables the reader of the financial statements to assess the inputs used to develop those measurements by establishing a hierarchy for ranking the quality and reliability of the information used to determine fair values. The statement requires that assets and liabilities carried at fair value be classified and disclosed in one of the following three categories:

*Level 1:* Quoted market prices in active markets for identical assets or liabilities.

*Level 2:* Observable market- based inputs or unobservable inputs that are corroborated by market data.

*Level 3:* Unobservable inputs that are not corroborated by market data.

The following table summarizes the valuation of assets and liabilities measured at fair value on a recurring basis as of the valuation date.

| | June 30, 2011 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Recurring measurements:** | | | | |
| Interest rate swaps-liability position | $(93,396) | — | (93,396) | — |
| Foreign currency forward contracts-position | 1,092 | 1,092 | — | — |
| Total | $(92,304) | 1,092 | (93,396) | — |

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements — (Continued)**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

**9.  Interest and Finance costs:**

The amounts in the accompanying unaudited interim condensed consolidated statements of operations are analyzed as follows:

|  | Six-Month Period Ended June 30, | |
|---|---|---|
|  | **2010** | **2011** |
| Interest on long-term debt, incl amortization financing fee(*) | $ 18,653 | $ 44,997 |
| Amortization unrealized OCI hedge reserve | — | 3,272 |
| Capitalized interest | (17,236) | (30,939) |
| Long-term debt commitment fees and Bank charges | 4,321 | 4,884 |
| Total | $ 5,738 | $ 22,214 |

(*) In addition, realized losses on certain IRS associated with capitalized interest on drillships under construction were stored in OCI waiting to be reclassified into earnings together with the depreciation of the vessels. The amounts recorded were $0 and $11,178 for the six month periods ended June 30, 2011 and 2010, respectively.

**10.  Income Tax**

Ocean Rig UDW operates through its various subsidiaries in a number of countries throughout the world. Income taxes have been provided based upon the tax laws and rates in the countries in which operations are conducted and income is earned. The countries in which Ocean Rig UDW operates have taxation regimes with varying nominal rates or no system of corporate taxation, as well differing deductions, credits and other tax attributes. Consequently, there is not an expected relationship between the provision for/or benefit from income taxes and income or loss before income taxes.

**11.  Commitments and Contingencies**

**_11.1 Legal proceedings_**

Various claims, suits, and complaints, including those involving government regulations and product liability, arise in the ordinary course of the offshore drilling business.

The Company has obtained insurance for the assessed market value of the rigs. However, such insurance coverage may not provide sufficient funds to protect the Company from all liabilities that could result from its operations in all situations. Risks against which the Company may not be fully insured or insurable for include environmental liabilities, which may result from a blow-out or similar accident, or liabilities resulting from reservoir damage alleged to have been caused by the negligence of the Company.

The Company's loss of hire insurance coverage does not protect against loss of income from day one, but will be effective after 45 days' off-hire. The occurrence of casualty or loss, against which the Company is not fully insured, could have a material adverse effect on the Company's results of operations and financial condition. The insurance covers approximately one year with loss of hire.

As part of the Company's normal course of operations, the Company's customer may disagree on amounts due to the Company under the provision of the contracts which are normally settled though negotiations with the customer. Disputed amounts are normally reflected in revenues at such time as the Company reaches an agreement with the customer on the amounts due. Except for the matter discussed below, the Company is not a party to any

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements — (Continued)**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

material litigation where claims or counterclaims have been filed against the Company other than routine legal proceedings incidental to the Company's business.

Ocean Rig's Leiv Eiriksson operated in Angola in the period 2002 to 2007. Ocean Rig understands that the Angolan government has retroactively levied import/export duties for two importation events in the period 2002 to 2007. As Ocean Rig has formally disputed all claims in relation to the potential duties, no provision has been made. The maximum amount is estimated to be between $5.0 and $10.0 million. The Company believes that the assessment of duties is without merit and that the Company will not be required to pay any material amount.

### 11.2 Contractual revenue

Future minimum contractual revenue, based on vessels and rigs committed to long-term contracts as of June 30, 2011, amount to $396.9 million during 2011, $720.1 million during 2012, and $387.1 million during 2013.

### 11.3 Purchase obligations

As of June 30, 2011, the future obligations in relation to the drillships under construction amounted to $673.3 million for the next 12 months thereafter. As of August 19, 2011, the Company made an aggregate of $726.7 million of construction and construction-related payments for the Company's seventh generation drillships and have remaining total construction and construction-related payments of approximately $1,186.9 million in the aggregate.

### 11.4 Rental payments

Ocean Rig entered into a five year office lease agreement with Vestre Svanholmen 6 AS which commenced on July 1, 2007. This lease includes an option for an additional five year term which must be exercised at least six months prior to the end of the term of the initial contract which expires in June 2012. As of June 30, 2011, the future obligations amount to $0.5 million for 2011 and $0.4 million for 2012.

### 12.   Total Comprehensive Income:

The Total Comprehensive Income is analyzed as follows:

|  | Six-Month Period Ended June 30, | |
| --- | --- | --- |
|  | **2010** | **2011** |
| Net Income | $ 31,145 | $10,433 |
| Cash flow hedge | (20,886) | 3,479 |
| Increase / (Decrease) in defined benefit plan adjustments | (659) | 140 |
| Total Comprehensive Income | $  9,601 | $14,052 |

### 13.   Subsequent Events:

**13.1** On July 20, 2011 the Company signed the *Ocean Rig Corcovado* and the *Ocean Rig Mykonos* drilling contract offshore Brazil with Petróleo Brasileiro S.A ("Petrobras"). The term of each contract is 1095 days, with a total combined value of $1.1 billion.

**13.2** On July 28, 2011 the Company took delivery of its newbuilding drillship, the *"Ocean Rig Poseidon"*, the third to be delivered of the four sister drillships being constructed by Samsung. In connection with the delivery of the *" Ocean Rig Poseidon"*, the final yard installment of $309.3 million was paid, which was financed with

F-46

**OCEAN RIG UDW INC.**

**Notes to Unaudited Interim Condensed Consolidated Financial Statements — (Continued)**
**June 30, 2011**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

additional drawdowns in July under the Company's credit facility for the construction of the *"Ocean Rig Poseidon"* , totaling $308.2 million.

**13.3** On August 4, 2011, the board of directors of DryShips announced that it approved the partial spin-off, or the Spin Off, of its interest in Ocean Rig, of which it owned, as of such date, approximately 78% of the issued and outstanding common stock. DryShips will distribute approximately 2,967,359 shares of common stock of Ocean Rig to existing shareholders, which will reduce DryShips' ownership interest in Ocean Rig by approximately 2%. The number of shares of common stock of Ocean Rig to be distributed for each share of common stock of DryShips will be determined by dividing 2,967,359 by the aggregate number of issued and outstanding shares of common stock of DryShips on September 21, 2011, the record date for the distribution. As of August 4, 2011, DryShips had outstanding 399,151,783 common shares, which would have resulted in the distribution of 0.007434 shares of common stock of Ocean Rig for every one share of common stock of DryShips. Ocean Rig has been advised that DryShips intends to conduct the Spin Off in order to satisfy the initial listing criteria of the NASDAQ Global Select Market, which require that Ocean Rig have a minimum number of round lot shareholders (shareholders who own 100 or more shares), and thereby increase the liquidity of its shares of common stock. Ocean Rig believes that listing its shares of common stock on the NASDAQ Global Select Market and thereby increasing the liquidity of its shares of common stock will benefit its shareholders by improving the ability of its shareholders to monetize their investment by selling its common shares, reduce volatility in the market price of its common shares, enhance its ability to access the capital markets and increase the likelihood of attracting coverage by research analysts which, in turn, would provide additional information to shareholders upon which to base an investment decision. The Spin Off will not require any action on the part of DryShips' shareholders. In connection with the Spin Off, Ocean Rig have applied to have its common shares listed for trading on the NASDAQ Global Select Market; however Ocean Rig cannot assure you that the Spin Off will be completed or that its common shares will be approved for listing on the NASDAQ Global Select Market.

**13.4** On August 10, 2011, the Company amended the terms of its $495.0 million credit facility for the construction of the *Ocean Rig Mykonos* to allow for full draw downs to finance the remaining installment payments for the *Ocean Rig Mykonos* based on the Petrobras Brazil contract and on August 10, 2011, the cash collateral deposited for the drillship was released. The amendment also requires that the *Ocean Rig Mykonos* be re-employed under a contract acceptable to the lenders meeting certain minimum terms and dayrates at least six months, in lieu of 12 months, prior to the expiration of the Petrobras Brazil contract. All other material terms of the credit facility were unchanged.

**13.5** On August 26, 2011, the Company commenced an offer to exchange up to 28,571,428 new common shares that have been registered under the Securities Act of 1933, as amended (the "Securities Act"), for an equivalent number of common shares of Ocean Rig UDW, previously sold in a private offering made in December 2010 to both non-U.S. persons in Norway in reliance on Regulation S under the Securities Act and to qualified institutional buyers in the United States in reliance on Rule 144A under the Securities Act, pursuant to a registration statement on Form F-4 (File No. 333-175940) of Ocean Rig UDW filed with the U.S. Securities and Exchange Commission (the "Commission") on August 1, 2011, as amended by Amendment No. 1 to Form F-4 and Post-Effective Amendment No. 1 to Form F-4 filed with the Commission on August 17, 2011 and August 30, 2011, respectively.

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Shareholders of
Ocean Rig UDW Inc.

We have audited the accompanying consolidated balance sheets of Ocean Rig UDW Inc. ("the Company") as of December 31, 2010 and 2009, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2010. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Ocean Rig UDW Inc. at December 31, 2010 and 2009, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2010, in conformity with U.S. generally accepted accounting principles.

As discussed in Note 3 to the consolidated financial statements, the financial statements as of and for the year ended December 31, 2009 have been restated to correct errors in the application of ASC 835-20, *Capitalization of Interest* and ASC 815-30, *Cash Flow Hedges* .

/s/  ERNST & YOUNG AS

ERNST & YOUNG AS

Stavanger, Norway
April 29, 2011

F-48

# OCEAN RIG UDW INC.

**Consolidated Balance Sheets**
**As of December 31, 2009 and 2010**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

|  | December 31, 2009 (As restated) | December 31, 2010 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 234,195 | $ 95,707 |
| Restricted cash (Note 6) | 220,690 | 512,793 |
| Trade accounts receivable, net | 65,486 | 24,286 |
| Due from related parties (Note 4) | 4,934 | — |
| Financial instruments (Note 11) | 434 | 1,538 |
| Other current assets | 32,819 | 37,682 |
| **Total current assets** | 558,558 | 672,006 |
| **FIXED ASSETS, NET:** | | |
| Rigs under construction (Note 7) | 1,178,392 | 1,888,490 |
| Drilling rigs, machinery and equipment, net (Note 8) | 1,317,607 | 1,249,333 |
| **Total fixed assets, net** | 2,495,999 | 3,137,823 |
| **OTHER NON CURRENT ASSETS:** | | |
| Restricted cash (Note 6) | — | 50,000 |
| Intangible assets, net (Note 9) | 11,948 | 10,506 |
| Above market acquired time charter (Note 9) | 2,392 | 1,170 |
| Pensions (Note 12) | 388 | — |
| Other non-current assets (Note 13) | 40,700 | 472,193 |
| **Total non current assets, net** | 55,428 | 533,869 |
| **Total assets** | $ 3,109,985 | $ 4,343,698 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Current portion of long-term debt (Note 10) | $ 537,668 | $ 560,561 |
| Accounts payable | 13,591 | 6,189 |
| Due to related parties (Note 4) | 48,110 | — |
| Accrued liabilities | 34,235 | 45,631 |
| Deferred revenue | 38,400 | 40,205 |
| Financial instruments (Note 11) | 5,467 | 12,503 |
| Other current liabilities | 4,816 | 2,829 |
| **Total current liabilities** | 682,287 | 667,918 |
| **NON CURRENT LIABILITIES** | | |
| Long term debt, net of current portion (Note 10) | 662,362 | 696,986 |
| Financial instruments (Note 11) | 64,219 | 96,901 |
| Deferred tax liability (Note 20) | — | 209 |
| Pensions (Note 12) | — | 602 |
| **Total non current liabilities** | 726,581 | 794,698 |
| **COMMITMENTS AND CONTINGENCIES** (Note 22) | — | — |
| **STOCKHOLDERS' EQUITY:** | | |
| Common stock, $0,01 par value; 250,000,000 shares authorized, 131,696,928 issued and outstanding at December 31, 2010 (Note 14) | 10 | 1,317 |
| Additional paid in capital | 2,386,953 | 3,457,444 |
| Accumulated other comprehensiveloss | (34,128) | (60,722) |
| Retained earnings | (651,718) | (516,957) |
| **Total stockholders' equity** | 1,701,117 | 2,881,082 |
| **Total liabilities and stockholders' equity** | $ 3,109,985 | $ 4,343,698 |

The accompanying notes are an integral part of these consolidated financial statements.

## OCEAN RIG UDW INC.

**Consolidated Statements of Operations**
**For the periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of U.S. Dollars — except for share and per share data)**

| | Year Ended | | |
|---|---|---|---|
| | **2008** | **2009** | **2010** |
| | | **(As restated)** | |
| **REVENUES:** | | | |
| Leasing revenues | $ 116,859 | $ 223,774 | $ 141,211 |
| Service revenue | 85,251 | 149,751 | 261,951 |
| Other revenues | 16,553 | 14,597 | 2,550 |
| **Total Revenues** | 218,663 | 388,122 | 405,712 |
| **EXPENSES:** | | | |
| Drilling rigs operating expenses (Note 16) | 86,229 | 133,256 | 119,369 |
| Depreciation and amortization (Note 8 and 9) | 45,432 | 75,348 | 75,092 |
| Gain/(loss) of sale assets | — | — | (1,458) |
| Goodwill Impairment (Note 17) | 761,729 | — | — |
| General and administrative expenses | 14,462 | 17,955 | 19,443 |
| **Operating income/(loss)** | (689,189) | 161,563 | 190,350 |
| **OTHER INCOME/(EXPENSES):** | | | |
| Interest and finance costs (Note 18) | (71,692) | (46,120) | (8,418) |
| Interest income (Note 19) | 3,033 | 6,259 | 12,464 |
| Gain/(loss) on interest rate swaps (Note 11) | — | 4,826 | (40,303) |
| Other, net (Note 11) | (2,300) | 2,023 | 1,104 |
| **Total expenses/ income, net** | (70,959) | (33,012) | (35,153) |
| **INCOME/(LOSS) BEFORE INCOME TAXES AND EQUITY IN LOSS OF INVESTEE** | (760,148) | 128,551 | 155,197 |
| Income taxes (Note 20) | (2,844) | (12,797) | (20,436) |
| Equity in loss of investee (Note 5.1) | (1,055) | — | — |
| **NET INCOME/(LOSS)** | (764,047) | 115,754 | 134,761 |
| Less: Net income attributable to non controlling interest | (1,800) | — | — |
| **NET INCOME/(LOSS) ATTRIBUTABLE TO OCEAN RIG UDW INC.** | $ (765,847) | $ 115,754 | $ 134,761 |
| **Earnings/(loss) per common share attributable to Ocean Rig UDW inc., basic and diluted** (Note 15) | (7.43) | 1.12 | 1.30 |
| **Weighted average number of common shares, basic and diluted** | 103,125,500 | 103,125,500 | 103,908,279 |

The accompanying notes are an integral part of these consolidated financial statements

F-50

## OCEAN RIG UDW INC.

### Consolidated Statements of Stockholders' Equity
### For the periods ended December 31, 2008, 2009 and 2010
### (Expressed in thousands of U.S. Dollars — except for share and per share data)

| | Comprehensive Income/(Loss) | # of Shares | Par Value | Additional Paid-in Capital | Cash Flow Hedge | Actuarial Pension Gain/(Loss) | Option Cost | Accumulated Other Comprehensive Income/(Loss) | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| **BALANCE, December 31, 2007** | | **103,125,500** | **10** | **162,057** | | | | **—** | **(3,425)** | **158,642** |
| Net income | (765,847) | | | | | | | | (765,847) | (765,847) |
| Unrealized gain on cash flows hedges, net of tax $0 (Note 20) | (46,637) | | | | (46,637) | | | (46,637) | | (46,637) |
| Increase in defined benefit plan adjustments, net of tax $0 (Note 20) | 1,240 | | | | | 1,240 | | 1,240 | | 1,240 |
| Option costs | 812 | | | | | | 812 | | 812 | 812 |
| Capital contribution from DryShips Inc | | | | 650,164 | | | | | | 650,164 |
| Capital contribution due to retirement of treasury shares | | | | 16,582 | | | | | | 16,582 |
| Capital contribution for subsidiary due to stock option program employees | | | | 7,087 | | | | | | 7,087 |
| Retained earnings acquired | | | | | | | | | 1,800 | 1,800 |
| Redemption adjustment | | | | (212) | | | | | | (212) |
| Comprehensive income | (810,432) | | | | (46,637) | 1,240 | 812 | | | |
| **BALANCE, December 31, 2008** | | **103,125,500** | **10** | **835,678** | | | | **(44,585)** | **(767,472)** | **23,631** |
| Net income- As restated (Note 3) | 115,754 | | | | | | | | 115,754 | 115,754 |
| Realized expense on Cash flow hedges, net of tax $0 (Note 20) - As restated(Note 3) | (6,253) | | | | (6,253) | | | (6,253) | | (6,253) |
| Unrealized gain on cash flows hedges, net of tax $0 (Note 20) | 16,140 | | | | 16,140 | | | 16,140 | | 16,140 |
| Increase in defined benefit plan adjustments, net of tax $0 (Note 20) | 570 | | | | | 570 | | 570 | | 570 |
| Contribution of net assets in Drillships Investments Inc.(Note 4) | | | | 439,900 | | | | | | 439,900 |
| Cancellation of shares in relation to acquisition of Drillship Holding (Note 4) | | (25,781,375) | (3) | | | | | | | (3) |
| Acquisition of Drillships Holdings Inc. (Note 4) | | 25,781,375 | 3 | 358,000 | | | | | | 358,003 |
| Capital contribution from DryShips Inc | | | | 753,375 | | | | | | 753,375 |
| Comprehensive income | 126,211 | | | | (36,750) | 1,810 | 812 | | | |
| **BALANCE, December 31, 2009 As restated — (Note 3)** | | **103,125,500** | **10** | **2,386,953** | | | | **(34,128)** | **(651,718)** | **1,701,117** |
| Net income | 134,761 | | | | | | | | 134,761 | 134,761 |
| Realized expense on Cash flow hedges, net of tax $0 (Note 20) | (21,523) | | | | (21,523) | | | (21,523) | | (21,523) |
| Unrealized gain on cash flows hedges, net of tax $0 (Note 20) | (5,495) | | | | (5,495) | | | (5,495) | | (5,495) |
| Increase in defined benefit plan adjustments, net of tax $0 (Note 20) | 424 | | | | | 424 | | 424 | | 424 |
| Share dividend (Note 14) | | | 1,021 | (1,021) | | | | | | |
| Private Placement (Note 14) | | 28,571,428 | 286 | 488,015 | | | | | | 488,301 |
| Capital contribution from DryShips Inc | | | | 583,497 | | | | | | 583,497 |
| Comprehensive income | 108,168 | | | | (63,768) | 2,234 | 812 | | | |
| **BALANCE, December 31, 2010** | | **131,696,928** | **1,317** | **3,457,444** | | | | **(60,722)** | **(516,957)** | **2,881,082** |

The accompanying notes are an integral part of these consolidated financial statements.

F-51

**OCEAN RIG UDW INC.**

**Consolidated Statement of Cash Flows**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars)**

| | January 1 to December 31, 2008 | January 1 to December 31, 2009 (As restated) | January 1 to December 31, 2010 |
|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | |
| Net income | $ (765,847) | 115,754 | $ 134,761 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 45,432 | 75,348 | 75,092 |
| Loss from disposal of assets | — | — | 1,458 |
| Commitments fees on undrawn line of credit | 6,188 | 4,300 | 6,375 |
| Amortization and premium paid over withdrawn loans | 14,062 | 10,973 | — |
| Net amortization of fair value of acquired drilling contracts | (16,553) | (14,597) | 1,222 |
| Payments for Cash flow hedge not included in expense | — | (6,253) | (21,523) |
| Interest income on restricted cash related to drillships | — | (3,837) | (6,205) |
| Goodwill impairment charge | 761,729 | — | — |
| Income from associated companies | 1,055 | | |
| Change in fair value of derivatives | 2,512 | 31,654 | 33,119 |
| **Changes in operating assets and liabilities:** | | | |
| Trade accounts receivable | (1,569) | (23,626) | 41,200 |
| Other current assets | (1,012) | (17,521) | (4,863) |
| Deferred taxes | — | — | 209 |
| Accounts payable | (1,955) | 6,147 | (7,402) |
| Due to related parties | (26,797) | 48,110 | — |
| Other current liabilities | 1,759 | (3,207) | (1,988) |
| Pension liability | (2,015) | (142) | 1,416 |
| Accrued liabilities | (869) | 1,940 | 5,022 |
| Deferred revenue | 4,999 | 26,732 | 1,805 |
| Payment of margin call for derivatives | — | (40,700) | (37,900) |
| **Net Cash Provided by Operating Activities** | 21,119 | 211,075 | 221,798 |
| **Cash Flows from Investing Activities:** | | | |
| Investments in Ocean Rig ASA, net of cash acquired | (972,802) | | |
| Advances for vessels under construction | — | (130,832) | (705,022) |
| Down payment for vessels under construction and other improvements | — | — | (294,569) |
| Drillship options | — | — | (99,024) |
| Drilling rigs, equipment and other improvements | (16,584) | (14,152) | (6,834) |
| Increase in restricted cash | (31,287) | (185,565) | (335,898) |
| Cash from acquisition of drillships | — | 183,770 | |
| **Net Cash Used in Investing Activities** | (1,020,673) | (146,779) | (1,441,347) |
| **Cash Flows from Financing Activities:** | | | |
| Capital contribution by DryShips Inc | 650,161 | 753,375 | 540,321 |
| Net proceeds from the issuance of common shares of subsidiary | 11,306 | — | — |
| Net proceeds from the issuance of common shares | | | 488,301 |
| Proceeds from long-term credit facility | 2,050,000 | 150,000 | 8,250 |
| Proceeds from short term credit facility | — | — | 300,000 |
| Principal payments and repayments of long-term debt | (1,438,941) | (650,000) | (132,717) |
| Principal payments and repayments of short-term debt | — | (355,052) | (115,000) |
| Payment of financing costs | (15,136) | (1,364) | (8,094) |
| **Net Cash Provided by (used in) Financing Activities** | 1,257,390 | (103,041) | 1,081,061 |
| **Net (decrease) / increase in cash and cash equivalents** | 257,836 | (38,745) | (138,488) |
| **Cash and cash equivalents at beginning of period** | 15,104 | 272,940 | 234,195 |
| **Cash and cash equivalents at end of period** | $ 272,940 | 234,195 | $ 95,707 |
| SUPPLEMENTAL CASH FLOW INFORMATION: | | | |
| Cash paid during the year/period for: | | | |
| Interest, net of amount capitalized | 23,103 | 51,093 | 43,203 |
| Income taxes | 2,566 | 13,233 | 19,803 |

The accompanying notes are an integral part of these consolidated financial statements.

F-52

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

**1a.    Basis of Presentation and General Information:**

The accompanying consolidated financial statements include the accounts of Ocean Rig UDW Inc. and its subsidiaries (collectively, the "Company," "Ocean Rig UDW" or "Group"). Ocean Rig UDW was formed under the laws of the Republic of the Marshall Islands on December 10, 2007 under the name Primelead Shareholders Inc. The Company was established by DryShips Inc. for the purpose of being the holding company of its drilling rig segment. Ocean Rig UDW Inc. acquired all of the outstanding shares of Primelead Limited in December 2007 in a reverse acquisition transaction under common control, which was accounted for as a pooling of interests. As a result, the consolidated financial statements include the results of operations of Primelead Limited since the date of its inception on November 16, 2007. In 2007, DryShips Inc. through its subsidiary, Primelead Limited of Cyprus, purchased approximately 30% of the shares in Ocean Rig ASA which was accounted for as an equity method investment. In 2008, the remainder of the shares in Ocean Rig ASA were acquired and Ocean Rig ASA was delisted from Oslo Stock Exchange. The transactions were accounted for as a step acquisition under the purchase method of accounting and the results of operations were consolidated subsequent to the date control was achieved on May 14, 2008. On November 24, 2010, Ocean Rig UDW established an office and was registered with the Cyprus Registrar of Companies as an overseas company.

The Company is controlled by DryShips Inc., a publicly listed company on NASDAQ exchange listed under the symbol "DRYS".

Through Ocean Rig ASA, the predecessor of the Group, the Company was organized in 1996, when Ocean Rig ASA ordered four Hulls. The 5th generation drilling rigs *Leiv Eiriksson* and *Eirik Raude* were delivered in 2001 and 2002, while two remaining Hulls were sold. Ocean Rig UDW owned and operated as of December 31, 2010 the two semi-submersible rigs that are among the world's largest drilling rigs, built for ultra deep-waters and extreme weather conditions.

Further, the Group has acquired companies holding contracts for four drillships which are currently under construction, two of which were originally ordered in 2007 and the other two in 2008 (Note 5). Two drillships (Hulls 1837 and 1838) were ordered by certain entities including entities affiliated with the CEO of DryShips Inc, George Economou. Hulls 1865 and 1866, were ordered by DryShips Inc. which subsequently contributed all its equity interests in the companies holding these contracts to Ocean Rig UDW on 5 March 2009. The Company acquired all of the shares in Drillships Holding Inc., being the holding company of the companies holding contracts for Hull Nos. 1837 and 1838, on 15 May 2009. The two other drillships, Hull 1837, which was named Ocean Rig Corcovado, was delivered on January 3, 2011. Hull 1838 which was named Ocean Rig Olympia was delivered on March 30, 2011. The other Hulls are scheduled to be delivered in 2011.

**1b.    Liquidity and Management Plans:**

At December 31, 2010, the Company's short-term contractual obligations to fund the construction installments under the drillship shipbuilding contracts in 2011 amount to $1,374 million. Cash expected to be generated from operations is not anticipated to be sufficient to cover the Company's capital commitments, current loan obligations and maintain compliance with minimum cash balance covenants. In April 2011, the Company entered into a $800.0 million senior secured term loan agreement and drew down the full amount of the loan. Furthermore, in April 2011, the Company entered into definitive loan documentation that allows it to draw an amount of $495.0 million to cover obligations falling due within 2011. Finally, in April 2011, the Company completed the issuance of $500.0 million in aggregate principal amount of 9.50% Senior Unsecured Bonds Due 2016. Additionally, DryShips Inc. has committed to provide cash to meet the Company's liquidity needs over the next twelve months. The Company believes that the above financing and support from Dryships Inc. will be sufficient to meet its working capital needs, capital commitments (including two newbuilding drillship options exercised in 2011

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

(see Note 23.10)), loan obligations and maintain compliance with its minimum cash balance and other loan covenants throughout 2011. In addition, should the Company exercise its options to construct two new drillships, the Company would expect to be required to pay additional cash payments of approximately $415 million in 2011, for which it would be dependent upon obtaining additional financing. However, should such financing and support from DryShips not be available when required due to unexpected events, this could severely impact the Company's ability to satisfy future liquidity requirements and its ability to finance future operations.

**2.  Significant Accounting policies:**

   *(a) Principles of Consolidation:*

   The accompanying consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("US GAAP") and include the accounts and operating results of Ocean Rig UDW Inc. and its wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

   *(b) Equity method investments:*

   Investments in entities that the Company does not control, but has the ability to exercise significant influence over the operating and financial policies, are accounted for using the equity method.

   *(c) Business Combinations:*

   In accordance with Financial Accounting Standards Board guidance ("guidance") related to business combinations, the purchase price of acquired businesses is allocated to tangible and identified intangible assets acquired and liabilities assumed based on their respective fair values. The excess of the purchase price over the respective fair value of net assets acquired is recorded as goodwill. Incremental costs incurred in relation to a business combination were capitalized until the adoption of the new guidance for business combinations on January 1, 2009 that requires all costs related to business combinations to be expensed. However, associated costs to obtain related debt financing are an element of the effective interest cost of the debt. Therefore they are capitalized and amortized over the term of the related debt an included as interest expense using the effective interest method.

   *(d) Use of Estimates:*

   The preparation of consolidated financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

   *(e) Current and non-current classification:*

   Assets and liabilities are classified as current assets and current liabilities, respectively, if their maturity is within one year of the balance sheet date. Otherwise, they are classified as non-current assets and non-current liabilities.

   *(f) Cash and Cash Equivalents:*

   The Company considers highly liquid investments such as time deposits and certificates of deposit with an original maturity of three months or less to be cash equivalents.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

*(g) Restricted Cash:*

Restricted cash may include (i) retention accounts which can only be used to fund the loan installments coming due; (ii) minimum liquidity collateral requirements under the loan facilities; (iii) taxes withheld from employees and deposited in designated bank accounts; and (iv) amounts pledged as collateral for bank guarantees to suppliers; and (v) amounts pledged as collateral for credit facilities.

Restricted cash balances include minimum required cash deposits, as defined in the loan agreements, and are classified as of December 31, 2008, 2009 and 2010 as either current or non-current depending on the individual deposit (note 6).

*(h) Trade Accounts Receivable:*

The amount shown as trade accounts receivable at each balance sheet date includes receivables from charterers for hire of drilling rigs and related billings, net of a provision for doubtful accounts. At each balance sheet date, all potentially uncollectible accounts are assessed individually for purposes of determining the appropriate provision for doubtful accounts. There were no provisions for doubtful accounts at December 31, 2009 or 2010.

*(i) Related parties:*

Parties are related if one party has the ability, directly or indirectly, to control the other party or exercise significant influence over the other party in making financial and operating decisions. Parties are also related if they are subject to common control or common significant influence. Related parties also include members of the Company's or its parent company's management or owners and their immediate families (Note 4).

*(j) Derivatives:*

The Company's derivatives include interest rate swaps and foreign currency forward contracts. The guidance on accounting for certain derivative instruments and certain hedging activities requires all derivative instruments to be recorded on the balance sheet as either an asset or liability measured at its fair value, with changes in fair value recognized in earnings unless specific hedge accounting criteria are met.

*(i) Hedge Accounting:*

At the inception of a hedge relationship, the Company formally designates and documents the hedge relationship to which the Company wishes to apply hedge accounting and the risk management objective and strategy undertaken for the hedge. The documentation includes identification of the hedging instrument, hedged item or transaction, the nature of the risk being hedged and how the entity will assess the hedging instrument's effectiveness in offsetting exposure to changes in the hedged item's cash flows attributable to the hedged risk. Such hedges are expected to be highly effective in achieving offsetting changes in cash flows and are assessed on an ongoing basis to determine whether they actually have been highly effective throughout the financial reporting periods for which they were designated.

The Company is party to interest swap agreements where it receives a floating interest rate and pays a fixed interest rate for a certain period in exchange. Certain contracts which meet the criteria for hedge accounting are accounted for as cash flow hedges.

A cash flow hedge is a hedge of the exposure to variability in cash flows that is attributable to a particular risk associated with a recognized asset or liability, or a highly probable forecasted transaction that could affect profit or loss.

F-55

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The effective portion of the gain or loss on the fair value of the hedging instrument is recognized directly as a component of Other comprehensive income in equity, while any ineffective portion is recognized, immediately, in current period earnings. The Company discontinues cash flow hedge accounting if the hedging instrument expires and it no longer meets the criteria for hedge accounting or designation is revoked by the Company. At that time, any cumulative gain or loss on the hedging instrument recognized in equity is kept in equity until the forecasted transaction occurs. When the forecasted transaction occurs, any cumulative gain or loss on the hedging instrument is recognized in profit or loss. If a hedged transaction is no longer expected to occur, the net cumulative gain or loss recognized in equity is transferred to net profit or loss for the year as financial income or expense.

*(ii) Other Derivatives:*

Changes in the fair value of derivative instruments that have not been designated as hedging instruments are reported in current period earnings under "Gain/(loss) on interest rate swaps" and "Other net".

*(k) Guidance "Fair Value Measurements":*

Effective January 1, 2008, the Company adopted the guidance "Fair Value Measurements and Disclosures". In addition, on January 1, 2008, the Company made no election to account for its monetary assets and liabilities at fair values as allowed by FASB guidance for financial instruments (Note 11).

*(l) Concentration of Credit Risk:*

Financial instruments, which potentially subject the Company to significant concentrations of credit risk, consist principally of cash and cash equivalents; trade accounts receivable and derivative contracts (interest rate swaps and foreign currency contracts. The maximum exposure to loss due to credit risk is the book value at the balance sheet date. The Company places its cash and cash equivalents, consisting mostly of deposits, with qualified financial institutions. The Company performs periodic evaluations of the relative credit standing of those financial institutions. The Company is exposed to credit risk in the event of non-performance by counter parties to derivative instruments; however, the Company limits its exposure by diversifying among counter parties. The Company's customers are mainly major oil companies. The credit risk has therefore determined by the Company to be low. When considered necessary, additional arrangements are put in place to minimize credit risk, such as letters of credit or other forms of payment guarantees. The Company limits its credit risk with trade accounts receivable by performing ongoing credit evaluations of its customer's financial condition and generally does not require collateral for its trade accounts receivable. The Company has made drillships prepayments to Samsung Heavy Industries. The ownership of the drillships is transferred from the yard to the Company at delivery. The credit risk of the prepayments is to a large extent reduced through refund guarantees by highly rated banks.

As of December 31, 2010, cumulative installment payments made to Samsung Heavy Industries amounts to approximately $1,512,655 for the four units contracted. These installment payments are, to a large extent, secured with irrevocable letters of guarantee, covering pre-delivery installments if the contract is rescinded in accordance with the terms of the contract. The irrevocable letters of guarantee are issued by high quality banks.

The coverage ratios (letter of credit to total Samsung payments) as per December 31, 2010, are 95%, 94% and 94% for Hulls 1838, 1865 and 1866, respectively. As a result, the open risk is $19,000 for Hull 1838 and $30,000 for the Hulls 1865 and 1866. The open risk (prepayments less letters of guarantee) is considered to be within acceptable levels given Samsung Heavy Industries' financial position and position as key company for South Korea. The drillships, while under construction, will be insured by Samsung Heavy Industries from the time of the keel-laying until delivery.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

*(m) Rigs under construction:*

This represents amounts expended by the Company in accordance with the terms of the construction contracts for drillships as well as expenses incurred directly or under a management agreement with a related party in connection with on sight supervision. In addition, interest costs incurred during the construction (until the asset is substantially complete and ready for its intended use) are capitalized. The carrying value of rigs under construction ("Newbuildings") represents the accumulated costs at the balance sheet date. Cost components include payments for yard installments and variation orders, commissions to related party, construction supervision, equipment, spare parts, capitalized interest, costs related to first time mobilization and commissioning costs. No charge for depreciation is made until commissioning of the newbuilding has been completed and it is ready for its intended use.

*(n) Capitalized interest* :

Interest expenses are capitalized during construction of rigs under construction based on accumulated expenditures for the applicable project at the Company's current rate of borrowing. The amount of interest expense capitalized in an accounting period is determined by applying an interest rate ("the capitalization rate") to the average amount of accumulated expenditures for the asset during the period. The capitalization rates used in an accounting period are based on the rates applicable to borrowings outstanding during the period. The Company does not capitalize amounts beyond the actual interest expense incurred in the period.

If the Company's financing plans associate a specific new borrowing with a qualifying asset, the Company uses the rate on that borrowing as the capitalization rate to be applied to that portion of the average accumulated expenditures for the asset that does not exceed the amount of that borrowing. If average accumulated expenditures for the asset exceed the amounts of specific new borrowings associated with the asset, the capitalization rate applied to such excess is a weighted average of the rates applicable to other borrowings of the Company.

*(o) Drilling Rigs machinery and equipment, Net:*

**(i)** Drilling rigs are stated at historical cost less accumulated depreciation. Such costs include the cost of adding or replacing parts of drilling rig machinery and equipment when that cost is incurred, if the recognition criteria are met. The recognition criteria require that the cost incurred extends the useful life of a drilling rig. The carrying amounts of those parts that are replaced are written off and the cost of the new parts is capitalized. Depreciation is calculated on a straight- line basis over the useful life of the assets as follows: bare deck 30 years and other asset parts 5 to 15 years.

**(ii)** Drilling rig machinery and equipment, IT and office equipment, are recorded at cost and are depreciated on a straight-line basis over the estimated useful lives, for Drilling rig machinery and equipment over 5-15 years and for IT and office equipment over 5 years.

*(p) Goodwill and Intangible assets:*

Goodwill represents the excess of the purchase price over the estimated fair value of net assets acquired in a business combination. Goodwill is reviewed for impairment whenever events or circumstances indicate possible impairment. The Company tests goodwill for impairment annually. Goodwill is not amortized. The Company has no other intangible assets with an indefinite life. The Company tests for impairment each year on December 31.

The Company tests goodwill for impairment by first comparing the carrying value of the reporting unit, which is defined as an operating segment or a component of an operating segment that constitutes a business for which

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

financial information is available and is regularly reviewed by management, to its fair value. The Company estimates the fair value of the reporting unit by weighting the combination of generally accepted valuation methodologies, including both income and market approaches.

For the income approach, the Company applies undiscounted projected cash flows. To develop the projected net cash flows from the Company's reporting unit, which are based on estimated future utilization, day rates, projected demand for its services, and rig availability, the Company considers key factors that include assumptions regarding future commodity prices, credit market uncertainties and the effect these factors may have on the Company's contract drilling operations and the capital expenditure budgets of its customers.

For the market approach, the Company derives publicly traded company multiples from companies with operations similar to the Company's reporting unit by using information publicly disclosed by other publicly traded companies and, when available, analyses of recent acquisitions in the marketplace.

If the fair value of a reporting unit exceeds its carrying value, no further testing is required. This is referred to as Step 1. If the fair value is determined to be less than the carrying value, a second step, Step 2, is performed to compute the amount of the impairment, if any. In this process, an implied fair value for goodwill is estimated, based in part on the fair value of the operations, and is compared to its carrying value. The shortfall of the implied fair value of goodwill below its carrying value represents the amount of goodwill impairment.

All of the Company's goodwill was impaired for the year ended December 31, 2008 (Note 17).

The Company's finite-lived acquired intangible assets are recorded at historical cost less accumulated amortization. Amortization is recorded on a straight-line basis over their estimated useful lives of the intangibles as follows:

| Intangible Assets/Liabilities | Years |
|---|---|
| Tradenames | 10 |
| Software | 10 |
| Fair value of above/below market acquired time charters | Over remaining contract term |

Tradenames and software constitute the item "Intangible assets" in the Consolidated Balance Sheets. The amortization of these items are included in the line "Depreciation and amortization" in the Consolidated Statement of Operations.

*(q) Impairment of Long-lived assets:*

The Company reviews for impairment long-lived assets and intangible long-lived assets held and used whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. In this respect, the Company reviews its assets for impairment on a rig by rig and asset by asset basis. When the estimate of undiscounted cash flows, excluding interest charges, expected to be generated by the use of the asset is less than its carrying amount, the Company evaluates the asset for impairment loss. The impairment loss is determined by the difference between the carrying amount of the asset and the fair value of the asset.

As at December 31, 2009 and 2010, the Company performed an impairment review of the Company's long-lived assets due to the global economic downturn, the significant decline in drilling rates in the rig industry and the outlook of the oil services industry. The Company compared undiscounted cash flows with the carrying values of the Company's long-lived assets to determine if the assets were impaired. In developing estimates of future cash flows, the Company relied upon assumptions made by management with regard to the Company's rigs, including future drilling rates, utilization rates, operating expenses, future dry docking costs and the estimated remaining

F-58

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

useful lives of the rigs. These assumptions are based on historical trends as well as future expectations in line with the Company's historical performance and the Company's expectations for future fleet utilization under its current fleet deployment strategy, and are consistent with the plans and forecasts used by management to conduct its business. The variability of these factors depends on a number of conditions, including uncertainty about future events and general economic conditions; therefore, the Company's accounting estimates might change from period to period. As a result of the impairment review, the Company determined that the carrying amounts of its assets held for use were recoverable, and therefore, concluded that no impairment loss was necessary for 2009 and 2010.

### (r) Fair value of above/below market acquired time charter:

In a business combination, the Company identifies assets acquired or liabilities assumed and records all such identified assets or liabilities at fair value. Favorable or unfavorable drilling contracts exist when there is a difference between the contracted dayrate and the dayrates prevailing at the acquisition date. The amount to be recorded as an asset or liability at the acquisition date is based on the difference between the then-current fair values of a charter with similar characteristics as the time charter assumed and the net present value of future contractual cash flows from the time charter contract assumed. When the present value of the time charter assumed is greater than the then-current fair value of such charter, the difference is recorded as "Fair value of above market acquired time charter." When the opposite situation occurs, the difference is recorded as "Fair value of below-market acquired time charter." Such assets and liabilities are amortized as a reduction of or an increase in "Other revenue," over the period of the time charter assumed.

### (s) Deferred financing costs:

Deferred financing costs include fees, commissions and legal expenses associated with the Company's long-term debt and are capitalized and recorded net with the underlying debt. These costs are amortized over the life of the related debt using the effective interest method and are included in interest expense. Unamortized fees relating to loans repaid or refinanced as debt extinguishments are expensed as interest and finance costs in the period the repayment or extinguishment is made.

### (t) Pension and retirement benefit obligation:

For employees, the Company has five retirement benefit plans, which are managed and funded through Norwegian life insurance companies. The projected benefit obligations are calculated based on projected unit credit method and compared with the fair value of pension assets.

Because a significant portion of the pension liability will not be paid until well into the future, numerous assumptions have to be made when estimating the pension liability at the balance sheet date. The assumption may be split into two categories; actuarial assumptions and financial assumptions. The actuarial assumptions are unbiased, mutually compatible and represent the Company's best estimates of the variables. The financial assumptions are based on market expectations at the balance sheet date, for the period over which the obligations are to be settled. Due to the long-term nature of the pension obligations, they are discounted to present value.

The funded status or net amount of the projected benefit obligation and pension asset (net pension liability or net pension asset) of each of its defined benefit plans, is recorded in the balance sheet under the captions "Non-current liabilities" and "Non-current assets" with an offsetting amount in "Accumulated other comprehensive income" for any amounts of actuary gains of losses or prior service cost that has not been amortized to income.

F-59

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

Net pension costs (benefit earned during the period including interest on the projected benefit obligation, less estimated return on pension assets and amortization of accumulated changes in estimates) are included in "General and administrative expenses" (administration employees) and "Rig operating expenses" (rig employees).

Actuarial gains and losses are recognized as income or expense when the net cumulative unrecognized actuarial gains and losses for each individual plan at the end of the previous reporting year exceed 10% of the higher of the present value of the defined benefit obligation and the fair value of plan assets at that date. These gains and losses are recognized over the expected average remaining working lives of the employees participating in the plans.

*(u) Provisions:*

A provision is recognized in the balance sheet when the Company has a present legal or constructive obligation as a result of a past event, and it is probable that an outflow of economic benefits will be required to settle the obligation and a reliable estimate of the amount can be made.

*(v) Revenue and Related Expenses:*

*Revenues:*  The Company's services and deliverables are generally sold based upon contracts with its customers that include fixed or determinable prices. The Company recognizes revenue when delivery occurs, as directed by its customer, or the customer assumes control of physical use of the asset and collectability is reasonably assured. The Company evaluates if there are multiple deliverables within its contracts and whether the agreement conveys the right to use the drill rigs for a stated period of time and meet the criteria for lease accounting, in addition to providing a drilling services element, which are generally compensated for by day rates. In connection with drilling contracts, the Company may also receive revenues for preparation and mobilization of equipment and personnel or for capital improvements to the drilling rigs and day rates or fixed price non-contingent demobilization fees. Revenues are recorded net of agents' commissions which may range from one to three percent of gross revenues. There are two types of drilling contracts: well contracts and term contracts.

*Well contracts:*  Well contracts are contracts under which the assignment is to drill a certain number of wells. Revenue from dayrate based compensation for drilling operations is recognized in the period during which the services are rendered at the rates established in the contracts. All mobilization revenues, direct incremental expenses of mobilization and contributions from customers for capital improvements are initially deferred and recognized as revenues over the estimated duration of the drilling period. To the extent that expenses exceed revenue to be recognized, they are expensed as incurred. Contingent demobilization revenues are recognized as the amounts become known over the demobilization period. Non-contingent demobilization revenues are recognized over the estimated duration of the drilling period. All costs of demobilization are expensed as incurred. All revenues for well contracts are recognized as "Service revenues" in the statement of operations.

*Term contracts:*  Term Contracts are contracts under which the assignment is to operate the unit for a specified period of time. For these types of contracts the Company determines whether the arrangement is a multiple element arrangement containing both a lease element and drilling services element. For revenues derived from contracts that contain a lease, the lease elements are recognized as "Leasing revenues" in the statement of operations on a basis approximating straight line over the lease period. The drilling services element is recognized as "Service revenues" in the period in which the services are rendered at estimated fair value. Revenues related to the drilling element of mobilization and direct incremental expenses of drilling services are deferred and recognized over the estimated duration of the drilling period. To the extent that expenses exceed revenue to be recognized, they are expensed as incurred. Contingent demobilization fees are recognized as the amounts become known over the demobilization period. Non-contingent demobilization revenues for the drilling services element are recognized

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

over the estimated duration of the drilling period. All costs of demobilization are expensed as incurred. Contributions from customers for capital improvements are initially deferred and recognized as revenues over the estimated duration of the drilling contract.

See *(r) Fair value of above/ below market acquired time charter* **,** for an explanation of "Other revenues."

**(w) Class costs:**

The Company follows the direct expense method of accounting for periodic class costs incurred during special surveys of drilling rigs, normally every five years. Class costs and other maintenance costs are expensed in the period incurred and included in drilling rigs operating expenses.

**(x) Foreign Currency Translation:**

The functional currency of the Company is the U.S. Dollar since the Company operates in international drilling markets, and therefore primarily transacts business in U.S. Dollars. The Company's accounting records are maintained in U.S. Dollars. Transactions involving other currencies during the year are converted into U.S. Dollars using the exchange rates in effect at the time of the transactions. At the balance sheet dates, monetary assets and liabilities, which are denominated in other currencies, are translated into U.S. Dollars at the year-end exchange rates. Resulting gains or losses are included in "General and administrative expenses" in the accompanying consolidated statements of operations.

**(y) Income Taxes:**

Income taxes have been provided for based upon the tax laws and rates in effect in the countries in which the Company's operations are conducted and income is earned. There is no expected relationship between the provision for/or benefit from income taxes and income or loss before income taxes because the countries in which the Company operates have taxation regimes that vary not only with respect to the nominal rate, but also in terms of the availability of deductions, credits and other benefits. Variations also arise because income earned and taxed in any particular country or countries may fluctuate from year to year. Deferred tax assets and liabilities are recognized for the anticipated future tax effects of temporary differences between the financial statement basis and the tax basis of the Company assets and liabilities using the applicable jurisdictional tax rates in effect at the year end. A valuation allowance for deferred tax assets is recorded when it is more likely than not that some or all of the benefit from the deferred tax asset will not be realized. The Company accrues interest and penalties related to its liabilities for unrecognized tax benefits as a component of income tax expense.

**(z) Earnings/(loss) per common share:**

Basic earnings per common share ("EPS") is calculated by dividing net income available to common stockholders by the weighted average number of common shares outstanding during the year. Diluted EPS reflect the potential dilution that could occur if securities or other contracts to issue common stock were exercised. Dilution has been computed using the treasury stock method.

**(aa) Other comprehensive income/(loss):**

The Company records certain transactions directly as "Comprehensive income/(loss)" which is shown as a separate component of "Stockholders' equity."

**(ab) Business segment:**

Offshore drilling operations represent the Company's only segment.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

*(ac) Recent accounting pronouncements:*

In September 2009, clarifying guidance was issued on multiple-element revenue arrangements. The revised guidance primarily provides two significant changes: 1) eliminates the need for objective and reliable evidence of the fair value for the undelivered element in order for a delivered item to be treated as a separate unit of accounting, and 2) eliminates the residual method to allocate the arrangement consideration. In addition, the guidance also expands the disclosure requirements for revenue recognition. The new guidance will be effective for the first annual reporting period beginning on or after June 15, 2010, with early adoption permitted provided that the revised guidance is retroactively applied to the beginning of the year of adoption. The Company is currently assessing the future impact of this new accounting pronouncement to its consolidated financial statements.

In January 2010, the FASB issued ASU 2010-01, Accounting for Distributions to Shareholders with Components of Stock and Cash which amends FASB ASC 505, Equity in order to clarify that the stock portion of a distribution to shareholders that allows the shareholder to elect to receive cash or stock with a potential limitation on the total amount of cash that all shareholders can elect to receive in the aggregate is considered a share issuance that is reflected in earnings per share prospectively and is not a stock dividend for purposes of applying FASB ASC 505, Equity and FASB ASC 260, The Company has not been involved in any such distributions and thus, the impact to the Company cannot be determined until any such distribution occurs.

In January 2010, the FASB issued ASU 2010-06, Fair Value Measurements and Disclosures (Topic 820)- Improving Disclosures about Fair Value Measurements. ASU 2010-06 amends ASC 820 to add new requirements for disclosures about transfers into and out of Levels 1 and 2 and separate disclosures about purchases, sales, issuances, and settlements relating to Level 3 measurements. It also clarifies existing fair value disclosures about the level of disaggregation and about inputs and valuation techniques used to measure fair value. The ASU also amends guidance on employers' disclosures about postretirement benefit plan assets under ASC 715 to require that disclosures be provided by classes of assets instead of by major categories of assets. The guidance in the ASU was effective for the first reporting period (including interim periods) beginning after December 15, 2009, except for the requirement to provide the Level 3 activity of purchases, sales, issuances, and settlements on a gross basis, which will be effective for fiscal years beginning after December 15, 2010, and for interim periods within those fiscal years. The adoption of this guidance did not have any impact on its financial position and results of operation, but the required note disclosures have been included in the financials.

**3.  Restatement of Previously Issued Financial Statements:**

The Company restated its previously reported consolidated financial statements for the year ended December 31, 2009 to reflect the correction of an error in computing capitalized interest expense for rigs under construction. Management concluded that the amortization of and the deferred financing cost should have been included in the capitalized rate affecting the capitalization of interest.

Additionally, the Company considered ASC 835-20, *Capitalization of Interest* , and ASC 815-30, *Cash Flow Hedges* , and restated its previously reported financial statements for 2009 to reflect the correction of an error to reverse the reclassification into earnings of that portion of interest that should have remained in accumulated other comprehensive loss since it related to cash flow hedges of the variability of interest on borrowings that was capitalized as part of rigs under construction. Such accumulated other comprehensive loss should be reclassified into earnings in the same periods during which the hedged transactions affect earnings.

The Company's management determined that the Interest and finance costs were overstated by $11,189, rigs under construction were understated by $6,253, accumulated other comprehensive loss was understated by $4,936 and retained earnings was understated by $11,189.

F-62

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The following tables reflect the impacts on the financial statement line items of the accounting adjustments:

| | As Previously Reported | For the Year Ended December 31, 2009 | |
| --- | --- | --- | --- |
| | | Errors | As Restated |
| **Consolidated Statement of Operations** | | | |
| Interest and finance costs | $ (57,309) | 11,189 | $ (46,120) |
| Net profit attributable to Ocean Rig UDW Inc. | 104,565 | 11,189 | 115,754 |
| Income per common share, basic and diluted | $ 1.01 | 0.1 | $ 1.12 |

| | As Previously Reported | December 31, 2009 | |
| --- | --- | --- | --- |
| | | Errors | As Restated |
| **Consolidated Balance Sheet** | | | |
| Rigs under construction | $ 1,173,456 | 4,936 | $1,178,392 |
| Total Fixed Assets, net | 2,491,063 | 4,936 | 2,495,999 |
| Total assets | 3,105,049 | 4,936 | 3,109,985 |
| Accumulated other comprehensive loss | (27,875) | (6,253) | (34,128) |
| Retained earnings | (662,907) | 11,189 | (651,718) |
| Total equity | 1,696,181 | 4,936 | 1,701,117 |
| Total liabilities and stockholders' equity | 3,105,049 | 4,936 | 3,109,985 |

| | As Previously Reported | For the Year Ended December 31, 2009 | |
| --- | --- | --- | --- |
| | | Errors | As Restated |
| **Consolidated Cash Flow** | | | |
| Net income | $ 104,565 | 11,189 | $ 115,754 |
| Interest income on restricted cash related to drillships(*) | — | (3,837) | (3,837) |
| Payments for Cash flow hedge not included in expense | — | (6,253) | (6,253) |
| Net Cash provided by Operating Activities | 209,976 | 1,099 | 211,075 |
| Advances for vessels under construction | (125,896) | (4,936) | (130,832) |
| Increase in restricted cash * | (189,403) | (3,837) | (185,565) |
| Net Cash Used in Investing Activities | (145,681) | (1,099) | (146,779) |
| Net (decrease)/increase in cash and cash equivalents | $ (38,745) | — | $ (38,745) |

(*) Interest income on restricted cash related to drillships has been reclassified from Increase in restricted cash, as included in the section Net Cash Used in Investing Activities, to Interest income on restricted cash related to drillships, as included in Net Cash provided by Operating Activities.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

**4.   Transactions with Related Parties:**

*Purchase of Ocean Rig ASA shares from a Related Party in 2007 and 2008*

On December 20, 2007, for consideration of $406,024, the Company acquired 51,778,647 shares in Ocean Rig ASA from Cardiff Marine Inc.(5). This represented 30.4% of the issued shares in Ocean Rig ASA. A commission was paid to Cardiff amounting to $4,050. The above commission was paid on February 1, 2008. The commission was expensed and presented as part of "Interest and finance costs" in 2007.

In April 2008, 7,546,668 shares, representing 4.4% of the share capital of Ocean Rig ASA were purchased from companies controlled by the Chairman and Chief Executive Officer of DryShips Inc for a consideration of $66,800, which is the U.S. dollar equivalent NOK 45 per share, which is the price that was offered to all shareholders in a mandatory offering.

In addition, a commission was paid to Cardiff amounting to $9,900 for services rendered in relation to the acquisition of the remaining shares in 2008 of Ocean Rig ASA. This commission was paid on December 5, 2008 and was expensed and presented as part of "Interest and finance costs" in 2008.

*Acquisition of Drillship Hulls 1837 and 1838*

On October 3, 2008, the Company entered into a share purchase agreement with certain unrelated parties and certain entities affiliated with the Chairman and Chief Executive Officer of DryShips Inc. to acquire the new build contracts for the drillship Hulls 1837 and 1838, which were under construction, and the associated debt, included in Drillships Holdings Inc. ("Drillships Holdings") (Note 1). On May 15, 2009, the transaction closed. Since the investment did not meet the definition of a business, it was accounted for as a net asset acquisition on the closing date. As consideration for this asset acquisition, Ocean Rig UDW cancelled 25% of the shares held by DryShips Inc. as of May 15, 2009 and simultaneously reissued the same number of shares to the sellers. Consequently, following this transaction the sellers held shares equal to 25% of the Company's total issued and outstanding common shares. The value of the shares issued was determined based on the fair value of the net assets acquired of $358,000 and was recorded as an increase in the paid in capital in stockholder's equity. The fair values of individual assets and liabilities acquired by the Company were as follows:

|  | Amount |
|---|---|
| Contracts for construction of drillship Hulls 1837 and 1838 | $ 625,400 |
| Cash deposits | 200 |
| Debt assumed | (259,900) |
| Other liabilities | (7,700) |
| Net assets acquired | $ 358,000 |

*Acquisition of Drillships Hulls 1865 and 1866*

On March 5, 2009, DryShips Inc. contributed to the Company the new build contracts for the drillship Hulls 1865 and 1866 under construction and other associated assets and debt included in Drillships Investments Inc. Since the transfer did not meet the definition of a business, it was not an exchange of a business under common control. Therefore, it was accounted for prospectively as a net asset acquisition under common control and the assets acquired and liabilities assumed were recorded at the historical cost of DryShips Inc. in the period in which the transfer occurred. The contribution of shares is recorded as an increase in paid in capital in stockholder's equity at the historical cost of net assets of $439,900.

F-64

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The carryover basis of individual assets and liabilities received by the Company were the construction contracts for Hulls 1865 and 1866 at an aggregate of $422,100, cash deposits of $183,500, other receivables of $40,700, intercompany receivables of $1,300, bank borrowings of $161,900, other liabilities of $100 and financial instruments with a negative fair value of $45,700.

### *Management Agreements with Cardiff Marine Inc. (Cardiff) and Vivid Finance Ltd.*

Cardiff engages primarily in the management of ocean-going vessels, including but not limited to vessels owned by DryShips Inc. Cardiff is beneficially majority-owned by the Chairman and Chief Executive Officer of DryShips, Mr. George Economou. In addition, Cardiff has management agreements in place with the Company relating to Hulls 1837 and 1838 for a management fee of $40 per month per hull.

The management agreements also provide for: (i) chartering commission of 1.25% on the revenue earned; (ii) a commission of 1.00% on all gross shipyards payments or sale proceeds for drillships; (iii) a commission of 1% on loan financing or refinancing; and (iv) a commission of 2% on insurance premiums. The management agreements were terminated effective December 21, 2010 and replaced by Vivid Finance and Global service agreements; however all obligations to pay for services rendered by Cardiff prior to termination remain in full effect, which amounted to $5.8 million as of December 31, 2010 and is due and payable in 2011. During the years ended December 31, 2008, 2009 and 2010, total charges from Cardiff under the management agreements amounted to $0.0 million, $1.9 million and $4.0 million, respectively. This was capitalized as drillship under construction cost, being a cost directly attributable to the construction of the two drillships, the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* .

Under this agreement Vivid Finance Ltd, a company controlled by the Chairman, President and Chief Executive Officer, Mr. George Economou, provides consultancy services on financing matters for DryShips and its affiliates, subsidiaries or holding companies, including the Company, as directed by DryShips. Under this agreement, Vivid Finance provides consulting services relating to (i) the identification, sourcing, negotiation and arrangement of new loan and credit facilities, interest swap agreements, foreign currency contracts and forward exchange contracts; (ii) the raising of equity or debt in the public capital markets; and (iii) the renegotiation of existing loan facilities and other debt instruments. In consideration for these services, Vivid Finance is entitled to a fee of twenty basis points, or 0.20%, on the total transaction amount. The Company does not pay for services provided in accordance with this agreement. DryShips Inc. pays for the services. Accordingly, these expenses are recorded in the consolidated statement of operations (or as otherwise required by US GAAP) and as a shareholders contribution to capital (additional paid-in capital).

Under the Global Services Agreement with DryShips, Cardiff, a company controlled by Mr. George Economou, or its subcontractor, will (i) provide consulting services related to identifying, sourcing, negotiating and arranging new employment for offshore assets of DryShips and its subsidiaries, including our drilling units; and (ii) identify, source, negotiate and arrange the sale or purchase of the offshore assets of DryShips and its subsidiaries, including our drilling units. In consideration of such services, DryShips will pay Cardiff a fee of 1.0% in connection with employment arrangements and 0.75% in connection with sale and purchase activities. The Company does not pay for services provided in accordance with this agreement, these expenses will however be recorded in the consolidated statement of operations and as a shareholders contribution to capital (additional paid-in capital).

In the period from acquisition of Hulls 1837 and 1838 on May 15, 2009 to December 31, 2009, and January 1 to December 31, 2010 total charges from Cardiff under the management agreements amounted to $1,868 and $3,983 respectively. Costs from management service agreements are capitalized as a component of "Rigs under

F-65

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

construction," being directly attributable cost to the construction. As of December 31, 2009 and 2010, no balances were outstanding to Cardiff.

In the period from September 1, 2010 to December 31,2010, total charges from Vivid Finance was $1,000 and charged to equity (additional paid-in capital) in relation to the private placement as cost directly attributable to the offering and reflected as an increase in shareholder contribution to capital, see note 14.

### Private offering

A company controlled by our Chairman, President and Chief Executive Officer, Mr. George Economou, purchased 2,869,428 common shares, or 2.38% of our outstanding common shares, in the private offering that was completed on December 21, 2010. The offering price was $17.50 per share. The price per share paid was the same as that paid by other investors taking part in the private offering. See note 14.

### Purchase of drillship options from DryShips

On November 22, 2010, DryShips entered into an option contract with Samsung for the construction of up to four ultra-deepwater drillships. The new orders would be "sister-ships" to the Ocean Rig Corcovado, the Ocean Rig Olympia and the two drillships under construction and would have the same specifications as the Ocean Rig Poseidon. Each of the four options to build a drillship may be exercised on or prior to November 22, 2011 with vessel deliveries ranging from 2013 until 2014 depending on when the options are exercised. The total construction cost, excluding financing costs, is estimated to be about $600 million per drillship. The agreement includes a non-refundable slot reservation fee of $24.8 million per drillship, which was paid by DryShips, which will be applied towards the drillship contract price if the options are exercised. This agreement was novated to the Company by DryShips on December 30, 2010 at a cost of $99.0 million. In addition, the Company paid deposits totaling $20.0 million to Samsung in the first quarter of 2011 to maintain favorable costs and yard slot timing under the option contract.

### Legal services

Mr. Savvas D. Georghiades, a member of the Company's board of directors, provides legal services to the Company and to its predecessor, Primelead Limited through his law firm, Savvas D. Georghiades, Law Office. In the year ended December 31, 2010, the Company and Primelead Limited paid a fee of Euro 94,235 for the legal services provided by Mr. Georghiades.

### Related party transactions on the balance sheet

DryShips, makes a number of payments towards yard installments, loan installments, loan interest and interest rate swap payments on behalf of Ocean Rig UDW. The receivable from or payable to DryShips Inc. included in the accompanying consolidated balance sheets amounted to receivables of $4,934 and payables of $48,110 as of December 31, 2009. There were no receivables or payables as of December 31, 2010.

## 5.  Acquisition of Ocean Rig:

### 5.1 Initial investment in 2007 using the equity method:

On December 20, 2007, the Company acquired 51,778,647 shares or 30.4% of the issued shares in Ocean Rig ASA from a related party (Note 4). Ocean Rig ASA, incorporated on September 26, 1996 and at that time domiciled in Norway, was a public limited company whose shares previously traded on the Oslo Stock Exchange.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The Company accounted for its investment in Ocean Rig for the year ended December 31, 2007, and for the period from January 1, 2008 to May 14, 2008 using the equity method of accounting. The Company's proportionate share in the loss of Ocean Rig ASA and related amortization of purchase price allocation adjustments is shown in the accompanying consolidated statements of operations for the year ended December 31, 2008 as "Equity in loss of investee" and amounted to a loss of $1,055.

Summarized financial information of the Company's equity method investees that represent 100% of the investees' financial information, is as follows:

|  | January 1 to May 14, 2008 |
| --- | --- |
| **Result of Operations** | |
| Revenues | $ 99,172 |
| Operating income/ (loss) | $ 19,521 |
| Net Loss | $ (23,396) |

### 5.2 Subsequent step transactions in 2008 to acquire 100%

After acquiring more than 33% of Ocean Rig ASA's outstanding shares on April 22, 2008, the Company, as required by Norwegian Law, launched a mandatory bid for the remaining shares of Ocean Rig at a price of NOK45 per share ($8.89 per share). The Company acquired control over Ocean Rig ASA on May 14, 2008. The results of operations related to the acquisition are included in the consolidated financial statements since May 15, 2008. The mandatory bid expired on June 11, 2008. As of July 10, 2008, the total shares held by the Company in Ocean Rig amounted to 100% (163.6 million shares). Out of the total shares acquired as discussed above, 5.4% of the share capital of Ocean Rig was purchased from companies controlled by George Economou (Note 4).

During the second quarter of 2008, the Company recorded a non-controlling minority interest on its balance sheet in accordance with guidance related to classification and measurement of redeemable equity securities. The resulting non-controlling interest was recorded at its fair value based upon the bid price in NOK which exceeded it carrying value with a reduction in paid in capital. When the non-controlling interest was purchased the adjustment to the carrying amount was eliminated in the manner it was initially recorded by increasing paid in capital with a resulting exchange rate difference of $212.

As a result of the change of control provisions in Ocean Rig ASA's employee stock option program, employee options became immediately vested and Ocean Rig ASA sold shares for cash to certain employees. The resulting gain of $7,087 for Ocean Rig UDW was recorded as equity transaction in consolidation and increased consolidated paid in capital. These shares were subsequently acquired by the Company through the public mandatory bid discussed in the paragraph above. Subsequent to the Company obtaining control of Ocean Rig ASA, Ocean Rig ASA retired treasury shares increasing the relative book value owned by the Company which was recorded as an increase in consolidated paid in capital of $16,852.

F-67

## OCEAN RIG UDW INC.

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

### 5.3 Purchase price allocation

The purchase price of Ocean Rig for each step of the acquisition comprised of the following:

|  | December 20, 2007 | May 14, 2008 | June 30, 2008 | July 10, 2008 | Total |
|---|---|---|---|---|---|
| Cash consideration | $ 405,168 | 682,427 | 288,978 | 21,283 | $1,397,856 |
| Transaction costs | 855 | 6,154 | 3,510 | 240 | 10,761 |
| Total purchase price | $ 406,024 | 688,581 | 292,488 | 21,523 | $1,408,618 |

The following table summarizes the aggregate fair values of the assets acquired and liabilities assumed by the Company as of the dates of the step acquisitions:

|  | December 20, 2007 | May 14, 2008 | June 30, 2008 | July 10, 2008 | Total |
|---|---|---|---|---|---|
| Total current assets | $ 28,469 | 43,179 | 25,029 | 1,895 | $ 98,572 |
| Drilling rigs, machinery and equipment | 386,080 | 664,659 | 288,981 | 21,976 | 1,361,696 |
| Intangible assets | 4,366 | 6,829 | 3,007 | 232 | 14,434 |
| Above market acquired time charter |  | 2,473 | 1,104 | 86 | 3,663 |
| Goodwill | 252,070 | 358,146 | 141,515 | 9,998 | 761,729 |
| Total assets acquired | $ 670,985 | 1,075,286 | 459,636 | 34,187 | $2,240,094 |
| Total current liabilities | (45,439) | (238,944) | (108,629) | (8,223) | (401,235) |
| Total non current liabilities | (207,632) | (130,127) | (52,506) | (3,975) | (394,241) |
| Below market acquired time charter | (11,890) | (17,633) | (6,013) | (464) | (36,000) |
| Total Liabilities assumed | $ (264,961) | (386,705) | (167,148) | (12,663) | $ (831,476) |
| Total purchase price | $ 406,024 | 688,581 | 292,488 | 21,525 | $1,408,618 |

A contingent liability that was settled during the allocation period of $3,143 was recognized, based on a claim from an investment bank in relation to DryShips acquisition of Ocean Rig ASA.

Goodwill included in the Company's single segment constitutes a premium paid by the Company over the fair value of the net assets of Ocean Rig ASA, which was attributable to the anticipated benefits from Ocean Rig ASA's unique position to take advantage of the fundamentals of the ultra deep water drilling market at the acquisition date. Goodwill is not deductible for income tax purposes. Goodwill was subsequently impaired as of December 31, 2008 (Note 17).

In connection with the acquisition, the Company acquired drilling contracts for the future contract drilling services of Ocean Rig ASA, some of which extend through 2011. These contracts include fixed day rates that were above or below day rates available as of the acquisition date. After determining the aggregate fair values of these drilling contracts as of the acquisition, the Company recorded the respective contract fair values on the consolidated balance sheet as non-current liabilities and non-current assets under "Fair value of below/above market acquired time charters." These are being amortized into revenues using the straight-line method over the respective contract periods (1 and 3 years for the respective contracts). The amount amortized for the period from May 15, 2008 to December 31, 2008 amounted to $16,553. For 2009 the amount amortized was $14,597. For 2010 the amount amortized was $(1,221).

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

Additionally, the Company identified finite-lived intangible assets associated with the trade names and software that will be amortized over their useful life which is determined to be 10 years. The fair value of the intangible assets acquired related to Trade names and Software were $8,774 and $5,659, respectively and are included in "Intangible assets, net" in the accompanying consolidated balance sheets.

| | Amount Acquired | Accumulated Amortization as of December 31, 2010 | Amount to be Amortized as of December 31 | | | |
|---|---|---|---|---|---|---|
| | | | 2011 | 2012 | 2013 | 2014-18 |
| Trade names | $ 8,774 | 2,384 | 877 | 877 | 877 | $3,759 |
| Software | 5,659 | 1,544 | 566 | 566 | 566 | 2,417 |
| | $14,434 | 3,928 | 1,443 | 1,443 | 1,443 | $6,177 |

Included in the amount amortized to December 31, 2008 was $97 and $67 related to Trade names and Software, respectively, that was recorded in the "Equity in (loss)/income of investee".

*Pro forma results of operations (unaudited)* — The following unaudited pro forma financial data for the periods ended December 31, 2008, give effect to the acquisition of Ocean Rig ASA, as though the business combination had been completed at the beginning of the period:

| | December 31, 2008 |
|---|---|
| Pro forma: | |
| Revenues | $    317,835 |
| Net Operating Income/(loss) | (669,675) |
| Net Income/(loss) | (789,250) |
| Earnings per Shares, basic and diluted | $       (7.65) |

The unaudited pro forma financial information includes adjustments for additional depreciation based on the fair market value of the drilling rigs, amortization of intangibles arising from the step acquisitions and amortization of the fair value above and below market with respect to the time charters acquired and increased interest expense and financing fees related to debt incurred to finance the acquisition of Ocean Rig ASA. The unaudited pro forma financial information is not necessarily indicative of the result of operations for any future periods. The pro forma information does not give effect to any potential revenue enhancement cost synergies or other operational efficiencies that could result from the acquisitions. The actual results of the operations of Ocean Rig ASA are consolidated since May 15, 2008, the date when control was obtained.

**6.   Restricted cash:**

Restricted cash balances include minimum required cash deposits, as defined in the loan agreements, are classified as both current and non-current assets in the accompanying consolidated balance sheets.

F-69

## OCEAN RIG UDW INC.

### Notes to Consolidated Financial Statement — (Continued)
### As of and for periods ended December 31, 2008, 2009 and 2010
### (Expressed in thousands of United States Dollars — except for share and per share data, unless otherwise stated)

Restricted cash as of December 31, 2009 and 2010 amounted to:

|  | December 31, 2009 | December 31, 2010 |
|---|---|---|
| Amount pledged as collateral for bank loans (Note 10 b and e) | $  187,389 | $  529,815 |
| Amounts pledged as collateral to customer | 1,000 | 1,000 |
| Amounts representing minimum liquidity requirements under the loan facilities (Note 10) | 30,000 | 30,000 |
| Taxes withheld from employees | 2,301 | 1,978 |
| Total restricted cash | $  220,690 | $  562,793 |

Restricted cash of $50,000 of total $562,793 has been classified as non-current as of December 31, 2010. As of December 31, 2009 total of $220,690 restricted cash was classified as current.

### 7.  Rigs under Construction:

The amounts shown in the accompanying consolidated balance sheets include the fair value at acquisition, milestone payments relating to the shipbuilding contracts with the shipyards, supervision costs and any material related expenses incurred during the construction periods including 1% commissions to related parties for Hulls 1837 and 1838, all of which are capitalized in accordance with the accounting policy discussed in Note 2. As of December 31, 2009 and 2010 the advances for rigs under construction and acquisitions are set forth below:

| Vessel Name | Expected Delivery | Contract Amount | December 31, 2009 | | | Total |
|---|---|---|---|---|---|---|
| | | | Contract Payments | Capitalized Expenses | Rig Fair Value Adjustments at Acquisition Date (As restated). | |
| H1837 | January 2011 | $  691,008 | 254,346 | 27,178 | 89,000 | $  370,524 |
| H1838 | March 2011 | 690,758 | 254,346 | 26,041 | 89,000 | 369,387 |
| H1865 | July 2011 | 715,541 | 205,940 | 13,827 | — | 219,767 |
| H1866 | September 2011 | 715,541 | 205,940 | 12,774 | | 218,714 |
| | | $2,812,848 | 920,572 | 79,820 | 178,000 | $1,178,392 |

| Vessel Name | Expected Delivery | Contract Amount | December 31, 2010 | | | Total |
|---|---|---|---|---|---|---|
| | | | Contract Payments | Capitalized Expenses | Rig Fair Value Adjustments at Acquisition Date | |
| H1837 | January 2011 | $  696,524 | 407,505 | 78,031 | 89,000 | $  574,536 |
| H1838 | March 2011 | 695,000 | 407,505 | 55,670 | 89,000 | 552,175 |
| H1865 | July 2011 | 731,987 | 374,833 | 33,033 | — | 407,866 |
| H1866 | September 2011 | 731,614 | 322,812 | 31,101 | — | 353,913 |
| | | $2,855,125 | 1,512,655 | 197,835 | 178,000 | $1,888,490 |

During the year ended December 31, 2009 and 2010 the Contract amount increased from $2,812,848 to $2,855,125 from scope changes.

F-70

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

During the year ended December 31, 2009 and 2010 the movement of the advances for drillships under construction and acquisitions was as follows:

| | |
|---|---:|
| Balance at December 31, 2008 | $ — |
| Acquisitions of Hulls 1837/ 1838 (May 15, 2009) | 625,445 |
| Acquisitions of Hulls 1865/ 1866 (March 5, 2009) | 422,114 |
| Advances for drillships under construction | 95,673 |
| Capitalized interest (as restated) | 24,457 |
| Capitalized expenses | 8,834 |
| Related Parties | 1,869 |
| Balance at, December 31, 2009 (as restated) | $1,178,392 |
| | |
| Balance at January 1, 2010 | $1,178,392 |
| Advances for drillships under construction | 592,085 |
| Capitalized interest | 35,781 |
| Capitalized expenses | 78,249 |
| Related Parties | 3,983 |
| Balance at, December 31, 2010 | $1,888,490 |

**8.  Drilling Rigs:**

The amounts in the accompanying consolidated balance sheets are analyzed as follows:

*Drilling Rigs, machinery and equipment:*

| | Cost | Accumulated Depreciation | Net Book Value |
|---|---:|---:|---:|
| Balance on acquisition May 14, 2008 | $1,405,346 | — | $1,405,346 |
| Additions | 16,584 | — | 16,584 |
| Depreciation | — | (44,571) | (44,571) |
| Balance, December 31, 2008 | 1,421,930 | (44,571) | 1,377,359 |
| Additions | 14,152 | — | 14,152 |
| Depreciation | — | (73,905) | (73,905) |
| Balance December 31, 2009 | 1,436,082 | (118,476) | 1,317,607 |
| Additions | 6,835 | — | 6,835 |
| Disposals | (2,800) | 1,342 | (1,458) |
| Depreciation | | (73,651) | (73,651) |
| Balance December 31, 2010 | $1,440,117 | ( 190,785) | $1,249,333 |

As of December 31, 2009 and 2010, all of the Company's drilling rigs and drillships under construction have been pledged as collateral to secure the bank loans (Note 10).

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

**9.  Intangible Assets and Liabilities:**

The Company identified, in connection with the acquisition of Ocean Rig, finite-lived intangible assets associated with the trade names, software, and above market acquired time charters that are being amortized over their useful lives. In the case of the trade names and software, the useful lives are estimated to be ten years. The useful lives of above market acquired time charters depend on the contract term remaining at the date of acquisition. Trade names and software are included in "Intangible assets, net" in the accompanying consolidated balance sheets net of accumulated amortization. Above-market acquired time charters are presented separately in the accompanying consolidated balance sheets, net of accumulated amortization.

| | Amount Acquired | Accumulated Amortization as of December 31, 2009 | Amortization for the Year Ended December 31, 2010 | Amortization Schedule | | | | | |
| | | | | 2011 | 2012 | 2013 | 2014 | 2015 | Thereafter |
|---|---|---|---|---|---|---|---|---|---|
| Trade names | $ 8,774 | (1,507) | (877) | (877) | (877) | (877) | (877) | (877) | $ (2,005) |
| Software | 5,659 | (978) | (565) | (565) | (565) | (565) | (565) | (565) | (1,291) |
| Total Intangible Assets, net | $ 14,433 | (2,485) | (1,442) | (1,442) | (1,442) | (1,442) | (1,442) | (1,442) | $ (3,296) |
| Above market time charters | $ 3,663 | (1,271) | (1,222) | (1,170) | | | | | |

**10.  Long-term Debt:**

The amount of long-term debt shown in the accompanying consolidated balance sheets is analyzed as follows:

| | December 31, 2009 | December 31, 2010 |
|---|---|---|
| Two 562,500 Loan Agreements | $  186,274 | $  194,524 |
| 1,040,000 Credit Facility | 808,550 | 675,833 |
| 230,000 Credit Facility | 230,000 | 115,000 |
| 300,000 Credit Facility | — | 300,000 |
| Total loan Facilities outstanding | 1,224,824 | 1,285,357 |
| Less: Deferred financing costs | (24,794) | (27,810) |
| Total debt reflected in balance sheet | 1,200,030 | 1,257,547 |
| Less: Current portion | (537,668) | (560,561) |
| Long-term portion | $  662,362 | $  696,986 |

The principal payments, excluding deferred financing costs, to be made during each of the twelve-month periods subsequent to December 31, 2010 for the loan payments as classified in the balance sheet in, are as follows:

| | |
|---|---|
| December 31, 2011 | $  568,333 |
| December 31, 2012 | 195,000 |
| December 31, 2013 | 522,024 |
| Total principal payments | 1,285,357 |
| Less: Financing fees | (27,810) |
| Total debt reflected in balance sheet | $1,257,547 |

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

Total interest and debt amortization cost incurred on long-term debt for the years ended December 31, 2009 and 2010 amounted to $63,407 and $57,350, respectively, of which $24,457 and $35,780 respectively, were capitalized as part of the cost of the rigs under construction. Total interest incurred and amortization of debt issuance cost on long-term debt, net of capitalized interest, are included in "Interest and finance costs" in the accompanying consolidated statement of operations.

Total interest incurred on the Company's long-term debt, including accrued interest, for the years ended December 31, 2008, 2009 and 2010 amounted to $55,165 , $57,154 and $35,827 respectively. These amounts are included in "Interest and finance costs" in the accompanying consolidated statements of operations. The Company's weighted average interest rate (including the margin) as of December 31, 2008, 2009 and 2010 was 5.0%, 4.2% and 4.5%, respectively. The stated interest rates on the debt is variable, based on LIBOR plus a margin. At December 31, 2008, 2009 and 2010, the margin ranged from 4.3% to 7.9%, 3.5% to 4.8% and 4.3% to 4.6%, respectively.

*a)  Acquisition Facility:*

On May 9, 2008, the Company concluded a guarantee facility of NOK 5.0 billion (approximately $974,500) and a term loan of $800,000 in order to guarantee the purchase price of the Ocean Rig shares to be acquired through the mandatory offering, to finance the acquisition cost of the Ocean Rig shares and to refinance existing debt. The term loan was repayable in four quarterly installments of $75,000 followed by four quarterly installments of $50,000 plus a balloon payment payable together with the last installment on May 12, 2010. As of December 31, 2008 the Company drew down the total amount of $800,000 and repaid $150,000. As of December 31, 2009, the Company had fully repaid it. The facility contained various covenants measured on a consolidated DryShips Inc. level, including a minimum market-adjusted equity ratio.

During the first quarter of 2009 and in April 2009, the Company repaid $190,000 and $160,000, respectively, of its existing $800,000 facility. The remaining outstanding balance of $300,000 was fully repaid in May 2009, of which $150,000 was paid with the Company's new credit facility discussed in the following paragraph below.

On May 13, 2009, the Company entered into a new one-year credit facility with the same lender as above for an amount of up to $300,000 in order to refinance the Company's existing loan indebtedness discussed in the above paragraph. In May 2009, the Company drew down $150,000 of the loan in order to refinance the $150,000 outstanding debt at the date of the drawdown of the above facility. The loan bore interest at LIBOR plus a margin. This new credit facility was fully repaid in May 2009 using proceeds from an increase in paid in capital from DryShips. DryShips' financed the capital contribution to the Company from its at-the-market offerings. The undrawn amount of the facility was fully cancelled.

*b) Two 562,500 Loan Agreements (the Two Deutsche Bank Facilities):*

On March 5, 2009, in connection with the acquisition of Drillships Investment Inc. including the two companies owning drillship Hulls 1865 and 1866, as further described in Note 5, the Company assumed two facility agreements for an aggregate amount of $1,125,000 in order to partly finance the construction cost of Drillship Hulls 1865 and 1866. The Two 562,500 Loan Agreements bear interest at LIBOR plus a margin and are repayable in eighteen semi-annual installments through November 2020. The first installment is payable six months after the delivery of the vessels, which is expected to be in the third quarter of 2011. The Two 562,500 Loan Agreements contains various covenants measured on a consolidated DryShips Inc. level, including: (i) a minimum market-adjusted equity ratio; and (ii) a minimum market value adjusted net worth.

F-73

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

On June 5, 2009, the Company entered into agreements with a bank, as facility agent, and certain other lenders on waiver and amendment terms with respect to the Two 562,500 Loan Agreements providing for a waiver of certain financial covenants through January 31, 2010. These agreements provide for, among other things; (i) a waiver of the required market adjusted equity ratio; (ii) a waiver of the required market value adjusted net worth; and (iii) a required payment from us to each lender and the facility agent.

On January 28, 2010, the Company signed two supplemental agreements that provided for certain non-financial covenant amendments to the Two 562,500 Loan Agreements. In addition these agreements revoked all waivers previously obtained related to the Two 562,500 Loan Agreements.

A basic principle of the two credit facilities is that any drawdown on the credit facility, prior to securing certain drilling contracts at acceptable terms is subject to cash deposit collateral of an equivalent amount to any drawdown.

As of December 31, 2010, the amount outstanding under the Two 562,500 Loan Agreements was $194,524. Cash deposits equivalent to the drawdowns on the Two 562,500 Loan Agreements are included as restricted cash (note 6).

As of December 31, 2010, the Company had an unutilized line of credit totaling $930,476. Drawdowns under this line of credit must be matched with corresponding cash collateral until the drillships enter into employment contracts for both vessels at specified minimum dayrates and for specified minimum terms with a charterer that is satisfactory to such lenders by the earlier of (i) April 30, 2011 or (ii) the delivery of the *Ocean Rig Poseidon* , at which point no cash collateral is needed. The Company is required to pay a quarterly commitment fee of 0.60% per annum of the unutilized portion of the unutilized line of credit.

On March 28, 2011 the company restructured these facilities, see note 23.8.

*c) 1,040,000 Credit Facility:*

On September 17, 2008, the Company entered into a new five-year secured credit facility for the amount of up to $1,040,000 in order to refinance the Company's existing loan indebtedness in relation to the drilling units Leiv Eiriksson and Eirik Raude and for general corporate purposes. The 1,040,000 Credit Facility consists of a guarantee facility, three revolving credit facilities (a, b and c) and a term loan. The aggregate amount of the term loan is up to $400,000 and the aggregate amount under the revolving credit facility A is up to $350,000. The aggregate amount under the revolving credit facility b is up to $250,000 and under the revolving credit facility c is up to $20,000. The guarantee facility provides the Company with a credit facility of up to $20,000.

In September and October, 2008, the Company drew down $1,020,000 of the new credit facility. The drawdown proceeds were used to repay all other Ocean Rig outstanding debt at the date of the drawdown amounting to $776,000.

The commitment under 1,040,000 Credit Facility's Revolving Credit Facility A was reduced by $17,500 on December 17, 2008 and will continue to be reduced by $17,500 quarterly thereafter until September 17, 2013, which is 60 months after the date of the agreement. Further, the commitment under 1,040,000 Credit Facility's Revolving Credit Facility B is reduced quarterly by 12 unequal quarterly installments with a final maturity date of not later than the earlier of a) the expiry of the time charter of the drilling rig the Eirik Raude, which is scheduled to expire in October 2011 or b) September, 2011. This loan bears interest at LIBOR plus a margin and is repayable in twenty quarterly installments. The term loan will be repaid by one balloon payment of $400,000 on September 17, 2013.

As of December 31, 2009 and 2010, the outstanding balances under the 1,040,000 Credit Facility were $808,550 and $675,833, respectively.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

*d) 230,000 Credit Facility:*

In connection with the acquisition of Drillships Holdings on May 15, 2009, the Company assumed the $230,000 loan facility that was entered into in September 2007, in order to finance the construction of Hulls 1837 and 1838. The 230,000 Credit Facility bear interest at the lender's funding cost a margin, and are repayable upon the delivery of Hull 1837 in January 2011, and Hull 1838 in March 2011. Borrowings under the 230,000 Credit Facility are subject to certain financial covenants and restrictions on dividend payments, assignment of the relevant shipbuilding contracts, refund guarantees and other related items. In addition to the customary security and guarantees issued to the borrower, the 230,000 Credit Facility was collateralized by certain vessels owned by certain related parties, corporate guarantees of certain related parties and a personal guarantee from George Economou. The Company repaid $115.0 million of the loan facility on December 22, 2010 in connection with the delivery of the *Ocean Rig Corcovado* and the remaining $115.0 million of the loan facility on March 18, 2011 in connection with the delivery of the *Ocean Rig Olympia*.

In connection with the acquisition of Drillships Holdings on May 15, 2009, the Company also assumed two $15,551 fixed-rate term notes that were entered into in January 2009, in order to finance the construction of Hulls 1837 and 1838. The term notes were fully repaid in July 2010.

*e) 300,000 Credit Facility:*

On December 28, 2010 the Company concluded a $300,000 loan facility to be repaid during 2011 which was callable by the bank at anytime and could be repaid without prepayment penalties. The loan was fully drawn on December 28, 2010 and fully repaid on January 3, 2011, see note 23.3. The loan cannot be redrawn. A corresponding amount was deposited on a required escrow account as required by the loan agreement as security for the loan, which is classified as restricted cash. Interest on the facility is LIBOR plus a margin while the borrowed funds are held with the bank earning LIBOR plus a margin.

*f) 325,000 Credit Facility:*

On December 21, 2010 the Company concluded a $325,000 bridge term loan facility, with its subsidiary Drillships Hydra Owners Inc. as intended borrower, for the purpose of (i) meeting the ongoing working capital needs of Drillships Hydra Owners Inc, (ii) financing the partial repayment of existing debt in relation to the purchase of the drillship identified as Samsung Hull 1837, or Ocean Rig Corcovado, and (iii) financing the payment of the final installment associated with the purchase of said drillship. Dry Ships Inc., Drillships Holdings Inc. and Ocean Rig UDW Inc. will act as joint guarantors and guarantee all obligations and liabilities of Drillships Hydra Owners Inc. The loan was drawn in full on January 5, 2011 and matures July 5, 2011.

The loans above (a-f) are secured by a first priority mortgage over the drillships/drill rigs or assignment of shipbuilding contracts, corporate guarantee, and a first assignment of all freights, earnings, insurances and requisition compensation. The loans contain covenants including restrictions, without the bank's prior consent, as to changes in management and ownership of the vessels, additional indebtedness and mortgaging of vessels, change in the general nature of the Company's business, and maintaining an established place of business in the United States or the United Kingdom. The loan described under the 1,040,000 Credit Facility also contains certain financial covenants relating to the Company's financial position, operating performance and liquidity. The loans described under the Two 562,500 Loan Agreements, the 230,000 Credit Facility and the 325,000 Credit Facility above also contain certain financial covenants relating to the consolidated financial position of DryShips Inc., operating performance and liquidity.

F-75