**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

A default situation in DryShips could have a substantial effect on the Company. Should DryShips fail to pay loan installments as they fall due, this would result in a cross-default on the Company's facilities. As of December 31, 2008 and 2009, DryShips was deemed to be in theoretical default of all its bank facilities. Due to the cross-default situation and breach of certain financial covenants both for the Company and for DryShips, the loan balances under the Company's affected facilities was fully classified as current. The cross default provisions of the Company's credit facility 1,040,000 is only triggered by the actual default on other indebtedness and was therefore classified as non-current except for repayments due in the next twelve months. In accordance with guidance related to classification of obligation that are callable by the creditor, the Company has as per December 31, 2009 classified all of its affected long-term debt in breach due to cross-default clauses of the credit facility agreements amounting to $400,036 as current at December 31, 2009. As per December 31, 2010 there was no default situation in DryShips and therefore no cross-default for the Company's loans.

**11.   Financial Instruments and Fair Value Measurements:**

All derivatives are carried at fair value on the consolidated balance sheets at each period end. Balances as of December 31, 2009 and December 31, 2010 are as follows:

| | December 31, 2009 | | | December 31, 2010 | | |
|---|---|---|---|---|---|---|
| | Interest Rate Swaps | Foreign Currency Forward Contracts | Total | Interest Rate Swaps | Foreign Currency Forward Contracts | Total |
| Current Assets | $ — | 434 | 434 | — | 1,538 | $ 1,538 |
| Current Liabilities | (5,467) | — | (5,467) | (12,503) | — | (12,503) |
| Non-current liabilities | (64,219) | — | (64,219) | (96,901) | — | (96,901) |
| Total | $(69,686) | 434 | (69,252) | (109,404) | 1,538 | $(107,866) |

***11.1   Interest rate swaps and cap and floor agreements:***

As of December 31, 2009 and 2010, the Company had outstanding eleven interest rate swap and cap and floor agreements, with a notional amount of $1,285,000 and $908,468 respectively, maturing from September 2011 through November 2017. These agreements are entered into in order to economically hedge its exposure to interest rate fluctuations with respect to the Company's borrowings. As of December 31, 2009 and 2010, eight of these agreements do not qualify for hedge accounting and, as such, changes in their fair values are included in the accompanying consolidated statement of operations. As of December 31, 2009 and 2010, three agreements qualify for and are designated for hedge accounting and, as such, changes in their fair values are included in other comprehensive loss. The fair value of these agreements equates to the amount that would be paid by the Company if the agreements were cancelled at the reporting date, taking into account current interest rates and creditworthiness of the Company.

As of December 31, 2010, security deposits (margin calls) of $78,600 were paid by the Company and were recorded as "Other non-current assets" in the accompanying consolidated balance sheet. These deposits are required by the counterparty due to the market loss in the swap agreements.

***11.2   Foreign currency forward contracts:***

As of December 31, 2009 and 2010, the Company had outstanding ten forward contracts to sell $20 million for NOK 119 million and twelve forward contracts to sell $28 million for NOK 174 million. These agreements are

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

entered into in order to hedge its exposure to foreign currency fluctuations. The fair value of these contracts at December 31, 2009 and December 31, 2010 was an asset of $434 and an asset of $1,538 respectively.

The change in the fair value of such agreements for the years ended December 31, 2009 and 2010 amounted to a gain of $2,023 and a gain of $1,104 respectively and is reflected under "Other, net" in the accompanying consolidated statement of operations.

| | | Asset Derivatives | | | Liability Derivatives | |
| | | December 31, 2009 | December 31, 2010 | | December 31, 2009 | December 31, 2010 |
| Derivatives Designated as Hedging Instruments | Balance Sheet Location | Fair Value | Fair Value | Balance Sheet Location | Fair Value | Fair Value |
|---|---|---|---|---|---|---|
| Interest rate swaps | Financial instruments | | | Financial instruments non-current liabilities | | |
| | | $ — | — | | (31,028) $ | (36,523) |
| | | | | Financial instruments current liabilities | | |
| | | — | — | | — | — |
| Total derivatives designated as hedging instruments | | — | — | | (31,028) | (36,523) |
| **Derivatives not Designated as Hedging Instruments** | | | | | | |
| Interest rate swaps | Financial Instruments current assets | | | Financial Instruments current liabilities | | |
| | | — | — | | (5,467) | (12,503) |
| Interest rate swaps | Financial Instruments non-current assets | | | Financial instruments-non current liabilities | | |
| | | — | — | | (33,191) | (60,378) |
| Foreign currency forward contracts | Financial instruments current assets | | | Financial instruments current liabilities | | |
| | | 434 | 1,538 | | — | — |
| Total derivatives not designated as hedging instruments | | 434 | 1,538 | | (38,658) | (72,781) |
| Total derivatives | | $ 434 | 1,538 | Total derivatives | (69,686) $ | (109,404) |

The effect of Derivative Instruments on Accumulated other comprehensive income:

| | Amount of Gain/(Loss) Recognized in OCI on Derivative (Effective Portion) | |
| | Year Ended December 31, 2009 | Year Ended December 31, 2010 |
| Derivatives Designated for Cash Flow Hedging Relationships | | |
|---|---|---|
| Interest rate swaps | 9,887 | $ (27,018) |
| Total | 9,887 | $ (27,018) |

No portion of the cash flow hedges shown above was ineffective during the year. In addition, the Company did not transfer any gains/losses on the hedges from accumulated OCI into the consolidated statement of operations.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The effect of Derivative Instruments on the Consolidated Statement of Operations:

| | | Amount of Gain/(Loss) | |
| Derivatives not Designated as Hedging Instruments | Location of Gain or (Loss) Recognized | Year Ended December 31, 2009 | Year Ended December 31, 2010 |
|---|---|---|---|
| Foreign currency forward contracts | Other, net | 2,023 | $ 1,104 |
| Interest rate swaps | Gain/(loss) interest rate swaps | 4,826 | (40,303) |
| Total | | 6,849 | $ (39,199) |

The Company recognizes all derivative instruments as either assets or liabilities at fair value on its consolidated balance sheet. The Company has designated all qualifying interest rate swap contracts as cash flow hedges, with the last qualifying contract expiring in September 2013.

For derivative instruments that are designated and qualify as a cash flow hedge, the effective portion of the gain or loss on the derivative is reported as a component of other comprehensive income and reclassified into earnings in the same period or periods during which the hedged transaction affects earnings. Gains and losses on the derivative representing either hedge ineffectiveness or hedge components excluded from the assessment of effectiveness are recognized in the accompanying consolidated statement of operations. Changes in the fair value of derivative instruments that have not been designated as hedging instruments are reported in the accompanying consolidated statement of operations.

The Company enters into interest rate swap transactions to manage interest costs and risk associated with changing interest rates with respect to its variable interest rate loans and credit facilities. The Company enters into foreign currency forward contracts in order to manage risks associated with future hire rates and fluctuations in foreign currencies, respectively. All of the Company's derivative transactions are entered into for risk management purposes.

The carrying amounts of cash and cash equivalents, restricted cash and trade accounts receivable reported in the consolidated balance sheets approximate their respective fair values because of the short term nature of these accounts. The fair value of the interest rate swaps was determined using a discounted cash flow method based on market-based LIBOR swap yield curves, taking into account current interest rates and the creditworthiness of both the financial instrument counterparty and the Company. The fair value of foreign currency forward contracts was based on the forward exchange rates.

Fair value measurements are classified based upon inputs used to develop the measurement under the following hierarchy:

*Level 1* — Quoted market prices in active markets for identical assets or liabilities.

*Level 2* — Observable market-based inputs or unobservable inputs that are corroborated by market data.

*Level 3* — Unobservable inputs that are not corroborated by market data.

F-78

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The following table summarizes the valuation of assets and liabilities measured at fair value on a recurring basis as of the valuation date.

| | December 31, 2009 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Recurring measurements:** | | | | |
| Interest rate swaps-liability position | $ (69,686) | — | (69,686) | $ — |
| Foreign currency forward contracts — asset position | 434 | — | 434 | — |
| Total | $ (69,252) | — | (69,252) | $ — |

| | December 31, 2010 | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Recurring measurements:** | | | | |
| Interest rate swaps-liability position | $ (109,404) | — | (109,404) | $ — |
| Foreign currency forward contracts — asset position | 1,538 | 1,538 | — | — |
| Total | $ (107,886) | 1,538 | (109,404) | $ — |

### 11.3   Amortization plan deferred OCI Cash flow hedge financing cost:

In 2011 the drillships will be delivered and put into operation. As the depreciation of the drillships will start in 2011, a portion of the net amount of the existing gains or losses on cash flow hedges reported in accumulated other comprehensive income will need to be reclassified into earnings. The estimated net amount of such existing gains or losses at December 31, 2010 that will be reclassified into earnings within the next 12 months is $694.

The following table summarizes the accumulated cash flow hedge interest expense in Other Comprehensive Income.

| | December 31, 2008 | December 31, 2009 | December 31, 2010 |
|---|---|---|---|
| Accumulated Cash flow interest expense | $ — | (6,253) | $ (27,776) |
| Amortized | — | — | — |
| Other Comprehensive Income | $ — | (6,253) | $ (27,776) |

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

**12.   Pensions:**

Pensions in the accompanying consolidated balance sheets are analyzed as follows:

|  | December 31, 2009 | December 31, 2010 |
|---|---|---|
| Pension benefit obligation/ (asset) | $ (388) | $ 602 |

The Company has three pension benefit plans for employees managed and funded through Norwegian life insurance companies. As of December 31, 2010 the pension plans cover 55 employees. The pension scheme is in compliance with the Norwegian law on required occupational pension.

The Company uses a January 1 measurement date for net periodic pension cost and a December 31 measurement date for benefit obligations and plan assets.

For defined benefit pension plans, the benefit obligation is the projected benefit obligation, the actuarial present value, as of our December 31 measurement data, of all benefits attributed by the pension benefit formula to employee service rendered to that date. The amount for benefit to be paid depends on a number of future events incorporated into the pension benefit formula, including estimates of the average life of employees/survivors and average years of service rendered. It is measured based on assumptions concerning future interest rates and future employee compensation levels.

The following table presents this reconsolidation and shows the change in the projected benefit obligation for the years ended December 31:

|  | 2009 | 2010 |
|---|---|---|
| Benefit obligation at January 1 | $ 7,032 | $ 8,897 |
| Service cost for benefits earned | 4,121 | 2,021 |
| Interest cost | 280 | 334 |
| Settlement | (1,983) | (2,985) |
| Actuarial gains/(losses) | (1,587) | 149 |
| Benefits paid | (42) | (72) |
| Payroll tax of employer contribution | (442) | (104) |
| Foreign currency exchange rate changes | 1,518 | (143) |
| Benefit obligation at end of year | $ 8,897 | $ 8,097 |

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The following table presents the change in the value of plan assets for the years ended December 31, 2009 and 2010 and the plans' funded status at December 31:

|  | 2009 | 2010 |
|---|---|---|
| Fair value of plan assets at January 1, | $ 6,320 | $ 9,284 |
| Expected return on plan assets | 378 | 395 |
| Actual return on plan assets | (1,395) | (760) |
| Employer contributions | 3,138 | 741 |
| Settlement | (624) | (1,986) |
| Foreign currency exchange rate changes | 1,467 | (178) |
| Fair value of plan assets at end of year | $ 9,284 | $ 7,496 |
| Funded/(unfunded) status at end of year | $   388 | $   602 |

Amounts included in accumulated other comprehensive incomes that have not yet been recognized in net periodic benefit cost at December 31 are listed below:

|  | 2008 | 2009 | 2010 |
|---|---|---|---|
| Net actuarial loss | $3,337 | $2,766 | $2,342 |
| Prior service cost | 187 | 964 | 424 |
| Defined benefit plan adjustment, before tax effect | $3,524 | $3,730 | $2,766 |

The accumulated benefit obligation for the pension plans represents the actuarial present value of benefit based on employee service and compensation as of a certain date and does not include an assumption about future compensation levels. The accumulated benefit obligation for the pension plans was $2,995 at December 31, 2010 and $6,265 at December 31, 2009.

The net periodic pension cost recognized in consolidated statements of income was $2,981, 3,652 and 2,008 for the years ended December 31, 2008, 2009 and 2010.

The following table presents the components of net periodic pension cost:

|  | 2008 | 2009 | 2010 |
|---|---|---|---|
| Expected return on plan assets | $ (410) | $ (378) | $ (395) |
| Service cost | 2,870 | 4,121 | 2,021 |
| Interest cost | 275 | 280 | 334 |
| Amortization of prior service cost | 190 | — | — |
| Amortization of actuarial loss | 146 | 168 | 47 |
| Settlement | (91) | (539) | 1 |
| Net periodic pension cost | $2,981 | $3,652 | $2,008 |

F-81

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The table below presents the components of changes in Plan Assets and Benefit Obligations recognized in Other Comprehensive Income:

|  | 2008 | 2009 | 2010 |
|---|---|---|---|
| Net actuarial loss (gain) | $   225 | $(1,091) | $ 1,101 |
| Prior service cost (credit) | (1,511) | 777 | (1,020) |
| Amortization of actuarial loss | 236 | (256) | (505) |
| Amortization of prior service cost | (190) | — | — |
| Total recognized in net pension cost and other comprehensive income, before tax effects | $(1,240) | $  (570) | $  (424) |

The estimated net loss for pension benefits that will be amortized from accumulated other comprehensive income into the periodic benefit cost for the next fiscal year is $112.

Pension obligations are actuarially determined and are affected by assumptions including expected return on plan assets. As of December 31, 2010 contributions amounting to $741 in total, have been made to the defined benefit pension plan.

The Company evaluates assumptions regarding the estimated long-term rate of return on plan assets based on historical experience and future expectations on investment returns, which are calculated by an unaffiliated investment advisor utilizing the asset allocation classes held by the plan's portfolios. Changes in these and other assumptions used in the actuarial computations could impact the Company's projected benefit obligations, pension liabilities, pension cost and other comprehensive income.

The Company bases its determination of pension cost on a market-related valuation of assets that reduces year-to-year volatility. This market-related valuation recognizes investment gains or losses over a five-year period from the year in which they occur. Investment gains or losses for this purpose are the difference between the expected return calculated using the market-related value of assets and the actual return based on the market-related value of assets.

The following are the weighted — average assumptions used to determine net periodic pension cost:

|  | December 31, 2008 | December 31, 2009 | December 31, 2010 |
|---|---|---|---|
| **Weighted average assumptions** | | | |
| Expected return on plan assets | 5.80% | 5.70% | 5.40% |
| Discount rate | 3.80% | 4.50% | 4.00% |
| Compensation increases | 4.25% | 4.50% | 4.00% |

The Company's investments are managed by the insurance company Storebrand by using models presenting many different asset allocation scenarios to assess the most appropriate target allocation to produce long-term gains without taking on undue risk. US GAAP standards require disclosures for financial assets and liabilities that are re-

F-82

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

measured at fair value at least annually. The following table set forth the pension assets at fair value as of December 31, 2009 and 2010:

|  | 2009 | 2010 |
|---|---|---|
| Share and other equity investments | $1,086 | $1,214 |
| Bonds and other security — fixed yield | 2,618 | 1,289 |
| Bonds held to maturity | 2,497 | 1,889 |
| Properties and real estate | 1,504 | 1,207 |
| Money market | 947 | 668 |
| Other | 631 | 1,229 |
| Total plan net assets at fair value | $9,284 | $7,496 |

The law requires a low risk profile; hence the majority of the funds are invested in government bonds and high-rated corporate bonds.

Investments are stated at fair value. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Investments in securities traded on a national securities exchange are valued at the last reported sales price on the last business day of the year. If no sale was reported on that date, they are valued at the last reported bid price. Investments in securities not traded on a national securities exchange are valued using pricing models, quoted prices of securities with similar characteristics or discounted cash flows.

Alternative investments, binding investment in private equity, private bonds, hedge funds, and real assets, do not have readily available marked values. These estimated fair values may differ significantly from the values that would have been used had a ready market for these investments existed, and such differences could be material. Private equity, private bonds, hedge funds and other investments not having an established market are valued at net assets values as determined by the investment managers, which management had determined approximates fair value. Investments in real assets funds are stated at the aggregate net asset value of the units of these funds, which management has determined approximate fair value. Real assets are valued either at amounts based upon appraisal reports prepared by appraisal performed by the investment manager, which management has determined approximates.

Purchases and sales of securities are recorded as of the trade date. Realized gains and losses on sales of securities are determined on the basis of average cost. Interest income is recognized on the accrual basis. Dividend income is recognized on the ex-dividend date.

The major categories of plan assets as a percentage of the fair value of plan assets are as follows:

|  | As of December 31, | |
|---|---|---|
|  | 2009 | 2010 |
| Shares and other equity instruments | 12% | 16% |
| Bonds | 55% | 42% |
| Properties and real estate | 16% | 16% |
| Other | 17% | 26% |
| Total | 100% | 100% |

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The US GAAP standards require disclosures for financial assets and liabilities that are re-measured at fair value at least annually. The US GAAP standards establish a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value. Tiers include three levels which are explained below:

*Level 1:*

Financial instruments valued on the basis of quoted priced for identical assets in active markets. This category encompasses listed equities that over the previous six months have experienced a daily average turnover equivalent to approximately $3,462 or more. Based on this, the equities are regarded as sufficiently liquid to be encompassed by this level. Bonds, certificates or equivalent instruments issued by national governments are generally classified as level 1. In the case of derivatives, standardized equity-linked and interest rate futures will be encompassed by this level.

*Level 2:*

Financial instruments valued on the basis of observable market information not covered by level 1. This category encompasses financial instruments that are valued on the basis of market information that can be directly observable or indirectly observable. Market information that is indirectly observable means that prices can be derived from observable, related markets. Level 2 encompasses equities or equivalent equity instruments for which market prices are available, but where the turnover volume is too limited to meet the criteria in level 1. Equities on this level will normally have been traded during the last month. Bonds and equivalent instruments are generally classified as level 2. Interest rate and currency swaps, non-standardized interest rate and currency derivatives, and credit default swaps are also classified as level 2. Funds are generally classified as level 2, and encompass equity, interest rate, and hedge funds.

*Level 3:*

Financial instruments valued on the basis of information that is not observable pursuant to by level 2. Equities classified as level 3 encompass investments in primarily unlisted/private companies. These include investments in forestry, real estate and infrastructure. Private equity is generally classified as level 3 through direct investments or investments in funds. Asset backed securities (ABS), residential mortgage backed securities (RMBS) and commercial mortgage backed securities (CMBS) are classified as level 3 due to their generally limited liquidity and transparency in the market.

F-84

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The following table sets forth by level, within the fair value hierarchy, the pension asset at fair value as of December 31, 2010:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Equity securities: | | | | |
| US Equities | $  531 | — | 133 | $  663 |
| Non-US Equities | 551 | — | — | 551 |
| Fixed Income: | | | | |
| Government Bonds | 2,336 | 842 | — | 3,178 |
| Corporate Bonds | 982 | — | — | 982 |
| Alternative Investments: | | | | |
| Hedge funds and limited partnerships | — | 225 | — | 225 |
| Other | 22 | — | — | 22 |
| Cash and cash equivalents | 667 | — | — | 667 |
| Real Estate | — | — | 1,207 | 1,207 |
| Net Plan Net Assets | $5,089 | $1,067 | $1,340 | $7,496 |

The following table sets forth by level, within the fair value hierarchy, the pension asset at fair value as of December 31, 2009:

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| Equity securities: | | | | |
| US Equities | $  516 | — | 57 | $  573 |
| Non-US Equities | 512 | — | — | 512 |
| Fixed Income: | | | | |
| Government Bonds | 3,344 | 1,206 | — | 4,550 |
| Corporate Bonds | 789 | — | — | 789 |
| Alternative Investments: | | | | |
| Hedge funds and limited partnerships | — | 214 | — | 214 |
| Other | 167 | — | — | 167 |
| Cash and cash equivalents | 975 | — | — | 975 |
| Real Estate | — | — | 1,504 | 1,504 |
| Net Plan Net Assets | $6,304 | $1,419 | $1,561 | $9,284 |

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The tables below set forth a summary of changes in the fair value of the pension assets level 3 investment assets for the years ended December 31.

|  | Year Ended December 31, | |
|---|---|---|
|  | 2009 | 2010 |
| Balance, beginning of year | $1,161 | $1,561 |
| Actual return on plan assets: | | |
| Assets sold during the period | — | — |
| Assets still held at reporting date | 310 | 75 |
| Purchases, sales, issuances and settlements (net) | 91 | (296) |
| Net Plan Net Assets | $1,561 | $1,340 |

The following pension benefits contributions are expected to be paid by the Company during the years ending:

| | |
|---|---|
| December 31, 2011 | $ 83 |
| December 31, 2012 | 84 |
| December 31, 2013 | 66 |
| December 31, 2014 | 106 |
| December 31, 2015 | 107 |
| December 31, 2016 — 2021 | 1,279 |
| Total pension payments | $1,726 |

The Company's estimated employer contribution to the define benefit pension plan for the fiscal year 2011 is $678.

The Company has a defined contribution pension plan that includes 354 employees. The contribution to the defined contribution pension plan for the year 2010 was $1,775. The contribution to the defined contribution pension plan for the years 2009 and 2008 was $104 and $54 respectively.

**13. Other non-current assets**

The amount of other non-current assets shown in the accompanying consolidated balance sheets is analyzed as follows:

|  | 2009 | 2010 |
|---|---|---|
| Margin calls | 40,700 | 78,600 |
| Advance payments drillships | — | 294,569 |
| Drillship options | — | 99,024 |
| Total | 40,700 | 472,193 |

On November 22, 2010, the Company, entered into a contract with Samsung that granted DryShips options for the construction of up to four additional ultra-deepwater drillships, which would be "sister-ships" to the Ocean Rig Corcovado, the Ocean Rig Olympia and the two drillships currently under construction and would have the same specifications as the Ocean Rig Poseidon with certain upgrades to vessel design and specifications. Each of the four options may be exercised at any time on or prior to November 22, 2011, with vessel deliveries ranging from 2013 to

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

2014 depending on when the options are exercised. The total construction cost is estimated to be $638.0 million per drillship. The option agreement required the Company to pay a non-refundable slot reservation fee of $24,756 per drillship, which fee will be applied towards the drillship contract price if the options are exercised. The cost of the option agreements of $99,024 was paid on December 30, 2010 and is recorded in the accompanying consolidated balance sheets as 'Other non-current assets'. On December 30, 2010 DryShips entered into a novation agreement with Ocean Rig UDW and transferred these options to its subsidiary. As of December 31, 2010, none of these options have been exercised.

**14. Shareholders' equity**

There is one class of common shares, and each common share is entitled to one vote on all matters submitted to a vote of shareholders.

Prior to December 8, 2010, the Company's authorized capital stock consisted of 500 common shares, par value $20.00 per shares. During December 2010, the Company adopted, amended and restated articles of incorporation pursuant to which its authorized capital stock will consist of 250,000,000 common shares, par value $0.01 per share; and (ii) declared and paid a stock dividend of 103,125,000 shares of its common stock to its sole shareholder, DryShips. On December 21, 2010 the Company completed through a private placement the sale of an aggregated of 28,571,428 common shares at $17.50 per share. Net proceeds from the private placement was $488,301 including $11,699 in attributable costs. The stock dividend has been accounted for as a stock split. As a result, we reclassified approximately $1,021 from APIC to common stock, which represents the par value per share of the shares issued. All previously reported share and per share amounts have been restated to reflect the stock dividend.

At December 31, 2010 the Company's authorized capital stock consisted of 250,000,000 common shares, par value $0.01 per shares, of which 131,696,928 common shares were issued and outstanding.

**15. Earnings/(loss) per share**

Basic earnings per share is calculated by dividing net profit/ (loss) for the year by the weighted average number of ordinary shares outstanding during the year.

Diluted earnings per share is calculated by dividing the net profit/(loss) by the weighted average number of ordinary shares outstanding during the year plus the weighted average number of ordinary shares that would have been issued on the conversion of options into ordinary shares.

The Company increased the number of authorized shares to 250,000,000 with par value of $0.01 on December 7, 2010. On December 8, 2010, the Company declared a stock dividend of 103,125,000 shares to its sole shareholder, DryShips. On December 21, 2010, the company completed the sale of an aggregate of 28,571,428 of the Company's common shares (representing a 22% ownership interest) in an offering made to both non-United States persons in Norway in reliance on Regulation S under the Securities Act and to qualified institutional buyers in the United States in reliance on Rule 144A under the Securities Act. We refer to this offering as the "private offering." A company controlled by our Chairman, President and Chief Executive Officer, Mr. George Economou, purchased 2,869,428 common shares, or 2.38% of our outstanding common shares, in the private offering at the offering price of $17.50 per share. After the completion of the private offering the Company's common stock issued is 131,696,928 shares with par value $0.01.

The following reflects the income and the share data used in the basic and diluted earnings per share computations under ASC 260-10-55-12, which states that if the number of common shares outstanding increases as

F-87

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

a result of a stock dividend prior to the private offering, the computations of basic and diluted EPS shall be adjusted retroactively for all periods presented to reflect that change in capital structure:

| | Earnings/(Loss) Applicable to Common Shares (Numerator) | Weighted Average Shares Outstanding (Denominator) | Basic Earnings/ (Loss) per Share Amount | Earnings/(Loss) Applicable to Diluted Shares (Numerator) | Weighted Average Shares Outstanding Diluted (Denominator) | Diluted Earnings/ (Loss) per Share Amount |
|---|---|---|---|---|---|---|
| For the year ended December 2010: | 134,761 | 103,908,279 | 1.30 | 134,761 | 103,908,279 | 1.30 |
| For the year ended December 31, 2009: | 115,754 | 103,125,500 | 1.12 | 115,754 | 103,125,500 | 1.12 |
| For the year ended December 2008: | (765,847) | 103,125,500 | (7.43) | (765,847) | 103,125,500 | (7.43) |

**16. Drilling rig operating expenses:**

The amounts of drilling rig operating expenses in the accompanying consolidated statements of operations are analyzed as follows:

| | Year Ended December 31, 2008 | Year Ended December 31, 2009 | Year Ended December 31, 2010 |
|---|---|---|---|
| Crew wages and related costs | $ 46,951 | 76,628 | $ 69,994 |
| Insurance | 12,686 | 7,869 | 7,918 |
| Deferred rig operating cost | — | 4,361 | 3,787 |
| Repairs and maintenance | 26,592 | 44,398 | 37,670 |
| Total | $ 86,229 | 133,256 | $ 119,369 |

**17. Impairment Charge**

From the date the Company acquired Ocean Rig ASA in May 2008 through the annual goodwill impairment test performed on December 31, 2008, the market declined significantly and various factors negatively affected industry trends and conditions, which resulted in the revision of certain key assumptions used in determining the fair value of the Company's single reporting unit (see Note 21) and therefore the implied fair value of goodwill. During the second half of 2008, the credit markets tightened, driving up the cost of capital and therefore the Company increased the rate of a long-term weighted average cost of capital. In addition, the economic downturn and volatile oil prices resulted in a downward revision of projected cash flows from the Company's reporting unit in the Company's forecasted discounted cash flows analysis for its 2008 impairment testing. Furthermore, the decline in the global economy negatively impacted publicly traded company multiples used when estimating fair value under the market approach. Based on results of the Company's annual goodwill impairment analysis, the Company determined that the carrying value of the Company's goodwill was impaired.

The Company recognized an impairment charge in the amount of $761,729 for the full carrying amount of Goodwill which had no tax effect.

F-88

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

**The Goodwill balance and changes in the Goodwill is as follows:**

| | |
|---|---:|
| Balance at January 1, 2008 | $ — |
| Goodwill from acquisition of Ocean Rig ASA | 761,729 |
| Goodwill impairment charge | (761,729) |
| Balance December 31, 2008 | $ — |

**18.   Interest and Finance Cost:**

The amounts in the accompanying consolidated statements of operations are analyzed as follows:

| | Year Ended December 31, | | |
|---|---:|---:|---:|
| | **2008** | **2009** | **2010** |
| | | **(As restated)** | |
| Interest costs on long-term debt(*) | $55,165 | 57,154 | $ 35,827 |
| Capitalized interest (see note 7) | — | (24,457) | (35,780) |
| Bank charges | 6,024 | 6,269 | 1,997 |
| Commissions and commitment fees | 10,503 | 7,154 | 6,374 |
| Total | $71,692 | 46,120 | $  8,418 |

(*)   In addition, a portion of interest was recorded in accumulated other comprehensive loss related to cash flow hedges of the variability of interest on borrowings that was capitalized as part of rigs under construction. The amounts recorded were $21,523 and $6,253 for 2010 and 2009, respectively.

**19.   Interest Income:**

The amounts in the accompanying consolidated statements of operations are analyzed as follows:

| | Year Ended December 31, | | |
|---|---:|---:|---:|
| | **2008** | **2009** | **2010** |
| Bank Interest Income | $3,033 | 6,254 | $12,464 |
| Other Financial Income | — | 5 | — |
| Total | $3,033 | 6,259 | $12,464 |

**20.   Income Taxes**

Ocean Rig UDW operates through its various subsidiaries in a number of countries throughout the world. Income taxes have been provided based upon the tax laws and rates in the countries in which operations are conducted and income is earned. The countries in which Ocean Rig UDW operates have taxation regimes with varying nominal rates, deductions, credits and other tax attributes. Consequently, there is not an expected relationship between the provision for/or benefit from income taxes and income or loss before income taxes.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The components of Ocean Rig's income/(losses) before taxes by country are as follows:

| | Year Ended | | |
|---|---|---|---|
| | December 31, 2008 | December 31, 2009 (As restated) | December 31, 2010 |
| Cyprus | $ (40,599) | $ (24,617) | $ (32,438) |
| Norway | (747,018) | 499,879 | 14,811 |
| Marshall Islands | 12,883 | (370,007) | 174,794 |
| Korea | — | 499 | |
| UK | 62 | 1,915 | 763 |
| Canada | — | (485) | (683) |
| USA | 13,820 | (262) | — |
| Ghana | 704 | 21,628 | (2,050) |
| Total income/(loss) before taxes and equity in loss of investee | $ (760,148) | $ 128,551 | $ 155,197 |

The table below shows for each entity's total income tax expense for the period and statutory tax rate:

| | Year Ended | | |
|---|---|---|---|
| | December 31, 2008 | December 31, 2009 | December 31, 2010 |
| Cyprus (10.0%) | $ — | $ — | $ 52 |
| Norway (28.0%) | — | — | 13 |
| Marshall Islands (0.0%) | — | — | — |
| Turkey(*) | — | — | 7,950 |
| Korea (24.2%) | — | 110 | — |
| UK (28.0%) | 366 | 727 | 765 |
| Ireland (25.0%) | 423 | — | — |
| Canada (10% — 19%) | — | 45 | 82 |
| USA (15.0%-35.0%) | 1,399 | 470 | — |
| Ghana(**) | 656 | 11,445 | 11,365 |
| Current Tax expense | $ 2,844 | $ 12,797 | $ 20,227 |
| Deferred Tax expense/(benefit) | — | — | 209 |
| Income taxes | 2,844 | $ 12,797 | $ 20,436 |
| Effective tax rate | 0% | 10% | 13% |

---

(*) Ocean Rig 1 Inc. paid in 2010 withholding tax to Turkey authorities, based upon 5% of total contract revenues.

(**) Tax in Ghana is a withholding tax, based upon 5% of total contract revenues.

Taxes have not been reflected in Other Comprehensive income since the valuation allowances would result in no recognition of deferred tax.

Up to December 15, 2009, when a corporate reorganization occurred, Ocean Rig's drilling operations were consolidated in Ocean Rig ASA, a company incorporated and domiciled in Norway. Subsequently, many of the activities and assets have moved to jurisdictions that do not have corporate taxation. As a result, net deferred tax

F-90

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

assets were reversed in 2009. The net deferred tax assets of $91.6 million consisted of gross deferred tax assets of $105.1 million net of gross deferred tax liabilities of $13.5 million. However, a corresponding amount ($91.6 million) of valuation allowance was also reversed. As a result, there was no impact on deferred tax expense for the change of tax status of these entities in 2009.

Reconciliation of total tax expense:

|  | Year Ended | | |
|---|---|---|---|
|  | December 31, 2008 | December 31, 2009 | December 31, 2010 |
| Statutory tax rate multiplied by profit/(loss) before tax* | $ (212,816) | $ — | $ — |
| Change in valuation allowance | 115 407 | (93,358) | (14,922) |
| Differences in tax rates | 135,908 | 138,865 | 14,177 |
| Effect of permanent differences | (74,929) | 21,317 | 40 |
| Adjustments in respect to current income tax of previous years | — | — | 281 |
| Effect of exchange rate differences | 39,274 | (65,472) | 1,465 |
| Withholding tax | — | 11,445 | 19,395 |
| Total | $ 2,844 | $ 12,797 | $ 20,436 |

---

\* Ocean Rig has for 2008 and 2009 elected to use the statutory tax rate for each year based upon the location where the largest parts of its operations were domiciled. During 2008 most of its activities were domiciled in Norway with tax rate 28%. During 2009 and 2010, most of its activities were re-domiciled to Marshall Islands with tax rate of zero.

Ocean Rig is subject to changes in tax laws, treaties, regulations and interpretations in and between the countries in which its subsidiaries operate. A material change in these tax laws, treaties, regulations and interpretations could result in a higher or lower effective tax rate on worldwide earnings.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

Deferred tax assets and liabilities are recognized for the anticipated future tax effects of temporary differences between the financial statement basis and the tax basis of the Company's assets and liabilities at the applicable tax rates in effect. The significant components of deferred tax assets and liabilities are as follow:

|  | Year Ended | |
|  | December 31, 2009 | December 31, 2010 |
|---|---|---|
| **Deferred tax assets** | | |
| Net operations loss carry forward | $ 65,045 | $ 49,707 |
| Accrued expenses | 728 | 944 |
| Accelerated depreciation of assets | 9 | 8 |
| Pension | — | 157 |
| Total deferred tax assets | $ 65,782 | $ 50,816 |
| Less: valuation allowance | (65,552) | (50,630) |
| Total deferred tax assets, net | 230 | 186 |
| **Deferred tax liabilities** | | |
| Depreciation and amortization | $ (122) | $ (394) |
| Pension | (108) | — |
| Total deferred tax liabilities | $ (230) | $ (394) |

The amounts above are reflected in the Consolidated Balance Sheet as follows:

|  |  |  |
|---|---|---|
| Net deferred tax assets /(liability) | $— | $(209) |
| Short-term net deferred tax assets | — | — |
| Long-term net deferred tax assets(liabilities) | $— | $(209) |

Ocean Rig ASA filed for liquidation in 2008 and on December 15, 2009 it distributed all significant assets to Primelead Ltd., a subsidiary of Dryships, as a liquidation dividend, including the shares in all its subsidiaries. The statute of limitation under Norwegian tax law is two years after the fiscal year, if correct and complete information is disclosed in the tax return. The tax treatment of the liquidation is therefore subject to audit by the tax authorities until the end of 2011. The company does not expect any adverse tax effects from this transaction.

A valuation allowance for deferred tax assets is recorded when it is more likely than not that some or all of the benefit from the deferred tax asset will not be realized. The Company provides a valuation allowance to offset deferred tax assets for net operating losses ("NOL") incurred during the year in certain jurisdictions and for other deferred tax assets where, in the Company's opinion, it is more likely than not that the financial statement benefit of these losses will not be realized. The Company provides a valuation allowance for foreign tax loss carry forward to reflect the possible expiration of these benefits prior to their utilization. As of December 31, 2010, the valuation allowance for deferred tax assets is reduced from $65,552 in 2009 to $50,630 if 2010 reflecting a reduction in net deferred tax assets during the period. The decrease is primarily a result of the reduction of deferred tax asset due to utilization of tax loss carry forwards in Norway and in Cyprus in 2010.

The table below explains the "Net operations loss carry forward" in 2010 and 2009 for the countries the Company is operating in.

F-92

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

| | Year Ended | |
| --- | --- | --- |
| | December 31, 2009 | December 31, 2010 |
| **Norway** | | |
| Net operations loss carry forward | $183,998 | $144,189 |
| Tax rate | 28% | 28% |
| Net operations loss carry forward, tax effect | 51,520 | 40,373 |
| **Cyprus** | | |
| Net operations loss carry forward | $ 57,112 | $ 89,832 |
| Tax rate | 10% | 10% |
| Net operations loss carry forward, tax effect | 5,711 | 8,983 |
| **Canada** | | |
| Net operations loss carry forward | $ 24,419 | $ 879 |
| Tax rate | 32% | 32% |
| Net operations loss carry forward, tax effect | 7,814 | 281 |
| **UK** | | |
| Net operations loss carry forward | $ — | $ 249 |
| Tax rate | 28% | 28% |
| Net operations loss carry forward, tax effect | — | 70 |
| **Accumulated** | | |
| Net operations loss carry forward | $265,529 | $235,106 |
| Net operations loss carry forward, tax effect | 65,045 | 49,707 |

The Company has tax losses, which arose in Norway of $183,998 and $144,146 at December 31, 2009 and 2010, respectively, that are available indefinitely for offset against future taxable profits of the companies in which the losses arose. However, all of these amounts are related to Ocean Rig ASA, Ocean Rig Norway AS, Ocean Rig 1 AS and Ocean Rig 2 AS that are under liquidation. Upon liquidation the tax losses will not be available.

The Company had tax losses, which arose in Cyprus of $57,112 and $89,832 at December 31, 2009 and 2010, respectively that are available indefinitely for offset against future taxable profits of the company in which the losses arose. A 100% valuation allowance in the assets resulting from the loss carry forward has been provided for as the Company is not profitable.

The Company had tax losses, which arose in Canada of $24,419 and $879 at December 31, 2009 and 2010, respectively, that are available indefinitely for offset against future taxable profits of the company in which the losses arose. The tax loss in Canada may be deducted in the future only against income and proceeds of disposition derived from resource properties owned at the time of the acquisition of control, or the Weymouth well. The possibility for utilization of this tax position for the period after the change of control in Ocean Rig on May 14, 2008, is in practice expired with an amount of $23,540. The tax loss carry forward per December 31, 2010 therefore only reflects tax losses after May 14, 2008.

The Company had tax losses, which arose in UK of $249 at December 31, 2010 that are available indefinitely for offset against future taxable profits of the company in which the losses arose. A 100% valuation allowance in the assets resulting from the loss carry forward has been provided for as the Company is not profitable.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The Company's income tax returns are subject to review and examination in the various jurisdictions in which the Company operates. Currently one tax audit is open. The Company may contest any tax assessment that deviates from its tax filing. However, this review is not expected to incur any tax payables.

The Company accrues for income tax contingencies that it believes are more likely than not exposures in accordance with the provisions of guidance related to accounting for uncertainty in income taxes.

The Company accrues interest and penalties related to its liabilities for unrecognized tax benefits as a component of income tax expense. During the year ended December 31, 2010, 2009 and 2008, the Company did not incur any interest or penalties. Ocean Rig UDW, and/or one of its subsidiaries, filed federal and local tax returns in several jurisdictions throughout the world. The amount of current tax benefit recognized during the years ended December 31, 2010, 2009 and 2008 from the settlement of disputes with tax authorities and the expiration of statute of limitations was insignificant.

Ocean Rig UDW is incorporated in Marshall Island and headquartered in Cyprus. Some of its subsidiaries are incorporated and domiciled in Norway, and as such, are in general subject to Norwegian income tax of 28%. Participation exemption normally applies to equity investments in the EEA (European Economic Area) except investments in low-tax countries. The model may also apply to investments outside of the EEA (except low-tax countries) to the extent the investment for the last two years have constituted at least 10% of the capital and votes in the entity in question. The Norwegian entities are subject to the Norwegian participation exemption model which provides that only 3% of dividend income and capital gains that are received by Norwegian companies are subject to tax. In effect this gives an effective tax of total income under the participation exemption for Norwegian companies of 0.84% (3% x 28%). After a restructuring of the Norwegian entities late in 2009, all Norwegian companies are owned directly by Primelead Ltd in Cyprus and the participation exemption model is therefore not relevant for 2010.

**21.   Segment information:**

The Company has one operating segment which is offshore drilling operations and this is consistent with management reporting and decision making. The operating segment is the Company's primary segment as the Group has only one segment. Therefore, the company only reports the entity wide information on products and services, geographical information and major customers.

For the years ended December 31, 2008, 2009 and 2010, all of the consolidated revenues related to the operations of the Company's two drilling rigs.

*21.1 Products and services*

In October 2009, the *Leiv Eiriksson* commenced the three year Petrobras contract to drill in the Black Sea. The Petrobras contract is accounted for as a Well Contract based on the terms of the contract as described in Note 2 (v). Revenues are recognized as the wells are drilled and recorded as Service revenues in the consolidated statement of operations. *Leiv Eiriksson* has operated under drilling contracts with Shell in the North Sea commencing on January 8, 2008 until October 2009. The Shell contract was accounted for as Term Contract as described in Note 2 (v). Revenues derived from the contract are partly accounted for as a lease, where the lease of the rig is recognized to the statement of operation as Leasing revenue on a straight line basis over the lease period, while the drilling services element is recognized in the period when drilling services are rendered as Service revenue. During 2007, the rig completed the Total contract on September 11, 2007 and underwent its five year class work prior to beginning the Shell contract. The Total contract was accounted for as a Term Contract as described for the Shell contract above.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

During 2010 and 2009, *Eirik Raude* worked under the three-year Tullow Oil contract which commenced in October 2008. *Eirik Raude* operated in the US Gulf of Mexico under a contract with Exxon Mobil from 2007 until October 9, 2008. Both, the ExxonMobil and the Tullow contracts qualify as Term Contracts, as described in Note 2 (v). Accounting for the contract follows the same principles as described for the Shell contract as outlined above.

As of December 31,2010, the estimated future minimum revenue is $1,091 million based on 100% earning efficiency and maximum bonuses. The estimated minimum revenue is distributed over 2011, 2012 and 2013 with $696 million, $335 million and $60 million, respectively. As of December 31, 2010, a total of $40,205 of revenue are deferred and will be recognized as revenue over the remaining contracts terms. As of December 31, 2009, a total of $38,400 of revenue was deferred.

See Note 2 (v) for a discussion of Other revenues.

### 21.2 Geographic segment information for offshore drilling operations

The revenue shown in the table below is revenue per country based upon the location that the drilling takes place related to the Offshore Drilling Operation segment:

|  | 2008 | 2009 | 2010 |
|---|---|---|---|
| Ghana | $ 40,120 | 230,815 | $227,649 |
| Turkey | — | — | 176,228 |
| Norway | 74,725 | 123,306 | (715) |
| UK | — | 19,404 | — |
| USA | 53,394 | — | — |
| Ireland | 33,749 | — | — |
| Other | 122 | — | — |
| Total leasing and service revenues | $202,110 | 373,525 | $403,162 |

The drilling rigs *Leiv Eiriksson* and *Eirik Raude* constitute the Company's long lived assets. Until December 22, 2008, the rigs were owned by Norwegian entities when ownership was transferred to Marshall Island entities.

### 21.3 Information about Major customers

Our customers are oil and gas exploration and production companies, including major integrated oil companies, independent oil and gas producers and government-owned oil and gas companies. In the year ended December 31, 2008, 2009 and 2010 our customers have been:

|  | 2008 | 2009 | 2010 |
|---|---|---|---|
| Customer A | 20% | 62% | 57% |
| Customer B | — | — | 43% |
| Customer C | 54% | 38% | — |
| Customer D | 26% | — | — |

The loss of any of these significant customers could have a material adverse effect on our results of operations if they were not replaced by other customers.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

**22.  Commitments and Contingencies**

*22.1 Legal proceedings*

Various claims, suits, and complaints, including those involving government regulations and product liability, arise in the ordinary course of the shipping business.

The Company has obtained insurance for the assessed market value of the rigs. However, such insurance coverage may not provide sufficient funds to protect the Company from all liabilities that could result from its operations in all situations. Risks against which the Company may not be fully insured or insurable for include environmental liabilities, which may result from a blow-out or similar accident, or liabilities resulting from reservoir damage alleged to have been caused by the negligence of the Company.

The Company's loss of hire insurance coverage does not protect against loss of income from day one, but will be effective after 45 days' off-hire. The occurrence of casualty or loss, against which the Company is not fully insured, could have a material adverse effect on the Company's results of operations and financial condition. The insurance covers approximately one year with loss of hire.

As part of our normal course of operations, our customer may disagree on amounts due to us under the provision of the contracts which are normally settled though negotiations with the customer. Disputed amounts are normally reflected in revenues at such time as we reach agreement with the customer on the amounts due. Except for the matter discussed below in 22.2, the Company is not a party to any material litigation where claims or counterclaims have been filed against the Company other than routine legal proceedings incidental to our business.

*22.2 Potential Angolan Import-/Export duties*

Ocean Rig's Leiv Eiriksson operated in Angola in the period 2002 to 2007. Ocean Rig understands that the Angolan government has retroactively levied import/export duties for two importation events in the period 2002 to 2007. As Ocean Rig has formally disputed all claims in relation to the potential duties and does not believe it is probable that the duties will be upheld, no provision has been made. The maximum amount is estimated to be between $5-10 million.

*22.3 Purchase obligations:*

The following table sets forth the Company's contractual purchase obligations as of December 31, 2010.

|  | 2011 |
|---|---:|
| Obligations to Cardiff under management agreements terminated effective December 21, 2010 (Note 4) | 5,774 |
| Drillships shipbuilding contracts and owner furnished equipment | 1,374,000 |
| Total obligations | 1,379,774 |

*22.4 Rental payments*

Ocean Rig entered into a five year office lease agreement with Vestre Svanholmen 6 AS which commenced on July 1, 2007. This lease includes an option for an additional five years term which must be exercised at least six months prior to the end of the term of the contract which expires in June 2012. As of December 31, 2010, the future obligations amount to $646 for 2011 and $323 for 2012.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

**23.    Subsequent Events:**

We have evaluated all subsequent events through April 29, 2011, the date the financial statements were available to be issued.

**23.1** On January 3, 2011 the Company took delivery of its newbuilding drillship, the *Ocean Rig Corcovado* , the first to be delivered of the four sister drillship vessels that are being constructed at Samsung Heavy Industries. In connection with the delivery of *Ocean Rig Corcovado* , the final yard installment of $289.0 million was paid and the pre-delivery loan from DVB Bank of $115.0 million was repaid in full on December 22, 2010.

**23.2** On January 4, 2011 the Company announced that it had entered into firm contracts with Cairn Energy PLC for the *Leiv Eiriksson* and the *Ocean Rig Corcovado* for a period of approximately 6 months each. The total contract value including mobilization for the *Leiv Eiriksson* is approximately $95 million. The mobilization period began in direct continuation from April 10, 2011, the agreed release date from the Petrobras contract, and the rig has been earning a reduced stand-by rate from that date. The total contract value including mobilization and winterization of the *Ocean Rig Corcovado* is approximately $142 million.

**23.3** On January 4, 2011 the Company repaid the $300 million short term overdraft facility with EFG Eurobank from restricted cash, which was drawn down in full on December 28, 2010.

**23.4** On January 4, 2011 the Company announced that it had entered into a firm contract with Petrobras Tanzania for its 3rd drillship newbuilding the *Ocean Rig Poseidon* . As part of this agreement the *Leiv Eiriksson* will be released early from the existing contract and will be made available in second quarter 2011. The firm contract period is for about 600 days plus a mobilization period. The total contract value including mobilization is $353 million.

**23.5** On January 5, 2011 the Company drew down the full amount of the $325 million Deutsche Bank term loan facility, with its subsidiary Drillships Hydra Owners Inc. as borrower, for the purpose of (i) meeting the ongoing working capital needs of Drillships Hydra Owners Inc, (ii) financing the partial repayment of existing debt in relation to the purchase of the drillship identified as Samsung Hull 1837, or *Ocean Rig Corcovado* , and (iii) financing the payment of the final installment associated with the purchase of said drillship. Dry Ships Inc., Drillships Holdings Inc and Ocean Rig UDW Inc. are joint guarantors and guarantee all obligations and liabilities of Drillships Hydra Owners Inc.

**23.6** On March 18, 2011, the Company repaid the second and final $115 million tranche of the predelivery financing for hulls 1837 and 1838.

**23.7** On March 30, 2011, the Company took delivery of its newbuilding drillship, the *Ocean Rig Olympia* , the second to be delivered of the four sister drillship vessels that are being constructed at Samsung Heavy Industries. The rig has been earning a mobilization rate under the Vanco contract from that date.

**23.8** On April 18, 2010, pursuant to the drillship master agreement, the Company exercised the first of its four newbuilding drillship options and entered into a shipbuilding contract for drillship NB #1 (TBN) for a total yard cost of $608 million. The Company paid $207.6 million to the shipyard in connection with the exercise of the option. Delivery of this hull is scheduled for July 2013. The estimated total yard cost of $608 million includes $38 million of specification upgrades agreed on April 13, 2011, including a 7 ram BOP, a dual mud system and, with the purchase of additional equipment, the capability to drill in water depths of 12,000 feet.

**23.9** On April 18, 2011, the Company entered into an $800 million Syndicated Secured Term Loan Facility to partially finance the construction costs of the *Ocean Rig Corcovado* and the *Ocean Rig Olympia* . This facility has a five year term and is repayable in 20 quarterly installments plus a balloon payment payable with the last installment.

**OCEAN RIG UDW INC.**

**Notes to Consolidated Financial Statement — (Continued)**
**As of and for periods ended December 31, 2008, 2009 and 2010**
**(Expressed in thousands of United States Dollars — except for share and per share data,**
**unless otherwise stated)**

The facility bears interest at LIBOR plus a margin. The facility is guaranteed by DryShips and Ocean Rig UDW and imposes certain financial covenants on both entities. On April 20, 2011, the Company drew down the full amount of this facility and prepaid its $325 million Bridge Loan Facility.

**23.10** During March and April 2011, we borrowed an aggregate of $175.5 million from DryShips through shareholder loans for capital expenditures and general corporate purposes. On April 20, 2011, these intercompany loans were repaid. As of the date of this proxy statement / prospectus, no balance exists between us and DryShips.

**23.11** On April 27, 2011, the Company entered into an agreement with all lenders under the Two $562,000 Loan Agreements to restructure the Two $562,000 Loan Agreements. The principal terms of the restructuring are as follows: (i) the maximum amount permitted to be drawn is reduced from $562.5 million to $495.0 million under each facility; (ii) in addition to the guarantee already provided by DryShips, we provided an unlimited recourse guarantee that will include certain financial covenants that will apply quarterly to Ocean Rig UDW; (iii) the Company is permitted to draw under the facility with respect to the *Ocean Rig Poseidon* based upon the employment of the drillship under its drilling contract with Petrobras Tanzania, and on April 27, 2010, the cash collateral deposited for this vessel was released; and (iv) the Company is permitted to draw under the facility with respect to the *Ocean Rig Mykonos* provided the Company has obtained suitable employment for such drillship no later than August 2011.

**23.12** On April 27, 2011, the Company completed the issuance of $500.0 million aggregate principal amount of 9.5% senior unsecured notes due 2016 offered in a private placement. The net proceeds from the notes offering of approximately $487.5 million are expected to be used to finance the Company's newbuilding drillships program and for general corporate purposes.

**23.13** On April 27, 2011, pursuant to the drillship master agreement, the Company exercised the second of its four newbuilding drillship options and entered into a shipbuilding contract for drillship NB #2 (TBN) for a total yard cost of $608.0 million. The Company paid $207.4 million to the shipyard in the second quarter of 2011 in connection with the exercise of the option. Delivery of this hull is scheduled for September 2013. The estimated total yard cost of $608.0 million includes $38 million of specification upgrades agreed on April 27, 2011, including a 7 ram BOP, a dual mud system and, with the purchase of additional equipment, the capability to drill in water depths of 12,000 feet.

**23.14** On April 27, 2011, and subsequent to the signing of the Two $562,000 Loan Agreements (see 23.11 above), a net amount of $88.7 million was released by the lenders to the Company, which was previously held by the lenders as cash collateral.

F-98

# OCEAN RIG UDW INC.

## UNAUDITED PRO FORMA CONDENSED STATEMENT OF OPERATIONS

Ocean Rig UDW Inc. (the "Company" or "OCR UDW") was formed under the laws of the Republic of the Marshall Islands on December 10, 2007, under the name Primelead Shareholders Inc., and as a wholly-owned subsidiary of DryShips Inc., a publicly traded company whose shares are listed on the NASDAQ Global Select Market under the symbol "DRYS".

The Company's predecessor, Ocean Rig ASA, was incorporated on September 26, 1996 under the laws of Norway and operated two drilling rigs. The Leiv Eiriksson and the Eirik Raude commenced operations in 2001 and 2002, respectively, under contracts with oil and gas companies. The shares of Ocean Rig ASA traded on Oslo Børs from January 1997 to July 2008.

OCR UDW acquired 30.4% of the shares in Ocean Rig ASA ("OCR ASA") on December 20, 2007. The Company acquired additional shares of Ocean Rig ASA during 2008. After acquiring more than 33% of Ocean Rig ASA's outstanding shares, the Company, as required by Norwegian Law, launched a mandatory bid for the remaining shares of Ocean Rig at a price of NOK 45 per share ($8.89 per share). The Company gained control over Ocean Rig ASA on May 14, 2008. Up to May 14, 2008, the Company recorded its minority share of OCR ASA's results of operations under the equity method of accounting. The results of operations related to OCR ASA are consolidated in the financial statements of OCR UDW starting May 15, 2008. The mandatory bid expired on June 11, 2008. As of July 10, 2008, the Company had acquired 100% of the shares in Ocean Rig ASA. During the period between May 15, 2008 and July 10, 2008, the Company reflected the minority shareholders interests in net income of OCR ASA on the line Net income attributable to non controlling interest in its consolidated statement of operations. The step acquisition was accounted for using the purchase method of accounting.

The accompanying unaudited pro forma condensed statement of operations gives effect to the acquisition of Ocean Rig ASA as if the transactions had occurred on January 1, 2008. The unaudited pro forma statement of operations was derived from, and should be read in conjunction with, the historical consolidated financial statements of Ocean Rig UDW Inc. for the period January 1, 2008 to December 31, 2008 and Ocean Rig ASA for the period January 1, 2008 to May 14, 2008 which are included elsewhere in this proxy statement / prospectus.

The unaudited pro forma condensed pro forma statement of operations has been prepared in conformity with U.S. generally accepted accounting principles ("GAAP") consistent with those used in OCR UDW's historical consolidated financial statements.

The adjustments reflected in the unaudited pro forma condensed statement of operations are principally related to the pro forma amortization of the purchase price adjustments to the statement of operations for the period from January 1, 2008 to May 14, 2008. These net incremental adjustments are based upon the fair value from the step acquisition reflected in Note 5.3 to the consolidated financial statements of OCR UDW. All pro forma adjustments related to the purchase price allocation have recurring effects.

The unaudited pro forma condensed statement of operations does not purport to present the OCR UDW Inc.'s results of operations had the acquisition actually been completed at the date indicated. In addition, they do not project the OCR UDW's results of operations for any future period.

F-99

**OCEAN RIG UDW INC.**

**Unaudited Pro Forma Condensed Statement of Operations**
**For the period ended December 31, 2008**
**(Expressed in thousands of United States Dollars)**

| | OCR UDW 01/01 — 12/31/2008 | OCR ASA 01/01 — 05/14/2008 | Adjustments | Pro Forma |
|---|---|---|---|---|
| **Condensed Statement of Operations:** | | | | |
| Leasing and service revenues | 202,110 | 99,172 | | 301,282 |
| Other revenues | 16,553 | — | 8,810(a) | 25,363 |
| **Total revenues** | **218,663** | **99,172** | **8,810** | **326,645** |
| Drilling rigs operating expenses | 86,229 | 48,144 | — | 134,373 |
| Goodwill impairment | 761,729 | — | — | 761,729 |
| Depreciation and amortization | 45,432 | 19,367 | 6,909(b) | 71,708 |
| General and administrative | 14,462 | 12,140 | | 26,602 |
| **Total operating expenses** | **907,852** | **79,651** | **6,909** | **994,412** |
| **Operating income/(loss)** | **(689,189)** | **19,521** | **1,901** | **(667,767)** |
| Interest and finance costs | (71,692) | (41,661) | (11,316)(c) | (124,669) |
| Interest income | 3,033 | 381 | — | 3,414 |
| Gain/(loss) on interest rate swaps | — | — | — | — |
| Other, net | (2,300) | — | — | (2,300) |
| **Total expenses, net** | **(70,959)** | **(41,280)** | **(11,316)** | **(123,555)** |
| Income/(loss) before income taxes | (760,148) | (21,759) | (9,415) | (791,322) |
| Income taxes | (2,844) | (1,637) | —(d) | (4,481) |
| Equity in loss of investee | (1,055) | — | 1,055(e) | — |
| **Net income/(loss)** | **(764,047)** | **(23,396)** | **(8,360)** | **(795,803)** |
| Less: Net income attributable to non controlling interest | (1,800) | — | 1,800(f) | — |
| **Net income/(loss)** | **(765,847)** | **(23,396)** | **(6,560)** | **(795,803)** |

F-100

**OCEAN RIG UDW INC.**

**Unaudited Pro Forma Condensed Statement of Operations**
**For the period ended December 31, 2008**
**(Expressed in thousands of United States Dollars)**

**Pro Forma Adjustments and Assumptions**

The unaudited pro forma condensed statement of operations give pro forma effect to the following:

(a) In connection with the acquisition, the Company acquired drilling contracts for the future contract drilling services of Ocean Rig ASA, some of which extend through 2011. These contracts include fixed day rates that were above or below day rates available as of the acquisition date. After determining the aggregate fair values of these drilling contracts as of the acquisition, the Company recorded the respective contract fair values on the consolidated balance sheet as non-current liabilities and non-current assets under "Fair value of below/above market acquired time charters." These are being amortized into revenues using the straight-line method over the respective contract periods (1 and 3 years for the respective contracts). The pro forma amount that was amortized to income for the period from January 1, 2008 to May 15, 2008 amounted to $8,810.

(b) The Company adjusted the carrying value of drilling rigs, machinery and equipment to its fair value that will be amortized over their useful life which was determined to be 30 years. Additionally, the Company identified finite-lived intangible assets associated with the trade names and software that will be amortized over their useful life which is determined to be 10 years. The pro forma amount of incremental depreciation of the fair value adjustment to drilling rigs, machinery and equipment for the period from January 1, 2008 to May 15, 2008 amounted to $6,404. The pro forma amount of amortization for identified finite-lived intangible assets for the period from January 1, 2008 to May 15, 2008 amounted to $505. The total pro forma adjustment for depreciation and amortization for the period from January 1, 2008 to May 15, 2008 amounted to $6,909.

(c) On May 9, 2008, the Company concluded a guarantee facility of NOK 5.0 billion (approximately $974,500) and a term loan of $800,000 in order to guarantee the purchase price of the Ocean Rig shares to be acquired through the mandatory offering, to finance the acquisition cost of the Ocean Rig shares. The loan bore interest at LIBOR plus a margin. — For purposes of the pro forma information it is assumed that loan drawn down from January 1, 2008 and therefore had interest expense for the whole year. The interest rate assumed was based upon the LIBOR in effect at the actual acquisition date of May 14, 2008. The total pro forma adjustment for interest expense for the period from January 1, 2008 to May 15, 2008 amounted to $11,316.

(d) There were no tax effects on amortization of the fair values for contracts, amortization and depreciation of tangible and intangible assets or interest expense because the tax effects were offset by changes in valuation allowance.

(e) For the period of January 1, 2008 to May 14, 2008, the Company recorded its minority share of OCR ASA's results of operations under the equity method of accounting on the line Equity in loss of investee. Since the unaudited pro forma condensed statement of operations includes 100% of OCR ASA's results of operations from January 1, 2008 to May 14, 2008, the minority share in the historical financial statements is reversed since this would include a portion of the results twice.

(f) During the period between May 15, 2008 and July 10, 2008, the Company reflected the minority shareholders interests in net income of OCR ASA on the line Net income attributable to non controlling interest in its consolidated statement of operations. Since the unaudited pro forma condensed statement of operations includes 100% of OCR ASA's results of operations as if the acquisition occurred on January 1, 2008, the non controlling interest in the historical financial statements is reversed.

**Annex A**

**<u>Execution Version</u>**

**AGREEMENT AND PLAN OF MERGER,**
**dated as of July 26, 2011,**
**among**
**DRYSHIPS INC.,**
**PELICAN STOCKHOLDINGS INC.,**
**and**
**OCEANFREIGHT INC.**

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I CERTAIN DEFINITIONS | | A-1 |
| Section 1.1. | Certain Definitions | A-1 |
| ARTICLE II THE MERGER | | A-7 |
| Section 2.1. | The Merger | A-7 |
| ARTICLE III EFFECT ON THE CAPITAL STOCK OF THE CONSTITUENT ENTITIES; EXCHANGE OF CERTIFICATES | | A-8 |
| Section 3.1. | Effect on Capital Stock | A-8 |
| Section 3.2. | Surrender and Payment | A-9 |
| Section 3.3. | [Intentionally Omitted] | A-10 |
| Section 3.4. | Withholding Rights | A-10 |
| Section 3.5. | Lost Certificates | A-10 |
| ARTICLE IV [INTENTIONALLY OMITTED] | | A-11 |
| ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE COMPANY | | A-11 |
| Section 5.1. | Organization, Qualification and Corporate Power | A-11 |
| Section 5.2. | Authorization | A-11 |
| Section 5.3. | Noncontravention | A-12 |
| Section 5.4. | Capitalization | A-12 |
| Section 5.5. | Subsidiaries | A-13 |
| Section 5.6. | Indebtedness | A-13 |
| Section 5.7. | SEC Filings and the Sarbanes-Oxley Act | A-14 |
| Section 5.8. | Financial Statements | A-15 |
| Section 5.9. | Disclosure Documents | A-15 |
| Section 5.10. | Taxes | A-16 |
| Section 5.11. | Compliance with Laws; Orders; Permits | A-16 |
| Section 5.12. | Absence of Certain Changes; No Undisclosed Liabilities | A-17 |
| Section 5.13. | Tangible Personal Assets | A-17 |
| Section 5.14. | Real Property | A-17 |
| Section 5.15. | Vessels; Maritime Matters | A-17 |
| Section 5.16. | Contracts | A-18 |
| Section 5.17. | Litigation | A-19 |
| Section 5.18. | Employee Benefits | A-20 |
| Section 5.19. | Labor and Employment Matters | A-20 |
| Section 5.20. | Environmental | A-21 |
| Section 5.21. | Insurance | A-21 |
| Section 5.22. | Opinion of Financial Advisor | A-21 |
| Section 5.23. | Fees | A-21 |
| Section 5.24. | Takeover Statutes; Rights Plan | A-21 |
| Section 5.25. | Interested Party Transactions | A-22 |
| Section 5.26. | Certain Business Practices | A-22 |
| Section 5.27. | No Existing Discussions | A-22 |
| Section 5.28. | No Other Representations or Warranties | A-22 |
| ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB | | A-22 |
| Section 6.1. | Organization, Qualification and Corporate Power | A-23 |

A-i

| | | Page |
|---|---|---|
| SECTION 6.2. | Authorization | A-23 |
| SECTION 6.3. | Noncontravention | A-23 |
| SECTION 6.4. | Disclosure Documents | A-23 |
| SECTION 6.5. | Fees | A-24 |
| SECTION 6.6. | Organization, Qualification and Corporate Power of Ocean Rig | A-24 |
| SECTION 6.7. | Capitalization of Ocean Rig | A-24 |
| SECTION 6.8. | Subsidiaries | A-25 |
| SECTION 6.9. | Ocean Rig SEC Filings | A-25 |
| SECTION 6.10. | Financial Statements | A-26 |
| SECTION 6.11. | Compliance with Laws; Orders; Permits | A-26 |
| SECTION 6.12. | Absence of Certain Changes; No Undisclosed Liabilities | A-27 |
| SECTION 6.13. | Contracts | A-27 |
| SECTION 6.14. | Tangible Personal Assets | A-27 |
| SECTION 6.15. | Labor and Employment Matters | A-27 |
| SECTION 6.16. | Environmental | A-27 |
| SECTION 6.17. | Litigation | A-27 |
| SECTION 6.18. | No Other Representations or Warranties | A-28 |
| ARTICLE VII CONDUCT OF BUSINESS PENDING THE MERGER | | A-28 |
| SECTION 7.1. | Operation of the Company's Business | A-28 |
| SECTION 7.2. | Operation of Ocean Rig's Business | A-30 |
| SECTION 7.3. | [Intentionally Omitted] | A-30 |
| SECTION 7.4. | Access to Information | A-30 |
| SECTION 7.5. | Notice of Developments | A-30 |
| SECTION 7.6. | No Solicitation | A-31 |
| SECTION 7.7. | Litigation | A-33 |
| SECTION 7.8. | Employee Matters | A-33 |
| SECTION 7.9. | Ocean Rig Common Stock | A-33 |
| ARTICLE VIII COVENANTS OF PARENT | | A-34 |
| SECTION 8.1. | Obligations of Merger Sub | A-34 |
| SECTION 8.2. | Voting of Shares | A-34 |
| SECTION 8.3. | Director and Officer Liability | A-34 |
| SECTION 8.4. | Stock Exchange Listing | A-35 |
| ARTICLE IX COVENANTS OF PARENT AND THE COMPANY | | A-35 |
| SECTION 9.1. | Company Stockholder Meeting; Proxy Statement; Registration Statement | A-35 |
| SECTION 9.2. | Regulatory Undertaking | A-36 |
| SECTION 9.3. | Certain Filings | A-37 |
| SECTION 9.4. | Public Announcements | A-37 |
| SECTION 9.5. | Further Assurances | A-37 |
| SECTION 9.6. | Stock Exchange De-listing | A-37 |
| SECTION 9.7. | Takeover Provisions | A-37 |
| SECTION 9.8. | Notices of Certain Events | A-37 |
| ARTICLE X CONDITIONS TO THE MERGER | | A-38 |
| SECTION 10.1. | Conditions to Obligations of Each Party | A-38 |

A-ii

| | | Page |
|---|---|---|
| SECTION 10.2. | Conditions to Obligations of the Company | A-38 |
| SECTION 10.3. | Conditions to Obligations of Parent and Merger Sub | A-39 |
| ARTICLE XI TERMINATION; AMENDMENT; WAIVER | | A-40 |
| SECTION 11.1. | Termination | A-40 |
| SECTION 11.2. | Effect of Termination | A-41 |
| ARTICLE XII MISCELLANEOUS | | A-41 |
| SECTION 12.1. | Notices | A-41 |
| SECTION 12.2. | Survival of Representations and Warranties | A-42 |
| SECTION 12.3. | Amendments and Waivers | A-42 |
| SECTION 12.4. | Expenses | A-42 |
| SECTION 12.5. | Disclosure Schedules | A-43 |
| SECTION 12.6. | Waiver | A-43 |
| SECTION 12.7. | Governing Law | A-43 |
| SECTION 12.8. | Jurisdiction | A-43 |
| SECTION 12.9. | WAIVER OF JURY TRIAL | A-44 |
| SECTION 12.10. | Counterparts; Effectiveness | A-44 |
| SECTION 12.11. | Entire Agreement | A-44 |
| SECTION 12.12. | Severability | A-44 |
| SECTION 12.13. | Specific Performance | A-44 |
| SECTION 12.14. | Headings | A-44 |
| SECTION 12.15. | Construction | A-44 |
| SECTION 12.16. | Binding Effect; Benefit; Assignment | A-45 |

A-iii

## AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER, dated as of July 26, 2011 (this " Agreement "), among DryShips Inc., a corporation organized under the laws of the Republic of the Marshall Islands (" Parent "), Pelican Stockholdings Inc., a corporation organized under the laws of the Republic of the Marshall Islands and a wholly-owned subsidiary of Parent (" Merger Sub "), and OceanFreight Inc., a corporation organized under the laws of the Republic of the Marshall Islands (the " Company ").

## RECITALS

WHEREAS, simultaneously herewith, Parent; Basset Holdings Inc., Steel Wheel Investments Limited and Haywood Finance Limited (collectively, the " Seller Group "); and the Company are entering into a Purchase and Sale Agreement (the " Purchase Agreement "), pursuant to which, subject to the terms and conditions set forth therein, the Seller Group has agreed to sell to Parent, and Parent has agreed to purchase from the Seller Group, no sooner than August 23, 2011 (the " Scheduled Seller Group Share Purchase Date "), a total of 3,000,856 shares of Class A common stock, par value of $0.01 per share, of the Company (the " Company Common Stock ") for consideration per share consisting of (x) $11.25 in cash and (y) a number of shares of Ocean Rig Common Stock (as defined below) owned by Parent equal to the Exchange Ratio (the date on which such purchase is consummated, the " Seller Group Share Purchase Date ");

WHEREAS, Parent owns 103,125,500, comprising approximately 78%, of the outstanding shares of common stock, par value of $0.01 per share (" Ocean Rig Common Stock "), of Ocean Rig UDW Inc., a corporation organized under the laws of the Republic of the Marshall Islands (" Ocean Rig ");

WHEREAS, each of the board of directors of the Company (the " Company Board ") and a special committee of independent directors established by the Company Board (the " Special Committee "), the board of directors of the Parent (the " Parent Board ") (on its own behalf and as the sole stockholder of Merger Sub) and the board of directors of Merger Sub (the " Merger Sub Board ") has approved the merger of Merger Sub with and into the Company (the " Merger ") on the terms and subject to the conditions provided for in this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations and warranties, covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I

## CERTAIN DEFINITIONS

SECTION  1.1.  *Certain Definitions.*

(a) When used in this Agreement, the following terms will have the meanings assigned to them in this Section 1.1(a) :

" *1933 Act* " means the Securities Act of 1933, as amended.

" *1934 Act* " means the Securities Exchange Act of 1934, as amended.

" *Acquisition Proposal* " means any offer, proposal or indication of interest by a Third Party relating to any transaction or series of transactions involving (i) any acquisition or purchase, direct or indirect, of 15% or more of the consolidated assets of the Company and its Subsidiaries, assets of the Company and/or any of its Subsidiaries that represented, individually or in the aggregate, 15% or more of the consolidated net income or revenues of the Company for the then most recently completed four quarter period, or 15% or more of any class of equity or voting securities of the Company or any one or more of its Subsidiaries whose assets (or whose net income or revenues for the then most recently completed four quarter period), individually or in the aggregate, constitute (or represented) 15% or more of the consolidated assets (or of the consolidated net income or revenues for the then most recently completed four quarter period) of the Company, (ii) any tender offer (including a self-tender offer) or exchange offer that, if consummated, would result in a Third Party beneficially owning 15% or more of any class of equity or voting securities of the Company or any one

or more of its Subsidiaries whose assets (or net income or revenues for the then most recently completed four quarter period), individually or in the aggregate, constitute (or represented) 15% or more of the consolidated assets (or of the consolidated net income or revenues for the most recently completed four quarter period) of the Company, or (iii) a merger, consolidation, share exchange, business combination, sale of substantially all the assets, reorganization, recapitalization, liquidation, extraordinary dividend, dissolution or other similar transaction involving the Company or any of its Subsidiaries whose assets (or whose net income or revenues for the then most recently completed four quarter period), individually or in the aggregate, constitute (or represented) 15% or more of the consolidated assets (or of the consolidated net income or revenues for the then most recently completed four quarter period) of the Company.

" _Action_ " means any litigation, claim, action, suit, hearing, proceeding, arbitration, audit, inspection or other investigation (whether civil, criminal, administrative, labor or investigative).

" _Affiliate_ " means, with respect to a Person, any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by or is under common Control with, such Person. For purposes of this definition and as used otherwise in this Agreement, "Control" (including the terms "Controlled by" and "under common Control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of securities or partnership or other ownership interests, as trustee or executor, by Contract or otherwise.

" _Applicable Law_ " means, with respect to any Person, any foreign, supranational, federal, state, provincial or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

" _Business Day_ " means (except as otherwise expressly set forth herein) a day other than Saturday, Sunday or other day on which commercial banks located in New York, New York are authorized or required by Applicable Law to close.

" _Code_ " means the Internal Revenue Code of 1986, as amended.

" _Company Balance Sheet_ " means the consolidated balance sheet of the Company as of December 31, 2010, and the footnotes thereto, set forth in the Company 20-F.

" _Company Balance Sheet Date_ " means December 31, 2010.

" _Company Benefit Plan_ " means any employee benefit plan, including any (i) deferred compensation or retirement plan or arrangement, (ii) defined contribution retirement plan or arrangement, (iii) defined benefit retirement plan or arrangement, (iv) employee welfare benefit plan or material fringe benefit plan or program, or (v) stock purchase, stock option, severance pay, employment, change-in-control, vacation pay, salary continuation, sick leave, excess benefit, bonus or other incentive compensation, life insurance, or other employee benefit plan, contract, program, policy or other arrangement, under which any present or former employee of the Company or any of its Subsidiaries has any present or future right to compensation, payments or benefits sponsored or maintained or contributed to by the Company or any Subsidiary of the Company.

" _Company Disclosure Schedule_ " means the disclosure schedule dated the date hereof regarding this Agreement that has been provided by the Company to Parent and Merger Sub.

" _Company Material Adverse Effect_ " means (i) a material adverse effect on the financial condition, business, assets (including Vessels), liabilities or results of operations of the Company and its Subsidiaries, taken as a whole, excluding any effect resulting from (A) changes in Applicable Law or GAAP, (B) changes in the global financial or securities markets or general global economic or political conditions, (C) changes or conditions generally affecting the industry in which the Company and its Subsidiaries operate, (D) acts of war, sabotage or terrorism or natural disasters, or (E) other than for purposes of Section 5.3 and Section 5.18(g) , the announcement or consummation of the transactions contemplated by this Agreement and the Purchase Agreement; provided that the effect of any matter referred to in clauses (A), (B), (C), or (D) shall only be excluded to the extent that such matter does not disproportionately affect the Company and its Subsidiaries,

A-2

taken as a whole, relative to other entities operating in the industry in which the Company and its Subsidiaries operate, or (ii) any event, circumstance or effect that materially impairs the ability of the Company to perform its obligations under this Agreement or materially delays the consummation of the transactions contemplated by this Agreement.

"*Company 20-F*" means the Company's annual report on Form 20-F for the fiscal year ended December 31, 2010, in the form publicly filed by the Company with the SEC prior to the date hereof.

"*Contract*" means any contract, agreement, note, bond, indenture, mortgage, guarantee, option, lease, license, sales or purchase order, warranty, commitment or other instrument, obligation or binding arrangement or understanding of any kind, whether written or oral.

"*Environmental Laws*" means Applicable Laws, any agreement with any Governmental Authority and Maritime Guidelines relating to human health and safety, the environment or to pollutants, contaminants, wastes or chemicals or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substances, wastes or materials.

"*Exchange Ratio*" means 0.52326.

"*GAAP*" means generally accepted accounting principles in the United States.

"*Governmental Authority*" means any entity or body exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to United States federal, state or local government or other non-United States (including the Marshall Islands), international, multinational or other government, including any department, commission, board, agency, instrumentality, political subdivision, bureau, official or other regulatory, administrative or judicial authority thereof and any self regulatory organization.

"*Governmental Authorizations*" means, with respect to any Person, all licenses, permits (including construction permits), certificates, waivers, consents, franchises, exemptions, variances, expirations and terminations of any waiting period requirements and other authorizations and approvals issued to such Person by or obtained by such Person from any Governmental Authority, or of which such Person has the benefit under any Applicable Law.

"*Indebtedness*" means, with respect to any Person, without duplication, any (i) obligation of such Person with respect to any indebtedness for borrowed money (including all obligations for principal, interest, premiums, penalties, fees, expenses and breakage costs), (ii) obligation of such Person with respect to any indebtedness evidenced by any bond, debenture, note, mortgage, indenture or other debt instrument or debt security (including all obligations for principal, interest, premiums, penalties, fees, expenses and breakage costs), (iii) commitments of such Person for which it assures a financial institution against loss (including contingent reimbursement obligations with respect to banker's acceptances or letters of credit), (iv) liability of such Person with respect to interest rate or currency exchange swaps, collars, caps or similar hedging obligations, and (v) responsibility or liability of such Person directly or indirectly as obligor, guarantor, surety or otherwise of any of the foregoing.

"*Knowledge of Parent*" or any similar phrase means the knowledge of the following persons: Pankaj Khanna, George Economou and Ziad Nakhleh.

"*Knowledge of the Company*" or any similar phrase means the knowledge of the following persons: Antonis Kandylidis, Demetris Nenes and Solon Dracoulis.

"*Law*" means any statute, law, ordinance, rule or regulation of any Governmental Authority.

"*Lien*" means, with respect to any property or asset, any mortgage, lien, pledge, hypothecation, charge, security interest, infringement, interference, right of first refusal, right of first offer, preemptive right, option, community property right or other adverse claim or encumbrance of any kind in respect of such property or asset.

"*Maritime Guidelines*" means any United States, international or non-United States (including the Marshall Islands and Greece) rule, code of practice, convention, protocol, guideline or similar requirement or

A-3

restriction concerning or relating to a Vessel, and to which a Vessel, is subject and required to comply with, imposed, published or promulgated by any relevant Governmental Authority, the International Maritime Organization, such Vessel's classification society or the insurer(s) of such Vessel.

" *Material Contracts* " means each Contract set forth on, or required to be set forth on, <u>Section 5.16(a) of the Company Disclosure Schedule</u>.

" *Nasdaq* " means the NASDAQ Stock Market LLC.

" *Newbuildings* " means vessels under construction or newly constructed for the Company or any of its Subsidiaries, other than Owned Vessels.

" *Ocean Rig Balance Sheet* " means the consolidated balance sheet of Ocean Rig as of December 31, 2010, and the footnotes thereto, set forth in the Ocean Rig Disclosure Document.

" *Ocean Rig Balance Sheet Date* " means December 31, 2010.

" *Ocean Rig Disclosure Document* " means the confidential draft disclosure document regarding Ocean Rig.

" *Ocean Rig Material Adverse Effect* " means (i) a material adverse effect on the financial condition, business, assets, liabilities or results of operations of Ocean Rig and Ocean Rig's Subsidiaries, taken as a whole, excluding any effect resulting from (A) changes in Applicable Law or GAAP, (B) changes in the global financial or securities markets or general global economic or political conditions, (C) changes or conditions generally affecting the industry in which the Company and its Subsidiaries operate, (D) acts of war, sabotage or terrorism or natural disasters, or (E) the announcement or consummation of the transactions contemplated by this Agreement and the Purchase Agreement; provided that the effect of any matter referred to in clauses (A), (B), (C), or (D) shall only be excluded to the extent that such matter does not disproportionately affect Ocean Rig and Ocean Rig's Subsidiaries, taken as a whole, relative to other entities operating in the industry in which Ocean Rig and Ocean Rig's Subsidiaries operate.

" *Ocean Rig Permitted Liens* " means (i) Liens disclosed on the Ocean Rig Balance Sheet, (ii) Liens for Taxes that are not yet due and payable or that may hereafter be paid without material penalty or that are being contested in good faith by appropriate proceedings (and for which adequate accruals or reserves have been established on the Ocean Rig Balance Sheet), (iii) statutory Liens of landlords and workers', carriers' and mechanics' or other like Liens incurred in the ordinary course of business consistent with past practices for amounts that are not yet due and payable or that are being contested in good faith, or (iii) Liens and encroachments which do not materially interfere with the present or proposed use of the properties or assets to which such Lien relates.

" *Order* " means any award, injunction, judgment, decree, order, ruling, subpoena or verdict or other decision issued, promulgated or entered by or with any Governmental Authority of competent jurisdiction.

" *Parent Material Adverse Effect* " means any event, circumstance or effect that (a) materially impairs the ability of Parent or Merger Sub to perform its obligations under this Agreement, or (b) materially delays the consummation of the transactions contemplated by this Agreement.

" *Per Share Merger Consideration* " means cash equal to $11.25 and a number of shares of Ocean Rig Common Stock owned by Parent equal to the Exchange Ratio; provided , however , that, if the Closing shall occur at any time after the Share Condition Waiver Time, the term " <u>Per Share Merger Consideration</u> " shall mean cash equal to $22.50.

" *Permit* " means any authorization, approval, consent, easement, variance, exception, accreditation, certificate, license, permit or franchise of or from any Governmental Authority of competent jurisdiction or pursuant to any Law.

" *Permitted Liens* " means (i) Liens disclosed on the Company Balance Sheet, (ii) Liens for Taxes that are not yet due and payable or that are being contested in good faith by appropriate proceedings (and for which adequate accruals or reserves have been established on the Company Balance Sheet), (iii) statutory Liens of

landlords and workers', carriers' and mechanics' or other like Liens incurred in the ordinary course of business consistent with past practices for amounts that are not yet due and payable or that are being contested in good faith, (iv) Liens and encroachments which do not materially interfere with the present or proposed use of the properties or assets to which such Lien relates, or (v) other maritime liens, charges and encumbrances incidental to the conduct of the business of each such party, the ownership of any such party's property and assets and which do not in the aggregate materially detract from the value of each such party's property or assets or materially impair the use thereof in the operation of its business.

" _Person_ " means an individual, corporation, partnership, limited liability company, a trust, an unincorporated association, or other entity or organization, including a Governmental Authority.

" _Representatives_ " means, with respect to any Person, the respective directors, officers, employees, counsel, accountants, agents, advisors and other representatives of such Person.

" _Sarbanes-Oxley Act_ " means the Sarbanes-Oxley Act of 2002.

" _SEC_ " means the United States Securities and Exchange Commission.

" _Share Condition Waiver Time_ " means 5:30 pm New York time on January 26, 2012 so long as at such time all of the conditions to the obligations of the parties set forth in Article X (other than the conditions set forth in Section 10.1(c) ) that are required by their terms to be satisfied shall be then satisfied or waived. In the event all of the conditions to the obligations of the parties set forth in Article X (other than the conditions set forth in Section 10.1(c) ) that are required by their terms to be satisfied shall not be then satisfied or waived, the " Share Condition Waiver Time " shall be the first time thereafter at which all of the conditions to the obligations of the parties set forth in Article X (other than the conditions set forth in Section 10.1(c) ) that are required by their terms to be satisfied shall be satisfied or waived.

" _Subsidiary_ " means, with respect to any Person, any corporation, limited liability company, partnership, joint venture or other legal entity of which such Person (either alone or through or together with any other Subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of a non-corporate Person.

" _Tax Returns_ " means any return, declaration, report, claim for refund, election, disclosure, estimate or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

" _Taxes_ " means all federal, state, local and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severance, stamp, payroll, sales, transfer, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy and other taxes, duties or assessments of any nature whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), including all estimated taxes, deficiency assessments, additions to tax, penalties and interest, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

" _Third Party_ " means any Person, including as defined in Section 13(d) of the 1934 Act, other than Parent or any of its Affiliates.

" _Vessels_ " means Owned Vessels and Leased Vessels.

(b) For purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (i) the meaning assigned to each term defined herein will be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting any gender will include all genders as the context requires; (ii) where a word or phrase is defined herein, each of its other grammatical forms will have a corresponding meaning; (iii) the terms "hereof", "herein", "hereunder", "hereby" and "herewith" and words of similar import will, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement; (iv) when a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule without reference to a document, such reference is to an Article, Section, paragraph,

Exhibit or Schedule to this Agreement; (v) a reference to a subsection without further reference to a Section is a reference to such subsection as contained in the same Section in which the reference appears, and this rule will also apply to paragraphs and other subdivisions; (vi) the word "include", "includes" or "including" when used in this Agreement will be deemed to include the words "without limitation", unless otherwise specified; (vii) a reference to any party to this Agreement or any other agreement or document will include such party's predecessors, successors and permitted assigns; (viii) a reference to any Law means such Law as amended, modified, codified, replaced or reenacted, and all rules and regulations promulgated thereunder; (ix) all accounting terms used and not defined herein have the respective meanings given to them under GAAP; and (x) any references in this Agreement to "dollars" or "$" shall be to U.S. dollars.

(c) Additional Terms. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Adverse Recommendation Change | Section 7.6(a) |
| Agreement | Preamble |
| Articles of Merger | Section 2.1(c) |
| Certificates | Section 3.2(a) |
| Class B Common Stock | Section 5.4(a) |
| Closing | Section 2.1(b) |
| Closing Date | Section 2.1(b) |
| Company | Preamble |
| Company Board | Recitals |
| Company Board Recommendation | Section 5.2(b) |
| Company Charter Documents | Section 5.1 |
| Company Common Stock | Recitals |
| Company Disclosure Documents | Section 5.9(a) |
| Company Rights | Section 5.4(a) |
| Company SEC Documents | Section 5.7(a) |
| Company Securities | Section 5.4(d) |
| Company Stockholder Approval | Section 5.2(a) |
| Company Stockholders Meeting | Section 9.1(d) |
| Company Subsidiary Securities | Section 5.5(c) |
| Confidentiality Agreement | Section 7.4 |
| D&O Insurance | Section 8.3(c) |
| Effective Time | Section 2.1(c) |
| Employment-Related Closing Payments | Section 7.8(b) |
| End Date | Section 11.1(b) |
| ERISA | Section 5.18(e) |
| Exchange Agent | Section 3.2(a) |
| Exchange Fund | Section 3.2(a) |
| Form F-4 | Section 9.1(a) |
| Indemnified Person | Section 8.3(a) |
| Interested Party Transaction | Section 5.25 |
| Internal Controls | Section 5.7(e) |
| Intervening Event | Section 7.6(b) |
| Leased Vessels | Section 5.15(a) |
| Material Company Breach | Section 11.1(f) |
| Material Company Breach of Covenant | Section 11.1(f) |

A-6

| Term | Section |
|------|---------|
| Material Parent Breach | Section 11.1(e) |
| Merger | Recitals |
| Merger Sub | Preamble |
| Merger Sub Board | Recitals |
| MIBCA | Section 2.1(a) |
| Non-Compete Arrangement | Section 5.16(a) |
| Notice Period | Section 7.6(b) |
| Ocean Rig | Recitals |
| Ocean Rig Common Stock | Recitals |
| Ocean Rig Preferred Stock | Section 6.7(a) |
| Ocean Rig SEC Documents | Section 6.9(a) |
| Ocean Rig Securities | Section 6.7(d) |
| Ocean Rig Subsidiary Securities | Section 6.8(b) |
| Owned Vessels | Section 5.15(a) |
| Parent | Preamble |
| Parent Board | Recitals |
| Policies | Section 5.21 |
| Preferred Stock | Section 5.4(a) |
| Proxy Statement | Section 9.1(a) |
| Purchase Agreement | Recitals |
| Real Property Leases | Section 5.14(b) |
| Rights Plan | Section 5.4(a) |
| Scheduled Seller Group Share Purchase Date | Recitals |
| Seller Group | Recitals |
| Seller Group Share Purchase Date | Recitals |
| Special Committee | Recitals |
| Special Committee Recommendation | Section 5.2(b) |
| Superior Proposal | Section 7.6(d) |
| Surviving Corporation | Section 2.1(a) |
| Termination Fee | Section 12.4(b) |

ARTICLE II

THE MERGER

SECTION 2.1.   *The Merger* .

(a)   *The Merger* .   At the Effective Time and upon the terms and subject to the conditions of this Agreement and in accordance with the Marshall Islands Business Corporations Act (the " MIBCA "), Merger Sub shall be merged with and into the Company. Following the Merger, the separate existence of Merger Sub will cease and the Company will continue its corporate existence under the MIBCA as the surviving corporation in the Merger (the " Surviving Corporation ").

(b)   *Closing* .   Subject to the provisions of Article X , the closing of the Merger (the " Closing ") shall take place in New York City at the offices of Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004 as soon as possible, but in any event no later than three (3) Business Days after the date the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at the Closing) have been satisfied or, to the

extent permissible, waived by the party or parties entitled to the benefit of such conditions, or at such other place, at such other time or on such other date as Parent and the Company may mutually agree. The date on which the Closing actually takes place is referred to as the " Closing Date ".

(c)  *Effective Time* .   At the Closing, the Company and Merger Sub shall cause to be filed articles of merger (the " Articles of Merger ") with the Registrar or Deputy Registrar of Corporations of the Marshall Islands and make all other filings or recordings required by the MIBCA in connection with the Merger. The Merger shall become effective at such time as the Articles of Merger are duly filed with the Registrar or Deputy Registrar of Corporations of the Marshall Islands (or at such later time as may be mutually agreed upon by Parent, Merger Sub and the Company and specified in the Articles of Merger in accordance with the MIBCA) (the time the Merger becomes effective, the " Effective Time ").

(d)  *Effects of the Merger* .   The Merger will have the effects set forth in this Agreement and in the MIBCA. Without limiting the generality of the foregoing and subject thereto, at the Effective Time, all the properties, rights, privileges, immunities, powers and purposes of the Company and Merger Sub shall vest in the Surviving Corporation and all liabilities, obligations and penalties of the Company and Merger Sub shall become the debts, obligations, liabilities, restrictions and duties of the Surviving Corporation.

(e)  *Articles of Incorporation* .   At the Effective Time, by virtue of the Merger, the articles of incorporation of the Company shall be amended so as to read in its entirety as the articles of incorporation of Merger Sub, until thereafter amended in accordance with such articles of incorporation and Applicable Law.

(f)  *By-Laws* .   The Company Board shall take such action as is necessary so that, at the Effective Time, the bylaws of the Merger Sub in effect immediately prior to the Effective Time shall be the bylaws of the Surviving Corporation until amended in accordance with Applicable Law.

(g)  *Directors* .   The Company Board shall take such action as is necessary so that, at the Effective Time, the directors of Surviving Corporation shall be such persons as shall be designated by Parent prior to the Effective Time.

(h)  *Officers* .   The Company Board shall take such action as is necessary so that, at the Effective Time, the officers of Surviving Corporation shall be such persons as shall be designated by Parent prior to the Effective Time.


ARTICLE III

EFFECT ON THE CAPITAL STOCK OF THE CONSTITUENT ENTITIES;
EXCHANGE OF CERTIFICATES

SECTION  3.1.   *Effect on Capital Stock* .   At the Effective Time, by virtue of the Merger and without any action on the part of the Company, Parent, Merger Sub or the holder of any shares of Company Common Stock or shares of common stock of Merger Sub:

(a) Except as otherwise provided in Section 3.1(b) or Section 3.1(c) , each share of Company Common Stock issued and outstanding immediately prior to the Effective Time shall, by virtue of the Merger and without any action on the part of Merger Sub, Parent, the Company or the holder thereof, be converted into the right to receive the Per Share Merger Consideration, less any applicable withholding Taxes. As of the Effective Time, all such shares of Company Common Stock shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and shall thereafter represent only the right to receive the Per Share Merger Consideration. Notwithstanding the foregoing, if, between the date of this Agreement and the Effective Time, the outstanding shares of Ocean Rig Common Stock or the shares of Company Common Stock shall have changed into a different number of shares or a different class by reason of any stock dividend, subdivision, reclassification, recapitalization, split or stock combination then, the Exchange Ratio shall be correspondingly adjusted to reflect such stock dividend, subdivision, reclassification, recapitalization, split or stock combination.

(b) Each share of Company Common Stock held by the Company as treasury stock or owned by Parent or Merger Sub immediately prior to the Effective Time shall be canceled, and no payment shall be made with respect thereto.

(c) Each share of Company Common Stock held by Parent or any Subsidiary of either the Company or Parent immediately prior to the Effective Time shall be canceled, and no payment shall be made with respect thereto.

(d) Each share of common stock of Merger Sub outstanding immediately prior to the Effective Time shall be converted into and become one share of common stock of the Surviving Corporation with the same rights, powers and privileges as the shares so converted and shall constitute the only outstanding shares of capital stock of the Surviving Corporation.

SECTION 3.2. *Surrender and Payment* .

(a) Prior to the Effective Time, Parent shall appoint a bank or trust company or similar entity reasonably acceptable to the Company which is authorized to exercise corporate trust or stock powers to act as Exchange Agent in the Merger (the " Exchange Agent ") for the purpose of exchanging for the Per Share Merger Consideration certificate or certificates that immediately prior to the Effective Time represented outstanding shares of Company Common Stock (the " Certificates "). Parent shall deliver to the Exchange Agent for the benefit of the holders of shares of Company Common Stock for exchange in accordance with this Article III the appropriate amount of cash and certificates representing the appropriate number of shares of Ocean Rig Common Stock, if any, payable pursuant to Section 3.1 hereof (such cash and shares of Ocean Rig Common Stock, if any, the " Exchange Fund "), in exchange for outstanding shares of Company Common Stock.

(b) As soon as practicable after the Effective Time, the Exchange Agent shall mail to each holder of Certificates whose shares of Company Common Stock were converted into the right to receive the Per Share Merger Consideration, pursuant to Section 3.1 hereof: (i) a letter of transmittal (which shall specify that delivery shall be effected and risk of loss and title to the certificates shall be effected and risk of loss and title to the Certificates shall pass only upon delivery of the Certificates to the Exchange Agent and shall be in such form and have such other customary provisions as Parent and the Company may reasonably specify), and (ii) instructions for use in effecting the surrender of the Certificates in exchange for the Per Share Merger Consideration. Upon surrender of a Certificate for cancellation to the Exchange Agent, together with such letter of transmittal duly executed, the holder of such Certificate shall be entitled to receive in exchange therefor a check representing the cash consideration to which such holder may be entitled and a certificate representing that number of whole shares of Ocean Rig Common Stock, if any, and the Certificate so surrendered shall forthwith be canceled. If any portion of the Per Share Merger Consideration is to be paid to a Person other than the Person in whose name the surrendered Certificate is registered, it shall be a condition to such payment that (i) either such Certificate shall be properly endorsed or shall otherwise be in proper form for transfer, and (ii) the Person requesting such payment shall pay to the Exchange Agent any transfer or other Taxes required as a result of such payment to a Person other than the registered holder of such Certificate or establish to the satisfaction of the Exchange Agent that such Tax has been paid or is not payable. Until surrendered as contemplated by this Section 3.2 , each Certificate shall be deemed at any time after the Effective Time to represent only the right of the holder thereof to receive upon such surrender cash and the Per Share Merger Consideration to which such holder is entitled as contemplated by this Section 3.2 .

(c) No dividends or other distributions declared or made after the Effective Time with respect to shares of Ocean Rig Common Stock with a record date after the Effective Time shall be paid to the holder of any unsurrendered Certificate with respect to the shares of Ocean Rig Common Stock represented thereby, if any, and no cash payment shall be paid to any such holder, until the holder of record of such Certificate shall surrender such Certificate. Subject to the effect of Applicable Laws, following surrender of any such Certificate there shall be paid to the record holder of the Certificates representing whole shares of Ocean Rig Common Stock delivered in exchange therefore without interest (i) the amount of cash payable hereunder in respect of the shares of Company Common Stock represented by such Certificate and the amount of dividends or other distributions with a record date after the Effective Time theretofore paid with respect to such number of whole shares of Ocean Rig Common Stock, and (ii) at the appropriate payment date the amount of dividends or other distributions with a record date after the Effective Time but prior to the surrender and a payment date subsequent to surrender payable with respect to such whole shares of Ocean Rig Common Stock.

(d) All cash and shares of Ocean Rig Common Stock delivered upon the surrender for exchange of shares of Company Common Stock in accordance with the terms hereof shall be deemed to have been delivered in full satisfaction of all rights pertaining to such shares of Company Common Stock.

(e) No fractions of a share of Ocean Rig Common Stock shall be paid in the Merger, but in lieu thereof each holder of shares of Company Common Stock otherwise entitled to a fraction of a share of Ocean Rig Common Stock shall upon surrender of his or her Certificate or Certificates be entitled to receive an amount of cash (without interest) determined by multiplying $21.50 by the fractional share interest to which such holder would otherwise be entitled. The parties acknowledge that payment of the cash consideration in lieu of delivering fractional shares was not separately bargained for consideration, but merely represents a mechanical rounding off for purposes of simplifying the corporate and accounting complexities that would otherwise be caused by the delivery of fractional shares of Ocean Rig Common Stock.

(f) After the Effective Time, there shall be no further registration of transfers of shares of Company Common Stock. If, after the Effective Time, Certificates are presented to the Surviving Corporation, they shall be canceled and exchanged for the Per Share Merger Consideration provided for, and in accordance with the procedures set forth in, this Article III , except as otherwise required by Applicable Law.

(g) Any portion of the cash or shares of Ocean Rig Common Stock comprising the Exchange Fund made available to the Exchange Agent pursuant to Section 3.2(a) (and any interest or other income earned thereon) that remains unclaimed by the holders of shares of Company Common Stock six months after the Effective Time shall be returned to Parent, upon demand, and any such holder who has not exchanged such shares of Company Common Stock for the Per Share Merger Consideration in accordance with this Section 3.2 prior to that time shall thereafter look only to Parent for payment of the Per Share Merger Consideration in respect of such shares of Company Common Stock without any interest thereon.

(h) Neither Parent nor the Company shall be liable to any holder of shares of Company Common Stock for cash or shares of Ocean Rig Common Stock (including dividends or distributions with respect thereto) from the Exchange Fund delivered to a public official pursuant to and as required by any applicable abandoned property, escheat or similar law.

(i) The Exchange Agent shall invest any cash in the Exchange Fund as directed by Parent. Any interest and other income resulting from such investments shall be paid to Parent.

SECTION  3.3.  _[Intentionally Omitted]_

SECTION  3.4.  _Withholding Rights_ .  Notwithstanding any provision contained herein to the contrary, each of the Exchange Agent, the Surviving Corporation and Parent shall be entitled to deduct and withhold from any consideration otherwise payable under this Agreement to any Person such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code, the rules and regulations promulgated thereunder or any provision of applicable state, local or foreign Law and shall timely pay such withholding amount to the appropriate Governmental Authority. If the Exchange Agent, the Surviving Corporation or Parent, as the case may be, so withholds amounts, such amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which the Exchange Agent, the Surviving Corporation or Parent, as the case may be, made such deduction and withholding.

SECTION  3.5.  _Lost Certificates_ .  If any Certificate shall have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the Person claiming such Certificate to be lost, stolen or destroyed (in form and substance reasonably satisfactory to the Surviving Corporation) and, if required by the Surviving Corporation, the posting by such Person of a bond, in such reasonable amount as the Surviving Corporation may direct, as indemnity against any claim that may be made against it or the Exchange Agent, as the case may be, with respect to such Certificate, the Exchange Agent shall pay, in exchange for such lost, stolen or destroyed Certificate, the Per Share Merger Consideration to be paid in respect of the shares of Company Common Stock represented by such Certificate, as contemplated by this Article III .

ARTICLE IV

[INTENTIONALLY OMITTED]

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in reasonable detail in the Company Disclosure Schedule or accurately disclosed in any report, schedule, form or document filed with, or furnished to, the SEC by the Company and publicly available on or after January 1, 2010 (other than any risk factor disclosure or forward-looking statements disclosing potential adverse future developments included in such reports, schedules, forms or documents), the Company represents and warrants to Parent and Merger Sub that:

SECTION 5.1. *Organization, Qualification and Corporate Power*. The Company is a corporation duly organized, validly existing and in good standing under the Laws of the Republic of the Marshall Islands, and has all requisite corporate power and authority and all Governmental Authorizations, directly or indirectly, to own, lease and operate its properties and assets and to carry on its business as it is now being conducted. The Company is duly qualified or licensed as a foreign corporation to do business, and is in good standing (where applicable) or has equivalent status, in each jurisdiction where the character of its properties or assets owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except where the failure to be so qualified or licensed and in good standing or to have equivalent status has not had and would not be reasonably expected to have, individually or in the aggregate, a Company Material Adverse Effect. The Company has heretofore made available to Parent true and complete copies of the articles of incorporation and bylaws of the Company (the " Company Charter Documents ") as currently in effect.

SECTION 5.2. *Authorization*.

(a) The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby are within the Company's corporate powers and, except for the approval of the Company's stockholders in connection with the consummation of the Merger, have been duly authorized by all necessary corporate action on the part of the Company. The affirmative vote of the holders of a majority of the outstanding shares of Company Common Stock is the only vote of the holders of any of the Company's capital stock necessary in connection with the transactions contemplated hereby (the " Company Stockholder Approval "). This Agreement constitutes a valid and binding agreement of the Company enforceable against the Company in accordance with its terms.

(b) At a meeting duly called and held, the Special Committee has (i) unanimously determined that this Agreement and the transactions contemplated hereby, including the Merger, are fair to and in the best interests of the Company and the Company's stockholders (other than Parent, Merger Sub, and the Seller Group), (ii) unanimously approved, adopted and declared advisable this Agreement and the Purchase Agreement and the transactions contemplated hereby and thereby, including the Merger, (iii) unanimously recommended that the adoption of this Agreement be submitted to the Company Stockholder Meeting to consummate the Merger under the MIBCA, and (iv) unanimously adopted the recommendation by the Special Committee for approval and adoption of this Agreement by the stockholders of the Company (such recommendation, the " Special Committee Recommendation ") (subject to Section 7.6(b) ), which resolutions have not been subsequently rescinded, modified or amended in any respect except to the extent occurring after the date of this Agreement. At a meeting duly called and held, the Company Board has (i) unanimously determined that this Agreement and the Purchase Agreement and the transactions contemplated hereby and thereby, including the Merger, are fair to and in the best interests of the Company and the Company's stockholders (other than Parent, Merger Sub, and the Seller Group), (ii) unanimously approved, adopted and declared advisable this Agreement and the transactions contemplated hereby, including the Merger, (iii) unanimously directed that the adoption of this Agreement be submitted to the Company Stockholder Meeting, to consummate the Merger under the MIBCA, and (iv) unanimously adopted the recommendation by the Company Board for approval and adoption of this Agreement by the stockholders of the Company (such recommendation, the " Company Board Recommendation ") (subject to Section 7.6(b) ), which resolutions have not been subsequently rescinded, modified or amended in any respect except to the extent occurring after the date of this Agreement.

A-11

(c) The execution, delivery and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated hereby require no action by or in respect of, or filing with, any Governmental Authority, other than (i) the filing and recordation of appropriate merger or other documents as required by the MIBCA and by relevant authorities of other jurisdictions in which the Company is qualified to do business (including the Articles of Merger), (ii) compliance with any applicable requirements of the 1933 Act, the 1934 Act, any other applicable U.S. state or federal securities laws and the rules and requirements of Nasdaq, and (iii) any actions or filings the absence of which would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

SECTION 5.3.  *Noncontravention* .  Except as set forth in <u>Section 5.3 of the Company Disclosure Schedule,</u> the execution, delivery and performance by the Company of this Agreement and the Purchase Agreement and the consummation of the transactions contemplated hereby and thereby do not and will not (i) violate any provision of the articles of incorporation or bylaws (or comparable organization documents, as applicable) of the Company or any of its Subsidiaries, (ii) assuming compliance with the matters referred to in <u>Section 5.2(c)</u> , contravene, conflict with or result in a violation or breach of any provision of any Applicable Law, (iii) assuming compliance with the matters referred to in <u>Section 5.2(c)</u> , require any consent or other action by any Person under, constitute a default, or an event that, with or without notice or lapse of time or both, would constitute a default under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit of the Company or any of its Subsidiaries under any provision of any agreement or other Contract binding upon the Company or any of its Subsidiaries or any Governmental Authorization of the Company or any of its Subsidiaries, (iv) result in the loss of, or creation or imposition of any Lien on, any asset of the Company or any of its Subsidiaries, or (v) result in a violation or breach of, conflict with, constitute a default under or otherwise violate any Material Contract, except in the case of clauses (ii) through (v) to the extent that any such violation has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

SECTION 5.4.  *Capitalization* .

(a) The authorized capital stock of the Company consists of (i) 333,333,333 shares of Company Common Stock, (ii) 10,000,000 shares of Class B common stock, par value $0.01 per share (" <u>Class B Common Stock</u> "), and (iii) 5,000,000 shares of preferred stock, par value $0.01 per share (" <u>Preferred Stock</u> "), a portion of which the Company has reserved for issuance upon the exercise of rights distributed to the holders of Company Common Stock pursuant to the Second Amended and Restated Stockholder Rights Agreement, dated as of April 8, 2011, by and between the Company and American Stock Transfer & Trust Company, LLC, as rights agent (the " <u>Rights Plan</u> ") (the rights issued to the holders of Company Common Stock pursuant to the Rights Plan are referred to as the " <u>Company Rights</u> "). As of the date of this Agreement, (i) 5,946,182 shares of Company Common Stock (including 3,334 shares of restricted Company Common Stock) are issued and outstanding, and (ii) no shares of Company Common Stock are held in the treasury of the Company. No shares of Class B Common Stock or Preferred Stock are issued and outstanding. All outstanding shares of capital stock of the Company have been duly authorized and validly issued and fully paid and nonassessable, and are free of preemptive or similar rights under any provision of the MIBCA and the Company Charter Documents or any agreement to which the Company is a party or otherwise bound.

(b) [Intentionally Omitted]

(c) There is no outstanding Indebtedness of the Company or any of its Subsidiaries having the right to vote (or convertible into or exchangeable for securities having the right to vote) on any matters on which stockholders of the Company may vote.

(d) Except as set forth in this <u>Section 5.4</u> , there are no issued, reserved for issuance or outstanding (i) shares of capital stock of or other voting securities of or ownership interests in the Company, (ii) securities of the Company or any of its Subsidiaries convertible into or exchangeable or exercisable for shares of capital stock or other voting securities of or ownership interests in the Company, (iii) warrants, calls, options or other rights to acquire from the Company or any of its Subsidiaries, or other obligation of the Company or any of its Subsidiaries to issue, any capital stock or other voting securities or ownership interests in or any securities convertible into or exchangeable or exercisable for capital stock or other voting securities or ownership interests in the Company, or (iv) restricted shares, stock appreciation rights, performance units, contingent value rights, "phantom" stock or similar securities

A-12

or rights that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any capital stock or voting securities of the Company (the items in clauses (i) through (iv) being referred to collectively as the " Company Securities "). There are no outstanding obligations of the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any of the Company Securities. The Company and its Subsidiaries are not a party to any voting agreements, voting trusts, proxies or other similar agreements or understandings with respect to the voting of any shares of Company Common Stock or other Company Securities. Except as may be required by applicable securities laws and regulations, the Company and its Subsidiaries are not bound by any obligations or commitments of any character restricting the transfer of, or requiring the registration for sale of, any shares of Company Common Stock or other Company Securities.

(e) Except as set forth in this Section 5.4 , none of (i) the shares of Company Common Stock, or (ii) any Company Securities is owned by any Subsidiary of the Company.

SECTION 5.5. _Subsidiaries_ .

(a) Section 5.5(a) of the Company Disclosure Schedule sets forth a complete and correct list of each Subsidiary of the Company, together with the jurisdiction of incorporation or formation of each such Subsidiary, the form of organization of each such Subsidiary, the authorized and issued capital stock or other ownership interest of each such Subsidiary and the name of each holder thereof.

(b) Each Subsidiary of the Company has been duly organized, is validly existing and in good standing (except with respect to jurisdictions that do not recognize the concept of good standing) under the Laws of the jurisdiction of its incorporation or formation, and has all requisite power, Governmental Authorizations and authority to own, lease and operate its properties and to carry on its business as now conducted, except where the failure to be in good standing or possess such Governmental Authorizations would not be reasonably expected to have, individually or in the aggregate, a Company Material Adverse Effect. Each such Subsidiary of the Company is duly qualified or licensed as a foreign corporation to do business, and is in good standing in each jurisdiction where the character of its properties or assets owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except where the failure to be so qualified or licensed and in good standing has not had and would not be reasonably expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(c) All of the outstanding shares of capital stock of, or voting securities of, or other ownership interests in, each Subsidiary of the Company, are owned by the Company directly or indirectly, free and clear of any Liens (other than Permitted Liens). There are no issued, reserved for issuance or outstanding (i) securities of the Company or any of its Subsidiaries convertible into, or exchangeable or exercisable for, shares of capital stock or other voting securities of, or ownership interests in, any Subsidiary of the Company, (ii) warrants, calls, options or other rights to acquire from the Company or any of its Subsidiaries, or other obligations of the Company or any of its Subsidiaries to issue, any capital stock or other voting securities of, or ownership interests in, or any securities convertible into, or exchangeable or exercisable for, any capital stock or other voting securities of, or ownership interests in, any Subsidiary of the Company, or (iii) restricted shares, stock appreciation rights, performance units, contingent value rights, "phantom" stock or similar securities or rights that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any capital stock or other voting securities of, or ownership interests in, any Subsidiary of the Company (the items in clauses (i) through (iii), together with all of the outstanding capital stock of, or other voting securities of, or ownership interests in, each Subsidiary of the Company, being referred to collectively as the " Company Subsidiary Securities "). Neither the Company nor any of its Subsidiaries owns, directly or indirectly, any equity or other ownership interests in any Person, except for the Subsidiaries of the Company. There are no outstanding obligations of the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any of the Company Subsidiary Securities. The Company is not subject to any obligation or requirement to provide funds to or make any investment (in the form of a loan, capital contribution or otherwise) in any Subsidiary of the Company.

SECTION 5.6. _Indebtedness_ .   As of the date of this Agreement, outstanding Indebtedness of the Company and each of its Subsidiaries is set forth in Section 5.6 of the Company Disclosure Schedule .

A-13

SECTION 5.7. *SEC Filings and the Sarbanes-Oxley Act* .

(a) The Company has filed with or furnished to the SEC, all reports, schedules, forms, statements, prospectuses, registration statements and other documents required to be filed with or furnished to the SEC by the Company since January 1, 2008 (collectively, together with any exhibits and schedules thereto and other information incorporated therein, the "Company SEC Documents"), except where such failure to file with or furnish to the SEC such reports, schedules, forms, statements, prospectuses, registration statements or other documents required to be filed with or furnished to the SEC has not had or would not reasonably be expected to have, individually or in the aggregate, a material and adverse effect on the Company.

(b) As of its filing date (or, if amended, by a filing prior to the date hereof, on the date of such filing), each Company SEC Document complied, and each Company SEC Document filed subsequent to the date hereof and prior to the earlier of the Effective Time and the termination of this Agreement will comply, as to form in all material respects with the applicable requirements of the 1933 Act and the 1934 Act, as the case may be.

(c) As of its filing date (or, if amended or superseded by a filing prior to the date hereof, on the date of such filing), each Company SEC Document filed pursuant to the 1934 Act did not, and each Company SEC Document filed subsequent to the date hereof and prior to the earlier of the Effective Time and the date of the termination of this Agreement will not, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

(d) Each Company SEC Document that is a registration statement, as amended or supplemented, if applicable, filed pursuant to the 1933 Act, as of the date such registration statement or amendment became effective, did not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading. The Company has made available to Parent copies of all comment letters received by the Company from the SEC prior to the date of this Agreement relating to the Company SEC Documents, together with all written responses of the Company thereto. As of the date of this Agreement, there are no outstanding unresolved comments received from the staff of the SEC with respect to the Company SEC Documents. To the Knowledge of the Company, as of the date of this Agreement, none of the Company SEC Documents is the subject of ongoing SEC review or investigation.

(e) The Company and each of its officers are in compliance in all material respects with the applicable provisions of the Sarbanes-Oxley Act. The management of the Company established and maintains a system (" Internal Controls ") of "internal control over financial reporting" (as defined in Rules 13a-15(f) and 15d-15(f) of the 1934 Act) that is sufficient to provide reasonable assurance (i) regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, (ii) that receipts and expenditures of the Company and its Subsidiaries are being made in accordance with management's general or specific authorizations, and (iii) regarding prevention or timely detection of the unauthorized acquisition, use or disposition of the Company's and its Subsidiaries' assets that could have a material effect on the Company's financial statements. The Company's "disclosure controls and procedures" (as defined in Rules 13a-15(e) and 15d-15(e) of the 1934 Act) are designed to ensure that all material information (both financial and non-financial) required to be disclosed by the Company in the reports that it files or submits under the 1934 Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC, and that all such material information is accumulated and communicated to the Company's management as appropriate to allow timely decisions regarding required disclosure and to make the certifications of the chief executive officer and chief financial officer of the Company required under the 1934 Act with respect to such reports. The management of the Company has disclosed, based on its most recent evaluation prior to the date hereof, to the Company's auditors and the audit committee of the Company Board (A) all significant deficiencies and material weaknesses in the design or operation of the Company's Internal Controls which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's Internal Controls. True and correct copies of any such disclosures made in writing (and the substance of all such disclosures made orally) have been made available to Parent.

(f) Except as set forth in Section 5.7(f) of the Company Disclosure Schedule , since January 1, 2008, the Company has complied in all material respects with the applicable listing and corporate governance rules and regulations of Nasdaq.

(g) Each of the principal executive officer and principal financial officer of the Company (or each former principal executive officer and principal financial officer of the Company, as applicable) have made all certifications required by Rule 13a-14 and 15d-14 under the 1934 Act and Sections 302 and 906 of the Sarbanes-Oxley Act and any related rules and regulations promulgated by the SEC and Nasdaq, and the statements contained in any such certifications are complete and correct.

SECTION  5.8.  *Financial Statements* .

(a) The audited consolidated financial statements (including the related notes and schedules) included or incorporated by reference in the Company SEC Documents complied, and audited consolidated financial statements (including the related notes and schedules) included or incorporated by reference in the Company SEC Documents filed after the date hereof will comply, in all material respects with applicable accounting requirements and the published regulations of the SEC, have been prepared in all material respects in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and fairly present or will fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of the Company and its Subsidiaries as of the indicated dates and for the indicated periods.

(b) The unaudited consolidated interim financial information (including the related schedules) included or incorporated by reference in the Company SEC Documents complied, and unaudited consolidated interim financial information (including the related schedules) included or incorporated by reference in the Company SEC Documents filed after the date hereof will comply, in all material respects with applicable accounting requirements and the published regulations of the SEC, have been prepared or will be prepared in all material respects in accordance with GAAP applied on a consistent basis throughout the periods involved, subject to normal and recurring year-end adjustments, the effect of which will not be materially adverse and fairly present or will fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of the Company and its Subsidiaries as of the indicated dates and for the indicated periods subject to normal year-end audit adjustments in amounts that are immaterial in nature and amounts consistent with past experience and the absence of full footnote disclosure.

SECTION  5.9.  *Disclosure Documents* .

(a) Each document required to be filed by the Company with the SEC or distributed or otherwise disseminated to the Company's stockholders in connection with the transactions contemplated by this Agreement (the " Company Disclosure Documents "), including the Proxy Statement (defined below), to be filed with the SEC or distributed or otherwise disseminated to the Company stockholders in connection with the Merger, and any amendments and supplements thereto, when filed, distributed or disseminated, as applicable, will comply as to form in all material respects with the requirements of Applicable Law, including the 1934 Act, to the extent applicable.

(b) (i) The Proxy Statement, as supplemented or amended, at the time such Proxy Statement or any amendment or supplement thereto is first mailed to stockholders of the Company and at the time such stockholders vote on adoption of this Agreement, and (ii) any Company Disclosure Document (other than the Proxy Statement), at the time of the filing of such Company Disclosure Document or any supplement or amendment thereto and at the time of any distribution or dissemination thereof, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

(c) The information with respect to the Company or any of its Subsidiaries that the Company supplies to Parent specifically for use in the Form F-4 (as defined below), at the time of the filing of the Form F-4 or any amendment or supplement thereto, at the time of any distribution or dissemination of the Form F-4 and at the time that the is declared effective, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The representations and warranties contained in this

A-15

Section 5.9 will not apply to statements or omissions included or incorporated by reference in the Company Disclosure Documents based upon information supplied by Parent or Merger Sub or any of their Representatives specifically for use or incorporation by reference therein.

SECTION 5.10.  *Taxes*.

(a) All material Tax Returns required by applicable Law to have been filed by the Company and each of its Subsidiaries have been filed when due (taking into account any extensions), and each such Tax Return is complete and accurate and correctly reflects the liability for Taxes in all material respects. All material Taxes that are due and payable have been paid.

(b) There is no audit or other proceeding pending against or with respect to the Company or any of its Subsidiaries, with respect to any material amount of Tax. There are no material Liens on any of the assets of the Company or any of its Subsidiaries that arose in connection with any failure (or alleged failure) to pay any Tax, other than Liens for Taxes not yet due and payable.

(c) The Company and each of its Subsidiaries have withheld and paid all material Taxes required to have been withheld and paid in connection with amounts paid or owing to any third-party.

(d) Neither the Company nor any of its Subsidiaries has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to any Taxes.

(e) Neither the Company nor any of its Subsidiaries is a party to any Tax allocation or sharing agreement.

(f) Neither the Company nor any of its Subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under the Law with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its Subsidiaries are the only members).

(g) Neither the Company nor any of its Subsidiaries has any liability for the Taxes of any Person (other than any of the Company or its Subsidiaries) under Treasury Regulation Section 1.1502-6 (or any similar provision of any state, local, or foreign Law), as a transferee or successor, by contract, or otherwise.

(h) Neither the Company nor any of its Subsidiaries is or has been a party to any "listed transaction" as defined in Section 6707A(c)(2) of the Code and Treasury Regulations Section 1.6011-4(b)(2).

(i) Neither the Company nor any of its Subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution in which the parties to such distribution treated the distribution as one to which Section 355 of the Code is applicable within the prior three (3) years.

(j) Neither the Company nor any of its Subsidiaries has, or since January 1, 2007 has had, a permanent establishment in any country other than the country of its organization.

(k) The Company and its Subsidiaries have complied in all material respects with the intercompany transfer pricing provisions of each applicable Law relating to Taxes, including the contemporaneous documentation and disclosure requirements thereunder.

(l) Each of the Company and its Subsidiaries is, and has been for the last five (5) years, exempt from U.S. federal income taxation on its U.S.-source shipping income under Section 883 of the Code.

(m) No written claim has ever been made by any Governmental Authority in a jurisdiction where the Company or any of its Subsidiaries does not file Tax Returns that the Company or any of its Subsidiaries is or may be subject to taxation by that jurisdiction.

SECTION 5.11.  *Compliance with Laws; Orders; Permits*.

(a) The Company and each of its Subsidiaries is, and has been, in compliance with all Laws, Orders and Permits to which the Company or such Subsidiary, or any of its or their Vessels or other material assets, is subject (including Maritime Guidelines), except where such failure to comply has not had or would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b) The Company and each of its Subsidiaries owns, holds, possesses or lawfully uses in the operation of its business all Permits (including those required by Maritime Guidelines) that are necessary or required for it to conduct its business as now conducted, except where the failure to own, hold, possess or lawfully use such Permit has not had or would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

SECTION 5.12. *Absence of Certain Changes; No Undisclosed Liabilities* .

(a) Since the Company Balance Sheet Date, the Company and its Subsidiaries have conducted their respective businesses only in the ordinary course of business and there has not been any change, event, circumstance, occurrence state of facts, development or effect that has had, or is reasonably likely to have, individually or in the aggregate, a Company Material Adverse Effect.

(b) Other than as expressly required by this Agreement or the Purchase Agreement, from the Company Balance Sheet Date until the date hereof, there has not been any action taken by the Company or any of its Subsidiaries or event that had such action or event occurred after the date of this Agreement without Parent's consent, would constitute a breach of Section 7.1 .

(c) There are no liabilities of the Company or any of its Subsidiaries of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than: (i) liabilities disclosed and provided for in the Company Balance Sheet or in the notes thereto, (ii) liabilities incurred in the ordinary course of business since the Company Balance Sheet Date and which are not, individually or in the aggregate, material to the Company and its Subsidiaries, taken as a whole, (iii) liabilities incurred in connection with the transactions contemplated hereby, and (iv) liabilities that would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. Neither the Company nor any of its Subsidiaries is a party to, nor do the Company or any of its Subsidiaries have any commitment to become a party to, any joint venture, off-balance sheet partnership or any similar Contract (including any Contract relating to any transaction or relationship between the Company, on the one hand, and any unconsolidated Affiliate, including any structured finance, special purpose or limited purpose entity or Person, on the other hand, or any "off-balance sheet arrangements" (as defined in Item 303(a) of Regulation S-K of the SEC)), where the results, purpose or effect of such Contract is to avoid disclosure of any material transaction involving, or material liabilities of, the Company in the Company SEC Documents.

SECTION 5.13. *Tangible Personal Assets* .   The Company and its Subsidiaries, in the aggregate, have good and valid title to, or a valid interest in, all of their respective tangible personal assets, free and clear of all Liens, other than Permitted Liens or (ii) Liens that individually or in the aggregate, do not materially interfere with the ability of the Company or any Subsidiary to conduct its business as currently conducted.

SECTION 5.14. *Real Property* .

(a) *Owned Real Property* .   Neither the Company nor any of its Subsidiaries owns any real property.

(b) *Leased Real Property* .   All leases under which the Company or any of its Subsidiaries is either lessor or lessee (collectively, the " Real Property Leases ") are valid and binding Contracts of the Company or one of its Subsidiaries, and are in full force and effect (except for those that have terminated or will terminate by their own terms), in each case, except where such failure to be valid, binding or in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, and (ii) neither the Company nor any of its Subsidiaries, nor any other party thereto, is in violation or breach of or default (or with notice or lapse of time, or both, would be in violation or breach of or default) under the terms of any such Contract, in each case, except where such default would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

SECTION 5.15. *Vessels; Maritime Matters* .

(a) Section 5.15(a) of the Company Disclosure Schedule contains a list of all vessels owned by the Company or any of its Subsidiaries (the " Owned Vessels ") or chartered-in by the Company or any of its Subsidiaries pursuant to charter arrangements (the " Leased Vessels "), including the name, registered owner, capacity (gross tonnage or deadweight tonnage, as specified therein), year built, classification society, official number, flag state, whether such Vessel is currently operating in the spot market or time chartered market, of each Owned Vessel and Leased Vessel.

Each Vessel is operated in compliance with all applicable Maritime Guidelines and Laws, except where such failure to be in compliance has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. The Company and each of its Subsidiaries are qualified to own and operate the Owned Vessels under applicable Laws, including the Laws of each Owned Vessel's flag state, except where such failure to be qualified would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. Each Vessel is seaworthy and in good operating condition, has all national and international operating and trading certificates and endorsements, each of which is valid, that are required for the operation of such Vessel in the trades and geographic areas in which it is operated, except where such failure to be qualified would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect.

(b) Each Vessel is classed by a classification society which is a member of the International Association of Classification Societies and is materially in class with all class and trading certificates valid through the date of this Agreement and, to the Knowledge of the Company, (i) no event has occurred and no condition exists that would cause such Vessel's class to be suspended or withdrawn, and (ii) is free of average damage affecting its class.

(c) With respect to each of the Owned Vessels, either the Company or one of its Subsidiaries, as applicable, is the sole owner of each such Vessel and has good title to such Vessel free and clear of all Liens other than Permitted Liens. Prior to the date of this Agreement, the Company has delivered and made available to the Company accurate, complete and correct copies of the most recent inspection reports relating to each Vessel.

SECTION 5.16. _Contracts_.

(a) Section 5.16(a) of the Company Disclosure Schedule lists the following Contracts to which the Company or any of its Subsidiaries is a party:

(i) each "material contract" (as such term is defined in Item 10.C and in Instructions As To Exhibits of Form 20-F) to which the Company or any of its Subsidiaries is a party to or bound;

(ii) each Contract not contemplated by this Agreement that materially limits the ability of the Company or any of its Subsidiaries or Affiliates to engage or compete in any manner (each such Contract, a " Non-Compete Arrangement ");

(iii) each Contract that creates a partnership, joint venture or any strategic alliance with respect to the Company or any of its Subsidiaries;

(iv) each indenture, credit agreement, loan agreement, security agreement, guarantee, note, mortgage or other evidence of indebtedness or agreement providing for indebtedness in excess of $100,000;

(v) each Contract that relates to the acquisition or disposition, directly or indirectly, of any material business (whether by merger, sale of stock, sale of assets or otherwise) or material asset, including any vessel, other than this Agreement;

(vi) each Contract that relates to the acquisition or disposition of, directly or indirectly (whether by merger, sale of stock, sale of assets or otherwise) by the Company or any of its Subsidiaries after the date of this Agreement of assets or any business for consideration with a fair market value in excess of $100,000;

(vii) any Contract related to the acquisition or disposition, directly or indirectly (by merger, sale of stock, sale of assets or otherwise), by the Company or any of its Subsidiaries prior to the date of this Agreement that include provisions that are in effect in respect of "earn-outs" or deferred or contingent consideration;

(viii) each ship-sales, memorandum of agreement or other vessel acquisition Contract for Newbuildings and secondhand vessels contracted for by the Company (other than Owned Vessels) and other Contracts with respect to Newbuildings and the financing thereof, including performance guarantees, refund guarantees and future charters;

(ix) each operating agreement, management agreement, crewing agreement, Contract of affreightment or financial lease (including sale/leaseback or similar arrangements) with respect to any Vessel;

(x) each Contract, including any option, with respect to the purchase or sale of any vessel;

(xi) any Contract with a Third Party for the charter of any Vessel;

(xii) each Contract that grants any right of first refusal or right of first offer or similar right or that limits or purports to limit the ability of the Company or any of its Subsidiaries to own, operate, sell, transfer, pledge or otherwise dispose of any material amount of assets or businesses;

(xiii) each voting agreement or registration rights agreement;

(xiv) each management service, consulting, financial advisory or other similar type Contract with any investment or commercial bank;

(xv) each Contract that would or would reasonably be expected to prevent or materially delay or impede the transactions contemplated by this Agreement, including the consummation of the transactions described in the Purchase Agreement or the Merger;

(xvi) each collective bargaining agreement or other Contract with a labor union to which the Company or any of its Subsidiaries is a party or otherwise bound;

(xvii) each Contract pursuant to which the Company or any of its Subsidiaries spent or received, in the aggregate, more than $100,000 during the 12 months prior to the date hereof or could reasonably be expected to spend or receive, in the aggregate, more than $100,000 during the 12 months immediately after the date hereof;

(xviii) each Contract that provides for indemnification by the Company or any of its Subsidiaries to any Person other than a Contract entered into in the ordinary course of business or that is not material to the Company;

(xix) each Contract to which the Company or any of its Subsidiaries is a party or otherwise bound that contains a so-called "most favored nations" provision or similar provisions requiring the Company or its Affiliates (including, after the Seller Group Share Purchase Date, Parent or any of its Affiliates) to offer to a Person any terms or conditions that are at least as favorable as those offered to one or more other Persons;

(xx) each Contract that includes a guarantee of obligations of any other Person that is not the Company or any of its Subsidiaries;

(xxi) each engagement and retention agreement between the Company or any of its Subsidiaries and any investment bank or financial advisor currently in effect;

(xxii) each Contract under which the execution or delivery of this Agreement or the Purchase Agreement or the consummation of the transactions contemplated hereby or thereby would result in a default, or an event that, with or without notice or lapse of time or both, would constitute a default under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation thereunder or the loss of any benefit of the Company or any of its Subsidiaries thereunder under; and

(xxiii) each Contract involving a standstill or similar obligation of the Company or any of its Subsidiaries.

(b) The Company has heretofore made available to Parent true and complete copies of the Material Contracts. Except for breaches, violations or defaults which would not be reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, each of the Material Contracts is valid, binding, enforceable and in full force and effect and neither the Company nor any of its Subsidiaries, nor to the Knowledge of the Company any other party to a Material Contract has violated any provision of, or taken or failed to take any act which, with or without notice, lapse of time, or both, would constitute a breach or default under, or give rise to any right of cancellation or termination of or consent under, such Material Contract, and neither the Company nor any of its Subsidiaries has received notice that it has breached, violated or defaulted under any Material Contract.

SECTION 5.17.  _Litigation_ .   There is no Action pending or, to the Knowledge of the Company, threatened against the Company or any of its Subsidiaries that (a) challenges or seeks to enjoin, alter, prevent or materially delay the transactions contemplated by this Agreement, or (b) has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. No officer or director of the Company or any

of its Subsidiaries is a defendant in any Action commenced by any stockholder of the Company or any of its Subsidiaries with respect to the performance of his duties as an officer or a director of the Company or any such Subsidiary under any Applicable Law. There is no material unsatisfied judgment, penalty or award against the Company or any of its Subsidiaries. Neither the Company nor any of its Subsidiaries is subject to any Orders that have had or would, individually or in the aggregate, reasonably be expected to have a Company Material Adverse Effect.

SECTION 5.18.  *Employee Benefits* .

(a)  Section 5.18(a) of the Company Disclosure Schedule includes a list of all Company Benefit Plans. The Company has delivered or made available to Parent copies of each Company Benefit Plan or, in the case of any unwritten Company Benefit Plans, a summary thereof.

(b)  Section 5.18(b) of the Company Disclosure Schedule includes a list of all employees of the Company and its Subsidiaries and independent contractors who perform substantially all of their personal services for the Company and its Subsidiaries pursuant to agreements to which the Company and its Subsidiary are parties and the amount of wages earned by each such individual and their place of employment, in each case as of the date of this Agreement.

(c)  Each Company Benefit Plan has been administered in accordance with its terms and is in compliance with all Applicable Laws, except for instances that would not reasonably be expected to result in, individually or in the aggregate, a Company Material Adverse Effect.

(d)  Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, (i) each Company Benefit Plan that is intended to qualify for favorable tax benefits under the Laws of any jurisdiction is so qualified, and (ii) to the Knowledge of the Company, no condition exists and no event has occurred that could reasonably be expected to result in the loss or revocation of such status. Except as would not, individually or in the aggregate, have a Company Material Adverse Effect, all benefits, contributions and premiums relating to each Company Benefit Plan have been timely paid or made in accordance with the terms of such Company Benefit Plan and the terms of all Applicable Laws and any related agreement.

(e)  None of the Company nor any of its Subsidiaries has, within the preceding six month period, ever maintained or contributed to, or had any obligation to contribute to any "employee benefit plan," within the meaning of Section 3 (3) of the U.S. Employee Retirement Income Security Act of 1974, as amended (" ERISA "), that is covered by ERISA.

(f)  None of the Company nor any of its Subsidiaries has incurred, and no event has occurred and no condition or circumstance exists that could reasonably be expected to result in, any unsatisfied liability of the Company and its Subsidiaries under Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA arising in connection with any employee benefit plan covered or previously covered by Title IV of ERISA or such sections of the Code or ERISA.

(g)  Except as set forth in Section 5.18(g) of the Company Disclosure Schedule the execution of, and performance of the transactions contemplated in, this Agreement and the Purchase Agreement will not (either alone or upon the occurrence of any additional or subsequent events) (i) constitute an event under any Company Benefit Plan or related trust or related loan that will or may result in any payment (whether of severance pay or otherwise), acceleration, forgiveness of indebtedness, vesting, distribution, increase in benefits or obligation to fund benefits with respect to any employee or consultant or trigger the right of any employee to terminate any employment relationship with the Company and its Subsidiaries, or (ii) result in the triggering or imposition of any restrictions or limitations on the right of the Company, or any of its Subsidiaries to amend or terminate any Company Benefit Plan.

SECTION  5.19.  *Labor and Employment Matters* .  The Company and all of its Subsidiaries have complied with all labor and employment Laws, including, all labor and employment provisions included in the Maritime Guidelines, and those relating to wages, hours, workplace safety and health, immigration, individual and collective termination, discrimination and data privacy, except where failure to comply has not had or would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. To the Knowledge of the Company, there are no material pending, threatened, labor disputes, work stoppages, requests for representation,

A-20

pickets, work slow-downs due to labor disagreements or any legal actions or arbitrations that involve the labor or employment relations of the Company or any of its Subsidiaries. There has been no labor strike, dispute, work stoppage, request for representation, picket or work slow-down within the past three years in respect of the Company or any of its Subsidiaries, except where such strike, dispute, work stoppage, request, picket or work slow-down has not had and would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. Neither the Company nor any of its Subsidiaries is party to any collective bargaining agreement or any other type of collective agreement with any type of local, national or supranational workers' representatives. To the Knowledge of the Company there is not pending or underway any union, or any other type of workers' representatives, organizational activities or requests or elections for representation with respect to employees of the Company or any of its Subsidiaries.

SECTION 5.20.  *Environmental* .  Except for any matter that would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, (a) the Company and each of its Subsidiaries is in compliance with all Environmental Laws, (b) the Company and each of its Subsidiaries possesses and is in compliance with all Permits required under Environmental Law for the conduct of their respective operations, and (c) there are no actions pending against the Company or any of its Subsidiaries alleging a violation of any Environmental Law.

SECTION 5.21.  *Insurance* .  The Company and its Subsidiaries maintain (i) insurance policies and fidelity bonds covering the Company, its Subsidiaries or their respective businesses, properties, assets, directors, officers or employees, and (ii) protection and indemnity, hull and machinery and war risks insurance policies and club entries covering the Vessels in such amounts and types as are customary in the shipping industry (collectively, the " Policies "). Neither the Company nor any of its Subsidiaries is in violation or breach of or default under any of its obligations under any such Policy, except where such default would not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect. Neither the Company nor any of its Subsidiaries has received any written notice that any Policy has been cancelled. There are no material claims individually or in the aggregate by the Company or any of its Subsidiaries pending under any of the Policies as to which coverage has been questioned, denied or disputed by the underwriters of such Policy, as applicable, in writing or in respect of which such underwriters have reserved their rights in writing.

SECTION 5.22.  *Opinion of Financial Advisor* .  The Special Committee has received the written opinion of Fearnley, financial advisor to the Special Committee, to the effect that, as of the date of this Agreement, the Per Share Merger Consideration to be paid pursuant to the Merger is fair to the Company's stockholders (other than Parent, Merger Sub and the Seller Group) from a financial point of view. The Company has made available to Parent a true and complete copy of such opinion and any engagement or retention agreement (and any amendments, supplements or side letters thereto) between Fearnley and the Company as in effect as of the date hereof.

SECTION 5.23.  *Fees* .

(a) Except as set forth in Section 5.23(a) of the Company Disclosure Schedule , neither the Company nor any of its Subsidiaries has any liability to pay any fees or commissions to any broker, finder or agent with respect to this Agreement or the transactions contemplated hereby. The Company has furnished to Parent true, correct and complete copies of engagement letters relating to any such services, and there have been no amendments or revisions to such engagement letters.

(b) Section 5.23(b) of the Company Disclosure Schedule sets forth the Company's good faith estimate of the maximum amount of fees and commissions (but not out-of-pocket expenses or disbursements) for which the Company or any of its Subsidiaries will be liable in connection with the Agreement or the transactions contemplated hereby to any accountant, broker, financial advisor, consultant or legal counsel retained by the Company or any of its Subsidiaries.

SECTION 5.24.  *Takeover Statutes; Rights Plan* .

(a) The Company has taken all action required to be taken by it in order to exempt this Agreement, and the transactions contemplated hereby from, and this Agreement and the Purchase Agreement and the transactions contemplated hereby and thereby are exempt from, the requirements of any "moratorium", "control share", "fair

price", "affiliate transaction", "business combination" or other anti-takeover laws and regulations of any Governmental Authority or contained in the Company's articles of incorporation.

(b) The Company has taken all action, if any, necessary or appropriate so that the execution of this Agreement and the Purchase Agreement and the consummation of the transactions contemplated hereby and thereby do not and will not result in the distribution of the Company Rights under the Rights Plan or the ability of any Person to exercise any Company Rights under the Rights Plan.

SECTION 5.25.  *Interested Party Transactions* .   Except as set forth in Section 5.25 of the Company Disclosure Schedule , (a) there are no Contracts or arrangements between the Company or any of its Subsidiaries, on the one hand, and any current or former officer or director of the Company or any of its Subsidiaries or any of such officer's or director's immediate family members or Affiliates, or any current or former record or beneficial owners of 3% or more of the outstanding shares of Company Common Stock or any of such owner's Affiliates, on the other hand (any such Contract or arrangement, an " Interested Party Transaction "), and (b) neither any Affiliate of the Company nor any of its Subsidiaries possesses, directly or indirectly, any material financial interest in, or is a director, officer or employee of, any Person which is a supplier, customer, lessor, lessee or competitor of the Company or any of its Subsidiaries, or, to the Knowledge of the Company, except as disclosed in any report, schedule, form or document filed with, or furnished to, the SEC in respect of the Company pursuant to Rule 13d-1 of the 1934 Act by reporting persons any Person that is the beneficial owner of more than 5% of Company Common Stock. Since December 31, 2010, no event has occurred that would be required to be reported by the Company under Item 404 of Regulation S-K promulgated by the SEC which has not been so reported.

SECTION  5.26.  *Certain Business Practices* .   Neither the Company nor any of its Subsidiaries nor (to the Knowledge of the Company), any director, officer, agent or employee of the Company or any of its Subsidiaries (a) used any funds for unlawful contributions, gifts, entertainment or other expenses relating to political activity or for the business of the Company or any of its Subsidiaries, (b) made any bribe or kickback, illegal political contribution, payment from corporate funds which was incorrectly recorded on the books and records of the Company or any of its Subsidiaries, unlawful payment from corporate funds to foreign or domestic government officials or employees or to foreign or domestic political parties or campaigns or violated any provision of the Foreign Corrupt Practices Act of 1977 or other anti-corruption laws, or (c) made any other unlawful payment.

SECTION  5.27.  *No Existing Discussions* .   As of the date hereof, neither the Company nor any of its Subsidiaries is engaged, directly or indirectly, in any discussions or negotiations with any party other than Parent with respect to an Acquisition Proposal.

SECTION  5.28.  *No Other Representations or Warranties* .   Except for the representations and warranties contained in this Article V , each of Parent and Merger Sub acknowledges that neither the Company nor any other Person on behalf of the Company makes any other express or implied representation or warranty with respect to the Company or its Subsidiaries or with respect to any other information provided to Parent or Merger Sub in connection with the transactions contemplated by this Agreement. Except in the case of fraud or willful misconduct, neither the Company nor any other Person will have or be subject to any liability or indemnification obligation to Parent, Merger Sub or any other Person resulting from the distribution to Parent or Merger Sub, or Parent's or Merger Sub's use of, any such information, including any information, documents, projections, forecasts or other material made available to Parent or Merger Sub in certain "data rooms" or management presentations or in any other form in expectation of, or in connection with, the transactions contemplated by this Agreement.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB

Except as set forth in the Ocean Rig Disclosure Document, or accurately disclosed in any report, schedule, form or document filed with, or furnished to, the SEC by Parent and publicly available on or after January 1, 2010 (other than any risk factor disclosure or forward-looking statements disclosing potential adverse future

A-22

developments included in such reports, schedules, forms or documents), Parent and Merger Sub, jointly and severally, represent and warrant to the Company that:

SECTION 6.1. *Organization, Qualification and Corporate Power* . Each of Parent and Merger Sub is a corporation duly organized, validly existing and in good standing under the Laws of the Republic of the Marshall Islands. Each of Parent and Merger Sub has all requisite corporate power and authority and all Governmental Authorizations, directly or indirectly, to carry on its business as it is now being conducted. Parent and each of its Subsidiaries is duly qualified or licensed as a foreign corporation to do business, and is in good standing (where applicable) or has equivalent status, in each jurisdiction where the character of its properties or assets owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except where the failure to be so qualified or licensed and in good standing or to have equivalent status has not had and would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

SECTION 6.2. *Authorization* .

(a) The execution, delivery and performance by Parent and Merger Sub of this Agreement and the consummation by Parent and Merger Sub of the transactions contemplated hereby are within the corporate powers of Parent and Merger Sub and have been duly authorized by all necessary corporate action of Parent and Merger Sub. This Agreement constitutes a valid and binding agreement of each of Parent and Merger Sub enforceable against each of them in accordance with its terms.

(b) The execution, delivery and performance by Parent and Merger Sub of this Agreement and the consummation by Parent and Merger Sub of the transactions contemplated hereby require no action by or in respect of, or filing with, any Governmental Authority, other than (i) the filing and recordation of appropriate merger or other documents as required by the MIBCA and by relevant authorities of other jurisdictions in which the Company is qualified to do business (including the Articles of Merger), (ii) compliance with any applicable requirements of the 1933 Act, the 1934 Act, any other state or federal securities laws and the rules and regulations of any national securities exchange which are applicable to Parent, Merger Sub or Ocean Rig, and (iii) any actions or filings the absence of which would not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect.

(c) The preparation and filing by Ocean Rig of the Form F-4 is within the corporate powers of Ocean Rig and has been or will be duly authorized by all necessary corporate action of Ocean Rig.

SECTION 6.3. *Noncontravention* . The execution, delivery and performance by Parent and Merger Sub of this Agreement, and the consummation by Parent and Merger Sub of the transactions contemplated hereby do not and will not (i) contravene, conflict with, or result in any violation or breach of any provision of the articles of incorporation or bylaws (or comparable organization documents, as applicable) of Parent, Merger Sub or Ocean Rig, (ii) assuming compliance with the matters referred to in Section 6.2(b) , contravene, conflict with, or result in a violation or breach of any provision of any Applicable Law, (iii) assuming compliance with matters referred to in Section 6.2(b) , require any consent or other action by any Person, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit to Parent, Merger Sub or Ocean Rig under any provision of any agreement or other instrument binding Parent, Merger Sub or Ocean Rig or any Governmental Authorization of Parent, Merger Sub or Ocean Rig, or (iv) result in the loss of, or creation or imposition of any Lien on any asset of the Parent, Merger Sub or Ocean Rig with only such exceptions in the case of clauses (ii) through (iv) as would not reasonably be expected to have, individually or in the aggregate a Parent Material Adverse Effect or an Ocean Rig Material Adverse Effect.

SECTION 6.4. *Disclosure Documents* .

(a) The information with respect to Parent, Ocean Rig and any of its Subsidiaries that Parent supplies to the Company specifically for use in any Company Disclosure Document will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading (i) in the case of the Proxy Statement, as supplemented or amended, if applicable, at the time such Proxy Statement or any amendment or supplement thereto is first mailed to stockholders of the Company and at the time such stockholders vote on

adoption of this Agreement, and (ii) in the case of any Company Disclosure Document other than the Proxy Statement, at the time of the filing of such Company Disclosure Document or any supplement or amendment thereto and at the time of any distribution or dissemination thereof.

(b) The Form F-4, when filed, will comply as to form in all material respects with the applicable requirements of the 1933 Act and, at the time of such filing or the filing of any amendment or supplement thereto and at the time of such distribution or dissemination, will not contain any untrue material misstatement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. The representations and warranties in this Section 6.4 will not apply to statements or omissions included or incorporated by reference in the Form F-4 based upon information supplied to Parent, Merger Sub or Ocean Rig by the Company or any of its Representatives specifically for use or incorporation by reference therein.

SECTION 6.5.  _Fees_ .   Except for Evercore Group L.L.C., whose fees will be paid by Parent, there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Parent who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

SECTION 6.6.  _Organization, Qualification and Corporate Power of Ocean Rig_ .   Ocean Rig is a corporation duly organized, validly existing and in good standing under the Laws of the Republic of the Marshall Islands, and has all requisite corporate power and authority and all Governmental Authorizations, directly or indirectly, to own, lease and operate its properties and assets and to carry on its business as it is now being conducted. Ocean Rig is duly qualified or licensed as a foreign corporation to do business, and is in good standing (where applicable) or has equivalent status, in each jurisdiction where the character of its properties or assets owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except where the failure to be so qualified or licensed and in good standing or to have equivalent status has not had and would not be reasonably expected to have, individually or in the aggregate, an Ocean Rig Material Adverse Effect. Parent has heretofore made available to the Company true and complete copies of the articles of incorporation and bylaws of Ocean Rig.

SECTION 6.7.  _Capitalization of Ocean Rig_ .

(a) The authorized capital stock of Ocean Rig consists of (i) 1,000,000,000 shares of Ocean Rig Common Stock and (ii) 500,000,000 shares of preferred stock, par value $0.01 per share (" Ocean Rig Preferred Stock "). As of the date of this Agreement, (i) 131,696,928 shares of Ocean Rig Common Stock are issued and outstanding, and (ii) no shares of Ocean Rig Common Stock are held in the treasury of Ocean Rig. As of the date hereof, no shares of Ocean Rig Preferred Stock are issued and outstanding. All outstanding shares of capital stock of Ocean Rig have been duly authorized and validly issued and fully paid and nonassessable, and free of preemptive or similar rights under any provision of the MIBCA and the articles of incorporation or bylaws of Ocean Rig or any agreement to which Ocean Rig is a party or otherwise bound.

(b) [Intentionally Omitted]

(c) As of the date hereof, there is no outstanding Indebtedness of Ocean Rig or any of its Subsidiaries having the right to vote (or convertible into or exchangeable for securities having the right to vote) on any matters on which stockholders of Ocean Rig may vote.

(d) Except as set forth in this Section 6.7 , as of the date hereof, there are no issued, reserved for issuance or outstanding (i) shares of capital stock of or other voting securities of or ownership interests in Ocean Rig, (ii) securities of Ocean Rig or any of Ocean Rig's Subsidiaries convertible into or exchangeable or exercisable for shares of capital stock or other voting securities of or ownership interests in Ocean Rig, (iii) warrants, calls, options or other rights to acquire from Ocean Rig or any of Ocean Rig's Subsidiaries, or other obligation of Ocean Rig or any of Ocean Rig's Subsidiaries to issue, any capital stock or other voting securities or ownership interests in or any securities convertible into or exchangeable or exercisable for capital stock or other voting securities or ownership interests in Ocean Rig, or (iv) restricted shares, stock appreciation rights, performance units, contingent value rights, "phantom" stock or similar securities or rights that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any capital stock or voting securities of Ocean Rig (the items in clauses (i) through (iv) being referred to collectively as the " Ocean Rig Securities "). There are no outstanding

A-24

obligations of Ocean Rig or any of Ocean Rig's Subsidiaries to repurchase, redeem or otherwise acquire any of the Ocean Rig Securities. Ocean Rig and Ocean Rig's Subsidiaries are not a party to any voting agreements, voting trusts, proxies or other similar agreements or understandings with respect to the voting of any shares of Ocean Rig Common Stock or other Ocean Rig Securities. Except as may be required by applicable securities laws and regulations, as of the date hereof, Ocean Rig and Ocean Rig's Subsidiaries are not bound by any obligations or commitments of any character restricting the transfer of, or requiring the registration for sale of, any shares of Ocean Rig Common Stock or other Ocean Rig Securities.

SECTION 6.8. *Subsidiaries* .

(a) Each Subsidiary of Ocean Rig has been duly organized, is validly existing and in good standing (except with respect to jurisdictions that do not recognize the concept of good standing) under the Laws of the jurisdiction of its incorporation or formation, and has all requisite power, Governmental Authorizations and authority to own, lease and operate its properties and to carry on its business as now conducted, except where the failure to be in good standing or possess such Governmental Authorizations would not be reasonably expected to have, individually or in the aggregate, an Ocean Rig Material Adverse Effect. Each such Subsidiary of Ocean Rig is duly qualified or licensed as a foreign corporation to do business, and is in good standing in each jurisdiction where the character of its properties or assets owned, leased or operated by it or the nature of its activities makes such qualification or licensing necessary, except where the failure to be so qualified or licensed and in good standing has not had and would not be reasonably expected to have, individually or in the aggregate, an Ocean Rig Material Adverse Effect.

(b) As of the date hereof, all of the outstanding shares of capital stock of, or voting securities of, or other ownership interests in, each Subsidiary of Ocean Rig, is owned by Ocean Rig directly or indirectly, free and clear of any Liens (other than Ocean Rig Permitted Liens). As of the date hereof, there are no issued, reserved for issuance or outstanding (i) securities of Ocean Rig or any of Ocean Rig's Subsidiaries convertible into, or exchangeable or exercisable for, shares of capital stock or other voting securities of, or ownership interests in, any Ocean Rig Subsidiary, (ii) warrants, calls, options or other rights to acquire from Ocean Rig or any of Ocean Rig's Subsidiaries, or other obligations of Ocean Rig or any of Ocean Rig's Subsidiaries, or other obligations of Ocean Rig or any of Ocean Rig's Subsidiaries to issue, any capital stock or other voting securities of, or ownership interests in, or any securities convertible into, or exchangeable or exercisable for, any capital stock or other voting securities of, or ownership interests in, any Subsidiary of Ocean Rig, or (iii) restricted shares, stock appreciation rights, performance units, contingent value rights, "phantom" stock or similar securities or rights that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any capital stock or other voting securities of, or ownership interests in, any Subsidiary of Ocean Rig (the items in clauses (i) through (iii), together with all of the outstanding capital stock of, or other voting securities of, or ownership interests in, each Subsidiary of Ocean Rig, being referred to collectively as the " Ocean Rig Subsidiary Securities "). As of the date hereof, there are no outstanding obligations of Ocean Rig or any of its Subsidiaries to repurchase, redeem or otherwise acquire any of the Ocean Rig Securities.

SECTION 6.9. *Ocean Rig SEC Filings* .

(a) Ocean Rig will file with or furnish to the SEC all reports, schedules, forms, statements, prospectuses, registration statements and other documents required to be filed with or furnished to the SEC by it from and after the date hereof (collectively, together with any exhibits and schedules thereto and other information incorporated therein, and the Ocean Rig Disclosure Document (including all amendments thereto), the " Ocean Rig SEC Documents "), except where such failure to file with or furnish to the SEC such reports, schedules, forms, statements, prospectuses, registration statements or other documents required to be filed with or furnished to the SEC has not had or would not reasonably be expected to have, individually or in the aggregate, a material and adverse effect on Ocean Rig.

(b) As of its filing date (or, if amended, by a filing prior to the date hereof, on the date of such filing), each Ocean Rig SEC Document complied, and each Ocean Rig SEC Document filed subsequent to the date hereof and prior to the earlier of the Effective Time and the termination of this Agreement will comply, as to form in all material respects with the applicable requirements of the 1933 Act and the 1934 Act, as the case may be.

(c) As of its filing date (or, if amended or superseded by a filing prior to the date hereof, on the date of such filing), each Ocean Rig SEC Document filed pursuant to the 1934 Act did not, and each Ocean Rig SEC Document filed pursuant to the 1934 Act subsequent to the date hereof and prior to the earlier of the Effective Time and the date of the termination of this Agreement will not, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. Ocean Rig has not been subject to the periodic reporting requirements of the 1934 Act prior to the date hereof.

(d) Each Ocean Rig SEC Document that is a registration statement, as amended or supplemented, if applicable, filed pursuant to the 1933 Act, as of the date such registration statement or amendment became effective, did not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading. To the Knowledge of Parent, as of the date of this Agreement, none of the Ocean Rig SEC Documents is the subject of ongoing SEC review or investigation.

(e) Each of the principal executive officer and principal financial officer of Ocean Rig (or each former principal executive officer and principal financial officer of Ocean Rig, as applicable) have made all certifications required by Rule 13a-14 and 15d-14 under the 1934 Act and Sections 302 and 906 of the Sarbanes-Oxley Act and any related rules and regulations promulgated by the SEC and Nasdaq, and the statements contained in any such certifications are complete and correct.

SECTION 6.10. *Financial Statements*.

(a) The audited consolidated financial statements (including the related notes and schedules) included or incorporated by reference in the Ocean Rig SEC Documents complied, and audited consolidated financial statements (including the related notes and schedules) included or incorporated by reference in the Ocean Rig SEC Documents filed after the date hereof will comply, in all material respects with applicable accounting requirements and the published regulations of the SEC, have been prepared in all material respects in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto) and fairly present or will fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of Ocean Rig and its Subsidiaries as of the indicated dates and for the indicated periods.

(b) The unaudited consolidated interim financial statements (including the related notes and schedules) included or incorporated by reference in the Ocean Rig SEC Documents complied, and unaudited consolidated interim financial statements (including the related notes and schedules) included or incorporated by reference in the Ocean Rig SEC Documents filed after the date hereof will comply, in all material respects with applicable accounting requirements and the published regulations of the SEC, have been prepared or will be prepared in all material respects in accordance with GAAP applied on a consistent basis throughout the periods involved, subject to normal and recurring year-end adjustments, the effect of which will not be materially adverse (except as may be indicated in the notes thereto) and fairly present or will fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of the Company and its Subsidiaries as of the indicated dates and for the indicated periods subject to normal year-end audit adjustments in amounts that are immaterial in nature and amounts consistent with past experience and the absence of full footnote disclosure.

SECTION 6.11. *Compliance with Laws; Orders; Permits*.

(a) Ocean Rig and each of its Subsidiaries is in compliance with all Laws, Orders and Permits to which Ocean Rig or such Subsidiary, or other material assets, is subject (including Maritime Guidelines), except where such failure to comply has not had or would not reasonably be expected to have, individually or in the aggregate, an Ocean Rig Material Adverse Effect.

(b) Ocean Rig and each of its Subsidiaries owns, holds, possesses or lawfully uses in the operation of its business all Permits (including those required by Maritime Guidelines) that are necessary or required for it to conduct its business as now conducted, except where the failure to own, hold, possess or lawfully use such Permit has not had or would not reasonably be expected to have, individually or in the aggregate, an Ocean Rig Material Adverse Effect.

SECTION 6.12. *Absence of Certain Changes; No Undisclosed Liabilities* .

(a) Since the Ocean Rig Balance Sheet Date, Ocean Rig and its Subsidiaries have conducted their respective businesses only in the ordinary course of business and there has not been any change, event, circumstance, occurrence state of facts, development or effect that has had, or is reasonably likely to have, individually or in the aggregate, an Ocean Rig Material Adverse Effect.

(b) There are no liabilities of Ocean Rig or any of its Subsidiaries of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than: (i) liabilities disclosed and provided for in the Ocean Rig Balance Sheet or in the notes thereto, (ii) liabilities incurred in the ordinary course of business since the Ocean Rig Balance Sheet Date and which are not, individually or in the aggregate, material to Ocean Rig and its Subsidiaries, taken as a whole, (iii) liabilities incurred in connection with the transactions contemplated hereby, and (iv) liabilities that would not reasonably be expected to have, individually or in the aggregate, an Ocean Rig Material Adverse Effect. Ocean Rig is not a party to, nor does Ocean Rig have any commitment to become a party to, any joint venture, off-balance sheet partnership or any similar Contract (including any Contract relating to any transaction or relationship between Ocean Rig on the one hand, and any unconsolidated Affiliate, including any structured finance, special purpose or limited purpose entity or Person on the other hand, or any off-balance sheet arrangements (as defined in Item 303(a) of Regulation S-K of the SEC), where the results, purpose or effect of such Contract is to avoid disclosure of any material transaction involving, or material liabilities of, Ocean Rig in the Ocean Rig SEC Documents.

SECTION 6.13. *Contracts* . Except for breaches, violations or defaults which would not be reasonably be expected to have, individually or in the aggregate, an Ocean Rig Material Adverse Effect, (i) each of Ocean Rig's material contracts is valid, binding, enforceable and in full force and effect and neither Ocean Rig, nor to the Knowledge of Parent any other party to a material contract has violated any provision of, or taken or failed to take any act which, with or without notice, lapse of time, or both, would constitute a breach or default under, or give rise to any right of cancellation or termination of or consent under, such material contract, and (ii) Ocean Rig has not received notice that it has breached, violated or defaulted under any material contract.

SECTION 6.14. *Tangible Personal Assets* . Ocean Rig and its Subsidiaries, in the aggregate, have good and valid title to, or a valid interest in, all of their respective tangible personal assets, free and clear of all Liens, other than Ocean Rig Permitted Liens or (ii) Liens that individually or in the aggregate, do not materially interfere with the ability of Ocean Rig or any of its Subsidiaries to conduct its business as currently conducted.

SECTION 6.15. *Labor and Employment Matters* . Ocean Rig has complied with all labor and employment Laws, including all labor and employment provisions included in the Maritime Guidelines, and those relating to wages, hours, workplace safety and health, immigration, individual and collective termination, discrimination and data privacy, except where failure to comply has not had or would not reasonably be expected to have, individually or in the aggregate, an Ocean Rig Material Adverse Effect.

SECTION 6.16. *Environmental* . Except for any matter that would not reasonably be expected to have, individually or in the aggregate, an Ocean Rig Material Adverse Effect, (a) Ocean Rig is in compliance with all Environmental Laws, (b) Ocean Rig possesses and is compliance with all Permits required under Environmental Law for the conduct of its operations, and (c) there are no actions pending against Ocean Rig alleging a violation of any Environmental Law.

SECTION 6.17. *Litigation* . There is no Action pending or, to the Knowledge of Parent, threatened against Ocean Rig or any of its Subsidiaries that (a) challenges or seeks to enjoin, alter, prevent or materially delay the transactions contemplated by this Agreement, or (b) has had or would reasonably be expected to have, individually or in the aggregate, an Ocean Rig Material Adverse Effect. No officer or director of Ocean Rig or any of its Subsidiaries is a defendant in any Action commenced by any stockholder of Ocean Rig or any of Ocean Rig's Subsidiaries with respect to the performance of his duties as an officer or a director of Ocean Rig or any such Subsidiary under any Applicable Law. There is no material unsatisfied judgment, penalty or award against Ocean Rig or any of Ocean Rig's Subsidiaries. Neither Ocean Rig nor any of its Subsidiaries is subject to any Orders that have had or would, individually or in the aggregate, reasonably be expected to have an Ocean Rig Material Adverse Effect.

SECTION 6.18. *No Other Representations or Warranties* . Except for the representations and warranties contained in this <u>Article VI</u> , the Company acknowledges that neither Parent nor Merger Sub nor any other Person on behalf of Parent or Merger Sub makes any other express or implied representation or warranty with respect to Parent, Ocean Rig or any of their respective Subsidiaries or with respect to any other information provided to the Company in connection with the transactions contemplated by this Agreement. Except in the case of fraud or willful misconduct, neither Parent nor any other Person will have or be subject to any liability or indemnification obligation to the Company or any other Person resulting from the distribution to the Company, or the Company's use of, any such information, including any information, documents, projections, forecasts or other material made available to the Company in certain "data rooms" or management presentations or in any other form in expectation of, or in connection with, the transactions contemplated by this Agreement.

## ARTICLE VII

## CONDUCT OF BUSINESS PENDING THE MERGER

SECTION 7.1. *Operation of the Company's Business* .

(a) Except (A) as set forth in <u>Section 7.1(a) of the Company Disclosure Schedule</u> , (B) as expressly required by this Agreement or permitted pursuant to <u>Section 7.6</u> of this Agreement, or (C) with the prior written consent of Parent, from the date hereof until the Effective Time, the Company shall, and shall cause each of its Subsidiaries to, carry on its business in the ordinary course and in a manner consistent with past practice and to use its reasonable best efforts to (i) preserve intact its present business organization, goodwill and material assets, (ii) maintain in effect all Governmental Authorizations required to carry on its business as now conducted, (iii) keep available the services of its present officers and other employees ( <u>provided</u> that the Company shall not be obligated to increase the compensation of, or make any other payments to, such officers and employees), and (iv) preserve its present relationships with customers, suppliers and other Persons with which it has a business relationship.

(b) Without limiting the generality of <u>Section 7.1(a)</u> , except (A) as set forth in <u>Section 7.1(b) of the Company Disclosure Schedule</u> , (B) as expressly required by this Agreement or permitted pursuant to <u>Section 7.6</u> of this Agreement, or (C) with the prior written consent of Parent, from the date hereof until the Effective Time, the Company shall not, nor shall it permit any of its Subsidiaries to, do any of the following:

(i) amend its articles of incorporation, bylaws or other comparable charter or organizational documents (whether by merger, consolidation or otherwise);

(ii) (A) declare, set aside or pay any dividends on, or make any other distributions (whether in cash, stock, property or otherwise) in respect of, any shares of Company Common Stock, other Company Securities or Company Subsidiary Securities, other than dividends and distributions by a direct or indirect wholly-owned Subsidiary of the Company to its parent, (B) split, combine or reclassify any shares of Company Common Stock, other Company Securities or Company Subsidiary Securities, (C) issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for, any shares of Company Common Stock, other Company Securities or Company Subsidiary Securities (D) purchase, redeem or otherwise acquire any shares of Company Common Stock, other Company Securities or Company Subsidiary Securities, or (E) take any action that would result in any amendment, modification or change of any term of, or material default under, any Indebtedness of the Company or any of its Subsidiaries;

(iii) (A) issue, deliver, sell, grant, pledge, transfer, subject to any Lien or otherwise encumber or dispose of any shares of Company Common Stock, shares of Class B Common Stock, shares of Preferred Stock, other Company Securities or Company Subsidiary Securities, or (B) amend any term of any Company Securities or any Company Subsidiary Securities (in each case, whether by merger, consolidation or otherwise);

(iv) incur more than $50,000 of capital expenditures, in the aggregate;

(v) acquire or commit to acquire (A) all or any substantial portion of a business or Person or division thereof (whether by purchase of stock, purchase of assets, merger, consolidation, or otherwise), or (B) any assets or properties involving a price in excess of $50,000 individually or $100,000 in the aggregate;

(vi) enter into or materially amend, modify, extend or terminate any Material Contact or any Interested Party Transaction;

(vii) sell, lease, license, pledge, transfer, subject to any Lien or otherwise dispose of, any of its assets or properties except (A) sales of used equipment in the ordinary course of business consistent with past practice, (B) Permitted Liens incurred in the ordinary course of business consistent with past practice;

(viii) adopt a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization or other reorganization of the Company or any of its Subsidiaries, or enter into any agreement with respect to the voting of its capital stock or other securities held by the Company or any of its Subsidiaries;

(ix) (A) grant to any current or former director, officer, employee or consultant of the Company or any of its Subsidiaries any increase or enhancement in compensation, bonus or other benefits, (B) grant to any current or former director or executive officer or employee of the Company or any of its Subsidiaries any severance, change in control, retention or termination pay or benefits or any increase in severance, change of control or termination pay or benefits, except in connection with actual termination in the ordinary course of any such Person to the extent required under Applicable Law or existing Company Benefit Plans or existing policy, or (C) adopt, enter into or amend or commit to adopt, enter into or amend any Company Benefit Plan except for amendments as required under Applicable Law (subject to approval of Parent, not to be unreasonably withheld) or pursuant to the terms of such plan;

(x) except as required by GAAP or Regulation S-X under the 1934 Act, make any change in any method of accounting principles, method or practices;

(xi) (A) incur or issue any Indebtedness, or (B) make any loans, advances or capital contributions to, or investments in, any other Person, other than to the Company or any of its Subsidiaries;

(xii) change any method of Tax accounting, make or change any material Tax election, file any material amended return, settle or compromise any material Tax liability, fail to complete and file, consistent with past practice, all Tax Returns required to be filed by the Company or any of its Subsidiaries, fail to pay all amounts shown due on such Tax Returns, agree to an extension or waiver of the statute of limitations with respect to the assessment or determination of material Taxes, enter into any closing agreement with respect to any material Tax, surrender any right to claim a material Tax refund, offset or otherwise reduce Tax liability or take into account on any Tax Return required to be filed prior to the Closing any adjustment or benefit arising from the transactions contemplated hereby;

(xiii) institute, settle, or agree to settle any action, suit, litigation, investigation or proceeding pending or threatened before any arbitrator, court or other Governmental Authority;

(xiv) disclose, or consent to the disclosure of, any of its trade secrets or other proprietary information, other than in the ordinary course of business consistent with past practice and pursuant to an appropriate non-disclosure agreement;

(xv) waive, release or assign any claims or rights having a value of $50,000 individually or $100,000 in the aggregate;

(xvi) fail to use commercially reasonable efforts to cause the current insurance (or re-insurance) policies maintained by the Company or any of its Subsidiaries, including directors' and officers' insurance, not to be cancelled or terminated or any of the coverage thereunder to lapse, unless simultaneously with such termination, cancellation or lapse, replacement policies underwritten by insurance or re-insurance companies of nationally recognized standing having comparable deductions and providing coverage equal to or greater than the coverage under the cancelled, terminated or lapsed policies for substantially similar premiums or less are in full force and effect; provided that neither the Company nor any of its Subsidiaries shall obtain or renew any insurance (or reinsurance) policy for a term exceeding twelve (12) months;

(xvii) knowingly or intentionally take, or agree in writing or otherwise to take, any action that would or is reasonably likely to result in any of the conditions to the Merger set forth in Article X not being satisfied, or would make any representation or warranty of the Company contained herein inaccurate in any material

respect at, or as of any time prior to, the Effective Time, or that would materially impair the ability of the Company to consummate the Merger in accordance with the terms hereof or materially delay such consummation;

(xviii) take any action which would, directly or indirectly, restrict or impair the ability of Parent or Merger Sub to vote, or otherwise to exercise the rights and receive the benefits of a stockholder with respect to, securities of the Company acquired or controlled or to be acquired or controlled by Parent or Merger Sub;

(xix) directly or indirectly (A) purchase or construct any vessel or enter into any Contract for the purchase or construction of any vessel, (B) sell or otherwise dispose of any Vessel or enter into any contract for the sale or disposal of any Vessel, (C) enter into any contract for the bareboat or time charter-out of any Vessel (including any Vessel owned or chartered-in by the Company or any of its Subsidiaries), (D) defer scheduled maintenance of any Vessel, (E) depart from any normal drydock and maintenance practices or discontinue replacement of spares in operating the Vessels, provided that the Company will not, and will cause its Subsidiaries not to enter into any contract for the drydocking or repair of any Vessel where the estimated cost thereof is in excess of $100,000 unless, in the case of this clause (E), such work cannot prudently be deferred and is required to preserve the safety and seaworthiness of such Vessel, or

(xx) except as permitted in Section 7.4 , authorize or enter into a Contract or arrangement to take any of the actions described in clauses (i) through (xix) of this Section 7.1 .

SECTION  7.2.   *Operation of Ocean Rig's Business* .   Except (A) as expressly required by this Agreement, or (B) with the prior written consent of the Company, from the date hereof until the Effective Time, Parent shall cause Ocean Rig and each of Ocean Rig's Subsidiaries to, carry on its business in the ordinary course and to use its reasonable best efforts to (i) preserve intact its present business organization, goodwill and material assets, (ii) maintain in effect all Governmental Authorizations required to carry on its business as now conducted, (iii) keep available the services of its present officers and other employees ( provided that Parent shall not be obligated to cause Ocean Rig or Ocean Rig's Subsidiaries to increase the compensation of, or make any other payments to, such officers and employees), and (iv) preserve its present relationships with customers, suppliers and other Persons with which it has a business relationship. Parent shall not knowingly or intentionally take or agree in writing or otherwise to take, any action that would or is reasonably likely to result in any of the conditions to the Merger set forth in Article X not being satisfied, or that would materially impair the ability of Parent to consummate the Merger in accordance with the terms hereof (including disposition of such quantity of Ocean Rig Common Stock as would result in their having insufficient shares to consummate the transaction contemplated hereby) or materially delay such consummation.

SECTION  7.3.   *[Intentionally Omitted]*

SECTION  7.4.   *Access to Information* .   After the date hereof until the Effective Time and subject to Applicable Law and the Confidentiality Agreement dated as of June 28, 2011 between the Company and Parent (the " Confidentiality Agreement "), the Company and Parent shall (i) give each other and their respective counsel, financial advisors, auditors and other authorized representatives, upon reasonable notice, reasonable access to the offices, properties, books and records of the Company, the Subsidiaries, Parent, Merger Sub and Ocean Rig, as applicable, (ii) furnish to each other and their respective counsel, financial advisors, auditors and other authorized representatives such financial and operating data and other information as such Persons may reasonably request, and (iii) instruct the employees, counsel, financial advisors, auditors and other authorized representatives of the Company, the Subsidiaries, Parent, Merger Sub and Ocean Rig, as applicable, to cooperate with Parent and the Company in the matters described in clauses (i) and (ii) above.

SECTION  7.5.   *Notice of Developments* .   The Company will give prompt written notice to the Parent of any event that has had or would reasonably be expected to give rise to, individually or in the aggregate, a Company Material Adverse Effect. The delivery of any notice pursuant to this Section 7.5 will not limit, expand or otherwise affect the remedies available hereunder (if any) to the party receiving such notice.

S<small>ECTION</small> 7.6. *No Solicitation* .

(a) *General Prohibitions* .  Subject to Section 7.6(b) after the date hereof and prior to the earlier of the termination of this Agreement in accordance with Section 11.1 and the Effective Time, the Company and its Subsidiaries shall not (and the Company shall use its reasonable best efforts to cause its or any of its Subsidiaries' Representatives not to), directly or indirectly, (i) solicit, initiate or knowingly take any action to facilitate or encourage the submission of any Acquisition Proposal, (ii) enter into or participate in any discussions or negotiations with, furnish any information relating to the Company or any of its Subsidiaries or afford access to the business, properties, assets, books or records of the Company or any of its Subsidiaries to any Third Party with respect to inquiries regarding, or the making of, an Acquisition Proposal, (iii) fail to make, withdraw, or modify or amend in a manner adverse to Parent the Special Committee Recommendation or the Company Board Recommendation (or recommend an Acquisition Proposal) (any of the foregoing in this clause (iii), an " Adverse Recommendation Change "), (iv) grant any waiver or release under any standstill or similar agreement with respect to any class of equity securities of the Company or any of its Subsidiaries, (v) approve, endorse, recommend or enter into (or publicly propose to do any of the foregoing) any agreement in principle, letter of intent, term sheet, merger agreement, acquisition agreement, option agreement or other similar instrument relating to an Acquisition Proposal (other than a confidentiality agreement with a Third Party to whom the Company is permitted to provide information in accordance with Section 7.6(b)(i) ), (vi) approve any transaction under Article K of the Company's articles of incorporation; or (vii) redeem the Company Rights, amend or modify or terminate the Rights Plan or exempt any Person from, or approve any transaction under, the Rights Plan. The Company and its Subsidiaries shall (and the Company shall use its reasonable best efforts to cause its or any of its Subsidiaries' Representatives to) cease immediately and cause to be terminated any and all existing activities, solicitations, encouragements, discussions or negotiations, if any, with any Third Party and its Representatives and its financing sources conducted prior to the date hereof with respect to any Acquisition Proposal or efforts to obtain an Acquisition Proposal and require the destruction or return of all non-public materials, documents and information concerning the Company and its Subsidiaries provided to any such Third Party or its Representatives or financing sources. Any failure of any Representative of the Company or any of its Subsidiaries to comply with this Section 7.6 shall constitute a breach by the Company of this Section 7.6 , regardless of whether the Company used its reasonable best efforts to cause its or any of its Subsidiaries' Representatives to comply with this Section 7.6 .

(b) *Exceptions* .

(i) Prior to (but not at any time after) the Scheduled Seller Group Purchase Date, the Company, directly or indirectly through its Representatives, may (A) engage in negotiations or discussions with any Third Party and its Representatives or financing sources that has made (and not withdrawn) after the date of this Agreement a bona fide, written Acquisition Proposal that (x) did not result from a breach or violation of the provisions of Section 7.6(a) , and (y) the Special Committee reasonably believes in good faith, after consulting with its outside legal and financial advisors, would reasonably be expected to lead to a Superior Proposal, and (B) thereafter furnish to such Third Party or its Representatives or its financing sources non-public information relating to the Company or any of its Subsidiaries pursuant to a confidentiality agreement (a copy of which shall be provided for informational purposes only to Parent) with such Third Party with terms no less favorable to the Company than those contained in the Confidentiality Agreement and containing additional provisions that expressly permit the Company to comply with the terms of this Section 7.6 if, in the case of either clause (A) or (B), the Special Committee determines in good faith, after consultation with outside legal counsel, that the failure to take such action is reasonably likely to result in a breach of its fiduciary duties under Applicable Law and the Company shall have provided Parent and Merger Sub two (2) Business Days notice of its intention to take any action discussed in clause (A) or (B); provided that all such information provided or made available to such Third Party (to the extent that such information has not been previously provided or made available to Parent) is provided or made available to Parent, as the case may be, prior to or substantially concurrently with the time it is provided or made available to such Third Party.

(ii) At any time prior to obtaining the Company Stockholder Approval, in response to a material fact, event, change, development, or set of circumstances (other than an Acquisition Proposal) occurring or arising after the date of this Agreement that was not known or reasonably foreseeable by the Special Committee or the Company Board as of or prior to the date of this Agreement (such material fact, event, change development or set of circumstances, an " Intervening Event "), if the Special Committee or the Company Board reasonably determines in good faith, after

consultation with outside legal and financial advisors, that in light of such Intervening Event, the failure of the Special Committee or the Company Board, as applicable, to effect an Adverse Recommendation Change is reasonably likely to result in a breach of its fiduciary duties under Applicable Law, the Special Committee or the Company Board, as applicable, may make an Adverse Recommendation Change; provided , however , that the Company shall not be entitled to exercise its right to make an Adverse Recommendation Change pursuant to this Section 7.6(b)(ii) unless the Company has (A) provided to Parent at least five (5) Business Days' prior written notice advising Parent that the Special Committee or the Company Board intends to take such action and specifying the facts underlying the Special Committee or the Company Board's determination that an Intervening Event has occurred, and the reasons for the Adverse Recommendation Change, in reasonable detail, and (B) during such five (5) Business Day period, if requested by Parent, engaged in good faith negotiations with Parent to amend this Agreement in such a manner that obviates the need for an Adverse Recommendation Change as a result of the Intervening Event.

(iii) Prior to (but not at any time from or after) the Scheduled Seller Group Share Purchase Date, the Company may, following receipt of and on account of a Superior Proposal, terminate this Agreement to enter into a definitive agreement with respect to, a Superior Proposal in accordance with Section 11.1 , or make an Adverse Recommendation Change in connection with such Superior Proposal, if such Superior Proposal did not result from a breach or violation of the provisions of Section 7.6 and the Special Committee reasonably determines in good faith, after consultation with outside legal and financial advisors, that in light of such Superior Proposal, the failure of the Special Committee to take such action is reasonably likely to result in a breach of its fiduciary duties under Applicable Law; provided , however , the Company shall not be entitled to terminate this Agreement or effect an Adverse Recommendation Change in connection with a Superior Proposal unless (A) the Company promptly notifies Parent, in writing, at least five (5) Business Days (the " Notice Period ") before making an Adverse Recommendation Change or terminating this Agreement to enter into (or causing a Subsidiary to enter into) a definitive agreement with respect to a Superior Proposal, of its intention to take such action with respect to such Superior Proposal, which notice shall state expressly that the Company has received an Acquisition Proposal that the Special Committee has determined to be a Superior Proposal and that the Special Committee intends to make an Adverse Recommendation Change and/or the Company intends to terminate this Agreement to enter into a definitive agreement with respect to such Superior Proposal; (B) the Company attaches to such notice the most current version of the proposed agreement and the identity of the Third Party making such Superior Proposal; (C) during the Notice Period, if requested by Parent, the Company has, and has directed its Representatives to, engaged in negotiations with Parent in good faith to amend this Agreement or increase the Per Share Merger Consideration in such a manner that such Superior Proposal ceases to constitute a Superior Proposal; and (D) following the Notice Period, the Special Committee shall have determined in good faith, taking into account any changes to this Agreement or increase to the Per Share Merger Consideration made or proposed in writing by Parent and Merger Sub, that such Superior Proposal continues to constitute a Superior Proposal; provided , however that with respect to any applicable Superior Proposal, any amendment to the financial terms or any other material amendment to a term of such Superior Proposal shall require a new written notice by the Company and a new Notice Period, and no such termination of this Agreement by the Company or Adverse Recommendation Change in connection with such Superior Proposal may be made during any Notice Period.

In addition, nothing contained herein shall prevent the Special Committee or the Company Board from (i) complying with Rule 14e-2(a) under the 1934 Act with regard to an Acquisition Proposal so long as any action taken or statement made to so comply is consistent with this Section 7.6 ; provided that any such action taken or statement made that relates to an Acquisition Proposal shall be deemed to be an Adverse Recommendation Change unless the Special Committee and the Company Board reaffirms the Company Board Recommendation in such statement or in connection with such action, or (ii) issuing a "stop, look and listen" disclosure or similar communication of the type contemplated by Rule 14d-9(f) under the 1934 Act (which it is agreed shall not constitute an Adverse Recommendation Change).

(c) *Required Notices* . The Company and the Company Board shall not take any of the actions referred to in Section 7.6(b) unless the Company shall have first complied with the applicable requirements of this Section 7.6 (c) . The Company shall notify Parent promptly (but in no event later than 24 hours) after receipt by the Company (or any of its Representatives) of any Acquisition Proposal, including the material terms and conditions thereof and the

identity of the Person making such Acquisition Proposal and its proposed financing sources, and shall keep Parent reasonably informed on a prompt basis (but in any event no later than 24 hours) as to the status (including changes or proposed changes to the material terms) of such Acquisition Proposal. The Company shall also notify Parent promptly (but in no event later than 24 hours) after receipt by the Company of any request for non-public information relating to the Company or any of its Subsidiaries or for access to the business, properties, assets, books or records of the Company or any of its Subsidiaries by any Third Party that has informed the Company that it is considering making, or has made, an Acquisition Proposal.

(d)  *Definition of Superior Proposal* .   For purposes of this Agreement, " Superior Proposal " means a bona fide, unsolicited written Acquisition Proposal ( provided that, for the purposes of this definition, references to "15%" in the definition of Acquisition Proposal shall be deemed replaced with references to "100%") that (i) is not subject to any financing condition and for which financing has been fully committed or is on hand or the Special Committee determines in good faith after considering the advice of its financial advisor of nationally recognized reputation is reasonably capable of being fully financed, (ii) the Special Committee determines in good faith by a majority vote, after considering the advice of its outside counsel and its financial advisor of nationally recognized reputation, is reasonably likely to be consummated in accordance with its terms, taking into account all aspects of the proposal and the identity of the Person making the Acquisition Proposal, and (iii) the Special Committee determines in good faith by a majority vote, after considering the advice of its financial advisor of nationally recognized reputation, would result in a transaction more favorable, from a financial point of view to the Company's stockholders than the Merger provided hereunder (after taking into account any amendment to this Agreement or increase the Per Share Merger Consideration proposed by Parent).

SECTION  7.7.  *Litigation* .

(a) The Company shall promptly advise Parent of any Action involving the Company or any of its officers or directors, or the Special Committee, relating to this Agreement or the Purchase Agreement or the transactions thereunder and shall keep Parent informed and consult with Parent regarding the status of the Action on an ongoing basis. The Company shall cooperate with and give Parent the opportunity to consult with respect to the defense or settlement of any such Action, and such settlement shall not be agreed to without the prior written consent of Parent.

(b) Parent shall promptly advise the Company of any Action involving Parent or Ocean Rig or any of its officers or directors, relating to this Agreement or the Purchase Agreement or the transactions thereunder and shall keep the Company informed and consult with the Company regarding the status of the Action on an ongoing basis. Parent shall cooperate with and give the Company the opportunity to consult with respect to the defense or settlement of any such Action.

SECTION  7.8.  *Employee Matters* .

(a)  *Employment Agreements* .   Prior to the Closing Date, Parent shall use reasonable efforts to enter into employment agreements effective as of the Closing Date, with Demetris Nenes and Solon Dracoulis in form and substance acceptable to Parent and such employees.

(b)  *Severance* .   Section 7.8(b) of the Company Disclosure Schedule sets forth a true and complete list of all severance payments and other employment-related payments due to any officer, director or employee of the Company in connection with, or as a result of, the Closing (the " Employment-Related Closing Payments "). Immediately prior to the Closing, the Company shall pay all Employment-Related Closing Payments. If the Closing occurs prior to December 31, 2011, the Company shall pay directors fees for the directors of the Company through December 31, 2011.

SECTION  7.9.  *Ocean Rig Common Stock* .   Parent shall cause the shares of Ocean Rig Common Stock that are to be delivered to the holders of Company Common Stock pursuant to Section 3.2(b) to be free of any Liens and restrictions on transfer, except those imposed by Applicable Law, and preemptive rights at the time of such delivery.

ARTICLE VIII

COVENANTS OF PARENT

SECTION 8.1.  *Obligations of Merger Sub* .  Parent shall take all action necessary to cause Merger Sub to perform its obligations under this Agreement and to consummate the Merger on the terms and conditions set forth in this Agreement.

SECTION 8.2.  *Voting of Shares* .

(a) Parent shall cause all shares of Company Common Stock owned beneficially or of record by it, Merger Sub or any of its other Subsidiaries to be voted in favor of adoption of this Agreement at the Company Stockholder Meeting or any postponement or adjournment thereof.

(b) Prior to the Effective Time, Parent shall not vote any of the shares of Company Common Stock owned beneficially or of record by it, Merger Sub or any of its other Subsidiaries in favor of the removal of any director of the Company or in favor of the election of any director not approved by the Special Committee.

SECTION 8.3.  *Director and Officer Liability* .  Parent shall cause the Surviving Corporation, and the Surviving Corporation hereby agrees, to do the following:

(a) For six years after the Effective Time, the Surviving Corporation shall indemnify and hold harmless the present and former officers and directors of the Company and its Subsidiaries (each, an " Indemnified Person ") in respect of acts or omissions in their capacities as officers or directors occurring at or prior to the Effective Time to the fullest extent permitted by the MIBCA or any other Applicable Law or provided under the Company's articles of incorporation and bylaws in effect on the date hereof; provided that such indemnification shall be subject to any limitation imposed from time to time under Applicable Law.

(b) For six years after the Effective Time, Parent shall cause to be maintained in effect provisions in the Surviving Corporation's articles of incorporation and bylaws (or in such documents of any successor to the business of the Surviving Corporation) regarding elimination of liability of directors, indemnification of officers, directors and employees and advancement of expenses that are no less advantageous to the intended beneficiaries than the corresponding provisions in existence on the date of this Agreement.

(c) Prior to the Effective Time, the Company shall (subject to the approval of Parent not to be unreasonably withheld or delayed) or, if the Company is unable to, Parent shall cause the Surviving Corporation as of the Effective Time to, obtain and fully pay the premium for the non-cancellable extension of the directors' and officers' liability coverage of the Company's existing directors' and officers' insurance policies and the Company's existing fiduciary liability insurance policies (collectively, " D&O Insurance "), in each case for a claims reporting or discovery period of at least six years from and after the Effective Time with respect to any claim related to any period or time at or prior to the Effective Time from an insurance carrier with the same or better credit rating as the Company's current insurance carrier with respect to D&O Insurance with terms, conditions, retentions and limits of liability that are no less favorable in the aggregate than the coverage provided under the Company's existing policies with respect to any actual or alleged error, misstatement, misleading statement, act, omission, neglect, breach of duty or any matter claimed against a current or former director or officer of the Company or any of its Subsidiaries by reason of him or her serving in such capacity that existed or occurred at or prior to the Effective Time (including in connection with this Agreement or the transactions or actions contemplated hereby). If the Company or the Surviving Corporation for any reason fail to obtain such "tail" insurance policies as of the Effective Time, the Surviving Corporation shall, and Parent shall cause the Surviving Corporation to, continue to maintain in effect, for a period of at least six years from and after the Effective Time, the D&O Insurance in place as of the date hereof with the Company's current insurance carrier or with an insurance carrier with the same or better credit rating as the Company's current insurance carrier with respect to D&O Insurance with terms, conditions, retentions and limits of liability that are no less favorable in the aggregate than the coverage provided under the Company's existing policies as of the date hereof, or the Surviving Corporation shall purchase from the Company's current insurance carrier or from an insurance carrier with the same or better credit rating as the Company's current insurance carrier with respect to D&O Insurance comparable D&O Insurance for such six-year period with

A-34

terms, conditions, retentions and limits of liability that are no less favorable than as provided in the Company's existing policies as of the date hereof; provided that in no event shall Parent or the Surviving Corporation be required to expend for such policies pursuant to this sentence an annual premium amount in excess of 200% of the amount per annum the Company paid in its last full fiscal year, which amount is set forth in Section 8.3(c) of the Company Disclosure Schedule ; and provided further that if the aggregate premiums of such insurance coverage exceed such amount, the Surviving Corporation shall be obligated to obtain a policy with the greatest coverage available, with respect to matters occurring prior to the Effective Time, for a cost not exceeding such amount.

(d) If Parent, the Surviving Corporation or any of its successors or assigns (i) consolidates with or merges into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger, or (ii) transfers or conveys all or substantially all of its properties and assets to any Person, then, and in each such case, to the extent necessary, proper provision shall be made so that the successors and assigns of Parent or the Surviving Corporation, as the case may be, shall assume the obligations set forth in this Section 8.3 .

(e) The rights of each Indemnified Person under this Section 8.3 shall be in addition to any rights such Person may have under the articles of incorporation or bylaws of the Company or any of its Subsidiaries, under the MIBCA or any other Applicable Law or under any agreement of any Indemnified Person with the Company or any of its Subsidiaries. These rights shall survive consummation of the Merger and are intended to benefit, and shall be enforceable by, each Indemnified Person.

SECTION  8.4.  *Stock Exchange Listing* .  Parent shall use its reasonable best efforts to cause Ocean Rig to take, or cause to be taken, all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on its part under Applicable Laws and rules and policies of Nasdaq to ensure that the shares of Ocean Rig Common Stock comprising the Per Share Merger Consideration are listed on Nasdaq prior to or as of the Effective Time.

# ARTICLE IX

## COVENANTS OF PARENT AND THE COMPANY

SECTION  9.1.  *Company Stockholder Meeting; Proxy Statement; Registration Statement* .

(a) As soon as reasonably practicable following the date of this Agreement, Parent and the Company shall jointly prepare, and Parent shall cause Ocean Rig to file with the SEC a registration statement on Form F-4 to register, under the 1933 Act, the shares of Ocean Rig Common Stock to be distributed in the Merger (together with all amendments supplements and exhibits thereto, the " Form F-4 "), which shall include a prospectus with respect to the shares of Ocean Rig Common Stock to be distributed in the Merger and a proxy statement to be sent to the stockholders of the Company relating to the Company Stockholders Meeting (together with any amendments and supplements thereto, the " Proxy Statement "). Parent and the Company shall use their respective reasonable best efforts to cause the Form F-4 to be declared effective under the 1933 Act as soon as reasonably practicable after such filing. Each of the Company and Parent shall furnish all information concerning such Person and its Affiliates to the other, and provide such other assistance, as may be reasonably requested in connection with the preparation, filing and distribution of the Form F-4 and Proxy Statement, and the Form F-4 and the Proxy Statement shall include all information reasonably requested by such other party to be included therein. Each of the Company and Parent shall promptly notify the other upon the receipt of any comments from the SEC or any request from the SEC for amendments or supplements to the Form F-4 or the Proxy Statement and shall provide the other with copies of all correspondence between it and its Representatives, on the one hand, and the SEC, on the other hand. The Company shall, and Parent shall cause Ocean Rig to, use its reasonable best efforts to respond as promptly as reasonably practicable to any comments from the SEC with respect to the Form F-4. Notwithstanding the foregoing, prior to filing the Form F-4 (or any amendment or supplement thereto) or mailing the Proxy Statement (or any amendment or supplement thereto) or responding to any comments of the SEC with respect thereto, the Company shall, and Parent shall cause Ocean Rig to, (i) provide the other an opportunity to review and comment on such document or response (including the proposed final version of such document or response), (ii) consider in good faith all comments reasonably proposed by the other and (iii) not file or mail such document or respond to the SEC prior to

receiving the approval of the other, which approval shall not be unreasonably withheld, conditioned or delayed. The Company shall, and Parent shall cause Ocean Rig to, advise the other, promptly after receipt of notice thereof, of the time of effectiveness of the Form F-4, the issuance of any stop order relating thereto or the suspension of the qualification of the shares of Ocean Rig Common Stock for offering or sale in any jurisdiction, and each of the Company and Parent shall use its reasonable best efforts to have any such stop order or suspension lifted, reversed or otherwise terminated. Each of the Company and Parent shall also take any other action (other than qualifying to do business in any jurisdiction in which it is not now so qualified) required to be taken under the 1933 Act, the 1934 Act, any applicable foreign or state securities or "blue sky" laws and the rules and regulations thereunder in connection with the Merger and the delivery of any shares of Ocean Rig Common Stock that comprise the Per Share Merger Consideration, if any.

(b) If prior to the Effective Time, any event occurs with respect to Parent, Ocean Rig or any of their respective Subsidiaries, or any change occurs with respect to other information supplied by Parent for inclusion in the Proxy Statement or the Form F-4, which is required to be described in an amendment of, or a supplement to, the Proxy Statement or the Form F-4, Parent shall promptly notify the Company of such event, and Parent shall cause Ocean Rig to, and the Company shall, cooperate in the prompt filing with the SEC of any necessary amendment or supplement to the Form F-4 and, as required by Law, in disseminating the information contained in such amendment or supplement to the Company's stockholders. Nothing in this Section 9.1(b) shall limit the obligations of any party under Section 9.1(a) .

(c) If prior to the Effective Time, any event occurs with respect to the Company or any of its Subsidiaries, or any change occurs with respect to other information supplied by the Company for inclusion in the Proxy Statement or the Form F-4, which is required to be described in an amendment of, or a supplement to, the Proxy Statement or the Form F-4, the Company shall promptly notify Parent of such event, and the Company shall, and Parent shall cause Ocean Rig to, cooperate in the prompt filing with the SEC of any necessary amendment or supplement to the Form F-4 and, as required by Law, in disseminating the information contained in such amendment or supplement to the Company's stockholders. Nothing in this Section 9.1(c) shall limit the obligations of any party under Section 9.1 (a) .

(d) The Company shall, as soon as reasonably practicable following the date of this Agreement, duly call, give notice of, convene and hold (no earlier than the Scheduled Seller Group Share Purchase Date) a meeting of the stockholders (the " Company Stockholders Meeting ") for the sole purpose of seeking the Company Stockholder Approval. The Company shall use its reasonable best efforts to (i) cause the Proxy Statement to be mailed to the Company's stockholders as promptly as practicable after the Form F-4 is declared effective under the 1933 Act and to hold the Company Stockholders Meeting as soon as practicable after the Form F-4 becomes effective and (ii) subject to Section 7.6(b) , solicit the Company Stockholder Approval. The Special Committee and the Company Board shall recommend to the holders of shares of Company Common Stock that they give the Company Stockholder Approval and shall include such recommendation in the Proxy Statement, except to the extent that the Special Committee or the Company Board shall have made an Adverse Recommendation Change as permitted by Section 7.6(b) . The Company agrees that its obligations to hold the Company Stockholders Meeting pursuant to this Section 9.1 shall not be affected by the commencement, public proposal, public disclosure or communication to the Company of any Acquisition Proposal or by the making of any Adverse Recommendation Change.

SECTION 9.2. *Regulatory Undertaking* .

(a) Subject to the terms and conditions of this Agreement, the Company and Parent shall use their respective reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under Applicable Law to consummate the transactions contemplated by this Agreement, including (i) preparing and filing as promptly as practicable with any Governmental Authority or other Third Party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, and (ii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other Third Party that are necessary, proper or advisable to consummate the transactions contemplated by this Agreement; provided that the obligations set forth in this sentence shall not be deemed to have been breached as a result of actions by the Company or its Subsidiaries permitted by Section 7.6(b) .

(b) Notwithstanding anything in this Section 9.2 or otherwise in this Agreement, none of Parent, Merger Sub or the Company shall be required, without the prior written consent of Parent, to consent to any requirement, condition, limitation, understanding, agreement or order (x) to sell, divest, license, assign, transfer, hold separate or otherwise dispose of any material portion of the assets or business of the Company, the Surviving Corporation, Parent or Merger Sub or any of their respective Subsidiaries, or (y) that materially limits the freedom of action with respect to, or ability to retain, any of the businesses, services, or assets of the Company, the Surviving Corporation, Parent or Merger Sub or any of their respective Subsidiaries.

SECTION  9.3.  _Certain Filings_ .  The Company and Parent shall cooperate with one another (i) in connection with the preparation of the Company Disclosure Documents and the Form F-4, (ii) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement, and (iii) in taking such actions or making any such filings, furnishing information required in connection therewith or with the Company Disclosure Documents or the and seeking timely to obtain any such actions, consents, approvals or waivers.

SECTION  9.4.  _Public Announcements_ .  Parent and the Company shall consult with each other before issuing any press release, having any communication with the press (whether or not for attribution) or making any other public statement, or scheduling any press conference or conference call with investors or analysts, with respect to this Agreement or the transactions contemplated hereby and, except in respect of any public statement or press release as may be required by Applicable Law or any listing agreement with or rule of any national securities exchange or association, neither the Company nor Parent shall issue any such press release or make any such other public statement (including statements to the employees of the Company or Parent, as the case may be, or any of their respective Subsidiaries) or schedule any such press conference or conference call without the consent of Parent.

SECTION  9.5.  _Further Assurances_ .  At and after the Effective Time, the officers and directors of the Surviving Corporation shall be authorized to execute and deliver, in the name and on behalf of the Company or Merger Sub, any deeds, bills of sale, assignments or assurances and to take and do, in the name and on behalf of the Company or Merger Sub, any other actions and things to vest, perfect or confirm of record or otherwise in the Surviving Corporation any and all right, title and interest in, to and under any of the rights, properties or assets of the Company acquired or to be acquired by the Surviving Corporation as a result of, or in connection with, the Merger.

SECTION  9.6.  _Stock Exchange De-listing_ .  Prior to the Effective Time, the Company shall cooperate with Parent and use its reasonable best efforts to take, or cause to be taken, all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on its part under Applicable Laws and rules and policies of Nasdaq to enable the de-listing by the Surviving Corporation of the shares of Company Common Stock from Nasdaq and the deregistration of the shares of Company Common Stock under the 1934 Act as promptly as practicable after the Effective Time, and in any event no more than ten days thereafter.

SECTION  9.7.  _Takeover Provisions_ .  If any "control share acquisition," "fair price," "moratorium" or other antitakeover or similar statute or regulation or provision of the articles of incorporation of the Company shall become applicable to the transactions contemplated by this Agreement or the Purchase Agreement, each of the Company, Parent and Merger Sub and the respective members of their boards of directors and the Special Committee shall, to the extent permitted by Applicable Law, use reasonable best efforts to grant such approvals and to take such actions as are reasonably necessary so that the transactions contemplated by this Agreement or the Purchase Agreement may be consummated as promptly as practicable on the terms contemplated herein and otherwise to take all such other actions as are reasonably necessary to eliminate or minimize the effects of any such statute or regulation on the transactions contemplated hereby.

SECTION  9.8.  _Notices of Certain Events_ .  Each of the Company and Parent shall promptly notify the other of:

(a) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b) any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement;

(c) any actions, suits, claims, investigations or proceedings commenced or, to its knowledge, threatened against, relating to or involving or otherwise affecting the Company or any of its Subsidiaries or Parent and any of its Subsidiaries, as the case may be, that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to any Section of this Agreement;

(d) any inaccuracy of any representation or warranty contained in this Agreement at any time during the term hereof that could reasonably be expected to cause any of the conditions set forth in Article X not to be satisfied; and

(e) any failure of that party to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.

ARTICLE X

CONDITIONS TO THE MERGER

SECTION 10.1. *Conditions to Obligations of Each Party*. The respective obligations of each party hereto to effect the Merger are subject to the satisfaction of the following conditions:

(a) the Company Stockholder Approval shall have been obtained in accordance with the MIBCA;

(b) no Applicable Law preventing or prohibiting the consummation of the Merger shall be in effect; and

(c) (i) the Form F-4 shall have become effective under the 1933 Act and shall not be the subject of any stop order suspending the effectiveness thereof or any proceedings seeking any such stop order; and (ii) the shares of Ocean Rig Common Stock included in the Per Share Merger Consideration payable to the holders of shares of Company Common Stock pursuant to the Merger shall have been approved for listing on Nasdaq, subject to the completion of the Merger.

Notwithstanding the foregoing, the conditions set forth in clause (c) above need not be satisfied in connection with any Closing after the Share Condition Waiver Time.

SECTION 10.2. *Conditions to Obligations of the Company*. The obligations of the Company to effect the Merger are further subject to the satisfaction by Parent of the following conditions:

(a) (i) the representations and warranties of Parent contained in Section 6.1 , and Section 6.2 of this Agreement (disregarding all materiality, Parent Material Adverse Effect and Ocean Rig Material Adverse Effect qualifications contained therein) shall be true and correct in all material respects as of the Seller Group Share Purchase Date (in connection with the Seller Group Share Purchase Date) or the Closing Date (in connection with the Closing), as applicable, as if made at and as of such time (except to the extent any such representation and warranty by its terms addresses matters only as of another specified time, in which case such representation and warranty will be true and correct in all material respects as of such other time), (ii) the representations and warranties of Parent contained in Section 6.7 of this Agreement shall be true and correct as of the Seller Group Share Purchase Date (in connection with the Seller Group Share Purchase Date) or the Closing Date (in connection with the Closing), as applicable, as if made at and as of such time (except to the extent any such representation and warranty by its terms addresses matters only as of another specified time, in which case such representation and warranty will be true and correct as of such other time), and (iii) all of the other representations and warranties of Parent contained in this Agreement or in any certificate or other writing delivered by Parent pursuant hereto (disregarding all materiality, Parent Material Adverse Effect and Ocean Rig Material Adverse Effect qualifications contained therein) shall be true and correct as of the Seller Group Share Purchase Date (in connection with the Closing, as applicable, as if made at and as of such time (except to the extent any such representation and warranty by its terms addresses matters only as of another specified time, in which case such representation and warranty will be true and correct as of such other time), except where the failure of such representations and warranties to be so true and correct does not have, and would be not reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect or an Ocean Rig Material Adverse Effect;

(b) Parent and Merger Sub shall have performed in all material respects all of the obligations required to be performed by them under this Agreement on or prior to the Seller Group Share Purchase Date (in connection with the Seller Group Share Purchase Date) or the Closing Date (in connection with the Closing), as applicable;

(c) from the date hereof and through the Seller Group Share Purchase Date (in connection with the Seller Group Share Purchase Date) or the Closing Date (in connection with the Closing), as applicable, there shall not have occurred any event, change, circumstance, occurrence, effect or state of facts that has had, or would reasonably be expected to have, individually or in the aggregate, a Parent Material Adverse Effect or an Ocean Rig Material Adverse Effect; and

(d) Parent shall have delivered to the Company as of the Closing Date, a certificate, dated as of such date, executed by an executive officer of Parent to the effect that the conditions set forth in clauses (a), (b) and (c) of this Section 10.2 have been satisfied as of the Closing Date.

SECTION 10.3. _Conditions to Obligations of Parent and Merger Sub_ .   The obligations of the Parent and Merger Sub to effect the Merger is further subject to the satisfaction by the Company of the following conditions:

(a) (i) the representations and warranties of the Company contained in Section 5.1 , Section 5.2 , and Section 5.16 (relating to Non-Compete Arrangements) of this Agreement (disregarding all materiality and Company Material Adverse Effect qualifications contained therein) shall be true and correct in all material respects as of the Seller Group Share Purchase Date (or, if the Seller Group Share Purchase Date shall not have previously occurred, the Closing Date) as if made at and as of such time (except to the extent any such representation and warranty by its terms addresses matters only as of another specified time, in which case such representation and warranty will be true and correct in all material respects as of such other time), (ii) the representations and warranties of the Company contained in Section 5.4 of this Agreement shall be true and correct as of the Seller Group Share Purchase Date (or, if the Seller Group Share Purchase Date shall not have previously occurred, the Closing Date) as if made at and as of such time (except to the extent any such representation and warranty by its terms addresses matters only as of another specified time, in which case such representation and warranty will be true and correct as of such other time), and (iii) all of the other representations and warranties of the Company contained in this Agreement or in any certificate or other writing delivered by the Company pursuant hereto (disregarding all materiality and Company Material Adverse Effect qualifications contained therein) shall be true and correct as of the Seller Group Share Purchase Date (or, if the Seller Group Share Purchase Date shall not have previously occurred, the Closing Date) as if made at and as of such time (except to the extent any such representation and warranty by its terms addresses matters only as of another specified time, in which case such representation and warranty will be true and correct as of such other time), except where the failure of such representations and warranties to be so true and correct does not have, and would be not reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect;

(b) the Company shall have performed in all material respects all of the obligations required to be performed by it under this Agreement on or prior to the Seller Group Share Purchase Date (in connection with the Seller Group Share Purchase Date) or Closing Date (in connection with the Closing), as applicable; and the Company shall have delivered to Parent on the Closing Date a certificate, dated as of such date, executed by an executive officer of the Company to the effect that the condition set forth in this clause (b) shall be then satisfied;

(c) from the date hereof through the Seller Group Share Purchase Date (or, if the Seller Group Share Purchase Date shall not have previously occurred, through the Closing Date), there shall not have occurred any event, change, circumstance, occurrence, effect or state of facts that has had, or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect; and

(d) the Company shall have delivered to Parent as of the Seller Group Share Purchase Date (or, if the Seller Group Share Purchase Date shall not have previously occurred, the Closing Date) a certificate, dated as of such date, executed by an executive officer of the Company to the effect that the conditions set forth in clauses (a), (b) and (c) of this Section 10.3 have been satisfied.

Notwithstanding the foregoing, the conditions set forth in this Section 10.3 (other than clause (b)) need not be satisfied in connection with any Closing after the Seller Group Share Purchase Date.

ARTICLE XI

TERMINATION; AMENDMENT; WAIVER

SECTION 11.1.  _Termination_ .  This Agreement may be terminated any time prior to the Effective Time (notwithstanding the receipt of the Company Stockholder Approval); provided that a majority vote of the Special Committee shall be necessary for termination by the Company and the Special Committee may prosecute any action related to this Agreement and the Purchase Agreement on behalf of the Company:

(a) by mutual written agreement of the Company and Parent; or

(b) by either the Company or Parent, if:

(i) the Effective Time shall not have occurred on or before March 26, 2012 (the " End Date "); or

(ii) there shall be any Applicable Law that prohibits the Company, Parent, or Merger Sub from consummating the Merger and such prohibition shall have become final and nonappealable; or

(c) by Parent, prior to the Seller Group Share Purchase Date, if:

(i) an Adverse Recommendation Change shall have occurred; or

(ii) the Company shall have entered into a binding agreement (other than a confidentiality agreement contemplated by Section 7.6(b)(i) ) relating to any Acquisition Proposal; or

(iii) the Special Committee or the Company Board fails publicly to reaffirm its recommendation of this Agreement or the Merger within five (5) Business Days of receipt of a written request by Parent or Merger Sub to provide such reaffirmation following an Acquisition Proposal; or

(iv) the Company or any of its Representatives shall have materially breached (or deemed pursuant to the terms thereof to have materially breached) any of its obligations under Section 7.6 ;

(d) by the Company, prior to the Scheduled Seller Group Share Purchase Date, in accordance with Section 7.6(b)(iii) , provided that the Company pays to Parent the amount due pursuant to Section 12.4(b) in accordance with the terms specified therein, and immediately following termination of this Agreement the Company enters into a definitive agreement with respect to a Superior Proposal;

(e) by the Company, if Parent and Merger Sub shall have breached or failed to perform any of its covenants or obligations required to be performed by it under this Agreement, if any representation or warranty of Parent and Merger Sub shall have become untrue or if any other event, change, circumstance, occurrence, effect or state of facts shall have occurred, in each case which breach or failure to perform or to be true or any events, changes, circumstances, occurrences, effects or states of facts, individually or in the aggregate has resulted or would reasonably be expected to result in a failure of a condition set forth in Section 10.2 (such circumstance, a " Material Parent Breach "), and such Material Parent Breach cannot be or, to the extent curable by Parent or Merger Sub, has not been cured by the earlier of (1) the End Date and (2) twenty (20) days after the giving of written notice to Parent of such breach or failure; and

(f) by Parent,

(i) if the Company shall have breached or failed to perform any of its covenants or obligations required to be performed by it under this Agreement (other than the covenants or obligations set forth in Section 7.6 , in respect of which Section 11.1(c)(iv) shall apply), which breach or failure to perform, individually or in the aggregate has resulted or would reasonably be expected to result in a failure of a condition set forth in Section 10.3(b) (such circumstance, a " Material Company Breach of Covenant "), and such Material Company Breach of Covenant cannot be or, to the extent curable by the Company, has not been cured by the earlier of (1) the End Date and (2) twenty (20) days after the giving of written notice to the Company of such breach or failure, or

A-40

(ii) on or prior to the Seller Group Share Purchase Date, if any representation or warranty of the Company shall have become untrue or if any other event, change, circumstance, occurrence, effect or state of facts shall have occurred, in each case which failure to be true or any events, changes, circumstances, occurrences, effects or states of facts, individually or in the aggregate has resulted or would reasonably be expected to result in a failure of a condition set forth in Section 10.3 (such circumstance, a " Material Company Breach "), and such Material Company Breach cannot be or, to the extent curable by the Company, has not been cured by the earlier of (1) the End Date and (2) twenty (20) days after the giving of written notice to the Company of such failure.

The party desiring to terminate this Agreement pursuant to this Section 11.1 (other than pursuant to Section 11.1 (a) ) shall give written notice of such termination to the other party.

SECTION 11.2. _Effect of Termination_ . If this Agreement is terminated pursuant to Section 11.1 , this Agreement shall become void and of no effect without liability of any party (or any stockholder, director, officer, employee, agent, consultant or representative of such party) to the other party hereto; provided that, if such termination shall result from the intentional breach by a party of its obligations hereunder, such party shall be fully liable for any and all liabilities and damages incurred or suffered by the other party as a result of such failure. For purposes hereof, an "intentional breach" means a material breach that is a consequence of an act undertaken by the breaching party with the intention of breaching the applicable obligation. The provisions of this Section 11.2 and Sections 12.1 , 12.4 , 12.7 , 12.8 and 12.9 shall survive any termination hereof pursuant to Section 11.1 .

ARTICLE XII

MISCELLANEOUS

SECTION 12.1. _Notices_ . All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Parent or Merger Sub, to:

DryShips Inc.
80 Kifissias Avenue
Amaroussion 15125
Athens Greece
Attention: Pankaj Khanna
Facsimile No.: 30 2108090577

with a copy to:

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Attention: Philip Richter, Esq.
Facsimile No.: (212) 859-4000

and

Fried, Frank, Harris, Shriver & Jacobson LLP
99 City Road
London, EC1Y 1AX, England
Attention: Robert Mollen, Esq.
Facsimile No.: 011.44.20.7972.9602

A-41

if to the Company, to:

Special Committee
Attention: John Liveris
c/o Oceanfreight Inc.
80 Kifissias Avenue
Amaroussion 15125
Athens Greece
Facsimile No.: 302106140284

with a copy to:

Seward & Kissel LLP
One Battery Park Plaza
New York, NY 10004
Attention: James Abbott, Esq. / Gary J. Wolfe, Esq.
Facsimile No.: (212) 480-8421

or to such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. on a business day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed to have been received on the next succeeding business day in the place of receipt.

SECTION 12.2. *Survival of Representations and Warranties* . The representations and warranties contained herein and in any certificate or other writing delivered pursuant hereto shall not survive the Effective Time.

SECTION 12.3. *Amendments and Waivers* .

(a) Any provision of this Agreement may be amended or waived prior to the Effective Time if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement or, in the case of a waiver, by each party against whom the waiver is to be effective; provided that (i) any such amendment shall require the approval of a majority of the Special Committee, and (ii) after the Company Stockholder Approval has been obtained there shall be no amendment or waiver that would require the further approval of the stockholders of the Company under the MIBCA unless such amendment is subject to stockholder approval.

(b) No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Applicable Law.

SECTION 12.4. *Expenses* .

(a) *General* . Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the party incurring such cost or expense.

(b) *Termination Fee* .

(i) If this Agreement is terminated by Parent pursuant to Section 11.1(c) or by the Company pursuant to Section 11.1(d) , then the Company shall pay to Parent in immediately available funds the Termination Fee, in the case of a termination by Parent, within two Business Days after such termination and, in the case of a termination by the Company, at the time of such termination. " Termination Fee " means $4.5 million in cash.

(ii) If (A) this Agreement is terminated by Parent pursuant to Section 11.1(f) , (B) prior to termination of this Agreement an Acquisition Proposal (with 45% being substituted for references to 15% in the definition thereof for the purposes of this Section 12.4(b)(ii) ) shall have been made, and (C) prior to the first anniversary of the date of such termination, the Company enters into a definitive agreement with respect to or recommends to its shareholders any Acquisition Proposal or any Acquisition Proposal shall have been consummated, then

the Company shall pay the Termination Fee to Parent in immediately available funds within two Business Days after the occurrence of the last of the events described in clauses (A), (B) and (C) of this Section 12.4(b)(ii) .

(c) *Other Costs and Expenses* .    The Company acknowledges that the agreements contained in this Section 12.4 are an integral part of the transactions contemplated by this Agreement and that, without these agreements, Parent and Merger Sub would not enter into this Agreement. Accordingly, if the Company fails promptly to pay any amount due to Parent pursuant to this Section 12.4 , it shall also pay any costs and expenses incurred by Parent or Merger Sub in connection with a legal action to enforce this Agreement that results in a judgment against the Company for such amount, together with interest on the amount of any unpaid fee, cost or expense at the publicly announced prime rate of Citibank, N.A. from the date such fee, cost or expense was required to be paid to (but excluding) the payment date.

(d) Parent and Merger Sub agree that, upon any termination of this Agreement under circumstances where the Termination Fee is payable by the Company pursuant to this Section and such Termination Fee is paid in full, Parent and Merger Sub shall be precluded from any other remedy against the Company, at law or in equity or otherwise, and neither Parent nor Merger Sub shall seek to obtain any recovery, judgment, or damages of any kind, including consequential, indirect, or punitive damages, against the Company or any of the Company's Subsidiaries or any of their respective directors, officers, employees, partners, managers, members, shareholders or Affiliates or their respective Representatives in connection with this Agreement or the transactions contemplated hereby.

SECTION 12.5.  *Disclosure Schedules* .    The parties hereto agree that any reference in a particular Section of the Company Disclosure Schedule shall be deemed to be an exception to (or, as applicable, a disclosure for purposes of) the representations and warranties (or covenants, as applicable) of the Company that are contained in the corresponding Section of this Agreement and any other representations and warranties of the Company that are contained in this Agreement to which the relevance of such item thereto is reasonably apparent. The mere inclusion of an item in the Company Disclosure Schedule as an exception to (or, as applicable, a disclosure for purposes of) a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would reasonably be expected to have a Company Material Adverse Effect.

SECTION 12.6.  *Waiver* .    At any time prior to the Effective Time, whether before or after the Company Stockholder Meeting, Parent (on behalf of itself and Merger Sub) may (a) extend the time for the performance of any of the covenants, obligations or other acts of the Company, or (b) waive any inaccuracy of any representations or warranties or compliance with any of the agreements, covenants or conditions of the Company or with any conditions to its own obligations. Any agreement on the part of Parent (on behalf of itself and Merger Sub) to any such extension or waiver will be valid only if such waiver is set forth in an instrument in writing signed on behalf of Parent by its duly authorized officer. At any time prior to the Effective Time, whether before or after the Company Stockholder Meeting, the Company may (a) extend the time for the performance of any of the covenants, obligations or other acts of Parent or Merger Sub, or (b) waive any inaccuracy of any representations or warranties or compliance with any of the agreements, covenants or conditions of Parent or Merger Sub, or with any conditions to its own obligations. Any agreement on the part of the Company to any such extension or waiver will be valid only if such waiver is set forth in an instrument in writing signed on behalf of the Company by its duly authorized officer. The failure of any party to this Agreement to assert any of its rights under this Agreement or otherwise will not constitute a waiver of such rights. The waiver of any such right with respect to particular facts and other circumstances will not be deemed a waiver with respect to any other facts and circumstances, and each such right will be deemed an ongoing right that may be asserted at any time and from time to time.

SECTION 12.7.  *Governing Law* .    This Agreement will be deemed to be made in and in all respects will be interpreted, construed and governed by and in accordance with the Laws of the State of New York without giving effect to any choice of Law or conflict of Law provision or rule that would cause the application of the Laws of any jurisdiction other than the State of New York, except to the extent that the law of the Marshall Islands is mandatorily applicable to the Merger.

SECTION 12.8.  *Jurisdiction* .    EACH OF THE PARTIES HERETO CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN MANHATTAN IN NEW YORK CITY OR IN THE FEDERAL SOUTHERN DISTRICT IN THE STATE OF NEW YORK AND ANY APPELLATE COURT

THEREFROM LOCATED IN NEW YORK, NEW YORK AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS RELATING TO THIS AGREEMENT, THE MERGER OR THE OTHER TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT MAY BE LITIGATED IN SUCH COURTS. EACH OF THE PARTIES HERETO ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS RESPECTIVE PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY FINAL AND NONAPPEALABLE JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT, THE MERGER OR THE OTHER TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH OF THE PARTIES HERETO FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT THE ADDRESS SPECIFIED IN THIS AGREEMENT, SUCH SERVICE TO BECOME EFFECTIVE 15 CALENDAR DAYS AFTER SUCH MAILING. NOTHING HEREIN WILL IN ANY WAY BE DEEMED TO LIMIT THE ABILITY OF ANY PARTY HERETO TO SERVE ANY SUCH LEGAL PROCESS, SUMMONS, NOTICES AND DOCUMENTS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW OR TO OBTAIN JURISDICTION OVER OR TO BRING ACTIONS, SUITS OR PROCEEDINGS AGAINST ANY OTHER PARTY HERETO IN SUCH OTHER JURISDICTIONS, AND IN SUCH MANNER, AS MAY BE PERMITTED BY ANY APPLICABLE LAW.

SECTION 12.9. *WAIVER OF JURY TRIAL*. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

SECTION 12.10. *Counterparts; Effectiveness*. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by all of the other parties hereto. Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).

SECTION 12.11. *Entire Agreement*. This Agreement and the Confidentiality Agreement constitute the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

SECTION 12.12. *Severability*. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other Governmental Authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such a determination, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

SECTION 12.13. *Specific Performance*. The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof in any federal court located in the State of New York or any New York state court, in addition to any other remedy to which they are entitled at law or in equity.

SECTION 12.14. *Headings*. The descriptive headings contained in this Agreement are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.

SECTION 12.15. *Construction*. The parties have participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be

construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

SECTION 12.16. *Binding Effect; Benefit; Assignment* .

(a) The provisions of this Agreement shall be binding upon and, except as provided in <u>Section 8.3</u> , shall inure to the benefit of the parties hereto and their respective successors and assigns. Except as provided in <u>Section 8.3</u> , no provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns.

(b) No party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto, except that Parent or Merger Sub may transfer or assign its rights and obligations under this Agreement, in whole or from time to time in part, to one or more of its Affiliates at any time and, after the Effective Time, to any Person.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

A-45

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

DRYSHIPS INC.

By: /s/  Pankaj Khanna
    Name:    Pankaj Khanna
    Title:    COO

PELICAN STOCKHOLDINGS INC.

By: /s/  Pankaj Khanna
    Name:    Pankaj Khanna
    Title:    Attorney-in-fact

OCEANFREIGHT INC.

By: /s/  Demetris Nenes
    Name:    Demetris Nenes
    Title:    PRESIDENT — COO

[Signature Page to the Agreement and Plan of Merger]

A-46

<u>**OCEANFREIGHT INC**</u> .

**DISCLOSURE SCHEDULES**
**(the " <u>Company Disclosure Schedules</u> ")**

**[SCHEDULE INTENTIONALLY LEFT BLANK]**

A-47

Annex B

Execution Version

## PURCHASE AND SALE AGREEMENT

PURCHASE AND SALE AGREEMENT (this " Agreement "), is made and entered into as of July 26, 2011, by and among Basset Holdings Inc., a corporation organized under the laws of the Republic of the Marshall Islands (" Basset "), Steel Wheel Investments Limited, a corporation organized under the laws of the Republic of the Marshall Islands (" Steel Wheel "), Haywood Finance Limited, a corporation organized under the laws of the Republic of the Marshall Islands (" Haywood " and, together with Basset and Steel Wheel, the " Sellers "), OceanFreight Inc., a corporation organized under the laws of the Republic of the Marshall Islands (the " Company ") and DryShips Inc., a corporation organized under the laws of the Republic of the Marshall Islands (the " Purchaser ").

Capitalized terms used but not defined herein have the meanings assigned to them in the Agreement and Plan of Merger, dated as of the date of this Agreement (together with any amendments or supplements thereto, the " Merger Agreement "), by and among the Company, the Purchaser and Pelican Stockholdings Inc., a corporation organized under the laws of the Republic of the Marshall Islands that is a wholly-owned subsidiary of the Purchaser (" Merger Sub ").

## WITNESSETH :

WHEREAS, (i) Basset owns 866,666 shares (the " Basset Shares ") of common stock, par value $0.01 of the Company (" Common Stock "); (ii) Steel Wheel owns 351,333 shares (the " Steel Wheel Shares ") of Common Stock; and (iii) Haywood owns 1,782,857 shares (the " Haywood Shares " and, together with the Steel Wheel Shares and the Basset Shares, the " Seller Shares ") of Common Stock;

WHEREAS, Basset, Steel Wheel and Haywood are each Controlled by Mr. Antonis Kandylidis (" Mr. Kandylidis ");

WHEREAS, the Purchaser wishes to purchase from the Sellers, and the Sellers wish to sell to the Purchaser, all of the Seller Shares on the terms and subject to the conditions of this Agreement; and

WHEREAS, simultaneously herewith, the Company, the Purchaser and Merger Sub, are entering into the Merger Agreement, pursuant to which, upon the terms and subject to the conditions thereof, Merger Sub will be merged with and into the Company, and the Company will be the surviving corporation in accordance with the Marshall Islands Business Corporations Act (the " Merger ").

ACCORDINGLY, the parties hereto hereby agree as follows:

1. *Sale and Purchase of Shares* .   On the terms and subject to the conditions contained in this Agreement, the Purchaser shall purchase from each of the Sellers, and each of the Sellers shall sell to the Purchaser, free and clear of any pledges, liens, claims, security interests, encumbrances, options, proxies, voting agreements or any other rights of third parties of any kind (" Liens "), all of the Seller Shares owned by such Seller, for consideration per share consisting of (x) $11.25 net to the Sellers in cash without interest (less any applicable withholding taxes) and (y) 0.52326 shares of common stock (the " Ocean Rig Common Stock ") of Ocean Rig UDW Inc. (" Ocean Rig "), (such consideration, with respect to the Seller Shares of each Seller, the " Purchase Consideration "). Notwithstanding the foregoing, no fractions of a share of Ocean Rig Common Stock shall be paid to a Seller, but in lieu thereof each Seller otherwise entitled to a fraction of a share of Ocean Rig Common Stock shall be entitled to receive an amount of cash (without interest) determined by multiplying $21.50 by the fractional share interest to which such Seller would otherwise be entitled.

2. *Payment; Delivery of Shares* .   The Purchase Consideration payable to each Seller for its Seller Shares shall be paid by the Purchaser to the applicable Seller at the Seller Closing (as herein after defined) (x) with respect to the cash portion, by wire transfer of immediately available funds from the Purchaser to one or more bank accounts of the Sellers for which wiring instructions shall be provided by such Seller to the Purchaser at least two (2) business

days prior to the Seller Closing, and (y) with respect to the share portion, by delivery by the Purchaser to such Seller of stock certificate or certificates (endorsed to such Seller) representing the applicable number of shares of Ocean Rig Common Stock, together with any documents that, in the reasonable judgment of each Seller, are necessary to transfer and convey to, and vest in, the Seller such number of shares of Ocean Rig Common Stock, free and clear of all Liens (other than restrictions under the securities laws (including the restrictions described in Section 7.9 hereof) and the restriction under Section 9.8 hereof). At the Seller Closing, each of the Sellers shall deliver to the Purchaser a stock certificate or certificates (endorsed to the Purchaser) representing the Seller Shares of such Seller, together with any documents that, in the reasonable judgment of the Purchaser, are necessary to transfer and convey to, and vest in, the Purchaser good and valid title to such Seller Shares, free and clear of all Liens (other than restrictions under the securities laws). The Purchaser shall not be obligated to purchase any of the Seller Shares at the Seller Closing unless all of the Seller Shares have been delivered by the Sellers in accordance with this Section 2.

3. *Seller Closing; Mutual Option* .

(a) Subject to the provisions of Section 12, the closing of the purchase and sale of the Seller Shares hereunder (the " Seller Closing ") shall take place one (1) Business Day after the date the conditions set forth in Section 12 (other than conditions that by their nature are to be satisfied at the Seller Closing, but subject to the satisfaction or, to the extent permissible, waiver of those conditions at the Seller Closing) have been satisfied or, to the extent permissible, waived by the party or parties entitled to the benefit of such conditions. The Seller Closing shall occur at the headquarters of the Purchaser, 80 Kifissias Avenue, Amaroussion, 15125 Athens, Greece or such other location as shall be agreed by the Purchaser and the Sellers. The date on which the Seller Closing occurs in accordance with this Agreement is referred to in this Agreement as the " Seller Closing Date ." Notwithstanding anything to the contrary in this Agreement, the Seller Closing Date shall not be prior to 5:00 P.M. Greece time on August 23, 2011.

(b) In the event the Share Condition Waiver Time shall occur and the Per Share Merger Consideration shall be converted to $22.50 in cash, (i) each of the Sellers or its Designee (as defined in Section 14 below) shall have the option, exercisable on and from the Effective Time until 25 days after the Effective Time, to sell to the Purchaser for a price of $21.50 in cash per share all or part of the shares of Ocean Rig Common Stock delivered to such Seller pursuant to Section 2 hereof, and such Seller or its Designee shall transfer such shares to the Purchaser, and the Purchaser shall purchase such shares, promptly, and in any event within three (3) Business Days of receipt of written notice from such Seller or such Seller's Designee of the exercise of such Seller's or Designee's option under this Section 3(b)(i); and (ii) the Purchaser shall have the option, exercisable on and from the Effective Time until 25 days after the Effective Time, to acquire for a price of $21.50 in cash per share from each of the Sellers or its Designee all or part of the shares of Ocean Rig Common Stock delivered to such Seller pursuant to Section 2 hereof, and such Seller or its Designee shall transfer such shares to the Purchaser, and the Purchaser shall purchase such shares, promptly, and in any event within three (3) Business Days of receipt of written notice from the Purchaser of the exercise of the Purchaser's option under this Section 3(b)(ii). In case any of the Sellers or its Designee or the Purchaser exercises its respective right, such Seller or its Designee, as applicable shall deliver to the Purchaser a stock certificate or certificates (endorsed to the Purchaser) representing the shares of Ocean Rig Common Stock of such Seller or its Designee, as applicable, together with any documents that, in the reasonable judgment of the Purchaser, are necessary to transfer and convey to, and vest in, the Purchaser good and valid title to such shares, free and clear of all Liens (other than restrictions under the securities laws), and the Purchaser shall, simultaneously with the delivery of such shares, pay the consideration to such Seller or its Designee, as applicable, by wire transfer of immediately available funds to one or more bank accounts of such Seller or its Designee, as applicable, for which wiring instructions shall be provided by such Seller or its Designee, as applicable, to the Purchaser.

4. *Documentation and Information* .    Each party (a) consents to and authorizes the publication and disclosure by the other parties of the other parties' identity and holding of Seller Shares, Mr. Kandylidis' identity and beneficial ownership of the capital stock of the Sellers, the nature of the other parties' commitments, arrangements and understandings under this Agreement (including, for the avoidance of doubt, the disclosure of this Agreement) and any information that each other party reasonably determines is required to be disclosed by such party under Applicable Law in any press release and any disclosure documents in connection with the transactions contemplated hereby or by the Merger Agreement and (b) agree to promptly give to the other parties any information such other parties may reasonably require for the preparation of any such disclosure documents. Each party agrees to

promptly notify the other parties of any required corrections with respect to any information supplied by such party specifically for use in any such disclosure document, if and to the extent that any such information shall be or have become false or misleading in any material respect.

5. *Voting Agreement; Irrevocable Proxy*

5.1 From the date hereof until termination of this Agreement in accordance with Section 13 hereof, each of the Sellers hereby irrevocably and unconditionally agrees that at any meeting (whether annual or special and whether or not an adjourned or postponed meeting) of the holders of Common Stock, however called (each, a " Stockholder Meeting "), or in any other circumstance in which the vote, consent or other approval of the holders of Common Stock is sought (in writing or otherwise), such Seller, as applicable, shall:

(a) be present, in person or represented by proxy, or otherwise cause its Seller Shares or any other shares of Common Stock that it or any of its Affiliates may at any time beneficially own directly or indirectly to be counted for purposes of determining the presence of a quorum at such meeting to the fullest extent that its Seller Shares (or such other shares) shall be entitled to be present at such meeting; and

(b) vote (or cause to be voted) all of its Seller Shares or any other shares of Common Stock that it or any of its Affiliates may at any time beneficially own directly or indirectly, or execute and deliver a written consent (or cause a written consent to be executed and delivered) with respect to all of its Seller Shares or any such other shares of Common Stock that it or any of its Affiliates may at any time beneficially own directly or indirectly, in connection with any meeting of the stockholders of the Company or any action by written consent in lieu of a meeting of stockholders of the Company, in each case, to the fullest extent that its Seller Shares or such other shares shall be entitled to be voted at the time of any vote or action by written consent:

(i) in favor of (A) approval and adoption of the Merger Agreement, the Merger and each of the other transactions contemplated by the Merger Agreement and, (B) without limiting the preceding clause (A), the approval of any proposal to adjourn or postpone the Stockholder Meeting at which such approval and adoption is to be sought at a later date if there are not sufficient votes for approval and adoption of the Merger Agreement on the date on which such Stockholder Meeting (or any adjournment or postponement thereof) is held; and

(ii) only as directed by the Purchaser with respect to (A) any proposal, action, transaction or contract that would reasonably be expected to (x) frustrate the purposes of, impede, hinder, interfere with, nullify, prevent, delay or adversely affect the purchase or sale of the Seller Shares hereunder, the Merger or any other transactions contemplated hereby or by the Merger Agreement, (y) result in a breach of any covenant, representation or warranty or any other obligation or agreement of the Company or the Sellers under this Agreement or the Merger Agreement (including, in the case of any representation or warranty, as if such representation or warranty was repeated at all times up to and including the Effective Time), or (z) result in any of the conditions set forth in Article X of the Merger Agreement not being fulfilled or satisfied, (B) any Acquisition Proposal and any action in furtherance of any Acquisition Proposal, (C) any merger, acquisition, sale, consolidation, reorganization, recapitalization, dissolution, liquidation or winding up of or by the Company, or any other extraordinary transaction involving the Company, and (D) subject to compliance with Section 8.2(b) of the Merger Agreement, any change in the business, management or the board of directors of the Company.

5.2 Each of the Sellers hereby revokes (or agrees to cause to be revoked) any proxies that it or he may have heretofore granted and hereby irrevocably appoints the Purchaser as attorney-in-fact and proxy for and on behalf of such Seller, for and in the name, place and stead of such Seller, to (a) attend any and all Stockholder Meetings, (b) vote, express consent or dissent or issue instructions to the record holder to vote its Seller Shares, or any other shares of Common Stock that it or any of its Affiliates may at any time beneficially own directly or indirectly, in accordance with the provisions of Section 5.1 (b) hereof at any such meeting and (c) grant or withhold, or issue instructions to the record holder to grant or withhold, consistent with the provisions of Section 5.1, all written consents with respect to its Seller Shares or any other shares of Common Stock that it or any of its Affiliates may at any time beneficially own directly or indirectly. The foregoing proxy shall be deemed to be a proxy coupled with an interest, is irrevocable and shall not be terminated by operation of Applicable Law or upon the occurrence of any

other event other than the termination of this Agreement in accordance with Section 13 hereof. Each of the Sellers authorizes such attorney and proxy to substitute any other person to act hereunder, to revoke any substitution and to file this proxy and any substitution or revocation with the Secretary of the Company. Each of the Sellers hereby affirms that the irrevocable proxy set forth in this Section 5.2 is given in connection with and granted in consideration of and as an inducement to the Purchaser and Merger Sub to enter into the Merger Agreement and that such irrevocable proxy is given to secure the obligations of the Sellers under Section 5.1. The Purchaser covenants and agrees with the Sellers that the Purchaser will exercise the foregoing proxy consistent with the provisions of Section 5.1.

5.3 The parties hereto hereby agree and acknowledge that neither any other party hereto, nor such party's respective successors, assigns, subsidiaries, divisions, employees, officers, directors, shareholders, agents or affiliates shall owe any duty to, whether in law or otherwise, or incur any liability of any kind whatsoever, including without limitation, with respect to any and all claims, losses, demands, causes of actions, costs, expenses (including attorneys' fees) and compensation of any kind or nature whatsoever to any other party hereto or its affiliates in connection with or as a result of any voting by the Purchaser of the Seller Shares, or any other shares of Common Stock that the Sellers or their affiliates may at any time beneficially own directly or indirectly, as contemplated hereby. The parties hereto acknowledge that, pursuant to the authority hereby granted under the proxy, the Purchaser may vote the Seller Shares, or any other shares of Common Stock that the Sellers or their Affiliates may at any time beneficially own directly or indirectly, in furtherance of its own interests, and the Purchaser is not acting as a fiduciary of the Sellers, any affiliates of any Seller, or the Company.

6. _Representations and Warranties of the Purchaser_.   The Purchaser represents and warrants to each of the Sellers as follows:

6.1 The Purchaser is duly organized, validly existing and in good standing under the applicable laws of the Republic of the Marshall Islands;

6.2 The Purchaser has the power and authority to execute, deliver and carry out the terms and provisions of this Agreement and consummate the transactions contemplated hereby, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement;

6.3 This Agreement has been duly and validly authorized, executed and delivered by the Purchaser and, assuming due authorization, execution and delivery by and on behalf of each the other parties hereto, constitutes a legal, valid and binding agreement of the Purchaser, enforceable in accordance with its terms;

6.4 The Ocean Rig Common Stock to be delivered to the Sellers hereunder has been duly and validly issued and will be delivered to the Sellers free of any Liens and restrictions on transfer (except as provided hereunder and under the securities laws) and preemptive rights;

6.5 No Person will have, as a result of the transactions contemplated by this Agreement, any right, interest or claim against or upon the Sellers for any commission, fee or other compensation pursuant to any agreement, arrangement or understanding entered into by or on behalf of the Purchaser;

6.6 The execution and delivery of this Agreement do not, and the consummation of the transactions contemplated hereby will not, (i) result in the imposition of any Liens under, cause or permit the acceleration of any obligation under, or violate or conflict with the terms, conditions or provisions of, any note, indenture, security agreement, lease, guaranty, joint venture agreement, or other contract, agreement or instrument to which the Purchaser or Ocean Rig is a party or by which it, Ocean Rig or any of the Ocean Rig Common Stock to be delivered hereunder is subject or bound, or (ii) result in a breach or violation by the Purchaser or Ocean Rig of any law, rule or regulation or any order, injunction, judgment or decree of any Governmental Authority to which Purchaser or Ocean Rig is a party or by which either the Purchaser or Ocean Rig or any of the Ocean Rig Common Stock to be delivered hereunder is subject or bound, except as would not reasonably be expected to materially impair the ability of the Purchaser to perform its obligations under this Agreement.

6.7 The Purchaser has such knowledge and experience in financial and business matters and in buying equity securities that it is capable of evaluating the merits and risks of the acquisition of the Seller Shares in exchange for Ocean Rig Common Stock pursuant to Section 2 hereof, and it is able to bear the economic risk of

such acquisition and is able to sustain a complete loss with regard to such acquisition. The Purchaser acknowledge that (x) it has had access to all such information regarding the Company and the Seller Shares and has made all such investigation with respect thereto as it deems necessary or appropriate to make the decision to enter into this Agreement, and it has satisfied itself concerning the relevant tax, legal, currency and other economic considerations relevant to the acquisition of the Seller Shares, (y) it has had the opportunity to ask questions to the Sellers and the Company concerning the Company and the Seller Shares and (z) in making its decision to enter into this Agreement, it has relied and will rely on its own investigation and, to the extent it deems appropriate, on consultations with its independent advisors. The Purchaser is an "accredited investor" within the meaning of Rule 501 under the 1933 Act. The Purchaser is acquiring the Seller Shares for its own account only for investment purposes and not with a view to any resale or distribution, within the meaning of the U.S. securities laws, of such shares. The Purchaser understands that the Seller Shares delivered to it pursuant to Section 1 hereof are "restricted securities" as defined in Rule 144(a)(3) under the 1933 Act. The Purchaser agrees that so long as such shares are restricted securities, such shares may not be reoffered, resold, pledged or otherwise transferred except (i) to the Company, (ii) pursuant to a registration statement that has been declared effective under the 1933 Act, (iii) outside the United States in an offshore transaction in accordance with Rule 903 or 904 of Regulation S under the 1933 Act or (iv) pursuant to any other available exemption from the registration requirements of the 1933 Act, and, in each case, such offer, sale, pledge or transfer must be made in accordance with all applicable laws and regulations, including any applicable securities laws of any state of the United States. The Company has the right to place legends on the stock certificates to the effect that the shares delivered to The Purchaser are subject to the restrictions of this Section 6.7.

7. _Representations and Warranties of the Sellers_.    The Sellers, jointly and severally, represent and warrant to the Purchaser as follows:

7.1 Each of the Sellers is duly organized, validly existing and in good standing under the applicable laws of the jurisdiction in which it is incorporated or constituted;

7.2 Each of the Sellers has the necessary legal capacity, power and authority to execute, deliver and carry out the terms and provisions of this Agreement and to consummate the transactions contemplated hereby and has taken all necessary action to authorize the execution, delivery and performance of this Agreement;

7.3 This Agreement has been duly and validly authorized, executed and delivered by each of the Sellers and, assuming due authorization, execution and delivery by and on behalf of the Purchaser, constitutes a legal, valid and binding obligation of each of the Sellers, enforceable in accordance with its terms;

7.4 Mr. Kandylidis is the Controlling stockholder of each Seller; Basset owns, beneficially and of record, all of the Basset Shares; Steel Wheel owns, beneficially and of record, all of the Steel Wheel Shares; and Haywood owns, beneficially and of record, all of the Haywood Shares; in each case, free and clear of any Liens, and each of the Sellers will transfer to the Purchaser good and valid title to the Seller Shares free and clear of any Liens at the Seller Closing;

7.5 Neither the Sellers nor any Affiliates of any Seller own beneficially or otherwise, directly or indirectly, any shares of Common Stock (other than the Seller Shares) or any options, warrants or other rights to acquire, currently, in the future or upon the occurrence of certain events shares of Common Stock;

7.6 The execution and delivery of this Agreement do not, and the consummation of the transactions contemplated hereby will not, (i) result in the imposition of any Liens under, cause or permit the acceleration of any obligation under, or violate or conflict with the terms, conditions or provisions of, any note, indenture, security agreement, lease, guaranty, joint venture agreement, or other contract, agreement or instrument to which any of the Sellers or Mr. Kandylidis is a party or by which any of the Sellers or Mr. Kandylidis or any of the Seller Shares is subject or bound, or (ii) result in a breach or violation by any of the Sellers or Mr. Kandylidis of any law, rule or regulation or any order, injunction, judgment or decree of any court, regulatory agency or other governmental authority (individually and collectively, a " Governmental Authority ") to which any of the Sellers or Mr. Kandylidis is a party or by which any of the Sellers or Mr. Kandylidis or any of the Seller Shares is subject or bound;

7.7 Except in respect of the matters addressed in Sections 8.1 and 8.2 hereof, there exists no restriction upon the sale and delivery to the Purchaser of the Seller Shares by any of the Sellers, nor are any of the Sellers required to obtain the approval of any person or entity or any court, governmental authority or regulatory agency to effect the sale of the Seller Shares in accordance with the terms hereof;

7.8 Except as set forth in Section 22 hereof, no Person will have, as a result of the transactions contemplated by this Agreement, any right, interest or claim against or upon the Purchaser or the Company for any commission, fee or other compensation pursuant to any agreement, arrangement or understanding entered into by or on behalf of any of the Sellers or Mr. Kandylidis; and

7.9 Each of the Sellers has such knowledge and experience in financial and business matters and in buying equity securities that each is capable of evaluating the merits and risks of the acquisition of shares of Ocean Rig Common Stock in exchange for Seller Shares pursuant to Section 2 hereof, and each is able to bear the economic risk of such acquisition and is able to sustain a complete loss with regard to such acquisition. The Sellers acknowledge that (x) they have had access to all such information regarding Ocean Rig and Ocean Rig Common Stock and have made all such investigation with respect thereto as they deem necessary or appropriate to make the decision to enter into this Agreement, and they have satisfied themselves concerning the relevant tax, legal, currency and other economic considerations relevant to the acquisition of shares of Ocean Rig Common Stock, (y) they have had the opportunity to ask questions to the Purchaser concerning Ocean Rig and Ocean Rig Common Stock and (z) in making their decision to enter into this Agreement, they have relied and will rely on their own investigation and, to the extent they deem appropriate, on consultations with their independent advisors. Each of the Sellers is an "accredited investor" within the meaning of Rule 501 under the 1933 Act. The Sellers are acquiring the shares of Ocean Rig Common Stock for their own account only for investment purposes and not with a view to any resale or distribution, within the meaning of the U.S. securities laws, of such shares. The Sellers understand that the shares of Ocean Rig Common Stock delivered to them pursuant to Section 2 hereof are "restricted securities" as defined in Rule 144(a)(3) under the 1933 Act. The Sellers agree that so long as such shares are restricted securities, such shares may not be reoffered, resold, pledged or otherwise transferred except (i) to Ocean Rig, (ii) pursuant to a registration statement that has been declared effective under the 1933 Act, (iii) outside the United States in an offshore transaction in accordance with Rule 903 or 904 of Regulation S under the 1933 Act or (iv) pursuant to any other available exemption from the registration requirements of the 1933 Act, and, in each case, such offer, sale, pledge or transfer must be made in accordance with all applicable laws and regulations, including any applicable securities laws of any state of the United States. The Purchaser may place (or cause to be placed) legends on the stock certificates representing the shares of Ocean Rig Common Stock being delivered to the Sellers hereunder to the effect that the shares delivered to the Sellers are subject to the restrictions of this Section 7.9 and Section 9.7 hereof.

8. _Representations of the Company_.

8.1 The Company has irrevocably taken all action required to be taken by it in order to exempt this Agreement and completion of the transactions contemplated hereby from, and this Agreement is and the transactions contemplated hereby will be, exempt from the requirements of any "moratorium", "control share", "fair price", "affiliate transaction", "business combination" or other anti-takeover laws and regulations of any Governmental Authority or contained in the Company's articles of incorporation or by-laws.

8.2 The Company has irrevocably taken all action necessary or appropriate so that the execution of this Agreement and the consummation of the transactions contemplated hereby do not and will not result in the distribution of the Company Rights (defined below) under the Second Amended and Restated Stockholders Rights Agreement, dated as of April 8, 2011 as amended (the "Rights Plan"), by and between the Company and American Stock Transfer & Trust Company, LLC, as rights agent (the rights issued to the holders of Common Stock pursuant to the Rights Plan are referred to as the "Company Rights") or the ability of any Person to exercise any Company Rights under the Rights Plan.

8.3 The Company has taken all action to vest any unvested Seller Shares, and eliminate any restriction on transfer applicable to any of the Seller Shares, effective as of immediately prior to the Seller Closing.

9. _Covenants_

9.1 From the date hereof until the termination of this Agreement in accordance with Section 13 hereof, the Sellers will not, except as expressly required hereby, offer, sell, contract to sell, announce the intention to sell, pledge, grant any option to purchase, enter into any derivative transaction (including, without limitation, any short sale or swap) with respect to, grant any proxy with respect to, lend, or otherwise transfer or dispose of, directly or indirectly, the Seller Shares or any other shares of Common Stock that the Sellers may at any time beneficially own directly or indirectly or any other rights or interests arising out of or associated with the Seller Shares or such other shares, or take any other action that would breach any of their or the Company's covenants or agreements hereunder or under the Merger Agreement or make any of their respective representations or warranties to be untrue or incorrect or in any way interfere with the performance of their or the Company's obligations hereunder or under the Merger Agreement or the transactions contemplated by the Merger Agreement.

9.2 Upon the terms and subject to the conditions hereof, each of the parties hereto shall use its reasonable best efforts to take, or cause to be taken, all appropriate action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement.

9.3 The parties will consult with one another before issuing any press release or otherwise making any public statement with respect to this Agreement, and shall not issue any such press release or make any such public statement absent mutual agreement thereon, provided, however, that each party hereto shall be entitled to make such press release, announcement or filing as it deems, in its reasonable discretion, to be necessary or appropriate under applicable law or stock exchange requirement.

9.4 The Company hereby agrees to take all actions necessary so that, upon consummation of the purchase and sale of the Seller Shares contemplated hereby, the Purchaser shall be the record owner of the Seller Shares and the Company shall list the Purchaser as the owner of record of the Seller Shares on the books and records of the Company.

9.5 The Sellers hereby agree that they will promptly notify the Purchaser in writing of any new shares of Common Stock or other shares of capital stock or securities of the Company directly or indirectly acquired by the Sellers or any Affiliate of any Seller, or of which the Sellers or any Affiliate of any Seller become directly or indirectly the beneficial owner, if any, after the date hereof.

9.6 This Agreement shall not be deemed to create any contractual duty to disclose any material, nonpublic, confidential information regarding Ocean Rig or the Company, including Ocean Rig's or the Company's financial condition, results of operations, businesses, properties, assets, liabilities, management, projections, appraisals, plans (including potential acquisitions and sales of assets and debt and equity financing activities) and prospects (collectively, the " Information "). Each of the parties hereto acknowledges and agrees that (i) each other party hereto and its subsidiaries and affiliates currently may have access to and/or be in the possession of, and later may come into possession of, Information that is not known to the other parties hereto and that may be material to a decision to acquire shares of Common Stock or Ocean Rig Common Stock, (ii) each party hereto has no duty (fiduciary or otherwise) to disclose to the other parties hereto or their respective affiliates any of the Information, (iii) the parties have determined to enter into this Agreement and to purchase and sell the Seller Shares and acquire and sell the shares of the Ocean Rig Common Stock on the terms and conditions set forth herein notwithstanding their lack of knowledge of the Information and notwithstanding that such Information, if known to the other parties, might affect their decision to, and the price at which such parties would be willing to, purchase and sell the Seller Shares and acquire and sell shares of the Ocean Rig Common Stock, (iv) each party hereto has not requested, and will not request, from the other parties hereto any of the Information that such other parties may now have or of which such other party may later come into possession, (v) each party hereto has not relied in any way upon any act, statement or omission of any other party hereto or any of its subsidiaries or affiliates with respect to the Company, the Common Stock, Ocean Rig or the Ocean Rig Common Stock, (vi) the parties hereto are experienced, sophisticated and knowledgeable in trading in securities of private and public companies and understand the disadvantage to which they are subject on account of the possible disparity of information between each such party, on the one hand, and each other party, on the other and (vii) each party has conducted its own investigation, to the extent that the Sellers or the Purchaser, as applicable, has determined necessary or desirable regarding the Company and Ocean

B-7

Rig, and each party has determined to enter into this Agreement and complete the transactions contemplated by this Agreement based on, among other things, such investigation.

9.7 [Reserved.]

9.8 For a period of six months starting from the Seller Closing Date, the Sellers will not offer, sell, contract to sell, announce the intention to sell, pledge, grant any option to purchase, enter into any derivative transaction (including, without limitation, any short sale or swap) with respect to, grant any proxy with respect to, lend, or otherwise transfer or dispose of, directly or indirectly, the shares of Ocean Rig Common Stock delivered to the Sellers pursuant to Section 2 hereof, or any other rights or interests arising out of or associated with such shares of Ocean Rig Common Stock, provided , however , that each Seller may, prior to the Seller Closing, transfer its rights to receive shares of Ocean Rig Common Stock hereunder, subject to the restrictions set forth above and in Section 14 below. The restrictions on transfer contained herein may be enforced by the Special Committee.

9.9 The Purchaser agrees to cause Ocean Rig to provide customary registration rights to the Sellers or their Designees at the end of the lock-up period set forth in Section 9.8 so long as: (i) the shares of Ocean Rig Common Stock transferred by Purchaser to the Sellers or their Designees have at all times been and are held by persons who are not affiliates of Ocean Rig or DryShips, (ii) the Sellers and their Designees have complied with the terms of this Agreement, including without limitation Sections 9.8 and 14, and (iii) the representations and warranties of the Sellers were true and correct as of the Seller Closing Date; provided , however , that if at the end of the lock-up period, all of the shares of Ocean Rig Common Stock held by a Seller or its Designees may be sold within any 90 day period under Rule 144 and the holder is not subject to the manner of sale requirements of Rule 144, that holder shall not have registration rights.

10. *Acquisition Proposals; Non-Solicitation* .

10.1 The Sellers shall, and shall cause their respective Representatives to, immediately cease and cause to be terminated any existing activities, discussions or negotiations with any person conducted prior to the date hereof with respect to any Acquisition Proposal or any offer, proposal or indication of interest by a Third Party to purchase or otherwise acquire any of the Seller Shares. The Sellers shall not, and shall use reasonable best efforts to cause their respective Representatives not to, directly or indirectly, (i) solicit, initiate or knowingly take any action to facilitate or encourage the submission of any Acquisition Proposal or any offer, proposal or indication of interest by a Third Party to purchase or otherwise acquire any of the Seller Shares, (ii) enter into or participate in any discussions or negotiations with, furnish any information relating to the Seller Shares or the Company or any of its subsidiaries or afford access to the business, properties, assets, books or records of the Company or any of its subsidiaries to, any Third Party with respect to inquiries regarding, or the making of, an Acquisition Proposal or offer, proposal or indication of interest to purchase or otherwise acquire any of the Seller Shares, or (iii) approve, endorse, recommend or enter into (or publicly propose to do any of the foregoing) any agreement in principle, letter of intent, term sheet, merger agreement, acquisition agreement, option agreement or other similar instrument relating to an Acquisition Proposal or the sale, transfer or other disposition of any the Seller Shares other than pursuant to this Agreement.

10.2 The Sellers shall notify the Special Committee promptly (but in no event later than 24 hours) after receipt by any of them (or any of their respective Representatives or Affiliates) of any Acquisition Proposal or any offer, proposal or indication of interest by a Third Party to purchase or otherwise acquire any of the Seller Shares, including the material terms and conditions thereof and the identity of the Person making such Acquisition Proposal or offer, proposal or indication of interest to purchase or otherwise acquire any of the Seller Shares and its proposed financing sources, and shall keep the Special Committee reasonably informed on a prompt basis (but in any event no later than 24 hours) as to the status (including changes or proposed changes to the material terms) of such Acquisition Proposal or offer, proposal or indication of interest to purchase or otherwise acquire any of the Seller Shares. The Sellers shall also notify the Special Committee promptly (but in no event later than 24 hours) after receipt by any of them (or any of their respective Representatives or Affiliates) of any request for non-public information relating to the Seller Shares or the Company or any of its Subsidiaries or for access to the business, properties, assets, books or records of the Company or any of its Subsidiaries by any Third Party that has informed the Sellers (or any of their respective Representatives or Affiliates) that it is considering making, or has made, an

Acquisition Proposal or an offer, proposal or indication of interest to purchase or otherwise acquire any of the Seller Shares.

11. *Waiver of Dissenting Rights* . Each of the Sellers hereby irrevocably waives any and all rights it may have as to appraisal, dissent or any similar or related matter with respect to the Seller Shares (or other shares of Common Stock that it or he may at any time beneficially own) that may arise with respect to the Merger or any of the transactions contemplated by the Merger Agreement.

12. *Closing Conditions*

12.1 *Conditions to Parties' Obligations* .

(a) The obligations of the parties to consummate the purchase and sale of the Seller Shares contemplated hereby are subject to the satisfaction of the following condition:

(i) No Applicable Law preventing or prohibiting the consummation of the purchase or sale of any of the Seller Shares hereunder shall be in effect.

(b) The obligation of the Purchaser to consummate the purchase of the Seller Shares contemplated hereby is also subject to the satisfaction of the following conditions:

(i) The conditions set forth in Section 10.3 of the Merger Agreement shall have been satisfied (except that those conditions that by their terms apply at the Effective Time shall be measured as if they applied as of the Seller Closing Date);

(ii) The Sellers shall have complied in all material respects with their obligations required to be performed by them under this Agreement at or prior to the Seller Closing; and

(iii) The representations and warranties of the Sellers and the Company in this Agreement shall be true and correct in all material respects as of the date when made and as of the Seller Closing Date, except for representations and warranties made as of a specified date, which shall be measured only as of such specified date.

(c) The obligation of the Sellers to consummate the sale of the Seller Shares contemplated hereby is also subject to the satisfaction of the following conditions:

(i) The conditions set forth in Section 10.2 of the Merger Agreement shall have been satisfied (except that those conditions that by their terms apply at the Effective Time shall be measured as if they applied as of the Seller Closing Date);

(ii) The Purchaser shall have complied in all material respects with the obligations required to be performed by it under this Agreement at or prior to the Seller Closing; and

(iii) The representations and warranties of the Purchaser in this Agreement shall be true and correct in all material respects as of the date when made and as of the Seller Closing Date, except for representations and warranties made as of a specified date, which shall be measured only as of such specified date.

13. *Termination* .

13.1 This Agreement may be terminated at any time prior to the Seller Closing Date by mutual written consent of the Purchaser and all the Sellers.

13.2 This Agreement shall automatically terminate as of the earlier of the termination of the Merger Agreement and the Effective Time.

13.3 If this Agreement is terminated as provided herein, no party hereto shall have any liability or further obligation to any other party to this Agreement; provided , however , that (A) Sections 11 and 13 through 24 (inclusive) of this Agreement shall survive any termination hereof in the event the Effective Time shall have occurred and (B) no such termination shall relieve or release the Company, the Sellers or the Purchaser from any obligations or liabilities arising out of its breach of this Agreement prior to its termination.

B-9

14. *Successors and Assigns*.   This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors, permitted assigns, heirs and personal representatives. None of the Sellers may assign its obligations hereunder.

Subject to the conditions set forth below, each Seller shall have the right, no later than seven Business Days prior to the Seller Closing, to designate a maximum of three (3) Persons to receive all or any portion of the Purchase Consideration payable to such Seller hereunder (each such transferee, a "Designee"). In arranging for such transfers of that portion of the Purchase Consideration that is comprised of Ocean Rig Common Stock, the Sellers shall engage in no "directed selling efforts" (as that term is defined in Regulation S of the U.S. Securities and Exchange Commission (the "SEC") or "general solicitation" (as that term is used in Regulation D of the SEC), and shall make offers to transfer Purchase Consideration, and actual transfers, only to Persons with whom it has an existing relationship and who satisfy the criteria set forth below. Additionally, all offering materials shall include statements to the effect that the securities have not been registered under the 1933 Act and may not be offered or sold in the United States or to U.S. persons (as defined in Regulation S of the SEC) unless the securities are registered under the Act, or an exemption from the registration requirements of the Act is available. In addition, each Person invited to become a Designee shall satisfy the following criteria: (a) such Person shall not be an affiliate (as that term is defined in Rule 144 of the SEC) of Ocean Rig or DryShips or any of their affiliates; (b) such Person shall not be a U.S. person, shall not receive the offer to become a Designee or any materials related thereto while in the United States, and shall accept the offer from outside of the United States; (c) such Person shall execute such documentation as DryShips may require for purposes of establishing to DryShips' satisfaction that such Person has appropriate wealth, sophistication and experience to invest in the securities that comprise the Purchase Consideration, understands the risks of the investment in such securities, is able to bear the loss of its entire investment, is acquiring the securities solely for purposes of investment, and otherwise is able to receive the offer and sale of the securities under applicable securities laws; (d) such Person understands and agrees that the shares will be legended with a legend to be determined by DryShips that will restrict the resales of such securities, including resales in the United States or to U.S. Persons; (e) such Person will be subject to all of the commitments, obligations and restrictions of the Sellers under this Agreement, including, without limitation, the prohibition on resales for six months provided for in Section 9.8 hereof and the provisions of Section 3(b); and (f) such Person shall comply with such other requirements as DryShips may reasonably require for purposes of satisfying applicable U.S. federal and state and other applicable securities laws. Each Designee shall execute and deliver to the Purchaser, Ocean Freight and the Company such agreements and documentation as they may require for purposes of establishing the Designee's agreement to, and compliance with, all of the foregoing.

The Purchaser may at its option assign its rights under this Agreement to any of its affiliates, but no such assignment shall relieve the Purchaser of its obligations hereunder.

15.   *Entire Agreement*.   This Agreement contains the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous arrangements or understandings with respect thereto.

16.   *Amendments*.   The terms and provisions of this Agreement may only be modified or amended by a written instrument executed and delivered by the Company (through the Special Committee) the Purchaser and each Seller.

17.   *Counterparts*.   This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute one agreement.

18.   *Governing Law*.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the principles of conflicts of law, except to the extent that the law of Marshall Islands is mandatorily applicable to the Transfer Documents.

19.   *Jurisdiction; Waiver of Jury Trial*.   EACH PARTY HERETO HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY LEGAL ACTION OR PROCEEDING AGAINST IT OR ANY OF ITS ASSETS WITH RESPECT TO ANY OF THE OBLIGATIONS ARISING UNDER OR RELATING TO THIS AGREEMENT MAY BE BROUGHT BY ANY PARTY IN ANY STATE OR FEDERAL COURT SITTING IN

MANHATTAN IN NEW YORK CITY OR IN THE FEDERAL SOUTHERN DISTRICT IN THE STATE OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS WITH REGARD TO ANY SUCH ACTION OR PROCEEDING, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, THE JURISDICTION OF THE AFORESAID COURTS AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF ANY ACTION THEREIN. EACH PARTY HERETO AGREES THAT THE SUMMONS AND COMPLAINT OR ANY OTHER PROCESS IN ANY ACTION MAY BE SERVED BY NOTICE GIVEN IN ACCORDANCE WITH THIS AGREEMENT, OR AS OTHERWISE PERMITTED BY LAW. EACH PARTY HERETO IRREVOCABLY WAIVES THE RIGHT TO TRIAL BY JURY.

20.  _Third Parties_ .   This Agreement is solely for the benefit of the parties hereto and then permitted assigns and no other party shall have any rights or remedies with respect hereto.

21.  _Specific Performance_ .   Each of the parties hereto agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties hereto shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court specified in Section 19 hereof, without bond or other security being required, this being in addition to any other remedy to which they are entitled at law or in equity. Except as otherwise provided herein, any and all rights and remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other right or remedy conferred hereby, or by law or equity upon such party, and the exercise by a party of any one right or remedy will not preclude the exercise of any other right or remedy.

22.  _Expenses; Fees_ .   All costs, fees and expenses incurred in connection with this Agreement shall be paid by or on behalf of the party incurring such cost or expense, except for legal fees and other advisory fees up to an aggregate of $1,500,000 incurred in connection with this Agreement by the Sellers, which shall be paid by the Company upon consummation of the Merger.

23.  _Severability_ .   If any term or other provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of applicable law or public policy, all other terms, provisions and conditions of this Agreement shall nevertheless remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible to the fullest extent permitted by applicable law in an acceptable manner to the end that the original intent of the parties are fulfilled to the extent possible.

24.  _Notices_ .   All notices and other communications to any party hereunder shall be in writing and shall be deemed duly given if delivered personally (notice deemed given upon receipt), sent by telecopier or facsimile (notice deemed given upon confirmation of receipt), sent by nationally recognized overnight courier or by electronic mail (notice deemed given upon receipt of proof of delivery) or sent by registered or certified mail, return receipt requested, postage prepaid (notice deemed given upon receipt of proof of delivery), in each case, to the parties at the following addresses or facsimile numbers (or at such other address or facsimile number for a party as shall be specified by like notice):

If to the Purchaser, to:

DryShips Inc.
80 Kifissias Avenue
Amaroussion 15125
Athens Greece
Attention: Pankaj Khanna
Facsimile No.: + 30 210 80 90 577

B-11

with a copy (which shall not constitute notice) to:

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Attention: Philip Richter, Esq.
Facsimile No.: (212) 859-4000

and

Fried, Frank, Harris, Shriver & Jacobson LLP
99 City Road
London, EC1Y 1AX, England
Attention: Robert Mollen, Esq.
Facsimile No.: +44.20.7972.9602

If to the Sellers to:

c/o Orrick, Herrington & Sutcliffe, LLP
51 W. 52nd Street
New York, NY 10019
Attention: William Haft, Esq.
Facsimile No.: (212) 506-5160

If to the Company to:

Special Committee
Attention: John Liveris
c/o Oceanfreight Inc.
80 Kifissias Avenue
Amaroussion 15125
Athens Greece
Facsimile No.: +30 210 61 40 284

cc:

Seward & Kissel LLP
One Battery Park Plaza
New York, NY 10004
Attention: James Abbott, Esq. / Gary J. Wolfe, Esq.
Facsimile No.: (212) 480-8421

or to such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. on a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed to have been received on the next succeeding business day in the place of receipt.

[Signature Page Follows]

B-12

IN WITNESS WHEREOF, the parties hereto have duly executed this Purchase and Sale Agreement as of the date first above written.

DRYSHIPS INC.

By: /s/ Pankaj Khanna
    Name:    Pankaj Khanna
    Title:    COO

BASSET HOLDINGS INC.

By: /s/ Anthony Kandylidis
    Name:    Anthony Kandylidis
    Title:

STEEL WHEEL INVESTMENTS LIMITED

By: /s/ Anthony Kandylidis
    Name:    Anthony Kandylidis
    Title:

HAYWOOD FINANCE LIMITED

By: /s/ Anthony Kandylidis
    Name:    Anthony Kandylidis
    Title:

OCEANFREIGHT INC.

By: /s/ Demetris Nenes
    Name:    Demetris Nenes
    Title:    PRESIDENT — COO

Annex C

July 25, 2011

Special Committee of the Board of Directors
OceanFreight Inc.
80 Kifissias Avenue
Athens 15125
Greece

Members of the Special Committee:

We understand that OceanFreight Inc. (the "Company"), DryShips Inc. (the "Merger Partner"), and Pelican Stockholdings Inc., a wholly-owned subsidiary of the Merger Partner ("Merger Sub"), propose to enter into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Merger Sub will merge with and into the Company (the "Merger") in a transaction in which each outstanding share of common stock, par value $0.01 per share, of the Company (the "Company Common Stock"), except shares of the Company Common Stock held by the Merger Partner or Merger Sub, will be converted into the right to receive from the Merger Partner $11.25 in cash (the "Cash Consideration") and 0.52326 of a share (the "Share Consideration") of Ocean Rig UDW Inc. ("Settlement Sub"), with the Cash Consideration and the Share Consideration jointly referred to as the "Exchange Consideration". The terms and conditions of the Merger are more fully set forth in the Merger Agreement. Concurrently with the execution of the Merger Agreement, the Company, the Merger Partner and Basset Holdings, Inc. ("Basset"), Steel Wheel Investments Limited ("Steel Wheel") Haywood Finance Limited ("Haywood," together with Basset and Steel Wheel, the "Sellers"), will enter into a Purchase and Sale Agreement, whereby, inter alia , the Merger Partner will purchase for the Exchange Consideration, an aggregate of 3,000,856 shares of the Company Common Stock, held by the Sellers.

You have asked for our opinion as to whether the Exchange Consideration pursuant to the Merger Agreement is fair, from a financial point of view, to the holders of the Company Common Stock.

In arriving at our opinion, we have, among other things:

(i) reviewed the Merger Agreement;

(ii) reviewed certain publicly available financial and other information about the Company;

(iii) reviewed certain information furnished to us by the management of the Company, including financial forecasts and analyses, relating to the business, operations and prospects of the Company;

(iv) held discussions with members of senior management of the Company concerning the matters described in clauses (ii) and (iii) above;

(v) reviewed the share trading price history and valuation multiples for the Company Common Stock and the Settlement Sub Common Stock and compared them with those of certain publicly traded companies that we deemed relevant;

(vi) compared the proposed financial terms of the Merger with the financial terms of certain other transactions that we deemed relevant;

(vii) reviewed appraisals dated July 25, 2011 and June 30, 2011 respectively prepared by [    *    ]( and [    *    ] with regard to the vessels owned by the Company (the "Appraisals");

(viii) conducted such other financial studies, analyses and investigations as we deemed appropriate.

In our review and analysis and in rendering this opinion, we have assumed and relied upon, but have not assumed any responsibility to independently investigate or verify, the accuracy and completeness of all financial and other information that was supplied or otherwise made available by the Company and the Merger Partner or that was publicly available (including, without limitation, the Appraisals and the other information described above), or

---

(* name omitted.

C-1

that was otherwise reviewed by us. We have relied on assurances of the managements of the Company and the Merger Partner that they are not aware of any facts or circumstances that would make such information inaccurate or misleading. In our review, we did not obtain any independent evaluation or appraisal of any of the assets or liabilities of, nor did we conduct a physical inspection of any of the properties or facilities of, the Company or the Merger Partner, nor have we been furnished with any such evaluations or appraisals, other than the Appraisals, nor do we assume any responsibility to obtain any such evaluations or appraisals.

With respect to the financial forecasts provided to and examined by us, we note that projecting future results of any company is inherently subject to uncertainty. The Company has informed us, however, and we have assumed, that such financial forecasts were reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the management of the Company as to the future financial performance of the Company. We express no opinion as to the financial forecasts provided to us by the Company or the assumptions on which they are made.

Our opinion is based on economic, monetary, regulatory, market and other conditions existing and which can be evaluated as of the date hereof. We expressly disclaim any undertaking or obligation to advise any person of any change in any fact or matter affecting our opinion of which we become aware after the date hereof.

We have made no independent investigation of any legal or accounting matters affecting the Company or the Merger Partner, and we have assumed the correctness in all respects material to our analysis of all legal and accounting advice given to the Company, the Special Committee of the Board of Directors of the Company (the "Special Committee") and the Board of Directors of the Company, including, without limitation, advice as to the legal, accounting and tax consequences of the terms of, and transactions contemplated by, the Merger Agreement to the Company and its stockholders. In addition, in preparing this opinion, we have not taken into account any tax consequences of the transaction to any holder of Company Common Stock. We have also assumed that in the course of obtaining the necessary regulatory or third party approvals, consents and releases for the Merger, no delay, limitation, restriction or condition will be imposed that would have an adverse effect on the Company, the Merger Partner, the Settlement Sub or the contemplated benefits of the Merger.

We were not authorized to and did not solicit any expressions of interest from any other parties with respect to the sale of all or any part of the Company or any other alternative transaction.

It is understood that our opinion is for the use and benefit of the Special Committee in its consideration of the Merger, and our opinion does not address the relative merits of the transactions contemplated by the Merger Agreement as compared to any alternative transaction or opportunity that might be available to the Company, nor does it address the underlying business decision by the Company to engage in the Merger or the terms of the Merger Agreement or the documents referred to therein. Our opinion does not constitute a recommendation as to how any holder of shares of Company Common Stock should vote on the Merger or any matter related thereto. In addition, you have not asked us to address, and this opinion does not address, the fairness to, or any other consideration of, the holders of any class of securities, creditors or other constituencies of the Company, other than the holders of shares of Company Common Stock. We express no opinion as to the price at which shares of Company Common Stock or the Settlement Sub Common Stock will trade at any time. Furthermore, we do not express any view or opinion as to the fairness, financial or otherwise, of the amount or nature of any compensation payable or to be received by any of the Company's officers, directors or employees, or any class of such persons, in connection with the Merger, whether relative to the Exchange Ratio or otherwise.

We have been engaged by the Special Committee to act as its financial advisor in connection with the Merger and will receive a fee for our services. We also will be reimbursed for expenses incurred. The Company has agreed to indemnify us against liabilities arising out of or in connection with the services rendered and to be rendered by us under such engagement. In the ordinary course of our business, we and our affiliates may trade or hold securities of the Company, the Merger Partner, the Settlement Sub and/or their respective affiliates for our own account and for the accounts of our customers and, accordingly, may at any time hold long or short positions in those securities. In addition, we may seek to, in the future, provide financial advisory and financing services to the Company, the Merger Partner, the Settlement Sub or entities that are affiliated with the Company, the Merger Partner or the Settlement Sub, for which we would expect to receive compensation. We have in the past provided services to the Settlement Sub, including as a lead manager in its $500 million private placement of equity in December 2010 and

as a lead manager in its $500 million private placement of unsecured bonds in April 2011. Except as otherwise expressly provided in our engagement letter with the Special Committee and the Company, our opinion may not be used or referred to by the Company, or quoted or disclosed to any person in any manner, without our prior written consent.

Based upon and subject to the foregoing, we are of the opinion that, as of the date hereof, the Exchange Consideration pursuant to the Merger Agreement is fair, from a financial point of view, to the holders of the Company Common Stock.

Very truly yours,
for Fearnley Fonds ASA

/s/  Petter Skar
Petter Skar, head of corporate finance

Annex D

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, DC 20549
# Form 20-F

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2010**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

OR

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of event requiring this shell company report: Not applicable**

**Commission file number: 001-33416**

# OCEANFREIGHT INC.

*(Exact name of Registrant as specified in its charter)*
**(Translation of Registrant's name into English)**
**Republic of the Marshall Islands**
**(Jurisdiction of incorporation or organization)**
**80 Kifissias Avenue, Athens 15125, Greece**
**(Address of principal executive offices)**
**Mr. Antonis Kandylidis**
**OceanFreight Inc.**
**80 Kifissias Avenue, Athens 15125, Greece**
**Phone: +30-210-6140283, Fax: +30-210-6140284**
**E-mail: management@oceanfreightinc.com**
*(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)*

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common stock, $0.01 par value | Nasdaq Global Market |
| Preferred Stock Purchase Rights | Nasdaq Global Market |

**Securities registered or to be registered pursuant to Section 12(g) of the Act: None**
**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: None**

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

As of December 31, 2010, the registrant had 83,266,655 common shares, $0.01 par value per share outstanding.

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   ☐ Yes   ☑ No

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.   ☐ Yes   ☑ No

Note-Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   ☑ Yes   ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   ☐ Yes   ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐                    Accelerated filer ☐                    Non-accelerated filer ☑

(Do not check if a smaller reporting company)

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☑                         International Financial Reporting Standards as issued by the International Accounting Standards ☐

Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.  ☐    Item 17    ☐    Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  ☐    Yes    ☑    No

**TABLE OF CONTENTS**

|  |  | **Page** |
|---|---|---|
| FORWARD-LOOKING STATEMENTS | | D-1 |

**PART I**

| Item 1. | Identity of Directors, Senior Management and Advisers | D-2 |
|---|---|---|
| Item 2. | Offer Statistics and Expected Timetable | D-2 |
| Item 3. | Key Information | D-2 |
| Item 4. | Information on the Company | D-28 |
| Item 4A. | Unresolved Staff Comments | D-47 |
| Item 5. | Operating and Financial Review and Prospects | D-47 |
| Item 6. | Directors, Senior Management and Employees | D-69 |
| Item 7. | Major Shareholders and Related Party Transactions | D-74 |
| Item 8. | Financial Information | D-79 |
| Item 9. | The Offer and Listing | D-80 |
| Item 10. | Additional Information | D-80 |
| Item 11. | Quantitative and Qualitative Disclosures about Market Risk | D-93 |
| Item 12. | Description of Securities Other than Equity Securities | D-94 |

**PART II**

| Item 13. | Defaults, Dividend Arrearages and Delinquencies | D-94 |
|---|---|---|
| Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | D-94 |
| Item 15. | Controls and Procedures | D-94 |
| Item 16A. | Audit Committee Financial Expert | D-95 |
| Item 16B. | Code of Ethics | D-95 |
| Item 16C. | Principal Accountant Fees and Services | D-95 |
| Item 16D. | Exemptions from the Listing Standards for Audit Committees | D-95 |
| Item 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | D-96 |
| Item 16F. | Change in Registrant's Certifying Accountant | D-96 |
| Item 16G. | Corporate Governance | D-96 |

**PART III**

| Item 17. | Financial Statements | D-97 |
|---|---|---|
| Item 18. | Financial Statements | D-97 |
| Item 19. | Exhibits | D-97 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | | DF-1 |

D-i

## FORWARD-LOOKING STATEMENTS

Matters discussed in this annual report may constitute forward-looking statements. The Private Securities Litigation Reform Act of 1995 provides safe harbor protections for forward-looking statements in order to encourage companies to provide prospective information about their business. Forward-looking statements include statements concerning plans, objectives, goals, strategies, future events or performance, and underlying assumptions and other statements, which are other than statements of historical facts.

OceanFreight Inc., or the "Company", desires to take advantage of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995 and is including this cautionary statement in connection with the safe harbor legislation. This document and any other written or oral statements made by the Company or on its behalf may include forward-looking statements, which reflect its current views with respect to future events and financial performance. The words "believe", "anticipate", "intend", "estimate", "forecast", "project", "plan", "potential", "may", "should", "expect" and similar expressions identify forward-looking statements.

Please note in this annual report, "we," "us," "our," and "the Company," all refer to OceanFreight Inc. and its subsidiaries.

The forward-looking statements in this document are based upon various assumptions, many of which are based, in turn, upon further assumptions, including, without limitation, management's examination of historical operating trends, data contained in our records and other data available from third parties. Although we believe that these assumptions were reasonable when made, because these assumptions are inherently subject to significant uncertainties and contingencies which are difficult or impossible to predict and are beyond our control, we cannot ensure that we will achieve or accomplish these expectations, beliefs or projections.

In addition to these important factors and matters discussed elsewhere in this report, and in our filings with the U.S. Securities and Exchange Commission (the "Commission"), important factors that, in our view, could cause actual results to differ materially from those discussed in the forward-looking statements include the strength of world economies and currencies, general market conditions, including changes in charterhire rates and vessel values, changes in demand in the drybulk carrier and tanker markets, changes in the Company's operating expenses, including bunker prices, drydocking and insurance costs, changes in governmental rules and regulations or actions taken by regulatory authorities including those that may limit the commercial useful lives of drybulk carriers and tankers, potential liability from pending or future litigation, general domestic and international political conditions, potential disruption of shipping routes due to accidents and political events, or acts of terrorists and other important factors described from time to time in the reports we file with the Commission and the Nasdaq Global Market. We caution readers of this report not to place undue reliance on these forward-looking statements, which speak only as of their dates. We undertake no obligation to update or revise any forward-looking statements. These forward looking statements are not guarantees of our future performance, and actual results and future developments may vary materially from those projected in the forward looking statements.

**PART I**

**Item 1.**  *Identity of Directors, Senior Management and Advisers*

    Not Applicable

**Item 2.**  *Offer Statistics and Expected Timetable*

    Not Applicable

**Item 3.**  *Key Information*

**A.**  **Selected Consolidated Financial and Other Data**

    The following table sets forth our selected consolidated financial and other data as of December 31, 2006, 2007, 2008, 2009 and 2010 and for the period from September 11, 2006 (date of inception) through December 31, 2006 and for the years ended December 31, 2007, 2008, 2009 and 2010. We refer you to the notes to our consolidated financial statements for a discussion of the basis on which our consolidated financial statements are presented. The information provided below should be read in conjunction with Item 5 "Operating and Financial Review and Prospects" and the consolidated financial statements, related notes and other financial information included herein.

    Following the 3:1 reverse stock split effected on June 17, 2010, pursuant to which every three shares of our common stock issued and outstanding were converted into one share of common stock, all share and per share amounts in this annual report have been retroactively restated to reflect this change in capital structure. Please refer to "Item 3.D. Industry Specific Risk Factors" and "Item 4.A History and Development of the Company."

    (Expressed in thousands of U.S. Dollars — except for share and per share data and average daily results)

| | September 11, 2006 (Inception) to December 31, 2006 | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2007 | 2008 | 2009 | 2010 |
| **Income Statement Data:** | | | | | |
| Voyage revenue and imputed deferred revenue | $ — | 41,133 | 157,434 | 132,935 | 102,190 |
| Gain/(loss) on forward freight agreements | — | — | — | 570 | (4,342) |
| Voyage expenses | — | (1,958) | (14,275) | (5,549) | (5,196) |
| Vessels' operating expenses | — | (9,208) | (28,980) | (43,915) | (41,078) |
| General and administrative expenses | (111) | (3,460) | (9,127) | (8,540) | (8,264) |
| Survey and drydocking costs | — | (1,685) | (736) | (5,570) | (1,784) |
| Impairment | — | — | — | (52,700) | — |
| Depreciation | — | (13,210) | (43,658) | (48,272) | (24,853) |
| Loss on sale of vessels and vessels held for sale | — | — | — | (133,176) | (62,929) |
| **Operating income/(loss )** | (111) | 11,612 | 60,658 | (164,217) | (46,256) |
| Interest income | 6 | 2,214 | 776 | 271 | 119 |
| Interest and finance costs | — | (5,671) | (16,528) | (12,169) | (6,775) |
| Gain/(loss) on derivative instruments | — | — | (17,184) | (2,567) | (8,713) |
| **Net Income/(loss)** | $ (105) | 8,155 | 27,722 | (178,682) | (61,625) |
| Earnings/(losses) per common share, basic and diluted | $ — | 2.52 | 5.82 | (6.82) | (0.87) |
| Earnings/(losses) per subordinated share, basic and diluted | $ (0.05) | 0.57 | — | — | — |
| Weighted average number of common shares, basic and diluted | — | 2,784,423 | 4,773,824 | 26,185,442 | 70,488,531 |
| Weighted average number of subordinated shares, basic and diluted | 2,000,000 | 2,042,566 | — | — | — |
| Cash dividends declared per share | — | 2.11 | 9.24 | — | — |

D-2

| | September 11, 2006 (Inception) to December 31, 2006 | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | | 2007 | 2008 | 2009 | 2010 |
| **Balance Sheet Data:** | | | | | |
| Cash and cash equivalents | 499 | 19,044 | 23,069 | 37,272 | 9,549 |
| Total current assets | 503 | 20,711 | 28,677 | 100,299 | 109,754 |
| Vessels, net of accumulated depreciation | | 485,280 | 587,189 | 423,242 | 311,144 |
| Total assets | 776 | 507,925 | 625,570 | 549,272 | 478,863 |
| Total current liabilities | 285 | 33,884 | 116,381 | 73,328 | 111,311 |
| Long-term imputed deferred revenue including current portion | — | 26,349 | 16,031 | 1,558 | — |
| Sellers' credit | — | — | 25,000 | — | — |
| Long — term debt including current portion | — | 260,600 | 308,000 | 265,674 | 209,772 |
| Total stockholders' equity | 491 | 213,410 | 246,961 | 256,611 | 235,236 |
| **Other Financial Data:** | | | | | |
| Net cash flow provided by operating activities | 1 | 24,434 | 81,369 | 26,552 | 28,449 |
| Net cash flow used in investing activities | (2) | (467,216) | (120,665) | (130,786) | (42,678) |
| Net cash flow provided by (used in) financing activities | 500 | 461,327 | 42,381 | 118,437 | (13,494) |
| Cash dividends per common and subordinated share | — | 2.11 | 7.74 | — | — |
| Cash paid for common and subordinated stock dividend | — | 13,048 | 47,772 | — | — |
| Adjusted EBITDA(1) | | 20,841 | 96,699 | 55,502 | 41,032 |
| **Fleet Data:** | | | | | |
| Average number of vessels(2) | — | 3.7 | 11.4 | 12.7 | 12 |
| Number of vessels | — | 10.0 | 13 | 13 | 11 |
| Average age of fleet | — | 12.2 | 13.9 | 12.3 | 9.7 |
| Total calendar days for fleet(3) | — | 1,364 | 4,164 | 4,650 | 4,371 |
| Total voyage days for fleet(4) | — | 1,282 | 4,125 | 4,466 | 4,213 |
| Fleet utilization(5) | — | 94.0% | 99.1% | 96.1% | 96.4% |
| **Average Daily Results:** | | | | | |
| Time charter equivalent (TCE) rate(6) | — | 30,558 | 34,705 | 28,523 | 23,022 |
| Daily vessel operating expenses(7) | — | 6,751 | 6,960 | 9,444 | 9,397 |

(1) Adjusted EBITDA represents net income before interest, taxes, depreciation, loss on sale of vessels and impairment charges on vessels. Adjusted EBITDA does not represent and should not be considered as an alternative to net income or cash flow from operations, as determined by U.S. GAAP Our calculation of Adjusted EBITDA may not be comparable to that reported by other companies. Adjusted EBITDA is included in this annual report because it is a basis upon which we assess our liquidity position, because it is used by our lenders as a measure of our compliance with certain loan covenants and because we believe that it presents useful information to investors regarding our ability to service and/or incur indebtedness. The following table

reconciles net cash from operating activities, as reflected in the 2007, 2008, 2009 and 2010 consolidated statements of cash flows, to Adjusted EBITDA.

|  | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Net cash from operating activities | 24,434 | 81,369 | 26,552 | 28,449 |
| Net increase in operating assets | 1,665 | 4,881 | 9,988 | (481) |
| Net increase in operating liabilities | (7,556) | (5,865) | 143 | (1,214) |
| Net interest expense(*) | 3,457 | 16,789 | 19,563 | 14,816 |
| Amortization of deferred financing costs included in interest expense | (1,159) | (475) | (744) | (538) |
| **Adjusted EBITDA** | 20,841 | 96,699 | 55,502 | 41,032 |

   (*) Net interest expense includes the realized loss of interest rate swaps included in "Loss on derivative instrument" in the consolidated statements of operations.

(2) Average number of vessels is the number of vessels that constituted the fleet for the relevant period, as measured by the sum of the number of days each vessel was a part of the fleet during the period divided by the number of calendar days in the related period.

(3) Calendar days are the total days the vessels were in the Company's possession for the relevant period including off-hire and drydock days.

(4) Total voyage days for the fleet are the total days during which the vessels were in the Company's possession for the relevant period, net of off-hire days.

(5) Fleet utilization is the percentage of time that the vessels were available for revenue generating voyage days, and is determined by dividing voyage days by fleet calendar days for the relevant period.

(6) Time charter equivalent, or TCE, is a measure of the average daily revenue performance of a vessel on a per voyage basis. The Company's method of calculating TCE is consistent with industry standards and is determined by dividing "voyage revenues" (net of voyage expenses) by voyage days for the relevant time period. Voyage expenses primarily consist of port, canal and fuel costs that are unique to a particular voyage, which would otherwise be paid by the charterer under a time charter contract, as well as commissions. TCE is a standard shipping industry performance measure used primarily to compare period-to-period changes in a shipping company's performance despite changes in the mix of charter types (i.e., spot charters, time charters and bareboat charters) under which the vessels may be employed between the periods.

(7) Daily vessel operating expenses, which include vessel management fees, crew costs, provisions, deck and engine stores, lubricating oil, insurance, maintenance and repairs, are calculated by dividing vessel operating expenses by fleet calendar days for the relevant time period.

**B.   Capitalization and Indebtedness**

   Not applicable.

**C.   Reasons for the Offer and Use of Proceeds**

   Not applicable.

**D.   Risk Factors**

   Some of the following risks relate principally to the sectors of the seaborne transportation industry in which we operate and our business in general. Other risks relate principally to the securities market and ownership of our common stock. The occurrence of any of the events described in this section could materially and adversely affect our business, financial condition, operating results and cash flows and the trading price of our securities could decline.

**Industry Specific Risk Factors**

*Charterhire rates for drybulk carriers and tanker vessels have been very volatile, which may adversely affect our earnings*

The drybulk and tanker shipping industries are cyclical with attendant volatility in charterhire rates and profitability. The degree of charterhire rate volatility among different types of drybulk and tanker carriers has varied widely. For example after reaching historical highs in mid-2008, charterhire rates for Panamax and Capesize drybulk carriers reached near historically low levels in 2009 and thereafter recovered considerably in 2010. We currently employ our drybulk carriers on long term time charters. We cannot ensure that we will be able to successfully charter our vessels in the future or renew existing charters at rates sufficient to allow us to meet our obligations in the future. Because the factors affecting the supply and demand for vessels are outside of our control and are unpredictable, the nature, timing, direction and degree of changes in industry conditions are also unpredictable.

Factors that influence demand for vessel capacity include:

- supply and demand for refined petroleum products and crude oil for tankers and drybulk commodities for drybulk carriers;

- changes in crude oil production and refining capacity for tankers and drybulk commodity production for drybulk carriers and resulting shifts in trade flows for crude oil, petroleum products and drybulk commodities;

- the location of regional and global exploration, production and manufacturing facilities;

- the location of consuming regions for energy resources and commodities;

- the globalization of production and manufacturing;

- competition from alternative sources of energy;

- global and regional economic and political conditions, including armed conflicts, terrorist activities; and piracy; nationalizations, sanctions, embargoes and strikes;

- developments in international trade and fluctuations in industrial and agricultural production;

- changes in seaborne and other transportation patterns, including the distance cargo is transported by sea;

- environmental and other legal and regulatory developments;

- currency exchange rates; and

- weather and acts of God and natural disasters, including hurricanes and typhoons.

The factors that influence the supply of vessel capacity include:

- the number of newbuilding deliveries;

- current and expected purchase orders for vessels;

- port and canal congestion;

- changes in environmental and other regulations that may limit the useful lives of vessels;

- the scrapping rate of older vessels;

- vessel freight rates;

- the price of steel and vessel equipment;

- vessel casualties; and

- the number of vessels that are out of service or converted to other use.

D-5

We anticipate that the future demand for our vessels will be dependent upon continued economic growth in the world's economies, including China and India, seasonal and regional changes in demand, changes in the capacity of the global drybulk carrier and tanker fleets and the sources and supply of drybulk cargo and oil and oil products to be transported by sea. The capacity of the global drybulk carrier and tanker fleet seems likely to increase and there can be no assurance that economic growth will continue. Adverse economic, political, social or other developments could have a material adverse effect on our business and operating results.

***The downturns in the drybulk carrier and tanker charter markets and related declines in vessel values may have an adverse effect on our earnings, affect compliance with our loan covenants, require us to raise additional capital in order to comply with our loan covenants, and affect our ability to pay dividends if reinstated in the future.***

The Baltic Dry Index (BDI), an average daily index of charter rates in 26 shipping routes measured on a time charter and voyage basis covering Supramax, Panamax and Capesize drybulk carriers, recovered significantly in 2010 as compared to the low of the fourth quarter of 2008. The 2010 average of the BDI was 2,761, which is about 8.1% lower than the 2009 average of 3,005 and 287% higher than the December 2008 average of 743. However, this is still below the BDI's high of 10,844 reached in May 2008. As of April 7, 2011, the BDI stands at 1,401.

A decline in the drybulk market will result in lower charter rates for vessels exposed to the spot market and time charters linked to the BDI. Our drybulk carriers are presently employed under time charters that are not directly linked to the BDI.

Drybulk vessel values have also rebounded in part since 2008's steep decline. Charter rates and vessel values were severely affected in 2008, in part by the lack of availability of credit to finance both vessel purchases and purchases of commodities carried by sea, resulting in a decline in cargo shipments, and the excess supply of iron ore in China that resulted in falling iron ore prices and increased stockpiles in Chinese ports. The increase in drybulk vessel values in 2009 resulted primarily from cheaper prices for raw materials from producing countries like Brazil and Australia compared to raw materials produced domestically in Asia; consequently China has increased its imports of raw materials. In 2008, China's iron ore imports comprised about 65% of the total volume of iron transported by sea. In 2009, this number increased to about 80% and in 2010 this number dropped slightly due to the global recovery of the steel industry. There can be no assurance as to how long charter rates and vessel values will remain at their current levels or whether they will experience significant volatility.

The decline in vessel values in the drybulk carrier and tanker markets resulted in an impairment loss of $52.7 million that we recorded in 2009 due to the impairment of the M/T *Pink Sands* and the M/T *Tamara* . In addition, the decline resulted in a loss from sale of vessels and vessels held for sale we recorded in 2009 of $133.2 million, and a loss from sale of vessels and vessels held for sale in 2010 of $62.9 million. The losses in 2010 were recorded as a result of the sale of the M/V *Pierre* , M/T *Tigani* and M/T *Pink Sands* and the classification of the M/T *Tamara* , M/V *Austin* , M/V *Trenton* and M/V *Augusta* as vessels held for sale. The losses in 2009 were recorded as a result of the sale of the M/V *Lansing* , M/V *Richmond* and M/V *Juneau* and the classification of the M/V *Pierre* , M/T *Olinda* and M/T *Tigani* as vessels held for sale.

The tanker industry has an inherent volatility caused by seasonal demand fluctuations. During the fall, refineries typically build stockpiles to cover demand for heating distillates during the winter. Early in the spring the refineries move into a maintenance period in order to switch production to gasoline instead of heavy distillates. This results in the reduction of required seaborne transportation of oil. As a general pattern, demand for petroleum products during the summer is less than the demand for such products during the winter. This seasonality is reflected in the time charter equivalent rate for a Suezmax tanker route loading in West Africa and discharging in the U.S. Atlantic Coast, where the average rate was $18,796 per day during August, 2010 compared to $32,503 per day during September 2010.

In response to a significant decline in oil prices during 2008, OPEC significantly reduced oil supply, causing WTI oil prices to recover from a low of $34 per barrel in December 2008 to an average WTI oil price of approximately $62 per barrel in 2009 and approximately $80 per barrel in 2010. During the last OPEC meeting, the ministers agreed to leave existing output targets unchanged in order to help economic recovery by avoiding further increases of oil prices during the economic recession. The decline in oil supply had an adverse effect on the demand

for tankers and tanker charter rates. Consistent with this trend, the value of the tankers in our fleet has declined, resulting in the impairment loss recorded in 2009 of $116.6 million.

On December 12, 2008, our Board of Directors determined, after careful consideration of various factors, including the recent decline in charter rates and vessel values in the drybulk sector, to suspend the payment of cash dividends until such time as the Board of Directors shall determine in its discretion, in order to preserve capital.

On January 9, 2009, we entered into an amendment to our Nordea credit facility that waived the December 9, 2008 breach of the collateral maintenance coverage ratio contained in such credit facility resulting from the decrease in the market value of our vessels and reducing the level of the collateral maintenance coverage ratio for the remaining term of the agreement. Please see "Item 5. Operating and Financial Review and Prospects — B. Liquidity and Capital Resources — Long Term Debt Obligations and Credit Arrangements and Note 7 to our financial statements."

On November 24, 2009, DVB consented to a reduction of the collateral maintenance coverage ratio to 125% for the period from November 24, 2009 to December 17, 2010 and the deposit of $2.5 million in the retention account that was blocked during the above period was classified in restricted cash in current assets in the 2009 consolidated balance sheet. As of December 31, 2010 we were in compliance with the collateral maintenance ratio contained in our DVB credit facility.

If the current low charter rates in the drybulk market continue through any significant period during which time charters for our vessels expire and we consequently become exposed to then-prevailing charter rates, our earnings may be adversely affected. If these trends continue, in order to remain viable, we may have to extend the period in which we suspend dividend payments or reinstate dividend payments at a reduced level (subject to restrictions in our credit facility, including a prohibition on dividend payments set forth in our amended Nordea credit facility, which matures in October 2015), sell vessels in our fleet and/or seek to raise additional capital in the equity markets. If we are able to sell additional shares at a time when the charter rates in the drybulk and tanker charter markets are low, such sales could be at prices below those at which shareholders had purchased their shares, which could, in turn, result in significant dilution of our then existing shareholders and affect our ability to pay dividends if reinstated in the future and our earnings per share. During the period from February 6, 2009 to the termination of the Standby Equity Distribution Agreement on March 28, 2010, we issued a total of 53.3 million common shares pursuant to our Standby Equity Purchase Agreement ("SEPA") and Standby Equity Distribution Agreement ("SEDA"), with YA Global Master SPV Ltd., or YA Global, resulting in net proceeds of $208.1 million. Even if we are able to raise additional capital in the equity markets, there is no assurance we will be able to comply with our loan covenants.

### *An over-supply of drybulk carrier and/or tanker capacity may lead to reductions in charterhire rates and profitability.*

The market supply of drybulk carriers has been increasing, and the number of drybulk carriers on order is near historic highs. These newbuildings were delivered in significant numbers starting at the beginning of 2006 and continuing through 2010. As of December 31, 2010, newbuilding orders had been placed for an aggregate of approximately 51.9% of the existing global drybulk fleet in terms of deadweight tonnage, or dwt, with deliveries expected during the next 36 months. The market supply of tankers is affected by a number of factors such as demand for energy resources, oil, and petroleum products, as well as strong overall economic growth in part of the world economy, including Asia. As of December 31, 2010 newbuilding orders have been placed for an aggregate of approximately 27.6% of the existing global tanker fleet in terms of dwt, with deliveries expected during the next 36 months. An over-supply of drybulk carrier and/or tanker capacity may result in a reduction of charterhire rates. If such a reduction occurs, upon the expiration or termination of our vessels' current charters we may only be able to re-charter our vessels at reduced or unprofitable rates or we may not be able to charter these vessels at all.

### *Declines in charter rates and other market deterioration could cause us to incur impairment charges.*

We evaluate the carrying amounts of our vessels in order to determine if events have occurred that would require an impairment of their carrying amounts. The recoverable amount of vessels is reviewed based on events and changes in circumstances that would indicate that the carrying amount of the assets might not be recovered. The

review for potential impairment indicators and projection of future cash flows related to the vessels is complex and requires us to make various estimates including future freight rates, earnings from the vessels and discount rates. All of these items have been historically volatile.

We evaluate an asset's recoverable amount as the sum of its future undiscounted cash flows generated through the asset's remaining useful life . If the recoverable amount is less than net book value of the vessel, the vessel is deemed to be impaired. The carrying values of our vessels may not represent their fair market value at any point in time because the new market prices of secondhand vessels tend to fluctuate with changes in charter rates and the cost of newbuildings. In the year ended December 31, 2009 and 2010, charter rates in the drybulk and tanker markets declined significantly and vessel values also declined. As a result, we recorded an impairment loss of $52.7 million that we recorded in 2009 due to the impairment of the M/T *Pink Sands* and the M/T *Tamara* . In addition, the decline resulted in a loss from sale of vessels or vessels held for sale we recorded in 2009 of $133.2 million, and a loss from sale of vessels or vessels held for sale in 2010 of $62.9 million, respectively. The losses in 2010 were recorded as a result of the sale of the M/V *Pierre* , M/T *Tigani* and M/T *Pink Sands* and the classification of the M/T *Tamara* , M/V *Austin* , M/V *Trenton* and M/V *Augusta* as vessels held for sale. The losses in 2009 were recorded as a result of the sale of the M/V *Lansing* , M/V *Richmond* and M/V *Juneau* and the classification of the M/V *Pierre* , M/T *Olinda* and M/T *Tigani* as vessels held for sale in 2009. Any additional impairment charges incurred as a result of further declines in charter rates could negatively affect our business, financial condition, operating results or the trading price of our common shares.

***Because the market value of our vessels may fluctuate significantly, we may incur losses when we sell vessels or we may be required to write down their carrying value, which would adversely affect our earnings.***

The fair market value of our vessels may increase or decrease depending on the following factors:

- general economic and market conditions affecting the international tanker and drybulk shipping industries;

- prevailing level of charter rates;

- competition from other shipping companies;

- types, sizes and ages of vessels;

- other modes of transportation;

- cost of newbuildings;

- price of steel;

- governmental or other regulations; and

- technological advances.

If we sell vessels at a time when vessel prices have fallen the sale may be at less than the vessel's carrying amount in our financial statements in which case we will realize a loss. Vessel prices can fluctuate significantly, and in the case where the market value falls below the carrying amount we evaluate the asset for a potential impairment and may be required to write down the carrying amount of the vessel on our financial statements and incur a loss and a reduction in earnings, if the estimate of undiscounted cash flows, excluding interest charges, expected to be generated by the use of the asset is less than its carrying amount.

***Changes in the economic and political environment in China and policies adopted by the government to regulate its economy may have a material adverse effect on our business, financial condition and results of operations.***

The Chinese economy differs from the economies of most countries that belong to the Organization for Economic Cooperation and Development, or OECD, in such respects as structure, government involvement, level of development, growth rate, capital reinvestment, allocation of resources, rate of inflation and balance of payments position. Prior to 1978, the Chinese economy was a planned economy. Since 1978, increasing emphasis has been

D-8

placed on the utilization of market forces in the development of the Chinese economy. Annual and five year State Plans are adopted by the Chinese government in connection with the development of the economy. Although state-owned enterprises still account for a substantial portion of the Chinese industrial output, in general, the Chinese government is reducing the level of direct control that it exercises over the economy through State Plans and other measures. There is an increasing level of freedom and autonomy in areas such as allocation of resources, production, pricing and management and a gradual shift in emphasis to a "market economy" and enterprise reform. Limited price reforms were undertaken, with the result that prices for certain commodities are principally determined by market forces. Many of the reforms are unprecedented or experimental and may be subject to revision, change or abolition based upon the outcome of such experiments. If the Chinese government does not continue to pursue a policy of economic reform, the level of imports to and exports from China could be adversely affected by changes to these economic reforms by the Chinese government, as well as by changes in political, economic and social conditions or other relevant policies of the Chinese government, such as changes in laws, regulations or export and import restrictions, all of which could adversely affect our business, operating results and financial condition.

### *Disruptions in world financial markets and the resulting governmental action in the United States and in other parts of the world, could have a material adverse impact on our ability to obtain financing, our results of operations, financial condition and cash flows, and could cause the market price of our common shares to decline.*

Although the world economy is currently recovering from the second-worst downturn in the last 100 years, the future of this recovery still remains fragile. The effects of the downturn are still lingering as credit remains tight, demand for goods and services has not yet fully recovered and unemployment is high. The credit markets worldwide and in the United States have experienced significant contraction, de-leveraging and reduced liquidity, and the United States federal government, state governments and foreign governments have implemented a broad variety of governmental action and/or new regulation of the financial markets.

Securities and futures markets and the credit markets are subject to comprehensive statutes, regulations and other requirements. The Commission, other regulators, self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies, and may effect changes in law or interpretations of existing laws.

A number of financial institutions have experienced serious financial difficulties and, in some cases, have entered bankruptcy proceedings or are in regulatory enforcement actions. The uncertainty surrounding the recovery of the credit markets in the United States and the rest of the world has resulted in reduced access to credit worldwide that is especially evident in our industry. Over the last few years, certain banking institutions have been forced to record heavy losses from troubled shipping loans. As of the date of this Annual Report, we had total outstanding indebtedness of $153.6 million under our existing credit facility.

We face risks attendant to changes in economic environments, changes in interest rates, and instability in certain securities markets, among other factors. Major market disruptions and adverse changes in market conditions and the regulatory climate worldwide may adversely affect our business or impair our ability to borrow amounts under our credit facility or any future financial arrangements. The current market conditions may last longer than we anticipate. These recent and developing economic and governmental factors may have a material adverse effect on our results of operations, financial condition or cash flows, have caused the price of our common shares to decline and could cause the price of our common shares to decline further.

### *The recent earthquake and tsunami in Japan may have an adverse affect on our business, results of operations, financial condition and ability to pay dividends.*

Japan is one of the world's leading importers of dry bulk commodities. The severe earthquake and tsunami that struck Japan on March 11, 2011 have caused an estimated $180 billion of damage and has threatened to send the Japanese economy into a recession. As of the date of this annual report, the extent to which the earthquake and tsunami and the pollution from the emitted radiation from the damaged nuclear reactors will affect the international economies and shipping industry is unclear. A prolonged recovery period with a relatively stagnant Japanese

economy could decrease dry bulk imports to that country. This, in turn, could have a material adverse effect on our business and results of operations.

### *Acts of piracy on ocean-going vessels have recently increased in frequency, which could adversely affect our business.*

Acts of piracy have historically affected ocean-going vessels trading in regions of the world such as the South China Sea and in the Gulf of Aden off the coast of Somalia extending throughout the Indian Ocean. Throughout 2008, 2009 and 2010, the frequency of piracy incidents against commercial shipping vessels increased significantly, particularly in the Gulf of Aden off the coast of Somalia. Drybulk vessels and tankers are particularly vulnerable to such attacks. For example, on January 15, 2010, the M/V *Samho Jewelry* , a tanker vessel not affiliated with us, was seized by pirates while transporting chemicals 800 miles off the Somali coast. If these piracy attacks result in regions in which our vessels are deployed being characterized as "war risk" zones by insurers, as the Gulf of Aden has been since May 2008, or Joint War Committee (JWC) "war and strikes" listed areas, premiums payable for such insurance coverage could increase significantly and such insurance coverage may be more difficult to obtain. In addition, crew costs, including costs related to the employment of onboard security guards, could increase in such circumstances. We may not be adequately insured to cover losses from these incidents, which could have a material adverse effect on us. In addition, any detention hijacking as a result of an act of piracy against our vessels, or an increase in cost, or unavailability, of insurance for our vessels, could have a material adverse impact on our business, financial condition, results of operations and ability to reinstate the payment of dividends.

### *Fuel, or bunker prices, may adversely affect profits.*

While we generally do not bear the cost of fuel, or bunkers, under our time charters, fuel is a significant factor in negotiating charter rates. As a result, an increase in the price of fuel beyond our expectations may adversely affect our profitability at the time of charter negotiation or when our vessels trade in the spot market. Fuel is also a significant, if not the largest, expense in our shipping operations when vessels are under voyage charter. Increases in the price of fuel may adversely affect our profitability. The price and supply of fuel is unpredictable and fluctuates based on events outside our control, including geopolitical developments, supply and demand for oil and gas, actions by OPEC and other oil and gas producers, war and unrest in oil producing countries and regions, regional production patterns and environmental concerns.

### *We are subject to complex laws and regulations, including environmental regulations that can adversely affect the cost, manner or feasibility of doing business.*

Our operations are subject to numerous laws and regulations in the form of international conventions and treaties, national, state and local laws and national and international regulations in force in the jurisdictions in which our vessels operate or are registered, which can significantly affect the ownership and operation of our vessels. These requirements include, but are not limited to, the International Convention on Civil Liability for Oil Pollution Damage of 1969, the International Convention for the Prevention of Pollution from Ships of 1975, the International Maritime Organization, or IMO, the International Convention for the Prevention of Marine Pollution of 1973, the IMO International Convention for the Safety of Life at Sea of 1974, the International Convention on Load Lines of 1966, the U.S. Oil Pollution Act of 1990, or OPA, the U.S. Clean Air Act, the U.S. Clean Water Act and the U.S. Marine Transportation Security Act of 2002. Compliance with such laws, regulations and standards, where applicable, may require installation of costly equipment or operational changes and may affect the resale value or useful lives of our vessels. We may also incur additional costs in order to comply with other existing and future regulatory obligations, including, but not limited to, costs relating to air emissions, the management of ballast waters, maintenance and inspection, development and implementation of emergency procedures and insurance coverage or other financial assurance of our ability to address pollution incidents. These costs could have a material adverse effect on our business, results of operations, cash flows and financial condition. A failure to comply with applicable laws and regulations may result in administrative and civil penalties, criminal sanctions or the suspension or termination of our operations. Environmental laws often impose strict liability for remediation of spills and releases of oil and hazardous substances, which could subject us to liability without regard to whether we were negligent or at fault. Under OPA, for example, owners, operators and bareboat charterers are jointly and severally

strictly liable for the discharge of oil within the 200-mile exclusive economic zone around the United States. An oil spill could result in significant liability, including fines, penalties and criminal liability and remediation costs for natural resource damages under other federal, state and local laws, as well as third-party damages. The 2010 Deepwater Horizon oil spill in the Gulf of Mexico may also result in additional regulatory initiatives or statutes or changes to existing laws that may affect our operations or require us to incur additional expenses to comply with such regulatory initiatives, statutes or laws. We are required to satisfy insurance and financial responsibility requirements for potential oil (including marine fuel) spills and other pollution incidents. Although we have arranged insurance to cover certain environmental risks, there can be no assurance that such insurance will be sufficient to cover all such risks or that any claims will not have a material adverse effect on our business, results of operations, cash flows and financial condition.

***We are subject to international safety regulations and the failure to comply with these regulations may subject us to increased liability, may adversely affect our insurance coverage and may result in a denial of access to, or detention in, certain ports.***

The operation of our vessels is affected by the requirements set forth in the IMO's International Management Code for the Safe Operation of Ships and Pollution Prevention, or ISM Code. The ISM Code requires shipowners, ship managers and bareboat charterers to develop and maintain an extensive "Safety Management System" that includes the adoption of a safety and environmental protection policy setting forth instructions and procedures for safe operation and describing procedures for dealing with emergencies. The failure of a shipowner or bareboat charterer to comply with the ISM Code may subject it to increased liability, may invalidate existing insurance or decrease available insurance coverage for the affected vessels and may result in a denial of access to, or detention in, certain ports. As of the date of this Annual Report, each of our vessels is ISM code-certified.

***Compliance with safety and other vessel requirements imposed by classification societies may be very costly and may adversely affect our business.***

The hull and machinery of every commercial vessel must be classed by a classification society authorized by its country of registry. The classification society certifies that a vessel is safe and seaworthy in accordance with the applicable rules and regulations of the country of registry of the vessel and the Safety of Life at Sea Convention.

A vessel must undergo annual surveys, intermediate surveys and special surveys. In lieu of a special survey, a vessel's machinery may be placed on a continuous survey cycle, under which the machinery would be surveyed periodically over a five-year period.

Our vessels are on special survey cycles for hull inspection and continuous survey cycles for machinery inspection. Every vessel is also required to be dry docked every two to three years for inspection of the underwater parts of such vessel.

If a vessel does not maintain its class and/or fails any annual survey, intermediate survey or special survey, the vessel will be unable to trade between ports and will be unemployable, which will negatively impact our revenues and results from operations.

***Our vessels may suffer damage due to the inherent operational risks of the seaborne transportation industry and we may experience unexpected drydocking costs, which may adversely affect our business and financial condition.***

Our vessels and their cargoes will be at risk of being damaged or lost because of events such as marine disasters, bad weather, business interruptions caused by mechanical failures, grounding, fire, explosions and collisions, human error, war, terrorism, piracy and other circumstances or events. These hazards may result in death or injury to persons, loss of revenues or property, environmental damage, higher insurance rates, damage to our customer relationships, delay or rerouting. If our vessels suffer damage, they may need to be repaired at a drydocking facility. The costs of drydock repairs are unpredictable and may be substantial. We may have to pay drydocking costs that our insurance does not cover in full. The loss of earnings while these vessels are being repaired and repositioned, as well as the actual cost of these repairs, would decrease our earnings. In addition, space at drydocking facilities is sometimes limited and not all drydocking facilities are conveniently located. We may be

unable to find space at a suitable drydocking facility or our vessels may be forced to travel to a drydocking facility that is not conveniently located to our vessels' positions. The loss of earnings while these vessels are forced to wait for space or to steam to more distant drydocking facilities would decrease our earnings.

### *Maritime claimants could arrest our vessels, which would interrupt our business.*

Crew members, suppliers of goods and services to a vessel, shippers of cargo and other parties may be entitled to a maritime lien against that vessel for unsatisfied debts, claims or damages. In many jurisdictions, a maritime lien holder may enforce its lien by arresting a vessel through foreclosure proceedings. The arrest or attachment of one or more of our vessels could interrupt our business or require us to pay large sums of funds to have the arrest lifted, which would have a negative effect on our cash flows.

In addition, in some jurisdictions, such as South Africa, under the "sister ship" theory of liability, a claimant may arrest both the vessel which is subject to the claimant's maritime lien and any "associated" vessel, which is any vessel owned or controlled by the same owner. Claimants could try to assert "sister ship" liability against one vessel in our fleet for claims relating to another one of our ships.

### *Governments could requisition our vessels during a period of war or emergency, resulting in loss of earnings.*

A government could requisition for title or seize our vessels. Requisition for title occurs when a government takes control of a vessel and becomes the owner. Also, a government could requisition our vessels for hire. Requisition for hire occurs when a government takes control of a vessel and effectively becomes the charterer at dictated charter rates. Generally, requisitions occur during a period of war or emergency. Government requisition of one or more of our vessels may negatively impact our business, financial condition, results of operations and ability to pay dividends if reinstated in the future.

### *We operate our vessels worldwide and as a result, our vessels are exposed to international risks which may reduce revenue and/or increase expenses.*

The international shipping industry is an inherently risky business involving global operations. Our vessels are at a risk of damage or loss because of events such as mechanical failure, collision, human error, war, terrorism, piracy, cargo loss and bad weather. In addition, changing economic, regulatory and political conditions in some countries, including political and military conflicts, have from time to time resulted in attacks on vessels, mining of waterways, piracy, terrorism, labor strikes and boycotts. These sorts of events could interfere with shipping routes and result in market disruptions, which may reduce our revenue and/or increase our expenses.

International shipping is subject to various security and customs inspections and related procedures in countries of origin and destination and at trans-shipment points. Inspection procedures can result in the seizure of cargo and/or our vessels, delays in loading, offloading or delivery and the levying of customs duties, fines or other penalties against us. It is possible that changes to inspection procedures could impose additional financial and legal obligations on us. Furthermore, changes to inspection procedures could also impose additional costs and obligations on our customers and may, in certain cases, render the shipment of certain types of cargo uneconomical or impractical. Any such changes or developments may have a material adverse effect on our business, results of operations, cash flows, financial condition, available cash and ability to pay dividends if reinstated in the future.

### *If our vessels call on ports located in countries that are subject to sanctions and embargoes imposed by the U.S. or other governments, that could adversely affect our reputation and the market for our common stock.*

From time to time on charterers' instructions, our vessels may call on ports located in countries subject to sanctions and embargoes imposed by the United States government and countries identified by the U.S. government as state sponsors of terrorism. The U.S. sanctions and embargo laws and regulations vary in their application, as they do not all apply to the same covered persons or proscribe the same activities, and such sanctions and embargo laws and regulations may be amended or strengthened over time. In 2010, the U.S. enacted the Comprehensive Iran Sanctions Accountability and Divestment Act ("CISADA"), which expanded the scope of the former Iran Sanctions

Act. Among other things, CISADA expands the application of the prohibitions to non-U.S. companies, such as our company, and introduces limits on the ability of companies and persons to do business or trade with Iran when such activities relate to the investment, supply or export of refined petroleum or petroleum products. Although we believe that we are in compliance with all applicable sanctions and embargo laws and regulations, and intend to maintain such compliance, there can be no assurance that we will be in compliance in the future, particularly as the scope of certain laws may be unclear and may be subject to changing interpretations. Any such violation could result in fines or other penalties and could result in some investors deciding, or being required, to divest their interest, or not to invest, in our company.

Additionally, some investors may decide to divest their interest, or not to invest, in our company simply because we do business with companies that do business in sanctioned countries, even if we have not violated any laws. Moreover, our charterers may violate applicable sanctions and embargo laws and regulations as a result of actions that do not involve us or our vessels, and those violations could in turn negatively affect our reputation. Investor perception of the value of our common stock may also be adversely affected by the consequences of war, the effects of terrorism, civil unrest and governmental actions in these and surrounding countries.

### *Political instability, terrorist attacks and international hostilities can affect the seaborne transportation industry, which could adversely affect our business.*

We conduct most of our operations outside of the United States, and our business, results of operations, cash flows, financial condition and ability to pay dividends if reinstated in the future may be adversely affected by changing economic, political and government conditions in the countries and regions where our vessels are employed or registered. Moreover, we operate in a sector of the economy that is likely to be adversely impacted by the effects of political instability, terrorist or other attacks, war or international hostilities. Terrorist attacks such as the attacks on the United States on September 11, 2001, the bombings in Spain on March 11, 2004, in London on July 7, 2005 and in Mumbai on November 26, 2008 and the continuing response of the world community to these attacks, as well as the threat of future terrorist attacks, continue to contribute to world economic instability and uncertainty in global financial markets. Future terrorist attacks could result in increased volatility of the financial markets in the United States and globally and could result in an economic recession in the United States or worldwide. These uncertainties could also adversely affect our ability to obtain additional financing on terms acceptable to us or at all.

### Company Specific Risk Factors

### *We may not be able to comply with the collateral maintenance coverage ratio covenants in our credit facility, which may affect our ability to conduct our business if we are unable to obtain waivers or covenant modifications from our lenders.*

Our credit facility with Nordea Bank Norge ASA, or Nordea, requires us to maintain a minimum ratio of the fair market value of our vessels mortgaged thereunder to our aggregate outstanding balance under the credit facility (please see Item 5. Operating and Financial Review and Prospects — B. Liquidity and Capital Resources — Long-Term Debt Obligations and Credit Arrangements). The market value of drybulk and tanker vessels is sensitive to, among other things, changes in the drybulk and tanker charter markets, respectively, with vessel values deteriorating in times when drybulk and tanker charter rates, as applicable, are falling and improving when charter rates are anticipated to rise. The current decline in charter rates in the drybulk market coupled with the prevailing difficulty in obtaining financing for vessel purchases have adversely affected drybulk vessel values. The recent fall in oil prices has also led to lower tanker charter rates and tanker vessel values. These conditions have led to a significant decline in the fair market values of our vessels since December 31, 2008, particularly with respect to our drybulk carriers.

On January 9, 2009, we entered into an amendatory agreement to our Nordea credit facility, or the Nordea Amendatory Agreement, which became effective on January 23, 2009. The Nordea Amendatory Agreement waives the breach of the collateral maintenance coverage ratio covenant contained in such credit facility resulting from the decrease in the market value of our vessels and reduces the level of the collateral maintenance coverage ratio to a level between 90% and 125% for the remaining term of the agreement, with such waiver taking effect from the date

D-13

of prior breach to the effective date of the Nordea Amendatory Agreement. Although we are currently in compliance with the collateral maintenance coverage ratio covenants under our credit facility, in the future we may fall out of compliance if our vessel values experience further declines. If this were to occur, under the terms of our credit facility, our lenders could require us to post additional collateral or pay down our indebtedness to a level at which we are in compliance with our loan covenants and, if we are unable to post this collateral, make these prepayments or obtain a waiver, our lenders could accelerate our indebtedness, which would impair our ability to continue to conduct our business. In such an event, our auditors may give either an unqualified opinion with an explanatory paragraph relating to the disclosure in the notes to our financial statements as to the substantial doubt of our ability to continue as a going concern, or a qualified, adverse or disclaimer of opinion, which could lead to additional defaults under our loan agreement.

If the current low charter rates in the drybulk market and the tanker market and low vessel values continue or decrease further, our ability to comply with various other covenants in our loan agreement may be adversely affected. In such event, we may have to seek additional covenant modifications or waivers. Any default by or the failure of our charterers to honor their obligations to us under our charter agreements would reduce the likelihood that our lenders would be willing to provide waivers or covenant modifications or other accommodations. If our indebtedness is accelerated in full or in part, it would be very difficult in the current financing environment for us to refinance our debt or obtain additional financing and we could lose our vessels if our lenders foreclose their liens.

Furthermore, as a result of the decline in our vessel values, we recorded an impairment loss of $52.7 million for the year ended December 31, 2009 (please see "Impairment on Vessels" in this Annual Report and "Impairment of Long-Lived Assets" in Note 2(l) to the consolidated financial statements for the year ended December 31, 2010 included herein) and if the current low charter rates in the drybulk market and the tanker market continue or decrease further, we may have to record further impairment adjustments to our financial statements which would adversely affect our financial results and further hinder our ability to raise capital. Also, because we sold certain of our vessels at prices lower than their book values, we incurred a loss of $133.2 million and $62.9 million in 2009 and 2010, respectively. If we find it necessary to sell additional vessels under the same circumstances, we will recognize losses and a reduction in our earnings which could affect our ability to raise additional capital that may be necessary to comply with our loan covenants.

***We depend upon a few significant customers for a large part of our revenues and the loss of one or more of these customers could adversely affect our financial performance.***

We derive a significant part of our revenue from a small number of customers, with 55.0% of our revenues for the year ended December 31, 2010 generated from two charterers. Our fleet is currently employed under fixed rate period charter arrangements to three charterers. If one or more of these customers is unable to perform under one or more charters with us and we are not able to find a replacement charter, or if a customer exercises certain rights to terminate the charter, we could suffer a loss of revenues that could materially adversely affect our business, financial condition and results of operations.

We could lose a customer or the benefits of a time charter if, among other things:

- the customer fails to make charter payments because of its financial inability, disagreements with us or otherwise;

- the customer terminates the charter because we fail to deliver the vessel within a fixed period of time, the vessel is lost or damaged beyond repair, there are serious deficiencies in the vessel or prolonged periods of off-hire, or if we are otherwise in default under the charter; or

- the customer terminates the charter because the vessel has been subject to seizure for more than a specified number of days.

If we lose a key customer, we may be unable to obtain charters on comparable terms or may become subject to the volatile spot market, which is highly competitive and subject to significant price fluctuations. The time charters on which we currently deploy six of the vessels in our fleet provide for charter rates that are significantly above current market rates, particularly spot market rates that most directly reflect the current depressed levels of the drybulk and tanker charter markets. If it were necessary to secure substitute employment, in the spot market or on

time charters, for any of these vessels due to the loss of a customer in these market conditions, such employment would be at a significantly lower charter rate than the charter rate currently generated by such vessel, or we may be unable to secure a charter at all, in either case, resulting in a significant reduction in revenues. The loss of any of our customers, time charters or vessels, or a decline in payments under our charters, could have a material adverse effect on our business, results of operations and financial condition and our ability to pay dividends, if reinstated, in the future. For example, in January 2010, we terminated the time charter agreement for the M/V *Pierre* as a result of the charterer's insolvency and failure to perform, and rechartered the vessel with a new charterer at the same gross daily hire rate of $23,000.

### *If we do not adequately manage the construction of our newbuilding vessels, the vessels may not be delivered on time or in compliance with their specifications.*

We have agreed to acquire five newbuilding vessels through wholly owned subsidiaries. We are obliged to supervise the construction of these vessels. If we are denied supervisory access to the construction of these vessels by the relevant shipyard or otherwise fail to adequately manage the shipbuilding process, the delivery of the vessels may be delayed or the vessels may not comply with their specifications, which could compromise their performance. Both delays in delivery and failure to meet specifications could result in lower revenues from the operations of the vessels, which could reduce our earnings.

### *We do not have financing arranged to fully cover the remaining yard obligations due for the construction of our five newbuilding VLOCs.*

We own contracts for the construction of five newbuilding VLOCs scheduled to be delivered in the first, second, and third quarters of 2012, and the second and fourth quarters of 2013, respectively. As of March 31, 2011, $68.8 million was paid in yard installments for these hulls, which was partially financed by SEDA proceeds and an equity issuance in April 2011 of 35,657,142 of our common shares. The remaining yard obligations amount to $254.3 million as of the date of this report, of which $40.9 million, $148.1 million and $65.3 million are payable in 2011, 2012 and 2013, respectively. We expect the remaining yard obligations to be financed by (1) a new facility with a major Chinese bank for which we have entered into a commitment letter but not yet entered into definitive documentation, which we expect will finance 60% of the cost of three of the VLOCs, (2) other forms of external financing; (3) equity offerings and (4) cash from operations. However, we have not yet obtained such financing. In the current challenging financing environment, it may be difficult to obtain secured debt to finance these purchases or raise debt or equity in the capital markets. If we fail to secure financing for the remaining payments due on these five newbuilding VLOCs, we could also lose our deposit money, which as of March 31, 2011 amounted to $68.8 million, and we may incur additional liability and costs.

### *The failure of our counterparties to meet their obligations under our time charter agreements could cause us to suffer losses or otherwise adversely affect our business.*

Six of our vessels are currently employed under time charters with two customers, with 55.0% of our revenues for the year ended December 31, 2010 generated from two customers chartering our drybulk carriers. The ability and willingness of each of our counterparties to perform its obligations under a time charter agreement with us will depend on a number of factors that are beyond our control and may include, among other things, general economic conditions, the condition of the drybulk shipping and tanker industries and the overall financial condition of the counterparty. In addition, in depressed market conditions, there have been reports of charterers renegotiating their charters or defaulting on their obligations under charters and our customers may fail to pay charterhire or attempt to renegotiate charter rates. For example, we agreed to reduce the contracted charter rate for one of our drybulk vessels, the M/V *Augusta* , from $42,100 per day to $16,000 per day upon its commencement in November 2008.

The time charters on which we are currently deploying six of the vessels in our fleet provide for charter rates that are above current market rates. If our charterers fail to meet their obligations to us or attempt to renegotiate our charter agreements, we could sustain significant losses which could have a material adverse effect on our business, financial condition, results of operations and cash flows, as well as our ability to pay dividends, if reinstated, in the future, and comply with covenants in our credit facility. For example, in January 2010, we terminated the time

charter agreement for the M/V *Pierre* as a result of the charterer's insolvency and failure to perform, and rechartered the vessel with a new charterer at the same gross daily hire rate of $23,000.

***The market price of our common shares has fluctuated widely and the market price of our common shares may fluctuate in the future. We are currently not in compliance with the minimum bid price rule of the Nasdaq Global Market and therefore we may need to take further action in order to maintain our listing.***

The market price of our common shares has fluctuated widely since our initial public offering in April 2007 and may continue to do so as a result of many factors, including our actual results of operations and perceived prospects, the prospects of our competition and of the shipping industry in general and in particular the drybulk and tanker sectors, differences between our actual financial and operating results and those expected by investors and analysts, changes in analysts' recommendations or projections, changes in general valuations for companies in the shipping industry, particularly the drybulk and tanker sectors, changes in general economic or market conditions and broad market fluctuations.

Since January 12, 2009, the market price of our common shares has dropped below $5.00 per share, and the last reported closing price on The Nasdaq Global Market on April 13, 2011 was $0.59 per share. If the market price of our common shares remains below $5.00 per share, under stock exchange rules, our shareholders will not be able to use such shares as collateral for borrowing in margin accounts. This inability to continue to use our common shares as collateral may lead to sales of such shares, thereby creating downward pressure on and increased volatility in the market price of our common shares.

In addition, under the rules of the Nasdaq Global Market, listed companies are required to maintain a share price of at least $1.00 per share and if closing share price stays below $1.00 for a period of 30 consecutive business days, then the listed company would have a cure period of at least 180 days for the purpose of regaining compliance with the $1.00 per share minimum. On March 1, 2010 we received notice from the Nasdaq Global Market that we were not in compliance with the minimum bid price rule, and we carried out a 1-for-3 reverse stock split on June 17, 2010 in order to regain compliance with Nasdaq rules. Our stock price has again declined below $1.00 per share for a period of 30 consecutive business days, and on January 25, 2011, we received notice from The Nasdaq Stock Market that we were not in compliance with the minimum bid price rule and as a result, we are required to take action during the relevant cure period ending in July 2011, such as another reverse stock split, in order to comply with Nasdaq rules. We are considering various options that will enable us to regain compliance within the cure period.

***Our earnings may be adversely affected if we do not successfully employ our vessels.***

Our strategy is to employ our vessels on fixed rate period charters, three of which are scheduled to expire in 2012 under the earliest re-delivery dates. Current charter rates have sharply declined from historically high levels and the charter market remains volatile. In the past, the charter rates for vessels have declined below the operating costs of vessels. If our vessels become available for employment in the spot market or under new period charters during periods when charter rates are at depressed levels, we may have to employ our vessels at depressed charter rates which would lead to reduced or volatile earnings. We cannot ensure that future charter rates will be at a level that will enable us to operate our vessels profitably or to reinstate dividend payments or repay our debt.

***The aging of our fleet may result in increased operating costs in the future, which could adversely affect our earnings.***

In general, the costs to maintain a vessel in good operating condition increase with the age of the vessel. As of the date of this Annual Report, our fleet has a weighted average age of 7.7 years. Older vessels are typically less fuel efficient and more costly to maintain than more recently constructed vessels due to newer vessels' improvements in engine technology. Cargo insurance rates increase with the age of a vessel, making older vessels less desirable to charterers. Governmental regulations, safety or other equipment standards related to the age of vessels may require expenditures for alterations or the addition of new equipment to our vessels and may restrict the type of activities in

which our vessels may engage. We cannot ensure that, as our vessels age, market conditions will justify those expenditures or enable us to operate our vessels profitably during the remainder of their useful lives.

> ### Purchasing and operating previously owned, or secondhand, vessels may result in increased drydocking costs and vessels off-hire, which could adversely affect our earnings.

Even following a physical inspection of secondhand vessels prior to purchase, we do not have the same knowledge about their condition and cost of any required (or anticipated) repairs that we would have had if these vessels had been built for and operated exclusively by us. Accordingly, we may not discover defects or other problems with such vessels prior to purchase. Defects or problems discovered after purchase may be expensive to repair, and if not detected, may result in accidents or other incidents for which we may become liable to third parties. Generally, we do not receive the benefit of warranties on secondhand vessels. Increased drydocking costs or vessels off-hire may adversely affect our earnings.

> ### Unless we set aside reserves or are able to borrow funds for vessel replacement, at the end of a vessel's useful life our revenue will decline, which would adversely affect our business, results of operations and financial condition.

Unless we maintain reserves or are able to borrow or raise funds for vessel replacement we will be unable to replace the vessels in our fleet upon the expiration of their remaining useful lives, which we expect to range from 25 years to 30 years, depending on the type of vessel. Our cash flows and income are dependent on the revenues earned by the chartering of our vessels to customers. If we are unable to replace the vessels in our fleet upon the expiration of their useful lives, our business, results of operations, financial condition and ability to pay dividends, if reinstated, will be materially and adversely affected. Any reserves set aside for vessel replacement may not be available for dividends if reinstated in the future.

> ### Investors may experience significant dilution as a result of future offerings and issuances of shares.

On July 24, 2009, we entered into the SEDA, which is described under Note 8(c) to our consolidated financial statements. The SEDA commenced on September 28, 2009 and was terminated on March 18, 2010. Under the SEDA we issued and sold an aggregate of 29,401,836 (88,208,508 before the reverse stock split) common shares with net proceeds of $98.2 million.

On January 12, 2010, we filed a shelf registration statement on Form F-3, which was declared effective on January 21, 2010, pursuant to which we may sell up to $400 million of an undeterminable number of securities. No shares had been issued under this shelf registration statement as of the date of this Annual Report.

On January 14, 2010, our Board of Directors adopted and approved the 2010 Equity Incentive Plan, under which 10,000,000 (30,000,000 before the reverse stock split) common shares were reserved for issuance. On January 18, 2010, our Board of Directors approved the award of 1,000,000 (3,000,000 before the reverse stock split) common shares to Steel Wheel Investments Limited, a company controlled by the Company's Chief Executive Officer and 66,667 (200,000 before the reverse stock split) common shares to the Company's Directors and officers. On December 17, 2010, our Board of Directors approved the award of 6,000,000 common shares to Steel Wheel Investments Limited, a company controlled by the Company's Chief Executive Officer.

On May 25, 2010, our Board of Directors approved an equity infusion of $20 million by Basset Holdings Inc., or Basset, a company controlled by the Company's Chief Executive Officer, in order to fund the Company's capital needs for the purchase of M/V *Montecristo* . On May 28, 2010, Basset paid the amount of $20 million in exchange for approximately 16.7 million (50 million before the reverse stock split) of the Company's common shares at a price of $0.40 per share before the reverse stock split.

On June 10, 2010, our stockholders approved a 3:1 reverse stock split, pursuant to which every three shares, of our common stock issued and outstanding, were converted into one share of common stock. The reverse stock split took effect as of the start of trading on the Nasdaq Global Market on June 17, 2010 and reduced the number of the then issued and outstanding common shares from 231,800,001 common shares to 77,266,655 common shares.

Accordingly, all share and per share amounts in this report have been retroactively restated to reflect this change in capital structure.

On April 1, 2011, we entered into two agreements to purchase two Capesize vessels under construction of 206,000 DWT each, through the acquisition of the shares of the relevant owning companies for a company ultimately controlled by the Company's Chief Executive Officer in exchange for an aggregate of 35,657,142 common shares of the Company. The vessels are scheduled to be delivered in the second and fourth quarter of 2013. The total outstanding yard payments amount to $96.24 million, of which $29.7 million is payable in 2012 and the balance is payable in 2013.

As our loan agreement contains provisions providing that a change-of-control will be deemed to have occurred if a person or entity, that was not a beneficial owner of our capital stock at the respective times of our entry into such agreements, becomes the beneficial owner, directly or indirectly, of more than 20% of the voting or ownership interest in the Company, such issuances of common shares could result in a change of control, thereby constituting an event of default under this loan agreement that entitles our lenders to declare all of our indebtedness thereunder immediately due and payable. Similar provisions may arise in our new loan agreement with a Chinese bank, to partially finance three VLOCs whose shipbuilding contracts we have acquired, once we enter into definitive documentation for such loan.

In addition, we may have to attempt to sell additional shares in the future in order to satisfy our capital needs; however there can be no assurance that we will be able to do so. Lenders may be unwilling to provide future financing or will provide future financing at significantly increased rates. If we are able to sell shares in the future, the prices at which we sell these future shares will vary, and these variations may be significant. Our existing shareholders will experience significant dilution if we sell these future shares at prices significantly below the price at which previous shareholders invested.

### *We intend to expand our operations into other sectors and own and operate a diversified fleet of vessels which will expose us to a greater number of risks.*

Our current fleet is comprised of six secondhand drybulk carriers that mainly transport iron ore, coal, grains and minerals, fertilizers and one secondhand tanker vessel that transports crude oil. We intend to grow our fleet and expand our operations into other sectors, as well. Operating a diversified fleet of vessels as opposed to a fleet concentrated in one sector of the seaborne transportation industry requires expertise in multiple sectors and the ability to avoid a greater variety of vessel management risks in order to maintain effective operations.

Until June 15, 2010, Cardiff Marine Inc., or Cardiff, provided technical and commercial vessel management services for our fleet. Subsequent to June 15, 2010, the management of our fleet was contracted to TMS Dry Ltd and TMS Tankers Ltd. We refer to TMS Dry Ltd. and TMS Tankers Ltd as our Fleet Managers. We cannot ensure that we or our Fleet Managers will have the requisite expertise to address the greater variety of vessel management risks to which we expect to be exposed as we expand into other sectors.

### *We are entirely dependent on our Fleet Managers to perform the day-to-day management of our fleet.*

Our executive management team consists of our Chief Executive Officer, our President and Chief Operating Officer, our Chief Financial Officer and Treasurer and our Chief Accounting Officer. As we subcontract the day-to-day vessel management of our fleet, including crewing, maintenance and repair to our Fleet Managers, we are dependent on our Fleet Managers and the loss of our Fleet Managers' services or failure to perform obligations to us could materially and adversely affect the results of our operations. Although we may have rights against our Fleet Managers if they default on their obligations to us, you will have no recourse directly against our Fleet Managers. Further, we expect that we will need to seek approval from our lenders to change our Fleet Managers. If our Fleet Managers suffer material damage to their reputation or relationships, such material damage may harm our ability to:

- continue to operate our vessels and service our customers;

- renew existing charters upon their expiration;

- obtain new charters;

- obtain financing on commercially acceptable terms;

- obtain insurance on commercially acceptable terms;

- maintain satisfactory relationships with our customers and suppliers; and

- successfully execute our growth strategy.

### Our Fleet Managers are privately held companies and there may be limited or no publicly available information about them.

Our Fleet Managers are privately held companies. The ability of our Fleet Managers to continue providing services for our benefit will depend in part on their own financial strength. Circumstances beyond our control could impair our Fleet Managers' financial strength, and there may be limited publicly available information about their financial strength. As a result, an investor in our common shares might have little advance warning of problems affecting our Fleet Managers, even though these problems could have a material adverse effect on us.

### Our Fleet Managers may have conflicts of interest between us and other clients of our Fleet Managers.

We have subcontracted the day-to-day technical and commercial management of our fleet, including crewing, maintenance, supply provisioning and repair to our Fleet Managers. Our contracts with our Fleet Managers have an initial term of one year which will automatically extend for successive one year terms, unless, in each case, at least two months' advance notice of termination is given by either party. Our Fleet Managers will be providing similar services for vessels owned by other shipping companies including companies with which they are affiliated. These responsibilities and relationships could create conflicts of interest between our Fleet Managers' performance of their obligations to us, on the one hand, and our Fleet Managers' performance of their obligations to their other clients on the other hand. These conflicts may arise in connection with the crewing, supply provisioning and operations of the vessels in our fleet versus vessels owned by other clients of our Fleet Managers. In particular, our Fleet Managers may give preferential treatment to vessels owned by other clients whose arrangements provide for greater economic benefit to our Fleet Managers. These conflicts of interest may have an adverse effect on our results of operations.

### Companies affiliated with our Fleet Managers own, and will acquire vessels that compete with our fleet.

Our Fleet Managers provide commercial and technical management for the vessels in our fleet. Both companies are beneficially owned (a) 30% by a company the beneficial owner of which is Mrs. Chryssoula Kandylidis, the mother of the Company's Chief Executive Officer and (b) 70% by a foundation controlled by Mr. George Economou. Mrs. C. Kandylidis is also the sister of Mr. G. Economou and the wife of one of the Company's directors, Mr. Konstandinos Kandylidis. Our Fleet Managers currently manage 31 tankers and 27 drybulk carriers and supervise the construction of 16 crude oil tankers, and four drybulk carriers with scheduled delivery dates in 2011 and 2012 on behalf of companies controlled by members of the Economou family and the construction of four ultra deep water drilling rigs. Moreover, Mr. Economou, members of his family and companies affiliated with our Fleet Managers, own and will acquire additional vessels in the future. These vessels could be in competition with our fleet. Our Fleet Managers may be faced with conflicts of interest with respect to their interests and their obligations to us.

### In the highly competitive international shipping industry, we may not be able to compete for charters with new entrants or established companies with greater resources.

We employ our vessels in a highly competitive market that is capital intensive and highly fragmented. Competition arises primarily from other vessel owners, some of whom have substantially greater resources than we do. Competition for the transportation of drybulk cargo by sea is intense and depends on price, location, size, age, condition and the acceptability of the vessel and its operators to the charterers. Due in part to the highly fragmented market, competitors with greater resources could enter the drybulk shipping industry and operate larger fleets

D-19

through consolidations or acquisitions and may be able to offer lower charter rates and higher quality vessels than we are able to offer.

### *We may be unable to effectively manage our growth.*

We intend to continue to grow our fleet. Our growth will depend on:

- locating and acquiring suitable vessels;

- identifying and consummating acquisitions or joint ventures;

- our ability to generate excess cash flow so that we can invest without jeopardizing our ability to cover current and foreseeable working capital needs (including debt service);

- obtaining required financing;

- integrating any acquired business successfully with our existing operations;

- enlarging our customer base;

- hiring additional shore-based employees and seafarers; and

- managing our expansion.

We intend to finance our growth with the net proceeds of future debt and equity offerings. Growing any business by acquisition presents numerous risks such as undisclosed liabilities and obligations, difficulty in obtaining additional qualified personnel and managing relationships with customers and suppliers and integrating newly acquired operations into existing infrastructures. The expansion of our fleet may impose significant additional responsibilities on our management and staff, and the management and staff of our Fleet Manager, and may necessitate that we, and they, increase the number of personnel. We cannot give any assurance that we will be successful in executing our growth plans or that we will not incur significant expenses and losses in connection therewith.

### *If our Fleet Managers are unable to recruit suitable seafarers for our fleet or as we expand our fleet, our results of operations may be adversely affected.*

We rely on our Fleet Managers to recruit suitable senior officers and crews for our fleet. In addition, as we expand our fleet, we will have to rely on our Fleet Managers to recruit suitable additional seafarers. We cannot ensure that our Fleet Managers will be able to continue to hire suitable employees as we expand our fleet. If our Fleet Managers' crewing agents encounter business or financial difficulties, they may not be able to adequately staff our vessels. The seafarers who are employed on the ships in our fleet are covered by industry-wide collective bargaining agreements that set basic standards. We cannot ensure that these agreements will prevent labor interruptions. If our Fleet Managers are unable to recruit suitable seafarers as we expand our fleet, our business, results of operations, cash flows, financial condition and our ability to pay dividends if reinstated in the future may be materially adversely affected.

### *Labor interruptions could disrupt our business.*

Our vessels are manned by masters, officers and crews that are employed by our shipowning subsidiaries. If not resolved in a timely and cost-effective manner, industrial action or other labor unrest could prevent or hinder our operations from being carried out normally and could have a material adverse effect on our business, results of operations, cash flows, financial condition and ability to pay dividends if reinstated in the future.

### *We may be unable to attract and retain key senior management personnel and other employees in the seaborne transportation industry, which may negatively affect the effectiveness of our management and our results of operations.*

Our success depends upon our ability to hire and retain key members of our senior management team. The loss of any of these individuals could adversely affect our business prospects and financial condition. Difficulty in hiring

D-20

and retaining personnel could adversely affect our business, results of operations and ability to pay dividends if reinstated in the future. We do not intend to maintain "key man" life insurance on any of our officers.

### *The operation of drybulk carriers and tankers each involve certain unique operational risks.*

The operation of drybulk carriers has certain unique operational risks. With a drybulk carrier, the cargo itself and its interaction with the ship can be a risk factor. By their nature, drybulk cargoes are often heavy, dense, easily shifted, and react badly to water exposure. In addition, drybulk carriers are often subjected to battering treatment during unloading operations with grabs, jackhammers (to pry encrusted cargoes out of the hold), and small bulldozers. This treatment may cause damage to the drybulk carrier. Drybulk carriers damaged due to treatment during unloading procedures may be more susceptible to a breach to the sea. Hull breaches in drybulk carriers may lead to the flooding of their holds. If a drybulk carrier suffers flooding in its forward holds, the bulk cargo may become so dense and waterlogged that its pressure may buckle the drybulk carrier's bulkheads leading to the loss of the drybulk carrier.

The operation of tankers has unique operational risks associated with the transportation of oil. An oil spill may cause significant environmental damage, and a catastrophic spill could exceed the insurance coverage available. Compared to other types of vessels, tankers are exposed to a higher risk of damage and loss by fire, whether ignited by a terrorist attack, collision, or other cause, due to the high flammability and high volume of the oil transported in tankers.

If we are unable to adequately maintain or safeguard our vessels we may be unable to prevent these events. Any of these circumstances or events could negatively impact our business, financial condition, results of operations and ability to pay dividends if reinstated in the future. In addition, the loss of any of our vessels could harm our reputation as a safe and reliable vessel owner and operator.

### *Our insurance may not be adequate to cover our losses that may result from our operations due to the inherent operational risks of the seaborne transportation industry.*

We carry insurance to protect us against most of the accident-related risks involved in the conduct of our business, including marine hull and machinery insurance, protection and indemnity insurance, which includes pollution risks, crew insurance and war risk insurance. However, we may not be adequately insured to cover losses from our operational risks, which could have a material adverse effect on us. Additionally, our insurers may refuse to pay particular claims and our insurance may be voidable by the insurers if we take, or fail to take, certain action, such as failing to maintain certification of our vessels with applicable maritime regulatory organizations. Any significant uninsured or under-insured loss or liability could have a material adverse effect on our business, results of operations, cash flows, financial condition and our ability to pay dividends if reinstated in the future. In addition, we may not be able to obtain adequate insurance coverage at reasonable rates in the future during adverse insurance market conditions.

As a result of the September 11, 2001 attacks, the U.S. response to the attacks and related concern regarding terrorism, insurers have increased premiums and reduced or restricted coverage for losses caused by terrorist acts generally. Accordingly, premiums payable for terrorist coverage have increased substantially and the level of terrorist coverage has been significantly reduced.

In addition, we may not carry loss-of-hire insurance, which covers the loss of revenue during extended vessel off-hire periods, such as those that occur during an unscheduled drydocking due to damage to the vessel from accidents. Accordingly, any loss of a vessel or extended vessel off-hire, due to an accident or otherwise, could have a material adverse effect on our business, results of operations and financial condition and our ability to pay dividends if reinstated in the future.

### *We may be subject to calls because we obtain some of our insurance through protection and indemnity associations.*

We may be subject to increased premium payments, or calls, in amounts based on our claim records and the claim records of our Fleet Managers as well as the claim records of other members of the protection and indemnity

associations through which we receive insurance coverage for tort liability, including pollution-related liability. In addition, our protection and indemnity associations may not have enough resources to cover claims made against them. Our payment of these calls could result in significant expense to us, which could have a material adverse effect on our business, results of operations, cash flows, financial condition and ability to pay dividends if reinstated in the future.

> ### *Servicing our debt limits funds available for other purposes and if we cannot service our debt, we may lose our vessels.*

Borrowing under our credit facility requires us to dedicate a part of our cash flow from operations to paying interest on our indebtedness. These payments limit funds available for working capital and capital expenditures. We expect our earnings and cash flow to vary from year to year due to the cyclical nature of the drybulk carrier and tanker industries. If we do not generate or reserve enough cash flow from operations to satisfy our debt obligations, we may have to undertake alternative financing plans, such as:

- seeking to raise additional capital;

- refinancing or restructuring our debt;

- selling vessels; or

- reducing or delaying capital investments.

However, these alternative financing plans, if necessary, may not be sufficient to allow us to meet our debt obligations. If we are unable to meet our debt obligations or if some other default occurs under our credit facility, our lenders could elect to declare that debt, together with accrued interest and fees, to be immediately due and payable and proceed against the collateral vessels securing that debt, which would have a material adverse effect on our business.

> ### *We cannot ensure that we will be able to borrow amounts under our senior secured credit facility and restrictive covenants in our senior secured credit facility may impose financial and other restrictions on us.*

Our senior credit facility, as amended, imposes operating and financial restrictions on us. These restrictions may limit our ability to, among other things:

- incur additional indebtedness, including through the issuance of guarantees;

- create or permit liens on our assets;

- sell our vessels or the capital stock of our subsidiaries;

- make investments;

- change the flag or classification society of our vessels;

- reinstate the payment of dividends (as described under "Item 5 — Operating and Financial Review and Prospects-B, Liquidity and Capital Resources);

- make capital expenditures;

- compete effectively to the extent our competitors are subject to less onerous financial restrictions; and

- change the management of our vessels or terminate or materially amend the management agreement relating to each vessel.

These restrictions could limit our ability to finance our operations or capital needs, make acquisitions or pursue available business opportunities. In addition, as discussed above, our credit facility requires us to maintain specified financial ratios and satisfy financial covenants. We expect to be able to comply with all of these specified financial ratios and financial covenants. However, should our charter rates or vessel values further decline in the future due to any of the reasons discussed in the industry specific risk factors set forth above or otherwise, we may be required to

D-22

take action to reduce our debt or to act in a manner contrary to our business objectives to meet these ratios and satisfy these covenants. Events beyond our control, including changes in the economic and business conditions in the shipping markets in which we operate, may affect our ability to comply with these covenants. We cannot ensure that we will meet these ratios or satisfy these covenants or that our lenders will waive any failure to do so. A breach of any of the covenants in, or our inability to maintain the required financial ratios under, our senior secured credit facility would prevent us from borrowing additional money under our credit facility agreements and could result in a default under this agreement. If a default occurs under our credit facility agreement, the lenders could elect to declare the outstanding debt, together with accrued interest and other fees, to be immediately due and payable and proceed against the collateral securing that debt, which could constitute all or substantially all of our assets.

Therefore, our discretion is limited because we may need to obtain consent from our lenders in order to engage in certain corporate actions. Our lenders' interests may be different from ours, and we cannot guarantee that we will be able to obtain our lenders' consent when needed. This may prevent us from taking actions that are in our best interest.

Our ability to obtain additional debt financing may be dependent on the performance of our then existing charters and the creditworthiness of our charterers.

The actual or perceived credit quality of our charterers, and any defaults by them, may materially affect our ability to obtain the additional capital resources required to purchase additional vessels or may significantly increase our costs of obtaining such capital. Our inability to obtain additional financing, whether at anticipated costs or at all may materially affect our results of operation and our ability to implement our business strategy.

We have entered into a commitment letter with a major Chinese bank, and the above considerations are expected to apply to our loan agreement with this lender upon our entry into definitive documentation.

***We cannot ensure that we will be able to refinance any indebtedness incurred under our credit facility.***

We have partially financed the acquisition of our vessels with secured indebtedness drawn under our credit facility. We cannot ensure that we will be able to refinance amounts drawn under our credit facility at an interest rate or on terms that are acceptable to us or at all. If we are not able to refinance these amounts with the net proceeds of debt and equity offerings at an interest rate or on terms acceptable to us or at all, we will have to dedicate a portion of our cash flow from operations to pay the principal and interest of this indebtedness. If we are not able to satisfy these obligations, we may have to undertake alternative financing plans.

The actual or perceived credit quality of our charterers, any defaults by them, and the market value of our fleet, among other things, may materially affect our ability to obtain alternative financing. In addition, debt service payments under our credit facility or alternative financing may limit funds otherwise available for working capital, capital expenditures, the payment of dividends and other purposes. If we are unable to meet our debt obligations, or if we otherwise default under our credit facility or an alternative financing arrangement, our lenders could declare the debt, together with accrued interest and fees, to be immediately due and payable and foreclose on our fleet, which could result in the acceleration of other indebtedness that we may have at such time and the commencement of similar foreclosure proceedings by other lenders.

We have entered into a commitment letter with a major Chinese bank, and the above considerations are expected to apply to our loan agreement with this lender upon our entry into definitive documentation.

***Trading and complementary hedging activities in Forward Freight Agreements (FFAs) subject us to trading risks, and we may suffer trading losses which could adversely affect our financial condition and results of operations.***

Due to drybulk shipping market volatility, success in this shipping industry requires constant adjustment of the balance between chartering-out vessels for long periods of time and trading them on a spot basis. A long term contract to charter a vessel might lock us into a profitable or unprofitable situation depending on the direction of freight rates over the term of the contract. From time to time and as our management sees fit, we may seek to manage and mitigate that risk through trading and complementary hedging activities in forward freight agreements, or FFAs. We are exposed to market risk in relation to our FFAs and could suffer losses from these activities in the event

D-23

that our expectations are incorrect. There can be no assurance that we will be able to successfully protect ourselves from volatility in the shipping market at all times. We may not successfully mitigate our risks, leaving us exposed to unprofitable contracts, and may suffer trading losses resulting from these hedging activities.

The FFA market has experienced significant volatility in the past few years and, accordingly, recognition of the changes in the fair value of FFAs has caused, and could in the future cause, significant volatility in earnings.

### *The derivative contracts into which we have entered to hedge our exposure to fluctuations in interest rates could result in higher than market interest rates and charges against our income.*

We have entered into two interest rate swaps for purposes of managing our exposure to fluctuations in interest rates applicable to indebtedness under our Nordea credit facility which was advanced at a floating rate based on LIBOR. Our hedging strategies, however, may not be effective and we may incur substantial losses if interest rates move materially differently from our expectations. Since our existing interest rate swaps do not, and future derivative contracts may not, qualify for treatment as hedges for accounting purposes we recognize fluctuations in the fair value of such contracts in our income statement. In addition, our financial condition could be materially adversely affected to the extent we do not hedge our exposure to interest rate fluctuations under our financing arrangements.

Any hedging activities we engage in may not effectively manage our interest rate exposure or have the desired impact on our financial conditions or results of operations. At December 31, 2010, the fair value of our interest rate swaps was at a loss position (liability) of $11.6 million (excluding accrued interest payable of $1.9 million). See Note 10 to our consolidated financial statements as of and for the year ended December 31, 2010.

### *We may be subject to tax on United States source income, which would reduce our earnings.*

Under the United States Internal Revenue Code of 1986, as amended, or the "Code", 50% of the gross shipping income of a vessel owning or chartering foreign corporation, such as ourselves and our subsidiaries, that is attributable to transportation that begins or ends, but that does not both begin and end, in the United States is characterized as United States source income and as such is subject to a 4% United States federal income tax without allowance for deduction, unless that corporation qualifies for exemption from United States federal income tax under Section 883 of the Code and regulations promulgated thereunder by the United States Department of the Treasury.

We expect that we and each of our subsidiaries will qualify for this statutory tax exemption and we intend to take this position for United States federal income tax return purposes for the 2010 taxable year. However, there are factual circumstances beyond our control that could cause us to lose the benefit of this tax exemption and thereby become subject to United States federal income tax on our United States source shipping income. For example, if shareholders each owning 5% or more of our common shares, or "5% Shareholders", together owned 50% or more of our outstanding common shares for more than half the days of a taxable year, then we would not be eligible for this statutory tax exemption unless we were able to establish that among our 5% Shareholders, there are sufficient 5% Shareholders that are qualified shareholders for purposes of Section 883 to preclude non-qualified 5% Shareholders from owning 50% or more of our common shares for more than half the number of days during the taxable year and we are able to satisfy certain substantiation requirements regarding the identity of our 5% Shareholders. Due to the factual nature of the issues involved, we can give no assurances on our future tax-exempt status or that of any of our subsidiaries.

If we or our subsidiaries are not entitled to exemption under Section 883 of the Code for any taxable year, we or our subsidiaries would be subject during those years to a 4% United States federal income tax on U.S. source shipping income on a gross basis. The imposition of this taxation could have a negative effect on our business and would result in decreased earnings available for distribution to our shareholders.

*United States tax authorities could treat us as a "passive foreign investment company", which could have adverse United States federal income tax consequences to U.S. shareholders.*

A foreign corporation will be treated as a "passive foreign investment company," or PFIC, for United States federal income tax purposes if either (1) at least 75% of its gross income for any taxable year consists of certain types of "passive income" or (2) at least 50% of the average value of the corporation's assets produce or are held for the production of those types of "passive income." For purposes of these tests, cash is treated as an asset that produces "passive income" and "passive income" includes dividends, interest, and gains from the sale or exchange of investment property and rents and royalties other than rents and royalties which are received from unrelated parties in connection with the active conduct of a trade or business. On the other hand, income derived from the performance of services does not constitute "passive income." U.S. shareholders of a PFIC may be subject to a disadvantageous U.S. federal income tax regime with respect to the income derived by the PFIC, the distributions they receive from the PFIC and the gain, if any, they derive from the sale or other disposition of their shares in the PFIC.

We do not believe that we were a PFIC during the 2010 taxable year or that we will be a PFIC with respect to any future taxable year. In this regard, we intend to treat the gross income we derive or are deemed to derive from our time chartering activities as services income, rather than rental income. Accordingly, we believe that our income from our time chartering activities does not constitute "passive income," and the assets that we own and operate in connection with the production of that income do not constitute assets that produce or are held for the production of passive income.

There is substantial legal authority supporting this position consisting of case law and United States Internal Revenue Service, or IRS, pronouncements concerning the characterization of income derived from time charters and voyage charters as services income for other tax purposes. However, it should be noted that there is also authority which characterizes time charter income as rental income rather than services income for other tax purposes. Accordingly, no assurance can be given that the IRS or a court of law will accept our position, and there is a risk that the IRS or a court of law could determine that we are a PFIC. Moreover, no assurance can be given that we would not constitute a PFIC for any future taxable year if there were to be changes in the nature and extent of our operations.

If the IRS or court of law were to find that we are or have been a PFIC for any taxable year, our U.S. shareholders would face adverse U.S. federal tax consequences. Under the PFIC rules, unless those shareholders make an election available under the Code (which election could itself have adverse U.S. federal tax consequences for such shareholders), such shareholders would be subject to U.S. federal income tax at the then highest rates on ordinary income plus interest upon excess distributions and upon any gain from the disposition of our common shares, as if the excess distribution or gain had been recognized ratably over the shareholder's holding period of our common shares. Please read "Taxation — United States Federal Income Taxation of U.S. Holders — United States Federal Income Tax Treatment of Common Shares — Passive Foreign Investment Company Status and Significant United States Federal Income Tax Consequences" for a more comprehensive discussion of the U.S. federal income tax consequences to U.S. shareholders if we are treated as a PFIC.

*Obligations associated with being a public company require significant company resources and management attention.*

We completed our initial public offering in April 2007 and are subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and the other rules and regulations of the SEC, including the Sarbanes-Oxley Act of 2002. Section 404 of the Sarbanes-Oxley Act requires that we evaluate and determine the effectiveness of our internal control over financial reporting. If we have a material weakness in our internal control over financial reporting, we may not detect errors on a timely basis and our financial statements may be materially misstated. We will continue to need to dedicate a significant amount of time and resources to ensure compliance with these regulatory requirements.

We will continue to work with our legal, accounting and financial advisors to identify any areas in which changes should be made to our financial and management control systems to manage our growth and our obligations as a public company. We will evaluate areas such as corporate governance, corporate control, internal audit,

disclosure controls and procedures as well as financial reporting and accounting systems. We will make changes in any of these and other areas, including our internal control over financial reporting, that we believe are necessary. However, these and other measures that we may take may not be sufficient to allow us to satisfy our obligations as a public company on a timely and reliable basis. In addition, compliance with reporting and other requirements applicable to public companies will create additional costs for us and will require the time and attention of management. Our limited management resources may exacerbate the difficulties in complying with these reporting and other requirements while focusing on executing our business strategy. We cannot predict or estimate the amount of the additional costs we may incur, the timing of such costs or the degree of impact that our management's attention to these matters will have on our business.

> ***Because we generate all of our revenues in dollars but incur a significant portion of our expenses in other currencies, exchange rate fluctuations could have an adverse impact on our results of operations.***

We generate all of our revenues in dollars but we incur a portion of our expenses in currencies other than the dollar. This difference could lead to fluctuations in net income due to changes in the value of the dollar relative to the other currencies, particularly relative to the Euro. Expenses incurred in foreign currencies against which the dollar falls in value can increase, thereby decreasing our revenues. Further declines in the value of the dollar could lead to higher expenses payable by us.

> ***We are a holding company, and we depend on the ability of our subsidiaries to distribute funds to us in order to satisfy our financial obligations.***

We are a holding company and our subsidiaries conduct all of our operations and own all of our operating assets. We have no significant assets other than the equity interests in our subsidiaries. As a result, our ability to satisfy our financial obligations depends on our subsidiaries and their ability to distribute funds to us. If we are unable to obtain funds from our subsidiaries, we may not be able to satisfy our financial obligations.

> ***There is no guarantee that there will continue to be an active and liquid public market for shareholders to resell our common stock in the future.***

The price of our common stock may be volatile and may fluctuate due to factors such as:

- actual or anticipated fluctuations in our quarterly and annual results and those of other public
- companies in our industry;
- mergers and strategic alliances in the shipping industry;
- market conditions in segments of the shipping industry in which we operate;
- changes in government regulation;
- shortfalls in our operating results relative to levels forecast by securities analysts;
- announcements concerning us or our competitors; and
- the general state of the securities market.

The drybulk and tanker industries have been highly unpredictable and volatile. The market for our common stock may be equally volatile.

> ***Our Board of Directors has determined to suspend the payment of cash dividends as a result of market conditions in the international shipping industry and until such market conditions significantly improve, it is unlikely that we will reinstate the payment of dividends and if reinstated, it is likely that any dividend payments would be at reduced levels.***

We previously paid regular cash dividends on a quarterly basis from our operating surplus, in amounts substantially equal to our available cash from operations in the previous quarter, less any cash reserves for drydockings and working capital, as determined by our Board of Directors.

Our Board of Directors has determined to suspend the payment of cash dividends as a result of market conditions in the international shipping industry and in particular the sharp decline in charter rates and vessel values in the drybulk sector. Until such market conditions significantly improve, it is unlikely that we will reinstate the payment of dividends and if reinstated, it is likely that any dividend payments would be at reduced levels. Furthermore, the amendatory agreement to our Nordea credit facility, which matures in October 2015, prohibits us from paying dividends.

As a result of deteriorating market conditions and restrictions imposed by our lenders, we will not reinstate the payment of dividends until our Nordea credit facility matures in October 2015 or the prohibition on our payment of dividends is removed from our amended Nordea credit facility agreement. If reinstated, any dividend payments would likely be at reduced levels.

### *Future sales of shares by our major shareholder could cause the market price of our common shares to decline.*

Companies controlled by Mr. Antonis Kandylidis, beneficially own an aggregate of 60,017,141 common shares, which represent approximately 50.5% of our outstanding common shares as of the date of this Annual Report. These common shares may be sold in registered transactions and may also be resold subject to the holding period, volume, manner of sale and notice requirements of Rule 144 under the Securities Act. Sales or the possibility of sales of substantial amounts of our common shares by these shareholders in the public markets could adversely affect the market price of our common shares.

### *We are incorporated in the Republic of the Marshall Islands, which does not have a well-developed body of corporate law and as a result, shareholders may have fewer rights and protections under Marshall Islands law than under a typical jurisdiction in the United States.*

Our corporate affairs are governed by our Amended and Restated Articles of Incorporation and by-laws and by the Marshall Islands Business Corporations Act, or BCA. The provisions of the BCA resemble provisions of the corporation laws of a number of states in the United States. However, there have been few judicial cases in the Republic of the Marshall Islands interpreting the BCA. The rights and fiduciary responsibilities of directors under the law of the Republic of the Marshall Islands are not as clearly established as the rights and fiduciary responsibilities of directors under statutes or judicial precedent in existence in certain United States jurisdictions. Shareholder rights may differ as well. While the BCA does specifically incorporate the non-statutory law, or judicial case law, of the State of Delaware and other states with substantially similar legislative provisions, our public shareholders may have more difficulty in protecting their interests in the face of actions by the management, directors or controlling shareholders than would shareholders of a corporation incorporated in a United States jurisdiction.

### *It may not be possible for investors to enforce U.S. judgments against us.*

We and all of our subsidiaries are incorporated in jurisdictions outside the U.S. and substantially all of our assets and those of our subsidiaries are located outside the U.S. In addition, most of our directors and officers are non-residents of the U.S., and all or a substantial portion of the assets of these non-residents are located outside the U.S. As a result, it may be difficult or impossible for U.S. investors to serve process within the U.S. upon us, our subsidiaries or our directors and officers or to enforce a judgment against us for civil liabilities in U.S. courts. In addition, you should not assume that courts in the countries in which we or our subsidiaries are incorporated or where our assets or the assets of our subsidiaries are located (1) would enforce judgments of U.S. courts obtained in actions against us or our subsidiaries based upon the civil liability provisions of applicable U.S. federal and state securities laws or (2) would enforce, in original actions, liabilities against us or our subsidiaries based on those laws.

*Anti-takeover provisions in our organizational documents could make it difficult for our shareholders to replace or remove our current board of directors or have the effect of discouraging, delaying or preventing a merger or acquisition, which could adversely affect the market price of our common shares.*

Several provisions of our Amended and Restated Articles of Incorporation and bylaws could make it difficult for our shareholders to change the composition of our board of directors in any one year, preventing them from changing the composition of management. In addition, the same provisions may discourage, delay or prevent a merger or acquisition that shareholders may consider favorable.

These provisions include:

- authorizing our board of directors to issue "blank check" preferred stock without shareholder approval;

- providing for a classified board of directors with staggered, three-year terms;

- prohibiting cumulative voting in the election of directors;

- authorizing the removal of directors only for cause and only upon the affirmative vote of the holders of a two-thirds majority of the outstanding shares of our common and subordinated shares, voting as a single class, entitled to vote for the directors;

- limiting the persons who may call special meetings of shareholders;

- establishing advance notice requirements for election to our board of directors or proposing matters that can be acted on by shareholders at shareholder meetings; and

- limiting our ability to enter into business combination transactions with certain shareholders.

In addition, we have adopted a stockholder rights plan or "poison pill." These anti-takeover provisions could substantially impede the ability of public shareholders to benefit from a change in control and, as a result, may adversely affect the market price of our common shares and your ability to realize any potential change of control premium.

## Item 4.  *Information on the Company*

### A.  **History and Development of the Company**

OceanFreight Inc. was incorporated on September 11, 2006 under the laws of the Marshall Islands. Our principal executive offices are at 80 Kifissias Avenue, Athens 15125, Greece. Our telephone number at that address is +30 210 614 0283. Our website is www.oceanfreightinc.com. The information on our website or accessible through our website shall not be deemed a part of this report. Our agent and authorized representative in the United States is Puglisi & Associates, located at 850 Library Ave, Newark, DE 19711.

In April 2007; we completed our initial public offering in the United States under the United States Securities Act of 1933, as amended, the net proceeds of which amounted to $216.8 million. The Company's common shares are listed on the Nasdaq Global Market under the symbol "OCNF".

We are a global provider of shipping transportation services. We specialize in transporting drybulk cargoes, including such commodities as iron ore, coal, grain and other materials and crude oil cargoes through the ownership and operation of six drybulk carriers and one tanker vessels as of the date of this report. As of December 31, 2010, our fleet consisted of five Panamax and four Capesize drybulk carriers, one Aframax and one Suezmax tanker vessels with a total capacity of 1.3 million dead weight tons (dwt) and a weighted average age of 9.7 years. In addition, we have agreed to acquire five newbuilding Very Large Ore Carriers with deliveries expected between 2012 and 2013.

From January 2009 through July 2009, Cardiff assumed the technical and commercial management of the eight Panamax drybulk carriers previously under the commercial management of Wallem Ship Management Ltd., or Wallem.

On January 30, 2009, the Company entered into a Standby Equity Purchase Agreement, or the SEPA, with YA Global Master SPV Ltd., or YA Global, for the offer and sale of up to $147,885,850 of our common shares, par value

$0.01 per share. Until May 21, 2009, when the SEPA was terminated, we had sold 71,850,000 common shares with net proceeds amounting to $109.9 million, of which $25 million was used to fully repay the sellers' credit of the *Tamara* and M/T *Tigani* . YA Global received a discount equal to 1.5% of the gross proceeds or $1.7 million.

In May 2009, we signed a memorandum of agreement with a third party to sell the M/V *Lansing* at a price of $21.95 million, which resulted in a loss of approximately $14.77 million. The vessel was delivered to its new owners on July 1, 2009.

In May 2009, we engaged in Forward Freight Agreement, or FFA, trading activities. As of December 31, 2010, the Company had no open positions.

On June 26, 2009, we agreed to acquire the M/V *Partagas* for a purchase price of $56 million. The vessel was delivered to the Company on July 30, 2009. The vessel is employed under a three-year time charter that commenced upon the vessel's delivery at a gross daily rate of $27,500.

On July 8, 2009, we agreed to acquire the M/V *Robusto* for a purchase price of $61.25 million. We took delivery of the vessel on October 19, 2009. Upon delivery to the Company, the vessel commenced a time charter employment for a minimum period of five years at a gross rate of $26,000 per day.

On July 10, 2009, the Company entered into a memorandum of agreement with a third party for the sale of the M/V *Juneau* for a sale price of $19.9 million. The vessel was delivered to its new owners on October 23, 2009. The sale resulted in a loss of approximately $16.3 million.

On July 13, 2009, during the Company's annual general meeting of shareholders, the Company's shareholders approved an amendment to the Company's articles of incorporation to increase the Company's authorized common shares from 31,666,667 (95,000,000 before the reverse stock split, which took effect June 17, 2010) common shares to 333,333,333 (1,000,000,000 before the reverse stock split) common shares. In connection with the reverse stock split, our shareholders approved another amendment to the Company's articles of incorporation, effective June 10, 2010, to decrease the Company's authorized shares in the same 3:1 ratio as the reverse stock split, which reduced the 1,000,000,000 authorized common shares on a pre-reverse stock split basis to 333,333,333 authorized common shares after giving effect to the reverse stock split.

On July 18, 2009, we agreed to acquire the M/V *Cohiba* for a purchase price of $61.25 million. The vessel was delivered on December 9, 2009 and commenced a minimum five year time charter at a gross daily rate of $26,250.

On July 24, 2009, we entered into a Standby Equity Distribution Agreement, or the SEDA, with YA Global, for the offer and sale of up to $450 million of the Company's common shares to YA Global. The SEDA commenced on September 28, 2009 and had an available duration of three years. Upon termination of the SEDA on March 18, 2010, we had sold 29,401,836 (88,205,508 before the reverse stock split) common shares with net proceeds amounting to $98.2 million. YA Global received a discount equal to 1.5% of the gross proceeds or $1.5 million.

On August 7, 2009, we entered into a memorandum of agreement with a third party for the sale of M/V *Richmond* for a sale price of $20.6 million. The vessel was delivered to its new owners on September 30, 2009. The sale of the vessel resulted in a loss of approximately $20.8 million.

On September 30, 2009, we agreed to acquire the M/V *Montecristo* for a purchase price of $49.5 million. The vessel was delivered to us on June 28, 2010 and commenced a minimum four-year time charter employment at a gross rate of $23,500 per day.

On November 24, 2009, DVB consented to a reduction of the collateral maintenance coverage ratio in our DVB loan to 125% for the period from November 24, 2009 to December 17, 2010 and the deposit of $2.5 million in the retention account that was restricted during the above period. As of December 31, 2010, following the sale of the M/T Tigani, the Company met the collateral ratio requirement and the bank released the $2.5 million from restricted cash.

On November 26, 2009, we contracted to sell the M/T *Olinda* for a gross sale price of $19.0 million with expected delivery between May 1, 2010 and December 31, 2010. In December 2010 the vessel's delivery period changed to between December 1, 2010 and April 30, 2011.

On December 11, 2009, we contracted to sell the M/V *Pierre* to a third party for a gross sale price of $22.6 million, which resulted in a loss of approximately $17.4 million. The vessel was delivered to its new owners on April 14, 2010.

On January 12, 2010, we filed a shelf registration statement on Form F-3, which was declared effective on January 21, 2010, pursuant to which we may sell up to $400 million of an undeterminable number of securities. No shares have been issued under this registration statement as of the date of this Annual Report.

On January 14, 2010, the Company's Board of Directors adopted and approved the 2010 Equity Incentive Plan, under which 30,000,000 common shares were reserved for issuance. On January 18, 2010, the Company's Board of Directors adopted and approved the award of an aggregate of 1,066,666 (3,200,000 before the reverse stock split) common shares to the Company's Directors and management. Please refer to Item 7 below "Major Shareholders and related Party Transactions".

On January 16, 2010 we terminated the time charter of the M/V Pierre due to the charterer's insolvency and failure to perform, which termination took effect on January 27, 2010, upon the vessel's delivery to a new charterer at the same gross daily hire rate of $23,000 for the balance of the original time charter ending in June 2010.

On February 20, 2010, we contracted to sell the M/T Tigani for a gross sale price of $12.25 million. The vessel was delivered to its new owners on May 4, 2010. In November 2009 we had previously recognized an estimated loss of $25.4 million based on an estimated sale price of $9.6 million, which had been determined in sale negotiations which were ultimately unsuccessful. Following the sale in 2010, we recognized a gain of $2.5 million, which represents the increase from the estimated sale price of $9.6 million in 2009 to its actual sale price of $12.25 million in 2010.

On March 4, 2010, we entered into an agreement with a shipyard for the construction of three Capesize Very Large Ore Carriers (VLOCs) for an aggregate price of $204.3 million. The vessels are scheduled for delivery in the first, second and third quarters of 2012.

On May 28, 2010, Basset Holding Inc., a company controlled by Mr. Antonis Kandylidis, our Chief Executive Officer, made an equity contribution of $20.0 million in exchange of approximately 16,666,667 (50,000,000 before the reverse stock split) of the Company's common shares. Please refer to Item 7 below "Major Shareholders and Related Party Transactions".

On June 10, 2010, our stockholders approved a 3:1 reverse stock split, pursuant to which every three shares, of our common stock issued and outstanding, were converted into one share of common stock. The reverse stock split took effect as of the start of trading on the Nasdaq Global Market on June 17, 2010 and reduced the number of the then issued and outstanding common shares from 231,800,001 common shares to 77,266,655 common shares. Accordingly, all share and per share amounts in this annual report have been retroactively restated to reflect this change in capital structure.

On June 10, 2010, at the Annual General Meeting of the Shareholders, Mr. George Biniaris was elected to serve as Director of the Company for a term of three years. On June 10, 2010, the Company's Board of Directors designated Mr. George Biniaris as the Chairman of the Audit Committee and determined that he qualifies as an audit committee financial expert as defined under Commission rules. Mr. George Biniaris replaced Mr. Stephen Souras, whose term expired and who did not stand for re-election at the Annual General Meeting of the Shareholders.

On June 15, 2010, the technical and commercial management of our drybulk and the tanker fleets as well as the supervision of the construction of the three VLOCs were contracted under separate management agreements to TMS Dry Ltd. and TMS Tankers Ltd., respectively, which are related technical and commercial management companies. Until June 15, 2010, the technical and commercial management of the Company's fleet was contracted under separate management agreements to Cardiff Marine Inc. (or "Cardiff"), a related technical and commercial management company. Until July 2009, the technical management of the drybulk carriers was performed by Wallem and the technical management of the tanker vessels and the commercial management of all vessels were performed by Cardiff.

On August 13, 2010, our Board of Directors approved the termination of the FFA service agreement that the Company entered into with Cardiff in May 2009, with termination effective on June 15, 2010.

On October 4, 2010, we contracted to sell the M/T *Pink Sands* and M/V *Augusta* for $11.1 million and $20.0 million, respectively. The M/T *Pink Sands* was delivered to its new owners on November 4, 2010 and the M/V *Augusta* on January 6, 2011. The sale of the vessels resulted in a total loss of $31.1 million. Furthermore, as provided by our loan agreement we made a loan prepayment of $17.4 million.

On November 19, 2010, we contracted to sell the M/V Austin and M/V Trenton for $22.25 million each. Based on an addendum signed February 11, 2011, the selling price was reduced to $21.0 million for each vessel. The vessels were delivered to their new owners on March 10 and 11, 2011, respectively. The sale of the vessels resulted in a total loss of $34.1 million. Furthermore, as provided by our loan agreement we made a loan prepayment of $24.7 million.

On December 12, 2010, we contracted to sell the M/T *Tamara* for $8.6 million. The vessel was delivered to its new owners on January 13, 2011. Following the sale of the vessel, our loan with DVB was fully repaid.

On December 17, 2010, our Board of Directors approved the award of an aggregate of 6,000,000 common shares under the 2010 Equity Incentive Plan to Steel Wheel Investments Limited, a company controlled by our Chief Executive Officer. Please refer to Item 7. "Major Shareholders and Related Party Transactions" below.

Our stock price declined below $1.00 per share for a period of 30 consecutive business days, and on January 25, 2011 we received notice from The Nasdaq Stock Market that we are not in compliance with the minimum bid price rule and as a result, we are required to take action during the relevant cure period ending in July 2011, such as a reverse stock split, in order to comply with Nasdaq rules.

On February 24, 2011, we accepted a commitment letter with a major Chinese bank for the financing of up to 60% of the aggregate contract cost of the three VLOCs discussed above.

On April 1, 2011, we entered into two agreements to purchase two VLOC vessels under construction of 206,000 DWT each, through the acquisition of the shares of the relevant owning companies for a company ultimately controlled by the Company's Chief Executive Officer in exchange for an aggregate of 35,657,142 common shares of the Company. The vessels are scheduled to be delivered in the second and fourth quarter of 2013. The total outstanding yard payments amount to $95.04 million, of which $29.7 million is payable in 2012 and the balance is payable in 2013.

## B. Business Overview

### OceanFreight's Strategy and Business Model.

Our strategy is to be a reliable and responsible provider of seaborne transportation services and to manage and expand our company in a manner that we believe will enable us to enhance shareholder value by increasing long-term cash flow. We intend to realize these objectives by adhering to the following:

*Strategic Fleet Expansion.* We intend to grow our fleet using our management's knowledge of the seaborne transportation industry to make accretive, timely and selective acquisitions of vessels in different sectors based on a number of financial and operational criteria. We will consider and analyze our expectation of fundamental developments in the particular industry sector, the level of liquidity in the resale and charter market, the cash flow earned by the vessel in relation to its value, its condition and technical specifications, expected remaining useful life, the credit quality of the charterer and duration and terms of charter contracts for vessels acquired with charters attached, as well as the overall diversification of our fleet and customers. We believe that secondhand vessels approximately in the middle of their useful economic life when operated in a cost efficient manner often provide better value to our shareholders and return on capital as compared with more expensive newer vessels.

*Tailored Fleet Composition.* Our current fleet consists of six drybulk carriers and one tanker, which we have agreed to sell. In addition, we have agreed to acquire five VLOC newbuilding drybulk carriers with deliveries expected between 2012 and 2013. We primarily focus on the drybulk and tanker segments because the acquisition and employment contracts of these vessels satisfy our financial and operating criteria. As we grow our fleet over time, we intend to explore acquisitions in other seaborne transportation sectors, as opportunities arise, that also meet our financial and operating criteria. We believe that monitoring

developments in multiple sectors will position us to opportunistically select vessels in different sectors for acquisition and vessel employment opportunities as conditions in those sectors dictate. We also believe that this outlook enables us to lower our dependence on any one shipping sector as we seek to generate revenues and find attractive acquisition opportunities.

*Fixed Rate Charters.*   With the exception of the M/T *Olinda* , which is employed in a tanker pool, we have entered into fixed rate period charters for all of our drybulk carriers and tanker vessels with an average remaining duration of approximately 42.2 months as of the date of this Annual Report. We believe these charters will provide us with stable cash flow and high vessel utilization rates and also limit our exposure to charter rate volatility. In the future we will continue to seek fixed rate period charter contracts for our vessels, which include time and bareboat charters, pursuant to which the charterer pays a fixed daily charter rate over a specified period of time. Period charter contracts may include profit sharing arrangements whereby we receive additional charterhire when spot charter rates exceed the fixed daily rate under the period charter. We may also enter into period charters that afford some exposure to the spot market through floating rate period charters where the daily charter rate fluctuates in line with spot rates but cannot fluctuate below a minimum rate, or floor, or above a maximum rate, or ceiling. We may enter into short-term spot charters or place additional vessels in pools which enable participating vessels to combine revenues.

*Staggered Charter Renewals.*   We seek employment for our vessels based on our analysis and assessment of fundamental developments in each particular sector of the industry and the difference in rates for short-, medium- and long-term charters. Renewing our period charters at different times enables us to reduce our exposure to market conditions prevailing at any one time.

*Diversified Charter Counterparties.*   Our vessels are chartered to two different charterers operating in the drybulk carrier sector and our tanker is employed in a spot market pool. We believe that chartering our vessels to well established and reputable charterers reduces counterparty risk. As we grow our fleet over time, we may invest in other seaborne transportation sectors and seek to further diversify the end-users of our vessels, thereby enhancing the overall credit quality of our charter portfolio.

*Quality Fleet Managers.*   Our Fleet Managers have established a reputation in the international shipping industry for high standards of performance, reliability and safety. We believe that contracting with fleet managers that have achieved this reputation will create greater opportunities for us to seek employment contracts with well established charterers, many of whom consider the reputation of the fleet manager when entering into charters. We believe we derive important benefits from our Fleet Managers' experience, which enables them to achieve significant economies of scale and scalability in areas such as crewing, supply procurement, and insurance which in addition to other benefits, are passed to us as the vessel owner. We intend to maintain the quality of our fleet through our Fleet Managers' rigorous maintenance programs. We believe that owning a fleet of well-maintained vessels will enable us to operate our vessels with lower operating costs, maintain their resale value and secure employment for our vessels with high quality charterers.

### Shipping Operations

*OceanFreight's Fleet.*   We operate a diversified fleet in order to reduce our dependency on any one shipping sector and to capitalize on opportunities for upside potential in both the drybulk and tanker markets. As of the date of this Annual Report, our fleet has a weighted average age of 7.7 years and is comprised of the vessels listed in the table below.

With the exception of the M/T *Olinda* , which is employed in a spot pool, all of our existing vessels are chartered under long term contracts expiring at various dates, with the latest possible expiration in 2018.

| Vessel Name | Vessel Type | Year Built | Deadweight (In metric tons) |
| --- | --- | --- | --- |
| **Drybulk Carriers** | | | |
| M/V *Robusto* | Capesize | 2006 | 173,949 |
| M/V *Cohiba* | Capesize | 2006 | 174,200 |
| M/V *Montecristo* | Capesize | 2005 | 180,263 |
| M/V *Partagas* | Capesize | 2004 | 173,880 |
| M/V *Topeka* | Panamax | 2000 | 74,710 |
| M/V *Helena* | Panamax | 1999 | 73,744 |
| **Tanker Held for Sale** | | | |
| M/T *Olinda* | Suezmax | 1996 | 149,085 |
| **Dry bulk Carriers to be Acquired** | | | |
| VLOC#1(1) | Capesize | 2012 | 206,000 |
| VLOC#2(1) | Capesize | 2012 | 206,000 |
| VLOC#3(1) | Capesize | 2012 | 206,000 |
| VLOC#4(2) | Capesize | 2013 | 206,000 |
| VLOC#5(2) | Capesize | 2013 | 206,000 |

(1) On March 4, 2010, we entered into an agreement with a shipyard for the construction of three Capesize Very Large Ore carriers (VLOCs) for an aggregate price of $204.3 million. The vessels are scheduled for delivery in the first, second and third quarters of 2012.

(2) On April 1, 2011, we entered into two agreements to purchase two Capesize vessels under construction of 206,000 DWT each, through the acquisition of the shares of the relevant owning companies for a company ultimately controlled by the Company's Chief Executive Officer in exchange for an aggregate of 35,657,142 common shares of the Company. The vessels are scheduled to be delivered, upon payment of the outstanding yard payments, in the second and fourth quarter of 2013. The total outstanding yard payments amount to $95.04 million, of which $29.7 million is payable in 2012 and the balance is payable in 2013.

Each of our vessels is owned through a separate wholly-owned subsidiary. Our vessels operate worldwide within the trading limits imposed by our insurance terms and do not operate in areas where sanctions of the United States, the European Union or the United Nations have been imposed.

### Vessel Management

We have contracted the day-to-day vessel management of our fleet, which includes performing the day-to-day operations and maintenance of the vessels to two management companies, which we refer to as our Fleet Managers, who are engaged under separate vessel management agreements directly by our respective wholly-owned subsidiaries. In 2008, our eight Panamax drybulk carriers were managed by Wallem an unrelated third party technical and commercial management company and our five remaining vessels were managed by Cardiff Marine Inc., or Cardiff, a related party. During the period from January 2009 to July 2009, the management of our drybulk vessels (previously under Wallem) was progressively assumed by Cardiff. Effective June 15, 2010, we have contracted the day-to-day management of our drybulk and tanker fleets, which includes performing the day-to-day operations and maintenance of the vessels, to TMS Dry Ltd., or TMS Dry, and TMS Tankers Ltd., or TMS Tankers, respectively. Both TMS Dry and TMS Tankers, or our Fleet Managers, are related party management companies engaged under separate vessel management agreements directly by our respective wholly-owned subsidiaries. Please see Note 3(a) to our consolidated financial statements included elsewhere in this Annual Report. Previously the management of our fleet was performed by Cardiff Marine Inc., or Cardiff, a related party management company. In 2010, Cardiff proceeded with an internal restructuring for the purpose of enhancing its efficiency and the quality of its ship management services. As part of this restructuring our Fleet Managers were established as two different

management companies to undertake the management of part of the fleet previously managed by Cardiff. Our Fleet Managers utilize the same experienced personnel previously utilized by Cardiff. We believe that our Fleet Managers maintain high standards of operation, vessel technical condition, safety and environmental protection and control operating expenses through comprehensive planned maintenance systems, preventive maintenance programs and by retaining and training qualified crew members. We further believe that the scale and scope of our Fleet Managers enables them to achieve significant economies of scale when procuring supplies and insurance. These economies of scale, as well as our Fleet Managers' ability to spread their operating costs over a larger number of vessels in conjunction with their cost containment programs, are expected to result in cost savings to us. We intend to rely on our Fleet Managers' established operations to help us manage our growth without having to integrate additional resources since we will rely on their resources to manage additional vessels we may acquire in the future.

Our Fleet Managers provide comprehensive vessel management services including technical supervision, such as repairs, maintenance and inspections, safety and quality, crewing and training, supply provisioning as well as vessel accounting.

Our Fleet Managers have implemented the International Maritime Organization, or IMO, International Management Code for the Safe Operation of Ships and Pollution Prevention, or ISM Code. It also has obtained documents of compliance for their offices and safety management certificates for their vessels as required by the ISM Code, as well as certificates for vessels under the International Ship and Port Security Code, or ISPS Code, as required by the International Convention for the Safety of Life at Sea, or SOLAS, and the Maritime Transportation Security Act Code, or MTSA Code.

Our Fleet Managers have the following departments:

- Operations,

- Technical,

- Accounting,

- Crewing,

- Insurance,

- Purchasing,

- Safety and Quality,

- Sale and Purchase, and

- Chartering.

Our Fleet Managers provide, under the separate vessel management agreements, specific day-to-day vessel management functions including:

- monitoring the quality and safety of vessel operations;

- performing general vessel maintenance and inspections;

- arranging and supervising special surveys, drydockings, vessel reconditioning and repair work;

- appointing supervisors, surveyors and technical consultants;

- ensuring compliance with all country of registry, classification society and port state rules and regulations;

- implementing of the Safety Management System (SMS) in accordance with the ISM code;

- providing employment, training and performance reviews of qualified officers and crew;

- arranging for transportation, repatriation, payroll, pensions and insurance of seafarers;

- purchasing of stores, supplies, spares, lubricating oil and new equipment for vessels;

- maintaining vessel condition acceptable to charterers and arranging for physical inspections by charterers;

D-34

- providing vessel operating expense budgets and monthly vessel working capital requirements; and

- providing vessel accounting and reporting.

*Vessel Management Agreements.* We do not employ personnel to run our day-to-day vessel management activities. Our Fleet Managers are responsible for all day-to-day vessel management functions pursuant to separate vessel management agreements. Our senior management team, under the supervision of our Board of Directors, manages our business as a holding company, including our administrative functions, and we monitor our Fleet Managers' performance under our vessel management agreements. The vessel management agreements have a one-year term and are automatically extended for successive one year terms, unless in each case, advance notice of termination is given by either party under the terms of the respective vessel management agreements.

In the event that the management agreement is terminated for any reason other than a Fleet Manager's default, we will be required to pay (a) management fees for a further period of three (3) calendar months as from the date of termination and (b) an equitable proportion of any severance crew costs which materialize as per the applicable Collective Bargaining Agreement, or CBA.

Pursuant to the management agreements, we are obligated to pay our Fleet Managers a daily management fee per vessel of €1,500 ($1,988 based on the exchange rate of December 31, 2010) and €1,700 ($2,253 based on the exchange rate of December 31, 2010) for the drybulk carriers and tanker vessels, respectively. The Fleet Managers are also entitled to (a) a discretionary incentive fee, (b) extra superintendents' fee of €500 ($676 based on the exchange rate of December 31, 2010) per day (c) a commission of 1.25% on charterhire agreements that are arranged by the Fleet Managers and (d) a commission of 1% of the purchase price on sales or purchases of vessels in our fleet that are arranged by the Fleet Managers. Furthermore, the Fleet Managers are entitled to a supervision fee payable upfront for vessels under construction equal to 10% of the approved annual budget for supervision cost.

*Vessel Employment.* We are responsible for all commercial management decisions for our fleet. We use the global network of chartering brokers and industry contacts to provide us with information on charter markets and possible employment opportunities for our vessels. With the exception of the M/T *Olinda*, which is currently employed in a spot market pool, and which we expect to deliver to its new owners in April 2011, our remaining vessels are presently operating under long-term time charter agreements as follows:

| Vessel Name | Estimated Expiration of Charter (*) | Gross Daily Rate |
|---|---|---|
| **Drybulk Carriers** | | |
| M/V *Robusto* | August 2014 to March 2018 | $26,000 |
| M/V *Cohiba* | October 2014 to May 2018 | 26,250 |
| M/V *Partagas* | July 2012 to December 2012 | 27,500 |
| M/V Montecristo | May 2014 to January 2018 | 23,500 |
| M/V *Topeka* | January 2012 to April 2013 | 15,000 |
| M/V *Helena* | May 2012 to October 2016 | 32,000 |
| **Drybulk Carriers to be Acquired** | | |
| VLOC#1(1) | April 2015 to April 2020 | 25,000 |
| VLOC#2(2) | August 2017 to August 2022 | 23,000 |
| VLOC#3(3) | October 2019 to October 2026 | 21,500 |
| VLOC#4 | Spot | |
| VLOC#5 | Spot | |

(*) The estimated expiration of charter provides the estimated latest redelivery dates at the end of any redelivery optional periods not yet exercised.

(1) Upon delivery of VLOC#1, which is expected in the first quarter of 2012, the vessel is scheduled to commence time charter employment for a minimum period of three years at a gross daily rate of $25,000.

(2) Upon delivery of VLOC#2, which is expected in the second quarter of 2012, the vessel is scheduled to commence time charter employment for a minimum period of five years at a gross daily rate of $23,000. In

addition the time charter contract provides for a 50% profit sharing arrangement when the daily Capesize average time charter rate, as defined in the charter agreement, is between $23,000 and $40,000 per day.

(3) Upon delivery of VLOC#3, which is expected in the third quarter of 2012, the vessel is scheduled to commence time charter employment for a minimum period of seven years at a gross daily rate of $21,500. In addition the time charter contract provides for a 50% profit sharing arrangement when the daily Capesize average time charter rate, as defined in the charter agreement, is between $21,500 and $38,000 per day.

We believe that these charters will provide us with stable cash flow and high vessel utilization rates and also limit our exposure to freight rate volatility. In addition, renewing our period charters at different times enables us to reduce our exposure to market conditions prevailing at any one time.

*Spot Charters.*   Spot charters generally refer to voyage charters and trip time charters, which generally last from ten days to three months. A voyage charter is generally a contract to carry a specific cargo from a load port to a discharge port for an agreed upon total amount. Under voyage charters, we pay voyage expenses such as port, canal and fuel costs. A trip time charter is generally a contract for a trip to carry a specific cargo from a load port to a discharge port at a set daily rate. Under time charters, including trip time charters, the charterer pays voyage expenses such as port, canal and fuel costs. Under both types of spot charters, we would pay for vessel operating expenses, which include vessel management fees, crew costs, provisions, deck and engine stores, lubricating oil, insurance, maintenance and repairs, and for commissions on gross revenues. We would also be responsible for each vessel's intermediate and special survey costs.

*Charterers.*   We believe that chartering our vessels to a number of well established and reputable charterers reduces the risk of default under our charter contracts. As we grow our fleet over time, we may invest in other seaborne transportation sectors and seek to further diversify the end-users of our vessels thereby enhancing the overall credit quality of our charter portfolio. Our assessment of a charterer's financial condition and reliability is an important factor in negotiating employment for our vessels. We generally charter our vessels to major corporations, publicly-traded shipping companies, reputable vessel owners and operators, trading houses (including commodities traders), major producers and government-owned entities.

For the year ended December 31, 2010, 55% of the Company's voyage revenues were earned from two charterers, who individually accounted for 44.7%, and 10.3% of such revenues, respectively.

*Competition.*   We operate in markets that are highly competitive and based primarily on supply and demand. We compete for charters on the basis of price, vessel location, size, age and condition of the vessel, as well as on our reputation. We arrange our charters (whether period charters or spot charters) through the use of brokers, who negotiate the terms of the charters based on market conditions.

Currently, we compete with other owners of vessels in the drybulk carrier and tanker sectors. Ownership of vessels is highly fragmented in all sectors of the seaborne transportation industry.

### The International Drybulk Shipping Industry.

We currently employ each of our six drybulk carriers under time charter agreements with an average remaining duration of approximately 42.2 months as of the date of this Annual Report.

The Baltic Dry Index (BDI), a daily average of charter rates in 26 shipping routes measured on a time charter and voyage basis covering Supramax, Panamax and Capesize drybulk carriers, recovered significantly in 2010 as compared to the low of the fourth quarter of 2008. The 2010 average of the BDI was 2,761, which is about 5.6% higher than 2009 average and 272% higher than the December 2008 average of 743. However, this is still below the BDI's high of 11,844 reached in May 2008.

The decline in the drybulk market since its peak in 2008 has resulted in lower charter rates for vessels exposed to the spot market and time charters linked to the BDI. Our drybulk carriers are presently employed under time charters and are not directly linked to the BDI. Drybulk vessel values have also rebounded in part since 2008's steep decline. Charter rates and vessel values were affected in 2008 in part by the lack of availability of credit to finance both vessel purchases and purchases of commodities carried by sea, resulting in a decline in cargo shipments, and the excess supply of iron ore in China which resulted in falling iron ore prices and increased stockpiles in Chinese

D-36

ports. The increase in drybulk vessel values in 2009 resulted primarily from cheaper prices for raw materials from producing countries like Brazil and Australia compared to raw materials produced domestically in Asia; consequently China has increased its imports of raw materials. In 2008, China's iron ore imports comprised about 65% of the total volume of iron transported by sea. In 2009, this number has increased to about 80%, while in 2010 this number dropped slightly due to global recovery of the steel industry. There can be no assurance as to how long charter rates and vessel values will remain at their current levels or whether they will experience significant volatility. Average daily Capesize rates improved significantly to approximately $42,600 for the year ended December 31, 2009, but declined to approximately $33,000 per day in the year ended December 31, 2010.

The global drybulk carrier fleet may be divided into four categories based on a vessel's carrying capacity. These categories consist of:

• Capesize vessels, which have carrying capacities of more than 85,000 dwt. These vessels generally operate along long haul iron ore and coal trade routes. There are relatively few ports around the world with the infrastructure to accommodate vessels of this size.

• Panamax vessels have a carrying capacity of between 60,000 and 85,000 dwt. These vessels carry coal, grains, and, to a lesser extent, minor bulks, including steel products, forest products and fertilizers. Panamax vessels are able to pass through the Panama Canal, thereby making them more versatile than larger vessels.

• Handymax vessels, which have a carrying capacity of between 35,000 and 60,000 dwt. These vessels operate along a large number of geographically dispersed global trade routes mainly carrying grains and minor bulks. Vessels below 60,000 dwt are sometimes built with on-board cranes, thereby enabling them to load and discharge cargo in countries and ports with limited infrastructure.

• Handysize vessels, which have a carrying capacity of up to 35,000 dwt. These vessels carry exclusively minor bulk cargo. Increasingly, these vessels have operated along regional trading routes. Handysize vessels are well suited for small ports with length and draft restrictions that may lack the infrastructure for cargo loading and unloading.

As of January 1, 2011, total newbuilding orders had been placed for an aggregate of about 51.9% of the existing global drybulk fleet, with deliveries expected during the next 36 months. According to market sources about 50% of the drybulk fleet is contracted at established yards, while the other 50% is contracted at yards that are less established and whose viability may be uncertain. Many analysts expect that newbuilding orders may experience significant cancellations and/or slippage, defined as the difference between newbuilding deliveries ordered versus actually delivered, in each case due to a lack of financing in the industry. Market sources indicate that slippage in the Handysize sector is about 50% and about 20% in the Capesize sector. The supply of drybulk carriers is dependent on the delivery of new vessels and the removal of vessels from the global fleet, either through scrapping or accidental losses. The level of scrapping activity is generally a function of scrapping prices in relation to current and prospective charter market conditions, as well as operating repair and survey costs. Scrapping in 2009 had been significant compared to the previous two years, while in 2010 it slowed down due to the recovery of the drybulk market. In 2009, about 10 million dwt was removed from the global drybulk fleet representing 30% of the carrying capacity of the total fleet delivered during the same year. Total drybulk scrapping during 2008 was 5.5 million dwt. As of the end of December 2010, about 24% of the total dry bulk fleet is 20 years old or older. Many analysts expect scrapping to continue to be a significant factor in offsetting the total supply of the drybulk fleet.

*The International Tanker Industry.*

We currently operate one tanker that we have agreed to sell. In the future, we may purchase additional tankers. The tanker industry has an inherent volatility that is caused by seasonal demand fluctuations. During the fall, refineries typically build stockpiles to cover demand for heating distillates during the winter. Early in the spring the refineries move into a maintenance period in order to switch production to gasoline instead of heavy distillates. This results in the reduction of required seaborne transportation of oil. As a general pattern, demand for petroleum products during the summer is less than the demand for such products during the winter. This seasonality is reflected in the time charter equivalent rate for Suezmax tanker route loading in West Africa and discharging in the

U.S. Atlantic Coast. This rate averaged $18,796 per day during August 2010 compared to $32,503 per day during December 2010.

In response to a significant decline in oil prices during 2008, OPEC significantly reduced oil supply, causing WTI oil prices to recover from a low of $34 per barrel in December 2008 to an average WTI oil price of approximately $62 per barrel in 2009 and approximately $80 per barrel in 2010. During the last OPEC meeting, the ministers agreed to leave existing output targets unchanged in order to help economic recovery by avoiding further increases of oil prices during the economic recession. The decline in oil supply had an adverse effect on the demand for tankers and tanker charter rates.

For 2010, newbuilding deliveries for Suezmax vessels amounted to about 6.2 million dwt tons or 25.2% of the total Suezmax orderbook of 24.6 million dwt tons. During the same period the newbuilding deliveries for Aframax vessels amounted to 7.5 million dwt tons or 48.1% of the total Aframax orderbook of 15.6 million dwt tons. As of January 1, 2011, the total tanker newbuilding orderbook stood at about 124.6 million dwt. It is expected that about 62.8 million dwt of tankers in excess of 10,000 dwt will be delivered in 2011.

Tanker vessels generally fall into one of seven major types of vessel classifications based upon carrying capacity:

*ULCCs (Ultra Large Crude Carriers), with a cargo carrying capacity of 320,000 dwt or more;*

*VLCCs (Very Large Crude Carriers), with a cargo carrying capacity of approximately 200,000 to 320,000 dwt;*

*Suezmax tankers, with a cargo carrying capacity of approximately 120,000 to 200,000 dwt;*

*Aframax tankers, with a cargo carrying capacity of approximately 80,000 to 120,000 dwt;*

*Panamax tankers, with a cargo carrying capacity of approximately 60,000 to 80,000 dwt;*

*Handymax tankers, with a cargo carrying capacity of approximately 30,000 to 60,000 dwt; and*

*Handysize tankers, with a cargo carrying capacity of approximately 10,000 to 30,000 dwt.*

Additionally, tankers are differentiated by the type of cargo that they carry. The industry identifies tankers as either product tankers or crude oil tankers on the basis of various factors including technical specifications and trading histories. Crude oil tankers carry crude oil and so-called "dirty" products such as fuel oils. Product tankers carry refined petroleum products such as gasoline, jet fuel, kerosene, naphtha and gas oil, which are often referred to as "clean" products.

Product tankers are tankers that typically have cargo handling systems that are designed to transport several different refined products simultaneously, such as gasoline, jet fuel, kerosene, naphtha and heating oil, from refineries to the ultimate consumer. Product tankers generally have coated cargo tanks that assist in tank cleaning between voyages involving different cargoes. This coating also protects the steel in the tanks from corrosive cargoes.

Product tankers generally range in size from 10,000 dwt to 80,000 dwt, although there are some larger product carriers designed for niche long-range trades like the Middle East to Southeast Asia.

Although product tankers can carry dirty products, they generally do not switch between clean and dirty cargoes because a vessel carrying dirty cargo must undergo a cleaning process prior to loading clean cargo. In addition, specified design, outfitting and technical factors tend to make some vessels better suited to handling the physical properties of distinct cargoes.

ULCCs and VLCCs carry the largest percentage of crude oil transported by sea. These large tankers are typically on long-haul voyages, but port constraints limit their trading routes. For example, only a few U.S. ports, such as the Louisiana Offshore Oil Port, are capable of handling a fully laden VLCC.

Suezmax tankers engage in a range of crude oil trades, usually from West Africa to the United States, the Gulf of Mexico, the Caribbean or Europe, within the Mediterranean, or within Asia. Most Aframax tankers carry dirty products in short regional trades, mainly within Northwest Europe, within the Caribbean, within the Mediterranean

or within Asia. Panamax tankers, which are the largest tankers that can pass fully-loaded through the Panama Canal, take advantage of size restrictions on larger vessels in South and North American terminals. Three-quarters of the world's Panamax fleet transports dirty products and the remainder transports clean products.

Handymax and Handysize tankers carry the vast majority of clean products, comprising 90% of all product tankers. Handymax tankers comprise the largest concentration of product tankers because smaller tankers have the greatest flexibility in trade routes and port access. They can service many ports and utilize berthing facilities, which cannot accommodate larger tankers due to size limitations or because those tankers require deeper water in which to operate. Also, port facilities may lack sufficient storage capacity to unload the large loads carried by larger tankers. At the same time, Handymax tankers can load a variety of different cargoes and thereby operate in a number of international oil and oil product trading routes.

*Charterhire Rates.*  Charterhire rates paid for drybulk carriers are primarily a function of the underlying balance between vessel supply and demand, although at times other factors may play a role. Furthermore, the pattern seen in charter rates is broadly mirrored across the different charter types and among the different drybulk carrier categories. However, because demand for larger drybulk carriers is affected by the volume and pattern of trade in a relatively small number of commodities, charterhire rates (and vessel values) of larger ships tend to be more volatile than those for smaller vessels.

In the time charter market, rates vary depending on the length of the charter period and vessel specific factors such as age, speed and fuel consumption. In the voyage charter market, rates are influenced by cargo size, commodity, port dues and canal transit fees, as well as delivery and redelivery regions. In general, a larger cargo size is quoted at a lower rate per ton than a smaller cargo size. Routes with costly ports or canals generally command higher rates than routes with low port dues and no canals to transit.

Voyages with a load port within a region that includes ports where vessels usually discharge cargo or a discharge port within a region with ports where vessels load cargo also are generally quoted at lower rates, because such voyages generally increase vessel utilization by reducing the unloaded portion (or ballast leg) that is included in the calculation of the return charter to a loading area.

Within the drybulk shipping industry, the charterhire rate references most likely to be monitored are the freight rate indices issued by the Baltic Exchange. These references are based on actual charterhire rates under charter entered into by market participants as well as daily assessments provided to the Baltic Exchange by a panel of major shipbrokers. The Baltic Panamax Index is the index with the longest history.

*Vessel Prices.*  Drybulk vessel prices, both for newbuildings and secondhand vessels, have also rebounded in part in 2010 following 2008's steep decline. The decrease from the peak prices seen in 2008 is a result of the reduction in drybulk freight rates, which occurred during the fourth quarter of 2008.

Vessel values have also declined as a result of a slowdown in the availability of global credit. The lack of credit has resulted in the restriction to fund both vessel purchases and purchases of commodities carried by sea.

As a result of the decline in oil demand and commensurate decline in tanker charter rates, tanker vessel values have also declined significantly, especially for the older vessels since competition is more evidenced in depressed markets where the charterers will choose younger vessels over older or single hull vessels.

There can be no assurance as to how long charterhire rates and vessel values will remain depressed or whether they will drop any further. Should charterhire rates remain at these depressed levels for some time our revenue and profitability will be adversely affected.

### Crewing and Shore-based Employees

We, through our vessel-owning subsidiaries, currently employ 162 seafarers onboard our vessels. OceanFreight Inc. employs five persons: our Chief Executive Officer; our Chief Financial Officer, Treasurer and interim Chief Accounting Officer; our President and Chief Operating Officer and two other employees. Pursuant to our management agreements we utilize TMS Dry Ltd and TMS Tankers Ltd, with approximately 73 shore-based employees, for commercial management services and supervisory services in connection with the technical and commercial management of our vessels.

As is common practice in the shipping industry, our Fleet Managers are responsible for identifying, screening and recruiting directly or through a crewing agent, the officers and all other crew members for our vessels who are employed by our vessel owning subsidiaries.

### *Permits and Authorizations*

We are required by various governmental and quasi-governmental agencies to obtain certain permits, licenses and certificates with respect to our vessels. The kinds of permits, licenses and certificates required depend upon several factors, including the commodity transported, the waters in which the vessel operates, the nationality of the vessel's crew and the age of a vessel. We have been able to obtain all permits, licenses and certificates currently required to permit our vessels to operate. Additional laws and regulations, environmental or otherwise, may be adopted which could limit our ability to do business or increase cost of our doing business.

## ENVIRONMENTAL AND OTHER REGULATIONS

Government regulations and laws significantly affect the ownership and operation of our vessels, which consist of both drybulk carriers and tankers. We are subject to various international conventions, laws and regulations in force in the countries in which our vessels may operate or are registered. Compliance with such laws, regulations and other requirements entails significant expense, including vessel modification and implementation of certain operating procedures.

A variety of government, quasi-governmental and private organizations subject our vessels to both scheduled and unscheduled inspections. These organizations include the local port authorities, national authorities, harbor masters or equivalent, classification societies, relevant flag state and charterers, particularly terminal operators and oil companies. Some of these entities require us to obtain permits, licenses, certificates and approvals for the operation of our vessels. Our failure to maintain necessary permits, licenses, certificates or approvals could require us to incur substantial costs or temporarily suspend operation of one or more of the vessels in our fleet, or lead to the invalidation or reduction of our insurance coverage.

We believe that the heightened levels of environmental and quality concerns among insurance underwriters, regulators and charterers have led to greater inspection and safety requirements on all vessels and may accelerate the scrapping of older vessels throughout the industry. Increasing environmental concerns have created a demand for tankers that conform to stricter environmental standards. We are required to maintain operating standards for all of our vessels that emphasize operational safety, quality maintenance, continuous training of our officers and crews and compliance with applicable local, national and international environmental laws and regulations.

We believe that the operation of our vessels is in substantial compliance with applicable environmental laws and regulations and that our vessels have all material permits, licenses, certificates or other authorizations necessary for the conduct of our operations; however, because such laws and regulations are frequently changed and may impose increasingly stricter requirements, we cannot predict the ultimate cost of complying with these requirements, or the impact of these requirements on the resale value or useful lives of our vessels. In addition, a future serious marine incident that results in significant oil pollution, such as the 2010 Deepwater Horizon spill, or otherwise causes significant adverse environmental impact could result in additional legislation or regulation that could negatively affect our profitability.

Our vessels are subject to both scheduled and unscheduled inspections by a variety of governmental and private entities, each of which may have unique requirements. These entities include the local port authorities (U.S. Coast Guard, harbor master or equivalent), classification societies, flag state administration (country of registry) and charterers, particularly terminal operators and oil companies. Failure to maintain necessary permits or approvals could require us to incur substantial costs or temporarily suspend operation of one or more of our vessels.

### *International Maritime Organization*

The International Maritime Organization, or IMO (the United Nations agency for maritime safety and the prevention of pollution by ships), has adopted the International Convention for the Prevention of Marine Pollution from Ships, 1973, as modified by the Protocol of 1978 relating thereto, which has been updated through various

amendments, or the MARPOL Convention. The MARPOL Convention implements environmental standards including oil leakage or spilling, garbage management, as well as the handling and disposal of noxious liquids, harmful substances in packaged forms, sewage and air emissions.

*Air Emissions*

In September 1997, the IMO adopted Annex VI to MARPOL to address air pollution from ships. Effective May 2005, Annex VI sets limits on sulfur oxide and nitrogen oxide emissions from all commercial vessel exhausts and prohibits deliberate emissions of ozone depleting substances (such as halons and chlorofluorocarbons), emissions of volatile organic compounds from cargo tanks, and the shipboard incineration of specific substances. Annex VI also includes a global cap on the sulfur content of fuel oil and allows for special areas to be established with more stringent controls on sulfur emissions. Additional or new conventions, laws and regulations may be adopted that could require the installation of expensive emission control systems and that could adversely affect our business, cash flows, results of operations and financial condition. In October 2008, the IMO adopted amendments to Annex VI regarding emissions of sulfur oxide, nitrogen oxide, particulate matter and ozone-depleting substances, which amendments entered into force on July 1, 2010. The amended Annex VI is expected to reduce air pollution from vessels by, among other things, (i) implementing a progressive reduction of sulfur oxide, emissions from ships by reducing the global sulfur fuel cap reduced initially to 3.50% (from the current cap of 4.50%), effective from January 1, 2012, then progressively to 0.50%, effective from January 1, 2020, subject to a feasibility review to be completed no later than 2018; and (ii) establishing new tiers of stringent nitrogen oxide emissions standards for new marine engines, depending on their date of installation. The United States ratified the Annex VI amendments in October 2008, and the U.S. Environmental Protection Agency, or EPA, promulgated equivalent emissions standards in late 2009.

On March 26, 2010, the IMO amended MARPOL to designate areas extending up to 200 nautical miles from the Atlantic/Gulf and Pacific coasts of the United States and Canada, the Hawaiian Islands and certain portions of French waters, as Emission Control Areas under the MARPOL Annex VI amendments. Once the designations take effect in August 2012, ocean-going vessels in these areas will be subject to stringent emission controls. As a result of these designations or similar future designations, we may be required to incur additional or other costs.

*Safety Requirements*

The IMO has also adopted the International Convention for the Safety of Life at Sea, or SOLAS Convention, and the International Convention on Load Lines, 1966, or LL Convention, which impose a variety of standards to regulate design and operational features of ships. SOLAS Convention and LL Convention standards are revised periodically. We believe that all our vessels are in substantial compliance with SOLAS Convention and LL Convention standards.

Under Chapter IX of SOLAS, the requirements contained in the International Safety Management Code for the Safe Operation of Ships and for Pollution Prevention, or ISM Code, promulgated by the IMO, also affect our operations. The ISM Code requires the party with operational control of a vessel to develop an extensive safety management system that includes, among other things, the adoption of a safety and environmental protection policy setting forth instructions and procedures for operating its vessels safely and describing procedures for responding to emergencies.

The ISM Code requires that vessel operators obtain a safety management certificate for each vessel they operate. This certificate evidences compliance by a vessel's management with code requirements for a safety management system. No vessel can obtain a certificate unless its manager has been awarded a document of compliance, issued by each flag state, under the ISM Code. We have obtained documents of compliance for our offices and safety management certificates for all of our vessels for which the certificates are required by the IMO. We renew these documents of compliance and safety management certificates annually.

Noncompliance with the ISM Code and other IMO regulations may subject the shipowner or bareboat charterer to increased liability, may lead to decreases in, or invalidation of, available insurance coverage for affected vessels and may result in the denial of access to, or detention in, some ports. The U.S. Coast Guard and European

D-41

Union authorities have indicated that vessels not in compliance with the ISM Code by the applicable deadlines will be prohibited from trading in U.S. and European Union ports, as the case may be.

The IMO has negotiated international conventions that impose liability for pollution in international waters and a signatory's territorial waters. Additional or new conventions, laws and regulations may be adopted which could limit our ability to do business and which could have a material adverse effect on our business and results of operations.

### Ballast Water Requirements

The IMO adopted an International Convention for the Control and Management of Ships' Ballast Water and Sediments, or the BWM Convention, in February 2004. The BWM Convention's implementing regulations call for a phased introduction of mandatory ballast water exchange requirements (beginning in 2009), to be replaced in time with mandatory concentration limits. The BWM Convention will not enter into force until 12 months after it has been adopted by 30 states, the combined merchant fleets of which represent not less than 35% of the gross tonnage of the world's merchant shipping. To date, there has not been sufficient adoption of this standard for it to take force. However, the IMO's Marine Environment Protection Committee passed a resolution in March 2010 encouraging the ratification of the Convention and calling upon those countries that have already ratified to encourage the installation of ballast water management systems. If ballast water treatment becomes mandatory, the cost of compliance could be significant.

### Oil Pollution Liability

IMO has negotiated international conventions that impose liability for pollution in international waters and the territorial waters of the signatory nations to such conventions. For example, many countries have ratified and follow the liability plan adopted by the IMO and set out in the International Convention on Civil Liability for Oil Pollution Damage, or the CLC, although the United States is not a party. Under this convention and depending on whether the country in which the damage results is a party to the 1992 Protocol to the CLC, a vessel's registered owner is strictly liable, subject to certain affirmative defenses, for pollution damage caused in the territorial waters of a contracting state by discharge of persistent oil. The limits on liability outlined in the 1992 Protocol use the International Monetary Fund currency unit of Special Drawing Rights, or SDR. The right to limit liability is forfeited under the CLC where the spill is caused by the shipowner's actual fault and under the 1992 Protocol where the spill is caused by the shipowner's intentional or reckless conduct. Vessels trading with states that are parties to these conventions must provide evidence of insurance covering the liability of the owner. In jurisdictions where the CLC has not been adopted, various legislative schemes or common law govern, and liability is imposed either on the basis of fault or in a manner similar to that of the CLC. We believe that our protection and indemnity insurance will cover the liability under the plan adopted by the IMO.

The IMO adopted the International Convention on Civil Liability for Bunker Oil Pollution Damage, or the Bunker Convention, to impose strict liability on ship owners for pollution damage in jurisdictional waters of ratifying states caused by discharges of bunker fuel. The Bunker Convention, which became effective on November 21, 2008, requires registered owners of ships over 1,000 gross tons to maintain insurance or other financial security for pollution damage in an amount equal to the limits of liability under the applicable national or international limitation regime (but not exceeding the amount calculated in accordance with the Convention on Limitation of Liability for Maritime Claims of 1976, as amended). With respect to non-ratifying states, liability for spills or releases of oil carried as fuel in ship's bunkers typically is determined by the national or other domestic laws in the jurisdiction where the events or damages occur.

The IMO continues to review and introduce new regulations. It is impossible to predict what additional regulations, if any, may be passed by the IMO and what effect, if any, such regulations might have on our operations.

### United States Requirements

In 1990, the United States Congress enacted OPA to establish an extensive regulatory and liability regime for environmental protection and cleanup of oil spills. OPA affects all owners and operators whose vessels trade with the United States or its territories or possessions, or whose vessels operate in the waters of the United States, which

include the U.S. territorial sea and the 200 nautical mile exclusive economic zone around the United States. The Comprehensive Environmental Response, Compensation and Liability Act, or CERCLA, imposes liability for cleanup and natural resource damage from the release of hazardous substances (other than oil) whether on land or at sea. Both OPA and CERCLA impact our operations.

Under OPA, vessel owners, operators and bareboat charterers are responsible parties who are jointly, severally and strictly liable (unless the spill results solely from the act or omission of a third party, an act of God or an act of war) for all containment and clean-up costs and other damages arising from oil spills from their vessels. These other damages are defined broadly to include:

- natural resource damages and related assessment costs;

- real and personal property damages;

- net loss of taxes, royalties, rents, profits or earnings capacity;

- net cost of public services necessitated by a spill response, such as protection from fire, safety or health hazards; and loss of subsistence use of natural resources.

Effective July 31, 2009, the U.S. Coast Guard adjusted the limits of OPA liability to the greater of $2,000 per gross ton or $17.088 million for any double-hull tanker that is over 3,000 gross tons and to the greater of $1,000 per gross ton or $854,400 for non-tank vessels (subject to possible adjustment for inflation). and our fleet is entirely composed of vessels of such classes. CERCLA, which applies to owners and operators of vessels, contains a similar liability regime and provides for cleanup, removal and natural resource damages. Liability under CERCLA is limited to the greater of $300 per gross ton or $5 million for vessels carrying a hazardous substance as cargo and the greater of $300 per gross ton or $0.5 million for any other vessel. These OPA and CERCLA limits of liability do not apply if an incident was directly caused by violation of applicable U.S. federal safety, construction or operating regulations, or by the responsible party's gross negligence or willful misconduct, or if the responsible party fails or refuses to report the incident or to cooperate and assist in connection with oil removal activities.

OPA and the U.S. Coast Guard also require owners and operators of vessels to establish and maintain with the U.S. Coast Guard evidence of financial responsibility sufficient to meet the limit of their potential liability under OPA and CERCLA. Vessel owners and operators may satisfy their financial responsibility obligations by providing a proof of insurance, a surety bond, self-insurance or a guaranty. We plan to comply with the U.S. Coast Guard's financial responsibility regulations by providing a certificate of responsibility evidencing sufficient self-insurance.

We insure each of our vessels with pollution liability insurance in the maximum commercially available amount of $1.0 billion. A catastrophic spill could exceed the insurance coverage available, which could have a material adverse effect on our business.

Owners or operators of tankers operating in the waters of the United States must file vessel response plans with the U.S. Coast Guard, and their tankers are required to operate in compliance with their U.S. Coast Guard approved plans. These response plans must, among other things:

- address a worst case scenario and identify and ensure, through contract or other approved means, the availability of necessary private response resources to respond to a worst case discharge;

- describe crew training and drills; and

- identify a qualified individual with full authority to implement removal actions.

We have obtained vessel response plans approved by the U.S. Coast Guard for our vessels operating in the waters of the United States. In addition, the U.S. Coast Guard has announced it intends to propose similar regulations requiring certain vessels to prepare response plans for the release of hazardous substances.

The U.S. Clean Water Act, or CWA, prohibits the discharge of oil or hazardous substances in U.S. navigable waters unless authorized by a duly-issued permit or exemption, and imposes strict liability in the form of penalties for any unauthorized discharges. The CWA also imposes substantial liability for the costs of removal, and remediation and damages and complements the remedies available under OPA and CERCLA. The EPA regulates the discharge of ballast water and other substances in U.S. waters under the CWA. Effective February 6, 2009, EPA

D-43

regulations require vessels 79 feet in length or longer (other than commercial fishing recreational vessels) to comply with a Vessel General Permit authorizing ballast water discharges and other discharges incidental to the operation of vessels. The Vessel General Permit imposes technology and water-quality based effluent limits for certain types of discharges and establishes specific inspection, monitoring, recordkeeping and reporting requirements to ensure the effluent limits are met. U.S. Coast Guard regulations adopted under the U.S. National Invasive Species Act, or NISA, also impose mandatory ballast water management practices for all vessels equipped with ballast water tanks entering or operating in U.S. waters, and in 2009 the Coast Guard proposed new ballast water management standards and practices, including limits regarding ballast water releases. Compliance with the EPA and the U.S. Coast Guard regulations could require the installation of equipment on our vessels to treat ballast water before it is discharged or the implementation of other port facility disposal arrangements or procedures at potentially substantial cost, and/or otherwise restrict our vessels from entering U.S. waters.

### Other Regulations

In addition, most U.S. states that border a navigable waterway have enacted environmental pollution laws that impose strict liability on a person for removal costs and damages resulting from a discharge of oil or a release of a hazardous substance. These laws may be more stringent than U.S. federal law.

The U.S. Clean Air Act of 1970, as amended by the Clean Air Act Amendments of 1977 and 1990, or the CAA, requires the EPA to promulgate standards applicable to emissions of volatile organic compounds and other air contaminants. Our vessels are subject to vapor control and recovery requirements for certain cargoes when loading, unloading, ballasting, cleaning and conducting other operations in regulated port areas. Our vessels that operate in such port areas with restricted cargoes are equipped with vapor recovery systems that satisfy these requirements. The CAA also requires states to draft State Implementation Plans, or SIPs, designed to attain national health-based air quality standards in primarily major metropolitan and/or industrial areas. Several SIPs regulate emissions resulting from vessel loading and unloading operations by requiring the installation of vapor control equipment. As indicated above, our vessels operating in covered port areas are already equipped with vapor recovery systems that satisfy these requirements. Although a risk exists that new regulations could require significant capital expenditures and otherwise increase our costs, based on the regulations that have been proposed to date, we believe that no material capital expenditures beyond those currently contemplated and no material increase in costs are likely to be required.

### European Union Regulations

In October 2009, the European Union amended a directive to impose criminal sanctions for illicit ship-source discharges of polluting substances, including minor discharges, if committed with intent, recklessly or with serious negligence and the discharges individually or in the aggregate result in deterioration of the quality of water. Criminal liability for pollution may result in substantial penalties or fines and increased civil liability claims.

### Greenhouse Gas Regulation

The IMO is evaluating mandatory measures to reduce greenhouse gas emissions from international shipping, which may include market-based instruments or a carbon tax. The European Union has indicated that it intends to propose an expansion of the existing European Union emissions trading scheme to include emissions of greenhouse gases from marine vessels. In the United States, the EPA has issued a proposed finding that greenhouse gases threaten the public health and safety. In addition, climate change initiatives are being considered in the U.S. Congress. Any passage of climate control legislation or other regulatory initiatives by the IMO, EU, the U.S. or other countries where we operate, or any treaty adopted at the international level to succeed the Kyoto Protocol, that restrict emissions of greenhouse gases could require us to make significant financial expenditures that we cannot predict with certainty at this time.

### Vessel Security Regulations

Since the terrorist attacks of September 11, 2001, there have been a variety of initiatives intended to enhance vessel security. On November 25, 2002, the U.S. Maritime Transportation Security Act of 2002, or MTSA, came

into effect. To implement certain portions of the MTSA, in July 2003, the U.S. Coast Guard issued regulations requiring the implementation of certain security requirements aboard vessels operating in waters subject to the jurisdiction of the United States. Similarly, in December 2002, amendments to SOLAS created a new chapter of the convention dealing specifically with maritime security. The new chapter became effective in July 2004 and imposes various detailed security obligations on vessels and port authorities, most of which are contained in the International Ship and Port Facilities Security Code, or the ISPS Code. The ISPS Code is designed to protect ports and international shipping against terrorism. After July 1, 2004, to trade internationally, a vessel must attain an International Ship Security Certificate (ISSC) from a recognized security organization approved by the vessel's flag state. Among the various requirements are:

- on-board installation of automatic identification systems to provide a means for the automatic transmission of safety-related information from among similarly equipped ships and shore stations, including information on a ship's identity, position, course, speed and navigational status;

- on-board installation of ship security alert systems, which do not sound on the vessel but only alert the authorities on shore;

- the development of vessel security plans;

- ship identification number to be permanently marked on a vessel's hull;

- a continuous synopsis record kept onboard showing a vessel's history including, name of the ship and of the state whose flag the ship is entitled to fly, the date on which the ship was registered with that state, the ship's identification number, the port at which the ship is registered and the name of the registered owner(s) and their registered address; and

- compliance with flag state security certification requirements.

The U.S. Coast Guard regulations, intended to align with international maritime security standards, exempt from MTSA vessel security measures non-U.S. vessels that have on board, as of July 1, 2004, a valid ISSC attesting to the vessel's compliance with SOLAS security requirements and the ISPS Code. We have implemented the various security measures addressed by MTSA, SOLAS and the ISPS Code, and our fleet is in compliance with applicable security requirements.

### *Inspection by Classification Societies*

The classification society certifies that the vessel is "in-class," signifying that the vessel has been built and maintained in accordance with the rules of the classification society and complies with applicable rules and regulations of the vessel's country of registry and the international conventions of which that country is a member. In addition, where surveys are required by international conventions and corresponding laws and ordinances of a flag state, the classification society will undertake them on application or by official order, acting on behalf of the authorities concerned.

The classification society also undertakes on request other surveys and checks that are required by regulations and requirements of the flag state. These surveys are subject to agreements made in each individual case and/or to the regulations of the country concerned.

For maintenance of the class, regular and extraordinary surveys of hull, machinery, including the electrical plant, and any special equipment classed are required to be performed as follows:

- *Annual Surveys.*  For seagoing ships, annual surveys are conducted for the hull and the machinery, including the electrical plant and where applicable for special equipment classed, at intervals of 12 months from the date of commencement of the class period indicated in the certificate.

- *Intermediate Surveys.*  Extended annual surveys are referred to as intermediate surveys and typically are conducted two and a-half years after commissioning and each class renewal. Intermediate surveys may be carried out on the occasion of the second or third annual survey.

- *Class Renewal Surveys.*  Class renewal surveys, also known as special surveys, are carried out for the ship's hull, machinery, including the electrical plant and for any special equipment classed, at the intervals indicated by the character of classification for the hull. At the special survey the vessel is thoroughly examined, including audio-gauging to determine the thickness of the steel structures.

Should the thickness be found to be less than class requirements, the classification society would prescribe steel renewals. The classification society may grant a one year grace period for completion of the special survey. Substantial amounts of money may have to be spent for steel renewals to pass a special survey if the vessel experiences excessive wear and tear. In lieu of the special survey every four or five years, depending on whether a grace period was granted, a ship owner has the option of arranging with the classification society for the vessel's hull or machinery to be on a continuous survey cycle, in which every part of the vessel would be surveyed within a five year cycle. At an owner's application, the surveys required for class renewal may be split according to an agreed schedule to extend over the entire period of class. This process is referred to as continuous class renewal.

All areas subject to survey as defined by the classification society are required to be surveyed at least once per class period, unless shorter intervals between surveys are prescribed elsewhere. The period between two subsequent surveys of each area must not exceed five years.

Most vessels are also drydocked every 30 to 36 months for inspection of the underwater parts and for repairs related to inspections. If any defects are found, the classification surveyor will issue a recommendation which must be rectified by the ship owner within prescribed time limits.

Most insurance underwriters make it a condition for insurance coverage that a vessel be certified as "in-class" by a classification society which is a member of the International Association of Classification Societies. All our vessels are certified as being "in-class" by Det Norske Veritas. All new and secondhand vessels that we purchase must be certified prior to their delivery under our standard purchase contracts and memoranda of agreement. If the vessel is not certified on the scheduled date of closing, we have no obligation to take delivery of the vessel.

In addition to the classification inspections, many of our customers regularly inspect our vessels as a precondition to chartering them for voyages. We believe that our well-maintained, high-quality vessels provide us with a competitive advantage in the current environment of increasing regulation and customer emphasis on quality.

### Risk of Loss and Liability Insurance

*General.*  The operation of any cargo vessel includes risks such as mechanical failure, physical damage, collision, property loss, and cargo loss or damage and business interruption due to political circumstances in foreign countries, hostilities, and labor strikes. In addition, there is always an inherent possibility of marine disaster, including oil spills and other environmental mishaps, and the liabilities arising from owning and operating vessels in international trade. OPA, which imposes virtually unlimited liability upon owners, operators or demise charterers of any vessel trading in the United States exclusive economic zone for certain oil pollution accidents in the United States, has made liability insurance more expensive for ship owners and operators trading in the United States market. While management believes that OceanFreight's present insurance coverage is adequate, not all risks can be insured, and there can be no guarantee that any specific claim will be paid, or that OceanFreight will always be able to obtain adequate insurance coverage at reasonable rates.

*Hull and Machinery and War Risk Insurances.*  OceanFreight has marine hull and machinery and war risk insurance, which includes the risk of actual or constructive total loss, for all of the seven owned vessels. Each of the owned vessels is covered up to at least fair market value, with a deductible for the hull and machinery insurance ranging from $100,000 to $125,000. OceanFreight has also arranged increased value insurance for all of the owned vessels.

Under the increased value insurance, in case of total loss of the vessel, OceanFreight will be able to recover the sum insured under the increased value policy in addition to the sum insured under the hull and machinery policy. Increased value insurance also covers excess liabilities that are not recoverable in full by the hull and machinery policies by reason of under insurance.

*Protection and Indemnity Insurance.*   Protection and indemnity insurance is provided by mutual protection and indemnity associations, or P&I Associations, which covers OceanFreight's third party liabilities in connection with its shipping activities. This includes third-party liability and other related expenses of injury or death of crew, passengers and other third parties, loss or damage to cargo, claims arising from collisions with other vessels, damage to other third-party property, pollution arising from oil or other substances, and salvage, towing and other related costs, including wreck removal. Protection and indemnity insurance is a form of mutual indemnity insurance, extended by protection and indemnity mutual associations, or "clubs." Subject to the "capping" discussed below, OceanFreight's coverage, except for pollution, is unlimited. OceanFreight's current protection and indemnity insurance coverage for pollution is $1.0 billion per vessel per incident. The 13 P&I Associations that comprise the International Group insure approximately 90% of the world's commercial tonnage and have entered into a pooling agreement to reinsure each association's liabilities. As a member of a P&I Association, which is a member of the International Group, OceanFreight is subject to calls payable to the associations based on its claim records as well as the claim records of all other members of the individual associations, and members of the pool of P&I Associations comprising the International Group.

### Risk Management

Risk management in the shipping industry involves balancing a number of factors in a cyclical and potentially volatile environment. Fundamentally, the challenge is to appropriately allocate capital to competing opportunities of owning or chartering vessels. In part, this requires a view of the overall health of the market, as well as an understanding of capital costs and return. Thus, stated simply, one may charter part of a fleet as opposed to owning the entire fleet to maximize risk management and economic results. This is coupled with the challenge posed by the complex logistics of ensuring that the vessels controlled by OceanFreight are fully employed.

### C.   Organizational structure

As of December 31, 2010, the Company is the sole owner of all of the outstanding shares of the subsidiaries, listed in Note 1 of our consolidated financial statements under item 18, and in exhibit 8.1.

### D.   Property, plants and equipment

We do not own real estate property. We lease office space in Athens, Greece, as disclosed in Notes 3, 13 and 16 of our consolidated financial statements under item 18. Our interests in the vessels in our fleet are our only material properties. See "OceanFreight's Fleet" in this section.

### Item 4A.  *Unresolved Staff Comments*

None.

### Item 5.  *Operating and Financial Review and Prospects*

The following management's discussion and analysis is intended to discuss our financial condition, changes in financial condition and results of operations, and should be read in conjunction with our historical consolidated financial statements and their notes included in this report.

This discussion contains forward-looking statements that reflect our current views with respect to future events and financial performance. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of certain factors, such as those set forth in the section entitled "Risk Factors" and elsewhere in this report.

A.   **Operating results**

*Factors Affecting our Results of Operations*

*Charters*

We generate revenues by charging customers for the transportation of drybulk and crude oil cargoes using our vessels. With the exception of the tanker M/T *Olinda* which is employed in the Blue Fin Tankers Inc. spot market pool, we employ our vessels to reputable charterers primarily pursuant to long-term time charters. As of the date of this annual report, our charters have remaining terms ranging between 26.4 months and 58.1 months. We may employ vessels under spot-market charters in the future. A time charter is a contract for the use of a vessel for a specific period of time during which the charterer pays substantially all of the voyage expenses, including port and canal charges and the cost of bunkers (fuel oil), but the vessel owner pays the vessel operating expenses, including the cost of vessel management fees, crewing, insuring, repairing and maintaining the vessel, the costs of spares and consumable stores and tonnage taxes. Under a spot-market charter, the vessel owner pays both the voyage expenses (less specified amounts covered by the voyage charterer) and the vessel operating expenses. Under both types of charters we pay commissions to ship brokers and to in-house brokers associated with the charterer, depending on the number of brokers involved with arranging the charter. Vessels operating in the spot-charter market generate revenues that are less predictable than time charter revenues but may enable us to capture increased profit margins during periods of improvements in charter rates. However, we are exposed to the risk of declining charter rates when operating in the spot market, which may have a materially adverse impact on our financial performance.

We believe that the important measures for analyzing future trends in our results of operations consist of the following:

- *Calendar days.*   Calendar days are the total days the vessels were in our possession for the relevant period including off hire and drydock days.

- *Voyage days.*   Total voyage days are the total days the vessels were in our possession for the relevant period net of off hire.

- *Fleet utilization.*   Fleet utilization is the percentage of time that our vessels were available for revenue generating voyage days, and is determined by dividing voyage days by fleet calendar days for the relevant period.

- *TCE rates.*   Time charter equivalent, or TCE, is a measure of the average daily revenue performance of a vessel on a per voyage basis. TCE is a non-GAAP measure. Our method of calculating TCE is consistent with industry standards and is determined by dividing voyage revenue (net of voyage expenses) by voyage days for the relevant time period. Voyage expenses primarily consist of port, canal and fuel costs that are unique to a particular voyage, which would otherwise be paid by the charterer under a time charter contract, as well as commissions. TCE is a standard shipping industry performance measure used primarily to compare period-to-period changes in a shipping company's performance despite changes in the mix of charter types (i.e., spot charters, time charters and bareboat charters) under which the vessels may be employed between the periods.

- *Daily vessel operating expenses* , which include vessel management fees, crew costs, provisions, deck and engine stores, lubricating oil, insurance, maintenance and repairs, are calculated by dividing vessel operating expenses by fleet calendar days for the relevant time period.

The following table reflects our calendar days, fleet utilization and daily TCE rate for the years ended December 31, 2010, 2009 and 2008.

**Year 2010**

|  | Drybulk Carriers | Tanker Vessels | Fleet |
|---|---|---|---|
| Calendar Days | 3,210 | 1,161 | 4,371 |
| Fleet Utilization | 96.5% | 96.6% | 96.4% |
| Time Charter Equivalent | 23,194 | 22,544 | 23,022 |

**Year 2009**

|  | Drybulk Carriers | Tanker Vessels | Fleet |
|---|---|---|---|
| Calendar Days | 3,190 | 1,460 | 4,650 |
| Fleet Utilization | 96.9% | 94.2% | 96.1% |
| Time Charter Equivalent | 29,881 | 25,471 | 28,523 |

**Year 2008**

|  | Drybulk Carriers | Tanker Vessels | Fleet |
|---|---|---|---|
| Calendar Days | 3,294 | 870 | 4,164 |
| Fleet Utilization | 98.9% | 99.8% | 99.1% |
| Time Charter Equivalent | 33,561 | 38,997 | 34,705 |

The following table reflects the calculation of our TCE daily rates for the years ended December 31, 2010, 2009 and 2008:

**(Dollars in thousands except for Daily TCE rate)**

**Year 2010**

|  | Drybulk Carriers | Tanker Vessels | Fleet |
|---|---|---|---|
| Voyage revenues and imputed deferred revenue | 76,186 | 26,004 | 102,190 |
| Voyage expenses | (4,329) | (867) | (5,196) |
| Time Charter equivalent revenues | 71,857 | 25,137 | 96,994 |
| Total voyage days for fleet | 3,098 | 1,115 | 4,213 |
| Daily TCE rate | 23,194 | 22,544 | 23,022 |

**Year 2009**

|  | Drybulk Carriers | Tanker Vessels | Fleet |
|---|---|---|---|
| Voyage revenues and imputed deferred revenue | 96,672 | 36,263 | 132,935 |
| Voyage expenses | (4,309) | (1,240) | (5,549) |
| Time Charter equivalent revenues | 92,363 | 35,023 | 127,386 |
| Total voyage days for fleet | 3,091 | 1,375 | 4,466 |
| Daily TCE rate | 29,881 | 25,471 | 28,523 |

**Year 2008**

| | Drybulk Carriers | Tanker Vessels | Fleet |
|---|---|---|---|
| Voyage revenues and imputed deferred revenue | 114,758 | 42,676 | 157,434 |
| Voyage expenses | (5,449) | (8,826) | (14,275) |
| Time Charter equivalent revenues | 109,309 | 33,850 | 143,159 |
| Total voyage days for fleet | 3,257 | 868 | 4,125 |
| Daily TCE rate | 33,561 | 38,997 | 34,705 |

- *Spot Charter Rates.* Spot charterhire rates are volatile and fluctuate on a seasonal and year to year basis. The fluctuations are caused by imbalances in the availability of cargoes for shipment and the number of vessels available at any given time to transport these cargoes.

- *Voyage and Time Charter Revenue.* Our revenues are driven primarily by the number of vessels in our fleet, the number of days during which our vessels operate and the amount of daily charterhire rates that our vessels earn under charters, which, in turn, will be affected by a number of factors, including:

  - the duration of our charters;

  - our decisions relating to vessel acquisitions and disposals;

  - the amount of time that we spend positioning our vessels;

  - the amount of time that our vessels spend in drydock undergoing repairs;

  - the amount of time that our vessels spend in connection with maintenance and upgrade work;

  - the age, condition and specifications of our vessels;

  - levels of supply and demand in the drybulk and crude oil shipping industries; and

  - other factors affecting spot market charterhire rates for drybulk carriers and tanker vessels.

As of December 31, 2010, with the exception of M/T *Olinda,* M/T *Tamara,* M/V *Augusta,* M/V *Austin and* M/V *Trenton* , all of our vessels were employed under time charter contracts, which had a remaining duration of a minimum of 30 months and a maximum of 62 months. We believe that these long-term charters provide better stability of earnings and consequently increase our cash flow visibility to our shareholders compared to short-term charters.

The M/T *Olinda* is employed in a spot market pool. Under the pooling agreement, the vessel will earn charterhire in accordance with the pool point formula as defined in the pool agreement. The pooling agreement provides that charterhire will be paid 30 days in arrears and bunkers on board at the time of delivery will be paid with the first hire payment. Preliminary charterhire will be based on the pool's then current earnings, and is not a guaranteed minimum rate obligation of the pool company. Hire is inclusive of overtime, communication, and victualling. The preliminary charterhire may be adjusted either up or down as necessary by the pool committee depending on the prevailing market condition of the vessel. Each vessel's earnings will be adjusted quarterly according to their actual operating days in the pool with surplus funds, if any, distributed based on each vessel's rating as defined in the pool point formula. This vessel is scheduled to be delivered to its new owners in April 2011.

### Lack of Historical Operating Data for Vessels Before Their Acquisition

Consistent with shipping industry practice, other than inspection of the physical condition of the vessels and examinations of classification society records, there is no historical financial due diligence process when we acquire vessels. Accordingly, we do not obtain the historical operating data for the vessels from the sellers because that information is not material to our decision to make acquisitions, nor do we believe it would be helpful to potential investors in our common shares in assessing our business or profitability. Most vessels are sold under a standardized agreement, which, among other things, provides the buyer with the right to inspect the vessel and the vessel's classification society records. The standard agreement does not give the buyer the right to inspect, or receive copies

D-50

of, the historical operating data of the vessel. Prior to the delivery of a purchased vessel, the seller typically removes from the vessel all records, including past financial records and accounts related to the vessel. In addition, the technical management agreement between the seller's technical manager and the seller is automatically terminated and the vessel's trading certificates are revoked by its flag state following a change in ownership.

Consistent with shipping industry practice, we treat the acquisition of a vessel (whether acquired with or without charter) as the acquisition of an asset rather than a business. Although vessels are generally acquired free of charter, we have acquired four vessels with existing time charters and we may do so in the future. We view acquiring a vessel that has been entered in a spot market related pool, whether through a pooling agreement or pool time charter arrangement, as equivalent to acquiring a vessel that has been on a voyage charter. Where a vessel has been under a voyage charter, the vessel is delivered to the buyer free of charter, and it is rare in the shipping industry for the last charterer of the vessel in the hands of the seller to continue as the first charterer of the vessel in the hands of the buyer. In most cases, when a vessel is under time charter and the buyer wishes to assume that charter, the vessel cannot be acquired without the charterer's consent and the buyer's entering into a separate direct agreement with the charterer to assume the charter. The purchase of a vessel itself does not transfer the charter, because it is a separate service agreement between the vessel owner and the charterer.

When we purchase a vessel and assume or renegotiate a related time charter, we must take the following steps before the vessel will be ready to commence operations:

- obtain the charterer's consent to us as the new owner;

- obtain the charterer's consent to a new technical manager;

- obtain the charterer's consent to a new flag for the vessel;

- arrange for a new crew for the vessel;

- replace all hired equipment on board, such as gas cylinders and communication equipment;

- negotiate and enter into new insurance contracts for the vessel through our own insurance brokers;

- register the vessel under a flag state and perform the related inspections in order to obtain new trading certificates from the flag state;

- implement a new planned maintenance program for the vessel; and

- ensure that the new technical manager obtains new certificates for compliance with the safety and vessel security regulations of the flag state.

The following discussion is intended to help you understand how acquisitions of vessels affect our business and results of operations.

Our business is comprised of the following main elements:

- employment and operation of our vessels; and

- management of the financial, general and administrative elements involved in the conduct of our business and ownership of our vessels.

The employment and operation of our vessels require the following main components:

- vessel maintenance and repair;

- crew selection and training;

- vessel spares and stores supply;

- contingency response planning;

- on board safety procedures auditing;

- accounting;

- vessel insurance arrangement;

- vessel chartering;

- vessel hire management;

- vessel surveying; and

- vessel performance monitoring.

The management of financial, general and administrative elements involved in the conduct of our business and ownership of our vessels requires the following main components:

- management of our financial resources, including banking relationships, i.e., administration of bank loans and bank accounts;

- management of our accounting system and records and financial reporting;

- administration of the legal and regulatory requirements affecting our business and assets; and

- management of the relationships with our service providers and customers.

The principal factors that affect our profitability, cash flows and shareholders' return on investment include:

- rates and periods of charterhire;

- levels of vessel operating expenses;

- depreciation expenses;

- financing costs; and

- fluctuations in foreign exchange rates.

### Critical Accounting Policies

The discussion and analysis of our financial condition and results of operations is based upon our consolidated financial statements, which have been prepared in accordance with generally accepted accounting principles in the United States, or U.S. GAAP. The preparation of those financial statements requires us to make estimates and judgments that affect the reported amount of assets and liabilities, revenues and expenses and related disclosure of contingent assets and liabilities at the date of our financial statements. Actual results may differ from these estimates under different assumptions or conditions.

Critical accounting policies are those that reflect significant judgments or uncertainties, and potentially result in materially different results under different assumptions and conditions. We have described below what we believe are our most critical accounting policies that involve a high degree of judgment and the methods of their application. For a description of all of the company's significant accounting policies, see Note 2 to our consolidated financial statements.

*Vessel Lives and Impairment:*   The carrying value of each of our vessels represents its original cost at the time it was delivered or purchased less depreciation calculated using an estimated useful life of 25 years from the date such vessel was originally delivered from the shipyard. The actual life of a vessel may be different. We depreciate our vessels based on a straight-line basis over the expected useful life of each vessel, based on the cost of the vessel less its estimated residual value, which is estimated at $200 per lightweight ton at the date of the vessel's acquisition, which we believe is common in the drybulk and tanker shipping industries.

Secondhand vessels are depreciated from the date of their acquisition through their remaining estimated useful life. However, when regulations place limitations over the ability of a vessel to trade on a worldwide basis, its useful life is adjusted to end at the date such regulations become effective.

The carrying values of our vessels may not represent their fair market value at any point in time since the market prices of second hand vessels tend to fluctuate with changes in charter rates and the cost of newbuildings. Historically, both charter rates and vessel values tend to be cyclical. We record impairment losses only when events

occur that cause us to believe that future cash flows for any individual vessel will be less than its carrying value. The carrying amounts of vessels held and used are reviewed for potential impairment whenever events or changes in circumstances indicate that the carrying amount of a particular vessel may not be fully recoverable. In such instances, an impairment charge would be recognized if the estimate of the undiscounted projected net operating cash flows expected to result from the use of the vessel and its eventual disposition is less than the vessel's carrying amount. This assessment is made at the individual vessel level as separately identifiable cash flow information for each vessel is available. Measurement of the impairment loss is based on the fair value of the asset. We determine the fair value of our assets based on management estimates and assumptions and by making use of available market data and taking into consideration third party valuations.

We determine undiscounted projected net operating cash flows for each vessel and compare it to the vessel's carrying value. In developing estimates of future cash flows, we must make assumptions about future charter rates, vessel operating expenses, fleet utilization, and the estimated remaining useful lives of the vessels. These assumptions are based on historical trends as well as future expectations. The projected net operating cash flows are determined by considering the charter revenues from existing time charters for the fixed fleet days and an estimated daily time charter equivalent for the unfixed days (based on the most recent 10 year historical average of the six month, one year and three year time charter rates for drybulk vessels, the three year projected time charter rate for the first three years and the 10 year historical average of the one year and three year time charter rates thereafter for the Suezmax tanker vessel), over the remaining estimated life of each vessel assuming an annual growth rate of 3.0%, net of brokerage commission for drybulk vessels and no growth rate for the tanker vessels. Expected outflows for scheduled vessels' maintenance and vessel operating expenses are based on historical data, and adjusted annually assuming an average annual inflation rate of 3%. Effective fleet utilization is assumed to be 99% and 97% for drybulk carriers and tanker vessels, respectively, taking into account the period(s) each vessel is expected to undergo her scheduled maintenance (drydocking and special surveys), as well as an estimate of 1% off hire days each year for drybulk carriers and 3% for tanker vessels. We have assumed no change in the remaining estimated useful lives of the current fleet, and scrap values based on $200 per Light Weight ton, or LWT, at disposal.

The current assumptions used and the estimates made are highly subjective, and could be negatively impacted by further significant deterioration in charter rates or vessel utilization over the remaining life of the vessels which could require us to record a material impairment charge in future periods.

In 2009 and 2010, in assessing our exposure to impairment risks for our fleet, we considered the current conditions of the international drybulk and tanker industry, the decline of the market values of our vessels, the deterioration of the charterhires and the expected slow recovery of the market, the age of our vessels and the increased costs for their maintenance and upgrading. As a result we determined that the utilization of our tanker vessels over their remaining useful lives has been negatively impacted by the market conditions with low possibilities for recovery. The assumptions used and the estimates made are highly subjective, and could be negatively impacted by further significant deterioration in charter rates or vessel utilization over the remaining life of the vessels which could require us to record a material impairment charge in future periods.

Our impairment analysis as of December 31, 2009 indicated that the undiscounted projected net operating cash flows of each of our tanker vessels the M/T *Pink Sands* and M/T *Tamara* were below their carrying value and an impairment loss was recognized (see Note 2(l) to our consolidated financial statements). As of December 31, 2010, our impairment analysis did not indicate any impairment issues on our vessels.

*Vessels held for sale:*   It is our policy to dispose of vessels or other fixed assets when suitable opportunities arise and not necessarily to keep them until the end of their useful life. We classify assets and disposal groups of assets as being held for sale in accordance with ASC 360, Property, Plant and Equipment, when the following criteria are met: (i) management possessing the necessary authority has committed to a plan to sell the asset (disposal group); (ii) the asset (disposal group) is immediately available for sale on an "as is" basis; (iii) an active program to find the buyer and other actions required to execute the plan to sell the asset (disposal group) have been initiated; (iv) the sale of the asset (disposal group) is probable, and transfer of the asset (disposal group) is expected to qualify for recognition as a completed sale within one year; (v) the asset (disposal group) is being actively marketed for sale at a price that is reasonable in relation to its current fair value and (vi) actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be

withdrawn. Long-lived assets or disposal groups classified as held for sale are measured at the lower of their carrying amount or fair value less cost to sell. These assets are not depreciated once they meet the criteria to be held for sale and are classified in current assets on the Consolidated Balance Sheet (see Note 4 to our consolidated financial statements).

*Imputed Prepaid/Deferred Revenue:*  Our records identified assets or liabilities associated with the acquisition of a vessel at fair value, determined by reference to market data. The Company values any asset or liability arising from the market value of assumed time charters as a condition of the original purchase of a vessel at the date when such vessel is initially deployed on its charter. The value of the asset or liability is based on the difference between the current fair value of a charter with similar characteristics as the time charter assumed and the net present value of contractual cash flows of the time charter assumed, to the extent the vessel capitalized cost does not exceed its fair value without a time charter contract. When the present value of contractual cash flows of the time charter assumed is greater than its current fair value, the difference is recorded as imputed prepaid revenue. When the opposite situation occurs, the difference is recorded as imputed deferred revenue. Such assets and liabilities are amortized as a reduction of, or an increase in, revenue respectively, during the period of the time charter assumed. In developing estimates of the net present value of contractual cash flows of the time charters assumed the Company must make assumptions about the discount rate that reflect the risks associated with the assumed time charter and the fair value of the assumed time charter at the time the vessel is acquired. Although management believes that the assumptions used to evaluate present and fair values discussed above are reasonable and appropriate, such assumptions are highly subjective.

*Voyage Revenue:*  The Company generates its revenues from charterers for the charterhire of its vessels. Vessels are chartered using either voyage charters, where a contract is made in the spot market for the use of a vessel for a specific voyage for a specified charter rate, or time charters, where a contract is entered into for the use of a vessel for a specific period of time and a specified daily charterhire rate. If a charter agreement exists and collection of the related revenue is reasonably assured, revenue is recognized as it is earned ratably during the duration of the period of each voyage or time charter. A voyage is deemed to commence upon the completion of discharge of the vessel's previous cargo and is deemed to end upon the completion of discharge of the current cargo. Demurrage income represents payments by a charterer to a vessel owner when loading or discharging time exceeds the stipulated time in the voyage charter and is recognized ratably as earned during the related voyage charter's duration period. Unearned revenue includes cash received prior to the balance sheet date and is related to revenue earned after such date. For vessels operating in pooling arrangements, the Company earns a portion of total revenues generated by the pool, net of expenses incurred by the pool. The amount allocated to each pool participant vessel, including the Company's vessels, is determined in accordance with an agreed-upon formula, which is determined by points awarded to each vessel in the pool based on the vessel's age, design and other performance characteristics. Revenue under pooling arrangements is accounted for on the accrual basis and is recognized when an agreement with the pool exists, price is fixed, service is provided and collectability has been reasonably assured. The allocation of such net revenue may be subject to future adjustments by the pool; however historically such changes have not been material.

Revenue is based on contracted charter parties and although our business is with customers who are believed to be of the highest standard, there is always the possibility of dispute over the terms. In such circumstances, we will assess the recoverability of amounts outstanding and a provision is estimated if there is a possibility of non-recoverability. Although we may believe that our provisions are based on fair judgment at the time of their creation, it is possible that an amount under dispute will not be recovered and the estimated provision of doubtful accounts would be inadequate. If any of our revenues become uncollectible these amounts would be written-off at that time.

*Accounting for Voyage Expenses and Vessel Operating Expenses:*  Voyage related and vessel operating costs are expensed as incurred. Under a time charter, specified voyage costs, such as fuel and port charges are paid by the charterer and other non-specified voyage expenses, such as commissions, are paid by the Company. Vessel operating costs including vessel management fees, crews, maintenance and insurance are paid by the Company. Under a bareboat charter, the charterer assumes responsibility for all voyage and vessel operating expenses and risk of operation.

D-54

For vessels employed on spot market voyage charters, we incur voyage expenses that include port and canal charges and bunker expenses, unlike under time charter employment, where such expenses are assumed by the charterers.

As is common in the drybulk and crude oil shipping industries, we pay commissions ranging from 1.25% to 6.25% of the total daily charterhire rate of each charter to ship brokers associated with the charterers.

*Depreciation:*  We depreciate our vessels based on a straight line basis over the expected useful life of each vessel, which is 25 years from the date of their initial delivery from the shipyard. Depreciation is based on the cost of the vessel less its estimated residual value at the date of the vessel's acquisition, which is estimated at $200 per lightweight ton, which we believe is common in the drybulk and tanker shipping industries. Secondhand vessels are depreciated from the date of their acquisition through their remaining estimated useful lives. When regulations place limitations over the ability of a vessel to trade on a worldwide basis, its useful life is adjusted to end at the date such regulations become effective.

*Accounting for Derivatives:*  ASC 815, Derivatives and Hedging, requires all derivative contracts to be recorded at fair value, as determined in accordance with ASC 820, Fair Value Measurements and Disclosures, which is more fully discussed in Note 10 to our consolidated financial statements. The changes in fair value of the derivative contract are recognized in earnings unless specific hedging criteria are met. The Company's derivative contracts do not qualify for hedge accounting, therefore changes in fair values have been accounted for as increases or decreases to earnings.

On January 29, 2008, we entered into two interest swap agreements with Nordea Bank Finland Plc to partially hedge our exposure to fluctuations in interest rates on $316.5 million ($236.2 million as of December 31, 2010) of our long term debt discussed in Note 7 to the consolidated financial statements, by converting our variable rate debt to fixed rate debt. Under the terms of the interest swap agreement we and the bank agreed to exchange, at specified intervals, the difference between paying a fixed rate at 3.55% and a floating rate interest amount calculated by reference to the agreed principal amounts and maturities. The gain derived from the derivative valuation movement is separately reflected in the consolidated statement of income.

Our forward freight agreements or FFAs did not qualify for hedge accounting and therefore changes in their value were reflected in earnings. As of December 31, 2010, we did not have any open positions.

*Segment Disclosures:*  ASC 280, Segment Reposting, requires descriptive information about its reportable operating segments. Operating segments, as defined, are components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing performance. The Company reports financial information and evaluates its operations and operating results by type of vessel and not by the length or type of ship employment for its customers. The Company does not use discrete financial information to evaluate the operating results for each such type of charter. Although revenue can be identified for different types of charters or for charters with different duration, management cannot and does not identify expenses, profitability or other financial information for these charters.

Furthermore, when the Company charters a vessel to a charterer, the charterer is free to trade the vessel worldwide and, as a result, the disclosure of geographic information is impracticable. Accordingly, the reportable segments of the company are the tankers segment and the drybulk carriers segment. See Segment Information in Note 15 to our consolidated financial statements included herein for further analysis of our two reportable segments.

*New Accounting Pronouncements:*  Please see Note 2(x) to our consolidated financial statements included herein for a discussion of new accounting pronouncements, none of which had a material impact on our consolidated financial statements.

### *Illustrative Comparison of Possible Excess of Carrying Value Over Estimated Charter-Free Market Value of Certain Vessels*

In "— Critical Accounting Policies — Vessel Lives and Impairment," we discuss our policy for impairing the carrying values of our vessels. During the past few years, the market values of vessels have experienced particular

volatility, with substantial declines in many vessel classes. As a result, the charter-free market value, or basic market value, of certain of our vessels may have declined below those vessels' carrying value, even though we would not impair those vessels' carrying value under our accounting impairment policy, due to our belief that future undiscounted cash flows expected to be earned by such vessels over their operating lives would exceed such vessels' carrying amounts. The table set forth below indicates (i) the carrying value of each of our vessels as of December 31, 2010, (ii) which of our vessels we believe has a basic market value below its carrying value, and (iii) the aggregate difference between carrying value and market value represented by such vessels. This aggregate difference represents the approximate analysis of the amount by which we believe we would have to reduce our net income if we sold all of such vessels in the current environment, on industry standard terms, in cash transactions, and to a willing buyer where we are not under any compulsion to sell, and where the buyer is not under any compulsion to buy. For purposes of this calculation, we have assumed that the vessels would be sold at a price that reflects our estimate of their current basic market values. However, we are not holding our vessels for sale, except as otherwise noted in this report.

Our estimates of basic market value assume that our vessels are all in good and seaworthy condition without need for repair and if inspected would be certified in class without notations of any kind. Our estimates are based on information available from various industry sources, including:

- reports by industry analysts and data providers that focus on our industry and related dynamics affecting vessel values;

- news and industry reports of similar vessel sales;

- news and industry reports of sales of vessels that are not similar to our vessels where we have made certain adjustments in an attempt to derive information that can be used as part of our estimates;

- approximate market values for our vessels or similar vessels that we have received from shipbrokers, whether solicited or unsolicited, or that shipbrokers have generally disseminated;

- offers that we may have received from potential purchasers of our vessels; and

- vessel sale prices and values of which we are aware through both formal and informal communications with shipowners, shipbrokers, industry analysts and various other shipping industry participants and observers.

As we obtain information from various industry and other sources, our estimates of basic market value are inherently uncertain. In addition, vessel values are highly volatile; as such, our estimates may not be indicative of the current or future basic market value of our vessels or prices that we could achieve if we were to sell them.

| | Dwt | Year Purchased | Carrying Value |
|---|---|---|---|
| **Drybulk Vessels** | | | |
| Trenton | 75,229 | 2007 | $ 21.0 million(1) |
| Austin | 75,229 | 2007 | $ 21.0 million(1) |
| Helena | 73,744 | 2007 | $ 38.9 million * |
| Topeka | 74,710 | 2007 | $ 52.4 million* |
| Augusta | 69,053 | 2007 | $ 20.0 million(2) |
| Partagas | 173,880 | 2009 | $ 52.9 million* |
| Robusto | 173,949 | 2009 | $ 58.8 million* |
| Cohiba | 174,200 | 2009 | $ 59.1 million* |
| Montecristo | 180,263 | 2010 | $ 48.9 million |
| **Total Drybulk dwt** | **1,070,257** | | |
| **Tanker Vessels** | | | |
| Olinda | 149,085 | 2008 | $ 19.0 million(3) |
| Tamara | 95,793 | 2008 | $ 7.3 million(4) |
| **Total Tanker dwt** | **244,878** | | |
| **TOTAL DWT** | **1,315,135** | | |

* Indicates drybulk carriers for which we believe, as of December 31, 2010, the aggregate basic charter-free market value is lower than the vessels' aggregate carrying value by approximately $53.7 million.

(1) On November 19, 2010, we contracted to sell the M/V Austin and M/V Trenton for $22.25 million each. Based on an addendum signed February 11, 2011, the selling price was reduced to $21.0 million for each vessel. The vessels were delivered to their new owners on March 10 and 11, 2011, respectively. The sale of the vessels resulted in a total loss of $34.1 million. Furthermore, as provided by our Nordea loan agreement we made a loan prepayment of $24.7 million.

(2) On October 4, 2010, we contracted to sell the M/V Augusta for $20.0 million. The M/V Augusta was delivered to its new owners on January 6, 2011. The sale of the vessel resulted in a loss of $31.6 million. Furthermore, as provided by our Nordea loan agreement, we made a loan prepayment of $11.6 million in connection with this sale.

(3) On November 26, 2009, we contracted to sell the M/T Olinda for a gross sale price of $19.0 million with expected delivery between May 1, 2010 and December 31, 2010. In December 2010 the vessel's delivery period changed to between December 1, 2010 and April 30, 2011.

(4) On December 12, 2010, we contracted to sell the M/T Tamara for $8.6 million. The vessel was delivered to its new owners on January 13, 2011. Following the sale of the vessel, our loan with DVB was fully repaid.

We note that six of our drybulk vessels are currently employed under long-term, above-market time charters. We believe that if the vessels were sold with those charters attached, we would receive a premium for those vessels over their basic market value.

We refer you to the risk factor entitled "Because the market value of our vessels may fluctuate significantly, we may incur losses when we sell vessels or we may be required to write down their carrying value, which would adversely affect our earnings" and the discussion herein under the heading "D. Risk Factors — Industry Specific Risk Factors".

**RESULTS OF OPERATIONS**

As discussed in Notes 2(t) and 15 to our consolidated financial statements included herein, we have two reportable segments, the drybulk carriers segment and the tankers segment.

The table below presents information about the Company's reportable segments as of December 31, 2008, 2009 and 2010 and for the years then ended, and is expressed in thousands of U.S. Dollars. The accounting policies followed in the preparation of the reportable segments are the same as those followed in the preparation of the Company's consolidated financial statements.

**December 31, 2010**

|  | Drybulk Carriers | Tankers | Other | Total |
|---|---|---|---|---|
| Revenues from external customers | $ 74,628 | $ 26,004 | $ — | $100,632 |
| Imputed revenue | 1,558 | — | — | 1,558 |
| Gain on forward freight agreements | (4,342) | — | | (4,342) |
| Voyage expenses | (4,328) | (868) | — | (5,196) |
| Vessels' operating expenses | (27,476) | (13,602) | — | (41,078) |
| Survey and dry docking costs | (1,784) | — | — | (1,784) |
| Interest expense and finance costs, net of capitalized interest | (4,270) | (2,461) | (44) | (6,775) |
| Interest income | — | — | 119 | 119 |
| Loss on interest rate swaps | (7,202) | (1,511) | — | (8,713) |
| Depreciation | (23,252) | (1,342) | (259) | (24,853) |
| Gain/(loss) on vessels sold and vessels held for sale | (65,711) | 2,782 | — | (62,929) |
| Segment (loss)/gain | (62,193) | 8,976 | (8,408) | (61,625) |
| Total assets | 428,187 | 33,588 | 17,088 | 478,863 |

**December 31, 2009**

|  | Drybulk Carriers | Tankers | Other | Total |
|---|---|---|---|---|
| Revenues from external customers | $ 82,199 | $ 36,263 | $ — | $ 118,462 |
| Imputed revenue | 14,473 | — | — | 14,473 |
| Gain on forward freight agreements | — | — | 570 | 570 |
| Voyage expenses | (4,309) | (1,240) | — | (5,549) |
| Vessels' operating expenses | (27,067) | (16,848) | — | (43,915) |
| Survey and dry docking costs | (2,845) | (2,725) | — | (5,570) |
| Interest expense and finance costs | (7,333) | (4,791) | (45) | (12,169) |
| Interest income | — | — | 271 | 271 |
| Loss on interest rate swaps | (1,856) | (711) | — | (2,567) |
| Depreciation | (30,100) | (18,080) | (92) | (48,272) |
| Impairment on vessels | — | (52,700) | — | (52,700) |
| Loss from sale of vessels | (69,250) | (63,926) | — | (133,176) |
| Segment loss | (46,248) | (124,865) | (7,569) | (178,682) |
| Total assets | 444,180 | 56,253 | 48,839 | 549,272 |

**December 31, 2008**

| | Drybulk Carriers | Tankers | Other | Total |
|---|---|---|---|---|
| Revenues from external customers | $104,440 | $ 42,676 | $ — | $147,116 |
| Imputed revenue | 10,318 | — | — | 10,318 |
| Voyage expenses | (5,449) | (8,826) | — | (14,275) |
| Vessels' operating expenses | (20,662) | (8,318) | — | (28,980) |
| Survey and dry docking costs | (736) | — | — | (736) |
| Interest expense and finance costs | (11,173) | (5,316) | (39) | (16,528) |
| Interest income | — | — | 776 | 776 |
| Loss on interest rate swaps | (12,076) | (5,108) | — | (17,184) |
| Depreciation | (32,865) | (10,762) | (31) | (43,658) |
| Segment profit/(loss) | 31,766 | 4,260 | (8,304) | 27,722 |
| Total assets | 408,680 | 184,753 | 32,137 | 625,570 |

### Year Ended December 31, 2010 Compared to the Year Ended December 31, 2009

#### Voyage Revenues

Voyage revenue decreased by $17.9 million, or 15.1%, to $100.6 million for 2010 as compared to $118.5 million for 2009. The decrease in revenues is mainly attributable to the net decrease in voyage days by 253 days representing 1,224 days lost due to the sale of vessels and 52 off-hire days which were mitigated by the 1,024 additional days of operations of the new acquisitions. Furthermore, revenue was adversely affected by the decline in the charter rates of M/T *Tigani,* M/V *Topeka,* M/V *Austin,* M/V *Trenton* and M/T *Olinda* and the sale of M/V *Richmond* , M/V *Lansing* , M/V *Juneau,* M/V *Pierre* , M/T *Tigani* and M/T *Pink Sands* which were replaced by M/V *Partagas* , M/V *Robusto* , M/V *Cohiba* and M/V *Montecristo,* which earned a lower average charter rate. The average TCE rate for 2010 was $23,022 per day as compared to $28,523 in 2009, and the fleet utilization was 96.4% in 2009 as compared to 96.1% in 2009. See above under "Factors Affecting our Results of Operations — TCE Rates" for information concerning our calculation of TCE rates.

#### Imputed Deferred Revenue

M/V *Trenton,* M/V *Austin,* M/V *Pierre* and M/V *Topeka* were each acquired in 2007 with an existing time charter at a below market rate. The Company adds the fair value of the time charters in the purchase price of the vessels and allocates it to a deferred liability which is amortized over the remaining period of the time charters as an increase of hire revenue. The amortization of imputed deferred revenue for 2010 and 2009 amounted to $1.6 million and $14.5 million, respectively. Imputed deferred revenue has been fully amortized as of December 31, 2010; see Note 6 to our consolidated financial statements.

#### Gain/(loss) on Forward Freight Agreements

During the year ended December 31, 2010, the loss on FFAs amounted to $4.3 million as compared to a gain of $0.6 million in 2009. Such agreements did not qualify for hedge accounting and therefore changes in their fair value were reflected in earnings. As of December 31, 2010, there were no open FFA positions.

#### Voyage Expenses

Voyage expenses decreased by $0.3 million, or 5.5%, to $5.2 million in 2010 as compared to $5.5 million in 2009. The decrease is mainly due to (a) lower port and bunker costs as a result of the reduced number of off hire days in 2010 of 157 days (including 88 drydocking days) as compared to off hire days in 2009 of 184 days (including 144 drydocking days) and (b) to reduced commissions on revenues as a result of the decrease in revenues.

### Vessel Operating Expenses

Vessel operating expenses include crew wages and related costs, the cost of insurance, expenses relating to repairs and maintenance, the cost of spares and consumable stores, management fees, tonnage taxes and other miscellaneous expenses. Vessel operating expenses for 2010 were $41.1 million as compared to $43.9 million for 2009. Excluding the effect of expenses related to drydocking activities of $1.0 million in 2010 and $2.7 million in the same period of 2009, there was decrease in operating expenses of 2.7%. The decrease is mainly due to the sale of vessels in 2010 which was partially mitigated by the additional voyage days of the new acquisitions and the increased management fees due to the change of managers. The calendar days in 2010 were 4,371 days as compared to 4,650 days in 2009. The daily operating expenses on a fleet basis in 2010 were $9,397 per vessel as compared to $9,444 per vessel in 2009.

### General and Administrative Expenses

Our general and administrative expenses include the salaries and other related costs of the executive officers and other employees, our office rents, legal and auditing costs, regulatory compliance costs, other miscellaneous office expenses, long-term compensation costs, and corporate overhead. General and administrative expenses for 2010 were $8.3 million as compared to $8.5 million for 2009. The decrease of $0.2 million is the net effect of (a) the decrease in office payroll and related cost of $0.5 million, (b) the increase in compensation cost of $1.0 million, (c) the net decrease in legal and audit fees of $0.6 million, and (d) net decrease of $0.1 million in all other expenses.

### Depreciation

Depreciation for 2010 amounted to $24.9 million as compared to $48.3 million in 2009. The decrease of $23.4 million in vessel depreciation charges is attributable to (a) the discontinuance of taking depreciation on M/T *Olinda*, M/V *Augusta, M/V Austin, M/V Trenton* and M/T *Tamara* due to their classification as vessels held for sale resulting in a reduction of $11.7 million, (b) the sale of M/V *Richmond* , M/V *Lansing* , M/V *Juneau*, M/V *Pierre*, M/T *Pink Sands* and M/T *Tigani* and their replacement by M/V *Partagas* , M/V *Robusto* , M/V *Cohiba* and M/V *Montecristo* in 2010 resulting in a net reduction of depreciation of $11.7 million.

### Drydocking

We incurred scheduled drydocking costs in 2010 of $1.8 million related to M/V *Trenton, M/V Austin* and M/V *Topeka* . In 2009 we incurred scheduled drydocking costs of $5.6 million related to M/V *Helena* , M/V *Pierre* , M/T *Tamara* and M/T *Tigani* .

### Impairment on Vessels

The carrying value of each of the Company's vessels represents its original cost at the time it was delivered or purchased less depreciation calculated using an estimated useful life of 25 years from the date such vessel was originally delivered from the shipyard. The actual life of a vessel may be different. We depreciate our vessels based on a straight-line basis over the expected useful life of each vessel, based on the cost of the vessel less its estimated residual value, which is estimated at $200 per lightweight ton at the date of the vessel's acquisition, which we believe is common in the drybulk and tanker shipping industries.

Secondhand vessels are depreciated from the date of their acquisition through their remaining estimated useful life. However, when regulations place limitations over the ability of a vessel to trade on a worldwide basis, its useful life is adjusted to end at the date such regulations become effective.

The carrying values of the Company's vessels may not represent their fair market value at any point in time since the market prices of second hand vessels tend to fluctuate with changes in charter rates and the cost of newbuildings. Historically, both charter rates and vessel values tend to be cyclical. The Company records impairment losses only when events occur that cause the Company to believe that future cash flows for any individual vessel will be less than its carrying value. The carrying amounts of vessels held and used by the Company are reviewed for potential impairment whenever events or changes in circumstances indicate that the carrying amount of a particular vessel may not be fully recoverable. In such instances, an impairment charge would be

recognized if the estimate of the undiscounted projected net operating cash flows expected to result from the use of the vessel and its eventual disposition is less than the vessel's carrying amount. This assessment is made at the individual vessel level as separately identifiable cash flow information for each vessel is available. Measurement of the impairment loss is based on the fair value of the asset. The Company determines the fair value of its assets based on management estimates and assumptions and by making use of available market data and taking into consideration third party valuations.

Our impairment analysis as of December 31, 2009 indicated that the undiscounted projected net operating cash flows of each of our tanker vessels the M/T *Pink Sands* and M/T *Tamara* were below their carrying value and an impairment loss was recognized (see Note 2(l) to our consolidated financial statements). As of December 31, 2010, our impairment analysis did not indicate any impairment issues on our vessels.

### Loss on Sale of Vessels and Vessels Held for Sale

As of December 31, 2010, we had contracted to sell, on a charter free basis, the M/T *Olinda* , M/T *Tamara* , the M/V *Augusta* , the M/V *Austin* and the M/V *Trenton* for an aggregate price of $89.6 million. The M/V *Augusta* was delivered to its new owners on January 6, 2011, the M/T *Tamara* on January 13, 2011, the M/V *Austin* on March 10, 2011 and the M/V *Trenton* on March 11, 2011. We expect to deliver M/T *Olinda* to its new owners in April 2011. We have classified the above five vessels as "held for sale" in the accompanying December 31, 2010 consolidated balance sheet at their estimated sale proceeds as all criteria required for their classification as "Held for Sale" were met. The estimated loss of approximately $65.9 million is included in "Loss on sale of vessels and vessels held for sale" in the accompanying 2010 consolidated statement of operations.

As of December 31, 2009, vessels held for sale consisted of the M/T *Olinda* (see above) and M/V *Pierre* and M/T *Tigani* , of which the latter two were delivered to their new owners on April 14, 2010 and May 4, 2010, respectively, resulting in a gain of $2.5 million included in the accompanying 2010 consolidated statement of operations under 'Loss on vessels sold and vessels held for sale'.

Vessels held for sale are stated at their fair values. The fair values were determined based on the memorandum of agreement prices less cost to sell (Level 1).

### Interest and Finance Costs

Interest and finance costs decreased by $5.4 million, or 44.3%, to $6.8 million in 2010 as compared to $12.2 million in 2009. The decrease is attributable to the prepayment of our long term debt by $14.4 million related to the sale of M/T Pink Sands and M/T Tigani. Financing costs include amortization of costs incurred in connection with the issuance of long-term debt of $0.5 million in 2010 as compared to $0.7 million in 2009. In 2010 interest was further reduced by $1.0 million representing capitalized imputed interest relating to the construction of the new buildings.

The realized loss of 2009 for the swap agreements discussed further below of $7.7 million previously included in "Interest and finance costs" were reclassified to "Loss on derivative instruments" to conform to the December 31, 2010, presentation.

### Derivative Instruments

*Swap Agreements:* We entered into two interest rate swap agreements on January 29, 2008 to partially hedge the interest rate exposure on our variable rate debt. At December 31, 2010 and 2009, the fair values of the derivative contracts amounted to $11.6 million and $11.0 million in liability, respectively. The decrease in fair values of $0.6 million is included in "Loss on derivative instruments" in the consolidated statements of operations. The current portion of the total fair value of $6.7 million is included in current liabilities as Derivative liability, while the non-current portion of $4.9 million is included in other non-current liabilities as Derivative liability in the December 31, 2010 consolidated balance sheet. The realized swap interest for 2010 amounted to $8.1 million.

*FFAs:* In 2010, the loss on FFAs amounted to $4.3 million. As of December 31, 2010 we had no open FFA positions. In 2009, the gain from FFAs amounted to $0.6 million. There were no open positions as of December 31, 2009.

*Year ended December 31, 2009 compared to the year ended December 31, 2008*

### Voyage Revenues

Voyage revenue decreased by $28.6 million, or 19.4%, to $118.5 million for 2009 as compared to $147.1 million for 2008. The decrease is mainly attributable to (a) the sale of three vessels which were replaced by new vessels chartered at lower hire rates resulting in $11,050 lower daily hire rate, (b) the employment of the M/T *Olinda* in a spot pool in October 2008 resulting in reduction of its daily TCE rate from $57,176 to $21,600, (c) the early termination of the charter party of M/V *Augusta* in November 2008 and its re-employment at lower daily hire rate resulting in the reduction of daily hire from $42,100 per day to $16,000 per day, (d) the early termination of the charter party of M/V *Topeka* in July 2009 and its re-employment at lower daily hire rate resulting in the reduction of daily hire from $23,100 per day to $18,000 per day and (e) the scheduled drydockings which resulted in 145 off hire days in 2009 as compared to no days in 2008. The effect of the decrease in hire rates was mitigated by the increase of voyage days from 4,125 in 2008 to 4,466 in 2009 mainly due to the operation the of M/T *Olinda* , M/T *Tigani* and M/T *Tamara* for the full year in 2009. The average TCE rate for 2009 was $28,523 per day as compared to $34,705 in 2008, and the fleet utilization was 96.1% in 2009 as compared to 99.1% in 2008. See above under "Factors Affecting our Results of Operations — TCE Rates" for information concerning our calculation of TCE rates.

### Imputed Deferred Revenue

M/V *Trenton,* M/V *Austin,* M/V *Pierre* and M/V *Topeka* were each acquired in 2007 with an existing time charter at a below market rate. The Company adds the fair value of the time charters in the purchase price of the vessels and allocates it to a deferred liability which is amortized over the remaining period of the time charters as an increase of hire revenue. For cash flow purposes (excluding the amortization of the fair value of the time charters) the Company received a TCE rate of $25,283 and $32,204 per day, in 2009 and 2008, respectively. The amortization for 2009 and 2008 amounted to $14.5 million and $10.3 million, respectively. The amount in 2009 includes $6.7 million of accelerated amortization due to the early termination of the time charter of M/V *Topeka* in July 2009.

### Voyage Expenses

Voyage expenses decreased by $8.8 million, or 61.5%, to $5.5 million in 2009 as compared to $14.3 million in 2008, including commissions which totaled $4.6 million and $6.5 million, in 2009 and 2008, respectively. The decrease is attributable to the employment of the M/T *Olinda* in the spot market from her acquisition in January 2008 until late October 2008 with voyage expenses amounting to $8.3 million. We had no vessels employed in the spot market in 2009.

When we employ vessels on spot market voyage charters, we incur voyage expenses that include port and canal charges and bunker expenses, unlike under time charter employment, where such expenses are assumed by the charterers.

As is common in the drybulk and crude oil shipping industries, we pay commissions ranging from 1.63% to 6.25% of the total daily charterhire rate of each charter to ship brokers associated with the charterers.

### Vessel Operating Expenses

Vessel operating expenses include crew wages and related costs, the cost of insurance, expenses relating to repairs and maintenance, the cost of spares and consumable stores, management fees, tonnage taxes and other miscellaneous expenses. Vessel operating expenses for 2009 increased by $15.0 million, or 51.9%, to $43.9 million in 2009 as compared to $28.9 million in 2008. The increase is mainly attributable to (a) the increase in calendar days as a result of the fact that the vessels were acquired at various dates in the fourth quarter of 2008 while the same vessels were operated for the full year in 2009, (b) the additional running costs incurred as a result of the scheduled drydockings of four vessels of $2.7 million and (c) the increase in repairs and maintenance expenses. The daily operating expenses in 2009 were $9,444 as compared to $6,960 in 2008.

### General and Administrative Expenses

Our general and administrative expenses include the salaries and other related costs of the executive officers and other employees, our office rents, legal and auditing costs, regulatory compliance costs, other miscellaneous office expenses, long-term compensation costs, and corporate overhead. General and administrative expenses for 2009 decreased by $0.6 million, or 6.6% to $8.5 million as compared to $9.1 million in 2008. The decrease is the net effect of the decrease in office payroll and related cost of $5.6 million in 2009 from $6.6 million in 2008, which was mitigated by the increase in legal and audit fees, and other expenses of $3.1 million in 2009 as compared to $2.7 million in 2008. The 2009 payroll and related costs of $5.6 million includes $1.96 million payroll cost, $3.6 million bonuses and $0.04 million compensation costs, while the 2008 amount of $6.6 million includes $1.7 million payroll cost, $2.2 million bonuses and $2.7 million compensation costs.

### Depreciation

Depreciation in 2009 increased by $4.6 million, or 10.5% to $48.3 million as compared to $43.7 million in 2008. The increase is mainly attributable to the increase of calendar days to 4,650 days in 2009 as compared to 4,164 days in 2008 due to the ownership of M/T *Olinda* , M/T *Tigani* and M/T *Tamara* for the full year in 2009 which was partially mitigated by the calendar days lost as a result of the purchase and sale transactions.

### Impairment on Vessels

We wrote down our tankers M/T *Pink Sands* and M/T *Tamara* to their market values by recording an impairment charge of $52.7 million in the year ended December 31, 2009. There was no impairment charge in 2008.

### Loss on Sale of Vessels and Vessels Held for Sale

The loss of $133.2 million consists of $51.9 million representing the loss incurred from the sale of M/V *Lansing* , M/V *Richmond* and M/V *Juneau* and from $81.3 million representing the estimated loss to be incurred from vessels M/V *Pierre* , M/T *Olinda* and M/T *Tigani* classified as vessels held for sale.

### Drydocking

We expense the total costs associated with a drydocking and special surveys in the period that they are incurred. Regulations or incidents may change the estimated dates of the next drydocking for our vessels. For 2009 and 2008, the expense related to drydocking totaled $5.6 and $0.7 million, respectively. Four vessels were drydocked in 2009 as compared to one vessel in 2008.

### Interest and Finance Costs

Interest and finance costs decreased by $4.3 million, or 26.1%, to $12.2 million in 2009 as compared to $16.5 million in 2008. Interest expenses in 2009 amounted to $10.6 million as compared to $14.8 million in 2008. The decrease is mainly attributable to the loan prepayment of $25 million made in early 2009 under our amendatory agreement to our Nordea credit facility, as discussed elsewhere in this annual report. Financing costs include amortization of costs incurred in connection with the issuance of long-term debt of $0.7 million in 2009 as compared to $0.5 million in 2008.

The realized loss of the swap agreements discussed further below for 2008 ($1.0 million) and 2009 ($7.7 million) previously included in "Interest and finance costs" were reclassified to "Loss on derivative instruments" to make these prior years comparable with the presentation for December 31, 2010.

### Financing Costs

Fees incurred for obtaining new loans or refinancing existing ones, including related legal and other professional fees, are deferred and amortized to interest expense over the life of the related debt. Unamortized fees relating to loans repaid or refinanced are expensed in the period the repayment or refinancing occurs. The total amortization cost for 2009 and 2008 amounted to $0.7 million and $0.5 million, respectively.

### Derivative Instruments

*Swap Agreements:*  We have entered into two interest rate swap agreements on January 28, 2008 to partially hedge the interest rate exposure on our variable rate debt. At December 31, 2009 and 2008, the fair values of the derivative contracts amounted to $11.0 million and $16.1 million in liability, respectively. The decrease in fair values of $5.1 million is reflected in Gain on derivative instruments in the consolidated statement of operations. The current portion of the total fair value of $7.4 million is included in current liabilities as Derivative liability, while the non-current portion of $3.6 million is included in other non-current liabilities as Derivative liability in the December 31, 2009 consolidated balance sheet. The realized swap interest for 2009 amounted to $7.7 million.

*FFAs:*  During the year ended December 31, 2009, the gain on FFAs amounted to $0.6 million. Such agreements did not qualify for hedge accounting and therefore changes in their fair value were reflected in earnings. As of December 31, 2009, there were no open FFA positions.

### Inflation

Inflation does not have significant impact on vessel operating or other expenses. We may bear the risk of rising fuel prices if we enter into spot-market charters or other contracts under which we bear voyage expenses. We do not consider inflation to be a significant risk to costs in the current and foreseeable future economic environment. However, should the world economy be affected by inflationary pressures this could result in increased operating and financing costs.

### Foreign Currency Risk

We generate all of our revenues in U.S. dollars, but incur approximately 2.88% of our expenses in currencies other than U.S. dollars. For accounting purposes, expenses incurred in Euros are converted into U.S. dollars at the exchange rate prevailing on the date of each transaction. At December 31, 2010, the outstanding accounts payable balance denominated in currencies other than the U.S. dollar was not material.

## B.   Liquidity and Capital Resources

Our principal sources of funds are equity provided by our shareholders, operating cash flows and long-term borrowings. Our principal use of funds has been capital expenditures to establish and grow our fleet, maintain the quality of our fleet, comply with international shipping standards and environmental laws and regulations, fund working capital requirements, make principal repayments on outstanding loan facility, and historically, to pay dividends.

We expect to rely upon operating cash flows, long-term borrowings, as well as equity financings to implement our growth plan and our capital commitments discussed in Note 5 to the December 31, 2010 consolidated financial statements. We have financed our capital requirements with the issuance of equity in connection with our initial public offering, our controlled equity offering and the Standby Equity Purchase Agreement, or SEPA, the Standby Equity Distribution Agreement, or SEDA, and the equity contribution from Basset Holding Inc. discussed in Note 8 to the December 31, 2010 consolidated financial statements, cash from operations and borrowings under our long-term arrangements, discussed in Note 7 to the December 31, 2010 consolidated financial statements. Under the SEPA, SEDA and the contribution from Basset we issued an aggregate of 70,018,503 of our common shares (210,055,508 common shares before the reverse stock split effect) with total net proceeds of $228.1 million. The SEPA and SEDA were terminated on May 21, 2009 and on March 18, 2010, respectively.

As of December 31, 2010, we had an outstanding indebtedness of $209.8 million and our aggregate payments of principal due within one year amounted to $82.3 million. Our loans contained a minimum cash requirement of $500,000 per vessel, which, on our fleet of 11 vessels, amounted to $5.5 million.

As of December 31, 2010, our capital commitments in connection with the construction of the three VLOCs were $159.3 million. Subsequent to December 31, 2010, our capital commitments increased by $95.0 million due to the acquisition of two additional VLOCs. We intend to partially finance our capital requirements with external bank financing, equity offerings and cash from operations.

Our practice has been to acquire drybulk and tanker carriers using a combination of funds received from equity investors and bank debt secured by mortgages on our vessels. Our business is capital intensive and its future success will depend on our ability to maintain a high-quality fleet through the acquisition of newer vessels and the selective sale of older vessels. These acquisitions will be principally subject to management's expectation of future market conditions as well as our ability to acquire drybulk carriers or tankers on favorable terms.

### *Long Term Debt Obligations and Credit Arrangements:*

On September 18, 2007, the Company entered into a loan agreement with Nordea Bank Norge ASA, for a $325 million senior secured credit facility, or the Nordea credit facility, for the purpose of refinancing the existing term loan facility with Fortis Bank of $118 million and financing the acquisition of additional vessels. The Company and Nordea completed the syndication of the Nordea credit facility on February 12, 2008 which resulted in certain amendments to repayment terms and financial covenants, increased interest margins and commitment fees on the undrawn portion of the Nordea credit facility.

The amended syndicated Nordea credit facility is comprised of the following two Tranches and bears interest at LIBOR plus a margin:

Tranche A is a reducing revolving credit facility in a maximum amount of $200 million of which the Company utilized $199 million to repay the outstanding balance of the credit facility with Fortis of $118 million, to partially finance the acquisition of vessels and for working capital purposes. As of December 31, 2010, following the mandatory prepayment of $24.7 million, due to the sale of M/V *Augusta* , M/V *Austin* and M/V *Trenton* the balance of Tranche A of $110.5 million will be reduced or repaid in nine semi-annual equal installments in the amount of $8.75 million each and a balloon installment in an amount of $31.75 million.

Tranche B is a term loan facility in a maximum amount of $125 million which was fully utilized to partially finance the acquisition of vessels. As of December 31, 2010, following the mandatory prepayment of $11.6 million due to the sale of M/V *Augusta* , M/V *Austin* and M/V *Trenton* , the balance of Tranche B of $58.5 million is repayable in one installment of $6.8 million followed by nine equal consecutive semi-annual installments in the amount of $5.5 million each and a balloon installment in the amount of $2.2 million. As of the December 31, 2010, we were in compliance with the loan covenants.

The Nordea credit facility is secured with first priority mortgages over the vessels, first priority assignment of vessels' insurances and earnings, specific assignment of the time charters, first priority pledges over the operating and retention accounts, corporate guarantee and pledge of shares. The Company is required to pay a commitment fee of 0.45% per annum payable quarterly in arrears on the un-drawn portion of the Nordea credit facility.

The loan agreement includes among other covenants, financial covenants requiring (i) the ratio of funded debt to the sum of funded debt plus shareholders' equity not to be greater than 0.70 to 1.00; (ii) effective July 1, 2008, the liquidity must not be less than $0.5 million multiplied by the number of vessels owned (iii) effective December 31, 2007, the ratio of EBITDA to net interest expense at each quarter end must not be less than 2.50 to 1; (iv) the aggregate fair market value of the vessels must not be less than 100% of the aggregate outstanding balance under the loan plus any unutilized commitment under Tranche A. As of December 31, 2010, we were in compliance with above mentioned covenants.

On December 23, 2008, we entered into a loan agreement with DVB Bank SE for a new secured term loan facility for an amount of $29.56 million, which was fully drawn on January 14, 2009 (see Note 7 to our consolidated financial statements). We used $25 million of the proceeds of the loan to make the prepayment in the amount of $25.0 million under its amendatory agreement to the Nordea credit facility described below. On May 4, 2010, the M/T *Tigani* was sold and as provided in the loan agreement a mandatory prepayment of the loan of $8.6 million was made, which reduced the outstanding loan balance. The balance of the loan at December 31, 2010 of $4.4 million was fully repaid following the sale of M/T *Tamara* in 2011.

As provided in the Nordea credit facility, in the case of a sale of a vessel, the Company has the option of either using the sale proceeds for the prepayment of the loan or depositing such proceeds in an escrow account pledged in favor of Nordea and using the funds to finance the purchase of a new vessel of the same type or better within 90 days.

The Company made use of this option and used the sale proceeds of the M/V *Pierre* , M/V *Lansing* M/V *Richmond* and M/V *Juneau* to partially finance the acquisition of M/V *Partagas* , M/V *Robusto* , M/V *Cohiba* and M/V *Montecristo* respectively.

As of December 31, 2010, we were in full compliance with our Nordea loan covenants.

On February 24, 2011, the Company accepted a commitment letter from a major Chinese bank for the financing of up to 60% of the aggregate contract cost of the three VLOCs discussed above.

### *Cash Flows*

Cash and cash equivalent are primarily held in U.S. dollars.

The following table presents cash flow information for the year ended December 31, 2008, 2009 and 2010. The information was derived from the audited consolidated statements of cash flows of OceanFreight and is expressed in thousands of U.S. Dollars.

| | 2008 | 2009 | 2010 |
|---|---|---|---|
| | (Dollars in thousands) | | |
| Net cash provided by operating activities | $ 81,369 | $ 26,552 | $ 28,449 |
| Net cash used in investing activities | (120,665) | (130,786) | (42,678) |
| Net cash provided by/(used in) financing activities | 43,321 | 118,437 | (13,494) |
| **Increase/(decrease) in cash and cash equivalents** | **4,025** | **14,203** | **(27,723)** |
| Cash and cash equivalents beginning of year | 19,044 | 23,069 | 37,272 |
| **Cash and cash equivalents end of year** | **$ 23,069** | **$ 37,272** | **$ 9,549** |

*Net cash provided by operating activities:*

Net cash provided by operating activities in 2010 increased by $1.9 million or 7.1% as compared to 2009, due to the decrease in operating losses. Net cash provided by operating activities in 2009 decreased by $54.8 million or 67.4% due to the decrease in our vessels' revenue and the scheduled drydocking of four vessels as compared to one in 2008.

*Net cash used in investing activities:*

Net cash used in investing activities in 2010 was $42.7 million, which represents $46.6 million paid in connection with the vessels under construction, $40.2 million paid for the acquisition of M/V *Montecristo* and $44.1 million of net proceeds collected from the sale of M/V *Pierre* , M/T *Tigani* and M/T *Pink Sands* . Net cash used in investing activities in 2009 was $130.8 million, which represents $9.9 million of initial deposits made in connection with the acquisition of M/V *Montecristo* , $180.5 million paid for the acquisition of M/V *Robusto* , M/V *Cohiba* and M/V *Partagas* , $0.8 million paid for the acquisition of two automobiles used for corporate purposes and $60.4 million proceeds from the sale of M/V *Lansing,* M/V *Juneau* and M/V *Richmond.*

*Net cash provided by/(used in) financing activities:*

Net cash used in financing activities in 2010 was $13.5 million and consists of (a) $39.2 million of net proceeds from our SEDA equity offering and capital contribution from Basset, (b) $41.5 million of repayment of long-term debt, (c) $14.4 million of prepayment of long term debt due to the sale of M/T *Tigani* and M/T *Pink Sands* , (d) $3.5 million representing decrease in restricted cash required under our loan agreements and (e) $0.3 million of financing costs.

Net cash provided by financing activities in 2009 was $118.4 million and consists of (a) $188.3 million of net proceeds from our SEPA and SEDA equity offerings, (b) $29.6 million of proceeds drawn under our secured long-term debt, (c) $71.9 million of repayment of long term debt, (d) $25 million of repayment of sellers' credit and (e) $2.5 million representing restricted cash required under our loan agreements.

Net cash provided by financing activities in 2008 was $43.3 million and consists of (a) $50.9 million of net proceeds from our controlled equity offering, (b) $63.4 million of proceeds drawn under our long-term debt, (c) $16.0 million of repayment of long term debt, (d) $47.8 million of dividends paid, (e) $6.5 million representing restricted cash required under our loan agreements and (f) $0.7 million in financing fees paid in connection with our DVB loan.

*Adjusted EBITDA:*

Adjusted EBITDA represents net income before interest, taxes, depreciation and amortization and excludes loss on sale of vessels and impairment charges on vessels. Adjusted EBITDA does not represent and should not be considered as an alternative to net income or cash flow from operations, as determined by U.S. GAAP and our calculation of Adjusted EBITDA may not be comparable to that reported by other companies. Adjusted EBITDA is included in this Annual Report because it is a basis upon which we assess our liquidity position, because it is used by our lenders as a measure of our compliance with certain loan covenants and because we believe that Adjusted EBITDA presents useful information to investors regarding our ability to service and/or incur indebtedness.

EBITDA and Adjusted EBITDA are non-GAAP measures and have limitations as analytical tools, and should not be considered in isolation or as a substitute for analysis of OceanFreight's results as reported under U.S. GAAP. Some of these limitations are: (i) EBITDA and Adjusted EBITDA do not reflect changes in, or cash requirements for, working capital needs, and (ii) although depreciation and amortization are non-cash charges, the assets that are depreciated and amortized may need to be replaced in the future, and EBITDA and Adjusted EBITDA do not reflect any cash requirement for such capital expenditures. Because of these limitations, EBITDA and Adjusted EBITDA should not be considered as a principal indicator of OceanFreight's performance.

The following table reconciles net cash provided by operating activities to Adjusted EBITDA for the years ended December 31, 2008, 2009 and 2010:

| | 2008 | 2009 | 2010 |
|---|---|---|---|
| | (Dollars in thousands) | | |
| **Net cash provided by operating activities** | $81,369 | $26,552 | $28,449 |
| Net increase in current and non-current assets | 4,881 | 9,988 | (481) |
| Net increase in current liabilities, excluding current portion of long term debt | (5,865) | 143 | (1,214) |
| Net Interest expense(1) | 16,789 | 19,563 | 14,816 |
| Amortization of deferred financing costs included in interest expense | (475) | (744) | (538) |
| **Adjusted EBITDA** | **$96,699** | **$55,502** | **$41,032** |

(1) Net Interest expense includes the realized interest on Interest Rate Swaps.

**Working Capital Position**

On December 31, 2010, our current assets totaled $109.8 million while current liabilities totaled $111.3 million, resulting in a negative working capital position of $1.5 million. We believe we will generate sufficient cash during 2011 to make the required principal and interest payment on our indebtedness and provide for our normal working capital requirements and remain in a positive cash position in 2011. Furthermore, as explained under Item 4.A in this report we have secured external financing that will enable us to meet our predelivery commitments under the shipbuilding contracts of the three VLOCs. Item 4.A. also describes the shipbuilding contracts for the additional two VLOCs which we agreed to acquire in April 2011 but we have not yet secured financing to satisfy the remaining payments. The total outstanding yard payments amount to $95.0 million, of which $29.7 million is payable in 2012 and the balance is payable in 2013. We expect that for these two VLOCs and for any additional vessels that we acquire, we will rely on new debt, proceeds from future offerings and revenues from our operations to meet our liquidity needs going forward.

*Interest Rate Risk:*

We are subject to market risks relating to changes in interest rates, because of our floating rate debt outstanding. During 2007, we paid interest on our debt based on LIBOR plus a margin. On January 29, 2008, we entered into two interest rate swap agreements to partially hedge our exposure to variability in LIBOR rates. Under the terms of our loan agreement, we have fixed our interest rate at 6.05% inclusive of margin.

The table below provides information about our long-term debt and derivative financial instruments and other financial instruments at December 31, 2010 that are sensitive to changes in interest rates. See notes 7 and 10 to our consolidated financial statements, which provide additional information with respect to our existing debt agreements and derivative financial instruments. For debt obligations, the table presents principal cash flows and related weighted average interest rates by expected maturity dates. For derivative financial instruments, the table presents average notional amounts and weighted average interest rates by expected maturity dates. Notional amounts are used to calculate the contractual payments to be exchanged under the contracts. Weighted average interest rates are based on implied forward rates in the yield curve at the reporting date.

|  | Expected Maturity Date | | |
|---|---|---|---|
|  | 2011 | 2012 | 2013 Onwards |
|  | (In thousands of U.S. Dollars) | | |
| **Long-term debt(1)** | | | |
| Repayment amount | 65,991 | 28,528 | 110,847 |
| Variable interest rate | 0.48% | 1.23% | 1.86% |
| Average interest rate | 3.55% | 3.55% | 3.55% |
| **Interest rate derivatives** | | | |
| Swap notional amount(2) | 214,932 | 179,053 | 157,651 |
| Average pay rate(2) | 3.55% | 3.55% | 3.55% |
| Average receive rate(2) | 0.48% | 1.23% | 1.86% |

---

(1) See note 7 to our consolidated financial statements for a description of our Nordea credit facility.

(2) On January 29, 2008, we entered into two interest rate swap agreements with Nordea Bank Norge ASA, our lending bank, to partially hedge our exposure to fluctuations in interest rates on an aggregate notional amount of $316.5 million, decreasing in accordance with the debt repayments, by converting the variable rate of our debt to fixed rate for a period for five years, effective April 1, 2008. Under the terms of the interest rate swap agreements, the Company and the bank agreed to exchange, at specified intervals, the difference between paying a fixed rate at 3.55% and a floating rate interest amount calculated by reference to the agreed notional amounts and maturities. These instruments have not been designated as cash flow hedges, under ASC 815, Derivatives and Hedging, and consequently, the changes in fair value of these instruments are recorded through earnings. The swap agreements expire in April 2013.

## C.   Research and development, patents and licenses

We incur from time to time expenditures relating to inspections for acquiring vessels that meet our standards. Such expenditures are insignificant and they are expensed as they incur.

## D.   Trend Information

Please see "The International Drybulk Industry" and "The International Tanker Industry" sections in Item 4.B.

## E.   Off-Balance Sheet Arrangements:

We do not have any off-balance sheet arrangements.

**F. Tabular Disclosure of Contractual Obligations**

The following table sets forth our contractual obligations and their maturity dates as of December 31, 2010:

| | Within One Year | One to Three Years | Three to Five Years | More than Five Years | Total |
|---|---|---|---|---|---|
| | | (In thousands of U.S. dollars) | | | |
| Long term debt(1) | 70,397 | 57,056 | 82,319 | — | 209,772 |
| Vessels under construction | 40,860 | 118,440 | — | — | 159,300 |
| Management fees | 4,624 | 11,923 | 9,501 | | 26,048 |
| Office Lease(2) | 16 | 32 | 32 | — | 80 |
| Total | 115,897 | 187,451 | 91,852 | — | 395,200 |

(1) As further discussed in our December 31, 2010 consolidated financial statements the outstanding balance of our long-term debt at December 31, 2010, was $209.8 million. The loan bears interest at LIBOR plus a margin. Estimated interest payments are not included in the table above. See "Item 5.B. Liquidity and Capital Resources — Long-Term Debt Obligations and Credit Arrangements" and Note 7 to our consolidated financial statements.

(2) As further explained in our December 31, 2010 consolidated financial statements, the two lease agreements we had for our office facilities in Athens expired on December 31, 2010. On January 1, 2011 we entered into a new lease agreement for the current office space leased from a family member of Mr. George Economou, which terminates on December 31, 2015.

**G. Safe Harbor**

See "Forward-Looking Statements" at the beginning of this annual report.

**Item 6. *Directors, Senior Management and Employees***

**A. Directors and Senior Management**

Set forth below are the names, ages and positions of our directors, executive officers and key employees. Our Board of Directors is elected annually on a staggered basis, and each director elected holds office until his successor shall have been duly elected and qualified, except in the event of his death, resignation, removal or the earlier termination of his term of office. Officers are elected from time to time by vote of our Board of Directors and hold office until a successor is elected. Antonis Kandylidis is the son of Konstantinos Kandylidis. There are no Directors' service contracts with the Company or any if its subsidiaries providing for benefits upon termination of employment.

On June 10, 2010, at the Annual General Meeting of the Shareholders, Mr. George Biniaris was elected to serve as Director of the Company for a term of three years. On June 10, 2010, the Company's Board of Directors designated Mr. George Biniaris as the Chairman of the Audit Committee and determined that he qualifies as an audit committee financial expert as defined under Commission rules. Mr. George Biniaris replaced Mr. Stephen Souras, whose term expired and who did not stand for re-election at the Annual General Meeting of the Shareholders.

In December 2010, our Chief Accounting Officer Mrs. Konstandia Papaefthymiou submitted her resignation for personal reasons and effective February 1, 2011, her duties were temporarily assumed by our Chief Financial Officer.

| Name | Age | Position |
|------|-----|----------|
| Antonis Kandylidis | 34 | Chief Executive Officer and Class B Director |
| Demetris Nenes | 35 | President — Chief Operating Officer |
| Solon Dracoulis | 56 | Chief Financial Officer and Treasurer |
| Konstandia Papaefthymiou | 42 | Chief Accounting Officer |
| Professor John Liveris | 57 | Chairman and Class A Director |
| Konstandinos Kandylidis | 60 | Class C Director |
| Panagiotis Korakas | 59 | Class B Director |
| George Biniaris | 52 | Class C Director |

*Antonis Kandylidis* has served as our Chief Executive Officer since December 2007, has served as a member of our Board of Directors since September 2007 and served as our Interim Chief Financial Officer from April 2008 to January 2010. Mr. A. Kandylidis started his career at OMI Corporation's commercial department. During his tenure at OMI Corporation he gained significant experience in the tanker vessel business and held various positions with responsibilities spanning Sale and Purchase, Time Charters, FFA Trading, Corporate Finance and Strategic Planning. In the spring of 2006, he returned to Greece where he provided consultancy services to companies affiliated with ship-owner Mr. George Economou. In September of 2006, Mr. Kandylidis founded OceanFreight Inc. and in April of 2007 he took the Company public. Mr. Kandylidis graduated Magna Cum Laude from Brown University and continued his studies at the Massachusetts Institute of Technology where he graduated with a Masters degree of Science in Ocean Systems Management.

*Demetris Nenes* was appointed Vice President — Business Development on February 8, 2009 following the resignation of Mr. M. Gregos who had served as our Chief Operating Officer since January 2008. Effective January 2010, Mr. D Nenes was appointed President and Chief Operating Officer. Mr. D. Nenes began his professional career working at Sikorsky Aircraft Corporation as a Design Engineer working in various positions, with the most significant being Head of the Transmission Design Team for the Navy version of the S92. Mr. Nenes began his shipping career in 2005, joining OMI Corporation's Vetting / Safety & Quality department. During his career at OMI he moved in the commercial side of the business being involved in Forward Freight Agreements (FFA) Trading and Sales and Purchase. After the sale of OMI to Teekay Shipping and Torm, Mr. Nenes joined Ospraie Management LLC. Ospraie is a commodity hedge fund based in New York. At Ospraie Mr. Nenes was involved in both FFA trading and Market Research and Intelligence. Mr. Nenes holds a diploma in Naval Architecture and Marine Engineering from the National Technical University of Athens and a Master's Degree in Business Administration from the University of Connecticut.

*Solon Dracoulis* has served as our Treasurer since April 2007 and had served as our Chief Accounting Officer from April 2007 until his promotion to Chief Financial Officer effective January 2010. During 2006 and 2007, Mr. Dracoulis was a consultant to Navios Maritime Holdings and assumed the responsibilities of financial reporting and filings with the Securities and Exchange Commission. Prior to that period he held the position of Chief Financial Officer of Stelmar Shipping, Inc. following the acquisition of the company by Overseas Shipholding Group in early 2005 and as a Financial Controller Budget and Reporting Officer since 2001. During that time he was responsible for the preparation of Stelmar's financial statements, filings with the Securities and Exchange Commission, the implementation of accounting procedures and controls administration of the financial and accounting management and information system, preparation of annual operating budgets, quarterly projections and monthly cash flow statements. During the period starting in 1980. Mr. Dracoulis worked for Arthur Andersen & CO., KPMG and PricewaterhouseCoopers, where he commenced his career as an auditor — analyst and later became a Principal in the shipping audit division where he conducted financial audits in accordance with International Standards on Auditing (I.S.A.) and U.S. Generally Accepted Auditing Standards (G.A.A.S), evaluation of internal controls and internal audit procedures. He has a degree in Accounting and Business Administration from the Business Administration and Commercial Studies branch of the University of Athens and is a

member of the Association of Certified Accountants and Auditors of Greece. He is also a graduate of the Merchant Marine Academy at Aspropyrgos and has a five year service at sea as a Radio Officer.

*Konstandinos Kandylidis* has served as a member of our Board of Directors since April 2007. He is the main shareholder and Managing Director of Lapapharm Trade & Distribution Company Inc. ("Lapapharm"), a private business operating since 1962 in the fields of pharmaceuticals, crop protection and veterinary products, representing in Greece, mainly U.S. multinational corporations in the field including Gilead Sciences, Pharmion and Fort Dodge among others and in the past the American Cyanamid Company until 1994. Mr. Kandylidis joined Lapapharm in 1975 and served in several positions until 1990, when he became a member of the Board of Directors and in 1996 when he became the Managing Director. He was also member of the Board of Directors for the Hellenic Association of Crop Protection Products and has served as a member in several committees for the Hellenic Association of Pharmaceutical Companies. Mr. Kandylidis is a graduate of the Athens University of Economics and Business and he has a certificate in Marketing from the College for the Distributive Trades in England.

*Panagiotis A. Korakas* was appointed to our Board of Directors in December 2008 following the resignation of Mr. H. Kerames in November 2008. He was born in 1950 in Athens, Greece. Mr. Korakas has had an extensive career in the construction and construction materials industry, both as an executive and an entrepreneur. For almost ten years, Mr. Korakas was the General Manager of Korakas & Partners, a commercial construction entity, while during the last 15 years he has run a business enterprise specializing in advanced composite metal construction.

*Professor John Liveris* has served as a member of our Board of Directors since April 2007, has served as our Chairman since December 2007 and is a consultant in the technology and defense industries based in Athens, Greece. His most recent affiliations include Contour Global LLC, Scientific Games Corporation, Hellenic Telecommunications Organization (OTE), Motorola, EADS Eurofighter, the Monitor Company and Northrop Grumman Corporation. Prior to his current activities, Professor Liveris was, until 1999, the Group Senior Advisor at Intracom, the leading Greek telecommunications and electronics manufacturer where he was responsible for developing thrusts into new markets, including the establishment of a Defense division, and new technologies, for revamping Intracom's image and for all relations with the multi-lateral funding institutions. Mr. Liveris studied Mechanical Engineering at Tufts University in Boston, Mass. He did his graduate and doctoral studies in Engineering Management at the George Washington University in Washington, DC. There he taught from 1979 to 1996, attaining Professorial rank. Prof. Liveris has had a twenty-year professional experience in Washington, DC in various Greek government and private sector managerial and consulting positions. He has also had an extensive career as a journalist.

*George Biniaris* has served as a member of our Board of Directors since June 2010. He served as Chief Financial Officer of Lapapharm, a private equity business, from 1995 until his retirement in 2010. Prior to this, he served as Chief Accountant of Lapapharm from 1990 to 1995, having initially joined Lapapharm, as an assistant to the Chief Accountant in 1986. Mr. Biniaris started his career working at the Greek Ministry of Agriculture and later worked for a law firm in the division of mergers and acquisitions. Prior to this, he graduated from the Athens University for Economics and Business in 1983.

*Stephen Souras* has served as a member of our Board of Directors from April 2007 until June 2010 when his term expired. He is also a director of Investment Yard Management Limited, a Cayman Islands investment manager, overseeing a portfolio of alternative investments. Prior to employment at Investment Yard Management Limited Mr. Souras worked at Goldman Sachs International in the Investment Management Division advising and managing the portfolios of high net worth clients. Prior to Goldman Sachs, Mr. Souras started his career in business development for a consumer goods company in Asia. Mr. Souras was also employed at UBS Warburg in equity sales and then research where he advised institutional investors. Mr. Souras is a graduate of Imperial College in London, where he obtained a Bachelor of Engineering degree in Information Systems Engineering in 1992 and M.Sc. with Distinction, in Applications of Electronics in Medicine in 1993. He also holds a MBA from INSEAD in Fontainebleau, France.

*Konstandia Papaefthymiou* has served as our Chief Accountant since June 2007 and as our Chief Accounting Officer since January 2010 and until January 2011 when she submitted her resignation. For the period from 2005 to 2007, Ms. Papaefthymiou was the chief accountant of Navios Maritime Holdings. Ms. Papaefthymiou has a long experience in the shipping industry and has served as Chief Accountant and Financial Controller in Private and

D-71

Public shipping companies since 1992. During the last five years, Ms. Papaefthymiou has been involved in various projects including M&A transactions, the designing and implementation of corporate internal controls and setup of IT integrated infrastructure for Shipping Companies. She holds a Bachelor Degree from the Law School of the University of Athens, Political and Economic Studies. She also holds an MBA in shipping from ALBA Business School.

## B.   Compensation

We paid an aggregate amount of $3.8 million and $3.9 million as annual compensation and cash bonus to our chief executive director officer for the fiscal years ended December 31, 2010 and 2009, respectively. Non-executive directors and officers other than our Chief Executive Officer received annual compensation and cash bonus in the aggregate amount of $1.2 million and $1.6 million for fiscal years ended December 31, 2010 and December 31, 2009, respectively, plus reimbursement of their out-of-pocket expenses. We do not have a retirement plan for our officers or directors.

On December 24, 2008, the Company's Board of Directors approved the amendment of the consultancy agreement for the services to the Company of the Chief Executive Officer and increased the annual base consulting fee from $0.66 million (Euro 0.5 million) to $0.93 million (Euro 0.7 million) with effect January 1, 2009. All other terms of the consultancy agreement remained unchanged. The duration of the agreement will be for five years beginning January 1, 2009, and ending, unless terminated earlier on the basis of any other provision as may be defined in the agreement, on the day before the fifth anniversary of such date. In addition, 80,000 subordinated shares were issued to our Chief Executive Officer and 5,150 common shares were issued to our former Chief Operating Officer. The aggregate of 696,050 (2,085,150 before the reverse stock split effect) subordinated shares were converted into common shares on August 15, 2008 following the satisfaction of conditions contained in our Amended and Restated Articles of Incorporation.

Pursuant to the Company's 2010 Equity Incentive Plan described below, in January 2010, an aggregate of 1,066,667 (3,200,000 before the reverse stock split) common shares were awarded to the Company's directors and officers. In December 2010, 6,000,000 common shares were awarded to Steel Wheel Investments Limited, a company controlled by the Company's Chief Executive Officer. These shares vest ratably over a three year period commencing on the date of issuance.

### Equity Incentive Plan

#### 2010 Equity Incentive Plan

In January 2010, we adopted an equity incentive plan which we refer to as the 2010 Equity Incentive Plan, or the Plan, under which officers, key employees, directors and consultants of us and our subsidiaries will be eligible to receive options to acquire common shares, stock appreciation rights, restricted stock, dividend participation rights and other stock-based or stock-denominated awards. We have reserved a total of 10,000,000 (30,000,000 before the reverse stock split) common shares for issuance under the Plan, subject to adjustment for changes in capitalization as provided in the Plan. The Plan will be administered by our Compensation Committee, or such other committee of our Board of Directors as may be designated by the board to administer the Plan.

Under the terms of the Plan, stock options and stock appreciation rights granted under the Plan will have an exercise price per common share equal to the fair market value of a common share on the date of grant, unless otherwise determined by the Plan administrator, but in no event will the exercise price be less than the fair market value of a common share on the date of grant. Options and stock appreciation rights will be exercisable at times and under conditions as determined by the Plan administrator, but in no event will they be exercisable later than ten years from the date of grant.

The Plan administrator may grant shares of restricted stock and awards of restricted stock units subject to vesting and forfeiture provisions and other terms and conditions as determined by the Plan administrator. Upon the vesting of a restricted stock unit, the award recipient will be paid an amount equal to the number of restricted stock units that then vest multiplied by the fair market value of a common share on the date of vesting, which payment

may be paid in the form of cash or common shares or a combination of both, as determined by the Plan administrator. The Plan administrator may grant dividend equivalents with respect to grants of restricted stock units.

Adjustments may be made to outstanding awards in the event of a corporate transaction or change in capitalization or other extraordinary event. In the event of a "change in control" (as defined in the Plan), unless otherwise provided by the Plan administrator in an award agreement, awards then outstanding will become fully vested and exercisable in full.

Our Board of Directors may amend or terminate the Plan and may amend outstanding awards, provided that no such amendment or termination may be made that would materially impair any rights, or materially increase any obligations, of a grantee under an outstanding award. Shareholder approval of Plan amendments will be required under certain circumstances. Unless terminated earlier by our Board of Directors, the Plan will expire ten years from the date the Plan was adopted.

On January 18, 2010, the Company's Board of Directors adopted and approved in all respect the resolutions of the meetings of the Compensation Committee held on January 15, 2010, pursuant to which 1,000,000 (3,000,000 before the reverse stock split) common shares were awarded to Steel Wheel Investments Limited, a company controlled by our Chief Executive Officer, and an aggregate of 66,667 (200,000 before the reverse stock split) common shares were awarded to the Company's Directors and officers. On December 17, 2010, Company's Board of Directors adopted and approved in all respect the resolutions of the meetings of the Compensation Committee held on December 17, 2010, pursuant to which 6,000,000 common shares were awarded to Steel Wheel Investments Limited.

## C.  Board Practices

Our Board of Directors is elected annually on a staggered basis, and each director elected holds office for a three year term or until his successor shall have been duly elected and qualified, except in the event of his death, resignation, removal or the earlier termination of his term of office. The current term of office of each director is as follows: our Class A directors will serve for a term expiring at the 2011 annual meeting of shareholders, our Class B directors will serve for a term expiring at the 2012 annual meeting, and our Class C directors will serve for a term expiring at the 2013 annual meeting.

### Committees of the Board of Directors

We have established an audit committee comprised of three independent members of our Board of Directors who are responsible for reviewing our accounting controls and recommending to the Board of Directors the engagement of our outside auditors. Our audit committee is responsible for reviewing all related party transactions for potential conflicts of interest and all related party transactions are subject to the approval of the audit committee. We have established a compensation committee comprised of independent directors which is responsible for recommending to the Board of Directors our senior executive officers' compensation and benefits. We have also established a nominating and corporate governance committee which is responsible for recommending to the Board of Directors nominees for director and directors for appointment to board committees and advising the board with regard to corporate governance practices. Shareholders may also nominate directors in accordance with procedures set forth in our bylaws. The members of the audit, compensation and nominating committees are Mr. G. Biniaris, who also serves as the chairman of our audit and compensation committees, Mr. Liveris who also acts as the chairman of our Board of Directors and corporate governance committee, and Mr. P. Korakas. Our Board of Directors has determined that Mr. G. Biniaris qualifies as "financial expert" under the Commission's rules.

## D.  Employees

As of December 31, 2010 the Company employed six persons, namely Antonis Kandylidis, our Chief Executive Officer, Demetris Nenes, our President and Chief Operating Officer, Solon Dracoulis, our Chief Financial Officer and Treasurer, Konstandia Papaefthymiou, our Chief Accounting Officer and two other employees, all of whom are located in Athens. Effective February 1, 2011, the duties of our Chief Accounting Officer were temporarily assumed by our Chief Financial Officer following the resignation of Ms. Papaefthymiou.

**E.   Share Ownership**

The shares beneficially owned by our directors and officers and/or companies affiliated with these individuals are disclosed in "Item 7A — Major Shareholders" below.

**Item 7.   *Major Shareholders and Related Party Transactions***

**A.   Major Shareholders**

The following table sets forth current information regarding (i) the owners of more than five percent of our voting securities of which we are aware, of which there were none as of the date of this Annual Report; and (ii) the total amount of common shares owned by all of our officers and directors, individually and as a group. All of our shareholders are entitled to one vote for each share held.

| Title of Class | Identity of Person or Group | Number of Shares Owned | Percent of Class |
|---|---|---|---|
| Common Stock, par value $0.01 | Antonis Kandylidis(1) | 60,017,141(1) | 50.5% |
| | All other Directors and officers as a group | 118,481 | * |

_____

(1) Mr. Antonis Kandylidis may be deemed to beneficially own (a) 17,333,333 of these common shares through Basset Holdings Inc., a company of which he is the controlling person, (b) 7,026,666 of these common shares through Steel Wheel Investments Ltd., a company of which he is the controlling person and (c) 35,657,142 of these common shares through Haywood Finance Limited, a company of which he is the controlling person.

 * Less than 1% of our issued and outstanding common stock.

**B.   Related Party Transactions**

*Registration Rights Agreement*

On September 3, 2008, we filed a resale shelf registration statement on Form F-3 to register 695,050 (2,085,150 before the reverse stock split) common shares on behalf of Basset Holdings Inc., Steel Wheel Investments Ltd. and Seabert Shipping Co., a company controlled by our former Chief Operating Officer. This resale shelf registration statement was amended on October 30, 2009 and has not yet been declared effective.

*Cardiff Marine Inc. ("Cardiff")*

Until June 15, 2010, we used the services of Cardiff, a ship management company with offices in Greece, for the technical and commercial management of the Company's fleet. The issued and outstanding capital stock of Cardiff is beneficially owned (a) 30% by a company the beneficial owner of which is Mrs. Chryssoula Kandylidis, the mother of the Company's CEO and (b) 70% by a foundation controlled by Mr. George Economou. Mrs. C Kandylidis is the sister of Mr. G Economou and the wife of one of the Company's director's, Mr. Konstandinos Kandylidis.

Prior to June 15, 2010, Cardiff was engaged under separate vessel management agreements directly by the Company's respective wholly owned vessel owning subsidiaries. Under the vessel management agreements Cardiff was entitled to a daily management fee per vessel of €764 ($1,013) and €870 ($1.153) for the drybulk carriers and tanker vessels, respectively. Cardiff also provided, other services pursuant to a services agreement, which was terminated on June 15, 2010, under which the Company paid additional fees, including (1) a financing fee of 0.2% of the amount of any loan, credit facility, interest rate swap agreement, foreign currency contract and forward exchange contract arranged by Cardiff, (2) a commission of 1% of the purchase price on sales or purchases of vessels in the Company's fleet that are arranged by Cardiff, (3) a commission of 1.25% of charterhire agreements arranged by Cardiff, (4) an information technology fee of €26,363 ($34,939) per quarter and (5) a fee of €527 ($698) per day for superintendent inspection services in connection with the possible purchase of a vessel. The U.S. dollar exchange figures above are based on the exchange rate at December 31, 2010. At the beginning of each calendar year, these fees were adjusted upwards according to the Greek consumer price index. We were also reimbursed Cardiff for any out-of-pocket expenses at cost plus 10%.

In May 2009, we entered into a service agreement with Cardiff whereby Cardiff is entitled to a 0.15% brokerage commission on the Company's FFA trading transactions. The agreement was terminated on June 15, 2010.

Until July 2009, when Cardiff assumed the management of all of our vessels, it was providing supervisory services for the vessels whose technical manager at the time was Wallem Ship Management Ltd. in exchange for a daily fee of €105 ($140 based on the exchange rateat December 31, 2010) per vessel.

Furthermore, based on the management agreements with Cardiff we, as of June 15, 2010, had made a security payment of $6,486, representing managed vessels' estimated operating expenses and management fees for three months. Following the termination of the agreements on June 15, 2010, the security payment was reimbursed to us in September 2010.

The fees charged by Cardiff for 2008, 2009 and 2010 are as follows:

| Nature of Charge | 2008 | 2009 | 2010 | Included in |
|---|---|---|---|---|
| | (In thousands of U.S. Dollars) | | | |
| Management fees | $1,605 | $4,594 | $2,275 | Vessels' operating expenses — Statement of Operations |
| Commission on charterhire agreements | 698 | 685 | 444 | Voyage expenses — Statement of Operations |
| Commission on FFA trading | — | 76 | 26 | Gain on forward freight agreements — Statement of Operations |
| Commission on vessels under construction | — | — | 450 | Vessels under construction — Balance Sheet |
| Commissions on purchase of vessels | 1,440 | 1,785 | — | Vessels, net — Balance Sheet |
| Commissions on sale of vessels | — | 1,135 | 28 | Loss on sale of vessels — Statement of Operations |
| Financing fees | 870 | — | — | Interest and finance costs — Statement of Operations |
| IT related fees | 29 | — | — | Other fixed assets, net — Balance Sheet |
| IT related fees | 27 | — | — | General and administrative expenses — Statement of Operations |
| Financing fees | 59 | — | — | Deferred financing fees, net — Balance Sheet |
| Legal Attendance | — | 80 | — | Vessels' operating expenses — Statement of Operations |
| Mark up on reimbursement of out of pocket expenses | — | 13 | 1 | Vessels' operating expenses — Statement of Operations |

At December 31, 2009 and 2010, $0.79 million and $nil million, respectively, are payable to Cardiff, and are reflected in the consolidated balance sheets as "Due to related parties". In addition, $0.34 million due from and $0.3 million due to Cardiff as at December 31, 2009 and 2010, respectively, relating to the operations of the vessels under Cardiff's management, are included in "Prepayments and other" and ''Accounts Payable" in the consolidated balance sheets.

### TMS Dry Ltd. and TMS Tankers Ltd.

Following termination of the management agreements with Cardiff discussed above, effective June 15, 2010, we contracted the technical and commercial management of our drybulk and tanker fleet as well as the supervision of the construction of the newbuildings to TMS Dry Ltd. and TMS Tankers Ltd., respectively, which we refer to as our Fleet Managers. Both companies are beneficially owned by (a) 30% by a company the beneficial owner of which is Mrs. Chryssoula Kandylidis, the mother of the Company's Chief Executive Officer and (b) 70% by a

foundation controlled by Mr. George Economou. Mrs. C. Kandylidis is also the sister of Mr. G. Economou and the wife of one of the Company's directors, Mr. Konstandinos Kandylidis

The Fleet Managers are engaged under separate vessel management agreements directly by the Company's respective wholly-owned vessel owning subsidiaries. Under the vessel management agreements we pay a daily management fee per vessel, which includes budgeted superintendent's fees per vessel plus expenses for any services performed relating to evaluation of the vessel's physical condition, supervision of shipboard activities or attendance upon repairs and drydockings. At the beginning of each calendar year, these fees are adjusted upwards according to the Greek consumer price index. Such increase cannot be less than 3% and more than 5%. In the event that the management agreement is terminated for any reason other than Fleet Managers' default, we will be required (a) to pay management fees for a further period of three (3) calendar months as from the date of termination and (b) to pay an equitable proportion of any severance crew costs which materialize as per applicable the Collective Bargaining Agreement (CBA). In this respect, we will have to pay approximately $942 due to the expected sale of the M/T *Olinda* , M/T *Tamara* , M/V *Augusta* , M/V *Austin* and M/V *Trenton* .

The Fleet Managers are also entitled to a daily management fee per vessel of €1,500 ($1,988 based on the exchange rate of December 31, 2010 and €1,700 ($2,253 based on the exchange rate of December 31, 2010) for the drybulk carriers and tanker vessels, respectively. The Fleet Managers are also entitled to (a) a discretionary incentive fee, (b) extra superintendents' fee of €500 ($663 based on the exchange rate of December 31, 2010) per day (c) a commission of 1.25% on charterhire agreements that are arranged by the Fleet Managers and (d) a commission of 1% of the purchase price on sales or purchases of vessels in our fleet that are arranged by the Fleet Managers. Furthermore, the Fleet Managers are entitled to a supervision fee payable upfront for vessels under construction equal to 10% of the approved annual budget for supervision cost.

Furthermore, based on the management agreements, as of December 31, 2010, we made a security payment of $4.1 million to TMS Dry Ltd, representing managed vessels' estimated operating expenses and management fees for three months which will be settled when the agreements terminate; however, in case of a change of control the amount of the security is not refundable. The amounts have been classified under "Other non-current assets" in the accompanying 2010 consolidated balance sheet.

The fees charged by TMS Dry Ltd. and TMS Tankers Ltd. during the period from June 15, 2010 to December 31, 2010 are as follows:

| Nature of Charge | TMS Dry LTD | TMS Tankers Ltd | Included in |
|---|---|---|---|
| | (In thousands of U.S. Dollars) | | |
| Management fees | $3,496 | $1,198 | Vessels' operating expenses — Statement of Operations |
| Commission on charterhire agreements | 477 | 94 | Voyage expenses — Statement of Operations |
| Commissions on acquisition of vessels | 495 | — | Vessels, net — Balance Sheet |
| Commissions on sale of vessels | 620 | 111 | Loss on sale of vessels — Statement of Operations |
| Termination fees | 559 | 430 | Loss on sale of vessels — Statement of Operations |
| Supervision fee on vessels under construction | 195 | — | Other fixed assets, net — Balance Sheet |

At December 31, 2010, $1.4 million and $0.4 million is payable to TMS Dry Ltd. and TMS Tankers Ltd., respectively, and are reflected in the accompanying consolidated balance sheet as "Due to related parties". In addition, $1.1 million and $2.0 million due from TMS Dry Ltd. and TMS Tankers Ltd. as at December 31, 2010, respectively, relating to the security payment as discussed above and the operations of the vessels under TMS Dry Ltd. and TMS Tankers Ltd. management are included in "Prepayments and other" in the accompanying 2010 consolidated balance sheet.

### Vivid Finance Limited ("Vivid")

On August 13, 2010, we entered into a consultancy agreement (the "Agreement") with Vivid, a related company organized under the laws of Cyprus, which is controlled by Mr. George Economou and of which he may be deemed the beneficial owner. Vivid serves as our financial consultant on matters related to (i) new loans and credit facilities with lenders and financial institutions, (ii) the raising of equity or debt from capital markets, (iii) interest rate swaps agreements, foreign currency contracts and forward exchange contracts and (iv) the renegotiation of existing loans and credit facilities. In consideration of these services we will pay Vivid a fee of 0.20% on the total transaction amount.

The agreement has a duration of five years and may be terminated (i) at the end of its term unless extended by mutual agreement of the parties; (ii) at any time by the mutual agreement of the parties; and (iii) by the Company after providing written notice to Vivid at least 30 days prior to the actual termination date. As defined in the Agreement, in the event of a "Change of Control" Vivid has the option to terminate the Agreement and cease providing the aforementioned service within three months from the Change of Control.

Vivid did not provide any services in 2010 and, accordingly, no fees were billed to the Company.

### Transbulk 1904 AB ("Transbulk")

The vessel M/V *Richmond* was employed on a time charter with Transbulk for a period of 24 to 28 months at gross charter rate of $29,100 per day. On August 1, 2009, the vessel was redelivered to the Company due to early termination of the charter party at the charterer's request. The vessel M/V *Lansing* was employed under a time charter with Transbulk until June 29, 2009 (the vessel was sold on July 1, 2009) at a gross charterhire of $24,000 per day. Transbulk is a company based in Gothenburg, Sweden. Transbulk has been in the drybulk cargo chartering business for a period of approximately 30 years. Mr. George Economou serves on its Board of Directors.

### Heidmar Trading LLC

On October 14, 2008, the M/T *Tigani* commenced her time charter employment with Heidmar Trading LLC, for a period of approximately one year at a gross daily rate of $29,800, the vessel was redelivered to the Company in December 2009. Mr. George Economou is the chairman of the Board of Directors of the company and the Company's Chief Executive Officer is a member of its Board of Directors. The vessel was redelivered on December 22, 2009.

### Tri-Ocean Heidmar Tankers LLC

On October 17, 2008, the M/T *Tamara* , concurrently with her delivery commenced her time charter employment with Tri-Ocean Heidmar Tankers LLC for a period of approximately 25 to 29 months at a gross daily rate of $27. Tri-Ocean Heidmar Tankers LLC is owned by Heidmar Inc. Mr. George Economou is the chairman of the Board of Directors of Heidmar Inc. and our Chief Executive Officer is a member of the Board of Directors of Heidmar Inc. The vessel was redelivered on November 6, 2010. At December 31, 2010, $1.0 million and $0.1 million are due to the Tri-Ocean Heidmar and are included in "Accounts Payable" and "Accrued Liabilities" in the accompanying consolidated balance sheet.

### Blue Fin Tankers Inc. pool ("Blue Fin")

On October 29, 2008 the M/T *Olinda* was employed in the Blue Fin tankers spot pool for a minimum period of twelve months. Blue Fin is a spot market pool managed by Heidmar Inc. Mr. George Economou is the chairman of the Board of Directors of Heidmar Inc. and our Chief Executive Officer is a member of the Board of Directors of Heidmar Inc. The vessel, as a pool participant, is allocated part of the pool's revenues and voyage expenses, on a time charter basis, in accordance with an agreed-upon formula. In October 2008, the Company made an initial advance to the pool for working capital purposes of $1.0 million. As of December 31, 2009 and 2010 we had a receivable from the pool, including advances made to the pool for working capital purposes, of $1.9 million (of which $0.1 million is included in receivables and $1.8 is included in "Prepayments and other") and $2.2 million (of which $0.1 million is included in "Receivables" and $2.1 million is included in "Prepayments and other"),

respectively, in the accompanying consolidated balance sheets. The revenue of M/T *Olinda* deriving from the pool amounted to $2.6 million, $8.0 million and $7.2 million for 2008, 2009 and 2010, respectively and is included in "Voyage revenue" in the accompanying consolidated statements of operations.

### Sigma Tankers Inc. pool ("Sigma")

On December 22, 2009 and November 6, 2010, the M/T *Tigani* and the M/T *Tamara* were both employed in the Sigma Tankers Inc. pool for a minimum period of twelve months. Sigma is a spot market pool managed by Heidmar Inc. Mr. George Economou is the chairman of the Board of Directors of Heidmar Inc. and our Chief Executive Officer is a member of the Board of Directors of Heidmar Inc. The vessels, as pool participants, are allocated part of the pool's revenues and voyage expenses, on a time charter basis, in accordance with an agreed-upon formula. The vessels were redelivered from the Pool on April 28, 2010 and January 6, 2011, respectively, due to their sale on May 4, 2010 and January 13, 2011, respectively. As of December 31, 2009 and 2010, the Company had a receivable from the pool of $1.0 million and $1,5 million, respectively, which is included in "Receivables" in the accompanying consolidated balance sheets. The revenue of the M/T *Tigani* and the M/T *Tamara* deriving from the pool for 2009 amounted to $0.2 million and nil, respectively, and for 2010 to $2.0 million and $0.7 million, respectively, and is included in "Voyage revenue" in the accompanying consolidated statements of operations.

### Lease Agreement

We have leased office space in Athens, Greece, from Mr. George Economou. The lease commenced on April 24, 2007, with a duration of six months and the option for the Company to extend it for another six months. The monthly rental amounts to Euro 680 ($901 at the December 31, 2010 exchange rate). This agreement was terminated on December 31, 2010. The rent charged for each of the years ended December 31, 2008, 2009 and 2010 amounted to $0.01 million, respectively and is included in General and Administrative expenses in the accompanying consolidated statements of operations. On January 1, 2011 we entered into a new lease agreement for the current office space leased from a family member of Mr. George Economou, which terminates on December 31, 2015.

### Capital infusion

On May 28, 2010, Basset Holding Inc., a company controlled by Mr. Anthony Kandylidis, made an equity contribution of $20 million in exchange for approximately 16,666,667 (50,000,000 before the reverse stock split effect, discussed in Note 8(f)) to the consolidated financial statements, of the Company's common shares at $0.40 per share before the reverse stock split effect.

### Vessels Under Construction

On April 1, 2011, we entered into two agreements to purchase two Capesize vessels under construction of 206,000 DWT each, through the acquisition of the shares of the relevant owning companies for a company ultimately controlled by the Company's Chief Executive Officer in exchange for an aggregate of 35,657,142 common shares of the Company. The vessels are scheduled to be delivered in the second and fourth quarter of 2013. The total outstanding yard payments amount to $96.24 million, of which $29.7 million is payable in 2012 and the balance is payable in 2013.

## Consultancy Agreement

Under an agreement between the Company and Steel Wheel Investments Limited ("Steel Wheel"), a company controlled by the our Chief Executive Officer, Steel Wheel provides consulting services to the Company in connection with the duties of the Chief Executive Officer of the Company, for an annual fee plus a discretional cash bonus as approved by the Compensation Committee. Such fees and bonuses for 2008, 2009 and 2010 totaled $2.6 million, $4.0 million and $3.8 million, respectively and are included in "General and administrative expenses", in the accompanying consolidated statements of operations. Furthermore, in 2009 and 2010 certain compensation in stock was granted to Steel Wheel. Please see Note 11 to our accompanying consolidated financial statements.

**C.   Interests of experts and counsel**

Not applicable.

**Item 8.**   *Financial Information*

**A.   Consolidated Statements and Other Financial Information**

See Item 18.

### Legal Proceedings

OceanFreight is not currently involved in any legal proceedings which may have a significant effect on its business, financial position, and results of operations or liquidity. The Company's former Chairman, President and Chief Executive Officer had previously asserted a claim for breach of his employment agreement and for unidentified post-employment conduct by the Company. On April 7, 2008, the Company and the former Chairman, President and Chief Executive Officer reached a settlement agreement resolving all claims asserted by him.

In connection with this agreement, the Company issued to the former Chairman, President and Chief Executive Officer 21,053 common shares in exchange for 21,053 restricted subordinated shares, plus an additional 52,105 common shares both of which took effect on April 22, 2008. The related expense was approximately $1,100,000 and is included in General and Administrative expenses in the accompanying consolidated statement of income for the year ended December 31, 2008. The Company also granted to Mr. Cowen certain registration rights for the 52,105 common shares held by him.

From time to time, OceanFreight may be subject to legal proceedings and claims in the ordinary course of business, involving principally commercial charter party disputes. It is expected that these claims would be covered by insurance if they involve liabilities arising from incidents such as a collision, other marine casualty, damage to cargoes, oil pollution and death or personal injuries to crew and are subject to customary deductibles. Those claims, even if lacking merit, could result in the expenditure of significant financial and managerial resources.

### Dividend Policy

See discussion under Item 10.B

**B.   Significant Changes**

See discussion under Item 4.A. which includes disclosure of significant changes since December 31, 2010.

**Item 9.** *The Offer and Listing*

Our common stock trades on The Nasdaq Global Market under the symbol "OCNF". Since our initial public offering in April 2007, the price history of our common stock is as follows:

| | High | Low |
|---|---|---|
| **2007** | | |
| 2nd Quarter ended June 30, 2007 | $19.67 | $19.14 |
| 3rd Quarter ended September 30, 2007 | 23.54 | 22.67 |
| 4th Quarter ended December 31, 2007 | 30.48 | 14.10 |
| 2007 Annual | 30.48 | 14.10 |
| **2008** | | |
| 1st Quarter ended March 31, 2008 | $24.74 | $14.71 |
| 2nd Quarter ended June 30, 2008 | 26.96 | 20.52 |
| 3rd Quarter ended September 30, 2008 | 23.23 | 11.87 |
| 4th Quarter ended December 31, 2008 | 14.12 | 1.80 |
| 2008 Annual | 26.96 | 1.80 |
| **2009** | | |
| 1st Quarter ended March 31, 2009 | $ 5.23 | $ 0.82 |
| 2nd Quarter ended June 30, 2009 | 1.88 | 1.04 |
| 3rd Quarter ended September 30, 2009 | 1.79 | 1.24 |
| 4th Quarter ended December 31, 2009 | 1.29 | 0.89 |
| 2009 Annual | 5.23 | 0.82 |
| **2010** | | |
| 1st Quarter ended March 31, 2010 | $ 1.05 | $ 0.71 |
| 2nd Quarter ended June 30, 2010 | 1.39 | 0.46 |
| 3rd Quarter ended September 30, 2010 | 1.41 | 0.76 |
| 4th Quarter ended December 31, 2010 | 1.12 | 0.92 |
| 2010 Annual | 1.41 | 0.46 |
| **Most Recent Six Months** | | |
| October 2010 | 1.12 | 0.93 |
| November 2010 | 1.09 | 0.95 |
| December 2010 | 1.01 | 0.92 |
| January 2011 | 0.96 | 0.80 |
| February 2011 | 0.83 | 0.77 |
| March 2011 | 0.76 | 0.64 |

**Item 10.** *Additional Information*

**A. Share Capital**

Not applicable.

**B. Memorandum and articles of association**

*Amended and Restated Articles of Incorporation and By-laws*

Our purpose as set forth in Section B of our Amended and Restated Articles of Incorporation is to engage in any lawful act or activity for which corporations may now or hereafter be organized under the Marshall Islands Business Corporations Act, or BCA. Our Amended and Restated Articles of Incorporation and by-laws do not impose any limitations on the ownership rights of our shareholders.

Under our by-laws, annual shareholder meetings will be held at a time and place selected by our Board of Directors. The meetings may be held in or outside of the Marshall Islands. Special meetings may be called by the Board of Directors, or by the Chairman, or by our President. Our Board of Directors may set a record date between 15 and 60 days before the date of any meeting to determine the shareholders that will be eligible to receive notice and vote at the meeting.

### Directors

Our directors are elected by a plurality of the votes cast at a meeting of the shareholders by the holders of shares entitled to vote in the election. There is no provision for cumulative voting.

The Board of Directors may change the number of directors only by a vote of at least $66\ ^2/_3\%$ of the entire board. Each director shall be elected to serve until his successor shall have been duly elected and qualified, except in the event of his death, resignation, removal, or the earlier termination of his term of office. The Board of Directors has the authority to fix the amounts which shall be payable to the members of our Board of Directors for attendance at any meeting or for services rendered to the Company.

### Subordinated Shares

Following the dividend payment on August 14, 2008 in the amount of $0.77 per share in respect of the second quarter of 2008, the Company satisfied the provisions under its Amended and Restated Articles of Incorporation for the early conversion of all of its issued and outstanding subordinated shares into common shares on a one-for-one basis. Accordingly, on August 15, 2008 the then issued and outstanding 2,085,150 subordinated shares, including 2,000,000 subordinated shares owned by Basset, a company controlled by Mr. Antonis Kandylidis, our Chief Executive Officer, were converted into common shares on a one-for-one basis.

### Dividends

On December 12, 2008, our Board of Directors determined, after careful consideration of various factors, including the recent sharp decline in charter rates and vessel values in the drybulk sector, to suspend the payment of cash dividends until such time as the Board of Directors shall determine in its discretion, in order to preserve capital. In addition, under the January 9, 2009 amendatory agreement to our Nordea credit facility which matures in October 2015, we are prohibited from paying dividends during the term of such credit facility.

Dividend payments that would require use of the remaining 50% of our quarterly net profits would be subject to our lender's consent.

Prior to this suspension of dividend payments, our policy was to declare and pay regular cash dividends on a quarterly basis from our operating surplus, in amounts substantially equal to our available cash from operations in the previous quarter, less any cash reserves for drydockings and working capital, as our Board of Directors might determine. Our target base dividend was $0.77 per common share, although the Board of Directors may change this amount in its sole discretion. In May 2008, we paid a dividend in the amount of $0.77 per share in respect of the first quarter of 2008, in August 2008, we paid a dividend in the amount of $0.77 per share in respect of the second quarter of 2008 and in November 2008, we paid a dividend in the amount of $0.77 per share in respect of the third quarter of 2008.

Declaration and payment of any dividend is subject to the discretion of our Board of Directors. The timing and amount of dividend payments, if reinstated in the future, will be dependent upon our earnings, financial condition, cash requirements and availability, restrictions in our credit agreement, the provisions of Marshall Islands law affecting the payment of distributions to shareholders and other factors. The payment of dividends, even if reinstated in the future, is not guaranteed or assured, and may be discontinued at any time at the discretion of our Board of Directors. Because we are a holding company with no material assets other than the stock of our subsidiaries, our ability to pay dividends will depend on the earnings and cash flow of our subsidiaries and their ability to pay dividends to us. Marshall Islands law generally prohibits the payment of dividends other than from our operating surplus or while a company is insolvent or would be rendered insolvent upon the payment thereof; but in

D-81

case there is no such surplus, dividends may be declared or paid out of net profits for the fiscal year in which the dividend is declared and for the preceding fiscal year.

Although the subordination period, as defined in our Amended and Restated Articles of Incorporation, terminated and all of our outstanding subordinated shares converted into common shares on a one-for-one basis following our dividend payment in the amount of $0.77 per share in respect of the second quarter of 2008, if we reinstate dividend payments in the future, we intend to pay such dividends out of operating surplus only. Our Board of Directors will treat all dividends as coming from operating surplus until the sum of all dividends paid since the closing of our initial public offering equals the amount of operating surplus as of the most recent date of determination. Our undistributed operating surplus at any point in time will be our operating surplus accumulated since the closing of our initial public offering less all dividends from operating surplus paid since the closing of our initial public offering. We will treat dividends paid from any amount in excess of our operating surplus, if any, as liquidating dividends. The classification of dividends as liquidating dividends for U.S. federal income tax purposes is governed by the Internal Revenue Code of 1986, as amended, and may be different than the classification of dividends under the Company's Amended and Restated Articles of Incorporation.

### Operating Surplus

Operating surplus means the greater of zero and the amount equal to:

- $5.0 million (which may be increased to $10.0 million as described below); plus

- all of our cash receipts after the completion of our initial public offering, excluding cash receipts reorganizations or restructurings, (5) the termination of interest rate swap agreements, (6) sales or other dispositions of vessels (except to the extent the proceeds from such dispositions exceed the initial purchase price or contributed value of the vessel subject to the disposition, which excess amount shall be treated as operating surplus) and (7) sales or other dispositions of other assets other than in the normal course of business; plus

- interest paid on debt incurred and cash dividends paid on equity securities issued by us, in each case, to finance all or any portion of the construction, replacement or improvement of a capital asset such as vessels during the period from such financing until the earlier to occur of the date the capital asset is put into service or the date that it is abandoned or disposed of; plus

- interest paid on debt incurred and cash dividends paid on our equity securities issued by us, in each case, to pay the construction period interest on debt incurred, or to pay construction period dividends on our equity issued, to finance the construction projects described in the immediately preceding bullet; less

- all of our cash expenditures after the completion of our initial public offering, including, but not limited to operating expenses, interest payments and taxes, but not (1) the repayment of borrowings, (2) the repurchase of debt and equity securities, (3) interest rate swap termination costs, (4) expenses and taxes related to borrowings, sales of equity and debt securities, capital contributions, corporate reorganizations or restructurings, the termination of interest rate swap agreements, sales or other dispositions of vessels, and sales or dispositions of other assets other than in the normal course of business, (5) capital expenditures and (6) payment of dividends, such expenditures are hereinafter referred to as Operating Expenditures; less

- cash capital expenditures incurred after the completion of our initial public offering to maintain our vessels and other assets including drydocking, replacement of equipment on the vessels, repairs and similar expenditures, but excluding capital expenditures for or related to the acquisition of additional vessels, and including capital expenditures for replacement of a vessel as a result of damage or loss prior to normal retirement, net of any insurance proceeds, warranty payments or similar property not treated as cash receipts for this purpose, such capital expenditures are hereinafter referred to as Maintenance Capital Expenditures; less

- the amount of cash reserves established by our Board of Directors for future (1) Operating Expenditures and (2) Maintenance Capital Expenditures.

The $5.0 million amount in the first bullet point above may be increased by our Board of Directors to $10.0 million only if our board determines such increase is necessary to allow it to pay all or part of the base dividend on our common shares.

As described above, our operating surplus, for determining whether we are paying ordinary dividends or liquidating dividends, does not reflect only cash on hand that is generated from our operations. For example, it includes a provision that will enable us to pay, under circumstances described above, a dividend from our operating surplus of up to $10.0 million of cash we receive from non-operating sources, such as asset sales, issuances of securities and borrowings. In addition, the effect of including, as described above, certain dividends on equity securities or interest payments on debt, related to the construction, replacement or improvement of an asset in operating surplus would be to increase our operating surplus by the amount of any such dividends or interest payments. As a result, we may also pay dividends from our operating surplus up to the amount of any such dividends or interest payments from cash we receive from non-operating sources.

Our Amended and Restated Articles of Incorporation provide that the construction or application of the definition of operating surplus may be adjusted in the case of any particular transaction or matter or type of transaction or matter if our Board of Directors, with the concurrence of our audit committee, is of the opinion that the adjustment is necessary or appropriate to further the overall purpose and intent of the definition of operating surplus.

### Liquidating Dividends

We do not expect to pay liquidating dividends.

### Adjustment of Base Dividend

The base dividend is subject to downward adjustment in the case of liquidating dividends. The base dividend amount will be reduced in the same proportion that the liquidating dividend had to the fair market value of the common shares prior to the payment of the liquidating dividend. So long as the common shares are publicly traded on a national securities exchange or market, that price will be the average closing sale price on each of the five trading days before the dividend date. If the shares are not publicly traded, the price will be determined by our Board of Directors.

In addition to the adjustment for liquidating dividends, if we combine our shares into fewer shares or subdivide our shares into a greater number of shares, we will proportionately adjust the base dividend level.

### Voting Rights

The holders of the common shares are entitled to one vote per share on each matter requiring the approval of the holders of our common shares, whether pursuant to our Articles, our Bylaws, the Marshall Islands Business Corporation Act or otherwise. Our directors shall be elected by a plurality vote of the common shares. A majority of the common shares in the aggregate shall constitute a quorum. Any preferred shares shall have whatever voting rights are provided on their issuance.

Upon our dissolution or liquidation or the sale of all or substantially all of our assets, after payment in full of all amounts required to be paid to creditors and to any holders of preferred shares having liquidation preferences, the holders of all classes of our common shares will be entitled to receive pro rata our remaining assets available for distribution. Holders of our common shares do not have conversion, redemption or pre-emptive rights to subscribe to any of our securities. The powers, preferences and rights of holders of all classes of our common shares are subject to the rights of the holders of any preferred shares that we may issue in the future.

### Anti-Takeover Provisions of Our Charter Documents

Several provisions of our Amended and Restated Articles of Incorporation and by-laws may have anti-takeover effects. These provisions are intended to avoid costly takeover battles, lessen our vulnerability to a hostile change of control and enhance the ability of our Board of Directors to maximize shareholder value in connection with any unsolicited offer to acquire us. However, these anti-takeover provisions, which are summarized below, could also

discourage, delay or prevent (1) the merger or acquisition of our company by means of a tender offer, a proxy contest or otherwise, that a shareholder may consider in its best interest and (2) the removal of incumbent officers and directors.

### Blank Check Preferred Stock

Under the terms of our Amended and Restated Articles of Incorporation, our Board of Directors has authority, without any further vote or action by our shareholders, to issue up to 5,000,000 shares of blank check preferred stock. Our Board of Directors may issue shares of preferred stock on terms calculated to discourage, delay or prevent a change of control of our company or the removal of our management.

### Stockholders Rights Agreement

We entered into a Stockholders Rights Agreement with American Stock Transfer & Trust Company, as Rights Agent, effective as of April 30, 2008, which has since been amended. Under this Agreement, we declared a dividend payable of one preferred share purchase right, or Right, to purchase one one-thousandth of a share of the Company's Series A Participating Preferred Stock for each outstanding share of OceanFreight Inc. common stock, par value U.S.$0.01 per share. The Rights will separate from the common stock and become exercisable after (1) the 10th day after public announcement that a person or group acquires ownership of 20% or more of the company's common stock or (2) the 10th business day (or such later date as determined by the company's board of directors) after a person or group announces a tender or exchange offer which would result in that person or group holding 20% or more of the company's common stock. On the distribution date, each holder of a Right will be entitled to purchase for $100 (the "Exercise Price") a fraction (1/1000th) of one share of the company's preferred stock which has similar economic terms as one share of common stock. If an acquiring person (an "Acquiring Person") acquires more than 20% of the company's common stock then each holder of a Right (except that Acquiring Person) will be entitled to buy at the exercise price, a number of shares of the company's common stock which has a market value of twice the exercise price. Any time after the date an Acquiring Person obtains more than 20% of the company's common stock and before that Acquiring Person acquires more than 50% of the company's outstanding common stock, the company may exchange each Right owned by all other rights holders, in whole or in part, for one share of the company's common stock. We amended the definition of "Acquiring Person" to exempt the May 2010 share purchase by Basset and the April 2011 share purchase by Haywood Finance Limited, both of which are companies owned and controlled by our Chief Executive Officer, Anthony Kandylidis. The Rights expire on the earliest of (1) May 12, 2018 or (2) the exchange or redemption of the Rights as described above. The company can redeem the Rights at any time on or prior to the earlier of a public announcement that a person has acquired ownership of 20% or more of the company's common stock, or the expiration date. The terms of the Rights and the Stockholders Rights Agreement may be amended without the consent of the Rights holders at any time on or prior to the Distribution Date. After the Distribution Date, the terms of the Rights and the Stockholders Rights Agreement may be amended to make changes that do not adversely affect the rights of the rights holders (other than the Acquiring Person). The Rights do not have any voting rights. The rights have the benefit of certain customary anti-dilution protections.

### Classified Board of Directors

Our Amended and Restated Articles of Incorporation provide for a Board of Directors serving staggered, three-year terms. Approximately one-third of our Board of Directors will be elected each year. This classified board provision could discourage a third party from making a tender offer for our shares or attempting to obtain control of our company. It could also delay shareholders who do not agree with the policies of the Board of Directors from removing a majority of the Board of Directors for two years.

### Election and Removal of Directors

Our Amended and Restated Articles of Incorporation and by-laws prohibit cumulative voting in the election of directors. Our by-laws require parties other than the Board of Directors to give advance written notice of nominations for the election of directors. Our Amended and Restated Articles of Incorporation and by-laws also provide that our directors may be removed only for cause and only upon the affirmative vote of the holders of at least

Table of Contents

66 $^2/_3$ % of the outstanding common shares and subordinated shares entitled to vote for those directors considered for this purpose as one class. These provisions may discourage, delay or prevent the removal of incumbent officers and directors.

### Limited Actions by Shareholders

Our by-laws provide that any action required or permitted to be taken by our shareholders must be effected at an annual or special meeting of shareholders or by the unanimous written consent of our shareholders. Our Amended and Restated Articles of Incorporation and our by-laws provide that only our Board of Directors, or our Chairman, or our President may call special meetings of our shareholders and the business transacted at the special meeting is limited to the purposes stated in the notice.

### Business Combinations

Although the BCA does not contain specific provisions regarding "business combinations" between corporations organized under the laws of the Republic of Marshall Islands and "interested shareholders," we have included these provisions in our Amended and Restated Articles of Incorporation. Our Amended and Restated Articles of Incorporation contain provisions which prohibit us from engaging in a business combination with an interested shareholder for a period of three years after the date of the transaction in which the person became an interested shareholder, unless:

- prior to the date of the transaction that resulted in the shareholder becoming an interested shareholder, our Board of Directors approved either the business combination or the transaction that resulted in the shareholder becoming an interested shareholder;

- upon consummation of the transaction that resulted in the shareholder becoming an interested shareholder, the interested shareholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced;

- at or subsequent to the date of the transaction that resulted in the shareholder becoming an interested shareholder, the business combination is approved by the Board of Directors and authorized at an annual or special meeting of shareholders by the affirmative vote of at least 66 $^2/_3$ % of the outstanding voting stock that is not owned by the interested shareholder; and

- the shareholder became an interested shareholder prior to the consummation of our initial public offering.

For purposes of these provisions, a "business combination" includes mergers, consolidations, exchanges, asset sales, leases and other transactions resulting in a financial benefit to the interested shareholder and an "interested shareholder" is any person or entity that beneficially owns 20% or more of our outstanding voting stock and any person or entity affiliated with or controlling or controlled by that person or entity.

### Other Matters

*Dissenters' Rights of Appraisal and Payment.*   Under the BCA, our shareholders have the right to dissent from various corporate actions, including any merger or sale of all or substantially all of our assets not made in the usual course of our business, and receive payment of the fair value of their shares. In the event of any further amendment of the articles, a shareholder also has the right to dissent and receive payment for his or her shares if the amendment alters certain rights in respect of those shares. The dissenting shareholder must follow the procedures set forth in the BCA to receive payment. In the event that we and any dissenting shareholder fail to agree on a price for the shares, the BCA procedures involve, among other things, the institution of proceedings in the circuit court in the judicial circuit in the Marshall Islands in which our Marshall Islands office is situated. The value of the shares of the dissenting shareholder is fixed by the court after reference, if the court so elects, to the recommendations of a court-appointed appraiser.

*Shareholders' Derivative Actions.*   Under the BCA, any of our shareholders may bring an action in our name to procure a judgment in our favor, also known as a derivative action, provided that the shareholder bringing the

action is a holder of common shares both at the time the derivative action is commenced and at the time of the transaction to which the action relates.

## C. Material Contracts

Attached as exhibits to this annual report are the contracts we consider to be both material and not entered into in the ordinary course of business.

For a description of our credit facility and commitment letter, see "Item 5. Operating and Financial Review and Prospects — Liquidity and Capital Resources". For a description of our Stockholders Rights Agreement, see "Item 10.B Memorandum and articles of association". For a description of our agreements with related parties, see "Item 7.B Related Party Transactions".

We have no other material contracts, other than contracts entered into in the ordinary course of business, to which the Company or any member of the group is a party.

## D. Exchange controls

Under the laws of the countries of incorporation of the Company and its subsidiaries, there are currently no restrictions on the export or import of capital, including foreign exchange controls or restrictions that affect the remittance of dividends, interest or other payments to non-resident holders of our common stock.

## E. Taxation

### *Marshall Islands Tax Considerations*

We are incorporated in the Marshall Islands. Under current Marshall Islands law, we are not subject to tax on income or capital gains, and no Marshall Islands withholding tax will be imposed upon distributions to our shareholders.

### *United States Federal Income Tax Considerations*

The following is a discussion of the material United States federal income tax considerations with respect to the Company and to U.S. Holders and Non-U.S. Holders, each as defined below, of the ownership of common shares. The following discussion of United States federal income tax matters is based on the United States Internal Revenue Code of 1986, or the "Code," judicial decisions, administrative pronouncements, and existing and proposed regulations promulgated by the United States Department of the Treasury, or the "Treasury Regulations," all of which are subject to change, possibly with retroactive effect.

### *United States Federal Income Taxation of Operating Income: In General*

Unless exempt from United States federal income taxation under the rules discussed below, a foreign corporation is subject to United States federal income taxation in respect of any income that is derived from the use of vessels, from the hiring or leasing of vessels for use on a time, voyage or bareboat charter basis, from the participation in a pool, partnership, strategic alliance, joint operating agreement, code sharing arrangements or other joint venture it directly or indirectly owns or participates in that generates such income, or from the performance of services directly related to those uses, which we refer to as "shipping income," to the extent that the shipping income is derived from sources within the United States. For these purposes, 50% of shipping income that is attributable to transportation that begins or ends, but that does not both begin and end, in the United States constitutes income from sources within the United States, which we refer to as "U.S.-source shipping income."

Shipping income attributable to transportation that both begins and ends in the United States is considered to be 100% from sources within the United States. We are not permitted by law to engage in transportation that produces shipping income which is considered to be 100% from sources within the United States.

Shipping income attributable to transportation exclusively between non-U.S. ports will be considered to be 100% derived from sources outside the United States. Shipping income derived from sources outside the United States will not be subject to any United States federal income tax.

*Exemption of Operating Income from United States Federal Income Taxation*

Under Section 883 of the Code, we will be exempt from United States federal income taxation on our U.S.-source shipping income if:

(1) we are organized in a foreign country (our "country of organization") that grants an "equivalent exemption" to corporations organized in the United States in respect of each category of shipping income for which exemption is being claimed under Section 883 of the Code; and

(2) either:

(A) more than 50% of the value of our stock is owned, directly or indirectly, by individuals who are "residents" of our country of organization or of another foreign country that grants an "equivalent exemption" to corporations organized in the United States, which we refer to as the "50% Ownership Test," or

(B) a class of our stock representing more than 50% of the vote and value of our outstanding stock is "primarily and regularly traded on an established securities market" in our country of organization, in another country that grants an "equivalent exemption" to United States corporations, or in the United States, which we refer to as the "Publicly-Traded Test."

The Republic of the Marshall Islands, the jurisdiction where we and our ship-owning subsidiaries are incorporated, grants an "equivalent exemption" to United States corporations. Therefore, we will be exempt from United States federal income taxation with respect to our U.S.-source shipping income if we satisfy either the 50% Ownership Test or the Publicly-Traded Test.

*Publicly-Traded Test*

The Treasury Regulations under Section 883 of the Code provide, in pertinent part, that shares of a foreign corporation will be considered to be "primarily traded" on an "established securities market" in a country if the number of shares of each class of stock that are traded during any taxable year on all established securities markets in that country exceeds the number of shares in each such class that are traded during that year on established securities markets in any other single country. Our common shares, which constitute our sole class of issued and outstanding stock, are "primarily traded" on the Nasdaq Global Market, which is an "established securities market" in the United States.

Under the Treasury Regulations, our common shares will be considered to be "regularly traded" on an established securities market if one or more classes of our stock representing more than 50% of our outstanding stock, by both total combined voting power of all classes of stock entitled to vote and total value, are listed on such market, to which we refer as the "Listing Threshold." Since our common shares are listed on the Nasdaq Global Market, we expect to have satisfied the Listing Threshold.

It is further required that with respect to each class of stock relied upon to meet the Listing Threshold, (1) such class of stock is traded on the market, other than in minimal quantities, on at least 60 days during the taxable year or one-sixth of the days in a short taxable year, or the "Trading Frequency Test"; and (ii) the aggregate number of shares of such class of stock traded on such market during the taxable year is at least 10% of the average number of shares of such class of stock outstanding during such year or as appropriately adjusted in the case of a short taxable year, or the "Trading Volume Test." We expect to have satisfied the Trading Frequency Test and Trading Volume Test.

Notwithstanding the foregoing, the Treasury Regulations provide, in pertinent part, that a class of stock will not be considered to be "regularly traded" on an established securities market for any taxable year during which 50% or more of the vote and value of the outstanding shares of such class are owned, actually or constructively under specified attribution rules, on more than half the days during the taxable year by persons who each own 5% or more of the vote and value of such class of outstanding shares, which persons we refer to as "5% Shareholders" and rule as the "5% Override Rule." In the event the 5% Override Rule is triggered, the Treasury Regulations provide that the 5% Override Rule will nevertheless not apply if it can be established that, within the group of 5% Shareholders, there are sufficient qualified shareholders for purposes of Section 883 of the Code to preclude

non-qualified shareholders in such group from owning 50% or more of the value of the outstanding shares of such class for more than half the number of days during the taxable year and certain substantiation requirements are satisfied. For purposes of identifying our 5% Shareholders, the Treasury Regulations permit us to rely on Schedule 13G and Schedule 13D filings with the United States Securities and Exchange Commission. The Company believes that the 5% Override Rule was not triggered during the 2010 taxable year.

Accordingly, we believe that we satisfied the Publicly-Traded Test for the 2010 taxable year and, consequently, were eligible for exemption from U.S. federal income tax under Section 833 of the Code, and we intend to take this position on our United States federal income tax returns for the 2010 taxable year. Although we expect to continue qualifying for exemption under Section 883 of the Code, there are circumstances beyond our control which could cause us to lose the benefits of the exemption in any future taxable year. For example, if the 5% Override Rule is triggered, there is no assurance that we will have sufficient qualified 5% Shareholders to satisfy the exception to the 5% Override Rule, nor that we will be able to satisfy the onerous substantiation requirements associated with such exception.

### *United States Federal Income Taxation in Absence of Exemption*

To the extent the benefits of Section 883 of the Code are unavailable, our U.S. — source shipping income, to the extent not considered to be "effectively connected" with the conduct of a United States trade or business, as described below, would be subject to a 4% tax imposed by Section 887 of the Code on a gross basis, without the benefit of deductions, which we refer to as the "4% gross basis tax regime". Since under the sourcing rules described above, no more than 50% of our shipping income would be treated as being derived from United States sources, the maximum effective rate of U.S. federal income tax on our shipping income would never exceed 2% under the 4% gross basis tax regime.

To the extent the benefits of the exemption under Section 883 of the Code are unavailable and our U.S.-source shipping income is considered to be "effectively connected" with the conduct of a United States trade or business, as described below, any such "effectively connected" U.S.-source shipping income, net of applicable deductions, would be subject to United States federal income tax currently imposed at corporate rates of up to 35%. In addition, we may be subject to the 30% "branch profits" tax on earnings effectively connected with the conduct of such trade or business, as determined after allowance for certain adjustments, and on certain interest paid or deemed paid attributable to the conduct of such United States trade or business.

Our U.S.-source shipping income would be considered "effectively connected" with the conduct of a United States trade or business only if:

- We have, or are considered to have, a fixed place of business in the United States involved in the earning of shipping income; and

- substantially all of our U.S.-source shipping income is attributable to regularly scheduled transportation, such as the operation of a vessel that follows a published schedule with repeated sailings at regular intervals between the same points for voyages that begin or end in the United States.

We do not intend to have, or permit circumstances that would result in having any vessel operating to the United States on a regularly scheduled basis. Based on the foregoing and on the expected mode of our shipping operations and other activities, we believe that none of our U.S.-source shipping income will be "effectively connected" with the conduct of a United States trade or business.

### *United States Federal Income Taxation of Gain on Sale of Vessels*

If, as we believe, we qualify for exemption from United States federal income tax under Section 883 of the Code in respect of the shipping income derived from the international operation of our vessels, then gain from the sale of any such vessel should likewise be exempt from tax under Section 883 of the Code. If, however, our shipping income does not for whatever reason qualify for exemption under Section 883 of the Code, then any gain on the sale of a vessel will be subject to U.S. federal income tax if such sale occurs in the United States. To the extent possible, we intend to structure our sales of vessels so that the gain therefrom is not subject to U.S. federal income tax. However, there is no assurance we will be able to do so.

### *United States Federal Income Taxation of U.S. Holders*

The following is a discussion of the material United States federal income tax considerations relevant to an investment decision by a U.S. Holder, as defined below, with respect to our common shares. This discussion does not purport to deal with the tax consequences of owning common shares to all categories of investors, some of which, such as dealers in securities, investors whose functional currency is not the United States dollar and investors that own, actually or under applicable constructive ownership rules, 10% or more of our common shares, may be subject to special rules. This discussion deals only with investors that hold our common shares as a capital asset. Investors are encouraged to consult their own tax advisors concerning the overall tax consequences arising in their own particular situations under United States federal, state, local or foreign law of the ownership of common shares.

As used herein, the term "U.S. Holder" means a beneficial owner of common shares that

- is an individual United States citizen or resident, a United States corporation or other United States entity taxable as a corporation, an estate the income of which is subject to United States federal income taxation regardless of its source, or a trust if a court within the United States is able to exercise primary jurisdiction over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust; and

- owns less than ten percent (10%) of our common shares as a capital assets for United States federal income tax purposes.

If a partnership holds our common shares, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. If you are a partner in a partnership holding our common shares, you are encouraged to consult your tax advisor.

### *United States Federal Income Tax Treatment of Common Stock*

#### *Distributions*

Subject to the discussion of passive federal foreign investment companies below, distributions made by us with respect to our common shares to a U.S. Holder will generally constitute dividends to the extent of our current or accumulated earnings and profits, as determined under United States federal income tax principles, and will be included in the U.S. Holder's gross income. Distributions in excess of such earnings and profits are treated first a nontaxable return of capital to the extent of the U.S. Holder's tax basis in his common shares on a dollar — for — dollar basis and thereafter as capital gain. Because we are not a United States corporation, U.S. Holders that are corporations will not be entitled to claim a dividends reduction with respect to any distributions it receives from the Company. Dividends paid with respect to our common shares will generally be treated as "passive category income" for purposes of computing allowable foreign tax credits for United States foreign tax credit purposes.

Dividends paid on our common shares to a U.S. Holder who is an individual, trust or estate, a "U.S. Non — Corporate Holder", will, under current law, generally be treated as "qualified dividend income" that is taxable to such U.S. Non — Corporate Holder at preferential U.S. federal income tax rates (through 2012), provided that (1) the common shares are readily tradable on an established securities market in the United States (such as the Nasdaq National Market on which our common shares are listed); (2) the Company is not a passive foreign investment company for the taxable year during which the dividend is paid or the immediately preceding taxable year (which the Company does not believe it has been, is or will be, as discussed in more detail below); (3) the U.S. Non — Corporate Holder has owned the common shares for more than 60 days in the 121 — day period beginning 60 days before the date on which the common shares becomes ex-dividend; and (4) the U.S. Non — Corporate Holder is under no obligation to make related payments with respect to positions in substantially similar or related property. Special rules may apply to any "extraordinary dividend" generally, a dividend paid by the Company in an amount equal to or in excess of 10% of a shareholder's adjusted tax basis in his common shares. If the Company pays an "extraordinary dividend" on its common shares that is treated as "qualified dividend income", then any loss derived by a U.S. Non — Corporate Holder from the sale or exchange of such common shares will be treated as long — term capital loss to the extent of such dividend.

Legislation has previously been introduced in the U.S. Congress which, if enacted in its present form would preclude our dividends from qualifying for such preferential tax rates prospectively from the date of its enactment. In addition in the absence of legislation extending the term of the preferential tax rates for qualified dividend income, all dividends received by a taxpayer after 2012 will be taxed at ordinary graduated rates. Accordingly, there is no assurance that any dividends paid on our common shares will be eligible for these preferential tax rates in the hands of a U.S. Non-Corporate Holder. Any dividends, which the Company pays which are not eligible for these preferential tax rates, will be taxed as ordinary income to a U.S. Non-Corporate Holder.

### Sale, Exchange or Other Disposition of Common Shares

Assuming the Company does not constitute a passive foreign investment company for any taxable year, a U.S. Holder generally will recognize taxable gain or loss up on a sale, exchange or other disposition of our common shares in an amount equal to the difference between the amount realized by the U.S. Holder from such sale, exchange or other disposition and the U.S. Holder's tax basis in such shares. Such gain or loss will be treated as long — term capital gain or loss if the U.S. Holder's holding period is greater than one year at the time of the sale, exchange or other disposition. Such capital gain or loss will generally be treated as United States source income or loss, as applicable, for United States foreign tax credit purposes. Long — term capital gains of U.S. Non — Corporate Holders are eligible for reduced rates of taxation. A U.S. Holder's ability to deduct capital losses is subject to certain limitations.

### Passive Foreign Investment Company Status and Significant United States Federal Income Tax Consequences

A foreign corporation will be treated as a "passive foreign investment company", or a PFIC, for United States federal income tax purposes, during any taxable year if (1) 75% or more of its gross income for such taxable year consists of certain types of "passive income" or (2) 50% or more of the average value of its assets for such taxable year produce or are held for the production of such types of passive income.

For purposes of determining whether the Company is a PFIC, the Company will be treated as earning and owning its proportionate share of the income and assets, respectively, of any of its subsidiary corporations in which it owns at least 25% of the value of the subsidiary's stock. Income earned, or deemed earned, by us in connection with the performance of services would not constitute "passive income". By contrast, rental income would generally constitute "passive income" unless the Company was treated under specific rules as deriving its rental income in the active conduct of a trade or business.

The Company does not believe that it was a PFIC during the 2010 taxable year. In addition, based on present operations and future projections, the Company does not expect to become a PFIC for any future taxable year. Although there is no legal authority directly on point, and the Company is not relying upon an opinion of counsel on this issue, this belief is based principally on the position that, for purposes of determining whether the Company is a PFIC, the gross income the Company derives or is deemed to derive from the time chartering and voyage chartering activities of its wholly owned subsidiaries should constitute services income, rather than rental income.

Correspondingly, such income should not constitute passive income, and the assets that the Company or its wholly owned subsidiaries own and operate in connection with the production of such income, in particular, the vessels, should not constitute passive assets that produce or are held for the production of for purposes of determining whether the Company is a PFIC. There is substantial legal authority supporting this position consisting of case law and United States Internal Revenue Service or "IRS" pronouncements concerning the characterization of income derived from time charters as services income for other tax purposes. However, there is also authority which characterizes time charter income as rental income rather than services income for other tax purposes. It should be noted that in the absence of any legal authority specifically relating to the statutory provisions governing PFICs, the IRS or a court could disagree with our position. Furthermore, although we intend to conduct our affairs in a manner to avoid being classified as a PFIC with respect to any taxable year, we cannot assure that the nature of our operations will not change in the future.

If the Company was to be classified as a PFIC in any taxable year, a U.S. Holder would be subject to different United States federal income taxation rules depending on whether the U.S. Holder makes an election to treat us as a

"Qualified Electing Fund," which election we refer to as a "QEF election." As an alternative to making a QEF election, a U.S. Holder should be able to make a "mark-to-market" election with respect to our common shares, as discussed below. In addition, if we were to be treated as a PFIC for any taxable year after 2010, a U.S. Holder would be required to file an annual report with the IRS for that year with respect to such U.S. Holder's common shares.

### U.S. Holders Making a Timely QEF Election

If a U.S. Holder makes a timely QEF election, which U.S. Holder we refer to as an "Electing Holder," the Electing Holder must report for United States federal income tax purposes his pro rata share of our ordinary earnings and net capital gain, if any, for each taxable year of the Company during which it is a PFIC that ends with or within the taxable year of the Electing Holder, regardless of whether distributions were received from us by the Electing Holder. The Electing Holder's adjusted tax basis in the common shares would be increased to reflect taxed but undistributed earnings and profits. Distributions of earnings and profits that had been previously taxed would result in a corresponding reduction in the adjusted tax basis in the common shares and would not be taxed again once distributed. An Electing Holder would not, however, be entitled to a deduction for his pro rata share of any losses that we incur with respect to any taxable year. An Electing Holder would generally recognize capital gain or loss on the sale, exchange or other disposition of our common shares.

### U.S. Holders Making a "Mark-to-Market" Election

Alternatively, if we were to be treated as a PFIC for any taxable year and, as we anticipate will be the case, our common shares are treated as "marketable stock," a U.S. Holder would be permitted to make a "mark-to-market" election with respect to our common shares. If that election is made, the U.S. Holder generally would include as ordinary income in each taxable year the excess, if any, of the fair market value of the common shares at the end of the taxable year over such U.S. Holder's adjusted tax basis in the common shares. The U.S. Holder would also be permitted an ordinary loss in respect of the excess, if any, of the U.S. Holder's adjusted tax basis in the common shares over its fair market value at the end of the taxable year, but only to the extent of the net amount previously included in income as a result of the mark-to-market election. A U.S. Holder's tax basis in his common shares would be adjusted to reflect any such income or loss amount. Gain realized on the sale, exchange or other disposition of our common shares would be treated as ordinary income, and any loss realized on the sale, exchange or other disposition of the common shares would be treated as ordinary loss to the extent that such loss does not exceed the net mark-to-market gains previously included by the U.S. Holder.

### U.S. Holders Not Making a Timely QEF or Mark-to-Market Election

Finally, if we were to be treated as a PFIC for any taxable year, a U.S. Holder who does not make either a QEF election or a "mark-to-market" election for that year, whom we refer to as a "Non-Electing Holder," would be subject to special rules with respect to (1) any excess distribution (i.e., the portion of any distributions received by the Non-Electing Holder on the common shares in a taxable year in excess of 125% of the average annual distributions received by the Non-Electing Holder in the three preceding taxable years, or, if shorter, the Non-Electing Holder's holding period for the common shares), and (2) any gain realized on the sale, exchange or other disposition of our common shares. Under these special rules:

- the excess distribution or gain would be allocated ratably over the Non-Electing Holder's aggregate holding period for the common shares;

- the amount allocated to the current taxable year, and any taxable year prior to the first taxable year in which we were a PFIC, would be taxed as ordinary income; and

- the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for the applicable class of taxpayer for that year, and an interest charge for the deemed tax deferral benefit would be imposed with respect to the resulting tax attributable to each such other taxable year.

### United States Federal Income Taxation of Non-U.S. Holders

A beneficial owner of common stock (other than a partnership) that is not a U.S. Holder is referred to herein as a Non-U.S. Holder.

#### Dividends on Common Shares

Non- U.S Holders generally will not be subject to United States federal income tax or withholding tax on dividends received with respect to our common shares, unless that income is effectively connected with the Non — U.S. Holder's conduct of a trade or business in the United States. If the Non — U.S. Holder is entitled to the benefits of a United States income tax treaty with respect to those dividends, that income is subject to United States federal income only if attributable to a permanent establishment maintained by the Non — U.S. Holder in the United States. See discussion above under "United States Tax Consequences — Taxation of Operating Income: In General".

### Sale, Exchange or other Disposition of Common Shares

Non-U.S. Holders generally will not be subject to United States federal income tax or withholding tax on any gain realized upon the sale, exchange or other disposition of our common shares, unless:

- the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States (and, if the Non-U.S. Holder is entitled to the benefits of a United States income tax treaty with respect to that gain, the gain is attributable to a permanent establishment maintained by the Non-U.S. Holder in the United States); or

- the Non-U.S. Holder is an individual who is present in the United States for 183 days or more during the taxable year of disposition and other conditions are met.

If the Non — U.S. Holder is engaged in a United States trade or business for United States federal income tax purposes, the income from the common shares, including dividends and the gain from the sale, exchange or other disposition of the common shares, that is effectively connected with the conduct of that trade or business, will generally be subject to regular United States federal income tax in the same manner as discussed in the previous section relating to the taxation of U.S. Holders. In addition, in the case of a corporate Non — U.S. Holder, the Non-U.S. Holder's earnings and profits that are attributable to the effectively connected income, subject to certain adjustments, may be subject to an additional branch profits tax at a rate of 30%, or at a lower rate as may be specified by an applicable United States income tax treaty.

### Backup Withholding and Information Reporting

In general, dividend payments or other distributions, made within the United States to a shareholder, will be subject to information reporting requirements if the shareholder is a U.S. Non-Corporate Holder. Such payments or distributions may also be subject to backup withholding tax if such shareholder:

- fails to provide an accurate taxpayer identification number;

- is notified by the IRS that the shareholder failed to report all interest or dividends required to be shown on the shareholder's United States federal income tax returns; or

- in certain circumstances, fails to comply with applicable certification requirements.

Non-U.S. Holders may be required to establish their exemption from information reporting and backup withholding by certifying their status on IRS Form W-8B or W-8IMY, as applicable.

If a Non-U.S. Holder sells common shares to or through a United States office of a broker, the payment of the proceeds is subject to both United States backup withholding and information reporting unless the Non-U.S. Holder certifies that the Non-U.S. Holder is a non-United States person, under penalties of perjury, or otherwise establishes an exemption. If the Non-U.S. Holder sells common shares through a non-United States office of a non-United States broker and the sales proceeds are paid to the Non-U.S. Holder outside the United States, then information reporting and backup withholding generally will not apply to that payment. United States information reporting requirements, but not backup withholding, however, will apply to a payment of sales proceeds, even if that

payment is made to the Non-U.S. Holder outside the United States, if the Non-U.S. Holder sells common shares through a non-United States office of a broker that is a United States person or has some other contacts with the United States. Such information reporting requirements will not apply, however, if the broker has documentary evidence in its records that the Non-U.S. Holder is a non-United States person and certain other conditions are met, or the Non-U.S. Holder otherwise establishes an exemption.

Backup withholding is not an additional tax. Rather, you generally may obtain a refund of any amounts withheld under backup withholding rules that exceed your United States federal income tax liability by filing a refund claim with the IRS.

## F.  Dividends and paying agents

Not applicable.

## G.  Statement by experts

Not applicable.

## H.  Documents on display

We file reports and other information with the SEC. These materials, including this annual report and the accompanying exhibits, may be inspected and copied at the public reference facilities maintained by the Commission at 100 F Street, N.E., Washington, D.C. 20549, or from the SEC's website http://www.sec.gov. You may obtain information on the operation of the public reference room by calling 1 (800) SEC-0330 and you may obtain copies at prescribed rates.

## I.  Subsidiary information

Not applicable.

## Item 11.  *Quantitative and Qualitative Disclosures about Market Risk*

**Interest Rate Risk:**

For fiscal years 2009 and 2010, the interest rate we paid under all of our long-term debt was LIBOR plus a margin. Amounts drawn under our long-term arrangements are secured by the assets of the Company. Because the interest on the debt was at a floating rate, changes in interest rates would have no effect on the value of the debt. Under the terms of our loan agreements a change in the LIBOR rate of 100 basis points would have changed interest expense for year 2010 by $2.3 million.

On January 29, 2008, we entered into two interest swap agreements to partially hedge our exposure to variability in LIBOR rates. Under the terms of the agreements we have fixed our interest rate at 6.05% inclusive of margin. a change in the LIBOR rate of 100 basis points would have changed interest expense for year 2010 by $2.4 million.

**Currency and Exchange Rates:**

We generate all of our revenues in U.S. dollars but currently incur approximately 27.4% of our operating expenses and the majority of our administration expenses in currencies other than the U.S. dollar, primarily the Euro. For accounting purposes, expenses incurred in Euros are converted into U.S. dollars at the exchange rate prevailing on the date of each transaction. Because a significant portion of our expenses are incurred in currencies other than the U.S. dollar, our expenses may from time to time increase relative to our revenues as a result of fluctuations in exchange rates, particularly between the U.S. dollar and the Euro, which could affect our net income. As of December 31, 2010, the effect of a 1% adverse movement in U.S. dollar/Euro exchange rates would not have a material effect on our results of operations. While we historically have not mitigated the risk associated with exchange rate fluctuations through the use of financial derivatives, we may determine to employ such instruments from time to time in the future in order to minimize this risk. Our use of financial derivatives, including interest rate

Table of Contents

swaps, would involve certain risks, including the risk that losses on a hedged position could exceed the nominal amount invested in the instrument and the risk that the counterparty to the derivative transaction may be unable or unwilling to satisfy its contractual obligations, which could have an adverse effect on our results.

**Item 12.** *Description of Securities Other than Equity Securities*

Not applicable.

## PART II

**Item 13.** *Defaults, Dividend Arrearages and Delinquencies*

Please see Note 7 to our consolidated financial statements.

**Item 14.** *Material Modifications to the Rights of Security Holders and Use of Proceeds*

Not applicable.

**Item 15.** *Controls and Procedures*

**a) Disclosure Controls and Procedures**

Management, including our Chief Executive Officer and Chief Financial Officer, has conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company in the reports that it files or submits to the SEC under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms.

**b) Management's Annual Report on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rule 13a-15(f) of the Exchange Act. The Company's internal control over financial reporting is a process designed under the supervision of the Company's Chief Executive Officer to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the Company's financial statements for external reporting purposes in accordance with accounting principles generally accepted in the United States.

Management has conducted an assessment of the effectiveness of the Company's internal control over financial reporting based on the framework established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this assessment, management has determined that the Company's internal control over financial reporting as of December 31, 2010 is effective.

**c) Attestation Report of Independent Registered Public Accounting Firm**

The registered public accounting firm that audited the consolidated financial statements, Ernst & Young (Hellas), Certified Auditors Accountants S.A., has issued an attestation report on the Company's internal control over financial reporting, appearing under Item 18, and is incorporated herein by reference.

**d) Changes in Internal Control over Financial Reporting**

None.

*Inherent Limitations on Effectiveness of Controls*

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls or our internal control over financial reporting will prevent or detect all error and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. Our disclosure controls and procedures are designed to provide reasonable assurance of achieving their objectives. The design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Further, because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, within the Company have been detected.

These inherent limitations include the realities that judgments in decision-making can be faulty and that breakdowns can occur because of simple error or mistake. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the controls. The design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Projections of any evaluation of controls effectiveness to future periods are subject to risks. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures.

## Item 16A. *Audit Committee Financial Expert*

Our Board of Directors has determined that Mr. George Biniaris, who serves on the Audit Committee, qualifies as an "audit committee financial expert" and that he is "independent" according to Securities and Exchange Commission rules.

## Item 16B. *Code of Ethics*

We have adopted a code of ethics applicable to officers, directors and employees. Our code of ethics complies with applicable guidelines issued by the SEC and is available for review on our website: http://www.oceanfreightinc.com.

## Item 16C. *Principal Accountant Fees and Services*

Our principal accountants for the years ended December 31, 2010 and 2009 were Ernst & Young (Hellas) Certified Auditors Accountants S.A. The "Audit Fees" for the years ended December 31, 2010 and 2009 were Euro 295,000 ($390,963) and Euro 409,500 ($542,710), respectively, with dollar values based in the currency exchange rate as at December 31, 2010. There were no additional "Audit-Related Fees," "Tax Fees" or "Other Fees" billed in 2010 and 2009. Audit fees in 2010 relate to audit services provided in connection with SAS 100 reviews, the audit of our consolidated financial statements, the audit of internal control over financial reporting, as well as audit services performed in connection with the Company's equity offerings.

The Audit Committee is responsible for the appointment, replacement, compensation, evaluation and oversight of the work of the independent auditors. As part of this responsibility, the Audit Committee pre- approves the audit and non-audit services performed by the independent auditors in order to assure that they do not impair the auditor's independence from the Company. The Audit Committee has adopted a policy which sets forth the procedures and the conditions pursuant to which services proposed to be performed by the independent auditors may be pre-approved.

All audit services and other services provided by Ernst and Young (Hellas) Certified Auditors Accountants S.A. were pre-approved by the Audit Committee.

## Item 16D. *Exemptions from the Listing Standards for Audit Committees*

None.

**Item 16E.   *Purchases of Equity Securities by the Issuer and Affiliated Purchasers***

The below discloses purchases of our equity securities by our affiliated purchasers since January 1, 2010.

**Issuer or Affiliated Purchases of Equity Securities**

| Period | Affiliated Purchaser(1) | Total Number of Shares Purchased | Average Price Paid per Shares* | Total Number of Shares Purchased as Part of Publicly Announced Programs | Maximum Amount in U.S.\$ That May Yet Be Expected on Share Repurchases Under Programs |
|--------|-------------------------|----------------------------------|--------------------------------|------------------------------------------------------------------------|------------------------------------------------------------------------------------|
| May 2010 | Basset Holdings Inc. | 16,666,667 | \$1.20(2) | 0 | \$0 |
| April 2011 | Haywood Finance Limited | 35,657,142 | \$0.70 | 0 | \$0 |

(1) Both of these affiliated purchasers are companies beneficially owned by our chief executive officer.

(2) This figure gives effect to the 3:1 reverse stock split in 2010.

**Item 16F.   *Change in Registrant's Certifying Accountant***

Not applicable.

**Item 16G.   *Corporate Governance***

We have certified to Nasdaq that our corporate governance practices are in compliance with, and are not prohibited by, the laws of the Republic of the Marshall Islands. Therefore, we are exempt from many of Nasdaq corporate governance practices other than the requirements regarding the disclosure of a going concern audit opinion, submission of a listing agreement, notification of material non-compliance with Nasdaq corporate governance practices and the establishment of an audit committee in accordance with Nasdaq Marketplace Rules 4350(d)(3) and 4350(d)(2)(A)(ii). The practices we follow in lieu of Nasdaq corporate governance rules are as follows:

- Our Board of Directors is comprised of a majority of independent directors which holds at least one annual meeting at which only independent directors are present, consistent with Nasdaq corporate governance requirements; however we are not required under Marshall Islands law to maintain a majority independent Board of Directors and we cannot guarantee that we will always in the future maintain a Board of Directors with a majority of independent members.

- In lieu of obtaining shareholder approval prior to the issuance of designated securities, we will comply with provisions of the Marshall Islands Business Corporations Act, which allows the Board of Directors to approve share issuances.

- As a foreign private issuer, we are not required to solicit proxies or provide proxy statements to Nasdaq pursuant to Nasdaq corporate governance rules or Marshall Islands law. Consistent with Marshall Islands law and as provided in our bylaws, we will notify our shareholders of meetings between 15 and 60 days before the meeting. This notification will contain, among other things, information regarding business to be transacted at the meeting. In addition, our bylaws provide that shareholders must give us between 150 and 180 days advance notice to properly introduce any business at a meeting of shareholders.

Other than as noted above, we are in full compliance with all other Nasdaq corporate governance standards applicable to U.S. domestic issuers.

## PART III

**Item 17.  *Financial Statements***

See Item 18

**Item 18.  *Financial Statements***

The following financial statements beginning on page F-1 are filed as a part of this annual report.

**Item 19.  *Exhibits***

| Exhibit Number | Description |
|---|---|
| 1.1 | Amended and Restated Articles of Incorporation of the Company(1) |
| 1.2 | Amended and Restated By-laws of the Company(2) |
| 2.1 | Form of Share Certificate(3) |
| 4.1 | Second Amended and Restated Stockholders Rights Agreement dated April 8, 2011, as amended(4) |
| 4.2 | Registration Rights Agreement(5) |
| 4.3 | 2010 Equity Incentive Plan(11) |
| 4.4 | Amended and Restated Loan Agreement with Nordea Bank Finland Plc(6) |
| 4.5 | Amendatory Agreement to Amended and Restated Loan Agreement with Nordea Bank Finland Plc(7) |
| 4.6 | Form of TMS Management Agreement — Drybulk Carrier |
| 4.7 | Form of TMS Management Agreement — Tanker |
| 4.8 | Share Purchase Agreement between OceanFreight Inc. and Haywood Finance Limited dated April 1, 2011, relating to Amazon Shareholders Limited |
| 4.9 | Share Purchase Agreement between OceanFreight Inc. and Haywood Finance Limited dated April 1, 2011, relating to Pasifai Shareholders Limited |
| 8.1 | Subsidiaries of the Company |
| 12.1 | Rule 13a-14(a)/15d-14(a) Certification of Chief Executive Officer |
| 12.2 | Rule 13a-14(a)/15d-14(a) Certification of Chief Financial Officer |
| 13.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1 | Consent of Independent Registered Accounting Firm |

(1) Filed as an Exhibit to the Company's report on Form 6-K filed on June 11, 2010.

(2) Filed as an Exhibit to the Company's report on Form 6-K filed on June 19, 2008.

(3) Filed as an Exhibit to the Company's Amended Registration Statement on Form F-1/A (Amendment No. 1) (File No. 333-141958 ) on April 18, 2007.

(4) Filed as an Exhibit to the Company's Registration Statement on Form 8-A/A filed April 8, 2011.

(5) Filed as an Exhibit to the Company's Amended Registration Statement on Form F-1/A (Amendment No. 3) (File No. 333-141958 ) on April 20, 2007.

(6) Filed as an Exhibit to the Company's Annual Report on Form 20-F for the year ended December 31, 2007 on March 7, 2008.

(7) Filed as an Exhibit to the Company's report on Form 6-K filed on February 2, 2009.

(8) Filed as an Exhibit to the Company's report on Form 6-K filed on February 13, 2009.

(9) Filed as an Exhibit to the Company's report on Form 6-K filed on July 24, 2009.

(10) Filed as an Exhibit to the Company's Annual Report on Form 20-F for the year ended December 31, 2008 on March 23, 2009.

(11) Filed as an Exhibit to the Company's Annual Report on Form 20-F for the year ended December 31, 2009 on March 9, 2010.

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and has duly caused and authorized the undersigned to sign this annual report on its behalf.

OceanFreight Inc.
(Registrant)

/s/  Antonis Kandylidis
_____
Antonis Kandylidis
Chief Executive Officer

Dated: April 14, 2011

D-98

**OCEANFREIGHT INC.**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Report of Independent registered public accounting firm | DF-2 |
| Report of Independent registered public accounting firm on internal control over financial reporting | DF-3 |
| Consolidated Balance Sheets as of December 31, 2009 and 2010 | DF-4 |
| Consolidated Statements of Operations for the years ended December 31, 2008, 2009 and 2010 | DF-5 |
| Consolidated Statements of Stockholders' Equity for the years ended December 31, 2008, 2009 and 2010 | DF-6 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2008, 2009 and 2010 | DF-7 |
| Notes to Consolidated Financial Statements | DF-8 |

DF-1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Stockholders of OCEANFREIGHT INC.

We have audited the accompanying consolidated balance sheets of OceanFreight Inc. as of December 31, 2010 and 2009, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2010. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of OceanFreight Inc. at December 31, 2010 and 2009, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2010, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), OceanFreight Inc.'s internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated April 14, 2011 expressed an unqualified opinion thereon.

/s/ Ernst & Young (Hellas) Certified Auditors Accountants S.A.

Athens, Greece
April 14, 2011

DF-2

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM ON INTERNAL CONTROL OVER FINANCIAL REPORTING

The Board of Directors and Stockholders of OCEANFREIGHT INC.

We have audited OceanFreight Inc.'s internal control over financial reporting as of December 31, 2010, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). OceanFreight Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control over Financial Reporting appearing under Item 15.b in the Company's Annual Report on Form 20-F for the year ended December 31, 2010. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, OceanFreight Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2010, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of OceanFreight Inc. as of December 31, 2010 and 2009 and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2010, of OceanFreight Inc. and our report dated April 14, 2011 expressed an unqualified opinion thereon.

/s/ Ernst & Young (Hellas) Certified Auditors Accountants S.A.

Athens, Greece
April 14, 2011

DF-3

## OCEANFREIGHT INC.

### Consolidated Balance Sheets
### December 31, 2009 and 2010

| | 2009 | 2010 |
|---|---|---|
| | **(Expressed in thousands of U.S. Dollars-except for share and per share data)** | |
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 37,272 | $ 9,549 |
| Restricted cash | 2,500 | — |
| Receivables | 2,254 | 3,168 |
| Inventories | 1,158 | 838 |
| Prepayments and other current assets | 6,035 | 7,925 |
| Vessels held for sale | 51,080 | 88,274 |
| **Total current assets** | 100,299 | 109,754 |
| **FIXED ASSETS, NET:** | | |
| Advances for vessel acquisition | 9,900 | — |
| Vessels under construction | — | 46,618 |
| Vessels, net of accumulated depreciation of $43,486 and $32,284, respectively | 423,242 | 311,144 |
| Other fixed assets, net of accumulated depreciation of $123 and $382, respectively | 856 | 597 |
| **Total fixed assets, net** | 433,998 | 358,359 |
| **NON-CURRENT ASSETS:** | | |
| Deferred financing fees, net of accumulated amortization of $2,378 and $2,916, respectively | 1,362 | 1,102 |
| Restricted cash | 6,511 | 5,511 |
| Other non-current assets | 7,102 | 4,137 |
| **Total assets** | $ 549,272 | $ 478,863 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $ 1,053 | $ 2,161 |
| Due to related parties | 785 | 1,867 |
| Accrued liabilities | 11,219 | 16,693 |
| Unearned revenue | 1,323 | 1,532 |
| Derivative liability | 7,443 | 6,727 |
| Imputed deferred revenue | 1,558 | — |
| Current portion of long-term debt | 49,947 | 82,331 |
| **Total current liabilities** | 73,328 | 111,311 |
| **NON-CURRENT LIABILITIES:** | | |
| Derivative liability, net of current portion | 3,606 | 4,875 |
| Long-term debt, net of current portion | 215,727 | 127,441 |
| **Total non-current liabilities** | 219,333 | 132,316 |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **STOCKHOLDERS' EQUITY:** | | |
| Preferred shares, par value $0.01; 5,000,000 shares authorized, none issued | — | — |
| Common Shares, par value $0.01; 333,333,333 shares authorized, 52,816,667 and 83,266,655 shares issued and outstanding at December 31, 2009 and 2010, respectively | 1,584 | 833 |
| Subordinated Shares, par value $0.01; 10,000,000 shares authorized, none shares issued and outstanding | — | — |
| Additional paid-in capital | 458,757 | 499,758 |
| Accumulated deficit | (203,730) | (265,355) |
| **Total stockholders' equity** | 256,611 | 235,236 |
| **Total liabilities and stockholders' equity** | $ 549,272 | $ 478,863 |

The accompanying notes are an integral part of these consolidated financial statements

**OCEANFREIGHT INC.**

**Consolidated Statements of Operations**
**For the years ended December 31, 2008, 2009 and 2010**

| | 2008 | 2009 | 2010 |
|---|---|---|---|
| | (Expressed in thousands of U.S. Dollars-except for share and per share data) | | |
| **REVENUES:** | | | |
| Voyage revenue | $ 147,116 | $ 118,462 | $ 100,632 |
| Gain/(loss) on forward freight agreements | — | 570 | (4,342) |
| Imputed deferred revenue | 10,318 | 14,473 | 1,558 |
| | 157,434 | 133,505 | 97,848 |
| **EXPENSES:** | | | |
| Voyage expenses | (14,275) | (5,549) | (5,196) |
| Vessels' operating expenses | (28,980) | (43,915) | (41,078) |
| General and administrative expenses | (9,127) | (8,540) | (8,264) |
| Survey and drydocking costs | (736) | (5,570) | (1,784) |
| Depreciation | (43,658) | (48,272) | (24,853) |
| Impairment on vessels | | (52,700) | — |
| Loss on sale of vessels and vessel held for sale | — | (133,176) | (62,929) |
| **Operating income/(loss )** | 60,658 | (164,217) | (46,256) |
| **OTHER INCOME (EXPENSES):** | | | |
| Interest income | 776 | 271 | 119 |
| Interest and finance costs | (16,528) | (12,169) | (6,775) |
| Loss on derivative instruments | (17,184) | (2,567) | (8,713) |
| **Total other income (expenses)** | (32,936) | (14,465) | (15,369) |
| **Net Income/(loss)** | $ 27,722 | $ (178,682) | $ (61,625) |
| Earnings (losses) per common share, basic and diluted | $ 5.82 | $ (6.81) | $ (0.87) |
| Earnings per subordinated share, basic and diluted | $ — | $ — | $ — |
| Weighted average number of common shares, basic and diluted | 4,773,824 | 26,185,442 | 70,488,531 |
| Weighted average number of subordinated shares, basic and diluted | — | — | — |

The accompanying notes are an integral part of these consolidated financial statements

DF-5

## OCEANFREIGHT INC.

### Consolidated Statements of Stockholders' Equity
### For the years ended December 31, 2008, 2009 and 2010

| | Comprehensive Income (Loss) | Common Shares # of Shares | Par Value | Subordinated Shares # of Shares | Par Value | Additional Paid-in Capital | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|---|---|
| | | | (Expressed in thousands of U.S. Dollars-except for share and per share data) | | | | | |
| **BALANCE, December 31, 2007** | | **4,131,360** | **$ 41** | **2,063,158** | **$ 21** | **$ 218,346** | **$ (4,998)** | **$ 213,410** |
| — Net income | $ 27,722 | — | — | — | — | — | 27,722 | 27,722 |
| — Proceeds from Controlled Equity Offering, net of related expenses | — | 1,333,333 | 13 | — | — | 50,887 | — | 50,900 |
| — Stock based compensation expense | — | 17,368 | 1 | 85,150 | 1 | 2,699 | — | 2,701 |
| — Cancellation of common and subordinated stock | — | (2,631) | — | (42,105) | (1) | 1 | — | — |
| — Conversion of subordinated stock to common stock | — | 702,068 | 7 | (2,106,203) | (21) | 14 | — | — |
| — Cash dividends | — | — | — | — | — | — | (47,772) | (47,772) |
| — Comprehensive income | $ 27,722 | — | — | — | — | — | — | — |
| **BALANCE, December 31, 2008** | | **6,181,498** | **$ 62** | **—** | **$ —** | **$ 271,947** | **$ (25,048)** | **$ 246,961** |
| — Net loss | (178,682) | — | — | — | — | — | (178,682) | (178,682) |
| — Proceeds from standby equity purchase and distribution agreements, net of related expenses | | 46,635,169 | 466 | — | — | 187,822 | — | 188,288 |
| — Stock based compensation expense | | — | — | — | — | 44 | — | 44 |
| — Comprehensive loss | $ (178,682) | — | — | — | — | — | — | — |
| **BALANCE, December 31, 2009** | | **52,816,667** | **$ 528** | **—** | **$ —** | **$ 459,813** | **$ (203,730)** | **$ 256,611** |
| — Net loss | $ (61,625) | — | — | — | — | — | (61,625) | (61,625) |
| — Proceeds from equity Offering, net of related expenses | — | 6,716,654 | 67 | — | — | 19,175 | — | 19,242 |
| — Stock based compensation expense | — | 7,066,667 | 71 | — | — | 993 | — | 1,064 |
| — Equity contribution, net of related expenses | — | 16,666,667 | 167 | — | — | 19,777 | — | 19,944 |
| — Comprehensive income | $ (61,625) | — | — | — | — | — | — | — |
| **BALANCE, December 31, 2010** | | **83,266,655** | **$ 833** | **—** | **$ —** | **$ 499,758** | **$ (265,355)** | **$ 235,236** |

The accompanying notes are an integral part of these consolidated financial statements

DF-6

# OCEANFREIGHT INC

## Consolidated Statements of Cash Flows
### For the years ended December 31, 2008, 2009 and 2010

|  | 2008 | 2009 | 2010 |
|---|---|---|---|
|  | (Expressed in thousands of U.S. Dollars) | | |
| **Cash Flows from Operating Activities:** | | | |
| **Net income/(loss):** | $  27,722 | $(178,682) | $(61,625) |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation | 43,658 | 48,272 | 24,853 |
| Amortization of financing costs | 475 | 744 | 538 |
| Amortization of imputed deferred revenue | (10,318) | (14,473) | (1,558) |
| Amortization of stock based compensation | 2,701 | 44 | 1,064 |
| (Gain)/Loss on derivative instruments | 16,147 | (5,098) | 553 |
| Impairment on vessels | — | 52,700 | — |
| Loss on sale of vessels and vessel held for sale | — | 133,176 | 62,929 |
| **Changes in operating assets and liabilities:** | | | |
| Receivables | (1,847) | (181) | (914) |
| Inventories | (660) | 180 | 320 |
| Prepayments and other current assets | (1,434) | (3,838) | (1,890) |
| Other non-current assets | (940) | (6,149) | 2,965 |
| Accounts payable | (660) | (714) | 1,108 |
| Due to/(from) related parties | (631) | 163 | 1,082 |
| Accrued liabilities | 6,822 | 907 | (1,185) |
| Unearned revenue | 334 | (499) | 209 |
| **Net Cash provided by Operating Activities** | **81,369** | **26,552** | **28,449** |
| **Cash Flows from Investing Activities:** | | | |
| Advances for vessels acquisition and vessels under construction | — | (9,900) | (46,618) |
| Additions to vessel cost (excluding sellers' credit) | (120,537) | (180,501) | (40,196) |
| Net proceeds from sale of vessels | — | 60,404 | 44,136 |
| Other fixed assets | (128) | (789) | — |
| **Net Cash used in Investing Activities** | **(120,665)** | **(130,786)** | **(42,678)** |
| **Cash Flows from Financing Activities:** | | | |
| Proceeds from equity offerings and contributions, net of related costs | 50,900 | 188,288 | 39,186 |
| Proceeds from long-term debt | 63,400 | 29,563 | — |
| Repayment of long-term debt | (16,000) | (71,889) | (55,902) |
| Repayment of sellers' credit | — | (25,000) | — |
| Cash dividends | (47,772) | — | — |
| (Increase)/decrease in restricted cash | (6,511) | (2,500) | 3,500 |
| Payment of financing costs | (696) | (25) | (278) |
| **Net Cash provided by/(used in) Financing Activities** | **43,321** | **118,437** | **(13,494)** |
| **Net increase/(decrease) in cash and cash equivalents** | **4,025** | **14,203** | **(27,723)** |
| **Cash and cash equivalents at beginning of year** | **19,044** | **23,069** | **37,272** |
| **Cash and cash equivalents at end of year** | **$  23,069** | **$  37,272** | **$  9,549** |
| **SUPPLEMENTAL CASH INFORMATION** | | | |
| Cash paid for interest, net of amounts capitalized | $  11,044 | $  13,339 | $  7,175 |
| Sellers' credit | $  25,000 | $      — | $      — |

The accompanying notes are an integral part of these consolidated financial statements

**1.  Basis of Presentation and General Information:**

The accompanying consolidated financial statements include the accounts of OceanFreight Inc. ("OceanFreight") and its wholly-owned subsidiaries (collectively, the "Company"). OceanFreight was incorporated on September 11, 2006 under the laws of the Marshall Islands. In late April 2007, OceanFreight completed its Initial Public Offering in the United States under the United States Securities Act of 1933, as amended, the net proceeds of which amounted to $216,794. The Company's common shares are listed on the Nasdaq Global Market.

The Company is engaged in the marine transportation of drybulk and crude oil cargoes through the ownership and operation of drybulk and tanker vessels. Effective May 2009, the Company is also engaged in Forward Freight Agreements (FFA) trading activities.

On May 28, 2010, Basset Holding Inc. ("Basset"), a company controlled by Mr. Antonis Kandylidis, the Company's Chief Executive Officer, made an equity contribution of $20,000 in exchange of 16,666,667 (50,000,000 before the reverse stock split) of the Company's common shares Note 8(f).

On June 10, 2010, the Company's stockholders approved a 3:1 reverse stock split, pursuant to which every three shares, of the Company's common stock issued and outstanding were converted into one share of common stock. The reverse stock split took effect as of the start of trading on the NASDAQ Stock Market on June 17, 2010 and reduced the number of the then issued and outstanding common shares from 231,800,001 common shares to 77,266,655 common shares. Accordingly, all share and per share amounts have been retroactively restated to reflect this change in capital structure discussed in Note 8(g)

On June 15, 2010, the technical and commercial management of the drybulk and the tanker fleets as well as the supervision of the construction of the three newbuildings Very Large Ore Carriers ("VLOCs") were contracted under separate management agreements to TMS Dry Ltd. and TMS Tankers Ltd., respectively, both related technical and commercial management companies (Note 3). Until June 15, 2010, the technical and commercial management of the Company's fleet was contracted under separate management agreements to Cardiff Marine Inc. ("Cardiff"), a related technical and commercial management company (Note 3). Until July 2009, the technical management of the drybulk carriers was performed by Wallem Ship Management Ltd. ("Wallem") and the technical management of the tanker vessels and the commercial management of all vessels were performed by Cardiff.

As of December 31, 2010, the Company is the ultimate owner of all outstanding shares of the following shipowning subsidiaries, each of which is domiciled in the Republic of the Marshall Islands:

| Company Name | Vessel Name | Deadweight Tonnage (In metric tons) | YearBuilt | Acquisition Date |
|---|---|---|---|---|
| **Subsidiaries established in the Republic of Marshall Islands** | | | | |
| Oceanship Owners Limited | *M/V Trenton* | 75,229 | 1995 | June 4, 2007 |
| Oceanventure Owners Limited | *M/V Austin* | 75,229 | 1995 | June 6, 2007 |
| Oceanenergy Owners Limited | *M/V Helena* | 73,744 | 1999 | July 30, 2007 |
| Oceantrade Owners Limited | *M/V Topeka* | 74,710 | 2000 | August 2, 2007 |
| Kifissia Star Owners Inc. | *M/V Augusta* | 69,053 | 1996 | December 17, 2007 |
| Oceanfighter Owners Inc. | *M/T Olinda* | 149,085 | 1996 | January 17, 2008 |
| Ocean Blue Spirit Owners Inc. | *M/T Tamara* | 95,793 | 1990 | October 17, 2008 |
| Oceanwave Owners Limited | *M/V Partagas* | 173,880 | 2004 | July 30, 2009 |
| Oceanrunner Owners Limited | *M/V Robusto* | 173,949 | 2006 | October 19, 2009 |
| Oceanfire Owners Inc. | *M/V Cohiba* | 174,200 | 2006 | December 9, 2009 |
| Oceanpower Owners Inc. | *M/V Montecristo* | 180,263 | 2005 | June 28, 2010 |
| Oceanview Owners Limited(i) | | | | |
| Oceansurf Owners Limited(i) | | | | |
| Oceancentury Owners Limited(i) | | | | |
| Freightwise Investments Ltd(ii) | | | | |

*Companies with vessels sold*

| | |
|---|---|
| Oceanstrength Owners Limited | Owner of M/V *Lansing* sold on July 1, 2009 |
| Oceanprime Owners Limited | Owner of M/V *Richmond* sold on September 30, 2009 |
| Oceanresources Owners Limited | Owner of M/V *Juneau* sold on October 23, 2009 |
| Oceanwealth Owners Limited | Owner of M/V *Pierre* sold on April 14, 2010 |
| Ocean Faith Owners Inc. | Owner of M/T *Tigani* sold on May 4, 2010 |
| Oceanclarity Owners Limited | Owner of M/T *Pink Sands* sold on November 4, 2010 |

*Subsidiaries established in the republic of Liberia*

| | |
|---|---|
| Oceanview Owners Limited | *New Building VLOC#1* |
| Oceansurf Owners Limited | *New Building VLOC#2* |
| Oceancentury Owners Limited | *New Building VLOC#3* |

(i) Subsidiaries established for Company's general purposes.

(ii) Freightwise Investments Ltd was established in 2009 to engage in Freight Forward Agreements ("FFA") trading activities Note 10.

Voyage revenues for 2008, 2009 and 2010 included revenues derived from the following significant charterers (in percentages of total voyage revenues):

| Charterer | 2008 | 2009 | 2010 | Reportable Segment (Note 15) |
|---|---|---|---|---|
| A | 19% | — | — | Drybulk |
| B | 13% | 16% | 10% | Drybulk |
| C | 13% | — | — | Drybulk |
| D | 12% | 11% | — | Drybulk |
| E | — | 15% | 45% | Drybulk |

## 2. Significant Accounting Policies:

*(a) Principles of Consolidation:* The accompanying consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles and include the accounts of OceanFreight Inc. and its wholly owned subsidiaries referred to in Note 1 above. All significant inter-company balances and transactions have been eliminated in the consolidation.

*(b) Use of Estimates:* The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*(c) Foreign Currency Translation:* The functional currency of the Company is the U.S. Dollar because the Company operates in international shipping markets, and therefore primarily transacts business in U.S. Dollars. The Company's accounting records are maintained in U.S. Dollars. Transactions involving other currencies during the periods presented are converted into U.S. Dollars using the exchange rates in effect at the time of the transactions. At the balance sheet date, monetary assets and liabilities, which are denominated in other currencies, are translated into U.S. Dollars at the period-end exchange rates. Resulting translation gains or losses are included in "General and administrative expenses" in the accompanying consolidated statements of operations.

(d) *Concentration of Credit Risk:*   Financial instruments, which potentially subject the Company to significant concentrations of credit risk, consist principally of cash and cash equivalents and trade accounts receivable. The Company places its cash and cash equivalents, consisting mostly of deposits, with qualified financial institutions with high creditworthiness. The Company performs periodic evaluations of the relative creditworthiness of those financial institutions that are considered in the Company's investment strategy. The Company limits its credit risk with accounts receivable by performing ongoing credit evaluations of its customers' financial condition and generally does not require collateral for its accounts receivable.

(e) *Cash and Cash Equivalents and Restricted Cash:*   The Company considers highly liquid investments such as time deposits and certificates of deposit with an original maturity of three months or less to be cash equivalents. Restricted cash concerns funds deposited in retention accounts for the payment of loan installments and minimum liquidity requirements under the loan facilities.

(f) *Receivables:*   The amount shown as receivables, at each balance sheet date, includes receivables from charterers for hire, freight and demurrage billings, net of a provision for doubtful accounts, if any. At each balance sheet date, all potentially uncollectible accounts are assessed individually for purposes of determining the appropriate provision for doubtful accounts. There were no doubtful receivables for the years ended December 31, 2010 and 2009.

(g) *Inventories:*   Inventories consist of consumable bunkers and lubricants which are stated at the lower of cost or market value. Cost is determined by the first in-first out method.

(h) *Insurance Claims:*   The Company records insurance claim recoveries for insured losses incurred on damage to fixed assets and for insured crew medical expenses. Insurance claim recoveries are recorded, net of any deductible amounts, at the time the Company's fixed assets suffer insured damages or when crew medical expenses are incurred, recovery is probable under the related insurance policies, and the Company makes an estimate of the amount to be reimbursed following the insurance claim.

(i) *Vessels Under Construction:*   This represents amounts expended by the Company in accordance with the terms of the related shipbuilding contracts. Interest costs incurred during the construction period (until the asset is complete and ready for its intended use) are capitalized. Capitalized interest for the year ended December 31, 2010 amounted to $964.

(j) *Vessels, Net:*   Vessels are stated at cost, which consists of the contract price and any material expenses incurred in connection with the acquisition (initial repairs, improvements, delivery expenses and other expenditures to prepare the vessel for her initial voyage as well as professional fees directly associated with the vessel acquisition). Subsequent expenditures for major improvements are also capitalized when they appreciably extend the life, increase the earning capacity or improve the efficiency or safety of the vessels; otherwise, these amounts are charged to expense as incurred.

The cost of each of the Company's vessels is depreciated from the date of its acquisition on a straight-line basis during the vessel's remaining economic useful life, after considering the estimated residual value (vessel's residual value is equal to the product of its lightweight tonnage and estimated scrap rate of $200 per lwt). Management estimates the useful life of the Company's vessels to be 25 years from the date of initial delivery from the shipyard. When regulations place limitations over the ability of a vessel to trade on a worldwide basis, its remaining useful life is adjusted at the date such regulations are adopted.

(k) *Vessels Held for Sale:*   It is the Company's policy to dispose of vessels and other fixed assets when suitable opportunities arise and not necessarily to keep them until the end of their useful life. The Company classifies assets and disposal groups as being held for sale in accordance with the ASC 360, Property, Plant and Equipment, when the following criteria are met: (i) management possessing the necessary authority has committed to a plan to sell the asset (disposal group); (ii) the asset (disposal group) is immediately available for sale on an "as is" basis; (iii) an active program to find the buyer and other actions required to execute the plan to sell the asset (disposal group) have been initiated; (iv) the sale of the asset (disposal group) is probable, and transfer of the asset (disposal group) is expected to qualify for recognition as a completed sale within one year; and (v) the asset (disposal group) is being actively marketed for sale at a price that is reasonable in relation to its current fair value and actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made

or that the plan will be withdrawn. Long-lived assets or disposal groups classified as held for sale are measured at the lower of their carrying amount or fair value. These assets are not depreciated once they meet the criteria to be held for sale and are classified in current assets on the Consolidated Balance Sheet.

*(l) Impairment of Long-Lived Assets:*   The Company uses ASC 360, Property, Plant and Equipment, which addresses financial accounting and reporting for the impairment or disposal of long-lived assets. The standard requires that long-lived assets and certain identifiable intangibles held and used by an entity be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the assets may not be recoverable. When the estimate of undiscounted projected net operating cash flows, excluding interest charges, expected to be generated by the use of the asset is less than its carrying amount, the Company evaluates the asset for an impairment loss.

Carrying values of Company's vessels may not represent their fair market value at any point in time since the market prices of second hand vessels tend to fluctuate with changes in charter rates and the cost of newbuildings. Historically, both charter rates and vessel values tend to be cyclical. The Company records impairment losses only when events occur that cause the Company to believe that future cash flows for any individual vessel will be less than its carrying value. The carrying amounts of vessels held and used by the Company are reviewed for potential impairment whenever events or changes in circumstances indicate that the carrying amount of a particular vessel may not be fully recoverable. In such instances, an impairment charge would be recognized if the estimate of the undiscounted future cash flows expected to result from the use of the vessel and its eventual disposition is less than the vessel's carrying amount. This assessment is made at the individual vessel level as separately identifiable cash flow information for each vessel is available. Measurement of the impairment loss is based on the fair value of the asset.

The Company determines undiscounted projected net operating cash flows for each vessel and compares it to the vessel's carrying value. In developing estimates of future cash flows, the Company must make assumptions about future charter rates, vessel operating expenses, fleet utilization, and the estimated remaining useful lives of the vessels. These assumptions are based on historical trends as well as future expectations. The projected net operating cash flows are determined by considering the charter revenues from existing time charters for the fixed fleet days and an estimated daily time charter equivalent for the unfixed days (based on the most recent 10 year historical average of the six month, one year and three year time charter rates for drybulk vessels, the three year projected time charter rate for the first three years and the 10 year historical average of the one year and three year time charter rates thereafter for the Suezmax tanker vessel), over the remaining estimated life of each vessel assuming an annual growth rate of 3.0%, net of brokerage commission for drybulk vessels and no growth rate for the tanker vessels. Expected outflows for scheduled vessels' maintenance and vessel operating expenses are based on historical data, and adjusted annually assuming an average annual inflation rate of 3%. Effective fleet utilization is assumed to be 99% and 97% for drybulk carriers and tanker vessels, respectively, taking into account the period(s) each vessel is expected to undergo her scheduled maintenance (drydocking and special surveys), as well as an estimate of 1% off hire days each year for drybulk carriers and 3% for tanker vessels. The Company has assumed no change in the remaining estimated useful lives of the current fleet, and scrap values based on $200 per lwt at disposal.

In 2010 and 2009, the Company in assessing its exposure to impairment risks for its fleet, has considered the current conditions of the of international drybulk and tanker industry, the decline of the market values, the deterioration of the charter hires and the expected slow recovery of the market, the age of its tanker vessels and the increased costs for their maintenance and upgrading. As a result it has determined that the utilization of its tanker vessels over their remaining useful lives has been negatively impacted by the market conditions with low possibilities for recovery and, accordingly, has decided to write down two of its tanker vessels to their market values by recording an impairment charge of $52,700 in its 2009 consolidated financial statements (Note 6). No impairment loss was identified or recorded for 2008 or 2010 and the Company has not identified any other facts or circumstances that would require the write down of vessel values.

The current assumptions used and the estimates made are highly subjective, and could be negatively impacted by further significant deterioration in charter rates or vessel utilization over the remaining life of the vessels which could require the Company to record a material impairment charge in future periods.

*(m) Accounting for Survey and Drydocking Costs:*   Special survey and drydocking costs are expensed in the period they are incurred.

*(n) Financing Costs:*   Costs associated with new loans or refinancing of existing ones including fees paid to lenders or required to be paid to third parties on the lender's behalf for obtaining new loans or refinancing existing ones are recorded as deferred charges. Such fees are deferred and amortized to interest and finance costs during the life of the related debt using the effective interest method. Unamortized fees relating to loans repaid or refinanced, meeting the criteria of debt extinguishment, are expensed in the period the repayment or refinancing is made.

*(o) Imputed Prepaid/Deferred Revenue:*   The Company records identified assets or liabilities associated with the acquisition of a vessel at fair value, determined by reference to market data. We value any asset or liability arising from the market value of assumed time charters as a condition of the original purchase of a vessel at the date when such vessel is initially deployed on its charter. The value of the asset or liability is based on the difference between the current fair value of a charter with similar characteristics as the time charter assumed and the net present value of contractual cash flows of the time charter assumed, to the extent the vessel capitalized cost does not exceed its fair value without a time charter contract. When the present value of contractual cash flows of the time charter assumed is greater than its current fair value, the difference is recorded as imputed prepaid revenue. When the opposite situation occurs, the difference is recorded as imputed deferred revenue. Such assets and liabilities are amortized as a reduction of, or an increase in, revenue respectively, during the period of the time charter assumed. In developing estimates of the net present value of contractual cash flows of the time charters assumed we must make assumptions about the discount rate that reflect the risks associated with the assumed time charter and the fair value of the assumed time charter at the time the vessel is acquired. Although management believes that the assumptions used to evaluate present and fair values discussed above are reasonable and appropriate, such assumptions are highly subjective.

*(p) Accounting for Voyage Revenue:*   The Company generates its revenues from charterers for the charter hire of its vessels. Vessels are chartered using either voyage charters, where a contract is made in the spot market for the use of a vessel for a specific voyage for a specified charter rate, or timecharters, where a contract is entered into for the use of a vessel for a specific period of time and a specified daily charter hire rate. If a charter agreement exists and collection of the related revenue is reasonably assured, revenue is recognized as it is earned ratably during the duration of the period of each voyage or timecharter. A voyage is deemed to commence upon the completion of discharge of the vessel's previous cargo and is deemed to end upon the completion of discharge of the current cargo. Demurrage income represents payments by a charterer to a vessel owner when loading or discharging time exceeds the stipulated time in the voyage charter and is recognized ratably as earned during the related voyage charter's duration period. Unearned revenue includes cash received prior to the balance sheet date and is related to revenue earned after such date. For vessels operating in pooling arrangements, the Company earns a portion of total revenues generated by the pool, net of expenses incurred by the pool. The amount allocated to each pool participant vessel, including the Company's vessels, is determined in accordance with an agreed-upon formula, which is determined by points awarded to each vessel in the pool based on the vessel's age, design and other performance characteristics. Revenue under pooling arrangements is accounted for on the accrual basis and is recognized when an agreement with the pool exists, price is fixed, service is provided and collectability has been reasonably assured. The allocation of such net revenue may be subject to future adjustments by the pool; however historically such changes have not been material.

Revenue is based on contracted charter parties and although the Company's business is with customers who are believed to be of the highest standard, there is always the possibility of dispute over the terms. In such circumstances, the Company will assess the recoverability of amounts outstanding and a provision is estimated if there is a possibility of non-recoverability. Although the Company may believe that its provisions are based on fair judgment at the time of their creation, it is possible that an amount under dispute will not be recovered and the estimated provision of doubtful accounts would be inadequate. If any of our revenues become uncollectible these amounts would be written-off at that time.

*(q) Accounting for Voyage Expenses and Vessel Operating Expenses* :   Voyage related and vessel operating expenses are expensed as incurred. Under a time charter, specified voyage expenses, such as fuel and port charges are paid by the charterer and other non-specified voyage expenses, such as commissions, are paid by the Company.

Vessel operating expenses including vessel management fees, crews, maintenance and insurance are paid by the Company. Under a bareboat charter, the charterer assumes responsibility for all voyage and vessel operating expenses and risk of operation.

For vessels employed on spot market voyage charters, we incur voyage expenses that include port and canal charges and bunker expenses, unlike under time charter employment, where such expenses are assumed by the charterers.

As is common in the drybulk and crude oil shipping industries, we pay commissions ranging from 1.25% to 6.25% of the total daily charter hire rate of each charter to ship brokers associated with the charterers. Commissions are deferred and amortized over the related voyage charter period to the extend revenue has been deferred since commissions are earned as the Company's revenues are earned.

*(r) Earnings/(loss) per Common Share:* Basic earnings (loss) per common share is computed by dividing net income available to common stockholders by the weighted average number of common shares outstanding for the year. Diluted earnings (losses) per common share reflect the potential dilution that could occur if securities or other contracts to issue common stock were exercised. In June 2010, the Company effected a 3:1 reverse stock split (Note 8(g)).

*(s) Accounting for Financial Instruments:* ASC 815, Derivatives and Hedging, requires all derivative contracts to be recorded at fair value, as determined in accordance with ASC 820, "Fair Value Measurements and Disclosures". The changes in fair value of the derivative contract are recognized in earnings unless specific hedging criteria are met. The Company's derivative contracts do not qualify for hedge accounting, therefore changes in fair value have been accounted for as increases or decreases to earnings.

*(t) Segment Reporting:* ASC 280, Segment Reporting, requires descriptive information about its reportable operating segments. Operating segments, as defined, are components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing performance. The Company reports financial information and evaluates its operations and operating results by type of vessel and not by the length or type of ship employment for its customers. The Company does not use discrete financial information to evaluate the operating results for each such type of charter. Although revenue can be identified for different types of charters or for charters with different duration, management cannot and does not identify expenses, profitability or other financial information for these charters. Furthermore, when the Company charters a vessel to a charterer, the charterer is free to trade the vessel worldwide and, as a result, the disclosure of geographic information is impracticable. The reportable segments of the company are the tankers segment and the drybulk carriers segment.

*(u) Stock Based Compensation:* In addition to cash compensation, the Company provides for the grant of restricted and subordinated shares to key employees. In accordance with ASC 718, Compensation — Stock Compensation, the Company measures the cost of employee services received in exchange for these awards based on the fair value of the Company's shares at the grant date (measurement date). The cost is recognized over the requisite service period, or vesting period. If these equity awards are modified after the grant date, incremental compensation cost is recognized in an amount equal to the excess of the fair value of the modified award over the fair value of the original award immediately before the modification.

*(v) Income taxation:* The Company is not liable for any income tax on its income derived from shipping operations. Instead, a tax is levied based on the tonnage of the vessels, which is included in vessel operating expenses in the accompanying consolidated statements of operations. The Company anticipates its income will continue to be exempt in the future, including U.S. federal income tax. However, in the future, the Company may not continue to satisfy certain criteria in the U.S. tax laws and as such, may become subject to U.S. federal income tax on future U.S. source shipping income.

*(w) Commitments and Contingencies:* Commitments are recognized when the Company has a present legal or constructive obligation as a result of past events and it is probable that an outflow of resources embodying economic benefits will be required to settle this obligation, and a reliable estimate of the amount of the obligation can be made. Provisions are reviewed at each balance sheet date.

*(x) New Accounting Pronouncements:*

In January 2010, the FASB issued an Accounting Standards Update (ASU) No. 2010-06, "Fair Value Measurements and Disclosures (Topic 820): Improving Disclosures about Fair Value Measurements." The updated guidance requires new disclosures to separately disclose the amounts of significant transfers in and out of Levels 1 and 2 fair value measurements and describe the reasons for the transfers; and in the reconciliation for fair value measurements using significant unobservable inputs (Level 3), a reporting entity should present separately information about purchases, sales, issuances, settlements. The updated guidance also clarifies existing disclosures related to the level of disaggregation, and disclosures about inputs and valuation techniques. The new disclosures and clarifications of existing disclosures are effective for interim and annual reporting periods beginning after December 15, 2009, except for the disclosures about purchases, sales, issuances, and settlements in the roll forward of activity in Level 3 fair value measurements. Those disclosures are effective for fiscal years beginning after December 15, 2010, and for interim periods with those fiscal years. The adoption of this guidance did not have any impact on Company's financial position or results of operations.

In February 2010, the FASB issued ASU 2010-09, Subsequent Events (Topic 855). ASU 2010-09 amends ASC 855 to clarify which entities are required to evaluate subsequent events through the date the financial statements are issued and the scope of the disclosure requirements related to subsequent events. The amendments remove the requirement for a SEC filer to disclose the date through which management evaluated subsequent events in both issued and revised financial statements. Revised financial statements include financial statements revised as a result of either correction of an error or retrospective application of U.S. GAAP. Additionally, the FASB has clarified that if the financial statements have been revised, then an entity that is not a SEC filer should disclose both the date that the financial statements were issued or available to be issued and the date the revised financial statements were issued or available to be issued. Those amendments remove potential conflicts with the SEC's literature. All of the amendments in this update are effective upon its issuance, except for the use of the issued date for conduit debt obligors. That amendment is effective for interim or annual periods ending after June 15, 2010. The adoption of the above amendments of ASU 2010-09 did not have any impact on the Company's consolidated financial statements.

In July 2010, the FASB issued ASU 2010-20, "Receivables (topic 310): Disclosures about the Credit Quality of Financing Receivables and the Allowance for Credit Losses". The updated guidance requires entities to provide extensive new disclosures about their financing receivables, including credit risk exposures and the allowance for credit losses and the quality of financing receivables. The amendments in this update enhance disclosures about the credit quality of financing receivables and the allowance from credit losses. Entities with financing receivables will be required to disclose, among other things: (a) a roll forward of the allowance for credit losses, (b) credit quality information such as credit risk scores or external credit agency ratings, (c) impaired loan information, (d) modification information and (d) non accrual and past due information. Trade receivables with maturities of one year or less that arose from sales of goods or services are excluded from the scope of the new disclosures. For public entities, the enhanced disclosures are effective for interim and annual reporting periods ending on or after December 15, 2010. The disclosures about activity that occurs during a reporting period are effective for interim and annual reporting periods beginning on or after December 15, 2010. The adoption of this guidance will not have any impact on the Company's financial position or results of operations.

**3. Transactions with Related Parties:**

*(a) TMS Dry Ltd. and TMS Tankers Ltd.:* Following termination of the management agreements with Cardiff discussed in Note 3(b), effective June 15, 2010, the Company contracted the technical and commercial management of its drybulk and tanker fleet as well as the supervision of the construction of the newbuildings to TMS Dry Ltd. and TMS Tankers Ltd. (the "Managers"). Both companies are beneficially owned (a) 30% by a company the beneficial owner of which is Mrs. Chryssoula Kandylidis, the mother of the Company's Chief Executive Officer and (b) 70% by a foundation controlled by Mr. George Economou. Mrs. C. Kandylidis is also the sister of Mr. G. Economou and the wife of one of the Company's directors, Mr. Konstantinos Kandylidis.

The Managers are engaged under separate vessel management agreements directly by the Company's respective wholly-owned vessel owning subsidiaries. Under the vessel management agreements the Company pays a daily management fee per vessel, covering also superintendent's fee per vessel plus expenses for any services

DF-14

performed relating to evaluation of the vessel's physical condition, supervision of shipboard activities or attendance upon repairs and drydockings. At the beginning of each calendar year, these fees are adjusted upwards according to the Greek consumer price index. Such increase cannot be less than 3% nor more than 5%. In the event that the management agreement is terminated for any reason other than Managers' default, the Company will be required (a) to pay management fees for a further period of three (3) calendar months as from the date of termination and (b) to pay an equitable proportion of any severance crew costs which materialize as per applicable Collective Bargaining Agreement (CBA). In this respect, the Company will have to pay approximately $942 due to the sale of M/T *Tamara* and M/V *Augusta* in January 2011 and the expected sale of M/T *Olinda*, M/V *Austin* and M/V *Trenton* (Note 4).

The Managers, for the services discussed above, are entitled to a daily management fee per vessel of €1,500 ($2.0 based on the exchange rate of December 31, 2010) and €1,700 ($2.3 based on the exchange rate of December 31, 2010) for the drybulk carriers and tanker vessels, respectively. The Managers are also entitled to (a) a discretionary incentive fee, (b) extra superintendents' fee of €500 ($0.7 based on the exchange rate of December 31, 2010) per day (c) a commission of 1.25% on charter hire agreements that are arranged by the Managers and (d) a commission of 1% of the purchase price on sales or purchases of vessels in the Company's fleet that are arranged by the Managers. Furthermore, the Managers are entitled to a supervision fee payable upfront for vessels under construction equal to 10% of the approved annual budget for supervision cost.

Furthermore, based on the management agreements, as of December 31, 2010, the Company made a security payment of $4,137 to TMS Dry Ltd. representing managed vessels' estimated operating expenses, including management fees, for three months which will be settled when the agreements terminate; however, in case of a change of control the amount of the security is not refundable. The amount has been classified under "Other non-current assets" in the accompanying 2010 consolidated balance sheet.

The fees charged by TMS Dry Ltd. and TMS Tankers Ltd. during the period from June 15, 2010 to December 31, 2010 are as follows:

| Nature of Charge | TMS Dry LTD | TMS Tankers Ltd | Included in |
|---|---|---|---|
| Management fees | $3,496 | $1,198 | Vessels' operating expenses — Statement of Operations |
| Commission on charter hire agreements | 477 | 94 | Voyage expenses — Statement of Operations |
| Commissions on acquisition of vessels | 495 | — | Vessels, net — Balance Sheet |
| Commissions on sale of vessels | 620 | 111 | Loss on sale of vessels — Statement of Operations |
| Termination fees | 559 | 430 | Loss on sale of vessels — Statement of Operations |
| Supervision fee on vessels under construction | 195 | — | Other fixed assets, net — Balance Sheet |

At December 31, 2010, $1,434 and $433 is payable to TMS Dry Ltd. and TMS Tankers Ltd., respectively, and are reflected in the accompanying consolidated balance sheet as "Due to related parties". In addition, as at December 31, 2010, $1,092 and $1,908 due from TMS Dry Ltd. and TMS Tankers Ltd. respectively, relating to the security payment as discussed above and the operations of the vessels under TMS Dry Ltd. and TMS Tankers Ltd. management are included in "Prepayments and other", in the accompanying 2010 consolidated balance sheet.

*(b) Cardiff Marine Inc. ("Cardiff"):* Until June 15, 2010, the Company used the services of Cardiff, a ship management company with offices in Greece, for the technical and commercial management of the Company's fleet. The issued and outstanding capital stock of Cardiff is beneficially owned (a) 30% by a company the beneficial owner of which is Mrs. Chryssoula Kandylidis, the mother of the Company's CEO and (b) 70% by a foundation controlled by Mr. George Economou. Mrs. C. Kandylidis is the sister of Mr. G. Economou and the wife of one of the Company's directors, Mr. Konstantinos Kandylidis.

DF-15

Prior to June 15, 2010, Cardiff was engaged under separate vessel management agreements directly by the Company's respective wholly owned vessel owning subsidiaries. Under the vessel management agreements Cardiff was entitled to a daily management fee per vessel of €764 ($1.0) and €870 ($1.2) for the drybulk carriers and tanker vessels, respectively. Cardiff also provided, other services pursuant to a services agreement, which was terminated on June 15, 2010, under which the Company paid additional fees, including (1) a financing fee of 0.2% of the amount of any loan, credit facility, interest rate swap agreement, foreign currency contract and forward exchange contract arranged by Cardiff, (2) a commission of 1% of the purchase price on sales or purchases of vessels in the Company's fleet that are arranged by Cardiff, (3) a commission of 1.25% of charter hire ship agreements arranged by Cardiff, (4) an information technology fee of €26,363 ($34.9) per quarter and (5) a fee of €527 ($0.7) per day for superintendent inspection services in connection with the possible purchase of a vessel. The U.S. $ figures above are based on the exchange rate at December 31, 2010. At the beginning of each calendar year, these fees were adjusted upwards according to the Greek consumer price index. The Company was also reimbursing Cardiff for any out-of-pocket expenses at cost plus 10%.

In May 2009, the Company entered into a service agreement with Cardiff whereby Cardiff is entitled to a 0.15% brokerage commission on the Company's FFA trading transactions. The agreement was terminated on June 15, 2010.

Until July 2009, when Cardiff assumed the management of all of the Company's vessels, Cardiff was providing supervisory services for the vessels whose technical manager was Wallem Ship Management Ltd. in exchange for a daily fee of €105 ($0.14 based on the exchange rate at December 31, 2010) per vessel.

Furthermore, based on the management agreements with Cardiff the Company, as of June 15, 2010, had made a security payment of $6,486, representing managed vessels' estimated operating expenses, including management fees, for three months. Following the termination of the agreements on June 15, 2010, the security payment was reimbursed to the Company in September 2010.

DF-16

The fees charged by Cardiff for 2008, 2009 and 2010 are as follows:

| Nature of Charge | 2008 | 2009 | 2010 | Included in |
|---|---|---|---|---|
| Management fees | $1,605 | $4,594 | $2,275 | Vessels' operating expenses — Statement of Operations |
| Commission on charter hire agreements | 698 | 685 | 444 | Voyage expenses — Statement of Operations |
| Commission on FFA trading | — | 76 | 26 | Gain/(loss) on forward freight agreements — Statement of Operations |
| Commission on vessels under construction | — | — | 450 | Vessels under construction — Balance Sheet |
| Commissions on purchase of vessels | 1,440 | 1,785 | — | Vessels, net — Balance Sheet |
| Commissions on sale of vessels | — | 1,135 | 28 | Loss on sale of vessels — Statement of Operations |
| Financing fees | 870 | — | — | Interest and finance costs — Statement of Operations |
| IT related fees | 29 | — | — | Other fixed assets, net — Balance Sheet |
| IT related fees | 27 | — | — | General and administrative expenses — Statement of Operations |
| Financing fees | 59 | — | — | Deferred financing fees, net — Balance Sheet |
| Legal Attendance | — | 80 | — | Vessels' operating expenses — Statement of Operations |
| Mark up on reimbursement of out of pocket expenses | — | 13 | 1 | Vessels' operating expenses — Statement of Operations |

At December 31, 2009 and 2010, $785 and $0, respectively, were payable to Cardiff, and are reflected in the accompanying consolidated balance sheets as "Due to related parties". In addition, $344 due from and $279 due to Cardiff as at December 31, 2009 and 2010, respectively, relating to the operations of the vessels under Cardiff's management, are included in "Prepayments and other" and "Accounts Payable", respectively, in the accompanying consolidated balance sheets.

*(c) Vivid Finance Limited ("Vivid"):* On August 13, 2010, the Company entered into a consultancy agreement (the "Agreement") with Vivid, a related company organized under the laws of Cyprus, which is controlled by Mr. George Economou and of which he may be deemed the beneficial owner. Vivid serves as the Company's financial consultant on matters related to (i) new loans and credit facilities with lenders and financial institutions, (ii) the raising of equity or debt from capital markets, (iii) interest rate swaps agreements, foreign currency contracts and forward exchange contracts and (iv) the renegotiation of existing loans and credit facilities. In consideration of these services the Company will pay Vivid a fee of 0.20% on the total transaction amount. Vivid did not provide any services in 2010 and, accordingly, no fees were billed to the Company.

The agreement has a duration of five years and may be terminated (i) at the end of its term unless extended by mutual agreement of the parties; (ii) at any time by the mutual agreement of the parties; and (iii) by the Company after providing written notice to Vivid at least 30 days prior to the actual termination date. As defined in the Agreement, in the event of a "Change of Control" Vivid has the option to terminate the Agreement and cease providing the aforementioned service within three months from the "Change of Control".

*(d) Transbulk 1904 AB ("Transbulk"):* The vessel M/V *Richmond* was employed on a time charter with Transbulk for a period of 24 to 28 months at gross charter rate of $29.1 per day. On August 1, 2009, the vessel was redelivered to the Company due to early termination of the charter party. The vessel M/V *Lansing* was employed

DF-17

under a time charter with Transbulk until June 29, 2009 (the vessel was sold on July 1, 2009) at a gross charter hire of $24 per day. Transbulk is a company based in Gothenburg, Sweden. Transbulk has been in the drybulk cargo chartering business for a period of approximately 30 years. Mr. George Economou serves on its Board of Directors.

*(e) Heidmar Trading LLC ("Heidmar Trading")*:    On October 14, 2008, the M/T *Tigani* commenced her time charter employment with Heidmar Trading LLC, for a period of approximately one year at a gross daily rate of $29.8 and it was redelivered to the Company in December 2009. Mr. George Economou is the chairman of the Board of Directors of the company and the Company's Chief Executive Officer is a member of its Board of Directors. The vessel was redelivered on December 22, 2009.

*(f) Tri-Ocean Heidmar Tankers LLC("Tri-Ocean Heidmar")*:    On October 17, 2008, the M/T *Tamara* , concurrently with her delivery commenced her time charter employment with Tri-Ocean Heidmar Tankers LLC for a period of approximately 25 to 29 months at a gross daily rate of $27. Tri-Ocean Heidmar Tankers LLC is owned by Heidmar Inc. Mr. George Economou is the chairman of the Board of Directors of Heidmar Inc. and the Company's Chief Executive Officer is a member of the Board of Directors of Heidmar Inc. The vessel was redelivered on November 6, 2010. At December 31, 2010, $998 and $123 are due to the Tri-Ocean Heidmar and are included in "Accounts Payable" and "Accrued Liabilities" in the accompanying December 31, 2010 consolidated balance sheet.

*(g) Blue Fin Tankers Inc. pool ("Blue Fin")*:    On October 29, 2008 the M/V *Olinda* was employed in the Blue Fin tankers spot pool for a minimum period of twelve months. Blue Fin is a spot market pool managed by Heidmar Inc. Mr. George Economou is the chairman of the Board of Directors of Heidmar Inc. and the Company's Chief Executive Officer is a member of the Board of Directors of Heidmar Inc. The vessel, as a pool participant, is allocated part of the pool's revenues and voyage expenses, on a time charter basis, in accordance with an agreed-upon formula. In October 2008, the Company made an initial advance to the pool for working capital purposes of $928.4. As of December 31, 2009 and 2010 the Company had a receivable from the pool, including advances made to the pool for working capital purposes, of $1,856 (of which $63 is included in receivables and $1,793 is included in "Prepayments and other") and $2,198 (of which $63 is included in "Receivables" and $2,135 is included in "Prepayments and other"), respectively, in the accompanying consolidated balance sheets. The revenue of M/V *Olinda* deriving from the pool amounted to $2,627, $8,021 and 7,172 for 2008, 2009 and 2010, respectively and is included in "Voyage revenue" in the accompanying consolidated statements of operations.

*(h) Sigma Tanker Pool ("Sigma")*:    On December 22, 2009 and November 6, 2010, the M/T *Tigani* and the M/T *Tamara* were both employed in the Sigma Tankers Inc. pool for a minimum period of twelve months. Sigma is a spot market pool managed by Heidmar Inc. Mr. George Economou is the chairman of the Board of Directors of Heidmar Inc. and the Company's Chief Executive Officer is a member of the Board of Directors of Heidmar Inc. The vessels, as pool participants, are allocated part of the pool's revenues and voyage expenses, on a time charter basis, in accordance with an agreed-upon formula. The vessels were redelivered from the Pool on April 28, 2010 and January 6, 2011, respectively, due to their sale on May 4, 2010 and January 13, 2011, respectively. As of December 31, 2009 and 2010, the Company had a receivable from the pool of $933 and $1,480, respectively, which is included in "Receivables" in the accompanying consolidated balance sheets. The revenue of the M/T *Tigani* and the M/T *Tamara* deriving from the pool for 2009 amounted to $178 and nil, respectively, and for 2010 to $2,000 and $651, respectively, and is included in "Voyage revenue" in the accompanying consolidated statements of operations.

*(i) Acquisition of Vessels:*    In October 2008, the Company took delivery of the tanker vessels M/T *Tigani* and M/T *Tamara* from interests associated with Mr. George Economou for an aggregate consideration of $79,000. The purchase price was financed by a sellers' unsecured credit of $25,000 ($12,000 for the M/T *Tamara* and $13,000 for the M/T *Tigani* ) and the Company's own funds. The sellers' credit was payable 18 months after the physical delivery of the vessel and bore interest at 9.0% per annum for the amount relating to the M/T *Tamara* and 9.5% per annum for the amount relating to the M/T *Tigani*. The total interest charged in this respect for 2008 and 2009 amounted to $500 and $639, respectively and is included in "Interest and finance costs" in the accompanying consolidated statements of operations. The Company also paid Cardiff $1,440 representing a 1% commission on the vessels' purchase price.

As provided in the Memorandum of Agreements, or MOA, of M/T *Tigani* and M/T *Tamara,* following the resignation of one of the Company's directors on November 25, 2008, the sellers of the vessels had the right to demand the immediate payment of the Sellers' Credit of $25,000. The sellers of the above vessels on December 9,

DF-18

2008, waived their contractual right to demand prompt prepayment of the Sellers' Credit until the amendment of the Nordea credit facility became effective (the "Amendatory Agreement"). On February 6, 2009, following the effectiveness of the Amendatory Agreement with Nordea, the sellers of the M/T *Tigani* and M/T *Tamara* exercised their option and requested the repayment of the sellers' credit to be made in cash from the proceeds of the Standby Equity Purchase Agreement discussed in Note 8 as also provided in the Amendatory Agreement, and waived their option for the settlement of the Sellers' Credit of $25,000 in the form of the Company's common stock at any date, effective December 9, 2008. As of December 31, 2009, the Company had fully repaid the Sellers' Credit.

*(j) Lease agreement:*   The Company has leased office space in Athens, Greece, from Mr. George Economou. The lease commenced on April 24, 2007, with a duration of six months and the option for the Company to extend it for another six months. The monthly rental amounts to Euro 680 ($0.90 at the December 31, 2010 exchange rate). This agreement was terminated on December 31, 2010. The rent charged for the years ended December 31, 2008, 2009 and 2010 amounted to $12.1, $11.4 and $11.0, respectively and is included in "General and administrative expenses" in the accompanying consolidated statements of operations.

*(k) Capital infusion:*   On May 28, 2010, Basset Holding Inc., a company controlled by Mr. Anthony Kandylidis, made an equity contribution of $20,000 in exchange for approximately 16,666,667 (50,000,000 common shares at $0.40 per share before the reverse stock split effect discussed in Note 8(f)) of the Company's common shares .

*(l) Steel Wheel Investments Limited.:*   Under an agreement between the Company and Steel Wheel Investments Limited ("Steel Wheel"), a company controlled by the Company's Chief Executive Officer, Steel Wheel provides consulting services to the Company in connection with the duties of the Chief Executive Officer of the Company, for an annual fee plus a discretional cash bonus as approved by the Compensation Committee. Such fees and bonuses for 2008, 2009 and 2010 totaled $2,601, $3,987 and $3,837, respectively and are included in "General and administrative expenses", in the accompanying consolidated statements of operations. Furthermore, as further discussed in Note 11, in 2008 and 2010 certain compensation in stock was granted to Steel Wheel.

## 4.   Vessels held for sale:

The Company has contracted to sell, on a charter free basis, the M/T *Olinda* , the M/T *Tamara* , the M/V *Augusta* , the M/V *Austin* and the M/V *Trenton* for an aggregate price of $89,600. The M/V *Augusta* was delivered to its new owners on January 6, 2011 and the M/T *Tamara* on January 13, 2011. The Company has classified the above five vessels as "Held for sale" in the accompanying December 31, 2010 consolidated balance sheet at their estimated sale proceeds as all criteria required for their classification as "Held for Sale" were met. The estimated loss of approximately $65,913 is included in "Loss on sale of vessels and vessels held for sale" in the accompanying 2010 consolidated statement of operations.

As of December 31, 2009, vessels held for sale consisted of the M/T *Olinda,* the M/V *Pierre* and the M/T *Tigani* , of which the latter two were delivered to their new owners on April 14, 2010 and May 4, 2010, respectively and M/T Olinda's delivery was rescheduled in December 2010 to take place in April 2011. In 2009 the Company recognized an estimated loss of $81,293 and in 2010 a gain of $2,487 due to the change of the sale price of M/T *Tigani* , included in the accompanying 2009 and 2010 consolidated statements of operations under "Loss on sale of vessels and vessels held for sale".

Vessels held for sale are stated at their fair values less cost to sell. The fair values were determined based on the MOA prices (Level 1).

## 5.   Vessels under construction:

On March 8, 2010, the Company concluded three shipbuilding contracts with China Shipbuilding Trading Company, Limited (the "Shipyard"), for the constructions of three Capesize VLOCs with a dwt of 206,000 tons each at a total contract price of $204,300. The vessels are scheduled for delivery in the first, second and third quarters of 2012. The advances paid to the Shipyard as of December 31, 2010, have partially been financed by the

SEDA proceeds (Note 8(c)). Upon their delivery, the vessels are scheduled to commence fixed rate employment as follows:

- the first vessel at a gross daily hire rate of $25 for a minimum period of three years;

- the second vessel at a gross daily hire rate of $23 for a minimum period of five years. The time charter agreement also provides for 50% profit sharing arrangement when the daily Capesize average time charter rate, as defined in the charter party, is between $23 and $40 per day; and

- the third vessel at a gross daily hire rate of $21.5 for a period of seven years. The time charter agreement also provides for a 50% profit sharing arrangement when the daily Capesize average time charter rate, as defined in the charter party, is between $21.5 and $38 per day.

As of December 31, 2010, the Company had paid $45,000 as provided in the shipbuilding contracts, which together with other related costs of $1,618, including capitalized interest of $964 (Note 14) and commissions and supervision fees of $450 and $195 paid to Cardiff and TMS Dry Ltd, respectively (Note 3), is included in "Vessels under construction" in the accompanying December 31, 2010 consolidated balance sheet.

## 6. Vessels, Net:

The amounts in the accompanying consolidated balance sheets are analyzed as follows:

| | Cost | Accumulated Depreciation | Net Book Value |
|---|---|---|---|
| **Balance December 31, 2008** | **$ 644,027** | **$   (56,838)** | **$ 587,189** |
| Additions | 180,501 | (48,180) | 132,321 |
| Impairment — ( Note 2(l)) | (67,903) | 15,203 | (52,700) |
| Vessel held for sale | (153,622) | 22,341 | (131,281) |
| Vessels sold | (136,275) | 23,988 | (112,287) |
| **Balance December 31, 2009** | **$ 466,728** | **$   (43,486)** | **$ 423,242** |
| Additions | 40,196 | (24,594) | 15,602 |
| Transfer from advances for vessel acquisitions | 9,900 | — | 9,900 |
| Vessel sold | (10,750) | 616 | (10,134) |
| Vessels held for sale | (162,646) | 35,180 | (127,466) |
| **Balance December 31, 2010** | **$ 343,428** | **$   (32,284)** | **$ 311,144** |

The Memoranda of Agreement associated with the acquisition of the vessels, M/V *Austin* , M/V *Pierre* , M/V *Trenton* and M/V *Topeka* in 2007 stipulated that the vessels were delivered to the Company with charter parties attached, which expired in 2010. The assumed charters were below market charter rates at the time of the delivery and, accordingly, a portion of the consideration paid for the vessels was allocated to the assumed charters to the extent the vessel capitalized cost would not exceed its fair value without a time charter contract. The Company recorded imputed deferred revenue totaling $31,347, with a corresponding increase in the vessels' purchase price, which is being amortized to revenue on a straight-line basis during the remaining duration of the corresponding charter. The amortization of imputed deferred revenue for 2008, 2009 and 2010, amounted to $10,318, 14,473 and $1,558, respectively and is separately reflected in the accompanying consolidated statements of operations.

On May 21, 2009, the Company signed a MOA with a third party for the sale of M/V *Lansing* at a price of $21,950. The vessel was delivered to its new owners on July 1, 2009. The sale of the vessel resulted in a loss of $14,770 and is included in "Loss on sale of vessels and vessels held for sale" in the accompanying 2009 consolidated statement of operations.

On June 26, 2009, the Company signed a MOA with a third party to purchase the 2004 Capesize bulk carrier (173,880 dwt) M/V *Partagas* for an aggregate price of $56,647 including $560 of commissions paid to Cardiff and pre-delivery expenses of $87. The vessel was delivered on July 30, 2009 and commenced a three year time charter at a gross daily rate of $27.5. The purchase price of the vessel was financed by equity raised under the Company's

Standby Equity Purchase Agreement or SEPA (Note 8(a)) and using the existing Nordea revolving credit facility (Note 7).

On July 8, 2009, the Company signed a MOA with a third party to purchase the 2006 Capesize bulk carrier (173,949 dwt) M/V *Robusto* for an aggregate price of $61,945 including $612.5 of commissions paid to Cardiff and pre-delivery expenses of $82.5. The vessel was delivered on October 19, 2009 and commenced a minimum five year time charter at a gross daily rate of $26. The purchase price of the vessel was financed by equity raised under the Company's SEPA (Note 8(a)) and using the existing Nordea revolving credit facility (Note 7).

On July 10, 2009, the Company signed a MOA with a third party for the sale of M/V *Juneau* at a price of $19,900. The vessel was delivered to its new owners charter free on October 23, 2009. The sale of the vessel resulted in a loss of $16,270 and is included in "Loss on sale of vessels and vessels held for sale" in the accompanying 2009 consolidated statements of operation.

On July 18, 2009, the Company signed a MOA with a third party to purchase a 2006 Capesize bulk carrier (174,200 dwt) M/V *Cohiba* for an aggregate price of $61,909 including $612.5 of commissions paid to Cardiff and pre-delivery expenses of $46.3. The vessel was delivered on December 9, 2009 and commenced a minimum five year time charter at a gross daily rate of $26.25. The purchase price of the vessel was financed by equity raised under the Company's (Note 8(a)) and using the existing Nordea revolving credit facility (Note 7).

On August 7, 2009, the Company signed a MOA with a third party for the sale of M/V *Richmond* at a price of $20.6 million. The vessel was delivered to her new owners on September 30, 2009. The sale of the vessel resulted in a loss of $20,842 and is included in "Loss on sale of vessels and vessels held for sale" in the accompanying 2009 consolidated statements of operation.

On September 30, 2009, the Company signed a MOA with a third party to purchase the 2005 Capesize bulk carrier (180,263 dwt) M/V *Montecristo* for an aggregate price of $50,096 including commissions paid to TMS Dry of $495 and pre-delivery expenses of $101. The vessel was delivered to the Company on June 28, 2010. Following its delivery the vessel commenced a time charter for a minimum period of four years at a gross daily rate of $23.50. The charterer has the option to extend the charter period for an additional four years escalated to a maximum gross daily rate of $24.5. The purchase price of the vessel was partially financed by the equity contribution of Basset (Note 8(f)) and using the Nordea existing revolving credit facility (Note 7).

On October 4, 2010, the Company signed a MOA with a third party for the sale of M/T *Pink Sands* at a price of $11.1 million. The vessel was delivered to its new owners on November 4, 2010. The sale resulted in a gain of $511.

The Company's vessels have been pledged as collateral to secure the bank loans discussed in Note 7.

As of December 31, 2010, except for the M/T *Olinda* and the M/T *Tamara* that are employed in separate tanker pools, and M/V *Austin* and M/V *Trenton* that are both employed in the spot market, the remaining vessels were operating under time charters, the last of which expires in May 2018. Contracts with expected duration in excess of one year as of December 31, 2010, were as follows:

| Vessel Name | Daily Time Charter Gross Rate (In U.S. Dollars) | Estimated Expiration of Charter* |
|---|---|---|
| **Drybulk Carriers** | | |
| M/V *Robusto* | $26,000 | August 2014 — March 2018 |
| M/V *Cohiba* | $26,250 | October 2014 — May 2018 |
| M/V *Partagas* | $27,500 | July 2012 — December 2012 |
| M/V *Montecristo* | $23,500 | May 2014 — January 2018 |
| M/V *Topeka* | $15,000 | January 2012 — April 2013 |
| M/V *Helena* | $32,000 | May 2012 — October 2016 |
| **Drybulk Carrier Held for Sale** | | |
| M/V *Augusta* | $16,000 | January 2011 (Note 16(a)) |

DF-21

_____

\* The Estimated Expiration of Charter provides the estimated latest redelivery dates presented above, except for M/V *Augusta* , at the end of any redelivery optional periods.

**7. Long-term Debt:**

As of December 31, 2010, the Company's long-term debt totaled $209,772 ($265,674 as of December 31, 2009) relating to a credit facility with Nordea Bank Norge ASA ("Facility" or "Nordea Credit Facility") and a term loan with DVB Bank SE ("loan" or "DVB loan").

*Nordea Credit Facility*

On September 18, 2007, the Company entered into an agreement with Nordea Bank Norge ASA ("Nordea"), for a $325,000 Senior Secured Credit Facility for the purpose of refinancing the then outstanding balance of $118,000 of a facility with Fortis Bank concluded in June 2007, to partially finance the acquisition cost of vessels M/V *Trenton* , M/V *Pierre* , M/V *Austin* , M/V *Juneau* , M/V *Lansing* , M/V *Helena* , M/V *Topeka* , M/V *Richmond* and M/T *Pink Sands* and financing the acquisition of additional vessels. The Company and Nordea completed the syndication of the Nordea credit facility on February 12, 2008 which resulted in certain amendments to repayment terms and financial covenants, increased interest margins and commitment fees on the undrawn portion of the Facility.

On January 9, 2009, the Company entered into an amendatory agreement to the Nordea credit facility which became effective on January 23, 2009 and waived the breach of the collateral maintenance coverage ratio covenant contained in such credit facility resulting from the decrease in the market value of the Company's vessels and reduced the level of the collateral maintenance coverage ratio for the remaining term of the agreement. The waiver was effective from the date the breach occurred, which was December 9, 2008. Under the terms of the amendatory agreement the Company on January 23, 2009, made a prepayment of $25,000, and among other requirements, is also required (i) to ensure that under the reduced collateral maintenance coverage ratio, the aggregate fair market value of the vessels in the Company's fleet other than the M/T *Tamara* and M/T *Tigani* , plus proceeds from a vessel's sale or insurance proceeds from a vessel's loss, and the excess of the fair market value of each of the M/T *Tamara* and M/T *Tigani* over the recorded amount of the first priority ship mortgage over each such vessel under the Company's DVB loan, described below, be not less than (a) 90% of the aggregate outstanding balance under the Nordea credit facility plus any unutilized commitment in respect of Tranche A until June 30, 2009, (b) 100% of the aggregate outstanding balance under the Nordea credit facility plus any unutilized commitment in respect of Tranche A from July 1, 2009 to December 31, 2009, (c) 110% of the aggregate outstanding balance under the Nordea credit facility plus any unutilized commitment in respect of Tranche A from January 1, 2010 to March 31, 2010, (d) 115% of the aggregate outstanding balance under the Nordea credit facility plus any unutilized commitment in respect of Tranche A from April 1, 2010 to June 30, 2010, and (e) 125% of the aggregate outstanding balance under the Nordea credit facility plus any unutilized commitment in respect of Tranche A at all times thereafter; (ii) to pay interest at an increased margin over LIBOR; (iii) to suspend the payment of dividends; and (iv) to pay the sellers' credit only with the proceeds of new equity offerings or, common shares, which the seller may request at any time, (v) from the closing date and until all commitments are terminated and all amounts due under the Facility have been repaid, the weighted average age of the vessels (weighted by the fair market value of the vessels) shall not exceed 18 years; if any vessel reaches the age of 21 years or more during this period, such vessel shall be assigned no value in the calculation of the aggregate fair market value of the vessels and (vi) liquidity must be at least $500 multiplied by the number of vessels owned.

As provided in the first amendatory agreement to the Nordea credit facility, in the case of a sale of a vessel the Company has the option of either using the sale proceeds for the prepayment of the facility or depositing such proceeds in an escrow account pledged in favor of Nordea and using the funds to finance the purchase of a new vessel of the same type or better within 90 days. The Company made use of this option and used the sale proceeds of the M/V *Lansing* , M/V *Richmond* , M/V *Juneau* and M/V *Pierre* to partially finance the acquisition of M/V *Partagas* , M/V *Robusto,* M/V *Cohiba* and M/V *Montecristo* , respectively.

On November 4, 2010, following the sale of M/T *Pink Sands* , the Company decided not to exercise its option to use the proceeds for a replacement vessel and accordingly made a mandatory prepayment of the loan of $5,856 ($3,854 and $2,002 for Tranch A and Tranch B, respectively).

The amended Nordea credit facility is comprised of the following two Tranches and bears interest at LIBOR plus a margin:

Tranche A is a reducing revolving credit facility in a maximum amount of $200,000 of which the Company utilized $199,000 to repay the outstanding balance of the credit facility with Fortis of $118,000, to partially finance the acquisition of vessels and for working capital purposes. As of December 31, 2010, following the mandatory prepayment of $24,654 in 2011, due to the sale of M/V *Augusta* , M/V *Austin* and M/V *Trenton* (Note 16) the balance of Tranche A of $110,493 will be reduced or repaid in nine semi-annual equal installments in the amount of $8,744 each and a balloon installment in an amount of $31,797.

Tranche B is a term loan facility in a maximum amount of $125,000 which was fully utilized to partially finance the acquisition of vessels. As of December 31, 2010, following the mandatory prepayment of $11,577 due to the sale of M/V *Augusta* , M/V *Austin* and M/V *Trenton* (Note 16), the balance of Tranche B of $58,643 is repayable in one installment of $6,752 followed by nine equal consecutive semi-annual installments in the amount of $5,520 each and a balloon installment in the amount of $2,211.

The Facility is secured with first priority mortgages over the vessels, first priority assignment of vessels' insurances and earnings, specific assignment of the time charters, first priority pledges over the operating and retention accounts, corporate guarantee and pledge of shares.

### DVB Loan agreement

On December 23, 2008, the Company entered into a loan agreement with DVB Bank SE ("DVB") for a new secured term loan facility for an amount of $29.56 million, which was fully drawn in January 2009. The Company used the proceeds of the loan to make the prepayment in the amount of $25.0 million under its amendatory agreement to its Nordea credit facility. On May 4, 2010, the M/T *Tigani* was sold and as provided in the loan agreement a mandatory prepayment of the loan of $8,562 was made, which proportionally reduced the then outstanding loan installments. As a result the balance of the loan at December 31, 2010 of $4,406 is repayable in eight equal quarterly installments of $517.5 each, plus a balloon installment of $266 payable together with the last installment. The loan bears interest at 3.0% over LIBOR. The loan is secured with first preferred mortgage on the M/T *Tamara* , a corporate guarantee by the Company, assignment of earnings and insurances and a pledge of shares of the borrower. The loan agreement includes, among other covenants, financial covenants requiring that (i) liquidity must be at least $500 multiplied by the number of vessels owned, (ii) total interest bearing liabilities over the sum of total interest bearing liabilities plus shareholders' equity adjusted to account for the market value of the vessel must not exceed 90% up to June 30, 2010, 80% up to December 31, 2010 and 70% thereafter; (iii) the ratio of EBITDA to net interest expense of any accounting period must not be less than 2.50 to 1; and (iv) the aggregate charter free fair market value of the vessel must not be less than 140% (increasing by five percentage points each year, reaching 155% in the last year) of the aggregate outstanding balance. The Company is permitted to pay dividends under the loan of up to 50% of quarterly net profits. The loan agreement contains certain events of default, including a change of control, a cross-default with respect to other financial indebtedness and a material adverse change in the financial position or prospects of the borrowers or the Company. Upon signing the loan agreement, the Company paid an upfront fee of $443.5, which was included in "Deferred Financing fees" in the accompanying December 31, 2009 and 2010 consolidated balance sheets and is amortized in accordance with the policy discussed in Note 2(n).

On December 17, 2010, the Company signed a MOA for the sale of M/T *Tamara* . The vessel was delivered to its new owners on January 13, 2011 Accordingly the balance of the loan as of December 31, 2010, of $4,406 has been classified as current (Note 16(b)).

The principal payments required to be made after December 31, 2010 for the long-term debt discussed above are as follows:

| Year Ending December 31, | Nordea Tranche A(1) | Nordea Tranche B(1) | DVB | Total |
|---|---|---|---|---|
| 2011 | $  42,140 | $  23,849 | $4,406 | $ 70,397 |
| 2012 | 17,488 | 11,040 | — | 28,528 |
| 2013 | 17,488 | 11,040 | — | 28,528 |
| 2014 | 17,488 | 11,040 | — | 28,528 |
| 2015 | 40,540 | 13,251 | — | 53,791 |
| | $  135,146 | $  70,220 | $4,406 | $209,772 |

_____

(1)  The current portion of the long term debt on the December 31, 2010, Consolidated Balance Sheet has further been adjusted to reflect the estimated amount of $11,934 to be prepaid as a result of the contemplated sale of M/T  *Olinda* .

Total interest expense for 2008, 2009 and 2010 amounted to $14,836, $10,561 and 6,856, respectively, and is included in "Interest and finance costs" in the accompanying 2008, 2009 and 2010 consolidated statements of operations (Note 14). The Company's weighted average interest rate (including the margin) for 2008, 2009 and 2010 was 4.49%, 3.41% and 2.88%, respectively.

## 8.  Common Stock and Additional Paid-In Capital:

*(a) Stockholders' Rights Agreement :*  On April 17, 2008, the Company approved a Stockholders' Rights Agreement with American Stock Transfer & Trust Company, as Rights Agent, effective as of April 30, 2008. Under this Agreement, the Company declared a dividend payable of one preferred share purchase right, or Right, to purchase one one-thousandth of a share of the Company's Series A Participating Preferred Stock for each outstanding share of OceanFreight Inc. Class A common stock, par value U.S. $0.01 per share. The Rights will separate from the common stock and become exercisable after (1) the 10th day after public announcement that a person or group acquires ownership of 20% or more of the Company's common stock or (2) the 10th business day (or such later date as determined by the Company's board of directors) after a person or group announces a tender or exchange offer which would result in that person or group holding 20% or more of the Company's common stock. On the distribution date, each holder of a Right will be entitled to purchase for $100 (the "Exercise Price") a fraction (1/1000th) of one share of the Company's preferred stock which has similar economic terms as one share of common stock. If an acquiring person (an "Acquiring Person") acquires more than 20% of the Company's common stock then each holder of a Right (except an Acquiring Person) will be entitled to buy at the exercise price, a number of shares of the Company's common stock which has a market value of twice the exercise price. Any time after the date an Acquiring Person obtains more than 20% of the Company's common stock and before that Acquiring Person acquires more than 50% of the Company's outstanding common stock, the Company may exchange each Right owned by all other Rights holders, in whole or in part, for one share of the Company's common stock. The Company can redeem the Rights at any time on or prior to the earlier of a public announcement that a person has acquired ownership of 20% or more of the Company's common stock, or the expiration date. The Rights expire on the earliest of (1) May 12, 2018 or (2) the exchange or redemption of the Rights as described above. The terms of the rights and the Stockholders Rights Agreement may be amended without the consent of the Rights holders at any time on or prior to the Distribution Date. After the Distribution Date, the terms of the rights and the Stockholders Rights Agreement may be amended to make changes that do not adversely affect the rights of the Rights holders (other than the Acquiring Person). The Rights do not have any voting rights. The Rights have the benefit of certain customary anti-dilution protections.

Under the Amended and Restated Stockholders Rights Agreement effective May 26, 2010, the purchase by Basset Holdings Inc. ("Basset") of shares of the Company's Common Stock directly from the Company in a transaction approved by the Company's Board of Directors in May 2010, shall not cause Basset Holdings Inc., or any beneficial owner or Affiliate or Associate thereof, to be considered an "Acquiring Person"; provided, however, that should Basset or any Affiliate or Associate of Basset thereafter acquire additional shares of Common Stock

constituting 1% or more of the Company's Common Stock then outstanding, and thereby beneficially own 20% or more of the Company's Common Stock then outstanding, other than by reason of an equity incentive award issued to Basset or such Affiliate or Associate by the Company's Board of Directors or a duly constituted committee thereof, then such Person shall be deemed an "Acquiring Person" for purposes of this Agreement.

*(b) Standby Equity Purchase Agreement — ("SEPA"):*   On January 30, 2009, the Company entered into a Standby Equity Purchase Agreement, or the SEPA, with YA Global Master SPV Ltd., or YA Global, for the offer and sale of up to $147.9 million of its common shares, par value $0.01 per share. In accordance with the terms of the SEPA, the Company sold 23,950,000 (71,850,000 before the reverse stock split effect) common shares with net proceeds amounting to $109,909. YA Global received a discount equal to 1.5% of the gross proceeds or $1,674. The SEPA was terminated on May 21, 2009. Of the SEPA proceeds, $25,000 was used to fully repay the sellers' credit of the M/T *Tamara* and M/T *Tigani*.

*(c) Amendment of the Company's Articles of Incorporation:*   On July 13, 2009, during the Company's annual general meeting of shareholders, the Company's shareholders approved an amendment to the Company's articles of incorporation to increase the Company's authorized common shares from 31,666,667 (95,000,000 before the reverse stock split effect)) common shares to 333,333,333 (1,000,000,000 before the reverse stock split effect) common shares.

*(c) Standby Equity Distribution Agreement — ("SEDA"):*   On July 24, 2009, the Company entered into a Standby Equity Distribution Agreement, or the SEDA, with YA Global, pursuant to which the Company may offer and sell up to $450,000 of the Company's common shares to YA Global. The SEDA commenced on September 28, 2009 and terminated on March 18, 2010. YA Global was entitled to receive a discount equal to 1.5%. As of December 31, 2009, 22,685,169 (68,055,508 before the reverse stock split) common shares had been sold with net proceeds amounting to $78,970. During the period from January 1, 2010 to March 18, 2010, 6,717,667 (20,150,000 before the reverse stock split) common shares were sold with net proceeds of $19,257. During the period from the commencement of the offering on September 28, 2009 to the termination of the offering on March 18, 2010, the Company sold 29,401,836 (88,205,508 before the reverse stock split) common shares with net proceeds amounting to $98,227, and YA Global received a discount equal to 1.5% of the gross proceeds or $1,496.

*(d) Shelf Registration Statement:*   On January 12, 2010, the Company filed a shelf registration statement on Form F-3, which was declared effective on January 21, 2010, pursuant to which it may sell up to $400,000 of an undeterminable number of securities.

*(e) Equity Incentive Plan — ("2010 Equity Incentive Plan"):*   On January 14, 2010, the Company's Board of Directors adopted and approved the 2010 Equity Incentive Plan, under which 10,000,000 (30,000,000 before the reverse stock split) common shares were reserved for issuance. On January 18, 2010, the Company's Board of Directors adopted and approved in all respects the resolutions of the meetings of the Compensation Committee held on January 15, 2010, pursuant to which 1,000,000 (3,000,000 before the reverse stock split) common shares were awarded to Steel Wheel Investments Limited, a company controlled by the Company's Chief Executive Officer and 66,667 (200,000 before the reverse stock split) common shares were awarded to the Company's Directors and officers. On December 17, 2010, the Company's Board of Directors approved in all respects the resolutions of the meetings of the Compensation Committee held on December 17, 2010, pursuant to which 6,000,000 were awarded to Steel Wheel Investments Limited, a company controlled by the Company's Chief Executive Officer.

*(f) Equity Infusion:*   On May 25, 2010, the Company's Board of Directors approved an equity infusion of $20,000 by Basset Holdings Inc. ("Basset"), a company controlled by Mr. Anthony Kandylidis the Company's CEO, in order to fund the Company's capital needs for the purchase of M/V *Montecristo* . On May 28, 2010, Basset paid the amount of $20,000 in exchange for approximately 16,666,667 (50,000,000 before the reverse stock split at a price of $0.40 per share) of the Company's common shares.

In determining the fair value of the shares to be issued in connection with the equity infusion, the Company used multiple inputs from different sources, including: (a) analyst target prices, (b) multiples-based valuation and (c) net asset value method. The Company considered the results of such analyses, together with: (1) the importance of the equity infusion, (2) the size of the equity infusion versus the limited market liquidity, and (3) the opportunity cost of the capital contribution for other similar investment opportunities. Given the specific circumstances of the

equity infusion, the results of the analysis and the factors described above, the Company approved the equity infusion of $20,000 in exchange of approximately 16,666,667 (50,000,000 before the reverse stock split effect) of the Company's common shares at a price of $0.40 per share before the reverse stock split effect.

On May 26, 2010, the Stockholders Right Agreement that the Company entered into on April 30, 2008, was amended and restated in connection with the above transaction such that Basset would not fall within the definition of "Acquiring Person" under the agreement.

*(g) Share Price and Reverse Stock Split:*   Under the rules of the NASDAQ Stock Market, listed companies are required to maintain a share price of at least $1.00 per share and if the closing share price stays below $1.00 for a period of 30 consecutive business days, then the listed company would have a cure period of at least 180 days to regain compliance with the $1.00 per share minimum. In the event the Company does not regain compliance within the period of 180 days, its securities will be subject to delisting. In addition if the market price of the common shares remains below $5.00 per share, under stock exchange rules, the Company's shareholders will not be able to use such shares as collateral for borrowing in margin accounts. The Company's stock price declined below $1.00 per share for a period of 30 consecutive business days, and on March 1, 2010 the Company received notice from the NASDAQ Stock Market that it is not in compliance with the minimum bid price rule. In order for the Company to regain compliance, its Board of Directors proposed a 3:1 reverse stock split, which automatically converted three current shares of the Company's class A common shares into one new share of common stock. The reverse stock split was approved by the Company's shareholders at the Annual General Meeting held on June 10, 2010. The reverse stock split took effect on June 17, 2010, and accordingly, the Company's authorized Class A common stock was converted to 333,333,333 shares, and the then issued and outstanding common stock of 231,800,001 common shares was converted to 77,266,655 common shares. Following the reverse stock split the Company's stock remained above $1.00 for a period of 10 consecutive business days and, as a result, on August 6, 2010, the Company received notice from the NASDAQ Stock market that it had regained compliance with the minimum bid price requirement and the compliance matter was closed

As of December 31, 2010, the Company's issued and outstanding stock amounted to 83,266,655 common shares. Common share shareholders are entitled to one vote on all matters submitted to a vote of shareholders and to receive interest, if any.

## 9.  Earnings/ (losses) per Share:

The components for the calculation of earnings/(losses) per common and subordinated share, basic and diluted, for the years ended December 31, 2008, 2009 and 2010, are as follows:

|  | 2008 | 2009 | 2010 |
| --- | --- | --- | --- |
| **Net income/(loss)** | $ 27,722 | $(178,682) | $(61,625) |
| — Less dividends paid |  |  |  |
| Common shares | (47,772) | — | — |
| Subordinated shares | — | — | — |
| **Undistributed losses** | $(20,050) | $(178,682) | $(61,625) |
| **Allocation of undistributed losses Common Shares:** |  |  |  |
| — 6,181,498, 52,816,667 and 83,266,655,as of December 31, 2008, 2009 and 2010, respectively | $(19,737) | $(178,682) | $(61,625) |
| **Subordinated shares** |  |  |  |
| — nil as of December 31, 2008, 2009 and 2010, respectively | — | — | — |
|  | $(19,737) | $(178,682) | $(61,625) |

DF-26

*Basic and diluted per share amounts:*

|  | Common Shares | | |
|---|---|---|---|
|  | **2008** | **2009** | **2010** |
| Distributed earnings | $ 10.00 | $ — | $ — |
| Undistributed losses | (4.20) | (6.81) | (0.87) |
| Total | $ 5.82 | $ (6.81) | $ (0.87) |
| Weighted average number of shares basic and diluted | 4,773,824 | 26,185,442 | 70,488,531 |

Due to the conversion of the subordinated shares into common shares during August 2008, the basic and diluted per share amounts are presented only for common shares for the year ended December 31, 2008, 2009 and 2010.

**10.   Derivatives and Fair Value Measurements:**

*Interest rate swaps*

On January 29, 2008, the Company entered into two interest rate swap agreements with Nordea, the Company's lending bank, to partially hedge its exposure to fluctuations in interest rates on a notional amount of $316,500 ($236,222 as of December 31, 2010), decreasing in accordance with the debt repayments, by converting the variable rate of its debt to fixed rate for a period of 5 years, effective April 1, 2008. Under the terms of the interest rate swap agreement the Company and the bank agreed to exchange at specified intervals, the difference between paying a fixed rate at 3.55% and a floating rate interest amount calculated by reference to the agreed notional amounts and maturities. These instruments have not been designated as cash flow hedges under ASC 815, Derivatives and Hedging and, consequently, the changes in fair value of these instruments are recorded through earnings. The fair value of these instruments at December 31, 2010, is determined based on observable Level 2 inputs, as defined in ASC 820, Fair Value Measurements and Disclosures, derived principally from or corroborated by observable market data. Inputs include quoted prices for similar assets, liabilities (risk adjusted) and market-corroborated inputs, such as market comparables, interest rates, yield curves and other items that allow value to be determined. The fair value of these instruments at December 31, 2009 amounted to a liability of $11,049 (excluding accrued interest receivable of $2,243), of which the current and non-current portions of $7,443 and $3,606, respectively, are included in current and non-current derivative liabilities in the accompanying consolidated balance sheet as of December 31, 2009. The fair value of these instruments at December 31, 2010 amounted to a liability of $11,602 (excluding accrued interest payable of $1,947), of which the current and non-current portions of $6,727 and $4,875, respectively, are included in current and non-current derivative liabilities in the accompanying consolidated balance sheet as of December 31, 2010. The unrealized result of the change in the fair value of these instruments for the years ended December 31, 2008, 2009 and 2010, was a loss of $16,147, a gain of $5,098 and an a loss of $553, respectively, and are included in "Loss on derivative instruments" in the accompanying consolidated statements of operations. The realized loss of these instruments for the years ended December 31, 2008, 2009 and 2010, was $1,037, $7,665 and $8,160, respectively, and is included in "Loss on derivative instruments" in the accompanying consolidated statements of operations.

The amounts for 2008 ($1,037) and 2009 ($7,665) previously included in "Interest and finance costs" (Note 14) were reclassified to "Loss on derivative instruments" to conform to the December 31, 2010, presentation.

*Forward Freight Agreements (FFAs)*

In May 2009, the Company engaged in Forward Freight Agreements (FFA) trading activities. The Company trades in the FFAs market with both an objective to utilize them as economic hedging instruments in reducing the risk on specific vessel(s), freight commitments, or the overall fleet or operations, and to take advantage of short term fluctuations in the market prices. FFAs trading generally have not qualified as hedges for accounting purposes and as such, the trading of FFAs could lead to material fluctuations in the Company's reported results from operations on a period to period basis. The open positions of FFAs are "marked to market" quarterly, using quoted prices in active markets for identical instruments (Level 1 inputs), to determine the fair values. As of December 31, 2009 and 2010, all FFA positions had been closed.

DF-27

The net realized gain/(loss) from FFAs for the year ended December 31, 2009 and 2010 amounted to $570 and $(4,342), respectively, and is separately reflected in the accompanying 2009 and 2010 consolidated statements of operations.

### *Fair value measurements*

The carrying amounts reflected in the accompanying Consolidated Balance Sheets of financial assets and accounts payable approximate their respective fair values due to the short maturity of these instruments. The fair value of long-term bank loans with variable interest rates approximate the recorded values, generally due to their variable interest rates.

The following tables set forth by level our assets and liabilities that are measured at fair value on a recurring and non-recurring basis. As required by the fair value guidance, assets and liabilities and are categorized in their entirety based on the lowest level of input that is significant to the fair value measurement.

| | Fair Value Measurements as of December 31, 2010 | | | |
| | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Recurring Measurements** | | | | |
| Interest rate swaps liability position | $11,602 | $— | $11,602 | $— |
| Total | $11,602 | $— | $11,602 | $— |

| | | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
|---|---|---|---|---|
| **Non-Recurring Measurements** | Total | | | |
| Long lived assets held for sale | $88,274 | $88,274 | $— | $— |
| Total | $88,274 | $88,274 | $— | $— |

### 11.  Stock based compensation:

On February 12, 2008, the Company granted 26,667 (80,000 before the reverse stock split effect) restricted subordinated shares, vesting 25% annually, to Steel Wheel Investments Limited, a company providing consulting services to the Company in connection with the duties of the Chief Executive Officer, which is controlled by the Chief Executive Officer, subject to contractual restrictions, including applicable vesting period. The shares were issued on March 27, 2008. Following the conversion of the Company's subordinated shares into common shares on August 15, 2008, the aggregate of 26,667 (80,000 before the reverse stock split effect) restricted subordinated shares mentioned above vested immediately as provided in the related agreements. In addition, in March 2008, the Company issued 1,716 (5,150 before the reverse stock split effect) ) shares to Sebert Shipping Co. a company providing consulting services to the Company and was controlled by the former Chief Operating Officer of the Company. Following the resignation of the former Chief Operating Officer in March 2009, the shares vested immediately pursuant to a resolution of the Company's Board of Directors.

Following the conversion of the Company's subordinated shares into common shares, the aggregate of 28,383 (85,150 before the reverse stock split effect) restricted subordinated shares mentioned above vested immediately as provided in the related agreements.

On January 14, 2010, the Company's Board of Directors adopted and approved the 2010 Equity Incentive Plan, under which 10,000,000 (30,000,000 before the reverse stock split) common shares were reserved for issuance. On January 18, 2010, the Company's Board of Directors adopted and approved in all respects the resolutions of the meetings of the Compensation Committee held on January 15, 2010, pursuant to which 1,000,000 (3,000,000 before the reverse stock split) common shares were awarded to Steel Wheel Investments Limited, a company controlled by the Company's Chief Executive Officer and 66,667 (200,000 before the reverse stock split effect) common shares were

DF-28

awarded to the Company's Directors and officers. On December 17, 2010, the Company's Board of Directors adopted and approved in all respects the resolutions of the meeting of the Compensation Committee held on December 17, 2010, pursuant to which 6,000,000 common shares were awarded to Steel Wheel Investments Limited, a company controlled by the Company's Chief Executive Officer.

There were 7,056,667 unvested shares as of December 31, 2010. Compensation cost recognized in the years 2008, 2009 and 2010 amounted to $2,701, $44 and $1,064, respectively. The compensation cost related to non-vested shares amounts to $7,676 with a weighted average remaining contractual life of 32 months.

## 12.   Income Taxes:

Under the laws of the Republic of Marshall Islands, Cyprus, Liberia and Malta, the companies are not subject to tax on international shipping income; however, they are subject to registration and tonnage taxes, which have been included in vessel operating expenses in the accompanying consolidated statement of operations.

Pursuant to the Internal Revenue Code of the United States (the "Code"), U.S. source income from the international operations of ships is generally exempt from U.S. tax if the company operating the ships meets both of the following requirements: (a) the Company is organized in a foreign country that grants an equivalent exemption to corporations organized in the United States and (b) either (i) more than 50% of the value of the Company's stock is owned, directly or indirectly, by individuals who are "residents" of the Company's country of organization or of another foreign country that grants an "equivalent exemption" to corporations organized in the United States (50% Ownership Test) or (ii) the Company's stock is "primarily and regularly traded on an established securities market" in its country of organization, in another country that grants an "equivalent exemption" to United States corporations, or in the United States (Publicly-Traded Test).

Under the regulations, the Company's stock will be considered to be "regularly traded" on an established securities market if (i) one or more classes of its stock representing 50 percent or more of its outstanding shares, by voting power and value, is listed on the market and is traded on the market, other than in minimal quantities, on at least 60 days during the taxable year; and (ii) the aggregate number of shares of our stock traded during the taxable year is at least 10% of the average number of shares of the stock outstanding during the taxable year. Notwithstanding the foregoing, the regulations provide, in pertinent part, that each class of the Company's stock will not be considered to be "regularly traded" on an established securities market for any taxable year in which 50% or more of the vote and value of the outstanding shares of such class are owned, actually or constructively under specified stock attribution rules, on more than half the days during the taxable year by persons who each own 5% or more of the value of such class of the Company's outstanding stock ("5 Percent Override Rule").

In the event the 5 Percent Override Rule is triggered, the regulations provide that the 5 Percent Override Rule will nevertheless not apply if the Company can establish that among the closely-held group of 5% Stockholders, there are sufficient 5% Stockholders that are considered to be "qualified stockholders" for purposes of Section 883 to preclude non-qualified 5% Stockholders in the closely-held group from owning 50% or more of each class of the Company's stock for more than half the number of days during the taxable year.

Treasury regulations are effective for calendar year taxpayers, like the Company, beginning with the calendar year 2005. All the Company's ship-operating subsidiaries currently satisfy the 50% Ownership Test. In addition, following the completion of the Initial Public Offering of the Company's shares, the management of the Company believes that by virtue of a special rule applicable to situations where the ship operating companies are beneficially owned by a publicly traded company like the Company, the Publicly Traded Test can be satisfied based on the trading volume and the widely-held ownership of the Company's shares, but no assurance can be given that this will remain so in the future, since continued compliance with this rule is subject to factors outside the Company's control.

## 13.   Commitments and Contingencies:

Various claims, suits, and complaints, including those involving government regulations and product liability, arise in the ordinary course of shipping business. In addition, losses may arise from disputes with charterers, agents, insurance and other claims with suppliers relating to the operations of the Company's vessels. Currently

management is not aware of any such claims or contingent liabilities which should be disclosed, or for which a provision should be established in the accompanying consolidated financial statements.

The Company accrues for the cost of environmental liabilities when management becomes aware that a liability is probable and is able to reasonably estimate the probable exposure. Currently, management is not aware of any such claim or contingent liabilities which should be disclosed, or for which a provision should be established in the accompanying consolidated financial statements. Up to $1 billion of the liabilities associated with the individual vessels' actions, mainly for sea pollution, are covered by the Protection and Indemnity (P&I) Club Insurance.

On August 13, 2007, the Company entered into a six-year lease for office facilities in Athens, which expires in August 2013 with the Company's option to extend the agreement through October 1, 2017. The monthly lease payment is Euro 5,175 ($6.85 based on the Euro to USD exchange rate at December 31, 2010) and is adjusted on August 1st of each year based on the inflation rate announced by the Greek State as defined in the agreement. On September 30, 2010, the Company gave notice to the owner for the termination of the lease agreement as of December 31, 2010. Based on the provisions of Greek law, the Company paid the owner a penalty equal to one month rental and the lease obligation up to December 31, 2010 and the lease agreement was terminated.

As further disclosed in Note 5 the Company has signed three shipbuilding contracts for the construction of three VLOCs. As of December 31, 2010, the amounts due until delivery of the vessels are as follows:

| Year | Amount |
|---|---|
| 2011 | $ 40,860 |
| 2012 | 118,440 |
| Total | $159,300 |

Future minimum contractual charter revenue deriving from vessels' long-term charter contracts represents revenue until the earliest redelivery of each vessel and includes also the revenue to be earned from vessels under construction. As of December 31, 2010, future contractual revenue is as follows:

| Year | Amount |
|---|---|
| 2011 | $ 54,877 |
| 2012 | 51,077 |
| 2013 | 53,016 |
| 2014 | 42,044 |
| 2015 | 18,518 |
| 2016 and thereafter | 42,772 |
| Total | $262,304 |

Revenue amounts do not include any assumed off-hires.

As further disclosed in Note 3 the Company has contracted the commercial and technical management of its vessels to TMS Dry Ltd and TMS Tankers Ltd. For these services it pays a monthly management fee. Such management fees until the expiration of the agreements are as follows:

| Year | Amount |
|---|---|
| 2011 | $ 4,624 |
| 2012 | 5,393 |
| 2013 | 6,530 |
| 2014 | 6,531 |
| 2015 | 2,970 |
| Total | $26,048 |

**14.   Interest and Finance Costs:**

The amounts included in the accompanying consolidated statements of operations are analyzed as follows:

|  | 2008 | 2009 | 2010 |
|---|---|---|---|
| Interest on long-term debt | $14,836 | $10,561 | $6,856 |
| Capitalized interest | — | — | (964) |
| Amortization and write-off of financing fees | 475 | 744 | 538 |
| Long-term debt commitment fees | 16 | 7 | — |
| Finance expenses | 1,127 | 709 | 255 |
| Other | 74 | 148 | 90 |
|  | $16,528 | $12,169 | $6,775 |

The realized result (loss) of the change in the fair value of the interest rate swaps discussed in Note 10 for the years ended December 31, 2008 and 2009, of $1,037 and $7,665, respectively, previously included in "Interest and finance costs" were reclassified to "Loss on derivative instruments" to conform with the December 31, 2010 presentation. In addition as a result of the above reclassification the amounts of interest paid in the consolidated statements of cash flows for the years ended December 31, 2008 and 2009, were changed from $12,340 and $18,509, respectively, to $11,044 and $13,339, respectively.

**15.   Segment Information:**

The table below presents information about the Company's reportable segments as of December 31, 2008, 2009 and 2010 and for the years then ended. The accounting policies followed in the preparation of the reportable segments are the same as those followed in the preparation of the Company's consolidated financial statements.

| December 31, 2008 | Drybulk Carriers | Tankers | Other | Total |
|---|---|---|---|---|
| Revenues from external customers | $114,758 | $ 42,676 | $      — | $157,434 |
| Interest and finance costs | (11,173) | (5,316) | (39) | (16,528) |
| Interest income | — | — | 776 | 776 |
| Loss on interest rate swaps | (12,076) | (5,108) | — | (17,184) |
| Depreciation and amortization | (32,865) | (10,762) | (31) | (43,658) |
| Segment profit/(loss) | 31,766 | 4,260 | (8,304) | 27,722 |
| Total assets | $408,680 | $184,753 | $32,137 | $625,570 |

| December 31, 2009 | Drybulk Carriers | Tankers | Other | Total |
|---|---|---|---|---|
| Revenues from external customers | $ 96,672 | $ 36,263 | $ 570 | $ 133,505 |
| Loss on sale of vessels and vessels held for sale | (69,250) | (63,926) | — | (133,176) |
| Interest and finance costs | (7,333) | (4,791) | (45) | (12,169) |
| Interest income | — | — | 271 | 271 |
| Loss on interest rate swaps | (1,856) | (711) | — | (2,567) |
| Depreciation and amortization | (30,100) | (18,080) | (92) | (48,272) |
| Impairment on vessels | — | (52,700) | — | (52,700) |
| Segment loss | (46,248) | (124,865) | (7,569) | (178,682) |
| Total assets | $444,180 | $ 56,253 | $48,839 | $ 549,272 |

| December 31, 2010 | Drybulk Carriers | Tankers | Other | Total |
|---|---|---|---|---|
| Revenues from external customers | $ 71,844 | $26,004 | $ — | $ 97,848 |
| Gain/(loss) on sale of vessels and vessels held for sale | (65,711) | 2,782 | — | (62,929) |
| Interest and finance costs, net of capitalized interest | (4,270) | (2,461) | (44) | (6,775) |
| Interest Income | — | — | 119 | 119 |
| Loss on interest rate swaps | (7,202) | (1,511) | — | (8,713) |
| Depreciation and amortization | (23,252) | (1,342) | (259) | (24,853) |
| Segment profit/(loss) | (62,193) | 8,976 | (8,408) | (61,625) |
| Total assets | $428,187 | $33,588 | $17,088 | $478,863 |

### 16.   Subsequent Events:

(a) On October 4, 2010, the Company contracted to sell the M/V *Augusta* (Note 4). The vessel was delivered to its new owners on January 6, 2011. Of the sale proceeds an amount of $11,580 was used to partially repay the Nordea credit facility (Note 7). The sale resulted in a loss of $31,628 reflected as an impairment loss and is included in "Loss on sale of vessels and vessels held for sale" in the accompanying consolidated statement of operations for the year ended December 31, 2010

(b) On December 17, 2010, the Company contracted to sell the M/T *Tamara* (Note 4). The vessel was delivered to its new owners on January 13, 2011. Of the sale proceed an amount of $4,406 was used to fully repay the DVB term loan (Note 7). The sale resulted in a gain of $858 recorded in 2011.

(c) Under the rules of The Nasdaq Stock Market, listed companies are required to maintain a share price of at least $1.00 per share and if the closing share price stays below $1.00 for a period of 30 consecutive business days, then the listed company would have a cure period of at least 180 days to regain compliance with the $1.00 per share minimum. The Company's stock price has declined below $1.00 per share for a period of 30 consecutive business days, and on January 25, 2011 the Company received notice from the Nasdaq Stock Market that it is not in compliance with the minimum bid price rule.

(d) On January 1, 2011, the Company leased office space in Athens, Greece, from a family member of Mr. George Economou. The lease has a duration of five years. The monthly rental for the first two years amounts to Euro 1,000 ($1.33 at the December 31, 2010 exchange rate) and thereafter is annually adjusted based on the annual inflation rate announced by the Greek State.

(e) On February 24, 2011, the Company signed a letter of commitment with a major Chinese bank for the financing of up to 60% of the aggregate construction cost of the three VLOCs discussed in Note 5.

(f) On November 19, 2010, the Company contracted to sell the M/V *Austin* (Note 4). The vessel was delivered to its new owners on March 10, 2011. Of the sale proceeds an amount of $12,325 was used to partially repay the Nordea credit facility (Note 7). The sale resulted in a loss of $17,184 reflected as an impairment loss and is included in "Loss on sale of vessels and vessels held for sale" in the accompanying consolidated statement of operations for the year ended December 31, 2010.

(g) On November 19, 2010, the Company contracted to sell the M/V *Trenton* (Note 4). The vessel was delivered to its new owners on March 11, 2011. Of the sale proceeds an amount of $12,325 was used to partially repay the Nordea credit facility (Note 7). The sale resulted in a loss of $16,882 reflected as an impairment loss and is included in "Loss on sale of vessels and vessels held for sale" in the accompanying consolidated statement of operations for the year ended December 31, 2010.

(h) On April 1, 2011, the Company entered into two agreements to purchase two capesize vessels under construction of 206,000 DWT each, through the acquisition of the shares of their owning companies (the "Owners"). The Owners are fully owned subsidiaries of a company (the "Sellers") ultimately controlled by the Company's CEO Mr. Anthony Kandylidis. The Sellers will receive in exchange of the selling price of both vessels a total number of 35,657,142 common shares of the Company and the Company will perform the shipbuilding contracts. The vessels are scheduled to be delivered in the second and fourth quarter of 2013. The total outstanding yard payments amount to $95,040 of which $29,700 is payable in 2012 and the balance in 2013.

**Annex E**

Unless the context otherwise requires, as used in this report, the terms "Company," "we," "us," and "our" refer to OceanFreight Inc. and all of its subsidiaries. "OceanFreight Inc." refers only to OceanFreight Inc. and not its subsidiaries.

We use the term deadweight tons, or dwt, in describing the size of vessels. Dwt expressed in metric tons, each of which is equivalent to 1,000 kilograms, refers to the maximum weight of cargo and supplies that a vessel can carry.

## Our Company

We are a Marshall Islands company with our principal executive offices located in Athens, Greece. As of August 22, 2011 we owned and operated, through our subsidiaries, a fleet of six vessels, consisting of two Panamax and four Capesize drybulk carriers, with a total carrying capacity of approximately 0.9 million dwt and a weighted average age of approximately 6.7 years. Our vessels are chartered under long term time charter contracts expiring at various dates, the latest through 2018. In March 2010, we entered into shipbuilding contracts for the construction of three Capesize Very Large Ore Carriers (VLOCs). In April 2011 we entered into two agreements to purchase two additional VLOCs under construction.

As further discussed under "Recent Developments", on July 26, 2011, we entered into a definitive agreement for DryShips Inc. to acquire our outstanding shares.

## Our Fleet

The following table presents summary information concering our fleet as of August 22, 2011:

| Vessel Name | Vessel Type | Year Built | Deadweight (in metric tons) |
|---|---|---|---|
| **Drybulk Carriers** | | | |
| Robusto | Capesize | 2006 | 173,949 |
| Cohiba | Capesize | 2006 | 174,200 |
| Montecristo | Capesize | 2005 | 180,263 |
| Partagas | Capesize | 2004 | 173,880 |
| Topeka | Panamax | 2000 | 74,710 |
| Helena | Panamax | 1999 | 73,744 |
| **Drybulk Carriers to be Acquired** | | | |
| New Building VLOC#1(1) | Capesize | 2012 | 206,000 |
| New Building VLOC#2(1) | Capesize | 2012 | 206,000 |
| New Building VLOC#3(1) | Capesize | 2012 | 206,000 |
| New Building VLOC#4(2) | Capesize | 2012 | 206,000 |
| New Building VLOC#5(2) | Capesize | 2013 | 206,000 |

———————

(1) On March 4, 2010, we entered into an agreement with a shipyard for the construction of three VLOCs for an aggregate price of $204.3 million. The vessels are scheduled for delivery in the first, second and fourth quarters of 2012.

(2) On April 1, 2011, we entered into two agreements to purchase two VLOCs currently under construction through the acquisition of the shares of the construction agreement owning companies that were indirectly controlled by our Chief Executive Officer in exchange for an aggregate of 1,782,849 common shares (35,657,142 common shares before the second reverse stock split) of the Company. The vessels are scheduled for delivery in the fourth quarter of 2012 and first quarter of 2013, respectively.

The total outstanding shipyard payments owed by us amount to $240.7 million, of which $26.4 million is payable in 2011, $184.6 million is payable in 2012 and the balance is payable in 2013.

E-1

Effective June 15, 2010, we have contracted the day-to-day management of our drybulk and tanker fleets, which includes performing the day-to-day operations and maintenance of the vessels, to TMS Dry Ltd., or TMS Dry, and TMS Tankers Ltd., or TMS Tankers, respectively. Both TMS Dry and TMS Tankers, or our Fleet Managers, are related party management companies engaged under separate vessel management agreements directly by our respective wholly-owned subsidiaries. Previously the management of our fleet was performed by Cardiff Marine Inc., or Cardiff, a related party management company. In 2010, Cardiff completed an internal restructuring for the purpose of enhancing its efficiency and the quality of its ship management services. As part of this restructuring our Fleet Managers were established as two different management companies that provide the same vessel management services previously provided by Cardiff. Our Fleet Managers utilize the same experienced personnel previously utilized by Cardiff and provide comprehensive vessel management services including technical supervision, such as repairs, maintenance and inspections, safety and quality, crewing and training, supply provisioning as well as vessel accounting. We believe that our Fleet Managers maintain high standards of operation, vessel technical condition, safety and environmental protection and control operating expenses through comprehensive planned maintenance systems, preventive maintenance programs and by retaining and training qualified crew members. We further believe that the scale and scope of our Fleet Managers enables them to achieve significant economies of scale when procuring supplies and insurance. These economies of scale, as well as our Fleet Managers' ability to spread their operating costs over a larger number of vessels in conjunction with their cost containment programs, are expected to result in cost savings to us. We intend to rely on our Fleet Managers' established operations to help us manage our growth without having to integrate additional resources since we will rely on their resources to manage additional vessels we may acquire in the future.

Our vessels are presently operating under long term fixed rate time charter agreements as follows:

| Vessel Name | Estimated Expiration Range of Charter | Gross Daily Rate |
|---|:---:|:---:|
| **Drybulk Carriers** | | |
| Robusto | August 2014 to March 2018 | $26,000 |
| Cohiba | October 2014 to May 2018 | $26,250 |
| Partagas | July 2012 to Dec 2012 | $27,500 |
| Montecristo | May 2014 to Jan 2018 | $23,500 |
| Topeka | January 2012 to April 2013 | $15,000 |
| Helena | May 2012 to October 2016 | $32,000 |
| **Drybulk Carriers to be Acquired** | | |
| New Building VLOC#1(1) | April 2015 to April 2020 | $25,000 |
| New Building VLOC#2(2) | August 2017 to August 2022 | $23,000 |
| New Building VLOC#3(3) | October 2019 to October 2026 | $21,500 |
| New Building VLOC#4 | Spot | |
| New Building VLOC#5 | Spot | |

(1) Upon delivery of *New Building VLOC#1* , which is expected in the first quarter of 2012, the vessel is scheduled to commence time charter employment for a minimum period of three years at a gross daily rate of $25,000.

(2) Upon delivery of *New Building VLOC#2* , which is expected in the second quarter of 2012, the vessel is scheduled to commence time charter employment for a minimum period of five years at a gross daily rate of $23,000. In addition the time charter contract provides for a 50% profit sharing arrangement when the daily Capesize average time charter rate, as defined in the charter agreement, is between $23,000 and $40,000 per day.

(3) Upon delivery of *New Building VLOC#3* , which is expected in the fourth quarter of 2012, the vessel is scheduled commence time charter employment for a minimum period of seven years at a gross daily rate of $21,500. In addition the time charter contract provides for a 50% profit sharing arrangement when the daily Capesize average time charter rate, as defined in the charter agreement, is between $21,500 and $38,000 per day.

E-2

We believe these charters will provide us with stable cash flows as well as upside potential under our profit sharing agreements. In addition, renewing our period charters at different times enables us to reduce our exposure to market conditions prevailing at any one time.

## OceanFreight's strategy and business model

Our strategy is to be a reliable and responsible provider of seaborne transportation services and to manage and expand our company in a manner that we believe will enable us to enhance shareholder value by increasing long term cash flow. We intend to realize these objectives by adhering to the following:

*Strategic Fleet Expansion.* We intend to grow our fleet using our management's knowledge of the seaborne transportation industry to make accretive, timely and selective acquisitions of vessels in different sectors based on a number of financial and operational criteria. We will consider and analyze our expectations of fundamental developments in the particular industry sector, the level of liquidity in the resale and charter market, the cash flows earned by the vessels in relation to their values, their conditions and technical specifications, expected remaining useful life, the credit quality of the charterer and duration and terms of charter contracts for vessels acquired with charters attached, as well as the overall diversification of our fleet and customers.

*Tailored Fleet Composition.* Our current fleet consists of six drybulk carriers. In addition, we have agreed to acquire five VLOC newbuilding drybulk carriers that are expected to be delivered in 2012 and 2013. We primarily focus on the drybulk and tanker segments because the acquisition and employment contracts of these vessels satisfy our financial and operating criteria. As we grow our fleet over time, we intend to explore acquisitions in other seaborne transportation sectors, as opportunities arise, that also meet our financial and operating criteria. We believe that monitoring developments in multiple sectors will position us to opportunistically select vessels in different sectors for acquisition and vessel employment opportunities as conditions in those sectors dictate. We also believe that this outlook enables us to lower our dependence on any one shipping sector as we seek to generate revenues and find attractive acquisition opportunities.

*Fixed Rate Charters.* We have entered into fixed rate period charters for all of our drybulk carrier vessels with an average remaining duration of approximately 39.3 months as of the date of this Report. We believe these charters will provide us with stable cash flow and high vessel utilization rates and also limit our exposure to charter rate volatility. In the future we will continue to seek fixed rate period charter contracts for our vessels, which include time and bareboat charters, pursuant to which the charterer pays a fixed daily charter rate over a specified period of time. Period charter contracts may include profit sharing arrangements whereby we receive additional charterhire when spot charter rates exceed the fixed daily rate under the period charter. We may also enter into period charters that afford some exposure to the spot market through floating rate period charters where the daily charter rate fluctuates in line with spot rates but cannot fluctuate below a minimum rate, or floor, or above a maximum rate, or ceiling. We may enter into short-term spot charters or place additional vessels in pools which enable participating vessels to combine revenues.

*Staggered Charter Renewals.* We seek employment for our vessels based on our analysis and assessment of fundamental developments in each particular sector of the industry and the difference in rates for short-, medium- and long-term charters. Renewing our period charters at different times enables us to reduce our exposure to market conditions prevailing at any one time.

*Diversified Charter Counterparties.* Our vessels are chartered to two different charterers operating in the drybulk carrier sector. We believe that chartering our vessels to well established and reputable charterers reduces counterparty risk. As we grow our fleet over time, we may invest in other seaborne transportation sectors and seek to further diversify the end-users of our vessels, thereby enhancing the overall credit quality of our charter portfolio.

*Quality Fleet Managers.* As discussed above, our Fleet Managers have established a reputation in the international shipping industry for high standards of performance, reliability and safety. We believe that contracting with fleet managers that have achieved this reputation will create greater opportunities for us to seek employment contracts with well established charterers, many of whom consider the reputation of the fleet

manager when entering into charters. We believe we derive important benefits from our Fleet Managers' experience, which enables them to achieve significant economies of scale and scalability in areas such as crewing, supply procurement, and insurance which in addition to other benefits, are passed to us as the vessel owner. We intend to maintain the quality of our fleet through our Fleet Managers' rigorous maintenance programs. We believe that owning a fleet of well-maintained vessels will enable us to operate our vessels with lower operating costs, maintain their resale value and secure employment for our vessels with high quality charterers.

## Corporate Structure

OceanFreight Inc. was incorporated on September 11, 2006 under the laws of the Marshall Islands. Our principal executive offices are at 80 Kifissias Avenue, GR — 151 25 Amaroussion, Athens, Greece. Our telephone number at that address is +30 210 614 0283. Our common shares are listed on The Nasdaq Global Market under the symbol "OCNF". Our website is www.oceanfreightinc.com. The information on our website shall not be deemed a part of this document. Our agent and authorized representative in the United States is Puglisi & Associates, located at 850 Library Ave, Newark, DE 19711.

On April 30, 2007, we completed our initial public offering in the United States the net proceeds of which amounted to $216.8 million.

## Recent Developments

Our stock price declined below $1.00 per share for a period of 30 consecutive business days, and on January 25, 2011 The Nasdaq Stock Market notified us that we are not in compliance with the minimum bid price rule and as a result, we are required to take action, such as a reverse stock split, prior to July 25, 2011, in order to comply with this rule. To regain compliance, our Board of Directors proposed a 20:1 reverse stock split of our issued and outstanding shares of class A common stock, which was approved by our shareholders at their Annual General Meeting held on June 15, 2011. As a result of the reverse stock split, which was effected on July 6, 2011, every 20 common shares issued and outstanding were converted into one share. On July 20, 2011, we received notice from the Nasdaq Stock market that we regained compliance with the minimum bid price and this noncompliance matter is now closed.

On July 25, 2011, we signed an addendum to the initial consultancy agreement with Steel Wheel Investment Limited, or Steel Wheel, providing for the termination of the agreement upon completion of the the merger with Dryships Inc., or DRYShips, discussed below. Following the termination of the agreement Steel Wheel will be entitled to receive $3.9 million (Euro 2.7 million) as provided in the related change of control clause. The Company's Chief Executive Officer will continue to provide his services on behalf of Steel Wheel under its current remuneration fee until the closing of the merger or December 31, 2011 whichever is latest.

On July 25, 2011we entered into an agreement with TMS Dry Ltd, or TMS Dry, and TMS Bulkers Ltd., or TMS Bulkers, providing for the termination of the management agreements with TMS Dry upon completion of the merger discussed below and TMS Dry will receive (a) $6.6 million due to the change of control and waive its contractual entitlement to seek fees for three years and (b) $2.4 million commission due to the merger transaction. Following the completion of the merger the we will enter into ship management agreements for each of the eleven owned vessels and hulls with TMS Bulkers on terms identical to those in the management agreements with TMS Dry.

On July 25, 2011, we signed an addendum to the initial agreement with Vivid Finance Limited, or Vivid, whereas upon completion of the merger discussed below the agreement will terminate and we will not be liable to any indemnification to Vivid.

On July 26, 2011, we entered into a definitive agreement for DryShips to acquire our outstanding shares for a consideration per share of $19.85, consisting of $11.25 in cash and 0.52326 of a share of common stock of Ocean Rig UDW Inc., or Ocean Rig, a global provider of offshore ultra deepwater drilling services that is 78% owned by DryShips, or Ocean Rig. The Ocean Rig shares that will be received by our shareholders will be from currently outstanding shares held by DryShips. Under the terms of the transaction, the Ocean Rig shares will be listed on the Nasdaq Global Select Market upon the closing of the merger.

Based on the July 25, 2011 closing price of 89.00 NOK ($16.44) for the shares of Ocean Rig on the Norwegian OTC, the transaction consideration reflects a total equity value for us of approximately $118 million and a total enterprise value of approximately $239 million, including the assumption of debt.

The transaction has been approved by the Boards of Directors of DryShips and OceanFreight, by the Audit Committee of the Board of Directors of DryShips, which negotiated the proposed transaction on behalf of DryShips, and by a Special Committee of independent directors of OceanFreight established to negotiate the proposed transaction on behalf of OceanFreight.

The public shareholders of OceanFreight will receive the consideration for their shares pursuant to a merger of OceanFreight with a subsidiary of DryShips. The completion of the merger is subject to customary conditions, including clearance by the Commission of a registration statement to be filed by Ocean Rig to register the shares being paid by DryShips in the merger and the listing of those shares on the Nasdaq Global Select Market. The cash portion of the consideration is to be financed from DryShips' existing cash resources and is not subject to any financing contingency. The merger is expected to close in the fourth quarter of 2011.

Simultaneously with the execution of the definitive merger agreement, DryShips, entities controlled by Mr. Anthony Kandylidis and OceanFreight, entered into a separate purchase agreement. Under this agreement, DryShips will acquire from the entities controlled by Mr. Kandylidis all their OceanFreight shares, representing a majority of the outstanding shares of OceanFreight, for the same consideration per share that the OceanFreight stockholders will receive in the merger. This acquisition is scheduled to close four weeks from the execution of the merger agreement, subject to satisfaction of certain conditions. DryShips intends to vote the OceanFreight shares so acquired in favor of the merger, which requires approval by a majority vote. The Ocean Rig shares to be paid by DryShips to the entities controlled by Mr. Kandylidis will be subject to a 6-month lock-up.

On August 22, 2011, the Stockholders Right Agreement that the Company entered into on April 30, 2008, as amended and restated on May 26, 2010 and April 8, 2011, was further amended and restated in connection with the above transaction such that the acquisition by DryShips of shares of the Company's Common Stock or interest therein pursuant to the terms and subject to the conditions of both the Purchase and Sale Agreement dated July 26, 2011, by and among Basset Holdings Inc., Steel Wheel, Haywood Finance Limited, the Company and DryShips and the Agreement and Plan of Merger dated July 26, 2011, by and among DryShips, Pelican Stockholdings Inc. and the Company, which agreements were unanimously approved by our Board of Directors in July 2011, shall not cause DryShips, or any beneficial owner or Affiliate or Associate thereof, to be considered an "Acquiring Person".

**The International Drybulk Shipping Industry**

We currently employ each of our six drybulk carriers under time charter agreements with an average remaining duration of approximately 39.3 months as of the date of this Report.

The Baltic Dry Index (or BDI), a daily average of charter rates in 26 shipping routes measured on a time charter and voyage basis covering Supramax, Panamax and Capesize drybulk carriers, recovered significantly in 2010 as compared to the low of the fourth quarter of 2008. For the first six months of 2011 the average of the BDI was 1,372, which has significantly declined as compared to the 2010 average of 2,758 and the 2009 average of 2,614.

The decline in the drybulk market since its peak in 2008 has resulted in lower charter rates for vessels exposed to the spot market and time charters linked to the BDI. Our drybulk carriers are presently employed under time charters that are not directly linked to the BDI. Drybulk vessel values have also rebounded in part since the steep decline in such vessel value in 2008. Charter rates and vessel values were affected in 2008 in part by the lack of availability of credit to finance both vessel purchases and purchases of commodities carried by sea, resulting in a decline in cargo shipments, and the excess supply of iron ore in China which resulted in falling iron ore prices and increased stockpiles in Chinese ports. The increase in drybulk vessel values in 2009 resulted primarily from cheaper prices for raw materials from producing countries like Brazil and Australia compared to raw materials produced domestically in Asia; consequently China has increased its imports of raw materials. In 2008, China's iron ore imports comprised approximately 65% of the total volume of iron transported by sea. In 2009, that number increased to approximately 80%, while in 2010 it dropped slightly due to global recovery of the steel industry. There can be no assurance as to how long charter rates and vessel values will remain at their current levels or whether they

E-5

will experience significant volatility. Average daily Capesize rates improved significantly to approximately $42,656 for the year ended December 31, 2009, but declined to approximately $33,300 per day in the year ended December 31, 2010 and to $8,546 in the six month period ended June 30, 2011.

The global drybulk carrier fleet may be divided into four categories based on a vessel's carrying capacity. These categories consist of:

- Capesize vessels, which have carrying capacities of more than 85,000 dwt. These vessels generally operate along long haul iron ore and coal trade routes. There are relatively few ports around the world with the infrastructure to accommodate vessels of this size.

- Panamax vessels have a carrying capacity of between 60,000 and 85,000 dwt. These vessels carry coal, grains, and, to a lesser extent, minor bulks, including steel products, forest products and fertilizers. Panamax vessels are able to pass through the Panama Canal making them more versatile than larger vessels.

- Handymax vessels have a carrying capacity of between 35,000 and 60,000 dwt. These vessels operate along a large number of geographically dispersed global trade routes mainly carrying grains and minor bulks. Vessels below 60,000 dwt are sometimes built with on-board cranes enabling them to load and discharge cargo in countries and ports with limited infrastructure.

- Handysize vessels have a carrying capacity of up to 35,000 dwt. These vessels carry exclusively minor bulk cargo. Increasingly, these vessels have operated along regional trading routes. Handysize vessels are well suited for small ports with length and draft restrictions that may lack the infrastructure for cargo loading and unloading.

As of July 1, 2011, total newbuilding orders had been placed for an aggregate of approximately 43.0% of the existing global drybulk fleet, with deliveries expected over the next 36 months. According to market sources about 50% of the drybulk fleet is contracted at established yards, while the other 50% is contracted at yards that are less established and whose viability may be uncertain. Many analysts expect that newbuilding orders may experience significant cancellations and/or slippage, defined as the difference between newbuilding deliveries ordered versus actually delivered, in each case due to a lack of financing in the industry. Market sources indicate that slippage in the Handysize sector is about 18.4% and about 28.0% in the Capesize sector. The supply of drybulk carriers is dependent on the delivery of new vessels and the removal of vessels from the global fleet, either through scrapping or accidental losses. The level of scrapping activity is generally a function of scrapping prices in relation to current and prospective charter market conditions, as well as operating repair and survey costs. Scrapping in 2009 had been significant compared to the previous two years, while in 2010 it decreased due to the recovery of the drybulk market. In 2010, about 5.8 million dwt was removed from the global drybulk fleet representing 7.3% of the carrying capacity of the total fleet delivered during the same year. In the first six months of 2011, approximately 13.0 million dwt was removed from the global drybulk-fleet representing approximately 27.5% of the carrying capacity of the total fleet delivered during the same period. As of the end of December 2010 and June 2011, approximately 22% and 19%, respectively, of the total dry bulk fleet was 20 years old or older. Many analysts expect scrapping to continue to be a significant factor in offsetting the total supply of the drybulk fleet.

**Our Loan Agreements Covenants**

As of August 22, 2011, we had a $137.7 million senior secured credit facility with Nordea Bank Norge ASA, or Nordea, consisting of Tranche A, a reducing revolving credit facility of $94.6 million, and Tranche B, a term loan facility of $43.1 million.

Our existing credit facility agreement contains certain events of default, such as a change of control, a cross-default with respect to financial indebtedness or a material adverse effect on our ability to perform our obligations under the loan or on any collateral thereunder. Our existing credit facility agreement also includes, among other covenants, financial covenants requiring:

- the ratio of funded debt to the sum of funded debt plus shareholders' equity at the end of each fiscal quarter to be no greater than 0.70 to 1.00;

- liquidity of at least $500,000 per vessel owned. Liquidity is defined as cash, cash equivalents with maturity of less than 12 months and undrawn availability under Tranche A;

- the ratio of EBITDA to net interest expense at the end of each fiscal quarter of at least 2.50 to 1; and

- the aggregate fair market value of the vessels pledged as security for this credit facility of at least 125% of the aggregate outstanding balance of the credit facility

This credit facility also contains provisions that prohibit us from paying dividends. Our board of directors determined in December 2008 to suspend the payment of dividends in order to preserve capital.

As at June 30, 2011, we were in compliance with the covenants contained in our senior secured credit facility.

E-7

# RISK FACTORS

Set forth below are updated or additional risk factors which should be read together with the risk factors contained in our Annual Report on Form 20-F for the fiscal year ended December 31, 2010 filed with the Securities and Exchange Commission on April 14, 2011.

## Company Specific Risk Factors

***Any delay of or the failure to complete the proposed merger transaction may significantly reduce the benefits expected to be obtained from the proposed merger transaction or could adversely affect the market price of the common shares of the Company or DryShips Inc. or their future business and financial results.***

The proposed transaction is subject to a number of conditions, including approval of the Company's shareholders, which is beyond the control of Company and which may prevent, delay or otherwise materially and adversely affect completion of the proposed transaction. Simultaneously with the execution of the definitive merger agreement, DryShips Inc., entities controlled by Mr. Anthony Kandylidis and the Company, entered into a separate purchase agreement. Under this agreement, DryShips Inc. will acquire from the entities controlled by Mr. Kandylidis all their OceanFreight Inc. shares, representing a majority of the outstanding shares of OceanFreight, for the same consideration per share that the OceanFreight stockholders will receive in the merger. This acquisition is scheduled to close four weeks from the execution of the merger agreement, subject to satisfaction of certain conditions. DryShips Inc. intends to vote the OceanFreight shares so acquired in favor of the merger, which requires approval by a majority vote. We cannot predict whether and when this and other conditions will be satisfied.

Failure to complete the proposed transaction would prevent the Company and DryShips Inc. from realizing the anticipated benefits of the proposed transaction. Each company would also remain liable for significant transaction costs, including legal, accounting and financial advisory fees. Any delay in completing the proposed transaction may significantly reduce the synergies and other benefits that the Company and DryShips Inc. expect to achieve if they successfully complete the proposed transaction within the expected timeframe and integrate their respective businesses.

In addition, the market price of each company's common stock may reflect various market assumptions as to whether and when the proposed transaction will be completed. Consequently, the completion of, the failure to complete, or any delay in the completion of the proposed transaction could result in a significant change in the market price of the common shares of the Company and DryShips Inc.

***Fluctuations in market prices may cause the value of the shares of Ocean Rig that you receive to be less than the value of your shares of the Company's common shares.***

Upon completion of the proposed transaction, all shares of the Company will be converted into cash and shares of Ocean Rig. The ratios at which the shares will be converted are fixed, and there will be no adjustment for changes in the market price of either the Company's common shares or Ocean Rig's common shares. Any change in the price of the Company's common shares and Ocean Rig's common shares will affect the value that the Company's shareholders will receive in the proposed transaction. The common shares of both the Company and Ocean Rig have historically experienced significant volatility, and the value of the shares of stock received in the proposed transaction may go up or down as the market price of the Company's common shares goes up or down. Stock price changes may result from a variety of factors that are beyond the control of the Company and DryShips Inc., including changes in their businesses, operations and prospects, regulatory considerations and general market and economic conditions. Neither party is permitted to "walk away" from the proposed transaction or resolicit the vote of its shareholders solely because of changes in the market prices of common shares of the Company or Ocean Rig.

The prices of common stock of the Company and Ocean Rig at the closing of the proposed transaction may vary from their respective prices on the date of this merger agreement. Because the date the proposed transaction is completed will be later than the dates of the merger agreements, the prices of the common shares of the Company and Ocean Rig on the date of the merger agreements may not be indicative of their respective prices on the date the proposed transaction is completed.

*We may fail to realize the anticipated benefits of the merger, and the integration process could adversely impact our ongoing operations.*

We and DryShips Inc. entered into the agreement and plan of merger with the expectation that the merger would result in various benefits, including, among other things, improved purchasing and placing power, an expanded customer base and ongoing cost savings and operating efficiencies. The success of the merger will depend, in part, on DryShips Inc.'s ability to realize such anticipated benefits from combining our businesses with their business. The anticipated benefits and cost savings of the merger may not be realized fully, or at all, or may take longer to realize than expected. Failure to achieve anticipated benefits could result in increased costs and decreases in the amounts of expected revenues of the combined company.

We and DryShips Inc. operated independently until the completion of the merger. It is possible that the integration process could result in the loss of key employees, the disruption of each company's ongoing businesses or inconsistencies in standards, controls, procedures or policies that adversely affect our ability to maintain relationships with customers and employees or to achieve the anticipated benefits of the merger. Integration efforts between the two companies will also divert management attention and resources. These integration matters could have an adverse effect on us and DryShips Inc. during the transition period. The integration may take longer than anticipated and may have unanticipated adverse results relating to our existing business.

*A drop in spot charter rates may provide an incentive for some charterers to default on their charters.*

When we enter into a time or bareboat charter, charter rates under that charter are fixed for the term of the charter. If the spot charter rates in the tanker or drybulk shipping industry, as applicable, become significantly lower than the time charter equivalent rates that some of our charterers are obligated to pay us under our existing charters, the charterers may have incentive to default under that charter or attempt to renegotiate the charter. If our charterers fail to pay their obligations, we would have to attempt to re-charter our vessels at potentially lower charter rates, which may affect our ability to comply with our loan covenants and operate our vessels profitably. If we are not able to comply with our loan covenants and our lenders choose to accelerate our indebtedness and foreclose their liens, we could be required to sell vessels in our fleet and our ability to continue to conduct our business would be impaired.

*The market price of our common shares has fluctuated widely and the market price of our common shares may fluctuate in the future.*

The market price of our common shares has fluctuated widely since our initial public offering in April 2007 and may continue to do so as a result of many factors, including our actual results of operations and perceived prospects, the prospects of our competition and of the shipping industry in general and in particular the drybulk and tanker sectors, differences between our actual financial and operating results and those expected by investors and analysts, changes in analysts' recommendations or projections, changes in general valuations for companies in the shipping industry, particularly the drybulk and tanker sectors, changes in general economic or market conditions and broad market fluctuations.

If the market price of our common shares falls below $5.00 per share, under stock exchange rules, our shareholders will not be able to use such shares as collateral for borrowing in margin accounts. This inability to continue to use our common shares as collateral may lead to sales of such shares creating downward pressure on and increased volatility in the market price of our common shares.

In addition, under the rules of The Nasdaq Stock Market, listed companies are required to maintain a share price of at least $1.00 per share and if the share price declines below $1.00 for a period of 30 consecutive business days, then the listed company would have a cure period of at least 180 days to regain compliance with the $1.00 per share minimum. If at any time during this cure period the bid price of the listed security closes at $1.00 per share or more for a *minimum* of ten consecutive business days, the Company would regain compliance with the minimum bid price requirement.

The Company's stock price declined below $1.00 per share for a period of 30 consecutive business days, and on March 1, 2010 the Company received notice from The Nasdaq Stock Market that it was not in compliance with the

minimum bid price rule. In order for the Company to regain compliance, our Board of Directors proposed a 3:1 reverse stock split, which was approved by the Company's shareholders at their Annual General Meeting held on June 10, 2010. As a result of the reverse stock split, which was effected on June 17, 2010, every three common shares issued and outstanding were converted into one common share. On August 6, 2010, the Company received notice from The Nasdaq Stock Market that it has regained compliance with the minimum bid price and the noncompliance matter is now closed.

Our stock price declined again below $1.00 per share for a period of 30 consecutive business days, and on January 25, 2011 we received notice from The Nasdaq Stock Market that we are not in compliance with the minimum bid price rule and as a result, we are required to take action during the relevant cure period ending in July 2011, such as a reverse stock split, in order to comply with Nasdaq rules. In the annual meeting of the Shareholders to be held on June 15, 2011, the Company intends to propose an amendment to the Company's Amended and Restated Articles of Incorporation to effect a reverse stock split at a ratio of not less than one-for-three and not more than one-for-twenty. As a result of the reverse stock split, which was effected on July 6, 2011, every 20 common shares issued and outstanding were converted into one common share. On July 20, 2011, we received notice from The Nasdaq Stock Market that it has regained compliance with the minimum bid price and the noncompliance matter is now closed.

### *We do not have financing arranged to fully cover our remaining shipyard obligations due for the construction of our five newbuilding VLOCs.*

We own contracts for the construction of five newbuilding VLOCs scheduled to be delivered to us in the first, second, and fourth quarters of 2012, and the first quarter of 2013, respectively. As of June 30, 2011, $82.4 million was paid in shipyard installments for these hulls, which was partially financed by the Standby Equity Distribution Agreement ("SEDA") proceeds and an equity issuance in April 2011 of 1,782,849 (35,657,142 before the second reverse stock split) of our common shares. The remaining shipyard obligations amount to $234 million as of the date of this report, of which $19.6 million, $184.7 million and $29.7 million are payable in 2011, 2012 and 2013, respectively. We expect the remaining shipyard obligations to be financed by (1) a new credit facility with a major Chinese bank for which we have received a commitment letter that contains terms acceptable to us but not yet entered into definitive documentation, which we expect will finance up to 60% of the aggregate contract cost of three of the VLOCs, (2) other forms of external financing; (3) equity offerings and (4) cash from operations. However, we have not yet obtained such financing. In the current challenging financing environment, it may be difficult to obtain secured debt to finance these purchases or raise debt or equity in the capital markets. If we fail to secure financing for the remaining payments due on these five newbuilding VLOCs, we could also lose all or a portion of our deposit money, which as of August 22, 2011 amounted to $89.2 million, and we may incur additional liability and costs.

E-10

## PER SHARE MARKET PRICE INFORMATION

Our common shares have traded on The Nasdaq Global Market under the symbol "OCNF" since April 30, 2007.

The table below sets forth the high and low closing prices for each of the periods indicated for our common shares.

Quoted prices as of July 5, 2011, are prior to our reverse stock split that went effective on July 6, 2011.

| 2008 | High | Low |
|------|------|-----|
| 2008 Annual | 26.70 | 1.87 |

| 2009 | High | Low |
|------|------|-----|
| 1 st Quarter ended March 31, 2009 | $5.23 | $0.82 |
| 2 nd Quarter ended June 30, 2009 | 1.88 | 1.04 |
| 3 rd Quarter ended September 30, 2009 | 1.79 | 1.24 |
| 4 th Quarter ended December 31, 2009 | 1.29 | 0.89 |
| 2009 Annual | 5.23 | 0.82 |

| 2010 | High | Low |
|------|------|-----|
| 1 st Quarter ended March 31, 2010 | $1.05 | $0.71 |
| 2 nd Quarter ended June 30, 2010 | 1.39 | 0.46 |
| 3 rd Quarter ended September 30, 2010 | 1.41 | 0.76 |
| 4 th Quarter ended December 31, 2010 | 1.12 | 0.92 |
| 2010 Annual | 1.41 | 0.46 |

| Most Recent Six Months | High | Low |
|------------------------|------|-----|
| February 2011 | 0.83 | 0.77 |
| March 2011 | 0.76 | 0.64 |
| April 2011 | 0.69 | 0.53 |
| May 2011 | 0.53 | 0.38 |
| June 2011 | 0.41 | 0.31 |
| July 1, 2011 to July 5, 2011 | 0.36 | 0.35 |
| July 6, 2011 to July 31, 2011 | 16.99 | 5.40 |

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The following is a discussion of our financial condition and results of operations for the six months ended June 30, 2011. Unless otherwise specified herein, references to "OceanFreight Inc." or the "Company" or "we" shall include OceanFreight Inc. and its applicable subsidiaries. The following management's discussion and analysis is intended to discuss our financial condition, changes in financial condition and results of operations, and should be read in conjunction with our interim consolidated unaudited financial statements and their notes included therein.

This discussion contains forward-looking statements made pursuant to the safe harbor provisions of the Private Securities Reform Act of 1995, as codified in Section 27A of the U.S. Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. These forward looking statements reflect our current views with respect to future events and financial performance. Our actual results may differ materially from those anticipated in these forward-looking statements as a result of certain factors among which are the following: (i) charter demand and/or charter rates, (ii) production or demand for the types of drybulk and petroleum products that are transported by the Company's vessels, or (iii) operating costs including but not limited to changes in crew salaries, insurance, provisions, repairs, maintenance and overhead expenses. For additional information on the Company's financial condition and results of operation please refer to our Annual Report on Form 20-F for the year ended December 31, 2010 filed with the Securities and Exchange Commission on April 14, 2011.

### Operating results

We generate revenues by charging customers for the transportation of drybulk and crude oil cargoes using our vessels. We employ our drybulk carriers to reputable charterers pursuant to long-term time charters, other than the M/T Olinda which was employed in a spot pool until May 25, 2011 when it was sold and delivered to its new owners. A time charter is a contract for the use of a vessel for a specific period of time during which the charterer pays substantially all of the voyage expenses, including port and canal charges and the cost of bunkers (fuel oil), but the vessel owner pays the vessel operating expenses, including the cost of crewing, insuring, repairing and maintaining the vessel, the costs of spares and consumable stores and tonnage taxes. Under a spot-market charter, the vessel owner pays both the voyage expenses (less specified amounts covered by the voyage charterer) and the vessel operating expenses. Under both types of charters we pay commissions to ship brokers and to in-house brokers associated with the charterer, depending on the number of brokers involved with arranging the charter. Vessels operating in the spot-charter market or under index related time charters can generate revenues that are less predictable than fixed rate time charter revenues but may enable us to capture increased profit margins during periods of improvements in drybulk and tanker rates. However, we are exposed to the risk of declining drybulk and tanker rates when operating in the spot market, which may have a materially adverse impact on our financial performance. As of August 22, 2011, our charters had remaining terms of an average of 39 months.

Furthermore, effective May 2009, we engaged in Forward Freight Agreements (FFA) trading activities. Please see Note 9 to the accompanying interim consolidated unaudited financial statements. As of June 30, 2011, we had no open positions. As of the date of this report we do not have any open positions.

### Factors Affecting our Results of Operations

We believe that the important measures for analyzing future trends in our results of operations consist of the following:

- *Calendar days.* Calendar days are the total days the vessels were in our possession for the relevant period including off hire days.

- *Voyage days.* Total voyage days are the total days the vessels were in our possession for the relevant period net of off hire days.

- *Fleet utilization.* Fleet utilization is the percentage of time that our vessels were available for revenue generating voyage days, and is determined by dividing voyage days by fleet calendar days.

- *TCE rates.*  Time charter equivalent, or TCE, is a measure of the average daily revenue performance of a vessel on a per voyage basis. TCE is a non-GAAP measure. Our method of calculating TCE is consistent with industry standards and is determined by dividing gross revenues (net of voyage expenses) by voyage days for the relevant time period. Voyage expenses primarily consist of port, canal and fuel costs that are unique to a particular voyage, which would otherwise be paid by the charterer under a time charter contract, as well as commissions. TCE is a standard shipping industry performance measure used primarily to compare period-to-period changes in a shipping company's performance despite changes in the mix of charter types (i.e., spot charters, time charters and bareboat charters) under which the vessels may be employed between the periods.

- *Daily vessel operating expenses* , which include crew costs, provisions, deck and engine stores, lubricating oil, insurance, maintenance and repairs, are calculated by dividing vessel operating expenses by fleet calendar days for the relevant time period.

The following table reflects our calendar days, voyage days, fleet utilization and daily TCE rate for the six-month period ended June 30, 2011.

|  | Drybulk Carriers | Tankers | Fleet |
|---|---|---|---|
| Calendar days | 1,229 | 157 | 1,386 |
| Voyage days | 1,215 | 138 | 1,353 |
| Fleet utilization | 98.9% | 87.9% | 97.6% |
| Time charter equivalent (TCE) daily rate | $21,921 | $15,384 | $21,254 |

The following table reflects the calculation of our TCE daily rates for the six-month period ended Jun 30, 2011:

|  | Drybulk Carriers | Tankers | Fleet |
|---|---|---|---|
|  | (Dollars in thousands except for Daily TCE rate) | | |
| Voyage revenues | $28,438 | $ 2,525 | $30,963 |
| Voyage expenses | (1,804) | (402) | (2,206) |
| Time charter equivalent revenues | $26,634 | $ 2,123 | $28,757 |
| Total voyage days for fleet | 1,215 | 138 | 1,353 |
| Daily TCE rate | $21,921 | $15,384 | $21,254 |

- *Spot Charter Rates.*  Spot charterhire rates are volatile and fluctuate on a seasonal and year to year basis. The fluctuations are caused by imbalances in the availability of cargoes for shipment and the number of vessels available at any given time to transport these cargoes.

- *Voyage and Time Charter Revenue.*  Our revenues are driven primarily by the number of vessels in our fleet, the number of days during which our vessels operate and the amount of daily charterhire rates that our vessels earn under charters, which, in turn, are affected by a number of factors, including:

  - the duration of our charters;

  - our decisions relating to vessel acquisitions and disposals;

  - the amount of time that we spend positioning our vessels;

  - the amount of time that our vessels spend in drydock undergoing repairs;

  - the amount of time that our vessels spend in connection with the maintenance and upgrade work;

  - the age, condition and specifications of our vessels;

  - levels of supply and demand in the drybulk and crude oil shipping industries; and

  - other factors affecting spot market charterhire rates for drybulk and tanker vessels.

E-13

As of August 22, 2011, we employed our six drybulk carriers under fixed rate time charter contracts, which had a remaining duration of a minimum of 22 months and a maximum of 56 months. We believe that these long-term charters provide better stability of earnings and consequently increase our cash flow visibility to our shareholders compared to short-term charters.

**Accounting Policies**

The discussion and analysis of our financial condition and results of operations is based upon our interim consolidated unaudited financial statements, which have been prepared in accordance with generally accepted accounting principles in the United States, or U.S. GAAP. The preparation of those financial statements requires us to make estimates and judgments that affect the reported amount of assets and liabilities, revenues and expenses and related disclosure of contingent assets and liabilities at the date of our financial statements. Actual results may differ from these estimates under different assumptions or conditions.

Critical accounting policies are those that reflect significant judgments or uncertainties, and potentially result in materially different results under different assumptions and conditions. We have described below what we believe are our most critical accounting policies that involve a high degree of judgment and the methods of their application.

*Vessel Lives and Impairment*

The carrying value of each of our vessels represents its original cost at the time it was delivered or purchased less depreciation calculated using an estimated useful life of 25 years from the date such vessel was originally delivered from the shipyard. The actual life of a vessel may be different. We depreciate our vessels based on a straight-line basis over the expected useful life of each vessel, based on the cost of the vessel less its estimated residual value, which is estimated at $200 per lightweight ton at the date of the vessel's acquisition, which we believe is common in the drybulk and tanker shipping industries.

Secondhand vessels are depreciated from the date of their acquisition through their remaining estimated useful life. However, when regulations place limitations over the ability of a vessel to trade on a worldwide basis, its useful life is adjusted to end at the date such regulations become effective.

The carrying values of our vessels including those under construction may not represent their fair market value at any point in time since the market prices of second hand vessels tend to fluctuate with changes in charter rates and the cost of newbuildings. Historically, both charter rates and vessel values tend to be cyclical. We record impairment losses only when events occur that cause us to believe that future cash flows for any individual vessel will be less than its carrying value. The carrying amounts of vessels held and used are reviewed for potential impairment whenever events or changes in circumstances indicate that the carrying amount of a particular vessel may not be fully recoverable. In such instances, an impairment charge would be recognized if the estimate of the undiscounted projected net operating cash flows expected to result from the use of the vessel and its eventual disposition is less than the vessel's carrying amount. This assessment is made at the individual vessel level as separately identifiable cash flow information for each vessel is available. Measurement of the impairment loss is based on the fair value of the asset. We determine the fair value of our assets based on management estimates and assumptions and by making use of available market data and taking into consideration third party valuations.

We determine undiscounted projected net operating cash flows for each vessel and compare it to the vessel's carrying value. In developing estimates of future cash flows, we must make assumptions about future charter rates, vessel operating expenses, fleet utilization, and the estimated remaining useful lives of the vessels. These assumptions are based on historical trends as well as future expectations. The projected net operating cash flows are determined by considering the charter revenues from existing time charters for the fixed fleet days and an estimated daily time charter equivalent for the unfixed days (based on the most recent 10 year historical average of the six month, one year and three year time charter rates for drybulk vessels, the three year projected time charter rate for the first three years and the 10 year historical average of the one year and three year time charter rates thereafter for the Suezmax tanker vessel), over the remaining estimated life of each vessel assuming an annual growth rate of 3.0%, net of brokerage commission for drybulk vessels and no growth rate for the tanker vessels. Expected outflows for scheduled vessels' maintenance and vessel operating expenses are based on historical data,

E-14

and adjusted annually assuming an average annual inflation rate of 3%. Effective fleet utilization is assumed to be 99% and 97% for drybulk carriers and tanker vessels, respectively, taking into account the period(s) each vessel is expected to undergo her scheduled maintenance (drydocking and special surveys), as well as an estimate of 1% off hire days each year for drybulk carriers and 3% for tanker vessels. We have assumed no change in the remaining estimated useful lives of the current fleet, and scrap values based on $200 per Light Weight ton, or LWT, at disposal.

The current assumptions used and the estimates made are highly subjective, and could be negatively impacted by further significant deterioration in charter rates or vessel utilization over the remaining life of the vessels which could require the Company to record a material impairment charge in future periods.

### Acquisition of vessels

When the Company enters into an acquisition transaction, it determines whether the acquisition transaction was the purchase of an asset or a business based on the facts and circumstances of the transaction. As is customary in the shipping industry, the purchase of a vessel is normally treated as a purchase of an asset as the historical operating data for the vessel is not reviewed nor is material to the Company's decision to make such acquisition.

### Vessels held for sale

It is the Company's policy to dispose of vessels and other fixed assets when suitable opportunities arise and not necessarily to keep them until the end of their useful life. The Company classifies assets and disposal groups as being held for sale in accordance with Accounting Standards Codification 360, or ASC 360, Property, Plant and Equipment, when the following criteria are met: (i) management possessing the necessary authority has committed to a plan to sell the asset (disposal group); (ii) the asset (disposal group) is immediately available for sale on an "as is" basis; (iii) an active program to find the buyer and other actions required to execute the plan to sell the asset (disposal group) have been initiated; (iv) the sale of the asset (disposal group) is probable, and transfer of the asset (disposal group) is expected to qualify for recognition as a completed sale within one year; and (v) the asset (disposal group) is being actively marketed for sale at a price that is reasonable in relation to its current fair value and actions required to complete the plan indicate that it is unlikely that significant changes to the plan will be made or that the plan will be withdrawn. Long-lived assets or disposal groups classified as held for sale are measured at the lower of their carrying amount or fair value. These assets are not depreciated once they meet the criteria to be held for sale and are classified in current assets on the Consolidated Balance Sheet (see Note 4 to our interim consolidated unaudited financial statements).

### Voyage Revenues

The Company generates its revenues from charterers for the charter hire of its vessels. Vessels are chartered using either voyage charters, where a contract is made in the spot market for the use of a vessel for a specific voyage for a specified charter rate, or timecharters, where a contract is entered into for the use of a vessel for a specific period of time and a specified daily charter hire rate. If a charter agreement exists and collection of the related revenue is reasonably assured, revenue is recognized as it is earned ratably during the duration of the period of each voyage or timecharter. A voyage is deemed to commence upon the completion of discharge of the vessel's previous cargo and is deemed to end upon the completion of discharge of the current cargo. Demurrage income represents payments by a charterer to a vessel owner when loading or discharging time exceeds the stipulated time in the voyage charter and is recognized ratably as earned during the related voyage charter's duration period. Unearned revenue includes cash received prior to the balance sheet date and is related to revenue earned after such date. For vessels operating in pooling arrangements, the Company earns a portion of total revenues generated by the pool, net of expenses incurred by the pool. The amount allocated to each pool participant vessel, including the Company's vessels, is determined in accordance with an agreed-upon formula, which is determined by points awarded to each vessel in the pool based on the vessel's age, design and other performance characteristics. Revenue under pooling arrangements is accounted for on the accrual basis and is recognized when an agreement with the pool exists, price is fixed, service is provided and collectability has been reasonably assured. The allocation of such net revenue may be subject to future adjustments by the pool; however historically such changes have not been material.

Revenue is based on contracted charter parties and although our business is with customers who are believed to be of the highest standard, there is always the possibility of dispute over the terms. In such circumstances, we will assess the recoverability of amounts outstanding and a provision is estimated if there is a possibility of non-recoverability. Although we may believe that our provisions are based on fair judgment at the time of their creation, it is possible that an amount under dispute will not be recovered and the estimated provision of doubtful accounts would be inadequate. If any of our revenues become uncollectible these amounts would be written-off at that time.

### Accounting for Voyage Expenses and Vessel Operating Expenses

Voyage related and vessel operating costs are expensed as incurred. Under a time charter, specified voyage costs, such as fuel and port charges are paid by the charterer and other non-specified voyage expenses, such as commissions, are paid by the Company. Vessel operating costs including crews, vessel management fees, maintenance and insurance are paid by the Company. Under a bareboat charter, the charterer assumes responsibility for all voyage and vessel operating expenses and risk of operation.

For vessels employed on spot market voyage charters, we incur voyage expenses that include port and canal charges and bunker expenses, unlike under time charter employment, where such expenses are assumed by the charterers.

As is common in the drybulk and crude oil shipping industries, we pay commissions ranging from 1.25% to 6.25% of the total daily charter hire rate of each charter to ship brokers associated with the charterers.

### Accounting for Financial Instruments

ASC 815, Derivatives and Hedging, requires all derivative contracts to be recorded at fair value, as determined in accordance with ASC 820, "Fair Value Measurements and Disclosures, which is more fully discussed in Note 9 to the accompanying interim consolidated unaudited financial statements. The changes in fair value of the derivative contract are recognized in earnings unless specific hedging criteria are met. The Company has elected not to apply hedge accounting, but to account for the change in fair value as an increase or decrease in earnings.

On January 29, 2008, we entered into two interest swap agreements with Nordea Bank Finland Plc to partially hedge our exposure to fluctuations in interest rates on $316.5 million of our long term debt discussed in Note 7 to the accompanying interim consolidated unaudited financial statements, by converting our variable rate debt to fixed rate debt. Under the terms of the interest swap agreement we and the bank agreed to exchange, at specified intervals, the difference between paying a fixed rate at 3.55% and a floating rate interest amount calculated by reference to the agreed principal amounts and maturities. The gain or loss derived from the change in fair value is separately reflected in the accompanying interim consolidated unaudited statements of operations.

As of June 30, 2011 and the date of this report, we had no open FFA positions.

### Segment Disclosures

ASC 280, Segment Reporting, requires descriptive information about its reportable operating segments. Operating segments, as defined, are components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing performance. The Company reports financial information and evaluates its operations and operating results by type of vessel and not by the length or type of ship employment for its customers. The Company does not use discrete financial information to evaluate the operating results for each such type of charter. Although revenue can be identified for different types of charters or for charters with different duration, management cannot and does not identify expenses, profitability or other financial information for these charters.

Furthermore, when the Company charters a vessel to a charterer, the charterer is free to trade the vessel worldwide and, as a result, the disclosure of geographic information is impracticable. Accordingly, the reportable segments of the company are the tankers segment and the drybulk carriers segment. See Segment Information in Note 14 to our interim consolidated unaudited financial statements included herein for further analysis of our two reportable segments.

E-16

*New Accounting Pronouncements*

Please see Note 2 to the accompanying interim consolidated unaudited financial statements included herein for a discussion of new accounting pronouncements, which did not have a material impact on our interim consolidated unaudited financial statements.

## Fleet employment profile

Please see the information under "Our Fleet" on page 2 of this report.

## RESULTS OF OPERATIONS

## Six-Month Period Ended June 30, 2011 compared to the Six-Month Period Ended June 30, 2010

### Voyage Revenue

Voyage revenues for the first six months of 2011 were $31.0 million, of which, $28.5 million was earned from our drybulk carriers and $2.5 million was earned from our tanker vessel. For the same period of 2010, voyage revenues were $52.8 million of which $36.6 million was earned by our drybulk carriers and $16.2 million from our tanker vessels. The decrease in revenues is mainly due to the sale of M/V Pierre, M/V Augusta, M/V Austin, M/V Trenton, M/T Pink Sands, M/T Tigani, M/T Tamara and M/T Olinda, which resulted in the decrease of voyage days from 2,115 days in the first six months of 2010 to 1,353 days in the same period of 2011. Furthermore, revenues were further adversely affected by the decrease of the charter rate of M/V Topeka.

### Imputed Deferred Revenue

The amortization of imputed deferred revenue for the first six months of each of 2011 and 2010 amounted to $0 and $1.6 million respectively. Imputed deferred revenue has fully been amortized as of June 30, 2011 as discussed in Note 6 to the accompanying interim consolidated unaudited financial statements.

### Voyage Expenses

For each of the first six months of 2011 and 2010, our voyage expenses amounted to $2.2 million and $2.6 million, respectively. Voyage expenses include bunkers cost to our charterers for off-hire, brokerage commissions on revenues and port expenses. The decrease in voyage expense is due to less off hire days.

### Vessel Operating Expenses

Vessel operating expenses include crew wages and related costs, the cost of insurance, expenses relating to repairs and maintenance, the cost of spares and consumable stores, management fees, tonnage taxes and other miscellaneous expenses. Vessel operating expenses for the first six months of 2011 were $12.1 million as compared to $21.6 million for the same period in 2010. The decrease is mainly due the sale of the vessels M/V Pierre, M/V Augusta, M/V Austin, M/V Trenton, M/T Pink Sands, M/T Tigani, M/T Tamara and M/T Olinda, which resulted in the decrease of calendar days from 2,220 days in the first six months of 2010 to 1,386 days in the same period of 2011. The decrease was mitigated by the increase in management fees due to the change of the fleet managers resulting in a daily increase from $1,180 per vessel in 2010 to $2,120 per vessel in 2011. The daily operating expenses on a fleet basis for the first six months of 2011 were $8,724 per vessel as compared to $9,708 per vessels for the same period of 2010.

### General and Administrative Expenses

Our general and administrative expenses include the salaries and other related costs of the executive officers and other employees, our office rents, legal and auditing costs, regulatory compliance costs, other miscellaneous office expenses, long-term compensation costs, and corporate overhead. General and administrative expenses for the first six months of 2011 were $3.9 million as compared to $2.7 million for the same period of 2010. The increase is mainly due to increased share based compensation cost. Although we report our general and administrative expenses in U.S. Dollars, some of these expenses are denominated in other currencies.

**Depreciation**

Depreciation for the first six months of 2011 amounted to $8.3 million as compared to $13.6 million in the same period of 2010. The decrease in vessel depreciation charges is attributable to the discontinuance of depreciating the M/V Augusta, M/V Austin, M/V Trenton, M/T Pink Sands and M/T Tamara, which were classified as held for sale subsequent to June 30, 2010 due to their contemplated sale. This decrease was mitigated by the depreciation of M/V Montecristo which was acquired in late June 2010 and therefore did not affect the first six months of 2011.

**Drydocking**

We did not incur any drydocking costs in the first six months of 2011. In the same period of 2010 we incurred scheduled drydocking costs of $1.3 million related to M/V Trenton and M/V Topeka.

**Vessel Lives and Impairment:**

The carrying value of each of the Company's vessels represents its original cost at the time it was delivered or purchased less depreciation calculated using an estimated useful life of 25 years from the date such vessel was originally delivered from the shipyard. The actual useful life of a vessel may be different. We depreciate our vessels based on a straight-line basis over the expected useful life of each vessel, based on the cost of the vessel less its estimated residual value, which is estimated at $200 per lightweight ton at the date of the vessel's acquisition, which we believe is common in the drybulk and tanker shipping industries.

Secondhand vessels are depreciated from the date of their acquisition through their remaining estimated useful life. However, when regulations place limitations over the ability of a vessel to trade on a worldwide basis, its useful life is adjusted to end at the date such regulations become effective.

The carrying values of the Company's vessels including those under construction may not represent their fair market value at any point in time since the market prices of second hand vessels tend to fluctuate with changes in charter rates and the cost of newbuildings. Historically, both charter rates and vessel values tend to be cyclical. The Company records impairment losses only when events occur that cause the Company to believe that future cash flows for any individual vessel will be less than its carrying value. The carrying amounts of vessels held and used by the Company are reviewed for potential impairment whenever events or changes in circumstances indicate that the carrying amount of a particular vessel may not be fully recoverable. In such instances, an impairment charge would be recognized if the estimate of the undiscounted future cash flows expected to result from the use of the vessel and its eventual disposition is less than the vessel's carrying amount. This assessment is made at the individual vessel level as separately identifiable cash flow information for each vessel is available. Measurement of the impairment loss is based on the fair value of the asset. The Company determines the fair value of its assets based on management estimates and assumptions and by making use of available market data and taking into consideration third party valuations.

In developing estimates of future cash flows, the Company must make assumptions about future charter rates, ship operating expenses, vessels' residual value and the estimated remaining useful lives of the vessels. These assumptions are based on historical trends as well as future expectations. Although management believes that the assumptions used to evaluate potential impairment are reasonable and appropriate, such assumptions are highly subjective.

As of June 30, 2011 our impairment analysis did not indicate any impairment loss on our vessels including those under construction.

**Vessels held for sale**

As of December 31, 2010, vessels held for sale consisted of M/V Augusta, M/T Tamara, M/V Austin, M/V Trenton and M/T Olinda. All vessels were delivered to their new owners in the first and second quarters of 2011. Vessels held for sale are stated at the prices set forth in the relevant memorandum of agreements or fair market values less cost to sell (Levels 1 and 2).

**Interest and finance costs**

For the first six months of 2011, interest and finance costs amounted to $1.9 million. This amount consists of interest expense of $2.3 million, less capitalized imputed interest of $0.8 million relating to the construction of the three VLOCs, amortization and write-off of financing fees of $0.2 million and other charges of $0.2 million. The interest paid (excluding swap interest) during the period amounted to $2.8 million. Effective April 1, 2008, we have fixed the rates applicable to our outstanding borrowings to 6.05% inclusive of margin (see "Quantitative and Qualitative disclosures about Market Risk-Interest Rate Risk" below). For the same period in 2010, interest and finance costs amounted to $3.1 million. The interest paid (excluding swap interest) during the respective period of 2010 amounted to $3.8 million.

**Derivative instruments**

*Interest Rate Swap Agreements:*  As of June 30, 2011 and December 31, 2010, the fair values of the derivative contracts amounted to $9.7 million and $11.6 million in liability, respectively. The decrease in fair values of $1.9 million is included in "Loss on interest rate swaps" in the accompanying 2011 interim consolidated unaudited statement of operations. The current portion of the total fair value of $6.3 million (excluding accrued interest of $1.8 million) is included in current liabilities as "Derivative liability", while the non-current portion of the total fair value of $3.4 million is included in non-current liabilities as "Derivative liability" in the June 30, 2011, interim consolidated unaudited balance sheet.

*FFAs:*  During the six-month period ended June 30, 2011, we did not engage in any FFA trading transactions. For the same period in 2010, the gain on FFAs amounted to $4.2 million. As of June 30, 2010, we had no open FFA positions.

### Liquidity and Capital Resources

Our principal sources of funds are equity provided by our shareholders, operating cash flows and long-term borrowings. Our principal use of funds has been capital expenditures to establish and grow our fleet, maintain the quality of our fleet, comply with international shipping standards and environmental laws and regulations, fund working capital requirements, make principal repayments on outstanding loan facilities, and historically, to pay dividends.

We expect to rely upon operating cash flows, long-term borrowings, as well as equity financings to implement our growth plan and our capital commitments discussed in Note 5 to the accompanying June 30, 2011 interim consolidated unaudited financial statements. We have financed our capital requirements with the issuance of equity in connection with our initial public offering, our controlled equity offering and the Standby Equity Purchase Agreement, or SEPA, the Standby Equity Distribution Agreement, or SEDA, and the equity contribution from Basset Holding Inc. discussed in Note 8 to the accompanying June 30, 2011 interim consolidated unaudited financial statements, cash from operations and borrowings under our long-term arrangements, discussed in Note 7 to the accompanying June 30, 2011 interim consolidated unaudited financial statements. Under the SEPA, SEDA and the contribution from Basset we issued an aggregate of 3,500,925 (70,018,503 before the second reverse stock split) of our common shares with total net proceeds of $228.1 million. The SEPA and SEDA were terminated on May 21, 2009 and on March 18, 2010, respectively.

As of June 30, 2011, we had an outstanding indebtedness of $142.8 million and our aggregate payments of principal due within one year amounted to $26.5 million. Our credit facility contains a minimum cash requirement of $500,000 per vessel, or $3 million on our current fleet of six vessels, amounts to $3 million.

As of June 30, 2011, our capital commitments in connection with the construction of the five VLOCs were $240.7 million. On February 24, 2011, we signed a commitment letter with a major Chinese bank for the financing of up to 60% of the aggregate contract cost for VLOC#1, VLOC#2 and VLOC#3. We intend to partially finance our capital requirements with external bank financing, equity offerings and cash from operations.

Our practice has been to acquire drybulk and tanker carriers using a combination of funds received from equity investors and bank debt secured by mortgages on our vessels. Our business is capital intensive and its future success will depend on our ability to maintain a high-quality fleet through the acquisition of newer vessels and the selective

sale of older vessels. These acquisitions will be principally subject to management's expectation of future market conditions as well as our ability to acquire drybulk carriers or tankers on favorable terms.

### Cash Flows

The following table presents cash flow information for the six-month periods ended June 30, 2010 and 2011. The information was derived from our interim consolidated unaudited statements of cash flows and is expressed in thousands of U.S. Dollars.

|  | 2010 | 2011 |
|---|---|---|
| Net cash provided by operating activities | $ 16,433 | $  5,802 |
| Net cash provided by/(used in) investing activities | (53,299) | 68,793 |
| Net cash provided by/(used in) financing activities | 11,489 | (64,869) |
| **Net Increase/(decrease) in cash and cash equivalents** | (25,377) | 9,726 |
| Cash and cash equivalents beginning of period | 37,272 | 9,549 |
| **Cash and cash equivalents end of period** | $ 11,895 | $ 19,275 |

Net cash provided by operating activities for the six-month period ended June 30, 2011, was $5.8 million as compared to cash provided by operating activities of $16.4 million in the same period of 2010. Substantially all our cash from operating activities is from revenues generated under our charter agreements. Income from operating activities , excluding non cash items, in 2011 was $9.1 million as compared to $14.1 million in 2010 due to the to the sale of the M/V Augusta, M/V Trenton, M/V Austin, M/T Pink Sands, M/T Tigani and M/T Tamara.

Net cash provided by investing activities for the six-month period ended June 30, 2011 was $68.8 million which includes proceeds from the sale of vessels of $85.0 million and costs in connection with the construction of the three VLOCs of $16.3 million. Net cash used in investing activities for the six-month period ended June 30, 2010 was $53.3 million which includes costs in connection with the construction of the VLOC#1, VLOC#2 and VLOC#3 of $46.6 million, payment for the acquisition of M/V Montecristo of $40.2 million and and net proceeds from the sale of M/V Pierre and M/V Tigani of $33.5 million.

Net cash used in financing activities for the six-month period ended June 30, 2011 was $64.9 million. During the six-month period ended June 30, 2011, we (a) paid the installments due under our senior secured credit facility of $15.5 million, (b) repaid $51.4 million of our senior secured credit facility due to the sale of the vessels M/V Augusta, M/T Tamara, M/V Austin, M/V Trenton and M/T Olinda, (c) decreased restricted cash by $2.5 million due to the sale of the above vessels and (d) paid financing costs of $0.4 million. Net cash provided by financing activities for the six-month period ended June 30, 2010 was $11.5 million. During the six-month period ended June 30, 2010, we (a) generated $19.1 million from the sale of common shares pursuant to our SEDA and $20.0 million from the capital contribution of Basset Holding Inc., (b) paid the installments due under our senior secured credit facility of $21.3 million, (c) prepaid the outstanding loan balance of M/T Tigani of $8.6 million due to its sale, (d) decreased restricted cash by $2.6 million and (e) paid financing costs of $0.3 million.

### Adjusted EBITDA

Adjusted EBITDA represents net income before interest, taxes, depreciation and amortization and excludes loss on sale of vessels. Adjusted EBITDA does not represent and should not be considered as an alternative to net income or cash flow from operations, as determined by U.S. GAAP and our calculation of Adjusted EBITDA may not be comparable to that reported by other companies. Adjusted EBITDA is included in this report because it is a basis upon which we assess our liquidity position, because it is used by our lenders as a measure of our compliance with certain loan covenants and because we believe that adjusted EBITDA presents useful information to investors regarding our ability to service and/or incur indebtedness.

EBITDA and adjusted EBITDA are non-GAAP measures and have limitations as analytical tools, and should not be considered in isolation or as a substitute for analysis of our results as reported under U.S. GAAP. Some of these limitations are: (i) EBITDA and adjusted EBITDA do not reflect changes in, or cash requirements for, working capital needs, and (ii) although depreciation and amortization are non-cash charges, the assets that are

E-20

depreciated and amortized may need to be replaced in the future, and EBITDA and adjusted EBITDA do not reflect any cash requirement for such capital expenditures. Because of these limitations, EBITDA and adjusted EBITDA should not be considered as a principal indicator of OceanFreight's performance.

The following table reconciles net cash provided by operating activities to adjusted EBITDA for the six-month periods ended June 30, 2010 and 2011:

|  | 2010 | 2011 |
|---|---|---|
|  | (Dollars in thousands) | |
| **Net cash provided by operating activities** | $16,433 | $ 5,802 |
| Net increase/(decrease) in current assets, excluding cash and cash equivalents and vessel held for sale | 6,155 | (6,966) |
| Net (increase)/decrease in current liabilities, excluding derivative liability, current portion of long term debt and current portion of imputed deferred revenue | (8,543) | 10,293 |
| Net interest expense(*) | 7,260 | 5,314 |
| Amortization of deferred financing costs included in Net Interest expense | (292) | (239) |
| **Adjusted EBITDA** | $21,013 | $14,204 |

---

(*)  Net interest expense includes the realized loss of interest rate swaps included in "Loss on interest rate swaps" in the interim consolidated unaudited statements of operations.

### Working Capital Position

On June 30, 2011, our current assets totaled $24.2 million while current liabilities totaled $43.5 million, resulting in negative working capital position of $19.3 million. We believe we will generate sufficient cash and secure the necessary financing during the next 12 months to make the required principal and interest payment on our indebtedness, our commitments under the shipbuilding contracts, provide for our normal working capital requirements and remain in a positive cash position for at least one year after June 30, 2011.

### Quantitative and Qualitative disclosures about market risk

#### Foreign Currency Risk

We generate all of our revenues in U.S. dollars, but incur approximately 30.8% of our expenses in currencies other than U.S. dollars. For accounting purposes, expenses incurred in Euros are converted into U.S. dollars at the exchange rate prevailing on the date of each transaction. At June 30, 2011, the outstanding accounts payable balance denominated in currencies other than the U.S. dollar was not material.

#### Inflation Risk

Inflation does not have significant impact on vessel operating or other expenses. We may bear the risk of rising fuel prices if we enter into spot-market charters or other contracts under which we bear voyage expenses. We do not consider inflation to be a significant risk to costs in the current and foreseeable future economic environment. However, should the world economy be affected by inflationary pressures this could result in increased operating and financing costs.

#### Interest Rate Risk

We are subject to market risks relating to changes in interest rates, because of our floating rate debt outstanding. On January 29, 2008, we entered into two interest rate swap agreements to partially hedge our exposure to variability in LIBOR rates. Under the terms of our senior secured credit facility we have fixed our interest rate at 6.05% inclusive of margin.

The table below provides information about our long-term debt and derivative financial instruments and other financial instruments at June 30, 2011 that are sensitive to changes in interest rates. See Notes 7 and 9 to the

accompanying interim consolidated unaudited financial statements, which provide additional information with respect to our existing debt agreements and derivative financial instruments. For debt obligations, the table presents principal cash flows and related weighted average interest rates by expected maturity dates. For derivative financial instruments, the table presents average notional amounts and weighted average interest rates by expected maturity dates. Notional amounts are used to calculate the contractual payments to be exchanged under the contracts. Weighted average interest rates are based on implied forward rates in the yield curve at the reporting date.

| | Expected Maturity Date | |
| | 2012 | 2013 |
| --- | --- | --- |
| | (In thousands of U.S. Dollars except for percentages) | |
| **Long-term debt(1)** | | |
| Repayment amount | 26,524 | 116,319 |
| Variable interest rate | 0.39% | 0.89% |
| Average interest rate | 3.55% | 3.55% |
| **Interest rate derivatives(2)** | | |
| Swap notional amount | 197,136 | 165,937 |
| Average pay rate | 3.55% | 3.55% |
| Average receive rate | 0.39% | 0.89% |

(1) See note 7 to our interim consolidated unaudited financial statements.

(2) On January 29, 2008, we entered into two interest rate swap agreements with Nordea Bank Norge ASA, our lending bank, to partially hedge our exposure to fluctuations in interest rates on an aggregate notional amount of $316.5 million ($218.3 million as of June 30, 2011), decreasing in accordance with the debt repayments, by converting the variable rate of our debt to fixed rate for a period for five years, effective April 1, 2008. Under the terms of the interest rate swap agreement, the Company and the bank agreed to exchange, at specified intervals, the difference between paying a fixed rate at 3.55% and a floating rate interest amount calculated by reference to the agreed notional amounts and maturities. These instruments have not been designated as cash flow hedges, under ASC 815, Derivatives and Hedging, and consequently, the changes in fair value of these instruments are recorded through earnings. The swap agreements expire in April 2013.

### Research and development, patents and licenses

We incur from time to time expenditures relating to inspections for acquiring new vessels that meet our standards. Such expenditures are insignificant and they are expensed as they incur.

### Concentration of credit risk

Financial instruments, which potentially subject the Company to significant concentrations of credit risk, consist principally of cash and cash equivalents, trade accounts receivable and derivative contracts (interest rate swaps). The Company places its cash and cash equivalents, consisting mostly of deposits, with high credit qualified financial institutions. The Company performs periodic evaluations of the relative credit standing of those financial institutions. The Company limits its credit risk with accounts receivable by performing ongoing credit evaluations of its customers' financial condition. The Company does not obtain rights to collateral to reduce its credit risk. The Company is exposed to credit risk in the event of non-performance by counter parties to derivative instruments; however, the Company limits its exposure by diversifying among counter parties with high credit ratings.

E-22

*Contractual obligations:*

The following table sets forth our contractual obligations and their maturity date going forward as of June 30, 2011 on a calendar year-end basis:

| | Within One Year | One to Three Years | Three to Five Years | More than Five Years | Total |
|---|---|---|---|---|---|
| | | | (In thousands of U.S. Dollars) | | |
| Long term debt(1) | $13,262 | $ 53,048 | $ 76,533 | $ — | $142,843 |
| Vessels under construction(2) | 26,370 | 214,350 | — | — | 240,720 |
| Management fees | 2,383 | 14,912 | 12,609 | — | 29,904 |
| Office lease(3) | 8 | 34 | 34 | — | 76 |
| Total | $42,023 | $ 282,344 | $ 89,176 | $ — | $413,543 |

_____

(1) As further discussed in the June 30, 2011 accompanying interim consolidated unaudited financial statements the outstanding balance of our long-term debt at June 30, 2011, was $142.8 million. The loan bears interest at LIBOR plus a margin. Estimated interest payments are not included in the table above.

(2) As further discussed in the accompanying June 30, 2011, interim consolidated unaudited financial statements on March 4, 2010, we entered into three shipbuilding contracts with China Shipbuilding Trading Company, Limited, for the construction of three VLOCs for an aggregate contract price of $204.3 million. On April 1, 2011, we entered into additional agreements to purchase, through the acquisition of their owning companies, two additional VLOCs under construction at China Shipbuilding Trading Company Limited for an aggregate contract price of $118.8 million. These vessels are scheduled for delivery in the first, second and fourth quarters of 2012 and first quarter of 2013.

(3) As further explained in our June 30, 2011 interim consolidated unaudited financial statements, the two lease agreements for our office facilities in Athens expired on December 31, 2010. On January 1, 2011 we entered into a new lease agreement for the current office space with a family member of Mr. George Economou, which expires on December 31, 2015.

**OCEANFREIGHT INC.**

**INDEX TO INTERIM CONSOLIDATED UNAUDITED FINANCIAL STATEMENTS**

|  | Page |
|---|---|
| Consolidated Balance Sheets as of December 31, 2010 and June 30, 2011 (Unaudited) | E-25 |
| Consolidated Unaudited Statements of Operations for the six-month periods ended June 30, 2010 and 2011 | E-26 |
| Consolidated Unaudited Statements of Stockholders' Equity for the six-month periods ended June 30, 2010 and 2011 | E-27 |
| Consolidated Unaudited Statements of Cash Flows for the six-month periods ended June 30, 2010 and 2011 | E-28 |
| Notes to Interim Consolidated Unaudited Financial Statements | E-29 |

OCEANFREIGHT INC.

**Consolidated Balance Sheets**
**December 31, 2010 and June 30, 2011 (Unaudited)**

|  | 2010 | 2011 |
|---|---|---|
|  |  | (Unaudited) (Expressed in thousands of U.S. Dollars — except for share and per share data) |
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 9,549 | $ 19,275 |
| Receivables | 3,168 | 732 |
| Inventories | 838 | 544 |
| Prepayments and other current assets | 7,925 | 3,686 |
| Vessels held for sale | 88,274 | — |
| **Total current assets** | 109,754 | 24,237 |
| **FIXED ASSETS, NET:** | | |
| Vessels under construction | 46,618 | 87,438 |
| Vessels, net of accumulated depreciation of $32,284 and $40,418, respectively | 311,144 | 303,010 |
| Other, net of accumulated depreciation of $382 and $501, respectively | 597 | 478 |
| **Total fixed assets, net** | 358,359 | 390,926 |
| **OTHER NON CURRENT ASSETS:** | | |
| Deferred financing fees, net of accumulated amortization of $2,916 and $3,155, respectively | 1,102 | 1,303 |
| Restricted cash | 5,511 | 3,011 |
| Other non-current assets | 4,137 | 4,140 |
| **Total assets** | $ 478,863 | $ 423,617 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Current portion of long-term debt | $ 82,331 | $ 26,524 |
| Accounts payable | 2,161 | 1,986 |
| Due to related parties | 1,867 | 152 |
| Accrued liabilities | 16,693 | 7,377 |
| Unearned revenue | 1,532 | 1,174 |
| Derivative liability, current portion | 6,727 | 6,326 |
| **Total current liabilities** | 111,311 | 43,539 |
| **NON-CURRENT LIABILITIES** | | |
| Derivative liability, net of current portion | 4,875 | 3,361 |
| Long-term debt, net of current portion | 127,441 | 116,319 |
| **Total non-current liabilities** | 132,316 | 119,680 |
| **COMMITMENTS AND CONTINGENCIES** | | |
| **STOCKHOLDERS' EQUITY:** | | |
| Preferred shares, par value $0.01; 5,000,000 shares authorized, none issued | — | — |
| Common shares, par value $0.01; 333,333,333 shares authorized, 4,163,333 and 5,946,182 shares issued and outstanding at December 31, 2010 and June 30, 2011, respectively | 42 | 60 |
| Subordinated Shares, par value $0.01; 10,000,000 shares authorized, none issued | — | — |
| Additional paid-in capital | 500,549 | 526,574 |
| Accumulated deficit | (265,355) | (266,236) |
| **Total stockholders' equity** | 235,236 | 260,398 |
| **Total liabilities and stockholders' equity** | $ 478,863 | $ 423,617 |

The accompanying notes are an integral part of these interim consolidated unaudited financial statements.

E-25

**OCEANFREIGHT INC.**

**Consolidated Unaudited Statements of Operations**
**For the six-month periods ended June 30, 2010 and 2011**

| | 2010 | 2011 |
|---|---|---|
| | (Expressed in thousands of U.S. Dollars — except for share and per share data) | |
| **REVENUES:** | | |
| Voyage revenue | $ 52,819 | $ 30,963 |
| Loss on forward freight agreements | (4,218) | — |
| Imputed deferred revenue | 1,558 | — |
| | 50,159 | 30,963 |
| **EXPENSES:** | | |
| Voyage expenses | (2,616) | (2,206) |
| Vessels' operating expenses | (21,551) | (12,091) |
| General and administrative expenses | (2,687) | (3,903) |
| Survey and dry-docking costs | (1,336) | — |
| Depreciation | (13,581) | (8,253) |
| Gain/(loss) on sale of vessels and vessels held for sale | 2,476 | (1,993) |
| **Operating income** | 10,864 | 2,517 |
| **OTHER INCOME (EXPENSES):** | | |
| Interest income | 110 | 230 |
| Interest and finance costs | (3,086) | (1,888) |
| Loss on interest rate swaps | (6,671) | (1,740) |
| **Total other expenses, net** | (9,647) | (3,398) |
| **Net income/(loss)** | $ 1,217 | $ (881) |
| Earnings/(loss) per common share, basic and diluted | $ 0.4 | $ (0.18) |
| Weighted average number of common shares, basic and diluted | 3,155,041 | 4,951,336 |

The accompanying notes are an integral part of these interim consolidated unaudited financial statements.

E-26

**OCEANFREIGHT INC.**

**Consolidated Unaudited Statements of Stockholders' Equity**
**For the six-month periods ended June 30, 2010 and 2011**

| | Comprehensive Income/(Loss) | Common Shares # of Shares | Par Value | Additional Paid-in Capital | Accumulated Deficit | Total |
|---|---|---|---|---|---|---|
| | | | | (Expressed in thousands of U.S. Dollars — except for share and per share data) | | |
| **BALANCE, December 31, 2009** | | 2,640,833 | $ 26 | $ 460,315 | $ (203,730) | $256,611 |
| — Net income | $ 1,217 | | | | 1,217 | 1,217 |
| — Proceeds from equity offerings, net of related expenses | — | 335,833 | 3 | 19,102 | — | 19,105 |
| — Stock based compensation expense | — | 53,333 | 1 | 484 | | 485 |
| — Equity contribution, net of related expenses | — | 833,334 | 8 | 19,945 | — | 19,953 |
| — Comprehensive income | $ 1,217 | — | — | — | — | — |
| **BALANCE, June 30, 2010** | | 3,863,333 | $ 38 | $ 499,846 | $ (202,513) | $297,371 |
| **BALANCE, December 31, 2010** | | 4,163,333 | $ 42 | $ 500,549 | $ (265,355) | $235,236 |
| — Net loss | $ (881) | — | | | (881) | (881) |
| — Issuance of shares for acquisition of subsidiaries | — | 1,782,849 | 18 | 24,585 | — | 24,603 |
| — Stock based compensation expense | — | — | — | 1,440 | — | 1,440 |
| — Comprehensive loss | $ (881) | | | | | |
| **BALANCE, June 30, 2011** | | 5,946,182 | $ 60 | $ 526,574 | $ (266,236) | $260,398 |

The accompanying notes are an integral part of these interim consolidated unaudited financial statements.

E-27

# OCEANFREIGHT INC.

### Consolidated Unaudited Statements of Cash Flows
### For the six-month periods ended June 30, 2010 and 2011

| | 2010 | 2011 |
|---|---|---|
| | (Expressed in thousands of U.S. Dollars) | |
| **Cash Flows from Operating Activities:** | | |
| **Net income/(loss):** | $  1,217 | $    (881) |
| Adjustments to reconcile net income to net cash from operating activities: | | |
| Depreciation | 13,581 | 8,253 |
| Amortization of financing costs | 292 | 239 |
| Amortization of imputed deferred revenue | (1,558) | — |
| Amortization of stock based compensation | 485 | 1,440 |
| (Gain)/loss on sale of vessels and vessels held for sale | (2,476) | 1,993 |
| (Gain)/loss on derivative instruments | 2,504 | (1,915) |
| **(Increase)/Decrease in** | | |
| Receivables | (592) | 2,436 |
| Inventories | 178 | 294 |
| Prepayments and other | (4,839) | 4,239 |
| Other assets | (902) | (3) |
| **Increase/(Decrease) in** | | |
| Accounts payable | 8,470 | (175) |
| Due to related parties | 547 | (1,715) |
| Accrued liabilities | 90 | (8,045) |
| Unearned revenue | (564) | (358) |
| **Net Cash provided by Operating Activities** | **16,433** | **5,802** |
| **Cash Flows from Investing Activities:** | | |
| Advances for vessels under construction and other related costs | (46,623) | (16,217) |
| Advances for vessel acquisition | (40,166) | — |
| Proceeds from sale of vessels | 33,490 | 85,010 |
| **Net Cash provided by/(used in) Investing Activities** | **(53,299)** | **68,793** |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from equity offerings and contribution, net of related expenses | 39,058 | — |
| Repayment of long term debt | (21,351) | (15,496) |
| Prepayment of long term debt | (8,562) | (51,433) |
| Restricted cash | 2,594 | 2,500 |
| Payment of financing costs | (250) | (440) |
| **Net Cash provided by/(used in) Financing Activities** | **11,489** | **(64,869)** |
| **Net increase/(decrease) in cash and cash equivalents** | **(25,377)** | **9,726** |
| **Cash and cash equivalents at beginning of period** | **37,272** | **9,549** |
| **Cash and cash equivalents at end of period** | **$ 11,895** | **$ 19,275** |
| **SUPPLEMENTAL CASH FLOW INFORMATION** | | |
| **Cash financing activities:** | | |
| Cash paid during the period for interest, net of amounts capitalized | $  2,818 | $  1,987 |

The accompanying notes are an integral part of these interim consolidated unaudited financial statements.

E-28

## OCEANFREIGHT INC.

**Notes to Interim Consolidated Unaudited Financial Statements**
**June 30, 2011**
**(Expressed in thousands of United States Dollars,**
**except for share and per share data, unless otherwise stated)**

### 1.  Basis of Presentation and General Information:

The accompanying interim consolidated unaudited financial statements include the accounts of OceanFreight Inc. ("OceanFreight") and its wholly owned subsidiaries (collectively, the "Company"). OceanFreight was incorporated on September 11, 2006 under the laws of the republic of the Marshall Islands. In late April 2007, OceanFreight completed its initial public offering in the United States under the United States Securities Act of 1933, as amended, the net proceeds of which amounted to $216,794. The Company's common shares are listed on the Nasdaq Global Market under the symbol "OCNF".

The Company is engaged in the marine transportation of drybulk and crude oil cargoes through the ownership and operation of drybulk and tanker vessels. Effective May 2009, the Company is also engaged in forward freight agreements (FFA) trading activities.

On June 15, 2010, the technical and commercial management of the drybulk and the tanker fleets as well as the supervision of the construction of the five newbuildings Very Large Ore Carriers (VLOCs) were contracted under separate management agreements to TMS Dry Ltd. and TMS Tankers Ltd., respectively, both related technical and commercial management companies (Note 3). Until June 15, 2010, the technical and commercial management of the Company's fleet was contracted under separate management agreements to Cardiff Marine Inc. ("Cardiff"), a related technical and commercial management company (Note 3).

On June 15, 2011, the Company's stockholders approved a 20:1 reverse stock split, pursuant to which every twenty shares, of the Company's common stock issued and outstanding were converted into one share of common stock. The reverse stock split took effect as of the start of trading on the NASDAQ Stock Market on July 6, 2011 and reduced the number of the then issued and outstanding common shares from 118,823,797 common shares to 5,946,182 common shares. Accordingly, all share and per share amounts have been retroactively restated to reflect the above changes in capital structure discussed in Note 8(f).

The accompanying interim consolidated unaudited financial statements have been prepared in accordance with U.S. generally accepted accounting principles for interim financial information. Accordingly, they do not include all the information and notes required by U.S. generally accepted accounting principles for complete financial statements. These statements and the accompanying notes should be read in conjunction with the Company's consolidated financial statements for the year ended December 31, 2010 included in the Company's Annual Report on Form 20-F filed with the Securities Exchange and Commission on April 14, 2011. These interim consolidated unaudited financial statements have been prepared on the same basis as the annual consolidated financial statements and, in the opinion of management, reflect all adjustments, which include only normal recurring adjustments considered necessary for a fair presentation of the Company's financial position, results of operations and cash flows for the periods presented. Operating results for the six-month period ended June 30, 2011 are not necessarily indicative of the results that might be expected for the fiscal year ending December 31, 2011.

**OCEANFREIGHT INC.**

**Notes to Interim Consolidated Unaudited Financial Statements — (Continued)**

As of June 30, 2011, the Company is the ultimate owner of all outstanding shares of the following shipowning subsidiaries:

| Company Name | Vessel Name | Deadweight Tonnage (in metric tons) | Year Built | Acquisition Date |
|---|---|---|---|---|
| ***Subsidiaries established in the Republic of Marshall Islands*** | | | | |
| Oceanenergy Owners Limited | M/V Helena | 73,744 | 1999 | July 30, 2007 |
| Oceantrade Owners Limited | M/V Topeka | 74,710 | 2000 | August 2, 2007 |
| Oceanwave Owners Limited | M/V Partagas | 173,880 | 2004 | July 30, 2009 |
| Oceanrunner Owners Limited | M/V Robusto | 173,949 | 2006 | October 19, 2009 |
| Oceanfire Owners Inc. | M/V Cohiba | 174,200 | 2006 | December 9, 2009 |
| Oceanpower Owners Inc | M/V Montecristo | 180,263 | 2005 | June 28, 2010 |
| Amazon Owning Company Limited | New Building VLOC#4 | | | |
| Pasifai Owning Company Limited | New Building VLOC#5 | | | |
| Oceanview Owners Limited(i) | | | | |
| Oceansurf Owners Limited(i) | | | | |
| Oceancentury Owners Limited(i) | | | | |
| Freightwise Investment Ltd.(ii) | | | | |
| **Companies with vessels sold** | | | | |
| Oceanstrength Owners Limited | (owner of M/V Lansing sold on July 1, 2009) | | | |
| Oceanprime Owners Limited | (owner of M/V Richmond sold on September 30, 2009) | | | |
| Oceanresources Owners Limited | (owner of M/V Juneau sold on October 23, 2009) | | | |
| Oceanwealth Owners Limited | (owner of M/V Pierre sold on April 14, 2010) | | | |
| Ocean Faith Owners Inc. | (owner of M/T Tigani sold on May 4, 2010) | | | |
| Oceanclarity Owners Limited | (owner of M/T Pink Sands sold on November 4, 2010) | | | |
| Kifissia Star Owners Inc. | (owner of M/V Augusta sold on January 6, 2011) | | | |
| Ocean Blue Spirit Owners Inc. | (owner of M/T Tamara sold on January 13, 2011) | | | |
| Oceanventure Owners Limited | (owner of M/V Austin sold on March 10, 2011) | | | |
| Oceanship Owners Limited | (owner of M/V Trenton sold on March 11, 2011) | | | |
| Oceanfighter Owners Inc. | (owner of M/T Olinda sold on May 25, 2011) | | | |
| ***Subsidiaries established in the Republic of Liberia*** | | | | |
| Oceancentury Owners Limited | New Building VLOC#1 | | | |
| Oceansurf Owners Limited | New Building VLOC#2 | | | |
| Oceanview Owners Limited | New Building VLOC#3 | | | |

(i)  Subsidiaries established for Company's general purposes.

(ii)  Freightwise Investment Ltd. was established in 2009 to engage in FFA trading activities (Note 9).

E-30

## OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

For the six-month periods ended June 30, 2010 and 2011 the following charterers accounted for 10% or more of the Company's revenues as follows:

| Charterer | % 2010 | % 2011 | Reportable Segment (Note 14) |
|---|---|---|---|
| A | 38 | 79 | Drybulk |
| B | 16 | — | Drybulk |

### 2.  Significant Accounting Policies

A discussion of the Company's significant accounting policies can be found in the Company's Consolidated Financial Statements included in the Annual Report on Form 20-F for the year ended December 31, 2010. There have been no material changes to these policies in the six-month period ended June 30, 2011, except for the following:

*Acquisition of vessels:*   When the Company enters into an acquisition transaction, it determines whether the acquisition transaction was the purchase of an asset or a business based on the facts and circumstances of the transaction. As is customary in the shipping industry, the purchase of a vessel is normally treated as a purchase of an asset as the historical operating data for the vessel is not reviewed nor is material to the Company's decision to make such acquisition.

*New Accounting Pronouncement:*   In June 2011, the FASB issued ASU 2011-05, "Comprehensive Income (Topic 220)".The amendments in this Update require that all nonowner changes in stockholders' equity be presented either in a single continuous statement of comprehensive income or in two separate but consecutive statements. In the two-statement approach, the first statement should present total net income and its components followed consecutively by a second statement that should present total other comprehensive income, the components of other comprehensive income, and the total of comprehensive income. For public entities, the amendments are effective for fiscal years, and interim periods within those years, beginning after December 15, 2011. Early adoption is permitted, because compliance with the amendments is already permitted. The amendments do not require any transition disclosures.

### 3.  Transactions with Related Parties:

(a)  *TMS Dry Ltd. and TMS Tankers Ltd.:*   Following the termination of the management agreements with Cardiff discussed in Note 3(b), the Company, effective June 15, 2010, contracted the technical and commercial management of its drybulk and tanker fleet as well as the supervision of the construction of the newbuildings to TMS Dry Ltd. and TMS Tankers Ltd. (the "Managers"), respectively. Both companies are beneficially owned by (a) 30% by a company the beneficial owner of which is Mrs. Chryssoula Kandylidis, the mother of the Company's Chief Executive Officer and (b) 70% by a foundation controlled by Mr. George Economou. Mrs. Chryssoula Kandylidis is also the sister of Mr. George Economou and the wife of one of the Company's directors, Mr. Konstandinos Kandylidis.

The Managers are engaged under separate vessel management agreements directly by the Company's respective wholly-owned vessel owning subsidiaries. Under the vessel management agreements the Company pays a daily management fee per vessel, covering also superintendent's fee per vessel plus expenses for any services performed relating to evaluation of the vessel's physical condition, supervision of shipboard activities or attendance upon repairs and drydockings. At the beginning of each calendar year, these fees are adjusted upwards according to the Greek consumer price index. Such increase cannot be less than 3% and more than 5%. In the event that the management agreement is terminated for any reason other than Managers' default, the Company will be required (a) to pay management fees for a further period of three (3) calendar months as from the date of termination and (b) to pay an equitable proportion of any severance crew costs which materialize as per applicable Collective Bargaining Agreement (CBA).

## OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

The Managers are also entitled to a daily management fee per vessel of €1,500 ($2.1) and €1,700 ($2.4) for the drybulk carriers and tanker vessels, respectively. The Managers are also entitled to (a) a discretionary incentive fee, (b) extra superintendents' fee of €500 ($0.7) per day (c) a commission of 1.25% on charter hire agreements that are arranged by the Managers and (d) a commission of 1% on the purchase price on sales or purchases of vessels in the Company's fleet that are arranged by the Managers. The U.S. $ figures above are based on the exchange rate at June 30, 2011. Furthermore, the Managers are entitled to a supervision fee payable upfront for vessels under construction equal to 10% of the approved annual budget for supervision cost.

Furthermore, based on the management agreements, as of June 30, 2011, the Company had made a security payment of $4,140, representing managed vessels' estimated operating expenses and management fees for three months which will be settled when the agreements terminate; however, in case of a change of control of the Company the amount of the security related to management fees is not refundable. The security payments to TMS Dry Ltd. have been classified under "Other non-current assets" in the accompanying 2011 interim consolidated unaudited balance sheet.

The fees charged by TMS Dry Ltd. and TMS Tankers Ltd. during the six month period ended June 30, 2011 are as follows:

| Nature of Charge | TMS Dry Ltd | TMS Tankers Ltd. | Included in |
|---|---|---|---|
| Management fees | $ 2,566 | $       372 | Vessels' operating expenses — Statement of Operations |
| Commission on charterhire agreements | 355 | 31 | Voyage expenses — Statement of Operations |
| Supervision fee on vessels under construction | 1,922 | — | Vessels under construction — Balance Sheet |

At June 30, 2011, $127 and $25 is payable to TMS Dry Ltd. and TMS Tankers Ltd., respectively, and are reflected in "Due to related parties" in the accompanying 2011 interim consolidated unaudited balance sheet. In addition as at June 30, 2011, $979 and $529 were due to TMS Dry Ltd. and due from TMS Tankers Ltd., respectively, relating to the security payment as discussed above and the operations of the vessels under TMS Dry Ltd. and TMS Tankers Ltd. management are included in "Accounts payable" and "Prepayments and other current assets", respectively, in the accompanying 2011 interim consolidated unaudited balance sheet.

(b)  *Cardiff Marine Inc. ("Cardiff"):*  Until June 15, 2010, the Company used the services of Cardiff, a ship management company with offices in Greece, for the technical and commercial management of its fleet. The issued and outstanding capital stock of Cardiff is beneficially owned by (a) 30% by a company the beneficial owner of which is Mrs. Chryssoula Kandylidis, the mother of the Company's CEO and (b) 70% by a foundation controlled by Mr. George Economou. Mrs. Chryssoula Kandylidis is the sister of Mr. George Economou and the wife of one of the Company's directors, Mr. Konstandinos Kandylidis.

Prior to June 15, 2010, Cardiff was engaged under separate vessel management agreements directly by the Company's respective wholly-owned vessel owning subsidiaries. Under the vessel management agreements Cardiff was entitled to a daily management fee per vessel of €764 ($1.1) and €870 ($1.3) for the drybulk carriers and tanker vessels, respectively. Cardiff also provided, other services pursuant to a services agreement, which was terminated on June 15, 2010, under which the Company paid fees, including (1) a financing fee of 0.2% of the amount of any loan, credit facility, interest rate swap agreement, foreign currency contract and forward exchange contract arranged by Cardiff, (2) a commission of 1% of the purchase price on sales or purchases of vessels in the Company's fleet that are arranged by Cardiff, (3) a commission of 1.25% of charter hire agreements arranged by Cardiff, (4) an information technology fee of €26,363 ($37.9) per quarter and (5) a fee of €527 ($0.7) per day for superintendent inspection services in connection with the possible purchase of a vessel. The U.S. $ figures above are based on the exchange rate at June 30, 2011. At the beginning of each calendar year, these fees are adjusted upwards according to the Greek consumer price index. The Company was also reimbursing Cardiff for any out-of-pocket expenses at cost plus 10%.

OCEANFREIGHT INC.

**Notes to Interim Consolidated Unaudited Financial Statements — (Continued)**

In May 2009, the Company entered into a FFA service agreement with Cardiff, which was terminated on June 15, 2010, whereby Cardiff was entitled to a 0.15% brokerage commission on the Company's FFA trading transactions.

Furthermore, based on the management agreements with Cardiff, the Company, as of June 15, 2010, had made a security payment of $6,486, representing managed vessels' estimated operating expenses and management fees for three months. Following the termination of the agreements on June 15, 2010, the security payment was reimbursed to the Company in September 2010.

The fees charged by Cardiff during the six month period ended June 30, 2010 are as follows:

| Nature of Charge | 2010 | Included in |
|---|---|---|
| Management fees | $2,281 | Vessels' operating expenses - Statement of Operations |
| Commission on charterhire agreements | 443 | Voyage expenses — Statement of Operations |
| Commission on FFA trading | 30 | Loss on forward freight agreements — Statement of Operations |
| Commissions on vessels under construction | 450 | Vessels under construction — Balance Sheet |
| Commission on sale of vessel | 28 | Gain/(loss) on sale of vessels and vessels held for sale — Statement of Operations |
| Mark up upon reimbursement of out of pocket expenses | 1 | General and administrative expenses — Statement of Operations |

At December 31, 2010 and June 30 2011, $279 and $690, respectively were due to Cardiff, relating to the operations of the vessels under Cardiff's management and are included in "Accounts Payable" in the accompanying interim consolidated unaudited balance sheets.

(c) *Vivid Finance Limited ("Vivid"):*  On August 13, 2010, the Company entered into a consultancy agreement (the "Agreement") with Vivid, a related company organized under the laws of Cyprus, which is controlled by Mr. George Economou and of which he may be deemed the beneficial owner. Vivid serves as the Company's financial consultant on matters related to (i) new loans and credit facilities with lenders and financial institutions, (ii) raise of equity or debt from capital markets, (iii) interest rate swaps agreements, foreign currency contracts and forward exchange contracts and (iv) renegotiation of existing loans and credit facilities. In consideration of these services the Company will pay Vivid a fee of 0.20% on the total transaction amount.

The agreement has duration of five years and may be terminated (i) at the end of its term unless extended by mutual agreement of the parties; (ii) at any time by the mutual agreement of the parties; and (iii) by the Company after providing written notice to Vivid at least 30 days prior to the actual termination date. As defined in the Agreement, in the event of a "Change of Control" Vivid has the option to terminate the Agreement and cease providing the aforementioned service within three months from the "Change of Control".

(d) *Tri-Ocean Heidmar Tankers LLC ("Tri-Ocean Heidmar"):*  On October 17, 2008, the M/T *Tamara* , concurrently with its delivery commenced its time charter employment with Tri-Ocean Heidmar for a period of approximately 25 to 29 months at a gross daily rate of $27. Tri-Ocean Heidmar is owned by Heidmar Inc. Mr. George Economou is the chairman of the Board of Directors of Heidmar Inc. and the Company's Chief Executive Officer is a member of the Board of Directors of Heidmar Inc. The vessel was redelivered on November 6, 2010. At December 31, 2010 and June 30, 2011, $998 and $68, respectively, included in "Accounts Payable" and $123 and nil, respectively, included in "Accrued Liabilities" in the accompanying December 31, 2010 and June 30, 2011, consolidated balance sheets are due to the Tri-Ocean Heidmar.

(e) *Blue Fin Tankers Inc. pool ( "Blue Fin"):*  On October 29, 2008 the M/T *Olinda* was employed in the Blue Fin tankers spot pool for a minimum period of twelve months. Blue Fin is a spot market pool managed by Heidmar Inc. Mr. George Economou is the chairman of the Board of Directors of Heidmar Inc. and the Company's Chief Executive Officer is a member of the Board of Directors of Heidmar Inc. The vessel, as a pool participant, is

E-33

# OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

allocated part of the pool's revenues and voyage expenses on a time charter basis in accordance with an agreed-upon formula. In October 2008, the Company made an initial advance to the pool for working capital purposes of $928.4. The vessel was redelivered from the Pool on May 16, 2011 due to its sale on May 25, 2011. As of December 31, 2010 and June 30, 2011, the Company had a receivable from the pool, including advances made to the pool for working capital purposes of $2,198 (of which $63 is included in "Receivables" and $2,135 is included in "Prepayments and other current assets") and $1,110 included in "Prepayments and other current assets"), respectively, in the accompanying consolidated balance sheets. The revenue of M/T *Olinda* derived from the pool amounted to $4,379 and $2,417 for the six month periods ended June 30, 2010 and 2011, respectively and is included in "Voyage revenue" in the accompanying interim consolidated unaudited statements of operations.

(f) *Sigma Tanker Pool ("Sigma"):*   On December 22, 2009 and November 6, 2010, the M/T *Tigani and the* M/T *Tamara* were both employed in the Sigma Tankers Inc. pool for a minimum period of twelve months each. Sigma is a spot market pool managed by Heidmar Inc. Mr. George Economou is the chairman of the Board of Directors of Heidmar Inc. and the Company's Chief Executive Officer is a member of the Board of Directors of Heidmar Inc. The vessels, as pool participants, are allocated part of the pool's revenues and voyage expenses, on a time charter basis, in accordance with an agreed-upon formula. The vessels were redelivered from the pool on April 28, 2010 and January 6, 2011, due to their sale on May 4, 2010 and January 13, 2011, respectively. As of December 31, 2010 and June 30, 2011, the Company had a receivable from and a payable to the pool of $1,480 and $64, respectively, which is included in "Receivables" and "Accounts payable", respectively in the accompanying consolidated balance sheets. The revenue of the M/T *Tigani* and the M/T *Tamara* derived from the pool for 2010 amounted to $1,990 and nil, respectively and for 2011 amounted to $54 for each vessel, and is included in "Voyage revenue" in the accompanying interim consolidated unaudited statements of operations.

(g) *Lease agreement:*   The Company had leased an office space in Athens, Greece from Mr. George Economou. The lease commenced on April 24, 2007, with a duration of six months and an option for the Company to extend it for a further six months. The monthly rental amounted to Euro 680 ($1.0 at the June 30, 2011 exchange rate). This agreement was terminated on December 31, 2010. The rent charged for the six-month period ended June 30, 2010 amounted to $5.4 and is included in "General and Administrative expenses" in the accompanying interim consolidated unaudited statements of operations.

On January 1, 2011, the Company leased an office space in Athens, Greece, from a family member of Mr. George Economou. The lease has duration of five years. The monthly rental for the first two years amounts to Euro 1,000 ($1.44 at the June 30, 2011 exchange rate) and thereafter is annually adjusted based on the annual inflation rate announced by the Greek State The rent charged for the six-month period ended June 30 2011 amounted to $8.4 and is included in "General and Administrative expenses" in the accompanying interim consolidated unaudited statements of operations.

(h) *Capital infusion:*   On May 28, 2010, Basset Holding Inc., a company controlled by Mr. Anthony Kandylidis, made an equity contribution of $20,000 in exchange for approximately 833,334 (50,000,000 before the reverse stock splits at a price of $0.40 per share) of the Company's common shares (Note 8(e)).

(i) *Steel Wheel Investments Limited:*   Under an agreement between the Company and Steel Wheel Investments Limited ("Steel Wheel"), a company controlled by the Company's Chief Executive Officer, Steel Wheel provides consulting services to the Company in connection with the duties of the Chief Executive Officer of the Company for an annual fee plus a discretional cash bonus as approved by the Compensation Committee. Such fees and bonuses for the six-month periods ended June 30, 2010 and 2011 amounted to $591 and $662 respectively and are included in "General and administrative expenses" in the accompanying consolidated statements of operations. Furthermore, as further discussed in Note 10, certain compensation in stock was granted to Steel Wheel.

(j) *Haywood Finance Limited:*   On April 1, 2011 ("the acquisition date"), the Company entered into two Share Purchase Agreements ("SPAs") with Haywood Finance Limited ("Haywood" or "the seller"), a company controlled by the Company's Chief Executive Officer, for the acquisition of 100% of the share capital of Amazon

## OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

Shareholders Limited ("Amazon"), the direct owner of all the outstanding shares of Amazon Owning Company Limited owner of one VLOC (206,000 dwt) under construction (Hull 1239) and Pasifai Shareholders Limited ("Pasifai"), the direct owner of all the outstanding shares of Pasifai Owning Company Limited, owner of one VLOC (206,000 dwt) under construction (Hull 1240), in exchange of 1,782,849 of Company's common shares (35,657,142 before the second reverse stock split).

Following the issuance of shares mentioned above the Company's Chief Executive Officer's shareholding in the Company's common stock increased to 50.5% (30%, 14.6% and 5.9% through Haywood Finance Limited, Basset Holdings Inc. and Steel Wheel Investments Limited, respectively).

On the acquisition date, the advances paid to the yard in respect of the two VLOCs under construction amounted to $23,760 (representing 20% of the total contract cost of $118,800 (Note 5)), while the combined net assets of the entities acquired amounted to $24,242. The fair value of the shares issued on the acquisition date was estimated as $24,603 based on the market closing price of the Company's shares of $0,69 (Level 1 input) as of April, 1, 2011. In determining the appropriateness of the fair value of the shares issued in connection with the aforementioned acquisition, the Company considered the fair value of the two VLOCs under construction based on independent broker's valuations (Level 2 inputs) amounting to $24,800 (representing 20% of the total contract fair value of $124,000).

The difference between the net assets of the entities acquired ($24,242) and the fair value of the shares issued ($24,603) amounted to $361 and is included as an addition to the cost of vessels under construction in the accompanying interim consolidated unaudited balance sheet as of June 30, 2011, in accordance with the Accounting Standards Codification ("ASC") 805-50-30 "Business Combinations, Acquisition of Assets rather than a Business".

### 4. Vessels held for sale:

As of December 31, 2010, vessels held for sale consisted of the M/T *Olinda* , the M/T *Tamara* , the M/V *Augusta* , the M/V *Austin* and the M/V *Trenton* . The M/V *Augusta* was delivered to its new owners on January 6, 2011, the M/T *Tamara* on January 13, 2011, the M/V *Austin* on March 10, 2011, the M/V *Trenton* on March 11, 2011 and the M/T *Olinda* on May 25, 2011.

### 5. Vessels under construction:

On March 8, 2010, the Company concluded three shipbuilding contracts with China Shipbuilding Trading Company, Limited, for the constructions of three Capesize Very Large Ore Carriers ("VLOC") with a dwt of 206,000 tons each at a total contract price of $204,300. The vessels are scheduled for delivery in the first, second and fourth quarters of 2012. The construction has been partially financed by the Standby Equity Distribution Agreement ("SEDA") proceeds (Note 8(b)). Upon delivery the vessels are scheduled to commence fixed rate employment as follows:

- the first vessel at a gross daily hire rate of $25 for a minimum period of three years;

- the second vessel at a gross daily hire rate of $23 for a minimum period of five years. The time charter agreement also provides for 50% profit sharing arrangement when the daily Capesize average time charter rate, as defined in the charter party, is between $23 and $40 per day; and

- the third vessel at a gross daily hire rate of $21.5 for a period of seven years. The time charter agreement also provides for a 50% profit sharing arrangement when the daily Capesize average time charter rate, as defined in the charter party, is between $21.5 and $38 per day.

On February 24, 2011, the Company accepted a commitment letter with a major Chinese bank for the financing of up to 60% of the aggregate contract cost of the three VLOCs discussed above

**OCEANFREIGHT INC.**

**Notes to Interim Consolidated Unaudited Financial Statements — (Continued)**

On April 1, 2011, the Company entered into two agreements to purchase two VLOC vessels under construction of 206,000 DWT each, through the acquisition of the shares of Amazon and Pasifai, the relevant owning companies, from Haywood in exchange for an aggregate of 1,782,849 (35,657,142 common shares before the second reverse stock split) common shares of the Company. The shipbuilding contracts are with China Shipbuilding Trading Company and total contract price for both vessels is $118,800 (Note 3(j)). The vessels are scheduled for delivery in the fourth quarter of 2012 and the first quarter of 2013.

As of June 30, 2011, the amounts paid to the yard, as provided in the shipbuilding agreements, amounted to $82,380, which together with other related costs of $5,058, including commissions and supervision cost of $450 and $2,324, respectively paid to Cardiff and TMS Dry Ltd (Note 3), are included in "Vessels under construction" in the accompanying June 30, 2011 interim consolidated unaudited balance sheet. As of June 30, 2011, the total outstanding yard payments amount to $240.7 million (Note 12).

**6. Vessels, Net:**

The amount in the accompanying June 30, 2011 interim consolidated unaudited balance sheet is analyzed as follows:

| | Cost | Accumulated Depreciation | Net Book Value |
|---|---|---|---|
| **Balance December 31, 2010** | **$343,428** | **$ (32,284)** | **$311,144** |
| Additions | — | (8,134) | (8,134) |
| **Balance June 30, 2011** | **$343,428** | **$ (40,418)** | **$303,010** |

The memoranda of agreement associated with the acquisition of vessels, M/V *Austin*, M/V *Pierre*, M/V *Trenton* and M/V *Topeka* in 2007 stipulated that the vessels were delivered to the Company with their current charter parties expiring in 2010. The assumed charters were below market charter rates at the time of the delivery and, accordingly, a portion of the consideration paid for the vessels was allocated to the assumed charters to the extent that each vessel's capitalized cost would not exceed its fair value without a time charter contract.

The Company recorded imputed deferred revenue totaling $31,346, with a corresponding increase in the vessels' purchase price, which is being amortized to revenue on a straight-line basis during the remaining duration of the corresponding charter. The amortization of imputed deferred revenue for the six-month periods ended June 30, 2010 and 2011 amounted to $1,558 and nil, respectively and is separately reflected in the accompanying interim consolidated unaudited statements of operations. As of June 30, 2011, the imputed deferred revenue was fully amortized.

All the Company's vessels, except for the five new-building VLOCs discussed in Note 5, have been pledged as collateral to secure the bank loans discussed in Note 7.

E-36

## OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

As of June 30, 2011, the vessels were operating under time charters, the last of which expires in May 2018. Contracts with expected duration in excess of one year as of June 30, 2011, were as follows:

| Vessel Name | Daily Time Charter Gross Rate (in U.S. Dollars) | Estimated Expiration of Charter* |
|---|---|---|
| **Drybulk Carriers** | | |
| M/V *Robusto* | $26,000 | August 2014 — March 2018 |
| M/V *Cohiba* | $26,250 | October 2014 — May 2018 |
| M/V *Partagas* | $27,500 | July 2012 — December 2012 |
| M/V *Montecristo* | $23,500 | May 2014 — January 2018 |
| M/V *Topeka* | $15,000 | January 2012 — April 2013 |
| M/V *Helena* | $32,000 | May 2012 — October 2016 |

* The Estimated Expiration of Charter provides the estimated latest redelivery dates presented above at the end of any redelivery optional periods.

### 7.  Long-term Debt:

As of June 30, 2011, the Company's long-term debt totaled $142,843 ($209,772 as of December 31, 2010) relating to a credit facility with Nordea Bank Norge ASA ("Facility" or "Nordea Credit Facility") and a term loan with DVB Bank SE ("loan" or "DVB loan") which was fully repaid on January 5, 2011.

#### *Credit Facility with Nordea Bank Norge ASA*

On September 18, 2007, the Company entered into an agreement with Nordea Bank Norge ASA ("Nordea") for a $325,000 Senior Secured Credit Facility for the purpose of refinancing the then outstanding balance of $118,000 of a facility with Fortis Bank concluded in June 2007, to partially finance the acquisition cost of vessels M/V *Trenton* , M/V *Pierre* , M/V *Austin* , M/V *Juneau* , M/V *Lansing* , M/V *Topeka* , M/V *Richmond* and M/T *Pink Sands* and financing the acquisition of additional vessels. On January 9, 2009, the Company entered into an amendatory agreement to the Nordea credit facility which became effective on January 23, 2009 and waived the breach of the collateral maintenance coverage ratio covenant contained in such credit facility resulting from the decrease in the market value of the Company's vessels and reduced the level of the collateral maintenance coverage ratio for the remaining term of the agreement. The waiver was effective from the date the breach occurred, which was December 9, 2008. Under the terms of the amendatory agreement the Company on January 23, 2009, made a prepayment of $25,000 and, among other requirements, is also required (i) to ensure that under the reduced collateral maintenance coverage ratio, the aggregate fair market value of the vessels in the Company's fleet other than the M/T *Tamara* and M/T *Tigani* , plus proceeds from a vessel's sale or insurance proceeds from a vessel's loss, and the excess of the fair market value of each of the M/T *Tamara* and M/T *Tigani* over the recorded amount of the first priority ship mortgage over each such vessel under the Company's DVB loan, described below, be not less than (a) 90% of the aggregate outstanding balance under the Nordea credit facility plus any unutilized commitment in respect of Tranche A until June 30, 2009, (b) 100% of the aggregate outstanding balance under the Nordea credit facility plus any unutilized commitment in respect of Tranche A from July 1, 2009 to December 31, 2009, (c) 110% of the aggregate outstanding balance under the Nordea credit facility plus any unutilized commitment in respect of Tranche A from January 1, 2010 to March 31, 2010, (d) 115% of the aggregate outstanding balance under the Nordea credit facility plus any unutilized commitment in respect of Tranche A from April 1, 2010 to June 30, 2010, and (e) 125% of the aggregate outstanding balance under the Nordea credit facility plus any unutilized commitment in respect of Tranche A at all times thereafter; (ii) to pay interest at an increased margin over LIBOR; (iii) to suspend the payment of dividends; and (iv) to pay the sellers' credit for M/T Tigani and M/T Tamara acquisition only with the proceeds of new equity offerings or, common shares, which the seller may request at any time, (v) from the closing date and until all commitments are terminated and all amounts due under the Facility have been repaid, the

E-37

**OCEANFREIGHT INC.**

**Notes to Interim Consolidated Unaudited Financial Statements — (Continued)**

weighted average age of the vessels (weighted by the fair market value of the vessels) shall not exceed 18 years; if any vessel reaches the age of 21 years or more during this period, such vessel shall be assigned no value in the calculation of the aggregate fair market value of the vessels and (vi) liquidity must be at least $500 multiplied by the number of vessels owned.

As provided in the amendatory agreement to the Nordea Credit Facility, in the case of a sale of a vessel the Company has the option of either using the sale proceeds for the prepayment of the facility or depositing such proceeds in an escrow account pledged in favor of Nordea and using the funds to finance the purchase of a new vessel of the same type or better within 90 days. The Company made use of this option and used the sale proceeds of the M/V *Lansing* , M/V *Richmond,* M/V *Juneau* and M/V *Pierre* to partially finance the acquisition of M/V *Partagas* , M/V *Robusto,* M/V *Cohiba* and M/V *Montecristo,* respectively.

The amended Facility is comprised of the following two Tranches and bears interest at LIBOR plus a margin.

Tranche A is a reducing revolving credit facility in a maximum amount of $200,000 of which the Company utilized $199,000 to repay the outstanding balance of the credit facility with Fortis of $118,000 to partially finance the acquisition of vessels and for working capital purposes. As of June 30, 2011, following the mandatory prepayment of $31,803 due to the sale of M/V *Augusta* , M/V *Austin* , M/V *Trenton* and M/T *Olinda* (Note 4), the balance of Tranche A of $94,599 will be reduced or repaid in eight semi-annual equal installments in the amount of $8,130 each and a balloon installment in an amount of $29,559.

Tranche B is a Term Loan Facility in a maximum amount of $125,000 which was fully utilized to partially finance the acquisition of vessels. As of June 30, 2011, following the mandatory prepayment of $15,224 due to the sale of M/V *Augusta* , M/V *Austin* , M/V *Trenton* and M/T *Olinda* (Note 4), the balance of Tranche B of $48,244 is repayable in nine equal consecutive semi-annual installments in the amount of $5,132 each and a balloon installment in the amount of $2,056.

The Facility is secured with first priority mortgages over the vessels, first priority assignment of vessels' insurances and earnings, specific assignment of the time-charters, first priority pledges over the operating and retention accounts, corporate guarantee and pledge of shares.

***Term Loan with DVB Bank SE***

On December 23, 2008, the Company entered into a loan agreement with DVB Bank SE ("DVB") for a new secured term loan facility for an amount of $29.56 million, which was fully drawn in January 2009. The Company used the proceeds of the loan to make the prepayment in the amount of $25.0 million under its amendatory agreement to its Nordea credit facility. On May 4, 2010, the M/T *Tigani* was sold and as provided in the loan agreement a mandatory prepayment of the loan of $8,562 was made, which proportionally reduced the then outstanding loan installments. On December 17, 2010, the Company signed a Memorandum of Agreement for the sale of M/T *Tamara* . The vessel was delivered to its new owners on January 13, 2011. The balance of the loan at December 31, 2010 of $4,406 was fully repaid following the sale of M/T *Tamara* .

**OCEANFREIGHT INC.**

**Notes to Interim Consolidated Unaudited Financial Statements — (Continued)**

The principal payments required to be made after June 30, 2011 for the long-term debt discussed above are as follows:

| Year Ending December 31, | Nordea Tranche A | Nordea Tranche B | Total |
|---|---|---|---|
| 2011 | 8,130 | 5,132 | 13,262 |
| 2012 | 16,259 | 10,265 | 26,524 |
| 2013 | 16,259 | 10,265 | 26,524 |
| 2014 | 16,259 | 10,265 | 26,524 |
| 2015 | 37,692 | 12,317 | 50,009 |
| | $ 94,599 | $ 48,244 | $142,843 |

Total interest expense on long-term debt for the six-month periods ended June 30, 2010 and 2011 amounted to $3,536 and $2,341, respectively, and is included in "Interest and finance costs" (Note 13) in the accompanying interim consolidated unaudited statements of operations. The Company's weighted average interest rates (including the margin) for the six-month periods ended June 30, 2010 and 2011 were 2.82% and 2.80%, respectively.

**8. Common Stock and Additional Paid-In Capital:**

(a) *Stockholders' Rights Agreement :* On April 17, 2008, the Company approved a Stockholders' Rights Agreement with American Stock Transfer & Trust Company, as Rights Agent, effective as of April 30, 2008. Under this Agreement, the Company declared a dividend payable of one preferred share purchase right, or Right, to purchase one one-thousandth of a share of the Company's Series A Participating Preferred Stock for each outstanding share of OceanFreight Inc. Class A common stock, par value U.S. $0.01 per share. The Rights will separate from the common stock and become exercisable after (1) the 10th day after public announcement that a person or group acquires ownership of 20% or more of the Company's common stock or (2) the 10th business day (or such later date as determined by the Company's board of directors) after a person or group announces a tender or exchange offer which would result in that person or group holding 20% or more of the Company's common stock. On the distribution date, each holder of a Right will be entitled to purchase for $100 (the "Exercise Price") a fraction (1/1000th) of one share of the Company's preferred stock which has similar economic terms as one share of common stock. If an acquiring person (an "Acquiring Person") acquires more than 20% of the Company's common stock then each holder of a Right (except an Acquiring Person) will be entitled to buy at the exercise price, a number of shares of the Company's common stock which has a market value of twice the exercise price. Any time after the date an Acquiring Person obtains more than 20% of the Company's common stock and before that Acquiring Person acquires more than 50% of the Company's outstanding common stock, the Company may exchange each Right owned by all other Rights holders, in whole or in part, for one share of the Company's common stock. The Company can redeem the Rights at any time on or prior to the earlier of a public announcement that a person has acquired ownership of 20% or more of the Company's common stock, or the expiration date. The Rights expire on the earliest of (1) May 12, 2018 or (2) the exchange or redemption of the Rights as described above. The terms of the rights and the Stockholders Rights Agreement may be amended without the consent of the Rights holders at any time on or prior to the Distribution Date. After the Distribution Date, the terms of the rights and the Stockholders Rights Agreement may be amended to make changes that do not adversely affect the rights of the Rights holders (other than the Acquiring Person). The Rights do not have any voting rights. The Rights have the benefit of certain customary anti-dilution protections.

Under the Amended and Restated Stockholders Rights Agreement effective May 26, 2010, the purchase by Basset Holdings Inc. ("Basset"), a company controlled by Mr. Anthony Kandylidis, the Company's CEO, of shares of the Company's Common Stock directly from the Company in a transaction approved by the Company's Board of Directors in May 2010, shall not cause Basset Holdings Inc., or any beneficial owner or Affiliate or Associate thereof, to be considered an "Acquiring Person"; provided, however, that should Basset or any Affiliate or Associate

E-39

# OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

of Basset thereafter acquire additional shares of Common Stock constituting 1% or more of the Company's Common Stock then outstanding, and thereby beneficially own 20% or more of the Company's Common Stock then outstanding, other than by reason of an equity incentive award issued to Basset or such Affiliate or Associate by the Company's Board of Directors or a duly constituted committee thereof, then such Person shall be deemed an "Acquiring Person" for purposes of this Agreement.

On April 8, 2011, the Stockholders Right Agreement that the Company entered into on April 30, 2008, was amended and restated in connection with the above transaction such that Haywood would not fall within the definition of "Acquiring Person" under the agreement.

(b) *Standby Equity Distribution Agreement — ("SEDA"):*   On July 24, 2009, the Company entered into a Standby Equity Distribution Agreement, or the SEDA, with YA Global, pursuant to which the Company may offer and sell up to $450,000 of the Company's common shares to YA Global. The SEDA commenced on September 28, 2009 and terminated on March 18, 2010. YA Global was entitled to receive a discount equal to 1.5%. As of December 31, 2009, 1,134,258 (68,055,508 before the two reverse stock splits) common shares had been sold with net proceeds amounting to $78,970. During the period from January 1, 2010 to March 18, 2010, 335,883 (20,150,000 before the two reverse stock splits) common shares were sold with net proceeds of $19,257. During the period from the commencement of the offering on September 28, 2009 to the termination of the offering on March 18, 2010, the Company sold 1,470,092 (88,205,508 before the two reverse stock splits) common shares with net proceeds amounting to $98,227 and YA Global received a discount equal to 1.5% of the gross proceeds or $1,496.

(c) *Shelf Registration Statement:*   On January 12, 2010, the Company filed a shelf registration statement on Form F-3, which was declared effective on January 21, 2010, pursuant to which it may sell up to $400,000 of an undeterminable number of securities.

(d) *Equity Incentive Plan — ("2010 Equity Incentive Plan"):*   On January 14, 2010, the Company's Board of Directors adopted and approved the 2010 Equity Incentive Plan, under which 500,000 (30,000,000 before the two reverse stock splits) common shares were reserved for issuance. On January 18, 2010, the Company's Board of Directors adopted and approved in all respects the resolutions of the meetings of the Compensation Committee held on January 15, 2010, pursuant to which 50,000 (3,000,000 before the two reverse stock splits) common shares were awarded to Steel Wheel Investments Limited, a company controlled by the Company's Chief Executive Officer and 3,333 (200,000 before the two reverse stock splits) common shares were awarded to the Company's Directors and officers. On December 17, 2010, the Company's Board of Directors approved in all respects the resolutions of the meetings of the Compensation Committee held on December 17, 2010, pursuant to which 300,000 (6,000,000 before the second reverse stock split) were awarded to Steel Wheel Investments Limited, a company controlled by the Company's Chief Executive Officer.

(e) *Equity Infusion:*   On May 25, 2010, the Company's Board of Directors approved an equity infusion of $20,000 by Basset Holdings Inc. ("Basset"), a company controlled by Mr. Anthony Kandylidis the Company's CEO, in order to fund the Company's capital needs for the purchase of M/V *Montecristo* . On May 28, 2010, Basset paid the amount of $20,000 in exchange for approximately 833,333 (50,000,000 before the two reverse stock splits at a price of $0.40 per share) of the Company's common shares. In determining the fair value of the shares to be issued in connection with the equity infusion, the Company used multiple inputs from different sources, including: (a) analyst target prices, (b) multiples-based valuation and (c) net asset value method. The Company considered the results of such analyses, together with: (1) the importance of the equity infusion, (2) the size of the equity infusion versus the limited market liquidity, and (3) the opportunity cost of the capital contribution for other similar investment opportunities. Given the specific circumstances of the equity infusion, the results of the analysis and the factors described above, the Company approved the equity infusion of $20,000 in exchange of approximately 833,333 (50,000,000 before the two reverse stock splits effect) of the Company's common shares at a price of $0.40 per share before the reverse stock split effect.

E-40

**OCEANFREIGHT INC.**

**Notes to Interim Consolidated Unaudited Financial Statements — (Continued)**

On May 26, 2010, the Stockholders Right Agreement that the Company entered into on April 30, 2008, was amended and restated in connection with the above transaction such that Basset would not fall within the definition of "Acquiring Person" under the agreement.

(f) *Share Price and Reverse Stock Split:*  Under the rules of the Nasdaq Stock Market, listed companies are required to maintain a share price of at least $1.00 per share and if the closing share price stays below $1.00 for a period of 30 consecutive business days, then the listed company would have a cure period of at least 180 days to regain compliance with the $1.00 per share minimum. In the event the Company does not regain compliance within the period of 180 days, its securities will be subject to delisting. In addition if the market price of the common shares remains below $5.00 per share, under stock exchange rules, the Company's shareholders will not be able to use such shares as collateral for borrowing in margin accounts. The Company's stock price declined below $1.00 per share for a period of 30 consecutive business days, and on March 1, 2010 the Company received notice from the Nasdaq Stock Market that it was not in compliance with the minimum bid price rule. In order for the Company to regain compliance, its Board of Directors proposed a 3:1 reverse stock split, which automatically converted three current shares of the Company's class A common shares into one new share of common stock. The reverse stock split was approved by the Company's shareholders at the Annual General Meeting held on June 10, 2010. The reverse stock split took effect on June 17, 2010 and accordingly, the Company's authorized Class A common stock was converted to 333,333,333 shares, and the then issued and outstanding common stock of 231,800,001 common shares was converted to 77,266,655 common shares. Following the reverse stock split the Company's stock remained above $1.00 for a period of 10 consecutive business days and, as a result, on August 6, 2010, the Company received notice from the Nasdaq Stock market that it had regained compliance with the minimum bid price requirement and the compliance matter was closed.

The Company on January 25, 2011, received again notice from the Nasdaq Stock Market that it was not in compliance with the minimum bid price rule. Accordingly, as explained above the Company must regain compliance within a period of 180 days. In order for the Company to regain compliance, its Board of Directors proposed a 20:1 reverse stock split of the Company's issued and outstanding shares of class A common stock, which automatically converted 20 current shares of the Company's class A common shares into one new share of common stock. The reverse stock split was approved by the Company's shareholders at the Annual General Meeting held on June 15, 2011. The reverse stock split took effect on July 6, 2011 and accordingly, the then Company's then issued and outstanding common stock of 118,823,797 common shares was converted to 5,946,182 common shares, with the Company's authorized Class A common stock remaining unchanged. Following the reverse stock split the Company's stock remained above $1.00 for a period of 10 consecutive business days and, as a result, on July 20, 2011, the Company received notice from the Nasdaq Stock market that it had regained compliance with the minimum bid price requirement and the compliance matter was closed.

(g) *Haywood shares:*  On April 1, 2011, the Company entered into two agreements to purchase two VLOC vessels under construction of 206,000 DWT each, through the acquisition of the shares of Amazon and Pasifai, the relevant owning companies, from Haywood in exchange for an aggregate of 1,782,857 (35,657,142 common shares before the second reverse stock split) common shares of the Company (Notes 1, 3(j) and 5).

On April 8, 2011, the Stockholders Right Agreement that the Company entered into on April 30, 2008, was amended and restated in connection with the above transaction such that Haywood would not fall within the definition of "Acquiring Person" under the agreement.

As of June 30, 2011, the Company's issued and outstanding stock amounted to 5,946,182 (118,823,797 before the second reverse stock split) common shares. Common share shareholders are entitled to one vote on all matters submitted to a vote of shareholders and to receive interest, if any.

## OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

**9. Derivatives and Fair Value Measurements:**

*Interest rate swaps*

On January 29, 2008, the Company entered into two interest rate swap agreements with Nordea, the Company's lending bank, to partially hedge its exposure to fluctuations in interest rates on a notional amount of $316,500 ($218,278 as of June 30, 2011), decreasing in accordance with the debt repayments, by converting the variable rate of its debt to fixed rate for a period for 5 years, effective April 1, 2008. Under the terms of the interest rate swap agreement the Company and the bank agreed to exchange at specified intervals, the difference between paying a fixed rate at 3.55% and a floating rate interest amount calculated by reference to the agreed notional amounts and maturities. These instruments have not been designated as cash flow hedges under ASC 815, Derivatives and Hedging and, consequently, the changes in fair value of these instruments are recorded through earnings. The fair value of these instruments at June 30, 2011, was determined based on observable Level 2 inputs, as defined in ASC 820, Fair Value Measurements and Disclosures, derived principally from or corroborated by observable market data. Inputs include quoted prices for similar assets, liabilities (risk adjusted) and market-corroborated inputs, such as market comparables, interest rates, yield curves and other items that allow value to be determined.

The fair value of these instruments at June 30, 2011 amounted to a liability of $9,687 (excluding accrued interest payable of $1,771), of which the current and non-current portions of $6,326 and $3,361, respectively, are included in current and non-current derivative liabilities in the accompanying interim consolidated unaudited balance sheet as of June 30, 2011. The fair value of these instruments at December 31, 2010 amounted to a liability of $11,602 (excluding accrued interest of $1,947), of which the current and non-current portions of $6,727 and $4,875, respectively, are included in current and noncurrent derivative liabilities in the accompanying consolidated balance sheet as of December 31, 2010. The unrealized result of the change in the fair value of these instruments for the six-month periods ended June 30, 2010 and 2011, resulted in an unrealized loss of $2,388 and an unrealized gain of $1,915, respectively, and are included in "Loss on interest rate swaps" in the accompanying interim consolidated unaudited statements of operations. The realized interest expense on the swap for the six-month periods ended June 30, 2010 and 2011 amounted to $4,284 and $3,656, respectively, and is included in "Loss on interest rate swaps" in the accompanying interim consolidated unaudited statements of operations.

The realized loss as of June 31, 2010, amounting to $4,284 previously included in "Interest and finance costs' (Note 13) was reclassified to "Loss on interest rate swaps" to conform to the June 30, 2011 presentation.

*Forward Freight Agreements (FFAs)*

In May 2009, the Company engaged in forward freight agreements (FFA) trading activities. The Company trades in the FFAs market with both an objective to utilize them as economic hedging instruments in reducing the risk on specific vessel(s), freight commitments, or the overall fleet or operations, and to take advantage of short term fluctuations in the market prices. FFAs trading generally have not qualified as hedges for accounting purposes and as such, the trading of FFAs could lead to material fluctuations in the Company's reported results from operations on a period to period basis. The open positions of FFAs are "marked to market" quarterly, using quoted prices in active markets for identical instruments (Level 1 inputs), to determine the fair values, which on June 30, 2010, generated unrealized losses of $116 and are included in "Loss on forward freight agreements" in the accompanying 2010 consolidated unaudited statement of operations. As of June 30, 2011 all FFA positions had been closed.

*Fair value measurements*

The carrying amounts reflected in the accompanying interim consolidated unaudited balance sheet of financial assets and accounts payable approximate their respective fair values due to the short maturity of these instruments. The fair value of long-term bank loans with variable interest rates approximate the recorded values, generally due to their variable interest rates.

## OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

The following tables set forth by level our assets and liabilities that are measured at fair value on a recurring and non-recurring basis. As required by the fair value guidance, assets and liabilities and are categorized in their entirety based on the lowest level of input that is significant to the fair value measurement.

| | | Fair Value Measurements as of June 30, 2011 | | |
| Recurring Measurements | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| --- | --- | --- | --- | --- |
| Interest rate swaps liability position | $9,687 | $— | $9,687 | $— |
| Total | $9,687 | $— | $9,687 | $— |

### 10.    Stock based compensation:

On January 14, 2010, the Company's Board of Directors adopted and approved the 2010 Equity Incentive Plan, under which 166,667 (10,000,000 before the reverse stock splits) common shares were reserved for issuance. On January 18, 2010, the Company's Board of Directors adopted and approved in all respects the resolutions of the meetings of the Compensation Committee held on January 15, 2010, pursuant to which 50,000 (3,000,000 before the reverse stock splits) common shares were awarded to Steel Wheel Investments Limited, a company controlled by the Company's Chief Executive Officer and 3,333 (200,000 before the reverse stock splits) common shares were awarded to the Company's Directors and officers. On December 17, 2010, the Company's Board of Directors adopted and approved the resolutions of the meeting of the Compensation Committee held on December 17, 2010, pursuant to which 300,000 (6,000,000 before the second reverse stock split) common shares were awarded to Steel Wheel Investments Limited, a company controlled by the Company's Chief Executive Officer.

There were 335,222 (6,704,445 before the second reverse stock split) unvested shares as of June 30, 2011. Compensation cost recognized in the six-month periods ended June 30, 2010 and 2011, amounted to $485, and $1,440, respectively. As of June 30, 2011, the compensation cost related to non-vested shares amounted to $7,708 with a weighted average remaining contractual life of 26 months.

### 11.    Income Taxes:

Under the laws of the Republic of Marshall Islands, Cyprus, Liberia and Malta, the companies are not subject to tax on international shipping income; however, they are subject to registration and tonnage taxes, which have been included in vessel operating expenses in the accompanying interim consolidated unaudited statement of operations.

Pursuant to the Internal Revenue Code of the United States (the "Code"), U.S. source income from the international operations of ships is generally exempt from U.S. tax if the company operating the ships meets both of the following requirements: (a) the Company is organized in a foreign country that grants an equivalent exemption to corporations organized in the United States and (b) either (i) more than 50% of the value of the Company's stock is owned, directly or indirectly, by individuals who are "residents" of the Company's country of organization or of another foreign country that grants an "equivalent exemption" to corporations organized in the United States (50% Ownership Test) or (ii) the Company's stock is "primarily and regularly traded on an established securities market" in its country of organization, in another country that grants an "equivalent exemption" to United States corporations, or in the United States (Publicly-Traded Test).

Under the regulations, the Company's stock will be considered to be "regularly traded" on an established securities market if (i) one or more classes of its stock representing 50 percent or more of its outstanding shares, by voting power and value, is listed on the market and is traded on the market, other than in minimal quantities, on at least 60 days during the taxable year; and (ii) the aggregate number of shares of our stock traded during the taxable year is at least 10% of the average number of shares of the stock outstanding during the taxable year. Notwithstanding the foregoing, the regulations provide, in pertinent part, that each class of the Company's stock will not be

## OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

considered to be "regularly traded" on an established securities market for any taxable year in which 50% or more of the vote and value of the outstanding shares of such class are owned, actually or constructively under specified stock attribution rules, on more than half the days during the taxable year by persons who each own 5% or more of the value of such class of the Company's outstanding stock ("5 Percent Override Rule").

In the event the 5 Percent Override Rule is triggered, the regulations provide that the 5 Percent Override Rule will nevertheless not apply if the Company can establish that among the closely-held group of 5% Stockholders, there are sufficient 5% Stockholders that are considered to be "qualified stockholders" for purposes of Section 883 to preclude non-qualified 5% Stockholders in the closely-held group from owning 50% or more of each class of the Company's stock for more than half the number of days during the taxable year.

Treasury regulations are effective for calendar year taxpayers, like the Company, beginning with the calendar year 2005. All the Company's ship-operating subsidiaries currently satisfy the 50% Ownership Test. In addition, following the completion of the Initial Public Offering of the Company's shares, the management of the Company believes that by virtue of a special rule applicable to situations where the ship operating companies are beneficially owned by a publicly traded company like the Company, the Publicly Traded Test can be satisfied based on the trading volume and the widely-held ownership of the Company's shares, but no assurance can be given that this will remain so in the future, since continued compliance with this rule is subject to factors outside the Company's control.

### 12.  Commitments and Contingencies:

Various claims, suits, and complaints, including those involving government regulations and product liability, arise in the ordinary course of shipping business. In addition, losses may arise from disputes with charterers, agents, insurance and other claims with suppliers relating to the operations of the Company's vessels. Currently management is not aware of any such claims or contingent liabilities which should be disclosed, or for which a provision should be established in the accompanying interim consolidated unaudited financial statements.

The Company accrues for the cost of environmental liabilities when management becomes aware that a liability is probable and is able to reasonably estimate the probable exposure. Currently, management is not aware of any such claim or contingent liabilities which should be disclosed, or for which a provision should be established in the accompanying interim consolidated unaudited financial statements. Up to $1 billion of the liabilities associated with the individual vessels' actions, mainly for sea pollution, are covered by the Protection and Indemnity (P&I) Club Insurance.

As further disclosed in Note 5 the Company has signed five shipbuilding contracts for the construction of five VLOCs. As of June 30, 2011, the amounts due until delivery of the vessels are as follows:

| Year | Amount |
|------|-------:|
| 2011 | $ 26,370 |
| 2012 | 184,650 |
| 2013 | 29,700 |
| Total | $240,720 |

E-44

## OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

Future minimum contractual charter revenue deriving from vessels' long-term charter contracts represents revenue until the earliest redelivery of each vessel and includes also the revenue to be earned from vessels under construction. As of June 30, 2011, future contractual revenue is as follows:

| Year | Amount |
|------|-------:|
| 2011 | $ 27,646 |
| 2012 | 51,077 |
| 2013 | 53,016 |
| 2014 | 42,044 |
| 2015 | 18,518 |
| 2016 and thereafter | 42,772 |
| Total | $235,073 |

Revenue amounts do not include any assumed off-hires.

As further disclosed in Note 3 the Company has contracted the commercial and technical management of its vessels to TMS Dry Ltd. For these services it pays a monthly management fee. Such management fees until the expiration of the agreements are as follows:

| Year | Amount |
|------|-------:|
| 2011 | $ 2,383 |
| 2012 | 6,314 |
| 2013 | 8,598 |
| 2014 | 8,667 |
| 2015 | 3,942 |
| Total | $29,904 |

### 13.  Interest and Finance Costs:

The amounts in the accompanying interim consolidated unaudited statements of operations are analyzed as follows:

|  | 2010 | 2011 |
|------|-----:|-----:|
| Interest on long-term debt | $3,536 | $2,341 |
| Capitalized interest | (972) | (857) |
| Amortization and write-off of financing fees | 292 | 239 |
| Other | 230 | 165 |
| Total | $3,086 | $1,888 |

The realized result (loss) of the change in the fair value of the interest rate swaps discussed in Note 9 for the six month period ended June 30, 2010, of $4,284, previously included in "Interest and finance costs" was reclassified to "Loss on interest rate swaps" to conform with the June 30, 2011 presentation. In addition as a result of the above reclassification the amounts of interest paid in the interim consolidated unaudited statements of cash flows for six month period ended June 30, 2010, was changed from $8,245 to $3,789.

### 14.  Segment Information:

The table below includes information about the Company's reportable segments as of and for the six-month periods ended June 30, 2010 and 2011. The accounting policies followed in the preparation of the reportable

E-45

## OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

segments are the same as those followed in the preparation of the Company's interim consolidated unaudited financial statements.

| June 30, 2010 | Drybulk Carriers | Tankers | Other | Total |
|---|---|---|---|---|
| Revenues from external customers | $ 36,648 | $16,171 | $   — | $ 52,819 |
| Gain/(loss) on vessels sold and vessels held for sale | (16) | 2,492 | — | 2,476 |
| Interest and finance costs, net of capitalized interest | (1,595) | (1,468) | (23) | (3,086) |
| Interest income | — | — | 110 | 110 |
| Loss on interest rate swaps | (4,830) | (1,841) | — | (6,671) |
| Depreciation | (12,576) | (877) | (128) | (13,581) |
| Segment profit/(loss) | 2,329 | 5,967 | (7,079) | 1,217 |
| Total assets | $503,845 | $43,878 | $20,819 | $568,542 |

| June 30, 2011 | Drybulk Carriers | Tankers | Other | Total |
|---|---|---|---|---|
| Revenues from external customers | $ 28,438 | $ 2,525 | $   — | $ 30,963 |
| Gain/(loss) on sale of vessels held for sale | 247 | (2,240) | — | (1,993) |
| Interest and finance costs, net of capitalized interest | (1,090) | (783) | (15) | (1,888) |
| Interest Income | — | — | 230 | 230 |
| Loss on interest rate swaps | (1,596) | (144) | — | (1,740) |
| Depreciation and amortization | (8,134) | — | (119) | (8,253) |
| Segment profit/(loss) | 6,070 | (3,352) | (3,599) | (881) |
| Total assets | $397,184 | $ 1,949 | $24,484 | $423,617 |

## 15. Subsequent events:

(a) As discussed in Note 8(f), the Company's stock price had declined below $1.00 per share for a period of 30 consecutive business days, and on January 25, 2011, it received notice from the Nasdaq Stock Market that it is not in compliance with the minimum bid price rule. Following the reverse stock split took effect on July 6, 2011, and accordingly, the Company's then issued and outstanding common stock remained above $1.00 for a period of 10 consecutive business days and, as a result, on July 20, 2011, the Company received notice from the Nasdaq Stock market that it had regained compliance with the minimum bid price requirement and the noncompliance matter was closed.

(b) On July 25, 2011, the Company and Steel Wheel (Note 3(i)) signed an addendum to the initial consultancy agreement providing for the termination of the agreement upon completion of the Company's merger with Dryships discussed below. Following the termination of the agreement Steel Wheel will be entitled to receive $3,890 (Euro 2.7 million) as provided in the related change of control clause. The Company's Chief Executive Officer will continue to provide his services on behalf of Steel Wheel under its current remuneration fee until the closing of the merger or December 31, 2011 whichever is latest.

(c) On July 25, 2011, the Company, TMS Dry Ltd and TMS Bulkers Ltd. entered into an agreement providing for the termination of the management agreements with TMS Dry (Note 3(a)) upon completion of the merger discussed below and TMS Dry Ltd will receive (a) $6.6 million due to the change of control and waive its contractual entitlement to seek fees for three year and (b) $2.4 million commission due to the merger transaction. Following the completion of the merger the Company will enter into ship management agreements for each of the eleven owned vessels and hulls with TMS Bulkers Ltd. on terms identical to those in the management agreements with TMS Dry Ltd.

E-46

## OCEANFREIGHT INC.

### Notes to Interim Consolidated Unaudited Financial Statements — (Continued)

(d) On July 25, 2011, the Company and Vivid (Note 3(c)), signed an addendum to the initial agreement whereas upon completion of the merger discussed below the agreement will terminate and the Company will not be liable to any indemnification to Vivid.

(e) On July 26, 2011, the Company and DryShips Inc. ("Dryships") announced that they have entered into a definitive agreement for DryShips to acquire the outstanding shares of the Company for a consideration per share of $11.25 in cash and 0.52326 shares of common stock of Ocean Rig UDW Inc., or Ocean Rig, a global provider of offshore ultra deepwater drilling services that is 78% owned by DryShips. The Ocean Rig shares that will be received by the Company's shareholders will be from currently outstanding shares held by DryShips. Under the terms of the transaction, the Ocean Rig shares will be listed on the Nasdaq Global Select Market upon the closing of the merger, expected in the fourth quarter of 2011. The transaction has been approved by the Boards of Directors of DryShips and OceanFreight, by the Audit Committee of the Board of Directors of DryShips, which negotiated the proposed transaction on behalf of DryShips, and by a Special Committee of independent directors of OceanFreight established to negotiate the proposed transaction on behalf of OceanFreight. In connection with the merger the Company is expected to pay consulting and legal fees of approximately $2.8 million.

Simultaneously with the execution of the definitive merger agreement, DryShips, entities controlled by the Company's CEO and OceanFreight, entered into a separate purchase agreement. Under this agreement, DryShips will acquire from the entities controlled by the Company's CEO all their OceanFreight shares, representing a majority of the outstanding shares of the Company, for the same consideration per share that the OceanFreight stockholders will receive in the merger. This acquisition is scheduled to close four weeks from the execution of the merger agreement, subject to satisfaction of certain conditions. DryShips intends to vote the OceanFreight shares so acquired in favor of the merger, which requires approval by a majority vote. The Ocean Rig shares to be paid by DryShips to the entities controlled by the Company's CFO will be subject to a 6-month lock-up.

(f) On August 22, 2011, the Stockholders Right Agreement that the Company entered into on April 30, 2008, as amended and restated on May 26, 2010 and April 8, 2011, was further amended and restated in connection with the above merger transaction such that the acquisition by DryShips of shares of the Company's Common Stock or interest therein pursuant to the terms and subject to the conditions of both the Purchase and Sale Agreement dated July 26, 2011, by and among Basset, Steel Wheel Investments Limited, Haywood, the Company and DryShips and the Agreement and Plan of Merger dated July 26, 2011, by and among DryShips, Pelican Stockholdings Inc. and the Company, which agreements were unanimously approved by our Board of Directors in July 2011, shall not cause DryShips, or any beneficial owner or Affiliate or Associate thereof, to be considered an "Acquiring Person".

# OCEAN RIG 

**ISSUER**

Ocean Rig UDW Inc.
10 Skopa Street, Tribune House
2 nd Floor, Office 202, CY 1075
Nicosia, Cyprus

# PART II

## INFORMATION NOT REQUIRED IN THE PROSPECTUS

**Item 20.**  *Indemnification of Directors and Officers*

I. Article VIII of the Amended and Restated Bylaws of the of the Registrant provides as follows:

1. Any person who is or was a Director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another, partnership, joint venture, trust or other enterprise shall be entitled to be indemnified by the Corporation upon the same terms, under the same conditions, and to the same extent as authorized by Section 60 of the MIBCA, if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The Corporation shall have the power to pay in advance expenses a director or officer incurred while defending a civil or criminal proceeding, provided that the director or officer will repay the amount if it shall ultimately be determined that he or she is not entitled to indemnification under this section.

2. The Corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a Director or officer of the Corporation or is or was serving at the request of the Corporation as a director or officer against any liability asserted against such person and incurred by such person in such capacity whether or not the Corporation would have the power to indemnify such person against such liability by law or under the provisions of these Bylaws.

II. Section 60 of the Associations Law of the Republic of the Marshall Islands provides as follows:

1. *Actions not by or in right of the corporation* .  A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that he is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of no contest, or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the bests interests of the corporation, and, with respect to any criminal action or proceedings, had reasonable cause to believe that his conduct was unlawful.

2. *Actions by or in right of the corporation* .  A corporation shall have the power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that he is or was a director or officer of the corporation, or is or was serving at the request of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him or in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claims, issue or matter as to which such person shall have been adjudged to be liable for negligence or misconduct in the performance of his duty to the corporation unless and only to the extent that the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the court shall deem proper.

3. *When director or officer successful* .  To the extent that a director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (1)

or (2) of this section, or in the defense of a claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.

4. *Payment of expenses in advance* . Expenses incurred in defending a civil or criminal action, suit or proceeding may be paid in advance of the final disposition of such action, suit or proceeding as authorized by the board of directors in the specific case upon receipt of an undertaking by or on behalf of the director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the corporation as authorized in this section.

5. *Indemnification pursuant to other rights* . The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

6. *Continuation of indemnification* . The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

7. *Insurance* . A corporation shall have the power to purchase and maintain insurance on behalf of any person who is or was a director or officer of the corporation or is or was serving at the request of the corporation as a director or officer against any liability asserted against him and incurred by him in such capacity whether or not the corporation would have the power to indemnify him against such liability under the provisions of this section.

## Item 21.   *Exhibits and Financial Statement Schedules*

(a) *Exhibits*

The exhibits filed as part of this registration statement are listed in the index to exhibits immediately preceding such exhibits, which index to exhibits is incorporated herein by reference.

(b) *Financial Statements*

The financial statements filed as part of this registration statement are listed in the index to the financial statements immediately preceding such financial statements, which index to the financial statements is incorporated herein by reference.

## Item 22.   *Undertakings*

The undersigned registrant hereby undertakes:

(a) Under Rule 415 of the Securities Act,

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement :

(i) To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) if, in the aggregate, the changes in volume and price represent no more than a 20 percent change in the maximum aggregate

offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement.

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act of 1933, as amended, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) To file a post-effective amendment to the registration statement to include any financial statements required by Item 8.A. of Form 20-F at the start of any delayed offering or throughout a continuous offering. Financial statements and information otherwise required by Section 10(a)(3) of the Act need not be furnished, *provided* , that the registrant includes in the prospectus, by means of a post-effective amendment, financial statements required pursuant to this paragraph (a)(4) and other information necessary to ensure that all other information in the prospectus is at least as current as the date of those financial statements. Notwithstanding the foregoing, with respect to registration statements on Form F-3, a post-effective amendment need not be filed to include financial statements and information required by Section 10(a)(3) of the Securities Act of 1933 or Rule 3-19 under the Securities Act of 1933 if such financial statements and information are contained in periodic reports filed with or furnished to the Commission by the registrant pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the Form F-3.

(b)-(g) Not applicable.

(h) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

(i)-(l) Not applicable.

The undersigned registrant hereby undertakes: (i) to respond to requests for information that is incorporated by reference into the prospectus pursuant to Items 4, 10(b), 11, 13 of this Form, within one business day of receipt of such request, and to send the incorporated documents by first class mail or other equally prompt means, and (ii) to arrange or provide for a facility in the United States for the purpose of responding to such requests. The undertaking in subparagraph (i) above includes information contained in documents filed subsequent to the effective date of the registration statement through the date of responding to the request.

The undersigned registrant hereby undertakes to supply by means of post-effective amendment all information concerning a transaction and the company being acquired involved therein, that was not the subject of and included in the registration statement when it became effective.

II-3

## SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this Amendment No. 1 to the registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Athens, Greece, on October 11, 2011.

### OCEAN RIG UDW INC.

| | |
|---|---|
| By: /s/ George Economou | |
| Name: | George Economou |
| Title: | President, Chief Executive Officer and Chairman of the Board of Directors |

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints each of Gary J. Wolfe, Robert E. Lustrin and Edward S. Horton, Philip Richter and Robert Mollen his true and lawful attorney-in-fact and agent, with full powers of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any or all amendments (including post-effective amendments) to this registration statement and any related registration statement filed pursuant to Rule 462(b), and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney-in-fact and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done, as fully for all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent, or his substitute.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated.

| Name | Position | Date |
|---|---|---|
| /s/ George Economou<br>George Economou | President, Chief Executive Officer and Chairman of the Board of Directors (Principal Executive Officer, Principal Financial Officer, Principal Accounting Officer) | October 11, 2011 |
| /s/ Prokopios (Akis) Tsirigakis<br>Prokopios (Akis) Tsirigakis | Director | October 11, 2011 |
| /s/ Michael Gregos<br>Michael Gregos | Director | October 11, 2011 |
| /s/ Trygve Arnesen<br>Trygve Arnesen | Director | October 11, 2011 |
| /s/ Savvas D. Georghiades<br>Savvas D. Georghiades | Director | October 11, 2011 |

II-4

## AUTHORIZED REPRESENTATIVE

Pursuant to the requirements of the Securities Act of 1933, as amended, the undersigned, the duly authorized representative of the Registrant in the United States, has signed this Amendment No. 1 to the registration statement in the City of Newark, State of Delaware, October 11, 2011.

### PUGLISI & ASSOCIATES

By: /s/  Donald J. Puglisi

Name:    Donald J. Puglisi
Title:      Authorized Representative

II-5

| Number | Description of Exhibit |
|---|---|
| 3.1 | Second Amended and Restated Articles of Incorporation of the Company(1) |
| 3.2 | Second Amended and Restated Bylaws of the Company(1) |
| 4.1 | Form of Share Certificate(5) |
| 4.2 | Amended and Restated Stockholders Rights Agreement, dated June 3, 2011(1) |
| 4.3 | Certificate of Designations of Rights, Preferences and Privileges of Series A Participating Preferred Stock of the Company(1) |
| 5.1 | Opinion of Seward & Kissel LLP, as to the legality of the Ocean Rig Shares |
| 8.1 | Opinion of Seward & Kissel LLP, as to certain tax matters |
| 10.1 | Drillship Master Agreement, dated November 22, 2010, between DryShips Inc. and Samsung Heavy Industries Co., Ltd.(1) |
| 10.2 | Novation Agreement, dated December 30, 2010, between Samsung Heavy Industries Co., Ltd., DryShips Inc. and Ocean Rig UDW Inc.(1) |
| 10.3 | Addendum No. 1 dated May 16, 2011 to a Drillship Master Agreement, dated November 22, 2010, between DryShips Inc. and Samsung Heavy Industries Co., Ltd., as novated by a Novation Agreement, dated December 30, 2010, between Samsung Heavy Industries Co., Ltd., DryShips Inc. and Ocean Rig UDW Inc.(1) |
| 10.4 | Senior Secured Credit Facility Agreement, dated April 15, 2011, by and among Drillships Holdings Inc. and Nordea Bank Finland plc, London Branch and certain financial institutions listed therein relating to a credit facility of $800,000,000(1) |
| 10.5 | Facility Agreement, dated December 21, 2010, by and among Drillship Hydra Owners Inc., Deutsche Bank AG, London Branch and certain financial institutions listed therein relating to a short-term loan facility of $325,000,000(1) |
| 10.6 | $230,000,000 Secured Loan Agreement, dated September 10, 2007, by and among Drillship Hydra Owners Inc. and Drillship Paros Owners Inc. and DVB Bank AG(1) |
| 10.7 | First Supplemental Agreement to Secured Loan Facility Agreement dated September 10, 2007, by and among Drillship Hydra Owners Inc. and Drillship Paros Owners Inc. and DVB Bank AG, relating to a loan of up to $230,000,000(2) |
| 10.8 | Second Supplemental Agreement to Secured Loan Facility Agreement dated September 10, 2007, as amended and supplemented by a First Supplemental Agreement dated January 10, 2008, by and among Drillship Hydra Owners Inc. and Drillship Paros Owners Inc. and DVB Bank AG, relating to a loan of up to $230,000,000(2) |
| 10.9 | Waiver Letter, dated April 16, 2010, to a Secured Loan Facility Agreement dated January 10, 2007, as amended by a First Supplemental Agreement dated January 10, 2008 and a Second Supplemental Agreement dated January 23, 2009, by and among Drillship Hydra Owners Inc. and Drillship Paros Owners Inc. and DVB Bank AG, relating to a loan of up to $230,000,000(3) |
| 10.10 | Compliance Confirmation Letter, dated June 16, 2010, to a Secured Loan Facility Agreement dated January 10, 2007, as amended by a First Supplemental Agreement dated January 10, 2008 and a Second Supplemental Agreement dated January 23, 2009, by and among Drillship Hydra Owners Inc. and Drillship Paros Owners Inc. and DVB Bank AG, relating to a loan of up to $230,000,000(1) |
| 10.11 | Compliance Confirmation Letter, dated June 16, 2010, to a Secured Loan Facility Agreement dated January 10, 2007, as amended by a First Supplemental Agreement dated January 10, 2008 and a Second Supplemental Agreement dated January 23, 2009, by and among Drillship Hydra Owners Inc. and Drillship Paros Owners Inc. and DVB Bank AG, relating to a loan of up to $230,000,000(3) |
| 10.12 | Compliance Confirmation Letter, dated September 3, 2010, to a Secured Loan Facility Agreement dated January 10, 2007, as amended by a First Supplemental Agreement dated January 10, 2008 and a Second Supplemental Agreement dated January 23, 2009, by and among Drillship Hydra Owners Inc. and Drillship Paros Owners Inc. and DVB Bank AG, relating to a loan of up to $230,000,000(3) |
| 10.13 | Compliance Confirmation Letter, dated November 25, 2010, to a Secured Loan Facility Agreement dated January 10, 2007, as amended by a First Supplemental Agreement dated January 10, 2008 and a Second Supplemental Agreement dated January 23, 2009, by and among Drillship Hydra Owners Inc. and Drillship Paros Owners Inc. and DVB Bank AG, relating to a loan of up to $230,000,000(3) |

| Number | Description of Exhibit |
|---|---|
| 10.14 | Guarantee and Indemnity, dated January 23, 2009, by DryShips Inc. in favor of DVB Bank SE, relating to a $230,000,000 secured loan agreement, dated September 10, 2007, as amended and supplemented, by and among Drillship Hydra Owners Inc. and Drillship Paros Owners Inc. and DVB Bank AG(1) |
| 10.15 | Guarantee, Revolving Credit and Term Loan Facility Agreement dated September 17, 2008 by and between Ocean Rig ASA, Ocean Rig Norway AS and certain financial institutions listed therein for $1,040,000,000(4) |
| 10.16 | Addendum No. 1, dated December 19, 2008, to a Guarantee, Revolving Credit and Term Loan Facility Agreement dated September 17, 2008 by and between Ocean Rig ASA, Ocean Rig Norway AS and certain financial institutions listed therein for $1,040,000,000(2) |
| 10.17 | Amendment and Restatement Agreement, dated November 19, 2009, relating to a Guarantee, Revolving Credit and Term Loan Facility Agreement dated September 17, 2008 by and between Ocean Rig ASA, Ocean Rig Norway AS and certain financial institutions listed therein, relating to a loan of up to $1,040,000,000(2) |
| 10.18 | Credit Facility Agreement, dated July 18, 2008, by and between Drillship Skopelos Owners Inc., Deutsche Bank A.G. and certain financial institutions listed therein, relating to a loan of up to $562,500,000(1) |
| 10.19 | Credit Facility Agreement, dated July 18, 2008, by and between Drillship Kithira Owners Inc., Deutsche Bank A.G. and certain financial institutions listed therein, relating to a loan of up to $562,500,000(1) |
| 10.20 | Supplemental Agreement, dated September 17, 2008, relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, between Drillship Skopelos Owners Inc. and Deutsche Bank AG(2) |
| 10.21 | Supplemental Agreement, dated September 17, 2008, relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, between Drillship Kithira Owners Inc. and Deutsche Bank AG(2) |
| 10.22 | Supplemental Agreement No. 2, dated December 18, 2008, relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, as amended and supplemented by Supplemental Agreement dated September 17, 2008, between Drillship Skopelos Owners Inc. and Deutsche Bank AG(2) |
| 10.23 | Supplemental Agreement No. 2, dated December 18, 2008, relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, as amended and supplemented by Supplemental Agreement dated September 17, 2008, between Drillship Kithira Owners Inc. and Deutsche Bank AG(2) |
| 10.24 | Waiver Letter, dated May 21, 2009, relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, as amended and supplemented by the Supplemental Agreement dated September 17, 2008 and the Supplemental Agreement No. 2 dated December 18, 2008, between Drillship Skopelos Owners Inc. and Deutsche Bank AG(3) |
| 10.25 | Waiver Letter, dated May 21, 2009, relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, as amended and supplemented by the Supplemental Agreement dated September 17, 2008 and the Supplemental Agreement No. 2 dated December 18, 2008, between Drillship Kithira Owners Inc. and Deutsche Bank AG(3) |
| 10.26 | Facility Agent's and Security Trustee's Consent Letter, dated June 5, 2009, relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, as amended and supplemented by the Supplemental Agreement dated September 17, 2008 and the Supplemental Agreement No. 2 dated December 18, 2008, between Drillship Skopelos Owners Inc. and Deutsche Bank AG(3) |
| 10.27 | Facility Agent's and Security Trustee's Consent Letter, dated June 5, 2009, relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, as amended and supplemented by the Supplemental Agreement dated September 17, 2008 and the Supplemental Agreement No. 2 dated December 18, 2008, between Drillship Kithira Owners Inc. and Deutsche Bank AG(3) |
| 10.28 | Supplemental Agreement No. 3, dated January 29, 2010, relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, as amended and supplemented by the Supplemental Agreement dated September 17, 2008 and the Supplemental Agreement No. 2 dated December 18, 2008, between Drillship Skopelos Owners Inc. and Deutsche Bank AG(2) |
| 10.29 | Supplemental Agreement No. 3, dated January 29, 2010, relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, as amended and supplemented by the Supplemental Agreement dated September 17, 2008 and the Supplemental Agreement No. 2 dated December 18, 2008, between Drillship Kithira Owners Inc. and Deutsche Bank AG(2) |

| Number | Description of Exhibit |
|--------|----------------------|
| 10.30 | Facility Agent's Consent Letter, dated June 23, 2010 relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, as amended and supplemented by the Supplemental Agreement dated September 17, 2008, the Supplemental Agreement No. 2 dated December 18, 2008 and the Supplemental Agreement No. 3 dated January 29, 2010, between Drillship Skopelos Owners Inc. and Deutsche Bank AG(3) |
| 10.31 | Facility Agent's Consent Letter, dated June 23, 2010, relating to a $562,500,000 Credit Facility Agreement dated July 18, 2008, as amended and supplemented by the Supplemental Agreement dated September 17, 2008, the Supplemental Agreement No. 2 dated December 18, 2008 and the Supplemental Agreement No. 3 dated January 29, 2010, between Drillship Kithira Owners Inc. and Deutsche Bank AG (3) |
| 10.32 | Amendment and Restatement Agreement, dated April 27, 2011, to the Credit Facility Agreement, dated July 18, 2008, as amended and supplemented on September 17, 2008, December 18, 2008 and January 29, 2010, between Drillship Skopelos Owners Inc., Deutsche Bank A.G. and certain financial institutions listed therein, relating to a loan of up to $562,500,000(1) |
| 10.33 | Amendment and Restatement Agreement, dated April 27, 2011, to the Credit Facility Agreement dated July 18, 2008, as amended and supplemented on September 17, 2008, December 18, 2008 and January 29, 2010, between Drillship Kithira Owners Inc., Deutsche Bank A.G. and certain financial institutions listed therein, relating to a loan of up to $562,500,000(1) |
| 10.34 | Amendment Agreement to the Credit Agreement dated August 10, 2011, between Drillship Skopelos Owners Inc., Deutsche Bank AG and certain financial institutions listed therein(5) |
| 10.35 | Sponsor Construction and Post-Delivery Guarantee, dated July 18, 2008, by and among DryShips Inc., Deutsche Bank Luxembourg S.A. and certain financial institutions listed therein(1) |
| 10.36 | Sponsor Construction and Post-Delivery Guarantee, dated July 18, 2008, by and among DryShips Inc., Deutsche Bank Luxembourg S.A. and certain financial institutions listed therein(1) |
| 10.37 | Guarantee, dated April 27, 2011, by and among Ocean Rig UDW Inc., Deutsche Bank Luxembourg S.A. and Deutsche Bank AG Filiale Deutschlandgeschaft, relating to the Amendment and Restatement Agreement, dated April 27, 2011, to the Credit Facility Agreement, dated July 18, 2008, as amended and supplemented, between Drillship Skopelos Owners Inc., Deutsche Bank A.G. and certain financial institutions listed therein(1) |
| 10.38 | Guarantee, dated April 27, 2011, by and among Ocean Rig UDW Inc., Deutsche Bank Luxembourg S.A. and Deutsche Bank AG Filiale Deutschlandgeschaft, relating to the Amendment and Restatement Agreement, dated April 27, 2011, to the Credit Facility Agreement, dated July 18, 2008, as amended and supplemented, between Drillship Kithira Owners Inc., Deutsche Bank A.G. and certain financial institutions listed therein(1) |
| 10.39 | Global Services Agreement, dated December 1, 2010, by and between DryShips Inc. and Cardiff Marine Inc.(1) |
| 10.40 | Consultancy Agreement, dated September 1, 2010, by and between DryShips Inc. and Vivid Finance Limited(1) |
| 10.41 | Bond Agreement between Ocean Rig UDW Inc. and Norsk Tillitsmann ASA, dated April 14, 2011(1) |
| 21.1 | List of Subsidiaries(1) |
| 23.1 | Consent of Seward & Kissel LLP (included in Exhibit 5.1) |
| 23.2 | Consent of Seward & Kissel LLP (included in Exhibit 8.1) |
| 23.3 | Consent of Independent Registered Public Accounting Firm of Ocean Rig (Ernst & Young AS) |
| 23.4 | Consent of Independent Registered Public Accounting Firm of OceanFreight (Ernst & Young Hellas Certified Auditors — Accountants S.A.) |
| 23.5 | Consent of Fearnley Offshore AS |
| 23.6 | Consent of Fearnley Fonds ASA |
| 24 | Power of Attorney (contained in the signature page hereto) |
| 99.1 | Form of Proxy Card |
| 99.2† | Agreement and Plan of Merger, dated July 26, 2011, by and among DryShips Inc., Pelican Stockholdings Inc. and OceanFreight Inc. (included as Annex A to this proxy statement / prospectus) |

| Number | Description of Exhibit |
|--------|------------------------|
| 99.3 | Purchase and Sale Agreement, dated July 26, 2011, by and among DryShips Inc., OceanFreight Inc., Basset Holdings Inc., Steel Wheel Investments Limited and Haywood Finance Limited (included as Annex B to this proxy statement / prospectus) |

---

† Schedules have been omitted pursuant to Item 601(b)(2) of Regulation S-K. A copy of any omitted schedule will be furnished supplementally to the Securities and Exchange Commission upon request.

(1) Filed as an Exhibit to Ocean Rig's Registration Statement on Form F-4 (File No. 333-175940) filed August 1, 2011.

(2) Incorporated by reference from an Exhibit to the Annual Report of DryShips Inc. filed on Form 20-F on April 9, 2010.

(3) Incorporated by reference from an Exhibit to the Annual Report of DryShips filed on Form 20-F on April 15, 2011.

(4) Incorporated by reference from an Exhibit to the Annual Report of DryShips Inc. filed on Form 20-F on March 30, 2009.

(5) Filed as an Exhibit to Ocean Rig's Amended Registration Statement on Form F-4/A (Amendment No. 1) (File No. 333-175940) filed August 17, 2011

II-9

**Exhibit 5.1**

[Seward & Kissel LLP Letterhead]

October 11, 2011

Ocean Rig UDW Inc.
10 Skopa Street, Tribune House
2 nd Floor, Office 202, CY 1075
Nicosia, Cyprus
011 357 22767517

**Re: Ocean Rig UDW Inc.**

Ladies and Gentlemen:

We have acted as Marshall Islands and United States counsel to Ocean Rig UDW Inc., (the "Company") in connection with the Company's Registration Statement on Form F-4 (File No. 333-176641) as filed with the U.S. Securities and Exchange Commission (the "Commission") on September 1, 2011, as thereafter amended or supplemented (the "Registration Statement") with respect to the transfer of up to 1,541,171 of the Company's common shares (including the related preferred stock purchase rights (the "Rights")), par value $0.01 per share (the "Securities"). The Registration Statement relates to the merger of Pelican Stockholdings Inc. ("Pelican") with and into OceanFreight Inc. ("OceanFreight") with OceanFreight as the surviving corporation (the "Merger") as a wholly-owned subsidiary of DryShips Inc. ("DryShips") pursuant to the Agreement and Plan of Merger, dated July 26, 2011, by and among DryShips, OceanFreight and Pelican (the "Merger Agreement"), as described in the form of the Proxy Statement/Prospectus included in the Registration Statement (the "Proxy/Prospectus").

The Securities covered by the Registration Statement were issued by way of a share dividend of 103,125,000 of the Company's common shares to DryShips that was made on December 8, 2010.

We have examined originals or copies, certified or otherwise identified to our satisfaction, of: (i) the Registration Statement; (ii) the Proxy/Prospectus of the Company included in the Registration Statement; (iii) the Amended and Restated Stockholders Rights Agreement dated as of June 3, 2011 (the "Rights Agreement"); (iv) the Merger Agreement; (v) the Purchase and Sale Agreement; and (vi) such corporate documents and records of the Company and such other instruments, certificates and documents as we have deemed necessary or appropriate as a basis for the opinions hereinafter expressed. In such examinations, we have assumed the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as copies or drafts of documents to be executed, the genuineness of all signatures and the legal competence or capacity of persons or entities to complete the execution of documents. As to various questions of fact which are material to the opinions hereinafter expressed, we have relied upon statements or certificates of public officials, directors of the Company and others.

Ocean Rig UDW Inc.
October 11, 2011
Page 2

We have further assumed for the purposes of this opinion, without investigation, that (i) all documents contemplated by the Proxy/Prospectus to be executed in connection with the Merger have been duly authorized, executed and delivered by each of the parties thereto other than the Company; and (ii) the terms of the Merger comply in all respects with the terms, conditions and restrictions set forth in the Proxy/Prospectus and all of the instruments, agreements and other documents relating thereto or executed in connection therewith.

Based upon and subject to the foregoing, and having regard to such other legal considerations which we deem relevant, we are of the opinion that under the laws of the Republic of the Marshall Islands, the Securities have been duly authorized, are validly issued, fully paid and non-assessable.

Furthermore, based upon and subject to the foregoing, and having regard to such other legal considerations which we deem relevant, we are of the opinion that under the laws of the State of New York, the Rights constitute binding obligations of the Company in accordance with the terms of the Rights Agreement.

This opinion is limited to the law of the Republic of the Marshall Islands and the State of New York as in effect on the date hereof.

We hereby consent to the filing of this opinion as an exhibit to the Registration Statement, and to each reference to us and the discussions of advice provided by us under the headings "Legal Matters" in the Prospectus, without admitting we are "experts" within the meaning of the Securities Act of 1933, as amended, or the rules and regulations of the Commission thereunder with respect to any part of the Registration Statement.

Very Truly Yours,

/s/ SEWARD & KISSEL LLP

2

**Exhibit 8.1**

[Seward & Kissel LLP Letterhead]

October 11, 2011

Ocean Rig UDW Inc.
10 Skopa Street, Tribune House
2 nd Floor, Office 202, CY 1075
Nicosia, Cyprus
011 357 22767517

**Re: Ocean Rig UDW Inc.**

Ladies and Gentlemen:

We have acted as Marshall Islands and United States counsel to Ocean Rig UDW Inc., (the "Company") in connection with the Company's Registration Statement on Form F-4 (File No. 333-176641) as filed with the U.S. Securities and Exchange Commission (the "Commission") on September 1, 2011, as thereafter amended or supplemented (the "Registration Statement") with respect to the transfer of up to 1,541,171 of the Company's common shares (including the related preferred stock purchase rights (the "Rights")), par value $0.01 per share (the "Securities"). The Registration Statement relates to the merger of Pelican Stockholdings Inc. ("Pelican") with and into OceanFreight Inc. ("OceanFreight") with OceanFreight as the surviving corporation (the "Merger") as a wholly-owned subsidiary of DryShips Inc. ("DryShips") pursuant to the Agreement and Plan of Merger, dated July 26, 2011, by and among DryShips, OceanFreight and Pelican (the "Merger Agreement"), as described in the form of the Proxy Statement/Prospectus included in the Registration Statement (the "Proxy/Prospectus").

In formulating our opinion as to these matters, we have examined such documents as we have deemed appropriate, including the Registration Statement and the Proxy/Prospectus. We also have obtained such additional information as we have deemed relevant and necessary from representatives of the Company.

Capitalized terms not defined herein have the meanings ascribed to them in the Registration Statement.

Based on the facts as set forth in the Registration Statement and, in particular, on the representations, covenants, assumptions, conditions and qualifications described under the captions "Risk Factors" and "Taxation" therein, we hereby confirm that the opinions that are attributed to Seward & Kissel LLP with respect to United States federal income tax matters and Marshall Islands tax matters in the Registration Statement under the captions:

(i) "Taxation — Material tax considerations with respect to the ownership and disposition of Ocean Rig common stock";

(ii) "Taxation — Distributions";

Ocean Rig UDW Inc.
October 11, 2011
Page 2

(iii) "Taxation — Sale, exchange or other disposition of Ocean Rig commons shares";

(iv) "Taxation — Passive foreign investment company status and significant tax consequences";

(v) "Taxation — Backup withholding and information reporting";

(vi) "Risk Factors — A change in tax laws, treaties or regulations, or their interpretation, of any country in which Ocean Rig operates could result in a higher tax rate on its worldwide earnings, which could result in a significant negative impact on Ocean Rig's earnings and cash flows from operations"; and

(vii) "Risk Factors — United States tax authorities may treat Ocean Rig as a 'passive foreign investment company' for United States federal income tax purposes, which may reduce Ocean Rig's ability to raise additional capital through the equity markets"

are the opinions of Seward and Kissel LLP and accurately state our opinion as to the tax matters discussed therein.

Our opinions and the tax discussion as set forth in the Registration Statement are based on the current provisions of the Internal Revenue Code of 1986, as amended, the Treasury Regulations promulgated thereunder, published pronouncements of the Internal Revenue Service which may be cited or used as precedents, and case law, any of which may be changed at any time with retroactive effect. No opinion is expressed on any matters other than those specifically referred to above by reference to the Registration Statement.

We hereby consent to the filing of this opinion as an exhibit to the Registration Statement.

Very Truly Yours,

/s/ SEWARD & KISSEL LLP

2

**Exhibit 23.3**

### Consent of Independent Registered Public Accounting Firm

We consent to the references to our firm under the caption "Experts" and to the use of our report dated April 29, 2011, with respect to the consolidated financial statements of Ocean Rig UDW Inc., in Amendment No. 1 to the Registration Statement (Form F-4 No. 333-176641) and Prospectus of Ocean Rig UDW Inc. for the registration of 1,541,171 shares of its common stock.

We also consent to the use herein of our report dated February 3, 2011, with respect to the consolidated financial statements of Ocean Rig ASA.

/s/ Ernst & Young AS
Stavanger, Norway
October 11, 2011

**Exhibit 23.4**

### CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM OF OCEANFREIGHT INC.

We consent to the reference to our firm under the caption "Experts" and to the inclusion of our reports dated April 14, 2011, with respect to the consolidated financial statements and the effectiveness of internal control over financial reporting of OceanFreight Inc. included in Amendment No. 1 to the Registration Statement (Form F-4 No. 333-176641) and Prospectus of Ocean Rig UDW Inc. for the registration of 1,541,171 shares of its common stock.

/s/ Ernst & Young (Hellas) Certified Auditors Accountants S.A.
October 10, 2011
Athens, Greece.

Exhibit 23.5



Ocean Rig UDW Inc.
10 Skopa Street, Tribune House,
2nd Floor, Office 202, CY 1075,
Nicosia, Cyprus

October 11, 2011

Dear Sir/Madam:

We hereby consent to the use, in the Registration Statement of Ocean Rig UDW Inc. ("Ocean Rig") on Form F-4 and in the related Proxy Statement/Prospectus of DryShips Inc. and OceanFreight Inc., to all references to our name and the use of statistical information supplied by us set forth therein under the headings "Ocean Rig Summary," "Risk Factors," "Ocean Rig Management's Discussion and Analysis of Ocean Rig's Financial Condition and Results of Operation" and "Business" and the use of our report in the section of the Proxy Statement/Prospectus entitled "The Offshore Drilling Industry." We further advise you that our role has been limited to the provision of such statistical data supplied by us. With respect to such statistical data, we advise you that:

- We have to the best of our knowledge accurately described the international offshore drilling industry; and

- Our methodologies for collecting information and data may differ from those of other sources and does not reflect all or even necessarily a comprehensive set of the actual transactions occurring in the offshore drilling industry.

We hereby consent to the filing of this letter as an exhibit to the Registration Statement of Ocean Rig on Form F-4 to be filed with the U.S. Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended, and the references to our firm in the section of the Registration Statement entitled "Experts."

Yours sincerely,
FEARNLEY OFFSHORE AS

/s/ Morten Maehle
_____

Morten Maehle
Managing Director

---

**Fearnley Offshore AS**

Enterprise number NO 884 661 412 VAT

Office:
Grev Wedels pl. 9
Oslo Norway

Mailing address:
P.O.Box 1158 Sentrum
N-0107 OSLO
NORWAY

Telephone:  +47 22 93 60 00
Telefax:  +47 22 93 63 05

Home page: www.fearnleyoffshore.com
Internet:  rig.offshore@fearnleys.no



An Astrup Fearnley company

Exhibit 23.6



## CONSENT OF FEARNLEY FONDS ASA

We hereby consent to the use of our opinion letter dated July 25, 2011 to the Special Committee of the Board of Directors of OceanFreight Inc. ("OceanFreight") included as Annex C to the Proxy Statement/Prospectus which forms a part of the Registration Statement on Form F-4 of Ocean Rig UDW Inc relating to the proposed transaction involving DryShips Inc and OceanFreight and to the references to such opinion in such Proxy Statement/Prospectus under the headings "Transaction Summary — The OceanFreight Special Committee has received an opinion from OceanFreight's Financial Advisor," "The Transaction — Background of the Transaction" and "The Transaction — Opinion of OceanFreight's Financial Advisor." In giving such consent, we do not admit that we come within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, as amended, or the rules and regulations of the Securities and Exchange Commission thereunder, nor do were thereby admit that we are experts with respect to any part of such Registration Statement within the meaning of the term "expert" as used in the Securities Act of 1933, as amended, or the rules and regulations of the Securities and Exchange Commission thereunder.

/s/ Eivind Hadler-Olsen
for Fearnley Fonds ASA
Eivind Hadler-Olsen, managing director

October 11, 2011

---

**Fearnley Fonds ASA**

An Astrup Fearnley company
Member of the Oslo Stock Exchange

Grev Wedels plass 9
P.O.Box 1158 Sentrum
N-0107 Oslo
Norway

Telephone:   +47 22 93 60 00
                      +47 22 41 50 30
Facsimile:   +47 22 93 63 60
Web:            www.fearnleyfonds.com

Bank account:
5001.06.89500
Enterprise number:
NO 945 757 647 VAT

Exhibit 99.1



0                    ■

# OCEANFREIGHT INC.

### THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

The undersigned hereby appoints Demetris Nenes and Solon Dracoulis, and each of them, as proxy, with full power of substitution, to represent and vote as designated on the reverse side, all the shares of Common Stock of OceanFreight Inc. held of record by the undersigned on October 7, 2011, at the Special Meeting of Shareholders to be held at the Company's offices located at 80 Kifissias Avenue, Amaroussion 15125, Athens, Greece on November 3, 2011 at 10:00 a.m. local time, or any adjournment or postponement thereof.

**(Continued and to be signed on the reverse side)**

■                                                                    14475 ■

## SPECIAL MEETING OF SHAREHOLDERS OF

# OCEANFREIGHT INC.

### November 3, 2011

**NOTICE OF INTERNET AVAILABILITY OF PROXY MATERIAL:**
The Notice of Meeting, Proxy Statement and Proxy Card
are available at www.oceanfreightinc.com/special_meeting.html

## Please sign, date and mail your proxy card in the envelope provided as soon as possible.

↓ Please detach along perforated line and mail in the envelope provided. ↓

■ 00030000000000000000 4                                    110311

---

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" THE ADOPTION AND APPROVAL OF THE MERGER AGREEMENT.**
**PLEASE SIGN, DATE AND RETURN PROMPTLY IN THE ENCLOSED ENVELOPE.  PLEASE MARK YOUR VOTE IN BLUE OR BLACK INK AS SHOWN HERE** ☒

FOR   AGAINST   ABSTAIN

1. To approve the Agreement and Plan of Merger, dated as of July 26, 2011, by and among DryShips Inc., or DryShips, Pelican StockHoldings Inc. and OceanFreight Inc., or OceanFreight, pursuant to which OceanFreight will become a wholly-owned subsidiary of DryShips.   ☐ ☐ ☐

To change the address on your account, please check the box at right and indicate your new address in the address space above.  Please note that changes to the registered name(s) on the account may not be submitted via this method.   ☐

Signature of Shareholder _____ Date: _____   Signature of Shareholder _____ Date: _____

**Note:**  Please sign exactly as your name or names appear on this Proxy. When shares are held jointly, each holder should sign.  When signing as executor, administrator, attorney, trustee or guardian, please give full title as such. If the signer is a corporation, please sign full corporate name by duly authorized officer, giving full title as such.  If signer is a partnership, please sign in partnership name by authorized person.