UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

                                                    :
JOAN LITWIN, *on behalf of herself and all other similarly* :
*situated shareholders,*                             :
                                                    :
                              Plaintiff,            :
                    -v-                             :
                                                    :
OCEANFREIGHT, INC., et al.,                          :
                                                    :
                              Defendants.            :
                                                    :
------------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 11/2/11

11 Civ. 7218 (PAE)

MEMORANDUM &
ORDER

PAUL A. ENGELMAYER, District Judge:


Plaintiff Joan Litwin ("Litwin"), on behalf of a putative class of holders of OceanFreight,

Inc. ("OceanFreight") common stock, has moved for a temporary restraining order and

preliminary injunction enjoining a special shareholder meeting presently scheduled for

November 3, 2011. The purpose of the shareholder meeting is to vote on a proposed transaction

in which OceanFreight would be acquired by a subsidiary of defendant DryShips, Inc.

("DryShips"). Under the transaction, each OceanFreight shareholder would receive, as

consideration for each OceanFreight share, a negotiated combination of cash and stock of

another DryShips subsidiary, Ocean Rig. For the following reasons, plaintiff's motion for

injunctive relief is denied.

## I.  Background[1]

This case arises out of the pending merger of defendant OceanFreight into a wholly-owned subsidiary of defendant DryShips.  OceanFreight and DryShips are owners and operators of drybulk vessels and are engaged in the international shipping business.  Both companies are organized under the laws of the Republic of the Marshall Islands, with headquarters in Greece.  The common stock of both companies trades on the NASDAQ Global Market in New York City, under the ticker symbols "OCNF" and "DRYS," respectively.

As of May 2011, the majority (approximately 50.5%) of OceanFreight's common stock was owned by defendant and OceanFreight chief executive officer Antonis Kandylidis ("Kandylidis"), either directly or, indirectly, by entities he controlled.  In late May 2011, DryShips approached OceanFreight regarding possible strategic transactions between the two companies.  In response to this inquiry, OceanFreight constituted a special committee of its board of directors (the "Special Committee") to evaluate DryShips's proposals and potentially to negotiate with DryShips.  The Special Committee consisted exclusively of independent directors of the company.[2]

Initially, DryShips proposed to gain control of OceanFreight by purchasing only Mr. Kandylidis's majority stake.  On June 15, 2011, the Special Committee responded by acknowledging the benefits of a potential transaction but stating its strong preference that all shareholders of OceanFreight participate in the transaction and receive the same consideration for their shares.  On June 17, 2011, DryShips responded that it preferred a transaction whereby it

---

[1] The following description of the underlying facts relevant to the pending motion is drawn from (1) the parties' submissions in support of or opposition to the application for a temporary restraining order, and (2) the portions of the Amended Complaint which the defendants have acknowledged as accurate.

[2] Plaintiff has represented to the Court that it does not challenge the independence of the Special Committee.

acquired only Kandylidis's shares. DryShips also made an offer to acquire, at a price to be negotiated, five contracts into which OceanFreight had entered to acquire newly-built ships.

On June 21, 2011, the Special Committee responded to DryShips. It reiterated its preference for a transaction that put all shareholders on equal terms to Kandylidis. The Special Committee stated that it was open to reaching this goal either by (1) DryShips extending an offer to all shareholders for the entire company, or (2) Kandylidis undertaking to extend DryShips' offer to other shareholders on a pro-rata basis. The Special Committee also advised DryShips that, while it was willing to sign a non-disclosure agreement and exchange due diligence material with DryShips so as to permit negotiations to go forward, it might consider other alternative courses of action to maximize shareholder value.

On June 28, 2011, DryShips advised the Special Committee that it had decided to proceed with an acquisition of all of the outstanding shares of OceanFreight common stock. As then proposed by DryShips, each OceanFreight shareholder would receive $12 per share in cash, subject to due diligence. A non-disclosure agreement was executed the same day, and DryShips provided a due diligence request list to the Special Committee shortly thereafter.

On July 1, 2011, the Special Committee held a telephonic meeting with its financial advisor Fearnley Fonds ASA ("Fearnley") and legal advisor to discuss the proposed transaction and related subjects, including Fearnley's views on potential alternatives.

On July 11, 2011, DryShips revised its proposal on the basis of the due diligence materials offered by OceanFreight. It now proposed to acquire Kandylidis's ownership stake for $14 per share in cash, and to acquire the remaining shares in exchange for shares of Ocean Rig, a DryShips subsidiary, with an implied value of $16 per OceanFreight share. On July 12, 2011, the Special Committee informed DryShips that it would not recommend the revised offer, that it

3

regarded the offer price as insufficient, and that an offer of at least $22.50 per OceanFreight share was warranted.

On July 14, 2011, DryShips presented a revised proposal. It now offered, for Kandylidis's shares, $16 per share in cash; and, for the remaining shares, Ocean Rig stock valued at $18 per share. The Special Committee responded by stating that the proposed offer was insufficient, and by repeating its preference for all shareholders to receive the same consideration in any transaction. The Special Committee proposed that DryShips instead make an offer with a value of $26 per OceanFreight share, half to be paid in cash and half in the form of Ocean Rig shares. On July 15, 2011, DryShips informed the Special Committee that it was willing to modify its terms so that all OceanFreight shareholders would receive the same cash and stock consideration.

At a face-to-face meeting on July 19, 2011, the parties agreed in principle to a transaction that would occur in two stages: (a) no less than four weeks after signing, DryShips would acquire Kandylidis's approximately 50.5% stake at a price per OceanFreight share equal to $11.25 in cash and .52326 shares of Ocean Rig stock (the "Merger Consideration"); and (b) DryShips would acquire all other shares of OceanFreight for the same Merger Consideration by means of a one-step merger between OceanFreight and a merger subsidiary created by DryShips for the purpose of the transaction.

On July 25, 2011, the Special Committee met to approve the transaction. At that meeting, Fearnley delivered an oral opinion valuing the Merger Consideration at the time of the meeting at approximately $19.85 per OceanFreight share. Fearnley also opined, including in a written report, that this price was fair. After Fearnley's presentation, the Special Committee unanimously approved and recommended the transaction to the Board. It also approved the

merger agreement and recommended that it be submitted to OceanFreight shareholders for their assent. After reviewing the Special Committee's recommendations, the Board unanimously approved the transaction. It directed that the merger agreement be presented to shareholders for a vote.

On July 26, 2011, the parties signed the merger agreement (and an attendant purchase agreement whereby Kandylidis sold his ownership stake to DryShips) and publicly announced the transaction.

On August 24, 2011, pursuant to the purchase agreement, DryShips acquired from Kandylidis a majority of OceanFreight shares.

The shareholders' meeting to vote on the merger has been scheduled for November 3, 2011 in Athens, Greece. The proxy statement sent to shareholders ahead of the vote, filed on a Form F-4, was declared effective by the SEC[3] on October 12, 2011, and mailed to shareholders on October 17, 2011. Because DryShips has committed in the merger agreement to vote its majority shares (those acquired from Kandylidis) in favor of the merger, the proxy statement sent to shareholders states on its first page that "approval of the merger is assured."

Plaintiff filed the underlying lawsuit in this case on October 13, 2011, the day after the Form F-4 became effective. The following day, plaintiff filed an amended complaint. Although the amended complaint purports to seek a preliminary injunction among the relief requested, plaintiff did not move the Court for an order to show cause in support of a temporary restraining order or preliminary injunction, or otherwise move for such an order or injunction, until the afternoon of October 27, 2011. Late that afternoon, the Court met with the parties and oversaw a brief discussion of the issues raised by this application, and set an expedited schedule for a

---

[3] The statement at issue is contained in a Form F-4, which included information regarding Ocean Rig because its shares are being offered to OceanFreight shareholders as part of the Merger Consideration.

responsive briefs and a hearing on this matter for 2:00 p.m. on Tuesday, November 1, 2011.[4]
Early on October 28, 2011, plaintiff submitted additional authorities in support of its application;
later that day, defendants submitted a letter outlining their responses; and on October 31, 2011,
defendants submitted a full memorandum of law in opposition to the application, with supporting
materials. On the afternoon of November 1, 2011, the parties appeared before the Court for
argument on plaintiff's application.

## II. Discussion

### A.    Plaintiff's arguments in support of a temporary restraining order

Plaintiff makes three arguments in support of its application for injunctive relief.

The first argument concerns the timing of the shareholder meeting. Plaintiff claims that
defendants failed to comply with SEC rules mandating that a minimum time period pass between
the delivery of a proxy to shareholders and the shareholder meeting. Specifically, plaintiff notes
that OceanFreight's Form F-4, filed in connection with the solicitation of shareholders' votes at
the November 3, 2011, meeting, was disseminated to shareholders on October 17, 2011 – *i.e.*, 17
calendar days before the meeting. Plaintiff claims that this 17-calendar-day notice period is,
under the law, too short, for two distinct reasons. First, plaintiff argues, it is inconsistent with
Instruction A.2 to Form F-4, which requires the issuer to send the relevant proxy or prospectus to
investors at least 20 days before the scheduled meeting if the Form F-4 incorporates information
by reference as to the registrant or the company being acquired. Second, plaintiff argues, it is

---

[4] At the October 27, 2011 conference, defendants advised the Court (and plaintiffs acknowledged) that defendants
have not yet been served with any process in this case. Both at the conference and in their written submissions,
defendants have reserved the right to contest both personal jurisdiction and adequacy of service should this case
proceed forward. The Court has advised the parties that defendants' participation in litigating the instant application
for emergency injunctive relief will be without prejudice to any later argument that personal jurisdiction is lacking
or that service of the underlying Complaint did not occur or was otherwise deficient. Defendants argue that in the
absence of service, they cannot be bound by the injunctive relief plaintiff seeks, a point that plaintiff contests.
Because the Court finds that the relief plaintiff seeks is unwarranted for a variety of other reasons, it does not reach
this issue.

inconsistent with a more general "timeliness requirement" outlined in Timely Distribution of

Proxy and Other Soliciting Material, Exchange Act Release No. 34-33768, 1994 SEC LEXIS

847 (1994), and echoed in various communications from the former New York Stock Exchange

and NASDAQ, which, plaintiff contends, should have resulted in OceanFreight's shareholders

receiving at least 20 business days notice of the shareholder meeting.

　　　　Second, plaintiff asserts that the disclosures on Form F-4 and the proxy statement

distributed therein are materially misleading, in violation of federal securities law, because they

omit information necessary to enable shareholders to cast informed votes as to whether to

approve or reject the proposed merger.  Plaintiff claims that the proxy should have discussed, or

discussed more fully (a) the substance of the financial projections relied upon by Fearnley in

concluding that the Merger Consideration was fair; and (b) the inputs used by Fearnley in

generating those financial projections, including assumed future financial results, details

regarding share price history and valuation multiples, and the terms of other transactions which

Fearnley used as comparators for judging the Merger Consideration in this case.  Due to these

allegedly materially misleading statements and omissions, plaintiffs assert that the proxy violates

Section 14(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n(a)) and Rule 14a-9

promulgated thereunder (17 C.F.R. § 240.14a-9(a)), and that certain control persons are

derivatively liable under Section 20(a) (15 U.S.C. § 78t(a)).

　　　　Third, plaintiff asserts that, in approving the merger, OceanFreight's board of directors

breached its fiduciary duties under applicable law, i.e., the law of the Republic of the Marshall

Islands, which the parties agree tracks Delaware law.  To this end, plaintiff (a) claims that the

Board failed to describe the sales process leading up to the merger, including any "value

maximizing" alternative transactions contemplated or leveraging tactics used by the Committee

in its negotiations with DryShips; (b) criticizes the fact that certain OceanFreight executives will allegedly retain prominent roles in the combined company, and that other company insiders may benefit from preexisting change-in-control payments, or so-called "golden parachutes"; and (c) criticizes the board's agreement to what plaintiff terms "deal protection devices," namely, a no-solicitation provision, a deal-breakup fee, and the assent to the pre-merger purchase agreement involving Kandylidis's majority shares, which rendered the November 3, 2011, shareholder vote a *fait accompli*.

After setting forth the legal standard governing the injunctive relief plaintiff requests in this instance, the Court will address each of these arguments in turn.

**B.      The standard for issuance of a temporary restraining order**

A temporary restraining order, like a preliminary injunction,

> is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.

*Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008)). Thus, a plaintiff seeking a temporary restraining order "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Psihoyos v. John Wiley & Sons, Inc.*, 2011 U.S. Dist LEXIS 115835, at *3 (S.D.N.Y. Oct. 4, 2011) (citing *Winter*, 555 U.S. at 20 (2008)); *see also Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446, 451–52 (S.D.N.Y. 2011). The party seeking the injunction carries the burden of persuasion to demonstrate, "by a clear showing," that the necessary elements are satisfied. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

### C. Likelihood of success on the merits

For the following reasons, the Court finds that plaintiff has failed to make a clear showing of a likelihood of success on the merits as to any of its three arguments.

#### (1) Plaintiff's arguments regarding the allegedly insufficient timing between distribution of the proxy and the shareholder meeting

As noted, plaintiff makes two distinct arguments as to why the 17-calendar-day solicitation period breached the requirements of federal securities law regarding proxy solicitations.

As a threshold matter, the Court is unpersuaded that either the 20-business-day rule governing certain incorporated materials nor any "general timeliness" requirement applies at all in this case. As defendants note and plaintiffs do not dispute, OceanFreight (and, for that matter, Ocean Rig and Dry Ships) is a foreign private issuer of securities, as defined in SEC Rule 3b-4 (17 C.F.R. § 240.3b-4).[5]  Under the law of this Circuit, foreign private issuers "are exempt from sections 14(a), 14(b), 14(c), 14(f) and 16 of the [Exchange] Act" as well as the rules promulgated thereunder, including Rules 14b-2(b) and 14b-1(b)(2).  17 C.F.R. § 240.3a12-3. *See De Vries v. Tower Semiconductor Ltd.*, 2004 U.S. Dist. LEXIS 29921, at *10-13 (S.D.N.Y. Aug. 28, 2004), *aff'd sub nom Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286 (2d Cir. 2006) (holding that SEC did not exceed its authority in adopting Rule 3a12-3(b), which exempts foreign private issuers from liability under the above sections of Section 14 and the rules promulgated thereunder).  The purpose of the exemption was to encourage foreign issuers to list on U.S. exchanges, whereas subjecting them to the full panoply of U.S. "regulatory burdens" might "chase such companies out of the American market, which would then force interested American investors to invest in foreign markets without any of the SEC's protections." *Id.* at 12-13 & n.8.

---

[5] The term "private" as used in this context is used to mean that the issuer is a non-government entity.

The exemption for foreign private issuers "unambiguously exempts foreign private issuers from Section 14(a), and thus extends to claims under that section and the rules promulgated thereunder based on alleged material misstatements in or omissions from proxy statements. *Id.* at *17 n.9.

Here, the only federal securities law claims that plaintiff brings are for alleged violations of Section 14(a) of the Exchange Act and the rules promulgated thereunder (and for derivative violations by control persons, under Section 20(a) of the same Act). See Amended Complaint, ¶10; *id.*, at Prayer for Relief, ¶ B. Plaintiff's claims that there is an insufficient period between the issuance of the proxy and the shareholder meeting, specifically that the 17-day period is inconsistent with the instructions to Form F-4 and with a general SEC "timeliness requirement," would thus be actionable in this case, if at all, only under Section 14(a). But, under *Tower Semiconductor*, as a matter of law, such allegations, where brought under Section 14(a), cannot state a claim against a foreign private issuer.

In any event, for the reasons that follow, even if the rules or requirements in question were applicable to the defendants, plaintiff has failed to show that she is likely to succeed on the merits as to them.

### (a) Plaintiff's claim of a failure to comply with Instruction A.2

Plaintiff argues that the OceanFreight proxy incorporates certain other documents by reference and that, accordingly, the 17-day notice period between the filing of the proxy and the shareholder meeting falls short of the 20-business-day notice period required by Instruction A.2 to Form F-4. The Instruction provides, in relevant part:

> If the registrant meets the requirements of and elects to comply with the provisions in any item of this Form [F-4] or Form S-4 (§239.25) that provides for the incorporation by reference of information about the registrant or the company being acquired, the prospectus must be sent to the security holders no later than 20 business days prior to the date on which the meeting of such security holders is held.

Instruction A.2 to SEC Form F-4, *available at* www.sec.gov/about/forms/formf-4.pdf (last visited October 30, 2011). However, for two related reasons, this Instruction does not apply to the situation at hand.

First, the only materials "incorporated by reference" in the Form F-4 are exhibits to the registration statement that are referenced in the company's response to Item 21 of the form. Item 21, which is entitled "exhibits and financial statement schedules," is contained in Part II of the Form F-4, entitled "Information Not Required in the Prospectus." The proxy as delivered to shareholders does not contain Part II of the registration statement. That is because, as defendants have explained, a registrant is not required to include Part II in the proxy. Instruction A.2 simply does not apply to this situation. The SEC has explained that the purpose of Instruction A.2 is to allow for shareholders to receive documents incorporated by reference "*where incorporation by reference is relied on to take the place of presentation in the delivered document.*" *See* Business Combination Transactions; Adoption of Registration Form; Foreign Registrants, Securities Act Release No. 33-6579, 1985 SEC LEXIS 1688, at *10 (April 23, 1985) (emphasis added); *see also* Regulation of Takeovers and Security Holder Communications, Securities Act Release No. 33-7607; Exchange Act Release No. 34-40633, Investment Company Release No. IC-23520, File No. S7-28-98, at 92, *available at* http://www.sec.gov/rules/proposed/33-7607a.pdf (last visited October 30, 2011) (purpose of Instruction A.2 is "to assure that security holders have time to obtain documents incorporated by reference and review their contents."). Thus, the SEC has stated, the 20-day requirement is triggered only "if the materials *being sent to shareholders* incorporate information by reference." Concept Release on the U.S. Proxy System, Exchange Act Release No. 34-62495; Investment Advisors-3052; Investment Company Release No. 29340; File No. 27-14-10 at 129–30, *available at* http://www.sec.gov/rules/concept/2010/34-62495.pdf

11

(last visited October 30, 2011) (emphasis added).  That is not the case here.  The only

"incorporation by reference" in this case occurred in a portion of the registration statement that

was not sent (and was not required to be sent) to shareholders.  Plaintiff's claim that Instruction

A.2 entitles her to 20 business days' lead time to access materials incorporated in a document

that was not sent or required to be sent to her is unpersuasive.

Second, Instruction A.2 requires incorporation only of "information about the registrant

or the company being acquired."  This phrase tracks specific sections of Form F-4 that do not

encompass Item 21:  Within Form F-4, the header "Information About the Registrant" appears

atop Items 10, 11, 12, 13 and 14; and the header "Information About the Company Being

Acquired," in turn, appears atop Items 15, 16, and 17.  It is reasonable to interpret the phrase

"information about the registrant or the company being acquired" in Instruction A.2 as referring

to those two distinct categories of items.  Item 21, by contrast, comes afterwards on the Form F-

4, beneath a different header, "Information Not Required in Prospectus."  For this reason too, the

Court concludes that the 20-day lead time requirement of Form F-4 does not apply in this case.[6]

### (b) Plaintiff's claim of a failure to comply with "general timeliness"

Plaintiff's second argument regarding the timing of the proxy's distribution was first

made in a letter submitted to the Court on Friday morning, October 28, 2011.[7]  Plaintiff contends

that, although the SEC's rules "'do not specify the number of days before the meeting by which

registrants must make their proxy materials available for distribution to their beneficial owners,'"

---

[6] At oral argument, plaintiff identified a new purported violation of Instruction A.2 in the filings by OceanFreight and Ocean Rig.  Plantiff noted that, in a different section entitled "Comparison of Shareholder Rights," the proxy alludes to, but does not attach (a) the articles of incorporation and bylaws of OceanFreight and Ocean Rig, and (b) "the full text of the Marshall Islands Business Corporations Act."  This portion of the proxy was responsive to Item 4(a)(4) of Form F-4.  Plaintiff's argument that this triggered the 20-day notice period of Instruction A.2 fails because "incorporation by reference" is a precise term of art.  It does not apply where, as here, the registrant does not use that term in the proxy, but merely alludes to other documents without expressly incorporating them by reference.  *See* SEC Rule 411(d) (requiring "express statement that the specified matter is incorporated by reference.").

[7] Because defendants have responded to this argument, the Court will consider it.

*see* Pl.'s 10/28/11 Letter Memorandum at 1–2, quoting Exchange Act Release No. 34-33768,

*supra*, at *3 (1994), its rules and pronouncements mandate a general "timeliness requirement."

*Id.* Specifically, plaintiff notes that the SEC requires that "the [proxy] materials must be mailed

sufficiently in advance of the meeting date to allow five business days for processing by the

banks and brokers and an additional period to provide ample time for delivery of the material,

consideration of the material by the beneficial owners, return of their voting instructions, and

transmittal of the vote from the bank or broker to the tabulator." Exchange Act Release No. 34-

33768, *supra*, at *3. Plaintiff also notes that the SEC, over the years, has favorably cited

recommendations by the New York Stock Exchange and the American Exchange which urged

that proxy statements be distributed between 20 and 30 calendar days before the scheduled

meeting. Plaintiff further notes that the NASDAQ, over whose exchange OceanFreight's and

DryShips's shares trade, last year suggested that proxy statements be mailed to stockholders

"preferably at least 20 days in advance of the meeting date." NASDAQ, Regulatory

Requirements at 27 (July 2010).

 In response, defendants observe that NASDAQ has pointedly permitted foreign private

issuers to exempt themselves from certain of NASDAQ's corporate governance rules, including

the rules with regard to proxy solicitation, provided that the issuer discloses in its annual report

filed with the SEC each requirement that it does not follow and that it describes the home

country practice followed in lieu of such requirement. *See* NASDAQ Marketplace Rule

5615(a)(3). Defendants further note that pursuant to that authorization, OceanFreight made the

following disclosure in its 2010 Form 20-F for the fiscal year 2010:

> As a foreign private issuer, we are not required to solicit proxies or provide proxy
> statements to Nasdaq pursuant to Nasdaq corporate governance rules or Marshall Islands
> law. Consistent with Marshall Islands law and as provided in our bylaws, we will notify
> our shareholders of meetings between 15 and 60 days before the meeting. This

> notification will contain, among other things, information regarding business to be transacted at the meeting . . . .

OceanFreight Inc., Annual Report (Form 20-F) (April 14, 2011). Marshall Islands Business Corporations Act ("MIBCA") § 65(2) does indeed provide that notice shall be given to registered shareholders not less than 15 nor more than 60 days before the meeting. Thus, defendants argue, the 17-day period the proxy issuance and the shareholder meeting complies with applicable law.

Plaintiff has not demonstrated a likelihood of success on this claim. To be sure, a 17-day notice period is on the shorter side of what courts and regulators have generally considered advisable. Especially in the context of a vote on a matter as consequential as a merger, a relatively short timeframe can raise legitimate questions about whether shareholders have had a full opportunity to inform themselves as to the important issue at hand. However, as to the law applicable to the proxy at issue in this case, defendants have far the better of the argument. There is no specific SEC rule dictating a particular minimum of days that must pass between a proxy and a shareholder meeting. And the NASDAQ – on which the shares at issue here trade and the trading on which supplies the only asserted basis for federal jurisdiction – clearly authorized foreign private issuers such as OceanFreight, upon proper notice to shareholders, to utilize the home country practice as to proxy timing. It is undisputed that the law of the home country here, the Marshall Islands, permits a 17-day notice period. OceanFreight therefore had the right to, and did, advise shareholders that it would abide by Marshall Islands' law as to the timing of a proxy notice to shareholders. Plaintiff fails to demonstrate that a different, more demanding, standard of advance notice applies in this case.[8]

---

[8] At oral argument, plaintiff advanced the new argument that a different provision of the MIBCA, §65(11), might govern notice. That section provides that, as to a shareholder of "bearer shares," notice sufficient to give such person a "reasonable opportunity to take action," as opposed to the 15–60 day period, is required. The Court has not been presented with any evidence that plaintiff is a bearer shareholder, and defense counsel represented to the Court that OceanFreight has no "bearer shares."

### (2) Plaintiff's argument that the disclosures in the proxy failed to comply with federal securities laws

Plaintiff asserts that the proxy as distributed to shareholders contains a number of material misstatements or omissions. As alleged, these lapses include (a) omission of the substance of the financial projections relied upon by Fearnley in approving the Merger Consideration as fair; and (b) omission of the inputs used by Fearnley in generating those financial projections, including assumed future financial results, details regarding share price history and valuation multiples, and the terms of other transactions which Fearnley used as comparators for judging the Merger Consideration in this case.

For two independent reasons, plaintiff does not have a likelihood of success on these claims. First, plaintiff's claim of materially misleading statements and omissions, and her derivative claim of control person liability, are based on asserted violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9(a)). But, as noted earlier, under the law of this Circuit, foreign private issuers such as OceanFreight are exempt from those rules. *Tower Semiconductor, supra,* at 2004 U.S. Dist. LEXIS 29921, at *10-13 and *17 n.9.

Second, even if Section 14(a) applied here, plaintiffs would be unable to establish the required element under Section 14(a) and Rule 14a-9 of causation – that the allegedly deficient proxy statement caused the challenged merger transaction to be approved. That is because, given DryShips' ownership and control of 50.5% of OceanFreight's shares, a majority vote in favor of the merger was a foregone conclusion. This point, in fact, was made to shareholders on the very first page of the proxy, which stated that "approval of the merger is assured."[9]

---

[9] At oral argument, plaintiff suggested that a two-thirds majority of OceanFreight shareholders might actually be required to approve the merger. In fact, as defense counsel explained, the provision of OceanFreight's bylaws on

In *Grace v. Rosenstock*, 228 F.3d 40 (2d Cir. 2000), the Second Circuit addressed this very scenario; its discussion there controls this case. The Second Circuit noted that under Rule 14a-9, a plaintiff must show that "the challenged proxy statement 'was an essential link in the accomplishment of the transaction.'" *Id.* at 20 (quoting *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970)). It followed from this, the Second Circuit held, that where the votes of minority shareholders are not required for approval of a merger, a minority shareholder plaintiff cannot show that materially misleading misrepresentations in the proxy statement had caused their injury. *Id.* at 21. The Second Circuit noted that this conclusion logically followed from the Supreme Court's analysis in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), which, as here, involved proxy-statement-fraud claims brought under Section 14(a) and Rule 14a-9. In *Virginia Bankshares*, the Supreme Court held that minority shareholders could not show causation by arguing that their negative votes – though insufficient to defeat the merger – might have created sufficient bad publicity to lead the directors not to go ahead with a merger. Such a scenario, the Supreme Court held, was simply too speculative to support a finding of causation. *See Grace*, 228 F.3d at 21 (citing *Virginia Bankshares*, 501 U.S. at 1105–06); *see also Wilson v. Great Am. Indus.*, 979 F.2d 924, 931 (2d Cir. 1992) ("the causal nexus between the merger and the proxy is absent when the minority stockholder's vote cannot affect the merger decision.").

Plaintiff thus fails to demonstrate a likelihood of success on the merits for her federal securities law claims.[10]

---

which plaintiff relied in so claiming relates only to a "poison pill" scenario, not applicable here. The applicable bylaw makes clear that approval is subject to a simple majority vote.

[10] For the above two reasons – that Section 14-a and Rule 14a-9 do not apply to foreign private issuers and that plaintiffs cannot establish the required element of causation – the Court has no occasion to reach the issue of whether there were material omissions from the proxy, under federal law. Defendants have cited Delaware case law to the effect that management does not invariably have a duty, in a proxy, to "discuss the panoply of possible alternatives to the course of action it is proposing," *In re 3Com S'holders Litig.*, 2009 Del. Ch. LEXIS 215, at *20

### (3) Plaintiff's claim that the board of directors breached its fiduciary duties in relation to the merger

Plaintiff also asserts that the OceanFreight board of directors breached its fiduciary duties in undertaking and negotiating this transaction.  Plaintiff argues (a) that the Board failed to describe adequately the process leading up to the merger, including failing to describe any "value maximizing" alternative transactions contemplated or leveraging tactics used by the Committee in its negotiations with DryShips; (b) that certain OceanFreight executives will allegedly retain prominent roles in the combined company, and that other company insiders may benefit from change-in-control payments, or so-called "golden parachutes"; (c) that the board should not have agreed to deal protection devices such as a no-solicitation provision, a deal breakup fee, and the assent to the pre-merger purchase agreement involving Kandylidis's majority shares, which rendered the November 3, 2011, shareholder vote a foregone conclusion.  We examine each claim of breach in turn.[11]

The Court notes preliminarily that the law applicable to these claims is that of the Republic of the Marshall Islands.  The Marshall Islands, in turn, adopt Delaware law, except where the MIBCA and the laws of Delaware conflict, in which case the MIBCA controls.  *See* MIBCA, Part I, § 13 (Marshall Islands law is "uniform with the laws of the State of Delaware and other places of the United States of America with substantially similar legislative provision."); *see also Rosenquist v. Economou et al.*, Supreme Court Case No. 2010-002, at 10 (Supreme Court, Republic of Marshall Islands Oct. 5, 2011) (MIBCA also adopts decisional law

---

(Del. Ch.. Dec. 18, 2009), or to set out the financial advisor's reasons for its conclusions, the fairness range used, and the analytical bases for its opinion, *Matador Capital Mgmt. Corp. v. BRC Holdings*, 729 A.2d 280, 297–98 (Del. Ch. 1998).

[11] Defendants also argue that plaintiff's fiduciary duty claim is properly viewed as a derivative, not a direct claim, because it alleges an injury that falls equally on all shareholders, and that before making this claim, plaintiffs failed to make the required demand upon OceanFreight or to demonstrate the futility of such a demand.  *See Agostino v. Hicks*, 845 A.2d 1110, 1119 (Del. 2004).  The Court has not reached this issue, because it finds that, even if this claim were properly pled as a direct claim, plaintiff has not demonstrated a likelihood of success on its merits.

of Delaware and other states "with substantially similar legislative provisions"). The parties

have both treated Delaware law as governing the fiduciary duty claims.[12]

### (a) The Board's alleged failure to maximize shareholder value or explore alternate transactions

In the context of a change-of-control situation, plaintiff argues that the directors of

OceanFreight owed the so-called *Revlon* duty to focus on "one primary objective – to secure the

transaction offering the best value reasonably available for the stockholders." *Paramount*

*Commc'n Inc. v. QVC Network, Inc.*, 637 A.2d 34, 44 (Del. 1994); *see also Revlon, Inc. v.*

*MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986). Plaintiff asserts that in this

case, the board neglected that duty either by failing to hold an active auction process or by failing

to use unspecified "leveraging tactics" in its negotiation of the Merger Consideration with

DryShips. To be sure, a failure to properly conduct an auction or market check may, under some

circumstances, constitute a breach of fiduciary duty. *See, e.g.*, *In re Netsmart Techs., Inc.*

*S'holder Litig.*, 924 A.2d 171, 195 n.76 (Del. Ch. 2007). And these techniques are commonly

used. *See In re Openlane, Inc. S'holders Litig.*, 2011 Del. Ch. LEXIS 156, at *18 (Del. Ch. Sept.

30, 2011) (noting common usage of "traditional value maximization tool[s], such as an auction, a

broad market check, or a go-shop provision . . . .").

However, the overarching principle under Delaware (and therefore Marshall Islands) law

is that:

> This duty ... does not, of course, require every board to follow a judicially prescribed
> checklist of sales activities. Rather, the duty requires the board to act reasonably, by
> undertaking a logically sound process to get the best deal that is realistically attainable.

---

[12] In the interest of completeness, the Court addresses plaintiff's claims based on Marshall Islands law. However, in the event that plaintiff was held to fail to state a federal claim – and, as noted, under *Tower Semiconductor*, OceanFreight was exempt from all of the requirements on which plaintiff's federal claims are based – the Court would lack jurisdiction to hear those claims. At argument, plaintiff suggested that the Court might have "pendent jurisdiction" over the Marshall Islands claims, but pendent jurisdiction presupposes a viable federal claim, and none is present here. Because plaintiff holds only about $75 of OceanFreight stock, the $75,000 amount-in-controversy requirement to establish diversity jurisdiction would not be satisfied.

> The mere fact that a board did not, for example, do a canvass of all possible acquirers before signing up an acquisition agreement does not mean that it necessarily acted unreasonably. [Delaware] case law recognizes that are a variety of sales approaches that might be reasonable, given the circumstances facing particular corporations.

*Id.* at 192. Accordingly, a board's directors may, when they "possess a body of reliable evidence with which to evaluate the fairness of a transaction[, . . . ] approve that transaction without conducting an active survey of the market." *Barkan v. Amsted Indus.*, 567 A.2d 1279, 1287 (Del. 1989); *In re Toys "R" Us, Inc., S'holder Litig.*, 877 A.2d 975, 1000–01 (Del. Ch. 2005) ("the duty to take reasonable steps to secure the highest immediately available price does not invariably require a board to conduct an auction process or even a targeted market canvass in the first instance"). Thus, Delaware courts have approved of a board's conduct relating to transactions in which no market canvass has been undertaken and no auction was held. *See, e.g., Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 244 (Del. 2009).

Here, the overall facts as presented to the Court do not suggest that such a canvass or auction was necessary. As plaintiff's submissions themselves chronicle, the Special Committee repeatedly turned away DryShips's successive offers, until finally accepting an offer (valued at $19.85 per share) that represented a more than doubling of OceanFreight's share price as of the date of the merger's approval ($9.47), and which benefited all shareholders, not just majority shareholder Kandylidis. Plaintiff also fails to offer any specific reason to assume that a canvass or auction would have achieved a better result. Further, as defendants note, given the uncertain Greek economy, it is speculative, to say the least, to assume that another bidder would have come forward with a better offer, and reasonable to assume that waiting for such a bidder might

19

have resulted in DryShips walking away.[13]  In the Court's judgment, plaintiff is therefore unlikely to prevail on this claim.

### (b) The fact that OceanFreight's management allegedly stood to gain by the completion of the merger

Plaintiff also notes that certain OceanFreight executives will allegedly retain prominent roles in the combined company after the merger, and that some company insiders may benefit from certain preexisting change-in-control provisions triggered by the merger ("golden parachutes").  Of central importance to the Court, the terms of the merger were negotiated by a Special Committee of OceanFreight's board, whose independence plaintiff concedes.  As such, the Special Committee's judgments as to the best interests of the company are "entitled to the protection of the business judgment rule." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 825 (Del. Ch. 2005), *aff'd* 906 A.2d 766 (Del. 2006); *Rosenquist*, at 22 (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).  Plaintiff has not offered any specific reason to overcome the presumption of validity that attaches to the Special Committee's decision that it was in the merged company's interests for OceanFreight's management team to remain in place. As for the fact that certain company insiders allegedly stood to benefit from the merger due to preexisting change-in-control provisions, it was the independent Special Committee, not those insiders, who approved the merger.  Plaintiff is therefore unlikely to succeed on this claim.

### (c) Deal Protection Devices

Finally, plaintiff takes issue with the "deal protection devices" included as part of the merger agreement as approved by the Special Committee and signed on July 26, 2011.  These included (a) "no-solicitation" protection which prohibits OceanFreight from soliciting competing

---

[13] There is no claim of an affirmative misstatement in the proxy as to this point.  The "risks" portion of the proxy statement distributed to shareholders clearly disclosed that "the OceanFreight Special Committee did not solicit alternative proposals prior to executing the merger agreement."  *See* OceanFreight, Inc., Registration Statement (Form F-4), at 67 (effective Oct. 12, 2011).

offers; (b) a $4.5 million deal breakup fee; and (c) DryShips' agreement to vote 50.5% of its shares (Kandilydis's former stake) in favor of the merger.  Plaintiff contend that the cumulative effect of these devices is to "chill[] any possibility of a post-signing market check."

Under Delaware law, "[a] board's decision to adopt defensive devices which 'lock up' a merger mandate special scrutiny." *Openlane*, 2011 Del. Ch. LEXIS 156, at *26 (citing *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del. 2003)).  Under the applicable test, the Board must first demonstrate that it "had reasonable grounds for believing a danger to corporate policy and effectiveness existed . . . ." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985).  This requirement may be satisfied by the Board's concluding, *inter alia*, that the danger identified is the possibility of losing the bidder's interest. *See Omnicare*, 818 A.2d at 935.  The Board must also demonstrate that its defensive response was "reasonable in relation to the threat posed." *Openlane*, 2011 Del. Ch. LEXIS 156, at *27.  "This inquiry involves a two-step analysis.  The [Board] must first establish that the merger deal protection devices adopted in response to the threat were not 'coercive' or 'preclusive,' and then demonstrate that their response was within a 'range of reasonable responses' to the threat perceived." *Id.*  "A response is 'coercive' if it is aimed at forcing upon stockholders a management-sponsored alternative to a hostile offer." *Id.*  "A response is 'preclusive' if it deprives stockholders of the right to receive all tender offers or precludes a bidder from seeking control by fundamentally restricting proxy contests or otherwise." *Id.*

Although significant facts would remain to be developed were this issue to proceed to full merits litigation, on balance, the Court does not believe that plaintiff has carried her burden of demonstrating likelihood of success on the merits, including, importantly, establishing injury from the challenged provisions.  The "no solicitation" measure did not prevent OceanFreight

from receiving competing offers, only from affirmatively soliciting them. Such provisions can serve the legitimate function of preventing a buyer from being used by the seller as a "stalking horse" to solicit better offers. As for the deal break-up fee of $4.5 million, as defendants explained, it too served to discourage OceanFreight from shopping DryShips's bid to other potential sellers, was consistent with break-up fee norms in the merger and acquisition area, and was not so large as to deter a markedly superior competing offer.

As for the shareholder voting agreement in this case, it is completely different from the restriction held impermissible in *Omnicare*. There, "shareholders representing in excess of 50% of the outstanding voting power would be required by [the acquiror] to enter into stockholder voting agreements contemporaneously with the signing of the merger agreement." *Omnicare*, 818 A.2d at 925. Here, by contrast, the *acquiror* (DryShips) is not seeking to bind the targets' shareholders. Rather, the target, OceanFreight, has obtained a commitment from its own majority shareholder (DryShips, which owns the 50.5% stake previously owned by Kandylidis) to vote in favor of the merger, thereby protecting OceanFreight's shareholders against the possibility of the acquiror's backing out. This agreement thus does not implicate the same policy concerns as troubled the Delaware court in *Omnicare*. As such, the Court views it as unlikely that plaintiff would prevail in challenging these provisions.

**D.     Irreparable Harm**

Plaintiff contends that she and the other shareholders of OceanFreight will be irreparably harmed without injunctive relief, because "a denial of Plaintiff's motion will forever foreclose shareholders' ability to make an informed decision on this fundamental question concerning the very corporate existence of [OceanFreight]." That argument is unpersuasive, for much the same reason as discussed above in connection with the causation element under Section 14(a) of the

Exchange Act. As the proxy statement states, approval of this merger is assured, given

DryShips' ownership of a 50.5% majority of shares and its commitment to vote them in favor of

the merger. As a result, whether fully informed or under-informed, and whether or not the

shareholder vote occurs on November 3, 2011 or thereafter, the minority shareholders of

OceanFreight cannot influence the outcome of that vote. There is thus no legally cognizable

harm, let alone irreparable harm, that flows from either the timing of the shareholder vote in

relation to the proxy, or the alleged substantive inadequacy of the proxy. *See Van Dewalle v.*

*Unimation, Inc.*, 1983 Del. Ch. LEXIS 573, at *8 (Del. Ch. Feb. 14, 1983) (denying plaintiff's

application for injunction where "[t]he minority's vote here . . . is not needed").

     In support of its argument, plaintiff cites *MONY Group, Inc. v. Highfields Cap. Mgmt.*,

368 F.3d 138, 147 (2d Cir. 2004), as support for what plaintiff terms the "well-settled"

proposition that irreparable harm "is established" by legally deficient proxy solicitations. That is

a significant overstatement. In *MONY*, the Second Circuit stated:

> It is well-established that a transaction--particularly a change-of-control transaction--that
> is influenced by noncompliance with the disclosure provisions of the various federal
> securities laws *can* constitute irreparable harm. We decline to hold that a transaction
> influenced by noncompliance with the securities laws *always* results in irreparable harm
> because there are a number of circumstances that arguably could defeat such a broad rule,
> including those involving acts of bad faith, securities law infractions on both sides of a
> transaction, a situation where an injunction would suppress the only voice opposing a
> transaction, or other circumstances that we need not try to anticipate today.

*MONY*, 368 F.3d at 147 (emphasis in original).

     *MONY* thus holds only that a legally deficiency proxy statement may give rise to a

situation in which failure to grant injunctive relief would lead to irreparable harm. It does not

hold that irreparable harm is inevitable in such circumstances. This case, in fact, where approval

of the proposed merger is inevitable regardless of the content of the proxy statement, supplies an

excellent illustration of the Second Circuit's wisdom in declining to make such a broad, categorical holding.

The absence of an injunction will not, finally, impair plaintiff's ability to seek monetary damages. Following approval of the merger, plaintiff will still be at liberty to pursue money-damage claims premised on the contention that the Merger Consideration was inadequate, and to obtain monetary relief for the putative class if a claim so premised is ultimately established.[14]

### E.   The Balance of Equities

A preliminary injunction may not issue unless the movant clearly shows that the balance of equities favors the movant. *Reckitt Benckiser Inc.*, 760 F. Supp. 2d at 451–52. No such showing has been made here.

Plaintiff in this case owns eight shares of OceanFreight stock worth approximately $75. If granted, her motion would delay and quite possibly imperil a $239 million transaction which was negotiated over a period of months by an independent Special Committee, is assured of completion, and which would more than double the value of the shares of all shareholders of the company. The merger also comes at a time of economic volatility, in general and as to the Greek economy specifically, such that it is far from assured that if this merger were to fall through, OceanFreight's shareholders could receive equal value elsewhere. Further, as discussed in the foregoing, plaintiff has not come close to demonstrating a likelihood of success on the merits.

On balance, the Court would "do more harm by enjoining the proposed transaction than by letting it proceed." *Ivarone v. Raymond Keyes Assocs., Inc.*, 733 F. Supp. 727, 732 (S.D.N.Y. 1990). The balance of equities accordingly favors denial of plaintiff's motion.

---

[14] At argument, plaintiff raised the new claim that under OceanFreight's bylaws she had a "right of appraisal" that could not realistically be effectuated in the 17-day period between the proxy notice and the shareholder vote. Assuming *arguendo* that this were so, such a claim would be compensable by money damages. It therefore does not support issuance of the requested injunction.

### F.    Public Policy

Finally, plaintiff has failed to carry its burden to demonstrate that "the public interest would not be disserved by a permanent injunction." *Salinger*, 607 F.3d at 77.  There is a significant public interest in giving parties to potential mergers confidence that courts will not enjoin such mergers where the requisite showings that support preliminary injunctive relief are absent.  Enjoining this merger based on plaintiff's unpersuasive claims of legal deficiencies would needlessly call into question whether other, future business transactions will similarly be disrupted while in progress.  The public interest, both as to the United States and the Marshall Islands, would be disserved by issuance of the requested injunction.

### G.    Expedited Discovery

In conjunction with her request for a temporary restraining order, plaintiff also seeks expedited discovery of a very broad array of material relating to the transaction (*e.g.*, "All documents concerning DryShips, Ocean Rig's and Pelican's 'actions' with respect to the Proposed Transaction.")  Courts in the Second Circuit employ two tests for determining the propriety of an expedited discovery request.  The first is a "reasonableness standard." *See KeyBank, Nat'l Assoc. v. Quality Pay-Roll Sys., Inc.*, 2006 U.S. Dist. LEXIS 42078, at *9–10 (E.D.N.Y. June 22, 2006) (citation omitted).  The second is a four-factor test set out in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982).  Under *Notaro*, a party seeking expedited discovery must show:

> 1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury the defendant will suffer if the expedited relief is granted.

*Notaro*, 95 F.R.D. at 405.

Plaintiff's request for expedited discovery satisfies neither standard.  For the reasons discussed earlier, plaintiff has shown neither a probability of success on the merits nor an injury, let alone an irreparable one.  The sheer volume and breadth of plaintiff's discovery requests further renders them unreasonable, and plaintiff has offered no concrete basis whatsoever to justify expedited discovery.  On the contrary, the defendants have represented to the Court that they have undertaken appropriate steps to preserve all potentially relevant materials, electronic or otherwise.  In the event that defendants are ultimately served with process and that the underlying action goes forward past the point at which the Private Securities Litigation Reform Act's automatic stay of discovery applies, *see* 15 U.S.C. § 78u-4(b)(3)(B), these materials will be available to plaintiff, to the extent responsive to appropriate discovery requests.

## III. Conclusion

For the foregoing reasons, it is ORDERED that plaintiff's motion for a temporary restraining order and preliminary injunction is DENIED.

It is FURTHER ORDERED that plaintiff's request for expedited discovery in this case is DENIED.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 2, 2011
      New York, New York

26